UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 19-cr-10063-DJC |
| ) | |
| RANDALL CRATER, ) | |
| ) | |
| Defendant ) | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT RANDALL CRATER'S MOTION *IN LIMINE*
TO PRECLUDE THE TESTIMONY OF PAMELA A. CLEGG
OR, IN THE ALTERNATIVE, TO HOLD A <u>DAUBERT</u> HEARING

___

Defendant Randall Crater, (hereinafter "Crater") by and through undersigned counsel, respectfully submits this memorandum of law in support of his motion *in limine* to preclude or limit the testimony Pamela A. Clegg or, in the alternative, to hold a <u>Daubert</u> hearing.

FACTUAL BACKGROUND

Crater has been charged in an eight count Superseding Indictment with Wire Fraud, Unlawful Monetary Transactions and Operating an Unlicensed Money Transmitting Business.  The government's case against Crater is premised, in large part, on the allegation that Crater was the principal operator of My Big Coin Pay, Inc., (hereinafter "MBC") which the government further alleges was a "purported" virtual currency company.  As part of its proof at trial, the government proposes to introduce the testimony of Pamela A. Clegg to "prove" that MBC was not a "blockchain" cryptocurrency until June 28, 2017.  Ms. Clegg's proposed testimony is

set forth in her written report dated April 9, 2020, and her supplemental report dated May 18, 2022, which are attached hereto as Exhibit "A". Crater moves to exclude Ms. Clegg's testimony and her report on the grounds that she is not qualified to testify under Daubert and its progeny and her testimony concerning events after June 2017 are irrelevant to the scheme alleged in the Superseding Indictment which allegedly took place between 2014 and June 2017. In addition, in the event the Court concludes that Ms. Clegg's testimony has any relevance, Crater further moves to exclude Ms. Clegg's testimony under Fed. Rule of Evid. 403 because its probative value, if any, is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its tendency to mislead the jury concerning events that occurred during 2014 through June 2017. Finally, to the extent the Court allows Ms. Clegg to testify in this case, her testimony should be limited to her purported area of expertise which is not blockchain technology. Moreover, she should not be permitted to testify to any federal regulations that may have applied to virtual currencies between 2014 and June 2017 as these legal conclusions are clearly outside her purported expertise.

## LEGAL BACKGROUND

Admission of expert testimony is governed by Fed. R. Evid. 702 and 703. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 703 provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

A further prerequisite to admissibility is that the proffered expert evidence must be relevant. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Id., quoting Weinstein & Berger ¶702[02], pp. 702-18. In Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) the Court stated:

To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, see Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue, see Daubert, 509 U.S. at 591–92, 113 S. Ct. 2786. In other words, Rule 702, as visualized through the Daubert prism, "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 592, 113 S. Ct. 2786.

Lastly, proffered expert evidence may be excluded when its prejudicial effect unfairly outweighs its probative value. Daubert, supra at 595; Fed. R. Evid. 403.

3

In Daubert and the many cases applying Daubert since, including Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167 (1999), the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court clarified in Kumho that this gatekeeper function applies to all expert testimony, not just testimony based in science. Kumho, supra 119 S. Ct. at 1178 (citing the Committee Note to the proposed amendment to Rule 702, which had been released for public comment before the date of the Kumho decision).

Rule 702 provides the Court with some general standards that the Court should use to assess the reliability and helpfulness of proffered expert testimony. Consistent with Kumho, Rule 702 applies to all types of expert testimony and lists the questions that a trial court should consider when deciding whether the purported expert testimony is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171 (1987).

Daubert set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. The specific factors explicated by the Daubert Court are (1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been

subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

The Court in <u>Kumho</u> held that these factors may also be applicable in assessing the reliability of non-scientific expert testimony, depending upon "the particular circumstances of the particular case at issue." 119 S. Ct. at 1175.  However, no attempt has been made to "codify" these specific factors. Rather, <u>Daubert</u> emphasized that these factors were neither exclusive nor dispositive. Other cases have recognized that not all of the <u>Daubert</u> factors will apply to every type of expert testimony. See <u>Tyus v. Urban Search Management</u>, 102 F.3d 256 (7th Cir. 1996)(noting that the factors mentioned by the Court in <u>Daubert</u> do not neatly apply to expert testimony from a sociologist); <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 809 (3d Cir. 1997) (holding that lack of peer review or publication was not dispositive where the expert's opinion was supported by "widely accepted scientific knowledge").

However, when a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  Cf. <u>Daubert</u>, <u>supra</u> at 1319 (Where such evidence is unavailable, the proponent of expert scientific testimony may attempt to satisfy its burden through the testimony of its own experts. For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some

objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field). In other words, the trial court's gatekeeping function requires more than simply "taking the expert's word for it." Id. ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under Daubert, that's not enough.").

The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on a completely subjective methodology held properly excluded); Kumho supra at 1176 ("[I]t will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.").

## ARGUMENT

I.   MS. CLEGG IS NOT SUFFICIENTLY QUALIFIED BY EDUCATION OR EXPERIENCE TO RENDER AN EXPERT OPINION IN THIS CRIMINAL CASE.

According to the "profile" attached to her April 9, 2020 report, Ms. Clegg has a Bachelor of Arts degree from the University of Texas, Austin in Government and Spanish Literature and a Master's in Business Administration from the University Autonoma of Madrid, Spain. Notably absent from her educational profile is any degree in computer science or software engineering or blockchain technology. Her

profile does indicate that since March 2018 she is a CAMS Certified Anti-Money Laundering Specialist; however, she is not CAMS Certified in Virtual Currency and Blockchain. She also does not have a CAMS Advanced Specialist Level Certification in Financial Crimes Investigations. Finally, according to her list of expert witness testimony, she has never been qualified or testified in any state or federal criminal case.

As noted above, it is the government's burden to show that Ms. Clegg is qualified as an expert by knowledge, skill, experience, training, or education before she may testify in the form of an opinion. The reports that Ms. Clegg has provided to the government do not demonstrate that she has the scientific, technical, or other specialized knowledge that will help the trier of fact understand the evidence in this case or determine the facts in dispute in this matter. Moreover, her reports do not demonstrate that her conclusions are based on sufficient facts or data, or that her proposed testimony will be the product of reliable principles and methods. Absent such a showing, this Court cannot discharge its gatekeeping function of assessing whether the government's proffered expert has reliably applied reliable principles and methods to the facts of this case.

Indeed, when a witness is relying primarily on experience, a witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how the experience is reliably applied to the facts. Indeed, a witness relying primarily on experience should explain precisely how she went about reaching her conclusions and point to some objective source, for

example, a learned treatise, a policy statement of a professional association, a published article in a reputable journal or the like to show that the principles and methods she applied are recognized in the blockchain and cryptocurrency fields as reliable and that she reliably applied those principles and methods to alleged facts in this case.

Because the government has not demonstrated that Ms. Clegg is sufficiently qualified by education or experience to render an expert opinion in this criminal case, she should be precluded from testifying in this case.

## II. MS. CLEGG'S PROPOSED TESTIMONY IS NOT RELEVANT TO THE FACTUAL ISSUES IN DISPUTE AND WILL NOT BE HELPFUL TO THE TRIER OF FACT.

The Superseding Indictment alleges that the scheme to defraud in this case began "in or around 2014 and continuing until at least in or around 2017" and that the scheme to defraud was that Crater and others allegedly "falsely claimed that, among other things, Coins were a functioning virtual currency and cryptocurrency, were backed by gold and other assets, and were readily exchangeable for goods and currencies." See Superseding Indictment, ¶ 8. Thus, the relevant time period for the alleged scheme to defraud was from 2014 through 2017.[1]

---

[1] Indeed, undersigned counsel believes the government will concede that MBC was a functioning cryptocurrency after a "hard fork" occurred in June 2017 and that the alleged scheme to defraud did not continue after the Commodity Futures Trading Commission filed a civil suit against Crater and others in January 2018. See Commodity Futures Trading Commission v. My Big Coin Pay, Inc., et al., Civil Action No. 18-10077-RWZ.

While it is unclear when Ms. Clegg was initially retained to review this case on behalf of the government suffice to say it was shortly before or after she became certified as an anti-money laundering specialist in March 2018. Interestingly, 2018 was also the year she began working for her current employer CipherTrace. Thus, it would not be a stretch of the imagination for one to conclude that this case was an important case for Ms. Clegg to demonstrate her value to her new employer.

However, putting aside her potential bias to please the government and her employer, it cannot be disputed that at the time that the CFTC filed suit against MBC and the DOJ was conducting a parallel criminal investigation, Ms. Clegg was asked to review this matter after being newly minted, not with a certification in blockchain or cryptocurrency, but in anti-money laundering.

Indeed, a review of her initial report dated April 9, 2020 demonstrates that her analysis for the relevant period from December 2013 through August 2015 was based on her review of MBC's twitter page. Her report also noted that for nearly a two-year period between June 2015 and August 2015, the MBC twitter page tweeted 'about topics not relevant to MBC….." Notably absent from Ms. Clegg's initial report and supplemental report is any analysis of the relevant issue in this case. The relevant issue is whether MBC was a virtual currency between 2014 and June 2017.

As noted above:

> To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, *see* Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue, *see Daubert,* 509 U.S. at 591–92, 113 S. Ct. 2786. In other words, Rule 702, as visualized through the *Daubert* prism, "requires a

9

valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 592, 113 S. Ct. 278 Ruiz-Troche, supra at 81.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Id., quoting Weinstein & Berger ¶702[02], pp. 702-18.

In this case, it does not matter whether MBC was a cryptocurrency after June 2017. The relevant issue is whether MBC was a virtual currency before June 2017. Ms. Clegg's proposed opinion does not speak to this material factual issue as set forth in paragraph 8 of the Superseding Indictment.

Moreover, admitting expert testimony about whether MBC was a cryptocurrency or a subset of virtual currency or whether MBC was a blockchain cryptocurrency after June 2017 does not answer the question of what it was before June 2017.

In sum, because Ms. Clegg's proposed testimony is not relevant to the factual issues in dispute and will not be helpful to the trier of fact, it should be excluded.

III. THE PROBATIVE VALUE OF MS. CLEGG'S PROPOSED TESTIMONY IS SUBTANTIALLY OUTWEIGHED BY ITS DANGER OF UNFAIR PREJUDICE, CONFUSES THE ISSUES IN DISPUTE AND WILL MISLEAD THE JURY CONCERNING EVENTS THAT OCCURRED DURING 2014 AND 2017.

The Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless presenting cumulative evidence." Fed. R. Evid. 403. Assuming the Court determines that Ms. Clegg's testimony has some limited relevance to the factual issues in dispute in this

case, the Court should nevertheless exclude Ms. Clegg's testimony because its probative value is substantially outweighed by its unfair prejudice, confusion of the issues and its tendency to mislead the jury.

Specifically, permitting Ms. Clegg to opine that MBC was a cryptocurrency after June 2017 implies that it was not a virtual currency before June 2017. This implication, which is unsupported by Ms. Clegg's analysis or other reliable evidence, will be unduly prejudicial to Crater.

Moreover, this purported evidence confuses the disputed issues in this trial. Specifically, the government alleges that MBC was not a virtual currency, was not backed by gold, and was not readily exchangeable for goods and currencies in the period from 2014 until June 2017. The government is not alleging that anyone was allegedly defrauded after June 2017. Thus, to allow the government to introduce evidence about what MBC was after 2017, or after the period that the alleged fraud occurred, will confuse the jury.

Finally, admission of this evidence will also mislead the jury into concluding that if MBC was not a cryptocurrency until June 2017, it was not a virtual currency before June 2017 even though the government will not be presenting any evidence through Ms. Clegg to support this factual assumption.

Because the probative value of Ms. Clegg's proposed testimony is substantially outweighed by its danger of unfair prejudice and will confuse the jury about the issues in dispute and will mislead the jury about events occurring between 2014 and June 2017, her testimony should not be permitted at trial.

IV.   **MS. CLEGG SHOULD NOT BE PERMITTED TO TESTIFY TO ANY FEDERAL REGULATIONS THAT MAY HAVE BEEN APPLICABLE TO VIRTUAL CURRENCIES BETWEEEN 2014 AND 2017 AS THESE REGULATIONS ARE CLEARLY OUTSIDE HER PURPORTED EXPERTISE.**

In March 2018, District Judge Jack B. Weinstein noted that "Congress has yet to authorize a system to regulate virtual currency. See Commodity Futures Trading Commission v. McDonnell, 287 F. Supp. 3d 213, 220 (E.D.N.Y. 2018). In 2018, the CFTC and other agencies claimed concurrent regulatory power over virtual currency in certain settings, but its Chair conceded in Congressional Testimony that "current law does not provide any U.S. Federal regulator with such regulatory oversight authority over spot virtual currency platforms not involving fraud operating in the United States or abroad. See Written Testimony of J. Christopher Giancarlo, Chairman, Commodity Futures Trading Commission Before the Senate Banking Committee, Washington, D.C. February 6, 2018.

Judge Weinstein further noted that until Congress acts to regulate virtual currencies, the following alternatives appear to be available: (1) no regulation; (2) partial regulation through criminal prosecutions of Ponzi-like schemes by the DOJ or state criminal agencies or civil lawsuits; (3) regulation by the CFTC; (4) regulation by the SEC; (5) regulation by the Treasury Department's Financial Enforcement Network ("FinCEN"); (6) regulation by the IRS; (7) regulation by private exchanges; (8) State regulations; and (9) a combination of any of the above. Id. at 220-222.

The CFTC is one of the federal administrative bodies that decided to exercise partial supervision of virtual currencies. See Christopher Giancarlo, *Chairman*

*Giancarlo Statement on Virtual Currencies*, CFTC, Jan. 4, 2018.  On September 17, 2015, the CFTC issued an administrative order (the Coinflip Order) filing and simultaneously settled charges against Coinflip, Inc and its chief executive officer.  In the Coinflip Order, the CFTC took the view for the first time that bitcoin and other virtual currencies are commodities subject to the Commodity Exchange Act (CEA) and CFTC regulations.  Id. at 222.  Following Chairman Giancarlo's Statement on Virtual Currencies on January 4, 2018, the CFTC announced on January 24, 2018, that they had filed a federal court enforcement action under seal on January 16, 2018, charging commodity fraud against Crater and MBC Pay, Inc.  Thirteen months later, on February 26, 2019, the U.S. Attorney's Office and DOJ filed an Indictment against Crater alone charging wire fraud, and unlawful monetary transactions.  Three years later, on January 18, 2022, the U.S. Attorney's Office filed a Superseding Indictment which added the charge of operating an unlicensed money transmitting business.

Given the uncertain legal landscape between 2014 and 2018, Crater submits that Ms. Clegg should not be permitted to testify that any federal regulations applied to virtual currencies during these years.  Putting aside the fact that these legal conclusions are outside her area of expertise, it is currently unclear whether any of the regulations allegedly applicable to this case will survive judicial scrutiny in the future.  Accordingly, Ms. Clegg's legal opinion as to which regulations applied to virtual currencies should not be allowed.

V. CONCLUSION.

For all of the foregoing reasons, Ms. Clegg should not be allowed to testify at Crater's criminal trial. Alternatively, the Court should conduct a *Daubert* hearing before allowing her to testify as an expert witness in this case.

Respectfully submitted,
For the Defendant,
Randall Crater
By his attorneys:

 /s/ Scott P. Lopez
Scott P. Lopez, BBO # 549556
splopez@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Ave, Suite 345
Boston, MA 02210
617-439-4990 (tel.)
617-439-3987 (fax)

Dated: June 9, 2022

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 9, 2022.

 /s/ Scott P. Lopez
Scott P. Lopez