IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-cr-10063-DJC |
| | ) | |
| RANDALL CRATER, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL (DKT. NO. 209)**

Over the course of a seven-day trial, the jury heard testimony from twenty-two witnesses and received voluminous documentary evidence demonstrating that the purported virtual currency company called "My Big Coin" was a fraudulent scheme and that the defendant was its principal operator. The defendant and his paid agents told a variety of lies and half-truths in order to obtain money from My Big Coin investors and customers, resulting in victim losses of approximately $6,313,927. All of that money went to bank accounts controlled by the defendant, which he subsequently used to fund his lavish lifestyle. The jury convicted the defendant on all counts after less than one day of deliberations.

The defendant now moves for a judgment of acquittal or, in the alternative, a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure. Dkt. No. 209. None of the defendant's arguments are supported by the record. The defendant's motion should be denied.

**STANDARD OF REVIEW**

A motion for judgment of acquittal under Rule 29 imposes "daunting hurdles" for defendants, *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir. 2006), and it is "rare" for a court to reverse a conviction under Rule 29. *United States v. Lopez-Diaz*, 794 F.3d 106, 108 (1st Cir.

2015).[1]   Indeed, challenges to convictions under Rule 29 are "a tough sell," *United States v. Polanco*, 634 F.3d 39, 45 (1st Cir. 2011), and defendants seeking acquittal "face an uphill battle." *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010).  In considering such motions, courts must determine "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994).  Accordingly, granting such a motion requires a court to find that "no levelheaded jury could have found the defendants guilty," *United States v. Sandoval*, 6 F.4th 63, 75 (1st Cir. 2021), and a court must make all "credibility choices in the government's favor."  *United States v. George*, 761 F.3d 42, 48 (1st Cir. 2014).  "[A]s long as the guilty verdict finds support in a plausible rendition of the record, it must stand." *United States v. Moran*, 312 F.3d 480, 487 (1st Cir. 2002).

Rule 33 provides its own standard with respect to a motion for new trial but sets a similarly high bar.  A court may grant a new trial only in "exceptional circumstances" where it is required by "the interests of justice." *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (reversing grant of new trial).  "[T]he remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and the evidence preponderates heavily against the verdict." *United States v. Chan*, 352 F. Supp. 3d 54, 78 (D. Mass. 2018) (quoting *Merlino*, 592 F.3d at 32), *aff'd*, 981 F.3d 39 (1st Cir. 2020).  "[T]he district court must generally defer to a jury's credibility assessments," *Merlino*, 592 F.3d at 32, and may not act as "a thirteenth juror who may set aside a verdict merely because [it] would have reached a different result." *United States v.*

---

[1] Unless otherwise noted, all emphasis is added, and all alterations, internal citations, and quotation marks are omitted.

*Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005) (quoting *United States v. Rothrock,* 806 F.2d 318, 322 (1st Cir.1986)).  Specifically when examining an allegedly improper closing argument, the question is "whether a prosecutor's improper statement so poisoned the well that a new trial is necessary." *United States v. D'Amico*, 496 F.3d 95, 104 (1st Cir. 2007).  Rebuttal arguments merit additional leeway because they may be "in response to [the defendant's] version of events." *United States v. de Leon Davis*, 914 F.2d 340, 345 (1st Cir. 1990).  For example, the government is entitled to "comment on the plausibility of the defendant's theory," and to respond to attacks on the credibility of witnesses with evidence and arguments based on inferences.  *United States v. Berroa*, 856 F.3d 141, 161 (1st Cir. 2017).[2]

Notably, an even more stringent standard applies to Rule 33 arguments that the defendant failed to preserve. Under Fed. R. Crim. P. 52(b), review of such forfeited issues is for plain error only, and the defendant must therefore establish that (i) there was error, (ii) the error was plain in the sense that it was "obvious," (iii) there is a "reasonable probability" the error altered the verdict, and (iv) a "miscarriage of justice" has resulted.  *See United States v. Lara*, 970 F.3d 68, 86-87 (1st Cir. 2020); *see* also 3B Wright & Miller, *Federal Practice and Procedure* § 851 (4th ed. 2021) (Rule 52 applies "when a trial court is passing on a post-trial motion."); *accord United States v. Brandao*, 448 F. Supp. 2d 311, 318 (D. Mass. 2006) (collecting cases), *aff'd*, 539 F.3d 44 (1st Cir. 2008).

---

[2] *See also United States v. Simon*, 12 F.4th 1, 59 (1st Cir. 2021) (affirming government's calling defense argument "preposterous" and analogizing defense theory to firing a gun at a group of people); *United States v. Vizcarrondo-Casanova*, 763 F.3d 89, 96 (1st Cir. 2014) (calling witnesses "credible" did not warrant new trial where defense argued "witnesses were lying"); *United States v. Sanchez-Berríos*, 424 F.3d 65, 73 (1st Cir. 2005) (describing defense as a "self serving absurdity" was "fair argument"); *United States v. Bennett*, 75 F.3d 40, 46-47 (1st Cir. 1996) (defense argument "doesn't pass the laugh test").

**ARGUMENT**

I.   **Defense Claims on Counts I through IV (Wire Fraud)**

   a.  **The Government Presented Sufficient Evidence that the Defendant and His Paid Agents Made Fraudulent Misrepresentations**

The defendant concedes that he and his paid agents made a variety of representations about My Big Coin but argues that the government failed to prove any fraudulent misrepresentations. Specifically, the defendant argues that there is insufficient evidence that My Big Coin was *not* a cryptocurrency, was *not* backed by gold, or did *not* have a partnership with Mastercard.  Def. Mot at 4-8.  While the defendant is incorrect that the government had the burden of proving that *all* of those representations were false, nevertheless, there was indeed sufficient evidence for a rational jury to conclude that each of those claims (and other claims) constituted fraudulent misrepresentations.

i.   **My Big Coin was not a cryptocurrency**

The testimony and evidence at trial showed that the defendant controlled My Big Coin and its virtual currency.  The defendant described himself as the "creator" and "developer" of My Big Coin, Ex. 1.a (Randall Crater LinkedIn Profile), and told individuals that he "built the system." Ex. 11t (April 11, 2014 email from the defendant to Robert McGowan, a government witness, stating "I built the system").  The defendant also personally conducted transfers of the My Big Coin currency for customers.  *See, e.g.*, Ex. 11i (March 13, 2014 email from the defendant to a customer asking "how many coins would you like to buy" and stating "I'll back date the cost of the coins to the day you set the account up"); Ex. 44 p. 11 (copy of checks for the "sale of coins" and "coin buy back").  And further, all of the money paid by customers and investors who purchased the My Big Coin currency went directly into bank accounts the defendant controlled. *See, e.g.*, Ex. 44 pp. 1-7 (summary financial exhibit showing flow of customer and investor funds);

4

Day 6 Tr. 94:10-17 (Kathleen Brekenfeld: "Q. Who does it appear, based on your analysis, controlled the My Big Coin accounts?  A. Mr. Crater.  Q. Did there appear to be personal spending in the My Big Coin accounts?  A. Yes.  Q. Personal spending by whom?  A. Mr. Crater.").

With this control over the My Big Coin currency and its operating accounts, the defendant proceeded to advertise My Big Coin as a "cryptocurrency" that could be "mined" and was similar to "Bitcoin".  *See, e.g.*, Ex. 1.a (defendant's LinkedIn page describing My Big Coin as a "Cryptocurrency"); Ex. 6 (defendant's Twitter page describing My Big Coin as a "CryptoCurrency"); Ex. 7.a (My Big Coin website claiming users could "mine" My Big Coin); Day 5 Tr. 47:10-14, 48:17-25 (Robert McGowan testifying that the defendant told him that My Big Coin was a "cryptocurrency" that utilized "blockchain" and was "[s]imilar to Bitcoin").  The defendant began making these claims in 2014, and the defendant also paid other individuals to make the same or similar claims.[3]

The evidence presented at trial showed that those claims were false.  The government's expert witness, Pamela Clegg, provided her opinion that "My Big Coin did not exist as a cryptocurrency until June 28, 2017."  Day 4 Tr. 194:18-19.  Ms. Clegg explained that her opinion was based, in part, on an analysis of the My Big Coin blockchain.  *See, e.g.*, Day 4 Tr. 207:19-21 ("Q. And based on your review and investigation, when was the first block of the blockchain? A. June 28, 2017.").  Ms. Clegg also testified that she reviewed publicly available cryptocurrency databases that contain historical information on cryptocurrencies and that My Big Coin was not reflected in those historical databases prior to June 28, 2017.  *Id.* 210:4-7 ("Q. Was there any

---

[3] *See* Gov't Motion on Hearsay Statements of Agents, Dkt. No. 159 (identifying evidence that several individuals, including Mark Gillespie, were paid agents of the defendant); Day 5 Tr. 245:8-11 (the Court holding "I think here there has been sufficient basis about the agency exception for the purposes of the admission of statements who are purported to be or alleged to be by the government agents of Mr. Crater").

information on those databases to suggest that My Big Coin was available as a cryptocurrency prior to June 28, 2017?  A. No.").  Ms. Clegg further testified that she reviewed over 1,300 cryptocurrency exchanges and that none of those exchanges allowed My Big Coin to be bought or sold.  *Id.* 210:13-17 ("Q. And you looked for My Big Coin on all of those exchanges?  A. That's correct. CipherTrace tracks over 1,300 cryptocurrency exchanges, and we reviewed all of them for the existence of My Big Coin. We did not have My Big Coin in our records.").  Notably, the defendant's own expert witness did not contradict Ms. Clegg's opinion.  Day 6 Tr. 157:18-21 ("Q. Are you testifying today that My Big Coin was operating as a cryptocurrency between 2014 and 2016?  A. I am not testifying to that. I have no opinion about that.").

The government also presented evidence that the My Big Coin cryptocurrency was only created and subsequently traded starting in June 2017 *as part of a cover-up* after the Commodity Futures Trading Commission ("CFTC") began investigating My Big Coin for fraud.  *See, e.g.*, Ex. 14f (June 1, 2017 email correspondence where the defendant tells Mr. Lynch that Mr. Lynch does not need to cooperate with the CFTC investigation and Mr. Lynch disagrees); Day 4 Tr. 217:23-218:4 ("Q. So after My Big Coin was available as a cryptocurrency, after June 28, 2017, you say in this first bullet that you identified trading indicative of wash trading. First, what is wash trading? A. Wash trading is used to inflate the transaction volume of a particular currency or stock to make it appear more transacted or more legitimate than it is.").

Viewing this evidence in the light most favorable to the government, a rational jury could have concluded that My Big Coin was not a cryptocurrency prior to June 28, 2017.  Further, a rational jury could have concluded that the defendant—as the individual who "built the system" for My Big Coin, was the "creator" and "developer" of My Big Coin, personally oversaw the

transfer of My Big Coin currency, and received all the money from My Big Coin currency sales—knew the truth about My Big Coin: that it was not a cryptocurrency.

### ii.     My Big Coin was not backed by gold

The defendant (and his paid agents) repeatedly claimed that My Big Coin was backed by gold.  *See, e.g.*, Ex. 1.a (defendant's LinkedIn page: "We are the only Cryptocurrency to be backed by Gold!"); Ex. 6 (defendant's Twitter page: "The first CryptoCurrency To be Backed by Gold"); Day 7 Tr. 27:5-7 (Mark Gillespie: "Q. The defendant told you that My Big Coin was a cryptocurrency backed by gold?  A. Yes, sir.").  However, the defendant's own witness, Richard Galvin, testified that the defendant's gold claim was false.  Day 7 Tr. 80:13-17 (Richard Galvin: "Q. And there's no gold bullion in those barrels, right?  A. No, no, of course not.  Q. And you never told anyone that there's gold bullion in those barrels.  A. I couldn't, no, that would be a lie."); *id.* 81:20-25 ("Q. Okay. You never gave those barrels to Randall Crater, correct?  A. No, sir.  Q. And you never told Randall Crater that there's $300 million worth of anything in those barrels?  A. No, sir.").

While conceding that My Big Coin did not actually have gold backing, the defendant argues that he had a "good faith" basis to believe My Big Coin was backed by gold from 2014 through 2017, Def. Mot. p. 6, based on documents the defendant received via email from William Donohue stating that My Big Coin had gold backing.  *See, e.g.*, Ex. 11k (email to the defendant with a letter attached that references a "Commitment to My Big Coin up to $100,000,000.00 . . . Gold Dore Bars Form and/or GLD Gold Bullion").  However, the evidence showed that the defendant did not believe My Big Coin actually had gold backing.  For example, the defendant made clear in emails on January 16 and 27, 2015, that he did not believe the gold backing actually existed.  Ex. 12b (January 16, 2015 email from the defendant stating "the coin is going public billy

and *we have to have proof the gold is setting [sic] there*" and going on to explain that there is currently no "proof" because "what you have sent is docs from 2006" and there "should have a safe keeping receipt from the bonded warehouse") (emphasis added); Ex. 12f (January 27, 2015 email from the defendant stating "*our biggest concern is that the word gold isn't mentioned anywhere*" and highlighting the lack of "an updated assayers report or something from a third party verifying that those barrels are filled with gold") (emphasis added).

Moreover, the defendant made other false claims about this non-existent gold backing. For example, the defendant claimed that the gold was held in his name in a bank in Spain. Ex. 11h (March 5, 2014 email from the defendant to Robert McGowan claiming "we are backed by gold we have 100 million dollars in my name in gold in Spain in a a [*sic*] bank".) However, Ms. Brekenfeld testified that the defendant did not have a bank account in Spain or a gold holding anywhere. Day 6 Tr. 75:13-17 ("Q. How about this claim about gold backing, did you see in the bank account records anything relating to a gold holding? A. I did not. Q. Did you see any transactions with a Spanish bank? A. I did not."). Joseph Guidoboni of the Internal Revenue Service ("IRS") also testified that the defendant would have been required to report any foreign bank account on his tax returns but never did so, further evidencing that no such foreign bank account existed. Day 5 Tr. 235:15-23. The defendant's bank records, which were corroborated by his travel records, also showed that the defendant had never even traveled to Spain. Day 6 Tr. 75:2-17 (Ms. Brekenfeld testimony).

As another example, the defendant falsely claimed to an investor (Mr. Lynch) that My Big Coin was backed by $300 million dollars in gold. Ex. 12g (January 28, 2015 email from the defendant to Mr. Lynch claiming "we have 300 million in gold backing us"). The defendant made this claim the day after he told a business partner that "our biggest concern is that the word gold

isn't mentioned anywhere" and highlighted the lack of "an updated assayers report or something from a third party verifying that those barrels are filled with gold."  Ex. 12f.  And further, the letter the defendant received from Mr. Donohue only referenced $100 million in gold backing, which is $200 million less than what the defendant claimed My Big Coin had in gold backing in his email to Mr. Lynch.

Viewing this evidence in the light most favorable to the government, a rational jury could have concluded that the defendant knew that My Big Coin was not backed by gold during the charged time period of 2014 through 2017.  And further, a rational jury could have also concluded that—contrary to statements the defendant made to investors and customers—the defendant knew that he did not have a bank account in Spain, did not have a gold holding in his own name, and did not have $300 million (as opposed to 100 million) in gold.

### iii.    My Big Coin did not have a partnership with Mastercard

The defendant (and his paid agents) repeatedly claimed that My Big Coin had a "partnership" with Mastercard that enabled My Big Coin customers to spend their virtual currency in the real world through a "closed loop system" with Mastercard.  *See, e.g.*, Ex. 1.a (defendant's LinkedIn page: "We are partners with Mastercard witch [*sic*] gives us a closed loop system so your able to brake [*sic*] down into any currency thats [*sic*] needed"); Ex. 6 (defendant's Twitter page describing My Big Coin as "Partners with Mastercard"); Ex. 7.a (My Big Coin website containing an image of a My Big Coin Mastercard and claiming "You can also buy merchandise from all over the world by using your My Big Coin MasterCard").  The defendant also personally approved a statement to investors that claimed "Randall Crater has an elite deal with Mastercard."  Ex. 32 (email from the defendant to Mr. Gillespie).

The evidence showed that those claims were false.  As the defendant's own witness (Thomas Callahan) testified, My Big Coin provided its customers a pre-paid debit card unconnected to their My Big Coin virtual currency.  Day 7 Tr. 92:22-93:4 ("Q. That was just a normal prepaid debit card, right?  A. Yeah, it was a prepaid debit card.  Q. You couldn't use your My Big Coins with that card, could you?  A. It never got to that point.  Q. So the cash that you spent was just your own cash you loaded on the card?  A. Yeah, yeah, exactly.").  Additionally, Richard Audet, a Vice President at Mastercard, testified that Mastercard never had any sort of partnership with My Big Coin.  Day 5 Tr. 101:15-22 ("Q. Here I'm showing you the defendant's LinkedIn page, and at 2 he says, We are partners with MasterCard which gives us a closed loop system so your able to brake down into any currency that is needed. Is that statement true?  A. It is not true.  Q. Did MasterCard have a partnership with My Big Coin in August 2015 or any time thereafter?  A. No.").  Mr. Audet's testimony was corroborated by Ms. Clegg, who testified that no cryptocurrency had the sort of partnership or "closed loop system" with a credit card company that My Big Coin was advertising in 2014 or 2015.  Day 4 Tr. 221:14-18.  Lastly, the defendant's own emails show that he knew My Big Coin did not have a "closed loop system" with Mastercard—as the defendant was told on August 29, 2015, even if Mastercard would enter into an agreement with My Big Coin (which it had not), the project still did not have the "funding" and needed "300 man hours" before it became functional.  Ex. 12x (August 29, 2015 email string between the defendant and Perry Orlando).  Viewing this evidence in the light most favorable to the government, a rational jury could have concluded that the defendant knew he did not have an "elite deal" with Mastercard and that My Big Coin did not have a partnership with Mastercard, let alone the sort of "closed loop system" that My Big Coin was advertising.

### iv.      Other Fraudulent Misrepresentations

In addition to the fraudulent misrepresentations discussed above, the government presented evidence that the defendant and those he paid made other fraudulent misrepresentations to investors and customers.  By way of example only, the defendant told his largest customer and investor (Mr. Lynch) that My Big Coin was so successful that the defendant was in "Colorado" for multiple days "counting cash" and, later, waiting for an armored car service to pick up the cash. Ex. 16 pp. 28-29, 34-35 (May 8 and 11, 2017 text messages between the defendant and Mr. Lynch). However, Ms. Brekenfeld testified that during the same time period the defendant was making those claims, his bank records reflected purchases in Florida (not Colorado) and a negative account balance.  Day 6 Tr. 77:11-23.  As another example, the defendant's paid agent (Mr. Gillespie) told a customer and investor (Peter Bell) that Mr. Gillespie was on the board of directors of My Big Coin and, because of his work with My Big Coin, was a "billionaire".   Day 7 Tr. 22:1-13. However, at trial, Mr. Gillespie admitted that those statements were false. *Id.* 23:11-24.  A rational jury could have properly considered these misrepresentations as evidence of the intent and bad purpose of the defendant and his paid agents, as discussed below.

### b.  The Government Presented Sufficient Evidence of the Defendant's Intent

The defendant argues that the government failed to present sufficient evidence that the defendant "willfully participated" in a scheme to defraud or acted with the "specific intent to defraud".  Def. Mot. p. 6.  The defendant is incorrect.

With respect to whether the defendant acted "willfully" and "intentionally", the Court instructed the jury about what evidence to consider. *See, e.g.,* Day 7 Tr. 163:4-164:3.  As the Court explained, it is "impossible to prove through direct evidence the inner workings of the human mind."  *Id.*   Therefore, "[i]n deciding whether something is done knowingly, willfully or

intentionally, you may consider the actions of the defendant by what he said or did, all of the facts and circumstances surrounding his conduct and any reasonable inferences to be drawn from those facts and circumstances." *Id.*; *see also id.* 162:17-19 ("willfully" means to act with "bad purpose" to either "disobey or disregard the law"). These instructions aligned with the First Circuit Pattern Jury Instructions and were given without objection.

As discussed *supra* pp. 4-11, a rational jury could have concluded that the defendant personally made a number of representations about My Big Coin that he knew were false when he made them, including statements about My Big Coin being a cryptocurrency, backed by gold, and partnered with Mastercard, among others. That the defendant made knowingly false statements to investors and customers when asking them to invest in My Big Coin and purchase its currency, standing alone, is sufficient for a rational jury to find that the defendant acted willfully and with the intent to defraud.

Further, viewing this evidence in the light most favorable to the government, a rational jury could have found that the defendant's structuring of his business evidenced that he was acting willfully and with an intent to defraud. For example, the defendant directed all payments from My Big Coin to be funneled into accounts that he controlled but that he opened in the names of his sister and mother. *See* Ex. 44 p. 1 (identifying My Big Coin accounts opened in the names of the defendant's sister (Kimberly Benge) and mother (Barbara Crater Meeks)); *see also* Ex. 25 (stipulation as to various facts, including that "Barbara Crater Meeks" is the defendant's mother); Day 4 Tr. 157:25-158:1, 160:6-161:5 (Kimberly Benge testifying that she is the defendant's sister and that the defendant instructed her to open the bank account). The defendant also forged his sister's signature on checks paid to individuals who were promoting My Big Coin. *Compare* Ex. 44 pp. 9, 11 (examples of checks containing a signature in the name of "Kimberly Benge" from

the Wells Fargo account controlled by the defendant) *with* Day 4 Tr. 162:21-22 (Kimberly Benge: "Q. Did you ever write any checks from this [Wells Fargo] account? A. No, sir.") *and id.* 164:6-8 (Kimberly Benge: "Q. . . . Who had the checkbook for Greyshore between the period of 2014 and 2017? A. Mr. Crater did."). The defendant also used investor funds primarily for personal expenses, including to buy a house, cars, and jewelry, among other personal items. *E.g.*, Ex. 44 pp. 6-7; Day 6 Tr. 94:10-17 (Ms. Brekenfeld testimony); Day 4 Tr. 140:18-19 (Mr. Abadi testimony). The defendant also never reported any of the My Big Coin income to the IRS and never registered the My Big Coin Exchange with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), both of which were legal requirements. *See, e.g.*, Ex. 42 (IRS Certification of Lack of Record), Ex. 43 (FinCEN Certification of Lack of Record); *see also United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005) (failure to comply with regulatory requirements may be considered as evidence of "knowledge of the fraudulent scheme").

In short, the evidence showed that My Big Coin was a fraud scheme designed by the defendant to enrich himself. Viewing this evidence in the light most favorable to the government, a rational jury could have reasonably concluded that the defendant acted willfully and with the intent to defraud.

## II.   Defense Claims on Counts V through VII (Unlawful Monetary Transactions)

The defendant was charged with making three unlawful monetary transactions in 2015, on May 2 (Count V), May 15 (Count VI), and June 2 (Count VII), respectively. All three transfers were made from a Wells Fargo account controlled by the defendant to a Bank of America account in the defendant's name. *See, e.g.,* Ex. 44 pp. 1, 2, 6; Day 6 Tr. 70:21-71:24. The defendant argues that the Wells Fargo account retained a substantial balance after each of the three charged wire transfers such that the government did not (and could not) prove that the criminally derived funds

deposited into the Wells Fargo account were transferred to the Bank of America account.  Def. Mot. pp. 8-9.  This argument is not supported by the record.

The government presented evidence that all of the payments from My Big Coin investors and customers leading up to May and June of 2014 (the time period of the three charged transactions) were deposited into the Wells Fargo account.  *See, e.g.,* Ex. 44 p. 3.  Additionally, Ms. Brekenfeld testified that, prior to each of the three charged transactions, the Wells Fargo account was funded primarily by identifiable transfers from My Big Coin investors or customers. Day 6 Tr. 71:21-72:4 ("Q. Leading up to each of those wires to the Bank of America account, did you observe how the Wells Fargo account was being funded?  A. I did.  Q. Okay. So before the Wells Fargo account moved the money to the Bank of America account, how was it being funded primarily?  A. With incoming funds from the individuals whose money was intended for My Big Coin.").  The existence of an account balance in the Wells Fargo account after the charged transactions does not impact the sufficiency of the evidence on Counts V through VII.  Regardless of the amount of other criminally derived funds that remained in the Wells Fargo account after the transactions, the government still presented sufficient evidence—particularly when viewed in the light most favorable to the government and taking all reasonable inferences in its favor—for a rational jury to conclude that each of the three charged transactions contained over $10,000 derived from the My Big Coin fraud scheme.

Specifically on Count VI, the defendant also argues that the money transfer from the Wells Fargo account to the Bank of America account contained funds that Mr. Lynch paid to the defendant in exchange for a marijuana license, not My Big Coin currency.  Def. Mot. p. 9. However, the defendant provides no record support for this claim, *see id.*, and it is contradicted by

the testimony of Ms. Brekenfeld.  Day 6 Tr. 71:21-72:4.[4]  Therefore, when viewing the evidence

in the light most favorable to the government, a rationally jury could have concluded that the wire

transfer identified in Count VI contained over $10,000 of criminally derived funds from the My

Big Coin scheme.

### III.        Defense Claims on Count VIII (Operating an Unlicensed Currency Exchange)

The defendant argues that the government failed to prove that Mr. Crater operated a money

transmitting business because (1) the government's position that My Big Coin was not a

cryptocurrency means that My Big Coin could not have been subject to the registration

requirements of the U.S. Treasury Department, and (2) the government's only proof of Mr.

Crater's involvement was his writing of personal checks to buy and sell My Big Coin.  Def. Mot.

pp. 9-10.  These arguments are not supported by the record.

As to the defendant's first argument, that the government presented evidence that My Big

Coin was *not* a cryptocurrency does not impact the sufficiency of the evidence as to whether the

defendant operated a money transmitting business.  While My Big Coin was not a cryptocurrency,

*supra* pp. 4-6, it was still a virtual currency.  *See* Ex. 7a (My Big Coin website describing My Big

Coin as a "virtual currency"); Day 4 Tr. 174:19-176:16 (Ms. Clegg testimony defining virtual

currency and explaining that cryptocurrency is a specific subset of virtual currency that utilizes

cryptography and blockchain technology).  Theodore Vlahakis, a Senior Compliance Officer at

---

[4] Moreover, Mr. Lynch testified that the defendant's sale of marijuana licenses always
utilized the fraudulent My Big Coin currency such that any funds received for marijuana licenses
would have still been criminally derived as part of the overall My Big Coin scheme.  Day 3 Tr.
3:8-10 (Mr. Lynch: "A. The way that was documented or was supposed to be documented was I
would get additional coins in my account while waiting for the licenses to come to me."); Day 2
Tr. 123-124 (Mr. Lynch testifying that licenses were converted into coins); Day 2 Tr. 132:18-21
(Mr. Lynch: "I had a total in there of more than $5.6 million. Some of it was, again, for the coins
and some of it for the various licenses, but it was all denominated in coins.").

FinCEN, testified that all virtual currency exchanges—regardless of whether they exchange cryptocurrency or some other virtual currency—must register with FinCEN.  Day 6 Tr. 24:3-8 ("Q. Are virtual currency exchanges required to register with FinCEN as money transmitters?  A. Yes, they are.  Q. Are cryptocurrencies exchanges required to register with FinCEN as money transmitters?  A. Yes, they are."), 28:1-3 ("Q. If a business is selling virtual currency and exchanging it for other currencies, is that money transmitting?  A. Yes, it is."), 28:10-13 ("Q. If a business is operating a forum where individuals can trade their virtual currency for U.S. dollars, is that a money transmitting business?  A. Yes.").  Ms. Clegg, a cryptocurrency expert and former Bank Services Act compliance officer, reiterated this point.  Day 4 Tr. 226:6-9.

As to the defendant's second argument, the government presented a plethora of evidence beyond the defendant's checks showing that he was operating the My Big Coin Exchange.  The evidence showed that My Big Coin had an online exchange called the My Big Coin Exchange. *See, e.g.,* Ex. 7g (screenshot of the My Big Coin Exchange website).   The Exchange website purported to offer customers the ability to sell My Big Coin currency in exchange for one or more other currencies and also purported to show the My Big Coin trading history.  *Id.* (website offering to "sell My Big Coin (MBC)", allowing customers to "Select currency to buy", and listing the "Latest trades").

The defendant discussed creating the My Big Coin Exchange with James Douglas, and specifically discussed the FinCEN registration requirements.  Day 5 Tr. 18:4-6 ("Q. Did you have discussions with the defendant about FinCEN regulations? A. Yes."); *see also* Ex. 10b (email from Mr. Douglas to the defendant identifying the FinCEN registration forms).  Once the My Big Coin Exchange was operational, the defendant personally told individuals, including defense witness Mark Gillespie and government witness Robert McGowan, that they could buy and sell My Big

16

Coin on the My Big Coin Exchange. *See, e.g.*, Day 7 Tr. 27:8-11 (Mr. Gillespie: "Q. And the defendant told you that My Big Coin had an exchange website where people could buy and sell their coins, right?  A. Yes, sir."), 29:21-25 (Mr. Gillespie: "A. I knew the exchange worked.  Q. Okay. So you knew that this exchange worked?  A. Absolutely.  Q. And the defendant told you it worked, right?  A. Well, I used it, all my friends had used it."); Day 5 Tr. 51:3-5 (Mr. McGowan: "Q. Specifically, did the defendant ever say that the My Big Coin cryptocurrency was trading on this exchange? A. Yes.").

The defendant's emails showed that he was personally involved in exchanging the My Big Coin currency for U.S. dollars through the My Big Coin Exchange. *See, e.g.*, Ex. 11i (March 13, 2014 email from the defendant to a customer asking "how many coins would you like to buy" and stating "I'll back date the cost of the coins to the day you set the account up"); Ex 11jj (December 23, 2014 email from Mr. Gillespie to the defendant containing a chat log with a customer where the customer is instructed how to buy and sell "coins" on the My Big Coin Exchange).  The defendant's financial records also showed that he personally controlled the bank accounts used to buy and sell the My Big Coin currency.  *See, e.g.*, Ex. 44 (summary financial exhibit showing all the money from My Big Coin investments and coin purchases, totaling $6,313,927, going into financial accounts controlled by the defendant, and copies of checks from accounts controlled by the defendant for the "sale of coins" and "coin buy back").

Viewing this evidence in the light most favorable to the government, a rational jury could have concluded that the My Big Coin Exchange was used to exchange the My Big Coin virtual currency for other forms of currency.  And further, the evidence was sufficient for a rational jury to find that the defendant owned and/or operated the My Big Coin Exchange.

### IV.   The Defendant Failed to Identify Any Improper Arguments in the Government's Closing Argument

The defendant argues that the government made improper arguments that (1) referenced matters not in evidence as to the defendant's travel to Spain, (2) mischaracterized an email about the defendant's lack of funding, and (3) shifted the burden of proof to the defendant.  The defendant fails to address how any of these statements could have "so poisoned the well that a new trial is necessary."  *D'Amico*, 496 F.3d at 104.  Additionally, as explained below, none of these arguments are supported by the record.

As to the first issue, the defendant claims that the government referenced evidence showing that the defendant had never traveled to Spain despite no such evidence being before the jury.  Def. Mot. p. 12.  However, Ms. Brekenfeld testified that bank records typically reflect the location where spending is occurring and that she analyzed the defendant's bank records to determine the location of his spending on specific dates.  Day 6 Tr. 73:15-74:2.  Ms. Brekenfeld further testified that the bank records, which were corroborated by the defendant's travel records, reflected that the defendant had not traveled to Spain between 2014 and 2017.  Day 6 Tr. 75:2-12 (Ms. Brekenfeld: "Q. When reviewing the defendant's financial records, did you identify any spending that appeared to be occurring in Spain?  A. I did not.  Q. And what time period did that include?  A. From 2014 to 2017.  Q. Were you also able to review the defendant's travel records in preparation for your testimony today?  A. I did.  Q. Did those travel records indicate any travel to Spain between 2013 and 2017?  A. No.").  The defendant did not object to this testimony, and it was properly before the jury.  The defendant also did not object to the government's reference to this evidence in its closing argument.  *See* Day 7 Tr. 128:6-15.  The defendant cannot now claim error, let alone overcome the plain error standard applicable to evidence and argument that was not objected-to at trial.

As to the second issue, the government did not mischaracterize the contents of the defendant's email discussing funding for My Big Coin. Def. Mot. p. 12. According to the defendant, the government's rebuttal closing argument improperly referenced that the defendant knew the payment system he was advertising required "300 man hours" and additional "funding". *Id.* The defendant did not object to that argument, *id.*, and there was indeed an email in evidence that supported that argument, *see* Ex. 12x (August 29, 2015 email string between the defendant and Perry Orlando where Mr. Orlando stated that the project still did not have the "funding" and needed "300 man hours" to create it). Under these circumstances, once again, the defendant cannot now claim error, let alone overcome the plain error standard applicable to evidence and argument that was not objected-to at trial.

Third, and lastly, the defendant's argument that the government attempted to shift the burden of proof, Def. Mot. p. 12, similarly falls flat. According to the defendant, the government improperly argued in rebuttal that "the defendant knows he doesn't have a bank account in Spain because he's the defendant. He knows he's never been to Spain because he's the defendant." Day 7 Tr. 157:23-158:1. But this does not constitute improper burden shifting. There was evidence before the jury that the defendant did not have a bank account in Spain, Day 6 Tr. 75:13-17, and had not travelled to Spain, *id.* 75:2-12. The government was permitted to argue reasonable inferences from that evidence, including that the defendant would of course have known that he had not opened a bank account in Spain or traveled to Spain. *See, e.g.*, *Berroa*, 856 F.3d at 161 (the government in rebuttal is permitted to "to discuss competing inferences from the evidence on the record" and "to comment on the plausibility of the defendant's theory") (quoting *United States v. Glover*, 558 F.3d 71, 76 (1st Cir. 2009)).

19

Furthermore, even if the defendant could identify some error—which he cannot—any such error would be harmless. *Berroa*, 856 F.3d at 162 (finding harmless error "[i]n light of the significant evidence against the defendants, the context of the prosecutor's statements, and the court's strong and unequivocal instruction on the presumption of innocence"). As discussed above, the government clearly presented "significant evidence" against the defendant. *Id.* And further, the Court instructed the jury on multiple occasions that the burden of proof is on the government, including prior to closing arguments, s*ee, e.g.*, Day 7 Tr. 114:5-9 ("The presumption of innocence until proven guilty means that the burden of proof is always on the government to satisfy you that Mr. Crater is guilty of the crime with which he's charged beyond a reasonable doubt."), and after closing arguments, *see, e.g.*, *id.* 162:1-3 ("To find the defendant guilty on any particular charge, the government must prove each of the elements of the charged offense beyond a reasonable doubt."), 163:1-3 ("The burden to prove intent, as with all other elements of the crime, rests with the government."). The government in rebuttal also cautioned the jury to follow the Court's instructions. *Id.* 156:13-14 ("What the government's going to ask you to do is listen to the Judge's instructions."). There is no basis to find that the jury was somehow misled about the government's burden of proof, particularly given that the jury is presumed to follow the Court's instructions. *United States v. Rullan-Rivera*, 60 F.3d 16, 18 (1st Cir. 1995) (holding that the "normal presumption" is "that juries follow the court's instructions"); *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841, (2009) ("[A]s in all cases, juries are presumed to follow the court's instructions.").

## V.      Conclusion

For the reasons stated above, the Court should DENY the defendant's motion for a judgment of acquittal and new trial.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     */s/ Christopher J. Markham*
        CHRISTOPHER J. MARKHAM
        Assistant United States Attorney

        */s/ Siji Moore*
        SIJI MOORE
        Trial Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

Dated:  August 18, 2022

By:     */s/ Christopher J. Markham*
        CHRISTOPHER J. MARKHAM
        Assistant United States Attorney

        */s/ Siji Moore*
        SIJI MOORE
        Trial Attorney