1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3      _____

4      UNITED STATES OF AMERICA,

5                        Plaintiff,        Criminal Action
                                           No. 19-10063-DJC
6      v.
                                           July 13, 2022
7      RANDALL CRATER,                      8:48 a.m.

8
                         Defendant.
9      _____

10

11

12                TRANSCRIPT OF JURY TRIAL DAY 2

13           BEFORE THE HONORABLE DENISE J. CASPER

14               UNITED STATES DISTRICT COURT

15            JOHN J. MOAKLEY U.S. COURTHOUSE

16                   1 COURTHOUSE WAY

17                  BOSTON, MA  02210

18

19

20

21              DEBRA M. JOYCE, RMR, CRR, FCRR
                    Official Court Reporter
22              John J. Moakley U.S. Courthouse
                  1 Courthouse Way, Room 5204
23                    Boston, MA  02210
                    joycedebra@gmail.com
24

25

1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    CHRISTOPHER J. MARKHAM, ESQ.
     BABASIJIBOMI MOORE, ESQ.
4    US Attorney's Office - MA
     J. Joseph Moakley U.S. Courthouse
5    1 Courthouse Way
     Suite 9200
6    Boston, MA 02210
     617-449-6890
7    christopher.markham2@usdoj.gov
     babasijibomi.moore2@usdoj.gov
8
     FOR THE DEFENDANT:
9
     SCOTT P. LOPEZ, ESQ.
10   Lawson & Weitzen
     88 Black Falcon Avenue
11   Suite 345
     Boston, MA 02210
12   617-439-4990
     splopez@lawson-weitzen.com
13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on July 13, 2022.

The defendant, Randall Crater, is present with

counsel.  The Assistant U.S. Attorneys are present.)

THE COURT:  Good morning.

THE CLERK:  Court is in session.  Please be seated.

THE COURT:  Good morning, counsel.

We're still waiting on a number of our jurors.  I

obviously wanted to get started.

Counsel, since yesterday, I've received Docket 164, a

stipulation between the parties regarding Exhibit 6.

Mr. Markham, does this negate the need for disputed L?

MR. MARKHAM:  Yes, your Honor.

THE COURT:  Okay.

Counsel, I also received Docket 165, the government's

supplemental memo on the Touhy regulations.  I've had a chance

to review that, which refreshed my recollection and also read

some of the key cases.

Mr. Lopez, do you need to be heard on this?

MR. LOPEZ:  Your Honor, I'd like an opportunity to

provide you with the alternative law on the issue.

             1          I'll have something to you at the close of business

             2     today.

             3          THE COURT:  Okay.  And I guess my question to you, is

             4     this still a live issue and which witnesses does this refer to,

             5     apply to?

             6          MR. LOPEZ:  I think there's two different types of

             7     witnesses.  One is the CFTC, which is not part of the

             8     Department of Justice, and the other is the FBI.

             9          THE COURT:  Okay.

08:50   10          MR. LOPEZ:  And the U.S. Postal Service, which isn't

            11     part of the Department of Justice, to my knowledge.

            12          THE COURT:  But, I guess, counsel -- so I'm happy to

            13     have you file something and I'll take up at the end of the day

            14     when --

            15          MR. LOPEZ:  What I expect to present is the caselaw

            16     that says that Touhy was a civil matter, an administrative

            17     matter, and before someone can testify in a civil case certain

            18     steps have to be taken.

            19          In a criminal case, where someone has -- can present

08:50   20     their defense, they don't have to disclose --

            21          THE COURT:  So I guess, counsel, a few things I would

            22     just ask you to address.  There's caselaw before me, U.S. v.

            23     Soriano-Jarquin, 492 F.3d 495, 504 (1st Cir. 2007), which

            24     stands for the proposition that Touhy regulations apply to the

            25     testimony of agency employees in federal criminal prosecutions.

1    So that's one.

2         Two is I think, as I understand it, federal agencies

3    may have different regulations about how <u>Touhy</u> can be complied

4    with, but I don't think this is limited to the FBI; and three,

5    I'd just like to know which witnesses this applies to in terms

6    of the witnesses you anticipate proceeding with since at least

7    the caselaw that I've reviewed suggests that <u>Touhy</u> needs to be

8    complied with even in criminal cases.

9         MR. LOPEZ:  That's fine, your Honor.

08:51 10         THE COURT:  Thank you.

11         MR. MARKHAM:  Your Honor, if I could make just one

12    note on this point.

13         THE COURT:  Sure.

14         MR. MARKHAM:  That the government's also going to be

15    objecting on the CFTC witness, if that's called, on relevance

16    grounds.  I know it's at the end of that sort of abbreviated

17    bench memo.  It's not just about the regulatory issue, if you

18    comply with it.  It's also about relevance.

19         THE COURT:  So, counsel, I was more focused on <u>Touhy</u>

08:52 20    since there's a procedure that needs to be complied with, but I

21    understand that there is another basis.

22         Counsel, I believe -- obviously we'll start with my

23    preliminary instructions and then openings.

24         Is the government's lineup the same as presented

25    yesterday?

1           MR. MARKHAM:  Yes, your Honor.  The first witness will
2     be John Lynch.
3           It will be helpful, but obviously the defense won't be
4     held to it, to know approximately how long the cross-
5     examination is going to be, because if we're done at 1:00, we
6     might not get through more than one witness.  We'd like to know
7     who else we need to have lined up.
8           Of course it depends on what he says on direct, we
9     understand.
08:53 10          THE COURT:  Sure.
11          Counsel, why don't we see how things are going and by
12     the 11:00 break I'll ask for that.
13          MR. MARKHAM:  Thank you, your Honor.
14          THE COURT:  Counsel, anything else from the
15     government's point of view?
16          MR. MARKHAM:  Your Honor, there was a question
17     yesterday about Zoom witnesses.
18          THE COURT:  Yeah, and I wasn't sure if there's overlap
19     between Zoom and Touhy.
08:53 20          MR. LOPEZ:  No, there's not.
21          THE COURT:  Okay.
22          MR. LOPEZ:  But those witnesses won't be reached until
23     next week.  The government I think is reaching out to them to I
24     guess affirm the representations I made about their inability
25     to travel.

```
 1              THE COURT:  Sure.  So does the government have a
 2      position on that yet?
 3              MR. MARKHAM:  So as a general matter, your Honor, the
 4      government wants to be able to cross-examine witnesses in
 5      person in order to test their credibility and their memory.  We
 6      understand the government doesn't have the confrontation right,
 7      the same confrontation right as the defendant, that the Court
 8      will make that decision.  As an initial matter we'd like to
 9      address them in person.
08:54 10         We are, though, in the process of trying to reach out
11      to them and talk to them and just confirm what their level of
12      immobility is, because if they're truly immobile, I'll try not
13      to be --
14              THE COURT:  So I'll review with counsel to see what
15      the government's position is once you gather more information.
16              Anything else from the government's side at this
17      point?
18              MR. MARKHAM:  No, your Honor.  Thank you.
19              THE COURT:  Mr. Lopez?
08:54 20         MR. LOPEZ:  No, your Honor.  I need to run back
21      downstairs.  I left my backpack downstairs.
22              THE COURT:  I will have you do that.
23              Just one other matter that I wanted to take up, but
24      hold on one second.
25              (Discussion off the record.)
```

|  |  |
|--|--|
| 1 | THE COURT:  Counsel, can I just speak with you on |
| 2 | Whisper Tech for a moment? |
| 3 | (Discussion at sidebar on the record.) |
| 4 | THE COURT:  Mr. Markham. |
| 5 | MR. MARKHAM:  Yes, your Honor. |
| 6 | THE COURT:  Mr. Lopez. |
| 7 | Mr. Lopez, can you hear me? |
| 8 | MR. LOPEZ:  I can't hear you. |
| 9 | THE COURT:  Can you hear me now? |
| 08:55 10 | MR. LOPEZ:  (Nodded.) |
| 11 | THE COURT:  Okay.  I just wanted to make you aware of |
| 12 | two juror issues.  One, juror -- |
| 13 | MR. MARKHAM:  I apologize, your Honor.  I'm having a |
| 14 | hard time hearing you.  I can only barely hear you. |
| 15 | THE COURT:  How about now? |
| 16 | MR. MARKHAM:  Much better, your Honor. |
| 17 | THE COURT:  Two juror issues.  The first is in regards |
| 18 | to Juror No. 11, Ms. Stocker.  She just raised with the CSO |
| 19 | that she has anxiety.  Ms. Hourihan had a conversation with her |
| 08:56 20 | to take it a day at a time, so I'm just telling counsel this, |
| 21 | just FYI. |
| 22 | Does either counsel need to be heard on that issue? |
| 23 | Mr. Markham? |
| 24 | MR. MARKHAM:  No, your Honor. |
| 25 | THE COURT:  Mr. Lopez? |

```
 1              MR. LOPEZ:  No, your Honor.

 2              THE COURT:  Juror No. 3, Ms. Warsing, raised with

 3      Ms. Hourihan that she remembered last night that her

 4      83-year-old uncle used to be a police officer.

 5              MR. MARKHAM:  I apologize, your Honor.  I can't hear

 6      you.

 7              THE COURT:  Can you hear me now?

 8              Can you hear me now?

 9              MR. MARKHAM:  Yes, your Honor.

10              THE COURT:  Ms. Warsing raised with Ms. Hourihan that

11      she remembered last night that her 83-year-old uncle used to be

12      a police officer.

13              Counsel, do you need to be heard on this issue?

14              MR. MARKHAM:  Not from the government, your Honor.

15              MR. LOPEZ:  No, your Honor.  I took that into

16      consideration.

17              THE COURT:  Okay.  That is just FYI.  Okay.

18              (End of discussion at sidebar.)

19              THE COURT:  We can come off of Whisper Tech.

20              It is my practice, as you might imagine, to limit

21      sidebars if we can at all avoid it, and we will do sidebars

22      using Whisper Tech but I do try to avoid it.

23              If an issue comes up, an objection comes up that we've

24      previously discussed, you can certainly reference our previous

25      discussions.  There may be some instances where if I think I
```

```
 1   need to hear you and I think we can push through -- have you
 2   push through through other topics so I can talk to you at a
 3   break, I'll try to do that as well.
 4           Ms. Hourihan --
 5           (Discussion off the record.)
 6           THE COURT:  I think -- counsel, I think we're still
 7   waiting on jurors.  I think it's always important, especially
 8   on the first day, to start as close to 9:00 as we can, but
 9   obviously they all need to be here.
10           Anything else I should take up or obviously I'll let
11   Mr. Lopez get back downstairs.
12           MR. MARKHAM:  No, your Honor, nothing from the
13   government.
14           THE COURT:  We can stand in recess.  But once you've
15   done that, Mr. Lopez, if everyone can stay close by because I
16   do want to start as soon as they're all here.
17           MR. LOPEZ:  Thank you, your Honor.
18           THE COURT:  Thank you.
19           THE CLERK:  All rise.
20           (Recess taken.)
21           THE CLERK:  All rise.
22           THE COURT:  Everyone can be seated.  We have all of
23   our jurors.  I know we're waiting for Mr. Lopez, so we won't
24   have them come in until he's back.
25           (Pause.)
```

1          (Discussion off the record.)

2          THE CLERK:  All rise for the jury.

3          (Jury entered the courtroom.)

4          THE CLERK:  Court is in session.  Please be seated.

5          THE COURT:  Good morning, jurors.

6          THE JURY:  Good morning.

7          THE COURT:  Seeing you all assembled, we'll get

8     started right away.

9          As I mentioned yesterday, I'm going to begin with some

09:06 10    preliminary jury instructions and then we'll move into openings

11    and then the government will begin to present its evidence to

12    you.

13          Jurors, I want to take a little time to talk to you

14    about your duties as jurors and give you some brief preliminary

15    instructions on the law that you are to follow.

16          At the end of the trial, I'll give you more complete

17    and more detailed instructions on the law.

18          The reason I give you some instructions now is to give

19    you some framework for considering the evidence you're about to

09:07 20    begin to hear.  I do not want you to think that these

21    preliminary instructions are the only ones that matter or that

22    they're somehow more important than the ones that come at the

23    end of the trial.  You must apply the instructions I give you

24    at the end of the trial as a whole.

25          It is your duty, jurors, to decide from the evidence

what the facts are.  You, and you alone, are the judges of the
facts.  You will hear the evidence, decide what the facts are,
and then apply the law that I give to you to those facts.  In
doing so, you must follow the law as I explain it to you
whether you agree with it or not.  You must decide this case on
the evidence before you and the law as I give it to you.

Sometimes jurors are curious about what I think,
whether I think, for example, a particular witness is
believable or how I think the case should come out.  My
opinion, if I have one, and I certainly don't have one at this
point, is not relevant.  It is your role, not mine, to decide
these issues.  You should not interpret anything I may say or
do during the course of the trial as indicating what I think
about a witness or what I think your verdict should be.

As I've said now a number of times to you yesterday,
this is a criminal case.  The defendant, Mr. Crater, has been
charged by the government with violations of federal law.  The
charges against Mr. Crater are contained in a document called
an indictment.  The indictment is simply a description of the
charges against him.  It is not evidence of anything.
Mr. Crater has pleaded not guilty to the charges in this case.

A defendant is presumed innocent.  The government must
prove his guilt beyond a reasonable doubt.  The defendant does
not have to prove his innocence.  He does not have to put on
any evidence.  He does not have to testify.  Those rights are

1    guaranteed by the United States Constitution.

2           At the end of the trial, you'll be asked to render a

3    verdict of guilty or not guilty.  Your verdict must be

4    unanimous; that is, you may convict the defendant only if every

5    one of you on the deliberating jury agrees that he is guilty

6    beyond a reasonable doubt.

7           Now, as I've indicated yesterday, Mr. Crater has been

8    charged with eight federal crimes, four counts of wire fraud,

9    which are Counts One through Four; three counts of unlawful

09:09 10   monetary transactions, Counts Five through Seven; and one count

11   of operating an unlicensed money transmitting business, Count

12   Eight.

13          To find the defendant, Mr. Crater, guilty on any

14   particular charge, the government must prove each element of

15   the charged offense beyond a reasonable doubt.  The Court will

16   now turn to the elements of each of these offenses.

17          As to each of the wire fraud charges, again, Counts

18   One through Four, the government must prove beyond a reasonable

19   doubt that there was a scheme to defraud or scheme to obtain

09:10 20   money or property through false or fraudulent pretenses, the

21   scheme to defraud involved the misrepresentation or concealment

22   of a material fact, or the scheme to obtain money or property

23   involved a false statement, assertion, half-truth or knowing

24   concealment of a material fact; that Mr. Crater knowingly and

25   willfully participated in this scheme with the intent to

defraud; and that Mr. Crater caused or should have reasonably foreseen an interstate wire communication to be used for the purpose of executing the scheme or otherwise in furtherance of the scheme.

As to each of the unlawful monetary transaction charges, again, Counts Five through Seven, the government must show beyond a reasonable doubt that Mr. Crater deposited, withdrew or exchanged funds over $10,000 in a financial institution affecting interstate commerce; that he knew the money came from some kind of criminal offense; the money was criminally derived from the wire fraud; and the wire fraud took place in the United States.

As to the unlicensed money transmitting business charge, again, Count Eight, the government must show beyond a reasonable doubt that Mr. Crater conducted, controlled, managed, supervised, directed or owned all or part of an unlicensed money transmitting business and that Mr. Crater did so knowingly.

Again, jurors, this is only a very preliminary outline. At the end of the trial, I'll give you final instructions on these matters, including definitions of important terms. Those instructions will govern your deliberations.

Now, you've heard me refer to the term "evidence" a number of times. I expect that the evidence in this case will

1    include the testimony of witnesses, documents and other items

2    received as exhibits, and any facts on which the parties have

3    agreed or stipulated.

4           There are rules that control what you may consider as

5    evidence.  When a lawyer asks a question or offers something as

6    evidence and the lawyer on the other side thinks it's not

7    permitted under the rules of evidence, that lawyer may object.

8    This simply means that the lawyer is requesting that I make a

9    decision about the application of a particular rule.

09:12 10          It may be on occasion necessary for me to discuss the

11   issue with the lawyers outside of your hearing, either by

12   having a conference on the Whisper Tech that you saw us use or

13   by calling a recess.  Please know that counsel and I will do

14   all that we can to keep these conferences to a minimum.  That's

15   one of the reasons that we meet early before you arrive and

16   also the reason we confer after you leave every day.

17          The purpose of these conferences is usually so I can

18   make a decision on the rules of evidence.  We're not trying to

19   keep things from you just to frustrate you.  It's just

09:13 20   sometimes important that we discuss these issue outside of your

21   earshot.

22          Jurors, certain things are not evidence.

23          Statements and arguments by the lawyers are not

24   evidence.  The lawyers are not witnesses.  Questions by lawyers

25   standing alone are not evidence.  Again, the lawyers are not

witnesses.  The question and the witness' answer taken together are evidence.

Objections are not evidence.  Lawyers have a duty to their respective clients to object when they believe something is improper under the rules of evidence.  If I sustain an objection, in other words, if I agree with the attorney objecting, you must ignore the question or exhibit and must not try to guess what the answer might have been or what the exhibit might have shown.

Anything I tell you to disregard is not evidence and must not be considered by you.

Anything you see or hear outside of this courtroom is not evidence.  You must decide this case based on what is presented in evidence here in open court.

Sometimes a particular piece of evidence may be received for a limited purpose only; that is, it can be considered by you only for a particular purpose and not for any other purpose.  I'll tell you when that occurs and instruct you on the purposes for which that particular item can or cannot be considered.

In deciding what the facts are, jurors, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe everything a witness says or only part of it or none of it.  It is entirely up to you.  I'll give you some suggestions at the end of the trial for you to

1    consider in assessing the credibility of all of the witnesses.

2         I'm now going to return to the rules and guidelines I

3    read to you before we took our recess for the day yesterday,

4    and, again, I want to reiterate these because these are all

5    important.

6         First of all, don't talk among yourselves about this

7    case or about anyone or anything involved with it until the end

8    of the case when you go to the jury room after all of the

9    evidence to decide your verdict.

09:15 10      You should feel free obviously to get to know each

11   other and talk, but on any topic but this case.

12        Second, don't make up your mind about what the verdict

13   should be until after you have gone to the jury room to decide

14   the case and you and the other jurors have discussed all of the

15   evidence.  Keep an open mind until then.

16        Third, don't talk to anyone else about this case or

17   about anyone who has anything to do with it, again, until the

18   end of the case and when I've discharged you as jurors.  Anyone

19   else, as I said yesterday, includes family members, co-workers,

09:16 20   your friends, anyone.  You may tell people that you've been

21   impaneled on a jury, but don't tell them anything about the

22   case until you've been discharged.

23        Do not mention or discuss this case in any electronic

24   form, as I said yesterday.

25        Don't let anyone talk to you about this case or about

anyone or anything who has anything to do with it.  If someone should try to talk to you, again, please let Ms. Hourihan know or one of the court security officers so it can be brought to my attention.

During the trial, don't speak with any of the parties, the attorneys or the witnesses.  It's important not only that you do justice but you avoid the appearance of partiality.  If someone saw you talking to someone else, they might question your ability to be fair and impartial, so just don't do that.

Don't read any news reports or articles or listen or watch anything related to this case.  Again, as I said yesterday, don't do any outside research.  That includes not doing any Google searches or internet searches or conduct any research of any kind regarding the subject matter of this case, the charges, the parties or the law.

Finally, as I mentioned yesterday, if during the course of the trial you can't hear, you can't see a witness, please let us know and we'll try to remedy the situation.

As I noted before, we always take a break around 11:00.  There will be snacks upstairs for you, you'll be able to take bathroom breaks then, but if there's another occasion when that's necessary, let us know.

Please keep all of these rules in mind.  They're very important to this process.

As I see, you all have notebooks and pens.  You

1    certainly may take notes if you choose to do so during the

2    course of this trial.  If you haven't done so yet, you should

3    put your juror seat number on the front of the notebook.  That

4    will be your notebook for the duration of this trial.

5          Obviously, it's your choice whether or not you take

6    notes.  I want to give you a few things to consider in making

7    that decision.  First and foremost, you're not required to take

8    any notes and you may choose not to do so.  It's a personal

9    preference and choice.  If you do decide to take notes, do not

09:18 10   allow your note-taking to distract you from listening carefully

11   to the testimony that's being presented to you.  It's important

12   that you observe and listen to the witnesses.  If you'd prefer

13   not to take any notes at all and just simply to listen, please

14   feel free to do that.

15          Please also remember that not everything you write

16   down is necessarily what was said.  Thus, when you return to

17   the jury room at the end of this case to begin your

18   deliberations, do not assume simply because something appears

19   in somebody's notes that it necessarily took place in court.

09:19 20   Notes are an aid to recollection, nothing more.  The fact that

21   it's written down doesn't mean that it's necessarily accurate.

22   It's your collective memory as the jury of the evidence that

23   governs during your deliberations.

24          During your recesses, just leave your notebooks on

25   your chair.  You can't take your notebooks home or upstairs

1    until the end when you begin your deliberations.

2         Ms. Hourihan will collect the notebooks at the end of

3    each day and return them to your seats before you return in the

4    morning.  No one will look at your notes.  That, again, will be

5    your notebook for the duration of this trial.

6         When this case is over, your notes will be destroyed.

7         All of these steps are in line with my earlier

8    instruction that it's important that you not discuss this case

9    with anyone or permit anyone to discuss it with you.

09:19  10        As you may have noticed at this point, we have a court

11   reporter, Ms. Joyce, who's creating a record of everything that

12   is said during the course of this trial.  Sometimes jurors

13   think that they'll be able to get a transcript of the trial for

14   the purposes of their deliberations at the end of the case.

15   Please know that is not true.  You will not be given a

16   transcript.

17        Since you will not have a transcript, you should

18   listen very carefully to the testimony and take whatever notes

19   you think may be necessary to help you remember the testimony.

09:20  20        Just to give you the sequence of what's going to

21   happen, as I said, the next step is that you'll hear opening

22   statements from the attorneys on either side.  The government

23   in its opening statement will tell you about the evidence it

24   intends to put before you so you will have an idea of what the

25   government's case is going to be.  The opening statement is not

1    evidence.  Its purpose is only to help you understand what the

2    evidence will be and what the government will try to prove.

3            After the government's opening statement, Mr. Crater's

4    attorney may, if he chooses to, make an opening statement as

5    well.  The defendant's opening statement is no more evidence

6    than the government's opening statement.  At this point in the

7    trial, no evidence has been offered.

8            Next the government will offer evidence that it says

9    will support the charges against the defendant, Mr. Crater.

09:21 10   The government's evidence in this case, as I said, will be the

11   testimony of witnesses, documents, and other exhibits and any

12   stipulations.

13           After the government's evidence, the defendant's

14   attorney may present evidence on the defendant's behalf, but he

15   is not required to do so.  I remind you that the defendant is

16   presumed innocent and the government must prove his guilt

17   beyond a reasonable doubt.  The defendant does not have to

18   prove his innocence and need not put on any evidence.

19           After you've heard all of the evidence, the government

09:21 20   and the defense will each be given an opportunity to present

21   closing arguments.  As I said, opening statements weren't

22   evidence, that's also true with closing arguments.  Those are

23   also not evidence.

24           In their closings, the lawyers for the parties will

25   attempt to summarize and help you understand the evidence that

1    was presented.

2         The final part of the trial occurs when I instruct you

3    about the rules of law that you are to apply in reaching your

4    verdict.  After hearing my instructions, you'll leave the

5    courtroom together to begin your deliberations and make your

6    decision.  Your deliberations will be secret among you.

7         As I indicated, our normal trial day is 9:00 to 4:00,

8    although, as I told you yesterday, today will just be 9:00 to

9    1:00.  We will take a break at 11:00 today, and on those days

09:22 10   we go to 4:00, we'll take a lunch break usually from 1:00 to

11   2:00.

12        Once you get this case for your deliberations, the

13   trial day will be 9:00 to 5:00.  I obviously will keep you

14   updated on when I think you'll get this case for your

15   deliberations.

16        And again, jurors, keep in mind we've done a fair

17   amount in collaboration with the attorneys from both sides to

18   make sure that things work efficiently.  There may be occasions

19   when I need to speak with the attorneys outside of your

09:23 20   hearing, and I'll certainly keep you informed about the

21   schedule as we move along.

22        With all of that said, we're now going to move to

23   opening statements, and the government, who bears the burden of

24   proof, will go first.

25        Mr. Markham.

 1          MR. MARKHAM:  Thank you, your Honor.

 2          THE COURT:  Let me just advise the jurors in the back

 3     row, every other seat there's a little case between you.  If

 4     you open that up, there's screens in there.  Why don't you pull

 5     those out.  These will be used to display the presentation I

 6     think each attorney is going to make during their openings and

 7     then also for the documents that will be presented during

 8     evidence.

 9          Can everyone see a screen?

09:24 10          It looks like it.

 11          Counsel.

 12          MR. MARKHAM:  Between 2014 and 2017, the defendant,

 13     his name is Randall Crater, and he's sitting right there, he

 14     told lies about his business in order to get money.

 15          You will hear that the defendant's business was called

 16     My Big Coin.  And the defendant told the world that My Big Coin

 17     was selling a cryptocurrency.  He claimed that that

 18     cryptocurrency was backed by $300 million in gold.  And he

 19     claimed that My Big Coin had partnerships with well-known

09:25 20     companies like MasterCard.

 21          Based on those claims, the defendant received millions

 22     of dollars from investors and from customers.  What those

 23     investors and the customers did not know was the truth.  There

 24     was no My Big Coin cryptocurrency.  There was no $300 million

 25     in gold.  And there was no business partnership with

1    MasterCard.

2          People lost their money based on claims that the

3    defendant made and that he knew were not true.  That's a crime.

4    It's called fraud, and it's why we're here.

5          Good morning.  My name is Chris Markham, and as you've

6    heard, I'm a federal prosecutor here in Massachusetts.

7          Sitting at counsel table with me is my colleague, Siji

8    Moore, he's also a federal prosecutor, as well as two

9    paralegals assigned to the case, Mr. Barbosa and

09:26 10    Ms. Badalament.

11          Together we represent the United States, and our job

12    is to demonstrate to you, the jury, that the defendant did what

13    he's charged with:  Lying to investors and customers in order

14    to pocket millions of dollars.

15          As I just mentioned, the defendant's business, My Big

16    Coin, claimed to be selling something called a cryptocurrency.

17    And during this trial, you are going to hear a lot about

18    cryptocurrency, which is a relatively new form of money that

19    exists only on the internet.

09:27 20          Some of you are probably familiar with cryptocurrency

21    and others are not.  So for those who are not familiar with

22    cryptocurrency, I'll set the stage a little bit.

23          So when it comes to money, most of us use this, the

24    U.S. dollar, and we buy things with it every day.  Dollars are

25    a form of physical currency that are created and backed by the

1    U.S. government.  And just like the U.S. dollar, other

2    countries have their own physical government-backed currency as

3    well.  And for as long as we've all been alive, these

4    government-backed physical currencies have been the primary way

5    that people buy things.

6           Then in the 1990s, with the rise of the internet,

7    people started to create something called virtual currency.

8    Virtual currencies were not created or backed by any government

9    and they were not physically available.  They were only

09:28  10  available online.  In those early days, most virtual currencies

11   didn't have any value because people didn't trust them and

12   people didn't want to use them.  But then, around 2009, a new

13   form of virtual currency started to become popular.  It was

14   called cryptocurrency.  Now, like other virtual currencies from

15   back in the 1990s, cryptocurrency was only available online and

16   was not created or backed by any government.  But unlike those

17   previous virtual currencies, cryptocurrency became incredibly

18   valuable.  The reason cryptocurrency became so valuable was

19   that it had key characteristics that those previous virtual

09:28  20  currencies did not have.

21          For example, cryptocurrency allows for transactions

22   between parties to be secured with something called

23   cryptography.  Now, cryptography is a series of very complex

24   mathematical equations, and that's where that name "crypto" in

25   cryptocurrency comes from, that word "cryptography."  So when

1    people transfer cryptocurrency from one person to another,

2    those very complex mathematical equations make sure that

3    transaction is secure.  It can't be hacked.

4          Another key characteristic of cryptocurrency that made

5    it very different from those earlier virtual currencies was

6    that transactions were traceable through something called a

7    blockchain.  Now, a blockchain is a record stored online of

8    every transaction made using that cryptocurrency.  So it's like

9    having a public ledger where you can trace the ownership of the

09:29 10   cryptocurrency from the first person who ever had it all the

11   way to the person who currently owns it, and you can see every

12   transaction in between.

13          So it was with these two innovations, transactions

14   secured through cryptography and transactions traceable through

15   the blockchain, that cryptocurrency became incredibly valuable.

16   People began to have confidence in it and use it more.

17          Now, back in 2010, the most well-known cryptocurrency

18   was something called Bitcoin, and I imagine many of you have

19   heard of it by now.

09:30 20          In 2010, if you wanted to buy a single Bitcoin, it

21   would have cost you less than a penny.  But by 2011, one

22   Bitcoin cost more than a dollar.  By 2012, more than $10.  And

23   by 2013, a single Bitcoin cost more than $100.  So what does

24   that mean?  If you bought $1 in Bitcoin in 2010, by 2013 you'd

25   have over $10,000.  The gains were incredible, and it was in

1    this context that Randall Crater entered the picture.

2          In 2013, as all this money was being invested in

3    Bitcoin and people were making great fortunes, the defendant

4    started marketing his own currency.  He called it My Big Coin.

5    And as you will hear, the defendant told the world that My Big

6    Coin would be the next big cryptocurrency.  And he brought in

7    other people to help him aggressively advertise it.

8          My Big Coin had a website, it had a Twitter account,

9    it had a Facebook page, and they even released a YouTube video.

09:31 10    In all these ways the defendant and the people he paid told

11    investors and customers a whole series of falsehoods.

12          The defendant claimed that My Big Coin was selling a

13    cryptocurrency and that it could be used to transfer money to

14    anyone anywhere in seconds.  He claimed that its value was safe

15    because it was backed by gold.  And he claimed that My Big Coin

16    had a partnership with MasterCard so that you could use your My

17    Big Coin MasterCard to go buy things in the real world with

18    your My Big Coin currency.

19          And the defendant also operated what he called the My

09:32 20    Big Coin Exchange, and he told people they could buy and sell

21    their My Big Coin cryptocurrency on that exchange.

22          You will see all the different ways the defendant was

23    spreading these falsehoods.  He talked to investors and

24    customers in person, on the phone, in text messages and in

25    emails.

          1         For example, you will see this email.  It's from the

          2    defendant and it's to a man named John Lynch.  You're going to

          3    hear from him later this morning.  And he not only invested a

          4    lot of his own money, but he told other people to invest as

          5    well.

          6         And the defendant tells John Lynch, We have $300

          7    million in gold backing us.

          8         You will also see the defendant promoting My Big Coin

          9    on his own social media pages.

09:33    10         For example, this is the defendant's LinkedIn page.

         11    And he describes himself as the creator and developer of My Big

         12    Coin.  He provides links to the My Big Coin website, its

         13    Twitter page and its Facebook page, and he announces, We are

         14    the only cryptocurrency to be backed by gold, exclamation

         15    point.  We are partners with MasterCard.

         16         You will also see the defendant repeating these same

         17    messages on his Twitter page.  Like here, where he posts an

         18    advertisement for the My Big Coin Exchange.  And the defendant

         19    claimed that My Big Coin is the first cryptocurrency to be

09:33    20    backed by gold, partners with MasterCard, and that you could

         21    transfer money in seconds anywhere in the world.

         22         All of those false claims about My Big Coin on the

         23    website, over social media, through the emails, the texts and

         24    the phone calls, you will hear that they tricked a lot of

         25    people into sending the defendant their money.

1          Between 2014 and 2016, the defendant received millions

2     of dollars from My Big Coin.  Now, some of that money came from

3     investors who wanted to own a piece of the My Big Coin company,

4     and others, other money came from customers who wanted to own

5     the My Big Coin currency so they could buy things with it or

6     watch its value rise.

7          And you will see the bank records showing that all

8     that money from the investors and the customers, it went to the

9     defendant, either to bank accounts in his name or sent to bank

09:34 10   accounts of his family members, like his mother, his sister,

11    and his wife.

12         But in the end, the customers who bought My Big Coin

13    currency, they couldn't buy anything with it, and the investors

14    couldn't get their money back.

15         The defendant had already spent most of that

16    investment money on personal items, like cars and jewelry.  And

17    the gold backing that was going to make all this secure was a

18    hoax.

19         As you will hear, My Big Coin did not have $300

09:35 20   million in gold, and it never did.  That's why the investors

21    didn't get their money back.  My Big Coin also did not have a

22    business partnership with MasterCard, and it did never, and

23    that's why none of the My Big Coin customers could ever buy

24    anything with their My Big Coin currency.

25         And for all those years the defendant was making these

claims, My Big Coin was not even a real cryptocurrency.  There
was no cryptography securing the transactions.  There was no
blockchain that was tracing the transactions.  And there was no
way to transfer money in seconds anywhere in the world,
quote-unquote, as the defendant claimed.

In reality, My Big Coin was just another virtual
currency, like those ones from back in the 1990s, and it was
basically worthless.

So around 2017, the federal government began
investigating My Big Coin for fraud, and you will see that at
that point the defendant starts scrambling to cover his tracks.
You will hear that it was only then for the first time, in June
of 2017, nearly four years after the defendant started telling
people he already had a cryptocurrency, that some version of
the My Big Coin cryptocurrency was actually created.  Despite
the fact that he said he was trading nearly four years earlier,
it didn't exist until 2017.

And you will learn that for all those years the
defendant was selling something that he didn't really have,
none of the My Big Coin money was ever reported to the IRS,
over $6 million.  And while My Big Coin claimed to be offered a
legitimate virtual currency exchange, he never registered the
exchange with the U.S. Treasury Department, which was a legal
requirement.  And that leads us here to the defendant's trial.

So how is the government going to prove all this to

1  you?

2         Well, first, you will hear from several people who

3  invested money in My Big Coin or who bought its currency

4  because they thought it was a cryptocurrency backed by gold and

5  partnered with MasterCard.  And you will see various records

6  like bank statements, the defendant's emails, and all of that

7  social media.  And these records will show that the defendant

8  created and operated both My Big Coin and the My Big Coin

9  Exchange.  And that the defendant brought in other people to

10  help him run that company.  You'll see emails with some early

11  business partners, and you'll see emails with people the

12  defendant paid to promote My Big Coin.

13         But as the evidence will make clear, this is not a

14  case about an aspiring business start-up that just didn't quite

15  make it.  And this is not a case about prosecuting a legitimate

16  cryptocurrency company.  This is a case about fraud.

17         You will see that the defendant told people he was

18  selling a cryptocurrency, but then you will hear from a

19  cryptocurrency expert who did an investigation of the My Big

20  Coin currency, and she will tell you that from 2014 through

21  2016, the My Big Coin cryptocurrency didn't even exist.

22         The defendant also told people that My Big Coin had

23  that partnership with MasterCard.  So you can use that

24  MasterCard to go buy things in the real world.  But then you're

25  going to hear from a representative from MasterCard who will

1    tell you MasterCard never had a partnership with My Big Coin.

2    That didn't exist either.

3            And the defendant told people that he had $300 million

4    in gold that would make their investment safe.  He even claimed

5    that $100 million of that gold was in his name in a bank in

6    Spain.  But, once again, you will see through the bank records

7    and the emails that all of that was made up.  While the

8    defendant had some early conversations with business partners

9    about gold backing, he never actually confirmed it existed

09:39 10    before he started making all those gold claims.

11            And then, when the gold backing never came through, he

12    never told his investors that.  He just kept taking their

13    money, and you will see him working to cover his tracks.

14            By 2017, when investors starting pushing to get their

15    money back, the defendant came up with all new lies.  He

16    claimed that money was on its way, but it was just taking a

17    long time because the money was coming from Europe.  He then

18    claimed that he was at an undisclosed location in Colorado

19    counting cash and waiting for an armored car service.

09:40 20            And then he claimed that My Big Coin was now working

21    with the NFL, the National Football League.  All of that was

22    made up.

23            And as for the My Big Coin Exchange, you will see U.S.

24    Treasury Department records showing that he never even

25    registered it, which he was required to do.

1          And you will hear from a witness from the treasury

2    department who will tell you why these registration

3    requirements exist.  It's to combat crimes, like fraud and

4    unlawful monetary transactions, the exact crimes the defendant

5    is charged with.

6          So now let's discuss those charges.

7          First, in Counts One through Four, as the Judge just

8    instructed you, the defendant is charged with wire fraud.

9    That's simply a form of fraud that uses interstate wires, like

09:40 10   a wire transfer from a bank or an email.  And as you'll see,

11   that's what happened here.  There was a fraud, the defendant

12   used emails to get false statements out, and he used wire

13   transfers to get money.

14         Next, in Counts Five through Seven, the defendant is

15   charged with unlawful monetary transactions.  The law prohibits

16   transfers of more than $10,000 obtained from criminal activity,

17   like fraud.

18         And in this case, the evidence will show that on

19   multiple occasions the defendant transferred way more than

09:41 20   $10,000 that he obtained through his fraud scheme that was My

21   Big Coin.

22         And lastly, Count Eight, the defendant is charged with

23   operating an unlicensed money transmitting business.  And the

24   evidence will show that the defendant violated this law by

25   operating the My Big Coin currency exchange without ever

1  registering it with the U.S. Treasury Department, as he's

2  required to do.

3        Those are the charges, and very soon you'll begin to

4  hear the evidence.

5        The government is going to ask you to focus on the

6  defendant's words and the defendant's actions, the lies and

7  half-truths that he told and caused other people to tell, all

8  the money he got from those falsehoods, and his failure to

9  comply with the reporting and registration requirements of the

09:42 10  federal government.

11        And after you've heard all of that evidence, the

12  government will come back to you and ask you to return the only

13  verdict that is consistent with both the evidence you've seen

14  and the law as the Judge will instruct you, that the defendant

15  is guilty of the crimes charged beyond a reasonable doubt.

16        Thank you.

17        THE COURT:  Thank you.

18        Mr. Lopez.

19        MR. LOPEZ:  Thank you, your Honor.

09:43 20        (Discussion off the record.)

21        MR. LOPEZ:  If everything that the government just

22  said was true, we wouldn't be here.

23        Ladies and gentlemen of the jury, it's my honor to

24  stand beside Randall Crater at this important time in his life.

25        Randall, will you please stand.

1          Randall Crater is 51 years old.  He's been married to

2    Erica Crater for 19 years.  He has had two young men, ages 14

3    and 17, and one young woman, age 15.

4          Randall did not graduate from high school, but he did

5    obtain his GED.  He did not go to college, and yet, he started

6    a successful software company called Greyshore Technologies

7    that has created software for the gaming and gambling

8    industries.

9          Randall is an idea guy.  He thinks up new ideas or new

09:44 10   applications of old ideas and then works very hard to bring

11   them to fruition.  He's an entrepreneur, he's a businessman,

12   and he's a deal maker.

13         Now, the Court has already told you that Randall is

14   presumed innocent and doesn't have to present any evidence in

15   this case.  He has no burden of proof.  The burden of proof

16   never shifts from the government to him.

17         And the government has told you what it hopes to prove

18   in this case.  However, the government's opening is not

19   evidence.  The government's opening is merely the government's

09:44 20   theory of the case.  And if the government doesn't prove the

21   facts that it hopes to prove, the presumption of innocence

22   requires you to find Randall not guilty.  That is the oath you

23   took freely and voluntarily.

24         Now, ladies and gentlemen of the jury, you are going

25   to be the finders of fact in this case.  You and only you get

          1    to decide what the facts are.  That's your solemn
          2    responsibility, and it's an awesome responsibility.  It is why
          3    Randall Crater has a constitutional right to a jury trial.  So
          4    it's very important that you keep an open mind until you've
          5    heard all the evidence and before you decide what the facts
          6    are, before you decide what the truth is in this case.
          7         Ladies and gentlemen, simply put, this case is about
          8    Randall Crater working very hard to start a new business, a
          9    cryptocurrency business.
09:45    10         The evidence will show that starting a new business is
         11    not a crime, asking others to participate in a new business
         12    venture is not a crime, asking others to invest in a new
         13    business venture is not a crime.  New businesses are started in
         14    this country every day.  Indeed, few things are more American
         15    than starting a new business.
         16         The evidence will also show that trying to start a new
         17    business comes with risks.  Asking others to participate in a
         18    new start-up business with no track record comes with risks.
         19         Now, the evidence will show, if the witnesses are
09:46    20    truthful, that they knew these risks and they assumed these
         21    risks in the hopes that they would have a handsome return on
         22    their investment, in the hope that they would make money in
         23    this new business.
         24         The evidence will show that Randall's motive was not
         25    to make money for himself, but to make money for others, and he

1    worked very hard to make this goal a reality.

2         The evidence will show that the witnesses you will

3    hear from knew they were investing in a new business and they

4    knew they could lose their money.  And the evidence will show

5    that they took that risk with full knowledge.  They took that

6    risk because they wanted to make money.

7         Now, the evidence will show that witnesses you hear

8    from participated in Bitcoin in one of three ways.  They either

9    purchased My Big Coin coins or they purchased stock in My Big

09:47 10   Coin or they did both.

11        Now, initially the witnesses purchased only My Big

12   Coin coins, but eventually a decision was made to take the

13   company public, and at that point some of the witnesses were

14   given the opportunity to purchase stock in the company that was

15   going to be part of the IPO, or in this case, an ICO, an

16   initial coin offering.

17        Now, to find Mr. Crater guilty beyond a reasonable

18   doubt of wire fraud, number one, you have to find that there

19   was in fact a scheme to defraud; two, that the scheme was to

09:47 20   obtain money or property by means of false statements,

21   half-truths or the knowing concealment of material facts; and

22   three, that Mr. Crater knowingly and willfully participated in

23   the scheme with the specific intent to defraud others.

24        Now, the government must prove these facts beyond a

25   reasonable doubt.

1         Now, during the course of this trial, you're going to

2    hear the statements that the government has cherry-picked and

3    selected to allege that they were false or made with

4    half-truths and that people purchased coin as a result.

5         And some of these statements was that Big Coin was a

6    functioning cryptocurrency, that it could be traded in exchange

7    for other currencies, that it could be exchanged for goods and

8    services, and that the value was actually based on the trading

9    of coins.

09:48  10         According to the government, these statements were

11   allegedly false when made.  But notice that each one of these

12   facts as a statement or half-truth are positive facts.

13        For example, the coins were backed by gold is a

14   positive fact.  I point this out because to prove that the fact

15   was untrue when made, maybe not later on, but when made, the

16   government must prove a negative fact, that the coins were not

17   backed by gold.  The government must also prove that Randall

18   Crater knew at the time the statement was made that it wasn't

19   backed by gold.  And finally, the government must prove both of

09:49  20   these facts, that there was no gold and that Randall knew it

21   beyond a reasonable doubt.  Otherwise, the presumption of

22   innocence requires you to find him not guilty.

23        And the same analysis applies to all the other

24   positive facts the government has alleged.

25        Now, as you listen to the evidence in this case, pay

close attention to when Randall Crater made the statement and
what type of statement it was.  Was it a statement of fact or
was it a forward-looking statement?

Now, a forward-looking statement, the evidence will
show, is a statement that says, in essence, this is what we
plan to do, as opposed to this is what now exists.

The evidence will show that many of the statements
made when My Big Coin was started were actually forward-looking
statements that had not yet come to fruition, and the people
that bought coins knew it.

Now, the reason I want you to pay close attention to
when the statement was made and what kind of statement was made
is because the government must prove that the statement was
material to the listener's decision to purchase coins or stock.
This is important because telling someone that we are planning
to do something is not the same as telling someone this is what
we have.

As you listen to the evidence, I want you to also pay
particular attention to Randall Crater's good faith belief.
This is very important because the Court has told you that you
must presume that Randall Crater is innocent unless and until
the government proves beyond a reasonable doubt that he's not.
So Randall Crater's good faith belief about My Big Coin is at
the heart of this case.

The government will attempt to prove that My Big Coin

was a scheme to defraud by having its witnesses say they would
not have purchased coin if they knew this or they knew that.
But the evidence will show that My Big Coin was a start-up
company that was intended to make people who purchased coins or
shares in the company a substantial profit.  The plan was to
make money.

More importantly, the evidence will show that the
early purchasers of coin were interested in one thing and one
thing only:  Buying coins at a low price in the hopes that they
would later sell coins at a higher price, and, thus, a
substantial profit.

The government raises the point of Bitcoin.  Well,
Bitcoin not so long ago was at $20,000 -- strike that --
$40,000 a coin and then it precipitously fell to $20,000 a coin
in a day.  So cryptocurrencies are risky.  Everyone knew that.

The evidence will show that reasonable people knew
that buying a virtual currency was extremely risky from the
outset, and that fact -- and the fact that that risky bet did
not pan out is not a crime.

Now, to understand what happened in this case, I'm
going to ask you to metaphorically join me in my time machine
and take you back to 2013.

In 2013, Bitcoin, which was the first cryptocurrency,
was only four years old.  There are more than a thousand
cryptocurrencies today.  In this case, you'll learn what a

1    cryptocurrency is.  The evidence will show that a

2    cryptocurrency is a peer-to-peer digital currency system.  It

3    is based on a decentralized network called a blockchain.

4         The decentralized nature of the network makes

5    cryptocurrency transactions free of the fees and regulations

6    placed on transactions by traditional institutions such as

7    banks and credit cards.  The evidence will show that

8    cryptocurrency transactions can't be traced or understood by

9    anyone besides the parties involved, the transaction

10   information can't be altered in any way, and the sender and

11   receiver can easily confirm the transaction between one

12   another.

13        That is why, the evidence will show, that

14   cryptocurrencies have also been described as a trustless

15   system.  The parties in each transaction do not have to trust

16   each other because the transaction or the addition to the

17   blockchain can't be altered in any way once it's added to the

18   blockchain.

19        Now, the evidence will show that cryptocurrencies have

20   no inherent value.  Inherent value is that value integral to

21   something's being.  Inherent value doesn't change and cannot be

22   taken away.

23        Cryptocurrencies do not have value simply because they

24   exist.  However, the evidence will show that cryptocurrencies

25   can have intrinsic value.  Intrinsic value is the measure of

what an asset is worth.  In the case of Bitcoin's coins, the
intrinsic value of the coins was determined by the trading
market price for the coins, just like the value of a house is
determined by what a willing buyer is willing to pay for it.
What a willing buyer would be willing to pay for coins and what
a seller would be willing to sell, to sell his coins is what
the market is.

Now, to understand what happened in this case, you
also have to keep in mind the state of the medical and
recreational marijuana industries in 2013.

The evidence will show that during the late 1990s and
early 2000s, up to about 2012, many states in the United States
decriminalized marijuana and legalized medical marijuana.
Beginning in 2012, states started to legalize recreational
marijuana.  However, because the United States government has
not decriminalized marijuana, the medical or recreational use
of marijuana is still illegal under federal law.

So in 2013, banks would not provide financing for new
marijuana businesses, and in some cases not even allow these
businesses to utilize traditional banking services such as bank
accounts or checking accounts because they were afraid that
they would be charged with money laundering.

That's still the case today, by the way.

Now, turning to this case with that background, the
evidence will show that in December 2013, Randall Crater was

1    approached by an individual by the name of John Roche with the

2    idea of starting a new cryptocurrency business.  Randall

3    immediately recognized the potential that a cryptocurrency

4    could have in the medical and recreational marijuana industry.

5    A cryptocurrency could solve the banking challenges in the

6    medical and recreational marijuana industries by allowing

7    buyers and sellers to purchase and sell marijuana

8    confidentially with cryptocurrency.  Better yet, the buyers and

9    sellers didn't even have to trust each other.  The new idea

09:56 10    resulted in the launch of a start-up called My Big Coin.

11          Now, the evidence will show that from the beginning,

12    the idea was to distinguish My Big Coin from other

13    cryptocurrencies and in particular Bitcoin.

14          Since a cryptocurrency has no inherent value, the gold

15    idea, which the evidence will show was not Randall's idea, was

16    to have the market value of My Big Coins backed by a commodity

17    like gold, just like the dollar used to be backed by gold in

18    Fort Knox using the gold standard, that was kind of the idea.

19          Because the plan was to use the coins in the medical

09:57 20    and recreational marijuana industries, the plan was to make the

21    coins liquid so that the owners could use their coins to

22    purchase goods and services.  The liquidity idea was to use a

23    loadable credit card that a seller of coins could load with the

24    profits from the sale of his or her coins to a willing buyer,

25    and then the profits could be used to purchase goods and

services.  And with respect to the medical and recreational

marijuana businesses, the plan was to replace traditional

banking services with My Big Coin coins.

The plan, the evidence will show, was to make My Big

Coin transactions fully transparent and trustless by using

blockchain technology.

Finally, once My Big Coin was a fully functioning

public cryptocurrency, the plan was to take the company public

in an initial coin offering, which, like an initial public

offering, would allow the public to buy shares in the company

and hopefully, hopefully result in substantial profits to the

early owners of the coins and the My Big Coin shareholders.

Now, the evidence will show that this was the plan.

But, like any start-up, the evidence will show that when My Big

Coin launched in 2014, although the plan was in place, time was

needed to implement the plan.  And like many start-ups, My Big

Coin had its ups and downs.  However, the evidence will show

that the early purchasers of coin and early purchasers of stock

were aware of these risks and purchased coin anyway.

Ultimately, the evidence will show that the plan did

not come to fruition for reasons entirely out of Randall

Crater's control, and the government has alluded to it, the

government's interference with this new start-up.

However, failing to launch a successful start-up,

particularly in the volatile world of cryptocurrency, the

1    evidence will show is not a crime.

2         So as you listen to the evidence in this case, I'm

3    asking you to think about Randall Crater's state of mind.  Ask

4    yourselves:  Did he have a good state of mind?  Was he acting

5    in good faith?  Was he really trying to make himself and others

6    rich?  Or did he have a specific intent to defraud others?

7         When you listen to the statements, you may ask

8    yourself did he believe them to be true at the time he made

9    them or did he know they were false when made?

09:59 10        And by the way, Randall Crater doesn't have to prove

11   his good faith.  Randall Crater has no burden of proof in this

12   case.  He doesn't have to prove he's innocent.  It's the

13   government's burden, and the burden never shifts to Mr. Crater,

14   to prove beyond a reasonable doubt that he acted with the

15   specific intent to defraud purchasers of coin.

16        Now, the government in its opening told you a lot

17   about Randall Crater's spending habits, but the evidence will

18   show that Randall Crater earned the money by selling his coin

19   to willing buyers.

10:00 20        Randall Crater did not make anyone buy his coins, he

21   didn't twist anybody's arm.

22        The evidence will show that Randall Crater actually

23   had a license with My Big Coin to provide the blockchain

24   technology to the company, and in payment for those services,

25   he received coins and shares from My Big Coin.

1          So he was hired by My Big Coin to provide the

2    technology.

3          Now, you may be asking but he didn't go to college.

4    But he hired someone who was a -- who was proficient in

5    building blockchain technology, and you're going to hear about

6    that.

7          Now, the evidence will show that Randall Crater sold

8    his coins to various individuals, some of the witnesses you'll

9    hear from in this case.

10:00 10          The evidence will show that those transactions were

11    arms-length transactions, and that they were at a price that

12    the buyer was willing to pay at that point in time.

13          Now, the evidence will show that there was one

14    witness, a lawyer by the name of John Lynch, that was the

15    largest purchaser of My Big Coins from Randall Crater.  The

16    evidence will show that Attorney Lynch bought coins for himself

17    and others, his family, his friends, his staff, and he

18    solicited his business partners and others to purchase coin.

19          The evidence will show that Attorney Lynch also

10:01 20    purchased an interest an in four marijuana licenses in which

21    Randall Crater held an interest, as well as an interest in a

22    marijuana business named Trokie.

23          The evidence will show that Attorney Lynch was and is

24    a sophisticated investor.

25          The evidence will show that in 2017, Attorney Lynch

1    decided he did not want to be involved in the marijuana

2    business any longer, shortly after he was contacted by the

3    government authorities in this case, and he requested that his

4    $3.7 million investment be repaid to him by Randall Crater in

5    coins.

6            The evidence will show that Randall Crater

7    accommodated Attorney Lynch's request and reimbursed his entire

8    marijuana investment in My Big Coins.

9            THE COURT:  Two minutes, Mr. Lopez.

10:02 10          MR. LOPEZ:  The evidence will also show that Randall

11   Crater also reimbursed other purchasers of coin when they

12   requested to be bought out.

13           Now, as you listen to the evidence in this case, you

14   must bear in mind there are actually two sides to every story.

15   Because the government has brought this case, they get to call

16   who they want first and ask questions, and I don't get to ask

17   questions until later.  It's called the process of cross-

18   examination.

19           I ask you to wait with every witness until after I've

10:02 20   cross-examined them before forming any impressions about their

21   credibility, because you're going to find that much of what the

22   witnesses tell you actually supports Randall Crater.

23           So as with every witness -- as with every witness,

24   just as if the witnesses were salespeople who knocked on your

25   door, you must ask yourself:  Is the person credible or does he

1    have something to gain?

2          Now, you're also going to hear from witnesses who work

3    for the U.S. government, the FBI, the IRS, the U.S. Treasury,

4    the U.S. Postal Service.  They're all employees of the United

5    States government, which is also prosecuting Randall Crater.

6          Some of the witnesses you will hear from have a clear

7    financial incentive to testify in a certain manner.

8          Now, with respect to the money laundering charges, the

9    evidence will not show that Randall Crater knew that the money

10   he received in exchange for his coins was criminally derived.

11   Rather, the evidence will show that the money came from a

12   series of legal arms-length transactions.

13         With respect to the unlicensed money transmitting

14   business, the evidence will show that My Big Coin did not

15   provide any money transmission services.  The evidence will not

16   show that My Big Coin was transferring funds from one location

17   to another, like Venmo or Apple Pay or Google Pay or Western

18   Union.  The evidence will show that My Big Coin did not touch

19   any money or currency, real or virtual.

20         Now, during the course of this trial, you're going to

21   hear that Randall Crater wasn't perfect.  You're going to learn

22   that he didn't file tax returns for a number of years.  Keep in

23   mind he has not been charged with a tax crime here, and the

24   government's only going to show that he didn't file taxes.

25   They can't show that he owed taxes because they don't know how

1    much he actually expended on My Big Coin.

2         Now, during the course of the trial you'll also find

3    out that he bought a number of big-ticket items.  There's

4    nothing illegal about buying stuff with money you've lawfully

5    earned.

6         At the conclusion of this trial, I'm going to ask you

7    to do what no one else has done for Randall Crater.  I'm going

8    to ask you to save him from the government in this case.  I'm

9    going to ask you to apply the rights guaranteed to him by our

10:04 10   Constitution to protect him.  I'm going to ask you to see the

11   other side of the story here.  And if you do, you're going to,

12   ladies and gentlemen, you're going to find him not guilty.

13        The truth in this case is much more complicated than

14   the simple summary that the government has put before you.

15   Listen to all the facts and decide what actually the truth is,

16   and I know at the end of this case you're going to do justice

17   by finding Randall Crater not guilty.

18        Thank you.

19        THE COURT:  Thank you.

10:05 20   Counsel, you can move the podium.

21        Counsel, you can call your first witness.

22        MR. MOORE:  At this time, your Honor, the United

23   States would like to call John Lynch.

24        THE COURT:  He may be called.

25        JOHN LYNCH, having been duly sworn by the Clerk, was

1  examined and testified as follows:

2          THE CLERK:  Thank you.  Please be seated.

3          THE COURT:  Good morning, sir.

4          THE WITNESS:  Good morning, your Honor.

5          THE COURT:  Sir, you can pull the microphone toward

6  you, the base moves.

7          THE WITNESS:  Thank you.

8          Mr. Moore.

9                       DIRECT EXAMINATION

10  BY MR. MOORE:

11  Q.   Good morning.  Please state your name for the record.

12  A.   John Lynch, L-y-n-c-h.

13          THE COURT:  Thank you.

14  BY MR. MOORE:

15  Q.   And where did you grow up?

16  A.   In Boston, Dorchester.

17  Q.   And can you please describe to the jury your level of

18  education.

19  A.   I graduated high school, college, and law school all in

10:07 20  Boston area schools.

21  Q.   And where are you employed?

22  A.   I'm employed at my own law firm and have been for decades.

23  Q.   And where is your law firm located?

24  A.   In Downtown Boston.

25  Q.   Where do you live now?

```
 1    A.    In Brookline, just outside of Boston, not far from Fenway
 2    Park.
 3    Q.    And did you live in the Boston area from 2014 to 2017?
 4    A.    Yes, during that entire time.
 5    Q.    Are you familiar with My Big Coin, sometimes known as MBC?
 6    A.    Yes.
 7    Q.    Who introduced you to My Big Coin?
 8    A.    In the first instance, a man named Michael Kruger, who was
 9    affiliated with My Big Coin.
10    Q.    Did Mr. Kruger explain to you what My Big Coin was?
11          MR. LOPEZ:  Objection.
12          THE COURT:  I'm sorry, objection?
13          Okay.  Hearsay?  Okay.
14          Counsel, you can rephrase.  Sustained.
15    BY MR. MOORE:
16    Q.    Do you have an understanding of what My Big Coin is?
17    A.    Yes.
18    Q.    Can you describe that to the jury?
19    A.    My Big Coin is a so-called cryptocurrency, it's a digital
20    currency.  Instead of reaching into your wallet and pulling out
21    dollar bills or something like that, this is an alternative
22    currency that exists in cyberspace.  It is meant to have value
23    and meant to be used and exchanged for purchases or whatever
24    use regular currency could be put to.
25    Q.    Who is the designer of My Big Coin?
```

10:07  (line 10)
10:08  (line 20)

1    A.    Randall Crater.

2    Q.    And is Randall Crater here in the courtroom?

3    A.    Oh, yes, right here.  I'm pointing to him.  He's next to

4    counsel.

5    Q.    Were you ever introduced to Randall Crater?

6    A.    Well, I never met him in person until five years after I

7    became acquainted with MBC.  Prior of that time our

8    communications were over the telephone, by text, by email, that

9    type of thing.

10:09 10    Q.    Do you remember about when you first started communicating

11    with Mr. Crater?

12    A.    Yes, in 2014, right around the time I got involved with My

13    Big Coin.

14    Q.    What did you understand Mr. Crater's background to be?

15    A.    Well, I understood his background to be in software.  He

16    was a software designer.  He had several companies dealing with

17    software, amongst which one was Greyshore Technologies, or

18    Greyshore, and he had developed software over a period of time.

19    It had different applications, different business applications.

10:10 20    It was used in the gaming industry, I was told, for one use,

21    and it had other types of uses.

22    Q.    When you were first introduced to Mr. Crater, were you

23    impressed with him?

24    A.    Well, I was impressed with the product and the idea.  He

25    likened it to Bitcoin, and at that particular time Bitcoin was

1  a very significant and important discussion in the business

2  world.  So, yes, I was impressed with his ideas and his

3  products.

4  Q.   Did you find him persuasive when you first spoke to him?

5  A.   Yes.  I spoke with him and Mr. Kruger and Mr. Gillespie

6  during this time, all three of them.  I was particularly

7  impressed by the scope of what they were doing, what they had

8  built, and the way it was presented to me.

9  Q.   Did Mr. Crater ever show you the source code for My Big

10:11 10  Coin?

11  A.   No, sir.

12  Q.   Did he ever show you a white paper explaining how it

13  operated?

14  A.   No.

15  Q.   Did he ever tell you that he was selling you coins in a

16  presale before My Big Coin was launched?

17  A.   Absolutely not.

18  Q.   Have you met with me before today?

19  A.   Yes, I have.

10:11 20  Q.   Did you have an opportunity to review an exhibit binder of

21  emails between you and Mr. Crater?

22  A.   I did.

23       MR. MOORE:  I'm going to ask to show, just for the

24  witness, Exhibit 11W.

25  Q.   At the top of this email, there's an email from

| | |
|---|---|
| 1 | greyshore@icloud.com.  Whose email address is that? |
| 2 | A.   Mr. Crater, Randall Crater. |
| 3 | THE COURT:  Sir, can you just move the microphone |
| 4 | over? |
| 5 | THE WITNESS:  Yes, thank you.  Sorry. |
| 6 | BY MR. MOORE: |
| 7 | Q.   And then there's also a "To" email here that's |
| 8 | jlynch@ldnllp.com.  Whose email address is that? |
| 9 | A.   That's my business email address. |
| 10:12 10 | Q.   Have you reviewed the emails that are contained in the |
| 11 | binder that are Exhibits 11 through 14?  Have you had an |
| 12 | opportunity to review those emails? |
| 13 | A.   I don't have the binder in front of me, but, yes, we |
| 14 | reviewed those emails. |
| 15 | Q.   And are those emails a true and correct copy of your |
| 16 | communications with Randall Crater? |
| 17 | A.   Yes, they are. |
| 18 | MR. MOORE:  Your Honor, at this time I'd ask to admit |
| 19 | Exhibits 11 through 14 and the rest of the uncontested |
| 10:12 20 | exhibits. |
| 21 | THE COURT:  Which is 1A through 15I? |
| 22 | MR. MOORE:  Yes, your Honor. |
| 23 | THE COURT:  Any objection? |
| 24 | MR. LOPEZ:  No, your Honor. |
| 25 | THE COURT:  Those may be admitted, 1A through 15I, and |

1    they may be published as you wish.

2              (Exhibits 1A - 15I received into evidence.)

3              MR. MOORE:  Can we publish 11W now.

4              THE COURT:  You may.

5              Jurors, you should now see it on your screens.

6              Thank you.

7    BY MR. MOORE:

8    Q.   At some point did you attempt to purchase My Big Coins?

9    A.   I did.

10:13 10    Q.   And did the My Big Coin website accurately track the

11   number of coins you were supposed to have?

12   A.   No.

13   Q.   So did you, therefore, have to keep track of the number of

14   coins you were supposed to have yourself?

15   A.   Well, I did that, yes.  I kept track of my funds that I

16   used to purchase My Big Coins and I kept track at what price I

17   purchased them and what the dollar value was of those, real

18   dollar value.

19   Q.   And when you wanted to have the number of coins that were

10:14 20   listed belonging to you corrected, who would you email?

21   A.   I would email either directly to Randall Crater or to Mark

22   Gillespie ordinarily.  Once in a while to Mr. Kruger at the

23   beginning, but the people that I communicated most directly

24   with on these matters were either Mr. Crater himself or Mark

25   Gillespie.

```
 1   Q.   All right.  And in this email, you write, Attached is a
 2   list of the total amounts to be allocated to each individual
 3   account.  Additionally, I will more carefully review my own
 4   account and previous wires before speaking with you over the
 5   weekend.
 6           When you write that, is that you trying to update
 7   Mr. Crater -- have Mr. Crater know that your account needs to
 8   be updated?
 9   A.   I'm not sure I'm on the same page with you here.
10:15 10        THE COURT:  Counsel, I'm not sure I'm seeing that.
11          MR. MOORE:  Could we go down one page?
12   A.   Now I'm there, okay.  I see what you mean now.  Yes.
13   Q.   So I'm reading here from right after the comma it says,
14   Attached is a list of the total amounts to be allocated to each
15   individual account.
16          Additionally, I will more carefully review my own
17   account and previous wires before speaking with you over the
18   weekend.
19          Is that you?
10:15 20   A.   That's correct, sir, yes.
21          MR. MOORE:  And then can we scroll up?
22          MR. MARKHAM:  Your Honor, if we just could -- the
23   touch screen has now made a line.
24          THE COURT:  So, counsel, can you clear that or,
25   Ms. Hourihan, can you.
```

1          Thank you.

2          (Discussion off the record.)

3    BY MR. MOORE:

4    Q.   And then do you see at the top here where on July 18th at

5    5:26 p.m. Mr. Crater says, No worries, sir, at all.  I have

6    sent your list over to my office manager to make sure this is

7    handled, and I think you will see there is more coins than you

8    have sent in your account, my friend.  I'm trying to look out

9    for us.  I think we are going to be a great team.

10:16 10          Do you see that?

11   A.   I do see that, yes.

12   Q.   What did Mr. Crater mean with this response?

13          MR. LOPEZ:   Objection.

14          THE COURT:   Overruled.

15   A.   Well, as stated in his response to my question, he said he

16   turned it over to his office manager and I'd be pleased because

17   I would see that there were more coins in my account than

18   apparently I paid for.

19   Q.   All right.  Can we go to Exhibit 11X?

10:16 20   A.   And he also called me a friend and whatnot.

21   Q.   Did you encourage others to invest in My Big Coin?

22   A.   I did.  I went to my friends and I also invested for some

23   of my family members.

24   Q.   Why did you encourage them to invest?

25   A.   I thought it was a great deal.  I thought within

1    approximately 60 days or less of my initial investments that
2    the company was going to go public and it would make a lot of
3    money.  So not only was I pleased for my finding this, I went
4    to family and friends and spoke with them about it and
5    suggested that they might consider it as well.
6    Q.   Did you make representations to them about how My Big Coin
7    operated?
8    A.   Yes.  I probably told them what I knew and why I thought
9    it was a good investment.  At the time it was portrayed as
10   being backed by gold bullion, oil, and around that time, or
11   shortly after, by insurance, and it was told to me that it was
12   really safer than the U.S. dollar because of the gold backing.

13         Also, on the materials that they published on the
14   website and whatnot, there were other businesses like
15   MasterCard, Visa, American Express, all being portrayed as in
16   the system with My Big Coin.

17         So these representations made me feel good about the
18   investment, and I was told that it was going to go public
19   almost immediately, and I was encouraged to move quickly.
20   Q.   Did you help track your friends' investments?
21   A.   I did.  For people that I -- to whom I discussed and
22   presented what I was doing, I did keep track of their
23   investments to make sure that their accounts were accurate.
24   These were my friends and my family.
25   Q.   So just an email of you trying to keep track of your

```
 1   friends' and family's investments?
 2   A.   Can I take a minute and read it.
 3        (Pause.)
 4   Q.   I'll just read the first sentence.
 5        Enclosed please find my updated statements, which I
 6   spent the afternoon reviewing, which I believe now to be
 7   accurate.  Unfortunately on Friday I had not included all of
 8   the wires that I had sent previously.
 9        The first two-page summary shows the amounts for each
10   account, including wires done by various individuals, as well
11   as myself, and a summary of what I believe are my holdings with
12   the inclusion of any additional accounts, with Michael
13   indicated you were considering to retire my loan.
14        The second two-page summary lists the necessary
15   allocations for all individual accounts for family and friends,
16   not including my own account.
17        Is this an email of you trying to update your friends
18   and family account?
19   A.   Yes, it is.
20        Can I look at the date again, please, at the top?
21        Right, exactly.  Yes, it is.
22   Q.   Who did you send this email to to update your friends and
23   family?
24        THE COURT:  Just for the record, this is Exhibit 11X.
25        Counsel, if we're moving to other exhibits, if you
```

10:19 10

10:20 20

         1    could just say what the exhibit number is.

         2             MR. MOORE:  Yes, your Honor.

         3             THE COURT:  Thank you.

         4    A.   So on 11X, Exhibit 11X, I sent this email to Mr. Randall

         5    Crater.

         6             MR. MOORE:  Can we go to Exhibit 13F.

         7             THE COURT:  Thank you.

         8    BY MR. MOORE:

         9    Q.   Can you tell the jury who Tom Callahan is?

10:20   10    A.   Tom Callahan has been a friend of mine for decades.

        11    Q.   Did he invest in My Big Coin?

        12    A.   Well, I'm not sure he had any of his own money in, but I

        13    told him about it.  He is a wonderful guy, lives paycheck to

        14    paycheck, and we're close friends, so I put up my money for him

        15    on the understanding when it went public that he would pay me

        16    back.  And it looks like I detailed the amounts that I wired in

        17    for Mr. Callahan on Exhibit 13F here, as you indicated.

        18    Q.   And the first sentence of this email says, It has been

        19    brought to my attention that Tom Callahan's MBC account is

10:21   20    missing the last investment I made on his behalf.  According to

        21    my accounting records, as well as the allocations for

        22    individual accounts previously forwarded to you, Tom's MBC

        23    account should be as follows.

        24             Is this an email of you trying to have Mr. Callahan's

        25    account updated?

A.   Yes, it is.  You can see that this is two-and-a-half years
after the original investments.  Tom's investments in his name
started in 2014, and there I was two-and-a-half years later or
two years later trying to get it corrected.

Q.   Have you invested in the stock market before?

A.   I have.

Q.   And has it been your general experience when investing in
the stock market that you need to track your accounts like
this?

A.   Well, usually the brokerage companies send you statements
every month, and they do it for you.

I've never been in this kind of a situation before
where you had to log into the website, put in your codes, and
then find the amount of your investment incorrectly stated in
your account.  I've never had that experience before with any
stock market investments or any types of investments really.

Q.   What was the My Big Coin exchange?

A.   My Big Coin Exchange was a system that you could go to
through the website, log in like you might in your own private
bank account, access your account, and go to a page that would
track recent activity in the coin, acquisitions or sales.  And
usually there would be a half a dozen trades listed.  They
would have the date of the trade, the amount of coin either
listed for sale or that had sold, the date and the price on
which they sold.  And the price would vary because I think at

1  the time, you know, clearly, whether it was Bitcoin or My Big

2  Coin or some other cryptocurrency, there was volatility in the

3  market.  So one trade might be for $200, the next one might be

4  $250, the third one could be $175, that type of thing.

5           So you'd look at the date, you'd look at the amounts,

6  and you'd get a picture from what the value of the coins were

7  at that point in time.

8  Q.   Did you list coins for sale on the My Big Coin Exchange?

9  A.   I tried to on at least two occasions.

10:24 10  Q.   Did you ever pull back that listing that you had put on

11  the My Big Coin Exchange?

12  A.   Yes, I did in both instances.

13  Q.   Did you talk to anyone before you pulled back that

14  listing?

15  A.   I talked to -- Mr. Crater was the person I talked most

16  about it, and I also probably mentioned Mr. Gillespie,

17  mentioned it to him as well.

18  Q.   Were you ever successful in selling any of the coins that

19  you listed on the My Big Coin Exchange?

10:25 20  A.   No.  As a matter of fact --

21           MR. LOPEZ:  Objection.

22           THE COURT:  I'm sorry, there was an objection.

23           THE WITNESS:  Oh, sorry.

24           THE COURT:  Can you say in a word?

25           MR. LOPEZ:  Assumes a fact.

            1            THE COURT:  Well, overruled.  Based on the previous

            2     questions and answers, I'll allow it.

            3            THE WITNESS:  I'm sorry, Mr. Moore, could you repeat

            4     the question, please.

            5     BY MR. MOORE:

            6     Q.  Were you ever successful in selling any of the coins you

            7     listed on the exchange?

            8     A.   I was never successful.  In fact, I was dissuaded from

            9     doing that by Mr. Crater.

10:25 10     Q.  Can you describe what you mean by saying you were

           11     dissuaded by Mr. Crater?

           12     A.   Well, he advised me that at the times I was doing the sale

           13     or attempting to do the sale to get some liquidity and learn

           14     how the exchange worked, that we'd almost immediately be going

           15     public and the coins would be worth far more than what I might

           16     reap from a sale at that particular time.

           17            So he was very affirmative about that, and based on

           18     Mr. Crater's representations to me, I pulled it back thinking

           19     I'd make more money later by hanging onto the coins.

10:26 20     Q.   All right.  And I'm just going to make sure that I

           21     understand what you're saying.

           22            Are you saying that you listed on the exchange, they

           23     did not sell, you spoke to Mr. Crater, and he advised you now

           24     to delist them, is that what your testimony was?

           25            MR. LOPEZ:  Objection.

```
 1              THE COURT:  Well, sustained -- as to form, I'm
 2      assuming.  Sustained as to form.
 3              Counsel, you can rephrase.
 4      BY MR. MOORE:
 5      Q.   So are you saying that you listed the coins on the
 6      exchange?
 7      A.   I got to the point where, yes, I was listing them or -- it
 8      did list them and then I'd have conversations with Mr. Crater
 9      almost simultaneously or right after.
10:27 10     Q.   And were they active on the exchange for at least some
11      period of time?
12      A.   Yes.  In one instance I waited I believe a week or
13      thereabouts, so they were on the exchange I thought for that
14      period of time.
15      Q.   And during that week did you have any offers to purchase
16      your coins?
17      A.   None.
18      Q.   And then after that week did you have a conversation with
19      Mr. Crater?
10:27 20     A.   Well, I might have had the conversation during that week,
21      and he told me what I said earlier, that, you know, very
22      shortly the coins -- the company was going to go public and the
23      coins would be worth a far greater amount than the amounts that
24      I had listed them on the exchange for.
25      Q.   And then based off of that conversation with Mr. Crater,
```

         1    did you take any action?
         2    A.   I delisted them or removed them and then tried to have
         3    those coins returned to my account in chief.
         4         MR. MOORE:  Can we bring up Exhibit 13B.
         5    Q.   And is this another email between you and Mr. Crater?
         6    A.   Yes, it is.  It's dated Wednesday, April 13, 2016 in the
         7    afternoon.
         8    Q.   In the bottom email you say, I have checked again and
         9    nothing has changed.  The accounts have not been updated.  Is
10:28   10    it just delayed, or something other than that?
        11         And in the top email Mr. Crater writes back, I did it
        12    myself, so I know it got done.  I stopped the sale of the coins
        13    and refunded your account.  It may take a little for it to
        14    update but I did this myself.
        15         Can you explain to the jury what's going on in this
        16    exchange?
        17    A.   Once again, this is two years after I started, the amounts
        18    in my account were incorrect, I felt.  I, once again, brought
        19    this to the attention of Mr. Crater, who was the person in
10:29   20    charge of making adjustments to the account, and on that
        21    particular day, it looks like I e-mailed him at 3:22 p.m. and
        22    he responded at 3:46, I did it myself, I got it done, and
        23    refunded your account.
        24         MR. MOORE:  Can we bring up Exhibit 13A.
        25    A.   The last part of that, Live every minute with love in your

1    heart, grace in your step and gratitude in your soul, is like a

2    theme song that he plays on his emails.  It's in many of the

3    emails.

4    Q.   All right.

5            Here at 1:42 you say, The balance shown on my account

6    is now $1,100.  Justine was successful in transferring 1,001

7    back into my MBC Wallet.  However, she is now getting an

8    insufficient balance alert when she tries to transfer the

9    remaining 1,100.  She thinks there may be a cap as to the

10:30 10   amount that can be transferred.

11           Although the coins do not yet appear in my Big Coin

12   account, I am assuming I will see the updated balance tomorrow?

13   Can you take care of transferring the remaining 1,100 coins in

14   my exchange account back to my MBC Wallet?

15           And then in the top email Mr. Crater responds back,

16   It's handled now.

17           Can you explain to the jury what's going on in this

18   exchange?

19   A.   Once again, I was trying -- I believe at this time trying

10:30 20   to get the coins back into my account that we delisted, it

21   appears from the dates.  We were having trouble doing that.

22           My paralegal was Justine Mahoney, who helped me with

23   these things.  There seemed to be a cap on what you could move

24   back, and that was the thrust of the first email.

25           And then I got Mr. Crater's response telling me it's

1    handled now.

2    Q.   Do you know whether any of your friends and family that

3    you encouraged to invest in My Big Coin were able to

4    successfully sell any of their coins on the My Big Coin

5    Exchange?

6    A.   I know of nobody that told me that they had successfully

7    sold coins on the exchange.

8    Q.   Are you familiar with the My Big Coin Wallet?

9    A.   And I'd like to amend that by saying that people that were

10:31 10   my friends or my family.  I'm not talking about people that I

11   didn't have contact with.

12        And what was the next question?  I'm sorry.

13   Q.   Are you familiar with the My Big Coin Wallet?

14   A.   Yes, that came later, sometime probably in the late 2015,

15   2016 time frame, or -- probably 2016, 2016.

16   Q.   Who developed the My Big Coin Wallet?

17   A.   Randall Crater.

18   Q.   Did you have conversations with Mr. Crater about the My

19   Big Coin Wallet?

10:32 20   A.   I did with him and with Mr. Gillespie.  They were almost

21   interchangeable on some of these conversations.

22   Q.   What is your understanding of what the My Big Coin Wallet

23   is?

24   A.   Well, they developed a system.  They froze or stopped

25   using the regular exchange that I described to you before where

         1    I wasn't able to sell any coins, and they developed a new
         2    system, which is -- was going to work more like a bank
         3    situation.  So they had a MasterCard credit card issued by a
         4    bank, and the bank's name was Allied National Bank.  And the
         5    idea would be that when you went to sell coins, it would pass
         6    through the credit card and the proceeds would then go into a
         7    wallet, a repository for your coins, and then you could direct
         8    the funds from your wallet to however you wished to use them.
         9    Q.   Was it your understanding that My Big Coin was backed by
10:33   10    assets?
        11    A.   Yes.  It was explained to me that My Big Coin was backed
        12    by gold bullion, oil, and at some point early on by insurance.
        13    And I remember corresponding at various times with both
        14    Mr. Crater and Mr. Gillespie about that and getting responses
        15    about that very thing from them.
        16    Q.   And what did you understand being backed by gold and oil
        17    and insurance to mean?
        18    A.   Well, there's something in the emails where I had sent
        19    him, Mr. Crater, with probably a copy to Mr. Gillespie, who was
10:34   20    his administrative assistant, I had sent them an email about a
        21    company that went bankrupt, a coin company, I think it was
        22    called Mt., M-t, Glox, G-l-o-x, and there had been some fraud
        23    or scamming going on and investors lost money with that.  So I
        24    sent them a summary of a news article that I had seen, I think
        25    in the Wall Street Journal, and they responded something to the

1    extent that we have gold backing and, you know, I remember the

2    figures being something like 300 million in gold bullion or

3    gold backing, so we don't have to worry -- investors wouldn't

4    have to worry about that with that kind of backing.

5    Q.   So what did you understand would happen if there was a

6    failure in My Big Coin?

7    A.   Well, I understand that -- I understood, and it was

8    critically important to me that the currency, the Big coins, if

9    you will, were supported and backed by gold bullion, by oil and

10:35 10   by insurance.  That was like, I described it, as I think a

11   three-legged stool.

12   Q.   Did you understand that one day in the future My Big Coin

13   would be backed by gold, insurance or oil, or did you

14   understand that currently it was already backed by gold, oil or

15   insurance?

16   A.   Right from the get-go, it was a big part of my decision.

17   Q.   Did Mr. Crater tell you he needed to implant this backing

18   gold, oil or insurance or did he tell you this was something

19   that already happened?

10:35 20         MR. LOPEZ:  Objection.

21         THE COURT:  Sustained as to form, counsel.

22         So, counsel has to ask you another question.

23         THE WITNESS:  Yes, your Honor.  I'm sorry.

24   BY MR. MOORE:

25   Q.   Did he tell you that he needed time to implement this

 1   backing that he described to you?

 2   A.   It was clear from everything he told me and Mr. Gillespie

 3   told me and Mr. Kruger at the beginning that it was a *fait*

 4   *accompli*.  The gold was there, it existed, and that was a major

 5   attraction to investors.  It should limit anybody's anxiety.

 6         And I think I mentioned earlier at some point they

 7   were saying actually with this kind of backing, it was safer

 8   than the U.S. dollar because the U.S. dollar no longer was

 9   backed dollar for dollar by gold as it once was.

10:36 10   MR. MOORE:  Can we bring up Exhibit 11EE.

11   Q.   All right.  In this top email, fourth from the bottom

12   line, you say, The insurance concept is really brilliant.  It

13   will give users a huge comfort.  Is the cost of coverage very

14   expensive?  As backup coverage to gold and oil, it must not be

15   too costly.  Have a great day, John.

16         Is this an email between you and Mr. Crater discussing

17   this backing?

18   A.   The insurance component, yes.  It was in 2014 that I sent

19   this to Mr. Crater.

10:37 20   MR. MOORE:  Can we bring up Exhibit 11FF.

21   Q.   And is this the email you were describing earlier?

22   A.   Yes, it is, 11FF, that's correct.

23   Q.   All right.  And in this top response Randall Crater

24   writes, This looks real good for us since we have gold and oil

25   backing us.

1          Do you see that?

2     A.    I do see that.

3     Q.    Did you -- at the time, based off of emails like this, is

4     that what you used to form your belief that there was already

5     gold and oil backing?

6          MR. LOPEZ:  Objection.

7          THE COURT:  Sustained as to form.

8     BY MR. MOORE:

9     Q.    All right.  What did you think when you saw Mr. Crater

10:38 10    saying, This looks really good for us since we have gold and

11    oil backing us?

12    A.    Well, in this email written to me by Mr. Crater in 2014,

13    it just reemphasized what he told me, what Mr. Crater told me

14    at the very beginning of my investments, they were backed by

15    gold and oil, and at some point insurance.

16          So this was nothing new to me.  It was right from the

17    get-go is what I think I said earlier.

18          MR. MOORE:  Can we go to Exhibit 12G.

19    Q.    All right.  In this top email, Mr. Crater says back to

10:38 20    you, And we have 300 million in gold backing us, they have

21    nothing, show you how strong we're going to be.

22          What did you understand Mr. Crater to be telling you

23    in this email?

24    A.    Once again, he was just reinforcing what he had previously

25    told me and was part of his materials, that they had plenty of

1    gold backing and I guess he was comparing it to another company

2    maybe that I wrote him about that had been in distress.  I'd

3    have to see what the chain said, but all this was, was just

4    telling me what I already knew from the very beginning.

5    Q.   All right.  Let's bring up Exhibit 12S.

6              And here in the top email Mr. Crater says to you, What

7    do you think is going to happen to us when the press comes out

8    about our gold and what all we have?  Guys get ready, we have

9    Moby Dick on the line.

10:39 10              What did you understand that to mean?

11   A.   Well, he -- the company still hadn't gone public a year

12   later, more than a year later, and he was saying that, you

13   know, when the public through the press would find out about

14   the significant gold backing, that, you know, we have a

15   product, you know, that was -- he likened it to something large

16   like Moby Dick, the whale, the giant leviathan.  So that's what

17   that was.

18   Q.   Did you attempt to investigate this supposed gold backing?

19   A.   Well, I did, in a strange way, I did.

10:40 20              The gold, as I understood it, was being milled --

21   being made available from a company with whom or with which

22   Mr. Crater had an agreement, and it was called Harmonie,

23   H-a-r-m-o-n-i-e.  And Harmonie was a big financial and

24   construction company with a worldwide reach.

25   Q.   Is that you -- and how did you get that information about

1    Harmonie?

2    A.    I was told that by Mr. Crater, by Mr. Gillespie, and

3    perhaps early on by Mr. Kruger.

4    Q.    Did you ever attempt to have a conversation with anyone

5    from Harmonie?

6    A.    Yes, I did.

7    Q.    Can you describe to the jury the circumstances around that

8    conversation?

9    A.    Yes.  It was a little unusual, but I was at my office, my

10:41 10    law office late on a particular night, it might have been a

11    Thursday or a Friday, and I was getting there 6:30 or 7:00, and

12    I happened to be looking at some of the My Big Coin materials,

13    and particularly about the company Harmonie that I described

14    earlier.

15         So I Googled it, and I found out that Harmonie was an

16    international company, as I described.  It had various aspects

17    to it.  They did large construction projects -- bridges,

18    tunnels, airports, these types of things -- which was explained

19    to me by the three gentlemen I mentioned earlier, Mr. Crater,

10:42 20    Mr. Gillespie, and Mr. Kruger, at various times.

21         So, anyway, they had a mining component and they had

22    an oil or an energy component.

23         So I saw on the website that they had a telephone

24    number for what I thought was a U.S. headquarters in Michigan.

25    So I dialed up the number that was listed on the website, and

1    somebody answered on the other end, and I had a conversation

2    with that person.

3    Q.   All right.  And did that person indicate to you where they

4    said they were?

5    A.   Yes.  That was, as I said earlier, the strange part.  I

6    dialed Michigan, and when he picked it up, he said he was in

7    Spain and that it was an international company and those calls

8    were forwarded to Spain.  I believe he said it was Marbella,

9    M-a-r-b-e-l-l-a, which is on the southern coast, I believe, of

10:43 10   Spain and he --

11           MR. LOPEZ:  Objection.  I think he's answered the

12   question.

13           THE COURT:  Okay.

14           THE WITNESS:  I'm sorry.

15           THE COURT:  Well, sustained as to the question.

16           Counsel, you can ask another question.

17   BY MR. MOORE:

18   Q.   And do you know what time it would have been in Spain at

19   the time you made this call?

10:43 20   A.   Well, yes, Spain was approximately six hours behind Boston

21   time, and I knew it was, as I said earlier, sometime between

22   6:30 and 7:00 that I initiated the call from my office in

23   Boston.  So it would have been like 1:00 in the morning or

24   close to 1:00 in the morning in Spain, if that's where he was.

25   Q.   But at the time did you find this call strange?

1   A.   Well, yes, that -- if I were calling a client, I wouldn't

2   expect somebody to be at the office at 1:00 in the morning, so,

3   yes, in that instance it was strange.  And I had a conversation

4   with this individual about his company and what they did.

5   Q.   And did the individual indicate they knew Randall Crater?

6   A.   Yes, he was familiar with Crater.  His name was Stewart,

7   and I think it was something like Stewart Bortland,

8   B-o-r-t-l-a-n-d, something like that, Stewart in any event, and

9   he spoke with a British accent and he said he was in Spain.

10:44 10   Q.   And did you talk to him about gold backing?

11   A.   I didn't get into the particulars because he wasn't going

12   to tell me -- there was only so far he was going to go but he

13   was in the gold and mining business and knew who Mr. Crater

14   was.

15        I asked who he worked for, and it was an Irish last

16   name, William either O'Donahue or Donahue, I think it was

17   Donahue.  You know, they had this international business doing

18   these many projects that I spoke about, finance and

19   construction projects, and so on and so forth, around the world

10:45 20   of the type that I described earlier.

21   Q.   Did Mr. Crater ever provide you documentation that showed

22   this gold backing?

23   A.   Never.

24   Q.   So the extent that you knew of the gold backing was

25   Mr. Crater's statement and this conversation, is that it?

1    A.   Well, it was all over his website materials, talking about

2    how effective he felt My Big Coin would be, how it was superior

3    to other cryptocurrencies, that it was backed by gold.  It was

4    plastered all over everything you might look at, on your

5    statements, in the web materials, so on, so forth.

6            And I did, as I said, decided to call Harmonie one

7    night, and that's what happened.

8            I don't know if that man was in Spain or not.  He said

9    he was, but I don't know.

10:46 10   Q.   How would you send money for the purchase of My Big Coin?

11   A.   By wire from my bank account, which was here in Boston.

12   Q.   Do you remember the name of the account where you would

13   send these wires to?

14   A.   At the outset it was to Greyshore Technology, Mr. Crater's

15   company.

16   Q.   Did you send these wires from here in the District of

17   Massachusetts?

18   A.   I did, from Boston, yes.

19   Q.   Do you know an individual by the name of Kim Benge?

10:46 20   A.   I did not at the time know who Kim Benge was.

21   Q.   Do you now know who she is?

22   A.   I learned five years later that I believe her to be

23   Mr. Randall Crater's sister.

24   Q.   All right.

25            MR. MOORE:  Can we bring up Exhibit 2B, please.

```
 1              And then if we can -- all right.
 2     Q.   Do you see the name on this account statement in the top
 3     left corner?
 4     A.   Yes, I do, Kimberly Renee Benge, d/b/a Greyshore
 5     Advertiset.  It could be advertisement, I'm not sure.
 6     Advertiset, whatever that means.
 7              MR. MOORE:  Can we go to page 40, line item for April
 8     8, 2014.
 9     Q.   All right.  Do you see a wire transfer here for $200,000
10:48 10  for John Lynch?
11     A.   Yes, I do.
12     Q.   Is this a wire transfer made by you?
13     A.   Well, yes, it came from my bank.
14     Q.   And is this the -- so this is -- and you sent this to Kim
15     Benge's Greyshore account, is that accurate?
16     A.   Yes.
17     Q.   And who instructed you that that's where you should send
18     the wire to?
19     A.   Mr. Crater and probably also Mr. Gillespie.  But
10:48 20  Mr. Crater definitely.
21              MR. MOORE:  Can we go to page 50, please.
22              And can we go to the entry for May 1, 2014.
23     Q.   And do you see this wire transfer for $250,000?
24     A.   I do see it, yes.
25     Q.   Is this a wire transfer you made to the Greyshore account?
```

1    A.    Yes, from my bank to the Greyshore account.

2    Q.    And who instructed you to make this wire to the Greyshore

3    account?

4    A.    Can you show me the Greyshore piece?  I don't know where

5    this went, whether it went to Greyshore or to Kimberly Benge.

6    Q.    All right.  So this is the same account statement.

7          We'll just go back to the bottom.  Can we go back to

8    the first page.

9    A.    Oh, I see what you're saying.  Yes, Kimberly Benge, who is

10:49 10   at Greyshore.

11   Q.    So now we're going to page 86 of this same account

12   statement.

13   A.    Thank you.

14   Q.    And August 13, 2014.

15         And for the same account statement, there's a wire

16   transfer for $103,000.  Did you make this wire transfer?

17   A.    Yes.

18   Q.    And did you -- and who instructed you to make these

19   transfers to the Greyshore account?

10:50 20   A.    Let's see.  In all instances, it would be Mr. Crater,

21   Mr. Gillespie, and possibly early on I might have -- Mr. Kruger

22   might have been in the loop slightly.  Both of those people

23   took their direction from Mr. Crater.  They were functionaries,

24   but in the loop.

25         MR. MOORE:  Can we bring up Exhibit 11AA.

1    Q.   All right.  In this email at 6:02 p.m., you write to

2    Randall, There's been additional wires by me today in the

3    amount of $140,700 and Maureen Arnold from Dublin last week in

4    the amount of $50,000.  Please note that 103 wired from my

5    account is to be entered totally for coins, the others are

6    split 50 percent stock, 50 percent coins.

7             What did you mean Split 50 percent stock, 50 percent

8    coins?

9    A.   Well, early on when I started investing, in anticipation

10:51 10   of the company going public within 60 days of my beginning

11   investment probably in April of 2014, in discussions primarily

12   with Mr. Crater, he suggested that he thought the price of the

13   stock might really take off and it might even be greater than

14   coin.  So he suggested that I put the original deposit 100

15   percent into the coin, but on the understanding I might do

16   better if I split half of the original investment in coin to

17   become or convert it to half coin, half stock when the stock

18   went public.  And the anticipation was the stock was going to

19   go public very shortly thereafter.

10:52 20            So that's what I did.  I indicated that I would be

21   amenable to his advice and asked that the accounts be split

22   50/50.

23   Q.   Was the money you gave or you sent to Mr. Crater, was

24   those for business investments?

25   A.   Oh, of course, yes.

1    Q.   Did you ever loan money to Mr. Crater?

2    A.   No.

3    Q.   Did you ever give money to Mr. Crater as a gift?

4    A.   No.

5    Q.   Did you ever provide a personal loan to Mr. Crater?

6    A.   No.

7    Q.   Did you receive a MasterCard related to My Big Coin?

8    A.   Downstream from the original investments, as I said

9    before -- oh, and let me go back a second.

10:52 10       Originally there were some MasterCards issued to

11   investors and they were going to function as debit cards.  I

12   didn't think I needed one because I had my own checking

13   accounts and my own credit cards, so I didn't need another

14   debit card, and -- so I didn't get one.

15       Downstream, in response to some of your earlier

16   questions, you asked me what a wallet was, and I said that in

17   order to operate the system at that point in time, there was a

18   wallet which was going to be the repository for your funds,

19   like a bank account, and any transactions would pass through a

10:53 20   credit card issued by this Allied National Bank.  And I did get

21   one of those credit cards, and I think it was sometime in the

22   neighborhood of 2016.

23       MR. MOORE:  Can we bring up Exhibit 14A.

24   Q.   And then in the top of this email you say, I heard -- to

25   Randall Crater -- I heard from Mark today that an account will

1  be opened for each investor, including myself, I think with

2  Allied Bank to redeem shares in MBCP.  Also, I believe each

3  investor will be issued a credit card from either Visa or

4  MasterCard that they can use to withdraw some or all of their

5  funds.

6           Is that what you were just describing to the jury?

7  A.   Yes, and what helps me about this, I said 2016 to your

8  last question.  It appears that it was in 2017 in March.

9  Q.   Did your card work?

10:54  10  A.   Well, that's another thing.  The card that I received in

11  the mail from Allied Bank, and I forget whether Mr. Gillespie

12  sent me the card or it came directly from Allied Bank, but

13  anyway, I got it, and it was a MasterCard and it said "Allied

14  Bank" and my name wasn't on the card.  It was blank, but it did

15  say "preferred customer."

16           And I had never seen a card like that, you know, from

17  any bank, let alone a new one.  And I did receive the card, but

18  I never transacted anything through that card into a wallet

19  because the exchanges, at least at that point, weren't open.

10:55  20  So it was sort of on hold in anticipation of something opening

21  up later.

22  Q.   So did the card ever work?

23           MR. LOPEZ:  Objection.

24           THE COURT:  Well -- so overruled.  Overruled.

25           You can answer.

```
  1              Counsel, was your objection asked and answered or
  2    foundation?
  3              MR. LOPEZ:  He just testified to the contrary.  He
  4    just said he didn't do anything with it, so how would he know
  5    if it worked?
  6              THE COURT:  Well, counsel, no speaking objections.
  7              MR. LOPEZ:  I'm sorry.
  8              THE COURT:  Overruled as to that, counsel.
  9              You can answer the question.
10:56 10    BY MR. MOORE:
 11    Q.   Were you ever able to get funds on the card?
 12    A.   I never got funds on the card because the exchanges that
 13    would allow me to use the card and transfer the money after
 14    they deducted the transfer fee of two-and-a-half percent, net
 15    proceeds going to the wallet, that never came about.  There was
 16    no access to these exchanges to sell coins.  So in that sense,
 17    you know, the card was just sitting there gathering dust.
 18    Q.   Did your friends and family who invested in My Big Coin,
 19    did they ever ask for their money back?
10:57 20    A.   Some of them did.
 21              MR. MOORE:  All right.  I'm going to bring up Exhibit
 22    12I, or can we show the defendant -- or the Court Exhibit 12I?
 23              THE COURT:  So, counsel, was that not admitted, 12I?
 24              MR. MOORE:  It is admitted, your Honor, sorry.
 25              Could we display Exhibit 12I.
```

```
 1              THE COURT:  It can be published.
 2    BY MR. MOORE:
 3    Q.   Who is Peter Antell?
 4    A.   Peter Antell was a Boston attorney and my friend for
 5    decades.  He's a very close friend of mine.
 6    Q.   Did he invest in My Big Coin?
 7    A.   He did.
 8    Q.   At some point did he want the return of his investment?
 9    A.   Yes, he did.  He needed to use the funds to refinance a
10:57 10    mortgage he had on his farm, f-a-r-m, farm.
11    Q.   Do you know if Mr. Antell sold his My Big Coins on the
12    exchange?
13    A.   No, he came to me and wanted me to buy them and buy them
14    quickly because he was in the midst of this effort to refinance
15    his farm in Upstate New York near the Hudson Valley.  He lived
16    in Boston, but he had this other property in New York.  So he
17    needed quick action, and at that point in time I communicated
18    with him, I think it's displayed here, suggesting that he might
19    wait because I was told by management, Mr. Crater and
10:58 20    Mr. Gillespie, that we were going to go public very shortly and
21    he'd do very well if he just held on a little bit longer.
22    Q.   In this top email you say to Randall Crater, Gentlemen,
23    Please transfer Peter Antell's account to mine today as I will
24    purchase his position for $20,000 now by wiring that amount to
25    his account now.  His original investment was $15,000, half to
```

1    coins and half for stock after public offering.

2         Why did you send this email to Mr. Crater?

3    A.   For two reasons:  To let them know that Peter was coming

4    out and I was going to buy his position, and that I would like

5    his account or the coins to be transferred from Peter's account

6    to my account on the purchase.  So there was a transaction

7    going on between me and Peter and it would involve Mr. Crater

8    and the company to make the changes.

9    Q.   Why would Mr. Crater be the person that you e-mailed about

10:59 10   this transaction?

11   A.   Mr. Crater had exclusive control over everybody's account

12   in terms of making transfers and monetary stuff.  Neither

13   Mr. Kruger or Mr. Gillespie had any authority to go into

14   somebody's account and make the changes or updates or whatever

15   was required at the time.

16        MR. MOORE:  Could we publish Exhibit 12J.

17   Q.   Who is Henry Kara?

18   A.   Henry Kara --

19        THE COURT:  Counsel, it appears we're addressing a new

11:00 20   topic.  Given the time, I think we should take our break here

21   and start with this exhibit.

22        MR. MOORE:  Yes, your Honor.

23        THE COURT:  Sir, you can step down.  We're going to

24   take a break.

25        THE WITNESS:  Thank you, your Honor.

           1           THE COURT:  Jurors, as I said, we'll take a 20-minute

           2     break.  There should be, if the system has worked, there should

           3     be snacks upstairs for you, and then we'll resume.

           4           THE CLERK:  All rise.

           5           THE COURT:  And you can just leave your pads on your

           6     seats.  Thank you.

           7           (Jury left the courtroom.)

           8           THE COURT:  Counsel, anything before we break?

           9           MR. MOORE:  Nothing from the government, your Honor.

11:01     10           THE COURT:  Mr. Lopez?

          11           MR. LOPEZ:  No, your Honor.

          12           THE COURT:  We'll take 20 minutes, thanks.

          13           (Recess taken.)

          14           (The Court entered the courtroom.)

          15           THE COURT:  Counsel, you can be seated.  Everyone can

          16     be seated.  Ms. Hourihan is getting the jury.

          17           Mr. Lopez, you're fine to examine from counsel table

          18     just as long as Ms. Joyce can hear you and the jury can hear

          19     you.

11:21     20           And just on objections, I usually am following the

          21     basis or the grounds for the objections, but if I ask for

          22     grounds, just a word or two, and if I think I need more

          23     narrative, we'll go on our headsets.

          24           MR. MARKHAM:  Your Honor, can we address just one

          25     issue on the record?

```
 1              THE COURT:  Sure.

 2              MR. MARKHAM:  Actually, two issues.

 3              One, I was just alerted by my paralegal that one of

 4    the jurors when they came in this morning asked her for

 5    directions, and she gave them to her.  I just wanted to put

 6    that on the record.

 7              THE COURT:  Sure.  Understood.

 8              MR. MARKHAM:  The second issue was just about agency

 9    statements.  I noticed the Court sustained one objection as to

11:22 10   what one of the agents said.  It was rephrased so it wasn't an

11    issue --

12              THE COURT:  And I didn't understand at that point that

13    your position was that person was an agent.

14              I understood it to be a hearsay objection.

15              MR. MARKHAM:  Yes, your Honor.  We're saying there's

16    an exception to all those hearsay statements --

17              THE COURT:  No, no.  I guess what I'm saying is I

18    didn't understand the person who allegedly asserted it was

19    alleged to be an agent.

11:22 20   MR. MARKHAM:  So all I'm doing is just putting on the

21    record we think at this point we have met our burden on the

22    agency exception.

23              THE COURT:  What was the name of that person?

24              MR. MARKHAM:  Mark Gillespie.

25              THE COURT:  Okay.  Understood.
```

```
 1                 MR. MARKHAM:  And Michael Kruger is the other one.

 2                 THE COURT:  Thank you.

 3                 MR. MARKHAM:  Thank you.

 4                 THE CLERK:  All rise for the jury.

 5                 (Jury entered the courtroom.)

 6                 THE CLERK:  Court is in session.  Please be seated.

 7                 THE COURT:  Thank you.

 8                 Mr. Moore.

 9    BY MR. MOORE:

10    Q.   Do you know an individual by the name of Henry Kara?

11    A.   Yes, I do.

12    Q.   And who is Henry Kara?

13    A.   Henry Kara is -- it's Kara, K-a-r-a, and he's an attorney

14    and a long-time friend of mine, many, many years.

15                 MR. MOORE:  Can we please publish Exhibit 12J.

16    Q.   Did Henry Kara invest in My Big Coin?

17    A.   Yes, he did.

18    Q.   At some point did he ask for a return of his funds?

19    A.   He did.

20    Q.   Did Mr. Kara -- was he able to get his funds back using My

21    Big Coin Exchange?

22    A.   No, he came to me.

23    Q.   And what did you do after he came to you?

24    A.   Much like Mr. Antell, I purchased Mr. Kara's position in

25    February of 2015, in that time frame.
```

11:23 10

11:23 20

1    Q.   And did you have to notify anyone that you purchased his

2    position?

3    A.   Well, I think this email on February 18th indicates that I

4    contacted Randall about it.  And I asked him to transfer

5    Henry's funds to my account.  I advised Mr. Crater, Randall,

6    that I'm able to wire the funds right now or give him a check.

7    Is either payment preferable from the company's perspective?

8    And I thanked him for his attention and guidance.

9    Q.   Who -- do you know an individual named Ernest DeSimone?

11:25 10    A.   Yes, I know him well as well.

11    Q.   And who is he?

12    A.   Ernest or Ernie is a lawyer who's retired and he was one

13    of my law partners.

14        MR. MOORE:  And can we bring up Exhibit 12P.

15    Q.   Did Mr. DeSimone invest in My Big Coin?

16    A.   Yes, he did.

17    Q.   At some point did he ask for a return of his investment?

18    A.   He did.

19    Q.   Was he able to use the My Big Coin Exchange?

11:25 20    A.   Again, like Mr. Antell and Mr. Kara, he came to me

21    directly and I purchased his position as well to increase my

22    share of coins and to accommodate their wishes.

23    Q.   And why did you purchase each of these individual's coins?

24    Why did you do it?

25    A.   Well, I felt responsible for putting them into the mix, so

1    to speak, into the investment mix, and they wanted their money

2    for various reasons quickly, and I felt, you know, they didn't

3    want to go through an exchange, and I thought that -- at that

4    point I was still thinking it would be a good investment,

5    because when I spoke to Mr. Crater about this and to

6    Mr. Gillespie and perhaps even to Mr. Kruger, they particularly

7    said, you know, they shouldn't be getting out, this thing is

8    going to go public, they're going to miss the boat, this is

9    going to do very well.  Those types of things were said to me

11:27 10   continuously and at this time.

11   Q.   Were you attempting to make your friends whole?

12   A.   Well, yes.  I did want to do that.  In fact, I paid

13   Mr. Antell a little bit more than he originally invested

14   because he said the coins were trading at that point for more

15   than he invested and he wanted 20,000 instead of 15.  I did pay

16   the 20,000.  He was my friend.  I didn't want to argue with him

17   about that, and I'm glad I did it.  He's my friend for years.

18   He's now dead.  He died of a heart attack in December.

19           MR. MOORE:  Can we bring up Exhibit 12P.

11:27 20           MR. LOPEZ:  It is up.

21           (Pause.)

22           (Discussion off the record.)

23           MR. MOORE:  Let's bring up 12O.

24   BY MR. MOORE:

25   Q.   All right.  In this middle email, you forward to Michael

1    Kruger an email that says, Ernie would like to sell his coins.
2    Is his email sufficient to wire funds to Ernie?
3            And then Mr. Kruger -- can you see who Mr. Kruger
4    forwards your message to?
5    A.   Yes, it goes directly to Randall Crater at Greyshore.
6    Q.   Do you have an understanding of why Mr. Kruger would then
7    need to send this message to Mr. Crater?
8            MR. LOPEZ:  Objection.
9            THE COURT:  Sustained.
11:28 10  BY MR. MOORE:
11   Q.   Who did you understand was the person who had the ability
12   to update the accounts for My Big Coin?
13   A.   Exclusively Mr. Crater.  As I mentioned before --
14           MR. LOPEZ:  Objection.
15           THE COURT:  I'm assuming it's foundation, counsel,
16   your objection?
17           MR. LOPEZ:  He's answered the question.  He's answered
18   the question and continued to speak.
19           THE WITNESS:  I hadn't completed --
11:29 20          THE COURT:  Well, counsel -- sustained as to asked and
21   answered, but you can ask a follow-up question.
22           Mr. Moore.
23   BY MR. MOORE:
24   Q.   And what was your basis for understanding that Mr. Crater
25   was the person who updated the account?

           1   A.   Well, I knew that from Mr. Gillespie, who was sort of the

           2   administrative person.  He had no authority, told me as such,

           3   and Mr. Crater said only -- excuse me, Mr. Kruger made it clear

           4   as well that only Mr. Crater could go in and change the

           5   accounts under his authority.  He had exclusive control and

           6   authority over the accounts.

           7   Q.   Did you ever indicate to Mr. Crater that you needed access

           8   to the money that you had invested in My Big Coin?

           9   A.   A couple of times, yes, I needed liquidity, and I

   11:29   10   mentioned that or told that to Mr. Crater.

          11   Q.   Did Mr. Crater ever provide you any funds?

          12   A.   No.

          13              MR. MOORE:  Can we bring up Exhibit 13C.

          14   Q.   All right.  And this is an email from Mr. Crater to you

          15   and Mr. Gillespie in which he says, John, I confirmed your

          16   licenses are sold for you and you doubled your money on that

          17   deal alone and you will be paid out Monday.

          18              Do you remember, were you paid out the Monday

          19   following this email?

   11:30   20   A.   I was not on that Monday or any Monday.  Mondays never

          21   came with Mr. Crater.

          22   Q.   All right.

          23              MR. MOORE:  Can we publish just to the witness Exhibit

          24   G1.

          25              THE COURT:  Just for the witness and counsel.

1    BY MR. MOORE:

2    Q.   Do you remember having text exchanges with Mr. Crater?

3    A.   Yes.  Mine says "G," it doesn't say "G1."  Is that what

4    you want?

5    Q.   G, yeah.

6         Before today did you review a printout of these text

7    exchanges with Mr. Crater?

8    A.   I did.

9    Q.   At the top of this in the top left corner, there's a phone

11:31 10   number that is 617-974-8414.  Do you recognize that phone

11   number?

12   A.   I do.  It's mine.

13   Q.   And then below that there is another phone number that is

14   631-346-1870.  Do you recognize that phone number?

15   A.   Yes, that was Mr. Crater's at that time, correct.

16   Q.   The text messages that are contained here in Exhibit G,

17   are they a true and correct copy of the text exchanges you had

18   with Mr. Crater?

19   A.   Yes, they are.

11:31 20        MR. MOORE:  At this time the government moves to admit

21   Exhibit G, your Honor.

22        THE COURT:  Any objection at this point?

23        MR. LOPEZ:  No, your Honor.

24        THE COURT:  They may be admitted.  What's the next

25   number, available number, counsel?

1          MR. MARKHAM:  I believe it's 16, your Honor.

2          THE COURT:  Okay.  16.  It's admitted.  It may be

3     published if you wish.

4          (Exhibit 16 received into evidence.)

5     BY MR. MOORE:

6     Q.   Can we go to page 1 at 7:26:01.

7          And then there's this first message in which you say,

8     What a gorgeous morning.  I guess you did not learn anything

9     from the bank yesterday or you would have told me.  I have run

11:32 10     out of time.  So is it possible now to sell one of my four

11     marijuana licenses or my investment in the Trokie business?

12     What is the value approximately of a license?  This is probably

13     a better solution that would bring in much more money quicker

14     than trying to sell 1,000 coins.  Would you call me soon in the

15     morning to discuss this, please.

16          Could you explain to the jury what is going on in this

17     exchange.

18     A.   Yes.  The date is April 11th and I have quarterly tax

19     payments due on April 15th and taxes I pay on a quarterly

11:33 20     basis.  And so I was getting concerned about liquidity enough

21     to pay my taxes.

22          So I wanted to get some money out to be able to do

23     that, and he had -- there's a string of these emails.  We were

24     waiting to hear from his bank yesterday, and I'm telling him

25     I'm running out of time.  Rather than wait for other funding

1    that he said was coming, could I sell one of the four marijuana

2    licenses that I purchased from him or my investment in the

3    Trokie business, which is a type of marijuana, that I was

4    involved with with Mr. Crater.  I asked if I could sell one of

5    the four licenses.  I'm asking him what is the value of a

6    license.

7          I paid about $750,000 for each license.  And I thought

8    that would be a quicker solution rather than trying to sell a

9    thousand coins.  I offered to fly to his office to work on the

11:34 10  sign-off of the transaction, his office being wherever he was

11   going to be, in New York, I guess.

12   Q.   So you said you needed this money for your taxes; is that

13   correct?

14   A.   Well, I did need it for that and that's why I was willing

15   to fly to meet him right away and get to work on this and get

16   it done.

17          MR. MOORE:  Can we go to page 6 and go to 5:08:15.

18   Q.   And then you start, about midway through you say, I asked

19   previously about selling coins to pay taxes due tomorrow.  You

11:34 20  said that was unnecessary.  All over the world money is moved

21   in hours and overnight if it's late in the day.  I need money

22   tomorrow and would hugely appreciate your assistance with this.

23   Would you kindly confirm your willingness to do this for me.

24          So is this the -- you asking him for money for taxes?

25   A.   Yes.  There was supposed to be some money coming to me

through his bank.  He was wiring me money, and the wire never

came, and I kept prodding him to do that and alerting him to

the fact that we were getting closer and closer to tax day.

Tax day that year was extended because it came over

the weekend and I think there was a federal holiday involved as

well, so they were due approximately on April 18th that year,

as I recall.

Q.   Do you remember text exchanges about gold?

A.   Could you repeat that?  I'm sorry.

Q.   Did you ever have any text conversations with the

defendant about gold?

A.   Yes.

MR. MOORE:  Could we go to -- stay on page 6 but go to

8:07:18 a.m.

All right.

Q.   And Mr. Crater writes to you, Morning, John.  I'm flying

out today to assure your funds, my friend.  We are so beyond

good on so many fronts.

You respond, Randall, are my funds overseas?  Would

you spare a minute for a quick call now, please?

And Mr. Crater responds back, Of course they are.

Everyone knows that, John.

And then Randall responds back, There is anything new

to anyone at all it's a gold deal to get it here.  I'm making

sure you're funded this week, not anyone else, you.

1          What did you understand when he said It's a gold deal

2     to get it here.  I'm making sure you're funded this week?

3     A.    Well, he was indicating that he was sensitive to my needs

4     to get money and apparently he was going to sell some gold and

5     he was going to make sure I was funded this week, and the funds

6     were going to come by way of wire, and this was sort of an

7     ongoing promise or effort on his part that preceded April 18th.

8     This had been going on for a while.

9          MR. MOORE:  Can we go to page 37, please, at 7:00 in

11:37 10    the morning and 55 seconds.

11    Q.    And starting here, you say, Okay, that is fine.  You are

12    welcome at my place.  I am very near the financial district and

13    we will have some fun as well.

14          And then below that Randall responds back, No, you're

15    not at all, John.  It may seem that way, but that's not the

16    case, John.

17          And Randall writes further, I would bankrupt the

18    company and allow the gold to settle things out before that

19    would happen to John.  You're my friend.

11:38 20          And you write back, I am a bit confused by the last

21    part of the text.  I only said you are welcome to stay those

22    few days at my place.  Also, you are welcome to have your

23    family join us here over the weekend.  I have room for them

24    also.

25          And then Crater responds back, I read the text wrong,

1    John.  I thought you said near financial distress.  I didn't

2    have my glasses on, now I see you're near financial district.

3    I was trying to say I have your back and would never allow that

4    to happen.

5         What did you understand him to mean when he said he

6    would bankrupt the company and let the gold settle?

7    A.   Well, just that.  If you read back over the series of

8    texts that you read and a couple before, he was scheduled to

9    come to Boston to meet with me.  He was promising to get money

11:39 10   wired to me, and when I suggested that he could -- that my

11   office was in the financial district and that he could stay

12   with me, he said he didn't have his glasses on and he thought I

13   was in financial distress and he would make sure nothing would

14   happen to me, he would have my back, never allow any financial

15   distress for me and he'd sell the gold and bankrupt the company

16   before he would let that happen.  I think that's the sequence

17   of what he said.

18   Q.   When he said, I would bankrupt the company, did that

19   suggest anything to you?

11:39 20   A.   And allow the gold to settle things out before anything

21   would happen to you, my friend.  He was trying to make me feel

22   special and also trying to make me -- let me know that the gold

23   was available, he'd take care of me and, you know, don't

24   stress, that type of thing.  That was his *modus operandi* all

25   the time, don't stress, I'll take care of it, I've got your

1    back, those type of things, repeatedly.  And nothing ever

2    happened.

3    Q.    Did you ever have text conversations with him about cash?

4    A.    Yes.

5         MR. MOORE:  Can we go to page 29, please, at 3:08:05

6    on May 8th.

7    A.    Yes.

8    Q.    And then actually go down to 3:10:06, Randall Crater

9    writes, Counting cash right now.

11:40 10        And you say, Call me -- or he says, Call when I'm

11   done.

12        You say, Sounds good.

13        And further at 10:11:59 Randall says, Still working

14   buddy.  Haven't forgotten about you.

15        What did you understand him to mean when he said,

16   Counting cash right now?

17        MR. LOPEZ:  Objection, foundation.

18        THE COURT:  Well, overruled for the purpose for which

19   its being offered.

11:41 20        So you can answer.

21   A.    So, again, you had read a previous set of emails.  I was

22   looking to get money.  All of a sudden on May 5, 2017 at 3:08

23   p.m. he says he's flown to Colorado.  I ask him if he's free

24   for a call.  He said he's counting cash.  Call you when I'm

25   done.  And he's still counting cash at 11:59 that evening.  He

1  hasn't forgotten about me.

2          So, you know, apparently -- I took it to mean that he

3  had some deal or reservoir of cash that he was counting and he

4  was going to get back to me.

5  Q.   Do you remember text conversations with Mr. Crater about

6  armored vehicles?

7  A.   Yes, I do.

8          MR. MOORE:  Can we go to page 32 and 11:57:13.

9  Q.   You ask Mr. Crater about when he's arriving in Boston.

11:42 10  And he responds back, I'm not sure.  I'm waiting on the armored

11  car guys.

12          What did you understand this to mean?

13  A.   Well, as it said in the upper email, I was trying to get

14  him to Boston so I could find out what the hell was going on on

15  some of these various things.  He never came to Boston, but in

16  this one he says, I'm not sure.  I'm waiting on the armored car

17  guys.

18          He had told me that he had apparently pallets of cash,

19  piles of cash, that he was going to transfer someplace in some

11:42 20  sort of a -- I'll liken it to a Brinks truck or something like

21  that, armored car guys, and he was waiting for them to come.

22  And that was on May 11th at 11:57 a.m. in the morning.

23          MR. MOORE:  Can we go to page 34 at 3:44:35.

24  A.   Yes.

25  Q.   And Randall says, I'm sitting here waiting on the armored

1    car service man.

2         And you respond back, That must be so annoying.  Which

3    one do you use?  At some point maybe Allied MBC should buy a

4    company.

5         And Randall responds back, They're already working on

6    that.

7         Is this more conversation about the armored car?

8    A.   Yes, it is.  And I was probably being a little critical

9    saying, Which one do you use, trying to find out.  And then I

11:43 10   made a sort of a sarcastic suggestion that rather than sitting

11   around waiting they should -- maybe they should buy a company,

12   Allied being Allied Bank and MBC, My Big Coin.

13        And then he comes back with, They're already working

14   on that.

15        MR. MOORE:  And can we go to page 35 at 7:54:07.

16   Q.   You write, Did the truck finally arrive?

17        MR. MOORE:  And then if we go down to the next page.

18   Right there.

19   Q.   And at 6:57:06 Randall writes back, No, sir, the truck

11:44 20   they sent yesterday couldn't pick up the volume we have here.

21   So I'm heading to the warehouse to sit again for the minute

22   they come.  I'm en route to you, John.

23        What did you understand him to mean when he said the

24   truck yesterday couldn't pick up the volume?

25   A.   I'm trying to read and listen at the same time.  Could you

1    please give me a second?  Okay.

2         (Pause.)

3    A.   Okay.  So I'm still expecting him to fly to Boston and

4    come see me on an early flight from Colorado.  And then the

5    third one down, No, sir, the truck they sent yesterday couldn't

6    pick up the volume we have here.  So I'm heading to the

7    warehouse to sit again.  The minute they come, I'm en route to

8    you, meaning he's going to come to see me in Boston.

9    Apparently, the truck was too small to hold all the cash,

11:45 10   according to Mr. Crater.

11   Q.   Do you remember text conversations about cards?

12   A.   Could you say that last word again?

13   Q.   Of cards, debit or credit cards.

14   A.   Of cards, yes, of course, yes, yes.

15        MR. MOORE:  Can we go to page 5 at 7:12:34.

16   Q.   And at number 3 there, you say, Any real chance of the

17   investor cards arriving today or tomorrow?

18        MR. MOORE:  And then if we can actually scroll down to

19   page 7 at 9:46:03.

11:46 20   Q.   You write again, Are the cards due to arrive today or

21   approximately when, please?

22        And right below that, Mr. Crater responds, This week

23   all is happening.

24        Do you remember -- did the cards come that week, as

25   Mr. Crater indicated?

A.    No.  It took a long time for the cards to come.  I kept

asking about them, and I thought the cards were critical to be

able to process any bank wire or transaction that would have to

pass through the card and go to the wallet.  So I was pressing

him on when the cards would come.  And that was just ongoing

and frustrating.

          MR. MOORE:  Let's go to page 15 at 6:26:25.

Q.    Randall says, And the cards are en route.

          MR. MOORE:  And then if we go down to page 17.

A.    Okay.

Q.    At 7:01:31, you write, Unfortunately, Randall, the cards

seem lost.  FedEx tracking system rarely fails.  You must not

have arranged the mailing yourself as it seems the cards were

never sent or lost or stolen.  What have you learned about

this?  Really a weird situation about these.  Will be a lengthy

nightmare to replace.

          And below that Randall writes, I'm handling in the

a.m., John.  They are still at the UPS Store.  I spoke with the

lady who runs the store and the box had fallen out of the bin.

I'm guessing where it got stacked so high but it's fine now and

I will get them out.

          What did you understand this exchange to mean?

A.    Well, a little -- you've given a literal reading.  When I

read it, it was -- I was incredulous.  It just was silly, I

thought.

```
        1              MR. MOORE:  Can we go to page 20.
        2    Q.   And here at 3:11:23, Randall says, Cards going out today
        3    John.
        4              And then if we go down to page 32 at 12:13:57, you
        5    say, My card just arrived.
        6              Do you remember finally receiving a card?
        7    A.   I did get a card, as I think I testified earlier, the one
        8    from Allied Bank, MasterCard without my name on it.
        9              MR. MOORE:  Can we go to page 33 at 12:16.
11:49  10    Q.   Here Randall says, I'll start moving funds your way for
       11    you to use the card.
       12              You respond back, Will that be today?
       13              Randall.  They are closed at the bank now.  Will be
       14    tomorrow as it's out of the country, as you know.  I'm glad you
       15    got the card so fast.  That's amazing.  I asked them to make
       16    that happen.  I don't load cards until they get them in case
       17    the cards not string there.
       18              What did you understand this exchange to mean?
       19    A.   Well, like many of his messages to me, you really had to
11:49  20    look hard to try to make out the English and the grammar and
       21    try to find out what you think he meant because it wasn't
       22    always clear.  But I think what he was saying here was he
       23    doesn't put the cash into the cards or wire the funds until
       24    they get them in case the cards are not -- I don't know what
       25    "string" means, strung, I'm not sure what it meant, but I think
```

1    I got the general tenor of it.

2    Q.   But were you expecting cash was going to be put on this

3    card?

4    A.   Yeah, he kept promising me that, you know, one way or the

5    other he'd get me cash, and there were various ways he was

6    going to accomplish, but I think you've touched on some of them

7    about selling gold and bankrupting the country (sic.) or

8    selling a license, those types of things to create the

9    available funding to send it to me through the card and into

11:50 10    the wallet.  That was the procedure.

11              MR. MOORE:  Can we go to page 34 at 12:30 p.m.

12   Q.   Here at the top at 12:30 you say, Also, Randall, Mark

13   asked me for a loan by wire a short time ago.  I can do that

14   soon today comfortably knowing that tomorrow you will be

15   funding me.  He is short on food, medicine for his wife,

16   overdrawn on his credit card, and owed money immediately on his

17   car and house insurance to avoid cancellation on both.  Arrival

18   and funding of my card (Mark already has his) is so timely for

19   us.

11:51 20              Randall writes back, I had and I told him there is no

21   way I could help him right now.

22              You write, I will this afternoon, but it would be

23   great if you could back me up tomorrow by funding my card.

24              Did Randall fund your card the following day?

25   A.   No, sir.

 1    Q.   All right.  Do you remember text messages with Randall in

 2    which he indicated that he would be traveling to various

 3    places?

 4    A.   I remember them.  It was all very confusing, where he was,

 5    where he was going to, whether he was en route, whether he had

 6    arrived, whether he was coming back to Boston to see me.  It

 7    was like scrambled eggs all over the place.

 8         MR. MOORE:  Let's go to page 25 at 3:09.

 9    Q.   And here he says, This is going to be my travels.  I'm

11:52 10   going to California, then Colorado, and then Boston Saturday.

11         Did he go to Boston on that following Saturday like he

12    indicated here?

13    A.   Absolutely not.

14    Q.   And do you remember other text messages with him talking

15    about traveling to Colorado and California?

16    A.   Yes, I think he was supposed to be loading an armored car

17    with piles of cash in the bigger truck in Colorado.

18    Q.   All right.  Do you remember text conversations with him

19    about the NFL?

11:52 20   A.   Yes.

21         MR. MOORE:  Can we go to page 13 at 6:27 p.m.

22    Q.   So Randall says, So the NFL is getting involved with us,

23    John.  Will explain.

24         Did he ever explain to you the involvement of the NFL?

25    A.   Not entirely, no.  It was -- he frequently would mention

1    companies that he was interviewing with and dealing with and

2    setting up to use the coin and further the potential success of

3    the company by bringing in this new business.  And with the

4    NFL, he basically just gave me an overview saying that we're

5    going to get involved with the NFL somehow and the NFL would

6    use the coin.  But no explanation beyond that really.  But it

7    was always something.  It was NFL one time, it was Mexico

8    another time, it was this, it was that, you know, all these

9    stories about businesses or countries coming to use the coin,

11:54 10   and to my knowledge none of it ever happened.

11   Q.   Is the NFL here the National Football League?

12   A.   Oh, yes, the National Football --

13   Q.   Did the National Football League ever adopt My Big Coin as

14   a currency?

15   A.   No, not to my knowledge.

16   Q.   Do you remember conversations with him about wires?

17   A.   Many.

18        MR. MOORE:  Can we go to page 2 at 6:17 p.m.

19   A.   Oh, I see it, down at the bottom, The cc cleared?

11:55 20   Q.   Yeah.

21   A.   Okay.

22   Q.   Randall writes, The cc cleared, John.  The funds should be

23   ready to wire tomorrow.

24        You respond back, That is great news.  Can you give it

25   a push tomorrow for me?  Also, may I ask what amount will be

 1   sent?

 2   A.   I see that, yes.

 3         MR. MOORE:  And then can we scroll down.

 4   Q.   You write, Good morning, Randall, can you respond, please,

 5   to my last text yesterday regarding the wire.  Also, does "cc"

 6   mean the credit card processing in your last text?  Thanks

 7   John.

 8         Randall responds back, The card bought the gold.  The

 9   gold is being sold today.  The wire for the gold clears today

11:55 10   and then you will be getting the wire I'm 90 percent tomorrow,

 11   John, this is 100 percent.

 12         What did you understand this exchange to mean?

 13   A.   Okay.  So we're now in a time frame -- we've gone back

 14   from May to just prior to tax date April 13th.  So what Randall

 15   is telling me is that he's been able to fund the credit card

 16   and the way he did it was the card bought the gold, the gold is

 17   being sold today, the wire for the gold will clear tomorrow,

 18   and then you'll be getting your wire.

 19         I think he goes on to mean, in Randall-speak, I am 90

11:56 20   percent tomorrow and, John, the overall deal is 100 percent

 21   going to happen.  And, again, this, is just a few days prior to

 22   date tax date, when I'm essentially begging him to send me the

 23   money.

 24         MR. MOORE:  Can we go to page 3.

 25   Q.   You write, So tomorrow is most likely the wire day, 90

1    percent probability.  What's the amount of the wire for
2    planning purposes?
3           Randall responds back, 3M.
4           What did you understand "3M" to mean?
5    A.   He told me that the 3M meant, and I took it to mean 3
6    million, you know, that he had sold the gold and I was going to
7    get $ 3 million right around in time for the tax date.  So
8    that's what we kept waiting for, was money of any type, and
9    this was very good news.  I think I said in the next line,
10   That's super, great.
11          MR. MOORE:  Can we go to page 8 at 3:11.
12   Q.   Randall at 3:12 goes, Wire is going out tomorrow 100
13   percent.
14          MR. MOORE:  If we scroll down to 7:34 a.m.
15   Q.   And at 7:36 Randall responds back to you, The wire is
16   going out from Europe today, John.  You won't receive it until
17   tomorrow.  I'm sitting here doing a ton of paperwork in order
18   to make this happen today.  You have to show your first born in
19   order to get over a million dollars sent out of the country
20   that was just deposited into a bank account less than a week
21   ago but it's all good and getting done, John.
22          What did you understand this exchange to mean?
23          MR. LOPEZ:  Objection.  Can we --
24          THE COURT:  I understand.  Mr. Moore, just ask the
25   questions.

```
 1              MR. MOORE:  Yes, your Honor.
 2     BY MR. MOORE:
 3     Q.   What did you understand this to mean?
 4     A.   I took that to mean that he was going to send me the money
 5     right away.
 6              You'll notice on this date it's past tax date.  It's
 7     4/20.  The money was promised a week prior on 4/13.  So I'm
 8     still chasing him, asking him, Is it still a hundred percent, I
 9     asked him at 7:34.
11:58 10           At 7:36, now the wire is going out today from Europe.
11     He had to do a ton of paperwork, and it was just deposited into
12     a bank account less than a week ago but it's all good and
13     getting done.
14              Again, assuring me money is on the way, a check is in
15     the mail type of thing.
16              MR. MOORE:  And page 9 at 3:20 p.m.
17     Q.   You say, Did you end up sending the wire from Europe
18     today?
19              Randall responds, Yes.
11:59 20           And then if we scroll down, you say, The wire has not
21     been received in my account at Bank of America.  Would you
22     confirm with your bank it was sent yesterday, please, and get
23     back to me.  Because of the six-hour time difference there's
24     only a few hours left today in Europe before closing.
25              And Randall responds back, Good morning, John, hope
```

1    all is well.  Please don't stress on this.  Wire, it's en route

2    to you, that I know for a fact, and it's only 7:36 in the a.m.,

3    John.  The wire couldn't even be showing up now at all,

4    honestly.  I wouldn't even think that it would show till

5    Monday.  Trust me, I'm looking for it like you are, John, and

6    Mark as well is ent us 3 wires me and Mark very small ones.

7         What did you understand that exchange to mean?

8    A.   Once again, we're now days after originally he sent --

9    said he had funded the account back prior to the tax date on

12:00 10   February 13th.  No money came through.  He assures me that it

11   is coming, that it's only 7:36 in the morning wherever he was,

12   I don't know if he was in Europe or where he was at that point

13   in time.  And he doesn't think now it will show until Monday.

14        And then he said he's looking for it as well, and

15   apparently there were three wires sent to me and Mark, very

16   small ones.

17        So in addition to my money, which he had promised me

18   $3 million, he was sending some money to himself and Mark as

19   well from wherever it was.

12:01 20   Q.   And then you ask him about the wires, and he responds

21   back, I sure hope so, John.  I'm on egg shells.

22        What did you understand him to mean by he's on egg

23   shells?

24              MR. LOPEZ:  Objection.

25              THE COURT:  Well, sustained as to the -- you can ask

1    another question.  Sustained as to form.

2         MR. MOORE:  Okay.

3    BY MR. MOORE:

4    Q.   What did you understand this exchange to mean when he

5    says, I'm on egg shells?

6    A.   Well, he's trying to give me some comfort in saying -- I

7    took it to mean he was as anxious as I was, anxious to take

8    care of me and perhaps take care of himself and Mark.

9         MR. MOORE:  Let's go to page 10 at 12:21.  Actually,

12:02 10  you can just actually go to 3:58 p.m. at the bottom there.

11   Q.   And after you inquire again about the wire, Randall says,

12   100 percent sent.  I'll call them a.m.  Nothing to worry about

13   at all.

14   A.   So if you also read the one in front of it, when I write

15   to him, I'm saying now it's the 24th of April.  Are you really

16   sure you wired it to me last Thursday?  Are you busy?  Could

17   you follow up with them and so on and so forth.

18        And then his answer, as you've indicated here and

19   highlighted, 100 percent sent.  I'll call them in the morning.

12:02 20  Nothing to worry about at all.

21        Now we're up to the 24th.

22        Nothing to worry about.

23        MR. MOORE:  Could we go to page 11.  And starting at

24   4:41.

25        And just go all the way to the bottom.

1    Q.   And then, here at 6:46, Randall writes back, Good morning,

2    John.  Spoke to the bank.  They said the wire will hit your

3    account tomorrow and/or Thursday.  Sorry for late fees back but

4    had to wait on the bank to get back to me and for them to open.

5         Did you receive that wire that day or Thursday as he

6    indicated?

7    A.   No, sir, not that day, not any day, no wires ever came.

8         MR. MOORE:  Can we go to page 17 at 4:54.

9    Q.   He writes, The Spain was an ACH different.  They both can

12:04 10   take up to 7 business days, John, to come through and, yes,

11   your funds should show up tomorrow.

12        What did you understand this exchange to mean?

13   A.   Just another excuse that makes no sense because now we're

14   up to April 30th on something that he said he sent on April

15   13th and I guess ACH is a type of wire.  But now we're two

16   weeks after he originally sent it and it wasn't consistent with

17   my experience on wiring.

18        MR. MOORE:  Can we go to page 18 at 5:05 p.m.

19   Q.   And Mr. Crater responds back at 5:07 p.m., Outside of the

12:04 20   country it can take seven days.

21        Is this more conversation about that same wire we just

22   discussed?

23   A.   Yes, sir.

24        MR. MOORE:  Can we go to page 20.  And starting at

25   7:15.

1           Keep going down a little further.

2    Q.   And then after you guys have some more conversation about

3    this wire you write, Nothing from Spain today.  You said you

4    did the wire on Thursday 4/20 so today is the 8th day.  Do they

5    respond your emails or calls?  What is the issue do you think?

6    And did you overnight the cards today?

7           What's happening here in this exchange?

8    A.   Just more delay and excuses.  No funds and at that point

9    no cards.

12:05 10        MR. MOORE:  And page 22.  Starting at 8:59 a.m.

11   Q.   You're asking about the wires from Spain and California,

12   and he responds back, I'm working on all fronts, John.

13          What did you understand him to mean by that?

14   A.   Just let me read it, please.

15          (Pause.)

16   A.   Again, this is May 3rd, in that time frame, and I'm

17   pressing him.  You know, it's now almost three weeks since

18   April 13th, when I was looking for the tax money, waiting for a

19   wire that I would expect overnight or within a day or two, and

12:06 20   nothing.

21          But he says, I'm working on all fronts, whatever that

22   means.  Another excuse I took it to mean.

23          MR. MOORE:  And then page 25, first at 3:11 p.m.

24   Q.   You ask again about the wire.  He said, Should be if not

25   tomorrow -- and then if we scroll down to 3:50.

1          You ask again about the wire, and he says, I'll walk

2     in there today and address them.

3          What did you understand that exchange to mean?

4     A.   Well, he was going to go directly to the bank wherever he

5     was, if he was in Europe or in Colorado or whatever, and he was

6     going to take it up with them personally for something that he

7     said -- this was on May the 5th for something he initiated on

8     April 13th, one, two, three weeks earlier, according to him.

9          But he's going to walk in there today and try to get

12:07 10    to the bottom of it, I guess.  That's what he's saying.

11    Q.   Do you remember conversations about you talking to a

12    government lawyer?

13    A.   Conversations with Mr. Crater?

14    Q.   Yes.

15    A.   Yes, whether it was by text or email or telephone, one of

16    those.

17          MR. MOORE:  Can we go to page 11.  And at 4:28 p.m.

18    Q.   You write, Just forwarded you a copy of an email from a

19    government attorney looking to interview me.

12:08 20         And he writes back, Okay, that's great.  That's about

21    getting the CFTC thing off our back.  It's fine.

22          You write, Would it be helpful to talk with him?

23          He writes, I'm asking now.  Will get back to you in

24    that shortly.

25          And then he also says, Also, I can assure you the wire

 1    is out.  You will have it, John.

 2             What's going on in this exchange?

 3    A.   Well, back on approximately April 24th, I got contacted by

 4    a government attorney from the Commodities Futures Trading

 5    Commission, I guess, and they were looking to find out --

 6             MR. LOPEZ:  Objection, your Honor.

 7             THE COURT:  Counsel, do you want to be heard?

 8             MR. LOPEZ:  Yes.

 9             THE COURT:  Okay.

12:09 10          Jurors, bear with us.  I'm just going to hear counsel

11    at our virtual sidebar.

12             (Discussion at sidebar.)

13             THE COURT:  Mr. Lopez.

14             MR. LOPEZ:  Your Honor, my objection is that this

15    witness goes beyond the scope of the question and goes into

16    commentary that he hasn't been asked about which might be

17    prejudicial to my client.  Since I don't know what he's going

18    to say because the question hasn't been asked about it, I'm at

19    a distinct disadvantage.

12:10 20          THE COURT:  Mr. Moore, can you give me a proffer?

21             MR. MOORE:  Yes, your Honor.  I expect that he will

22    testify that he was contacted by the CFTC about --

23             Can you hear me, your Honor?

24             THE COURT:  I can.

25             MR. MOORE:  I expect that he will testify that the

1    CFTC contacted him about My Big Coin and that he then was

2    subpoenaed to testify and testified in front of the CFTC about

3    My Big Coin and also had conversations with Mr. Crater about

4    what his testimony would entail.

5         THE COURT:  Mr. Lopez, any objections to the limits of

6    that testimony, particularly if I have Mr. Moore ask leading

7    questions?

8         MR. LOPEZ:  No, so long as he also asks the question

9    what did Mr. Crater tell him and he responds that Mr. Crater

12:11 10   told him to tell the CFTC the truth.

11        THE COURT:  Mr. Moore, agreed?

12        MR. MOORE:  I will ask him what Mr. Crater told him,

13   but what Mr. -- I mean, I'm not sure Mr. Lopez's representation

14   will come out in the testimony.  He's certainly free to ask him

15   about that on cross.

16        MR. LOPEZ:  It's in the transcript.

17        THE COURT:  Okay.  Well, it might be a completeness

18   issue.  I'll let the government elicit what -- well, we'll see

19   where the testimony goes, but, Mr. Moore, you should lead here.

12:11 20        Any reason why I should give a limiting instruction?

21        MR. LOPEZ:  Your Honor, I think after the testimony

22   comes in, I think a limiting instruction would then be

23   appropriate.

24        THE COURT:  Just to say it's another civil proceeding

25   and the testimony is only be considered in regards to the

```
 1   charges in this case?
 2              MR. LOPEZ:  That's correct, your Honor.
 3              MR. MOORE:  No objection, your Honor.
 4              THE COURT:  Thank you.
 5              (End of discussion at sidebar.)
 6              THE COURT:  Mr. Moore, you can ask the questions as I
 7   indicated.
 8              MR. MOORE:  All right.
 9   BY MR. MOORE:
10   Q.   Do you remember having this text exchange with Mr. Crater?
11   A.   Starting from the top of the page, yes, I do.
12              MR. MOORE:  And then I'll ask for Exhibit 14B.
13   Q.   Is this an email exchange between you and a government
14   attorney from the CFTC?
15   A.   Just give me a second.
16              (Pause.)
17   A.   Yes, sir, it is.
18              MR. MOORE:  All right.  And we can scroll to the top
19   of this.
20   Q.   And after you received this email message, what did you do
21   to it?  Or what did you do with it?
22   A.   Shortly after I received it, I forwarded it to Mr. Crater.
23              MR. MOORE:  Can we go to Exhibit 14F.
24              And if we could start at 3:17.
25   Q.   So you -- Randall -- actually, let's go one email below
```

1    this.

2         So in this email exchange were you having a

3    conversation with Mr. Crater about complying with the CFTC

4    subpoena?  Is that an accurate description?

5    A.   Yes.  There was a series of exchanges in very short order

6    that afternoon between me and Mr. Crater after I sent him the

7    inquiry that I got from the government attorney looking to

8    interview me, and then we went back and forth several times,

9    and you've picked one of them, I guess, here.

12:14 10   Q.   And apart from the email, were you also issued a subpoena

11   to testify by the CFTC?

12   A.   Yes.  They came a relatively short time apart.  I sent the

13   first one to Randall to get his comment on it and see what was

14   going on, and then very shortly later I got a second one where

15   they wanted to both interview me and take my testimony under

16   oath.

17        MR. MOORE:  Now can we go up to the 3:17.

18   Q.   And here it says, Randall -- specifically it says, In Re:

19   Certain Persons Engage in Fraud With Respect to Unlawful Retail

12:15 20   Commodity Transactions.  I think it must be MBC or MBCP.

21   That's all I'm involved with.  I am not worried about anything

22   I have done, and my knowledge is limited.  Sadly, the time and

23   expense involved will be significant.  As a lawyer in good

24   standing, I will respect the process and will do the best I can

25   to comply.  What time are you arriving this evening?

1          If we go up above, Randall responds to you, The one

2     for oral statements is the one I was asking about.  You got

3     another subpoena for you to make oral statements about MBC is

4     what I was asking.

5          And then above that you write, The oral subpoena was

6     titled with the language I sent you.  There was no actual

7     mention of MBC.

8          And then in the top email or, sorry, the second-to-top

9     email Randall responds back, I'm still thinking you don't have

12:16 10   to answer for attorney-client, John.  I'm waiting for the

11    feedback about this but we had many talks over the past few

12    years about the business and I think we're covered 100 percent

13    with protection.  I don't see how we aren't.

14         What's going on in this exchange?

15    A.   All right.  So I had sent him the original inquiry from

16    the attorney from the government.  I got immediately

17    thereafter, shortly thereafter, a notice to be deposed, and he

18    wanted some particulars about the oral testimony.  And then he

19    suggested to me that as an attorney I should claim what is

12:16 20   called the attorney-client privilege and not have to answer

21    these discovery requests or be deposed.  And that -- as you'll

22    see, as we move on, I told him that was ridiculous.  I wasn't

23    his attorney, I was an investor, and that I intended to answer

24    any questions and disclose fully any materials and testify

25    truthfully under oath about anything they would ask me.

```
 1              There was no attorney-client privilege between me or
 2    Mr. Crater or the company -- any of his companies.  I was never
 3    asked to give advice to Mr. Crater or the companies.  There was
 4    no fee agreement between us.  There was nothing of a
 5    professional nature, which, you know, would trigger an
 6    attorney-client privilege.  So that was -- it just wasn't so
 7    and I wasn't going to do it.
 8    Q.   And so at the very top you respond, How does this
 9    attorney-client privilege apply to me as an investor?
12:18 10    A.   Yes.
11    Q.   What was your perception of this overall email exchange?
12              MR. LOPEZ:  Your Honor --
13              THE COURT:  Well, sustained as to that given our
14    discussion at sidebar.
15              MR. MOORE:  Okay.
16    BY MR. MOORE:
17    Q.   Did you understand Mr. Crater's email to you below where
18    he says --
19              MR. MOORE:  Can we scroll down one --
12:18 20    Q.   -- I think we're covered 100 percent with the protection.
21              What did you understand that to mean?
22              MR. LOPEZ:  Objection.
23              THE COURT:  Mr. Moore, being offered for the effect on
24    the listener?
25              MR. MOORE:  Yes, your Honor.
```

```
 1              THE COURT:  So overruled on that basis.
 2    A.   So, again --
 3              THE COURT:  So here I think I'm going to give an
 4    instruction, counsel.
 5              So, jurors, as I said, there's sometimes occasions
 6    that come up where evidence is offered for one particular
 7    purpose but not any other.
 8              Obviously one person can't attest to what's in the
 9    mind of someone else, but there are certain statements that are
12:19 10   being offered about their effect on the listener, here the
11    witness.  So it's being offered and admitted for that purpose.
12    BY MR. MOORE:
13    Q.   And just to clarify my question -- what did you -- what,
14    if anything, did you understand was being communicated to you
15    by that, I think we're 100 percent covered with that
16    protection?
17    A.   It was clear to me that he was encouraging me not to
18    cooperate with the government, not to testify, not to turn over
19    my records and do so by claiming the attorney-client privilege.
12:19 20   And he thought, he suggested --
21              MR. LOPEZ:  Objection.
22              THE COURT:  Sustained as to the continued answer.
23              MR. MOORE:  Thank you.
24    BY MR. MOORE:
25    Q.   Did you ever meet in person with the defendant?
```

1   A.   I did one time finally, and that only occurred by

2   agreement after this whole investigation started triggered by

3   these emails that you have put in front of me.

4   Q.   So you met with him after this email exchange?

5   A.   Not until -- there were many occasions where we were going

6   to meet, I was trying to get more information --

7            MR. LOPEZ:  Objection, your Honor.

8            THE COURT:  Well, sustained in terms of responsiveness

9   to the question, Mr. Lopez?

12:20 10         MR. LOPEZ:  Yes.

11           THE COURT:  Okay.

12           So, Mr. Lynch, just listen and answer the question

13   asked.

14           THE WITNESS:  Certainly, your Honor.  I'm sorry.

15           THE COURT:  Mr. Moore, can you ask the question again?

16   BY MR. MOORE:

17   Q.   So you met with him for the first time in person after

18   this email exchange; is that correct?

19   A.   That is correct.

12:20 20   Q.   Do you remember where that meeting occurred?

21   A.   I flew to South Carolina where Mr. Crater was at the time

22   working.  I think he had family down there or something, and

23   the meeting took place at his lawyer's office in Charleston,

24   South Carolina.  And the date was June 5, 2017.

25   Q.   And did you guys discuss the investigation by the CFTC at

1    this meeting?

2    A.    Yes.

3    Q.    Did you guys discuss the need for you to testify?

4    A.    That was brought up by Mr. Crater, yes.

5    Q.    At the end of this meeting, did Randall Crater agree to

6    increase the number of coins that was held in your My Big Coin

7    account?

8    A.    Well, one of the things we discussed was that my records

9    didn't reflect the total amount that I had invested in the

12:21 10   company, so I was trying to get that squared away, too,

11   particularly now when there were government inquiries and

12   investigations.  My records were a mess I felt.  So that was

13   one of the topics that we discussed.  And as a result of these

14   discussions --

15   Q.    Let me -- so as a result of the discussions, did he change

16   your account to what you thought the number of coins were?

17   A.    That's exactly correct.

18   Q.    And is the number of coins that you thought you should

19   have more than what was originally listed in your account

12:22 20   before this conversation?

21   A.    Yes.  I needed more coins to properly reflect the monies

22   that I had sent.  So he was able to increase the amount of

23   coins to my satisfaction, to the right amount.

24   Q.    And did you convert -- did you discuss transferring some

25   of your licenses from license purchases to coins at this

1   meeting?

2   A.   Yes.

3   Q.   And then did Randall Crater tell you that he would update

4   the account to show the appropriate amount of coins?

5   A.   He did.

6   Q.   And did that happen within a two-week time period?

7   A.   I'd say it happened within the week, approximately a week

8   or a little longer or shorter.  I think it happened in a couple

9   of segments, but within a week certainly.

12:23 10   Q.   All the previous times you had asked Randall Crater to

11   update your account, did he update it as quickly as he did

12   after this in-person meeting?

13   A.   Absolutely not.  This took me years to get this done, and

14   it only happened after I got these documents from the

15   government and flew to his lawyer's office in North Carolina --

16   South Carolina, Charleston, South Carolina.

17   Q.   During this meeting did Randall Crater tell you that My

18   Big Coin would be available on a series of exchanges shortly

19   after this meeting?

12:23 20   A.   Yes.  That was something he was telling me, yes.  And

21   continued to tell me -- that was in June of -- June 5, 2017,

22   and he continued to tell me that through the date of my

23   deposition, which was approximately 30 or 35 days later here in

24   Boston.  In fact, when I walked into the deposition, I was in

25   touch with him and Mr. Gillespie.  They were telling me that

         1    we're going -- the exchanges are going to light up at any
         2    moment and there will be active trading there.
         3         THE COURT:  Counsel, Mr. Lopez, did you want a
         4    limiting instruction at this point in regards to the subject
         5    matter?
         6         MR. LOPEZ:  Yes, your Honor.
         7         THE COURT:  In regards to the other proceeding?
         8         MR. LOPEZ:  Yes.
         9         THE COURT:  Okay.  So, jurors, you've heard reference
12:24 10    in the last series of questions to an investigation by the
        11    CFTC, which you've heard I think earlier referred to as a
        12    federal agency.  I note that the statements being offered here
        13    are only being offered for the purposes of the charges against
        14    Mr. Crater in this case.
        15         To the extent that there was any other agency
        16    proceeding, a civil proceeding, has no bearing on the guilt or
        17    innocence of Mr. Crater.  The statements are just being offered
        18    by the government as part of their case in chief about the
        19    present charges against Mr. Crater.
12:25 20         Okay.  Thank you.
        21         Mr. Moore.
        22    BY MR. MOORE:
        23    Q.   And during this conversation in South Carolina, did
        24    Mr. Crater also tell you something to the extent that you have
        25    nothing to be afraid of and neither does he?

1          MR. LOPEZ:  Objection.

2          THE COURT:  I assuming form, counsel?

3          MR. LOPEZ:  Yes.

4          THE COURT:  Sustained as to form, counsel.

5          MR. MOORE:  Okay.

6    BY MR. MOORE:

7    Q.   What did Mr. Crater tell you as to your testimony in front

8    of the CFTC?

9    A.   Well, first -- it was in segments, and regarding testimony

12:26 10   before the CFTC, he tried to persuade me not to testify and to

11   assert the attorney-client privilege, which we discussed

12   before.

13          When I was adamant in saying I was an attorney in good

14   standing, I was going to cooperate fully, answer all of the

15   questions, I had done nothing wrong, I was an investor, and I

16   was not going to impeding the investigation in any way.  When

17   he realized that that was it, he said, Well, I haven't done

18   anything wrong either.  And he said, So if you feel that way,

19   just go ahead and testify and tell them what you know and tell

12:26 20   them the truth.

21          And so he went from trying to encourage me not to do

22   it.  I was adamant that I was going to do it.  And then, you

23   know, he made those comments.

24   Q.   Did you testify in front of the CFTC?

25   A.   I did.

1    Q.   And at the beginning of that testimony did you still
2    believe My Big Coin was a legitimate business?
3    A.   Yes.  I had invested so much money in the business.  Even
4    though I was getting the runaround on certain things that
5    you've gone over, I was hoping that there would be some success
6    here and I'd get my money out and maybe I'd even make a profit
7    for myself, my family and my friends that had invested in this.
8            So when I walked into the deposition, I was hopeful
9    that it would ultimately lead to something.  Then we got into
12:27 10   the deposition, and there was some changes.
11   Q.   At some point during your testimony did your amount of
12   faith in My Big Coin start to decrease?
13   A.   No question, yes.
14   Q.   What made you start to finally lose faith in My Big Coin?
15   A.   Well, during the deposition -- it was a long deposition.
16   We started first thing in the morning at 9:00 or thereabouts
17   and we went until 5:30 or 6:00.  But somewhere after the
18   midpoint or at the midpoint, in that period of time, there were
19   two attorneys from the government agency questioning me, and
12:28 20   one would start and somebody else would pick something up and
21   it would go back and forth.
22           But it was revealed to me how the money --
23           MR. LOPEZ:  Objection.
24           THE COURT:  Sustained here.  Counsel, given our
25   sidebar conversation, counsel.  So unless you want to take this

1    in baby steps for the benefit of the Court, you should move on.

2            MR. MOORE:  Okay.

3    BY MR. MOORE:

4    Q.   During your testimony in front of the CFTC, were you

5    confronted with facts about My Big Coin?

6            MR. LOPEZ:  Objection.

7            THE COURT:  Well, sustained as to that.

8    BY MR. MOORE:

9    Q.   Do you currently believe My Big Coin is a legitimate

12:29 10  company?

11   A.   I believe it is not -- isn't and wasn't ever a legitimate

12   company.

13   Q.   What made you come to that realization?

14   A.   Well, a number of things, but specifically with respect to

15   my deposition before the CFTC --

16   Q.   Well, just not about your deposition.

17            Just sitting here today, what makes you realize that

18   My Big Coin is not the investment that you thought it was?

19            MR. LOPEZ:  Objection.  Is he asking an opinion, your

12:29 20  Honor?

21            THE COURT:  Well, sustained as to this, counsel.

22            You can rephrase to ask other questions.

23   BY MR. MOORE:

24   Q.   Did you ever receive stock shares in My Big Coin?

25   A.   Never.

```
 1            MR. MOORE:  Can we bring up Exhibit 14G.
 2    Q.    Is November 5, 2017 after your testimony in front of the
 3    CFTC?
 4    A.    Yes, it's about five months later.
 5    Q.    All right.  Did you reach out in this email to Mr. Crater
 6    about My Big Coin?
 7    A.    Yes, I did.
 8    Q.    Here you say, MBC is no longer on Nova or anywhere else
 9    that I am aware.  What is the timing of getting on an exchange
12:30 10   and the start of trading?
11            Do you see that?
12    A.    I do.
13    Q.    What's going on in this exchange?
14    A.    As I said earlier, I was waiting to be able to sell some
15    of my coins -- some or all of my coins on an exchange.  The MBC
16    exchange was frozen or closed and they were trying to get us
17    onto other exchanges using also the credit card and the wallet
18    and that system I described before.  And apparently at one
19    point they must have been listed on Nova, N-o-v-a, which I take
12:31 20   to be an exchange, but it was no longer listed.  And I'm asking
21    of Mr. Crater, once again, what's the timing of getting on an
22    exchange and the start of trading so I could get some money out
23    of my investment or sell it.
24    Q.    Was your understanding that My Big Coin was backed by gold
25    important in your decision to purchase My Big Coin?
```

A.   Critical.

Q.   Was your understanding that My Big Coin was backed by oil important to your purchase of My Big Coin?

A.   Very much so, yes.

Q.   Was your understanding that My Big Coin could be traded on an exchange important to your decision to purchase My Big Coin?

A.   Yes, that way I could know the value of -- the approximate value of each coin.

Q.   Was it important to you that the transactions listed on the exchange, the actual transactions that occurred on the exchange?

A.   Well, yes, of course.

Q.   Was it important to you that My Big Coin had a partnership with MasterCard?

A.   That gave me a great deal of comfort to know he was working with MasterCard, a very reputable credit card company, yes.

Q.   Did it also become important to you that you could access your funds through this My Big Coin MasterCard?

A.   Yes.

Q.   Did anyone ever tell you that the money you were sending for My Big Coins -- did Randall Crater ever tell you that the money you sent to him for My Big Coin would be spent on jewelry?

A.   Absolutely not.  I was never told that.

```
 1    Q.   Did Randall Crater ever tell you that the money you were
 2    sending for My Big Coin would be spent on artwork?
 3    A.   No, never.
 4    Q.   Did he ever tell you it would be spent at an auction
 5    house?
 6    A.   Never.
 7    Q.   Did you expect that when you sent money to Randall Crater
 8    that he would keep that money and use it on his personal
 9    expenses?
10    A.   Those were not my expectations at all.
11    Q.   When you invested shares in My Big Coin, did you have an
12    expectation that that money would be spent on Randall Crater's
13    personal expenses?
14    A.   Absolutely not.
15    Q.   For all of the previous -- the gold, the backed by oil,
16    traded on an exchange, did Randall Crater tell you those were
17    things that would happen in the future when he told you about
18    those, or did he tell you it was things that were already
19    occurring?
20    A.   Are you talking about the exchange, listed on exchanges,
21    is that the question?
22    Q.   I'll go one by one.
23         When he told you it was backed by gold, did he tell
24    you that that it was currently backed by gold or will be backed
25    by gold?
```

1    A.    Currently, it already existed when I got involved and was

2    investing.  It was preexisting fund of gold bullion.

3    Q.    When he said "backed by oil," did he say it's currently

4    backed by oil or one day in the future it will be backed by

5    oil?

6    A.    Currently.

7    Q.    When he said that it could be traded on an exchange, did

8    he say currently traded on an exchange or hopefully one day?

9    A.    No, that it was being actively traded, and that's how you

12:34 10   determine the price.  It was an internal exchange, not an

11   external exchange.

12   Q.    Did he say that he hoped to one day have an agreement with

13   MasterCard, or did he say that he currently had an agreement

14   with MasterCard?

15   A.    Currently had an agreement with MasterCard.

16   Q.    Over the course of your investment in My Big Coin,

17   approximately how much money did you send to Randall Crater?

18   A.    Well, on behalf of myself and my family and -- and my

19   family, I had a total in there of more than $5.6 million.  Some

12:34 20   of it was, again, for the coins and some of it for the various

21   licenses, but it was all denominated in coins.

22   Q.    And have you received any of that money back?

23   A.    Not one penny.

24           MR. MOORE:  Thank you.

25           Nothing further, your Honor.

```
 1              THE COURT:  Thank you.

 2              Mr. Lopez, cross-examination.

 3              MR. LOPEZ:  Thank you, your Honor.

 4              THE COURT:  And as I said, you can do it from there as

 5    long as you keep your voice up for the jury.

 6              MR. LOPEZ:  I think for the first part of this I think

 7    I'd rather --

 8              THE COURT:  Okay, sure.

 9                          CROSS-EXAMINATION

10    BY MR. LOPEZ:

11    Q.   Good afternoon, Mr. Lynch.

12    A.   Good afternoon, sir.

13    Q.   My name is Scott Lopez.

14    A.   Yes, sir.

15    Q.   I represent Mr. Crater.

16    A.   Yes.

17    Q.   My private investigator tried to contact you a number of

18    times to speak with you.  Do you recall that?

19    A.   He never called me that I'm aware of.  What's his name?

20    Q.   John Cinotti.

21    A.   Never that I know of.

22    Q.   Never left you messages?

23    A.   Nothing that I know of.

24    Q.   He never left you voicemails?

25    A.   I don't remember any, no.
```

```
 1            What did he call?
 2   Q.   He's been calling for months, sir.
 3   A.   What, did he call my office or --
 4   Q.   He called your office, yes.
 5   A.   I don't remember that.
 6   Q.   In any event, you haven't talked to him?
 7   A.   Not a bit.
 8   Q.   Now, I want to take you back to the beginning of My Big
 9   Coin, when you first became aware of My Big Coin.
12:36 10   A.   Yes.
11   Q.   What did you know about cryptocurrencies at that point in
12   time?
13   A.   Well, what I -- I was certainly no expert, but, you know,
14   I read the newspapers and the financial newspapers and I was
15   aware of what was going on with Bitcoin, and that was of
16   interest to me.
17   Q.   And you didn't learn about My Big Coin from Mr. Crater,
18   correct?
19   A.   Well, I did at some stage, but initially, the very first
12:36 20   time, if that's what you mean, no, it was through Mr. Michael
21   Kruger, who worked for Mr. Crater.
22   Q.   Well, that's what you thought.  You thought he worked for
23   Mr. Crater?
24   A.   Well, he told me and he showed me a card that said he
25   worked for My Big Coin and Mr. Crater -- well, the card didn't
```

1  say that he worked for Randall Crater.  It said he worked for

2  My Big Coin.

3  Q.    Do you know who the chief executive officer of My Big Coin

4  was?

5  A.    I knew Mr. Crater was the creator, and later I learned on

6  various correspondence there were a couple of MBC companies, My

7  Big Coin and My Big Coin Pay, and I saw the name, a name other

8  than Mr. Crater's listed as the president, I believe.

9  Q.    Does the name John "Ro-shay" ring a bell with you?

12:37 10  A.    I thought it was John Roche.  I grew up in Dorchester,

11  R-o-c-h-e would be Roche, but if you say "Ro-shay," it's

12  "Ro-shay."

13  Q.    Fair enough.  I stand corrected.

14        Did you do any due diligence on Mr. Roche or

15  Mr. "Ro-shay"?

16  A.    I didn't learn about Mr. Roche until I was downstream.  My

17  involvement was either with -- at the beginning with

18  Mr. Kruger, as I've said, and then Mr. Crater and his

19  aide-de-camp or administrative person, Mr. Mark Gillespie.

12:38 20  Q.    Now, where did you meet Mr. Kruger?

21  A.    I met him in Boston.  I was out to dinner one night with

22  my brother and we were going to a lecture, and we were sitting

23  at the bar having dinner and we were going to a lecture at

24  Boston Symphony Hall.  I had tickets for a lecture series at

25  Symphony Hall called the Boston Speaker Series.

```
 1   Q.   He you known Mr. Kruger prior to that first meeting?
 2   A.   No.
 3   Q.   And did you have an understanding as to why he was in
 4   Boston?
 5   A.   He told me why he was in Boston.
 6   Q.   And what did he tell you?
 7   A.   He told me that he was attending a convention next door at
 8   the Hynes Auditorium and it had to do with medical marijuana
 9   and that he was working with My Big Coin and he was trying to
12:39 10   solicit business opportunities in the medical marijuana field
11   for use in My Big Coin -- use -- for medical marijuana people
12   to use My Big Coin.
13   Q.   So he told you he was in Boston trying to find customers
14   for My Big Coin in the medical marijuana industry?
15   A.   I think that's fair, yes.
16   Q.   And did that intrigue you?
17   A.   I don't know if "intrigue" is the word, but it was of
18   interest certainly.
19   Q.   And what was of interest to you?
12:40 20   A.   Well, I forget, you know, step by step which was first in
21   the sequence.  It was eight years ago.  But the fact that he
22   was into cryptocurrency, he likened it to Bitcoin, he felt very
23   enthused about it, and he was trying to develop business for
24   it, as you suggested.  So that was of interest to me.
25   Q.   A few minutes ago you were very definitive about why you
```

1    entered into My Big Coin.  What I'm trying to get at is, what

2    did you know and when did you know it.

3             So you met Mr. Kruger.  He told you that he was there

4    at a medical marijuana conference.

5    A.   Yes.

6    Q.   He told you that he was trying to figure out how

7    cryptocurrency could be used in the medical marijuana business.

8    A.   I don't think he told me he was trying to figure out how

9    it could be used.  I don't think that's a --

12:41 10   Q.   Well, do you know whether or not My Big Coin existed at

11   that point in time?

12   A.   In 2014?

13   Q.   In early 2014.

14   A.   Well, I thought there was a company -- I was told there

15   was a company My Big Coin and that was the business of the

16   company by Mr. Kruger.

17   Q.   And you were told by Mr. Kruger.

18            And upon learning that information, what due diligence

19   did you do on My Big Coin, Inc.?

12:41 20   A.   Well, I finished my dinner and I went to the lecture.  I

21   mean, I didn't do anything that day.

22   Q.   Okay.  At some point did Mr. Kruger contact you again or

23   did you contact him?

24   A.   Always the contact was from outside to me.

25   Q.   Did he call you at his office?

1    A.    Did he call me at --

2    Q.    Did he call you at your office?

3    A.    Oh, at my office.  I'm not sure.  I think he may have

4    contacted me on my cell phone or by text or by email or

5    something.  I'm not sure.

6    Q.    Is it fair to say at that first meeting you exchanged

7    phone numbers?

8    A.    Very possibly.

9    Q.    How long after he met you --

12:42 10  A.    He gave me his card.  So I had his number, and I may well

11    have given him my number.  That's quite possible.

12    Q.    Do you remember what month you met him?

13    A.    Yes, it was at the very end of March, the first day or so

14    of April of 2014, and I remember that date because of an event

15    that happened that week.

16    Q.    You're referring to the event with the firemen?

17    A.    Yes, there was a very serious fire not far from the

18    restaurant we were having dinner and two firemen died in the

19    flames, and there was a funeral that day, I think it was in

12:42 20  West Roxbury or Watertown.  That's where the homes of each of

21    the firefighters were, and the firemen returned -- there was a

22    fire station directly across the street from the restaurant

23    where we were in the Prudential Center and there were literally

24    dozens of firemen in and around the firehouse and a number of

25    them came into the restaurant.  So that was in my mind at the

1  time, yes, that's how I knew.

2  Q.   Okay.  So you meet Mr. Kruger.

3        THE COURT:  I'm sorry, Mr. Lopez, can you move the

4  microphone a little closer to you?

5        Thank you.

6  BY MR. LOPEZ:

7  Q.   So you meet Mr. Kruger, and was Mr. Kruger from this area?

8  A.   No, he was from the West Coast.  I think he was from the

9  West Coast, either Arizona or California or both.  I think that

12:43 10  that's where --

11  Q.   By the way, before you came here today, did you review

12  your testimony in the CFTC matter?

13  A.   I did, I read my deposition.

14  Q.   You read that carefully to refresh your recollection of

15  what you said?

16  A.   Yeah, I was deposed five years ago, and the meeting with

17  Mr. Kruger was eight years ago.  So I did look at my

18  deposition, yes.

19  Q.   And you were represented by counsel at that deposition?

12:44 20  A.   Yes, I was.

21  Q.   And your counsel is in the courtroom here today?

22  A.   Yes, he is, he's sitting there.

23  Q.   And you sat down with the U.S. Attorney's Office on a

24  number of occasions to prepare for your testimony here today?

25  A.   There were several meetings at different times with the

1    U.S. Attorney, and the pandemic happened in the middle of all

2    of that.  So I had one set of people I met with either from the

3    U.S. Attorney's Office or the Justice Department back several

4    years ago, three, four years ago.  And then during the pandemic

5    I think things got delayed, I guess, and the people or the

6    attorney that I met with originally from either the Justice

7    Department or the U.S. Attorney's Office left the U.S.

8    Attorney's Office and went someplace else, into private

9    practice, I guess.  So then post-pandemic or as the pandemic

12:45 10   was winding down, I had perhaps another meeting, and then more

11   recently, in the last week or so, another meeting, something

12   like that.

13   Q.   In any event, you were prepared for your testimony here

14   today.

15   A.   I wouldn't say "prepared."  I was organized in a sense.

16   There was so much material here, so many texts, so much product

17   in the discovery process that it was voluminous.  There was a

18   lot of it.

19        I think my sense was that the U.S. Attorneys, you

12:46 20   know, wanted to put it in some sort of order.  They never told

21   me what to say other than to tell the truth.  It was just more

22   of an organizational thing than instructing me what to say or

23   something like that.

24   Q.   I didn't imply that they instructed --

25   A.   Well, I just want to be clear on it, that's all.

1    Q.   So you met Mr. Kruger in late March, early April of 2014.

2    A.   That is correct.

3    Q.   And you never met Mr. Kruger before?

4    A.   That is correct also.

5    Q.   And at that time you hadn't met Mr. Crater.

6    A.   Not at that moment, no, that's true.

7    Q.   And you heard about My Big Coin?

8    A.   Correct.

9    Q.   And you heard about My Big Coin from Mr. Kruger?

12:47 10  A.   Yes.

11   Q.   Did you do anything to check the background of Mr. Kruger?

12   A.   No.  He gave me his card, and I guess I was more concerned

13   about My Big Coin than I was about Mr. Kruger.

14   Q.   I think you said earlier you're a lawyer?

15   A.   I am a lawyer, yes.

16   Q.   I think you're a real estate lawyer?

17   A.   I do litigation that's related to real estate.  When I was

18   a younger person, I did more of a wider range of litigation,

19   that's correct.

12:47 20  Q.   And lawyers like to document transactions, would you

21   agree?

22   A.   Some lawyers document transactions.  I was not a

23   transactional lawyer.

24   Q.   But you're aware that when transactions occur,

25   transactional lawyers create documentation to document the

1    transaction.

2    A.   Well, again, it depends on what field you're in.

3         If you're in commercial real estate, there's no

4    question that there are mortgage documents, there are deeds,

5    there are purchase and sale agreements.  There's a lot of

6    documentation.

7         If you're doing an estate plan, you're an estate

8    planning attorney, yes, there would be a lot of paperwork, yes,

9    that's true.

12:48 10   Q.   Before you made your first purchase of My Big Coin coins,

11   what, if any, due diligence did you do on My Big Coin?

12   A.   I would say that I read about the cryptocurrency field and

13   that I looked at the promotional material that was available

14   about My Big Coin, My Big Coin, Inc., that type of thing, and I

15   learned about the gold, the oil, at some point the insurance,

16   and the affiliation with MasterCard.  I know I called the

17   provider of the gold and oil, whom I thought was Harmonie

18   Corporation, and, you know, just general reading and things

19   like that is what I did.

12:49 20   Q.   So if I understand your testimony, you did all of that

21   before your first purchase?

22   A.   I don't know the day that I called Harmonie.  I don't have

23   that date, but I did those types of things before I started

24   making investments.

25        And I started off slowly, you know, not putting the

1    great numbers into it that I did.

2    Q.    But, sir, to the best of your memory --

3    A.    Yes.

4    Q.    -- what exactly did you do to verify My Big Coin coins

5    prior to making your first purchase?

6    A.    Well, I think I just explained that.  Do you want me to go

7    through it again?

8    Q.    So -- well, you spoke to Harmonie before your first

9    purchase?

12:50 10   A.    I thought I was clear about that when I said I spoke to

11   Harmonie but I'm not sure as I sit here the date that

12   conversation took place with Harmonie.  But I did --

13   Q.    Well, then what did you do to confirm the gold?

14   A.    I was very impressed by the promotional material furnished

15   by --

16   Q.    Sir, the question is:  What did you personally do to

17   verify that there was gold backing this company before you made

18   your first purchase?

19   A.    No, I understand your question.  I'm just trying to get

12:50 20   the answer out.

21          I relied chiefly on the promotional material furnished

22   by My Big Coin material about Randall Crater, about the

23   development of it.  I had spoken with Mr. Kruger,

24   Mr. Gillespie, at some point Mr. Crater, and also had made that

25   inquiry about My Big Coin.

1          I did not invest all of my funds on day one.  It was a

2    gradual process, and I was told --

3          MR. LOPEZ:  Objection.  I didn't ask what you were

4    told.

5          THE WITNESS:  Okay.  Sorry.

6          THE COURT:  Sustained as to just this last part.  The

7    rest will stand.

8          Mr. Lopez.

9          MR. LOPEZ:  Yes, your Honor, I'll move to strike the

12:51 10   last part.

11         THE COURT:  Right.  So, yes, just the last part of the

12   start of the sentence.

13   BY MR. LOPEZ:

14   Q.   You said promotional materials.  Did Mr. Kruger give you

15   promotional materials on My Big Coin?

16   A.   No.  I looked at the My Big Coin site.  I had some

17   direction from Mr. Kruger about what was going on with My Big

18   Coin and what kind of an investment it was, and I read the

19   material that was publicly available on the internet, I guess,

12:52 20   I call it promotional material, about MBC, background material,

21   promotional material, that type of thing.

22   Q.   So in early April of 2014 --

23   A.   Yes.

24   Q.   -- is it your testimony that you went to the My Big Coin

25   website and the My Big Coin website said it was backed by gold?

```
 1   A.    It's right on there, yes, backed by gold.
 2   Q.    In 2014?
 3   A.    Yeah, right from the get-go.
 4   Q.    Okay.  Are you certain about that?
 5   A.    I -- yes, that's my understanding, that it was backed by
 6   gold.  I was told that by Mr. Kruger, by Mr. Gillespie, by
 7   Mr. Crater, and it was on materials.  MasterCard was on the
 8   materials.  And backed by gold was a big statement and a big
 9   distinguisher or differentiator from other types of
10   cryptocurrency according to the management people that I just
11   identified.
12   Q.    So, to be clear, it's your testimony that you were told it
13   was backed by gold prior to your first purchase.
14   A.    Yeah.  Yes.
15   Q.    The statement "backed by gold" was on the website?
16   A.    That's my recollection.
17   Q.    But you don't --
18   A.    It was on promotional material that I accessed somehow,
19   and I -- that was a search that I did and that's what I found
20   out.
21   Q.    Did you determine who controlled the website?
22   A.    Well, I was told that Mr. Crater had created the software
23   that underlaid My Big Coin and My Big Coin Pay, that that was
24   his area of expertise.  I looked up his information about
25   Greyshore, what he did, and the others told me a lot about
```

```
 1  Mr. Crater, and at some point I had some discussions with
 2  Mr. Crater.  So --
 3  Q.   I'm focusing on before your first investment.
 4       I think you told us you didn't know who the president
 5  of My Big Coin was.  So I take it you didn't search the
 6  Secretary of State's office in Nevada to determine where the
 7  articles of incorporation were filed and who was the president.
 8  A.   I -- at some point, and I don't know whether it was day
 9  one, I did look at the Secretary of State's office in Nevada --
10  Q.   Sir, sir --
11  A.   What, what --
12  Q.   I'm trying to focus you on before your first purchase.  I
13  don't care what you did afterwards.  I'll ask those questions
14  later.
15       Before your first purchase did you search the
16  Secretary of State's office to determine who was the owner and
17  operator of My Big Coin?
18  A.   I don't remember what day I searched the Secretary of
19  State's office in Nevada, but I did.  And I can't say if it was
20  immediately before the purchase, slightly after the first, the
21  initial purchase, or what -- it was more than eight years ago.
22  I just don't remember clearly now.  It's something I did do,
23  but I don't remember what day I did it.  But it was at the
24  start of my investments.
25       I can't do any better than that, I'm sorry.
```

1    Q.   Now, I think you testified earlier that Mr. Crater never

2    provided you with any documentation showing that it was backed

3    by gold prior to your first purchase or at any time, for that

4    matter.

5    A.   I don't remember saying that Mr. Crater didn't show me

6    documentation prior to my first purchase, but I do remember

7    testifying that -- I do remember testifying that it was, I

8    felt, according -- it was my understanding, and I was told that

9    it was backed by gold.  I didn't get certificates or a

12:56 10   statement, a written statement from Mr. Crater that it was

11   backed by gold, that's true.

12   Q.   Well, Mr. Moore asked you if you ever received any

13   documentation from Mr. Crater that proved to you that it was

14   backed by gold, and I believe you answered, No.

15   A.   Well, that would be true.

16   Q.   Now, going back --

17   A.   If I did say that, yes, that is true.

18   Q.   Going back again to early April, before your first

19   purchase, did you ask Mr. Crater for any documentation that

12:57 20   demonstrated it was backed by gold?

21   A.   I don't recall doing so.  I don't think I did.

22   Q.   Do you recall when your first purchase was?

23   A.   It was sometime in April of 2014.

24   Q.   Does April 8th ring a bell?

25   A.   Could well be.

1    Q.   And the amount was $200,000?

2    A.   I don't know for sure as I'm sitting here with you what

3    the amount was.

4    Q.   Would you agree with me that when you made that first

5    purchase, you had done nothing to verify that it was backed by

6    gold?

7    A.   Did I do nothing to verify.  If you're talking about

8    written documentation, I didn't have any, that's true.  If

9    that's what you mean.

12:58 10   Q.   And you didn't ask for any either, did you?

11   A.   Well, I had the benefit of my discussions with Mr. Kruger,

12   Mr. Gillespie, Mr. Crater, and seeing the materials that I

13   discussed before, the public documents, the promotional

14   documents, I looked at that, and I -- for better or worse, I

15   put my trust in these people and did that.  That's what I did.

16   Q.   You relied on someone you met a couple of weeks before?

17   A.   I did.

18   Q.   In a bar?

19   A.   In a restaurant, yes, in the bar section of a restaurant.

12:58 20   I was having dinner.  It's a nice restaurant.

21   Q.   You relied on, you claim, what Mr. Crater told you having

22   never met him?

23   A.   I didn't meet Mr. Crater --

24   Q.   Not 2007.  I'm talking 2014.

25   A.   No, I understand what you're talking about.  I was about

1   to say I never met him in person until 2017.  And I tried

2   mightily to meet him on many occasions but he refused to meet

3   with me.

4   Q.   And you relied upon, according to you, what Mr. Gillespie

5   told you, and you had never met Mr. Gillespie in person?

6   A.   All this is true.  I put my trust in these people, that's

7   what I did, and I did the types of things that we've described

8   and I testified to you, that's what I did.  Should I have done

9   more?  Well, in retrospect obviously I should have.  The whole

12:59 10  thing was ridiculous.

11  Q.   When you made your first purchase, do you know, as you sit

12  here today, whether My Big Coin was in fact backed by gold?

13  A.   I believe it was.  That's my belief then and now.

14  Q.   So --

15  A.   That's what I was told.  Did I see the gold?  No, I did

16  not.

17          MR. LOPEZ:  Your Honor, I think this is a good time to

18  stop.

19          THE COURT:  Okay.

12:59 20         Sir, you can step down.  We're going to have to

21  continue in the morning.

22          THE WITNESS:  What time, your Honor?

23          THE COURT:  9:00 a.m., if you could be here a little

24  before then.  Thank you.

25          THE WITNESS:  Sure.

 1          THE COURT:  Jurors, as I said, today we're going to

 2     end at 1:00.  So I'm going to let you go for the day.

 3          Just give me one moment.

 4          (Discussion off the record.)

 5          THE COURT:  And tomorrow's schedule, just so you know,

 6     will be until 3:30.  So you should be here a little before

 7     9:00.  We'll take our mid-morning break, we'll take a lunch

 8     break 1:00 to 2:00, and then we'll resume from 2:00 to 3:30.

 9          Jurors, as you go about the rest of your day, just

01:00  10     keep my cautionary instructions in mind.  Don't talk to each

11     other or anyone else about this case, keep an open mind and

12     don't do any outside research and we'll see you tomorrow.

13     Again, if you can be here a little before 9:00, we'll get

14     started promptly.  Thank you.

15          THE CLERK:  All rise.

16          (Jury left the courtroom.)

17          THE COURT:  And, Mr. Lynch, you can step down.  Thank

18     you.

19          MR. MARKHAM:  If we could just have an admonishment to

01:01  20     the witness on the record to not discuss his testimony.  I

21     don't know if you did that already.

22          THE COURT:  No, it's not my practice.  I assume

23     witnesses know that.

24          Is that fair?

25          THE WITNESS:  Very fair, your Honor.

1          I have one question, if I may.  And you might not have

2     the answer to this, Your Honor.  I have meetings tomorrow at

3     2:00, and I'm wondering if there's any way of knowing if we

4     might be finished.

5          THE COURT:  Certainly we should be done before that

6     with Mr. Lynch's testimony; is that fair?

7          MR. LOPEZ:  I anticipate we'll be done before that.

8          THE COURT:  Okay.  I think that's fair.

9          THE WITNESS:  Thank you.

01:02 10          THE COURT:  Thank you.  You're excused for the day.

11          Everyone can be seated.

12          Counsel, anything else before we break?

13          MR. MARKHAM:  Nothing from the government, your Honor.

14          THE COURT:  And just in terms of who's coming up after

15     Mr. Lynch, is it the same -- give me a moment -- is it still

16     Mr. Byrd, Mr. Desa, Mr. Mendiola -- I may be mispronouncing

17     that -- Mr. Bell?  Is that still the same order?

18          MR. MARKHAM:  Those will be the witnesses.  The order

19     may change, particularly if the defense goes to 2:00 tomorrow

01:02 20     on cross-examination of this witness because we just can't get

21     through certain witnesses in the remaining time.  Those will be

22     the four witnesses, yes, your Honor.

23          THE COURT:  And the same disputed exhibits?

24          MR. MARKHAM:  Yes, your Honor.  We're happy to address

25     those now.

1          THE COURT:  Sure.  I think it's just as to Mr. Bell,

2     which was S, T, and U.

3          MR. MARKHAM:  No -- well, I think, your Honor, the S,

4     T, and U are probably the easier ones for Mr. Bell because it's

5     simply authentication, as I understand.  He'll just have to get

6     up there and say those are what he says they are.

7          I think the main exhibits that are at issue is with

8     Mr. Desa, which is the Facebook, Twitter, and YouTube.

9          THE COURT:  Oh, yes, I do have a notation of that.

01:03 10    Hold on.  And I had previously looked at that.

11          Counsel, given the testimony so far, does the

12     government have an update on its position or anything it wanted

13     to add?

14          MR. MARKHAM:  Your Honor, I'm happy to lay out why

15     each of these individual ones come in.  We did brief this in

16     the trial brief, and what are now already admitted as exhibits

17     show, for instance, with Twitter, Randall Crater emailing a

18     customer the link to the Twitter feed.

19          What's also admitted now into evidence is the

01:04 20    defendant's LinkedIn page, which is stipulated to as authentic,

21     that has links to the Facebook and the Twitter pages as well,

22     and to the My Big Coin website.

23          And also what's now admitted into evidence are website

24     pages from the My Big Coin website where it has the video

25     that's in Exhibit C, that's the YouTube video, as well as an

1    email in the defendant's email inbox with that YouTube video.

2         So we've been able -- through the evidence that's

3    already before the Court, this has all been connected to My Big

4    Coin and specifically to the defendant in certain instances.

5    To be clear, the government's position is that we don't have to

6    do that, but we have been able to do that in each of these

7    three instances.

8         And I would also note that the statements being made

9    in the Twitter, Facebook, and the YouTube video are the same

01:05 10   statements that you're hearing were made by the defendant

11   himself and on the LinkedIn page.

12        So I guess that's not really a proffer, your Honor,

13   because all that evidence is already admitted, except for these

14   last three, but I think that's a good summary of where we're

15   at.

16        THE COURT:  Thank you.

17        Mr. Lopez, do you want to be heard any further on

18   these?

19        MR. LOPEZ:  Your Honor, it's the same position.  Just

01:05 20   because he has a link doesn't mean he controls the content and

21   doesn't mean that he's promoting the content.  It seems to me

22   that they should bring in the person who actually controlled it

23   and was responsible for the content.

24        THE COURT:  Counsel, I will look again at the admitted

25   exhibits.  I think we're further down that road, Mr. Lopez,

1  just even based on Mr. Lynch's testimony and the exhibits that

2  were published to the jury today in terms of Mr. Crater's role.

3         I understand the argument.  It may go more to weight

4  as opposed to admissibility, but I'll consider that.

5         MR. LOPEZ:  Thank you.

6         THE COURT:  Anything else on the government's side?

7         MR. MARKHAM:  No, your Honor.  Just so the Court's

8  aware, Mr. Desa may be the first witness after Mr. Lynch.  So

9  we may move him up one, which means these exhibits --

01:06 10        THE COURT:  Before Mr. Byrd, sure.

11         MR. MARKHAM:  If they're not going come in, we would

12  ask the Court the opportunity to fully brief that issue to make

13  our position understood because that's going to be --

14         THE COURT:  I understand the argument.

15         MR. MARKHAM:  Okay.  Thank you, your Honor.

16         THE COURT:  I'll decide if I agree based on where we

17  are, but I think it's been fully briefed for what that's worth.

18         Counsel, anything else on Mr. Crater's side?

19         MR. LOPEZ:  Your Honor, I think I'll attempt to

01:06 20  introduce -- I think it's Exhibit M, Contested Exhibit M

21  through Mr. Lynch.

22         THE COURT:  Just give me a second.  That's on your

23  list, I guess?

24         MR. LOPEZ:  Yes, it's the Harmonie webpage which the

25  My Big Coin web page had a link to, and since he's already --

1          THE COURT:  So I'm just looking -- I'm looking at

2    Docket 152, M1 and M2, or do you mean M on the government's

3    list?

4          MR. LOPEZ:  I think it's M1, M2, and M3.

5          MR. MARKHAM:  Well, your Honor, I think Docket No. 163

6    is the updated exhibit list.

7          THE COURT:  Yeah, but I guess I was confused

8    because -- hold on.

9          Yes.  So is the list I have as Docket 152, am I just

01:07 10   not looking at that anymore?  Meaning, is there -- is

11   Mr. Lopez's proposed exhibits that the government doesn't agree

12   to now on 163?

13         MR. MARKHAM:  Yes, your Honor, 163 -- and that's why I

14   came in late, your Honor, we got together and made it joint.

15         THE COURT:  Got it, so I will just look at this one.

16         Yes, I see that, Mr. Lopez.

17         MR. LOPEZ:  And since he's indicated that he did talk

18   to Harmonie and there's a link from My Big Coin to Harmonie, I

19   think I'll try to get them admitted if, in fact, he saw them --

01:08 20        THE COURT:  Okay.

21         MR. LOPEZ:  -- in part of his due diligence.

22         THE COURT:  What's the government's position on that,

23   given the testimony at this point from Mr. Lynch?

24         MR. MARKHAM:  Yes, your Honor.  I would note that the

25   defense's position is that anything that someone didn't

1  personally write doesn't come into evidence when it's on a

2  website.  So I don't understand how this would come in through

3  Mr. Lynch based on the defense's position --

4          THE COURT:  Putting that aside.

5          MR. MARKHAM:  Putting that aside, I completely

6  disagree with that notion.  The government would object on

7  hearsay and relevance grounds.

8          So hearsay, I don't know why this is coming in, except

9  for the truth of the matter asserted on those website pages.

01:08 10          MR. LOPEZ:  It's not being offered for the truth.

11          THE COURT:  Well, let me have Mr. Markham finish.

12          Okay.  So I understand that.

13          What about the relevance?  Hasn't this come out before

14  the jury for the purpose of Mr. Lopez's argument about what due

15  diligence Mr. Lynch did about presumably the risks of investing

16  in My Big Coin?

17          MR. MARKHAM:  So my understanding is that the

18  defendant wants to put in the Harmonie website so the defendant

19  can say or the defense can say that that's exactly what the

01:09 20  defendant relied on.

21          To be clear, this has no relevance as to what the

22  defendant relied on unless the defendant gets on the stand and

23  says he looked at it or unless someone else says that they saw

24  the defendant look at it.  That's the reason why this is being

25  entered.  It's hearsay statements and it's for the effect on

1    the defendant, not for the effect on the listener that's on the

2    stand.

3          It's also not clear to me that Mr. Lynch will look at

4    these website pages or has looked at these specific website

5    pages and say he recognizes them as authentic anything.

6          THE COURT:  Mr. Lopez, what's the purpose they're

7    being offered, M1 through 3?

8          MR. LOPEZ:  Your Honor --

9          THE COURT:  Assuming authentication or that he saw

01:10 10    them.

11          MR. LOPEZ:  One of the defenses in this case will be

12    that Mr. Crater was defrauded by Billy Donahue, William

13    Donahue, who led him to believe that the asset was backed by

14    gold when, in fact, it wasn't.  And he went so far as to allow

15    a link from My Big Coin to Harmonie to create the appearance

16    that My Big Coin was backed by gold to Mr. Crater.

17          So Mr. Crater's reliance upon it is just as

18    significant as Mr. Lynch's reliance upon it if he looked at

19    that and relied upon it.

01:10 20          Mr. Lynch didn't know it was a fraud, the same way

21    Mr. Crater didn't know it was a fraud, but it's not being

22    offered for the truth of it because it was a fraud.  It's being

23    offered for its impact on the listener or the viewer.

24          MR. MARKHAM:  I would just note, your Honor, that the

25    concern is that the defense just said they were doing exactly

1   what our concern is, which is that they're trying to say that

2   this was a fraud on Randall Crater, and there's no testimony

3   and zero evidence that Randall Crater ever looked at these

4   websites.

5          THE COURT:  Right.  So I agree with you at this point,

6   Mr. Markham, and I don't think -- let's just play out if I

7   allow Mr. Lynch to be asked about it, assuming he even

8   recognizes them, I don't see that alone, Mr. Lopez, to be a

9   basis to later argue about what effect they had on Mr. Crater

01:11 10  absent what Mr. Markham points out would be the necessary link.

11  Do you understand my point?

12          MR. LOPEZ:  I do, but there are now other stipulated

13  exhibits or admitted exhibits that we'll either read into the

14  record -- they're already admitted, but we'll draw attention to

15  them by having a reader or my just standing up and making them

16  known to the jury.

17          THE COURT:  But I guess absent testimony of reliance

18  by Mr. Crater, how would there ever be a factual basis for

19  making that argument?  Putting aside whether or not Mr. Crater

01:12 20  chooses to take the stand.

21          MR. LOPEZ:  Well, your Honor, it's evidence that he

22  was provided information that was false.  So --

23          THE COURT:  So the other documents you're talking

24  about --

25          MR. LOPEZ:  It goes to his good faith.

1          THE COURT:  So what are the other documents you're

2    talking about, the other exhibits?

3          MR. LOPEZ:  So starting with Exhibit 12, I think 12A,

4    12AA, 12B, 12C, D.  I mean, old gold concentrate invoice.

5          THE COURT:  Okay.

6          MR. MARKHAM:  So, your Honor, I think I might be able

7    to -- if I may cut to the chase a little bit about what I think

8    is happening I think it might be helpful, which is that there

9    are emails that are stipulated to and in the record between the

01:13  10    defendant and a man named Billy Donahue.  There's also this

11    website from something called Harmonie International that makes

12    all these claims on its website that are unverified.  And I

13    think what the defense is trying to do is make the logical

14    link, though not the proven link, that because the defendant

15    received an email from somebody named Billy Donahue at

16    Harmonie, he looked at these website pages and relied on them.

17          The government's position is that they cannot argue

18    that unless there's some evidence that that occurred.

19          THE COURT:  I understand the government's argument.

01:14  20          I guess what I'm saying is I understand Mr. Lopez may

21    be building the foundation to make an argument where this is

22    only one building block as to the factual basis for making an

23    argument.

24          So I understand the arguments on either side.  I'll

25    give further consideration to them.

1          I'm assuming the government doesn't dispute the legal

2     matter that good faith would be a defense here.

3          MR. MARKHAM:  No, of course not, your Honor.

4          I would just note that -- it's not clear to me John

5     Lynch, if shown these on the stand tomorrow, has any idea --

6          THE COURT:  I understand, but there are a whole bunch

7     of steps that need to be made, but I wanted to understand what

8     the nature of the objection was and what it was being offered

9     for, and this is helpful and I'll take a look at those

01:14 10   exhibits.

11          MR. MARKHAM:  Thank you, your Honor.

12          THE COURT:  Mr. Lopez, anything else on your side?

13          MR. LOPEZ:  No, just to that point I just didn't want

14     you to be surprised tomorrow when I --

15          THE COURT:  No, understood, understood.  And again,

16     we'll starting tomorrow at 8:45, and since we're going longer

17     tomorrow, we'll stop at 1:00 and resume at 2:00.

18          Thank you.

19          MR. MARKHAM:  Thank you, your Honor.

01:15 20   THE CLERK:  All rise.

21          (Court adjourned at 1:15 p.m.)

22          - - - - - - - - - - - -

23                    CERTIFICATION

24          I certify that the foregoing is a correct transcript

25     of the record of proceedings in the above-entitled matter to

the best of my skill and ability.


/s/Debra M. Joyce                    July 13, 2022
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter

INDEX


WITNESS                                                        PAGE


JOHN LYNCH

    Direct Examination                                          50
    By Mr. Moore
    Cross-Examination                                          133
    By Mr. Lopez



                        E X H I B I T S


Exhibit No.            Description                         Received


    1A - 15I                                                   55

    16                                                         93