1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3      _____

4      UNITED STATES OF AMERICA,

5                      Plaintiff,          Criminal Action
                                           No. 19-10063-DJC
6      V.
                                           July 14, 2022
7      RANDALL CRATER,                     8:46 a.m.

8                      Defendant.
9      _____

10

11

12              TRANSCRIPT OF JURY TRIAL DAY 3

13           BEFORE THE HONORABLE DENISE J. CASPER

14              UNITED STATES DISTRICT COURT

15           JOHN J. MOAKLEY U.S. COURTHOUSE

16                  1 COURTHOUSE WAY

17                 BOSTON, MA  02210

18

19

20

21              DEBRA M. JOYCE, RMR, CRR, FCRR
                    Official Court Reporter
22             John J. Moakley U.S. Courthouse
                1 Courthouse Way, Room 5204
23                   Boston, MA  02210
                    joycedebra@gmail.com
24

25

APPEARANCES:

FOR THE GOVERNMENT:

CHRISTOPHER J. MARKHAM, ESQ.
US Attorney's Office - MA
J. Joseph Moakley U.S. Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-449-6890
christopher.markham2@usdoj.gov

BABASIJIBOMI MOORE, ESQ.
DOJ-Crm
110 9th Ave S
Nashville, TN 37203
615-736-2127
babasijibomi.moore2@usdoj.gov

FOR THE DEFENDANT:

SCOTT P. LOPEZ, ESQ.
Lawson & Weitzen
88 Black Falcon Avenue
Suite 345
Boston, MA 02210
617-439-4990
splopez@lawson-weitzen.com

P R O C E E D I N G S

1
2          (The following proceedings were held in open
3   court before the Honorable Denise J. Casper, United States
4   District Judge, United States District Court, District of
5   Massachusetts, at the John J. Moakley United States Courthouse,
6   1 Courthouse Way, Boston, Massachusetts, on July 14, 2022.
7          The defendant, Randall Crater, is present with
8   counsel.  The Assistant U.S. Attorneys are present.)
9          THE CLERK:  Court is in session.  Please be seated.
10         THE COURT:  Good morning.
11         ALL:  Good morning.
12         THE COURT:  Counsel, just a few things from my
13   perspective.
14         (Discussion off the record.)
15         THE COURT:  Ms. Hourihan will check on our jurors.
16         Just a few things, to return to some of our discussion
17   yesterday.
18         First of all, I did receive, Mr. Lopez, your response
19   on the Touhy issue, Docket -- I think it was Docket 167.  I'll
20   return to that issue in a moment.
21         First, on the disputed exhibits that were anticipated
22   today, Mr. Markham, Exhibits A through C2, which I think you
23   were planning to offer through Mr. Desa, I have considered the
24   testimony so far, and I reviewed the admitted exhibits, which
25   are 1 through 16, with particular attention to Exhibits 6 and

1    then the 12 series, as you asked me to review.  I think,

2    Mr. Lopez, these are likely to come in as the statements of a

3    party opponent, either as Mr. Crater's own statements or

4    adoptive statements, given some of the links to some of these

5    materials, or as the statements of agents or co-conspirators.

6    Your objection in that regard is preserved, but just noting

7    that, my likely ruling for the benefit of both sides.

8            As to disputed Exhibits S, T, and U, which I

9    understood were going to be offered through Mr. Bell, I think

08:48 10   similar to the exhibits that were admitted through Mr. Lynch, I

11   think S is text exchanges between Mr. Bell and Mr. Crater, and

12   then the other two exhibits I believe were his own --

13   Mr. Bell's own My Big Coin account.  I think those are likely

14   to come in if they're authenticated by Mr. Bell.  So that's my

15   anticipated ruling.

16           Counsel, just to return to a few matters.  I know we

17   have the Touhy issue and then witnesses that Mr. Lopez may want

18   to call by zoom.

19           Does the government have any update as to their

08:48 20   position on the zoom issue?

21           MR. MARKHAM:  Your Honor, we're not going to object to

22   zoom if that's the only --

23           THE COURT:  Okay.  And which witnesses were those?

24           MR. LOPEZ:  Your Honor, that would be John Gifford

25   and, assuming Mr. Galvin's cooperation, Richard Galvin.

1          THE COURT:  Richard Galvin?

2          MR. LOPEZ:  Richard Galvin.

3          THE COURT:  Thank you.

4          MR. LOPEZ:  We're having some issues with his

5    unwillingness to honor a subpoena.  I may be in a position to

6    ask you to enforce the subpoena tomorrow.

7          THE COURT:  So, counsel, obviously, perhaps at the end

8    of tomorrow I'll check in with the government about where they

9    are in their case just so we are sort of technically prepared

08:49 10   for the presentation, but, counsel.

11          MR. MARKHAM:  Yes, your Honor.  I just wanted to note

12   for the record that the second witness we haven't been able to

13   talk to.  He has an attorney --

14          THE COURT:  His lack of interest flows both ways.

15          MR. MARKHAM:  Yes, your Honor.  So I don't know

16   whether he's actually unable to come or whether he'd be willing

17   to testify or anything.

18          MR. LOPEZ:  Your Honor, I can tell you that I spoke to

19   his attorney a few days ago, and at first he said his client

08:49 20   told him he had not been served, which was not accurate, and

21   then he said but he didn't get any witness fees so it wasn't

22   good service.  And I said because I'm CJA counsel, I'll be

23   providing those fees, and we've been unable -- my private

24   investigator has been unable to contact him directly since.

25   I'm going to try to have him reserved today or tomorrow, and

```
 1    give him his witness fee, and then --

 2          THE COURT:  We'll see.  So, counsel, if you need

 3    further action, I'm sure you'll let me know.

 4          Counsel, today in terms of the schedule, obviously, as

 5    I told the jury, we'll go until about 3:30 --

 6          (Discussion off the record.)

 7          THE COURT:  So, counsel, we may end up stopping about

 8    3:25 or so because my other matter is on at 3:30.  And tomorrow

 9    we will go until 4:00, and I'll remind the jury about that.

10          Counsel, at the end of today I'll ask about the lineup

11    for tomorrow.

12          Just to turn to the Touhy issue for the moment, and I

13    don't know if there's any further update on the parties'

14    relative positions, but I did read the filings on either side,

15    and I did read the key cases that were cited, both in the

16    government's brief and then the 9th Circuit case relied on by

17    Mr. Lopez.

18          The 9th Circuit in Bahamonde, 445 F.3d 1225 at 1228 to

19    29, which is a 9th Circuit case in 2006, appears, as I'm sure

20    Mr. Lopez would acknowledge, as an outlier as the dissent in

21    that case acknowledges.

22          The other circuits to reach this issue squarely, the

23    4th Circuit, the 5th Circuit, the 6th Circuit and the 10th,

24    those are at least the circuits that were either opinions that

25    were cited in the government's papers or were cases cited
```

1    within a number of these cases.  At least those circuits have

2    determined that Touhy applies in criminal cases.

3          There appears to be no 1st Circuit precedent squarely

4    on point, I imagine counsel on either side would have provided

5    it if there were, and the Court hasn't been able to find any.

6    But Cabral v. U.S. DOJ, 587 F.3d 13 at 22, a 1st Circuit 2009

7    case, I acknowledge, Mr. Lopez, that was a civil case, but

8    certainly the 1st Circuit applied the Touhy regulations there.

9          Counsel, in the absence of any contrary binding

08:53 10   precedent, and also given the balance of what the other

11   circuits have decided, I'd be inclined to apply Touhy here

12   given what appears to be the state of the law in this circuit.

13         I know there was also a relevance argument on the

14   government's side.  Perhaps I should hear you on that.

15         MR. MARKHAM:  Yes, your Honor.  I think it might be

16   more helpful for a proffer of what the relevance would be,

17   because the government is in a distinct disadvantage of not

18   knowing exactly why they would be called, but the precedent

19   makes clear that even if the Touhy regulations were complied

08:54 20   with, in order to have a court order to have them actually

21   come, there would have to be some demonstration that the

22   testimony would be relevant.

23         And what the caselaw also makes clear is that

24   preliminary agency determinations or the internal deliberations

25   about how, for instance, the CFTC might have gone about its

 1   investigation are entirely not relevant in a criminal case.

 2   And the government's understanding is that's what the defense

 3   would want.

 4        In this case it's essentially speak to a CFTC agent

 5   about, well, why didn't you do this, and why didn't you do

 6   that.  In a civil investigation, which I would also note that

 7   the Court in this case has made clear to the jury and the

 8   defense asked for the jury not to consider what happened in

 9   that civil investigation as relevant to the guilt or innocence

08:54 10   in this matter.

11        THE COURT:  And, counsel, I did pull the regs that

12   appear to apply to the CFTC, which 17 CFR 144.3, and then the

13   regs that apply to FBI agents -- I'm assuming -- these are the

14   DOJ regs, so I'm assuming they would apply to the FBI --

15   28 CFR 16.21 through 16.26.

16        I would say that the specificity of what a defendant

17   has to provide to the agency is not entirely clear.  What is

18   the government's position in that regard?

19        MR. MARKHAM:  Well, the government --

08:55 20        THE COURT:  Given that this is a criminal case versus

21   a civil case.

22        MR. MARKHAM:  Yes, your Honor.  The government's

23   position is that there's been -- we don't necessarily have to

24   argue about the level of specificity at this point because

25   there's been no proffer whatsoever.  But the level of

1  specificity just needs to be sufficient so the agency can

2  understand what topics do you want them to testify about.

3          Because particularly for the CFTC in their

4  regulations, if you're going to be asking them about internal

5  agency deliberations, they're going to move to quash the

6  subpoena and ask to appear and be heard by the Court as to why

7  that's not relevant and totally improper.

8          I can't speak for the FBI or the CFTC, of course, but,

9  you know, we want to bring it to the Court's attention so that

08:56 10  this doesn't cause a delay in the trial.

11          I have no ability to actually get the CFTC witness on

12  an airplane, contrary to the CFTC's wishes.

13          THE COURT:  Right.

14          Mr. Lopez, let me turn to you.

15          And I guess part of my concern is, as I read these

16  regs, I don't think the individual employees are permitted by

17  the regs to appear but for this notification.  So what -- how

18  do you recommend, given what I've said, how do you recommend we

19  proceed?

08:57 20          MR. LOPEZ:  So that's exactly my point.  I'm saying

21  that applying the Touhy regulations in a criminal case

22  infringes upon Mr. Crater's constitutional right to present a

23  defense.

24          Specifically with respect to the CFTC attorney, Jason

25  Mahoney, he actually asked -- he actually was part of the team

1    that was investigating Mr. Crater and was one of the attorneys

2    who actually questioned Mr. Lynch in Mr. Lynch's interview

3    under oath.

4        Mr. Mahoney actually had communications with Mr. Roche

5    and asked for the same documents he asked from everyone, and

6    Mr. Roche refused to comply with that subpoena.  At that point,

7    Mr. Mahoney drafted an affidavit for Mr. Roche based on a

8    conversation which basically said, I, John Roche, say my

9    girlfriend got into my office and destroyed all the records and

08:58 10  erased my computer and, therefore, I can't comply with the

11   subpoena.

12       I want to ask Mr. Mahoney if he did anything to verify

13   that, because on -- well, as far as it's relevant, there's a

14   third-party culprit argument that I could make with respect to

15   Mr. Roche.

16       In addition, when it came time for the privilege for

17   My Big Coin to be waived, Attorney Mahoney required Mr. Roche

18   to sign that privilege waiver because he knew he was in control

19   of the corporation.  That's relevant evidence that this jury

08:58 20  should know because the government's claim is that Mr. Crater

21   was the principal operator of My Big Coin, which just isn't the

22   truth.

23       With respect to agents --

24       THE COURT:  Counsel, just give me one second.

25       (Discussion off the record.)

1          THE COURT:  Before you do that, is Mr. Lynch here?

2          MR. NOONAN:  Yes, your Honor.

3          THE COURT:  So, counsel, I'm inclined -- and

4     Mr. Lopez, I'll give you an opportunity to finish your thoughts

5     if you don't finish them now -- but if they're all here, I'm

6     inclined to bring the jurors down.  Okay?

7          MR. MARKHAM:  Yes, your Honor, as long as -- I would

8     like to put on the record at some point why all of that is

9     irrelevant and inadmissible.

08:59 10          THE COURT:  I understand.

11          I just wanted you to be not surprised.  So we can wait

12     to see if they're coming down.

13          Ms. Hourihan.

14          (Discussion off the record.)

15          THE COURT:  Counsel, as you may be aware, we're having

16     an issue with the jurors' monitors, which we're trying to

17     remedy.  I don't know if counsel has a backup way of proceeding

18     with your documents, the old-fashioned way on the ELMO.

19          MR. MARKHAM:  Your Honor, I think with that -- it

09:01 20     might be possible to do -- if we move that.

21          Is the witness monitor working?

22          THE CLERK:  Yes.

23          MR. MARKHAM:  So, at least for our next witness,

24     Mr. Desa, if that TV is moved.

25          (Discussion off the record.)

1          THE COURT:  Mr. Lopez, I will finish hearing you.  You

2    were about to change topics.  Why don't I take this up with you

3    either at the 11:00 break or maybe we'll come back a little bit

4    early from the 1:00 so I can hear you.

5          MR. LOPEZ:  That's fine, your Honor.

6          THE COURT:  And I'll just say for the record, my

7    memory is the standard for third-party culprit defense is much

8    higher than sort of a completeness of the investigation line of

9    argument.  So I want to think about that as well for purposes

09:02 10    of relevance.

11          MR. LOPEZ:  And when thinking about that, think about

12    all the social media that's going to be now admitted against my

13    client.

14          THE COURT:  Understood.  But I guess at some point the

15    third-party culprit and selective prosecution, which I don't

16    think would be properly before the jury, converge.  I'll give

17    that further thought.

18          THE CLERK:  All rise for the jury.

19          (Jury entered the courtroom.)

09:03 20          THE CLERK:  Court is in session.  Please be seated.

21          THE COURT:  Good morning, jurors.

22          JURY:  Good morning.

23          THE COURT:  Mr. Lynch, you can take the stand.  We'll

24    get started right again.

25          Good morning.

```
 1              THE WITNESS:  Good morning, your Honor.
 2              THE COURT:  Sir, I just remind you, you remain under
 3      oath.
 4              THE WITNESS:  Yes.
 5              JOHN LYNCH, having been previously duly sworn by the
 6      Clerk, was further examined and testified as follows:
 7              THE COURT:  And I think, Mr. Lopez, we were in the
 8      midst of cross-examination?
 9              MR. LOPEZ:  Yes, your Honor.
10              THE COURT:  We can resume.
11                        CONTINUED CROSS-EXAMINATION
12      BY MR. LOPEZ:
13      Q.   Good morning, Mr. Lynch.
14      A.   Good morning, sir.
15      Q.   Now, I want to take you back to April of 2014.
16              Initially you purchased coin from My Big Coin; is that
17      correct?
18      A.   Yes.  I did purchase coin in 2014, that's correct, in
19      April.
20      Q.   And did you have an understanding as to who you purchased
21      the coin from?
22      A.   From My Big Coin and that enterprise through Mr. Kruger,
23      Gillespie, and Crater.
24      Q.   So it was your belief at that time that the coins you
25      purchased -- I'm talking about the initial coins -- were owned
```

1  by My Big Coin?

2  A.    Yes.

3  Q.    So it's your testimony that they were not owned by

4  Mr. Crater?

5  A.    It was eight years, three months ago, something like that.

6         I considered Mr. Crater and MBC and the others to be

7  part of one enterprise, MBC.  So I'm not sure I can parse it

8  down to say I bought it from Mr. Crater or MBC.  I think it was

9  all one in my mind at the time over eight years ago.

09:05 10  Q.    So as of today, your best memory is you don't recall

11  whether you bought them from Mr. Crater as a personal asset of

12  his versus the company; is that true?

13  A.    No, I didn't understand them to be Mr. Crater's coin.

14  What I'm saying is my investment in coins was through MBC, not

15  Mr. Crater privately, if that's what you're driving at.

16  Q.    So you didn't have any understanding that Mr. Crater

17  actually had a licensing agreement with My Big Coin?

18  A.    No, that wasn't told to me.

19  Q.    And you didn't know that Mr. Crater was paid for that

09:06 20  license by My Big Coin issuing coin to him personally which he

21  owned?

22  A.    I knew none of that.

23  Q.    No one told you that.

24  A.    That's correct, not Mr. Crater, not Mr. Gillespie or not

25  Mr. Kruger.

1    Q.    Why did you buy the coin initially?

2    A.    Because they persuaded me that it was a good investment.

3    Q.    And why was it a good investment in your mind?

4    A.    Well, as I testified yesterday, I forget whether it was in

5    response to your questions, Mr. Lopez, or to Attorney Moore,

6    they likened this to Bitcoin.  I was well aware of Bitcoin at

7    the time and reading about that in the financial press, and it

8    mimicked Bitcoin in many ways, and it had the additional

9    advantage of being backed by gold, oil, and it was a rising

09:07 10   value.  The coins were selling more than they were

11   initially I was told.  They started selling at $20 and they

12   moved up.  And by the time I made my first purchase in April of

13   2014, they had reached $75 a coin, and they progressed to, I

14   think it was 81 and then maybe 91 at the time I was purchasing.

15         So there was that upward trend, increase in value that

16   I could see, and then protection through the gold and the oil

17   and so on and so forth.  So it seemed --

18   Q.    So, in your mind --

19   A.    It seemed feasible to me.

09:07 20   Q.    So, in your mind, there was no risk involved here.

21   A.    There's always risk in anything you do, but it seemed to

22   me, given those things and the fact that I was told that the

23   company was going to go public within 60 days, and it seemed to

24   be an appreciating asset and it was backed by those other

25   valuable assets, I thought that the risk was worth taking.

Q.   Did you think there was any risk in investing in a -- or
purchasing coins, because you weren't investing at this
point -- purchasing coins in a cryptocurrency that had just
started a few months before?

A.   Well, I felt it was an investment.  You described it as a
coin purchase.  I thought I was investing in coins, so I
thought at the time, given all of the things I just said to you
and previously, that there was risk but there was much more
upside than risk.

Q.   And you thought by purchasing coins you were making an
investment?

A.   That's what I said.  Are you missing something?

Q.   Well, I guess I'm confused because an investment usually
comes with some documentation.

A.   That's true, yeah.

Q.   And you didn't receive any documentation as to what you
were purchasing.

A.   Well, as I explained yesterday, the way this was
structured with the company was that you'd have an account on a
website, you could access your account and follow it along that
way.  As I said, I think in response to Attorney Moore's
questions, that I never received regular statements at regular
intervals.  The procedure was to go to the website and look at
your investment and track it that way.

Q.   And did you go to the website?

1    A.    Yes.

2    Q.    Did you set up an account?

3    A.    Yes.

4    Q.    And did that account contain the coins that you purchased?

5    A.    I made several purchases at the beginning --

6    Q.    Sir, just can you just answer the question?

7          The question is:  Did that account contain the coins

8    you had purchased?

9    A.    Some of them.

09:10 10    Q.    Now, you also invested in a pot license, or a marijuana

11   license, right?

12   A.    Several of them, yes.

13   Q.    Four to be exact.

14   A.    That's correct.

15   Q.    And you paid $700,000 for the first one and $750,000 for

16   the other three.

17   A.    That is correct.

18   Q.    Did you get any paperwork on that investment?

19   A.    No, I got -- I was supposed to get additional coins, and I

09:10 20   asked for paperwork --

21   Q.    Sir --

22         MR. LOPEZ:  Your Honor, can you please instruct him to

23   just answer the question, not the question he wants to answer.

24         THE COURT:  Well --

25         MR. LOPEZ:  I asked him if he received any documents.

1          THE COURT:  Did you get any paperwork on that
2    investment.
3          Although, counsel, given the prior answer, it's not
4    clear which investment.
5          MR. LOPEZ:  The marijuana license investment.
6          THE COURT:  Okay.  Given that, Mr. Lynch, can you
7    answer that?
8    A.   The way that was documented or was supposed to be
9    documented was I would get additional coins in my account while
09:11 10   waiting for the licenses to come to me.
11   Q.   Was it your understanding that your name was going to be
12   on the license?
13   A.   Yes.
14   Q.   And did you ever receive the license?
15   A.   No.  I asked for it any number of times and I never got
16   it.
17   Q.   So you, as a lawyer, gave Mr. Crater $700,000 with no
18   proof that you actually purchased a license?
19   A.   I invested $700,000 for the license.  I relied on the
09:12 20   representations of Mr. Crater on that.  I did.
21   Q.   And you also purchased an interest in a company called
22   Trokie, right?
23   A.   I don't know if the company was called Trokie, but the
24   name of the product was certainly Trokie, T-r-o-k-i-e.
25   Q.   And you don't know if the name of the company was Trokie

1    because you never received any documentation for your

2    investment, right?

3    A.   I never received paperwork from Trokie.  I received

4    photographs from Mr. Crater showing the product being grown and

5    on the expectation that when the product matured, that it would

6    be sold and there would be money coming in.

7         He explained to me that --

8         MR. LOPEZ:  Objection, your Honor.  Well beyond the

9    scope.

09:13 10         THE COURT:  As to the last start of the sentence,

11   sustained.  The rest of the answer will stand.

12   BY MR. LOPEZ:

13   Q.   So the answer is no, you didn't receive any documentation,

14   right?

15   A.   I said what I received was pictures and no paperwork,

16   that's correct.  I asked for it, didn't get it.

17   Q.   Did you put that request in writing?

18   A.   I may have.  I don't recall as I sit here.  It was eight

19   years ago.

09:13 20   Q.   Did you put it in a text?

21   A.   I can't recall.  If you've got one, I'll look at it, but I

22   certainly --

23   Q.   As you sit here today, you have no memory as to how you

24   asked for this paperwork, right?

25   A.   As I sit here today -- well, I guess I'm saying I'm

1    unclear on that.  It's possible that I asked in writing on a

2    text or an email.  I know I asked orally, but I also knew that

3    the value of that investment for the licenses and the interest

4    in the Trokie company was going to be reflected with coins in

5    my account while I was awaiting the licenses, and that's --

6    that was my understanding at the time and gave me some comfort.

7    Q.   And did your wallet contain the coins for those licenses

8    and interest in Trokie?

9    A.   The wallet concept didn't come along until sometime in

09:14 10   2016.

11        My account on the website showing the amount of coins

12   that I had wired money for and purchased never reconciled

13   correctly.  There was not enough coins in my account to account

14   for the totality of what I purchased.

15        So I know on multiple occasions I texted and wrote and

16   inquired about getting my account to properly reflect what I

17   invested.

18   Q.   When you purchased the coins, did you believe them to be

19   the market price for the coins?

09:15 20   A.   Absolutely, yes.

21   Q.   And when you had your first account, were you able to mine

22   your coins?

23        THE COURT:  You said mine, m-i-n-e?

24        MR. LOPEZ:  Yes.

25        THE COURT:  And for what it's worth, the Court may not

 1   understand that term, so perhaps there are jurors that do not.

 2           MR. LOPEZ:  I'd like an answer before I --

 3           THE COURT:  Sure.

 4   A.   Did I mine the coins, m-i-n-e the coins, in 2014 after my

 5   first purchase?

 6   Q.   Between 2014 and 2017, did you at any time mine the coins

 7   in your account?

 8   A.   I didn't have the ability to mine coins.  That was a

 9   blockchain function, not something I could control.

09:16 10   Q.   Well, in 2017, it was your understanding that the account

11   from 2014 to 2017 was a blockchain, right?

12   A.   I'm a little foggy on the technical side of it, but I

13   think I can agree with you on that.  I think that's probably

14   correct.

15   Q.   Well, you testified that you were told it was a

16   cryptocurrency.

17   A.   I have testified, that's correct.

18   Q.   And a cryptocurrency requires a blockchain.

19   A.   Well, that's true, I think, yup.

09:17 20   Q.   And from 2014 to 2017, you had no difficulty with your

21   accounts other than the adjustments from here and there in

22   terms of the blockchain.

23   A.   The difficulties I had with my account was they were

24   woefully inaccurate.

25   Q.   But you never -- but you never questioned whether or not

1    the account was connected in a peer-to-peer network by a

2    blockchain, right?

3    A.    I was hundreds of thousands of dollars short, and I wasn't

4    concerned about blockchain or your term mining.  I wanted my

5    account to accurately reflect what I had sent to Greyshore and

6    Mr. Crater to invest in the coins of this company.

7    Q.    So whether it was a blockchain or not was not material to

8    you.

9    A.    It was the least of my concerns at that moment in time.  I

09:18 10   wasn't focused on that.  I was focused in trying to make sure

11   that my account would be brought up to date accurately by

12   Mr. Crater who controlled the account and refused -- or ignored

13   it or said he handled it, and it never got done.  And it was a

14   concern.

15           So that -- the amount of coins dwarfed whatever

16   blockchain money might have gone on.

17   Q.    Now, you testified yesterday that you had a conversation

18   with someone who represented Harmonie?

19   A.    Well, I explained that, yes.  I called the Harmonie

09:19 20   office, yes, I did, correct.

21   Q.    It's a yes-or-no question.  Did you speak to someone at

22   Harmonie?

23   A.    I spoke -- I called the Harmonie number and spoke with a

24   gentleman, who spoke with a British accent, who said he was an

25   official at Harmonie.

1    Q.   And I think yesterday you testified that his name was

2    Stewart Bortland, right?

3    A.   I thought -- yes, I thought it was Stewart, and then it

4    occurred to me sometime that it might be Bortland, yes, I did

5    say that.

6    Q.   All the British names, it occurred to you that it might be

7    Bortland.

8    A.   Well, many things happened starting in 2014, and --

9    Q.   Sir, did you testify yesterday that his name was Stewart

09:19 10   Bortland?

11   A.   Clearly I said his name might be Stewart Bortland.  I knew

12   his name was Stewart.

13   Q.   And you spelled his last name, right?

14   A.   Yes, it either ended in T or D.

15   Q.   But in 2017, when you spoke to the CFTC, you didn't

16   remember his name, did you?

17   A.   I did not at that moment in time.

18   Q.   So something's happened between then and now to jog your

19   memory?

09:20 20   A.   In two thousand -- excuse me --

21   Q.   When did you first realize his last name was Bortland

22   after 2017?

23   A.   Just recently.

24   Q.   Just recently.  Did someone tell you his last name?

25   A.   Nobody told me that.

1    Q.   Okay.  You just -- it just came to you.

2    A.   It did.

3    Q.   Five years after you couldn't remember it in 2017.

4    A.   There are literally millions of details involved in this,

5    and that's what happened.  I was thinking about it, and I

6    thought that maybe what he said was his name was Bortland or

7    Borlant.

8    Q.   Now, you also testified yesterday that in 2017 you

9    received a card from Allied Bank.

09:21 10    A.   You mean the credit card?

11    Q.   Yes.

12    A.   Yes, I did.

13    Q.   And it had "preferred customer" on it?

14    A.   It did.

15    Q.   Did it also have "MasterCard" on it?

16    A.   Yes, it did.

17    Q.   And did you follow the instructions on how to get a card

18    that would have your name on it?

19    A.   Did I follow the instructions -- I forget.

09:21 20    Q.   Well, did you go to the website and register for the card

21    so they'd send you a MasterCard with your name on it?

22    A.   I forget what I did with relationship to the card, whether

23    I did that or I didn't do that.

24    Q.   Now, you also said that it was your understanding that

25    Mr. Crater had exclusive use -- exclusive control over the

1    accounts.

2    A.    Are we talking about when I invested in the coins?

3    Q.    Between 2014 and 2017.

4    A.    That was my understanding, yes.  Anything to do with

5    updating the accounts could only be done by Randall Crater.  He

6    had exclusive control, as I said.

7    Q.    But didn't your own paralegal, Justine Mahoney, update

8    your account in 2017?

9    A.    Well, we -- Justine Mahoney was my paralegal, and I tried

09:22 10   repeatedly by writing or texting and whatever we did --

11   Q.    Sir, did she update your account --

12   A.    I don't know --

13   Q.    You don't remember when she added a thousand coins to your

14   account?

15   A.    Okay.

16   Q.    Yes or no, sir?

17         THE COURT:  Well, counsel, just wait for the answer.

18         The last question is:  You don't remember when she

19   added a thousand coins to your account?

09:23 20   A.    Okay.  The context of that thousand coins was that I had

21   placed them on the exchange for sale.  After they were on the

22   exchange and couldn't be sold, I was advised by Mr. Crater, as

23   I testified yesterday, that we were going public shortly and

24   would do much better to pull them off of the exchange.

25         And I had correspondence, Justine and I, going either

1     to Mr. Crater or Mr. Gillespie trying to get the coins off of

2     the exchange and back into my account.  And the number was like

3     a thousand, I believe.  And we ran into a problem, as I recall.

4     And the question was for the amount of coins I was trying to

5     move back, it seemed like there was a glitch or something and

6     we were trying to iron that out.  So that was the thousand

7     coins.

8     Q.    But she was able to add a thousand coins from the exchange

9     back into your account?

10    A.    She had no control over the account.  You're misstating

11    what the procedure was.

12    Q.    I'll get back to that later.

13          Now, you also said that you bought out Mr. DeSimone's,

14    your partner for many years, coins, right?

15    A.    I did say that, that's true.

16    Q.    And you said that you did that because you felt

17    responsible.

18    A.    Yeah, he wanted out of the investment, and there were two

19    reasons.

20    Q.    Did you pay him market price at that time for his coins?

21    A.    He just wanted his money back.

22    Q.    So is that a no, you did not pay him market price?

23    A.    I did not pay him market price.

24          What he asked me for was to refund his $75,000, and I

25    purchased --

```
 1   Q.   And you were happy to do that because you knew the market
 2   price was higher --
 3            THE COURT:   Counsel, let the witness finish the prior
 4   answer.
 5   A.   Could you give me the question again, Mr. Lopez?
 6   Q.   Did you pay him market price at the time you purchased his
 7   coins from him?
 8   A.   He wanted a refund, a full refund of his money, which was
 9   $75,000.   That's what we agreed on, and that's what I did.
10   Q.   Do you remember what you purchased his coins for?
11   A.   Do I remember what I purchased his coins for?
12            Well, I sent him a wire, and I don't know --
13   Q.   When he purchased his coins --
14   A.   Oh, when he purchased his coins.
15   Q.   -- do you know what price he purchased them at?
16   A.   If you could give me the date, I might be able to give you
17   a better answer.
18   Q.   Do you know how many coins he purchased for his $75,000?
19   A.   I don't have that number in front of me eight years ago.
20   It was recorded someplace, but I don't have any paper here.
21   Q.   When you purchased his -- when you refunded him his -- the
22   amount that he paid for the coins, did you pay him what the
23   market cost for the coins were at that point?
24   A.   That's not what he wanted.   He wanted $75,000, and that's
25   what I did.
```

09:25 (line 10)
09:26 (line 20)

1    Q.   And do you have any memory as to whether the market price

2    for the coins at that point in time were greater than the price

3    he paid when he purchased his coins?

4    A.   You know, I didn't look at that because he made it clear

5    he just wanted his money back, $75,000, and that's what we did.

6    So on that transaction, the market price of the coin wasn't

7    relevant to either of us.  He just wanted his money back, the

8    $75,000.

9    Q.   So you're telling me and this jury that it didn't even

09:26 10   occur to you to see whether or not you were getting a deal?

11   A.   Well, I thought -- I was in contact regularly with

12   Mr. Gillespie and Mr. Crater, and I may have e-mailed them,

13   giving them notice that I was going to buy Ernie's position and

14   I'd like the coins transferred to my account.  I don't believe

15   I gave them a price.  And I did feel, based on their

16   representations to me they were about to go public and it would

17   be a stronger investment to own the coins than not.  So that's

18   what I did.

19          That's what I did with the other people that we went

09:27 20   through yesterday as well.

21   Q.   Yesterday the government went through a series of texts

22   with you in April of 2017, right around tax time.

23   A.   Yes, that's correct.

24   Q.   And at the beginning of those texts, there was no mention

25   of how much money you needed, right?

```
 1   A.   In the texts we reviewed yesterday, there was not an
 2   amount of money mentioned as I recall, you're correct.
 3   Q.   But later on, after you were contacted by the CFTC, you
 4   were asking for $3 million from Mr. Crater, right?
 5   A.   Well --
 6   Q.   Yes or no, sir?
 7   A.   I don't think that's a correct statement.
 8   Q.   Well, the texts said 3M and you said yesterday that
 9   signified $3 million.
10   A.   I think you've misstated what I said clearly.  I think
11   you've got it all wrong.
12   Q.   Now, at some point --
13   A.   I didn't expect $3 million --
14            THE COURT:  Mr. Lynch, wait for the next question.
15            THE WITNESS:  I'm sorry.
16            THE COURT:  Mr. Lopez.
17   BY MR. LOPEZ:
18   Q.   At some point My Big Coin was on the Nova Exchange,
19   correct?
20   A.   I believe it was because that was the subject of one of
21   the texts yesterday that we discussed.
22   Q.   When you first started purchasing coin and you received an
23   account, did you think that account could be seen by the
24   public?
25   A.   No, I felt it was private to me.
```

1   Q.    It was a private account?

2   A.    Yeah, like your bank account online, that type of thing.

3   Q.    So you had to have permission or a set of passwords in

4   order to look at your account.

5   A.    That's correct.

6   Q.    And you thought initially, at least, that it was a

7   blockchain because that's what you purchased, right?

8   A.    I purchased cryptocurrency coins.  Part of the technology

9   for cryptocurrency is the blockchain.  But when you say I

09:29 10   purchased blockchain, I was purchasing coins.  What underlaid

11   the system was -- it was tracked on the blockchain.  So I'm

12   trying to keep it straight on that.

13   Q.    Now, I think you testified yesterday that before your

14   investment or before your first purchase, you were told that My

15   Big Coin was backed by gold, right?

16   A.    Yes, that's true.

17   Q.    And I think you testified yesterday that that was told to

18   you by Mr. Kruger.

19   A.    Mr. Kruger, Mr. Gillespie and Mr. Crater, all three.

09:30 20   Q.    And Mr. Crater told you that orally?

21   A.    I think so, yeah.

22   Q.    During a phone conversation?

23   A.    I remember speaking with all three people about the

24   distinguishing factors of My Big Coin versus Bitcoin and how

25   there was -- there were assets backing this.  And we traded

correspondence at various times about this.  And my memory was
that in the materials that promoted Big Coin or kept the
records or whatever, there were statements in there, MasterCard
backed by gold bullion, and you can trade the coins, you can
sell them, you can donate them, you could do this, you could do
that with them.  And that's my memory.

What the dates were eight years later, I can't say
with specificity, but that's what I knew at the time.  That's
what was explained to me.

Q.   Isn't it true that Mr. Kruger told you first it was backed
by gold?

A.   Well, yes, of course, I met him first, yeah.

Q.   Isn't it true that Mr. Kruger sent you documentation
showing in his mind that it was backed by gold?

A.   If you show me what he sent me.  I don't remember, sitting
here eight years later, what he may have sent me.

MR. LOPEZ:  Madam Clerk, can you bring up the screen?

Joe, 191 for identification.

THE COURT:  Just for the witness and counsel?

MR. LOPEZ:  Yes.

THE COURT:  And does it have a letter, counsel?

MR. LOPEZ:  Not yet, your Honor.

THE COURT:  Okay.  What's the next available letter?

MR. LOPEZ:  I was going to move to admit it.

THE COURT:  Well, just for identification at the

```
 1   moment.
 2              Are we up to W, counsel?  Is that right?
 3              MR. LOPEZ:  I have to check.  I should have brought
 4   this with me.  I apologize.
 5              THE COURT:  I'm getting a nod from the government's
 6   paralegal, which is probably a good source here.
 7              MR. MARKHAM:  Always the best source, your Honor.
 8              THE COURT:  Okay.
 9              So we'll go with W just for ID.
09:33 10             (Exhibit W marked for identification.)
11              Counsel.
12   BY MR. LOPEZ:
13   Q.   Sir, do you see that email addressed "To" up on the top?
14   A.   It's to me from Michael Kruger.
15              THE COURT:  Sir, can you just move the microphone?
16              THE WITNESS:  I'm sorry, your Honor.
17   A.   It's addressed to me from Michael Kruger.
18   Q.   And the date is April 4, 2014?
19   A.   That is correct.
09:33 20   Q.   And it appears as though there's an attachment to that
21   email.
22   A.   Well, it's a very brief email, about 12 words, and it says
23   this will show that we're backed by gold and who we are with.
24   There's no attachment on what I see on this page.
25   Q.   You see on the bottom where it says 100M commitment.docx?
```

1    A.   I do see that, yes.

2    Q.   Do you know whether or not that was -- that that signifies

3    an attachment?

4    A.   Well, it looks like there could be an attachment.  I don't

5    see it on the screen.

6              MR. LOPEZ:  I move to admit this document, your Honor.

7              THE COURT:  Any objection?

8              MR. MOORE:  No objection, your Honor.

9              THE COURT:  Okay.  It may be admitted as the next

09:34 10   number, which, Ms. Hourihan, is what, 17?

11             THE CLERK:  Yes.

12             THE COURT:  Exhibit 17.

13             (Exhibit 17 received into evidence.)

14             THE COURT:  It may be published, if you wish.

15   BY MR. LOPEZ:

16   Q.   So this is an email from Mr. Kruger the week after you met

17   him.

18   A.   Yes, it appears so.

19   Q.   And you and Mr. Kruger became pretty good friends, right?

09:35 20   A.   Yes.  He came to Boston on a number of occasions, and we

21   socialized and, you know, it struck me as important to be

22   friendly with him because of the investment and getting

23   knowledge about it and staying in touch with it, and so on and

24   so forth, yes.

25   Q.   So it's your testimony today you became friendly with him

1    to protect your investment?

2    A.    That was a major part of it, yes.

3    Q.    And in fact, you used to travel with Europe with him,

4    right?

5    A.    Well, I took him to Ireland -- or we went together to

6    Ireland, yes.

7    Q.    Well, but you paid for him to go to Ireland.

8    A.    I did.

9    Q.    So you did take him to Ireland.

09:36 10    A.    Well, he accompanied me and I paid for his ticket.

11    Q.    And when you were in Ireland, you solicited other people

12    to purchase My Big Coin coins, right?

13    A.    I didn't solicit anybody.  I did tell some of my friends

14    in Ireland about the investment, and I introduced Mr. Kruger to

15    those various people.  And I was over there for a week or

16    whatever, whatever time it was.

17    Q.    So if I understand, you didn't solicit, but you made them

18    aware of this investment opportunity, and as a result, they

19    purchased My Big Coins?

09:36 20    A.    I think that's a much fairer way of putting it, Mr. Lopez.

21              MR. LOPEZ:  Can you bring up 189 for identification.

22              THE COURT:  Just for the witness and counsel?

23              MR. LOPEZ:  Yes.

24              THE COURT:  Should we make this X, counsel?

25              MR. LOPEZ:  Yes.

```
 1              (Exhibit X1 marked for identification.)
 2    BY MR. LOPEZ:
 3    Q.   Now, you see that -- do you see what's here?
 4    A.   Okay.  Just give me a second.
 5              This says March 13, 2014.  I didn't know anybody,
 6    didn't know these people at that time.
 7    Q.   Do you have a memory as to whether or not the email that
 8    Mr. Kruger sent to you on April 4th had that attachment to it?
 9    A.   Without looking at the attachment, I need to be refreshed.
09:38 10   I can't remember it from eight-plus years ago.
11              MR. LOPEZ:  Can we bring up 189-002 for
12    identification, which is the first page.
13              THE COURT:  We'll make this -- the first one was X1.
14    We'll make this X2.
15              (Exhibit X2 marked for identification.)
16              MR. LOPEZ:  That's fine, your Honor.
17    BY MR. LOPEZ:
18    Q.   Does that document refresh your memory as to whether or
19    not that was the attachment that Mr. Kruger sent to you on
09:39 20   April the 4th?
21    A.   I just read the heading.  I haven't read the document.
22    Q.   Take your time.
23    A.   It's going to take me a couple of minutes to get through
24    this.
25    Q.   Take your time.
```

1    A.   Thank you.

2         (Pause.)

3    A.   I think this is only the first page.  Is there another

4    page to this?  May I look at that?

5    Q.   Yes.

6         MR. LOPEZ:  Can we mark that as X-3 for

7    identification.

8         THE COURT:  Yes.

9         Well, it can stay as X2, right?  It's the next page.

09:40 10      MR. LOPEZ:  Yes, your Honor.  It's the same document.

11        MR. MARKHAM:  X2, that's fine.

12        THE COURT:  Thank you.

13   A.   I see the second page.  I've read it.

14   Q.   And does that refresh your memory any as to whether or not

15   that was the attachment that Mr. Kruger sent to you on April 4,

16   2014?

17   A.   It does not.

18   Q.   Thank you very much.

19   A.   And it's unsigned.

09:41 20      MR. LOPEZ:  Now, can you bring up 11S, which is 6-0.

21        THE COURT:  That may be published.

22        MR. MOORE:  I don't believe this has been admitted.

23        THE COURT:  Okay, 11S.

24        MR. LOPEZ:  Do you see at the bottom of that, if you

25   can make that larger.  Before that, the top.  There you go.

BY MR. LOPEZ:

Q.   That appears to be the same email from Mr. Kruger dated
April 4, 2014.  John, this shows we are backed by gold and who
we are with.

A.   It's the -- it appears to be the same one you showed me a
few minutes ago, the 12 words.

Q.   Right.  And the document that you don't recall.

         MR. LOPEZ:  Can you go up, Joe, to the top of that
email.

A.   No, I -- did you say, And the document I don't recall?

Q.   I'm saying this is the same email with the attachment you
just reviewed but you don't recall the attachment.

A.   I haven't seen that attachment that I can ever remember
seeing it from eight years ago even I don't remember.  But I
haven't seen it recently at all.  So I just don't remember it.

Q.   So would you say your memory about what happened eight
years ago is a little foggy?

A.   Of course.

Q.   Okay.

A.   Anybody's would be.

         MR. LOPEZ:  If you go up to the top of that email and
just -- right there.

Q.   You respond to Mr. Kruger, Thanks, Michael.  Is your call
at 11 in lieu of Ron's call at 10?  Then you go on to say at
the bottom, It also would give me a chance to review the

 1  materials that you have sent.  Please let me know your

 2  thoughts.

 3          So back in 2004, this email seems to suggest that you

 4  did in fact review the attachment.  Or that you were going to

 5  review the attachment.

 6  A.   I'm just trying to read this, so if you just give me a

 7  second, please.  Thank you.

 8          (Pause.)

 9  A.   Well, this seems to indicate that whatever he sent me I

10  hadn't reviewed, and I'm asking would it be possible to talk

11  any time tomorrow.  I'm headed to the ball game with my family,

12  the Red Sox home opener, and, you know, time was tight that day

13  and I haven't had a chance to review your materials.

14  Q.   But at some point you reviewed the attachment to that

15  email.

16  A.   I don't remember that, sir.  That's what -- I don't

17  remember the attachment.  I would tell you if I did, but I

18  don't.  And it's unsigned, that attachment.  I don't know what

19  it's standing is of what you showed me.

20          MR. LOPEZ:  Okay.  Can you publish 11V.  Number 63,

21  Joe.

22          Could you enlarge the email itself.

23  BY MR. LOPEZ:

24  Q.   At the top of this email it says, 1,200 coins, Michael

25  Kruger to Randall Crater and a cc to you.

1          Randall, John Lynch is depositing $100,000 for 1,200

2    coins of which he is giving me 200 coins to my account.  This

3    will happen on Monday or Tuesday.  Thank you, Michael.

4          Did I read that correctly?

5    A.   You did.

6    Q.   So you gave Mr. Kruger 200 coins?

7    A.   That's what it looks like, yes.

8    Q.   Why did you give Mr. Kruger 200 coins?

9    A.   I'm guessing --

09:45 10   Q.   I don't want you to guess.  The jury doesn't want you to

11   guess.

12          Do you know why you gave Michael Kruger 200 coins at a

13   cost of $100,000?

14   A.   No, no, the $100,000 was for 1,200 coins.  I was going --

15   of that I was going to give him 200 coins.  For example, if the

16   coins should -- if the cost of the coins at that point were

17   $80, that would be $16,000.  And the balance of it would go to

18   my account.

19          So it was a portion of $100,000, which I appear to be

09:46 20   designating to go to Mr. Kruger's account.

21   Q.   I'm not a mathematician, but 200 out of 1,200 is 1/6 of

22   the 100,000, so approximately 1/6 of the $100,000?

23   A.   I said about $16,000, which is pretty close to 1/6.

24   Q.   Why were you giving Mr. Kruger $16,000?

25   A.   I think he was broke.

```
 1              MR. LOPEZ:  Now, 11X, can we put up 11X, which is 65.

 2    Q.    Now, this is an email to Mr. Crater with a blind cc to

 3    your legal assistant, Justine Mahoney, where you're saying,

 4    Enclosed please find my updated statements which I spent the

 5    afternoon reviewing which I believe now to be accurate.

 6    Unfortunately, on Friday I had not included all the wires I had

 7    sent previously.

 8              Did I read that correctly?

 9    A.    You read the first two lines correctly.  There's much more

09:47 10    to it.

11    Q.    And attached to that was a document dated July 21, 2014?

12              MR. LOPEZ:  Joe, could you show the second document?

13    A.    I haven't read the first one, but --

14    Q.    You need more time -- you want to read the whole --

15    A.    If you could go back and read the first one.

16    Q.    Sure.

17              MR. LOPEZ:  Why don't you enlarge the text for the

18    jury as well.

19              (Pause.)

09:49 20    A.    Okay.  I read that part.  Thank you.

21    Q.    This email at the bottom says, Talk to you soon.  Thanks

22    very much for your patience and kindness toward me, right?

23    A.    That's what it says, correct.

24              MR. LOPEZ:  Now, if we go to the next page, we'll

25    just -- we'll take it a group at a time.
```

```
 1              Just do that first group on the top.
 2     Q.   So you sent $100,000 for coins at $75 per MK.  MK would be
 3     Michael Kruger, right?
 4     A.   That's correct.
 5     Q.   Not Randall Crater?
 6     A.   No, MK is Michael Kruger.  RC is Randall Crater.
 7     Q.   Okay.  And it's $20,000 for Barbara Hatzmann, $40,000 for
 8     the Lynch group number 1.  Is that your family?
 9     A.   Yes, it is.
09:50 10     Q.   $20,000 for Stephen DeCourcey.
11     A.   Right.
12     Q.   He wired his own.
13     A.   Correct.
14     Q.   $10,000 for Shannon Michaud --
15     A.   Michaud.
16     Q.   -- wired by you.  And $10,000 for Justine Mahoney, your
17     legal assistant, wired by you.
18     A.   That is correct.
19     Q.   So am I to understand that you purchased $20,000 worth of
09:50 20     coins for Barbara Hatzmann?
21     A.   My memory was that Barbara put her own money in for the
22     coins.  The purchases for various people were ongoing.  So what
23     may have occurred in April or May or June or July, whenever it
24     was, may have changed as we went forward.
25              So at this particular point, there's a $20,000 number
```

in there for Barbara Hatzmann, who is a friend.  But my memory
was at the end of the day Barbara purchased more coins, and I
didn't have any of Barbara's money.  It was her money, as I
recall.  I'm not -- that's my best memory today.

Q.   When you listed Justine Mahoney, you said it was wired by
you.

A.   I did.  And I said --

Q.   And when you said Stephen DeCourcey, you said he wired his
own.

A.   Correct.

Q.   But you didn't say Barbara Hatzmann wired his own -- wired
her own.

And you had just reviewed this.  You said you spent --

THE COURT:  Well, counsel, let's wait for an answer to
the first question.

A.   My memory was when Barbara completed her acquisition of
coins, it was entirely her money.  Whether at this moment in
time she wired the money or I wired it for her and she had
given me the money, I'm not sure.  But at the end of the day,
my memory was that Barbara had her own money entirely in the
enterprise, not mine.

Q.   Okay.

So when -- to your knowledge, did Randall Crater ever
speak to Barbara Hatzmann?

A.   I don't know that.

1    Q.    Did Michael Kruger?

2    A.    I don't know that either.

3    Q.    Who introduced My Big Coin to Barbara Hatzmann?

4    A.    I think I had put Barbara Hatzmann in touch with Mark

5    Gillespie.

6          I told Barbara Hatzmann about the -- what I was doing.

7    I can't recall if she ever met Michael Kruger.  I don't think

8    she did, but, again, eight years ago, I'm not sure about that.

9    I don't think she did.

09:53 10   Q.    Do you recall what you told her to get her interested in

11   My Big Coin?

12   A.    Well, I told her about what I've testified before, that

13   this was a company that was going to go public shortly and was

14   backed by gold and oil, and the price of the coins was

15   increasing and it seemed like it was going to go public very

16   shortly.  And in fact, at that point in time, July, I had

17   expected that it would be public by that time.

18   Q.    And when you told her those things, that it was backed by

19   coin -- by gold and oil, it was going to go public, you

09:54 20   believed that to be true at that time, right?

21   A.    Of course I did.

22   Q.    You didn't think you were lying to her.

23   A.    Of course not.

24   Q.    You told her in good faith what your beliefs were at that

25   time.

A.   I certainly did.

Q.   And did you also share those same beliefs with your family?

A.   Well, with my family I put up all the money.  So it was really a gift, as it was for Justine and Shannon.  Shannon was a lawyer in my office, who had previously been my secretary, and went to law school while she was working for me, and has been a terrific employee and almost a partner.  So I treated them like I treated my family.

     Steve DeCourcey works with me.  He's a man of some means, and wired his own account.

Q.   But you introduced him to My Big Coin.

A.   I did.  I did.

Q.   The same way Mr. Kruger introduced you to My Big Coin.

A.   Well, I can't say for certain whether I introduced Steve DeCourcey to Michael Kruger.  Michael Kruger had come to Boston at various times, and he may have met some of the people in my office with me.  But I certainly told Steve DeCourcey what I was doing, and I'm sure I told Shannon and Justine, my colleagues, what I was doing, and I certainly told Barbara Hatzmann what I was doing.  That's all true.

Q.   And what you told them you believed to be true at the time you made those statements.

A.   A hundred percent.

          MR. LOPEZ:  Joe, could you put up the next grouping.

```
 1   Q.   Is it also true that you introduced Henry Kara to My Big
 2   Coin?
 3   A.   Yes, he's in the office, as is Richard Nylen.
 4   Q.   And Richard Nylen?
 5   A.   Yes, all of the people are in my office.
 6   Q.   How about the next grouping?
 7        Ernest DeSimone.
 8   A.   DeSimone, yes.
 9   Q.   You introduced him to My Big Coin.
10   A.   Yes.
11   Q.   And Nancy Colletti?
12   A.   She's my bookkeeper and she's 80-something years old, and
13   I, within the last year or so, I refunded her money.  She
14   needed the money, and I did that as well.  But I did --
15   Q.   Thank you for that information.  But in 2014, in July, did
16   you introduce Nancy Colletti to My Big Coin?
17   A.   I did.
18   Q.   And Peter Antell.
19   A.   Yes, that's correct.
20   Q.   And Moyra O'Donoghue?
21   A.   That's correct.
22   Q.   And you note there that she's a resident of Ireland?
23   A.   Yes.
24   Q.   Had you been to Ireland in 2014?
25   A.   I've been to Ireland almost every year.
```

```
 1   Q.   Did you take Michael Kruger with you in 2014?

 2   A.   It was in that time frame, I think, yes.

 3   Q.   So you both told her about My Big Coin.

 4   A.   I met so many people in Ireland.  I knew Moyra before

 5   this, and I may have introduced Mr. Kruger to her when we were

 6   both over there.  I'm just a little hazy on that.  But I

 7   certainly told her about it, and it's likely that I introduced

 8   Mr. Kruger to her.

 9   Q.   It says here she wired $6,000 and you wired $4,000.

10   A.   Right.

11   Q.   So you had known Ms. O'Donoghue prior to going to Ireland?

12   A.   Well, I met her in Ireland years ago.  She's a friend of

13   mine.  As a matter of fact, she and her girlfriends, doctors,

14   lawyers, a group of them came and visited me in Boston prior to

15   this, and we've been friends for a long time.

16   Q.   And that's why you gave her $4,000 worth of My Big Coin.

17   A.   That's right.  I wanted to do a good turn for her.  She's

18   a very nice person and she was having some financial

19   difficulties.

20        MR. LOPEZ:  Let's go down to the next grouping.

21   Q.   Now, this next grouping includes Seamus Connolly.

22   A.   That's correct.

23   Q.   Also a resident of Ireland.

24   A.   He is.  He's my -- he's one of my best friends.

25   Q.   And he wired his own money.
```

1    A.    He did, that's correct.

2    Q.    And you introduced him to My Big Coin?

3    A.    I told him what I was doing, and I know I had spent some

4    time with him in the company of Mr. Kruger, talking about this.

5    Q.    Did Mr. Connolly know about My Big Coin before he spoke to

6    you?

7    A.    No, he had no -- I, you know -- he had no -- he wasn't

8    following this.  I brought it to his attention, along with

9    Mr. Kruger.

10:00 10   Q.    So you introduced him to My Big Coin.

11   A.    I think that's fair, yes.

12   Q.    Okay.  Paul Flaherty.

13   A.    Right.

14   Q.    You introduced him to My Big Coin.

15   A.    I did.  He is an outside consultant to our office.  He's

16   an IT specialist and runs our office IT computer systems.  I've

17   known him for a long time.

18   Q.    Tom Callahan.

19   A.    I'm known him for a long time.

10:01 20   Q.    But you wired $12,150 on his behalf.

21   A.    I did.  He's a friend, and he also has had some financial

22   problems, and he's been a friend of mine for a long, long time.

23   Q.    And you introduced him to My Big Coin.

24   A.    I did, and he also met -- when he met with me on this, he

25   met Michael Kruger on several occasions.

1    Q.    Mick Farrell, resident of Ireland, wired by John Lynch.

2    A.    Right.

3    Q.    You introduced Mr. Farrell?

4    A.    Yes, and his wife.

5    Q.    And you paid for the coin.

6    A.    I had rented a home in Ireland for some years.  And Mick

7    and his wife, Gina, you know, took care of the place for me,

8    and we were very friendly, and they had some -- like some

9    people, they had some financial difficulties.  We had a

10:02   10   long-term friendship, and that's what I did.

11    Q.    Leslie --

12    A.    Daoust.

13    Q.    She wired 5,000, you fired 10,000?

14    A.    As of that time, that's correct.  She was a friend of mine

15    from Florida.  She's in the construction design business.

16    Q.    And you introduced her to My Big Coin.

17    A.    I did, that's correct.

18    Q.    Mike Taranto.

19    A.    Mike is my carpenter.  I spoke to him this morning, as a

10:03   20   matter of fact.

21    Q.    You introduced him to My Big Coin.

22    A.    Well, I did, and I put the money up for him.

23    Q.    Now, it says here, you note here, Has registered, wired by

24    John Lynch.  And you reviewed this document before you sent it.

25    What does "has registered" mean to you?

1    A.   Well, at the time -- Mike's a wonderful guy.  He works

2    with his hands.  He's a skilled carpenter.  He had done some

3    projects for me, and he was not computer literate.  And in

4    order to open his account, he had to have his sister help him

5    with, you know, signing up, getting on the website, those types

6    of things.  So I was making it -- they probably wondered where

7    his paperwork was, and I guess I'm commenting here that he has

8    registered and I had wired the money.

9    Q.   Did you register on your own?

10   A.   Open up my account?

11   Q.   Yes.

12   A.   I forget.  I could have or I could have done it with

13   Justine or Shannon.

14   Q.   Is it more likely Justine did it than you?

15   A.   I'm just trying to remember.  I don't have a clear memory

16   eight years later how I accomplished that.  I'd tell you if I

17   knew for certain but I don't.

18   Q.   So if I was to ask you how you actually went through the

19   process of registering an account with My Big Coin in 2014,

20   today you can't tell me.

21   A.   Well, I can't tell you the steps that I took on my

22   computer to do that or whether Justine or Shannon was standing

23   with me assisting me.  I just don't remember eight years ago.

24           I know I registered and I opened my account and I got

25   an account.  I just don't remember from April 2014 or June, or

           1   whenever it was, how it was accomplished.  I mean, that's -- a
           2   lot of life has passed between then and now.
           3   Q.   Now, with respect to the people on this page, other than
           4   Mike Taranto, do you know whether or not they registered an
           5   account?
           6   A.   I believe they all did.
           7   Q.   And you didn't have access to those accounts.
           8   A.   That's correct.
           9   Q.   So you couldn't confirm what was in their accounts or what
10:05     10   wasn't in their accounts.
          11   A.   The only access I would have is what they would tell me if
          12   I asked.
          13   Q.   You were doing this to tell My Big Coin what should be in
          14   the accounts because you couldn't get access to the accounts,
          15   right?
          16   A.   I think that's part of it, yes.  I think you're correct.
          17   Q.   Okay.
          18            MR. LOPEZ:  Let's go to the next page.
          19            And the second grouping, miscellaneous.
10:06     20   Q.   And this has Ms. Hatzmann again, which she wired $10,300
          21   for 100 coin.  Again, I'm not good at math, but is that $103
          22   per coin?
          23   A.   I would agree with your math, yes.
          24   Q.   And Paul Flaherty also wired some $50,000 for My Big Coin
          25   at $91 plus or minus?

```
 1   A.   Right.  The price is going up and down at that time, in
 2   June.
 3   Q.   Just like Bitcoin?
 4   A.   Cryptocurrency is volatile, no question about it.
 5   Q.   And Paola Vogrich?
 6   A.   Vogrich, I believe.
 7   Q.   Vogrich.  And you wired $10,300 for her.
 8   A.   I did.
 9   Q.   Does she live in the United States?
10   A.   No.  She presently lives -- splits her time primarily in
11   London and she's an Italian citizen from northern Italy.
12   Q.   And so you purchased coin for her.
13   A.   I did.
14   Q.   And do you visit her in London regularly?
15   A.   I did probably a couple of times in 2015 or 2017.  She
16   was -- I met her in Boston.  She was -- she's an attorney, an
17   international business attorney, and she was taking courses at
18   Harvard when I met her, and we became friendly, and we're still
19   in contact and --
20   Q.   So the answer to my question is yes, you visit with her
21   regularly in London?
22   A.   No.
23   Q.   Okay.
24   A.   I did visit her in London on several occasions.  I have
25   not visited her or seen her in a number of years currently.
```

1    Q.   Now --

2         MR. LOPEZ:  Go to the next page, Joe.

3    Q.   Now, the next page is the attachment for allocations for

4    individual accounts.  And on this page, if you look at the

5    first grouping, you're communicating what each -- what

6    Ms. Hatzmann purchased her coins at different points in time.

7    A.   That is correct.  There are three numbers, 75, 81, and 92.

8    Similar to my own, actually.

9    Q.   And the only date on this is on 6/10/14 coin was at $92 a

10:09 10  coin.

11   A.   That's correct.

12   Q.   It had gone up from $75 a coin to $92 a coin.

13   A.   It appreciated in that number, that's correct.

14   Q.   So on June 10, 2014, it was your understanding and

15   Ms. Hatzmann's understanding that the market value for the coin

16   was $92 a coin, correct?

17   A.   Hundred percent correct.

18        MR. LOPEZ:  Now if you could go down to the next

19   grouping.

10:10 20  Q.   And again, that also shows, even though there aren't

21   dates, that the coin continued to appreciate.  Right?

22   A.   I'm just looking at -- just give me a second.

23   Q.   Take your time.

24        (Pause.)

25   A.   Right.  Starting at $75 and by the time of this update, it

1   was at $92.  And that looks like it might have been late June,

2   although I did the update on July 21st.

3   Q.   And you could see that on the website, right?

4   A.   Yes.

5   Q.   Okay.  Now, I think yesterday you told us that when you

6   first purchased My Big Coin's coins, emblazoned across website

7   was the words "backed by gold," right?

8   A.   On materials that I have seen, it was backed by gold

9   bullion.  That's what I recall.

10:11 10   Q.   Was it on the website?

11   A.   It may have been.  I've seen -- maybe it was in account

12   summaries.  I've seen those words plus, you know, you can buy,

13   sell, trade, donate, MasterCard and so on and so forth splashed

14   across a number of these MBC documents.

15          What was on the website eight years ago, whether it

16   was exactly that or not, sitting here today I don't remember.

17   But I know I have seen that on various documents.  Was it there

18   in April of 2014?  I don't remember fully, but I have seen it.

19   That's what was on there, on the documents that I saw.

10:12 20          And I've seen many documents at different times.

21   Q.   So yesterday when I asked you that same question, you

22   said, yes, it was on the website, right?

23   A.   It may well have been --

24   Q.   Sir, yesterday when I asked you if it was on the

25   website --

```
 1   A.   I'd have to take your word for it.

 2   Q.   Don't you remember what you testified to yesterday?

 3   A.   I do.

 4   Q.   Did you testify that it was on the homepage of the

 5   website?

 6   A.   I think I said I found it through the website.  I think

 7   you're right.

 8   Q.   Okay.

 9        MR. LOPEZ:  Pull up 15A.

10   Q.   That's My Big Coin's website in August of 2014.

11        (Pause.)

12        THE COURT:  So, counsel, is there a question?

13        MR. LOPEZ:  I'm asking him if that is the website from

14   August of 2014.

15   A.   I thought you just made a statement.  I didn't know it was

16   a question.

17   Q.   Then let's go through this.

18        MR. LOPEZ:  Under "Latest News," Joe, could you

19   enlarge that?

20   Q.   Now, I think you said that the website said that it was

21   backed by MasterCard, right?

22   A.   The logo of MasterCard was on the materials that I saw.

23        You used the words "backed by MasterCard."  Do you

24   mean insured by MasterCard or something?  What do you mean by

25   that?
```

```
 1   Q.    I think you testified yesterday --
 2              MR. MOORE:  Objection, your Honor.
 3              THE COURT:  Counsel, basis in a word for objection?
 4              MR. MOORE:  Foundation that he has seen this.
 5              THE COURT:  Oh, okay.
 6              Counsel, Mr. Lopez, you can back up and ask questions
 7   about whether or not he's seen this in the time frame.
 8              THE WITNESS:  Could you just put it back on the screen
 9   for me, Mr. Lopez, or your assistant.
10:15 10         MR. LOPEZ:  Absolutely.
11   BY MR. LOPEZ:
12   Q.    Do you recognize this as My Big Coin's website in 2014?
13   A.    I can't say definitively that this was the only thing on
14   the website, but it certainly looks authentic as, you know,
15   part of My Big Coin materials.
16   Q.    Well --
17   A.    And if you're telling me it came off the website, then I
18   have no doubt.
19              I have no reason to doubt what you're suggesting to
10:15 20  me.
21   Q.    I'm not suggesting anything to you.
22   A.    Oh.
23              MR. LOPEZ:  Why don't we enlarge the current value of
24   MBC.  Maybe that will help refresh your memory as to whether or
25   not this was in 2014.
```

1    A.   Is there a date on this?  I didn't notice.

2    Q.   Well, I mean, I think -- I think you just testified

3    earlier that in 2014, Barbara Hatzmann purchased 100 coins for

4    $10,300, which is $103 a coin.  And this says the value is

5    102.13 USD, U.S. dollars.  Does that refresh your memory as to

6    whether or not this was the website in 2014 when Ms. Hatzmann

7    in June purchased her coin?

8    A.   What was the date of Ms. Hatzmann's purchase?

9    Q.   June 10, 2014.

10:17 10   A.   Okay.  Is there a June 10th date on this document?  If

11   there is, I would agree that that's 102.13 was the value as of

12   June 10th.

13        But I don't see -- I didn't remember seeing a date on

14   the website.

15        Can you help me with that?  Do you want to --

16   Q.   The parties have agreed that the website was in Exhibit

17   15A is what the website looked like from May of 2014 until at

18   least August of 2014.

19   A.   Okay.

10:17 20        MR. MARKHAM:  Your Honor, just to make clear, we have

21   not made that stipulation as to a date range.

22        THE COURT:  Okay.

23        So, counsel, Mr. Lopez, you can go to the next

24   question as to this witness.

25        MR. LOPEZ:  So can we show "The Latest News" again.

1            Latest news on this website, which you may or may not

2       have seen, says, New MasterCard for clients coming soon.

3            Do you see that?

4       A.   I do.

5       Q.   My Big Coin coming to a merchant near you.

6       A.   Correct, I read that, yes.

7       Q.   Would you agree with me that those are forward-looking

8       statements?

9       A.   Yes, I would agree with you.

10:18 10           MR. LOPEZ:  And going back to the full page again,

11      Joe.

12      Q.   Do you see "backed by gold" anywhere on this document?

13      A.   Earlier while I was waiting for your question I looked

14      this over quickly and I didn't see it at all.  And I didn't see

15      the date of this either.

16           MR. LOPEZ:  Joe, can you enlarge the part that talks

17      about currency.

18      Q.   Do you see where it says there My Big Coin is a virtual

19      currency?

10:19 20      A.   Which side?

21      Q.   On the left side.

22      A.   Okay.  Yes, in the second paragraph it says My Big Coin is

23      a virtual currency, that's correct.

24      Q.   You would agree with me that blockchain technology is also

25      a virtual currency?

1    A.    I think I can agree that the blockchain is the underlying

2    mechanism by which these cryptocurrencies function.

3    Q.    And it says you can mine them.

4    A.    It says that.

5    Q.    Did you know how to mine them?

6    A.    I never tried to mine them, and in my accounts --

7    Q.    So you don't know whether or not you could have mined them

8    because you never tried.

9    A.    Well, it's more than I never tried.  May I finish the

10   answer?

11   Q.    Yes or no, did you mine your --

12        THE COURT:  Counsel, I think he was still answering

13   the question.

14        MR. LOPEZ:  Your Honor, he's answering the questions

15   he wants to answer, not the questions I'm asking.

16        THE WITNESS:  I'm trying to respond to your questions,

17   sir.

18        THE COURT:  Counsel, no commentary.

19        Did you know how to mine them?  So that was the

20   question you were answering.

21        You can finish your answer.

22   A.    Okay.  Just give me a second.

23        Did I know how to mine them.

24        In my account, there was no evidence of any increasing

25   or decreasing because of mining.

1          I don't remember at that point in time that I was

2    trying to mine coins.

3          My memory was in my accounts the mining feature only

4    came into play in 2016, '17 when the MBC exchange was frozen

5    and scrapped and this new system was being put in.  Because at

6    that point in time, in 2017, if I looked at my accounts, there

7    was mining going on and the mining is a verification process

8    that takes place when people make transfers.  And if your

9    account is part of the mining process, you get a very small

10:21 10   increase for a very small fraction of a coin for each

11   transaction that occurs.

12         So because at that point in time I had 73,000 coins,

13   everything in coin, every day I'd get an additional couple of

14   coins.

15         As far as I know, that never happened back in 2014,

16   2015, 2016.  And my concern in that period, the earlier period

17   was just trying to get my accounts updated so that they

18   reflected all of my investment.

19         So although this says you can mine them, I never did,

10:22 20   and I don't know that I could have because it didn't happen in

21   my account.

22   Q.   So, sir, just -- thank you for that.

23   A.   I hope it was helpful.

24   Q.   Very helpful.

25   A.   Okay.

```
 1    Q.   So in 2014, did you know how to mine your coins?

 2    A.   I never tried.  I don't --

 3    Q.   Sir --

 4    A.   I don't think I could have --

 5    Q.   I know you want to say you didn't think you could have.

 6    But you never tried, right?

 7    A.   Mining isn't a process that I think or any investor could

 8    undertake.  I believe --

 9    Q.   Sir, that's your opinion, right?

10:23 10   A.   Well, that's what I was about to say before you cut me

11    off.

12    Q.   I'm asking for a fact.  Did you try to mine your coins in

13    2014, yes or no?

14    A.   I don't have any recollection of trying to mine my coins

15    in 2015, nor did I see any evidence of that occurring in my

16    account.

17         THE COURT:  Counsel, for what it's worth, I may not be

18    alone in not understanding what you're talking about.

19         MR. LOPEZ:  Well, your Honor, I will be presenting

10:23 20   expert testimony later on that, but I'm trying to find out what

21    this --

22         THE COURT:  No, no, I understand the questions -- the

23    questions and the answers are going in, but for what it's

24    worth.

25    BY MR. LOPEZ:
```

1   Q.   And you testified that in 2017 that you did actually see

2   mining in your account.

3   A.   Yes.  I did nothing --

4   Q.   Just answer -- I just asked that question.  I don't -- I

5   don't want all the other --

6   A.   Well --

7          THE COURT:  Counsel, the question was, Mr. Lynch:  And

8   you testified that in 2017 you did actually see mining in your

9   account?

10:24 10          That was the question, Mr. Lopez?

11          MR. LOPEZ:  Yes, and it's a yes or no.

12   A.   My account increased because of mining in that time

13   period, the later time period, automatically.

14   Q.   And you understood in 2014 and 2015 that in order to

15   increase your account by mining, you had to actually do mining,

16   right?

17   A.   I could not, nor could any investor, do mining --

18          MR. LOPEZ:  Objection, your Honor.  Move to strike.

19   A.   -- in that period of time.

10:24 20          MR. LOPEZ:  He doesn't know what other --

21          THE COURT:  So, counsel, no commentary.

22          So sustained as to the answer.

23          Mr. Lynch, the question is:  And you understood in

24   2014 and 2015 that in order to increase your account by mining,

25   you had to actually do mining, right?

```
 1              THE WITNESS:  I had no ability --
 2              THE COURT:  Can you answer yes or no?
 3              THE WITNESS:  I apologize, your Honor.  I was lost in
 4     my own thoughts.  Could you repeat that for me?
 5              THE COURT:  Sure.  And do you understand that in 2014
 6     and 2015, that in order to increase your account by mining, you
 7     had to actually do mining, right?
 8              THE WITNESS:  I didn't have that understanding.
 9              THE COURT:  Okay.
10              So, counsel, next question.
11     BY MR. LOPEZ:
12     Q.   Before you invested or purchased My Big Coin coins, did
13     you review the terms of the My Big Coin website?
14     A.   Is this the page you're showing me?
15     Q.   No, this isn't it.
16     A.   The terms.
17     Q.   The terms.
18     A.   Well --
19     Q.   Did you review what you were agreeing to do?
20     A.   Again, eight years later, I don't remember the terms as
21     you've stated them.  As I sit here today, I don't know whether
22     I reviewed the terms or didn't.  I just have no memory.  I may
23     well have, but I just don't remember sitting here eight years
24     later.
25     Q.   Do you recall reviewing the member agreement?
```

1    A.   The best I can do for you, Mr. Lopez, is say I may have

2    reviewed it.  I just can't recall at this moment in time for

3    certain.

4              MR. LOPEZ:  Can you bring up 15F, which is 114, Joe.

5              Can you enlarge the Disclaimer of Warranties and

6    Limitation of Liability, which is paragraph 2.

7    Q.   Before you put down $200,000 to purchase coin, did you

8    review the Disclaimer of Warranties and Limitation of

9    Liability?

10:27 10   A.   Can you give me a second to read this, Mr. Lopez?

11             May I have a minute to read this?

12   Q.   Absolutely.  Take all the time you need.

13   A.   Thank you.

14             (Pause.)

15   A.   I've read it, Mr. Lopez.

16   Q.   And as a lawyer did you understand what the terms mean?

17   A.   I don't remember seeing this or reading it.

18   Q.   So you don't remember what the home page looked like and

19   you don't remember reading this.

10:28 20   A.   I guess I can say honestly that I don't remember reading

21   this.  This is my testimony.

22   Q.   At any time before you put down all the money you put

23   down, you never read this?

24   A.   I'm not even sure I was presented this to read, but I have

25   no memory of reading this, Mr. Lopez.  None.

1            MR. LOPEZ:  Can you go to 115, which is 15G.

2            And could you enlarge Disclaimer of Warranties and

3     Limitation of Liability.

4     Q.   Before you signed up for My Big Coin exchange, did you

5     review the Disclaimer of Warranties and Limitation of

6     Liability?

7     A.   Is this different from what I read earlier?

8     Q.   This is on the My Big Coin Exchange.

9     A.   So it's different.

10:30 10            Just give me a second, please.

11    Q.   Sure.

12            (Pause.)

13    A.   I've read it.

14    Q.   Do you recall reading that before you signed up for My Big

15    Coin Exchange?

16    A.   I have no memory of being presented this or reading it.

17            What is the date?  Is there a date on this?

18            THE COURT:  Well, sir, why don't you wait for the next

19    question.

20            THE WITNESS:  Thank you, your Honor.

21            THE COURT:  Mr. Lopez.

22            MR. LOPEZ:  Yes, your Honor.

23            The next document I'm just going to mark for

24    identification.

25            THE COURT:  Just for the witness and counsel.

         1              MR. LOPEZ:  Just for the witness, yes.

         2              THE COURT:  Is this a new letter?

         3              MR. LOPEZ:  Yes.

         4              THE COURT:  Okay.  So we'll make this Y.  I don't see

         5    it yet.

         6              MR. LOPEZ:  I think it is Y.  It's a two-page

         7    document.

         8              THE COURT:  And I don't see it on the screen, counsel.

         9              MR. LOPEZ:  Oh, I'm sorry.  Joe, 157.

10:31 10              (Exhibit Y marked for identification.)

        11              THE COURT:  Counsel.

        12              THE WITNESS:  Do you want me to read this?

        13    BY MR. LOPEZ:

        14    Q.   Do you recognize this document?

        15    A.   I haven't read it.

        16    Q.   Well --

        17              (Pause.)

        18    A.   It looks like there's a second page to this.

        19              MR. LOPEZ:  Joe, can you grab the second page for

10:33 20    Mr. Lynch?

        21              (Pause.)

        22    A.   Okay.  I've read both pages.

        23    Q.   Do you recognize that document?

        24    A.   Do I recognize -- could you go back to the first page for

        25    me, please?

1           No, I don't.

2   Q.   I think you testified at some point someone told you that

3   the company was going to go public within 60 days?

4   A.   They did.

5   Q.   And who's Adam Tracy?

6   A.   Adam Tracy is a lawyer, is my understanding.  He is

7   representing My Big Coin in a -- I don't know if it's a

8   related --

9           THE COURT:  Well --

10:34 10         THE WITNESS:  I'm sorry.

11          THE COURT:  I want to make sure that you're testifying

12  from your memory right now and not from a document.

13          THE WITNESS:  No, I'm testifying from my memory.  I've

14  talked to Adam Tracy, your Honor.  I've spoken with him.

15          Should I continue?

16          THE COURT:  You may.

17  A.   Adam Tracy is a lawyer who told me that -- and wrote to me

18  and the other investors saying that he had represented My Big

19  Coin Pay, I believe, and a company called Shot Spirits, and

10:35 20  that there was going to be a merger between My Big Coin Pay and

21  Shot Spirits, and he was the attorney representing those

22  companies, and his client also I thought was Mr. Crater.  And

23  there was going to be a transaction, and this transaction was

24  in two parts.

25          In 2015, there was a subscription agreement prepared

```
       1   by Attorney Tracy for each of the investors to sign, and there
       2   was going to be a merger then between these companies, My Big
       3   Coin Pay, I believe, and Shot Spirits Corporation.  That didn't
       4   go forward.
       5          Approximately 12 or 13 months later, there was a new
       6   venture being proposed, a merger between the same companies, My
       7   Big Coin Pay and Shot Spirits Corporation with Mr. Tracy being
       8   the securities lawyer in charge of this for the companies and
       9   Mr. Crater.
10:36 10          And that, as I said, was in 2016-'17, into 2017, so
      11   two separate transactions.  And --
      12   Q.   Now, this document references Attorney Tracy, right?
      13          THE COURT:  Well, counsel.
      14   A.   It does.
      15          MR. MOORE:  Objection.
      16          THE COURT:  Objection, yeah.  Sustained based on the
      17   prior answer regarding not recognizing the document.
      18          THE WITNESS:  Oh, okay.
      19          THE COURT:  So, Mr. Lopez, you can ask another
10:37 20   question.
      21   BY MR. LOPEZ:
      22   Q.   Did you know who Adam Tracy was in 2014?
      23   A.   No, I wasn't told who he was until later.
      24   Q.   So you were told on the one hand that there was going to
      25   be an IPO within 60 days, and on the other hand you're telling
```

1    us you didn't know who the attorney was that was handling that?

2    A.   I don't think I was told his name at that point in time.

3    Q.   And although you owned a substantial amount of My Big

4    Coin --

5            THE COURT:  We should take the exhibit down.

6            Thank you.

7            Mr. Lopez, you can ask your question.

8    BY MR. LOPEZ:

9    Q.   Although you were waiting for this IPO to happen, you

10:38 10   didn't review press releases that were issued by the company

11   during this time period?

12   A.   They weren't issued to me.

13   Q.   Okay.

14           MR. LOPEZ:  Can I put up 168 for identification.

15           THE COURT:  We'll make this Z, counsel.  Just for

16   counsel and the witness.

17           MR. LOPEZ:  Yes.

18           THE COURT:  Thank you.

19           (Exhibit Z marked for identification.)

10:39 20   BY MR. LOPEZ:

21   Q.   Sir, do you recognize this document?

22   A.   Well, this is an email from me to Randall Crater and

23   Michael Kruger.  And it says there's an attachment about a New

24   York Times article, 10-6-14.  And it says FYI from me to them.

25   Q.   So do you recognize the document?

```
 1    A.    I don't see it.
 2    Q.    This document, this email, do you recognize that?
 3    A.    Oh, this document.  Well, I wasn't thinking of it is a
 4    document.  I recognize -- well, I recognize that I sent them,
 5    that's my email address and their email address.  So, I don't
 6    remember specifically the document, but I don't dispute it.
 7    It's obviously from me to them, so --
 8    Q.    Okay.  And there appears to be an attachment.
 9    A.    Yes, correct.
10          MR. LOPEZ:  Can you show the witness the attachment,
11    Joe?
12          THE COURT:  And we'll make -- this will be Z1.  The
13    next one is Z2.  Thank you.
14          (Exhibit Z1 marked for identification.)
15    BY MR. LOPEZ:
16    Q.    Does that appear to be an article from the New York Times
17    dated 10/16/2014?
18    A.    Yes, that information is at the top of the article,
19    correct.
20          MR. LOPEZ:  Your Honor, I move for this to be admitted
21    at this time.
22          THE COURT:  Any objection?
23          MR. MOORE:  Objection.  Hearsay, your Honor.
24          MR. LOPEZ:  It's not being offered for the truth of
25    the matter.
```

1            THE COURT:  Well, can you back up to the cover sheet?

2       I mean, go back to the email, please.

3       And then go forward to the attachment.

4       Can I see the attachment, whoever is in control here?

5       MR. LOPEZ:  Joe, the first page of the attachment.

6       (Pause.)

7       THE COURT:  Thank you.

8       MR. LOPEZ:  Your Honor, why don't I just hand one up.

9       THE COURT:  That would be easier.  Thank you.

10:42 10       (Pause.)

11            THE COURT:  So, counsel, I don't think it's being

12      offered for the truth, but having not had a chance to go

13      through the entirety of it, I think you can display it.  I'll

14      take up later with counsel in what form it should be admitted.

15            MR. LOPEZ:  Well, your Honor, why don't we go to the

16      next page.

17            THE COURT:  Okay.

18            MR. LOPEZ:  And you'll see why I believe it's

19      admissible.

10:42 20            THE COURT:  Okay.  What page, the last page?

21            MR. LOPEZ:  The second-to-last page of the document.

22      There's some notations down in the bottom margin.

23            THE COURT:  Yeah, and I guess what I'm trying to say,

24      counsel, is for the purposes of impeachment, I don't know if it

25      comes in substantively, but you can ask the question.  I'll

```
 1   take up later with counsel what form it's coming in.  But you
 2   can ask the question.
 3             MR. LOPEZ:  Can you show the first page again, Joe, to
 4   the jury.
 5             THE COURT:  And we'll keep it as ID for the moment.
 6   This is Z1 and Z2.
 7   BY MR. LOPEZ:
 8   Q.   For the jury, again, Mr. Lynch, this is an email that you
 9   sent to Mr. Crater and to Mr. Kruger in October of 2014?
10   A.   That's correct, yes.
11   Q.   And it had an attachment, a New York Times article dated
12   October 6, 2014?
13   A.   Also correct, yes.
14             MR. LOPEZ:  And the next page, Joe.
15   Q.   That appears to be the article?
16   A.   It has the same dates and times, so I would think it would
17   be.
18             MR. LOPEZ:  Joe, if you go to the next page.
19   Q.   There's a notation down in the bottom right-hand corner
20   there.  And I believe it says -- well, there's an asterisk next
21   to the phrase "Most of the company's revenue comes from
22   advertising."  Is that your handwriting?
23   A.   In the margin, it appears to be my handwriting.
24   Q.   And you say R -- did that refer to Randall?
25   A.   Correct.
```

          1    Q.    -- can we advertise products on our MBC exchange site for

          2    interested companies?

          3          Is that what you asked Mr. Crater?

          4    A.    That's what it says, yes.

          5    Q.    So in --

          6          THE COURT:  And you can take it down now, counsel.

          7    BY MR. LOPEZ:

          8    Q.    In 2014, you were making suggestions to Mr. Crater about

          9    how to make MBC better, right?

10:45    10    A.    Well, I did in that instance it appears, yes.

         11    Q.    So you were more than an investor or purchaser of coin,

         12    you were helping with the MBC product, right?

         13    A.    Well, as a relatively large investor, I made inquiry about

         14    the capacity of the system.  So that was a question.

         15          THE COURT:  Counsel, I just want to give an

         16    instruction to the jury about this.

         17          Jurors, you've seen that there are a few exhibits that

         18    you don't see initially.  That's because there are certain

         19    exhibits that haven't been admitted yet and the attorneys on

10:45    20    either side need to lay a foundation before evidence can be

         21    presented to you.  So that's why -- again, we're not doing that

         22    to frustrate you.  It's just I need to see it, counsel on the

         23    other side needs to see it, and the witness needs to see it so

         24    I can determine if there's foundation.

         25          What was just displayed to you is being offered not as

1    substantive evidence, but as evidence to question the witness

2    for the possibility of impeaching the witness, and that's why

3    it was published and not admitted.

4          So, Mr. Lopez.

5          MR. LOPEZ:  Thank you, your Honor.

6          I'd like to have the next document marked for

7    identification as well.

8          THE COURT:  Sure.  I think we're at AA.

9          MR. LOPEZ:  Yes.

10:46 10          (Exhibit AA marked for identification.)

11          MR. LOPEZ:  Can you put up 179, Joe.

12          THE COURT:  Just for the witness.

13          This may already be --

14          MR. LOPEZ:  No, that's not 179.  That's the wrong

15    document.

16          That's it.

17          THE COURT:  Thank you.

18    BY MR. LOPEZ:

19    Q.   Mr. Lynch, do you recognize this document?

10:47 20    A.   Can you give me a minute to read it?

21    Q.   Absolutely.

22    A.   Thank you.

23          (Pause.)

24    A.   I've read it now.  Thank you.

25    Q.   Is that an email that you sent to Mark Gillespie and

1    Michael Kruger in October of 2014?

2    A.    Yes, it is.  It appears so, yes.

3    Q.    And your legal assistant, Justine Mahoney?

4    A.    She was copied on it as well.

5    Q.    But it was not sent to Mr. Crater.

6    A.    No, this was to Mr. Gillespie with whom I was working

7    on -- he was the administrative account person designated by

8    Mr. Crater.  So I had a lot of exchanges with Mr. Gillespie

9    over the time period in question.

10   Q.    And would you agree with me that this email refers to your

11   accounts?

12   A.    It does, yes.

13   Q.    And other people's accounts.

14   A.    Correct.

15   Q.    And there appears to be a number of attachments?

16          THE COURT:  Counsel, do you want to show the witness?

17          MR. LOPEZ:  It might jut be easier just to show him

18   the document.

19          THE COURT:  Sure.  You may approach.

20          (Discussion off the record.)

21          (Pause.)

22   A.    Okay.

23   Q.    All right.  Having reviewed that document, is that a

24   document you wrote and does it contain the attachments

25   referenced in the email?

```
 1    A.    I would say it does, yes, sir.

 2              MR. LOPEZ:  I move to admit that, your Honor.

 3              THE COURT:  Any objections?

 4              MR. MOORE:  Yes, your Honor.  Hearsay.

 5              MR. LOPEZ:  It's his email.

 6              THE COURT:  Well, that doesn't answer that question.

 7              Counsel, it's being offered for the purposes of

 8    impeachment?

 9              MR. LOPEZ:  Yes.

10              THE COURT:  So, counsel, we'll take the same approach

11    as we did before.  We'll keep it as AA.

12              And I'll just note, counsel, in regards to these

13    rulings, I am relying upon Rule 613(b) in regards to extrinsic

14    evidence.  I think for purposes of presentation to the jury I'm

15    allowing the document to be published for the purposes of

16    facilitating the questioning, but otherwise won't be admitted.

17              That was AA?

18              MR. LOPEZ:  Yes, your Honor.

19              THE COURT:  It may be published.

20    BY MR. LOPEZ:

21    Q.    Now, this email begins, As we are getting closer to the

22    IPO for MBC, I wanted to make sure the accounts for my family

23    and friends, as well as my own, are brought up to date.

24              Did I read that correctly?

25    A.    Yes, you did, yes, correct.
```

1    Q.   So you had an understanding in 2014 that an IPO was

2    imminent?

3    A.   I had an ongoing anticipation that there would be an IPO

4    in 2014 60 days out from when I started the purchasing.

5         It was related to me by these parties that it was

6    about to happen on a number of different occasions, this being

7    one of them in October of 2004.

8    Q.   In October of 2004 what was your understanding of when the

9    IPO was going to occur?

10:53  10    A.   I'm going to use your word "imminent."

11    Q.   Well, what do you mean by "imminent"?

12    A.   I think probably what you meant, which is it's going to

13    happen very shortly, immediately, soon.

14    Q.   So in October?

15    A.   Well, that's what I said in the email at the time.  So

16    that represented my thinking back on Sunday, October 19, 2014,

17    that we are getting closer to the IPO for MBC.

18         So "closer," "imminent," "immediate," whatever words

19    you choose to use.

10:54  20    Q.   And at this point in time you didn't own any stock in MBC,

21    right?

22    A.   Well, as I've said many times, the anticipation, at least

23    mine was, on the recommendation of Mr. Crater, that I should

24    divide my portfolio of coins in half so that half of the coin

25    account would become denominated in stock, because he felt that

1    there was a real upside to the stock, and balancing it to 50/50

2    would be a good thing to do.

3          So technically at that moment in time, since the

4    company had not yet gone public, all of my holdings were in

5    coin and not in stock, but the anticipation was when the

6    company went public, my account would be split, as I've said on

7    a number of occasions here.

8    Q.   And so you got share certificates to prove this?

9    A.   No, I had no share certificates.  I was waiting for those,

10:55 10   and they never came.

11   Q.   Did you have anything in writing from Mr. Crater that said

12   that?  In October of 2014.

13   A.   No, I just -- I relied on his representations.

14   Q.   And you're relying upon your memory today of what he said

15   in 2004, right?

16   A.   Well, right from the beginning, that was the advice I got,

17   about splitting it.

18          And later on, in 2015, you know, there was the

19   material -- there was material I received from Adam Tracy in

10:55 20   connection with that merger and going public later.

21          But as of 2014, I was told that we'd be going public

22   very shortly.  And my understanding was that -- well, I'm just

23   repeating myself.  I'm sorry.

24   Q.   Did you sign any type of subscription agreement?

25   A.   In 2015 I did.

1    Q.    How about in 2014?

2    A.    No, there was no -- none existed.

3    Q.    Did you fill out any questionnaires about whether you were

4    a qualified investor?

5    A.    None were presented to me in 2014.

6    Q.    And yet, you thought the IPO was imminent.

7    A.    That's what I was told by your client, by Mr. Crater

8    repeatedly.

9    Q.    That's what you say he told you.

10:56 10   A.    I'm under oath, and I take my oath very seriously, sir.

11   That's what I was told repeatedly.  That's my testimony.

12   Q.    And I think you used the words "he advised you."  So I'm

13   taking it that instead of you advising him as an attorney, he

14   was advising you --

15   A.    I never gave him any advice as an attorney.

16         MR. LOPEZ:  Your Honor, this is I think a good place

17   to stop, unless you want me to go another five minutes.  I'm

18   happy to do that.

19         I'll go through this document.  Why don't I do that.

10:57 20         THE COURT:  We can take our break now and we'll take

21   the same amount of time.

22         Sir, Mr. Lynch, you can step down.  We're going to

23   take 20 minutes.

24         THE WITNESS:  Thank you.

25         THE COURT:  Jurors, we'll take our break a little bit

```
 1    early for 20 minutes.
 2             You can leave your notebooks on the chair.  Thank you.
 3             THE CLERK:  All rise.
 4             (Jury left the courtroom.)
 5             THE COURT:  Mr. Lynch, you can step down.
 6             THE WITNESS:  Thank you, your Honor.
 7             THE COURT:  Everyone can be seated.
 8             Counsel, just briefly, just so we can all have the
 9    benefit of the break, Mr. Lopez, to the extent that this issue
10:58 10  is going to keep coming up in regards to impeachment, to the
11    extent that these are emails that could be I suppose
12    characterized as the witness' -- I guess I wasn't understanding
13    if these are prior statements or impeachment about the sequence
14    of events, which is why I was allowing their publication but
15    not admission.  But I figured I'd hear you further on this
16    issue outside of the presence of the jury.
17             MR. LOPEZ:  Your Honor, it's really -- it all goes to
18    bias.
19             Mr. Lynch at this point has completely reversed his
10:58 20  testimony since 2017, which I'll get to later when I get to the
21    CFTC.
22             THE COURT:  Sure.
23             MR. LOPEZ:  This is just part of that bias.
24             He was intimately involved in MBC and but for the
25    government's determination that he wasn't guilty, he hasn't
```

1   been charged.

2        THE COURT:  So I understood the purposes for

3   impeachment.  In regards to the government's objection for

4   admission is what I was focused on.

5        Mr. Markham.

6        MR. MARKHAM:  Just so that we can have our next

7   witness ready to go, and they are coming from different places.

8   I note Mr. Lynch has left the room, if we could just have a

9   general estimate that of course he won't be held to --

10:59 10        THE COURT:  Mr. Lopez, generally speaking.

11        MR. LOPEZ:  I intend to go until 1:00, your Honor.  I

12   have a substantial amount to go with this witness.  He's the

13   star witness in this case.

14        THE COURT:  Okay.  Is it your fair to say your

15   cross-examination of subsequent witnesses may be shorter?

16        MR. LOPEZ:  Absolutely.

17        THE COURT:  Okay.  Mr. Markham.

18        MR. MARKHAM:  That's fine.

19        THE COURT:  For what it's worth, Mr. Lynch, the

11:00 20   breadth of his answers is not necessarily helping the timing

21   piece.

22        MR. MARKHAM:  Yes, your Honor.  As you know, I'm not

23   allowed to talk to him.

24        THE COURT:  I understand counsel takes the witnesses

25   as they come, but I'm sympathetic.

```
 1              MR. MARKHAM:  I would be happy to instruct him
 2    otherwise, but, as you know, I can't at this point, your Honor.
 3              THE COURT:  I didn't necessarily agree with Mr. Lopez
 4    that all of the answers were nonresponsive, but they were all
 5    not brief.
 6              MR. LOPEZ:  I mean, he just -- he answers a question
 7    and then just continues on.
 8              THE COURT:  I will take it question by question,
 9    counsel, but here we are.
11:00 10         MR. LOPEZ:  I'm trying not to interrupt him to be
11    polite because of his age, but at some point I'm --
12              THE COURT:  Understood, understood.
13              So, counsel, I think that's the best guidance.
14    Obviously we'll take our break.  I may -- as I said, I may have
15    the attorneys come back a little before 2:00 so I can just hear
16    the rest on Touhy.  Mr. Lopez was in the midst of a proffer to
17    the Court.  So when I turn back to the government, I would hear
18    your response in regards to whatever the rest of the proffer
19    is.
11:01 20         MR. MARKHAM:  Thank you, your Honor.  After we'll have
21    our next witness here at 2:00 ready to go.
22              THE COURT:  Okay.  Why don't we take 20 minutes from
23    now.  So you can tell the jury that, Ms. Hourihan.  Thank you.
24              THE CLERK:  All rise.
25              (Recess taken.)
```

         1              (The Court entered the courtroom.)

         2              THE COURT:  You can be seated.  Ms. Hourihan is

         3    getting the jury.

         4              THE CLERK:  All rise for the jury.

         5              (Jury entered the courtroom.)

         6              THE CLERK:  Court is in session.  Please be seated.

         7              THE COURT:  Thank you.

         8              Mr. Lopez.

         9              MR. LOPEZ:  Thank you, your Honor.

11:21   10              Joe, could you put AA back up for Mr. Lynch, 179.

        11              THE COURT:  That may be published, AA.

        12    BY MR. LOPEZ:

        13    Q.   Do you see what's before you, Mr. Lynch?

        14    A.   I do.

        15    Q.   Now --

        16    A.   I do.

        17    Q.   This is in October of 2014?

        18    A.   That's correct, sir.

        19    Q.   In the second paragraph, it says towards the end, It's

11:22   20    clear that the present balances do not reflect all of the

        21    deposits and, therefore, on the website the current balance,

        22    MBC is incorrect.

        23              Did I read that correctly?

        24    A.   Yes, you did.

        25              THE COURT:  Counsel, just give me one moment just so

```
 1    we're clear.
 2              MR. LOPEZ:  At the top it says, Sequence of wiring
 3    activity.
 4              THE COURT:  So this is AA?
 5              MR. LOPEZ:  Yes.
 6              THE COURT:  The other one was Z.  I just had it marked
 7    incorrectly.
 8              You can proceed.
 9    BY MR. LOPEZ:
11:22 10   Q.   So I take it you went to the website?
11    A.   That's what it appears, yes.
12    Q.   Well, did you go to the website or did Justine or don't
13    you remember?
14    A.   We may have both done it or I did it.  I can't really say
15    what I did eight years ago, I'm sorry.
16    Q.   All right.  Then the next paragraph starts, When accessing
17    my account, I'm showing a net number of coins of 43,883.93, an
18    average price of $83 per MBC.  The amount totals $3,642,366.19.
19              That total is far in excess of the amount that should
11:23 20   be properly allocated to my personal account.
21              Did I read that correctly?
22    A.   You did.
23    Q.   So it's fair to say either you or Justine went to the
24    website and you saw that your account was more valuable than
25    you thought it should be.
```

```
          1    A.    Well, this gets to the heart of the problem.

          2          If you look at just what was coins, it appears at that

          3    moment in time it was greater, but --

          4    Q.    Sir, we can really move this along a lot faster if you

          5    just answer the question and not then continue with what else

          6    you want to say.

          7          Just did you write this -- at the time you wrote it,

          8    were you saying that your account had more in it than you

          9    thought it should have?

11:24    10    A.    That was one of the things I said, yes.

         11    Q.    And then you raised the issue of -- that your -- you've

         12    also invested substantial monies for interest in other portions

         13    of the MBC business that do not relate to coins or stock,

         14    right?

         15    A.    That's correct.

         16    Q.    And you're referring there to the marijuana licenses?

         17    A.    That's what I was suggesting, yes.

         18    Q.    Are you also referring to the Trokie interest?

         19    A.    That's true.

11:25    20    Q.    And then you write, I am guessing that some of those wire

         21    deposits may have been placed in my personal account to have

         22    the benefit of being insured by gold pending application to

         23    other interests and have remained there.

         24          Did I read that correctly?

         25    A.    You did.
```

```
 1    Q.   So in October 2014, did you believe that your interest in
 2    My Big Coin was insured by gold?
 3    A.   Well, I used the word "insured" synonymously with the word
 4    "backed by gold."  So my way of thinking, backed by gold
 5    bullion, you know, was synonymous with the word "insured" by
 6    gold.
 7    Q.   But no one ever told you that the gold was insurance on
 8    your My Big Coin, right?
 9    A.   What I was told --
10    Q.   Sir, no one ever told you that your coins were insured by
11    gold, yes or no?
12    A.   The word was "backed" by gold.
13    Q.   So the answer is no?
14    A.   No, the answer is backed by gold is in my mind the same as
15    insured by gold.
16    Q.   But no one ever told you it was insured by gold, yes or
17    no?
18    A.   "Insured" is my word, synonymous with backed by gold.
19    Q.   Mr. Crater never told you your coins were insured.
20    A.   He told me they were backed by gold.
21    Q.   Now, you go on to say in the second paragraph -- I'm
22    sorry, the second-to-last paragraph, the last line, Also, I
23    need similar information to confirm the appropriate amounts to
24    be credited to the accounts for each of my colleagues and
25    friends, who wired their own money directly at various times.
```

1          Did I read that correctly?

2    A.    You read that sentence correctly.

3    Q.    So you were asking My Big Coin to disclose to you the

4    personal information contained in those other accounts?

5    A.    Just give me a second please, thank you.

6          (Pause.)

7    A.    Yes, I was attempting to verify the accuracy of my

8    friends' and colleagues' accounts as well.

9    Q.    Because you didn't have access to their accounts.

11:27 10   A.    That appears to be the case, yes.

11   Q.    Did you think you had the authority at the time you wrote

12   this email to gain access to the information in those accounts?

13   A.    Authority from whom?

14   Q.    Did you have -- did you think you had the authority to ask

15   My Big Coin for the information in those accounts?

16   A.    Authority from whom do you mean?  Do you mean my

17   friends --

18   Q.    Did you have authority from anyone?

19   A.    Okay, I wanted to clarify that.  I knew that with -- as

11:28 20   far as my friends and colleagues went, they would appreciate me

21   checking on the accuracy of the various transactions.  That was

22   my thought at the time.

23   Q.    So you as a lawyer must have gotten a release --

24   A.    No, I didn't get a release, no, of course not.

25   Q.    Well, you were seeking personal information, right?  How

much they had in their accounts, like a bank account.

A.   Well, if you look at the exhibit that's attached to this,
I kept track of not only my own account but everybody else's
that -- my family, my friends, my colleagues that invested and
I updated it and went along, and I think the attachment shows
that, and I was just trying to double check.

Q.   So you think the attachment gave you the authority to --

A.   That's not -- that's not what I said.

THE COURT:   Sir, sir, wait for the end of the
question.

Mr. Lopez, finish your question.

BY MR. LOPEZ:

Q.   Are you saying that the attachment gave you the authority
to access those personal accounts?

A.   The attachment did not give me the authority to do that.
I was using the attachment as an example of the work that I did
not only trying to keep updated and accurate my account, my
children's account, my family's account, my friends' account,
my colleagues' account, people that I had wired money for, to
keep it straight.  And I submitted various sequences of wiring
activity and account activity periodically over a long period
of time.  And this is one near the beginning in October of
2014.  And I updated those and because, as you pointed out in
the first paragraph, we were getting closer to an IPO, I wanted
to make sure everything was ironed out and straight and correct

1   so that we wouldn't have problems after the IPO.  That's what I

2   was trying to do.

3   Q.   I know what you were trying to do.  Do you realize what

4   you were doing was illegal?

5         MR. MARKHAM:  Objection, your Honor.

6         THE COURT:  Sustained.  Although no double teaming,

7   counsel, if you know what I mean.

8         MR. MARKHAM:  I do know what you mean, your Honor.

9         THE COURT:  Thank you.

11:30  10        Sustained as to that question.

11        Next question.

12   BY MR. LOPEZ:

13   Q.   You didn't have a release to access their personal

14   accounts, true or false?

15   A.   I had no written release from my family, my friends, my

16   colleagues for whom I was performing the service.

17   Q.   And My Big Coin didn't provide you with that information,

18   right?

19   A.   I don't think so, but I don't know.

11:31  20   Q.   All right.

21         MR. LOPEZ:  Put up 11EE, number 41.

22   Q.   Is that an email from you to Mr. Crater with a blind cc to

23   Mr. Kruger?

24   A.   Yes, it appears to be exactly that, correct.

25   Q.   Okay.  And the last paragraph -- I mean the first -- the

           1   last paragraph in the chain, the one that you wrote, starting,

           2   Thanks, Randall.

           3          MR. LOPEZ:  Could you highlight that?

           4          THE WITNESS:  Could you also highlight the one beneath

           5   it that I wrote before he replied?  Just the very --

           6          MR. LOPEZ:  I actually get to --

           7          THE COURT:  Well, I'll let Mr. Lopez ask the

           8   questions, but, counsel.

           9          Mr. Lopez, you can --

   11:32   10          THE WITNESS:  So the one you pointed to me was the

          11   second of two.

          12          THE COURT:  No, I understand, but --

          13          THE WITNESS:  Okay.

          14          THE COURT:  As counsel, Mr. Lynch, I'm sure you

          15   understand, Mr. Lopez in his capacity gets to ask the

          16   questions, so.

          17          THE WITNESS:  Could you repeat the question, please,

          18   Mr. Lopez?

          19          MR. LOPEZ:  I didn't ask a question.  I'm just trying

   11:33   20   to get it pulled up on the screen so the jurors can see it.

          21          THE WITNESS:  Okay.  I beg your pardon.

          22   BY MR. LOPEZ:

          23   Q.   Now, I think you testified yesterday and today that one of

          24   the reasons why you bought My Big Coin coins was because it was

          25   backed by insurance, right?

A.   One of the reasons I bought coin was because it was backed
by gold, oil, and insurance was about to come or had come or,
you know, whatever, but insurance was discussed and as of
October 20, 2014 --

Q.   Well, it's the jury's memory, not mine.

But in October of 2014, you write, The insurance
concept is really brilliant.  It will give users huge comfort.
Is the cost of coverage very expensive?  As backup coverage to
gold and oil, it must not be too costly.  Have a great day,
John.

So you knew in October of 2014 that the insurance was
a new concept, right?

A.   I don't know if it was a new concept that hadn't been
discussed before.  I don't think it was new news to me, but I
was trying to find out about the coverage and whatnot, and I
complimented Mr. Crater on having this.  And I read the lower
piece as well.

So I'm not saying it's new news, but I said the
concept is really brilliant, just as you've read, is the cost
of coverage very expensive, et cetera.

Q.   So in October of 2014, it was just a concept.

A.   I can't say that it's just a concept.  I phrased it the
insurance concept is really brilliant.  So I don't know when it
came into play or when it was discussed or whether it was
complete and signed up, and that's why I was asking those

```
        1   questions.  Is it expensive?  It couldn't be too costly because
        2   you already have two other commodities backing this up, backed
        3   by gold, backed by oil.
        4   Q.   Well, you would agree with me that it wasn't in place when
        5   you purchased all of the coins you purchased prior to October
        6   of 2014, right?
        7   A.   I think it was a coming attraction.  You know, it was
        8   going to be done and I don't know when it was completed or if
        9   it ever was for that matter.
11:36  10          MR. LOPEZ:  Your Honor, may I approach the witness
       11   with Exhibit 12A?
       12          THE COURT:  You may.
       13   BY MR. LOPEZ:
       14   Q.   Mr. Lynch, I'm going to ask you to go through that
       15   document page by page, and then I'm going to ask you a
       16   question.
       17   A.   Could you help me, Mr. Lopez.  There's a cover letter.
       18   There's some photographs, and then there's a lot of pages at
       19   the bottom behind the photographs.  Do you mean the text I
11:36  20   should be -- what do you want me to go through?
       21   Q.   I wanted you to go through it page by page.
       22   A.   It's like a small telephone directory.
       23   Q.   That's why I made it double-sided so it would be easier
       24   for you to do it.
       25          Just look through that document.  Then I'm going to
```

1    ask you a question.

2    A.   So do you want me to look through page after page

3    double-sided pages, is that what you're --

4    Q.   I do.

5    A.   I wish we had done this before the break.

6            MR. MOORE:  Your Honor, can we ask if he even

7    recognizes the document or if he's ever seen it?

8            THE COURT:  Counsel, why don't we have the witness

9    look through the first page and we can ask that question.

11:37 10           MR. LOPEZ:  With all due respect to Mr. Moore, I want

11    him to look through the entire document before asking that

12    question.

13           THE COURT:  Well, counsel --

14           MR. LOPEZ:  Because parts of the document may refresh

15    his memory.

16           THE COURT:  Counsel, we'll start with the first page,

17    and then we'll see where we are.

18           Mr. Lynch, just look through the first page.

19           THE WITNESS:  Yes, your Honor.  Thank you.

11:38 20           THE COURT:  Counsel, for my benefit, can we see it on

21    the screen while the witness is looking at it?

22           MR. LOPEZ:  Yes, your Honor.

23           Number 68, Joe.

24           THE COURT:  Thank you.

25           MR. MOORE:  Your Honor, I would just note that this is

```
 1    an email that he is not -- has not been sent.
 2             THE COURT:  I understand.
 3             (Pause.)
 4             THE WITNESS:  Do you want me to --
 5             THE COURT:  Mr. Lopez, why don't you ask the question
 6    as to the first page, and then --
 7    BY MR. LOPEZ:
 8    Q.   Have you ever seen this email before?
 9    A.   I don't think so.  It wasn't sent to me.  It was sent to
11:38 10   Mr. Crater by somebody else whom I don't --
11             THE COURT:  And, Mr. Lopez, if you want to direct --
12    and I'm aware that 12A is otherwise in -- if you want to direct
13    the witness to a particular attachment, you can do that.
14             MR. LOPEZ:  The attachment directly behind or what was
15    directly behind the document, a series of photos.
16             THE COURT:  I think those are now at the end.
17             MR. LOPEZ:  I think they are now.
18             THE COURT:  Mr. Lynch, if you could turn to the
19    photos.
11:39 20         MR. LOPEZ:  Yes, your Honor.
21             THE COURT:  Thank you.
22             And, Mr. Lopez, do you want him to look at those?
23             MR. LOPEZ:  I would.
24             THE COURT:  Look at those.
25             (Pause.)
```

```
 1              THE COURT:  Mr. Lopez.
 2    BY MR. LOPEZ:
 3    Q.   Mr. Lynch, having reviewed those photos, do those
 4    photos --
 5    A.   I looked at them starting with the first one which says
 6    Exhibit M2 at the bottom.
 7    Q.   Yup.  Does it -- have you ever seen them before?
 8    A.   No, sir.
 9    Q.   Okay.
10              MR. LOPEZ:  Can I collect that back up, your Honor?
11              THE COURT:  You may.
12              And so M2 is a separate document from 12A?
13              MR. LOPEZ:  Yes.
14              THE COURT:  Okay.
15              MR. MOORE:  And, your Honor, can we take this document
16    down if he hasn't seen it.  We're not asking about it.
17              THE COURT:  Mr. Lopez, if you're done?
18              MR. LOPEZ:  Yes, I'm done.
19              THE COURT:  Okay.  We can take it down.
20              MR. LOPEZ:  I'm trying to move along here.
21              Can you bring up 12I.
22              THE COURT:  It may be published.
23              MR. LOPEZ:  Which is 78.  It's already been published.
24    BY MR. LOPEZ:
25    Q.   This is the email that you sent to Mr. Crater and
```

1    Mr. Kruger regarding Peter Antell's account?

2    A.   That's correct.

3    Q.   And he wanted to get out of his investment?

4    A.   That's correct.

5    Q.   He was in need of money?

6    A.   Well, he was in the process of refinancing his farm

7    property that I spoke about, so he wanted this money.

8    Q.   He needed liquidity?

9    A.   That's correct.

11:42 10   Q.   And you purchased his shares.

11   A.   That's true.

12   Q.   And you paid $20,000 to him, even though his original

13   investment was $15,000.

14   A.   I did.  That's what he wanted.

15   Q.   Did you look at the price of the coin at the time you made

16   the purchase?

17   A.   I could have, I don't know.  I don't know if I did or I

18   didn't.

19   Q.   Do you know how many coins he had as a result of his

11:43 20   $15,000 investment?

21   A.   I may have known at the time and it may be on one of these

22   lists, but I can't recite that number with any degree of

23   accuracy at this moment sitting here eight years later or six

24   years later, whatever it is.

25   Q.   Do you know, as you sit here today, whether the $15,000

1    that he invested in 2014 had grown to $20,000 in 2015?

2    A.   I'd have to look at one of the exhibits, one of my

3    records.

4    Q.   So I take it you don't have any memory as to whether or

5    not you got a good deal?

6    A.   Did I get a good deal?

7              I wasn't thinking about whether I was going to get

8    more than $20,000.  Peter was a very close friend of mine, and

9    we spent a lot of time together.  He wanted $20,000, and that's

11:44 10    what I did.  So I don't know sitting here today how many coins

11    I got.

12   Q.   Did you have any discussion with him about this buyout?

13   A.   Well, I think it's more or less recited in our emails

14   here.

15   Q.   I know that there's discussion in the email, but the

16   question was:  Did you have any other discussion with

17   Mr. Antell about this buyout?

18   A.   Well, I did, I guess.  I told him that -- oh, you don't

19   want to know what I told him or what he said.  I'm sorry, okay.

11:44 20   Q.   Did you learn from that discussion how he tried to cash

21   out prior to you buying him out?

22              MR. MOORE:  Objection.  Hearsay, your Honor.

23              THE COURT:  Overruled for the purpose for which it's

24   being offered.

25              Overruled.

1    A.    So what was the question again, I'm sorry, did I what?

2    Q.    Do you know whether he went to the exchange to try to cash

3    out?

4    A.    I don't think he did, but again, that was a long time ago.

5    I don't know.

6    Q.    So sitting here today, you don't know whether he tried to

7    get liquid by selling his coins.

8    A.    My best memory is he did not, but I can't be sure of that

9    so much time has passed.

11:45 10          MR. LOPEZ:  Can you bring up 12J, which is 79.

11    Q.    And again, you did the same for Henry Kara.

12    A.    Yes.

13    Q.    And again, do you know whether or not he tried to sell his

14    coins through the exchange?

15    A.    I don't know for an absolute certainty.  I don't think he

16    did, however.

17    Q.    And you don't know whether the coins that you purchased

18    for his investment of $175,000 was worth more than $175,000

19    when you paid him the 175; is that correct?

11:46 20    A.    Well, ultimately the coins are worthless, but at that

21    moment in time he wanted his money back, $175,000.  We didn't

22    discuss or argue or haggle about it.  He just wanted his money

23    back, and, as I say, he was my good friend and I did it.

24          MR. LOPEZ:  Your Honor, I move to strike that

25    ultimately the coins were worthless and I ask you --

1           THE COURT:  As nonresponsive, yeah.

2           MR. LOPEZ:  Yeah.

3           THE COURT:  It's struck.

4           MR. LOPEZ:  And I also ask the Court for a limiting

5     instruction.

6           THE COURT:  Well, obviously, jurors, you may recall at

7     the beginning of my instructions to you I said any objection I

8     sustain you can't consider what might have been said to you and

9     anything I order struck you can't consider.

11:47 10          Thank you.

11          Mr. Lopez.

12          MR. LOPEZ:  Thank you.

13    BY MR. LOPEZ:

14    Q.   Now, I take it from your prior testimony that there was no

15    ICO, initial coin offering, in 2014.

16    A.   Do you mean IPO or ICO?

17    Q.   IPO.

18    A.   In 2014, yes, that's correct, sir.

19    Q.   And in 2015, was anyone on behalf of My Big Coin working

11:48 20   to make that a reality?

21    A.   At some point in I think it was 2015, we received the

22    initial subscription agreement.  It was a page and a half

23    document with a few small paragraphs in it.  It emanated from

24    Adam Tracy on behalf of My Big Coin or My Big Coin Pay, Shot

25    Spirits and I think Mr. Crater as well.  That was the first

```
        1    piece of documentation in terms of a potential IPO.  I think it
        2    was in the summer.
        3              MR. LOPEZ:  Can we bring up 196 for the witness only?
        4              THE COURT:  Just for the witness.
        5              MR. LOPEZ:  I think we're at BB.
        6              THE COURT:  Yes.
        7              (Exhibit BB marked for identification.)
        8              MR. LOPEZ:  Do you want me to read this?
        9    BY MR. LOPEZ:
11:49  10    Q.   I want you to tell me whether or not you recognize it.
       11    A.   Okay.
       12              (Pause.)
       13    A.   Is there a second page?  It's not showing.
       14              MR. LOPEZ:  Can you show the second page.
       15    A.   Yes, I recognize it.  I signed it.
       16    Q.   Is that your signature on the second page?
       17    A.   It is.
       18              MR. LOPEZ:  Your Honor, I move to admit.
       19              THE COURT:  Any objection?
11:49  20              MR. MOORE:  No objection.
       21              THE COURT:  So this will be the next number, which
       22    is --
       23              THE CLERK:  18.
       24              THE COURT:  18, okay.  It's admitted as 18.  It may be
       25    published.
```

```
 1              (Exhibit 18 received into evidence.)
 2    BY MR. LOPEZ:
 3    Q.   Now -- you're at the second page.
 4              MR. LOPEZ:  Can you show them the first page, Joe.
 5    BY MR. LOPEZ:
 6    Q.   So this is a subscription agreement for 685,422 shares of
 7    common stock in the company Shot Spirits Corporation.
 8    A.   Yes, that's in the first paragraph, correct.
 9    Q.   And was it your understanding that MBC was going to be
11:50 10  purchased by Shot Spirits Corporation?
11              (Pause.)
12    A.   I know the second agreement was a merger and --
13    Q.   Well, was it 2015, the plan to do a merger?
14    A.   I'm trying to figure out whether it was a merger or an
15    acquisition, as you posit it.  You said it was an acquisition.
16    I was not certain whether it was going to be a merger or an
17    acquisition.  I was just looking to see if I had any
18    clarification on it.
19              (Pause.)
11:51 20  A.   It's not clear from this which it was.  It could have been
21    either, but it was going to be something here.  It could have
22    been an acquisition or it could have been a merger, I guess.
23    Q.   Do you have a clear memory of what this was in 2015?
24    A.   Well, I signed it, yeah.  No, this is part one.  Part two
25    occurred a year or so, 12, 13 months later.  This was
```

withdrawn, and a new system was promulgated again by the same

Adam Tracy, as I testified before.

Q.   So the answer is you don't have a clear recollection of

what this was, a merger or an IPO, correct?

A.   The document doesn't say.  There probably are other

documents that define it more clearly.  Just looking at this, I

can't remember whether this was going to be like the second

one, a merger between Shot Spirits or it was going to be an

acquisition.

Q.   That is your signature.

A.   Oh, yes, absolutely.  I signed it.

Q.   And yet, you didn't know what it was for.

A.   I knew what it was for.

Q.   I withdraw the question.

A.   That's unfair.

          THE COURT:  Well, it's withdrawn, so we'll move on.

          Mr. Lopez.

          MR. LOPEZ:  I guess we'll just mark it as CC.  I have

another --

          THE COURT:  Just for the witness.

          MR. LOPEZ:  Yes, just for the witness.  158, Joe.

          THE COURT:  CC.

          (Exhibit CC marked for identification.)

          MR. MARKHAM:  Your Honor, can I just note for the

record that these aren't on the contested exhibit list.  So the

1    government hasn't seen any of these before if we're admitting

2    them through the witness.

3            THE COURT:  Okay.

4            MR. MARKHAM:  Just noted for the record.

5            MR. LOPEZ:  Do you want a hard copy of them?

6            THE COURT:  Noted for the record.

7            In the meantime, you wanted Mr. Lynch to look at this?

8            MR. LOPEZ:  Yes.

9            THE WITNESS:  Oh, to look at this.

10           THE COURT:  Yes.

11           MR. LOPEZ:  And when you're ready for the second page,

12   let me know.

13           THE WITNESS:  Is this the same one you showed me

14   before except a different --

15           THE COURT:  Mr. Lynch, I just ask you to read it to

16   yourself.

17           THE WITNESS:  Okay.  I beg your pardon.

18           THE COURT:  Thank you.

19           (Pause.)

11:54 20         THE WITNESS:  I've read it.

21           MR. LOPEZ:  Can you show the second page.

22   BY MR. LOPEZ:

23   Q.   Is that your signature on the second page?

24   A.   Yes, on behalf of my son.

25           MR. LOPEZ:  I move to admit.

```
 1              THE COURT:  Any objection?

 2              MR. MOORE:  No objection.

 3              THE COURT:  Okay.  It may be admitted.  We'll make

 4   this, what, 19?

 5              THE CLERK:  Yes.

 6              THE COURT:  Thank you.

 7              (Exhibit 19 received into evidence.)

 8              THE COURT:  It may be published.

 9   BY MR. LOPEZ:

11:55 10   Q.   Now, with respect to the second subscription agreement --

11              MR. LOPEZ:  Go back to the first page, Joe.

12   Q.   -- in the middle it says -- paragraph 3, it says, Legend

13   on Certificates.  The undersigned agrees to the placement of an

14   appropriate legend reflecting the restrictive nature of the

15   shares on the certificates representing the shares.

16              Did I read that correctly?

17   A.   You did.

18   Q.   And you signed this document?

19   A.   I did.

11:55 20   Q.   In July of 2015?

21   A.   Yes, whatever it says.  There's a date on it.  I think it

22   was July of 2015.

23   Q.   When you signed this document, what did you understand

24   that Legend on Certificates to mean?

25   A.   What it says, I guess.
```

```
 1    Q.   So you knew that there were going to be restrictive
 2    covenants on the shares.
 3    A.   It says, An appropriate legend reflecting the restrictive
 4    nature of the shares on the certificates representing the
 5    shares.
 6    Q.   Did you have any understanding as to the length of that
 7    restrictive nature?
 8    A.   Not on this -- not in this document, no.
 9    Q.   And is that also true of Exhibit 18?
11:56 10         MR. LOPEZ:  Can you bring up Exhibit 18, 196.
11    Q.   Same legend in paragraph 3?
12    A.   Yes, it's the same, except this is my agreement that I
13    signed.  The second one you previously showed me was one I
14    signed for my son.
15    Q.   So I take it no one represented to you, to the best of
16    your knowledge or memory today, that there was a -- the period
17    of time that these certificates would be restricted, these
18    shares would be restricted?
19    A.   I don't recall any being stated to me.
11:57 20         MR. LOPEZ:  Can you bring up 13B, number 96.
21              No, number 96 -- 13A, number 96.
22    Q.   Now, you remember earlier we were going back and forth
23    about whether or not Mr. Crater had exclusive -- exclusive
24    ability to control accounts on the exchange?  Remember that?
25    A.   Yes, I do.
```

```
 1   Q.   Now, this email says, The balance shown on my exchange
 2   account is now 1,100.  Justine was successful in transferring
 3   1,001 back into my MBC Wallet, however, she is now getting an
 4   insufficient balance alert when she tries to transfer the
 5   remaining 1,100.
 6            Did I read that correctly?
 7   A.   You did.
 8   Q.   Now, first of all, you wrote this email, right?
 9   A.   I sure did, yes.
10   Q.   And I think you testified earlier that the wallet concept
11   didn't come into place until 2017, right?
12   A.   I thought I said '16 or '17.
13   Q.   So in 2016, you're referring to a wallet.
14   A.   I did, yes, correct.
15   Q.   And the different wallet that came later came in 2017,
16   right?
17   A.   It came either end of '16 into '17, something in that time
18   period.
19   Q.   Is it fair to say, sir, that as you sit here today, you
20   don't know whether or not between 2014 and 2017 your account
21   had a wallet?
22   A.   I don't know what it was called.
23   Q.   Thank you.  You've answered the question.
24            But this also says that Justine was successful in
25   transferring 1,001 back into my MBC Wallet, right?
```

1    A.   This is a snippet of --

2    Q.   Is that what it says, sir?

3    A.   This particular line says that, yes.

4    Q.   Thank you.

5         Now, this email is referring to the time that you

6    tried to sell some of your coin on the exchange, right?

7    A.   That's what I was trying to get at, yes.

8    Q.   And you said earlier that you didn't get any offers on

9    that exchange; is that correct?

12:00 10   A.   I never got an offer for any of my coins on an exchange,

11   on these exchanges.

12   Q.   I'm going to remind you that you're under oath, and I'm

13   going to ask that question again.

14        Did you or did you not get an offer from a purchaser

15   for your coins on the exchange?

16   A.   I don't remember getting an offer.

17   Q.   And I think you testified that you pulled back because you

18   talked to Randall and he told you something that made you pull

19   back, right?

12:01 20   A.   There were at least two times I tried to sell coins --

21   Q.   Sir.

22   A.   -- and --

23   Q.   Answer the question, please.

24        THE COURT:  Well, counsel, no commentary there.

25        Ask the question again.  I think the witness was in

1    the process --

2    Q.   You testified earlier that you pulled back your sale

3    because of something Randall Crater told you, yes or no?

4    A.   Which sale are you speaking about, this one?

5    Q.   This sale, yes.

6    A.   I did pull it back as a result of my discussions with

7    Mr. Crater.

8    Q.   Thank you.

9         Okay.

12:02 10        MR. LOPEZ:  Can I pull up 163 for the witness only.

11        THE COURT:  Just for the witness.

12   BY MR. LOPEZ:

13   Q.   Sir, do you recognize --

14        THE COURT:  And we'll make this DD?

15        MR. LOPEZ:  Yes.

16        (Exhibit DD marked for identification.)

17        MR. LOPEZ:  In the interest of time, your Honor, may I

18   approach the witness?

19        THE COURT:  You may.

12:02 20   BY MR. LOPEZ:

21   Q.   Sir, do you recognize that email?

22   A.   I'm just looking at it now.

23        (Pause.)

24   A.   I do.

25   Q.   All right.  And can you just look through the attachments

```
 1   and see if you recognize the attachments.
 2            (Pause.)
 3   A.   I've looked at everything.
 4   Q.   And do you -- is that an email to you?
 5            Strike that.
 6            Were you cc'd on that email?
 7   A.   That's correct.
 8   Q.   And you recognize it?
 9   A.   I do.
10   Q.   Okay.
11            MR. LOPEZ:  I move to admit it, your Honor.
12            MR. MOORE:  No objection.
13            THE COURT:  It may be admitted.  I think we're up to
14   20.
15            THE CLERK:  Yes.
16            (Exhibit 20 received into evidence.)
17            THE COURT:  It may be admitted and published.
18            MR. LOPEZ:  Joe, can you go to the last page, which is
19   163.
20            Can you rotate that for me?
21            MR. SWEENEY:  I'd have to exit out.
22            MR. LOPEZ:  Lisa, can you rotate it?
23            THE COURT:  I'm not sure we can on our system, but
24   there's an arrow on the bottom.  No?
25            MR. LOPEZ:  Modern technology.
```

```
 1    BY MR. LOPEZ:
 2    Q.   As best the jurors can see, Mr. Lynch, does that appear to
 3    be a printout of your My Big Coin account on August 3, 2016
 4    from what you can see?
 5    A.   No.
 6    Q.   And in your -- on page 1 of the document, it references
 7    that --
 8             THE COURT:  Well, I thought he said "no."
 9             MR. LOPEZ:  I understand.
12:06 10         THE COURT:  Okay.
11             THE WITNESS:  You said June or something.  There's a
12    date on this of April 14th.
13             THE COURT:  Mr. Lynch, just wait for a question.
14             So, Mr. Lopez, the answer was no, but what's the next
15    question?
16    BY MR. LOPEZ:
17    Q.   So if you go back to the first page, your paralegal is
18    writing, His current MBC balance as shown on the attached
19    account summary is MBC 44,636.32.  Right?
12:07 20    A.   That's what it says, yes.
21    Q.   And then if you go to the last page, and if you could turn
22    it --
23             THE COURT:  Last page of the exhibit?
24             MR. LOPEZ:  Last page of this document which is 08.
25    BY MR. LOPEZ:
```

1  Q.   Do you see where it says, Current balance, MBC?  And it's

2  got 44,636.32?

3  A.   Yes.  That matches, but the date doesn't.  That's the

4  point I was making.  You asked --

5  Q.   So you're saying it was as of some other date?

6  A.   Well, if you look in the right-hand side, a third of the

7  way down from the top, it says 4/14/2016.

8  Q.   Okay.  So when your paralegal attached it on page 1 in the

9  attachment and titled it JML MBC Account Summary as of

12:08 10  8/3/2016, that was incorrect?

11         MR. MOORE:  Objection.

12         THE COURT:  Sustained as to the question.

13         MR. LOPEZ:  I'll move on from this document.

14         THE COURT:  Thank you.

15         MR. LOPEZ:  I'm sure the jury won't mind.

16         Now, can you put up 166 for the witness only.

17         And I think we're on DD.

18         THE CLERK:  EE.

19         (Exhibit EE marked for identification.)

12:09 20  BY MR. LOPEZ:

21  Q.   Sir, have you seen this email before?

22  A.   I'm just looking at it, if you give me a second.

23         (Pause.)

24  A.   I do see it and I've read it.

25         MR. MOORE:  Your Honor, I don't think -- I think he

1    answered a different question than was asked.  Not has he read

2    it at this time.  I think the question was, has he seen this

3    before.

4              THE WITNESS:  Sorry.

5    BY MR. LOPEZ:

6    Q.   Have you seen this before?

7    A.   I would say yes.

8    Q.   Okay.  But it's not sent to you.

9              Let me cut to the chase.

12:10 10              In August of 2016, was there a further attempt to so

11   call take the company public?

12              MR. MOORE:  Objection, your Honor.  Lack of personal

13   knowledge.

14              MR. LOPEZ:  He already testified --

15              THE COURT:  Yeah, so overruled as to that.

16              You can answer if you can.

17   BY MR. LOPEZ:

18   Q.   And did you have a series of communications --

19              THE COURT:  I don't know if there was an answer yet.

12:10 20              THE WITNESS:  I'm pretty sure I'm going to answer yes.

21   If you could just give me the question again, please.

22              THE COURT:  In August of 2016, was there a further

23   attempt to so call take the company public?

24              THE WITNESS:  Yes, your Honor, there was.  And I have

25   testified to that before.  We all received this amended

|   |   |
|---|---|
| 1 | subscription agreement from Adam Tracy.  And Ashley Lydon, the |
| 2 | person mentioned, is the paralegal for Adam Tracy. |
| 3 | BY MR. LOPEZ: |
| 4 | Q.   And would it be fair to say that you had a series of |
| 5 | communications with Adam Tracy over the course of August and |
| 6 | September? |
| 7 | A.   Yes, and, you know, I think also with Ashley Lydon. |
| 8 | Q.   And it was about the subscription agreements that he was |
| 9 | proposing? |
| 12:11 10 | A.   Correct. |
| 11 | Q.   And you were acting on your own behalf and on behalf of |
| 12 | the other parties that you brought to MBC, including your |
| 13 | friends and family and colleagues and other lawyers? |
| 14 | A.   When the subscription agreement came out, it was quite a |
| 15 | bit different from the early one and questions arose not only |
| 16 | from myself but from other of the investors.  And so I |
| 17 | contacted Adam Tracy.  And as you indicated or suggested, we |
| 18 | had dialogue and exchanges going back and forth about that.  So |
| 19 | that's correct. |
| 12:12 20 | MR. LOPEZ:  Your Honor, in the interest of time again, |
| 21 | can I approach the witness? |
| 22 | THE COURT:  You may. |
| 23 | BY MR. LOPEZ: |
| 24 | Q.   I'm going to show you another email that's been marked |
| 25 | November 21, 2016. |

```
 1              MR. LOPEZ:  Joe, can we bring up 184 for the witness
 2       only.
 3              THE COURT:  We'll make this FF, just for the witness.
 4              (Exhibit FF marked for identification.)
 5              (Pause.)
 6       BY MR. LOPEZ:
 7       Q.    Do you recall writing that email?
 8       A.    Are we talking just the cover page or the attachments?
 9       Q.    The cover page.
12:13 10  A.    Yes, I did write that to Mr. Crater.
11       Q.    And just -- I'll -- did you review the other documents
12       that are attached?
13       A.    I was almost finished when you -- just give me another
14       second.
15       Q.    Okay.
16              (Pause.)
17       A.    All set.  I've read everything.
18              Yes, I did author the memo to Mr. Crater, and I
19       authored the other documents corresponding with Mr. Tracy.
12:14 20  That's my work.
21              MR. LOPEZ:  Your Honor, may I offer it into evidence.
22              THE COURT:  Any objection?
23              MR. MOORE:  No, your Honor.
24              MR. LOPEZ:  Mr. Lynch, why don't you just hold onto
25       it.
```

1           THE WITNESS:  Sure.

2           THE COURT:  It's admitted, number 21.

3           (Exhibit 21 received into evidence.)

4           THE COURT:  It can be published, if you wish.

5           MR. LOPEZ:  I'm sorry, your Honor?

6           THE COURT:  It may be published.  It's now published.

7    BY MR. LOPEZ:

8    Q.    And just -- this email is about the amended subscription

9    agreement?

12:15 10  A.    That's correct, yes.

11   Q.    And you referenced clauses 9 through 11?

12   A.    That's true, right in the second paragraph I said that,

13   correct.

14   Q.    And you had a telephone conversation with Adam Tracy on

15   September 9th?

16   A.    I did.

17   Q.    And that was concerning a memo you sent to him on

18   September 2nd?

19   A.    Correct.

12:15 20  Q.    And you sent him a follow-up email on September 9th?

21   A.    Correct.

22   Q.    And he responded on September 11th?

23   A.    Correct.

24   Q.    And you attached all of those correspondence to this

25   email?

A.   Absolutely correct.

Q.   And then you're writing to Mr. Crater that, Meanwhile, back in September I believe you suggested we were selling the company and it would not be necessary to sign the subscription agreements as drafted.  Has that changed?

A.   Correct.

Q.   So you're asking Mr. Crater if what Mr. Tracy is doing on behalf of MBC has changed; is that correct?

A.   Yes.

Q.   Sir, would it be fair to say that in November of 2016, there were a lot of balls up in the air and things really didn't know what was going to happen -- or you didn't know what was going to happen, let's put it that way.

A.   Well, there were balls up in the air starting in September at the beginning of this correspondence initiated by Mr. Tracy, and then the back and forth with Mr. Tracy as to what all this meant in particular clauses and trying to get answers for everybody's questions.

         I laid out the questions as best I could.  I did some research on these types of things, talked to various people, and framed the issues as best I could, sent them to Mr. Tracy, had a conversation with him.  We went back and forth, and we -- he wanted me to write a letter, and not him, telling the shareholders what their rights were.  I didn't do that.

         And then I found out later that we weren't -- the

1    company wasn't going to utilize the amended subscription

2    agreement, it wasn't going public, and it was being sold.

3              And that's what led to the email that I wrote in

4    November -- on November 21st to Mr. Crater with those

5    questions.

6              So that was the sequence of events and what happened.

7    Q.   And did you have any understanding as to who was footing

8    the bill for all this legal work that Mr. Tracy was doing?

9    A.   I thought it was Mr. Crater and MBC.  And I don't know how

10   much legal work he did do.

11   Q.   Okay.

12   A.   I didn't discuss that with him.

13   Q.   In April of 2017, you're contacted by a Jason Mahoney from

14   the CFTC, right?

15   A.   I think that's correct, in April of 2017.

16   Q.   And you responded to him in an email -- in a series of

17   emails.

18              MR. LOPEZ:  If you could pull up 14C, which is 104.

19              And let's -- just highlight the bottom, the first

20   email so we can do the string.  The one at the bottom of the

21   page.

22   A.   Is that the first one?

23   Q.   I believe so.

24              I'm sorry, no.  It's on the second page.  This is the

25   first one.

```
 1              Go to the second page, which is --
 2              So in this email, Attorney Mahoney informs you he's an
 3     attorney with the U.S. Commodity Futures Trading Commission,
 4     and he's questioning whether you may have purchased virtual
 5     currency called My Big Coin from an entity called My Big Coin
 6     and he's asking to speak with you, right?
 7     A.   Yes, he identifies My Big Coin, My Big Coin Pay and
 8     Greyshore Advertisement.
 9     Q.   And he suggests some times next week.
12:20 10    A.   He did.
11              MR. LOPEZ:  Can you go to the first page, Joe.
12     Q.   And then, when he didn't hear from you on April 26th, on
13     the bottom, he says, I'm following up from my email on Monday.
14     I would appreciate it if you would let me know whether you'd be
15     willing to speak to me about those various entities, right?
16     A.   That's what he wrote, yes.
17              MR. LOPEZ:  Joe, can you get out of that and go to the
18     next email.
19     Q.   Then he writes again, Thank you, Mr. Lynch, for your
12:20 20    prompt response.  I appreciate your candor about your
21     experience with your investment and request clarification about
22     the topics I wish to discuss with you.
23              When he said he appreciated your candor, how were you
24     candid with him?
25              MR. MOORE:  Objection, your Honor.  It's hearsay
```

```
  1    statements.
  2           THE COURT:  Well, overruled.  Although, counsel, I'm
  3    not sure I understood the question.  Perhaps you could put it
  4    again to the witness.
  5    A.    Could you help me --
  6    Q.    He's appreciating your candor during his conversation.
  7    A.    Right.
  8    Q.    And I take it you said something to him about your
  9    experience with My Big Coin but he wanted further
12:21 10    clarification.  Do you recall what you told him?
 11    A.    If you could help me, this says April 26th.  What was the
 12    date of the one just below that you already showed me?  I'm
 13    just trying to put the sequence --
 14    Q.    April 26th.
 15    A.    All the same day.
 16    Q.    Yeah.
 17    A.    Thank you very much.
 18           MR. LOPEZ:  Joe, go down to -- go down to the email
 19    before that, the one from John Lynch.
12:22 20    A.    That's the one I was --
 21    Q.    Mr. Mahoney, you are correct, I am an investor, and I am
 22    content with my investment.  Beyond that, what, if anything,
 23    are you looking for from me?
 24    A.    Right.
 25    Q.    Then he writes back saying he appreciates your candor.
```

A.    Okay.

Q.    Then you write back to him -- go to the top email.

      Mr. Mahoney, Beyond my original investments, I have made no trades or received any funds either from MBCP or MBC. As I stated earlier, at this point I am content with my investment.

      Accordingly, I see no need to engage further with you at this time.

      Right?

A.    That's all correct, yes.

Q.    And you wrote that --

A.    In April of 2017.

Q.    Long before Mr. Crater suggested to you that some attorney-client privilege might apply between you and him, right?

A.    Well, not long before, no.  Very close by.

      MR. LOPEZ:  Well, bring up 14F, page 107.

Q.    The prior email was in April of 2017.

A.    It was the end of April, that's correct.

Q.    And more than a month later --

A.    A month later, okay.

Q.    -- on June 1, Mr. Crater suggests that there may be an attorney-client privilege even though Mr. Crater is not a lawyer.  Right?

A.    That's the timing and there were some intervening things,

1    subpoenas and document requests and things like that that went

2    on during May, and then that led to this at the end of May or

3    beginning of June.

4    Q.   But this is the first documentation of him suggesting

5    that, correct?

6    A.   Meaning Mr. Crater suggesting that I should take the

7    attorney-client privilege --

8    Q.   Not that you should take it.  That you might be able to

9    assert it based on his communications with you and his belief

12:24 10    that you may have been representing him in certain matters.

11    A.   I think this is the first written communication, this

12    follows along the sequence.

13    Q.   And you did not agree with his --

14    A.   Absolutely not.  I made that clear.

15    Q.   But you know as an attorney it's not your beliefs, it's

16    his belief, right?

17              MR. MOORE:  Objection, your Honor.

18              THE COURT:  Well, sustained.  Sustained.

19    BY MR. LOPEZ:

12:24 20    Q.   Do you know whether it's the client's privilege or your

21    privilege?

22              MR. MOORE:  Same objection, your Honor.

23              THE COURT:  Sustained, counsel, on this point.

24    BY MR. LOPEZ:

25    Q.   Now, taking you to August of 2017 when -- or right around

1    the time that there was an update to the system, which I

2    believe happened sometime in late June 2017, is that a fair

3    statement?

4    A.   I think it's fair as far as the year goes.  I've forgotten

5    the month.  But if you see it there or have it, I wouldn't

6    disagree with you, but I just can't say the month.

7    Q.   And did you have any conversations with Mr. Crater

8    regarding your wallet?

9    A.   In -- what, in 2017?

12:26 10    Q.   Yes.

11    A.   Yeah, I sure I may have.  Yeah, that -- I don't remember

12    what conversation --

13    Q.   Do you recall him suggesting to you to make a backup of

14    your wallet in 2017?

15    A.   He could have, I don't recall.  Sitting here today I don't

16    recall.  If you've got something to show me --

17    Q.   Do you recall whether you have a backup of your wallet?

18    A.   As I recall, at some point between mid '17 and 2018 the

19    system got shut down.  Whether I made a back up or not, I don't

12:26 20    remember.

21    Q.   Well, did you --

22    A.   The government shut it down.

23    Q.   Did you have a reason for making a backup?

24    A.   I would assume it had something to do with the government

25    investigation of the company and the systems here.

```
 1    Q.    So did the government ask you for your backup?

 2    A.    Did the government ask me for my backup?

 3          The government asked me for massive amounts of

 4    production around the time I was deposed in 2017 and then

 5    subsequent to that as well, and --

 6          MR. LOPEZ:  Joe, could you bring up Exhibit -- number

 7    188 just for the witness.

 8          THE COURT:  I'm sorry, were you done with your answer?

 9          THE WITNESS:  I was just trying to remember, your

10    Honor.  I think I probably was done from what I can remember at

11    that time.

12          THE COURT:  Mr. Lopez.

13          MR. LOPEZ:  Yes, could you bring up 188 just for the

14    witness for identification.

15          THE COURT:  Just for the witness.

16          MR. LOPEZ:  Yes.

17          THE COURT:  We'll make this GG.

18          (Exhibit GG marked for identification.)

19          MR. LOPEZ:  Can you enlarge that for the witness, Joe?

20    BY MR. LOPEZ:

21    Q.    Do you see that email, Mr. Lynch?

22    A.    Oh, okay, yes, I do.

23    Q.    Did you send that email to Mr. Crater?

24    A.    I did.

25          MR. LOPEZ:  Your Honor, I move to admit this email.
```

```
 1                    THE COURT:  Any objection?
 2                    MR. MOORE:  No, your Honor.
 3                    THE COURT:  It may be admitted.  What are we up to?
 4                    THE CLERK:  22.
 5                    MR. LOPEZ:  It may be admitted as 22 and published.
 6                    (Exhibit 22 received into evidence.)
 7         BY MR. LOPEZ:
 8         Q.   You write, Randall, At your suggestion with Justine's
 9         help, we created a flash drive backup of the wallet data.
12:28 10   Also, one of the investors is inquiring about how to restore
11         the backup that would allow anyone to move the wallet data to
12         another computer or recover from a crash?  We want to be sure
13         we can get the data onto a different piece of hardware in a
14         useable state if it should ever become necessary because of a
15         crash or the need for a new computer.
16                    Did I read that correctly?
17         A.   You sure did, yes.
18         Q.   Did you, in fact, make a backup?
19         A.   Clearly I did, we did.
12:29 20   Q.   Do you still possess that backup?
21         A.   I may.  I haven't -- if I have it, I haven't seen it in
22         some time, but I must have it somewhere.
23         Q.   Did anyone from the CFTC --
24                    MR. MOORE:  Objection, your Honor.
25         Q.   -- ask you about a backup?
```

1          THE COURT:  Sustained as to the question.

2          MR. LOPEZ:  Did anyone from the FBI ask for a backup?

3          MR. MOORE:  Objection, your Honor.

4          THE COURT:  Sustained as to that question, but,

5    counsel, if I need to take it up with you later, I will.

6          MR. LOPEZ:  Well, I might as well finish it out.

7    BY MR. LOPEZ:

8    Q.   Did anyone from the Postal Service ask for a copy of that

9    backup?

12:29 10          MR. MOORE:  Objection, your Honor.

11          THE COURT:  Sustained, but counsel --

12          MR. LOPEZ:  May I be heard, your Honor?

13          THE COURT:  I'll hear you.

14          (Discussion at sidebar.)

15          THE COURT:  Mr. Lopez.

16          MR. LOPEZ:  Yes, your Honor.

17          This evidence goes to the heart of our defense, which

18    is the government's contention that a cryptocurrency did not

19    exist before June of 2017 and our contention that it did.  But

12:30 20    we have no burden of proof.  It's the government's burden, as

21    you know, to prove that it wasn't a cryptocurrency.  He has a

22    backup.  The government never looked at it, never cared to look

23    at it, and I think it's important to be allowed.  It's

24    relevant, it's material, it's exculpatory.

25          THE COURT:  I ask counsel to keep their voices down.

1          MR. MARKHAM:  Your Honor, I would note that there was

2     a motion in limine to keep out the CFTC investigation, so as an

3     initial matter --

4          Your Honor, can you hear me?

5          THE COURT:  Yes.

6          MR. MARKHAM:  Okay.

7          Mr. Lopez had a amotion in limine to keep out the CFTC

8     investigation.

9          I would note now for the record that he's opened the

12:31 10     door and the government reserves the right to put in now the

11     CFTC lawsuit because Mr. Lopez is going into it, which is --

12          THE COURT:  So, counsel, while we have the jury in the

13     box, let me hear the government on the questions as to the FBI

14     and Postal.

15          MR. MARKHAM:  Your Honor, as to the FBI and Postal, I

16     would note that this email is from August of 2017.  So this is

17     not relevant to what happened before June of 2017.  And to the

18     extent he's asking whether he ever gave that wallet to the FBI,

19     I do think that question just standing alone is okay.

12:32 20          THE COURT:  Meaning there's no objection to that?

21          MR. MARKHAM:  Yes, your Honor.  I don't think there's

22     an objection to him asking do you remember whether you gave a

23     copy of that wallet to the FBI.

24          THE COURT:  Okay.

25          Counsel, I'll allow that question, Mr. Lopez, and I'll

1    hear you outside of the hearing of the jury if you need to be

2    heard or want --

3            MR. LOPEZ:  I didn't quite hear the question I'm

4    allowed to ask.

5            THE COURT:  Go ahead.

6            MR. MARKHAM:  Your Honor, the question was:  Did you

7    ever give a copy of that wallet to the FBI?

8            THE COURT:  Mr. Lopez.

9            MR. MARKHAM:  I think we're in agreement.

12:32 10        MR. LOPEZ:  That's fine, your Honor.

11           THE COURT:  Thank you.

12           (End of discussion at sidebar.)

13   BY MR. LOPEZ:

14   Q.   Mr. Lynch, did you ever give a copy of that wallet to the

15   FBI?

16   A.   Are you talking about the flash drive, Mr. Lopez?

17   Q.   I'm talking about the wallet that we're talking that's

18   on --

19   A.   Yes, the backup.

12:33 20   Q.   Right.

21           (Pause.)

22   A.   I don't think so.

23   Q.   Now --

24           MR. LOPEZ:  May I approach the witness, your Honor?

25           THE COURT:  You may.

```
 1              (Pause.)
 2    BY MR. LOPEZ:
 3    Q.    Now, you were called to provide an interview to the CFTC
 4    back in July of 2017; is that correct?
 5    A.    That is correct.
 6    Q.    And you would agree with me that your memory in 2017 about
 7    events that occurred between 2014 and 2017 were more clear to
 8    you at that time.
 9    A.    In many regards, yes.
10    Q.    Okay.  And in 2017, you didn't remember what Mr. Kruger
11    told you about the application of coin in the medical marijuana
12    business, did you?
13    A.    If you could refresh me, direct me to the page, is that
14    what you're talking about, something --
15    Q.    Sir, in 2017, did you remember what Mr. Kruger told you
16    about the medical marijuana business and the coin's application
17    to it?
18    A.    I can't answer that without looking at the deposition.  If
19    you want to give me the citation of the page, I can look at it
20    and respond more accurately to your question.
21    Q.    I think the way this goes is I ask the question.  You
22    answer it if you can, and if you can't, then I show you the
23    document.
24    A.    Okay.  So, once again, without looking at the document, I
25    can't answer your question.
```

1  Q.   Okay.

2       Turn to page 33.

3  A.   33?

4  Q.   Mm-hmm.  Line 12.

5       And I'll read it.  Mr. Lynch, that's you --

6       THE COURT:  Well --

7       MR. MOORE:  Objection, your Honor.

8       THE COURT:  Yeah, so here, counsel, we're refreshing,

9  so have him read it to himself first.

12:36 10       MR. LOPEZ:  Okay.

11       THE COURT:  So what lines?  Lines 12 through --

12       MR. LOPEZ:  Lines 12 through 23.

13       THE COURT:  Yes.  Please read those to yourself,

14  Mr. Lynch.

15       THE WITNESS:  Lines 12 through 23?

16       THE COURT:  Yes.

17       MR. LOPEZ:  Mm-hmm.

18       THE WITNESS:  Thank you.

19       (Pause.)

12:37 20       THE WITNESS:  I've read it, your Honor.

21       THE COURT:  Mr. Lopez.

22  BY MR. LOPEZ:

23  Q.   And would it be fair to say that in July of 2017, you

24  didn't remember what Mr. Kruger told you three years earlier

25  about the coin's application to the medical marijuana business,

1   correct?

2   A.   That's not exactly what I said.

3   Q.   You didn't remember everything he said.

4   A.   I said I don't remember line by line what we talked about

5   in connection with the medical marijuana business.

6   Q.   You also said this was three years ago --

7          MR. MOORE:  Objection, your Honor.

8          THE COURT:  Well, sustained, counsel.

9          I think we've gotten the question and answer.

12:38 10         Next question.

11  BY MR. LOPEZ:

12  Q.   And the first time that you met Mr. Crater was on June 5,

13  2017, right?

14  A.   That's the first time I met him in person at the offices

15  of his then attorney in South Carolina.

16  Q.   And that was after you received not one, but two subpoenas

17  from the CFTC, right?

18  A.   Yes, one for the records and then the second to be deposed

19  or interrogated, whatever the word is.

12:38 20  Q.   And you reached out to Mr. Crater's attorney after you

21  received the subpoena for your testimony, right?

22  A.   I'm not sure whether -- I know I reached out to

23  Mr. Crater.  I'm not sure I reached out to his attorney.  I may

24  have.

25  Q.   And the reason you reached out to Randall is because you

1  wanted to get some specific answers to the questions that you

2  were contacted about by the CFTC, right?

3  A.   Well, the questions prior to the subpoena, the subpoenas

4  by the CFTC were more general in nature.  They wanted to know

5  if I was involved in owning or buying MBC coins, whether I knew

6  Greyshore, that type of thing.  They were generalized

7  questions.

8       And then followed, I guess in May sometime or early

9  June, by the subpoenas.  So I did contact Randall.

12:40 10       I was expecting Randall to come to Boston to meet with

11  me as we had gone through earlier, but he didn't come.  Then we

12  arranged the meeting for June 5th in his attorney's office,

13  Raymond Chandler's office in Charleston, South Carolina.  That

14  was the sequence.

15  Q.   So after receiving the subpoena to testify, you initiated

16  a meeting with Randall, right?

17  A.   Well --

18  Q.   Did you request a meeting with Randall?

19  A.   Many times.

12:40 20  Q.   After you received the subpoena, you requested a meeting?

21  A.   I did, and I thought -- the meeting I thought was going to

22  take place in Boston.

23  Q.   I didn't ask you where you thought it was going to take

24  place.  I asked you did you initiate it?

25  A.   I did many times.

```
  1   Q.   It wasn't Randall who --
  2   A.   Oh, no --
  3   Q.   -- on learning you had the subpoena said to you, I want to
  4   meet with you about this, right?
  5   A.   No.  I wanted to meet with Randall.
  6   Q.   Thank you.  You wanted to meet with him?
  7   A.   Yes, true.
  8   Q.   And you wanted to get rid of your interest in marijuana
  9   and in Trokie, right?
12:41 10  A.   That's not consistent with what I've testified to.
 11            I went down to --
 12   Q.   I know that, but that's why I'm cross-examining you.
 13            THE COURT:  Well, counsel, no commentary.  Let's just
 14   jump to the next question.  What's the next question?
 15   BY MR. LOPEZ:
 16   Q.   You went down there and you wanted Randall to buy out your
 17   business in the marijuana business and the Trokie business,
 18   right?
 19   A.   I went down there, amongst other things, I think I
12:41 20  testified to several things, to get the accounts straightened
 21   out, because they were now under investigation, to find out
 22   what was going on with the marijuana license.  My documentation
 23   on that was woefully inadequate.  He hadn't sent me anything on
 24   that, so that certainly was a question.
 25   Q.   So you wanted to confirm --
```

1          THE COURT:  Well, counsel, he wasn't finished.

2          MR. LOPEZ:  Well, he's answering beyond my question.

3          THE COURT:  Well, counsel, given the scope, the

4     breadth of the question which I have in front of me, it's

5     responsive.

6          You can finish your answer.

7     A.   So I went down there with several things in mind, and I

8     wanted to get the accounts squared away, including the

9     documentation for the licenses and whatnot.

12:42 10        You recall that prior to going down there, I tried to

11    sell one of the licenses, and he said that he had sold it at

12    double my cost and he was sending me $3 million.

13         So there was a lot of reasons to get down and talk to

14    Randall, including the government investigations launched by

15    CFTC.

16    Q.   And when you left there, Randall agreed to purchase your

17    interest in all your marijuana licenses and the Trokie

18    business, right?  Yes or no?

19    A.   I can't answer that question yes or no.

12:43 20   Q.   Did he buy your interest in the marijuana licenses and the

21    Trokie business in exchange for coins pursuant to your request

22    for more coins?  Yes or no?

23    A.   There are two parts to that question.  So the answer is

24    yes and no.

25    Q.   You're saying he never gave you the coins?

```
 1    A.    I can explain --

 2    Q.    I'm asking a question --

 3    A.    -- what my answer is.

 4    Q.    Are you saying he never gave you the coins?

 5    A.    Randall suggested that the viability of the licenses had

 6    come to an end and I was better off going into the coins.

 7          He indicated to me the licenses had little worth

 8    despite earlier telling me he sold one for double what I

 9    invested and he was sending me $3 million.

10          At that point I agreed to his suggestion, his

11    suggestion that we convert the money I paid for the license in

12    the Trokie business back into coin.

13          It wasn't I suggested to him.  It was him suggesting

14    to me, and I'm absolutely clear on that.

15    Q.    Today?

16    A.    Today, absolutely today and --

17    Q.    Thank you.

18          Now, you also purchased coin from Mr. Gillespie,

19    right?

20    A.    Yes, I did, much earlier in the process I did.

21    Q.    How did you do that?

22    A.    Well, he approached me, I think it was in 2015, 2015 at

23    some point, needing money, and he asked me to purchase his

24    coins, I think there were 200 of them.  And he said he needed

25    money quickly --
```

```
 1   Q.   Sir, did you hear my question?  How did you do it, not
 2   why.  How did you --
 3           MR. MOORE:  Objection, your Honor.
 4           THE COURT:  Sustained as to commentary, but the
 5   question is:  How did you do it?  Meaning you --
 6   A.   I wired money to acquire his coins.
 7   Q.   You didn't use the exchange.
 8   A.   No, I wired money, I believe.
 9   Q.   If you can turn to page 93, line 24.
10           (Pause.)
11           THE COURT:  Counsel, did you have a question, or did
12   you want Mr. Lynch to read?
13   BY MR. LOPEZ:
14   Q.   Did you testify in 2013, that when you went to South
15   Carolina --
16           MR. MOORE:  Objection, your Honor.
17           THE COURT:  Well, I'm assuming, Mr. Lopez, you're
18   going from page 93-24 through the top of 94?
19           MR. LOPEZ:  Yes.
20           THE COURT:  And not for the purposes of refreshing,
21   that's fair to say, right?
22           MR. LOPEZ:  Yes.
23           THE COURT:  So overruled.
24           You can ask the question.
25   BY MR. LOPEZ:
```

```
 1    Q.   You testified in 2017, that when you went to South

 2    Carolina for that meeting in 2017, you transferred out of the

 3    marijuana investment that I made and converted that to coins.

 4    Right?

 5    A.   I'm trying to look at where you are.

 6         This is page 93 in the lower right-hand corner.

 7    Q.   Onto the next page.

 8    A.   Give me a second.

 9         (Pause.)

10    A.   I see it.

11    Q.   Isn't that what you testified to in 2017?

12         MR. MOORE:  Just for clarity, what is the question?

13    Is it what he testified?

14         THE COURT:  He just read it back.

15         Mr. Lopez's question was:  You testified in 2017, that

16    when you went to South Carolina for that meeting in 2017 you

17    transferred out of investment that I made and converted that to

18    coins, right?

19         MR. MOORE:  Your Honor, this -- can we have a sidebar?

20    Sorry, I think this might be a longer objection.

21         THE COURT:  Well, it's for prior statement, so --

22         MR. MOORE:  It would need to be inconsistent to be

23    admissible.

24         THE COURT:  I understand, but noted for the record,

25    counsel.
```

 1              MR. MOORE:  Okay.

 2              The Court disagrees, so --

 3              So that's the pending question.

 4              Is that what you said?

 5              THE WITNESS:  Yes, as transcribed I said I went to

 6    South Carolina for a meeting in 2017.  I transferred out of the

 7    marijuana investment that I made and converted to coins.

 8    That's what I said.

 9    By MR. LOPEZ:

12:50 10    Q.   And after that transaction, you held in excess of 73,000

11    coins; is that correct?

12    A.   That is true.

13    Q.   And at that time, the coins were valued at $310 a coin,

14    right?

15    A.   That sounds right to me, yes.

16    Q.   So that would be somewhere in the neighborhood of $22

17    million worth of coins.

18    A.   That's what the multiplication shows, yes.

19    Q.   And I'm guessing that's why you were content with your

12:50 20    investment at the time you met with the CFTC?

21    A.   Exactly.  I wanted to get my money out of this thing and

22    not have the government close it down.  I was very concerned

23    that I'd lose my funds, so that's why I said I was content with

24    the investment.

25    Q.   Now, in 2017, you were clear that you didn't own any

1    stock, right?

2    A.   Well, I've been over this a lot.  But my --

3    Q.   Sir --

4    A.   -- potential ownership.

5    Q.   You were clear that you didn't own any stock in 2017,

6    correct?

7    A.   I never owned any stock.  I intended to convert to stock

8    once it went public.  But since it didn't go public, all my

9    ownership was in coins, that's true.

12:51 10   Q.   Thank you.

11         Now, over the course of the period from 2014 and 2017

12   at the time you testified before the CFTC, there were actually

13   three different credit cards that My Big Coin was involved

14   with, right?

15   A.   I'm not sure.

16   Q.   Well, let's go to page 128.

17         Strike that.  Bottom of 127.

18         Initially there was a card from Ultra Card, right?

19   A.   May I just look at this?

12:52 20   Q.   Sure.  Bottom of page 127, line 23.

21   A.   Just give me a second, please.

22         (Pause.)

23   Q.   If you can just read from page 127, line 23, to 128, line

24   12.

25         (Pause.)

```
 1    A.    Okay.  I've read that, Mr. Lopez.
 2    Q.    So would you agree with me that over the course of the
 3    period of time prior to meeting with the CFTC, the company
 4    arranged three different credit cards with the MasterCard logo
 5    on them?
 6    A.    In my testimony, my sworn testimony to CFTC, I think what
 7    I recalled at the time was I was familiar with two cards.
 8    Q.    Did they have a MasterCard logo on them?  Or don't you
 9    recall?
12:54 10    A.    I know the Ultra Card did.
11    Q.    The first one.
12    A.    The Ultra Card was the second card.
13    Q.    Okay.
14    A.    And that had a MasterCard.
15          The first one I never applied for because it was only
16    a debit card and I didn't need it.  And I don't remember a
17    third card, if you could help me with that --
18    Q.    Well, you testified that the first one was called Ultra
19    Card, right?
12:54 20          THE COURT:  Yeah, so, counsel --
21          MR. LOPEZ:  Page 127, line 23.
22          THE COURT:  So, counsel, for the purposes of
23    presentation, I don't see inconsistency.  So did you want to
24    ask an outright question?
25          MR. LOPEZ:  That's all right, your Honor, I'll move
```

```
 1   on.
 2            THE COURT:  Thank you.
 3   BY MR. LOPEZ:
 4   Q.   Now, in 2017, you couldn't recall whether Mr. Crater or
 5   anyone else told you that the money you had paid for your coins
 6   could be used for corporate purposes, did you?
 7   A.   I think that's what I said at the time.
 8   Q.   You didn't recall anyone saying that the money you wired
 9   for coins was going to be used for corporate purposes, right?
12:55 10   A.   I'm sorry, could you repeat that?
11   Q.   You didn't recall anyone saying that the money you sent to
12   purchase coins was going to be used for corporate purposes.
13   You had no memory of that.
14   A.   At that time I didn't have a memory of that at that time,
15   that's right.
16   Q.   Now, sir, do you believe you sustained losses in this
17   matter?
18   A.   Absolutely.
19   Q.   And I think earlier you quantified those losses?
12:56 20   A.   I did.
21   Q.   And let me ask you, do you file tax returns?
22   A.   I do.
23   Q.   And have you taken those losses on your tax returns?
24   A.   Not as yet.
25            MR. LOPEZ:  Can I just have a moment, your Honor?
```

```
 1              THE COURT:  You may.

 2              (Defendant conferred with counsel.)

 3              MR. LOPEZ:  I have no further question, your Honor.

 4              THE COURT:  Thank you.

 5              Redirect?

 6              MR. MOORE:  It's very brief, your Honor.  I don't know

 7     if you want to take lunch or I can streamline it and do it --

 8              THE COURT:  When you say "very brief," it's probably

 9     longer than three minutes.

12:57 10          MR. MOORE:  Longer than three minutes but less than

11     10.

12              THE COURT:  So, Mr. Lynch, I'll have you step down.

13     We're going to take our lunch break.

14              MR. LOPEZ:  I thought Mr. Lynch had a 2:00

15     appointment.

16              MR. NOONAN:  Your Honor, it's taken care of.

17              THE COURT:  It's taken care of?

18              MR. NOONAN:  Yes.

19              THE COURT:  Mr. Lynch, if we can have you back for

12:58 20  what has been represented as a brief time after lunch.

21              THE WITNESS:  Thank you.

22              THE COURT:  You may step down.

23              Jurors, we'll take our lunch break.  Leave your

24     notebooks on the chairs.

25              Keep all my cautionary instructions in mind obviously
```

 1    during the lunch break.  Please be back up in the jury room a

 2    little before 2:00 so we can start promptly at 2:00.  Thank

 3    you.

 4              (Jury left the courtroom.)

 5              THE COURT:  Counsel, anything before we break?

 6              Mr. Lynch is stepping down.

 7              I will -- I'm inclined to come back at 1:50, if that

 8    works for my staff, at 1:50 to finish hearing Mr. Lopez on the

 9    Touhy issue and I'll hear from the government, and then we'll

12:59 10   start right up at 2:00 obviously.

 11             I do two rounds of examination, so direct, cross,

 12    redirect, recross, done.

 13             Counsel, who's up after Mr. Lynch?

 14             MR. MARKHAM:  Mr. Desa, your Honor.

 15             THE COURT:  Counsel, anything else we should take up

 16    now?

 17             MR. MARKHAM:  Just one thing for the record, your

 18    Honor.

 19             As I said at the sidebar, defense put in a motion in

12:59 20   limine for the government to not discuss the marijuana licenses

 21    or the CFTC investigation and then promptly in its opening and

 22    with the first witness went into both.  So the government just

 23    wants to make clear that it will now affirmatively be

 24    presenting evidence, one, that the marijuana licenses were a

 25    fraud and that that was part of that scheme to defraud

1    Mr. Lynch; and, two, of the CFTC allegations and the responses.

2    There's no reason to keep out those allegations anymore because

3    defense counsel has purposefully put them in after requesting

4    that the government not put them in.

5         THE COURT:  Mr. Lopez -- everyone else can be seated

6    for the moment.

7         Mr. Lopez, do you want to respond?

8         MR. LOPEZ:  Your Honor, my purpose in putting in that

9    motion was to prevent the government from claiming that

01:00 10   participation in a medical marijuana business was a federal

11   crime.  And so we haven't opened the door -- I don't believe

12   we've opened the door to that.  But if they want to go down

13   that road, it's at their risk I guess.

14        THE COURT:  So I guess, counsel, at the end of the day

15   I know what the motion was.  I do think it was about the

16   suggestion of the criminal nature in regards to the marijuana

17   business.

18        My recollection from Mr. Lopez's opening was not about

19   criminality, it was actually the opposite, to suggest that

01:01 20   there was a reason for the -- there was a reason for interest

21   of marijuana distributors, dispensaries, rather, to use

22   Bitcoins because banking systems were still -- were wary of

23   providing funds.

24        So I don't think that opened the door, counsel.

25        MR. MARKHAM:  No, your Honor.  My recollection from

         1   the pretrial conference was also, though, that the marijuana

         2   licenses themselves, just to give the Court background, were

         3   made up in order to get rid -- and in order to get Mr. Lynch

         4   off of yet another made-up investment he made up coins.

         5          THE COURT:  I guess what I'm saying is I didn't take

         6   anything from my ruling or from the motion that if there's a

         7   basis, a reasonable basis for arguing about them being

         8   fraudulent, that's different than the suggestion by the

         9   government that that conduct was criminal.

01:02   10          MR. MARKHAM:  Absolutely, your Honor.  So if that's

        11   the ruling, I think we're fine.

        12          THE COURT:  That would be my ruling.

        13          On the CFTC, I don't know how much the door has been

        14   opened.  I mean, much of the focus was for the purposes of

        15   impeaching Mr. Lynch who gave sworn testimony before them and

        16   also obviously to the extent it went to bias.  Right?  Either

        17   bias in wanting to get his money out, bias in being called

        18   before a federal agency to get sworn testimony, and the

        19   exchange between Mr. Crater and Mr. Lynch about this, which I

01:03   20   think was reflected in part in undisputed exhibits.

        21          So all of this to say, I still have a great concern

        22   about not putting that agency matter squarely before this jury

        23   for 403 purposes, as to confusion.

        24          So I would tread it lightly.

        25          MR. MARKHAM:  Yes, your Honor.

```
 1              THE COURT:  And I will listen carefully.
 2              MR. MARKHAM:  Thank you, your Honor.
 3              THE COURT:  Thank you.  We'll take the break and then
 4    I'll see you how about five minutes before, 1:55.
 5              MR. LOPEZ:  You're the Judge, your Honor.
 6              THE COURT:  Thank you.
 7              (Recess taken.)
 8              THE CLERK:  All rise.
 9              Court is in session.  Please be seated.
01:56 10        THE COURT:  Counsel, we can pick up on the Touhy
11    issue.
12              Mr. Lopez, you were giving a proffer, and I'll have
13    Ms. Hourihan go up a minute before 2:00 so we can start
14    promptly back with the jury at 2:00.
15              Mr. Lopez.
16              MR. LOPEZ:  Yes, your Honor.  I started the proffer
17    with respect to -- I'm looking for my witness list now.  Hold
18    on.
19              With respect to David Cirilli, who's with the FBI, the
01:57 20   purpose of those questioning is that this -- in reading through
21    the reports of this investigation, I was struck by the approach
22    that Mr. Cirilli and others took to questioning witnesses and
23    essentially corrupting their recollection of what was going on.
24    It wasn't -- in my mind it wasn't a search for truth, it was a
25    search to convict, and I'd like to be able to question him
```

1       about how he conducted his interviews, and the same is true of

2       the postal inspector, who was even a worst offender in my mind.

3                THE COURT:  And his name is?

4                MR. LOPEZ:  Jan Kostka.  I don't have the list in

5       front of me.

6                MR. MOORE:  That's correct, Jan Kostka.

7                THE COURT:  Okay.  I'll hear Mr. Markham's response.

8                MR. MARKHAM:  So, again, this is assuming he actually

9       puts that in a proper Touhy request.  This is just about the

01:58  10       proffer and what they'd actually testify about.  I note that

11       he's not actually laid any foundation for that through any

12       witnesses who are testifying.  So if he talks to witnesses who

13       are testifying and he gets them to say like, yeah, David

14       Cirilli told me to say this, and, yeah, the FBI told me to say

15       that, that would be one thing.  But until that happens, I don't

16       see the basis for it.

17                THE COURT:  Mr. Lopez.

18                MR. LOPEZ:  Are you done, Mr. Markham?

19                THE COURT:  Yes.

01:59  20                MR. LOPEZ:  Your Honor, I'm making this proffer for

21       purposes of the Sixth Amendment argument I'm making, not with

22       respect to Touhy.

23                THE COURT:  Right.  But, counsel, I guess, as I said

24       before, there's compelling -- there's compelling caselaw that

25       Touhy does apply in criminal cases.  In some of those cases,

1    the Sixth Amendment issue was raised.

2         I was asking the relevance question as to both issues,

3    because Touhy is moot if I don't think there's -- if I either

4    think it's not relevant or not a basis to be admissible

5    evidence.  So --

6         MR. LOPEZ:  I understand.

7         THE COURT:  Sure.

8         MR. LOPEZ:  The relevance is that witnesses were --

9    for example, witnesses were asked questions such as, Well, did

02:00 10   Mr. Crater ever tell you that he spent his money on extravagant

11   items?

12        THE COURT:  Counsel, and I just -- because I know the

13   jury is going to come in soon and I think it's important for

14   all of us that we get back to the evidence.

15        I guess, Mr. Lopez, where the government is not

16   relying on the witnesses that you point to, I think there are a

17   few links that have to be made about how that would be relevant

18   to what's before this jury, even for impeachment purposes.  So

19   that's what I was trying to get at, Mr. Lopez.

02:01 20        THE CLERK:  All set?

21        THE COURT:  Yes.

22        THE CLERK:  All rise for the jury.

23        THE COURT:  Can we get Mr. Lynch back?

24        Counsel, obviously we'll have further discussion.

25        MR. LOPEZ:  Yes, your Honor.

```
 1              (Jury entered the courtroom.)

 2              THE CLERK:  Court is in session.  Please be seated.

 3              THE COURT:  Thank you.

 4              Redirect, Mr. Moore.  Give Mr. Lynch a moment.

 5                      REDIRECT EXAMINATION

 6    BY MR. MOORE:

 7    Q.    Good afternoon, Mr. Lynch.

 8    A.    Good afternoon, Mr. Moore.

 9    Q.    I just have a couple brief questions for you.

10            Do you remember on cross when you were asked about

11    blockchain?

12    A.    Yes.

13    Q.    Did Mr. Crater ever tell you that My Big Coin is like

14    Bitcoin?

15    A.    Yes.

16    Q.    Was it important to you that My Big Coin be like Bitcoin?

17    A.    Yes, it was comforting.  I drew some comfort from that.

18    Q.    Did Mr. Crater ever tell you that My Big Coin was a

19    cryptocurrency?

20    A.    Yes.

21    Q.    Was it important to you that My Big Coin actually be a

22    cryptocurrency?

23    A.    Well, that was my understanding of what it was, yes, so,

24    that interested me, yes.

25    Q.    Would you have invested in My Big Coin if you knew at the
```

1    time that it was not like Bitcoin and not actually a
2    cryptocurrency?
3    A.    Well, I probably wouldn't have.  I'd tried to find out
4    what it was, but I was interested in investing in something
5    like Bitcoin, that type of cryptocurrency.  Go ahead.
6    Q.    Are you an expert on the blockchain?
7    A.    Oh, no, of course not.
8    Q.    So would you have known if the blockchain on My Big Coin
9    was actually operational when Mr. Crater told you it was?
02:03 10          MR. LOPEZ:  Objection.
11          THE COURT:  The form of the question, counsel?
12          MR. LOPEZ:  Yes, your Honor.
13          THE COURT:  Okay.  You can rephrase.
14    BY MR. MOORE:
15    Q.    Who did you rely on for information that My Big Coin had a
16    blockchain?
17    A.    Well, I was told about it, as I've said, in the first
18    instance by Mr. Kruger.  And then I had various conversations
19    with Mr. Gillespie and with Mr. Crater at some point.
02:03 20    Q.    And did you rely on the statements Mr. Crater made about
21    the blockchain?
22    A.    I relied on everything Mr. Crater told me at all times.  I
23    relied on him heavily, unfortunately.
24          MR. MOORE:  Can we bring up Exhibit 13A.
25    Q.    Do you remember questions about Justine Mahoney making

```
 1   transfers on your account?
 2   A.   I do.
 3   Q.   Did Justine Mahoney control the My Big Coin --
 4   A.   Absolutely not.
 5   Q.   And here in this email is she simply talking about
 6   transferring coins that were already in your account?
 7   A.   The coins -- we'd pull them out of my account to put them
 8   on the exchange.  That didn't work.  So we were trying to get
 9   them back into my account, and that's all that was about.  She
10   wasn't manipulating or operating the -- my account.
11   Q.   Who had control over the My Big Coin Exchange?
12   A.   Mr. Crater exclusively, as I've said many times.
13            MR. MOORE:  Can we bring up 14G.
14   Q.   Do you remember questions about -- on direct -- or on
15   cross-examination about My Big Coin being on Nova?
16   A.   Yes, I remember that being discussed.
17   Q.   And did you remember being shown this email from November
18   5, 2017 about My Big Coin on Nova?
19   A.   Yes.
20   Q.   Is November 5, 2017 before you spoke to the CFTC or after
21   you spoke to the CFTC?
22   A.   Well after.  Five or six months after I spoke to the CFTC
23   that I was deposed and testified under oath.
24   Q.   Do you remember being asked questions about mining?
25   A.   By the CFTC?
```

1    Q.    I'm sorry, on cross-examination, were you asked

2    questions --

3    A.    This morning, yes, I remember that this morning, yes.

4    Q.    And do you remember testifying that you saw some evidence

5    of mining at some point in your account?

6    A.    Yes, later on around this time, 2017, end of the year, I

7    noticed my amount of coins, as I explained, increasing

8    slightly, maybe a coin or two each day, as part of this what I

9    was told was the mining process.

02:05 10   Q.    So when you noticed that increase, was that before you

11   spoke to the CFTC or after you spoke to the CFTC?

12   A.    Long after.

13   Q.    All right.

14         MR. MOORE:   Can we bring up Exhibit 15A.

15   Q.    Do you remember being asked questions about My Big Coin

16   being a private account?

17   A.    Do you mean today --

18   Q.    I'm sorry, yesterday on cross-examination.

19   A.    I'm not sure I remember the words "private account."

02:06 20   Q.    Or a private exchange.

21   A.    Oh, private exchange, okay.  I guess I do remember that,

22   yeah.  Sorry.

23   Q.    Do you see here where it says Anytime, Anyplace, My Big

24   Coin?  Do you see that on the website?

25   A.    I sure do.

1    Q.    Did you believe that My Big Coin was a public

2    cryptocurrency that could be used by the general public?

3              MR. LOPEZ:  Objection.

4              THE COURT:  Sustained as to form.

5    BY MR. MOORE:

6    Q.    Did you believe My Big Coin was private or public?

7              MR. LOPEZ:  Objection.  Time.

8              THE COURT:  Oh, time?

9              You can rephrase the question.

02:07 10   BY MR. MOORE:

11   Q.    In 2014, when you invested in My Big Coin, did you believe

12   that it was private or did you believe that it was public?

13   A.    Well, public in the sense that anybody could sign up for

14   it and invest in it in that way in order to get on the website.

15   On the other hand, nobody coming in off the street, you know,

16   could get onto the website without making an investment.  So I

17   guess in that sense you could call it private.

18   Q.    Did you believe businesses could sign up to accept it,

19   that that was one of the goals of My Big Coin?

02:07 20   A.    Yes.

21   Q.    Did you believe it was supposed to be used to transfer

22   money to people around the world?

23   A.    Yes.

24   Q.    Was the ability of lots of people to some day use My Big

25   Coin important to you?

A.   Oh, yes.  It would grow the business, increase the revenue

streams and, you know, drive up the price of the coin and drive

up ultimately the price of the stock when the stock went

public.

Q.   Would you have been interested in investing in My Big Coin

if it was limited to Randall Crater and his few closest

friends?

A.   Of course not, no, absolutely not.

     MR. MOORE:  All right.  Can we bring up Exhibit 11S,

02:08  please.

Q.   All right.  Do you remember being asked --

     MR. MOORE:  Can we go down to the second page.  Sorry,

midway between the two.

     Can we highlight this bottom "From."

Q.   Do you remember being asked about this $100 million

commitment on cross-examination?

A.   Yes, I do.  I do, sir, yes.

Q.   All right.  Can you see who the original sender is right

above where it says $100 million commitment?

02:09  A.   This was March 12th of 2014 from Michael Kruger to Randall

Crater before I had met either one of them, but that's the

timing of it.

Q.   Do you see right below the two double lines, do you see

what name is written there?

A.   Yes.  It was to Randall Crater at his Greyshore address,

```
 1   email address.
 2   Q.   So you see where it says Randall Crater and Greyshore@
 3   icloud.com wrote and then below it, it says $100 million
 4   commitment?
 5   A.   Correct.
 6           MR. MOORE:  Can we bring up Exhibit 12G.
 7   Q.   Do you see here where Randall Crater says, We have $300
 8   million in gold backing us?
 9   A.   I do.
10   Q.   Is $300 million bigger than $100 million?
11   A.   I know that much for sure, yes, it is, it's bigger by a
12   multiple of three.
13           MR. MOORE:  Can we bring up Exhibit 11B.
14   Q.   All right.  Do you remember being asked on
15   cross-examination about 200 coins going to Mr. Kruger?
16   A.   I do.
17   Q.   Who did you have to email to make those 200 coins go to
18   Mr. Kruger?
19   A.   On any instance involving coins and going into accounts
20   and updating or working with the accounts, it was Mr. Crater
21   who had control over the accounts and nobody else.
22           MR. MOORE:  Can we go to Exhibit 11AA.
23   Q.   All right.  Do you remember being asked on cross-
24   examination about whether you received any documentation for
25   your stocks?
```

1    A.    Yes.

2    Q.    All right.

3          MR. MOORE:  Could we zoom in on where it says, Please

4    note, the second paragraph here.

5    Q.    Is this an email from you to Mr. Crater in which you're

6    saying that 50 percent of your investment goes for stock?

7    A.    Well, on this particular email at the top, it says --

8    okay.  I -- the top one says it's from Randall to me, but he's

9    responding to this question that I posed to him.

02:11 10          Please note that 103,000 was wired for my account.  It

11   is to be entered totally for coins.  The others are split 50

12   percent stock and 50 percent coins.

13   Q.    When you -- sir, you see it says that?

14   A.    Yes, it's from me to Randall.

15   Q.    When you e-mailed Mr. Crater saying that 50 percent of

16   your investment would be for stock, did you rely on him to

17   honor what you said in that email?

18   A.    Yes.  When -- the expectation -- my expectation was that

19   ultimately my account would be split between coins and stock

02:12 20   when the stock became available after going public.

21   Q.    Did you pass along information about My Big Coin to your

22   family and friends who also got involved?

23   A.    Yes.

24   Q.    Where did you get the information that you passed along to

25   your family and friends?

1    A.   Well, from the same three people, Mr. Crater, Mr. Kruger

2    and Mr. Gillespie.

3    Q.   Did you have an understanding of who, if anyone,

4    Mr. Kruger got his information from?

5    A.   Mr. Kruger was totally reliant on Mr. Crater and got his

6    information from Mr. Crater.  They were in touch routinely.

7    Many times I'd be on the phone with Mr. Kruger and interrupt

8    and say, Oh, Randall's calling me now, I'll get back to you.

9    And then he would get back to me and tell me what Randall told

02:13 10   him, so on and so forth.  But I knew Kruger's information came

11   from Randall.  Occasionally he would have -- Kruger would have

12   information from Gillespie, who got his information from

13   Randall.  So it was sort of a triangle between the three of

14   them.

15   Q.   Do you know if Mr. Crater ever gave any money to

16   Mr. Kruger?

17   A.   No.  What I understood was Mr. Kruger was going to be

18   getting something close to five percent of the value of the

19   company from Mr. Crater, 4.9 is what I believe I testified to.

02:14 20        So he was not on a salary that I was aware of, but his

21   reward would come when the investment materialized and went

22   public.

23   Q.   And do you know who he had discussions with about his

24   remuneration for his involvement in My Big Coin?

25   A.   He was very open about it, yes, with Mr. Crater, and what

1    Mr. Crater promised to do for him.

2    Q.    Do you know who Mr. Gillespie got his information from

3    about My Big Coin?

4    A.    Yes, you asked me that, and it was Mr. Crater.

5    Q.    Do you know if Mr. Gillespie was promised any remuneration

6    for his involvement in My Big Coin?

7    A.    He was promised several things.  Like Mr. Kruger, he was

8    to get a percentage of the company, and my memory was -- and I

9    think I testified to this either -- it was one and a half to

02:15 10   two percent of the company, and he was going to get a board

11   seat on either My Big Coin Pay or whatever the ultimate entity

12   was going to be.  And I think that was more or less it.

13         I was unaware of him getting any salary, regular

14   salary from Mr. Crater during this period before the company

15   went public.

16   Q.    Do you know who he had discussions with about his

17   remuneration for his involvement in My Big Coin?

18   A.    Yes.

19         MR. LOPEZ:  Objection.

02:15 20         THE COURT:  Counsel, what, foundation?  I'm

21   assuming --

22         MR. LOPEZ:  This is double hearsay.

23         THE COURT:  It's also foundation, counsel.  So

24   sustained as to that question.

25   A.    So --

1        THE COURT:  Well, sustained.  So next question.

2        MR. MOORE:  I just want to make sure, the question was

3   do you know if -- who he had discussions with about his

4   remuneration.

5        MR. LOPEZ:  You're right, your Honor, foundation.

6        THE COURT:  Right.  So sustained.

7        MR. MOORE:  All right.

8   BY MR. MOORE:

9   Q.   Do you know -- do you remember talking to the CFTC?

02:16 10  A.   I sure do.

11  Q.   Do you remember at some point telling them you were

12  content with your investment?

13  A.   Well, that was before it got rolling, and I was hoping it

14  would go away, and that's what I told Jason Mahoney in one of

15  the emails that was shown to me this morning.

16  Q.   And after that did the CFTC issue a subpoena?

17  A.   They did, two.

18  Q.   And did the subpoena require you to give them certain

19  evidence?

02:16 20  A.   Yes, they were looking for exhaustive documentation of my

21  records and they also required me to come and testify under

22  oath, both of which I did.

23  Q.   And after they issued you that subpoena, did you comply

24  with it?

25  A.   Fully.

 1    Q.    Were you honest when you spoke to them?

 2    A.    At all times.  I knew, for example, when I was testifying

 3    it was under oath.  Being under oath means a lot to me as a

 4    lawyer and as a person.  I think of myself as a truthful

 5    person, and I wanted to fully cooperate.  Same with providing

 6    the documentation.  We sent the documentation over and they

 7    asked us for more after my deposition, and working with myself

 8    and my attorney, we furnished everything they wanted.

 9    Q.    Were you content with your investment in My Big Coin after

02:17 10   your CFTC testimony?

11          MR. LOPEZ:  Objection, your Honor.  We've been over

12    this.

13          THE COURT:  I think I'll allow a yes-or-no answer.

14    A.    Absolutely not, or no.

15          MR. MOORE:  All right.  Can we bring up the ELMO,

16    please?

17          (Pause.)

18          MR. MOORE:  Just for the witness, I apologize.

19    BY MR. MOORE:

02:18 20   Q.    Do you recognize the --

21    A.    That's a little bit -- it goes off the screen for me.

22    Just a little bit more.

23          THE COURT:  Does this have a letter?

24          MR. MOORE:  No, it does not.

25          THE COURT:  All right.  So if you could back out so we

1    can see it.  Thank you.

2          THE WITNESS:  I can see it now.

3    BY MR. MOORE:

4    Q.   Do you recognize the number at the top of this exhibit,

5    631-346-1870?

6    A.   Yes, I do.

7    Q.   Whose number is that?

8    A.   Mr. Crater's.

9    Q.   And then there's another number, 617-974-8414.

02:18 10   A.   That's my number.

11   Q.   Can you read this text message and then tell me if this is

12   a true and accurate representation of a text message between

13   you and Mr. Crater?

14   A.   I shall.

15          (Pause.)

16   A.   Yes, I've read it and I see it.

17          THE COURT:  I'm sorry, we should make this --

18   Ms. Hourihan, what was the next letter?

19          THE CLERK:  HH.

02:19 20          (Exhibit HH marked for identification.)

21   BY MR. MOORE:

22   Q.   Is this a true and accurate copy of this text

23   conversation?

24   A.   Yes.

25          MR. MOORE:  Your Honor, at this time I move this in as

```
 1    Exhibit HH.
 2               THE COURT:  Any objection?
 3               MR. LOPEZ:  No, your Honor.
 4               MR. MOORE:  Can we publish, please.
 5               THE COURT:  Let's give it the next number,
 6    Ms. Hourihan.
 7               THE CLERK:  23.
 8               MR. MOORE:  Sorry.
 9               THE COURT:  23, it can be published.
10               (Exhibit 23 received into evidence.)
11    BY MR. MOORE:
12    Q.   All right.  Do you see here where he says, Good afternoon,
13    John.  So sorry haven't gotten email over to you.  Been with
14    MasterCard guys all minting.  Do you see where it says that?
15    A.   Yes, I think "minting" meant "morning."
16    Q.   Based off of text messages like this, did you believe
17    Mr. Crater was having direct meetings with MasterCard?
18    A.   I did.
19    Q.   Was that important to you, Mr. Crater meeting directly
20    with MasterCard?
21    A.   Well, it was in furtherance of what he had previously told
22    me, that he had a deal with MasterCard that made me feel good.
23    Q.   If Mr. Crater had told you that he was having meetings
24    with third-party debit card providers, would that have been
25    material information for you?
```

```
 1   A.   Any information that he sent along to me like that would
 2   be of interest to me and certainly material in some way, some
 3   more than others, but, yes.
 4   Q.   Can you see the line five down that says, You will own 25
 5   percent of the Trokie deal in every state for medical marijuana
 6   and the other states for the low-grade Trokie for personal use.
 7        Do you see that?
 8   A.   I do see it.
 9   Q.   Did you believe that Randall Crater had medical marijuana
10   licenses?
11   A.   Yes.
12   Q.   Did you believe those were real?
13   A.   I was told they were real by Mr. Crater.
14   Q.   Was it material to you that the medical marijuana licenses
15   be real?
16   A.   Of course, yes.
17   Q.   Do you see where he says in every state for the medical
18   marijuana?
19   A.   I do see that, yes.
20   Q.   Where did you think that -- did you think that these
21   medical marijuana licenses were in Mr. Crater's name?
22   A.   I believe he had control of them and so -- I believe he
23   had legal control of them.  I don't know whether they went to
24   him personally or they went to Greyshore or they went to My Big
25   Coin or whatever, but I knew that he controlled them.  That's
```

```
 1   what I was told.  There were four licenses plus this interest
 2   in the Trokie business.
 3   Q.   And what states did you think those licenses were in?
 4   A.   I believed them at the time to be two in Florida and I
 5   think two in Michigan.
 6   Q.   Would it have been important to you that Mr. Crater be
 7   able to legally hold these medical marijuana licenses?
 8   A.   Of course, yes.
 9             MR. LOPEZ:  Objection, your Honor.
10             THE COURT:  Foundation, counsel, as to that question?
11             MR. LOPEZ:  Yes.
12             THE COURT:  Sustained as to the last question and
13   answer.
14             MR. MOORE:  Can we bring up Exhibit 15F -- sorry, can
15   we switch back to -- thank you.
16             Can we zoom in on paragraph 2.
17   Q.   Do you remember on cross-examination being shown a
18   disclaimer on the My Big Coin website?
19   A.   I do remember that.
20   Q.   Do you remember reviewing this disclaimer earlier?
21   A.   This morning, yes.
22   Q.   All right.  Did you see anywhere in this disclaimer that
23   it says My Big Coin is not actually cryptocurrency?
24   A.   No.
25             MR. LOPEZ:  Objection, your Honor.  Foundation.
```

```
 1              THE COURT:  Well, overruled on that based on the
 2    question.  Overruled.
 3              The answer can stand.
 4              MR. LOPEZ:  It assumes --
 5              THE COURT:  I understand.  I understand the objection.
 6    Overruled.
 7              MR. LOPEZ:  I note my objection.
 8              THE COURT:  Noted.
 9    BY MR. MOORE:
02:24 10   Q.    Do you see in this disclaimer that My Big Coin is not
11    actually backed by gold?
12    A.    I'll have to -- do you mind if I just --
13    Q.    Take your time reading it.
14              (Pause.)
15    A.    This disclaimer doesn't say anything about disclaiming
16    gold.
17    Q.    Does it say that it's not backed by oil?
18    A.    It does not.
19    Q.    Does it say it's not backed by insurance?
02:24 20   A.    It does not.
21    Q.    Does it say there's no partnership with MasterCard?
22    A.    It does not.
23              MR. LOPEZ:  Your Honor, I object to this entire line
24    of questioning.
25              THE COURT:  So, counsel, we're going to move on at
```

1    some point.  There's 403 here.  Counsel will have the

2    opportunity for argument.

3          We can move on.

4          MR. MOORE:  Thank you.

5    BY MR. MOORE:

6    Q.  Do you remember being asked on cross-examination about the

7    value of My Big Coin at various times when you made transfers?

8    A.  Yes.  I was furnished some sheets.  And we also talked

9    about the price at the beginning and how it appreciated.  Yes,

02:25 10   I do remember that.

11   Q.  So you said the price appreciated.  What is your basis for

12   knowing that the price of My Big Coin appreciated?

13   A.  Well, from my discussions with the three people,

14   Mr. Crater, Mr. Gillespie and Mr. Kruger, as well as the

15   information they provided me about the pricing, and I bought in

16   at those numbers and they suggested that I should do it quickly

17   because the price was rising and soon it would go public and

18   rise even more, raise or rise even more.

19   Q.  Did you have any independent basis for valuing My Big Coin

02:26 20   apart from Mr. Crater's representations and the My Big Coin

21   website representations?

22   A.  No.  There was an exchange at some point where

23   transactions were listed, I forget exactly what day that was,

24   but you could check the activity that showed what sales, what

25   price, the amount of coins, that type of thing.  No names, no

1   person's names, but a list of transactions that would go up.

2   Q.   Is that the My Big Coin Exchange?

3   A.   Yes, that's what I'm speaking about.

4   Q.   And who operated the My Big Coin Exchange?

5   A.   Mr. Crater did.

6   Q.   All right.  So all of the information that you were

7   provided about the value of My Big Coin, did that ultimately

8   come from Mr. Crater?

9            MR. LOPEZ:  Objection.

02:27 10         THE COURT:  Overruled.

11   A.   The source of that information was Mr. Crater.  It was

12   either from him directly or at various times relayed to me by

13   Mr. Gillespie or Mr. Kruger.

14   Q.   Ultimately, what value did the My Big Coins you purchased

15   from Mr. Crater and Mr. Crater's My Big Coin have?

16           MR. LOPEZ:  Objection.

17           THE COURT:  Overruled given the scope of cross.  I'll

18   allow the question.

19           You can answer.

02:27 20         MR. LOPEZ:  Note my objection.

21           THE COURT:  Noted.

22   A.   They ultimately had zero value.

23           MR. MOORE:  Just one moment, your Honor.

24           (Discussion off the record.)

25           MR. MOORE:  Those are my questions, your Honor.

```
 1              THE COURT:  Thank you.

 2              Mr. Lopez, recross.

 3              MR. LOPEZ:  Yes, briefly.

 4              THE COURT:  Sure.

 5                        RECROSS-EXAMINATION

 6   BY MR. LOPEZ:

 7   Q.   So, Attorney Lynch, you were told by Mr. Kruger that his

 8   efforts on behalf of My Big Coin would be compensated by shares

 9   of stock down the road.

10   A.   That he would have a percentage of ownership in the

11   company when it went public, that's what I was told, and it was

12   almost 5 percent, 4.9 percent.

13   Q.   And you would agree that he put a substantial amount of

14   time into these efforts, correct?

15   A.   Mr. Kruger?

16   Q.   Mr. Kruger, yes.

17   A.   Yes, I would say so.

18   Q.   And the same is true of Mr. Gillespie, right?

19   A.   Yes.

20   Q.   And they weren't getting a salary?

21   A.   Not that I was aware of.

22   Q.   And they were hopeful that when MBC was a success, they

23   would be compensated.

24   A.   That's what they told me.

25   Q.   Okay.  And Mr. Kruger wasn't being paid by Mr. Crater,
```

1    right?

2    A.    That was my understanding, that he was not getting a

3    salary.

4    Q.    But for a period of time you were paying Mr. Kruger

5    monthly, right?

6    A.    Well, I purchased coins and gave him some coins, and I had

7    a couple of other transactions, but I was not paying a salary

8    to Mr. Kruger.

9    Q.    So for a period of eight months you were paying him about

02:29 10   $5,000 a month, no?

11   A.    No.

12   Q.    Okay.

13          Now, when you testified before the CFTC, you testified

14   under oath that the price of the coin was market price, right?

15   A.    Which time are we speaking about, any time?

16   Q.    On July 19, 2017.

17   A.    That's the date I testified, yes.

18          I was asking you when you said -- I realize I

19   testified on July 19th, but what dates were you referring to

02:30 20   from my July 19th testimony when I said it was market?

21   Q.    There's no date.  You simply said in response to a

22   question:  Who is determining the price of these coins?  And

23   your response was, The price is a market price.

24   A.    That was my understanding at that time.

25   Q.    And at the time you took your testimony to be something

1    that you were very mindful of speaking the truth, right?

2    A.    I believe in speaking the truth, yes.

3    Q.    So you didn't lie to the CFTC when you testified under

4    oath that the price was a market price.

5    A.    I never lied to the CFTC about anything.

6    Q.    So when you said the price was a market price, you were

7    telling the CFTC the truth, right?

8    A.    All of my testimony to the CFTC was truthful as far as I

9    could be.

02:31 10         I would admit that there were things I couldn't

11   remember from time to time, but everything I testified to was

12   the absolute truth as best as I knew it.

13   Q.    And you also told them about the gold that was located in

14   either Colorado or California, and your memory at that time

15   that it was worth $100 million.  You testified to that, right?

16   A.    That sounds right.  I can look it up if you want me to.

17   Q.    That's okay.

18         And you further testified that when you were asked

19   have you ever tried to sell anything --

02:31 20         MR. MOORE:  Objection, your Honor.

21         THE COURT:  I haven't heard the rest of the question,

22   so, okay.

23   BY MR. LOPEZ:

24   Q.    -- on the exchange, that you may have pulled back on it,

25   right?

```
 1              THE COURT:  Well, okay, I think I understand.
 2              Sustained there, counsel, because I don't -- I'm not
 3      clear on what we're impeaching.
 4              So can you ask the first question first?
 5      BY MR. LOPEZ:
 6      Q.   Earlier you testified that you pulled back on a sale
 7      because of something that Mr. Crater said to you, right?
 8              MR. MOORE:  Your Honor, this is beyond the scope of
 9      the redirect.  I think he's just bringing up new topics now.
02:32 10         THE COURT:  Counsel, there's been a lot of ground
11      covered.  I'll allow the question.  Let me hear it.
12      BY MR. LOPEZ:
13      Q.   But when you testified before the CFTC, you didn't say --
14      well, strike that.
15              You said to them that you may have pulled it back, I
16      think I remember on one or two occasions.
17              THE COURT:  So, counsel, the objection was improper
18      impeachment, as I understand it, Mr. Moore.
19              MR. MOORE:  Yes, first the proper impeachment and
02:33 20     also --
21              THE COURT:  So, Mr. Lopez, you can ask the witness a
22      question so I understand what you're trying to impeach from the
23      redirect.
24      BY MR. LOPEZ:
25      Q.   Did you further testify that you pulled back of your own
```

```
 1   volition?
 2   A.    Can you give me a time reference here?
 3   Q.    Sure.  Do you still have the transcript in front of you?
 4              THE COURT:  Well, counsel --
 5              THE WITNESS:  I'm just wondering what year --
 6              THE COURT:  Mr. Lynch, wait a minute.
 7              Mr. Lopez, just ask a question in regards to the
 8   redirect.
 9   BY MR. LOPEZ:
10   Q.    So we're in 2017, you're being deposed by the CFTC
11   lawyers.
12   A.    Yes.
13   Q.    And did you or did you not testify that you pulled back on
14   a sale of your own volition?
15   A.    Well, I did that more than once and that was why I was
16   asking you what period of time you're speaking about.
17   Q.    And you further testified earlier --
18              MR. MOORE:  Objection, your Honor.
19              THE COURT:  So I guess, counsel, so there needs to be
20   the predicate to the redirect and not the prior testimony in
21   isolation.  So if you can connect it to that, counsel.  These
22   are scope objections.
23              MR. LOPEZ:  I understand the scope objections.
24   BY MR. LOPEZ:
25   Q.    In 2017, you didn't think -- in 2017, when you testified
```

```
 1    before the --
 2    A.    The CFTC --
 3    Q.    -- you didn't think the coins were worthless, right?
 4          MR. MOORE:  Same objection, your Honor.  He's still
 5    asking about the CFTC testimony.
 6          THE COURT:  Well, there was testimony on redirect
 7    about value.
 8          So, counsel, why don't you put that question.
 9    BY MR. LOPEZ:
10    Q.    You did tell the CFTC that you received offers for your
11    coin in 2017, right?
12    A.    I don't have a present recollection of that without --
13    Q.    Turn to page 100, line 20.
14          MR. MOORE:  I don't think this is a question about
15    value as you indicated that it should be, your Honor.
16          THE COURT:  Well, counsel, I'll listen to the
17    questions.
18          I understand the scope objections.
19          Mr. Lopez.
20          MR. LOPEZ:  Well, I'm waiting for him to get to the
21    page, your Honor.
22    A.    Did you say page 100?
23    Q.    Page 100, lines 20 through 22.
24    A.    Okay.
25          (Pause.)
```

```
 1   Q.   Have you read it?

 2   A.   I'm reading it.

 3   Q.   It's three lines.

 4   A.   Well, I'm trying to read a few lines before it so I can

 5   understand what we're talking about and your three lines that

 6   you're directing me to.

 7   Q.   No, I'm asking you to read those three lines and were you

 8   asked whether you testified that you had offers before on your

 9   coins?

10         And you testified, "I did."  Right?

11   A.   I think you've got that backwards.

12   Q.   That was your testimony, wasn't it?

13         MR. MOORE:  Your Honor, he is just reading the CFTC

14   testimony.

15         THE COURT:  Sustained.  Counsel, sustained for the

16   reasons I --

17   BY MR. LOPEZ:

18   Q.   Did you think your coins were valueless --

19         THE COURT:  And I think, Mr. Lynch, he's now asking

20   you a direct question, Mr. Lynch.

21         THE WITNESS:  I'm still on the last question, your

22   Honor.

23         THE COURT:  We're past that question, at least I am.

24         So, Mr. Lopez.

25   BY MR. LOPEZ:
```

1    Q.   You didn't think your coins were valueless in 2017 when

2    you testified before the CFTC, right?

3    A.   I was hoping they were not valueless, yes.

4    Q.   You thought they were worth more than $22 million.

5    A.   I'm trying to remember.  Let's see --

6              MR. LOPEZ:  Strike that.

7    Q.   It was only after you met with the CFTC that you thought

8    they didn't have value; is that correct?

9    A.   Yes.

02:37 10              MR. LOPEZ:  Thank you.

11              THE COURT:  Thank you.

12              Thank you, Mr. Lynch, you're excused.

13              Thank you.

14              You can leave that there, I believe.  Thank you.

15              Counsel, next witness.

16              MR. MARKHAM:  Yes, your Honor.  The government calls

17    David Desa of the United States Postal Service.

18              Your Honor, there are several stipulations during this

19    testimony.  You asked for a warning.

02:38 20              THE COURT:  Sure.  Just let me know when we get there.

21              MR. MARKHAM:  I'll ask before I do them.

22              THE WITNESS:  Thanks, Judge.

23              THE COURT:  Thank you.  Thank you.

24              Mr. Desa can come in.

25              DAVID DESA, having been duly sworn by the Clerk, was

```
 1   examined and testified as follows:
 2            THE CLERK:  Thank you.  Please be seated.
 3            THE COURT:  Good afternoon, sir.
 4            THE WITNESS:  Good afternoon.
 5            THE COURT:  Counsel, Mr. Markham.
 6            MR. MARKHAM:  Thank you, your Honor.
 7                         DIRECT EXAMINATION
 8   BY MR. MARKHAM:
 9   Q.   Could you please state your name.
10   A.   David Desa.
11            THE COURT:  And can you please spell your last name,
12   please.
13            THE WITNESS:  D-e-s-a.
14            THE COURT:  Thank you.
15   BY MR. MARKHAM:
16   Q.   And what is your current job?
17   A.   I'm an analyst with the U.S. Postal Inspection Service.
18   Q.   What does that job entail just broadly?
19   A.   It entails assisting investigators in fraud
20   investigations.
21   Q.   How long have you had that job?
22   A.   About seven years.
23   Q.   And can you provide the jury just a brief educational
24   background.
25   A.   I have a Bachelor's of Science, as well as a Master of
```

1    Science, from Clemson University, South Carolina.

2    Q.   At some point were you asked to assist in the

3    investigation of My Big Coin and the defendant, Randall Crater?

4    A.   Yes, I did.

5    Q.   And what were you asked to do?

6    A.   I was asked to capture social media and web pages and

7    accounts.

8    Q.   Okay.  And did that include the website LinkedIn?

9    A.   Yes, it did.

02:40 10   Q.   Did that also include Facebook, Twitter and YouTube?

11   A.   Yes, it did.

12   Q.   Did it also include the websites for My Big Coin and the

13   My Big Coin Exchange?

14   A.   Yes, it did.

15   Q.   In preparation for testifying here today, were you also

16   asked to review a number of emails from the defendant's email

17   account?

18   A.   Yes, I did.

19   Q.   Besides reviewing those websites and some of the

02:40 20   defendant's emails, were you involved in any other aspect of

21   this investigation?

22   A.   No.

23   Q.   So you didn't conduct witness interviews?

24   A.   No.

25   Q.   You didn't review bank records?

1  A.    No.

2  Q.    You were basically just focused on the social media and

3  getting screen captures of those?

4  A.    That's right.

5  Q.    Let's go to that social media.

6         First, are you familiar with the website LinkedIn?

7  A.    Yes.

8  Q.    That's a place where people can post public information

9  about their professional background?

02:40 10  A.    Yes.

11  Q.    Have you reviewed the defendant's publicly available

12  LinkedIn profile?

13  A.    Yes.

14  Q.    Were you also able to review his subscription information?

15  A.    Yes.

16         MR. MARKHAM:  Your Honor, at this time I'd like to

17  read in a stipulation with respect to the LinkedIn records.

18         THE COURT:  Sure.

19         Jurors, you may recall that in my opening instructions

02:41 20  I mentioned stipulations.  Just to let you know, a stipulation

21  just simply means that the parties, here the government and

22  Mr. Crater, accept the truth of a particular proposition or

23  fact.  Since there's no disagreement, there's no need for

24  evidence apart from the stipulation.  You must accept the

25  stipulation as fact to be given whatever weight you choose in

```
 1    your final deliberations.
 2            And I expect, based on my conversation with counsel,
 3    there may be more than one of these, but this is the first of
 4    them.  Thank you.
 5            MR. MARKHAM:  Thank you, your Honor.
 6            The stipulation is as follows:  In lieu of live
 7    testimony or other evidence at trial, and for purposes of
 8    authenticity, counsel for the United States and counsel for the
 9    defendant have stipulated and agreed to the following:
10            Government Exhibit 1A is an accurate and authentic
11    representation of a LinkedIn profile belonging to the
12    defendant, Randall Crater, available on the LinkedIn website,
13    and Government Exhibits 1B through 1D are accurate and
14    authentic records associated with that LinkedIn profile
15    obtained from the LinkedIn corporation.
16            That's the end of the stipulation.
17            THE COURT:  Thank you.  Counsel, you don't need to
18    stop and do this formally now, but I do want to mark those as
19    exhibits, so we'll just give each of the stipulations exhibit
20    numbers.  We'll make this 24, Ms. Hourihan.
21            THE CLERK:  Yes.
22            (Exhibit 24 received into evidence.)
23            THE COURT:  Counsel, we can do the housekeeping later,
24    but you can proceed.
25            MR. MARKHAM:  Yes, your Honor.  Thank you.
```

1          Can you bring up Exhibit 1B, Mr. Barbosa.

2    BY MR. MARKHAM:

3    Q.    Mr. Desa, is this a business record from LinkedIn?

4    A.    Yes, it is.

5    Q.    What email address does it provide for Randall Crater's

6    LinkedIn account?

7    A.    Greyshore@me.com.

8          MR. MARKHAM:  Can you now bring up Exhibit 1C.

9    Q.    Is this another LinkedIn business record?

02:43 10    A.    Yes, it is.

11    Q.    And when does it say that the defendant's LinkedIn account

12    was registered?

13    A.    January 17, 2013.

14          MR. MARKHAM:  And now Exhibit 1D, please.

15    Q.    And is this another LinkedIn business record?

16    A.    Yes, it is.

17    Q.    And who does it appear -- if you could just actually --

18    well, leave it at that.  I think we can see it okay.

19          Who does it appear is paying for the account according

02:43 20    to these records?

21    A.    Randall Crater.

22          MR. MARKHAM:  Now let's take a look at the defendant's

23    online LinkedIn profile, Exhibit 1A, please.

24    Q.    Mr. Desa, does this accurately reflect the defendant's

25    LinkedIn page that you observed on the publicly available

```
 1   website?
 2   A.   Yes, it is.
 3         MR. MARKHAM:   On the first page can you zoom in on the
 4   picture and the name and title?
 5   Q.   Could you please read that information for the jury,
 6   Mr. Desa?
 7   A.   Sure.  This is Randall Crater owner/CEO at Greyshore
 8   Technology East Hampton, New York, United States.
 9         MR. MARKHAM:   And now can you go to page 3 of this
02:44 10   LinkedIn profile.
11         Near the top there can you zoom in from "Creator" down
12   through the date range.
13   Q.   Mr. Desa, please read that information.
14   A.   It says, Creator/Developer My Big Coin Inc., December 2011
15   to present, 10 years, 1 month.
16         MR. MARKHAM:   Now let's take a look at defendant's
17   description of My Big Coin Inc.
18         Can you zoom in on 1 lieu 5, please.
19   Q.   Can you just read number 1 there?
02:44 20         MR. MARKHAM:   And highlight as we go, Mr. Barbosa.
21   A.   We are the only cryptocurrency to be backed by gold.
22   Q.   With the exclamation point on the end, right?
23   A.   Yes.
24   Q.   Now can you read number 2, please, including the sentence
25   below on MasterCard?
```

```
      1    A.    We are partners with MasterCard, which gives us a closed

      2    loop system so your able to brake down into any currency that's

      3    needed!

      4          MasterCard is accepted in over 35.9 million locations

      5    Q.    Now highlight in number 3, please.

      6    A.    Send money in seconds anywhere in the world!

      7    Q.    And now number 4.

      8    A.    Amazingly low transfer fees!

      9    Q.    And now number 5.

02:45 10    A.    My Big Coin Inc. is the only commercial-based

     11    cryptocurrency in the world!

     12          MR. MARKHAM:  Above number 1, where it says

     13    "cryptocurrency backed by gold," can you just zoom in on those

     14    links above that?

     15    Q.    Mr. Desa, do you recognize some of these website links?

     16    A.    Yes.

     17          MR. MARKHAM:  Can you highlight the one

     18    www.mybigcoin.com.

     19    Q.    Is that the link to the My Big Coin website?

02:46 20    A.    Yes.

     21    Q.    And then the two below, the Twitter and the Facebook, are

     22    these links to the My Big Coin Twitter page and the My Big Coin

     23    Facebook page?

     24    A.    Yes, they are.

     25    Q.    And were you able to make copies of those Facebook,
```

1    Twitter and website pages?

2    A.   Yes.

3    Q.   Let's start with the website.

4         First, how were you able to recover the My Big Coin

5    website pages?

6    A.   I used the website called Internet Archive.

7         MR. MARKHAM:   Your Honor, at this point I'd read a

8    stipulation about the Internet Archive.

9         THE COURT:   Okay.   Jurors, obviously my instruction

02:46 10  applies to this stipulation as well.

11        Counsel, and we'll make this the next one 25.

12        MR. MARKHAM:   Yes, your Honor.

13        (Exhibit 25 received into evidence.)

14        MR. MARKHAM:   The parties stipulate and agree that

15   records obtained from the Internet Archive, available at

16   archive.org, are accurate and authentic representations of

17   website pages as of the date those pages were recorded by the

18   Internet Archive.

19        And with that, please bring up Exhibit 7A, the My Big

02:47 20  Coin web page.

21   BY MR. MARKHAM:

22   Q.   Mr. Desa, is this the My Big Coin website home page we

23   were just discussing?

24   A.   Yes, it is.

25   Q.   And what is the date this website was made available to

1    the public on the internet?

2    A.    May 17, 2014.

3    Q.    And is that date noted just above the yellow exhibit

4    sticker there on the bottom right?

5    A.    Yes.

6    Q.    Just so we're clear, that May 17, 2014, that wasn't on the

7    original website, that's a notation you made to make clear the

8    date.

9    A.    Correct.

02:47 10    Q.    Do you see on the top right there where it says "My Big

11    Coin"?

12          MR. MARKHAM:   If you can zoom in on that.

13    Q.    What is the tag line underneath that?

14    A.    It says, Anytime, Anyplace, My Big Coin.

15          MR. MARKHAM:   And on the top left there, can you zoom

16    in on that very large blue credit card.

17    Q.    Mr. Desa, what does this appear to be an image of?

18    A.    It appears to be an image of a credit card.

19    Q.    And that's a MasterCard?

02:48 20    A.    Yes.

21    Q.    And does it appear to say "My Big Coin" on the MasterCard?

22    A.    Yes.

23    Q.    And what's the tag line underneath it?

24    A.    Any time, any place, My Big Coin.

25    Q.    Also does it appear to have a name on it?

1    A.    Yes.

2          MR. MARKHAM:  Now can you zoom in on the middle of the

3    website, that blue box, the current value.

4    Q.    Okay.  What is this claim, The current value of My Big

5    Coin is?

6    A.    It says one big coin is equal to $102.13.

7          MR. MARKHAM:  Now, can you just go to the right, those

8    five paragraphs, zoom in on the first one.

9    Q.    Mr. Desa, can you read this for the jury?

02:48 10    A.    Send MBC to anyone, instantly:  My Big Coin.  The easy way

11    to send and receive MBC worldwide, economically 24-7.

12          MR. MARKHAM:  Now the box right below that, please.

13    Zoom in.

14    Q.    Mr. Desa, please read that for the jury.

15    A.    It says, My Big Coin is a virtual currency.  That you can:

16    Mine them, buy them, sell them, trade them, save them, donate

17    them.

18          MR. MARKHAM:  Okay.  Now can we go to the next box in

19    the top right there.  Yup.

02:49 20    Q.    Please read that.

21    A.    You can send them to friends and family around the world.

22          MR. MARKHAM:  Now let's just zoom in on the last two

23    boxes.

24    Q.    Mr. Desa can you just read both of them.

25    A.    You can also buy merchandise from all over the world by

```
 1    using your My Big Coin MasterCard.

 2            We are here for your success on the World Wide Web!

 3    Q.   And this statement about you can buy stuff all over the

 4    world using My Big Coin MasterCard, this again is from 2014,

 5    correct?

 6    A.   That's right.

 7    Q.   Did you also identify the My Big Coin website during the

 8    year 2015?

 9    A.   Yes.

10            MR. MARKHAM:  Can you go to Exhibit 7C.

11    Q.   Is this the My Big Coin website that was publicly

12    available in 2015?

13    A.   Yes.

14    Q.   And that's August 1, 2015, that notation right there?

15    A.   Yes.

16    Q.   Does the website provide substantially the same

17    information as the 2014 website?

18    A.   Yes.

19            MR. MARKHAM:  Can you zoom in on the middle there, the

20    blue box with current value.

21    Q.   What does that say the current value is?

22    A.   $389.86.

23    Q.   So we just looked at the current value from the previous

24    year.  This is about $280 more is what it's claiming the value

25    went up.
```

1    A.    Yes.

2    Q.    For both this day in 2015 and the date we just looked at

3    in 2014, did you also download the "About" sections of the My

4    Big Coin website?

5    A.    Yes.

6    Q.    And are those available for the jury in Exhibits 7B and 7D

7    if they want to look at them?

8    A.    Yes.

9    Q.    Now moving onto 2016, did you identify the My Big Coin

02:51 10   website as still publicly available in 2016?

11   A.    Yes.

12          MR. MARKHAM:  Let's go to Exhibit 7E.

13   Q.    Sir, is this the publicly available website in 2016?

14   A.    Yes.

15   Q.    Does this website provide substantially the same

16   information as the website in 2014 and 2015?

17   A.    Yes, it does, with the exception of the video in the

18   middle.

19   Q.    And you notice that there's a video in the middle there.

02:51 20   Does it say "Current Value" anymore?  Do you see that blue box?

21   A.    No, it does not.

22   Q.    This is embedded video on the My Big Coin public website.

23   Were you able to identify and download that video?

24   A.    Yes, I did.

25   Q.    And was that video also available on YouTube?

A.    Yes.

Q.    Separately, did you also identify this exact same video as an attachment in the defendant's own email records?

A.    Yes.

Q.    First of all, are you familiar with YouTube generally?

A.    Yes.

Q.    This is a place where people can post videos publicly for the world to see?

A.    That's right.

Q.    And when you reviewed this video from the public YouTube site and from the defendant's email records, did the video include various references to My Big Coin?

A.    Yes.

Q.    Did the video also make similar claims about My Big Coin as we just reviewed on the defendant's LinkedIn page?

A.    Yes.

Q.    And this still shot here, we'll see it in the video, but you can just read it once for the jury?

A.    Several currency exchanges exist where you can trade your My Big Coins for dollars, euros and more.  My Big Coins are a great way for small businesses and freelancers to get noticed. Use worldwide anywhere MasterCard is accepted!

Q.    So this statement where it says, Several currency exchanges currently exist where you can trade your My Big Coins for dollars, euros and more, this was a publicly available

1    statement in 2016, correct?

2             MR. LOPEZ:  Objection, your Honor.  I think

3    Mr. Markham inserted a word that wasn't there.

4             MR. MARKHAM:  I'll read it again, your Honor.

5             THE COURT:  Okay.  From reading the still that's on

6    the screen?

7             MR. LOPEZ:  Yes.

8             THE COURT:  Okay.  You can read it again.

9    BY MR. MARKHAM:

02:53 10   Q.   Several currency exchanges exist where you can trade your

11   My Big Coins for dollars, euros and more.

12            Do you see where it says that?

13   A.   Yes.

14   Q.   Does it say several currency exchanges will somehow at

15   sometime exist in the future or does it say they exist

16   currently?

17            MR. LOPEZ:  Objection.

18   A.   Exists currently.

19            THE COURT:  Well, sustained.  It is --

02:53 20          MR. MARKHAM:  It speaks for itself, your Honor.

21            THE COURT:  It speaks for itself.

22            MR. MARKHAM:  Actually, I agree with that.

23            Can you please bring up Exhibit C1 for the witness

24   only, please.  I apologize.

25            Your Honor, is it my understanding that these are

1  admitted at this point or should we go through --

2          THE COURT:  No, you should go through.

3          MR. MARKHAM:  Understood, your Honor.

4          THE COURT:  Just for the witness at the moment.

5  BY MR. MARKHAM:

6  Q.   Mr. Desa, is this a screenshot of the My Big Coin YouTube

7  video we were just discussing?

8  A.   Yes, it is.

9  Q.   And you made a full copy of the My Big Coin YouTube video

02:54 10  as well; is that correct?

11  A.   That's right.

12  Q.   And that was also available in the defendant's emails,

13  correct?

14  A.   Yes.

15          MR. MARKHAM:  Your Honor, at this time I ask

16  permission to publish this to the jury.

17          THE COURT:  Any objection?

18          MR. LOPEZ:  No, your Honor.

19          THE COURT:  It may be admitted as what will now be 26.

02:54 20          THE CLERK:  Yes.

21          (Exhibit 26 received into evidence.)

22  BY MR. MARKHAM:

23  Q.   And what is now Exhibit 26, do you see in the bottom left

24  there where it says September 3, 2015?

25  A.   Yes.

```
 1              MR. MARKHAM:  And at this point I'd like to go to

 2      Exhibit C2 and play the video for the jury.

 3              THE COURT:  Just for the witness for the moment.

 4              MR. MARKHAM:  Yes, your Honor.

 5              THE COURT:  C2.

 6      BY MR. MARKHAM:

 7      Q.   Prior to testifying here today, did you review Exhibit C2

 8      and confirm that this was the same video in the defendant's

 9      email records and on the publicly available YouTube website?

02:55 10      A.   Yes, I did.

11              MR. MARKHAM:  At this point, your Honor, I'd like to

12      play it for the jury.

13              THE COURT:  Any objection to its admission?

14              MR. LOPEZ:  No, your Honor.

15              THE COURT:  It may be admitted and published.  That

16      will be 27.

17              MR. MARKHAM:  Do we have volume?  There's a

18      soundtrack.

19              THE COURT:  It should play.  Let's try it.

02:55 20              (Exhibit 27 received into evidence.)

21              (Played video.)

22              MR. MARKHAM:  Can we go back to 1:45, please?

23      BY MR. MARKHAM:

24      Q.   First, Mr. Desa, did you see some of the claims made in

25      that YouTube video?
```

1   A.   Yes.

2   Q.   And are those similar claims that you saw on the

3   defendant's LinkedIn page that we just reviewed?

4   A.   Yes.

5   Q.   And here, you see where it says the Facebook.com/My Big

6   Coin?

7   A.   Yes.

8   Q.   Is that the exact same link that we just reviewed on the

9   defendant's LinkedIn profile?

02:58 10   A.   Yes.

11   Q.   Next on the right, Twitter.com/My Big Coin, is this the

12   exact same link we just reviewed on the defendant's LinkedIn

13   profile?

14   A.   Yes, it is.

15   Q.   And the same for the My Big Coin website below, this was

16   the same one on defendant's LinkedIn profile, correct?

17   A.   Yes.

18   Q.   And the My Big Coin website itself also makes reference to

19   Facebook and Twitter?

02:58 20   A.   Yes, it does.

21   Q.   Well, let's take a look at those starting with the Twitter

22   page.

23        MR. MARKHAM:  For the witness only, please bring up

24   Exhibit B.

25        THE COURT:  Just for the witness, B.

```
  1   BY MR. MARKHAM:

  2   Q.   Mr. Desa, is this the My Big Coin Twitter page?

  3   A.   Yes, it is.

  4   Q.   And did you personally make a copy of the My Big Coin

  5   Twitter page as part of this investigation?

  6   A.   Yes, I did.

  7   Q.   And is this that copy?

  8   A.   Yes.

  9        MR. MARKHAM:  Permission to publish to the jury, your

02:58 10   Honor.

 11        THE COURT:  Any objection to the admission?

 12        MR. LOPEZ:  No, your Honor.

 13        THE COURT:  Okay.  It may be admitted as the next

 14   number, 28.

 15        (Exhibit 28 received into evidence.)

 16        THE COURT:  It may be published as well.

 17   BY MR. MARKHAM:

 18   Q.   Mr. Desa, are you familiar with Twitter in general?

 19   A.   Yes, I am.

02:59 20   Q.   And is that essentially a place where people can make

 21   posts that are then available to anyone in the world who is on

 22   Twitter?

 23   A.   Yes.

 24   Q.   Can you read the title page and the tag line there at the

 25   top?
```

1    A.    My Big Coin, Anytime, Anyplace, My Big Coin.

2    Q.    Again, in addition to being a link on the defendant's

3    LinkedIn page, does this Twitter feed make some of the same

4    claims that you observed on the defendant's LinkedIn page?

5    A.    Yes, it is.

6    Q.    Okay.  And in the defendant's emails you reviewed, did you

7    observe an email where the defendant was sharing this Twitter

8    page, or the link to it, to what appeared to be a My Big Coin

9    customer?

03:00 10    A.    Yes.

11            MR. MARKHAM:  Let's go to the very first page made on

12    this Twitter page.  Page 40, please.  Actually zoom in, once

13    you get there, on those first three posts.

14    Q.    Now, Mr. Desa, are all these posts dated December 22,

15    2013?

16    A.    Yes.

17    Q.    And let's read that first post at the bottom, if you could

18    highlight, please.

19    A.    Start accepting online payment instantly.  Sign up today.

03:00 20    Q.    So you can start accepting online payment instantly,

21    that's on December 22, 2013, correct?

22    A.    That's right.

23    Q.    Can you read the one above it, please?

24    A.    No paperwork or approval process.  You can register for an

25    account and start accepting payments on your website instantly.

1    Q.    Now the one above that.

2    A.    My Big Coin presents the new online universal payment

3    systems.  Sign up today.

4    Q.    Now let's look at the post being made the next month in

5    January of 2014.

6              MR. MARKHAM:  So go to page 39 and zoom in on that

7    post from January 31, 2014.

8    Q.    Can you please read that for the jury.

9    A.    My Big Coin was launched so anyone with an email account

03:01  10    can send or receive, #My Big Coin.  Current value $28.87.

11    Q.    Okay.  So on January 31, 2014, this claims the value is

12    just over $28; is that right?

13    A.    That's right.

14    Q.    Now let's go up a couple of posts to February 12, 2014.

15              Mr. Desa, can you read that, please?

16    A.    Sign up and register now to receive your My Big Coin

17    visa/MasterCard.

18              MR. MARKHAM:  Now let's go to later that month, page

19    38, and just zoom in on those three posts at the bottom for

03:02  20    now.

21              Thank you, Mr. Barbosa.

22    Q.    Can you read that first one at the bottom, please.

23    A.    Major announcement coming out of My Big Coin the next 24

24    hours.  Please stay tuned.

25    Q.    And after that, quote, Major announcement, the next post

 1   claims that the value went up to $47?

 2   A.   Yes.

 3   Q.   Over $47.  Before it was $28, correct?

 4   A.   Yes.

 5   Q.   Okay.  Now can you read the announcement right above it?

 6   A.   This announcement will change the game in cryptocurrency.

 7   Please stay tuned.

 8   Q.   You see here where it refers to My Big Coin as a

 9   cryptocurrency and also says #Bitcoin?

03:02 10   A.   That's right.

11        MR. MARKHAM:  Stay zoomed in and just go up to the

12   next three above.

13   Q.   Can you read that next one from March 6, 2014 after the

14   #Bitcoin.

15   A.   The wait is over officially.  My Big Coin has entered into

16   a contract where all My Big Coins will be backed 100 percent by

17   gold.

18   Q.   After this claim about the gold contract on March 6, 2014,

19   does it claim that the value went up again to over $52?

03:03 20   A.   Yes.

21   Q.   Okay.  Now can you read the announcement right above the

22   $52 claim?

23   A.   The only cryptocurrency to back your money with gold.

24   Sign up today to receive your My Big Coin visa/MasterCard.

25        MR. MARKHAM:  Now can we scroll up to the next three

 1    above this one.  Thank you.

 2    Q.   So after repeating the gold claim and then adding the visa

 3    and MasterCard claim, does it appear in these next three posts

 4    that this Twitter site is claiming that the value is going up

 5    and up and up?

 6    A.   That's right.

 7             MR. MARKHAM:  Can you scroll up a few to May 1st and

 8    May 2nd still in 2014, so about a month later.  Just the May

 9    1st and May 2nd.

03:04 10    Q.   Can you first read that post from May 1st.

 11    A.   Major news.  My Big Coin is taking steps to be the number

 12    1 cryptocurrency company to launch an IPO.  mybigcoin.com

 13    #cryptocurrency, #stocks.

 14    Q.   So after it says it's a cryptocurrency company that's

 15    going to be the first to launch an IPO, #stocks, does it then

 16    claim that the price has now jumped to over $91?

 17    A.   Yes, it does.

 18    Q.   Now let's go beyond 2014 into 2015.

 19             MR. MARKHAM:  Page 36, please.

03:05 20             Can you zoom in on that very large gold advertisement

 21    in the middle there.

 22    Q.   Mr. Desa, what is the of date of this advertisement?

 23    A.   1st August 2015.

 24    Q.   And it says "My Big Coin Exchange" next to that; is that

 25    right?

```
 1    A.    That's right.

 2    Q.    And can you read those three claims under the QR code and

 3    where it says, "Sign up," all three of them?

 4    A.    The first cryptocurrency to be backed by gold.  Partners

 5    with MasterCard.  Transfer money in seconds anywhere in the

 6    world.

 7    Q.    Okay.  Mr. Desa, as part of this investigation, were you

 8    also able to identify the defendant's personal Twitter page?

 9    A.    Yes.

10    Q.    And did you take a screenshot of the defendant's personal

11    Twitter page for Exhibit 6?

12    A.    Yes.

13             MR. MARKHAM:  Your Honor, at this time I'd like to

14    read another stipulation regarding the Twitter page.

15             THE COURT:  You may.  And this is a separate document,

16    the stipulation?

17             MR. MARKHAM:  Yes, your Honor.

18             THE COURT:  So we'll make this 29.

19             (Exhibit 29 received into evidence.)

20             THE COURT:  You may read it.

21             MR. MARKHAM:  The parties have stipulated and agreed

22    that Exhibit 6 is a true and accurate representation of a

23    posting made on Randall Crater's personal Twitter page, end

24    quote.

25             Now please bring up Exhibit 6.
```

03:05 (line 10)
03:06 (line 20)

1    BY MR. MARKHAM:

2    Q.   Mr. Desa, this is the defendant's personal Twitter page we

3    were just discussing, correct?

4    A.   That's right.

5         MR. MARKHAM:   Can you zoom in on the top part starting

6    "Randall Crater retweeted" down to the My Big Coin website.

7    Q.   Just read that information for the jury.

8    A.   Randall Crater retweeted.  My Big Coin Exchange at MBC

9    Exchange, August 1, 2015.  Sign up now to receive your free

03:07 10   MBC.

11   Q.   Okay.

12        MR. MARKHAM:   And below that, again, can you zoom in

13   on that big golden advertisement.

14   Q.   So here, does Randall Crater appear to be making the same

15   claims we just reviewed on the My Big Coin Twitter page?

16   A.   Yes.

17   Q.   Now moving on to the My Big Coin Facebook page, are you

18   familiar with Facebook?

19   A.   Yes.

03:07 20   Q.   Is Facebook also a publicly available website where people

21   can post and share information?

22   A.   Yes.

23   Q.   Were you able to identify the My Big Coin Facebook page

24   that was linked to the defendant's LinkedIn page and also the

25   defendants emails?

```
 1    A.   Yes.

 2    Q.   Did you personally make a copy of the My Big Coin Facebook

 3    page?

 4    A.   Yes.

 5              MR. MARKHAM:  Can we please bring up Exhibit A just

 6    for the witness.

 7              THE COURT:  Just for the witness.

 8    BY MR. MARKHAM:

 9    Q.   Mr. Desa, is this the My Big Coin Facebook page we were

10    just discussing?

11    A.   Yes.

12              MR. MARKHAM:  Permission to publish to the jury, your

13    Honor.

14              THE COURT:  Are you offering it?

15              MR. MARKHAM:  Yes, your Honor.

16              THE COURT:  Okay.  Any objection to A?

17              MR. LOPEZ:  Your Honor, I'll just make my prior

18    objections for the record.

19              THE COURT:  Noted for the record.

20              It may be admitted as 30.

21              THE CLERK:  Yes.

22              (Exhibit 30 received into evidence.)

23              THE COURT:  And published.

24    BY MR. MARKHAM:

25    Q.   Mr. Desa, having reviewed this Facebook page, does it make
```

       1    similar claims about My Big Coin as the defendant's Twitter

       2    page we just reviewed?

       3    A.   Yes.

       4    Q.   And does it make similar claims about My Big Coin as the

       5    defendant's personal LinkedIn page as well?

       6    A.   Yes.

       7    Q.   For instance, did you identify claims about gold backing

       8    and about MasterCard?

       9    A.   Yes.

03:08 10            MR. MARKHAM:  Let's go to page 7, please.

      11            And zoom in on that post from November 4, 2014 as well

      12    as the article below it.

      13    Q.   What is the date of this post?

      14    A.   November 4, 2014.

      15    Q.   Can you read that post, just the top part?

      16    A.   My Big Coin Pay Inc. finalizes MasterCard deal,

      17    cryptocurrency and MasterCard.

      18    Q.   So where it says "cryptocurrency and MasterCard" and it

      19    says "finalizes MasterCard deal," that's on November 4, 2014,

03:09 20    correct?

      21    A.   That's right.

      22    Q.   Does it say anywhere on here that there's going to be a

      23    MasterCard deal somewhere in the future or does it suggest it

      24    currently is finalized?

      25            MR. LOPEZ:  Objection, your Honor.

```
 1              THE COURT:  Sustained.
 2    BY MR. MARKHAM:
 3    Q.   And below it there appears to be a CNBC article.  Can you
 4    read that for the jury?
 5    A.   It says, My Big Coin Pay Inc.'s cofounder, Randall Crater,
 6    announces the cryptocurrency exchange company's --
 7    Q.   Dot-dot-dot, right?
 8    A.   Yes.
 9              MR. MARKHAM:  You can take this down.
10    Q.   Mr. Desa, some of the social media we just reviewed, do
11    you recall seeing references to the My Big Coin Exchange?
12    A.   Yes.
13    Q.   And that's including in that announcement on Facebook
14    there related to Randall Crater and on Randall Crater's
15    personal Twitter page, correct?
16    A.   Yes.
17              MR. MARKHAM:  If we bring up Exhibit 7F.
18    Q.   Mr. Desa, is this the My Big Coin Exchange website?
19    A.   Yes.
20    Q.   And again, is this from the internet archive?
21    A.   Yes.
22    Q.   On the top left there where it says "My Big Coin
23    Exchange," what is the tag line underneath it?
24    A.   Anytime, Anyplace, My Big Coin.
25    Q.   And is that the same logo and tag line as we saw on the
```

03:10 (line 10)
03:10 (line 20)

1    defendant's social media and on the My Big Coin social media

2    and website?

3    A.   Yes.

4    Q.   What is the date that this page was made available to the

5    public?

6    A.   December 26, 2014.

7    Q.   Did you also observe web pages for the My Big Coin

8    Exchange in 2015 and in 2016?

9    A.   Yes.

03:11 10   Q.   And did those web pages look substantially similar to this

11   with, just some numbers maybe changed?

12   A.   Yes.

13   Q.   And are those available for the jury in Exhibit 7G and 7H

14   if they want to review them?

15   A.   Yes.

16          MR. MARKHAM:  You can take this down.

17   Q.   Now moving on from the social media and the websites, in

18   preparation your testimony today, we talked a little bit

19   earlier about how you were asked to review a series of email;

03:11 20   is that correct?

21   A.   That's right.

22   Q.   Do those appear to be from the email account in the name

23   of Greyshore belonging to the defendant?

24   A.   Yes.

25          MR. MARKHAM:  Your Honor, at this time I'd like to

        1    read another stipulation specifically regarding the email
        2    records.
        3            It's the same docket number as the LinkedIn records.
        4    I don't know if you want it to be the same --
        5            THE COURT:  Sure.  What exhibit number was that?  Was
        6    that the first or second of the --
        7            MR. MARKHAM:  It would have been the first one.
        8            THE COURT:  So we'll -- you can still refer to it as
        9    Exhibit 24.
03:12  10            MR. MARKHAM:  Thank you, your Honor.  And permission
       11    to read.
       12            THE COURT:  You may.
       13            MR. MARKHAM:  The parties stipulate and agree that
       14    records obtained from Apple, Inc., pursuant to a search warrant
       15    signed on January 24 of 2019 related to the
       16    greyshore@icloud.com account, are accurate and authentic
       17    representations of e-mails stored by Apple, Inc. for the
       18    greyshore@icloud.com account.
       19    BY MR. MARKHAM:
03:12  20    Q.   Now let's walk through some of the emails in that account
       21    that you reviewed.
       22            Just to be clear before we do, did you review every
       23    email in this account?
       24    A.   No.
       25    Q.   So you were just basically asked to review a series of

1    emails so you could testify and read them into the record

2    today; is that right?

3    A.    Yes.

4    Q.    Did you observe any emails discussing prepaid debit cards?

5    A.    Yes.

6          MR. MARKHAM:  Can you go to Exhibit 11E, please.  Zoom

7    in on the top "From" line down to the attachments.  Okay.

8    Perfect.

9    Q.    This is an email to Randall Crater on February 3, 2014.

03:13 10   And the subject is Top Card Invoice.

11         So looking at the "From" line, does that appear to be

12    a MasterCard email account or is that a Gmail account?

13         MR. LOPEZ:  Objection, your Honor.

14         THE COURT:  Well --

15         MR. MARKHAM:  I can rephrase, your Honor.

16         THE COURT:  I'm assuming it's foundation.

17    BY MR. MARKHAM:

18    Q.    Does anything in the "From" line say MasterCard?

19    A.    No.

03:13 20   Q.    Does it say "Gmail"?

21    A.    Yes.

22    Q.    Okay.

23         MR. MARKHAM:  Can you zoom in on the email now.

24    Q.    Do you see on the first line there where it says, Hello,

25    Randall.  Please find attached an invoice from Top Tier for

```
 1    their program C business to business pre-paid MasterCard
 2    program.
 3           Do you see where it says that?
 4    A.   Yes.
 5    Q.   Did I read that correctly?
 6    A.   Yes.
 7    Q.   Does this email say anything about a credit card?
 8    A.   No.
 9    Q.   It does say prepaid MasterCard, though, correct?
10    A.   Yes.
11    Q.   Does this email say anything about a closed-loop system
12    with My Big Coin?
13    A.   No.
14           MR. MARKHAM:  Can you go to Exhibit 12T, please.  This
15    is an email from -- this is an email to Randall Crater from
16    Adam Tracy in July of 2015.
17           Can you go to the attachment on page 2.
18           THE COURT:  Counsel, I think you may have said that
19    backwards but --
20           MR. MARKHAM:  I apologize, your Honor.  This is an
21    email to -- I'm sorry, from Randall Crater to Adam Tracy.
22           Can you zoom in on the name of the agreement through
23    the first paragraph.
24    BY MR. MARKHAM:
25    Q.   Can you read the title and the name of the agreement?
```

1    A.    Prepaid card marketing and distribution agreement.

2    Q.    Okay.  And then in the next paragraph, do you see that it

3    states this is between three companies, Greyshore Technologies

4    Inc., Cyber Centers International, Inc., and then FirstView

5    LLC?

6    A.    Yes, sir.

7    Q.    Do you see the name MasterCard anywhere in here?

8    A.    No.

9    Q.    And again, do you see anything about a credit card or a

03:15 10    closed-loop system with My Big Coin?

11    A.    No.

12          MR. MARKHAM:  Can you go to Exhibit 12X.

13          And zoom in on the middle email there from August 29,

14    2015 at 12:15 p.m.

15    Q.    So this is an email from Perry Orlando that says, This is

16    why you drive me crazy.  I did listen and that is what we

17    built.  A closed-loop MBC linked to the MasterCard.  As soon as

18    I get our funding, no matter where it comes from, I will make

19    your product the best and the first.  Xapo does not do this.  I

03:16 20    feel we are really close.  Colorado or California should make

21    it happen.

22          Did I read that correctly?

23    A.    Yes.

24    Q.    Do you see where it says, As soon as I get our funding, I

25    will make your product the first and the best -- the best and

```
 1    the first?
 2    A.   Yes.
 3    Q.   Do you see where it says, I feel we are really close?
 4    A.   Yes.
 5    Q.   When the defendant is being told that they need to -- we
 6    need to get our funding and we are really close, what is the
 7    date on this email on the top left?
 8    A.   August 29, 2015.
 9         MR. MARKHAM:  Okay.  Can you scroll up to the very top
10    email, which is, again, from Perry Orlando.
11    Q.   Okay.  So in this email, Perry Orlando tells the
12    defendant, We already have that.  Just not automated without
13    API.  Our developers will make this seamless in about 300
14    man-hours building from scratch.  Fabio is already on it.
15    Other guys when I return.
16         Did I read that correctly?
17    A.   Yes, sir.
18    Q.   And do you see where the defendant is told, Our developers
19    will make this seamless in about 300 man-hours building from
20    scratch?
21    A.   Yes.
22    Q.   And this reference to 300 man-hours and building from
23    scratch, what is the date of this email?
24    A.   August 29, 2015.
25         MR. MARKHAM:  Can we go to Exhibit 7B, please.
```

```
 1    Q.   So this is from 2014, correct?

 2    A.   That's right.

 3    Q.   And that's about a year before the last email discussing

 4    needing 300 man-hours and building from scratch?

 5    A.   That's right.

 6    Q.   Okay.

 7         Under the "Latest News," can you blow up what it says

 8    there?

 9         Do you see where it says, New MasterCard for clients

10    has arrived?

11    A.   Yes.

12    Q.   And this claimed that the MasterCard already existed.  Was

13    that also in the defendant's LinkedIn and Twitter pages?

14    A.   Yes.

15    Q.   And again, that's a year before the email about needing

16    funding.

17    A.   That's right.

18    Q.   Okay.  Mr. Desa, did you also observe emails where the

19    defendant was discussing gold backing?

20    A.   Yes.

21         MR. MARKHAM:  Can you please bring up Exhibit 12B.

22         First zoom in on the e-mail just below the middle at

23    8:50 p.m. from William E. Donahue.

24    Q.   This is an email from January 15, 2015; is that right?

25    A.   Yes.
```

1    Q.   Okay.  And do you see where it says there, Our product is

2    in a Texas U.S. Fed. bonded warehouse, just that first line?

3    A.   Yes.

4         MR. MARKHAM:  Now can we go to Randall Crater's

5    response just above it and highlight just the first two lines.

6    Q.   So this is Randall Crater's response.

7         He says, I'm not giving the privilege information to

8    anyone but the lawyers, Billy, in not trying to do anything

9    with your gold.  You pledged it to back.  The coin is going

03:20 10    public, Billy, and we have to have proof the gold is setting

11    there.  What you have sent is docs from 2006 and they are

12    saying that's billion dollars.

13         Did I read that correctly?

14    A.   Yes.

15    Q.   Okay.  Again, where it says you sent docs from 2006, this

16    is an email from 2015; is that right?

17    A.   Yes.

18    Q.   All right.  And now the last two lines, where it says,

19    There are now 49.7 million clients on the site, so we need to

03:20 20    make sure every eye and t is dotted and crossed, Billy.  It's

21    not hard.  And we don't have to bounce around words.  You

22    should have a safekeeping receipt from the bonded warehouse

23    current one to what is there and we are cooking then.

24         That was a little bit difficult but did I read that

25    correctly?

1   A.   Yes.

2   Q.   I think I did.

3        Now, let's take a look at the next gold email from

4   about two weeks later after this one from Randall Crater.  So

5   that's Exhibit 12E.

6        Can you blow up the forwarded message from Billy

7   Donahue, down through the signature line.

8        This is another email to Randall Crater from Billy

9   Donahue; is that right?

03:21 10  A.   Yes.

11  Q.   Okay.  And he says to the defendant, Guys, here is the

12  updated documentation.  This documentation and our assays

13  provided is more than sufficient to confirm and cover the 100M,

14  hundred million, for the MBC pay IPO underwriting guarantee of

15  value... all great work and let's get on with next steps.

16        Did I read that correctly?

17  A.   Yes.

18  Q.   So this email references 100 million.  Do you see that?

19  A.   Yes.

03:22 20  Q.   Again, it's signed by someone named Billy, who is also

21  William Donahue; is that right?

22  A.   That's right.

23        MR. MARKHAM:  Now, let's bring up Randall Crater's

24  email from later that same day, Exhibit 12F.

25        Can you zoom in on this.

1   Q.   So after the email discussing 100 million, this is an

2   email later on January 27th, and it reads, Billy, thanks for

3   what you have supplied us thus far, yet our biggest concern is

4   that the word gold isn't mentioned anywhere in either of

5   documents you forwarded to us this morning.

6        We need an updated assayer's report or something from

7   a third party verifying that those barrels are filled with

8   gold.  Having your assayer sign off on the gold's authenticity

9   updated within the fourth quarter of 2014 would be terrific, or

03:23 10  something from the warehouse attesting as to what type of metal

11  is in those containers listed in their invoice.

12       Okay.  First, did I read that correctly?

13  A.   Yes.

14  Q.   Do you see -- and you can -- can you unhighlight and just

15  highlight these parts.

16       Do you see where it says, Our biggest concern is that

17  the word gold isn't mentioned anywhere in that top paragraph?

18  A.   Yes.

19  Q.   Now, in the bottom paragraph, do you see where it says, We

03:23 20  need an updated assayer's report or something from a third

21  party verifying that those barrels are filled with gold?

22  A.   Yes, I see it.

23  Q.   All right.

24       MR. MARKHAM:  Now let's go to the defendant's email,

25  the very next day on January 28th.  So this is 12G.  Okay.

1    Q.   So the day after the defendant received that email about

2    100 million and then noted that the word "gold" isn't mentioned

3    and needing an updated assayer's report, what does the

4    defendant tell John Lynch?

5              MR. MARKHAM:   If you could just pull up the actual

6    substance of the email.

7    A.   It says, And we have 300 million in gold backing us.  They

8    have nothing to show you how strong we are going to be.

9    Q.   Does this email mention anything about needing an updated

03:24 10    assayer's report?

11              MR. LOPEZ:   Objection.

12              THE COURT:   Sustained, sustained.

13              And so, counsel, it's -- as counsel knows, the Court

14    has another hearing in five minutes.  So where are we?

15              MR. MARKHAM:   Do you want me to just finish up this --

16    I have a couple more questions on this topic, and then that

17    might be a good time to break.

18              THE COURT:   How much longer, counsel?

19              MR. MARKHAM:   With this witness, maybe 10 minutes.

03:24 20              THE COURT:   And, Mr. Lopez, rough estimate?

21              MR. LOPEZ:   Under a half an hour, your Honor.

22              THE COURT:   So we're going to have to -- we're going

23    to have to go over into tomorrow given the other criminal

24    matter I have on.

25              So, sir, you're going to have to step back and come

 1  back tomorrow.

 2          THE WITNESS:  Okay.

 3          THE COURT:  Thank you.

 4          Jurors, you may recall today was a day -- I can't

 5  remember if I said 4:00 or 3:30, but I have another matter on.

 6  Hopefully you'll understand if we end a little early today.

 7          Just keep all of my cautionary instructions in mind.

 8          Tomorrow will be a 9:00 to 4:00 day, so sort of the

 9  split that we did today with the same break and the same lunch

03:25 10  break.

11          As always, keep all of my cautionary instructions in

12  mind.  Don't speak to each other or anyone else about the case,

13  keep an open mind and don't do any outside research, and enjoy

14  the rest of your day.  Thank you.

15          THE CLERK:  All rise.

16          THE COURT:  Sir, you can step down.  Thank you.

17          THE WITNESS:  Thank you.

18          (Jury left the courtroom.)

19          THE COURT:  Counsel, just in terms of the lineup

03:26 20  tomorrow.

21          Mr. Markham, can you tell me where we're going from

22  here?

23          MR. MARKHAM:  Yes, your Honor.

24          We anticipate Norman Mendiola, Peter Bell, Jay Byrd,

25  Pamela Clegg.

```
 1                  THE COURT:  The expert?

 2                  MR. MARKHAM:  Yes, your Honor.

 3                  THE COURT:  Okay.

 4                  MR. MARKHAM:  And then James Douglas and Robert

 5       McGowan, if we can get there.

 6                  THE COURT:  Any disputed exhibits?  You can just tell

 7       me the letters.

 8                  MR. MARKHAM:  Only for --

 9                  MR. MOORE:  Bell.

03:27 10                  THE COURT:  Bell, which I already have.  Any for the

11       others that you --

12                  (Discussion off the record.)

13                  MR. MARKHAM:  I believe for Norman Mendiola there was

14       just an authenticity of certain Facebook posts, whether he

15       could say he saw them.

16                  THE COURT:  Okay.

17                  And for the others that you added.

18                  MR. MARKHAM:  No, your Honor, we don't anticipate any.

19                  THE COURT:  And just a note, since we're having an

03:27 20       expert, it's my practice that the reports, the expert reports

21       themselves obviously don't go into evidence.  Obviously I

22       understand there may be use made of them for purposes of

23       refreshing or impeachment, so I just say that for the benefit

24       of both sides.

25                  MR. MARKHAM:  Yes, your Honor.  I would note --
```

```
 1                THE COURT:  And I'll ask -- Mr. Desa, you're excused
 2       for the moment.  Thank you.
 3                MR. MARKHAM:  Just so the Court is aware, I think it's
 4       Exhibit B is a demonstrative, it's only for that purpose.
 5                THE COURT:  For Ms. Clegg?
 6                MR. MARKHAM:  Yes, your Honor.
 7                THE COURT:  Okay.
 8                MR. MARKHAM:  And I'd also just ask the Court's
 9       practice on tendering an expert.  I know for some --
03:28 10                THE COURT:  Yes, so I don't -- you can tender.  I
11       don't -- I'll just say "noted for the record."  I won't say
12       accepted as an expert, but you can certainly lay the foundation
13       and indicate when you're signalling that you plan to move to
14       opinion.
15                MR. MARKHAM:  Understood, your Honor.
16                THE COURT:  Okay.
17                That would go for Mr. Lopez later on as well.
18                Counsel, anything else we should take up now?
19                MR. LOPEZ:  I'm just curious as to whether any other
03:28 20       government witnesses have dropped off the list, because I need
21       to plan for next week.  I have my witnesses coming in Sunday.
22                THE COURT:  So I'll let counsel deal with that offline
23       just so I can move to the other matter, and then counsel we'll
24       certainly take that up tomorrow because I'll be asking about
25       next week, and I'd like to be able to tell the jury something
```

         1   about next week before I let them go for the weekend.

         2           MR. MARKHAM:  Yes, your Honor.  It will certainly

         3   depend on the cross.

         4           THE COURT:  Understood.  But perhaps you can talk

         5   about it before both sides leave the courthouse.

         6           MR. MARKHAM:  And we haven't finished the Touhy

         7   conversation, your Honor.

         8           THE COURT:  We haven't finished the Touhy

         9   conversation.

03:29   10           Counsel, I guess, as I indicated before, I'm not --

        11   Mr. Lopez, one, I think as the law stands right now, I don't

        12   see a compelling reason not to follow the majority of circuits

        13   that follow Touhy applying it also in the criminal context.

        14   But the other matter I'm considering is whether or not you can

        15   introduce something for impeachment for witnesses who are not

        16   being offered by the government against Mr. Crater.

        17           So that's what I'm focusing on.  I'll just leave that

        18   with you to give some further thought and I'll bring it up.  We

        19   can discuss it again tomorrow in terms of planning for next

03:30   20   week.

        21           Thank you.

        22           I will remain.  Counsel should feel free to leave

        23   while I'm still here so we can get the other criminal matter up

        24   to counsel table.

        25           Thank you.

1          (Court adjourned at 3:30 p.m.)

2              - - - - - - - - - - - -

3                      CERTIFICATION

4          I certify that the foregoing is a correct transcript

5    of the record of proceedings in the above-entitled matter to

6    the best of my skill and ability.

7

8

9

10   /s/Debra M. Joyce                 July 14, 2022
     Debra M. Joyce, RMR, CRR, FCRR    Date
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3      WITNESS                                                    PAGE

4

       JOHN LYNCH
5
          Continued Cross-Examination                             13
6         By Mr. Lopez
          Redirect Examination                                   147
7         By Mr. Moore
          Recross-Examination                                    166
8         By Mr. Lopez

9      DAVID DESA

10        Direct Examination                                     174
          By Mr. Markham
11

12

13                              E X H I B I T S

14

       Exhibit No.           Description              Received
15

16        W                                               32

17        17                                              33

18        X1                                              35

19        X2                                              35

20        Y                                               65

21        Z                                               68

22        Z1                                              69

23        AA                                              73

24        BB                                              99

25        18                                             100

| | | |
|---|---|---|
| 1 | CC | 101 |
| 2 | 19 | 103 |
| 3 | DD | 107 |
| 4 | 20 | 108 |
| 5 | EE | 110 |
| 6 | FF | 113 |
| 7 | 21 | 114 |
| 8 | GG | 122 |
| 9 | 22 | 123 |
| 10 | HH | 159 |
| 11 | 23 | 160 |
| 12 | 24 | 177 |
| 13 | 25 | 181 |
| 14 | 26 | 188 |
| 15 | 27 | 189 |
| 16 | 28 | 191 |
| 17 | 29 | 196 |
| 18 | 30 | 198 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |