```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   UNITED STATES OF AMERICA,

 5                   Plaintiff,          Criminal Action
                                         No. 19-10063-DJC
 6   V.
                                         July 15, 2022
 7   RANDALL CRATER,                     8:45 a.m.

 8
                     Defendant.
 9   _____

10

11

12            TRANSCRIPT OF JURY TRIAL DAY 4

13        BEFORE THE HONORABLE DENISE J. CASPER

14            UNITED STATES DISTRICT COURT

15        JOHN J. MOAKLEY U.S. COURTHOUSE

16               1 COURTHOUSE WAY

17             BOSTON, MA  02210

18

19

20

21              DEBRA M. JOYCE, RMR, CRR, FCRR
                    Official Court Reporter
22            John J. Moakley U.S. Courthouse
               1 Courthouse Way, Room 5204
23                   Boston, MA  02210
                   joycedebra@gmail.com
24

25
```

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:

 3    CHRISTOPHER J. MARKHAM, ESQ.
      BABASIJIBOMI MOORE, ESQ.
 4    US Attorney's Office - MA
      J. Joseph Moakley U.S. Courthouse
 5    1 Courthouse Way
      Suite 9200
 6    Boston, MA 02210
      617-449-6890
 7    christopher.markham2@usdoj.gov
      babasijibomi.moore2@usdoj.gov
 8
      FOR THE DEFENDANT:
 9
      SCOTT P. LOPEZ, ESQ.
10    Lawson & Weitzen
      88 Black Falcon Avenue
11    Suite 345
      Boston, MA 02210
12    617-439-4990
      splopez@lawson-weitzen.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

       (The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on July 15, 2022.

       The defendant, Randall Crater, is present with counsel.  The Assistant U.S. Attorneys are present.)

       THE CLERK:  All rise.

       (Court entered.)

       THE CLERK:  Court is in session.  Please be seated.

       THE COURT:  Good morning.

       ALL:  Good morning, your Honor.

       THE COURT:  Counsel, there was one matter I was going to return to, but are there any topics that counsel wants to discuss before we start up again today?

       MR. MARKHAM:  Only as an FYI, your Honor.  There are two exhibits that are contested that will be coming through Mr. Desa this morning.  I spoke to counsel today.  I don't anticipate there will be an objection to them.  Just so you know, when they come up --

       THE COURT:  Which letters are those?

       MR. MARKHAM:  They're going to be Exhibits II and JJ.

       THE COURT:  And just what's the --

       MR. MARKHAM:  They're emails, two more emails from the

 1    Randall Crater email account.

 2              THE COURT:  Okay.  And, counsel, I did look at Exhibit

 3    V, which I understand is going to be introduced as a chalk

 4    during Ms. Clegg's testimony.

 5              MR. MARKHAM:  It won't be introduced -- it will be --

 6              THE COURT:  Well, offered, published.

 7              MR. MARKHAM:  We won't be introducing it.

 8              THE COURT:  Okay.  That was just what I was

 9    confirming.

08:46 10            MR. MARKHAM:  Yes, your Honor.

11              THE COURT:  Mr. Lopez, anything on your side?

12              MR. LOPEZ:  No, your Honor.

13              THE COURT:  Okay.

14              MR. LOPEZ:  Well, actually, I'm going to try to

15    publish a number of uncontested exhibits that have already been

16    admitted through this witness because he reviewed the email

17    accounts.

18              THE COURT:  Okay.

19              MR. LOPEZ:  And I've got some questions as to whether

08:47 20    or not that's outside the direct.

21              THE COURT:  But these are already admitted.

22              MR. LOPEZ:  They're already admitted.  I guess the

23    alternative is for me to have at some point a reader read them

24    to the jury.

25              THE COURT:  Any objection?

1          MR. MARKHAM:  Yes, your Honor.  The government's

2     position is that the defense shouldn't be able to put on its

3     case through the government's witnesses.  And this reader

4     specifically only read 20 emails that I put in front of him,

5     and we'll make that very clear.  So allowing the defense, which

6     happened, frankly, yesterday with John Lynch, to publish

7     exhibits that the government hadn't even seen before in one

8     instance affirmatively through our witnesses is not --

9          THE COURT:  Right.  Counsel, I saw that as -- well,

08:47 10   two different issues.

11          One, I should just mention for the benefit of both

12     counsel, it is my general practice, counsel, to confine the

13     cross-examination to scope and credibility issues unless

14     there's an agreement between the parties otherwise.  So just,

15     Mr. Lopez, that's my general approach.

16          I thought yesterday with Mr. Lynch there's a line I

17     think between, counsel, matters that are being offered for

18     impeachment versus matters that are introduction of substantive

19     evidence beyond the scope.  So I was trying to navigate that

08:48 20   line, counsel.

21          But I understand the government's position as to

22     scope.

23          Mr. Lopez, I will listen in terms of whether or not I

24     think it's outside of the scope or if I think it's for the

25     purposes of impeachment.  So with that said, okay.

1          MR. LOPEZ:  Yes, your Honor.

2          THE COURT:  Anything else, Mr. Lopez, from your side?

3          MR. LOPEZ:  No, your Honor.

4          THE COURT:  Counsel, I just wanted to return to this

5     Touhy issue.  Is there anything else, Mr. Lopez, first, that

6     you wanted to add in this regard?

7          MR. LOPEZ:  No, your Honor.

8          THE COURT:  Okay.  So I would just say for the record,

9     and incorporating everything I said yesterday afternoon

08:49 10    regarding the scope of the law and the cases that each side

11    offered to the Court, I'm not going to repeat all of that, I'll

12    just incorporate it by reference, and also to incorporate

13    everything I said yesterday afternoon when we return to this

14    issue.

15          Given the proffer to date and the caselaw provided by

16    either side, and I understand, Mr. Lopez, you're raising this

17    issue not just as a matter of Touhy, but as a constitutional

18    issue separate from any Touhy -- any challenge to Touhy, I've

19    considered that.  Some of the cases that were proffered by the

08:49 20    parties, including specifically U.S. v. Soriano-Jarquin, that's

21    492 F.3d 495, 504 to 505 (4th Cir. 2007), which separately

22    addressed this issue as a constitutional matter.  As in that

23    case, I don't see a basis for allowing departure from the Touhy

24    process for constitutional reasons or allowing or compelling

25    the witnesses to testify as a constitutional issue, at least

1    based on the record as I have it based on the proffer and the

2    evidence I've heard to date.  I don't think it amounts to a

3    deprivation of a defense here where it's not clear from the

4    proffer that the testimony would be relevant, material, and

5    vital to the defense.  Again, I cite to Soriano.  I think at

6    most it would be impeachment, but as I think I raised yesterday

7    afternoon, potentially impeachment of witnesses that the

8    government's not calling.

9              On the separate issue of Touhy, I think -- I don't

08:51 10   think, Mr. Lopez, you were suggesting there's been any attempt

11   to comply with Touhy, given your position that Mr. Crater

12   shouldn't be required to.  So for that separate reason, that's

13   a separate basis for denial of any motion to compel the

14   government's witnesses or at least the two agents that were

15   referenced to testify in the defense case.

16             So that would be my ruling, Mr. Lopez, at this point

17   based on the proffer.

18             If you want me to revisit this in the future, next

19   week, just raise it with me and we can go from there.  But just

08:52 20   for the benefit of planning, counsel, I wanted to give you my

21   thinking at this point.

22             MR. LOPEZ:  Your Honor --

23             THE COURT:  Yes.

24             MR. LOPEZ:  I just -- just for the record.

25             THE COURT:  Yes.

1          MR. LOPEZ:  Next week when we are putting our case on,

2     I will call them as a witness even though they're not here just

3     to preserve our rights.

4          THE COURT:  Well, counsel, I think you can preserve

5     your rights otherwise, so I'll give some thought about whether

6     or not -- meaning, I don't think you have to call them, which

7     is a separate issue of being before the jury, as opposed to

8     preserving your objection on the record.

9          MR. LOPEZ:  Well, your Honor, you're probably right,

08:52 10     but I knowing the 1st Circuit and --

11          THE COURT:  Yeah.  I think --

12          MR. LOPEZ:  Knowing this is a question of first

13     impression, I want to make the record crystal clear.

14          THE COURT:  Sure.  I think, counsel, I guess my

15     concern is what's before this jury as opposed to a legal issue

16     that you're preserving.

17          MR. MARKHAM:  Yes, your Honor, as long as he doesn't

18     in front of the jury, I now call --

19          THE COURT:  That's what I'm saying.

08:53 20          Meaning, I think, counsel, during your case, your

21     defense case not before the jury you indicate your intention to

22     call witnesses X, Y, and Z.

23          MR. LOPEZ:  I can use this (indicating).

24          THE COURT:  Yes.

25          MR. LOPEZ:  So there's no -- I'm not looking to do

1    anything --

2            THE COURT:  That was my only concern, but I understand

3    your point for preservation of the record.

4            Counsel, any further update on the so-called Zoom

5    witnesses, or should I just return to this on Monday?

6            I think these were -- at least one of the witnesses

7    you were going to attempt to serve again.  Should I just raise

8    this again with you on Monday?

9            MR. LOPEZ:  Yeah, on that witness --

08:53 10         THE COURT:  This is Mr. Galvin?

11           MR. LOPEZ:  Yes.  My private investigator contacted

12   the U.S. Marshal's office out in Colorado.  Apparently,

13   Mr. Galvin was called by the marshal and the marshal was

14   instructed to leave the summons or the subpoena at his home

15   instead of in-hand service, so -- and now they're claiming that

16   he didn't -- because he didn't get a witness fee, he's not

17   going to comply with the subpoena.  So I'm trying to get him

18   reserved again today and --

19           THE COURT:  Okay.  So why don't -- I'll just plan to

08:54 20    raise this on Monday, counsel.

21           And then, Mr. Markham, obviously today will be a long

22   day for all, going to 4:00, so I may check in with you right

23   before we return at 2:00 to get a sense of where you think the

24   government is and your best guess of when you might be resting

25   just so I know for next week.

1        I would like to be able, if we can, honestly, to tell

2   this jury before I send them off at 4:00 that we're at least on

3   track in terms of where we are, but I'll check in with you a

4   little before 2:00.

5        MR. MARKHAM:  Yes, your Honor.  I can tell you right

6   now we are off track.  I thought we were going to -- there was

7   opening and then there was a shorter day and the cross of

8   Mr. Lynch.  I thought we were going to be --

9        THE COURT:  This jury thinks we're going into the week

08:55 10   of the 25th.

11        MR. MARKHAM:  So we're still on track certainly for

12   that.  I think at the end of the day or by the break we'll

13   certainly have a better idea.

14        THE COURT:  So let's plan to do that.  Obviously I'd

15   like to get the lineup for next week with a particular focus on

16   which disputed exhibits may be coming up.

17        Anything else before we check on how many jurors we

18   have?

19        MR. MARKHAM:  Nothing from the government, your Honor.

08:55 20        MR. LOPEZ:  No, your Honor.

21        (Discussion off the record.)

22        THE COURT:  We can stand in recess.  Thank you.

23        (Recess taken.)

24        MR. MARKHAM:  Just a forewarning to the Court, it will

25   be very brief, but I'll do a quick recap.  It's not quite asked

1    and answered, but just to sort of set the scene for where we

2    left off of yesterday.

3              THE COURT:  Okay.  Good morning.

4              THE WITNESS:  Good morning.

5              THE CLERK:  All rise for the jury.

6              (Jury entered the courtroom.)

7              THE CLERK:  Court is in session.  Please be seated.

8              THE COURT:  Good morning, jurors.

9              THE JURY:  Good morning.

08:59 10         THE COURT:  We'll get started again.

11              Sir, I just remind you, you remain under oath.

12              THE WITNESS:  Yes, ma'am.

13              THE COURT:  Mr. Markham.

14              MR. MARKHAM:  Thank you, your Honor.

15              Ms. Hourihan, if we could switch over to the HDMI1.

16              DAVID DESA, having been previously duly sworn by the

17    Clerk, was further examined and testified as follows:

18                    CONTINUED DIRECT EXAMINATION

19    BY MR. MARKHAM:

08:59 20    Q.   Mr. Desa, yesterday we discussed various claims made on

21    the defendant's social media pages.  Do you remember that?

22    A.   Yes, I do.

23    Q.   Did that include Randall Crater's LinkedIn and Twitter

24    pages?

25    A.   Yes, it did.

1    Q.   And then we went over the same or similar claims

2    identified on the My Big Coin social media.  Do you recall

3    that?

4    A.   Yes.

5    Q.   And that included Twitter, Facebook, and YouTube; is that

6    right?

7    A.   Yes, sir.

8    Q.   Then we also reviewed the My Big Coin website and My Big

9    Coin Exchange website.

09:00 10    A.   Yes, sir.

11    Q.   In terms of your involvement in this investigation, is it

12    fair to say that was your role, to look at the social media and

13    take screenshots of it?

14    A.   Yes.

15    Q.   And then in preparation your testimony today, you were

16    provided a number of emails to read and then read into the

17    record.

18    A.   Yes, sir.

19    Q.   Okay.  Yesterday we left off discussing emails about gold.

09:00 20    Do you recall that?

21    A.   Yes.

22    Q.   Let's do a quick recap of what we looked at.

23         MR. MARKHAM:  Can you bring up Exhibit 12E, please.

24         Can you blow up the forwarded message from William

25    Billy Donahue through the signature line.

 1           Sorry, 12E.

 2    Q.   This was that email from William Billy Donahue referencing

 3    the 100 million.

 4           MR. MARKHAM:   Can you highlight that 100M.

 5    Q.   Do you remember we went over this yesterday?

 6    A.   Yes.

 7           MR. MARKHAM:   Now can we go to Exhibit 12F.

 8    Q.   Which is an email from later that day where the defendant

 9    wrote this message.

09:01 10           MR. MARKHAM:   In the top paragraph can you highlight,

11    Our biggest concern is that the word gold isn't mentioned

12    anywhere.

13    Q.   Mr. Desa, did I just read that correctly?

14    A.   Yes.

15           MR. MARKHAM:   And in the bottom paragraph can you

16    please highlight, We need an updated assayer's report or

17    something from a third party verifying that those barrels are

18    filled with gold.

19    Q.   Again, did I read that part correctly?

09:01 20    A.   Yes, sir.  Okay.  Now let's go to the defendant's email

21    the next day, January 28th.

22           That's 12G.

23    Q.   So this is the day after the defendant received that email

24    100 million and then noted that the word "gold" isn't mentioned

25    and the assayer's report being needed.  Can you read what the

| | |
|---|---|
| 1 | defendant writes to John Lynch? |
| 2 | A.   And we have 300 million in gold backing us they have |
| 3 | nothing to show you how strong we are going to be. |
| 4 | MR. MARKHAM:  Can you please bring up Exhibit II for |
| 5 | the witness only? |
| 6 | THE COURT:  Just the witness. |
| 7 | MR. MARKHAM:  And just zoom in on the top part. |
| 8 | BY MR. MARKHAM: |
| 9 | Q.   Mr. Desa, is this another email from the defendant's |
| 09:02 10 | Greyshore email account? |
| 11 | A.   Yes. |
| 12 | Q.   Can you just read that over to yourself. |
| 13 | (Pause.) |
| 14 | Q.   Do you see in the middle there where it says, I've had to |
| 15 | pay another 1 million out of my pocket here and has left me a |
| 16 | little short on cash. |
| 17 | A.   Yes. |
| 18 | MR. MARKHAM:  Your Honor, permission to publish this. |
| 19 | THE COURT:  Any objection? |
| 09:03 20 | MR. LOPEZ:  No, your Honor. |
| 21 | THE COURT:  It may be admitted. |
| 22 | Ms. Hourihan, what's the next number? |
| 23 | THE CLERK:  I believe it's 31. |
| 24 | THE COURT:  Yes, okay.  It may be admitted and |
| 25 | published as 31. |

```
 1              (Exhibit 31 received into evidence.)
 2   BY MR. MARKHAM:
 3   Q.   So that highlighted part says, I've had to pay another 1
 4   million out of my pocket here and it's left me a little short
 5   on cash and for my pot shops.
 6              Do you see that at the end of there?
 7   A.   Yes.
 8              MR. MARKHAM:   Okay.   You can take this down.
 9   Q.   Moving on, Mr. Desa, were you provided a series of emails
10   where the defendant appeared to be speaking directly with My
11   Big Coin customers?
12   A.   Yes.
13   Q.   Did that include emails where he was directing customers
14   to the My Big Coin website and Twitter page?
15   A.   Yes.
16   Q.   And prior to your testimony here today, did you view
17   examples in Exhibits 10C, 11A, and 11B that are available for
18   the jury?
19   A.   Yes.
20   Q.   Let's just take a look at one example of those.
21              MR. MARKHAM:   Can you bring up 11B.
22   Q.   And this email from Randall Crater to someone named Jesse
23   Dreyer.   What is the link that he's sending?
24   A.   It's a Twitter link, Twitter.com/My Big Coin.
25   Q.   Is this the same Twitter link that you observed on the
```

1  defendant's LinkedIn profile?

2  A.   Yes.

3  Q.   And this is also the Twitter page that you took a copy of

4  and we went over yesterday?

5  A.   Yes.

6  Q.   Mr. Desa, were you also provided emails where the

7  defendant appeared to be speaking with My Big Coin customers

8  specifically about buying and selling coins?

9  A.   Yes.

09:04 10          MR. MARKHAM:  Can you please go to Exhibit 11I.

11          And zoom in on that middle email from Randall Crater.

12          Actually, can you go to the email right below this

13  first?

14  Q.   Okay.  Do you see there on the top part where it says,

15  Notification of MBC paid into your account?

16  A.   Yes.

17          MR. MARKHAM:  And then can you go above that, please.

18  Q.   And then what is Randall Crater telling Steven Queale?

19  A.   Yes, sir.  I got your email now, sir.  I'll find you in

09:05 20  the system and get back to you tomorrow and help you get things

21  set up.  How many coins would you like to buy?  As I told John,

22  I'll back date the cost of the coins to the day you set the

23  account up.  That's the only right thing to do.

24  Q.   Okay.  Now can we go to Exhibit 11BB.

25          So first can you zoom in on the bottom email from

1    August 24, 2014 from George Schmidt.

2    Q.   And do you see the first line it says, I've tried to put

3    some coins on the exchange and they don't show up.  I must be

4    doing something wrong.

5         Did I read that correctly?

6    A.   Yes.

7         MR. MARKHAM:  Now let's go to the defendant's response

8    right above that.

9    Q.   And the defendant responds that same day, Sir, your fine.

09:06 10   Just hit the support icon on the screen and they will help you,

11   sir.  If not, please lmk -- let me know -- I'll make sure they

12   get posted for you, sir.  Hope and have a great day, sir.

13   Thanks again for having faith in what we have done.

14        Did I read that correctly?

15   A.   Yes.

16        MR. MARKHAM:  You can take that down.

17   Q.   Prior your testimony today were you shown additional

18   emails to and from the defendant discussing coin sales

19   specifically on the My Big Coin Exchange?

09:07 20   A.   Yes.

21   Q.   And are those available for the jury at Exhibits 11D and

22   11JJ?

23   A.   Yes.

24   Q.   In addition to speaking with customers, were you provided

25   emails where the defendant appeared to be discussing My Big

```
 1   Coin with someone named Marcus Gorby?
 2   A.   Yes.
 3   Q.   Did that include emails containing the links to the My Big
 4   Coin Facebook and Twitter accounts that we reviewed yesterday?
 5   A.   Yes.
 6   Q.   Does it also include an attachment to an email that
 7   contained the My Big Coin YouTube video that we played
 8   yesterday?
 9   A.   Yes.
10        MR. MARKHAM:  Can you bring up what was Exhibit C1.
11   Q.   Was this that YouTube video?
12   A.   Yes.
13   Q.   So there was an MP4 that was actually an attachment to an
14   email that you saw?
15   A.   Yes.
16   Q.   Again, prior your testimony today, did you confirm those
17   emails are available for the jury at Exhibits 11Q and 12B?
18   A.   Yes.
19        THE COURT:  Just so the record's clear, I think what's
20   being displayed is now 26.
21        MR. MARKHAM:  My paralegal tells me that that is
22   correct, your Honor.
23        THE COURT:  Okay.
24        MR. MARKHAM:  Apologies.
25   BY MR. MARKHAM:
```

Q.   In addition to Marcus Gorby, were you provided emails

where the defendant appeared to be speaking about My Big Coin

with someone named Michael Kruger?

A.   Yes.

Q.   Let's look at an example.

MR. MARKHAM:  11Z, please.

Can you zoom in on that.

Q.   So this is from Michael Kruger to the defendant August 9,

2014.  Can you read the subject line at the top there?

A.   Update $113,000.

Q.   It says 113K?

A.   Yes, sir.

Q.   I'll read this.  Let me know if I read this correctly.

We did a little better last night.

We did get $50K wire done by Maureen Arnold.

Got another $50K by Norville Connolly.  Will wire

early this week.

And 13K by Mic Mickfarell.  He has account already and

John Lynch will wire this $13K Monday or Tuesday.

That half and half, so I got us $56K for company use.

Sorry I did not do better.  This was -- expletive -- trip with

rain all the time.  That's the way it went, brother.  Cost me

about 10K easy by the time I get home.  Have a chance to maybe

get more at dinner tonight.

Take care, Michael.

```
 1              Besides me skipping the swear word, did I read that
 2    correctly?
 3    A.    Yes.
 4    Q.    Mr. Desa, did I also provide you emails like this one
 5    between Kruger and the defendant discussing other My Big Coin
 6    investors?
 7    A.    Yes.
 8    Q.    Did you confirm those were available for the jury at
 9    Exhibits 11R and 11Y?
10    A.    Yes.  Okay, thank you.
11              In addition to the emails with Michael Kruger and
12    Marcus Gorby, did you also review emails regarding My Big Coin
13    between the defendant and someone named Mark Gillespie?
14    A.    Yes.
15    Q.    Did one of those emails appear to be Gillespie discussing
16    how Randall Crater would pay him for My Big Coin work?
17    A.    Yes.
18              MR. MARKHAM:  Can you please bring up Exhibit 11D.
19              And zoom in on the top.
20    Q.    This is an email from Mark Gillespie to Randall Crater's
21    email account on February 1, 2014; is that correct?
22    A.    That's right.
23    Q.    And I will read this.
24              Randall, afternoon!
25              I'm trying to get some skin in the game.  So hard to
```

1    converse with Mike, John and you, feel all your excitement, get

2    my friends and family in and not feel a part of this.

3           Would you consider - not paying me the 700 plus I have

4    earned at 3 percent and not paying me for the 6 PR's -- I'll do

5    all that for free -- and instead, lock me in (or put the coins

6    in my account) for today's rate at 28.87 for $5,774, 200 of MBC

7    that would be paid.  The 5,774 within 60 days, probably 30, as

8    I have 8K coming within that time frame in one lump sum from

9    Canada.

09:11 10          Your answer, pro or con, will in no way affect my

11   commitment here.

12          Thanks for your consideration, Mark.

13          This was a long email, but did I appear to read that

14   correctly?

15   A.   Yes.

16          MR. MARKHAM:  Can we go to Exhibit 11G.

17          This is another email string with Mark Gillespie

18   starting with a customer email, but let's zoom in on the

19   Randall Crater email from March 1, 2014 at 2:43 p.m.

09:12 20          Apologies, Mr. Barbosa.  That's 2:41.  It's the one

21   above that.

22   Q.   Okay.  And here Randall Crater writes, We are building an

23   exchange site, Mark, that goes live next week.  They cal -- can

24   -- sale their coins there.  Who wants to sale their coins?  I

25   Jane buyers send me their information.  I'll make it happen

```
 1   this week for them.
 2         Did I read that correctly?
 3   A.  Yes.
 4         MR. MARKHAM:  Now can we go above to Mark Gillespie's
 5   response.
 6   Q.  So after the defendant talks about building an exchange
 7   site and making the sale of coins happen, what does Mark
 8   Gillespie say?
 9   A.  Understood, exclamation.  Thanks again, Randall, dot, dot,
10   dot.
11   Q.  Now can we go to the defendant's response above, and
12   include the date.
13         Okay.  Then the defendant in response tells Mark
14   Gillespie, And now we are in with gold, it will be very easy.
15         What is the date on that, sir?
16   A.  March 1, 2014.
17         MR. MARKHAM:  Can you bring up Exhibit JJ for the
18   witness only.
19   Q.  Mr. Desa, is this another email exchange between Randall
20   Crater and Mark Gillespie?
21   A.  Yes.
22   Q.  And is this from the Randall Crater Greyshore@icloud.com
23   account that we read a stipulation about yesterday?
24   A.  Yes.
25         MR. MARKHAM:  Permission to publish and enter into the
```

```
 1   record, your Honor.
 2              THE COURT:  Any objection?
 3              MR. LOPEZ:  No, your Honor.
 4              THE COURT:  It may be admitted.
 5              MR. MARKHAM:  I believe it's 32, your Honor.
 6              THE COURT:  32.
 7              (Exhibit 32 received into evidence.)
 8              THE COURT:  It may be published.
 9              MR. MARKHAM:  First, let's zoom in on the bottom email
10   from Mark Gillespie.
11              It appears to be -- can you highlight the two lines --
12   some sort of investor group, foritaginvestors@yahoogroups.com.
13   Q.   Did I read that correctly?
14   A.   Yes.
15   Q.   Mark Gillespie is giving a lot of information about
16   Randall Crater, but let's look on the 5 backslash.
17              MR. MARKHAM:  Can you highlight that?
18   Q.   Can you read what that says, Mr. Desa?
19   A.   Randall Crater has an elite deal with MasterCard dot dot
20   dot.  He is highly vetted.
21              MR. MARKHAM:  Okay.  Then toward the end, highlight
22   the two lines starting with "lastly."
23   Q.   Then it says -- Mark Gillespie says, Lastly, you all are
24   assuming MBC is interested in your investment dollars.  Don't
25   you think if they were, there would be info all over the net?
```

|      |                                                                    |
|------|--------------------------------------------------------------------|
| 1    | Now the only relevant question is why wouldn't that be?  Your       |
| 2    | assumption that very little public info indicates a problem is      |
| 3    | flawed.                                                             |
| 4    | Did I read that correctly?                                          |
| 5    | A.   Yes.                                                           |
| 6    | Q.   And at the end he says, Sit on the side-lines and watch.       |
| 7    | But, by all means watch.                                            |
| 8    | Did I read that correctly?                                          |
| 9    | A.   Yes.                                                           |

09:15 10   MR. MARKHAM:  Now, can you scroll up to the top email.

11   Q.   Mark Gillespie forwards that email to the investor group

12   to Randall Crater.

13   And after receiving that email, how does Randall

14   Crater respond to Mark Gillespie?

15   A.   Looks great.

16   MR. MARKHAM:  And can you please go to Exhibit 11U.

17   Q.   Now, the first email is from a customer named Norman

18   Mendiola telling Mark Gillespie about an issue with his account

19   or account issues.

09:16 20   But after Mr. Gillespie receives this email about the

21   My Big Coin account, can you scroll above to identify who he

22   forwards it to?

23   Who is on the "To" line there?

24   A.   It's Greyshore@me.com.

25   Q.   And there's also My Big Coin --

A.   There's also, yes, My Big Coin -- the email is
support@mybigcoin.com.

Q.   And the Greyshore email, that's the defendant's email
address, right?

A.   Yes, sir.

Q.   And Mark Gillespie says, Morning, Randall and support!
Please find below the detail and information to update Norman
Mendiola's account.  I have just finished a phone call with
Michael Kruger confirming the 17K was to be at 70.89 -
obviously, your call, Randall.

        Do you see at the end there where it says "obviously
your call"?

A.   Yes.

Q.   Whose call is it?

A.   Randall Crater.

Q.   Okay.  Mr. Desa, from the best of your recollection, did
we just review all the emails you were provided and asked to
read into the record today?

A.   Yes.

        MR. MARKHAM:  No more questions, your Honor.

        THE COURT:  Counsel, let me just hear you on Whisper
Tech before we proceed with cross.

        MR. MARKHAM:  Yes, your Honor.

        (Discussion at sidebar.)

        THE COURT:  Mr. Markham, can you hear me?

```
 1            MR. MARKHAM:  Yes, your Honor.
 2            THE COURT:  Mr. Lopez?
 3            MR. LOPEZ:  Yes, your Honor.
 4            THE COURT:  Counsel, I just wanted to revisit this
 5    issue of scope.
 6            This is a little bit different than the usual
 7    percipient witness because --
 8            MR. LOPEZ:  Your Honor, can you speak a little louder.
 9    I'm having difficulty hearing you.
10            THE COURT:  How about now?
11            MR. LOPEZ:  Try again.
12            THE COURT:  I wanted to revisit the issue of scope
13    that Mr. Lopez raised.
14            This witness is different than the usual percipient
15    witness since it was basically a pass-through witness for the
16    purposes of reading certain things into the record.
17            Mr. Lopez, did I understand you were planning to do
18    the same with exhibits that have already been admitted?
19            MR. LOPEZ:  That is correct, your Honor.
20            THE COURT:  And are these also exhibits that Mr. Desa
21    collected from a technical standpoint, Mr. Markham?
22            MR. MARKHAM:  No, your Honor.  Mr. Desa did not
23    collect a single email from a technical standpoint.  He
24    reviewed the social media, and in order to streamline the
25    government's case, we had him be a reader as well we wouldn't
```

1  be calling separate witnesses.

2       But as I tried to make clear on direct, he was handed

3  basically 25 emails and asked to read them so he could read

4  them into the record today.

5       THE COURT:  I guess how is that different from what

6  Mr. Lopez is asking?

7       MR. MARKHAM:  Apologies, your Honor.  You mean in

8  terms of him just asking to read emails into the record?

9       THE COURT:  Yes, that are already admitted.

09:20 10       MR. MARKHAM:  Your Honor, for the purposes of

11  streamlining, you want Mr. Desa to then read in the defense's

12  case in terms of the emails they want to highlight through our

13  witness, of course, you can do that, but the government's

14  position is that the defense should put on the emails for their

15  case in chief when it's time for their case in chief.

16       THE COURT:  Understood, but I guess for the purposes

17  of both streamlining and parity here, counsel, particularly

18  given that we're talking about uncontested exhibits and this

19  witness won't be asked for interpretation since he has no

09:21 20  basis, then I would allow that, Mr. Lopez.

21       Understood?

22       MR. LOPEZ:  Understood, your Honor.

23       THE COURT:  Thank you.

24       (End of discussion at sidebar.)

25       THE COURT:  Mr. Lopez.

```
 1              MR. LOPEZ:  Thank you, your Honor.

 2              I need a second.

 3              (Pause.)

 4              MR. LOPEZ:  Mr. Sweeney, can you bring up 7A?

 5                        CROSS-EXAMINATION

 6    BY MR. LOPEZ:

 7    Q.   Mr. Desa, yesterday the government showed you 7B.

 8              MR. MARKHAM:  Objection, your Honor.  Misstates

 9    testimony.  The government did not bring up 7B.

09:23 10         THE COURT:  Well, counsel, you can rephrase.

11              MR. LOPEZ:  All right.

12              Can you go to 7B?

13    BY MR. LOPEZ:

14    Q.   And do you recall seeing that yesterday?

15              MR. MARKHAM:  Objection, your Honor.  This wasn't

16    brought up yesterday.

17              MR. LOPEZ:  Yes, it was.

18              THE COURT:  With this witness?

19              MR. LOPEZ:  I believe so.

09:24 20         MR. MARKHAM:  No, your Honor.

21              THE COURT:  Counsel, I do recall it being displayed

22    yesterday.  I just don't recall --

23              MR. LOPEZ:  Well, I'll focus on the important part.

24              THE COURT:  Okay, sure.

25    BY MR. LOPEZ:
```

1    Q.   If you look at 7B, it's dated 5/17/2014 above the 7B

2    label?

3    A.   That's right.

4    Q.   And then yesterday, I believe we focused on the part that

5    said "MasterCard for clients has arrived."

6         MR. LOPEZ:  Can you enlarge that, Mr. Sweeney?

7    Q.   Do you see that?

8    A.   Yes, sir.

9    Q.   Do you remember seeing that yesterday?

09:24 10   A.   Yes.

11        MR. LOPEZ:  Now, if you go to 7A.

12   Q.   Does that appear to be the home page of My Big Coin on

13   5/17/2014?

14   A.   Yes.

15        MR. LOPEZ:  And, Mr. Sweeney, if you could enlarge

16   that same section.

17   Q.   And that says, "New MasterCard for clients coming soon."

18   A.   Yes, sir.

19        MR. LOPEZ:  Now if we go back to 7B -- strike that.

09:25 20        Just look at the whole thing again, the whole 7A.

21   Q.   That is the home page.

22   A.   Yes, sir.

23        MR. LOPEZ:  If we go to 7B.

24   Q.   And that's not the home page, right?

25   A.   This is still the home page.

```
 1    Q.   Well, is this the "About Us" page?

 2         (Pause.)

 3    A.   Yes.

 4    Q.   Okay.

 5         MR. LOPEZ:  And if we enlarge that section again.

 6    Q.   And that says, "New MasterCard for clients has arrived."

 7         So one page says it hasn't arrived yet, and another

 8    page says it has arrived.

 9         In your experience of reviewing social media, have you

10    ever seen a situation where one of these pages has a different

11    reference when it appears to be the same source, if you will?

12    Do you understand the question?

13         MR. MARKHAM:  Objection, vague.

14         THE COURT:  Sustained.

15         MR. LOPEZ:  I'm going to try to rephrase it again.

16    BY MR. LOPEZ:

17    Q.   Websites that have information on them that is repeated on

18    each page, in your experience do they tend to have the same

19    information on each of those pages?

20    A.   Yes.

21    Q.   So to say the least, it would be unusual if one page said

22    it hasn't arrived and another page said it did arrive if it was

23    the same date.

24    A.   Yes.

25    Q.   Thank you.
```

1           Do you recall the date of the video?

2     A.   I do not accurately remember exactly.

3     Q.   I believe that was 30 -- 26.

4           THE COURT:  I think the video is 27, counsel.

5           MR. LOPEZ:  Okay.  Which I don't -- bear with me.

6           Joe, if you can bring up C1.

7           THE COURT:  Which is now 26.

8           MR. LOPEZ:  Yes.

9     BY MR. LOPEZ:

09:28 10   Q.   And can you -- do you see a date on that page?

11    A.   Yes, I do.

12          MR. LOPEZ:  Can you enlarge that date, Joe?

13    Q.   So the date is September 3, 2015?

14    A.   Yes, sir.

15          MR. LOPEZ:  Go back to the full page.

16    Q.   Does this page tell you when that page was actually put

17    up?

18    A.   It does not.

19    Q.   But we do know that at least on September 3, 2015 there

09:29 20   were 4,299 views.

21    A.   That's right.

22    Q.   Now, you also were asked about the Twitter account?

23    A.   Yes.

24    Q.   And did you determine, as you did for the LinkedIn

25    account, who controlled the Twitter account?

```
 1    A.    Who controlled the Twitter account?

 2    Q.    Who was it registered to?

 3    A.    I just -- no, I did not --

 4    Q.    Okay.  And with respect to the Facebook account, did you

 5    determine who the account was registered to?

 6    A.    No.

 7    Q.    What about My Big Coin Exchange?

 8    A.    No.

 9    Q.    Okay.

10          (Pause.)

11    Q.    Now, we stipulated in this case that views of the internet

12    that are from the Wayback Machine are considered authentic.

13    A.    Right.

14          MR. LOPEZ:  Can you bring up Exhibit 8, Joe, or

15    Mr. Sweeney.

16    Q.    And can you tell what that is?

17          MR. LOPEZ:  Joe, can you enlarge the top portion of

18    it, make it easier to read.

19    A.    So this appears to be a screen capture of the website

20    novaexchange.com/markets.

21    Q.    Okay.  And it has a date on it?

22    A.    It says here September 3, 2017.

23    Q.    Now, does it appear to be the Nova Exchange?

24    A.    Yes.

25          MR. LOPEZ:  Joe, if you can go to page 3.
```

```
 1              And can you enlarge the center portion.
 2              THE COURT:  So, counsel, are these -- is this
 3   exhibit -- I'm sorry, was this 8?
 4              MR. LOPEZ:  Yes, it's an uncontested exhibit.
 5              THE COURT:  I know, but is it an exhibit this witness
 6   has seen before?
 7              MR. LOPEZ:  I don't know.
 8              THE COURT:  Okay.  So I guess, counsel, let me talk to
 9   you on Whisper Tech for a moment.
09:32 10              Jurors, just bear with us.
11              (Discussion at sidebar.)
12              THE COURT:  Counsel, Mr. Markham, can you hear me?
13              MR. MARKHAM:  Yes, your Honor.
14              THE COURT:  Mr. Lopez?
15              MR. LOPEZ:  I didn't hear what you said, your Honor.
16              THE COURT:  Can you hear me?
17              MR. LOPEZ:  Barely.
18              THE COURT:  Can you hear me, Mr. Lopez?
19              MR. LOPEZ:  I can hear you now.
09:33 20              THE COURT:  Counsel, I guess I was a little confused
21   here, Mr. Lopez.
22              To the extent that you're asking this witness more
23   than to make certain assumptions based on the documents, I do
24   think that's beyond the scope.  So I wanted counsel to
25   understand the limits of what my ruling was before.
```

1    I'll hear from both sides if you want to be heard.

2   Mr. Markham.

3        MR. MARKHAM:  Yes, your Honor.  Our objection remains

4   to the defense putting in their case through a government

5   witness when the government witness hasn't seen the exhibits

6   before that they're talking about in particular.

7        THE COURT:  Mr. Lopez, okay.  I'll hear Mr. Lopez.

8        MR. LOPEZ:  Your Honor, my understanding is that we

9   had a stipulation about the Wayback Machine and I'm just

09:34 10   showing him a page that has already been admitted into

11   evidence.

12        THE COURT:  But, counsel, I guess here where there's

13   certain -- some of the questions in regards to now going

14   through the documents where this witness hasn't seen them

15   before, I think is more than the Court anticipated in my

16   discussion with counsel before.

17        MR. LOPEZ:  Your Honor, it's the defense's position

18   that the government's presentation was misleading and --

19   because they only selected certain documents out of context,

09:34 20   and it seems to me that I should be allowed to provide the jury

21   with a fuller context so that they could understand this

22   witness' testimony.

23        THE COURT:  Mr. Markham.

24        MR. MARKHAM:  Your Honor, this heading, specifically

25   the exhibit that's up now is a screenshot of a website from

<pre>
     1   September of 2017.  I don't believe we even showed the witness
     2   anything from this date or beyond it or in this time frame.
     3          So I don't understand how this could impeach the
     4   witness in any way.
     5          THE COURT:  So, counsel, that's -- meaning, I thought,
     6   Mr. Lopez, what you were planning to go through were other
     7   emails, for example, in the same time frame here.  We haven't
     8   even touched on this particular topic, so I think we should
     9   move on from this exhibit.
09:35 10          MR. LOPEZ:  Understood, your Honor.
    11          May I ask, there are other emails that provide context
    12   to the emails in, for example, Exhibit 12 that were not put up
    13   even though some of the other emails were.
    14          THE COURT:  Right.
    15          MR. LOPEZ:  Will I be permitted to put those up?
    16          THE COURT:  You will be permitted do that, but to
    17   ask -- the limits of the question are basically the date of the
    18   email and did you read that correctly.
    19          MR. LOPEZ:  Understood.
09:36 20          THE COURT:  Okay.  Thank you.
    21          (End of discussion at sidebar.)
    22          THE COURT:  Jurors, thanks for bearing with us.
    23          As I said, I try to keep my conferences with counsel
    24   to a minimum, but sometimes they're necessary for the more
    25   efficient presentation of evidence to you.
</pre>

```
 1              Thank you.
 2              MR. LOPEZ:  Joe, can you bring up 12B?
 3              Can you enlarge the email on the bottom.
 4    BY MR. LOPEZ:
 5    Q.   This is an email from William Billy Donahue, Jr., and it
 6    says, Our product is in a Texas U.S. Fed bonded warehouse.  We
 7    have monthly storage invoices and third party reports as to the
 8    quantity and quality of our elements, from PhD big bang guys...
 9    accepted by banks.  Pictures of barrels attached.
10              Did I read that correctly?
11    A.   Yes, you did.
12              MR. LOPEZ:  Can you bring up 12A.
13    Q.   And this appears to be an email from John Roche to Randall
14    Crater.
15    A.   Yes.
16    Q.   And it's a forward of an email that he received from
17    William Donahue.
18    A.   That's right.
19              MR. LOPEZ:  Can you enlarge that email, Joe -- no, the
20    entire -- with the "From" and "To" date, from the top.  In the
21    middle.  Yes, thank you.
22    Q.   William Donohue is writing to an individual named
23    Harrysen.
24              Thanks for the call.  Here is the 2012 underwriting
25    third party report assays for review.
```

09:38 (line 10)
09:39 (line 20)

```
 1              As discussed, we have the product and plans to
 2      increase value, but let's see what RBC wants to do on LTV an
 3      amount in its current form and in the 100 to 200M range,
 4      attached is enough to get started.  All pretty straightforward
 5      to get on the same page to move forward.
 6              Did I read that correctly?
 7      A.   Yes, you did.
 8              MR. LOPEZ:  Joe, could you go to the second page of
 9      that email?
10              And the next?  No, the next page.
11      Q.   And does it look like that's a picture of barrels?
12      A.   That's right.
13      Q.   Okay.
14              MR. LOPEZ:  Go to the next page.
15              Just keep scrolling through.
16              Stop here.
17              And just focus on the top.
18      Q.   And that reads, I, Richard C. Galvin, hereby certify that
19      I am the principle and secretary of Galvin Investment Company
20      LLC, a private corporation duly organized and existing under
21      the laws of Colorado, USA, and that the following resolutions
22      were adopted by the board of directors at a duly called meeting
23      on or by unanimous consent on January 29th, 2014.
24              Do you see that?
25      A.   Yes.
```

```
 1              MR. LOPEZ:  Joe, can you go to the second page.

 2              Keep going.

 3              And stop there.

 4              Enlarge the "William Donahue" down to paragraph e.

 5    Q.   And it says, William E. Donahue, Jr., director, principle

 6    facilitator and fund manager, Galvin Investments LLC to open

 7    deposit accounts in foreign currencies with any depository to

 8    purchase, sell, transfer, dispose of for present or future

 9    delivery foreign monies, credits or exchange on deposit or

10    otherwise and all manner of instruments representative thereto

11    by endorsement or otherwise and to execute and deliver any

12    agreements or instruments relating to any such transactions.

13              Do you see that?

14    A.   Yes, I do.

15              MR. LOPEZ:  Joe, can you continue to scroll through

16    that document.

17              Stop here.

18    Q.   It looks like that was signed by Galvin Investments by

19    Richard Galvin and on behalf of -- well, by William Donahue?

20    A.   Yes.

21              MR. LOPEZ:  Can you continue scrolling, Joe.

22              Stop here.

23              And enlarge the first paragraph.

24    Q.   It looks like this is to Richard Galvin from a DRRF

25    Metals, Inc.
```

         1           And it says, I have done a wet chemical test of the

         2    500 barrels of mineral concrete for you.  These barrels are

         3    numbered, have identification seals and are held in safe

         4    keeping at Broker's Logistics Ltd. warehouse located at 1000

         5    South Main, Anthony, Texas.  I found the concentrates have a

         6    considerable amount of gold, platinum, palladium, and other

         7    precious metals in the platinum group metals family.  Regarding

         8    the ore contained in the 500 barrels, I have identified varying

         9    amounts of gold, silver, platinum, palladium, rhodium, iridium

09:43  10    and osmium.  Please see my attached analytical report.

        11           And at the bottom it appears to be signed by a

        12    Dr. Robert Finch.

        13           MR. LOPEZ:  Can we go to the next page.

        14           THE COURT:  And, counsel, is there a question for this

        15    witness on that?

        16    BY MR. LOPEZ:

        17    Q.   Does it appear to be signed by a Dr. Robert Finch?

        18    A.   Yes.

        19    Q.   Who purports to be a nuclear chemist.

09:44  20    A.   Yes.

        21           MR. LOPEZ:  And then just scroll through.

        22    Q.   Does this appear to be -- does it appear to be an

        23    assayer's resumé, just --

        24    A.   It says assayer's resumé on the top.

        25           MR. LOPEZ:  Scroll through.

1    Q.   This appears to be another resumé.

2    A.   Yes.

3    Q.   And some other document.

4         Another resumé.

5    A.   Yes.

6         MR. LOPEZ:  Keep going, Joe.

7         And stop here.

8    Q.   And then it lists -- does it appear to list a number of

9    assay reports?

09:45 10        I'm just saying does it appear to have a list of

11   what's --

12   A.   That's what it says, yes.

13   Q.   It says, Several independent accredited assayers on the

14   concentrate held by Galvin Investments.

15   A.   Yes.

16        MR. LOPEZ:  Keep going, Joe.

17        Stop here.

18   Q.   Is this a document that appears -- that has a letterhead

19   of Mineral World, Inc.?

09:45 20   A.   Yes.

21   Q.   Specializing in precious metals?

22   A.   Yes.

23        MR. LOPEZ:  Keep going down.

24        Stop.

25   Q.   And does this look -- does this purport to be an

1    analytical report?

2           On the top.

3    A.    Yes.

4    Q.    And now this document purports to be an analytical

5    analysis.

6    A.    Yes.

7           MR. LOPEZ:  And Joe, if you can just enlarge the box

8    that is element and go down to the value.

9    Q.    And you see here that it lists certain precious metals and

09:46 10   tells you how much of each is contained?

11   A.    Yes.

12   Q.    And the total value is $3 million per ton or approximately

13   $3 million per ton?

14   A.    Yes.

15          MR. LOPEZ:  All right, Joe, come out of that.

16   Q.    And then this appears to be some other report.

17          And this appears to be --

18          MR. LOPEZ:  If you go back to page 1.

19   Q.    And this is all sent to Randall Crater by John Roche and

09:47 20   the first page shows that there's a number of attachments.

21   A.    Yes.

22   Q.    And what we just looked at appeared to be those

23   attachments.

24   A.    It does appear.

25   Q.    Okay.

1          (Pause.)

2          MR. LOPEZ:  Can you go to 12C.

3          And can you just enlarge the top.

4    Q.    This looks to be an email from William Donahue to Randall

5    Crater and John Roche?

6    A.    Yes.

7    Q.    And it looks like there's an attachment?

8    A.    Yes.

9          MR. LOPEZ:  Can you enlarge the email text.

09:48 10   Q.    And again, this is William Donahue purporting to have --

11   well, Our product is in a Texas U.S. Fed bonded warehouse.

12   A.    That's right.

13   Q.    Okay.

14         MR. LOPEZ:  Can you go to 12D.

15   Q.    And again, this is an email from William Donahue to

16   Randall Crater, John Roche, Stuart Borlant, and Alexander Wich?

17   A.    Yes.

18   Q.    And the date is January 26, 2015?

19   A.    That's right.

09:49 20   Q.    And it reads, Randall, We will get this updated, but it

21   shows that the product is in a secure storage facility and is

22   there.

23         In most cases, the bank will want to send an

24   inspector to the facility, when they want to confirm.  We have

25   not placed this on a bank ledger yet, but we have all the

```
 1   supporting documents to confirm its authenticity.
 2            Thanks, Billy.
 3            MR. LOPEZ:  Can you get out of that.  Thank you.
 4            Now, can you scroll down.
 5   Q.   This is -- appears to be an attachment from Broker's
 6   Logistics Ltd.
 7   A.   Yes.
 8   Q.   And it also has Galvin Investment Companies LLC at 4645
 9   East Lake Avenue, Centennial, Colorado.
10   A.   Yes.
11   Q.   Okay.  And then it lists various metals.
12   A.   Yes.
13   Q.   Or it references metal C but doesn't name what the metal
14   is.
15   A.   That's right.
16            MR. LOPEZ:  Can you scroll down.
17   Q.   And this goes on and on and on.
18            (Pause.)
19            MR. LOPEZ:  All right.  Can you go back to page 1
20   again?
21   Q.   And this is date January 26, 2015?
22   A.   That's right.
23   Q.   Which is a couple of days before the email that talked
24   about the problem with this is it doesn't say "gold" on the
25   documents, right?
```

```
 1    A.    That's right.
 2              MR. LOPEZ:  Now, can you go to 12E.
 3              (Discussion off the record.)
 4              MR. LOPEZ:  Could I have a second, your Honor?
 5              THE COURT:  Sure.
 6              (Discussion off the record.)
 7              MR. LOPEZ:  Can you go to 12H.
 8    Q.    And this appears to be an email from William Donahue to
 9    mybigcoin@gmail.com --
10    A.    Yes.
11    Q.    -- Randall Crater, greyshore@icloud.com and Stuart
12    Borlant?
13    A.    Yes.
14    Q.    And it appears to be an attachment, a Galvin Investment
15    corporate resolution?
16    A.    Yes.
17              MR. LOPEZ:  Can you enlarge the email.
18    Q.    Attached, as requested, Harmonie is the authorized
19    partner, asset managing partner, fund manager, principle
20    facilitator and trader for HI Galvin relationship portfolio,
21    plus I am a trusted director.
22              When do we start speaking with underwriting to
23    coordinate when, where and with whom?  We keep performing and
24    we still see no confirms of back office progress.  Ton of work
25    to do when going public and we are not seeing any plan of next
```

1    steps, launch and road show events?  I have spoken to our

2    world-class business PR contacts and we should have a

3    conversation and also discuss the stock and officer

4    appointments.

5              And then he appears to give a Frankfurt number.

6              Did I read that correctly?

7    A.   Yes.

8              Can you go down and just enlarge the bottom portion.

9    This is William Donahue sending an email to John Roche, Randall

09:55  10    Crater and Stuart Borlant, and Alex Wich.  As requested,

11    attached are the assay reports updated and signed.  Please

12    inform us in advance as to whom, where and when they being

13    submitted too.  These are very expensive and not to be abused.

14              Did I read that correctly?

15    A.   Yes.

16              MR. LOPEZ:  Can you go to 12K now.

17    Q.   This appears to be an email from John Roche to Randall

18    Crater with an attachment MBCpaygoodstanding.pdf?

19    A.   Correct.

09:56  20              MR. LOPEZ:  Can you go to the next page.

21    Q.   That appears to be a certificate of existence with status

22    in good standing?

23    A.   Yes.

24    Q.   And it references My Big Coin Pay, Inc. as a corporation

25    formed in Nevada.

1    A.    Yes.

2          MR. LOPEZ:  Can you go to 12N.

3    Q.    This appears to be an email from My Big Coin to Randall

4    Crater.

5    A.    Yes.

6    Q.    It looks to be a forward.

7    A.    Yes.

8    Q.    And the email below appears to be from Richard Galvin to

9    mybigcoin@gmail.com, billy@hiintl.com and

09:58 10   stuartborlant@hiintl.com?

11   A.    Yes.

12   Q.    And the subject is, Partnership portfolio commitment to

13   MBC and now MBCPay?

14   A.    That's right.

15   Q.    And the date is February 20, 2015?

16   A.    Yes.

17   Q.    It says, Dear John, I am aware of the HI Galvin 100

18   million partnership portfolio commitment to MBC and now MBCPay.

19   We hope to have much success with this portfolio investment and

09:58 20   look forward to receiving good news and a return on our

21   partnerships portfolio investment.

22          Billy says yes, we say yes.  Sincerely, Richard

23   Galvin.

24   A.    That's right.

25          MR. LOPEZ:  Joe, could you bring up N1 just for -- no,

1    strike that.

2              (Pause.)

3              Could you bring up 11C.

4    Q.    And this appears to be an email from John Roche to Randall

5    Crater?

6    A.    Yes.

7    Q.    And the date is January 7, 2014?

8    A.    Yes.

9    Q.    And it states, Took down www.mybigcoinexchange.com.  Go to

10:01 10   www.godaddy.com and there's a user name and a password.

11   A.    That's right.

12             MR. LOPEZ:  Can you go to 11BB.

13   Q.    And this email is from Randall Crater to George Schmidt,

14   and it's dated 24 August 2014, and it says, Sir, your fine.

15   Just hit the support icon in the screen and they will help you.

16   A.    Yes.

17   Q.    In your review, you saw other emails that referred to the

18   support people, right?

19   A.    Yes.

10:02 20            MR. LOPEZ:  Can you go to 11E.

21   Q.    And we've seen this email earlier.  This is from

22   Marc Ariza to Randall Crater talking about an invoice from Top

23   Tier for their program C business to business prepaid

24   MasterCard program.

25   A.    Yes.

1              MR. LOPEZ:  Can you go to page 2 on that.

2    Q.   And does that appear to be an invoice for $25,000 -- I'm

3    sorry, strike that -- $75,000?

4    A.   Yes.

5              MR. LOPEZ:  Can you go to 11HH.

6    Q.   And this is an email from My Big Coin to Randall Crater?

7    A.   Yes.

8    Q.   And it references Harmonie, My Big Coin Inc. pay 100

9    million gold-backed commitment, 11/15/2014?

10:04 10   A.   Yes.

11   Q.   And the email itself says, John, As discussed, attached is

12   our 100 million, or M, gold-backed commitment.  We look forward

13   to being part of this revolutionary endeavor.  We look forward

14   to a mutually beneficial relationship with My Big Coin Pay.

15   Sincerely, Billy.

16   A.   Yes.

17             MR. LOPEZ:  Can you scroll to the next page?

18             Stop.

19   Q.   This appears to be a letter to Mr. John Roche dated

10:05 20   November 15, 2014?

21   A.   Yes.

22   Q.   And the reference says, Commitment to My Big Coin Pay up

23   to $100 million equal to approximately plus or minus 2,231

24   kilograms gold dore bars form and/or GLD gold bullion.

25   A.   Yes.

```
 1              MR. LOPEZ:  Can you go to the first paragraph.
 2    Q.   We, Harmonie International Limited, with address of Suites
 3    41/42-26 Main Street, Gibraltar represented by authorized
 4    officer signed below confirm with full responsibility that we
 5    Harmonie International Limited at the request of My Big Coin
 6    Pay, for the value hereby irrevocably and unconditionally
 7    without protest or notification promise to guarantee against
 8    any default by My Big Coin Pay for a sum of up to $100 million,
 9    both in the numbers and also spelled out, in the lawful
10:06 10    commodity of gold in an amount of approximately 2,231
11    kilograms.
12              Did I read that correctly?
13    A.   Yes.
14              MR. LOPEZ:  And go down to the "We are hereby
15    pleased."
16    Q.   We are hereby pleased to commit $100 million value of
17    approximately 2,231 kilograms to My Big Coin Pay by Harmonie
18    International Limited GLD, gold bullion, as follows:
19              Certified AU metal, in dore bars form and/or GLD,
10:06 20    gold, bullion.
21              Minimum 999.5 percent or better.
22              Daily value against LMBA price, upon "second London
23    fixing."
24              Did I read that correctly?
25    A.   Yes.
```

```
 1    Q.   And do you see at the bottom of the page there appears to
 2    be initials on that page?
 3    A.   Yes.
 4    Q.   Okay.
 5         MR. LOPEZ:  And go to the last paragraph on this page.
 6    Q.   That reads, Harmonie International Limited hereby declares
 7    and warrants that we are the legal owner of the AU metal and he
 8    undertakes to provide this commitment with full legal authority
 9    and corporate responsibility as gold dore bars and/or as GLD
10    gold bullion on the terms and conditions stated in this
11    agreement, having a valid --
12         MR. LOPEZ:  Can you go to the next page.
13    Q.   -- having a valid license to sell or pledge AU metal and
14    to export it with full necessary export licenses/permits.
15         This guarantee is an operative investment which is
16    callable at Harmonie International Limited and is subject to
17    the uniform customs practice.
18         Sincerely, and it appears to be signed by William
19    Donahue.
20    A.   Yes.
21         MR. LOPEZ:  Go out.
22    Q.   Now, this is the same document.
23         MR. LOPEZ:  Keep scrolling, please.
24         Keep scrolling.
25         MR. LOPEZ:  Can you go to 11II.
```

```
 1   Q.   This is an email from Michael Singleton to, among other
 2   people, Adam Tracy, Randall Crater, two different addresses,
 3   John Roche, and Michael Singleton.  It looks like it lists a
 4   number of documents, including an MBC stock option plan, an MBC
 5   shareholder UWC stock option plan, an MBC Roche employment
 6   agreement, an MBC BOD UWC Tobias doc, and so on and so on.
 7            Can you just scroll to the first page of this.
 8            We can look at it later because it's been admitted
 9   into evidence.  But it goes on to list a number of documents in
10   this email.  Is that what it appears to be?
11   A.   Yes.
12            MR. LOPEZ:  Can you go to 11JJ.
13   Q.   And this is an email from Mark Gillespie to
14   greyshore@me.com?
15   A.   Yes.
16            MR. LOPEZ:  And can you just enlarge the text there.
17   Q.   Seems like a great job by Tom - Mike should have no
18   complaints!  I sent you (Greyshore) his email to me.
19            Did I read that correctly?
20   A.   Yes.
21            MR. LOPEZ:  Now, Joe, can you go to the end of this
22   email.
23            No, this is a multiple-page email.  Can you go to the
24   end of it.
25            Okay.  Can you go to the bottom there.
```

```
 1              Can you start with the "Hello"?
 2    Q.   Hello from TomC at 14:25.  How can I help you today?  From
 3    TomC at 14:25.
 4              Please advise how I change the selling amount that I
 5    have my coins listed for sale on the exchange, from Mlummis at
 6    14:25.
 7              You have to go to your profile, cancel the trade and
 8    list them again.  From TomC at 14:26.
 9              Will I have to wait another 48 hours for the transfer
10:12 10   of the coins?  Also, when the coins are sold how long do I wait
11    before the money is transferred to my bank account?  From
12    Mlummis at 14:27.
13              No, from TomC at 14:27.
14              Did I read that correctly?
15    A.   Yes.
16              MR. LOPEZ:  Can you go up to the next chat starting
17    from, "Hi, did I lose" down to "You're welcome."
18    Q.   Hi, did I lose you there.  From TomC at 9:32?
19              I transferred the coins from my account to the
10:12 20   exchange.  When will I see them on the exchange?  Also, how do
21    I know when and if they sell?  Am I notified by email or
22    question mark.  From Mike at 9:33.
23              They will be in your account within 48 hours.  From
24    TomC at 9:34.
25              You have to list them for sale.  From TomC at 9:34.
```

         1          Yes, you will be notified by email.  From TomC at
         2   9:35.
         3          Currently my balance in the exchange says zero.  Will
         4   it allow me to list them for sale.  From Mike at 9:36.
         5          Not until they get credited into your account from
         6   TomC at 9:36.
         7          Okay.  Thank you.  From Mike at 9:37.
         8          You're welcome, from TomC at 9:37.
         9          Did I read that correctly?
10:13   10   A.   Yes.
        11          MR. LOPEZ:  Go up to the next.
        12          From the top of the page down to "Correct."
        13   Q.   You have to deposit coins into your exchange account.
        14   From TomC.
        15          How do I do that?  From Mike at 9:19?
        16          Click on "Profile" and then right of "My MBC balance"
        17   click "Deposit."  From TomC at 9:19.
        18          Then you enter the amount of coins you want to deposit
        19   and complete the process.  From TomC at 9:20.
10:14   20          This will take the coins from one account and deposit
        21   into the other?  From Mike at 9:21.
        22          Let me say that again -- it will take the coin from my
        23   holding account and deposit them into the exchange account?
        24   From Mike at 9:23.
        25          Yes.  It transfers from your My Big Coin account and

```
 1   goes into your exchange account.  From TomC at 9:23.
 2           Did I read that correctly?
 3   A.   Yes.
 4           MR. LOPEZ:  Now go back to the first page.
 5           And the bottom.
 6   Q.   And that's a repeat of what we've -- I'm sorry, that's
 7   not --
 8           Hello, Mike.  How can I help you today?  From TomC at
 9   9:07?
10   Good morning, Tom.  Can you advise the current selling
11   price?  From Mike at 9:07.
12           Based on the website coin exchange, it's hard to tell
13   when the coins were sold, as there is no date listed.  From
14   Mike at 9:09.
15           If I want to sell coin, am I putting in my asking
16   price.  From Mike at 9:13.
17           Yes.  The amount of coins and the price you want to
18   sale them for.  From TomC at 9:14.
19           My balance of coin is zero.  How does this get updated
20   to the number of coins I have?  From Mike at 9:18.
21           Did I read that correctly?
22   A.   Yes.
23           MR. LOPEZ:  And then finally from "Chat log started."
24   Q.   Chat log started on Friday 19th December.
25           Hello, Michael.  From TomC at 19:02.
```

10:14 (line 10)
10:15 (line 20)

1           How can I help you?  From TomC at 19:03.

2           How late are you open in support?  We are in Las Vegas

3    at don't get home until 6:30 Pacific, PT.  We have some

4    questions on the exchange.  From Michael Lummis at 19:04.

5           We are here for a further 3 hours.  From TomC at

6    19:05.

7           What time do you open in the morning?  From Michael

8    Lummis at 19:05:

9           9 a.m.  From TomC at 19:06.

10:16 10    Is that Eastern Standard Time or Pacific Time?  From

11   Michael Lummis at 19:06.

12          Eastern Standard Time.  From TomC at 19:07.

13          Thank you very much.  From Michael Lummis at 19:08.

14          You're welcome.  Probably from TomC at 19:08.

15          Strike that.  It's just "you're welcome."

16          MR. SWEENEY:  Scott, do you want 12E?

17          MR. LOPEZ:  12E you said?

18          MR. SWEENEY:  Yeah, I have it.

19          MR. LOPEZ:  No, I think we did that already.

10:17 20    MR. SWEENEY:  I couldn't find it.  I have it now.

21          MR. LOPEZ:  Bring it up.

22          No, we did 12E.

23          Okay.

24          THE COURT:  Counsel, for what it's worth, I think

25   there was 12B but not 12E.

```
 1              MR. LOPEZ:  I stand corrected.  Let's bring up 12E.

 2              Can you get the top part of that?

 3    Q.   And this is a Forward HI MBCPay-100M gold backed -

 4    insurance and product confirmations.

 5    A.   Yes.

 6    Q.   And it looks like it's dated April 21, 2015?

 7    A.   Yes.

 8    Q.   And it has an attachment a Broker's Logistics 500 barrels

 9    inventory list?

10:18 10   A.   Yes.

11    Q.   And then it has HI MBC broker insurance 500 barrels

12    9-1-2014 through 9-1-2015?

13    A.   Yes.

14              MR. LOPEZ:  Go to the email.

15    Q.   From William Donahue to forward.  It was to John Roche,

16    Randall Crater, and Stuart Borlant.

17              Guys, here is the updated documentation.  This

18    documentation and our assays provided is more than sufficient

19    to confirm and cover the 100 million, 100M, for the MBC pay IPO

10:19 20   underwriting guarantee of value:  Of all great work and let's

21    get on with the next steps.

22              MR. LOPEZ:  If you'd go to the next page of this

23    email.

24    Q.   Again, we have an inventory from Broker's Logistics Ltd.

25    dated 12/1/2014 to 12/31/2014?
```

1    A.    Yes.

2              MR. LOPEZ:  You can keep scrolling down.

3              Just scroll to the next new document.

4              (Discussion off the record.)

5              MR. LOPEZ:  I want to get to the end of this, the

6    insurance documents.

7    Q.    Okay.  So this appears to be a document that states

8    commercial lines Wells Fargo Insurance Services USA from

9    California?

10:21 10   A.    Yes.

11   Q.    And in the middle there it appears to be addressed to

12   Gilman Metals?

13   A.    Yes.

14   Q.    To the attention of Richard C. Galvin?

15   A.    Yes.

16             MR. LOPEZ:  Go to the next page.

17   Q.    And this appears to be a certificate of liability

18   insurance?

19   A.    Yes.

10:21 20             MR. LOPEZ:  And can you enlarge the part that talks

21   about the coverage on the far right-hand side.

22             Below that.

23   Q.    And there's dates here from 9/1/2014 to 9/1/2015, and it

24   appears to be insurance for $2 million for certain things and

25   $1 million for other?

A.   Yes.

      MR. LOPEZ:  Can you bring up 11JJ.

      11K.

      So can you enlarge this?

Q.   This appears to be a document dated March 15, 2014?

A.   Correct.

Q.   And it says, Dear customer, for your convenience, a copy of your signed document is attached.

A.   Yes.

      MR. LOPEZ:  Can you go to the next page.

Q.   Now, this document is a document dated February 26, 2014.

A.   Yes.

Q.   And it's addressed to Mr. Randall Crater.

A.   Yes.

      MR. LOPEZ:  And if you could open up that first paragraph again.  Okay.

Q.   It purports to be the same language as the later document from -- to Mr. Roche, right, it seems to have the same language?

A.   I cannot tell.  It's too much -- a lot of information.

Q.   Okay, that's fine.

      MR. LOPEZ:  Can you go to the second page?

Q.   Does it appear that that is signed by Randall Crater?

A.   Yes.

      MR. LOPEZ:  Go To the next page.

```
 1              Go back to the first page.

 2              And go to 11L.

 3    Q.   This looks to be an email from Randall Crater to William

 4    Donahue?

 5    A.   Yes.

 6    Q.   From March 15, 2014?

 7    A.   Yes.

 8    Q.   And it reads, This document was securely signed using

 9    SignEasy app?

10    A.   Yes.

11              MR. LOPEZ:  Can you scroll down.

12    Q.   Does that appear to be the same document as in the last

13    email?

14    A.   Yes.

15              MR. LOPEZ:  Can you scroll down some more.

16    Q.   Same as the other email?

17    A.   Yes.

18              MR. LOPEZ:  Go to 11M.

19              MR. MARKHAM:  Your Honor, I object at this point.

20    We're putting in the same document over and over again which

21    makes -- I'd like to be heard at sidebar.

22              MR. LOPEZ:  Let's go to 11N.

23              THE COURT:  Counsel, overruled.  No speaking

24    objections.

25              But Mr. Lopez.
```

```
 1              MR. LOPEZ:  Let's go to 11N.
 2    Q.   This is an email from Randall Crater to himself dated
 3    March 21, 2014?
 4    A.   Yes.
 5    Q.   Can you scroll down?  That appears to be the same document
 6    as before?
 7              MR. MARKHAM:  Your Honor, I object again.
 8              THE COURT:  Well, overruled, given the cover pages are
 9    different.  So overruled.
10:26 10              MR. LOPEZ:  And scroll down.
11    Q.   And this document --
12              THE COURT:  What I mean is they're different
13    documents.
14              Counsel, continue.
15    BY MR. LOPEZ:
16    Q.   And does this appear to be that same document that were in
17    the prior emails but this time signed by Mr. Donahue?
18    A.   Yes.
19              MR. LOPEZ:  I have no further questions, your Honor.
10:27 20              THE COURT:  Thank you.
21              Redirect?
22              MR. MARKHAM:  Yes, your Honor, one moment, please.
23              Can you please bring up Exhibit 7B.
24              And can you also bring up Exhibit 7D on the right,
25    just a side-by-side comparison.
```

                              REDIRECT EXAMINATION

1

2   BY MR. MARKHAM:

3   Q.   So on the left here, Mr. Desa, defense counsel had you

4   look at the My Big Coin page from May 17, 2014, that's on the

5   left, correct?

6   A.   Yes.

7   Q.   Now can we zoom in under "Latest News" where it says, "New

8   MasterCard for clients has arrived."  Did I read that

9   correctly?

10:29 10  A.   Yes.

11  Q.   Now on the right, this is the same My Big Coin web page

12  but from August 1, 2015; is that right?

13  A.   Yes.

14       MR. MARKHAM:   Now can you zoom in under "Latest News."

15  Q.   So over a year later does it still say "new MasterCard for

16  clients has arrived"?

17  A.   Yes.

18  Q.   Again, you personally went to the Wayback Machine and

19  looked at these dates?

10:29 20  A.   Yes.

21       MR. MARKHAM:   Can you keep up Exhibit 7B on the left

22  and bring up Exhibit 28 on the right.

23       I'm sorry, 7B on the left.

24  BY MR. MARKHAM:

25  Q.   So in a moment on left will be Exhibit 7B, which is that

 1    My Big Coin website from May 17, 2014, and then on the right,

 2    Exhibit 28, which is the My Big Coin Twitter page that, again,

 3    you personally took a screenshot of this page, correct?

 4    A.   Yes.

 5         MR. MARKHAM:   Okay.  So on the left on the My Big Coin

 6    website can you again zoom in on the "New MasterCard for

 7    clients has arrived."

 8         And then on the My Big Coin Twitter page on the right,

 9    can you go to page 38.

10    And zoom in on the post -- the posts from March 6,

11    2014.

12    Q.   So this is a Twitter post from March 6, 2014, that one on

13    the bottom, correct?

14    A.   Yes.

15    Q.   And that's before May 17, 2014, the My Big Coin website on

16    the left?

17    A.   Yes.

18    Q.   Do you see where it says, My Big Coin has entered into a

19    contract where all My Big Coin's will be backed by 100 percent

20    gold?

21    A.   Yes.

22         MR. MARKHAM:   Can you scroll up to the next March 6th

23    post.

24    Q.   And then do you see here on March 7, 2014, the post at the

25    top?

1    A.    Yes, I do.

2    Q.    Do you see where it says, The only cryptocurrency to back

3    your money with gold.  Sign up today to receive your My Big

4    Coin Visa/MasterCard.

5    A.    I see it.

6    Q.    So does this say that you can sign up today to receive the

7    MasterCard?

8    A.    Yes.

9    Q.    And that's from March 7, 2014?

10:31 10   A.    Yes.

11   Q.    Which, again, is over two months before the My Big Coin

12   website on the left.

13   A.    Correct.

14        MR. MARKHAM:   Okay.  Now can you go to Exhibit 1A --

15   you can take down the side by side.

16        Go to page 3.

17        Zoom in on 2, that whole part.

18   Q.    So, again, we just looked at the My Big Coin website and

19   the My Big Coin Twitter page.  Can you now read what the

10:32 20   defendant's LinkedIn, his personal LinkedIn page is saying?

21   A.    We are partners with MasterCard which gives us a closed

22   loop system so you are able to break down into any currency

23   that's needed.

24        MasterCard is accepted in over 35.9 million locations.

25   Q.    You see there it says, We are partners with MasterCard,

1   correct?

2   A.   Yes.

3        MR. MARKHAM:  Now let's go to Exhibit 6, please.

4   Q.   Mr. Desa, do you recall personally going to Randall

5   Crater's Twitter page?

6   A.   Yes.

7   Q.   And this is a screenshot from that Twitter page, correct?

8   A.   Correct.

9        MR. MARKHAM:  Can you highlight the part there where

10:32 10   it says "Partners with MasterCard" and the claims at the

11   bottom.  So under where it says "cryptocurrency" and above

12   where it says "transfer money in seconds," "Partners with

13   MasterCard," just highlight that.

14   Q.   Okay.  Mr. Desa, approximately when did you confirm that

15   this was available on the defendant's Twitter page?

16   A.   When was the page downloaded, when did I --

17   Q.   Yes, Mr. Desa.  Let me just ask it this way:  Did you

18   confirm this web page existed in 2022, this year?

19   A.   Yes.

10:33 20        MR. MARKHAM:  Okay.  You can take this down.

21   Q.   Now, the defense cross-examination put a bunch of

22   documents in front of you that were in attachments.  Do you

23   remember that?

24   A.   Yes.

25   Q.   And just to be clear, do you have any personal knowledge

 1    of whether those attachments are real or whether they were

 2    forged?

 3    A.    I have no way of knowing.

 4    Q.    Okay.  Let's go through a few of those.

 5          MR. MARKHAM:  Please bring up Exhibit 12A, please.

 6    Q.    Okay.  What is the date on this email?

 7    A.    The date is January 15, 2015.

 8    Q.    Okay.  So this is to Randall Crater on January 15, 2015.

 9    A.    Correct.

10:34 10         MR. MARKHAM:  Now let's go to page 3.

11    Q.    These are all these pictures of barrels that the defense

12    put in front of you.

13          Again, do you have any idea what these are?

14    A.    No.

15    Q.    Do you see there where it says "September 18, 2006" on

16    that barrel --

17    A.    Yes.

18    Q.    -- or on that picture of barrels?

19    A.    Yes.

10:34 20    Q.    So that's almost ten years before the email was sent,

21    correct?

22    A.    Correct.

23          MR. MARKHAM:  Can we go down to the next picture.

24    Q.    Is that 2006?

25    A.    Yes.

1          MR. MARKHAM:  Let's keep scrolling down through these

2     pictures.

3     Q.   You can stop there.

4          Same, 2006.

5     A.   Yes.

6          MR. MARKHAM:  Okay.  Can you keep scrolling down

7     through these barrels.

8          That last barrel there, the last page of barrels,

9     that's also in 2006, right?

10:35 10   A.   Yes.

11    Q.   Does it appear that these black barrels are discolored?

12    A.   Some of them are discolored, yes.

13    Q.   And they're all opaque and have canisters on top, right,

14    so you can't actually see what's in these --

15    A.   No.

16    Q.   -- 2006 barrels.

17         MR. MARKHAM:  Can you go to page 13, I believe it was.

18    Q.   Now, this is another document the defense put in front of

19    you.  You have never seen this before, right?

10:35 20   A.   I haven't seen this before.

21         MR. MARKHAM:  Can you zoom in on the top left, what

22    the date is there.

23    Q.   Does that say October 12, 2011?

24    A.   Yes.

25    Q.   So from the email that this is an attachment to, that's

1   over five years before, correct?

2   A.   Correct.

3   Q.   Or -- yes, I believe it's over five years.

4        MR. MARKHAM:   Can we go to page 22.

5   Q.   This is another document the defense put in front of you.

6   Again, do you have any idea what this is?

7   A.   No.

8   Q.   Okay.  But the date speaks for itself, so let's zoom in on

9   that.

10:36 10        Does that appear to say August 7, 1996?

11  A.   Yes.

12  Q.   So that's almost -- or around 20 years before the email

13  that it's attached to, correct?

14  A.   Correct.

15       MR. MARKHAM:   Can you go to page 23.

16  Q.   Again, any idea what this document is?

17  A.   No.

18  Q.   But the date speaks for itself, so let's zoom in on this.

19  Does that appear to say July maybe 3, 1993?

10:36 20  A.   Yes.

21  Q.   Okay.  So that's maybe 23 years before the email it's

22  attached to, something like that?

23  A.   Yes.

24       MR. MARKHAM:   Can we go to Exhibit 12D, please.

25  Q.   So now we're fast-forwarding 20-plus years when people are

1    actually speaking to each other.

2         And this is the email from William Donahue to Randall

3    Crater.

4         Did I read that correctly?

5    A.   Yes.

6    Q.   And this is where -- this email and those attachments is

7    where Billy Donahue claims to -- this is in the second line --

8    we have all the supporting documentation to confirm its

9    authenticity.

10:37 10    A.   That's right.

11    Q.   You see where it says that?

12    A.   Yes.

13         MR. MARKHAM:   Okay.  So now let's go to 12F, which

14    are -- we'll see how the defendant responds.

15         Can you zoom in just on the email itself?

16    Q.   So this is from, again, about 20 years after those

17    documents or those attachments we just reviewed.

18         So after the defendant receives that email, the

19    attachments from Billy Donahue and all the documents from the

10:38 20    1990s, up through I guess the 2000s, he says, Billy, Thank you

21    for what you have supplied us thus far, yet our biggest concern

22    is that the word gold isn't mentioned anywhere in either of

23    documents that you forwarded to us this morning.

24         Did I read that correctly?

25    A.   Yes.

1  Q.   And then he says, We need an updated assayer's report or

2  something from a third party verifying that those barrels are

3  filled with gold.

4       Mr. Desa, do you recall when defense counsel again put

5  those pictures of barrels in front of you?

6  A.   Yes.

7  Q.   Again, they were opaque so you couldn't see what was in

8  them?

9  A.   Correct.

10:38 10 Q.   In this email Randall Crater is saying, We need an updated

11 assayer's report or something from a third party verifying that

12 those barrels are filled with gold.

13      Did I read that correctly?

14 A.   Yes.

15 Q.   Having your assayers -- he goes on to say, Having your

16 assayers sign off on the gold's authenticity updated within the

17 fourth quarter of 2014 would be terrific, or something from the

18 warehouse attesting as to what type of metal is in those

19 containers listed on their invoice.

10:39 20      Do you see where he says "needing something attesting

21 to what type of metal is in those containers"?

22 A.   I see that.

23      MR. MARKHAM:   Now let's go to the very next email

24 that's entered into evidence from the defendant the next day,

25 so that's 12G.

1          This is January 27th.

2          Can you just zoom in on that top part.

3    Q.   What does Randall Crater tell John Lynch the very next

4    email in evidence the very next day?

5          Can you read that, please?

6    A.   You want me to read the email?

7    Q.   Yes, just the body of the email, please.

8    A.   And we have 300 million in gold backing us.  They have

9    nothing show you how strong we are going to be.

10:39 10   Q.   Does this say anything about needing an updated assayer's

11   report?

12         MR. LOPEZ:  Objection.

13         THE COURT:  Sustained.

14         MR. MARKHAM:  Can we go -- actually, can you highlight

15   300 million there?

16   Q.   I'm reading that correctly, 300 million?

17   A.   Yes.

18         MR. MARKHAM:  Can we go to Exhibit 12N.

19   Q.   So this is another document the defense put in front you,

10:40 20   or this is an email.

21         Can you zoom in on the middle email where it says,

22   "Dear John" in the first -- that's fine.

23   Q.   Do you see where it says, I am a aware of our HI Galvin

24   100 million partnership portfolio commitment to MBC and MBCPay?

25   A.   Yes.

Q.   And 100 million is about 200 million less than 300 hundred
million?

A.   Correct.

        MR. MARKHAM:  Can you go to Exhibit 11HH.

        Can you just zoom in on -- so this is from My Big Coin
to Randall Crater.  Can you just zoom in on the subject line
where it says "Forward."

Q.   Can you read that to the jury, please?

A.   Harmonie International Limited 100M gold-backed
commitment.

Q.   Again, same question, 100 million is about 200 million
less than 300 million?

        MR. LOPEZ:  Objection.

        THE COURT:  Sustained.

        MR. MARKHAM:  Okay.  Can we go to Exhibit 11N.

        And then go down to the second page, please.

BY MR. MARKHAM:

Q.   So do you recall the defense counsel putting in multiple
documents that looked like this one?

A.   Yes.

Q.   Some were unsigned and then some were signed, right?

A.   Yes.

        MR. MARKHAM:  All right.  And can you zoom in on just
the reference part.

Q.   Again, am I reading this correctly, Reference:  Commitment

1   to My Big Coin up to 100 million equal to approximately plus

2   minus some level of kilograms in gold.

3          Did I read that correctly?

4   A.   Yes.

5          MR. MARKHAM:  Can we go to Exhibit 11H.

6          Actually, can we start with 12C, please.

7   Q.   So this email, there's a reference to the gold location.

8   This is from William Donahue to Randall Crater.

9          Can you zoom in on the top there where it says,

10:42 10   "Randall, Our product."

11          And just highlight "our product is in a Texas U.S. Fed

12   bonded warehouse."

13   Q.   Did I read that correctly?

14   A.   Yes.

15          MR. MARKHAM:  Now can we go to Exhibit 11H.

16   Q.   Now, can you zoom in on Randall Crater's email at the

17   bottom there from March 5, 2014.

18          And just I'll read the last two lines and tell me if I

19   got this right.

10:43 20          It says, How could we then issue a cc for the clients

21   to use.  We are backed by gold.  We have 100 million dollars in

22   my name in gold in Spain in a bank.

23          Did I read that correctly?

24   A.   Yes.

25   Q.   And Spain and Texas are two different places.

```
 1   A.    Correct.
 2             MR. MARKHAM:   Now can we go back to Exhibit 11N, the
 3   one we were looking at before.
 4             And go to page 2.
 5             So this is a document we just reviewed talking about
 6   $100 million commitment, correct?
 7   A.    Yes.
 8             MR. MARKHAM:   Can we zoom in just on the very last
 9   paragraph there.
10   Q.    It says, Harmonie International Limited hereby declares
11   and warrants that we are the legal owner of the AU metal and he
12   undertakes to provide this commitment with full legal
13   authority, and it goes on to reference gold bars.
14             Did I read that correctly?
15   A.    Yes.
16   Q.    So here it says Harmonie hereby declares and warrants that
17   we are the legal owner.  Did I read that right?
18   A.    Yes.
19             MR. LOPEZ:   Objection.
20             THE COURT:   What, asked and answered?
21             MR. LOPEZ:   It doesn't say "we" anywhere in that --
22             MR. MARKHAM:   Your Honor, can you highlight the word
23   "we" please.
24             MR. LOPEZ:   I apologize.
25             THE COURT:   Withdrawn?
```

```
 1              MR. LOPEZ:  I withdraw my objection.
 2    BY MR. MARKHAM:
 3    Q.   Let me ask this question:  Is Harmonie International a
 4    different name than Randall Crater?
 5    A.   Yes.
 6              MR. MARKHAM:  Can we go to Exhibit 6, please?
 7    Q.   Again, we reviewed this.  This is the Randall Crater
 8    Twitter page, correct?
 9    A.   Yes.
10:45 10         MR. MARKHAM:  Can you highlight there where it says,
11    "The first cryptocurrency to be backed by gold."
12    Q.   Now, you testified earlier that you found that this post
13    was still up in 2022, correct?
14    A.   Correct.
15    Q.   So is it fair to say that this post was never -- after
16    August 1, 2015, this post was not taken down in 2016.
17    A.   It wasn't.
18    Q.   And it wasn't taken down in 2017.
19    A.   No, it wasn't.
10:45 20    Q.   So I don't bore the jury, all the way up to present day,
21    it wasn't taken down.
22    A.   Correct.
23    Q.   Okay.
24              MR. MARKHAM:  Can you go to Exhibit 11JJ.
25    Q.   Defense brought up this email to you on their
```

cross-examination, and it appears to be a discussion of

exchanging My Big Coin virtual currency for U.S. dollars on the

My Big Coin Exchange.  Do you recall going through these?

A.   Yes.

MR. MARKHAM:  And then can you just zoom in at the top

there.

Q.   So after this exchange about exchanging virtual currency

for dollars, Mark Gillespie appears to forward this to Randall

Crater in December of 2014; is that right?

A.   Yes.

Q.   And then he says, I sent you, in parenthesis, Greyshore

his email to me.

A.   Yes.

MR. MARKHAM:  Then can you scroll down where it says

"TomC."

Q.   He had you read just any statement from someone named TomC

in there.

So he had you read various statements from TomC on

this chat log.

A.   Yes.

Q.   Do you remember that?

A.   Yes.

Q.   Do you have any idea who the handle "TomC" actually

belongs to?

A.   No.

1    Q.   So you have no idea if TomC is a man named Tom or a man

2    named Randall Crater?

3    A.   I wouldn't know that.

4             MR. MARKHAM:  No more questions, your Honor.

5             THE COURT:  Thank you.  Recross?

6             (Discussion off the record.)

7             MR. LOPEZ:  Can you pull up 15A.

8             MR. MARKHAM:  Your Honor, this is not an exhibit I

9    brought up in redirect.

10:47 10          THE COURT:  Counsel, let me hear the questions, but

11   I'm focused on scope.

12             Mr. Lopez.

13                        RECROSS-EXAMINATION

14   BY MR. LOPEZ:

15   Q.   So you said you went to the Wayback Machine and pulled up

16   a number of different pages?

17   A.   Correct.

18   Q.   And if you look --

19             MR. LOPEZ:  Can you -- at the top of the page,

10:48 20   Mr. Sweeney, can you pull that up.

21             That's fine.

22   Q.   Now, at the top of this page it says, "The Wayback

23   Machine," it gives a web address, and then it has 20140816.

24             Does that tell you something?

25             MR. MARKHAM:  Your Honor, object to the lack of

```
  1    personal knowledge.
  2              MR. LOPEZ:  He's the one that went to the Wayback
  3    Machine.
  4              MR. MARKHAM:  This is how the --
  5              THE COURT:  Counsel, sustained as to this question.
  6    You can ask another question.
  7    BY MR. LOPEZ:
  8    Q.   When you go to the Wayback Machine, does it tell you the
  9    date of the web page that you're pulling en?
10:48 10   A.   It does.
 11    Q.   And in the case of the home page, when you go to May 17,
 12    2014 and click on it, it brings you up a page that's dated
 13    August 16, 2014?
 14              MR. MARKHAM:  Your Honor, objection, testifying.
 15    Again, he's testifying as to --
 16              THE COURT:  Counsel, sustained as to the question.
 17              You can ask another question.
 18    BY MR. LOPEZ:
 19    Q.   Are you aware that when you go to the Wayback Machine and
10:49 20   pull up a page, it gives you the date of the page?
 21    A.   It gives you the date of the web page as it existed that
 22    date.
 23    Q.   Okay.  And those numbers on the top, does that indicate
 24    the date?
 25              MR. MARKHAM:  Objection, lack of personal knowledge.
```

```
 1   Q.   If you know.

 2              MR. LOPEZ:  If he knows.

 3              THE COURT:  Well, overruled given the amendment to the

 4   question.

 5              If you know.

 6              (Pause.)

 7   A.   I don't know.  I don't know what those numbers are.

 8              MR. LOPEZ:  No further questions.

 9              THE COURT:  Thank you.

10:50 10         Thank you, sir.  You're excused.

11              THE COURT:  Counsel, next witness.

12              MR. MARKHAM:  Yes, your Honor.  The government calls

13   Jay Byrd.

14              THE COURT:  He may be called.

15              I'm aware of the time, jurors, but we'll get started.

16   Thank you.

17              JAY BYRD, having been duly sworn by the Clerk, was

18   examined and testified as follows:

19              THE CLERK:  Thank you.  Please be seated.

10:51 20         THE COURT:  Good morning, sir.

21              THE WITNESS:  Good morning.

22              THE COURT:  Mr. Markham.

23              MR. MARKHAM:  Yes, your Honor.

24                          DIRECT EXAMINATION

25   BY MR. MARKHAM:
```

```
 1    Q.   Mr. Byrd, can you please state your full name and spell
 2    your last name for the record.
 3    A.   Yes.  Jay Charles Byrd, B-y-r-d.
 4         THE COURT:  Thank you.
 5    BY MR. MARKHAM:
 6    Q.   So just to give the jurors some background about you, what
 7    line of work are you in?
 8    A.   Well, I'm retired right now, but for about 35 years before
 9    I retired I was in the pharmaceutical industry.
10    Q.   Can you provide some background on your education?
11    A.   Yes, I have a Bachelor of Science from Wayne State
12    University in Detroit, graduated in 1976.
13    Q.   Where are you from?
14    A.   Detroit area.
15    Q.   Do you live with your family in Detroit?
16    A.   Yes, in Leonard, Michigan is what it's called, it's north
17    of Detroit.
18    Q.   Have you heard of My Big Coin?
19    A.   Yes, I have.
20    Q.   How did you first hear about My Big Coin?
21    A.   I heard it through a friend of mine.
22    Q.   What was his name?
23    A.   Don McGinley.
24    Q.   Approximately what year was that?
25    A.   That would have been around 2015.
```

1    Q.    Did you ever end up speaking with someone who was

2    associated with My Big Coin to learn more about it?

3    A.    Yes, I did.

4    Q.    And what was that man's name?

5    A.    Mark Gillespie.

6    Q.    Just as a general overview, what did Mark Gillespie tell

7    you about My Big Coin?

8    A.    He told me that it was an unbelievable opportunity, ground

9    floor opportunity to get into cryptocurrency and that it was --

10:52 10   I guess the best way to put it, it was even a better

11   opportunity than Bitcoin because it was offering things that

12   Bitcoin had not offered at the time.

13   Q.    Let's break that down a little bit.  You were told that My

14   Big Coin was in cryptocurrency, right?

15   A.    Correct.

16   Q.    And you just referenced Bitcoin?

17   A.    Mm-hmm.

18   Q.    Were you told it was like Bitcoin or did you just think it

19   was like Bitcoin?

10:53 20   A.    No, I was actually told that it was like a Bitcoin, it was

21   a cryptocurrency, and that this was actually going to be a

22   better one than Bitcoin.

23   Q.    When considering whether or not to invest in My Big Coin,

24   was the fact that this was like Bitcoin important to you?

25   A.    Yes, it was.

1   Q.   Can you tell the jury why?

2   A.   Well, when you looked the Bitcoin and a lot of things that

3   I read, that it was a great opportunity as it seemed to be the

4   wave of the future.

5   Q.   When you say "the wave of the future," is that the

6   cryptocurrency part?

7   A.   Correct.

8   Q.   Do you remember hearing anything about gold backing?

9   A.   That was one of the first things that when I was, after

10:53 10   talking to my friend Don McGinley, then he referred me to talk

11   to Mark Gillespie, that was one of the things that Mark was

12   talking about, that it was backed by gold.

13   Q.   And when considering whether or not to invest, was the

14   fact that My Big Coin was backed by gold important to you?

15   A.   Yes, it was.

16   Q.   So why, if you're buying a cryptocurrency, did it matter

17   to you that it was backed by gold?

18   A.   Well, I think that's one of the opportunities, is that it

19   offered something other than what I had known about

10:54 20   cryptocurrency and Bitcoin, and that it was offering more

21   security when purchasing it.

22   Q.   Do you remember being told anything about Goldman Sachs?

23   A.   Yes, that was also part of the conversation I had with

24   Mark initially.

25   Q.   And what did Mark Gillespie tell you about Goldman Sachs?

1    A.   The best that I can recall is that he mentioned that
2    Goldman Sachs highly -- it was highly recommended, or they were
3    recommending My Big Coin.
4    Q.   And when Mark Gillespie told you that Goldman Sachs was
5    recommending the cryptocurrency My Big Coin, was that important
6    to you in your decision whether or not to invest?
7    A.   Yes, it was.
8    Q.   Can you explain to the jury why?
9    A.   Any time you get a company, say, a JPMorgan or any of the
10:55 10   big investment companies and they back it up with or recommend
11   it, it has -- carries a lot of weight.
12   Q.   Were you told that the cryptocurrency itself, the My Big
13   Coin cryptocurrency, could be traded on exchanges?
14   A.   Yes, I did.
15   Q.   And when considering whether to invest, was the fact that
16   this was a publicly tradeable cryptocurrency important to you?
17   A.   Yes, it was.
18   Q.   Can you explain to the jury why?
19   A.   Well, that means I would be able to utilize it -- when I
10:55 20   put the money towards it, I'd be able to utilize it for
21   purchases of something I wanted later on, might want.
22   Q.   Do you know the name Randall Crater?
23   A.   Yes, I do.
24   Q.   And how did you first hear about Randall Crater?
25   A.   Through Mark Gillespie.

```
 1   Q.   And what did Mr. Gillespie tell you about Randall Crater?
 2   A.   He told me he was well-to-do, very wealthy, had his -- had
 3   a lot of opportunities in a lot of businesses, he was spread
 4   out, and that this was one of the things that he had started
 5   during that time.
 6   Q.   Okay.  So he told you that Randall Crater had started My
 7   Big Coin?
 8   A.   Yes.
 9   Q.   And then he told you a bunch of information about My Big
10   Coin?
11   A.   Correct.
12   Q.   Where did Mr. Gillespie tell you he was getting his
13   information about My Big Coin?
14   A.   Every time I talked to Mark Gillespie it was always -- he
15   always referred to Randall Crater.  He passed the information
16   from Randall Crater on to us.
17   Q.   Prior to investing, did you look at any websites to
18   research My Big Coin?
19   A.   Yes, I did.  Initially I looked at the website itself and
20   kind of reviewed it, and I'm not a real techie, but it looked,
21   like, really good, everything was all put together correctly.
22   Q.   Did you ever put money into My Big Coin?
23   A.   Yes, I did.
24   Q.   Did that include buying what you thought was stock in the
25   My Big Coin company?
```

1    A.    Yes, I did.

2    Q.    Did you also purchase what you thought was the My Big

3    Coin -- separate from the stock, did you also buy what you

4    thought was the My Big Coin cryptocurrency?

5    A.    Yes, I did.

6    Q.    In total about how much did you put into My Big Coin?

7    A.    Total about $87,000.

8    Q.    And how much of that was for investment in the company,

9    the stock, and how much of it was for the publicly tradeable

10:57 10    cryptocurrency?

11   A.    Initially it was for the coins, and it was $37,000; and

12   the stock came a little bit later, and that was $50,000.

13   Q.    How did you send money to My Big Coin when you were making

14   these investments or purchases?

15   A.    When I purchased it, I was told to wire the money, and

16   during the purchase of this I was given 48 hours because they

17   were going to close it, and so they gave me a name of Barbara

18   Meeks, in which I was told was the holding person for the

19   funds.

10:58 20   Q.    So at the time you were told that Barbara Meeks was the

21   holding person for the My Big Coin funds?

22   A.    Correct.

23   Q.    Did you later find out who Barbara Meeks was?

24   A.    Yes, I did.

25   Q.    And who was that?

```
 1   A.   Can you repeat that?

 2   Q.   And who was Barbara Meeks?

 3   A.   From what I understood, Barbara Meeks was --

 4            MR. LOPEZ:  Objection, source.

 5            THE COURT:  Counsel, foundation?

 6            MR. LOPEZ:  Yes.

 7            MR. MARKHAM:  Yes, your Honor.

 8   BY MR. MARKHAM:

 9   Q.   Did someone tell you who Barbara Meeks is?

10   A.   Yes, they did.

11   Q.   And who told you that?

12   A.   Mark Gillespie.

13   Q.   And who did Mark Gillespie tell you is Barbara Meeks?

14   A.   That Barbara Meeks was Randall Crater's mother, is what he

15   told me initially.

16   Q.   So you made two investments or one purchase of the

17   cryptocurrency and then also the investment for stocks.

18            Did you ever receive a stock certificate?

19   A.   No, I did not.

20   Q.   Were you ever told that you would?

21   A.   Many times.

22   Q.   By whom?

23   A.   Mark Gillespie.

24   Q.   Were you ever told that My Big Coin had currently a

25   partnership with MasterCard?
```

1   A.   Yes, it was -- yes, I did.

2   Q.   And what were you told was the purpose of My Big Coin

3   having a partnership with MasterCard?

4   A.   Well, we'd be able to download our coins onto the

5   MasterCard, and we'd be able to use that similar to a debit

6   card.

7   Q.   So you were told that you'd be able to basically buy

8   things in the real world using your My Big Coin cryptocurrency?

9   A.   Correct.

11:00 10   Q.   Did you ever receive a MasterCard in the mail?

11   A.   Yes, I did.

12   Q.   Can you just describe for the jury what that looked like?

13   A.   It had, if I remember, it was a My Big Coin, MBC, on

14   there.   It was black and yellow, and it did not have my name,

15   it just said "preferred customer" on the bottom.

16   Q.   Were you ever able to spend your My Big Coin currency

17   using the MasterCard?

18   A.   No.

19   Q.   Did you ever hear Randall Crater speak directly?

11:00 20   A.   I heard him one time when I had called Mark Gillespie, and

21   he must have been on another line and I heard what Mark

22   Gillespie told me was Randall Crater.

23   Q.   Okay.   So just to be clear.   You were having a

24   conversation with Mark Gillespie about My Big Coin --

25   A.   Correct.

```
 1   Q.    -- and you could hear a voice on the other line that you
 2   were told was Randall Crater?
 3   A.    Correct.
 4   Q.    From what you could personally hear on that conversation,
 5   who was Mark Gillespie getting his information from?
 6   A.    From Randall Crater.
 7   Q.    You testified earlier that in 2015 you put over -- or
 8   around $87,000 into My Big Coin either for the cryptocurrency
 9   or investments; is that right?
10   A.    Correct.
11   Q.    Since 2015, have you tried to get your money back?
12   A.    Yes, I have.
13   Q.    Does that include trying to get money back from the stock
14   and selling what you thought was cryptocurrency?
15   A.    Well, yes, I was trying to get the -- sell the
16   cryptocurrency back.  I was in some financial circumstances
17   myself, and I was told before by Randall -- I'm sorry, by Mark
18   Gillespie that Randall would purchase the coins back from me
19   for $300 a coin.  So when I asked Mark, Hey, I'd like to cash
20   these in, I need this because of financial reasons, I was told
21   from Mark that he never said that.  And I said, Well, let me
22   ask you a question, How did I come up with the $300?  I could
23   have came up with 50, 25, a thousand.  Why does $300 ring a
24   bell?  He goes, I just never said it.  But I know he did.
25   Q.    Okay.  So for --
```

```
 1              THE COURT:  Counsel, just given the time --
 2              MR. MARKHAM:  Three more questions, your Honor.
 3              THE COURT:  Three more -- if the jury can bear with
 4    us, we'll stop after the direct.  Thank you.
 5              Mr. Markham.
 6              MR. MARKHAM:  Yes, your Honor.
 7    BY MR. MARKHAM:
 8    Q.   Okay.  So just to be clear, since 2015, when you put in
 9    around $87,000, have you been able to get any money back?
10    A.   No, I have not.
11    Q.   What about the gold backing you were told it had, did you
12    ever receive any gold?
13    A.   No, I did not.
14    Q.   And you testified earlier that you also couldn't spend the
15    My Big Coin currency on the MasterCard either, correct?
16    A.   Correct.
17    Q.   And how about, lastly, trading My Big Coin currency on the
18    cryptocurrency exchange, were you ever able to do that?
19    A.   Never.
20    Q.   Why not?
21    A.   They weren't on there.  I was told where to go.  I tried
22    to go there.  I could never find them.
23              MR. MARKHAM:  That's all, your Honor.  Thank you.
24              THE COURT:  Thank you.
25              Sir, I'll have you step down now.  We're going to take
```

```
 1    a 20-minute break, and then we'll have you come back for the
 2    rest of examination.
 3              THE WITNESS:  Thank you, your Honor.
 4              THE COURT:  You can step down.
 5              Jurors, as I said, we'll take 20 minutes.
 6              (Jury left the courtroom.)
 7              THE COURT:  Counsel, anything before we break?
 8              MR. MARKHAM:  Nothing from the government, your Honor.
 9              MR. LOPEZ:  No, your Honor.
11:04 10        THE COURT:  We'll take our break.  Thank you.
11              (Recess taken.)
12              (The Court entered the courtroom.)
13              THE COURT:  The jury is about to come in.  Thank you.
14              (Jury entered the courtroom.)
15              THE CLERK:  Court is in session.  Please be seated.
16              THE COURT:  Mr. Lopez.
17              MR. LOPEZ:  Thank you, your Honor.
18                          CROSS-EXAMINATION
19    BY MR. LOPEZ:
11:25 20   Q.   Good morning, Mr. Byrd.
21    A.   Good morning.
22    Q.   We've never met.
23    A.   No.
24    Q.   Did my private investigator, John Cinotti, reach out to
25    you?
```

1    A.    Not that I recall.

2    Q.    He didn't leave you any messages to call him?

3    A.    Not that I recall, no.

4    Q.    Now, I think you said you got involved in My Big Coin

5    because a friend of yours introduced you to Mark Gillespie.

6    A.    Correct.

7    Q.    And it wasn't clear to me from your testimony when that

8    was.

9          Do you remember the month?

11:25 10    A.    It would have been somewhere before I made the investment.

11    I'm going to guess maybe a few weeks before that maybe.

12    Q.    And do you remember when your first investment was made?

13    A.    That was made in 2015, and I believe it was, in looking at

14    everything, it was in June.

15    Q.    Does the date June 4, 2015 ring a bell?

16    A.    Not today.

17    Q.    It was a long time ago.

18    A.    Yes.

19    Q.    Now, I think you said that Mark Gillespie told you that

11:26 20    this was a ground floor opportunity is what I think you said.

21    A.    I'd say that's correct.

22    Q.    And was that important to you?

23    A.    Yeah.

24    Q.    Why was it important to you?

25    A.    Usually a lot of times when you get in on an investment

1   early, it's a good thing.

2   Q.   So you were hoping to make money on this deal.

3   A.   Sure.

4   Q.   You were hoping to have coins that appreciated in value.

5   A.   Sure.

6   Q.   And -- now, you said that you never met Mr. Crater.

7   A.   No, I did not.

8   Q.   And you've never talked to Mr. Crater.

9   A.   Not directly, no.

11:27 10   Q.   And the complete source of your information is through

11   Mark Gillespie and your friend Don Mackley.

12   A.   McGinley, correct.

13   Q.   McGinley.  Can you tell me what your friend McGinley told

14   you about My Big Coin?

15   A.   He told me that he had been contacted by one of his

16   friends that knew Mark Gillespie and he explained what it was,

17   and he gave me Mark Gillespie's phone number.

18   Q.   And what did your friend tell you My Big Coin was?

19   A.   It was an opportunity like Bitcoin, that it was going to

11:28 20   be even better.

21   Q.   Is that all he told you?

22   A.   Pretty much.

23   Q.   So he didn't tell you anything about it being backed by

24   gold?

25   A.   Not right off the bat.  I think when I talked to Mark,

1    that's when I got the information.

2    Q.   And he didn't tell you that you would get a MasterCard?

3    A.   No.

4    Q.   All he told you is that it was an opportunity like Bitcoin

5    to get in on the ground floor?

6    A.   He said it was going to be better than Bitcoin is what I

7    was told.

8    Q.   So at that point in time you thought this was going to be

9    a get rich quick scheme, right?

11:28 10   A.   No, not -- I'm not looking for that.  I was looking for an

11   opportunity.

12   Q.   Now, I think you said that after you spoke to

13   Mr. Gillespie, you did some research on your own?

14   A.   Only on the website that he gave me, that was basically

15   what I used initially.

16   Q.   And that website was the My Big Coin website?

17   A.   Yes, I was.

18   Q.   And do you remember if that website said that My Big Coin

19   was like Bitcoin?

11:29 20   A.   I don't recall.

21   Q.   Do you know whether or not that website said that My Big

22   Coin was a cryptocurrency?

23   A.   Yes, as much as I can remember, yes, that's what it said.

24   Q.   Do you recall whether the website said it was a virtual

25   currency?

```
 1    A.    I don't recall.

 2    Q.    Do you know the difference between a virtual currency and

 3    a cryptocurrency?

 4    A.    No, I do not.

 5    Q.    In 2015, when you invested in this, what did you -- did

 6    you know what a cryptocurrency was?

 7    A.    Only through me going through what Bitcoin was doing.

 8    That's about all I knew.

 9    Q.    So if I understand your answer, you read some information

11:30 10   about Bitcoin?

11    A.    Correct.

12    Q.    So you didn't really know how a cryptocurrency worked.

13    A.    No, I do not.

14    Q.    And yet, you invested anyway.

15    A.    Yes, I did.

16    Q.    Okay.  When you met with Jan Kostka, the postal inspector,

17    in August of 2018, did you tell him that you conducted internet

18    research?

19    A.    I don't recall.

11:30 20   Q.    Do you recall telling him that you knew cryptocurrencies

21    were on the rise and a potentially good investment?

22    A.    I don't recall that conversation.

23    Q.    And that was in 2018.

24    A.    Correct.

25             MR. MARKHAM:  Objection, your Honor, he said he didn't
```

 1    recall.

 2          THE COURT:  Well, overruled.  It's noted.

 3    BY MR. LOPEZ:

 4    Q.   Now, you said that Mr. Gillespie told you that it was

 5    backed by gold?

 6    A.   Yes.

 7    Q.   What was backed by gold?

 8    A.   That the coins were being backed by gold is what I was

 9    told.

11:31 10   Q.   The coins, not the company.

 11   A.   That's what I -- I mean, you're talking about eight, nine

 12   years ago.  Company, coins, I'm not sure but it was backed.

 13   Q.   So he used the words "backed by gold."

 14   A.   Correct.

 15   Q.   And what did you understand that to mean?

 16   A.   I understand it to mean that it would be a very safe

 17   investment, and that's kind of what got me intrigued with it,

 18   because it was backed by gold.

 19   Q.   Okay.  What did you understand "backed by gold" meant?

11:31 20   A.   That meant that it was secure, your investment was secure.

 21   Q.   So did you think that "backed by gold" meant -- remember,

 22   we're both older men, remember when Fort Knox used to hold gold

 23   bullion and backed the U.S. dollar?

 24   A.   Mm-hmm.

 25         THE COURT:  I'm sorry, when you say -- you have to

```
 1   give a verbal response.
 2            THE WITNESS:  I'm sorry.
 3            THE COURT:  Do you mean "yes"?
 4   A.   I don't know if I would use that analogy, but I would say
 5   that when it's backed by gold, that makes the investment safe.
 6   Q.   But I guess what I'm trying to understand is, did you
 7   think that if your coin got lost, you would get gold in return?
 8   A.   No, I thought that the gold, since it was backed by gold,
 9   would be a safe investment, that that gold would always have
10   the power in which to purchase items in the future.
11   Q.   I'm -- forgive me, but I'm not following.
12            You made this investment, and I think you testified,
13   because someone -- because Mark Gillespie told you it was
14   backed by gold.
15   A.   Correct.
16   Q.   Did he tell you how it was backed by gold?
17   A.   I don't recall.
18   Q.   Did he tell you what would happen or how you would access
19   the gold?
20   A.   I don't recall.
21   Q.   Now, I think you said in your testimony that you -- you're
22   not a techie.
23   A.   That's correct.
24   Q.   Do you use email?
25   A.   Yup.
```

```
  1    Q.    Did you use email back in 2014?

  2    A.    Yup.

  3    Q.    And --

  4    A.    Yes.

  5    Q.    And you made your investment in early June of 2015, and I

  6    think you said you were told it was backed by gold, that

  7    Goldman Sachs was highly recommending My Big Coin, that it

  8    traded on the exchange, it could be traded on exchanges --

  9    A.    That's what I was told.

 10    Q.    -- and that it could be publicly traded.

 11    A.    That's what I was told.

 12    Q.    So between June 4, 2015 and your next investment, did you

 13    go to the website and verify that that was what the deal was?

 14    A.    I honestly don't remember.  I don't recall how all that

 15    transpired.

 16    Q.    Do you recall setting up an account?

 17    A.    I set up an account a little bit later than -- and I was

 18    helped by Mark Gillespie in setting up an account, but when and

 19    where, I don't remember.

 20    Q.    All right.  So you didn't personally set up your account,

 21    you needed Mark Gillespie to help you.

 22    A.    Initially, yes.

 23    Q.    Okay.  And you don't recall when you actually set up your

 24    account.

 25    A.    No.
```

11:34 10

11:34 20

1    Q.    When you did set up the account, were you able to access

2    your information?

3    A.    I was able to access the information that was downloaded

4    on the website that showed the amount of coins that I had

5    purchased.

6    Q.    In a wallet?

7    A.    No.   That was just online.   It showed what I had in my

8    account.

9    Q.    Well --

11:35 10   A.    Not a wallet, not initially, no.

11   Q.    Well, let me ask you this:  Did you actually go online and

12   register your account or did someone do it for you?

13   A.    I think I said I believe Mark Gillespie helped set it up

14   with me.

15   Q.    And I think I understand your testimony to be saying that

16   after it was set up, you didn't think it was a wallet?

17   A.    No.

18   Q.    And I'm talking in 2014, not 2022.

19   A.    Correct.

11:36 20   Q.    So no one told you it was a wallet.

21   A.    No, they said the MasterCard was the wallet later on.

22   Q.    And after it was set up, did you go to exchanges to see if

23   you could trade it?

24   A.    Yes, I did.

25   Q.    Did you do that right after your first investment?

1    A.   I don't recall the date of when I did it.  I don't recall.

2    Q.   So is it fair to say that you may not have gone to verify

3    what you were told by Mr. Gillespie after you made your initial

4    investment?

5    A.   I verified the number of coins that I had.

6    Q.   And I think --

7    A.   If that's what you're asking.

8    Q.   Well, ultimately you had 2,070 coins, right?

9    A.   I know it was over 2,000, yes.

11:36 10   Q.   Okay.  And at that time, the last time you checked, it was

11   worth $543 per coin, right?

12   A.   That's what was online, yes.

13   Q.   And then you subsequently purchased more coin later in

14   June.  Your initial investment was $25,000?

15   A.   Correct.

16   Q.   Your second investment was for $12,500.

17   A.   Correct.  I don't remember the dates.

18   Q.   But that -- okay.

19        After your second investment, did you do anything to

11:37 20   verify that what Mark Gillespie told you was true?

21   A.   I talked to the friends I talked to that were invested.

22   We kept each other informed.  Just went with whatever Mark

23   Gillespie told me.

24   Q.   I guess what I'm most interested in -- in response to a

25   leading question from counsel, you said that it was --

```
         1              MR. MARKHAM:  Objection.
         2    Q.    -- publicly traded, it could be publicly traded?
         3              MR. MARKHAM:  Commentary.
         4              THE COURT:  Well, Sustained as to that.
         5              Counsel, you can rephrase.
         6    BY MR. LOPEZ:
         7    Q.   You understood when you invested, or you told us that you
         8    thought it could be publicly traded.
         9    A.   Well, I didn't know a lot about it initially, but I was
11:38   10    told that it could be publicly traded.  I wasn't sure what that
        11    was at the time.
        12    Q.   So you didn't -- that wasn't one of the things that you
        13    relied upon, that wasn't important to you, right?
        14    A.   I don't recall that.
        15    Q.   Okay.  So, in any event, when you made your first and
        16    second investment, you didn't actually try to see whether or
        17    not it was publicly traded.  It was sometime later.
        18    A.   I think that's correct.
        19    Q.   Okay.
11:38   20    A.   I'm not a hundred percent sure.
        21    Q.   All right.  And then I think you made a third investment,
        22    but this time in stock or purchase of stock.
        23    A.   Correct.
        24    Q.   And I think you said you purchased -- or you thought you
        25    were purchasing $50,000 worth of stock.
```

```
 1   A.   Correct.
 2   Q.   And do you remember how many shares of stock you were
 3   supposed to get for that $50,000?
 4   A.   I don't recall the figure.
 5   Q.   Do you remember what the par value for each share was for
 6   that stock purchase?
 7   A.   I believe the par value was -- I believe, and I don't even
 8   know if I can really recall the number, but $10 seemed about
 9   right, was par value.  But even then it's -- I don't really
10   recall.
11            MR. LOPEZ:  May I approach the witness, your Honor?
12            THE COURT:  You may.
13            MR. MARKHAM:  Your Honor, if I could have a copy of
14   whatever he's showing.
15            THE COURT:  Sure.
16            (Discussion off the record.)
17            MR. MARKHAM:  It's not marked, your Honor.
18            THE COURT:  Well, it's for refreshing, right?
19            MR. LOPEZ:  Yes, refreshing.
20   BY MR. LOPEZ:
21   Q.   Sir, I just ask you to look through that document.
22            (Discussion off the record.)
23   A.   You want me to look at all these?
24   Q.   Mm-hmm.
25            (Pause.)
```

```
 1   A.   I don't remember these, but --
 2          THE COURT:  Well, counsel, do you want to ask a
 3   question now?
 4          MR. LOPEZ:  I will ask it.
 5   BY MR. LOPEZ:
 6   Q.   Having reviewed this document, does that refresh your
 7   memory as to the par value of the stock?
 8   A.   No, it really doesn't, sorry.
 9   Q.   Don't be sorry.
10          Now, you also said that you never saw it on an
11   exchange.
12   A.   I never saw it on an exchange.
13   Q.   And which exchange did you go to see?
14   A.   The one that I was referred to by Mark Gillespie, Nova.
15   Q.   Okay.
16   A.   And I never found it on there.
17   Q.   And when did you do that?
18   A.   I don't remember.  I mean, many times.
19   Q.   Did you do it before you were interviewed by the postal
20   inspector?
21   A.   Oh, yes.
22   Q.   Okay.  Did you do it in 2017?
23   A.   Again, I don't remember the time frame of when I went on
24   my computer to look at things.
25          MR. LOPEZ:  Mr. Sweeney, could you bring up Exhibit 8.
```

11:41 (line 10)
11:41 (line 20)

```
 1              MR. MARKHAM:  Your Honor, can the government ask for
 2     what purpose?  Is this to refresh?
 3              THE COURT:  Well, counsel, no speaking objections.  So
 4     we'll hear the question.  Okay?
 5              Counsel.
 6     BY MR. LOPEZ:
 7     Q.   Does this look like the Nova Exchange that you looked at
 8     whenever?
 9     A.   I don't recall.  I just remember going on it.
11:42 10 Q.   Okay.
11              Now, when you were interviewed by Postal
12     Inspector Kostka --
13              MR. MARKHAM:  Your Honor, I'd ask to take the exhibit
14     down.
15              MR. LOPEZ:  Yes.
16              THE COURT:  Thank you.
17              Mr. Lopez.
18     BY MR. LOPEZ:
19     Q.   -- did you tell him that you thought the value of your
11:43 20 investment was supposed to be transferred to a MasterCard from
21     your online wallet?
22     A.   Yes, somewhere along the line they said that when we
23     finally received the MasterCard that they would download the
24     coins and our value onto that.
25     Q.   Now, let me ask you this:  After you had invested by
```

buying coin, were you satisfied with your investment at the

time that you decided to spend more money on the stock?

A.   I think it happened so quickly.  I don't recall how

satisfied I was, but I must have thought it was a good

opportunity from what I knew and what I was being told.

Q.   And does the date 8/27/2015, or August 27, 2015, is that

around the time that you made the $50,000 purchase for stock?

A.   I believe it was in August.

Q.   So you had all of July and August to verify that this was

a solid investment.

And you were satisfied because you put up money for

the stock.

A.   Yes.

Q.   And at that point in time, before you put up the money for

the stock, did you try to sell any of your coin?

A.   No, I didn't.  I figured the coin would go up in value,

and so why sell it?

Q.   And that was the main purpose for you buying it to begin

with, right?

A.   Well, I think that's why we buy anything in any market,

just hope that it goes up in time.

Q.   And you were told that there was going to be an IPO?

A.   Correct.

Q.   And you bought stock because you thought the stock was

going to go up in price.

1   A.   Sure.

2   Q.   And the gold had nothing to do with the stock, right?

3   A.   It shouldn't have, but it probably did.  I mean, you're

4   looking at stock and gold by one company My Big Coin.

5   Q.   And prior to your interview with Inspector Kostka, had you

6   asked anyone to buy your coin?

7   A.   Yes, I did.

8   Q.   And when was that?

9   A.   I don't recall the dates, but, yes, I did.  I asked Mark

11:46 10   Gillespie if -- since he had made a statement that Randall

11   Cunningham would buy the coins back at $300 apiece, that's the

12   only time I tried to get money back.

13         THE COURT:  I'm sorry, sir.  You said Randall

14   Cunningham?

15         THE WITNESS:  I'm sorry, Crater.  My bad.

16   BY MR. LOPEZ:

17   Q.   So before you were interviewed, you asked for Mr. Crater

18   to purchase the coin back?

19         THE COURT:  Mr. -- okay.

11:46 20   A.   I don't know when it was.  I don't know if it was before

21   or after, I don't know.

22   Q.   But after you were interviewed, you had a heated

23   discussion with Mr. Gillespie, right?

24   A.   I don't think I had a heated discussion with him.  I think

25   we had some emails going back and forth, if I recall.

1    Q.    Some heated emails where you called Mr. Gillespie a liar.

2    A.    Well, I was told one thing and it wasn't true.

3    Q.    And you were told something else when you were interviewed

4    by Mr. Kostka, right?

5    A.    What was that?  I don't understand.

6    Q.    You were told by Inspector Kostka that there was no gold?

7          MR. MARKHAM:  Objection, hearsay.

8          THE COURT:  Sustained as to the form, counsel.

9    A.    I'm not sure what you're asking.

11:47 10         THE COURT:  You'll have to wait for another question.

11         Mr. Lopez.

12   BY MR. LOPEZ:

13   Q.    Would you agree with me that your view of My Big Coin

14   coins and stocks was affected by your interview with the postal

15   inspector?

16   A.    No, not at all.

17   Q.    So you were angry with Mr. Gillespie before that?

18   A.    I guess.  You're asking me to recall it.  The time frame I

19   don't recall.

11:47 20   Q.    But you don't -- you didn't send an email calling

21   Mr. Gillespie a liar until after you met with the postal

22   inspector, correct?

23   A.    I don't know.  I don't have the dates, I don't have that

24   in front of me.  I don't recall that, no.

25   Q.    Would it be fair to say, sir, that you're angry?

1   A.   No, not at all.

2   Q.   You're not angry?

3   A.   No.  I'm frustrated and discouraged, but I'm not angry.

4   Q.   And are you hoping to get something out of this proceeding

5   if the prosecution is successful?

6   A.   I don't know what I'll get out of this.  I do know that

7   everything I've been told over the course of time has not come

8   true, and whether I get anything or not, I'm still going to go

9   home and put my head down on the pillow.

11:48 10   Q.   So you're not seeking restitution in this case?

11        MR. MARKHAM:  Objection.

12   A.   If it comes, it comes.

13        THE COURT:  Sustained as to the question.  And to the

14   extent there's an answer, it's struck.

15   BY MR. LOPEZ:

16   Q.   So you were angry with Mr. Gillespie, so angry with him in

17   2018, after you spoke to the postal inspector, to call him a

18   liar, which he denied, by the way -- but you're not angry

19   today.

11:49 20        MR. MARKHAM:  Objection.

21        THE COURT:  Sustained to the form of the question

22   based on the prior answers.

23        You can ask another question.

24   BY MR. LOPEZ:

25   Q.   Were you angry with Mr. Gillespie in 2018 after you spoke

1    to the postal inspector?

2    A.   Again, I don't recall the time, how the time frame worked.

3    Was it before or after?  I don't remember.

4    Q.   But, in any event, you were angry with Mr. Gillespie?

5    A.   Yes, because over the course of time everything that was

6    brought up, none of it came true, yes.

7    Q.   But --

8    A.   But that wasn't --

9    Q.   You're not angry today.

11:49 10   A.   It's not angry, no.  I was frustrated.

11   Q.   All right.

12            THE COURT:  Mr. Lopez, are you finished?

13            MR. LOPEZ:  I am, your Honor.

14            THE COURT:  Okay.  Redirect?

15                        REDIRECT EXAMINATION

16   BY MR. MARKHAM:

17   Q.   Mr. Byrd, you said on cross-examination that you weren't

18   quite sure how the gold backing worked; is that right?  So you

19   weren't positive how that gold backing worked?

11:50 20   A.   No, just -- it was a phrase that was used, that you --

21   that I thought that it was backed by gold, and that it made

22   your investment a lot more secure.

23   Q.   Okay.  So while you didn't know exactly how it worked,

24   were you 100 percent certain that it did, in fact, exist?

25   A.   Yes.  At the time, yes.

     1    Q.    You said on cross-examination that, again, you weren't 100

     2    percent positive how cryptocurrency technology worked; is that

     3    fair?

     4    A.    That's fair.

     5    Q.    You're not a cryptocurrency expert?

     6    A.    No.

     7    Q.    But, again, you were sure that My Big Coin, as a

     8    cryptocurrency, in fact existed when you invested.

     9    A.    Yes.

11:50 10    Q.    Had you invested in stocks before?

    11    A.    Yes, I have.

    12    Q.    And if you're comfortable, just give an example.

    13    A.    I own Tesla.

    14    Q.    I think that's a good example.

    15          So for that company, when you invested in Tesla, did

    16    you know how the Tesla non-gas-using motor operates?

    17    A.    No, not at all.

    18    Q.    So is it fair to say when you invested in Tesla, in that

    19    stock, you were simply believing the public statements that

11:51 20    Tesla was putting out.

    21    A.    Correct.

    22    Q.    You thought you could rely on those.

    23    A.    Correct.

    24    Q.    Did you also think you could rely on the statements by My

    25    Big Coin?

1    A.    Yes.

2    Q.    The defense asked you about the value of the coins at

3    different periods.  Do you remember that?

4    A.    Yes.

5    Q.    Do you remember the defense asking you about that?

6    A.    Yes.

7    Q.    To be clear, did you know that the coins had value on a

8    specific date or were you just told by Mark Gillespie as to

9    what the value --

11:51 10   A.    Well, initially I was told, but after going onto the

11   website, it showed a figure of what each coin was worth.

12   Q.    So, again, did you know that that's what the coin was

13   worth or were you just reading what was on the website to rely

14   on that?

15   A.    I was relying on the website.

16   Q.    Okay.  When Mr. Gillespie told you things, who did

17   Mr. Gillespie say he was getting his information from?

18   A.    He always -- almost every time we had talked, he always

19   said that Randall Crater said, or this is what he is telling

11:52 20   us.  So he always tried to kind of make us aware that it wasn't

21   him that was directing this, that it was Randall Crater.

22   Q.    So putting aside the value of the cryptocurrency coins,

23   you also invested in stock in My Big Coin, in the company.

24   A.    Correct.

25   Q.    And defendants asked you about the value of the My Big

```
 1   Coin stock at different times.  Do you recall that?
 2   A.   Yes.
 3           MR. LOPEZ:  Objection.  I didn't --
 4           THE COURT:  Yeah, I don't specifically recall that,
 5   counsel.  Why don't you -- you can ask --
 6   BY MR. MARKHAM:
 7   Q.   Do you recall being asked about par value?
 8   A.   Yes.
 9   Q.   And again, to be clear, when you were talking about the
10   par value, is that something you were able to independently
11   verify or was that just being told to you by someone else?
12   A.   That was just being told.
13   Q.   And who was that being told to you by?
14   A.   Mark Gillespie.
15   Q.   And who was Mark Gillespie getting his information from,
16   according to Mark Gillespie?
17   A.   Randall Crater.
18   Q.   Defense asked you about investing money in August of 2015
19   after previously investing money in June of 2015.  Do you
20   recall that conversation?
21   A.   Could you repeat that one more time, please?
22   Q.   Do you recall investing money around June of 2015?
23   A.   Correct.
24   Q.   And then defense counsel asked you about a couple months
25   later putting more money in in August of 2015.
```

```
 1    A.    For the stock, yes.

 2    Q.    And then -- so that's about two months in between those

 3    two.

 4    A.    Mm-hmm.

 5          THE COURT:  Do you mean "yes," sir?

 6          THE WITNESS:  Yes.  I'm sorry.

 7          THE COURT:  Thank you.

 8    BY MR. MARKHAM:

 9    Q.    Between June and August of 2015, did anyone tell you that

10    My Big Coin was not actually backed by gold?

11    A.    No.

12    Q.    Between June and August of 2015, did anyone tell you that

13    My Big Coin was not yet actually a cryptocurrency?

14    A.    No.

15    Q.    In between June and August of 2015, did anyone tell you

16    that My Big Coin did not have a partnership with MasterCard?

17    A.    No.

18          MR. MARKHAM:  No more questions, your Honor.

19          THE COURT:  Any recross, Mr. Lopez?

20          MR. LOPEZ:  No, your Honor.

21          THE COURT:  Thank you, sir.  You're excused.

22          THE WITNESS:  Thank you very much.

23          THE COURT:  Counsel.

24          MR. MOORE:  The United States calls Kimberly Benge.

25          THE COURT:  She may be called.
```

Lines 10 and 20 are timestamped 11:54.

```
 1              MR. LOPEZ:  Your Honor, we were not notified of this.
 2              THE COURT:  Counsel, was this part of the discussion
 3      yesterday?
 4              MR. LOPEZ:  No.
 5              THE COURT:  Do you want to be heard on Whisper Tech?
 6              Why don't we hold the witness outside for one moment.
 7              (Discussion at sidebar.)
 8              THE COURT:  Mr. Markham, was this one of the names
 9      that was on the lineup?
11:55  10       MR. MARKHAM:  Your Honor, the names we gave for the
11      lineup were the ones that we anticipated in the morning, that
12      is correct.  This was not one of the names.
13              What happened is that we were told that she cannot
14      stay this weekend.  So we're trying to get her on and off
15      today.  If the Court thinks that that was not sufficient
16      notice, we could wait until after the lunch break.
17              THE COURT:  Are there other witnesses here?
18              MR. MARKHAM:  Your Honor, we could have one here
19      relatively quickly if given the opportunity.
11:56  20       THE COURT:  Remind me what this witness is about.  Is
21      it another investor?
22              MR. MARKHAM:  No, your Honor.  This is Randall
23      Crater's sister.  She was on the witness list as coming up
24      after the victims.
25              THE COURT:  Mr. Lopez.
```

1       MR. LOPEZ:  Yes, your Honor.  My understanding is that

2  Ms. Benge arrived yesterday and that the government had to have

3  notice that she could not stay the weekend because she has

4  other responsibilities, and I believe she also has issues with

5  flying.

6       So, I mean, I didn't prepare for this witness.

7       THE COURT:  Okay.  So who do we have otherwise right

8  now or as soon as possible?

9       MR. MOORE:  We have Norman Mendiola and Gavin Abadi.

11:57 10       THE COURT:  And who is here?

11       MR. MOORE:  They both are here.  We could call either

12  of them.

13       THE COURT:  Mr. Lopez, given the travel conflicts and

14  the fact that they were on the witness list, I'd be inclined to

15  get to the other witness after lunch, but we'll go to the other

16  witnesses now.  Okay?

17       MR. LOPEZ:  Okay, your Honor.

18       THE COURT:  Thank you.

19       (End of discussion at sidebar.)

11:57 20       MR. MOORE:  We'll call Norman Mendiola, your Honor.

21       THE COURT:  Thank you.

22       NORMAN MENDIOLA, having been duly sworn by the Clerk,

23  was examined and testified as follows:

24       THE CLERK:  Thank you.  Please be seated.

25       THE COURT:  Good morning, sir.

```
 1              THE WITNESS:  Good morning.
 2              THE COURT:  Counsel.
 3              MR. MOORE:  Can we switch to HDMI1.
 4              THE CLERK:  Yes.
 5                        DIRECT EXAMINATION
 6    BY MR. MOORE:
 7    Q.   Could you please state your name for the record and spell
 8    your last name?
 9    A.   Yeah, my name is Norman Mendiola, M-e-n-d-i-o-l-a.
11:58 10   Q.   And where did you grow up?
11    A.   Orange County, California.
12    Q.   And what is your level of education?
13    A.   I have a master's degree.
14    Q.   What was your level of education in early 2014?
15    A.   I was working on my master's degree, finished my
16    bachelor's.
17    Q.   Where are you employed now?
18    A.   I am self-employed.
19    Q.   And where were you employed in early 2014?
11:58 20   A.   I was working at the Fairmont Hotel as a valet in Newport
21    Beach, California.
22    Q.   And did you --
23              THE COURT:  I'm sorry, sir, can you move the
24    microphone just a little built closer to you.  The base moves.
25    Thank you.
```

```
 1            Counsel.
 2    BY MR. MOORE:
 3    Q.    And did you live in the Newport area in --
 4    A.    I did, I lived in Orange County at the time, yes.
 5    Q.    Are you familiar with My Big Coin?
 6    A.    Yes, I am.
 7    Q.    Who introduced you to My Big Coin?
 8    A.    Mr. Michael Kruger.
 9    Q.    And did Mr. Kruger explain to you what My Big Coin was?
10    A.    Yes, he did.
11    Q.    And how did he describe My Big Coin?
12    A.    My Big Coin was a cryptocurrency that was going to be
13    competing with Bitcoin at the time.
14    Q.    And who -- and did he explain to you who the designer of
15    the My Big Coin platform was?
16    A.    I learned that Mr. Crater was the designer from Mr. Mark
17    Gillespie.
18    Q.    Did you invest in My Big Coin?
19    A.    I did.
20    Q.    How did you invest?
21    A.    I made deposits into a bank account to Greyshore
22    Technologies.
23    Q.    Do you remember approximately how much you invested?
24    A.    $19,500.
25    Q.    At that time was $19,500 a significant amount of money to
```

```
 1   you?
 2   A.   Very much so.
 3            MR. MOORE:  Can we bring up Exhibit 2B and go to page
 4   40.
 5   Q.   Did you make all your investments at one time?
 6   A.   No, I made several investments over a period of a month
 7   and a half.
 8            MR. MOORE:  And can we go to the April 7th entry at
 9   the top there.
10   Q.   Do you see this Greyshore account statement?
11   A.   Yes.
12   Q.   Do you recognize this name that is wiring $6,000?
13   A.   That's my name there.
14   Q.   And is that one of the investments that you made into My
15   Big Coin?
16   A.   Yes, it is.
17            THE COURT:  Maybe it's just me.
18            I'm going to ask both the witness and counsel to slow
19   down a little.
20            MR. MOORE:  Yes, your Honor.
21   BY MR. MOORE:
22   Q.   Do you remember the features of My Big Coin that got you
23   interested in investing?
24   A.   Yes.  One of the major factors was that it was backed by
25   gold, which was a really appealing thing for me, with it being
```

1    a cryptocurrency, that was a really big selling factor.

2          There were social media posts with price action

3    increasing over time, and I thought that there was a good

4    opportunity to invest.

5          It looked like a legitimate project and company with a

6    website and all the features.  You were able to, you know, send

7    money instantly around the world to anywhere, anytime, so that

8    was really appealing to me as well.

9    Q.   And did you believe that this was available to the public?

12:01 10   A.   Yes.

11   Q.   Did you ever hear about My Big Coin Exchange?

12   A.   Yes.

13   Q.   Was the existence of a functioning exchange important in

14   your decision to invest?

15   A.   Yes, that's how you'd be able to convert the Big Coin.

16   Q.   Do you remember anyone ever telling you that My Big Coin

17   is like Bitcoin?

18   A.   Yes, it was a -- it was competing with Bitcoin.

19   Q.   And do you remember ever having discussion about a credit

12:02 20   card related to My Big Coin?

21   A.   It was stated that you would be able to spend your My Big

22   Coin with a credit card, with a partnership that they had with,

23   I believe, MasterCard.

24   Q.   Would you have invested in My Big Coin if it wasn't backed

25   by an asset?

1  A.   Being backed by gold was a big factor, selling factor for

2  me.

3  Q.   Did you ever have any discussion about where this gold was

4  located?

5  A.   I remember hearing that it was potentially stored on an

6  Indian reservation, so that the government wouldn't be able to

7  take it.  It was one of the things that I heard.

8  Q.   Did anyone ever tell you that My Big Coin was only limited

9  to some sort of private network?  Did anyone say that to you?

12:03 10  A.   No.

11  Q.   Was it important to you that My Big Coin could be

12  available anytime, anywhere?

13  A.   Yes.

14  Q.   Did anyone ever tell you that you were buying coins in

15  some type of presale before My Big Coin was launched?

16  A.   I don't recall that.

17  Q.   Did you think that My Big Coin was something that actually

18  already existed or did you think someone was going to make it

19  at some point in the future?

12:03 20  A.   No, I thought it was an up and running cryptocurrency when

21  I first started doing my research and seeing the website,

22  seeing the social media posts about it, I thought it was up and

23  running.

24  Q.   Would you have been less interested in investing if this

25  was just a project to be completed at some point in the future?

1   A.   Yes, yes.

2   Q.   Did you ever sell coins on the My Big Coin exchange?

3   A.   I did not.  I attempted to use the exchange.  It was -- I

4   had a few communications via email.  It was a difficult

5   process.  And I don't think anything came out of it.

6   Q.   Do you know anyone who successfully sold any of their

7   coins on the My Big Coin Exchange?

8   A.   I don't.

9   Q.   Do you remember if there was any fees associated with the

12:04 10   exchange?

11   A.   There was a 2.5 percent transfer fee to the person on the

12   other end, I believe, once you sent it.

13   Q.   Do you know if you were ever charged that fee?

14   A.   When I tried to use the exchange, I was missing -- 2 Big

15   Coin were missing at the time, it was around a $200 value, and

16   I believe I somehow lost those Big Coin when I attempted to do

17   the transfer.

18   Q.   So, just to clarify, so they charged you for attempting to

19   sell on the exchange?

12:05 20        MR. LOPEZ:  Objection.

21        THE COURT:  So sustained as to this.

22        MR. MOORE:  I'll move on.

23   BY MR. MOORE:

24   Q.   Did you receive a credit card related to My Big Coin?

25   A.   I didn't receive a credit card.  We were told that we were

1   going to get a card that you could spend Big Coin with.  In the

2   mail I received a debit card where I would have to deposit my

3   own money to spend.

4   Q.   Is that what you were promised?

5   A.   No, it's not.

6   Q.   Did you have any interest in a prepaid debit card?

7   A.   I did not, no.

8   Q.   Did that have any value to you?

9   A.   I was really concerned about my investment once I received

12:05 10   that.

11   Q.   Have you been able to withdraw any money from your My Big

12   Coin account?

13   A.   No.

14   Q.   Have you been able to use your My Big Coin card at all?

15   A.   No.

16   Q.   Do you remember the name of the account that you were

17   wiring money to to make purchases of My Big Coin?

18   A.   Yes, it was Greyshore Technologies.

19   Q.   Did you know who Kim Benge was when you sent the wire

12:06 20   transfer?

21   A.   I did not.

22   Q.   Do you know who she is now?

23   A.   I was informed that she's a relative of Mr. Crater.

24   Q.   Would it have concerned you at the time to know that you

25   were sending money to Mr. Crater's relatives?

```
 1              MR. LOPEZ:  Objection.

 2              THE COURT:  Sustained.

 3    BY MR. MOORE:

 4    Q.   Did you attempt to purchase any My Big Coin stock?

 5    A.   One of my purchases I informed Mr. Kruger that I wanted to

 6    have the stock, and it was $500 worth.

 7    Q.   Do you remember ever coming across something identified as

 8    the My Big Coin Mall?

 9    A.   Yes, there was -- you would have the ability to spend your

10    Big Coin in this marketplace.

11    Q.   All right.  Did the My Big Coin Mall function?

12    A.   I didn't attempt to buy anything on the mall.  It was --

13    there were a few items on there, but nothing was available for

14    me that I really wanted to purchase.  I wasn't -- I didn't

15    utilize it, no.

16    Q.   And can we show just to the witness Exhibit H1.

17              THE COURT:  Just for the witness and counsel.

18    BY MR. MOORE:

19    Q.   All right.  Did you follow My Big Coin on social media?

20    A.   Yes.

21    Q.   And have me and you met before today?

22    A.   Yes.

23    Q.   And did you have an opportunity to review social media

24    posts from My Big Coin?

25    A.   Yes.
```

1    Q.   And had you seen these posts before when they were made?

2    A.   Yes, I recall these posts.

3    Q.   And are the exhibits in H1 through H7 a fair and accurate

4    representation of the My Big Coin posts that you have seen?

5    A.   Yes.

6            MR. MOORE:  Your Honor, at this time I'd like to move

7    into evidence Exhibits H1 through H7.

8            THE COURT:  Any objection?

9            MR. LOPEZ:  No, your Honor.

12:08 10         THE COURT:  Okay.  They may be admitted.

11   Ms. Hourihan, what are we up to?

12           THE CLERK:  33.

13           THE COURT:  33?

14           THE CLERK:  Yes.

15           THE COURT:  So we'll make this 33A through G, I

16   believe.

17           (Exhibits 33A through G received into evidence.)

18           THE COURT:  It may be published if you wish.

19   BY MR. MOORE:

12:08 20  Q.   All right.  And then is that your name liking the comment

21   here?

22   A.   Yes, it is.

23   Q.   Can you read to us what this social media post says?

24   A.   The wait is over.  Officially My Big Coin has entered into

25   a contract where all My Big Coin's will be backed 100 percent

1    by gold.

2    Q.   Did you rely on this representation in investing in My Big

3    Coin?

4    A.   It was a confirmation of what I was told.

5         MR. MOORE:  Can we go to H2.

6    Q.   And is this you, the first name, liking this comment as

7    well?

8    A.   Yes.

9    Q.   Can you read what this social media post says?

12:09 10   A.   My Big Coin, the only cryptocurrency to back your money

11   with gold.  Sign up today to receive your My Big Coin

12   Visa/MasterCard.

13   Q.   And is this also a confirmation of what you had been told?

14   A.   Yes.

15        MR. MOORE:  And then could we go to H4.

16        If we go down to the second page.

17   Q.   And then do you see your name liking this at the bottom of

18   the second page here?

19   A.   Yes, that's me.

12:10 20        MR. MOORE:  Can we go back up to the post.

21   Q.   And can you read what this says?

22   A.   Today My Big Coin (MBC) current value is $76.57 USD.

23   Q.   All right.  And then is this one of the posts about the

24   price of My Big Coin --

25   A.   Yes.

```
 1    Q.    -- that you relied upon?
 2    A.    Yes.
 3          MR. MOORE:  Can we go to H5.
 4    Q.    Now, is this your name on the first line liking this page?
 5    A.    Yes, it is.
 6    Q.    And then is this another post about the price of My Big
 7    Coin?
 8    A.    Yes.
 9    Q.    And has the price increased since the last post?
10    A.    It did.
11          MR. MOORE:  And can we bring up H3.
12    Q.    And was it important to you that the price of My Big Coin
13    was going up?
14          MR. LOPEZ:  Objection, your Honor.  This is direct
15    exam.
16          THE COURT:  Counsel, you mean in terms of the form of
17    the questions?
18          MR. LOPEZ:  Yeah.
19          THE COURT:  Yeah, sustained.  Sustained.
20          You don't have to say anymore on this.
21    BY MR. MOORE:
22    Q.    Did you testify earlier about -- did you testify earlier
23    about how -- about price movement in My Big Coin?
24    A.    I did.
25    Q.    Was the price movement of My Big Coin going up or down
```

```
 1   when you saw it?
 2   A.   It was going up.
 3   Q.   Was it important to you that it was going up?
 4   A.   It was very important to me.
 5        MR. MOORE:  Can we go to H6, please.
 6   Q.   I think that you're the sixth name here.  Do you see your
 7   name there?
 8   A.   Yes.
 9   Q.   And can you read this social media post.
10   A.   Yes.  My Big Coin IPO news backed by gold.  Yahoo! and
11   then there's an article there.  Revolutionary cryptocurrency
12   platform mybigcoin.com announces that the company is
13   negotiating -- and then the rest.
14   Q.   And there's also a confirmation of the backed by gold?
15   A.   Yes, it is.
16        MR. MOORE:  Can we go to H7, please.
17   Q.   And then can you read what this post says?
18   A.   Yes.  My Big Coin finalizes MasterCard deal cryptocurrency
19   and MasterCard.
20   Q.   And did you take this as a reference to the card you had
21   been promised?
22   A.   Yes.
23   Q.   Was your understanding that My Big Coin was backed by gold
24   important to your purchase of My Big Coin?
25   A.   That was one of the if not the major factor that I
```

1    invested, that it was backed by gold.

2    Q.   Did you rely on the social media posts showing the price

3    of My Big Coin?

4    A.   I did.

5    Q.   Did anyone ever tell you that My Big Coin was backed by

6    anything else apart from what we've discussed already, the

7    gold, the credit card, the exchange, do you remember anything

8    else?

9         MR. LOPEZ:  Objection, your Honor.

12:13 10        THE COURT:  Sustained as to form.  Counsel, direct.

11   So you can rephrase.

12   BY MR. MOORE:

13   Q.   Was there any other thing apart from what we discussed

14   already that was important in your decision to purchase My Big

15   Coin?

16   A.   No, these are the major factors on why I invested in My

17   Big Coin.

18   Q.   And the fact that My Big Coin could be traded on an

19   exchange, was that important to your purchase of My Big Coin?

12:14 20   A.   It was essential to be able to trade, you know, trade on

21   the exchange for the cryptocurrency, yes.

22   Q.   And was the deal with MasterCard also important to you?

23   A.   That legitimized, in my eyes, the My Big Coin as a real

24   company that was, you know -- that was making moves with the

25   large corporations, you know, MasterCard and PR posts like this

1   was a big factor for me investing.

2   Q.   Did anyone ever tell you that your money that you were

3   sending for My Big Coin would be spent on jewelry?

4   A.   No.

5        MR. LOPEZ:  Objection, your Honor.

6        THE COURT:  Sustained as to this.

7   BY MR. MOORE:

8   Q.   Did anyone ever tell you that the money you were sending

9   for My Big Coin would be spent on personal expenses?

12:14 10        MR. LOPEZ:  Objection.

11        THE COURT:  Well, sustained as to the line, counsel.

12   So moving on.

13   BY MR. MOORE:

14   Q.   Did you ever get any of your money back from My Big Coin?

15   A.   I have not, no.

16        MR. MOORE:  Thank you.  Nothing further.

17        THE COURT:  Thank you.

18        Cross-examination, Mr. Lopez.

19        MR. LOPEZ:  Yes, your Honor.

12:15 20                    CROSS-EXAMINATION

21   BY MR. LOPEZ:

22   Q.   Good morning, Mr. Mendiola.

23   A.   Good morning, sir.

24   Q.   Good afternoon.

25   A.   Good afternoon.

```
 1    Q.    We've never met before?
 2    A.    No.
 3    Q.    Did you have an opportunity to speak to my private
 4    investigator, John Cinotti?
 5    A.    No.
 6    Q.    Did he reach out to you?
 7    A.    Somebody did reach out to me, I don't know who it was.
 8    Q.    And you didn't return his phone call?
 9    A.    I did not speak to anybody.
10    Q.    Who told you that Kimberly Benge was Mr. Crater's sister?
11    A.    I was informed by the prosecutors.
12    Q.    By the prosecutors -- these prosecutors?
13    A.    Yes.
14    Q.    And when were you informed of that?
15    A.    We reviewed what we were going over testimony, and I was
16    told that that was the -- the sister was the --
17    Q.    Just -- these prosecutors told you who she was?
18    A.    Yes.
19    Q.    Did anyone tell you that My Big Coin was not backed by
20    gold?
21    A.    No.
22    Q.    So as you sit here today, you don't know whether or not My
23    Big Coin was backed by gold when you made your investment, true
24    or false?
25    A.    I believed it was backed by gold when I made my
```

        1    investment.

        2    Q.   And to your knowledge, no one told you it wasn't backed by

        3    gold.

        4    A.   No.

        5    Q.   Now, I think you said that you were told it was backed by

        6    gold at the time you first invested.

        7    A.   Yes.

        8    Q.   You weren't told that the plan was to have it backed by

        9    gold.

12:17  10    A.   I was told that it was backed by gold.

       11    Q.   Okay.  Now, going through these My Big Coin exchanges,

       12    H1 --

       13              THE COURT:  Again, just for the record, they're now

       14    33.

       15              MR. LOPEZ:  33.  Thank you, your Honor.

       16              THE COURT:  Sure.

       17    BY MR. LOPEZ:

       18    Q.   So 33 --

       19              MR. LOPEZ:  Is the first one 33-1, your Honor?

12:17  20              THE COURT:  I think A, but you can refer to them by

       21    the H numbers given their markings.  Just so the record is

       22    clear, it's the 33 series.

       23              MR. LOPEZ:  Can you bring that up, Mr. Sweeney, H1?

       24    BY MR. LOPEZ:

       25    Q.   Now, this says that My Big Coin has entered into a

1  contract where all My Big Coin will be backed 100 percent by

2  gold, right?

3  A.   Yes.

4  Q.   And the date on that is March 6, 2014.

5  A.   Correct.

6  Q.   So at that time it appeared as though there was a contract

7  that had been signed prior to March 6, 2014 indicating that it

8  was backed by gold?

9  A.   Yes.

12:18 10  Q.   And --

11       MR. LOPEZ:   Then go to H3.

12  Q.   And there's a price there of $70.89 and it's dated April

13  1, 2014?

14  A.   That's correct.

15  Q.   And your first purchase was on April 7, 2014.  Did you pay

16  $79.80 per coin when you made your purchase?

17  A.   I don't recall, sir.

18  Q.   You don't remember what the price of the coin was that you

19  purchased?

12:19 20  A.   It was around this price.

21  Q.   So around --

22  A.   Around $70, somewhere around there, yeah.

23  Q.   And I think you said you were introduced to My Big Coin by

24  Michael Kruger?

25  A.   Yes, sir.

1    Q.    And how did you know Michael Kruger?

2    A.    He was staying at the Fairmont Hotel where I was a valet,

3    and he came up to me one day and was talking about My Big Coin

4    and, you know, that I should invest in this company.

5    Q.    Had you met him before you talked with him?

6    A.    No, no.

7    Q.    So you were working as a valet.  And was he a guest at the

8    hotel?

9    A.    He was a guest at the hotel, stayed there -- it was like

12:20 10   he lived at the hotel pretty much.

11   Q.    He lived at the hotel.

12   A.    Yes.

13   Q.    So how long had you known him before you had this

14   conversation?

15   A.    I didn't.

16   Q.    You didn't know him.

17   A.    He was a frequent -- he would come -- he was a guest at

18   the hotel, so I would see him, you know -- I would see him

19   every morning when he would leave, so -- I'd see him for a

12:20 20   while, and then when he brought up this conversation, I was

21   highly interested.

22   Q.    Did he appear to be credible?

23   A.    Yes.

24   Q.    Did he appear to be wealthy?

25   A.    Yes.

Q.   And I take it that that was important to you, that he was
making this recommendation because he appeared credible and
wealthy?

A.   Yes, sir.

Q.   Okay.  And you were a young student?

A.   Yes, sir.

Q.   And you had some money to invest?

A.   Yes.

Q.   And this credible, wealthy man said you should get in on
the ground floor.

A.   Yes.

Q.   And you wanted to.

A.   I did.

Q.   Because you saw this as an opportunity to make money.

A.   I was interested in investing in Bitcoin at the time, and
so I was researching what to invest in.  It was pretty much my
first investment into something, and when the My Big Coin
opportunity came around, it sounded like something I wanted to
invest in.

Q.   So when you were researching Bitcoin while deciding
whether to purchase My Big Coin, what was the price of Bitcoin
per coin?

A.   At that time it was around -- it was in between $300 and
$400 per Bitcoin.

Q.   So fair to say you could buy a lot more My Big Coin with

1   your investment than Bitcoin?

2   A.   Yes, sir.

3   Q.   Did you think My Big Coin was risky in any way?

4   A.   All investments are risky.

5   Q.   And did you think investments in cryptocurrency are risky?

6   A.   Yes, sir.

7   Q.   And did you think a startup cryptocurrency company would

8   be risky?

9   A.   Yes, sir.

12:22 10   Q.   And those were factors that you took into consideration?

11   A.   Yes.

12   Q.   But you thought you were going to make money here?

13   A.   Yes, sir.

14   Q.   Okay.

15       MR. LOPEZ:   Now go to H6.

16       And could you highlight the top portion down through

17   the Yahoo! box.   All the way to the end.

18       Perfect.

19   Q.   Okay.   Now, this is a post on August 5, 2014.   And it

12:23 20   appears as though you liked it.   So you saw it that day.

21   A.   Yes.

22   Q.   And you -- did you actually go to the link?

23   A.   I don't recall, sir.

24   Q.   So, The revolutionary cryptocurrency platform My Big Coin

25   announces that the company is negotiating to -- you didn't

```
 1   actually review it before you liked it?
 2   A.   It's been a while and I don't -- I'm sure -- I probably
 3   read it.
 4   Q.   You probably clicked on the link?
 5   A.   I probably clicked on it and read it.
 6   Q.   And read it before you said you liked it?
 7   A.   I can't recall exactly what I did, I'm sorry.
 8   Q.   I understand, it's a long time ago.
 9   A.   It's been a long time.
```

12:23 10   Q.   If you read it says, August 4, 2014, mybigcoin.com, the

```
11   corporate parent of the online cryptocurrency platform and
12   virtual wallet website www.mybigcoin.com today announces that
13   the company is now entering into final negotiations with
14   Harmonie International to obtain a committed backing for -- do
15   you remember what it was for?
16   A.   This -- no, I don't -- I can't recall, I'm sorry.
17   Q.   So --
18   A.   It's been --
19   Q.   You have no memory?
```

12:24 20   A.   It's been a long time.  I'm sorry.

```
21   Q.   That's all right.
22            MR. LOPEZ:  And pull up H7.
23            And can you highlight everything -- exactly.
24   Q.   And you liked this post as well.
25   A.   Yes, sir.
```

Q.   And this post says, My Big Coin, a Nevada corporation and a worldwide exchange portal for cryptocurrency transfers, trades and buy and sell services, announces today that it has reached an agreement with TruCash, a/k/a DCR Strategies, a Canadian corporation.

Did you click on that link and read that?

A.   Again, I can't recall if I did.  I'm sure I did.

Q.   Do you know whether or not that was for a credit card?

A.   It could be.  I'm -- again, I can't recall each article that came out.  All these articles were a confirmation of things that I was verbally told from investment --

Q.   Well, my question is after this date, November 4, 2014, did you receive a credit card in the mail?

A.   I did not receive a credit card.

Q.   What did you receive?

A.   Debit card.

Q.   Did that debit card have "MasterCard" on it?

A.   I believe so.

Q.   Okay.  And prior to that, you had not received either a credit card or a debit card?

A.   No, sir.

Q.   And did that debit card say "preferred customer" on it?

A.   I -- I can't recall if it did or not.  I think it might have.

Q.   And I think you said you weren't interested in a debit

1   card, so you didn't do anything with it?

2   A.   You have to put your own cash into it and then spend it.

3   Q.   But did you understand that you could put the -- well --

4   you said you attempted one time to use the exchange.

5   A.   I tried, yes.

6   Q.   And you weren't successful.

7   A.   I don't believe I was.

8   Q.   Did you reach out to support?

9   A.   Yes.

12:26 10   Q.   And you still weren't successful.

11   A.   No, I don't think I was successful.  No, they helped me.

12   Support did help.  They did -- something did happen, but at the

13   time I -- I really -- I -- I didn't know how to utilize it.

14   Q.   So bottom line is you didn't transmit any money from point

15   A to point B?

16   A.   I did.  I believe I did.

17   Q.   But did you sell coin?

18   A.   You know what, I'm sorry, like I -- I don't recall -- I

19   did try, it was -- I was really busy at the time advancing in

12:27 20   my career and it was -- it took two months of email

21   communications back and forth and I just kind of -- I let

22   whatever transaction happen and I don't recall what I did after

23   that.

24   Q.   So you just got frustrated?

25   A.   I just kind of got frustrated.

Q.   After you made your initial investment, did you go to the
website and set up a wallet?

A.   Yes.

Q.   And you were able to see your accounts on the website?

A.   Yes.

Q.   And you could see that the price fluctuated?

A.   Yes, there was a price on the website, yes.

Q.   Did you understand that the exchange worked in a way where
you could say you wanted to sell your coins for X price and if
someone wanted to purchase them, they would contact you?

A.   I believe so.

Q.   Okay.  And did you have any understanding as to how the
exchange of money or other currencies would be used to purchase
your coins?

A.   I had limited understanding on how it worked.

Q.   So you didn't -- you don't know whether or not the
exchange actually transmitted the money from point A to point
B?

A.   Yeah, I don't recall at all.

          MR. LOPEZ:  I have no further questions, your Honor.

          THE COURT:  Thank you.

          Any redirect, Mr. Moore?

          MR. MOORE:  Very brief, your Honor.

          THE COURT:  Sure.

                         REDIRECT EXAMINATION

1  BY MR. MOORE:

2  Q.   Do you remember being asked on cross-examination about the

3  riskiness of investments?

4  A.   Yes.

5  Q.   Did the gold backing affect your view of the risk of My

6  Big Coin?

7  A.   I thought it would -- it was more secure because it was

8  backed by gold.

9  Q.   And do you remember being asked on cross about the price

12:29 10  movements of My Big Coin?

11  A.   Yes.

12  Q.   Did you have an independent way to verify the price of My

13  Big Coin apart from what they told you?

14  A.   Other than what they represented, you know, through social

15  media posts or the website, no.

16  Q.   So when you bought My Big Coin, were you relying on the

17  price that they had told you it was?

18  A.   Yes.

19       MR. MOORE:  Nothing further, your Honor.

12:29 20       THE COURT:  Any recross, Mr. Lopez?

21       MR. LOPEZ:  Yes.

22                    RECROSS-EXAMINATION

23  BY MR. LOPEZ:

24  Q.   You were told that the coins were backed by gold.

25  A.   Yes.

1    Q.    Were you told what that meant?

2    A.    I just meant that it would be secured by gold, yes.

3    Q.    I'm asking what you were told it was meant.  Were you told

4    what "backed by gold" meant?

5    A.    I don't understand.

6          MR. LOPEZ:  No further questions, your Honor.

7          THE COURT:  Thank you.

8          Thank you, sir.  You're excused.  Thank you.

9          THE WITNESS:  Thank you.

12:30 10          THE COURT:  Mr. Moore.

11          MR. MOORE:  Your Honor, the United States calls Gavin

12    Abadi.

13          THE COURT:  He may be called.

14          GAVIN ABADI, having been duly sworn by the Clerk, was

15    examined and testified as follows:

16          THE CLERK:  Thank you.  Please be seated.

17          THE COURT:  Good afternoon, sir.

18          THE WITNESS:  Hi.

19          THE COURT:  Mr. Moore.

12:31 20                    DIRECT EXAMINATION

21    BY MR. MOORE:

22    Q.    Please state your name for the report and spell your last

23    name for the record.

24    A.    Gavin Abadi, A-b-a-d-i.

25    Q.    And what is your level of education?

1    A.    High school education and auctioneers licenses, several

2    auctioneers licenses.

3    Q.    Do you work in the auctioneer field?

4    A.    Yes, I do.

5    Q.    Are you familiar with a company called Lord & Guy?

6    A.    Yes.

7    Q.    Can you describe to the jury what Lord & Guy is or was?

8    A.    It was a gallery that I opened in East Hampton.

9    Q.    Approximately when was it in operation?

12:31 10   A.    It was about I think eight or ten years ago, eight years

11   ago, sir.

12   Q.    Do you know Randall Crater?

13   A.    Yes.

14   Q.    What was the nature of your relationship?

15   A.    He was a customer.

16   Q.    Was he a significant customer of Lord & Guy?

17   A.    Yes.

18   Q.    Was he the most significant customer of Lord & Guy?

19   A.    Yes.

12:32 20   Q.    Did you meet Mr. Crater's family?

21   A.    Yes, I did.

22   Q.    Did you meet his wife?

23   A.    Yes.

24   Q.    Did you meet any of his children?

25   A.    Yes, I did.

1    Q.   Have you ever met anyone named Kimberly Benge?

2    A.   No.  I don't think so, not that I recall.

3    Q.   Did Mr. Crater attend any auctions?

4    A.   Yes.

5    Q.   Did his family attend these auctions?

6    A.   Yes.

7    Q.   Did Mr. Crater bid on any items from Lord & Guy?

8    A.   Yes.

9    Q.   Did any other members of his family bid on items from Lord

10   & Guy?

11   A.   Yes.

12   Q.   Did his children bid on items from Lord & Guy?

13   A.   His children were with him, and, you know, they raised

14   their cards, but I'm sure with, you know -- yeah, his son

15   raised his card but I'm sure with consent.

16   Q.   What kind of items were the children bidding on?

17   A.   Coins maybe, little things.

18        MR. MOORE:  Can we show just to the witness what's

19   been premarked as Government Exhibit E.

20        THE COURT:  Yes, just for the witness and counsel.

21   BY MR. MOORE:

22   Q.   Did you receive a request to submit records from Lord &

23   Guy to the government?

24   A.   Yes, yes.

25   Q.   And have you reviewed these records at Government Exhibit

1    E?

2    A.   Yes.

3    Q.   And are they a true and correct copy of the Lord & Guy

4    receipts that you submitted to the government?

5    A.   Yes.

6         MR. MOORE:   Your Honor, I ask to admit Government

7    Exhibit E.

8         THE COURT:   Any objection to E?

9         MR. LOPEZ:   No, your Honor.

12:33 10    THE COURT:   It may be admitted as what -- 34,

11    Ms. Hourihan? -- as 34.

12         (Exhibit 34 received into evidence.)

13         THE COURT:   It may be published if you wish.

14    BY MR. MOORE:

15    Q.   Is this a receipt from Lord & Guy?

16    A.   Yes, it is.

17    Q.   And who is the name in the top left corner?

18    A.   Randall Crater.

19    Q.   And what is the email address on this receipt?

12:34 20    A.   greyshore@me.com.

21    Q.   And can you tell the jury what is the HC Picasso pastel?

22    What is that?

23    A.   That's H.C. Pissarro pastel.  That's an original work by

24    H.C. Pissarro.  He's the grandson of Camille Pissarro, who is

25    an impressionist artist, and that's an original work.

1    Q.   And then what is this tanzanite 2.85 carat diamond ring?

2    A.   Tanzanite is a rare precious stone, and that's a ring that

3    has -- I believe it is 5.13 carat of tanzanite.  So it has a

4    center stone of five carats with 2.86 carats of diamonds

5    around.

6    Q.   Is that diamond necklace, is it part of some set or is

7    that just a similar type of --

8    A.   No, no, that would be a diamond necklace, a tanzanite

9    diamond necklace that has 26 carats of tanzanite and 2 carats

12:35 10  of diamonds.

11        MR. MOORE:  Can we go to page 20, please.

12   Q.   All right.  And whose name is on this receipt?

13   A.   Randall Crater.

14   Q.   And what's the email address on this receipt as well?

15   A.   Greyshore@me.com.

16   Q.   Can you tell the jury what this 14-carat emerald necklace

17   is?

18   A.   That's an emerald necklace that is 14-carats of natural

19   emeralds and 1.9 carats of diamonds, and it's a diamond and

12:35 20  emerald necklace.

21   Q.   And then can you also say what that diamond ring is?

22   A.   That's a diamond and ruby ring with a center stone ruby of

23   7.82 carats a large ruby in the center with diamonds around it.

24   Q.   Is there also a Rolex watch on this receipt?

25   A.   Yes, that's a Rolex watch.

```
  1            MR. MOORE:  Can we go to 24, please.

  2    Q.   And whose name is on this receipt?

  3    A.   Randall Crater.

  4    Q.   And what's that email address say?

  5    A.   greyshore@me.com.

  6    Q.   Can you explain to the jury what these two Steve Penleys

  7    are?

  8    A.   Steve Penley is a very famous American artist and those

  9    are original works by Steve Penley.

12:36 10   Q.   Are those paintings?

  11   A.   Oil paintings, oil on canvass.

  12            MR. MOORE:  Can we go to page 28.

  13   Q.   And whose name is on this receipt?

  14   A.   Randall Crater.

  15   Q.   And the email address?

  16   A.   greyshore@me.com.

  17   Q.   And also, is this receipt signed at the bottom?

  18   A.   Yes.

  19   Q.   And is it general practice to have the purchasers sign the

12:36 20   receipt?

  21   A.   Yes.

  22   Q.   Can you explain to the jury what this alexandrite stone

  23   is?

  24   A.   Alexandrite is a very rare, very precious Russian stone.

  25   It originates from Russia.  I believe it's extinct now.  It's
```

1    far more rare than a diamond.  And that's a 35-carat .17-carat

2    alexandrite.  I remember this stone.  It was the largest

3    alexandrite ever appraised by GIA.  So it's just a very large

4    30-carat natural alexandrite and diamond ring.  I shouldn't say

5    ring.  It's a stone.  It's just a very large alexandrite stone.

6    Very valuable.

7    Q.   And there's a court reporter here, so if you could just

8    slow down a little bit in your answers.

9    A.   I'm so sorry.

12:37 10        MR. MOORE:   Then can we go to page 34.

11   Q.   And whose name is on this receipt?

12   A.   Randall Crater.

13   Q.   And what's the email address?

14   A.   greyshore@me.com.

15   Q.   Can you tell the jury what this 12.66-carat sapphire

16   diamond ring is?

17   A.   That's a diamond, a large diamond ring with a sapphire in

18   the center which weighs 12 carats, 12.6 to be exact, and has 2

19   carats of diamonds around it.

12:38 20   Q.   Is that like a normal size --

21   A.   That's -- I remember that piece as well.  What it is, is

22   that's a -- most sapphires -- about 97 percent of sapphires, or

23   not even, 99 percent of sapphires are heat treated.  So that's

24   a sapphire that has not been treated.  It's earth-mined and

25   came out of the earth like that so.  So they call it a no heat

1    treated sapphire.

2    Q.   Is that like a small ring, an average size ring?

3    A.   It's 12 carats.  No, that's a very large ring.

4              MR. MOORE:  Thank you.  Nothing further.

5              THE COURT:  Cross-examination?

6              MR. LOPEZ:  Yes, your Honor.  Thank you.

7              THE COURT:  Yes.

8              MR. LOPEZ:  May I approach the witness, your Honor?

9              THE COURT:  You may.

10                    CROSS EXAMINATION

11   BY MR. LOPEZ:

12   Q.   I'm going to show you a document.  Were you just

13   discussing that document?

14             THE COURT:  Mr. Lopez, can you just keep up your

15   voice.

16             MR. MOORE:  Your Honor, can we see what he's showing

17   the witness?

18             THE COURT:  Sure.

19             MR. MOORE:  I think this is admitted into evidence.

12:39 20   You can just put it on the screen.

21             MR. LOPEZ:  If I could find the page.  I'm trying to

22   do this quickly.

23             THE COURT:  Mr. Lopez, can you just say what number it

24   is.

25             MR. LOPEZ:  I don't -- it's --

|    |    |
|----|----|
| 1  | THE COURT:  Is it part of the H series? |
| 2  | MR. MOORE:  It's page 28 of the last exhibit. |
| 3  | THE COURT:  Okay.  Thank you. |
| 4  | MR. LOPEZ:  Can you put it up? |
| 5  | MR. MOORE:  Yes. |
| 6  | THE COURT:  Thank you. |
| 7  | Page 28 of Exhibit 34.  Thank you. |
| 8  | (Discussion off the record.) |
| 9  | THE COURT:  Mr. Lopez, is this what you were -- |
| 12:39 10 | MR. LOPEZ:  No, 28 -- there it is. |
| 11 | THE COURT:  Okay.  Thank you. |
| 12 | BY MR. LOPEZ: |
| 13 | Q.   This alexandrite stone. |
| 14 | A.   Yes, sir. |
| 15 | Q.   And I see on the side there's an X -- it looks like RZZZ. |
| 16 | What does that signify? |
| 17 | A.   That would be a stock number. |
| 18 | Q.   And this was -- you provided these documents in response |
| 19 | to a subpoena? |
| 12:40 20 | A.   Correct. |
| 21 | Q.   And does this show that this stone is in your stock? |
| 22 | A.   I don't understand. |
| 23 | Q.   Well, it's a stock number. |
| 24 | A.   Yes, it would be the stone that we had, correct. |
| 25 | Q.   That you said you sold to Mr. Crater. |

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | But isn't it still in stock? |
| 3 | A. | No. |
| 4 | Q. | No?  He didn't return it to you? |
| 5 | A. | No. |
| 6 | Q. | And you didn't say you were going to sell it for him? |
| 7 | A. | No. |
| 8 | Q. | And you didn't sell it for him? |
| 9 | A. | Absolutely not. |

12:40 10   Q.   And you didn't give him any money for it?

11   A.   No.

12   Q.   Okay.  Sir, I think you said that you're an auctioneer?

13   A.   Yes.

14   Q.   Do you have more than one name?

15   A.   No --

16          MR. MOORE:  Objection, your Honor.

17          THE COURT:  Overruled.

18          Counsel, offering for credibility?  Mr. Lopez?

19          MR. LOPEZ:  Yes.

12:41 20          THE COURT:  Okay.  So I'll hear the question.

21   A.   I was in the process of changing my name, but I never

22   formally did it.

23   Q.   So you haven't done business under other aliases?

24   A.   While I was in the process I did -- I did use that name.

25   Q.   So before you changed your name, you were already using

1  it?

2  A.   No, when you do a name change, you get like a document and

3  then -- so it makes it official, but then you have to send that

4  document in to get your driver's license and everything changed

5  into your name, but I just never finalized it.

6  Q.   Are you able to operate your auctions in the State of

7  Ohio?

8  A.   I haven't been there in decades, I wouldn't know.

9  Q.   Is that because you can no longer do business in Ohio?

12:42 10  A.   I really honestly don't remember what happened in Ohio,

11  but I've done business in many states.

12  Q.   What about New Jersey?

13  A.   I don't think you even need a license in New Jersey that

14  I'm aware of.

15  Q.   And what about the State of Florida?

16  A.   I'm not currently licensed in the State of Florida.  I

17  have one license, but I don't have my auctioneer's license.

18  Q.   And have you ever been investigated for unlicensed

19  auctioneering?

12:42 20  A.   Yes, I've had hundreds of licenses in all different

21  states.  Some of them expire, and there's been times where, you

22  know, I didn't realize the license had expired and maybe did an

23  auction without knowing.  I would never do an auction if I

24  knew.  I mean, I have had dozens and dozens of licenses for

25  over 30 years.

1   Q.   And in 2020 you filed for Chapter 13 bankruptcy three

2   times?

3   A.   Yes.  Well -- I guess it wasn't done correctly.  It was

4   three times in like a two-month period.  It was I kept trying

5   to do it -- we kept trying to do it, and I don't think it was

6   filed correctly.

7   Q.   And each time they were dismissed.

8   A.   It wasn't -- again, it wasn't followed through.  I was

9   trying to figure out the process and I did the beginning

12:43 10   portion but I was never really quite able to finish up with it.

11   Q.   Didn't you have an attorney?

12   A.   I had somewhat of an attorney.  I had attorney help on it,

13   but it wasn't like an attorney was handling the whole thing.  I

14   was trying to help with it.

15   Q.   Was that because you couldn't pay the attorney?

16   A.   Yeah, I was having financial difficulties.

17   Q.   And back in 2017, were you trying to sell goods that you

18   claimed and advertised were once owned by Bernie Madoff?

19   A.   Yes -- no, no, not owned by Bernie Madoff, that we used

12:43 20   sell the goods from victims of Bernie Madoff.

21   Q.   And you were investigated for that as well, right?

22   A.   Well, I wasn't -- I don't think I was investigated, but

23   there was a lot of stories and articles and so forth about it.

24   Q.   That's because the items weren't from Bernie Madoff?

25   A.   No, no, not at all.  Actually, that's because -- if you

1    read the articles, what we did was anyone who was a victim of

2    Bernie Madoff could bring us their merchandise and we would

3    sell their merchandise, but I was never put into any trouble or

4    anything like that because of that.

5           MR. LOPEZ:  No further questions, your Honor.

6           THE COURT:  Thank you.

7           Redirect, Mr. Moore.

8           MR. MOORE:  No, your Honor.

9           Given who we anticipate for our next witness, it may

12:44  10   make sense --

11          THE COURT:  We still have a witness on the stand.

12          So no further questions?

13          MR. MOORE:  No further questions, your Honor.

14          THE COURT:  Thank you, sir.

15          THE WITNESS:  Thank you, your Honor.

16          THE COURT:  Are you about to ask me to take our break

17   now?

18          MR. MOORE:  Yes, your Honor.

19          THE COURT:  Any objection, Mr. Lopez?

12:44  20          MR. LOPEZ:  No objection, your Honor.

21          THE COURT:  Okay.

22          Jurors, I'm sure you won't mind if we take our break a

23   little early.  We'll still take an hour.  So if you can be back

24   up in the jury room a little before 1:45, that would be great.

25   Thank you.

```
 1              THE CLERK:  All rise.

 2              (Jury left the courtroom.)

 3              THE COURT:  Everyone can be seated for the moment.

 4         Counsel, now that we're not on Whisper Tech, the

 5    witness the government was planning to offer you'd like to go

 6    to next after the lunch break?

 7              MR. MARKHAM:  Yes, your Honor.  This is Benge.  We

 8    just wanted make sure we can finish her so she can get out of

 9    here today.

12:46 10              THE COURT:  Yes.

11              MR. MARKHAM:  After that, it will be Pamela Clegg, who

12    is the cryptocurrency expert who was on notice for today.  And

13    I anticipate that will bring us to the end of the day.

14              THE COURT:  Mr. Lopez, anything further?  That's what

15    I anticipated based on the Whisper Tech discussion.

16              MR. LOPEZ:  No, your Honor.  But I would ask that in

17    the future that the lineup is the lineup.  Mr. Abadi wasn't on

18    the lineup either for today.

19              THE COURT:  So, counsel, I will have you take that up

12:46 20    with counsel during the break.

21         Obviously, counsel, the lineup is important not just

22    to the Court, but to Mr. Lopez, so I'll ask you about that

23    further for next week.

24              MR. MARKHAM:  Yes, your Honor.

25              THE COURT:  Okay.
```

1          We'll stand in recess, although in looking over

2     Ms. Clegg's report again, I got my answer to mining, although I

3     don't know if Mr. Lopez disagrees with the definition.

4     Hopefully that's going to be covered with the jury today.

5          MR. MARKHAM:  Yes, your Honor.  We'll be asking her

6     what mining is.

7          THE COURT:  All right.  We'll take our break.

8          Actually, counsel, we should return a little before so

9     I can hear you on what the government's best estimate is about

12:47 10   when you're going to rest and what the lineup is through the

11    end of your case for next week.

12         MR. MARKHAM:  So 1:40, your Honor.

13         THE COURT:  1:40 should be fine, both sides.  Thank

14    you.

15         (Recess taken.)

16         (Resumed, 1:40 p.m.)

17         THE CLERK:  Court is in session.  Please be seated.

18         THE COURT:  Mr. Markham, if you could give me the

19    lineup through the end of the government's case and then when

01:41 20   you think you're likely to rest.

21         MR. MARKHAM:  Yes, Your Honor.  The next witness will

22    be Ms. Benge.  Approximately how long is that?

23         MR. MOORE:  20 minutes.

24         THE COURT:  Okay.

25         MR. MARKHAM:  And after that is Pamela Clegg.  We're

1   hoping we can get those two in today, which would leave us

2   starting on Monday with Rich Audet from MasterCard.

3           THE COURT:  Gaudet?

4           MR. MARKHAM:  Audet, A-u-d.

5           THE COURT:  Audet.

6           MR. MARKHAM:  Robert McGowan, James Douglas.

7           THE COURT:  Give me a second.

8           And remind me, are Mr. McGowan and Mr. Douglas

9   investors?

01:42 10          MR. MARKHAM:  They are percipient witnesses.  They did

11   not end up investing but they worked with people.  They're fact

12   witnesses about investments.

13          THE COURT:  Okay.

14          MR. MARKHAM:  After that, Salvatore Olivo, who is a

15   jewelry seller.

16          THE COURT:  Sure.

17          MR. MARKHAM:  And then the last three are IRS, which

18   is Joseph Guidoboni, FinCEN, which is Theodore Vlahakis, and

19   lastly Kathleen Brekenfeld with the FBI.  We do have -- there's

01:43 20   one other witness named Peter Bell, Your Honor, who was an

21   investor.  We don't know whether we're going to get him back by

22   Monday.  So it's possible he would go on Monday, and we will

23   let counsel for the defense know this weekend.

24          THE COURT:  Okay.  So counsel, obviously you can't

25   perfectly estimate cross-examination, but when do you expect to

1    rest?

2         MR. MARKHAM:  We should rest on Tuesday in the

3    morning.  All the witnesses I just mentioned for Monday and

4    Tuesday are very short.  The only one -- or relatively short.

5    The only one that goes a little longer is Kathleen Brekenfeld.

6    So very dependent on cross, but Tuesday I think is very safe.

7         THE COURT:  Okay.  Mr. Lopez, do you want to be heard

8    at all in terms of the schedule?  Obviously from my perspective

9    I just don't want to have any dead time.  So I think to the

01:44 10  extent the defense was planning to call any witnesses, it

11   sounds like Tuesday morning would be the time frame.

12        MR. LOPEZ:  Okay.  Thank you, Your Honor.

13        THE COURT:  And I'll talk to you on Monday about who

14   you might be anticipating.  And then obviously Mr. Crater's

15   decision to take the stand or not I will ask about but

16   understand you can wait to tell me that.  It's just more for

17   planning purposes, counsel.

18        MR. LOPEZ:  To be clear, Randall Ross is not going to

19   testify?

01:44 20       MR. MARKHAM:  No, Your Honor.

21        MR. LOPEZ:  And neither is Harrison Mittler?

22        MR. MARKHAM:  That's correct.

23        THE COURT:  Anything else we should take up?

24        MR. MARKHAM:  Nothing from the government, Your Honor.

25        THE COURT:  Mr. Lopez.

 1          MR. LOPEZ:  No, Your Honor.

 2          THE COURT:  Okay.  And give me a second.  And I think

 3   we said 1:45.  So, Ms. Hourihan, if everyone is upstairs, we

 4   can get started.

 5          Is the next witness ready?

 6          MR. MOORE:  Yes, Your Honor.

 7          THE COURT:  Okay.  We can wait until they come down.

 8   Thank you.

 9          Counsel, just from your perspective, it's fair to tell

01:46 10   the jury we're on track at least based on what we've told them?

11          MR. MARKHAM:  Yes, Your Honor.  What we were just

12   discussing is we would anticipate closings on Wednesday or

13   Thursday.

14          THE COURT:  Okay.  All right.  So, okay.

15          MR. MARKHAM:  Obviously it's the Court's decision.

16          THE COURT:  What I may say at the end, just for their

17   planning purposes, we're on track and not ahead.

18          MR. MARKHAM:  Yes, Your Honor.

19          THE CLERK:  All rise for the jury.

01:47 20          (Jury enters the courtroom.)

21          THE CLERK:  Court is in session.  Please be seated.

22          THE COURT:  Thank you.  Mr. Moore.

23          MR. MOORE:  United States calls Kimberly Benge.

24          THE COURT:  She may be called.

25          KIMBERLY BENGE, Sworn

```
 1              THE CLERK:  Thank you.  Please be seated.

 2              THE COURT:  Good afternoon.  Good afternoon.

 3              THE WITNESS:  Good afternoon.

 4              THE COURT:  Counsel.

 5                       DIRECT EXAMINATION

 6   BY MR. MOORE:

 7   Q.   Please state your name for the record and spell your last

 8   name.

 9   A.   Kimberly Renee Benge, B-e-n-g-e.

10   Q.   What city and state do you live in?

11   A.   Ronda, North Carolina.

12   Q.   And approximately when did you move to Ronda, North

13   Carolina?

14   A.   About seven years ago.

15   Q.   And can you briefly describe your level of education?

16   A.   Ninth grade.

17   Q.   What do you do for a living?

18   A.   I work for Aramark.

19   Q.   What did you do for a living between 2014 and 2017?

20   A.   I worked for Aramark.

21   Q.   In what department of Aramark?

22   A.   Food service.

23   Q.   Do you know an individual named Randall Crater?

24   A.   Yes, sir.

25   Q.   How do you know him?
```

```
 1    A.   He's my brother.

 2    Q.   Is he older or younger?

 3    A.   Younger.

 4    Q.   Do you know where Mr. Crater currently lives?

 5    A.   Florida.

 6    Q.   Do you know where he lived from 2014 to 2017?

 7    A.   I think in Florida or Myrtle Beach.  I'm not sure.

 8    Q.   Okay.  Do you know if he had a place in Southampton, New

 9    York during that time period?

10    A.   Yes, I think so.

11    Q.   And do you know if he had a place in North Carolina?

12    A.   No.

13    Q.   Do you know an individual named Barbara Meeks?

14    A.   Yes, sir.

15    Q.   And who is she?

16    A.   My mom.

17    Q.   And what state or -- what state does she live in?

18    A.   She lives in North Carolina.

19    Q.   Do you know an individual named Erica Crater?

20    A.   Yes, sir.

21    Q.   Does she live with the defendant?

22    A.   Yes, sir.

23    Q.   And did she live with the defendant from 2014 to 2017?

24    A.   Yes, sir.

25    Q.   Do you know if Randall and Erica Crater have any children?
```

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 1     | A. | Yes, sir.                                                |
| 2     | Q. | Approximately how old are they?                          |
| 3     | A. | Grace 17, Gabby's 15 and I think Grant is 14.            |
| 4     | Q. | Do you know Randall's middle name?                       |
| 5     | A. | Grey.                                                    |
| 6     | Q. | Are you familiar with a company named Greyshore?         |
| 7     | A. | Yes, sir.                                                |
| 8     | Q. | Do you know the origin of the name Greyshore?            |
| 9     | A. | Yeah, it was my dad, my dad is Grey.                     |
| 01:50 10 | Q. | Who owned the company Greyshore?                      |
| 11    | A. | My brother.                                              |
| 12    | Q. | What does Greyshore do or did?                           |
| 13    | A. | Arcade equipment and, like, gambling machines.           |
| 14    | Q. | All right.  At some point did you work for Greyshore?    |
| 15    | A. | We done it together, yes, years ago.                     |
| 16    | Q. | Did you stop working for Greyshore before 2014?          |
| 17    | A. | Oh, yes.                                                 |
| 18    | Q. | Do you know Randall's level of education?                |
| 19    | A. | He has a GED.                                            |
| 01:50 20 | Q. | Do you know if he has an education in computer        |
| 21    |    | programming?                                             |
| 22    | A. | Not to my knowledge.                                     |
| 23    | Q. | Is Greyshore still currently in operation?               |
| 24    | A. | I don't know.                                            |
| 25    | Q. | When you did work for Greyshore, what did you do?        |

| | |
|---|---|
| 1 | A.   Help set up equipment and picked up -- went around and |
| 2 | checked out machines. |
| 3 | Q.   Did anyone tell you what you were supposed to do when you |
| 4 | worked for Greyshore?  Did anyone give you instructions? |
| 5 | A.   Yes. |
| 6 | Q.   Who gave you those instructions? |
| 7 | A.   Randall did. |
| 8 | Q.   Did you open any bank accounts in the name of Greyshore? |
| 9 | A.   Yes, sir. |
| 01:51 10 | MR. MOORE:  Can we bring up 2A, please. |
| 11 | Q.   And then, do you see this name in the bottom left corner |
| 12 | where it says "Customer Name"? |
| 13 | A.   Yes. |
| 14 | Q.   And is that your name? |
| 15 | A.   Yes, sir. |
| 16 | Q.   All right.  And do you see where it says "sole owner" |
| 17 | under "Account Relationship"? |
| 18 | A.   Yes, sir. |
| 19 | Q.   Why does it say "sole owner"? |
| 01:51 20 | A.   Because Randall asked me to open up an account. |
| 21 | Q.   Did he tell you to put "sole owner" on the account for |
| 22 | you? |
| 23 | A.   Yes. |
| 24 | MR. MOORE:  Can we go to page 4. |
| 25 | Q.   All right.  Whose signature are these on this page? |

1    A.    These are mine.

2    Q.    Do you remember approximately when you opened this

3    account?  I'll direct you to the top right where it says

4    "November 25, 2013."

5    A.    Yes.

6    Q.    Does that sound about right?

7    A.    Yes, I reckon.  I don't remember dates very well.

8    Q.    Did Mr. Crater ever tell you that he was going to add his

9    name to this account?

01:52 10   A.    Yes, sir.

11   Q.    Did he do that?

12   A.    No, sir.

13   Q.    How much money did you open this account with?

14   A.    $100.

15   Q.    Whose money was that that you used?

16   A.    That was my money.

17   Q.    Did anyone pay you back that $100?

18   A.    Yes.

19   Q.    And who paid you back that $100?

01:52 20   A.    Mr. Crater, Randall.

21   Q.    Did you receive a bank debit card?

22   A.    Yeah, they give you the temporary, whatever card.

23   Q.    Did they at some point issue a permanent card?

24   A.    I reckon, not to me.

25   Q.    Who would that permanent card have gone to?

```
 1   A.    It went to Randall.
 2   Q.    Who did the account statements for this account go to?
 3   A.    Randall.
 4   Q.    Did you have a PIN for any cards associated with this
 5   account?
 6   A.    No, sir.
 7   Q.    Did you have access to the online account for this?
 8   A.    No, sir.
 9   Q.    Did you even have internet at home --
10   A.    No, sir.
11   Q.    -- between 2014 and 2017?
12   A.    Mm-hmm.
13         THE COURT:  I'm sorry.  We need a verbal response.
14   When you say "mm-hmm," do you mean yes?
15         THE WITNESS:  Sorry.
16   A.    No, sir, I didn't have no --
17   Q.    Just to clarify, between 2014 and 2017 you did not have
18   home internet; is that correct?
19   A.    Yeah, no internet.
20         THE COURT:  Thank you.
21   Q.    Did you ever write any checks from this account?
22   A.    No, sir.
23         MR. MOORE:  Can we bring up Exhibit 2C.  And can we go
24   to page 4.
25   Q.    All right.  Is that your signature on this check?
```

```
 1    A.   No, sir.

 2              MR. MOORE:  All right.  Can we go to the next page.

 3    Q.   Is that your signature on this check?

 4    A.   No, sir.

 5    Q.   And the next page.  Is this your signature?

 6    A.   No, sir.

 7    Q.   And the next page.

 8    A.   No, sir.

 9    Q.   So not your signature either?

10    A.   No, sir.

11    Q.   All right.  Next page.

12    A.   No, sir.

13    Q.   Is this your signature?

14    A.   No, sir.

15    Q.   All right.  Next page.  Is this your signature?

16    A.   No, sir.

17    Q.   Next page.  Is this your signature?

18    A.   No, sir.

19    Q.   Next.  Is this your signature?

20    A.   No, sir.

21    Q.   And next.  How about this one?

22    A.   No, sir.

23    Q.   All right.  Next.  How about this one?

24    A.   No, sir.

25    Q.   Are you familiar with Lord & Guy?
```

1    A.    No, sir.

2    Q.    Have you shopped there?

3    A.    Not that I know of.

4    Q.    All right.  Next page.  Is this your signature?

5    A.    No, sir.

6    Q.    All right.  Next.  Okay.  Who had the checkbook for

7    Greyshore between the period of 2014 and 2017?

8    A.    Mr. Crater did.

9    Q.    Do you know an individual by the name of John Lynch?

01:55  10    A.    No, sir.

11    Q.    Did you ever instruct anyone named John Lynch to send you

12    money?

13    A.    No, sir.

14         MR. MOORE:  Can we bring up what was pre-marked as

15    Exhibit 2B.  Can we go to page 40.  Can we go to April 8, 2014.

16    Q.    Did you instruct John Lynch to send you this $200,000

17    wire?

18    A.    No, sir.

19         MR. MOORE:  Can we go to page 50.  Can we go to the

01:56  20    $250,000 wire on May 1.

21    Q.    Did you instruct John Lynch to send you this $250,000

22    wire?

23    A.    No, sir.

24         MR. MOORE:  Can we go to page 86.  And go to the

25    $103,000 wire on August 13.

1    Q.   How about this, did you instruct for this wire to be sent

2    to you?

3    A.   No, sir.

4    Q.   Did you make any purchases from this account, this Wells

5    Fargo account?

6    A.   No, sir.

7         MR. MOORE:   Can we go to page 77.  And go to the July

8    11 Southampton Jewelry Exchange.

9    Q.   Did you make this purchase at the Southampton Jewelry

01:57 10   Exchange?

11   A.   No, sir.

12        MR. MOORE:   Can we go to page 79.  July 2.  Santi

13   Automotive.  Let's go to page 86 and go to August 11, Lord &

14   Guy.

15   Q.   Did you make this $7,500 purchase at Lord & Guy?

16   A.   No, sir.

17   Q.   Did you get any money from this Wells Fargo account?

18   A.   Yes, sir.

19   Q.   Can you explain to the jury what money it is that you got

01:58 20   from this account?

21   A.   I got $35,000 from this account.

22   Q.   And can you tell the jury why you got $35,000 from this

23   account?

24   A.   Randall had some issues a while back, and I had some

25   machines that I had, and I let him sell the machines to use the

1    money to help himself.  And then I told him, I said if you ever

2    get squared up, you know, just help me, and he said no problem

3    whatsoever, and I just let it be.

4         Then down the road this year this happened, and then

5    I asked him -- I found a house and I asked him if I could

6    purchase the house, you know, for what he owed me, and he said

7    yeah, that's fine.  So I got the $35,000 and purchased the

8    house.

9    Q.   So that money was just him paying you back a debt he owed

10   you?

11   A.   Yes, sir, yes.

12   Q.   Did he pay you for opening this account?

13   A.   No, sir.

14   Q.   And why did you open this account?

15   A.   Because he's my brother.  I was helping him.

16   Q.   Did you own real estate in South Carolina between 2014 and

17   2017?

18   A.   No, sir.

19   Q.   Did you have a place in The Hamptons between 2014 and

20   2017?

21   A.   No, sir.

22   Q.   Do you know if Mr. Crater has had a place in Florida?

23   A.   Yeah, he has a place in Florida.

24   Q.   Have you ever visited that place?

25   A.   One time.

```
 1   Q.   You visited the house?

 2   A.   Yes, sir.

 3   Q.   How would you describe the house?

 4   A.   It's a big house.  Nice house.

 5   Q.   Is this Greyshore account still open now?

 6   A.   I don't know.  Not as I know of, not the Wells Fargo is

 7   not.

 8   Q.   Okay.  Were you ever issued a check to close out the

 9   account?

10   A.   Yes.  They issued a check for, I think it was 1.8, I

11   think.

12   Q.   $1.8 million?

13   A.   Yes, sir.

14   Q.   All right.  And do you remember, did you ask them to close

15   the account, or did they tell you it needed to be closed?

16   A.   They shut the account.

17   Q.   Okay.  And this check, was it issued in your name?

18   A.   Yes, sir.

19   Q.   What did you do with this check for $1.8 million after you

20   received it?

21   A.   Yes.  We was going to visit, me and my mom was, my brother

22   in New York, and I just took the check with me up there to give

23   it to him.

24   Q.   Okay.  At some point did Mr. Crater try to cash this

25   check?
```

```
  1    A.    Yes.

  2    Q.    Was he successful in cashing the check for $1.8 million?

  3    A.    No, sir.  No, sir.

  4    Q.    After he tried to cash the check, what happened next?

  5    A.    We went to Bank of America and he got an account there and

  6    they had to add my name to put the check into the account.

  7    Q.    All right.  And so were you guys successful in depositing

  8    the check in the Bank of America account?

  9    A.    Yes, sir.  Yes, sir.

02:00 10    Q.    Did you control this new Bank of America account that the

 11    check was put in?

 12    A.    No, sir.

 13          MR. MOORE:  All right.  Thank you.  Nothing further.

 14          THE COURT:  Thank you.  Mr. Lopez, cross exam.

 15                     CROSS-EXAMINATION

 16    BY MR. LOPEZ:

 17    Q.    Good afternoon, Ms. Benge.

 18    A.    Good afternoon, sir.

 19    Q.    My name is Scott Lopez.  I represent your brother.  I'm

02:01 20    guessing you don't want to be here.

 21    A.    No.

 22    Q.    And you're here because you received a subpoena?

 23    A.    Yes, sir.

 24    Q.    And I think you said that -- well, did Randall graduate

 25    from high school?
```

         1    A.   It was a GED.

         2    Q.   So he didn't graduate from high school?

         3    A.   Right.

         4    Q.   He subsequently got a GED?

         5    A.   Yes, sir.

         6    Q.   Did he go in high school further than you?

         7    A.   Yes, sir.

         8    Q.   Did he go to 10th grade, 11th grade?

         9    A.   I think he did to the 11th grade.

02:02   10    Q.   Okay.  Now, you've opened accounts for him before?

        11    A.   Yes, sir.

        12    Q.   And you've operated a business with him before?

        13    A.   Yes, sir.

        14    Q.   And after the gambling business, the arcade business that

        15    you had together, he owed you some money?

        16    A.   Yes.

        17    Q.   And I think you said it was $35,000?

        18    A.   Yes, sir.

        19    Q.   And he paid you?

02:02   20    A.   Yeah.

        21    Q.   And you bought a house?

        22    A.   Yes, sir.

        23    Q.   Now, did you know that some of the money in the account

        24    was for marijuana licenses?

        25    A.   Yes.  That's what he told me, yes, sir.

```
 1    Q.   Okay.  Do you know how much?

 2    A.   He didn't tell me how much.

 3    Q.   Okay.  Why did you close down the Wells Fargo account?

 4    A.   I didn't close it down.

 5    Q.   Do you have an understanding as to why it was closed down?

 6    A.   No, I'm not sure as to why it was closed down.

 7    Q.   Okay.  But in any event, you received a check for $1.8

 8    million?

 9    A.   Yes, I believe that's what it was.

02:03 10   Q.   And you then deposited that in the Bank of America?

11    A.   Yeah, with him.

12         MR. LOPEZ:  Thank you.  No more questions.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Redirect?

15         MR. MOORE:  No, Your Honor.

16         THE COURT:  Thank you.  Ma'am, you're excused.  Thank

17    you.

18         THE WITNESS:  Yes, ma'am.  Thank you.

19         THE COURT:  Mr. Markham.

02:03 20        MR. MARKHAM:  Yes, Your Honor.  The government calls

21    Pamela Clegg of CipherTrace.

22         THE COURT:  She may be called.

23         PAMELA CLEGG, Sworn

24         THE CLERK:  Thank you.  Please be seated.

25         THE COURT:  Good afternoon.
```

```
 1              THE WITNESS:  Good afternoon.  Thank you.

 2              THE COURT:  Counsel.

 3              MR. MARKHAM:  Thank you.

 4                      DIRECT EXAMINATION

 5    BY MR. MARKHAM:

 6    Q.    Could you please state your full name, spelling your last.

 7    A.    Yes, Pamela Ann Clegg, C-l-e-g-g.

 8    Q.    And what is your current occupation?

 9    A.    I am the vice president of financial investigations for
      CipherTrace, a MasterCard company.
10

11    Q.    And what is CipherTrace?

12    A.    CipherTrace is a blockchain analytics firm.  We analyze

13    the cryptocurrency ecosystem and the transactions within it.

14    Q.    And what is your job at CipherTrace?

15    A.    I oversee our professional services department.  That

16    includes overseeing all financial investigations involving

17    cryptocurrency, overseeing our training, we have several

18    certification courses, and also overseeing all of our

19    consulting that we provide to governments, regulators and

20    banks.

21    Q.    Prior to CipherTrace, where did you work?

22    A.    Prior to CipherTrace I was the BSA officer, which is Bank

23    Secrecy Act officer, essentially the anti-money laundering

24    officer for a large community bank in Texas.

25    Q.    Can you provide the jury just a brief educational
```

1    background.

2    A.    Sure.  So I received my undergraduate degree in government

3    and Spanish literature from the University of Texas in Austin.

4    I received my masters in business administration from the

5    University Autonomous of Madrid.

6    Q.    And do you have any professional certifications?

7    A.    Yes.  I have a certified anti-money laundering specialist

8    certification from ACAMS, which is Association of Certified

9    Anti-Money Laundering Specialists.  It's a global organization.

02:06 10    Q.    Okay.  Now I'll bring you back to your current job.  When

11    you did you join CipherTrace?

12    A.    In 2018.

13    Q.    And as part of your job, do you work on investigations

14    related to cryptocurrency?

15    A.    Yes.  I conduct them and oversee them.

16    Q.    Have you testified before about these cryptocurrency

17    investigations?

18    A.    Yes, I have.

19    Q.    As part of your job do you sometimes provide training

02:06 20    seminars for law enforcement?

21    A.    Yes.  I've created three certification courses that we

22    provide to law enforcement regulators, banks and cryptocurrency

23    exchanges around the world.

24    Q.    So just as an example from your resume, what is the

25    blockchain and cryptocurrency essential certification course?

1   A.   That is a two-hour course designed for executives and

2   senior management to understand the principles of

3   cryptocurrency and blockchain and how they can be tracked and

4   traced.

5   Q.   Okay.  How about the cryptocurrency tracing certified

6   examiner course?

7   A.   That is an eight-hour certification course designed

8   primarily for law enforcement and other investigators to be

9   able to thoroughly conduct cryptocurrency investigations.

02:07 10   Q.   From time to time do you also publish articles on the

11   subject?

12   A.   I do, yes.

13   Q.   And again, as an example, the article entitled *Crypto Red

14   Flags For Law Enforcement*, what was that article about?

15   A.   That was an article designed to highlight ways in which

16   law enforcement may encounter cryptocurrency in an

17   investigation, whether they're in the street or they're doing

18   detective work, how it is that a suspect or particular

19   individual may be using cryptocurrency in a case.

02:07 20   Q.   Okay.  How about the article entitled *Wallet-to-Wallet

21   Tracing in Bitcoin Investigations*?

22   A.   So that was a little bit more in depth, more of a white

23   paper that we wrote to explain the advantages of tracing

24   cryptocurrency at more of a granular level, which is deeper

25   than wallet-to-wallet.  It's actually looking at the

cryptocurrency at its UTXO level, which is -- it's a technical

term for unspent transaction output, which is really looking at

movement of the coin instead of looking at a wallet-to-wallet

transaction.

Q.   With all of that background in mind, I'd like you to

provide the jury some basics of cryptocurrency.  They've heard

a lot about it.  So let's provide some background.

A.   Okay.

Q.   Is cryptocurrency the same thing as fiat currency?

A.   No, it is not.

Q.   Okay.  So what is fiat currency?

A.   Fiat currency is the currency that's issued by a nation

state by a monetary authority or central bank such as the U.S.

dollar, the euro, peso, or the yen, in the case of Japan, but

it is issued by a government.

Q.   So if I buy a cup of coffee with a couple dollars, that's

fiat currency?

A.   That's correct.

Q.   Next, what is virtual currency?

A.   Virtual currency is a type of digital currency that does

not have a tangible representation.  It does not have a

physical form.  So it only exists virtually.  It only exists

out there in the ether.

Q.   So I have no ability to reach back into my pocket and hold

up a virtual currency right now, correct?

A.    No ability, no.

Q.    When were virtual currencies first starting to pop up on the market?

A.    We refer to modern cryptocurrencies, modern virtual currencies starting with the inception of Bitcoin in 2009. There were other examples of virtual currency prior to that that either took off or were shut down throughout the '90s and into the 2000s.  But we really refer to modern cryptocurrency as starting in 2009 with Bitcoin.

Q.    So that was in 2009.  Prior to 2009, so say in the 1990s, did virtual currencies that were not cryptocurrency, did those exist?

A.    Yes, they did.

Q.    But is it fair to say that those virtual currencies in the 1990s, they didn't become widely used.  Is that fair to say?

A.    It's fair to say.  One exception may be e-gold, but it didn't last beyond 15 years.

Q.    Okay.  Then we fast forward to 2009, and that's when the modern cryptocurrency started; is that right?

A.    That's correct, in January of 2009 with the launch of Bitcoin blockchain.

Q.    So just so we're very clear, is every virtual currency a cryptocurrency?

A.    No, it's not.

Q.    So for virtual currencies, does every virtual currency use

1    cryptography?

2    A.    No, they did not.  A great example would be if any of your

3    kids play Roblox and they buy Robux, those are considered

4    virtual currency but they are not cryptocurrency.

5    Q.    So the word "crypto" and "cryptocurrency," does that

6    relate to cryptography?

7    A.    Yes, it does.

8    Q.    So cryptocurrency uses cryptography but not all virtual

9    currencies are cryptocurrency?

02:10 10    A.    That's correct.

11    Q.    How about blockchain technology, do all virtual currencies

12    have a blockchain that tracks transactions?

13    A.    Not virtual currencies, no.

14    Q.    So it's fair to say that cryptocurrency is a specific

15    subset of virtual currency?

16    A.    That's correct.

17    Q.    Ms. Clegg, are you familiar with the term "stablecoin"?

18    A.    Yes.

19    Q.    And what is a stablecoin?

02:11 20    A.    A stablecoin is a type of cryptocurrency that has its

21    value pegged to some type of external source such as U.S.

22    dollar, euro or commodity like gold.

23    Q.    So why is it called a stablecoin?

24    A.    It was coined stablecoin because the attempt of pegging

25    that value to something external gives it a stabilized value

1   with regard to open market fluctuations that we see with

2   Bitcoin or Ether, some of the more open market

3   cryptocurrencies.

4   Q.   So if a cryptocurrency was backed by gold or if it was

5   marketed that way, would that be marketed as a stablecoin?

6   A.   Yes.

7   Q.   And that's because its value would presumably be more

8   stable because of the gold backing?

9   A.   That's correct.  It would be able to withstand the market

02:12 10   fluctuations.

11   Q.   So putting aside specifically stablecoin for a moment --

12          THE COURT:  Just so I understand, so what you're

13   talking about with stablecoin would be a further subsection of

14   cryptocurrency?

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  Because not all cryptocurrency would be

17   stable currency?

18          THE WITNESS:  Yes, ma'am, that's correct.

19          THE COURT:  Thank you.

02:12 20   Q.   So now widening the aperture back out.  So stablecoin is a

21   specific subset of cryptocurrency.  Let's just talk about

22   cryptocurrency more broadly, whether it's stable or not.

23          What is cryptocurrency?

24   A.   So cryptocurrency is a digital or virtual currency that

25   utilizes cryptography to verify and secure transactions on a

1   distributed ledger technology known as blockchain.

2   Q.   And the name itself "crypto" and using the word

3   "cryptography," is cryptography basically complex math

4   equations?

5   A.   Yes.

6   Q.   What role do those complex math equations play in the

7   cryptocurrency?

8   A.   They play a very important role.  It's what secures the

9   data and it's what allows us to digitally sign or show

02:13 10  ownership or control over cryptocurrency.

11  Q.   So if I wanted to transfer my cryptocurrency to you, there

12  would be some sort of complex math equations involved in that

13  transaction?

14  A.   Sure.  The blockchain would verify that you have the

15  authority, first of all, with the right code known as a private

16  key to be able to send me that crypto.

17  Q.   Have you heard of the term "mining" in the context of

18  cryptocurrency?

19  A.   Yes.

02:13 20  Q.   And what is mining specifically in the context of

21  cryptocurrency?

22  A.   Mining is done within proof of work.  It's a consensus

23  mechanism, a consensus algorithm that is used to verify

24  transactions, verify those algorithms that we just discussed

25  and add those blocks with transactions to the blockchain.

1    Q.   Okay.  So, because I think this is a little bit

2    complicated, person A is transferring cryptocurrency to person

3    B, and that requires cryptography to be used in the process.

4    But am I saying this correctly that before that transaction

5    gets added to the blockchain, which is separate, before it gets

6    added to the blockchain, there's mining involved?

7    A.   Correct.  Miners are basically solving really hard math

8    problems or math puzzles.  And they're competing to do this.

9    The first miner to solve that really hard math problem and get

02:14 10  the correct answer then wins the right to add their block to

11   the blockchain.  That block of theirs that they're adding to

12   the blockchain is comprised of transactions that are awaiting

13   to be completed.  So they are building blocks that they will

14   then add to the blockchain if they win that prize, if they win

15   that math problem first.

16   Q.   Okay.  So if person A wants to transfer money to person

17   B -- I think we all understand the various reasons why someone

18   might want to do that -- why would person C, this person over

19   here, spend their time solving really complex math equations to

02:15 20  make sure it's recorded properly?

21   A.   Right.  Spend their time and their energy, right?  They're

22   spending computing resources to do this.  Miners receive what's

23   referred to as incentives or mining rewards.  There's a couple

24   of different terminologies that we use.  Essentially they are

25   paid for that work.  So if they do win, if they do solve that

math puzzle first and they are the ones to add the block, they

receive payment for doing that.

Miners also receive transaction fees of those

transactions that are in their blocks.  So they receive almost

a double payout in a sense, but those rewards that they are

receiving for adding that block in most cases are newly

created, newly minted, newly mined -- that's where we get the

term "mining" -- coins that the blockchain just created for

them.

02:15 Q.   So person A sends to person B, and when person C solves

the complex math equation, which is mining, they get some coin

themselves?

A.   That's correct, they get paid.

Q.   Okay.  And Ms. Clegg, you and I met in preparation for

your testimony here today, correct?

A.   Yes.

Q.   Is it fair to say that I wouldn't be able to do the mining

that we're talking about in terms of solving those complex math

equations personally?

02:16 A.   Yes, that's very likely.

Q.   Okay.  With cryptocurrency, once the transaction is

validated through cryptography and then mining, you said the

transactions are recorded?

THE COURT:  I'm sorry.  Just to back up, can you only

do mining with cryptocurrency?

1          THE WITNESS:  Mining is a type of consensus algorithm

2     for a particular blockchain.  So in most cases yes.

3     Q.   If I could just maybe step back for a second.  Is it fair

4     to say when people are talking about mining, they are talking

5     about a specific type of cryptocurrency, correct?

6     A.   They are talking about a specific type of blockchain.

7     It's the protocol.  So it's the rules that that particular

8     blockchain follows.  There are other forms of creating

9     consensus.  Consensus is just putting everybody in agreement

02:17 10     that these transactions are valid.  That's all we're doing.

11     When we talk about consensus, think of it like a democracy.

12     We're all agreeing that these are correct.

13          So there's other types of consensus mechanisms.  You

14     could also have proof of stake but proof of work was the first

15     one that -- and Bitcoin still uses proof of work.  So it's one

16     of the more popular ones.

17     Q.   So within cryptocurrency, some cryptocurrency requires

18     mining; is that fair?  And other types of cryptocurrency may

19     not necessarily require mining?

02:17 20     A.   Correct.  It depends on their blockchain.

21     Q.   But if somebody is talking about mining, they are talking

22     about a type of cryptocurrency; is that fair?

23     A.   In most cases, yes.

24     Q.   So once the mining occurs and so it gets added to the

25     blockchain, let's talk about the blockchain.  What is a

 1    blockchain?

 2    A.   A blockchain is really a database.  It's a database.  When

 3    we're talking about cryptocurrency, we're really just talking

 4    about computer bytes, right?  We're talking about bits of

 5    information, and that blockchain is one of the ways that we

 6    store that data.  It's one of the ways that we record those

 7    transactions and how we actually track who owns which piece of

 8    that cryptocurrency or which pieces of the cryptocurrency.

 9    Q.   So when you say that a blockchain is a database, if

02:18 10   there's just a single website that has lists of who owns

11    currency, is that a blockchain?  Can that website be the

12    blockchain?

13    A.   That blockchain would or that website would actually be

14    referred to as a block explorer.  The blockchain itself is

15    actually the data.

16    Q.   So the blockchain, is it distributed?

17    A.   Yes, it is distributed.  It is a type of distributed

18    ledger technology.  Whether it's public or private, it's a

19    distributed ledger.  So just, if you think back to your

02:18 20   traditional ledgers of where you keep data, like your bank is a

21    centralized form of a ledger for you right now.  So instead, in

22    blockchain, we're actually taking that database and we're

23    distributing it among what we refer to as nodes or computers in

24    a particular network.

25    Q.   Okay.  So it's money that's in a bank that one bank

1    controls the ledger, correct?

2    A.    That's correct.

3    Q.    And with blockchain technology, which is distributed, it's

4    decentralized.  So it's not just one person controlling that

5    ledger?

6    A.    That's correct.

7    Q.    For a given cryptocurrency, say Bitcoin just as an

8    example, are all transactions made with that cryptocurrency

9    recorded on the Bitcoin blockchain?

02:19 10    A.    Yes.  So it's really important to understand that

11    cryptocurrency only exists on the blockchain.  So

12    cryptocurrency doesn't come off the blockchain and reside in a

13    wallet, for example.  It only exists on the blockchain.  And so

14    all we're really doing with transactions is we're assigning and

15    reassigning ownership of that cryptocurrency on the blockchain.

16    Q.    Okay.  So if I'm a person who owns cryptocurrency, I store

17    it in something called a wallet; is that right?

18    A.    You actually don't store the cryptocurrency itself.  You

19    actually store the private key, which is what gives you the

02:20 20    authorization to spend that cryptocurrency on the blockchain.

21    Q.    Understood.  So the wallet would have records of all my

22    cryptocurrency, correct?

23    A.    Correct.

24    Q.    But in terms of the blockchain for the cryptocurrency writ

25    large for all the people that own it, that would all be on the

1  blockchain?

2  A.   That's correct.  It would have a record of all

3  transactions for all users.

4  Q.   Okay.  So the blockchain, which is decentralized and

5  distributed, has all the information, my wallet that I control

6  has just my information.  Is that right?

7  A.   That's correct.

8  Q.   Okay.  For the blockchain, the thing that has all the

9  information, is CipherTrace able to analyze the blockchain of

02:20 10  any publicly available cryptocurrency?

11  A.   Yes, we are.

12  Q.   And how do you that?

13  A.   We take a look at the blockchain itself.  Whether we spin

14  up our own node so that we have direct access to the blockchain

15  data or whether we go through a block explorer, as I mentioned

16  those websites that all they do is take the data and put it in

17  a nice pretty web page for us to look at, we're able to look at

18  all the transactions then.  We're able to look at transactional

19  patterns.  We're able to see date, time, everything about every

02:21 20  transaction on that blockchain.

21  Q.   So publicly available cryptocurrencies, their blockchains

22  are publicly available for people to review?

23  A.   That's correct.

24  Q.   And when CipherTrace conducts a blockchain analysis of

25  that publicly available cryptocurrency, you're able to see each

1   instance it was traded?

2   A.   Absolutely.  We are, as well as everybody else.

3   Q.   And you are able to observe trading patterns?

4   A.   Yes.

5   Q.   Can you go all the way back -- I guess since you can see

6   every transaction, does that mean you can go all the way back

7   to the very first one?

8   A.   Yes.  That would be called the genesis block.  You can

9   trace all the way back to the genesis block of a blockchain.

02:22 10   Q.   So the genesis block is a specific cryptocurrency term,

11   that means the first one?

12   A.   That's right.

13   Q.   Yesterday there was some discussion and perhaps some

14   confusion about the difference between a public company and a

15   public blockchain.  So just out of an abundance of caution,

16   let's break those down.  What is a public company?

17   A.   A public company is a company that the shares of that

18   company can be publicly traded in something like a stock

19   market.

02:22 20   Q.   So when I own shares in the company, that's ownership of

21   the company, and those are traded on a stock market?

22   A.   That's correct.  And you have to go through a third party

23   to do that, like a brokerage firm.

24   Q.   Okay.  Now, by contrast to publicly available stock, like

25   GE or something, what is a publicly available cryptocurrency?

A.   A publicly available cryptocurrency is operating on a
public blockchain so that, for example, anyone anywhere could
utilize that cryptocurrency if they have a wallet.  And there
is no need to go through a third party or another firm or a
cryptocurrency exchange even to utilize that blockchain and
that crypto.

Q.   So is it fair to say that trading publicly tradable stock
on a stock exchange has absolutely nothing to do with trading
cryptocurrency on a cryptocurrency exchange?

A.   That's correct.

Q.   All right.  Let's do a brief cryptocurrency history.  What
was the first well known cryptocurrency?

A.   The first well known cryptocurrency is Bitcoin.

Q.   And approximately when did Bitcoin become available to the
public?

A.   So the white paper for Bitcoin was published in October of
2008.  And the genesis block, as I mentioned, the first block
of that blockchain, started in January of 2009.

Q.   You mentioned white paper twice now.  Can we just make
sure we understand what that is.

A.   Yes.

Q.   What is a white paper?

A.   A white paper is essentially a paper that is like a
concept of operations, if you have a military background.  Or
it's an overview of the project itself.  It talks about the

1    project.  It talks about the objectives of the project, why is

2    this important, how is this different than other projects or

3    other technology that's out there now and what are the, you

4    know, expected outcomes of this particular project.

5    Q.    Okay.  So there was a white paper for Bitcoin?

6    A.    Absolutely.

7    Q.    And with most cryptocurrencies, is there typically a white

8    paper?

9    A.    That's correct.  Ethereum blockchain as well.

02:24 10    Q.    Okay.  So we're talking about Bitcoin.  Before we were

11    talking about cryptocurrency in general.  So like other

12    cryptocurrencies, does Bitcoin use cryptography and mining to

13    secure transactions?

14    A.    Yes.

15    Q.    And did Bitcoin have a blockchain to record the Bitcoin

16    transactions?

17    A.    Yes.

18    Q.    By 2014 was Bitcoin essentially available to anyone

19    anywhere?

02:24 20    A.    Anyone anywhere with the technical know-how to access that

21    blockchain, yes.

22    Q.    Over the years has Bitcoin become valuable?

23    A.    Yes.

24    Q.    How valuable?

25    A.    Last year the price of Bitcoin peaked at around 68,000

 1    U.S. dollars.

 2    Q.    And it's gone down recently, correct?

 3    A.    Yes, it has.  It's hovering around 20,000 U.S. dollars at

 4    the moment.

 5    Q.    Still around 20,000 --

 6              THE COURT:  Per coin?  Per coin?

 7              THE WITNESS:  Per coin, yes, ma'am.

 8    Q.    But it's still around $20,000 per coin, right?

 9    A.    Yes.

02:25 10    Q.    Back in 2010, how much would it cost to buy a Bitcoin?

11    A.    It varied throughout the year.  But it would, you know,

12    anywhere from a dollar to a little bit more, possibly up to ten

13    dollars.  In 2010 it was definitely under a dollar.

14    Q.    From 2010 to 2013, did its value go up?

15    A.    Yes, almost 100 times.

16    Q.    Since 2013, when Bitcoin's value went up 100-fold, have

17    other cryptocurrencies come on the market?

18    A.    Yes.

19    Q.    How about exchanges since 2013, have various

02:26 20    cryptocurrency exchanges become available?

21    A.    Yes, cryptocurrency exchanges, there's thousands of them

22    around the world now.

23    Q.    Can you explain to the jury what a cryptocurrency exchange

24    is?

25    A.    Yes.  So a cryptocurrency exchange is a digital platform

1   that allows you to exchange fiats, so the U.S. dollars that we

2   talked about, for cryptocurrency, or you can exchange one

3   crypto for another type of cryptocurrency.  So if I have

4   Bitcoin and I want to exchange it for Ether, I can do that at a

5   cryptocurrency exchange.  If I have U.S. dollars and I want to

6   buy Bitcoin, I can do that through a cryptocurrency exchange as

7   well.

8   Q.   Just so we're clear, Ether is just another cryptocurrency?

9   A.   That's correct.

02:26 10   Q.   So it uses cryptography and has a blockchain?

11   A.   That's correct.

12   Q.   I believe you mentioned earlier that you have personally

13   conducted cryptocurrency fraud investigations.  Is that right?

14   A.   Yes.

15   Q.   Does that include investigations for the federal

16   government?

17   A.   Yes, it does.

18   Q.   How does your involvement in those types of investigations

19   generally come about?

02:27 20   A.   So generally we work in two different ways with the U.S.

21   government.  Either we are brought on to assist with a complex

22   investigation or we are actually contracted to conduct the full

23   investigation at CipherTrace and then we provide those results

24   to our federal customer.

25   Q.   And CipherTrace gets paid for that involvement, correct?

```
 1    A.   We do, yes.

 2    Q.   You're not a volunteer organization?

 3    A.   No, we are not.

 4    Q.   And then your salary comes from CipherTrace?

 5    A.   My salary comes from CipherTrace, ultimately MasterCard.

 6    Q.   Does your fee depend on the outcome of any given

 7    investigation?

 8    A.   No, it does not.

 9    Q.   Have you ever testified as a cryptocurrency expert before?

02:27 10    A.   Yes.

11    Q.   In addition to government investigations, have you worked

12    for defense counsel on investigations?

13    A.   Yes, I have.

14    Q.   So it's not just the government.  It's defense too?

15    A.   That's correct.

16    Q.   Now, with respect to those cryptocurrency investigations,

17    let's discuss some common steps you take.

18         When you conduct a cryptocurrency investigation, do

19    you typically review public statements made by the

02:28 20    cryptocurrency or about the cryptocurrency?

21    A.   If available, yes.

22    Q.   And why do you do that?

23    A.   To understand a little bit about the cryptocurrency, the

24    objective of it, maybe the creation of that blockchain.  Why

25    this blockchain was different from another blockchain.  How
```

1 this cryptocurrency is actually transacted.  To understand the

2 project and understand the protocol, again, that's just the

3 rules that the particular blockchain follows.

4 Q.   And if something based on their public statements is

5 claiming to be a cryptocurrency, do you typically analyze the

6 cryptocurrency's blockchain, that public ledger?

7 A.   Yes.

8 Q.   And why do you do that?

9 A.   Again, to understand how those transactions were made.

02:28 10 That will determine how I am able to trace the funds.  It will

11 also determine how maybe what accounting principles we need to

12 follow when tracking those funds.  For example, certain

13 blockchains function more like bank accounts.  So then we

14 follow certain accounting principles for that.  Other

15 blockchains, like Bitcoin, spend like cash, where it's actually

16 like spending a 10-dollar or a 20-dollar bill.  So it really

17 affects the way that we're able to trace and it helps us

18 game-plan our ability to investigate.

19 Q.   So you talked about the different ways cryptocurrency

02:29 20 might move, but again, all that movement is on the blockchain,

21 correct?

22 A.   Correct.  It's all recorded on the blockchain, yes.

23 Q.   And it still involves cryptography?

24 A.   That's correct.

25 Q.   How about regulatory filings.  If available, do you review

1    those?

2    A.    Yes, absolutely.

3    Q.    And why would you do that?

4    A.    In particular to understand, for example, maybe if they

5    have filed with the SEC, the Securities Exchange Commission, to

6    understand if maybe we're looking at a cryptocurrency that's

7    acting more like a security, or if they have filed with the

8    CFTC, we may be looking at a cryptocurrency that's functioning

9    like a commodity.  We would also look at other aspects and

02:30 10   regulatory obligations that a particular cryptocurrency may

11   follow particularly in regards if we're looking at a

12   stablecoin, for example.

13   Q.    Are there, for instance, tax requirements for

14   cryptocurrency sales?

15   A.    There are, yes.

16   Q.    And how about for cryptocurrency exchanges, does the U.S.

17   Treasury have registration requirements?

18   A.    Yes.  The U.S. Treasury, specifically FinCEN, which is the

19   financial crimes enforcement network, which is within the

02:30 20   Department of Treasury, requires cryptocurrency exchanges to

21   register as money services businesses.  They are acting as

22   non-bank financial institutions.  So, much like a Western Union

23   or Pay Pal type entity, they are also required to register with

24   the Department of Treasury.

25   Q.    All right.  With that background in mind, let's talk about

1    this specific case.

2              MR. MARKHAM:  And Your Honor, at this point I will be

3    tendering Ms. Clegg as an expert.

4              THE COURT:  Noted for the record.

5    Q.   Ms. Clegg, are you familiar with something called My Big

6    Coin?

7    A.   Yes.

8    Q.   And how are you familiar with My Big Coin?

9    A.   We were asked by the Department of Justice to investigate

10   the purported cryptocurrency My Big Coin.

11   Q.   Did you, in fact, assist in that investigation?

12   A.   I assisted and oversaw the investigation.

13   Q.   Did you draft a report summarizing your findings?

14   A.   Yes, I did.

15   Q.   And in preparation for testifying, have you created a

16   slide that summarizes the key findings in your report?

17   A.   Yes, I did.

18             MR. MARKHAM:  Can we bring up Exhibit V just for the

19   witness.

20             THE COURT:  Before it's published let me just give the

21   jury an instruction.  What I understand is going to be

22   displayed to you is what we call a chalk.  It's not an exhibit.

23   It's just an illustrative aid to assist the witness in giving

24   you testimony.  So the testimony, the evidence is the witness'

25   testimony, not the document itself.  So we'll just keep it

1  marked as V and you can publish it.

2          MR. MARKHAM:   Thank you, Your Honor.

3  Q.   Let's walk through the summary.  Can you just zoom in on 1

4  and the bullet points below it.

5          It says, My Big Coin investigation summary of key

6  findings.  Can you please read your first finding?

7  A.   Yes.  Starting in 2014, My Big Coin was advertised as a

8  cryptocurrency that was publicly available and tradable.

9  Q.   And does it list examples of the some of the items you

02:32 10  reviewed in coming to that finding?

11  A.   Yes, it does.

12  Q.   Okay.  Can you please read those.

13  A.   My Big Coin social media, Randall Crater social media, My

14  Big Coin website.

15  Q.   Okay.  Now let's go to number 2 and the bullet points

16  below it.  So after that first finding, what was then your

17  second finding?

18  A.   My Big Coin did not exist as a cryptocurrency until June

19  28, 2017.

02:33 20  Q.   And did you provide some examples of the items you

21  reviewed here?

22  A.   Yes, I did.

23  Q.   So in coming to that finding, can you just read these

24  different items you considered?

25  A.   My Big Coin blockchain, public databases of

1    cryptocurrencies, cryptocurrency exchanges, and comparison of

2    My Big Coin statements before and after June 28, 2017.

3            MR. MARKHAM:   Now can we zoom in on number 3, please.

4    Q.   So after the first finding, which is that starting in 2014

5    it was advertised as publicly available cryptocurrency, and

6    then you said it wasn't available publicly as a cryptocurrency

7    until after June 28, 2017, what is your third finding?

8    A.   After June 28, 2017 the My Big Coin cryptocurrency had

9    several abnormalities.

02:33 10   Q.   And then do you provide two key examples of those

11   abnormalities here?

12   A.   Yes.

13   Q.   Can you read those, please.

14   A.   Trading was indicative of wash trading and lack of

15   publicly available information about the blockchain and

16   protocols.

17   Q.   All right.  Let's go through each of these in more detail.

18           MR. MARKHAM:   Can you go back to 1, please.

19   Q.   So in coming to this finding, starting in 2014, My Big

02:34 20   Coin was advertised as a cryptocurrency that was publicly

21   available and tradable.  Can you highlight the first example of

22   items reviewed, My Big Coin social media.

23           Let's walk through this one first, Ms. Clegg.  Okay?

24   A.   Yes.

25           MR. MARKHAM:   Can you please bring up what was

```
 1    originally marked as Exhibit A.  That's Exhibit 30 for the
 2    record, Your Honor.
 3                 THE COURT:  Thank you.
 4    Q.   Ms. Clegg, what is this?
 5    A.   These are screenshots of the Facebook page from My Big
 6    Coin.
 7    Q.   Did you identify statements on this Facebook page that
 8    described My Big Coin as a cryptocurrency?
 9    A.   Yes.
10                 MR. MARKHAM:  Can you please go to page 7 and zoom in
11    on the November 4, 2014 post.
12    Q.   Is this just one of the examples of the items you
13    observed?
14    A.   Yes.
15    Q.   And what is the date on this?
16    A.   November 4, 2014.
17    Q.   And can you please read the post up above the article.
18    A.   My Big Coin Pay Inc. finalizes MasterCard deal,
19    Cryptocurrency and MasterCard.
20    Q.   So after it talks about cryptocurrency and MasterCard, can
21    you please read what's purported to be a CNBC article
22    underneath it.
23    A.   My Big Coin Pay Inc.'s cofounder Randall Crater announces
24    the cryptocurrency exchange companies.
25    Q.   Okay.  Ms. Clegg, does this describe My Big Coin as a
```

 1  cryptocurrency?

 2  A.    Yes.

 3  Q.    Does this also reference Randall Crater announcing a

 4  cryptocurrency exchange?

 5  A.    Yes.

 6         MR. MARKHAM:  Can you please bring up Exhibit B,

 7  please.  That's Exhibit 28, Your Honor.

 8         THE COURT:  Thank you.

 9  Q.    And Ms. Clegg, what is this?

02:36 10  A.    This is the Twitter feed screenshot for My Big Coin.

11  Q.    And did you identify statements on this Twitter page that

12  also described My Big Coin as being a cryptocurrency?

13  A.    Yes.

14         MR. MARKHAM:  Can we please go to page 36.  And zoom

15  in on that August 1, 2015 post, the big golden advertisement.

16  Q.    Is this one of the statements you observed?

17  A.    Yes.

18  Q.    And what is the date on that?

19  A.    August 1, 2015.

02:37 20  Q.    Do you see up above where it says "My Big Coin Exchange"?

21  A.    Yes.

22  Q.    Okay.  Now, can you please read the substantive post up

23  above as well as the claims made down below under "sign up"?

24  A.    Sign up now to receive your free MBC, My Big Coin, My Big

25  Coin Inc., scan the QR code to sign up.  The first

1    cryptocurrency to be backed by gold.   Partners with MasterCard.

2    Transfer money in seconds anywhere in the world.

3    Q.   Okay.   Does this describe My Big Coin as a cryptocurrency?

4    A.   Yes.

5    Q.   And does it also say it can be transferred in seconds

6    anywhere in the world?

7    A.   Yes.

8         MR. MARKHAM:   Okay.   Can you please bring up Exhibit

9    C2 or what was Exhibit C2.   I believe this is 27, Your Honor.

02:38 10        THE COURT:   Thank you.

11         MR. MARKHAM:   Can you just start to play it.

12         (Video played.)

13         MR. MARKHAM:   Now can you pause it.   That was just to

14    refresh the jury of what you were looking at.   They've seen it

15    before.

16         Can we go to 1 minute and 23 second in this video, and

17    pause it when you get there.

18    Q.   Can you please read these claims on the My Big Coin

19    YouTube video.

02:38 20    A.   Several currency exchanges exist where you can trade

21    you're my Big Coins for dollars, euros and more.   My Big Coins

22    are a great way for small businesses and freelancers to get

23    noticed.   Use worldwide anywhere MasterCard is accepted.

24    Q.   Does this suggest that My Big Coin is publicly tradable?

25    A.   Yes.

```
 1            MR. LOPEZ:  Objection.
 2            THE COURT:  Well, sustained as to that.  You can ask a
 3   different question.
 4   Q.   Does this say that several currency exchanges exist where
 5   you can trade you're my Big Coins for dollars, euros and more?
 6   A.   Yes.
 7            MR. MARKHAM:  Now can you bring up Exhibit 1A.
 8   Q.   Ms. Clegg, do you recognize this?
 9   A.   Yes.
10   Q.   And what is this?
11   A.   This is a screenshot of Randall Crater's LinkedIn page.
12   Q.   So now we're moving on from the My Big Coin social media
13   to your second bullet, correct, the Randall Crater social
14   media?
15   A.   Yes.
16   Q.   And does this Linked-In page include statements describing
17   My Big Coin as a publicly available cryptocurrency?
18   A.   Yes, it does.
19            MR. MARKHAM:  Can you please go to page 3 and zoom in
20   on the description 1 through 3.
21   Q.   Are these some of the statements you reviewed?
22   A.   Yes.
23   Q.   And can you please read those for the jury.
24   A.   Number 1, we are the only cryptocurrency to be backed by
25   gold.  Number 2, we are partners with MasterCard which gives us
```

        1    a closed loop system so you're able to break down into any
        2    currency that's needed.  MasterCard is accepted in over 35.9
        3    million locations.  Number 3, send money in seconds anywhere in
        4    the world.
        5    Q.   Okay.  Based on your expertise in the cryptocurrency
        6    markets does this post suggest that My Big Coin is a publicly
        7    tradable cryptocurrency?
        8            MR. LOPEZ:  Objection.
        9            THE COURT:  Well, counsel, you can rephrase in terms
02:40  10    of basis of opinion.
       11    Q.   How many years have you been working in the cryptocurrency
       12    field?
       13    A.   Four.
       14    Q.   Do you look at advertising in the cryptocurrency field
       15    regularly?
       16    A.   Yes.
       17    Q.   Does that include advertising for publicly available
       18    cryptocurrencies?
       19    A.   Yes.
02:40  20    Q.   And based on your expertise and your years of knowledge in
       21    the cryptocurrency field, does this advertising suggest that My
       22    Big Coin is a publicly available cryptocurrency?
       23    A.   I interpret it as a publicly available cryptocurrency
       24    based on this.
       25    Q.   Okay.  And can you describe for the jury what are some of

1    the reasons that you say that?

2    A.    Number one, it says "anywhere in the world, accepted at

3    over 35.9 locations."  That would imply that anyone is able to

4    access this cryptocurrency, i.e. it is a public blockchain.

5              Also, "Send money anywhere in the world in seconds"

6    would imply some type of an underlying cryptocurrency of

7    blockchains supporting those transactions.  As well as, a

8    cryptocurrency being backed by gold would also even further

9    define it as a stablecoin.

02:41 10            MR. MARKHAM:  All right.  Now can you bring up Exhibit

11    6, please.

12    Q.    This is a post from Randall Crater's personal Twitter

13    page.  Have you reviewed this before?

14    A.    Yes.

15    Q.    And once again, does this include claims about My Big Coin

16    being a publicly available cryptocurrency?

17    A.    Yes, it does.

18            MR. LOPEZ:  Objection.

19            THE COURT:  Well, sustained as to the question.  You

02:42 20    can rephrase.  Still direct.

21            MR. MARKHAM:  Understood, Your Honor.

22    Q.    Does anything about this post suggest that My Big Coin is

23    only available to a couple people?

24    A.    No.

25    Q.    Does it suggest that it's available to people anywhere in

1    the world in seconds?

2    A.    Yes.

3    Q.    And based on your expertise and background in

4    cryptocurrency that we just went over, does this imply to you

5    that My Big Coin is a publicly available cryptocurrency?

6    A.    Yes, specifically "any time, any place."

7    Q.    And that's the tag line up at the top, correct?

8    A.    That's correct.

9    Q.    And do these appear to be some of the same claims on the

02:42 10    defendant's LinkedIn page that we just looked at?

11    A.    Yes.

12    Q.    Moving on from the social media, let's go to your third

13    bullet, the My Big Coin website.

14         MR. MARKHAM:  Can you please bring up Exhibit 7A.

15    Q.    What is this?

16    A.    This is a screenshot of the My Big Coin website.

17    Q.    And did you review this as part of your investigation?

18    A.    Yes, I did.

19         MR. MARKHAM:  Can you zoom in on the text to the right

02:43 20    of the middle starting with "Send MBC to anyone."

21    Q.    Can you please read this.

22         MR. MARKHAM:  Can you zoom out just a little bit so

23    it's not so blurry.

24    Q.    And could you read this for jury, please.

25    A.    Send MBC to anyone instantly.  My Big Coin, the easy way

1    to send and receive MBC worldwide economically 24/7.

2    Q.   And again, just like we went over before, does this

3    suggest to you that My Big Coin is private or publicly

4    available?

5                MR. LOPEZ:  Objection.

6                THE COURT:  Sustained as to the form of the question,

7    counsel.

8    Q.   Do you see where it says, The easy way to send and receive

9    MBC Worldwide economically, 24 hours a day seven days a week?

02:43 10   A.   Yes.

11   Q.   And what does that suggest to you?

12               MR. LOPEZ:  Objection.

13               THE COURT:  Well --

14               MR. MARKHAM:  Your Honor, could I be heard at sidebar?

15               THE COURT:  No.  Sustained as to form, counsel.  You

16   can rephrase.

17   Q.   Based on your expertise and your years working in the

18   cryptocurrency markets, what, if anything, does this post

19   suggest to you?

02:44 20   A.   To be able to send MBC to anyone implies that anyone has

21   access to that cryptocurrency.

22               MR. MARKHAM:  Okay.  Can you zoom in on the text to

23   the right of the middle starting "My Big Coin is a virtual

24   currency," the next one.

25   Q.   Can you read that, please.

A.   My Big Coin is a virtual currency that you can mine them,
buy them, sell them, trade them, save them, donate them.

Q.   And what does this statement or claim about My Big Coin
suggest to you about the nature of My Big Coin?

     MR. LOPEZ:  Objection.

     THE COURT:  Well, sustained as to form, counsel.

Q.   What does this post suggest to you about My Big Coin and
its nature?

     MR. LOPEZ:  Objection.

     THE COURT:  Well, it's the same question, isn't it?
So sustained.  You can reframe.

Q.   Based on your expertise, four years working in the
cryptocurrency field, and everything you know about the
cryptocurrency markets, what does this statement suggest to you
about the nature of My Big Coin?

     MR. LOPEZ:  Objection as to "suggest."

     THE COURT:  So, counsel, here, let me give the jury an
instruction, counsel.

     So jurors, unlike the other witnesses, which were fact
witnesses, this witness is being offered as an expert based on
her training and experience to offer an opinion.  As with any
other kind of evidence, what, if any, weight you choose to give
it is up to you.  This, unlike other witnesses, this witness,
Ms. Clegg, is, based on training and experience, able to offer
her opinion based on her training and experience and

1    investigation.  Here, you're hearing testimony elicited about

2    her opinion and the bases for her opinions for conclusions that

3    are up to you to draw one way or the other.

4          So with that background, jurors, Mr. Markham, you can

5    certainly elicit whether or not these were characteristics that

6    were part of Ms. Clegg's basis for her opinion.

7          MR. MARKHAM:  Can I ask her what her opinion is of

8    what the statements mean, Your Honor?

9          THE COURT:  It's not an opinion of the statements.

02:46 10   It's an opinion of what she drew from what she saw on the

11   websites.

12         MR. MARKHAM:  I understand, Your Honor.

13         THE COURT:  Okay.  Thank you.

14         MR. MARKHAM:  Thank you.

15   BY MR. MARKHAM:

16   Q.   Do you see where it says "mine them"?

17   A.   Yes.

18   Q.   Is it possible to, quote, "mine them" if it's a virtual

19   currency and not a cryptocurrency?

02:46 20   A.   No.

21   Q.   Okay.  So this website is from 2014.  Do you see where it

22   says that on the bottom right?

23   A.   Yes.

24   Q.   Okay.  Have you also reviewed My Big Coin website pages

25   from 2015 and 2016?

1    A.    Yes.

2    Q.    Do they make the same or similar claims about My Big Coin

3    as the ones we just went over?

4    A.    Yes.

5          MR. MARKHAM:   Can we go back to Ms. Clegg's summary

6    slide on Exhibit V.

7    Q.    So all of that advertising we just reviewed was related to

8    your first finding, correct?

9    A.    Yes.

02:47 10   Q.    Okay.  So after that advertising about My Big Coin being a

11   publicly available cryptocurrency starting in 2014, let's move

12   on to the second finding.

13         MR. MARKHAM:   Could you just blow up number 2, please,

14   and the bullets below it.

15   Q.    All right.  Can you please just read that, just the

16   finding at the top again.

17   A.    My Big Coin did not exist as a cryptocurrency until June

18   28, 2017.

19   Q.    Okay.  Let's talk about the first example you provide

02:48 20   here.  My Big Coin blockchain.  First, can you refresh the

21   jurors on how CipherTrace, your company, was able to find the

22   My Big Coin blockchain?

23   A.    We were able to identify the My Big Coin blockchain

24   through a block explorer called Block Experts.

25   Q.    And was CipherTrace ever able to indeed find a My Big Coin

1    blockchain?

2    A.    We were never able to identify the source code for the

3    blockchain, no.

4    Q.    And when you analyze a blockchain, you're able to see all

5    the transactions made on the cryptocurrency, correct?

6    A.    All the transactions made with that cryptocurrency on that

7    blockchain, yes.

8    Q.    Does that mean you are able to see the very first time My

9    Big Coin was ever transferred as a cryptocurrency on the

02:48 10   blockchain?

11   A.    Yes.  The start of the blockchain was the genesis block.

12   Q.    Okay.  So while you weren't able to find the source code,

13   you were able to identify the genesis block?

14   A.    That's correct.  We were able to view the blockchain via

15   this block explorer.

16   Q.    Okay.  And to refresh the jurors who don't work with

17   genesis blocks a lot, what is the genesis block?

18   A.    The genesis block is the first block of the blockchain.

19   Q.    And based on your review and investigation, when was the

02:49 20   first block of the blockchain?

21   A.    June 28, 2017.

22   Q.    Okay.  So based on your analysis of the My Big Coin

23   blockchain through a block explorer, was there a My Big Coin

24   cryptocurrency that was being bought or sold in 2014?

25   A.    No.

```
 1   Q.   How about in 2015?

 2   A.   No.

 3   Q.   How about in 2016?

 4   A.   No.

 5        MR. MARKHAM:   Let's go on to the next bullet.  Public

 6   databases of cryptocurrencies.

 7   Q.   What are some of the databases you typically review during

 8   a cryptocurrency investigation?

 9   A.   There are several different websites that we utilize

10   within the cryptocurrency ecosystem.  For example,

11   CoinMarketCap is a useful website that lists all the

12   cryptocurrencies available for trade, buy, hold, sell.  And it

13   has information about each one of these cryptocurrencies or

14   tokens with regard to the crypto, its project, its founders,

15   the type of consensus algorithm, some of these technical terms

16   that I've used.

17   Q.   So there's multiple public databases that essentially

18   aggregate data about or information about cryptocurrencies; is

19   that correct?

20        MR. LOPEZ:  Objection.

21        MR. MARKHAM:  I'm laying the foundation, Your Honor.

22        THE COURT:  I'm assuming it's a form objection.

23        MR. LOPEZ:  Yes.

24        THE COURT:  Okay.  So sustained as to form.  Direct

25   exam, counsel.
```

 1          MR. MARKHAM:   Understood, Your Honor.

 2     Q.   Are there public databases that have information about

 3     cryptocurrencies?

 4     A.   Yes, there are several.

 5     Q.   Okay.  So by "several," do you mean two or three or more

 6     than that?

 7     A.   I would estimate somewhere around a dozen.

 8     Q.   You just went through some of the information that those

 9     public databases have about cryptocurrencies; is that correct?

02:51 10     A.   That's correct.

11     Q.   Did you look for My Big Coin on those databases?

12     A.   Yes, we did, all of them.

13     Q.   And what did you find when you looked for My Big Coin on

14     all of the databases?

15     A.   We did not find --

16          MR. LOPEZ:   Objection.  Timeframe.

17          THE COURT:   Well, okay.  Timeframe, counsel.

18     Q.   When did you look -- when were you investigating My Big

19     Coin and looking at the databases?

02:51 20     A.   In 2019.

21     Q.   And when you look at the publicly available databases, do

22     they have historical information on the cryptocurrency as well?

23     A.   They do.  They include listings of cryptocurrencies that

24     are no longer active, blockchains that are no longer active, so

25     there is historical information as well.

1    Q.    Okay.  So, again, back to my question, when you looked at

2    all the databases for My Big Coin, what did you find?

3    A.    We did not find My Big Coin.

4    Q.    Was there any information on those databases to suggest

5    that My Big Coin was available as a cryptocurrency prior to

6    June 28, 2017?

7    A.    No.

8            MR. MARKHAM:   Okay.  Let's go to the next bullet,

9    cryptocurrency exchanges.

02:52 10   Q.    What are some of the cryptocurrency exchanges you

11   reviewed?

12   A.    All of them.

13   Q.    And you looked for My Big Coin on all of those exchanges?

14   A.    That's correct.  CipherTrace tracks over 1,300

15   cryptocurrency exchanges, and we reviewed all of them for the

16   existence of My Big Coin.  We did not have My Big Coin in our

17   records.  We were able to find an old screenshot on a now

18   defunct cryptocurrency exchange called Nova Exchange.

19   Q.    And when you found that screenshot from the defunct

02:52 20   exchange, do you remember approximately when that was

21   available?

22   A.    Yes.  We found screenshots from 2017 and 2019.

23   Q.    Okay.  But when you say 2017, was that before or after

24   June 28, 2017?

25   A.    September of 2017.

1   Q.   Okay.  So that's after?

2   A.   That's correct.

3   Q.   Was there any information on that exchange, or any of the

4   exchanges, that suggested My Big Coin was available as a

5   cryptocurrency prior to June 28, 2017?

6   A.   No.

7       MR. MARKHAM:  Now, can we highlight the next bullet,

8   comparison of My Big Coin statements before and after June 28,

9   2017.

02:53 10   Q.   We talked earlier about the My Big Coin Facebook page.  Do

11   you recall whether it was advertising My Big Coin as a

12   cryptocurrency as early as 2014?

13   A.   Yes.

14   Q.   Okay.  But in 2014 did My Big Coin ever provide a link to

15   their blockchain ledger?

16   A.   No.

17   Q.   What about in 2015?

18   A.   No.

19   Q.   What about in 2016?

02:53 20   A.   No.

21   Q.   Do you recall when the first time My Big Coin social media

22   pages provided a link to a public ledger?

23   A.   Yes.  It was after June 28, 2017, a link to Block Experts.

24       MR. MARKHAM:  Okay.  Can you please bring up Exhibit A

25   or what was Exhibit A.  That's Exhibit 30, Your Honor, for the

1    record.

2            THE COURT:  Thank you.

3            MR. MARKHAM:  Can we go to the bottom of page 2 and

4    scroll down a little bit because it's the top of page 3 as

5    well, and zoom in on that post.

6    Q.    Ms. Clegg, what is the date of this post?

7    A.    September 15, 2017.

8    Q.    And is this what you were referencing before?

9    A.    Yes.

02:54 10   Q.    Okay.  So at any time before this post did you see any

11   sort of link to a cryptocurrency ledger by My Big Coin?

12   A.    We saw a reference that there would be a link to a

13   cryptocurrency ledger to a block explorer prior to, but there

14   was no substance, there was no actual link yet.

15   Q.    Okay.  So this date, September 15, 2017, that's after June

16   of 2017, correct?

17   A.    Yes.

18   Q.    Is this approximately the same time period where you found

19   that screenshot of the now defunct cryptocurrency exchange with

02:55 20   My Big Coin on it?

21   A.    Yes.

22           MR. MARKHAM:  Can you bring up Exhibit 22, please.

23   No.  That's G.

24           One moment, Your Honor.

25           THE COURT:  Yes.

```
 1   Q.   This is an email from a My Big Coin investor named John

 2   Lynch to the defendant dated August 15, 2017.  Do you see that

 3   information at the "From," "To" and "Date" at the top?

 4   A.   Yes.

 5   Q.   Okay.  In that first line, do you see where it says -- can

 6   you highlight this.  "We created a flash drive backup of the

 7   wallet data."  Do you see that?

 8   A.   Yes.

 9        MR. MARKHAM:  You can take this down.

10   Q.   Ms. Clegg, is the existence of a wallet containing My Big

11   Coin cryptocurrency data in August of 2017 consistent with your

12   finding that My Big Coin did not exist as a publicly available

13   cryptocurrency until June of 2017?

14        MR. LOPEZ:  Objection.

15        THE COURT:  Sustained as to form.

16   Q.   Okay.  Is anything about that wallet data existing in

17   August 2017 inconsistent with your findings?

18        MR. LOPEZ:  Objection.

19        THE COURT:  Overruled.

20   A.   No.

21   Q.   And can you explain why?

22   A.   The wallet, as I mentioned earlier, it does not contain

23   coins.  It does not reflect transactions for the blockchain.  A

24   wallet -- the objective of a wallet is to store your private

25   and public key pairs.  So it's really your key to be able to
```

1    unlock your cryptocurrency on the blockchain.

2           A wallet will have a transaction log of transactions

3    that you have conducted in and out of that wallet.  However,

4    those transactions would still be reflected on the blockchain.

5    So it's really only holding your information so that you can do

6    your transactions, but those transactions are still done and

7    recorded on the blockchain.

8    Q.   Okay.  I think there's two points in there so let's try to

9    break them down.  First you had the finding that My Big Coin

02:57 10   did not exist as a cryptocurrency until June 28, 2017.  That

11   was your finding; is that right?

12   A.   Yes.

13   Q.   Okay.  And then the date of that email about a wallet was

14   in August of 2017.  Do you remember that?

15   A.   Yes, that's correct.

16   Q.   And is August after June in 2017?

17   A.   Yes.

18   Q.   Okay.  The next thing you talked about is the difference

19   between what data would be in a wallet and what data would be

02:58 20   on the blockchain.  With a wallet of an individual person, is

21   all the information about -- is all of the transaction

22   information about a cryptocurrency in an individual person's

23   wallet?

24   A.   No.

25   Q.   Is it just that person's information on that wallet?

1    A.    If the wallet is holding a transaction log, yes.

2    Q.    Okay.  But you reviewed the My Big Coin blockchain,

3    correct?

4    A.    That's correct.

5    Q.    And does that have one, some or all of the transaction

6    information?

7    A.    It has all of the transaction information, should have all

8    the transaction information recorded on the blockchain.  A

9    wallet -- existence of a wallet, again, is not reflective of

02:58 10    when a cryptocurrency may or may not have been started.  The

11    wallet is expected, once there is a blockchain, and we found a

12    blockchain on June 27, 2017.  So it would be natural that there

13    is a wallet in existence after that date.

14    Q.    Is it possible for a wallet to contain secret transaction

15    information that you somehow couldn't see on the blockchain you

16    already reviewed?

17    A.    Not --

18          MR. LOPEZ:  Objection, Your Honor.  Are we talking

19    after June?

02:59 20          THE COURT:  So sustained as to form both direct and

21    timing, counsel.  You can rephrase.

22    Q.    So just as a general matter, no matter what the

23    cryptocurrency and no matter what the timing, is it possible

24    for a wallet to contain secret transaction information for a

25    cryptocurrency that wouldn't be available on the blockchain?

A.   No.  All transactions are recorded to the blockchain.  The
only thing the wallet may have that's not reflected on the
blockchain are addresses or kind of like new accounts that
haven't been used yet.  So i.e. there are no transactions for
those yet.

Q.   Okay.  So a John Lynch wallet in August of 2017, is it
fair to say that wouldn't contain any secret information either
compared to the blockchain you reviewed that started in June of
2017?

03:00 10   MR. LOPEZ:  Objection.

THE COURT:  Sustained as to form.

Q.   I'll ask this as the most open-ended question as possible.
You saw an email about a wallet in August of 2017.  Would you
have gleaned anything from reviewing that wallet?

THE COURT:  That's open-ended?  So counsel --

MR. LOPEZ:  Objection.

THE COURT:  -- you can ask an open-ended question.

Q.   What would you have gleaned from reviewing the wallet?

MR. MARKHAM:  I don't know how to ask it any more
03:00 20   open-ended than that, Your Honor.

THE COURT:  So jurors, just so there's no mystery
about what we're talking about, there's this idea of
cross-examination -- direct examination and cross-examination.
Direct examination should be non-leading questions.
Cross-examination, when it's a witness adverse to you, there

1    would be close-ended questions that presume an answer and

2    you're trying to get the witness to say yes or no.

3         So counsel, you can ask an open-ended question.  Often

4    they start with, "What, if anything."

5    Q.   Okay.  What, if anything, or nothing, would you have found

6    on John Lynch's wallet that appeared to be in existence in

7    August of 2017?

8    A.   Again, all transactional data is recorded on the

9    blockchain.  We reviewed the blockchain.  That would include

03:01 10   all transactions from My Big Coin.  The wallet would not have

11   provided additional insight into transactions for My Big Coin.

12   It would have only provided insight into John Lynch

13   transactions, but, again, all of John Lynch's transactions and

14   all of Jane Doe's and John Doe's transactions using My Big Coin

15   would be recorded on the My Big Coin blockchain.

16        MR. MARKHAM:  And I apologize to the room.  It took us

17   a while, but we got there.  So thank you.

18        Let's go back to Exhibit V, please, and zoom in on

19   that third finding.

03:02 20   Q.   Can you please read that third finding.

21   A.   After June 28, 2017, the My Big Coin cryptocurrency had

22   several abnormalities.

23   Q.   So after My Big Coin was available as a cryptocurrency,

24   after June 28, 2017, you say in this first bullet that you

25   identified trading indicative of wash trading.  First, what is

1    wash trading?

2    A.    Wash trading is used to inflate the transaction volume of

3    a particular currency or stock to make it appear more

4    transacted or more legitimate than it is.

5    Q.    And what's the purpose of wash trading, based on your

6    experience both in the anti-money laundering world and as an

7    expert in cryptocurrency?

8    A.    Wash trading is generally used to make the currency, in

9    this case cryptocurrency, appear to be more used by more users

03:03 10    to give it more legitimacy, to give it more value that more

11    people are using this particular cryptocurrency.

12    Q.    So specifically with My Big Coin, where did you see

13    evidence of wash trading?

14    A.    We saw evidence of wash trading on the My Big Coin

15    blockchain.  We saw the same small group of My Big Coin

16    addresses, i.e. kind of accounts, over and over sending crypto

17    to and from themselves or sending crypto to themselves and

18    combining and dividing the same My Big Coin over and over

19    through various transactions.

03:03 20    Q.    Now, for that second bullet, you said that there was a

21    lack of publicly available information about the My Big Coin

22    blockchain and protocols.  First, can you describe what sort of

23    information you would expect to see publicly available for a

24    cryptocurrency?

25    A.    Yes, so public blockchains utilize open source code.  That

1    means that, again, anyone can access that blockchain, anyone

2    can use that blockchain.  So therefore, anyone can utilize that

3    cryptocurrency.  In order to do that, the code and the

4    information has to be available open source to anyone.

5            There's one primary site.  There's another site

6    that's also used.  GitHub is the primary site.  There is also

7    GitLab that's also available, but those are the sites that are

8    used to publish this code so that users can access and users

9    can view the information.

03:04 10          The GitHub site did reference My Big Coin.  There is

11   a My Big Coin page on GitHub.  However, it did not contain any

12   code for the blockchain.

13   Q.   So the information you saw in GitHub, did anything on

14   there suggest that My Big Coin existed as a cryptocurrency

15   prior to June 28, 2017?

16   A.   No.  The GitHub page was actually created five years ago.

17   Q.   And you mentioned the term source code and then white

18   paper, which you defined before.  Was any of that information

19   publicly available for My Big Coin?

03:05 20   A.   No.

21           MR. MARKHAM:  Moving on from your specific findings

22   there, can you bring up a side by side of Exhibit 1A on the

23   left and 7C on the right.  On the left, can you go to page 3

24   and zoom in on the number 3 claim there, "Send money in seconds

25   anywhere in the world."  And now on the My Big Coin website on

1  the right, can you zoom in on the statement to the right of the

2  center there where it says, "Send MBC to anyone instantly."

3  Q.   Now, Ms. Clegg, these claims that you could send

4  cryptocurrency instantly or in seconds, in 2014, was that

5  possible?

6  A.   Not as a cryptocurrency.

7  Q.   Why not?

8  A.   So cryptocurrencies, because they run on blockchain,

9  require a little bit of work to be done in order to add those

03:06 10  blocks to the blockchain.  That work is not done instantly.

11  There are nowadays some blockchains -- there are some blockless

12  blockchains that can get close to instant, and there are some

13  off-chain capabilities, such as Lightning Network that also

14  provide instant transfer, but, again, those are within the past

15  few years those have become available.

16       Cryptocurrency, for example Bitcoin, has a block time

17  of ten minutes.  That means that the Bitcoin blockchain is

18  adding a block with new transactions every ten minutes.  And

19  that's built into the code.  So if it speeds up, it slows

03:07 20  itself down.  If it slows down, it speeds itself up.

21       Ethereum, the other cryptocurrency, the other

22  blockchain that we mentioned was Ether, runs on Ethereum

23  blockchain.  It's faster.  Its block times are about 13 to 14

24  seconds.  But still, it generally averages about 30 seconds or

25  so for your transaction to be completed on the Ethereum

1     blockchain.

2     Q.   So if My Big Coin was a cryptocurrency, is it possible

3     that these were accurate, these statements?

4     A.   No.  And including when the blockchain did launch on June

5     28, 2017, the block times were not reflective of instant

6     transactions either.  The block times for the My Big Coin

7     blockchain averaged anywhere from sometimes 10 to 20 seconds

8     all the way up to a few minutes between a block.

9               MR. MARKHAM:   Okay.  On the defendant's LinkedIn page

03:08  10     on the left, can you go to row 2 with the sentence below it as

11     well, the entirety of 2 and that statement.

12               Now, on Exhibit 7C on the right, can you zoom in on

13     the big picture of the MasterCard there on the top left.

14     Q.   Ms. Clegg, back in the 2014 to 2015 timeframe, based on

15     your knowledge of the cryptocurrency markets, did any

16     cryptocurrency have this sort of relationship with a credit

17     card company as reflected in these claims?

18     A.   No.

19     Q.   Based on your knowledge of the cryptocurrency markets, if

03:08  20     the defendant's MasterCard claim had actually been true, would

21     that have likely made My Big Coin more valuable?

22               MR. LOPEZ:   Objection, Your Honor.  May I be heard?

23               THE COURT:   Counsel, I'll hear you.

24     **SIDEBAR:**

25               THE COURT:   Mr. Lopez.

1          MR. LOPEZ:  Your Honor, this is way outside of the

2     scope of the expert's disclosure.

3          THE COURT:  Mr. Markham, proffer from you.

4          MR. MARKHAM:  Your Honor, the expert's disclosure said

5     that the advertising made various claims that were either

6     impossible or false or couldn't be verified.  I'd have to look

7     at the report to see if the MasterCard specifically was in

8     there, but I can move on from the specific inquiry.  I think

9     they get the point.

03:09 10          THE COURT:  Okay.  Counsel, while we're in this

11     sidebar, just because Mr. Lopez may, for strategic reasons, may

12     decide not to object to leading questions, there have been a

13     lot of leading questions by the government over the course of

14     the past few days.  So I'm sustaining objections to form on

15     direct.  Okay.

16          MR. MARKHAM:  Yes, Your Honor.  We'll do better.

17          (End of sidebar.)

18          THE COURT:  Counsel.

19          MR. MARKHAM:  You can take down these two exhibits.

03:10 20     Can you please go to Exhibit 6, and this is Randall Crater's

21     Twitter page.  Can you zoom in on the gold.

22     Q.   Do you see there where it says, "First cryptocurrency to

23     be backed by gold"?

24     A.   Yes.

25     Q.   Back in the 2014-2015 timeframe, was it common for

1   cryptocurrencies to be backed by tangible assets?

2   A.   No.

3   Q.   So based on your knowledge of the cryptocurrency markets,

4   would this have made -- potentially made My Big Coin more or

5   less valuable?

6           MR. LOPEZ:  Objection.

7           THE COURT:  Overruled.  Overruled.  You can answer.

8   A.   More valuable.

9   Q.   And can you explain why?

03:11 10   A.   Because it goes back to the concept of a stablecoin,

11   having a tangible asset to back that virtual, that non-tangible

12   coin, especially for a lot of people to understand this

13   non-tangible aspect.  It gives something tangible, something

14   stable, a stable value to back that asset.

15           MR. MARKHAM:  Now can you please go to Exhibit A,

16   which is now --

17           THE COURT:  Which is now --

18           MR. MARKHAM:  I believe it's 30, Your Honor.

19           THE COURT:  Thank you.

03:12 20           MR. MARKHAM:  And go to Page 9.  And can you zoom in

21   on that post from May 7, 2014.

22   Q.   Can you please read the top one?

23   A.   My Big Coin is looking forward to becoming the first

24   company in the digital currency space to launch an IPO.

25   Q.   Are you familiar with the acronym IPO?

1    A.    Yes, initial public offering.

2    Q.    We spoke earlier about the difference between public

3    companies and public cryptocurrencies.  Which one would this

4    relate to?

5    A.    An IPO would relate to a public company.

6    Q.    Back in 2014 to the 2015 timeframe, was it common for

7    companies in the cryptocurrency space to IPO?

8          MR. LOPEZ:  Objection, Your Honor.  May I be heard?

9          THE COURT:  Counsel, in a word, report.

03:13 10         MR. LOPEZ:  Outside.

11          THE COURT:  Right.  So counsel, can you respond to

12    that?

13          MR. MARKHAM:  This expert is being used to provide

14    background on cryptocurrency generally.

15          THE COURT:  Well, I guess scope of the report.

16          MR. MARKHAM:  The report expressed that she would be

17    describing cryptocurrency generally and its history.

18          THE COURT:  Okay.  Counsel, do you want to -- I have

19    the report in front of me.  Do you want to direct me to

03:13 20    where --

21          MR. MARKHAM:  One moment, Your Honor.

22          THE COURT:  Thank you.

23          MR. MARKHAM:  Your Honor, part 2, which is page 5.

24          THE COURT:  Page 5, hold on.

25          MR. MARKHAM:  Part 2, section 1 says "background on

1    virtual currency."

2          THE COURT:  Counsel, I have different numbering on

3    mine so give me a second.

4          Okay.  I'm sorry, I'm on page 5.  What section?

5          MR. MARKHAM:  Yes, Your Honor.  Part 2, section 1

6    discusses background on virtual currency generally.  And then

7    section 2 discusses the potential SEC and CFTC requirements for

8    virtual currencies.  And then it goes into the summary of

9    findings.  This is just part of the background on virtual

03:14 10   currencies generally.

11         THE COURT:  Counsel, I thought the question here was

12   about IPOs.

13         MR. MARKHAM:  Yes, Your Honor.  She did not define the

14   acronym for initial public offering in her report, that's

15   correct.

16         THE COURT:  Well, it wasn't the definition.  It was

17   about --

18         MR. MARKHAM:  Commonality?

19         THE COURT:  Yes.

03:15 20   MR. MARKHAM:  Understood, Your Honor.  I'll move on.

21         THE COURT:  Thank you.

22   Q.   Okay.  So lastly, you discussed earlier that when

23   investigating a cryptocurrency, it's common to look at any

24   available regulatory filings with the U.S. government; is that

25   right?

1   A.   Yes.

2   Q.   And just to remind the jury, why do you do that?

3   A.   To understand again what type of cryptocurrency we may be

4   dealing with, if it's a security or a commodity or functioning

5   as a currency.

6   Q.   As an example, do virtual currency exchanges have to

7   register with the federal government?

8   A.   Yes.  Virtual currency exchanges are required to register

9   within the Department of Treasury.

03:15 10   Q.   And how are you familiar with that registration

11   requirement?

12   A.   I utilized that registry quite often in my function as the

13   BSA officer at a bank looking up money service businesses, as

14   well as in my current role looking up cryptocurrency exchange

15   registrations.

16            MR. MARKHAM:  Can you please bring up Exhibit 7F.

17   Q.   And this is a screenshot from December 26, 2014.  Do you

18   see that there in the bottom right?

19   A.   Yes.

03:16 20   Q.   And have you reviewed this screenshot before?

21   A.   Yes.

22   Q.   Can you please read the title and tag line on the top

23   left.

24   A.   "My Big Coin Exchange.  Any time, any place, My Big Coin."

25   Q.   And now, in the middle do you see where it says, "Sell My

1  Big Coin MBC," and then it has the back and forth arrows.  And

2  what does it say on the right?

3  A.   "Sell My Big Coin, select currency to buy."

4  Q.   Okay.  Underneath do you see where it says "last trades"?

5  A.   Yes.

6  Q.   As part of your investigation were you able to review

7  screenshots of the same My Big Coin Exchange from 2015 and

8  2016?

9  A.   Yes.

03:17 10  Q.   Have you reviewed Treasury Department records relating to

11  My Big Coin and Randall Crater?

12  A.   Yes.

13  Q.   And in addition to certified records obtained in this

14  case, are those records also publicly available on the U.S.

15  Treasury Department website?

16  A.   Yes, anyone can access that website and use its database.

17  Q.   Okay.  And based on those records, has My Big Coin or the

18  My Big Coin Exchange ever been registered as a currency

19  exchange?

03:17 20       MR. LOPEZ:  Objection.

21       THE COURT:  Counsel, is this the objection you raised

22  in our pretrial conference?

23       MR. LOPEZ:  Yes.

24       MR. MARKHAM:  Your Honor, we can address this with

25  another witness then.

```
 1              THE COURT:  Okay.  Noted.  Counsel, this was part of
 2     the basis of the proffered opinion?
 3              MR. MARKHAM:  Reviewing the My Big Coin Exchange
 4     website and the My Big Coin website was part of the basis of
 5     the proffered opinion, as well as looking at --
 6              THE COURT:  All right.  Well, if you're going to
 7     address it with another witness.
 8              MR. MARKHAM:  We can do that then.  Thank you.
 9              THE COURT:  Thank you.  Cross-examination.
03:18 10              MR. LOPEZ:  Thank you, Your Honor.
11              THE COURT:  While Mr. Lopez is moving to the podium,
12     why don't we all stand up to stretch.  It's been a long day.
13     Thank you.
14              Mr. Lopez, when you're ready.
15              MR. LOPEZ:  Thank you, Your Honor.
16              THE COURT:  Thank you.
17                        CROSS-EXAMINATION
18     BY MR. LOPEZ:
19     Q.   Good afternoon, Ms. Clegg.
03:19 20     A.   Good afternoon.
21     Q.   My name is Scott Lopez.  I represent Randall Crater.
22              So let me start with your education.  You went to the
23     University of Texas, Austin.  And you graduated in 2001?
24     A.   Yes.
25     Q.   And your degree was a bachelor of arts in government and
```

| | |
|---|---|
| 1 | Spanish literature? |
| 2 | A.   Yes. |
| 3 | Q.   You would agree with me that that does not -- you didn't |
| 4 | learn anything about blockchains? |
| 5 | A.   I did not. |
| 6 | Q.   Okay.  And then in 2004, you went to the University |
| 7 | Autonomous of Madrid in Madrid, Spain and you received an MBA? |
| 8 | A.   Yes. |
| 9 | Q.   Was that an MBA in computer science? |
| 03:19 10 | A.   No, it was not. |
| 11 | Q.   Was it in business administration? |
| 12 | A.   International business administration, yes. |
| 13 | Q.   And then you worked a number of years for a number of |
| 14 | different companies and then you landed at your current |
| 15 | company, CipherTrace, in May of 2018? |
| 16 | A.   In November 2018. |
| 17 | Q.   Okay.  And I think you said earlier that your company, |
| 18 | CipherTrace, is owned by MasterCard? |
| 19 | A.   That's correct.  In October of 2021 we were acquired by |
| 03:20 20 | MasterCard. |
| 21 | Q.   Okay.  Do you have any computer science background? |
| 22 | A.   I do not. |
| 23 | Q.   Have you ever created a blockchain? |
| 24 | A.   I do not -- I have not, no. |
| 25 | Q.   Have you ever taught anyone how to create a blockchain? |

A.    No.

Q.    Do you have any personal knowledge on how to create a
blockchain?

A.    No.  To clarify, I'm a cryptocurrency expert, not a
blockchain expert.

Q.    Okay.  And so when you say you're a cryptocurrency expert,
would you agree with me that you're a cryptocurrency expert of
publicly available blockchains?

A.    No.

Q.    Well, when you do your investigations on blockchains that
are available to the public, you look to public information?

A.    For public blockchains, yes, but we can also be
permissioned on to permissioned blockchains.

Q.    Okay.  And that is also referred to as a private
blockchain?

A.    There's a slight difference between a private and a
permission, but yes.

Q.    All right.  So let me -- so I think that you joined
CipherTrace in 2018.  Was this one of the first cases that you
worked on?

A.    No.  I had done several cases prior to this.

Q.    Okay.  And you wrote two reports on this matter.  And did
you distinguish between publicly available blockchains and
permissioned or privacy blockchains in either report?

A.    No, we did not.

1    Q.    Okay.  And in fact, the investigation that you did with

2    respect to My Big Coin is an investigation into publicly

3    available blockchains?

4    A.    The evidence in the marketing suggested it was a public

5    blockchain, so we investigated for a public blockchain.

6    Q.    Okay.  I'll get back to that.  Now, one of your

7    conclusions, starting in 2014 My Big Coin was advertised as a

8    cryptocurrency that was publicly available and tradable.

9    Right?

03:23 10    A.    Yes.

11    Q.    Did you say that in the report that you wrote in May of

12    2020?

13    A.    No, it did not specify that.

14    Q.    Okay.  Did you say that in your report dated May 18, 2022?

15    A.    Can you specify which report that is?

16    Q.    That's the report that you -- well, let me show it to you.

17    A.    Thank you.

18           (Witness reviews document.)

19    A.    Can you repeat the question.

03:24 20    Q.    Did you say in your report that it was publicly available?

21    A.    I didn't use the term "publicly available," no.

22    Q.    Thank you.

23           And as you indicated, there are other types of

24    blockchain that are considered private?

25    A.    Yes.

```
 1    Q.    And permissioned?

 2    A.    Yes.

 3    Q.    And the blockchain itself also has various rules?

 4    A.    Yes.  Each blockchain has its own protocol in most cases.

 5    Q.    And the person who programs it puts those rules on the

 6    blockchain?

 7    A.    I wouldn't refer to them as a person.  If we're talking

 8    about truly open source decentralized blockchains, I would

 9    refer to them as the developers.

10    Q.    Okay.  But that's with open source publicly available

11    blockchains?

12    A.    That's correct.

13    Q.    Privately, private blockchains, like blockchains that IBM

14    uses, are not publicly available?

15    A.    That's correct.

16    Q.    Blockchains that are used in various industries that are

17    protecting their trade secrets and their trademarks are not

18    publicly available?

19    A.    That's correct.  They're also not transacting

20    cryptocurrency either.

21    Q.    Because they're not programmed to do so?

22    A.    Correct.

23    Q.    But that might be in the future with banking industries

24    and things of that nature?

25    A.    Today there are private blockchains with private
```

1    cryptocurrencies.

2    Q.    But back then in 2013, there weren't any publicly

3    available ones?

4    A.    Can you clarify the question?

5    Q.    Well, your key finding was that My Big Coin was advertised

6    as a cryptocurrency that was publicly available and tradable.

7    And did you see anywhere in the social media where the words

8    "publicly available" were used?

9    A.    Not that terminology.

03:26 10   Q.    Okay.  So your conclusion that the words that were used

11   indicated that they were publicly available, is your opinion

12   based on words other than the words "publicly available"?

13   A.    Based on words "any time," "anywhere," "any place," yes.

14   Q.    Okay.  And you interpret that to mean that it has to be a

15   publicly available blockchain if you can trade any time

16   anywhere?

17   A.    As well as the term "decentralized," which was used in

18   your client's YouTube video.  "Decentralized" would imply that

19   is a public blockchain that is truly decentralized so no one

03:26 20   person is controlling it.

21   Q.    Okay.  But is it possible that there was a private

22   blockchain that was a permissioned blockchain and that the

23   people who signed up for that permissioned blockchain were able

24   to trade any time, anywhere in the world?

25   A.    It's possible.  I saw no evidence of that.

1    Q.    Because it could have been a private blockchain?

2    A.    If it had been a private blockchain, then it wouldn't be

3    anyone anywhere in the world.  They would still have to be

4    permissioned in.

5    Q.    Correct.  They could go to the website and sign up and get

6    a private key?

7    A.    Then that would make that more of a virtual currency, not

8    a cryptocurrency.

9    Q.    Well, but prior to June of 2017, you don't really know

03:27 10   whether or not My Big Coin was a blockchain because there's no

11   publicly available evidence that it was, right?

12   A.    Prior to June 2017, it was not a public blockchain.

13   Q.    Correct.  But it could have been a private blockchain?

14   A.    That's correct.  It could have been a private blockchain

15   which, again, limits the users and who can access that

16   blockchain.

17   Q.    Right.  Now, as part of your analysis in this case, you

18   relied on information other than what was available that was

19   publicly available, right?

03:28 20   A.    Can you give an example.

21   Q.    Well, you reviewed any reports made to government

22   regulatory agencies?

23   A.    Yes.

24   Q.    So your analysis wasn't strictly based on what was

25   publicly available.  You were also shown or given other

1  reports, and your opinion is based on what you saw in those

2  reports?

3  A.   No, we were not given any additional reports.

4  Q.   Well, your report says "review any reports made to

5  government regulatory agencies, e.g., SEC, CFTC, FinCEN or IRS?

6  A.   That's publicly available information.

7  Q.   So you weren't given the interviews that were done by the

8  CFTC?

9  A.   No.

03:29 10  Q.   Okay.  Good.  Now, in going through the social media, is

11  there any indication that My Big Coin could not be traded

12  anywhere in the world?

13  A.   Can you rephrase the question, please.

14  Q.   Was there any indication that My Big Coin could not be

15  traded anywhere in the world?

16  A.   No.

17  Q.   Okay.  And was there any indication that if someone from,

18  let's say, Spain wanted to purchase My Big Coin, they could do

19  so?

03:30 20  A.   Again, with the evidence that we saw, there was no open

21  source code to be able to access that, My Big Coin.  So I would

22  assume if they did, they would have to go through some type of

23  a centralized location like a website.

24  Q.   Well, I don't want you to assume anything.  I want -- as I

25  understand your testimony, when someone is dealing in

1    cryptocurrencies, they get a wallet, right?

2    A.    That's correct.

3    Q.    And in that wallet is a private key.  And that private key

4    allows them to participate on the blockchain?

5    A.    That's correct.  In a publicly available cryptocurrency,

6    anyone can access the code to build their own wallet or they

7    can download a wallet or they can purchase a hardware wallet,

8    but, again, that's assuming access to anywhere in the world for

9    a publicly available cryptocurrency.

03:31 10   Q.    And that would also be true for a permissioned blockchain?

11   A.    If they were permissioned in, yes.

12   Q.    Yes.  Okay.  And the purpose of that private key is to be

13   able to be identified on the blockchain?

14   A.    The private key is what gives the user ownership -- I

15   prefer the term "control" -- over the cryptocurrency on the

16   blockchain.

17   Q.    And there's another key on the blockchain, which is a

18   publicly available key?

19   A.    The addresses on a blockchain are actually derivatives of

03:32 20   the public key.  So the public key comes from the private key

21   and those match up.  Those are your private and public key

22   pairs, yes.

23   Q.    And when the miners mine pursuant to a consensus

24   algorithm, they have to verify on the blockchain that the

25   public key that they can find is actually the owner of the coin

1    on the blockchain so that they can -- so the so-called double

2    spend doesn't occur, right?

3    A.   It also keeps others from being able to spend your crypto

4    at your public key address, right, at your address, yes.

5    Q.   Are you familiar with the theory of the double spend?

6    A.   Yes.

7    Q.   Okay.  Can you explain that to the jury.

8    A.   A double spend is when you're able to basically utilize

9    the same coins in two separate transactions.  Obviously the two

03:33 10   coins can't be spent in two places at once.  So in a double

11   spend attack, as it's often referred to, you may send ten

12   Bitcoin to one exchange.  You may try to send that same ten

13   Bitcoin to another exchange and cash out those 10 Bitcoin

14   before somebody realizes you have actually spent the same

15   Bitcoin twice.

16   Q.   In fact, that double spend concept has been with us for

17   centuries?

18   A.   Yes.

19   Q.   It's as old as gold itself?

03:33 20   A.   Yes, it's native to currency as we know it, yes.

21   Q.   It goes back to the barter system?

22   A.   Yes.

23   Q.   Okay.  Now, your opinion is that, based on blockchain

24   analysis, MBC was not available as a cryptocurrency until June

25   28, 2017?

1    A.    Yes.

2    Q.    Would you agree with me that it would be more precise to

3    say, based on blockchain analysis, MBC was not available as a

4    publicly available cryptocurrency until June 28, 2017?

5    A.    Yes.

6    Q.    And your review of public databases also suggests that MBC

7    was not traded as a cryptocurrency until after June 28, 2017?

8    A.    Yes, that's consistent with the marketing messages.

9    Q.    And again, that's of a publicly available cryptocurrency?

03:34 10   A.    Yes.  Again, that's how we interpreted the marketing

11   messages about the cryptocurrency.

12   Q.    Okay.  And the so-called wash trading that you rendered

13   your opinion about, you didn't find any evidence of that

14   happening prior to June 28, 2017, right?

15   A.    There was no evidence of a crypto prior to June 28, 2017.

16   Q.    And I think you said that you went to GitHub.  Do you

17   remember when you went to GitHub to look at whether or not the

18   source code was there?

19   A.    Yes.  So we reviewed GitHub in 2019.  We have also

03:35 20   reviewed GitHub in 2021.  We also reviewed GitHub in 2022.  To

21   be clear, I also had a team of computer engineers that work at

22   CipherTrace who have been utilizing, building and conducting

23   cryptocurrency blockchains and cryptocurrency transactions

24   since 2009 who also assisted on this investigation.

25   Q.    So if I was to ask you whether or not the MIT blockchain

1    source code was the source code identified on the GitHub site

2    as of June 2017, you would say that didn't exist?

3    A.   We didn't review the GitHub in June 2017.  Is that the

4    question?

5    Q.   Well, no, that wasn't the question.  The question is if

6    today you went to the GitHub site and you looked at the My Big

7    Coin site, you're saying that you wouldn't find a reference to

8    the MIT blockchain source code, which is an open source, right?

9    A.   I can't speak to going to GitHub today.  I can tell you

03:37 10   that the times that we have visited GitHub on those years,

11   those dates that I mentioned, there was no source code for a

12   blockchain.

13   Q.   So even after June 28, 2017, it's your opinion that there

14   was no source code on the GitHub page?

15   A.   There was source code.  There was no source code for

16   blockchain.

17   Q.   Well, what kind of source code was on the GitHub?

18   A.   There was some copied and reused source code for building

19   a wallet.

03:37 20   Q.   Okay.  Now, you talked earlier about a decentralized

21   distributed ledger.  And that decentralized distributed ledger

22   goes to nodes on a network?

23   A.   Yes.

24   Q.   And that's a peer-to-peer network?

25   A.   Yes.

Q.   And it's decentralized because it's not controlled by any
one node?

A.   By any one computer or any one individual, yes.

Q.   And "node" is just another word for computer, right?

A.   Yes, that's correct.

Q.   Or server?

A.   That's correct.

Q.   And as I understand it, the way the blockchain works is
you have a wallet that can communicate with a node, and then
all the other nodes communicate with each other, and they,
through an algorithm, figure out whether or not any particular
transaction should be added to the blockchain?

A.   Yes.  You could compare it to a cell phone network.  Your
cell phone, to execute a call, connects to one cell tower and
then that cell tower replicates out that phone call to the
other towers in the network.

Q.   Now, your opinion is that My Big Coin did not exist as a
cryptocurrency until June 28, 2017.

A.   Yes.

Q.   But you've admitted that if it was a private blockchain or
permissioned blockchain, it could have existed.  There's just
no public information about it?

A.   That's correct, or it could have been a virtual currency,
which is not a cryptocurrency.

Q.   But in any case, you don't know what it was between 2014

1    and 2017 based on the analysis that you did?

2    A.    Based on the evidence that was available, that was my

3    opinion.

4    Q.    That it didn't exist?

5    A.    That it did not exist.

6    Q.    But you concede that it could have existed in a private

7    permissioned blockchain?

8    A.    If it existed in a private permissioned blockchain prior

9    to June 28, 2017, then the advertising of Randall Crater in My

03:40 10   Big Coin would not be consistent with that.

11   Q.    Well, specifically which advertisement?

12   A.    That it advertised it as a cryptocurrency anywhere,

13   anywhere available any time.

14   Q.    Well, if it was a private permissioned blockchain, could

15   it be operated anywhere, any time over the internet anywhere in

16   the world?

17   A.    It could but with only a select group of users.

18   Q.    Correct.  And all I'm asking is, was it possible?

19   A.    It's possible.  I don't know if it would be decentralized,

03:41 20   but yes, it's possible.

21   Q.    Because you don't -- in other words, let me put it to you

22   this way:  You don't know what it was because your

23   investigation wasn't provided with anything as to what it was

24   during those three years?

25   A.    Can you rephrase the question.

1    Q.    You weren't given a node to look at to see whether it was,

2    in fact, a cryptographic blockchain.  Right?  You didn't review

3    any computers?

4    A.    Are you referencing prior to June 28, 2017?

5    Q.    Yes.

6    A.    We were not provided with a node prior to June 28, 2017.

7    Q.    You weren't provided with the source code?

8    A.    We absolutely were not provided with the source code.

9    Q.    You weren't provided with a wallet that could connect to

03:42 10    those nodes?

11   A.    No.

12   Q.    So as you sit here today, you really don't know what

13   existed prior to June 28, 2017, correct?

14   A.    I don't know what existed prior to June 28, 2017.

15            MR. LOPEZ:  Thank you.

16            THE COURT:  Mr. Lopez, you're done?

17            MR. LOPEZ:  I am.

18            THE COURT:  Redirect?

19                      REDIRECT EXAMINATION

03:42 20   BY MR. MARKHAM:

21   Q.    So the defense just cross-examined you essentially the

22   entire time on this idea of a private blockchain?

23   A.    Yes.

24   Q.    Which would not be the same thing as a publicly available

25   cryptocurrency?

1    A.    No.

2    Q.    So they asked you if prior to June 28, 2017 it was

3    possible that My Big Coin was a private cryptocurrency,

4    correct?

5    A.    Correct.

6    Q.    And you said that that's technically impossible?

7    A.    Yes.

8          MR. LOPEZ:  Objection.  I don't remember her saying

9    "technically impossible."

03:43 10         THE COURT:  Well, counsel you can reframe the

11   question.

12   Q.    Based on your expert opinion, was it a private

13   cryptocurrency prior to June 28, 2017?

14   A.    No.

15   Q.    Based on your understanding of the cryptocurrency markets

16   and your expertise, prior to June 28, 2017, what was My Big

17   Coin advertising itself as?

18   A.    To be a publicly available cryptocurrency.

19   Q.    Prior to June 28, 2017, did you see any evidence that My

03:44 20   Big Coin was operating as a private blockchain?

21   A.    No.

22   Q.    Did you see any advertising to suggest that My Big Coin

23   was a private blockchain in those years?

24   A.    No.

25   Q.    From 2014 to June of 2017, if My Big Coin was operating as

1   a private blockchain, could you send them to anyone anywhere?

2   A.   No.  They would have to be permissioned in to that

3   database.

4   Q.   If My Big Coin was a private blockchain --

5         THE COURT:  I'm sorry.  When you say "permissioned

6   in," what do you mean?

7         THE WITNESS:  It means that whoever is controlling,

8   operating the developers running that blockchain, they have to

9   give you permission to access it.  The concept of a database

03:44 10   really is more about who can access the data in that database.

11        So what makes Bitcoin unique is that it's

12   permissionless, is the term that is used, which means you don't

13   need permission to use it.  Anybody can use it.  So

14   "permissioned" means you have to receive permission,

15   authorization to utilize it.

16        THE COURT:  Thank you.

17   Q.   Do you need to be permissioned in to Bitcoin?

18   A.   No.

19   Q.   If My Big Coin was a private blockchain prior to June of

03:45 20   2017, would My Big Coin be the same kind of cryptocurrency as

21   Bitcoin?

22        MR. LOPEZ:  Objection.

23        THE COURT:  Sustained as to that, counsel, as to the

24   form.

25   Q.   So is Bitcoin a private blockchain?

1  A.   No.

2  Q.   If My Big Coin was a private blockchain, could it have a

3  closed loop system with MasterCard where you would then spend

4  money in the physical world?

5        MR. LOPEZ:  Objection.

6        THE COURT:  Overruled as to this.

7  A.   No.  In 2014, 2015, that wasn't available.  BitPay was one

8  of the first organizations to launch a prepaid Visa card that

9  was tied to your Bitcoin holdings, and that happened in May of

03:46 10  2016.

11  Q.   If My Big Coin was a private blockchain, could you mine

12  them and donate them to anyone?

13  A.   No.

14  Q.   If individuals were told that My Big Coin was tradable on

15  the Nova Exchange, could My Big Coin have been a private

16  blockchain?

17  A.   It could have been.  Nova Exchange would have had to have

18  been permissioned in as well to that blockchain.

19  Q.   Understood.  And the first time -- when was the first time

03:46 20  you saw My Big Coin, whether it was permissioned in or a

21  publicly available blockchain, when was the first time you saw

22  evidence of that on the Nova Exchange?

23  A.   September 2017.

24  Q.   Did you ever see it on any other exchange?

25  A.   No.

1    Q.   You said that prior to June 28, 2017, you were not

2    provided with a wallet or a node.  Do you remember saying that?

3    A.   Yes.

4    Q.   Based on your expert opinion, prior to June 28, 2017, was

5    there a wallet or a node to review?

6              MR. LOPEZ:  Objection.

7              THE COURT:  Well, sustained as to form, counsel.

8    Q.   Based on your opinion in this case, would there have been

9    wallets to review prior to June 28, 2017?

03:47 10              MR. LOPEZ:  Objection.

11              THE COURT:  Overruled.

12    A.   There was no evidence of wallets or nodes prior to June

13    28, 2017.

14              MR. MARKHAM:  That's all from the government, Your

15    Honor.

16              THE COURT:  Recross?

17                        RECROSS-EXAMINATION

18    BY MR. LOPEZ:

19    Q.   And your opinion is based on the four years of experience

03:47 20    you have with CipherTrace?

21    A.   Yes.

22    Q.   Based on what you read about blockchain?

23    A.   I teach certifications in blockchain and cryptocurrency.

24    Q.   Correct.  Which is based on what you've read about

25    blockchains?

1    A.    No.   It's based on working side by side computer engineers

2    that have been doing this since 2009.

3    Q.    But your opinion is not based on any computer science

4    background you have?

5    A.    No.   And to be clear, when I obtained my --

6                MR. LOPEZ:   Thank you.   Thank you.

7                MR. MARKHAM:   Your Honor, if she could finish.

8                MR. LOPEZ:   It's a yes or no answer.

9                THE COURT:   I think that was responsive up to that

03:48 10   point.   Ma'am, you're excused.   Thank you.

11                THE WITNESS:   Thank you.

12                MR. MARKHAM:   Your Honor, we may not have someone.   I

13   apologize.

14                THE COURT:   You're asking for the mercy of the Court?

15                MR. MARKHAM:   Yes, the jury might appreciate it.

16                THE COURT:   For benefit of the jury, we'll stop there.

17                MR. MARKHAM:   Thank you, Your Honor.

18                THE COURT:   Jurors, just before we let you go for the

19   weekend, I just wanted to give you an update.   Based on counsel

03:49 20   and my view, we're actually on schedule, if not ahead of

21   schedule, which may be hard, or not, for you to imagine, but we

22   are.   So I'll give you a further update next week, but I just

23   wanted to share that with you before you go about your weekend.

24                Please keep all of my cautionary instructions in mind.

25   Don't talk to each other or anyone else about the case.   Keep

```
  1    an open mind.  You're still hearing evidence.  Don't do any
  2    outside research.  And we'll see you at 9:00 on Monday.
  3             Have a good weekend.  Thank you.
  4             THE CLERK:  All rise.
  5             THE COURT:  You can leave your notebooks on the chair.
  6    Thank you.
  7             (Jury exits the courtroom.)
  8             THE COURT:  Everyone can be seated.  Counsel, it's
  9    been a long week for counsel as well.
 10             I'm assuming there have been no changes in the lineup
 11    the government gave me for next week.
 12             MR. MARKHAM:  No, Your Honor.
 13             THE COURT:  Okay.  Anything we need to address now?
 14             MR. MARKHAM:  Nothing from the government, Your Honor.
 15             MR. LOPEZ:  Your Honor, I do have a problem with
 16    Mr. Galvin.  Mr. Galvin, the docket now contains the return of
 17    service --
 18             THE COURT:  Okay.
 19             MR. LOPEZ:  -- for Mr. Galvin.  The return I believe
 20    says -- well, I don't know if the one on the docket says it.  I
 21    know I have another one in my email from my brother.
 22             THE COURT:  Okay.
 23             MR. LOPEZ:  He was contacted by the marshals and he
 24    told the marshals to leave the subpoena at a certain location,
 25    and now he's claiming that there wasn't good service.  As far
```

1   as I'm concerned, the only reason why he wasn't served in hand

2   is because he directed the marshal to do something else.

3           THE COURT:  Okay.

4           MR. LOPEZ:  So I may need an order to compel him to

5   appear.

6           THE COURT:  Okay.  So counsel, why don't I -- well,

7   you can file a motion to that effect or you can simply update

8   me on Monday with the further communication that you've had, it

9   sounds like.

03:51 10           MR. LOPEZ:  The problem is I have to arrange for his

11   transportation as well.

12           THE COURT:  I guess, counsel, what is the order you're

13   asking me to enter?

14           MR. LOPEZ:  To compel him to appear.

15           THE COURT:  Okay.

16           MR. LOPEZ:  And if -- I guess we have to wait -- the

17   subpoena was for him to appear this week.  He's not here, but I

18   haven't arranged for transportation because he's gone into the

19   dark.

03:51 20           THE COURT:  Right.  So I guess, counsel, the only

21   thing is, as I sit here today, I haven't seen what you entered

22   on the docket.  I certainly accept your representation.

23   Certainly if there was acceptance of service or acceptable

24   service, certainly the Court could order his appearance.  I

25   haven't looked at the rules of the statute.

```
 1              Where is he again?  What state?

 2              MR. LOPEZ:  I believe he's in Michigan.

 3              THE COURT:  Meaning, as I stand here today, I'm not

 4      clear what the --

 5              MR. LOPEZ:  He's in Colorado.

 6              THE COURT:  -- rule is in regards to out-of-district

 7      witnesses.  That's my only hesitation.

 8              MR. LOPEZ:  I will file a motion over the weekend,

 9      Your Honor.

03:52 10         THE COURT:  It can just be a proposed order, counsel,

11      as long as it spells out the citation citing what authority I

12      am acting upon.  I'm assuming the government doesn't need to be

13      heard on this?

14              MR. MARKHAM:  Your Honor, we are not planning on

15      filing an opposition, no.

16              THE COURT:  Mr. Lopez, anything else?

17              MR. LOPEZ:  No, Your Honor.  Thank you.

18              THE COURT:  Counsel, I'll see you at 8:45.  I know, as

19      I said, it's been a long week, but I appreciate the courtesy

03:53 20    from both sides to this court and have a good weekend.

21              MR. LOPEZ:  You too, Your Honor.

22              MR. MARKHAM:  Thank you, Your Honor.

23              THE COURT:  All rise.

24              (Adjourned at 3:52 p.m.)

25                        -----------------
```

```
 1                         CERTIFICATION

 2          We certify that the foregoing is a correct transcript

 3   of the record of proceedings in the above-entitled matter to

 4   the best of our skill and ability.

 5

 6

 7   /s/Debra M. Joyce              July 16, 2022
     Debra M. Joyce, RMR, CRR, FCRR  Date
 8   Official Court Reporter

 9

10

11   /s/Kelly Mortellite            July 16, 2022
     Kelly Mortellite, RMR, CRR     Date
12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2    WITNESS                                                  PAGE

3    DAVID DESA

4       Continued Direct Examination                           11
        By Mr. Markham
5       Cross-Examination                                      28
        By Mr. Lopez
6       Redirect Examination                                   61
        By Mr. Markham
7       Recross-Examination                                    76
        By Mr. Lopez
8
     JAY BYRD
9
        Direct Examination                                     78
10      By Mr. Markham
        Cross-Examination                                      89
11      By Mr. Lopez
        Redirect Examination                                  107
12      By Mr. Markham

13   NORMAN MENDIOLA

14      Direct Examination                                    114
        By Mr. Moore
15      Cross-Examination                                     127
        By Mr. Lopez
16      Redirect Examination                                  137
        By Mr. Moore
17      Recross-Examination                                   138
        By Mr. Lopez
18
     GAVIN ABADI
19
        Direct Examination                                    139
20      By Mr. Moore
        Cross Examination                                     146
21      By Mr. Lopez

22   KIMBERLY BENGE

23      Direct Examination                                    157
        By Mr. Moore
24      Cross-Examination                                     168
        By Mr. Lopez
25      Cross-Examination                                     168
        By Mr. Lopez

PAMELA CLEGG

Direct Examination                                          171
By Mr. Markham
Cross-Examination                                           228
By Mr. Lopez
Redirect Examination                                        242
By Mr. Markham
Recross-Examination                                         246
By Mr. Lopez

E X H I B I T S

Exhibit No.              Description                    Received

31                                                         15

32                                                         23

33A through G                                             122

34                                                        142