1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5                    Plaintiff,        Criminal Action
                                       No. 19-10063-DJC
6    v.
                                       July 18, 2022
7    RANDALL CRATER,                   8:47 a.m.

8
                     Defendant.
9    _____

10

11

12            TRANSCRIPT OF JURY TRIAL DAY 5

13        BEFORE THE HONORABLE DENISE J. CASPER

14            UNITED STATES DISTRICT COURT

15        JOHN J. MOAKLEY U.S. COURTHOUSE

16              1 COURTHOUSE WAY

17            BOSTON, MA  02210

18

19

20

21            DEBRA M. JOYCE, RMR, CRR, FCRR
                    Official Court Reporter
22            John J. Moakley U.S. Courthouse
               1 Courthouse Way, Room 5204
23                  Boston, MA  02210
                   joycedebra@gmail.com
24

25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   CHRISTOPHER J. MARKHAM, ESQ.
     BABASIJIBOMI MOORE, ESQ.
 4   US Attorney's Office - MA
     J. Joseph Moakley U.S. Courthouse
 5   1 Courthouse Way
     Suite 9200
 6   Boston, MA 02210
     617-449-6890
 7   christopher.markham2@usdoj.gov
     babasijibomi.moore2@usdoj.gov
 8
     FOR THE DEFENDANT:
 9
     SCOTT P. LOPEZ, ESQ.
10   Lawson & Weitzen
     88 Black Falcon Avenue
11   Suite 345
     Boston, MA 02210
12   617-439-4990
     splopez@lawson-weitzen.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          (The following proceedings were held in open

3   court before the Honorable Denise J. Casper, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   1 Courthouse Way, Boston, Massachusetts, on July 18, 2022.

7          The defendant, Randall Crater, is present with

8   counsel.  The Assistant U.S. Attorneys are present.)

9          THE CLERK:  All rise.

08:47 10          (The Court entered the courtroom.)

11          THE CLERK:  Court is in session.  Please be seated.

12          THE COURT:  Good morning.

13          ALL:  Good morning, your Honor.

14          THE COURT:  Counsel, I had one or two things I was

15   going to bring to your attention.

16          Anything from either side that we need to talk about

17   before today's witnesses?

18          MR. MARKHAM:  A couple things from the government,

19   your Honor.

08:48 20          THE COURT:  Sure.

21          MR. MARKHAM:  So, first, what were marked as Exhibits

22   24 and 25 were actually the same stipulation.  They were

23   different stipulations within the same docket number.

24          THE COURT:  Okay.

25          MR. MARKHAM:  So we do actually have one more

1   stipulation that we'll be reading into the record and then

2   marking -- and what we'd propose is marking that as Exhibit 25.

3            THE COURT:  That's fine.  Just mention that when you

4   propose to read it.

5            MR. MARKHAM:  Yes, your Honor.

6            And then the last three things are really one thing,

7   which is that we have three more exhibits that are contested

8   that will be coming through witnesses potentially today that

9   the Court was reserving rulings on.

08:48 10         THE COURT:  Okay.  And which are those?

11           MR. MARKHAM:  Exhibit I is the summary exhibit from

12  Ms. Brekenfeld, she's last.

13           And then Exhibit J is the IRS records.

14           And Exhibit K are the FinCEN records.

15           THE COURT:  Counsel, let me just see if I can bring

16  those up.

17           I remember I.  Are J and K voluminous?

18           MR. MARKHAM:  No.  They're certification of lack of

19  records, and they're stipulated to as authentic.

08:49 20         There was an objection -- I believe they went from

21  2013 to 2018.

22           THE COURT:  Yes.

23           MR. MARKHAM:  So there was the objection about 2018.

24           THE COURT:  Counsel, do you have hard copies of those?

25           MR. MARKHAM:  Yes, your Honor.

1          THE COURT:  Thank you.

2          Mr. Lopez, do you want to be heard further on Exhibit

3   I, the summary exhibit?

4          MR. LOPEZ:  Your Honor, my primary objection is that

5   there were monies -- there are monies that are listed, which,

6   according to Mr. Lynch's testimony, has nothing to do with My

7   Big Coin coins and had only to do with the marijuana licenses.

8          It's a substantial sum of money, $3.7 million.  So I

9   think that the exhibit is misleading because it appears to be

08:50 10   more money than actually is part of this alleged scheme.

11          In addition to that, I don't know how she selected

12   which wire transfers into these accounts were the ones that she

13   focused on as opposed to other wire transfers, or deposits that

14   were made into the account at the counter.

15          I just -- so I would object to it being used in this

16   trial.

17          THE COURT:  Okay.

18          Counsel, if you have a hard copy of it.

19          MR. MARKHAM:  Yes, your Honor.  May I approach?

08:50 20          THE COURT:  You may.

21          Thank you.

22          MR. MARKHAM:  I would like to respond, your Honor, to

23   those.

24          THE COURT:  Yes.  Just give me a second.

25          I do recall this, but it was several charts.

1           (Pause.)

2           THE COURT:  Counsel, on the first issue about the

3    marijuana licenses versus Big Coin.

4           MR. MARKHAM:  Yes, your Honor.  Mr. Lynch testified

5    that while he originally put the money in for marijuana

6    licenses, that, at the defendant's request, those marijuana

7    licenses -- monies were then converted into coin.  That's why

8    those are still included on the summary exhibit, is based on

9    John Lynch's testimony, which this 1006 summary exhibit witness

08:52 10   observed.

11          THE COURT:  Okay.

12          And on the second issue about the selection of which

13   wires went into Exhibit I, and I'm assuming that's in regards

14   to the summary of incoming payments, it hits me that that goes

15   more to weight as opposed to admissibility for a 1006 issue,

16   but why don't I have the government respond to that.

17          MR. MARKHAM:  Yes, your Honor.

18          We are going to walk through with Ms. Brekenfeld how

19   she chose those wire transfers.  How we anticipate her

08:52 20   testimony is going to be is that, one, she listened to

21   testimony of witnesses in this case, for instance, Norman

22   Mendiola, Jay Byrd, Mr. Lynch, they are all on that summary

23   exhibit, and they testified in this case.

24          Additionally, there is a stipulation in this case that

25   the defendant sold certain coins and then received monies into

1  his bank accounts.  So that is more of a general stipulation as

2  to money coming into the accounts.

3         And then, third, what I think defense counsel is

4  probably most pushing back on is that she reviewed emails that

5  are stipulated to as authentic, and they're in the record

6  already from the defendant's email account, but in those emails

7  it lists people who were sending money to My Big Coin and were

8  My Big Coin investors.

9         And what we anticipate Ms. Brekenfeld will testify to

08:53 10  is that she reviewed emails from the defendant's email account

11  of individuals who were identified as My Big Coin investors and

12  then she went into the defendant's bank records and identified

13  incoming wires from those people.  So that's where some of the

14  other names come from, and that's how she connects up which

15  ones she used.

16         If she didn't find a name in an email discussing My

17  Big Coin, then she left the wire transfer off the summary

18  exhibit.

19         Lastly, there are checks where it says "My Big Coin"

08:54 20  and those are going to the defendant's bank accounts.

21         So it's those four things.

22         THE COURT:  Okay.

23         Mr. Lopez, I'll give you the last word on this, if you

24  want it.

25         MR. LOPEZ:  No, your Honor.

1          There is another issue that I'd like to bring up.

2          THE COURT:  Sure.

3          MR. LOPEZ:  I was just handed the government's

4    organization of exhibits, and their exhibits are not consistent

5    with what the clerk's notes were.  So I just want to make sure

6    that the record is clear if we refer to these exhibits.

7          So, for example, their Exhibit Number 21, which is an

8    email from John Lynch dated November 21, 2016 is what I believe

9    to be Exhibit Number 23.

08:54 10          They're missing Exhibit Number 22, which is an email

11   from John Lynch to Randall Crater dated August 15, 2017.

12          My Exhibit 21 is an email from John Lynch to Mark

13   Gillespie with a cc to Michael Kruger dated October 19, 2014.

14          And their --

15          THE COURT:  I have Exhibit 21 as a November 16 Lynch

16   to Crater attaching a second subscription contract.

17          So, counsel, I guess on this issue, my practice is at

18   the end of the trial before the exhibits go up to the jury, I

19   have counsel on each side certify on the record to Ms. Hourihan

08:55 20   that the exhibits are in order, both the hard copies, as well

21   as what I am assuming everybody wants uploaded to the JERS

22   system.  So I just ask counsel to confer offline about this

23   issue.

24          Obviously I've been listening carefully to make sure

25   that the numbers referred to reflect what Ms. Hourihan and I

1    had noted have come into evidence, but, counsel, if the Court

2    gets any of that wrong, Mr. Lopez, you should correct us.

3          MR. LOPEZ:  That's fine, your Honor.

4          THE COURT:  Counsel, just -- I wanted to return to

5    this issue on the Zoom witnesses, particularly Mr. Galvin.

6          I'll just note for the record since I saw you on

7    Friday, I did review Docket 171, the return of service to

8    Mr. Galvin, and then I also saw over the weekend Docket 190,

9    the return of service on Mr. Gifford, which appears that he was

08:56 10   unable to be located, or at least that's what the deputy

11   marshal indicated here.

12          I also refreshed my own recollection about the reach

13   of Rule 17.

14          And then, lastly, I received this morning -- I don't

15   know when the Court received it, but it was dated July 15th

16   from Mr. Galvin, hopefully counsel has seen this, a letter, *pro*

17   *se* letter seeking to quash the subpoena to the extent it seeks

18   in-person appearance, but indicates some willingness to appear

19   by Zoom.

08:57 20          So, Mr. Lopez, I'll start with you.  I'm not sure if

21   these are still live issues, but I just wanted to let you know

22   where I was in terms of having reviewed the documents.

23          MR. LOPEZ:  Your Honor, my understanding is that my

24   private investigator, John Cinotti, has been attempting to

25   reach out to Mr. Galvin without success.  Quite frankly, I had

1    not personally done that, so I don't have an answer for you.  I

2    was hoping that after court today I'd call him and see if he's

3    willing to appear by Zoom tomorrow.

4         THE COURT:  And have you seen this letter, Mr. Lopez?

5         MR. LOPEZ:  I have.

6         THE COURT:  Okay.  I'll just note that he says, I can

7    get some place in the Denver area to testify by Zoom.  He's --

8    I won't go into the details, if both counsel have read it, but

9    he has some health concerns.

08:58 10        MR. MARKHAM:  The government takes no position on

11   this, your Honor, if he's able to testify via Zoom.

12        THE COURT:  I guess, the reason I was raising it was,

13   Mr. Lopez, if you wanted me to take some action.  Obviously

14   Rule 17 gives me nationwide subpoena power, although, in light

15   of his letter and I think the willingness on both sides to have

16   him heard by Zoom, I would entertain, if you thought it

17   necessary, an order for appearance via Zoom.  But I just want

18   to make sure that Ms. Hourihan has an update because it does

19   require some logistics on our end to make that happen.

08:59 20        And are you planning to still call Mr. Gifford?

21        MR. LOPEZ:  I am, your Honor.

22        THE COURT:  Okay.  And I guess, counsel, he has not

23   been -- at least based on what I've received in Docket 190, it

24   appears he has not been served, at least as the record stands

25   at this moment.  So if you wanted me to take some action in

1    that regard, I would need to have the proof of service.

2          MR. LOPEZ:  Understood, your Honor.

3          THE COURT:  I raise all of that, Mr. Lopez, because I

4    know you're in court all day today, but I also understand the

5    government anticipates resting sometime tomorrow, so I just

6    wanted to raise it now.

7          MR. LOPEZ:  Your Honor, that is one of many issues I

8    have logistically.

9          THE COURT:  Okay.

08:59 10          MR. LOPEZ:  Three witnesses missed one of their

11   connecting flights yesterday.  I have no idea where they are,

12   if they're here in Boston or if they're somewhere in Detroit

13   or --

14          THE COURT:  Okay.

15          MR. LOPEZ:  So I just --

16          THE COURT:  Okay.

17          MR. LOPEZ:  Unfortunately, as CJA counsel, I have to

18   rely on multiple third parties --

19          THE COURT:  Understood.

09:00 20          So, counsel, I think we should check in at the lunch

21   break about these issues, maybe coming back a little bit

22   earlier than our jury, just because I don't want to have gaps

23   in the presentation of evidence to them.  And I also want to

24   take any Court action you think I should, Mr. Lopez, in regards

25   to the witnesses we're talking about.

```
  1              Ms. Hourihan, do we have everybody?

  2              (Discussion off the record.)

  3              THE COURT:  We have all of our jurors.

  4              Where are we going now?  Who's the first witness?

  5              MR. MARKHAM:  James Douglas will be the first witness,

  6   your Honor.

  7              THE COURT:  And remind me who he is.

  8              MR. MARKHAM:  I'll let Mr. Moore.

  9              THE COURT:  Sure, Mr. Moore.

09:00 10          MR. MOORE:  He's an early business associate of My Big

 11   Coin.

 12              THE COURT:  Okay.  We can -- why don't we get the

 13   jury, and we can bring the witness in and we'll get started.

 14              And no disputed exhibits anticipated here?

 15              MR. MOORE:  Yes, your Honor.  What's been premarked as

 16   14A, it's text messages between Mr. Douglas and the defendant.

 17              THE COURT:  But no lettered exhibits that are

 18   disputed?

 19              MR. MOORE:  Yeah, this -- he'll have to authenticate

09:01 20      the text messages.

 21              THE COURT:  I'm sorry.  You said 14A.  I guess I'm --

 22              MR. MOORE:  Sorry, it's R1 through R6.

 23              THE COURT:  Thank you.

 24              MR. MOORE:  Sorry, your Honor.

 25              THE COURT:  And are these text message with
```

```
 1   Mr. Crater?
 2              MR. MOORE:  Yes, your Honor.
 3              THE COURT:  Thank you.
 4              Oh, and counsel, in terms of a jury charge conference,
 5   at least based on what the government told me yesterday, my
 6   inclination, as I have done in other criminal cases, is to have
 7   the jury charge probably early tomorrow morning.  We'd start a
 8   little bit earlier.
 9              THE CLERK:  All rise for the jury.
10              (Jury entered the courtroom.)
11              THE COURT:  And I'll return to details about that
12   later.
13              THE CLERK:  Court is in session.  Please be seated.
14              THE COURT:  Good morning, jurors.
15              THE JURY:  Good morning, your Honor.
16              THE COURT:  We'll get started.
17              Mr. Moore.
18              MR. MOORE:  The United States calls James Douglas.
19              THE COURT:  He may be called.
20              JAMES DOUGLAS, having been duly sworn by the Clerk,
21   was examined and testified as follows:
22              THE CLERK:  Thank you.  Please be seated.
23              THE COURT:  Good morning, sir.  Good morning.
24              THE WITNESS:  Good morning.
25              THE COURT:  Mr. Moore.
```

09:02 (line 10)
09:03 (line 20)

```
 1                        DIRECT EXAMINATION
 2   BY MR. MOORE:
 3   Q.   Please state your name for the record, and spell your last
 4   name.
 5   A.   James Douglas, D-o-u-g-l-a-s.
 6             THE COURT:   Thank you.
 7   BY MR. MOORE:
 8   Q.   Can you please describe for the jury your education?
 9   A.   Some college.
10   Q.   And where are you currently employed?
11   A.   Recall Masters.
12   Q.   And what is Recall Masters?
13   A.   We track recalls on vehicles.
14   Q.   Are you familiar with a company called NetVersa?
15   A.   Yes.
16   Q.   Can you describe to the jury what NetVersa is or was?
17   A.   NetVersa was a startup, a software development startup,
18   and we pursued a couple of different ventures, one of them
19   being TradeBitcoin, which was a cryptocurrency exchange.
20   Q.   And what was your -- what was your role in
21   tradebitcoin.com?
22   A.   I was COO of NetVersa.  I was seeking a -- I put together
23   all the development and coding and everything for TradeBitcoin,
24   and I also seeked investment partners for licensing and legal.
25   Q.   About when did you start working on the idea for
```

1    tradebitcoin.com?

2            Just year, approximately.

3    A.   2012.

4    Q.   Are you familiar with Randall Crater?

5    A.   Yes.

6    Q.   How are you familiar with Randall Crater?

7    A.   I was introduced to Randall as a potential partner that

8    could help with licensing and legal for TradeBitcoin.

9    Q.   Did you seek out Mr. Crater's help with the coding for

10   tradebitcoin.com?

11   A.   No.

12   Q.   Why did you not seek his help for the coding?

13   A.   I didn't know Randall to be a coder.  We were only seeking

14   assistance with licensing and legal.

15   Q.   What did you understand was the licensing and legal that

16   you needed for tradebitcoin.com?

17           MR. LOPEZ:  Objection.

18           THE COURT:  Counsel, in a word or two, basis?

19           MR. LOPEZ:  Leading.

20           THE COURT:  Sustained as to form.

21   BY MR. MOORE:

22   Q.   Did you say that you needed licensing and legal?  Is that

23   what you said?

24   A.   Yes.

25   Q.   What was your understanding of the licensing and legal

1    that you needed?

2    A.    Either to register with FinCEN or to be covered with a

3    federal banking charter.

4    Q.    And the requirement for licensing with FinCEN, is that

5    what you had discussions with Mr. Crater about?

6    A.    Yes, among other things.

7    Q.    Did you have discussions with Mr. Crater about My Big Coin

8    serving as a white label solution for tradebitcoin.com?

9    A.    Yes.

09:06 10    Q.    Could you describe to the jury what a white label solution

11    is?

12    A.    It's when one company is the face to consumers and another

13    company provides the technology behind the scenes.

14    Q.    All right.  Did you end up using My Big Coin as the white

15    label solution for tradebitcoin.com?

16    A.    No, I did not.

17    Q.    Over your time having discussions with Mr. Crater, did you

18    get familiar with a company called Greyshore?

19    A.    I believe Greyshore was Mr. Crater's company.

09:07 20    Q.    All right.

21          MR. MOORE:  Can we bring up Exhibit 10B, please.

22    Q.    Have you seen this email before?

23    A.    Yes.

24    Q.    All right.  And JamesDouglas@NetVersa.com, is that you?

25    A.    Yes.

 1   Q.   And do you know who greyshore@me.com is?

 2   A.   Randall Crater.

 3   Q.   All right.  In the bottom email here, you say, Attached is

 4   a high level overview of our business model.  Please let me

 5   know if you need more information.

 6        Can you explain to the jury what's going on in that

 7   exchange?

 8   A.   What the business model is?

 9   Q.   Are you explaining your business model to Mr. Crater?

09:08 10   A.   Yes.

11   Q.   Do you know -- and then in the top email, you say, Also,

12   below is a link to the form we will definitely need to complete

13   for FinCEN.

14        Do you see that there?

15   A.   Yes.

16   Q.   And then you send a link to the defendant.  Do you see

17   that as well?

18   A.   Yes.

19   Q.   Is this the regulatory approval that you believe you

09:09 20   needed for tradebitcoin.com?

21   A.   Yes.

22   Q.   Do you know if the defendant ever submitted documentation

23   to FinCEN for tradebitcoin.com?

24        MR. LOPEZ:  Objection.

25        THE COURT:  Foundation?

```
 1              MR. LOPEZ:  Yes.
 2              THE COURT:  Sustained as to that.
 3    BY MR. MOORE:
 4    Q.   Did you have discussions with the defendant about FinCEN
 5    regulations?
 6    A.   Yes.
 7    Q.   Did those discussions result in the defendant providing
 8    FinCEN documents for tradebitcoin.com?
 9    A.   No.
09:09 10        MR. MOORE:  Can we show just to the witness Exhibit
11    R1.
12              THE COURT:  Just for the witness and counsel.
13    BY MR. MOORE:
14    Q.   We met before today, correct?
15    A.   Yes.
16    Q.   And you provided text messages between you and the
17    defendant to the government?
18    A.   Yes.
19    Q.   Have you had a chance meeting with me to review those text
09:10 20    messages?
21    A.   Yes.
22    Q.   And are they an accurate representation of the
23    conversations between you and the defendant?
24    A.   Yes.
25              MR. MOORE:  All right.  At this time I move to admit
```

```
 1   Exhibit R1, your Honor.
 2            THE COURT:  Any objection, R1?
 3            MR. LOPEZ:  No objection, your Honor.
 4            THE COURT:  It may be admitted.
 5            Ms. Hourihan, what's the next number?
 6            THE CLERK:  35.
 7            THE COURT:  I'm sorry, 35?
 8            THE CLERK:  Yes.
 9            THE COURT:  It may be admitted and published as 35.
10            (Exhibit 35 received into evidence.)
11   BY MR. MOORE:
12   Q.   Here at 1:36:10, Mr. Crater says to you, Got it, sir,
13   already.  On with my lawyer about this, man.  I'm just jacked
14   about this.  FYI, I have the kind of software to run our own
15   coin with mining, all the bells and whistles if you ever need
16   it.
17            And you write back, I have my own code as well.  Can
18   you tell me more about yours?
19            Did the defendant ever provide you any details about
20   the My Big Coin code?
21   A.   No.
22   Q.   Based off of your interactions with the defendant, did you
23   form an opinion about his ability to code?
24   A.   Yes.
25   Q.   And what was that opinion?
```

1   A.   I did not believe him to be a coder.

2   Q.   Are you familiar with cryptocurrency mining?

3   A.   Yes.

4   Q.   Does cryptocurrency mining happen on a blockchain?  Do you

5   know?

6   A.   Yes.

7   Q.   Did the defendant ever show you a white paper explaining

8   how My Big Coin operated?

9   A.   No.

09:11 10   Q.   Did he ever show you the source code for My Big Coin?

11   A.   No.

12            MR. LOPEZ:  Objection.

13            THE COURT:  Overruled.  To the extent there was an

14   answer, it may stand.

15            MR. MOORE:  Can we bring up R2, please.

16            THE COURT:  Just for the witness.

17            Meaning, was R1 just 35 or was 35 --

18            MR. MOORE:  They're just different days off all the

19   same text messages.

09:12 20            THE COURT:  Mr. Lopez, so you had no objection to the

21   R series?

22            MR. LOPEZ:  It's my understanding that all of these

23   are from Mr. Douglas to Mr. Crater.  So to that extent I have

24   no objection.

25            THE COURT:  Is that correct?

1              MR. MOORE:  That is correct.

2              THE COURT:  Can you just read me the R1 numbers that

3      are in 35, R1 to what?

4              MR. MOORE:  R1 through R6.

5              THE COURT:  All right.  So R1 through R6 are all 35.

6      So it may be published.

7              MR. MOORE:  Can we publish what was R2.

8      BY MR. MOORE:

9      Q.   Here at 2:00:32, Randall Crater says to you, Have credit

09:13 10      cards set up now as well.

11              You write back, What do you mean?  You can accept

12      credit card deposits?

13              The defendant responds back, Yes.

14              So here on December 14th, which is three days after

15      you send him the FinCEN regulation, he says that he already has

16      credit cards set up now as well.  Do you see that?

17      A.   Yes.

18      Q.   Did it surprise you that he was already accepting credit

19      cards after you had just sent him the FinCEN forms?

09:13 20      A.   Yes.

21      Q.   And then at 2:38:36 the defendant says, Any time you want

22      to do some cash transactions in the meantime lmk.  I'll make

23      them happen for you.

24              And you write back, Cash transactions for what?

25              Did you have an understanding of what he meant by "do

```
    1    some cash transactions"?
    2              MR. LOPEZ:  Objection.
    3              THE COURT:  Well, sustained as to form, counsel.  You
    4    can ask a different question.
    5    BY MR. MOORE:
    6    Q.   What, if any, understanding did you take from this
    7    exchange?
    8    A.   It wasn't clear.
    9    Q.   Did you agree to do any sort of cash transactions on My
09:14 10    Big Coin?
   11    A.   No.
   12    Q.   Why not?
   13              MR. LOPEZ:  Objection.
   14              THE COURT:  Sustained as to that question.
   15              MR. MOORE:  Can we bring up what was R3.
   16              Can we go to 11:51:38.
   17    BY MR. MOORE:
   18    Q.   Here the defendant says, Be assured, we have the banking
   19    100 percent lined up and don't have to worry about whetting
09:15 20    shut down by the bank.
   21              What, if any, understanding did you take to mean from
   22    his "banking 100 percent lined up"?
   23    A.   That he had a banking partner to cover the licensing and
   24    legal requirements for TradeBitcoin to operate.
   25    Q.   Was it important to you that tradebitcoin.com have all the
```

1    proper registrations?

2    A.   Was it what?

3    Q.   Was it important to you --

4    A.   Yes.

5    Q.   -- for tradebitcoin.com to have all the proper

6    registrations?

7    A.   Yes, definitely.

8    Q.   Did you end up turning tradebitcoin.com into a money

9    services business?

09:16 10    A.   No.

11    Q.   Why not?

12    A.   Because we didn't ever secure the licensing and legal

13    requirements necessary to operate.

14    Q.   Did the defendant ever show you any paperwork evidencing

15    to you that all the FinCEN paperwork had been done?

16    A.   No.

17         MR. MOORE:  Can we go to R4.

18         Can we start at 9:53:30.

19    Q.   Here the defendant says, I'm making some real good headway

09:16 20    with the Big Coin.  We're making a lot of changes to the system

21    to be more like eBay.  This is just soft.

22         What do you think of My Big Coin site?

23         And you respond back, All the logic worked out.  Can't

24    wait to see the master domain view.

25         And the defendant writes back, I'll send it over

1    tomorrow.  I am already selling coin, about 100k worth today.

2            You write back, That's awesome.  Are people just using

3    it to move money?  Or casinos too?

4            Did the defendant send over the master admin view as

5    he indicated he would have?

6    A.    No.

7    Q.    And what, if any, understanding did you take from his

8    message, "I'm already sailing coin about 100k worth today"?

9    A.    I wasn't sure.  It sounded like he was selling his My Big

09:17 10   Coin currency.  I'm not sure what the purpose is, but to me it

11   sounded like he was just trying to establish some form of

12   credibility, like for me to believe that his operation was

13   legitimate and that I could use him to operate TradeBitcoin.

14   Q.    Did you view his operation as legitimate?

15   A.    No.

16   Q.    Did the defendant ever show you any evidence that casinos

17   were using My Big Coin?

18   A.    No.

19            MR. MOORE:  Can we bring up number 5.

09:18 20           And let's start at the top here, 7:50:10.

21   Q.    Here Randall writes, both www.Twitter.com/My Big Coin

22   check followers.

23            You write back, 10k followers for $10?

24            The defendant writes, I'm a little lost in this text.

25   Are you saying I bought these followers?

1           You write back, Asking.

2           The defendant writes back, No, this is all organic.

3    Of course, I could have bought 100k of them if needed to be.

4           You write back, Wow, that's impressive for organic.

5    How did you get so much exposure?

6           The defendant writes back, Right market guys that I

7    have, a lot of dealing with.

8           You write back, I'm just curious in the details

9    because online marketing is my core competency and 10k

09:19 10    followers organically usually leaves a footprint on the web.

11           He writes back, I'll explain later, busy right now

12    with clients for the coin.

13           Can you explain to the jury what's going on in this

14    set of exchanges?

15           MR. LOPEZ:  Objection.

16           THE COURT:  Sustained as to form of this question.

17           You can ask another question.

18    BY MR. MOORE:

19    Q.   So here you write, 10k followers for $10.  What does that

09:19 20    mean?

21    A.   I'm asking if he purchased 10,000 followers for $10.

22    Q.   And why -- what made you suspect that the defendant was

23    purchasing followers?

24    A.   Because there's no footprint that was visible on the web.

25           So if you look in the sentence at 10:09:56, I post a

```
 1   link there on Google, and generally when you have a lot of
 2   exposure of things like that on Twitter, you'll see pages and
 3   pages of results of people who are tweeting about it and
 4   talking about that term, where you see that term is trending.
 5   Q.   Did you have an understanding of why someone who operated
 6   cryptocurrency would want to purchase Twitter followers?
 7             MR. LOPEZ:  Objection.  Relevance.
 8             THE COURT:  Overruled.  Overruled on those grounds.
 9             You can answer.
10   A.   To establish legitimacy, social proof.
11   Q.   The defendant says, I'll explain later, busy right now.
12             Did he ever provide an explanation?
13   A.   No.
14   Q.   And then if we go down to 10:25:09, the defendant writes,
15   Our system works and we are trading money now, as you can see.
16             What did you understand that message to mean?
17   A.   I didn't -- just another claim that it was operating, so I
18   should believe that I could use it as a white label for
19   TradeBitcoin, too.
20             MR. MOORE:  And can we go to 6, please.
21   Q.   And then, starting at 12:23:26, the defendant says, I'm
22   allowing guys to promote the coin and set up their own
23   businesses.  If you set up an account, you will see the
24   breakdown of the affiliate program.  Then it will give a new
25   URL to send out to clients.  For example, I have one guy set
```

|  | |
|---|---|
| 1 | up.  He has 35 guys in his downline and he is making a |
| 2 | percentage off the deal.  It's a way to get guys working for no |
| 3 | money out-of-pocket, as I'm sure you know about this already. |
| 4 | Did you have an understanding of what the defendant |
| 5 | meant by he has 35 guys in his downline? |
| 6 | A.   Yes. |
| 7 | Q.   And what was that understanding? |
| 8 | A.   Like a multilevel marketing business structure. |
| 9 | Q.   And -- |
| 09:22 10 | A.   Meaning he has people that he's -- are selling the |
| 11 | product, and he's earning a commission off of all of their |
| 12 | sales. |
| 13 | Q.   And when he says, "get guys working for no money |
| 14 | out-of-pocket," what did you take that to mean? |
| 15 | A.   Usually in multilevel marketing, you're recruiting people |
| 16 | who are going to join and start their own -- like they're an |
| 17 | independent agent of the business, so they invest their own |
| 18 | time and money in trying to sell the product, and you earn a |
| 19 | commission off of all the work that they do. |
| 09:23 20 | Q.   Do you know in an arrangement like that, do individuals |
| 21 | get paid upfront or do they get paid further down the line? |
| 22 | A.   They get paid down the line when there's actually sales. |
| 23 | MR. MOORE:  Can we go down to 12:50:31. |
| 24 | Q.   The defendant says, I'm having My Big Coin listed in that |
| 25 | site about the new coins in the market that will happen next |

1    week.

2            Did you have an understanding of what he meant by

3    that?

4    A.   I don't recall.

5    Q.   Do you remember if in January 2014 the defendant ever

6    showed you evidence that My Big Coin was listed on any

7    exchange?

8    A.   No.

9    Q.   Did the defendant ever show you evidence that My Big Coin

09:24 10   utilized a blockchain at any point?

11   A.   No.

12   Q.   Did the defendant ever explain to you how My Big Coin was

13   valued?

14   A.   Not an explanation that I understood.

15   Q.   Can you explain to the jury what you mean by not an

16   explanation you understood?

17   A.   Well, I mean, I definitely asked him, you know, and

18   explained how Bitcoin and other cryptocurrencies establish

19   their value through scarcity and math and cryptography, but it

09:24 20   didn't seem to me that My Big Coin had a component like that,

21   and rather it was backed by just Randall Crater, like, whatever

22   he decided the value was, he would back that.

23           MR. MOORE:  Thank you.  Nothing further.

24           THE COURT:  Thank you.

25           Mr. Lopez, cross-exam.

```
 1              MR. LOPEZ:  Yes, your Honor.
 2                           CROSS-EXAMINATION
 3     BY MR. LOPEZ:
 4     Q.    Good morning, Mr. Douglas.
 5     A.    Good morning.
 6     Q.    My name is Scott Lopez; I represent Mr. Crater.
 7              THE COURT:  Sir, I'm just going to ask you to move the
 8     mic in a little bit closer and keep your voice up.
 9              THE WITNESS:  Sure.
10     BY MR. LOPEZ:
11     Q.    Now, when you first approached Mr. Crater, it was your
12     understanding that he might be interested in funding your
13     company, TradeBitcoin?
14     A.    Yes.
15     Q.    And you had that impression from a conversation that you
16     had with another individual?
17     A.    Yes.
18     Q.    And who was that individual?
19     A.    John Roche.
20     Q.    And did you have conversations with Mr. Roche about My Big
21     Coin funding TradeBitcoin?
22              MR. MOORE:  Objection, hearsay.
23              THE COURT:  Counsel, I'm assuming this is being
24     offered for bias, Mr. Lopez?
25              MR. LOPEZ:  I'm not going to ask what was said.  I'm
```

```
 1    just asking whether he had conversations.
 2            THE COURT:  So I'll allow a yes-or-no answer.
 3    A.    Can you please restate the question.
 4            THE COURT:  And did you have conversations with
 5    Mr. Roche about Big Coin funding trading Bitcoin.
 6    A.    Not about My Big Coin funding TradeBitcoin, no.
 7    Q.    Well, who referred you to Mr. Crater?
 8    A.    John Roche.
 9    Q.    And it was your understanding when you were referred to
10    Mr. Crater that there was a possibility that he might be
11    interested in funding TradeBitcoin.
12    A.    Correct.
13    Q.    And at some point you actually signed a non-disclosure
14    agreement, right?
15    A.    I believe so, yes.
16    Q.    Well, actually, strike that.
17            You didn't sign the non-disclosure agreement, the
18    person you worked for did; isn't that correct?
19    A.    I don't recall.
20    Q.    Well, who owned TradeBitcoin?
21    A.    NetVersa.
22    Q.    Mmm?
23    A.    NetVersa.
24            MR. LOPEZ:  Just give me a minute, your Honor.
25    Q.    Who's Alan Salisbury?
```

```
 1    A.   Andy Salisbury?

 2    Q.   Andy Salisbury, yes.

 3    A.   Yeah, Andy Salisbury is one of the owners of NetVersa.

 4    Q.   And did you work for him?

 5    A.   Yes.

 6    Q.   And at some point there was a non-disclosure agreement

 7    signed between NetVersa LLC and Greyshore Technologies LLC,

 8    correct?

 9    A.   Yes.

10    Q.   And do you remember when that was?

11    A.   December 2013.

12              MR. LOPEZ:  Your Honor, may I approach the witness?

13              THE COURT:  You may.

14    BY MR. LOPEZ:

15    Q.   Can you look at that document and tell me if it refreshes

16    your memory as to when a non-disclosure agreement was signed

17    between NetVersa LLC and Greyshore Technology.

18              Does it refresh your recollection?

19    A.   Sure, yeah.

20    Q.   Okay, thank you.

21              Having reviewed that document, do you now have a

22    memory as to when a non-disclosure agreement was signed between

23    NetVersa LLC and Greyshore Technologies?

24    A.   January 14, 2014.

25    Q.   So now, going back to R1 through R6, would you agree with
```

```
 1    me --
 2              THE COURT:  And I'll just note that that's now Exhibit
 3    35.
 4    BY MR. LOPEZ:
 5    Q.   Would you agree with me that all those communications
 6    occurred before the non-disclosure agreement was signed?
 7    A.   Yes.
 8    Q.   And the purpose of the non-disclosure agreement was to
 9    ensure that neither party could use the confidential
10    information that they were going to share with each other, they
11    couldn't disclose it to other parties, correct?
12    A.   Yes.
13    Q.   So you would agree with me that prior to signing that
14    non-disclosure agreement, Mr. Crater wasn't required to
15    disclose confidential information to you, right?
16    A.   Yes.
17    Q.   And in fact, he didn't disclose confidential information
18    to you.
19    A.   Correct.
20    Q.   And you didn't disclose confidential information to him.
21    A.   Correct.
22    Q.   In fact, these texts back and forth with you were really
23    about something else, wasn't it?
24    A.   What do you mean?
25    Q.   Well, didn't it have something to do with marijuana?
```

1    A.    I don't see anything about marijuana in the texts.

2    Q.    So you weren't looking to get involved with My Big Coin

3    and its plan to be a cryptocurrency in the marijuana industry?

4    A.    No.

5    Q.    Okay.  Now --

6          MR. LOPEZ:  Can you pull up Exhibit 10B, Mr. Sweeney.

7    Q.    Now, you sent this email to Mr. Crater on December 11,

8    2013, correct?

9    A.    Yes.

09:32 10   Q.    And you attached, I think it says a high-level overview of

11   our business model.

12   A.    Yes.

13   Q.    Now, at that time, was your business model licensed by

14   FinCEN?

15   A.    No.

16   Q.    And in fact, you weren't doing anything that would require

17   your company to be licensed with FinCEN, correct?

18   A.    We were not operating, no.

19   Q.    Okay.  Now, if you could go to page 5.  Page 5 says that

09:33 20   you're the founder of Crown Grip, an internet marketing

21   consultancy with an emphasis in organic SEO and lead

22   generation.

23         What does "SEO" stand for?

24   A.    Search engine optimization.

25   Q.    It says, Also, James is a co-founder of NetVersa, a

1    technology company working on a conglomerate of businesses

2    focused on helping businesses be successful with internet

3    marketing.

4          Did I read that correctly?

5    A.   Yes.

6    Q.   And then going down below, Product and Services, it says

7    TradeBitcoin aims to become the most trusted provider of

8    Bitcoin transactions and storage.  TradeBitcoin launched its

9    local Bitcoin directory in April of 2011 quickly gaining market

09:34 10   share to be the second-largest local Bitcoin directory with

11   over 10,000 members averaging 30,000 visitors per month.

12         Did I read that correctly?

13   A.   Yes.

14   Q.   So in December of 2013, TradeBitcoin was aiming to become

15   the most trusted provider of Bitcoin transactions and storage,

16   correct?

17   A.   I guess you could say that.

18   Q.   Well, I'm not saying anything.

19         Were you, in fact, a trusted provider of Bitcoin

09:35 20   transactions and storage in December of 2013?

21   A.   No.

22   Q.   You were hoping to do that in the future?

23   A.   Yes.

24   Q.   And then the next paragraph says, Currently, TradeBitcoin

25   operates as a local directory for Bitcoin buyers and sellers.

```
 1   The site displays a simple map that can be searched by zip code
 2   or browsed by dragging the map around.  Bitcoin buyers can then
 3   easily find the closest sellers to them and contact the sellers
 4   to conduct a Bitcoin transaction.  TradeBitcoin does not act as
 5   an intermediary between these transactions --
 6            MR. LOPEZ:  Can you go to the next page.
 7   Q.   -- but simply connects the buyers and sellers to one
 8   another.
 9            Did I read that correctly?
10   A.   Yes.
11   Q.   So in December of 2013, you had this program which was a
12   local directory, and it allows -- it would allow sellers and
13   buyers of Bitcoin to find each other.  And once they found each
14   other, they could decide whether they wanted to buy and sell
15   Bitcoin, right?
16   A.   (Nodded head.)
17   Q.   They could determine --
18            THE COURT:  Was that a question?
19   A.   Yes.
20   Q.   They could determine whether or not they wanted to pay a
21   certain price for the Bitcoin, right?
22   A.   Yes.
23   Q.   And then they could do the transaction off to the side,
24   not through TradeBitcoin?
25   A.   Correct.
```

```
       1    Q.   And because of that, because TradeBitcoin didn't act as
       2    the intermediary, you didn't have to register with FinCEN,
       3    correct?
       4    A.   Correct.
       5    Q.   Did you ever get an understanding as to whether My Big
       6    Coin operated in that same model?
       7    A.   No.
       8    Q.   You didn't.
       9    A.   No.
09:36 10    Q.   Well, were you ever -- did you ever take Mr. Crater up on
      11    signing into My Big Coin?
      12    A.   Yes.
      13    Q.   Okay.  And when did you do that?
      14    A.   I don't recall exactly the date.
      15    Q.   And was My Big Coin Exchange up at that point?
      16    A.   It didn't seem like a full functioning exchange to me.
      17    Q.   Okay.  But what I'm asking is, you went to the My Big Coin
      18    website?
      19    A.   Yes.
09:37 20    Q.   And you downloaded a wallet?
      21    A.   No.
      22    Q.   You didn't download a wallet?
      23    A.   No.
      24    Q.   You just looked at the site?
      25    A.   Yeah.
```

```
 1    Q.    So you never actually signed up as a --

 2    A.    There was no wallet.

 3    Q.    Did you actually click on and register?

 4    A.    I had a user name and password provided to me.

 5    Q.    Okay.  And when you went onto the site, could you sell

 6    coin to anyone on the site?

 7    A.    Not that I could tell.

 8    Q.    Okay.  And did you go to the exchange site?

 9    A.    I don't know that there was a difference.

10    Q.    Okay.  In any event, you didn't see any capability of

11    selling coin to someone else using My Big Coin as an

12    intermediary, correct?

13    A.    Not at that time, no.

14    Q.    Okay.  Now, I think you also said that one of the

15    discussions you had was that Mr. Crater was having individuals

16    promote the coin and set up their own business like a

17    multilevel marketing program, right?

18    A.    Yes.

19    Q.    And I think you told us that a multilevel marketing

20    program is -- the agents are independent agents.

21    A.    Yes.

22    Q.    They're not controlled by Mr. Crater, right?

23    A.    Correct.

24    Q.    And they have a motive or an incentive to promote the

25    coin --
```

```
 1              MR. MOORE:  Objection, your Honor.
 2              THE COURT:  Let me hear the rest of the question.
 3    BY MR. LOPEZ:
 4    Q.   They have an incentive to promote the coin because if a
 5    coin is sold, they get a percentage in compensation, right?
 6              THE COURT:  Was there an objection to that?
 7              MR. MOORE:  Yes, your Honor.
 8              THE COURT:  Sustained as to that question.
 9              MR. LOPEZ:  All right.  Well, let's go to R6.
10              You can focus in on January 4th, 12:23:28 to 12:23:38.
11              A little higher than that, the one above.
12    Q.   Randall says, Get guys working for no money out-of-pocket,
13    as I'm sure you know about all of this already.
14              And you say, Oh, I see, okay, thanks for the
15    clarification.
16              What did you mean by that?
17    A.   By what?
18    Q.   When you said, "Oh, I see, okay, thanks for the
19    clarification."
20              (Pause.)
21    A.   I was reviewing a contract, I believe the NDA that you
22    provided previously, and I was confused about some of the
23    language in the contract and so I asked Randall a question
24    about that, and he responded and then I said, Okay, thanks for
25    the clarification.
```

09:39 (line 10)
09:41 (line 20)

```
 1   Q.   So that conversation had to do with the contract.

 2   A.   Yes.

 3   Q.   Not My Big Coin?

 4   A.   No.

 5   Q.   Okay.  Okay, fair enough.

 6              Now, let's go back to Exhibit 10B.

 7              MR. LOPEZ:  Go back to the same page you were on

 8   before.

 9              No, can you scroll down until you get to -- yeah,

10   right there.

11   Q.   Now, again, this is your high-level presentation to

12   Mr. Crater who you're hoping is going to fund TradeBitcoin,

13   right?

14   A.   Yes.

15   Q.   And you say here, Future updates of TradeBitcoin platform

16   will include major components.  The first one is escrow

17   multicurrency exchange.  TradeBitcoin will offer a

18   multicurrency exchange similar to mtgox.com?

19              Now, can you tell me what mtgox.com is?

20   A.   Bitcoin exchange.

21   Q.   Can you tell us how that works?

22   A.   Yeah, buyers and sellers can both register with the site

23   and then they can place buy and sell tickets to exchange, you

24   know, dollars for Bitcoin.

25   Q.   So does mtgox.com act as an intermediary between the
```

1    buyers and sellers?

2    A.    Yes.

3    Q.    And do they charge a fee?

4    A.    Yes.

5    Q.    And did you have an understanding as to whether you would

6    need FinCEN licensing in order to do that?

7    A.    To do the same thing?

8    Q.    Yes.

9    A.    Yes.

09:43 10   Q.    And that's why you were talking to Mr. Crater about the

11   FinCEN licensing?

12   A.    Yes.

13   Q.    Something you wanted to do in the future.

14   A.    Yes.

15   Q.    Did you also talk to Mr. Crater about a debit card?

16   A.    I don't recall.

17   Q.    How about a credit card?

18   A.    I don't recall.

19   Q.    But you did understand that Mr. Crater was not someone

09:44 20   skilled in programming, right?

21   A.    Yes.

22   Q.    And would it be fair to say that you understood that he

23   must have hired someone to do the coding for him?

24   A.    Yes.

25   Q.    And at some point during the negotiations, did you decide

          1    to end the negotiations or did Mr. Crater?

          2    A.   I don't know that we formally decided to end negotiations.

          3    We just sort of stopped communicating.

          4    Q.   Well, didn't Mr. Crater tell you he was never going to

          5    fund TradeBitcoin?

          6    A.   He did say that.

          7    Q.   And your discussions ended shortly thereafter.

          8    A.   Yes.

          9         MR. LOPEZ:   No further questions.

09:45    10         THE COURT:   Thank you.

         11         Mr. Moore, redirect?

         12         MR. MOORE:   Just briefly, your Honor.

         13         THE COURT:   Sure.

         14                    REDIRECT EXAMINATION

         15    BY MR. MOORE:

         16    Q.   Do you remember being asked on cross-examination about a

         17    confidentiality agreement?

         18    A.   Yes.

         19    Q.   After that confidentiality agreement was signed, did the

09:45    20    defendant ever provide you information about how My Big Coin

         21    operated?

         22    A.   No.

         23         MR. MOORE:   Can we go to page 7 of 10B.

         24         I'm sorry, 6.

         25    Q.   And on cross-examination you were asked about the future

```
 1    updates of TradeBitcoin.com.  Why in December 2013, when you
 2    sent this email to the defendant, why was TradeBitcoin.com at
 3    that point not running a multicurrency exchange?
 4    A.   Because we didn't have a license.
 5              MR. LOPEZ:  Objection.
 6              THE COURT:  Overruled.  To the extent there was an
 7    answer, it may stand.
 8    BY MR. MOORE:
 9    Q.   Sorry.  Can you repeat that?
10    A.   Because we weren't licensed.
11    Q.   Did you have the technical capability to set up a website
12    that would have been a multicurrency exchange?
13    A.   Yes.
14    Q.   So the only thing you were missing was the licensing?
15    A.   Yes.
16    Q.   At this point, in December 2013, did you send cash to
17    third parties for them to trade Bitcoin with other third
18    parties?
19    A.   No.
20    Q.   Why did you not do that?
21    A.   Because we weren't licensed.
22    Q.   All right.
23              MR. MOORE:  And can we go to R6.
24              At 12:35:31.
25    Q.   Here the defendant says to you, You see I have
```

1  freestanding units, like I was telling you about that you can

2  walk up to and get coin, do anything from and they have bill

3  validates on them as --

4          MR. MOORE:  Scroll down.

5  Q.   -- as well.

6          What did you understand the defendant to mean by he

7  has freestanding units?

8  A.   ATMs.

9  Q.   Would those be ATMs where you could conduct cryptocurrency

10  transactions?

11  A.   Yeah, like a Bitcoin ATM.

12  Q.   Did he ever show you any evidence of these --

13  A.   No.

14  Q.   -- units?

15  A.   No.

16          MR. MOORE:  Thank you.  Nothing further.

17          MR. LOPEZ:  Did he ever tell yu --

18          THE COURT:  Mr. Lopez, recross.  You may start.

19                        RECROSS-EXAMINATION

20  BY MR. LOPEZ:

21  Q.   Did he ever tell you that those freestanding ATMs had

22  anything to do with cryptocurrency?

23  A.   No, not specifically.

24  Q.   So you're assuming they had something to do with

25  cryptocurrencies?

1    A.    Yes.

2    Q.    Now, does it cost money to get a licensing from FinCEN?

3    A.    I'm not sure.

4    Q.    Well, does it require hiring a lawyer?

5    A.    I would think so.

6    Q.    And you were looking for funding, right?

7    A.    Yes.

8    Q.    So you could get licensed?

9    A.    Yes.

09:48 10   Q.    And you went to Mr. Crater?

11   A.    Yes.

12   Q.    And he told you he wasn't funding you, right?

13   A.    He told me he could help with the licensing and legal

14   component but he wasn't going to invest any money.

15   Q.    But he didn't help you with any of it because he walked

16   away, right?

17   A.    Yes.

18         MR. LOPEZ:   Thank you.

19         THE COURT:   Thank you, sir.

09:48 20         You're excused.   Thank you.

21         Mr. Markham.

22         MR. MARKHAM:   The government's next witness is Robert

23   McGowan, your Honor.

24         THE COURT:   He may be called.

25         ROBERT McGOWAN, having been duly sworn by the Clerk,

```
        1   was examined and testified as follows:

        2           THE CLERK:  Thank you.  Please be seated.

        3           THE COURT:  Good morning, sir.

        4           Good morning.

        5           THE WITNESS:  Good morning.

        6           THE COURT:  Thanks.

        7           Mr. Markham.  Thank you.

        8                      DIRECT EXAMINATION

        9   BY MR. MARKHAM:

09:49  10   Q.   Can you please state your full name, spelling your last

       11   name.

       12   A.   Robert Steven McGowan.

       13   Q.   Can you spell your last name?

       14           Spell your last name, please.

       15   A.   Spell it?

       16   Q.   Yes.

       17   A.   M-c-G-o-w-a-n.

       18           THE COURT:  Counsel, if you can keep your voice up, I

       19   will do the same.

09:50  20           MR. MARKHAM:  Yes, your Honor.

       21           THE COURT:  Thank you.

       22   BY MR. MARKHAM:

       23   Q.   Mr. McGowan, what is your occupation?

       24   A.   I'm a consultant.  I provide consulting services to

       25   clients looking to employ payment systems, prepaid debit cards
```

       1  or blockchain applications.

       2  Q.    And what is your educational background?

       3  A.    High school, trade school, and some college.

       4  Q.    Have you ever heard of My Big Coin?

       5  A.    Yes.

       6  Q.    How did you first come to hear about My Big Coin?

       7  A.    Through a friend that invested in the company.

       8  Q.    Who's the friend?

       9  A.    Timothy Harrington.

09:50 10  Q.    And what year was this in, approximately, when

      11  Mr. Harrington first told you about My Big Coin?

      12  A.    It was around 2014.

      13  Q.    And when Mr. Harrington approached you, what, if anything,

      14  did he tell you about My Big Coin?

      15            MR. LOPEZ:   Objection.

      16            THE COURT:   Hearsay, counsel?

      17            MR. LOPEZ:   Yes.

      18            THE COURT:   And this name I haven't heard before in

      19  our discussions, counsel.

09:51 20            MR. MARKHAM:   Yes, your Honor.   It's another person

      21  who invested.   I'm just asking a question for effect on

      22  listener, and the remainder will be based on his personal

      23  knowledge.

      24            THE COURT:   Well, I would say sustained as to this

      25  question, but you can ask a yes-or-no question and then what,

1    if anything, he did after that.

2    BY MR. MARKHAM:

3    Q.   Without going into the specifics, did Mr. Harrington tell

4    you certain things about My Big Coin?  Just yes or no.

5    A.   Yes.

6    Q.   And what, if anything, did Mr. Harrington ask you to do?

7    A.   He asked me to help him review what he had invested in so

8    he could better understand it because he didn't have a full

9    understanding of the technology or applications behind it.

09:52 10   Q.   Okay.  Based on your relationship with Mr. Harrington, did

11   you, in fact, look into My Big Coin?

12   A.   I did.  I had a few conversations with Randall and with

13   Tim and I understood it to be a cryptocurrency payment system

14   operating on a peer-to-peer ledger similar to Bitcoin.

15   Q.   Did you ever look at the My Big Coin website?

16   A.   I did.

17   Q.   And you mentioned the name Randall earlier.  Are you

18   talking about the defendant, Randall Crater?

19   A.   Yes.

09:52 20   Q.   Did you ever speak to him personally about My Big Coin?

21   A.   One time I believe I met him in person at Tim Harrington's

22   house.

23   Q.   And so for in-person are you saying you met him once at

24   Tim Harrington's house?

25   A.   Yes.

1    Q.   At that meeting did you discuss My Big Coin?

2    A.   I believe so.  I don't recall exactly what we discussed at

3    the meeting, but that would be why I would have met him.

4    Q.   In addition to the one in-person meeting, did you ever

5    have email communications with the defendant?

6    A.   Yes, I did.

7    Q.   So based on your discussions with the defendant, whether

8    in person or in email, and your view of the My Big Coin

9    website, what was your understanding of what My Big Coin was

09:53 10    selling?

11   A.   Cryptocurrency.

12   Q.   What, if anything, did the defendant tell you about

13   whether that cryptocurrency was publicly tradeable?

14   A.   It was my understanding that it was publicly tradeable.  I

15   believe they had a trading website as well that showed pricing

16   of the tokens that were being traded on a daily basis.

17   Q.   You mentioned earlier the word "blockchain."  Did you ever

18   discuss with the defendant whether My Big Coin had a

19   blockchain?

09:54 20    A.   Yes.

21   Q.   And what did he say?

22   A.   That it was a blockchain developed by his company.

23   Q.   And you also mentioned the name of another cryptocurrency

24   earlier that you understood to be -- it to be similar to.

25   A.   Similar to Bitcoin.

```
 1   Q.    Understood.
 2              Do you remember any representations by the defendant
 3   about gold backing for My Big Coin?
 4   A.    Yes, I believe it was gold-backed.
 5   Q.    And why did you believe it was gold-backed?
 6   A.    I was told it was gold-backed.
 7   Q.    By who?
 8   A.    Randall.
 9   Q.    Did you ever ask the defendant for more details about the
10   My Big Coin cryptocurrency and how it worked?
11   A.    Yes, I did.
12   Q.    And what sort of questions were you asking him?
13   A.    I asked him how it operated, how you were able to transfer
14   coins, were there wallets, was there mining capabilities
15   similar to Bitcoin, were there nodes, and how could you deploy
16   these.
17   Q.    Did the defendant ever reference using a programmer to
18   create the cryptocurrency?
19   A.    I believe he had a head programmer that developed the
20   software.
21   Q.    So when you said you believe he had a head programmer to
22   develop that cryptocurrency, who told you that?
23   A.    Randall.
24   Q.    Did you ever ask to speak directly to that programmer?
25   A.    I believe I did, yes.
```

1    Q.    Approximately how many times, once, more than once?

2    A.    I don't recall.

3    Q.    Were you ever able to connect with that programmer?

4    A.    No, I was not.

5    Q.    For approximately how long were you in touch with the

6    defendant and having communications about My Big Coin?

7    A.    Off and on for about a year, I guess.

8    Q.    During that time, were you ever able to validate that My

9    Big Coin was actually functioning as a cryptocurrency?

09:56 10   A.    No.

11   Q.    Do you know whether Mr. Harrington at any time in 2014 and

12   2015 had some kind of cryptocurrency wallet?

13   A.    I never saw a wallet.  Tim had told me that he was just

14   e-mailed the coins or tokens.

15   Q.    You mentioned earlier the defendant speaking to you about

16   the My Big Coin Exchange; is that correct?

17   A.    Yes.

18            MR. MARKHAM:  Can you bring up Exhibit 7F.

19   Q.    Have you seen this website before?

09:57 20   A.    Yes, I have.

21   Q.    Is this the My Big Coin Exchange website?

22   A.    Yes.

23   Q.    What, if anything, did the defendant tell you about how

24   this website operated?

25   A.    My understanding was that it depicted volume of trades

1    that were happening peer to peer through people that owned the

2    tokens.

3    Q.   Specifically, did the defendant ever say that the My Big

4    Coin cryptocurrency was trading on this exchange?

5    A.   Yes.

6    Q.   Did the defendant ever tell you who controlled the

7    exchange?

8    A.   I don't recall precisely.

9    Q.   You mentioned gold backing earlier.  Do you remember

09:58 10   exchanging e-mails with the defendant about how the gold

11   backing worked?

12   A.   Yes.

13            MR. MARKHAM:  Can you bring up Exhibit 11H, please.

14   Q.   Now, Mr. McGowan, up the top there it says "Robert

15   McGowan" and then provides an email address.  Is that your

16   email address?

17   A.   Yes.

18   Q.   And below it says "To Randall Crater."  Do you see that?

19   A.   Yes.

09:58 20   Q.   And who is on the "cc" line?

21   A.   Timothy Harrington.

22   Q.   And just to remind the jurors, is that your friend who

23   asked you to look into My Big Coin?

24   A.   Yes.

25   Q.   And can you read the subject line there?

A.    "My Big Coin Overview."

Q.    All right.  Let's go to page 3.

A.    PowerPoint.

Q.    And zoom in on the email just below the middle of the page on March 4, 2014 at 6:21 p.m. from Randall Crater.

A.    You want me to read this?

Q.    Yes, please.

A.    The guy giving us the gold is the owner of the bank in Spain.  He is worth about 3 billion dollars.

Q.    Were you ever able to verify that this owner of the bank in Spain worth 3 billion dollars actually existed?

A.    I don't recall that I ever was able to verify that.

Q.    Well, let's break that down.

      Do you not recall whether you were able to verify or did you ever verify --

A.    I don't recall I was ever able to verify that the gold was there.

Q.    After he told you this, did you follow up with more emails asking questions about the gold?

A.    I believe so.

      MR. MARKHAM:   Okay.  Can we scroll up to page 1 and that last email on March 5, 2014 at 6:52 a.m.

A.    We don't buy the gold with the money.  The gold has been given to us as a backing.  If we bought the gold with the cash coming in, how could we then issue a credit card for the

1    clients to use?  We are backed by gold.  We have 100 million

2    dollars in my name in gold in Spain in a bank.

3             MR. MARKHAM:  All right.  Can you highlight that part

4    where it says "100 million dollars in my name in gold in a bank

5    in Spain."

6    Q.   Mr. McGowan, did you ever see any proof that the defendant

7    actually had $100 million in gold in his name in a Spanish

8    bank?

9    A.   I did not say I received any statements from any banks

10:00 10   that had $100 million of gold in it.

11   Q.   Do you see here where it references $100 million?

12   A.   Yes.

13   Q.   Did the defendant ever tell that you that, in fact, he had

14   more than that, that he had $300 million?

15   A.   I don't recall.

16             MR. MARKHAM:  Let's scroll to his response.

17   Q.   Now in, response to his email, you write a fairly lengthy

18   email here about the gold backing.

19             Why were you writing this email?

10:01 20   A.   I wanted to understand how the coins were secured with the

21   gold.  I didn't have a clear picture of how that happened.

22             MR. MARKHAM:  Can you zoom in on the bottom paragraph

23   where it says, "Again, I'm sorry."

24   Q.   Can you read this last paragraph of your email, please?

25   A.   Again, I am sorry for staying on this subject, but I am

1    getting hammered with questions that I can't answer.  My own

2    interpretation is that the collateral is not to back the price

3    or provide stability of the actual coin but to back the payment

4    system and protect the merchants.

5    Q.   When you say here that you were getting hammered with

6    questions that you can't answer, what were you referencing

7    there?

8    A.   Mr. Harrington was asking me if I was able to get

9    determination on some of the questions that we had answered.

10   Q.   And were you ever able to answer those questions?

11   A.   No.

12        MR. MARKHAM:  Can you go to Exhibit 11P.

13   Q.   This is another email string between you and the

14   defendant.

15        MR. MARKHAM:  First, can you zoom in on that email at

16   the very bottom.

17   Q.   Do you see here that you sent the defendant an article?

18   A.   I'm sorry?

19   Q.   Do you see here in this email that you sent the defendant

20   a link to an article?

21   A.   Yes.

22   Q.   Do you recall, just generally speaking, what this article

23   was about?

24   A.   It was a pot payment kiosk.

25   Q.   Okay.  Can you just describe for the jury, who might not

1  be familiar with what a pot payment kiosk is?

2  A.   It would be a payment kiosk to accept payments for

3  purchases of marijuana.

4  Q.   And why were you sending this to the defendant?

5  A.   I believe that him and Tim Harrington had a discussion

6  about it.  And I was just following up.

7          MR. MARKHAM:  Can you zoom in on the defendant's

8  response above at 6:45 a.m.

9  Q.   Can you read what the defendant told you in response?

10:03 10  A.   We are in the mix of all this.  They have one of our

11  kiosks as well for testing.  This is what I've been saying.

12  Q.   When he says "they have one of our kiosks as well for

13  testing," did you know what he was referencing here?

14  A.   I didn't know who, but I know he was referencing a My Big

15  Coin kiosk.

16  Q.   So your understanding is that this was a My Big Coin

17  physical kiosk?

18  A.   It would be a physical kiosk.

19          MR. MARKHAM:  Now can we scroll up and zoom in on the

10:04 20  defendant's email at 7:07 a.m., March 25, 2014.

21  Q.   Can you read this email from the defendant for the jury.

22  A.   Yes, sir.  Information is king, my friend.  I wasn't

23  saying this in a bad way just letting you guys know I'm working

24  on this for us.  I'm competing against this guys for sure.  The

25  advantage for us, we have the crypto to work with.  See, Tim,

```
         1    is pushing for contracts to get money everyone wants to see

         2    what you have first and that takes money.  Look at the guy we

         3    are up against, deep pockets, but I'm getting it done, no

         4    question.

         5    Q.   Okay.

         6              MR. MARKHAM:  Can you highlight where the defendant

         7    says, "The advantage for us, we have the crypto to work with"?

         8              THE COURT:  Is there a way we can get rid of the

         9    elongation?  It's a little bit --

10:05   10              Thank you.

        11              THE COURT:  That's good.

        12    BY MR. MARKHAM:

        13    Q.   Mr. McGowan, in March of 2014, do you remember what crypto

        14    he's referencing here?

        15    A.   My Big Coin.

        16    Q.   And what was your understanding of why having My Big Coin

        17    as a cryptocurrency would have been an advantage?

        18    A.   I really don't recall.

        19    Q.   Okay.  Well, stepping back, were you ever able to confirm

10:06   20    that the defendant actually had physical kiosks for My Big

        21    Coin?

        22    A.   No, I was not.

        23              MR. MARKHAM:  Can we go to Exhibit 11T.

        24              This is another email string between you and the

        25    defendant.
```

```
 1              Let's zoom in on the first email at the bottom from
 2     April 10, 2014 at 6:31 a.m.
 3     Q.   Can you read that for the jury, please.
 4     A.   Just a little something working on, need to change the
 5     corp. and a few things but gives you an idea.
 6     Q.   Do you recall what he was sending you in this email, the
 7     My Big Coin Revolution PowerPoint?
 8     A.   Do I recall --
 9     Q.   What was in it?
10:06 10     A.   I don't recall what this relates to.
11              MR. MARKHAM:   Okay.  Can we zoom in on your response
12     from April 11, 2014.
13     Q.   Okay.  And before you read that, do you see at the very
14     top there where it has a subject line?
15     A.   Sure.
16     Q.   Can you just read that subject line?
17     A.   I believe you stated this already, but I could use some
18     clarification.
19     Q.   Sorry.  Just stop for a second.
10:07 20              So the big thing at the top, that's the subject line.
21     Can you read that for the jury.
22     A.   I'm sorry.  The My Big Coin Revolution.
23     Q.   So this email string talking about the My Big Coin
24     Revolution, can you now read your email from 7:45 a.m.
25     A.   I believe you stated this already, but I could use some
```

1    clarification.  Are we using the same platform as Bitcoin or is

2    it one that was created by you?  If created by you, why is it

3    better than Bitcoin's?

4    Q.    Why were you asking these questions?

5    A.    Because I wanted to understand the technology behind it.

6    Q.    You say -- you used the comparison Bitcoin here.  Had the

7    defendant ever compared My Big Coin to Bitcoin, or were you

8    coming up with this comparison?

9    A.    The defendant compared it to Bitcoin.

10:08 10          MR. MARKHAM:  Okay.  Let's go to the defendant's

11   response at 7:48 a.m., right above it.

12   Q.    Again, I know public reading is no fun, but if you could,

13   could you just read this email for the jury from the defendant.

14   A.    Yes, I built the system, and the biggest reason is there

15   is no controlling company over the Bitcoin, so it can be copied

16   and anyone can start an exchange site and say it's Bitcoin.

17   There is no control.  It's like the wild wild west.  With the

18   Big Coin, we are backed by gold they are backed by air they

19   have no credit card attached with their card you can load

10:08 20   through Western Union after it's sold our card is linked to

21   their account.  Very big difference.

22   Q.    All right.  Let's walk through some of these statements.

23          MR. MARKHAM:  First, can you highlight "I built the

24   system."

25   Q.    So based on what the defendant had told you, what sort of

1   system did he say he had built?

2   A.   The blockchain system that the cryptocurrency My Big Coin

3   runs on.

4   Q.   All right.

5        MR. MARKHAM:   Next can you please highlight, "We are

6   backed by gold they are backed by air."

7   Q.   In this email, according to the defendant, who is backed

8   by air?

9   A.   My Big Coin.

10:09 10   Q.   Well, you see where it says, "We are backed by gold"?

11        Let's walk through this again.

12        Do you see where it says, "We are backed by gold"?

13   A.   "We are backed by gold," yes.

14   Q.   According to the defendant, who is backed by gold?  Who is

15   "we"?

16   A.   My Big Coin.

17   Q.   Understood.  And then where he says, "They are backed by

18   air," who is the "they"?

19   A.   Bitcoin.

10:10 20   Q.   Okay.  And were you ever able to validate this claim that

21   the My Big Coin currency was backed by gold?

22   A.   No.

23        MR. MARKHAM:   Next, can you please highlight where it

24   says, "They have no credit card," all the way to the end.

25   Q.   Okay.  So in this sentence, where it says, "They have no

1    credit card," again, who is the "they"?

2    A.    Bitcoin.

3    Q.    And by comparison, what is he saying My Big Coin has?

4    A.    A credit card.

5    Q.    Specifically, he says, "Our card is linked to their

6    account."

7          Based on your conversations with the defendant, what

8    did you understand that to mean, that the card is linked to the

9    account?

10   A.    That there would be a customer's account that would

11   have -- that would be linked to the card.

12   Q.    When you say "a customer's account," customer for who?

13   A.    My Big Coin.

14   Q.    And again, were you ever able to validate that My Big Coin

15   customers had a credit card linked to their virtual currency

16   account?

17   A.    No.

18   Q.    And why not?

19   A.    I was never able to validate it.

20   Q.    It may be apparent based on the tenor of this

21   conversation, but did you ever find it difficult to get

22   information from the defendant?

23   A.    It took many calls and text messages in order to get

24   responses.

25   Q.    Okay.  What was, for example, the ratio?  Approximately

```
 1   how many times would you need to email the defendant to get him
 2   to email you back?
 3   A.   I don't have an exact number.
 4   Q.   Okay.  Did you ever personally invest in My Big Coin?
 5   A.   I did not.
 6        MR. MARKHAM:  No more questions, your Honor.
 7        THE COURT:  Thank you.
 8        Mr. Lopez.
 9        MR. LOPEZ:  Thank you, your Honor.
10                  CROSS-EXAMINATION
11   BY MR. LOPEZ:
12   Q.   Good morning, Mr. McGowan.
13   A.   Good morning, sir.
14   Q.   My name is Scott Lopez.  I represent Randall Crater.
15        We've never met before, right?
16   A.   No.
17   Q.   Did you get a phone call from my private investigator,
18   John Cinotti?
19   A.   I do not recall getting a phone call from a private
20   investigator.
21   Q.   So you didn't return any phone call if he made one?
22   A.   I don't recall getting one.
23   Q.   So I think you testified that --
24        THE COURT:  Mr. Lopez, I'd just also ask you to keep
25   your voice up.  Thank you.
```

```
       1            MR. LOPEZ:  Yes, your Honor.
       2   BY MR. LOPEZ:
       3   Q.   I think you testified that you were a consultant?
       4            Or you are a consultant.
       5   A.   I do consulting, yes.
       6   Q.   And you do consulting on blockchain technology?
       7   A.   Yes.
       8   Q.   Although you don't have any college degree in computer
       9   science?
10:13 10   A.   I do not, no.
      11   Q.   Software engineering?
      12            Software engineering?
      13   A.   I attended Chubb Institute, which is a programming school.
      14   Q.   You couldn't build a blockchain if you wanted to, could
      15   you?
      16   A.   I'm sorry, I'm having a hard time hearing.
      17   Q.   Can you build a blockchain if you wanted to?
      18   A.   Could I build a blockchain?  No, I could not.
      19   Q.   And you understand that Randall couldn't build a
10:13 20   blockchain either, right?
      21   A.   He said he had a programmer that built the blockchain for
      22   him.
      23   Q.   Do you know where that programmer was located?
      24   A.   I don't recall.
      25   Q.   Now, Mr. Harrington and you were actually engaged to
```

```
        1    perform services for My Big Coin, right?
        2    A.   I'm sorry?
        3    Q.   Weren't you retained to build a marijuana payment system?
        4    A.   No.
        5    Q.   No?  All right.  So Mr. Harrington came to you, and as a
        6    result you started looking into My Big Coin?
        7    A.   I had met Tim a couple of months prior to that point and
        8    there were discussions -- he understood I was in the payment
        9    business, so he asked me to take a look at My Big Coin.
10:14  10    Q.   So when you went in to look at My Big Coin, you were under
       11    the impression that it was a payment system?
       12    A.   I was under the impression that it was a cryptocurrency.
       13    Q.   So a cryptocurrency, not a payment system?
       14    A.   It was a cryptocurrency, yes, that was going to be used as
       15    a payment system.
       16    Q.   And that's what Mr. Harrington was interested in, getting
       17    it to be used as a payment system, right?
       18              MR. MARKHAM:  Objection.
       19              THE COURT:  Basis in a word, counsel?
10:15  20              MR. MARKHAM:  Lack of personal knowledge.
       21              THE COURT:  Oh, counsel, you can rephrase the
       22    question.
       23    BY MR. LOPEZ:
       24    Q.   Do you know why Mr. Harrington was interested in My Big
       25    Coin?
```

```
 1    A.    Why he invested in it?

 2    Q.    Why he was interested in it.

 3               MR. MARKHAM:  Objection.

 4    A.    I --

 5               THE COURT:  Overruled.

 6    A.    I don't know how he got involved with it.

 7    Q.    He asked you to look into it.

 8    A.    Yes.

 9    Q.    Were you paid to look into it?

10:15 10    A.    Yes.

11    Q.    And you asked for $200,000 to look into it, right?

12    A.    I don't recall what the money was, what the amount was.  I

13    don't believe it was that much.

14    Q.    I think -- I think you said that you worked on this on or

15    off for about one year?

16    A.    Again, it was a very long time ago.  I don't remember the

17    exact time frame.  It was about one year.

18    Q.    Well, I note that the emails end somewhere around May --

19    strike that.

10:16 20               August of 2014.

21               MR. MARKHAM:  Objection, your Honor.

22               MR. LOPEZ:  If he knows.

23               THE COURT:  Well, sustained.

24               Counsel, why don't you just reframe a question.

25    BY MR. LOPEZ:
```

1    Q.   How long did you work on this project, sir?

2    A.   It was about -- the length of time was about a year.

3    Q.   So from December of 2013 until December of 2014?

4    A.   Around there.

5    Q.   Well, when you say "around there," was it more or was it

6    less?

7    A.   I don't recall the exact time frame.  It was so long ago,

8    I don't recall.

9    Q.   All right.  But Mr. Crater did tell you that he had a head

10:17 10   programmer, right?

11             A head programmer.

12   A.   Yes.

13   Q.   And you attempted to contact that head programmer?

14   A.   I had asked Randall if I could speak to the programmer,

15   yeah.

16   Q.   All right.  And did you ever get any contact information

17   to speak to the head programmer?

18   A.   I did not.

19   Q.   Did he ever tell you the name of the head programmer?

10:17 20   A.   I don't recall.

21   Q.   But you continued to work on this even though he didn't

22   give you the name of the head programmer.

23   A.   Yes.

24   Q.   At what point did you ask for the name of the head

25   programmer?  Was it early on?

1    A.    It was towards the beginning, yes.

2    Q.    And a year later he still had not provided you with that

3    information?

4    A.    That's correct.

5    Q.    Did you ever sign up for My Big Coin?

6    A.    I did not.

7    Q.    Did you ever get a wallet?

8    A.    I did not.

9    Q.    So you conducted your due diligence without actually

10:18 10   getting a wallet on the My Big Coin website.

11   A.    Yes, that's correct.

12   Q.    And did you sign up for the My Big Coin Exchange?

13         Did you sign up for the My Big Coin Exchange?

14   A.    I did not.

15   Q.    Yet, you did due diligence on My Big Coin Exchange.

16   A.    I did not.

17   Q.    That's your testimony.

18         Well, did you check it out for Mr. Harrington or did

19   you not?

10:18 20   A.    We looked at it online with Mr. Harrington.

21   Mr. Harrington had all of his stuff.

22   Q.    Okay.  Now --

23         (Pause.)

24   Q.    I think you testified earlier that it was your

25   understanding that My Big Coin was a payment system?

```
 1   A.   It was my understanding that it was a cryptocurrency
 2   payment system.
 3   Q.   Okay.
 4          MR. LOPEZ:  May I approach the witness, your Honor?
 5          THE COURT:  You may.
 6          MR. LOPEZ:  I need the ELMO.
 7   BY MR. LOPEZ:
 8   Q.   I show you an email.  Is that your email address?
 9   A.   Yes.
10   Q.   And it's to Randall Crater?
11   A.   To Randall Crater, yes.
12   Q.   And it's dated January 17, 2014?
13   A.   Yes, it is.
14          MR. LOPEZ:  I'll move to admit this document, your
15   Honor.
16          THE COURT:  We should just make it the next letter,
17   Ms. Hourihan, which I think is KK.
18          THE CLERK:  I don't know, I have HH as the last.
19          THE COURT:  No, we have an II and JJ.
20          So I think it's KK, and the paralegals can confirm.
21          MR. LOPEZ:  Are we marking for identification or --
22          THE COURT:  First for identification.
23          Is there any objection?
24          MR. MARKHAM:  None, your Honor.
25          THE COURT:  We'll make it -- let's just make this one,
```

```
 1    Ms. Hourihan, KK.
 2           (Exhibit KK marked for identification.)
 3           THE COURT:  And what's the next number, 36?
 4           THE CLERK:  Yes.
 5           THE COURT:  It may be admitted and published as 36.
 6           (Exhibit 36 received into evidence.)
 7    BY MR. LOPEZ:
 8    Q.   Now, in January of 2014, you're asking, Do you have a
 9    payment switch, such as a jPOS, or is that not required.  The
10:21 10  bank requires that we collect biometrics at the enrollment
11    stage, as well as for confirmation of a purchase or other
12    banking function.  What they are creating is an agent banking
13    model, using a POS terminal which I have secured exclusive
14    rights to in the U.S. and Mexico.  I also have the ability to
15    expand that exclusivity through Latin America and the
16    Caribbean.  I further have the back end and front end
17    programming to open the account, provide bill payment and
18    prepaid top up and the contracts with the cell phone providers
19    worldwide through a web services portal.  The bill payment
10:22 20  software is there but we need to work with the local vendors to
21    sign them up.  This is where the contact from the gas stations
22    is.  We are using them a banking agents.
23           Did you write that email, sir?
24    A.   I believe so, yes.
25    Q.   Are you talking about a payment system?
```

```
 1    A.   I'm talking about a different application.  It was a
 2    project I was working on down in Mexico that involved payment
 3    kiosks.
 4    Q.   In the medical marijuana industry?
 5    A.   No, sir.
 6    Q.   And why were you telling Randall Crater about this?
 7    A.   Randall was in the middle of purchasing a kiosk company,
 8    and I was interested in the kiosk technology.
 9    Q.   So this had nothing to do with My Big Coin?
10    A.   It has nothing to do with My Big Coin, sir.
11    Q.   Thank you.
12              (Construction noise in courtroom.)
13              THE COURT:  We can all hear that sound.  We're
14    investigating.  That's all I can say, Mr. Lopez.
15              MR. LOPEZ:  Mr. Sweeney, can you bring up Exhibit 11H?
16              Can you go to page 2.
17              Is that me?  Could you clear that, Madam Clerk?
18              THE COURT:  It's cleared.
19              MR. LOPEZ:  Thank you.
20    BY MR. LOPEZ:
21    Q.   So this is an email from you to Randall where you're
22    saying --
23              MR. LOPEZ:  Can you just expand on the top portion of
24    that email?
25    Q.   In this email you're discussing My Big Coin.
```

A.   Yes.

Q.   Okay.  So what we are really saying is that My Big Coin offers something like deposit insurance, this is done by purchasing gold.

This only covers the actual coin, the money on the credit card is already insured by FDIC.

So what is needed is to determine how much each coin or each wallet or single person is covered to.

Would it be fair to say that this email is talking about what exactly "backed by gold" means?

A.   I was trying to understand what it meant, yes.

So I was asking questions and trying to understand exactly what it meant.

Q.   So would you agree with me that the phrase "backed by gold" is ambiguous?

MR. MARKHAM:  Objection.

THE COURT:  Counsel, give me one second.

Sustained as to form, counsel.

BY MR. LOPEZ:

Q.   Would you agree with me that your understanding of the phrase "backed by gold" was ambiguous?

A.   That my understanding "backed by gold" was ambiguous?

Q.   Yes.

A.   In the case of My Big Coin?

Q.   Yes.

1    A.   I didn't have an understanding exactly how it was backed,

2    so that's why I was asking these questions, to better

3    understand that.

4    Q.   Right.  You didn't --

5    A.   So I didn't have a clear understanding of it.

6    Q.   Because it could mean -- the phrase "backed by gold" could

7    mean various -- could have various interpretations, according

8    to you?

9    A.   It could be presented in a number of ways, yes.

10:26 10          MR. LOPEZ:  Now can we go back to the first page.

11               Can we go back to the first paragraph.

12   Q.   I'm just trying to understand how to address the issue to

13   potential customers.

14               Were you involved with soliciting customers to My Big

15   Coin?

16   A.   I was not.

17   Q.   Okay.  So when you're talking about potential customers,

18   you're talking about potential customers of My Big Coin?

19   A.   Yeah.

10:26 20  Q.   And was it your understanding that you were going to

21   describe what backed by coin (sic.) meant?

22   A.   Yeah, I wanted to get a determination of exactly what it

23   meant.

24   Q.   Was it your understanding at that point in time that you

25   would provide documentation or a description that could be put

1  up on the website to better clarify what "backed by gold"

2  meant?

3  A.   That would be my understanding.  It would be clarification

4  of exactly, you know, what that -- usually like a user

5  agreement or something like that would have some kind of

6  paragraph in there explaining, you know, what it -- what it

7  meant.

8  Q.   You go on to say, So what you have done is put up

9  collateral, in this case 100 million in gold bars.  The gold is

10:27 10  not actually used in the process or offered to the customers.

11  It's there to show the customers that the coin is a safe

12  investment, because if anything happens to the company, there

13  is this collateral sitting there that can be accessed via a

14  bankruptcy filing -- or filling -- and they could recoup some,

15  if not all, of their deposits.

16       Did I read that correctly?

17  A.   Did I --

18  Q.   Did I read that correctly?

19  A.   That's correct.

10:28 20  Q.   Would it be fair to say that you're asking a question in

21  that paragraph?

22  A.   I was questioning how it's backed and if it's backed one

23  way, this could happen; if it's backed another way, that could

24  happen.  So they were probing questions.

25       MR. LOPEZ:  Okay.  Now can we go to 11P.

         1    Q.   Now, do you know a company by the name of DCR Strategies?

         2    A.   Do I know --

         3    Q.   A company by the name of DCR Strategies?

         4    A.   I do.

         5    Q.   And what does DCR Strategies do, to your knowledge?

         6    A.   They're a prepaid card provider.

         7    Q.   And where are they located, if you know?

         8    A.   Canada.

         9    Q.   And during this time period, did you have any dealings

10:29   10    with DCR Strategies?

        11         During this time period we're in, say early 2014, were

        12    you aware that DCR Strategies was involved with My Big Coin?

        13    A.   I became aware sometime around August.

        14    Q.   Of 2014?

        15    A.   Around that time frame.

        16    Q.   And was that around the same time frame that you stopped

        17    working on this matter?

        18    A.   That I stopped working on it?

        19    Q.   On the My Big Coin matter.

10:30   20    A.   I'm not sure.  There was conversations that we had after

        21    that time that I recall as well.

        22    Q.   Well, did you recall that DCR Strategies had the

        23    capabilities, if you know, of setting up kiosks?

        24    A.   I don't believe they had kiosks.

        25    Q.   Were you interested in setting up kiosks for DCR

1   Strategies?

2   A.   Was I setting up kiosks for them?  No.

3   Q.   Was Mr. Harrington?

4   A.   No.

5   Q.   Didn't Mr. Harrington and you ultimately get involved with

6   DCR Strategies after August of 2014?

7   A.   I believe in October.

8   Q.   And prior to that time, if you know, wasn't DCR Strategies

9   working with Mr. Crater to provide a credit card for My Big

10:31 10   Coin?

11   A.   I know they were in discussions about it.

12   Q.   They were in discussions about it.

13         And ultimately, those discussions didn't lead to

14   anything.

15   A.   That's my understanding, yes.

16         MR. LOPEZ:  Now, Joe, if you can enlarge the part of

17   this email that starts at 7:01 a.m.  It's kind of in the

18   middle.

19   Q.   And this is you sending an email to Randall, Just passing

10:31 20   through some info.  The market is estimated to be $2.5 billion

21   in 2014.

22         Is that correct?

23   A.   Do I recall this email?  Yes.

24   Q.   Well, did I read that correctly?

25   A.   Just passing through some info.  The market is estimated

```
 1    to be $2.5 billion in 2014.
 2    Q.    $2.5 billion.  At a charge of 3 percent per transaction,
 3    that will be $75 million in fees.
 4            What are you talking about there?
 5    A.    If you were to use the payment kiosk that he had --
 6    Q.    That Randall --
 7    A.    -- and charged a 3 percent fee, that's the revenue you
 8    could generate.
 9    Q.    You said that Randall had, right?
10:32 10  A.    I believe so, yes.
11    Q.    Randall had purchased kiosks, right?
12    A.    I believe he was purchasing or purchased a kiosk company.
13    Q.    Were you giving him -- were you providing consultation
14    services on his purchase of the kiosks?
15    A.    Was I what?
16    Q.    Were you providing consultation services to him on his
17    purchase of the kiosks?
18    A.    No, he was already well into the deal at that point.  I
19    was interested in the kiosk for some clients that I was working
10:33 20  with.
21    Q.    All right.
22            Were the kiosks that he was purchasing, if you know,
23    for My Big Coin?
24    A.    I believe they were to be used for My Big Coin.
25    Q.    Now, you write, If we could just capture 10 percent of the
```

1    market, it is about $7.5 million in revenue.  If you add in all

2    the other services, bill pay, et cetera, you could double that.

3    Perhaps we should get in touch with the VC people listed in the

4    article the seems to be interested in funding this type of

5    endeavor.

6              Did I read that correctly?

7    A.    I --

8    Q.    So what you're doing here is suggesting to Randall that

9    having a kiosk system connected to My Big Coin could be a very

10:34 10   profitable endeavor, correct?

11   A.    I was not selling him kiosks.  He was already well

12   advanced in discussions with the kiosk company.  I was

13   interested in the kiosks that he was purchasing for a client.

14   Q.    So --

15   A.    This was a discussion on the payment kiosk that he already

16   had, that he said he had in the market and he was testing, so

17   that's what --

18   Q.    And what was he testing it for, if you know?

19   A.    I believe he was testing it for marijuana payments.

10:34 20   Q.    And was it in any way linked to My Big Coin?

21   A.    I believe it was going to use the My Big Coin as the

22   payment mechanism inside of it.

23   Q.    Okay.

24              MR. LOPEZ:  Now, Joe, can you go to 11T.

25              And could you enlarge the portion, the top April 11th.

```
 1    All the way down.  Just do the whole --
 2    Q.    Randall says there, Yes, I built the system.
 3          What did you interpret that to mean?
 4    A.    That his company built the system.
 5    Q.    Not that he personally built the system, right?
 6    A.    No.
 7    Q.    And the biggest reason is there's no controlling company
 8    over the Bitcoin so it can be copied and anyone can start an
 9    exchange site and say it's Bitcoin there's no control it's like
10    the wild west -- and pardon the runon sentence -- with the IT
11    coin we are back by gold they are backed by air they have no
12    credit card attached with their card you can load through
13    Western Union after it's sold, our card is linked to their
14    account very big difference.
15    A.    Do you want me to read -- yeah.
16    Q.    Okay.  So was it your understanding that the credit
17    card -- that his plan for the credit card was to be able to be
18    loaded through something like a Western Union?
19    A.    I think what he's talking about, that they can load their
20    card with Western -- at Western Union.
21          It says with their card you can load through Western
22    Union after it's sold, our card is linked to their account very
23    big difference.
24    Q.    Well, he says there, They have -- "they" meaning
25    Bitcoin -- have no credit card attached.  That would be
```

1    attached to My Big Coin, right?

2    A.    Have no credit card attached with their --

3    Q.    He's comparing My Big Coin to Bitcoin.

4    A.    Yeah, I'm kind of confused by that --

5    Q.    Okay.  Let's go back.

6          He talks about there's no controlling company over the

7    Bitcoin so it can be copied and anyone can start an exchange

8    site.

9          What did you understand that to mean?

10:37 10   A.    Bitcoin is a distributed network where anybody can become

11   a miner or if they want to become a node or if they want to

12   open up an exchange, anybody has the ability to do that.

13   Q.    Because it's open-source software?

14   A.    Yes, it's an open-source system.

15   Q.    All right.  And then he goes on to say, And say it's

16   Bitcoin there's no control it's like the wild wild west.

17   Meaning it's open source, right?

18   A.    Yes.

19   Q.    With the IT coin we are backed by gold they are backed by

10:38 20   air.

21         They have no credit card attached, meaning -- "they,"

22   meaning Bitcoin, they have no credit card attached with their

23   card.  You can load through Western Union after it's sold.  Our

24   card is link to their account, very big difference.

25         Now, I understand it's not the best English, but what

```
 1   did you understand Randall to be telling you there about the
 2   credit card and Western Union?
 3   A.   It seems like that's what he's saying.
 4   Q.   That --
 5   A.   It can be loaded at Western Union and then it's linked to
 6   their account.
 7   Q.   So Western Union would be the intermediary for the
 8   transactions, is that your understanding?
 9   A.   It would be a loading agent where they could load money on
10   the card, yeah, that's pretty standard.
11   Q.   And Western Union would have to be licensed by FinCEN, if
12   you know?
13   A.   Would have to be?
14   Q.   Licensed by FinCEN.
15        MR. MARKHAM:   Objection.
16   BY MR. LOPEZ:
17   Q.   If you know.
18        THE COURT:   Sustained as to this.
19   BY MR. LOPEZ:
20   Q.   Now, you were asked whether or not you were able to verify
21   whether the company was actually backed by $100 million in
22   gold, right?
23   A.   That's correct.
24   Q.   What did you -- what exactly did you do to verify whether
25   it was backed by $100 million in gold?
```

```
 1   A.   I believe I asked for some kind of statement because if

 2   it's vaulted, if it's in a vault, there should be a vault

 3   statement, or if he had something from somebody saying that the

 4   gold was there.  I don't recall receiving anything.

 5        MR. LOPEZ:  Can you bring up Exhibit 11K.

 6   Q.   Now, this is already in evidence.

 7        This is talking about a signed document.

 8        MR. LOPEZ:  Can you go to the next page, Mr. Sweeney.

 9   Q.   Can you read that?

10        Want me to enlarge it for you?

11        MR. LOPEZ:  Enlarge the top half.

12   A.   Commitment to My Big Coin --

13   Q.   You see there it says "To Mr. Randall Crater, My Big

14   Coin"?

15   A.   Right.

16   Q.   Reference:  Commitment to My Big Coin up to $100 million

17   equal to approximately plus or minus 2,231 kilograms gold dore

18   bars form and/or GLD gold bullion?

19   A.   Mm-hmm.

20        THE COURT:  You have to give a verbal answer.  Do you

21   mean "yes" when you said "uh-hmm"?

22        You have to give a verbal answer.

23        THE WITNESS:  I'm sorry, I'm having a hard time

24   hearing.

25        THE COURT:  You have to give a verbal answer.  When
```

1    you said "mm-hmm," did you just mean "yes"?

2         THE WITNESS:  Okay.  Can you repeat the question?

3    BY MR. LOPEZ:

4    Q.   Do you see the reference line where it says, Commitment to

5    My Big Coin up to $100 million equal to approximately plus or

6    minus 2,231 kilograms gold dore bars form and/or GLD gold

7    bullion?

8    A.   Yes, I see that.

9    Q.   I take it you have never seen this document before?

10:42 10   A.   The name Harmonie International sounds familiar.  I do

11   recall the name.

12   Q.   So do you recall having discussions with Mr. Crater about

13   Harmonie International providing $100 million in gold backing?

14   A.   I remember Harmonie International and gold, but I don't

15   remember exactly what the conversation was.

16   Q.   But suffice to say, you never saw any actual

17   documentation?

18        You never saw any actual documentation?

19   A.   I don't recall seeing this document.

10:42 20   Q.   And as a result, you couldn't -- you weren't able to

21   verify whether or not the statement "backed by $100 million in

22   gold" was accurate.

23   A.   Right.  I don't recall seeing the document.

24        I remember hearing about Harmonie International, but I

25   don't recall seeing this document.

```
 1    Q.    Okay.
 2          Now, sir, did there come a time when there was a
 3    falling out between Mr. Harrington and Mr. Crater?
 4    A.    Yeah.  I'm not exactly sure when -- when that happened.
 5    Q.    All right.  And did Mr. Harrington end up suing Mr. Crater
 6    in a civil action?
 7          MR. MARKHAM:  Objection, your Honor.
 8          THE COURT:  Let me hear you on Whisper Tech for a
 9    moment.
10    (Discussion at sidebar.)
11          THE COURT:  Counsel, before I hear Mr. Markham's
12    objection, I just wanted to give you an update.  You'll hear
13    the banging upstairs has stopped and I have gotten an email
14    from the maintenance department that they've called off the
15    workers, so hopefully we'll continue.
16          Mr. Markham.
17          MR. MARKHAM:  Can you hear me, your Honor?
18          THE COURT:  I can now.
19          MR. MARKHAM:  I'm sorry, your Honor.  I didn't hear
20    you first if you asked me a question.
21          THE COURT:  I'll hear you on your objection.
22          MR. MARKHAM:  Yes, your Honor.
23          He's getting into the statements of Mr. Harrington,
24    which are hearsay.  During the direct examination I asked for
25    the effect on listener what some of the statements were of
```

1    Mr. Harrington and you did not allow it.

2          Now, if we're going to get into the basis of the

3    lawsuit, then the government's going to get back into the basis

4    of that lawsuit on redirect.

5          THE COURT:  And what is the lawsuit?

6          MR. LOPEZ:  Your Honor, it's a lawsuit where

7    Mr. Harrington sued Mr. Crater, but the purpose of this isn't

8    to get into the lawsuit.  It's just some lead up to the fact

9    that he filed an affidavit which is directly contrary to his

10   testimony here, and I want to impeach him with his affidavit.

11         THE COURT:  Okay.

12         Counsel, I understand that you're laying the

13   foundation to do that.  I wanted to avoid, for 403 purposes,

14   getting into the details of a lawsuit that's not before this

15   jury, particularly if it regards My Big Coin, and I'm sure the

16   government is going to ask me to provide more details if we get

17   too deep into that.

18         MR. MARKHAM:  Yes, your Honor.  We are going to ask

19   why did he sue him, that he sued him because the defendant

20   stole his money, to get it back.

21         THE COURT:  Okay.  So, Mr. Lopez, do you want to

22   just -- obviously cross-examination, you're leading anyway, but

23   lead for the foundation of you provided an affidavit in another

24   proceeding?

25         MR. LOPEZ:  That's fine, your Honor.

```
  1              THE COURT:  Okay.  Let's do that.  Thank you.
  2              MR. MARKHAM:  Thank you.
  3              (End of discussion at sidebar.)
  4              THE COURT:  Jurors, you may have noticed that the --
  5     what sounded like jackhammering has stopped above us.  I did
  6     get a note that they've called off that work for the moment.
  7     So hopefully that will continue.
  8              Mr. Lopez, based on our discussion.
  9              MR. LOPEZ:  Yes, thank you, your Honor.
10:47 10    BY MR. LOPEZ:
 11     Q.   Mr. McGowan, do you recall submitting an affidavit in
 12     connection with that proceeding?
 13     A.   Do I recall --
 14     Q.   Submitting an affidavit in connection with the civil
 15     action that Mr. Harrington filed against Mr. Crater?
 16     A.   I believe so.
 17              MR. LOPEZ:  May I approach the witness, your Honor?
 18              THE COURT:  You may.
 19     Q.   Can I ask you to review that affidavit.
10:48 20         (Pause.)
 21              THE COURT:  Mr. Lopez.
 22     BY MR. LOPEZ:
 23     Q.   Have you had an opportunity to review that affidavit?
 24     A.   Yes.
 25     Q.   And can you go to the last page.
```

           1              Is that your signature, sir?

           2              Is that your signature on the last page?

           3    A.   Yes, it is.

           4    Q.   Can you turn back to page 2.

           5    A.   Page 2?

           6    Q.   2, yes.

           7              Specifically paragraph 8.

           8    A.   During the period December '13 through December --

           9    Q.   Don't read it, sir.  Just I want to ask you --

10:49    10              You understand, don't you, that submitting an

          11    affidavit is the same as testifying under oath?

          12    A.   That what -- yeah.

          13              MR. MARKHAM:  Your Honor, object at this point.  If

          14    he's refreshed his recollection, it should be taken from the

          15    witness.

          16              THE COURT:  Counsel, do you have a spare copy of this

          17    for my benefit?

          18              Thank you.

          19              THE COURT:  Mr. Lopez, I think you said page 2?

10:49    20              MR. LOPEZ:  Page 2, paragraph 8, your Honor.

          21              THE COURT:  Thank you.

          22              So, I guess, counsel, if you were offering it to

          23    refresh, or to impeach.

          24              MR. LOPEZ:  To impeach.

          25              THE COURT:  Okay.

```
 1              MR. MARKHAM:  Withdrawn, your Honor.

 2              THE COURT:  Why don't you ask the question.

 3              MR. LOPEZ:  Sure.

 4    BY MR. LOPEZ:

 5    Q.   Previously you testified that you worked on the My Big

 6    Coin for approximately one year?

 7    A.   About that time.

 8    Q.   And would you agree with me that --

 9              (Pause.)

10:50 10        MR. LOPEZ:  Strike that.

11    Q.   In your affidavit did you testify that during the period

12    from December 2013 through 2015, I worked continuously on the

13    project for Greyshore Website Management Company.  I dedicated

14    most of my professional time to my work on the technology used

15    for Greyshore Website Management Company and MyBigCoin.com.

16    A.   Mmm.

17              THE COURT:  You have to give a verbal answer.  Do you

18    mean "yes"?

19              THE WITNESS:  Yes.  Sorry.

10:51 20        MR. LOPEZ:  Thank you, your Honor.

21              THE COURT:  Counsel, redirect?

22              MR. MARKHAM:  Yes, your Honor.

23                        REDIRECT EXAMINATION

24    BY MR. MARKHAM:

25    Q.   So just one question on this affidavit.  This relates to
```

```
 1   lawsuit where Mr. Harrington was sued --
 2           THE COURT:  Counsel.  Is there an objection,
 3   Mr. Lopez?
 4           MR. LOPEZ:  Yes.
 5           THE COURT:  Sustained here.
 6           MR. MARKHAM:  We won't talk about the lawsuit then.
 7           THE COURT:  And, jurors, just so you understand, there
 8   was reference to another proceeding and the statement was
 9   introduced for the purposes of impeaching this witness with a
10   prior statement, and the reference to another proceeding was
11   only for that purpose and you shouldn't consider it for any
12   other reason, other than the witness gave a sworn statement in
13   another matter.
14           Counsel.
15           MR. MARKHAM:  Thank you, your Honor.
16   BY MR. MARKHAM:
17   Q.   When the defense was asking you questions, they talked
18   about the defendant having a, quote, head programmer.  Do you
19   remember that line of questioning?
20   A.   Yes.
21   Q.   Do you know whether that head programmer actually existed?
22   Or were you just told that he existed?
23   A.   I never was able to talk with him.
24   Q.   And that was from, according to your affidavit, from 2013
25   to 2015; is that right?
```

1   A.   It was about a year that I -- yeah.

2   Q.   The defense also mentioned My Big Coin Wallet.  Do you

3   recall that line of questioning?

4   A.   Yes.

5   Q.   Did you ever actually see proof that a My Big Coin Wallet

6   actually existed?

7   A.   I did not.

8   Q.   The defense also talked to you about Randall Crater buying

9   a kiosk system.  Do you remember that line of questioning?

10:53 10   A.   Mm-hmm.  Yes.

11   Q.   Again, just to be clear, do you know whether Randall

12   Crater actually bought a kiosk system or was that just a claim

13   made to you by Randall Crater?

14   A.   I'm sorry, repeat the question.

15   Q.   Do you actually know whether Randall Crater ever owned a

16   single kiosk?

17   A.   I know he was in the process of purchasing a company from

18   the discussions we had.  I don't know if he finalized it or

19   not.

10:53 20   Q.   Right.  So I want to drill down on this.

21        When you say you know he was buying a kiosk system, is

22   that because the defendant told you that?

23   A.   Yes.

24   Q.   And you never saw a kiosk.

25   A.   I never is saw a kiosk, no.

1   Q.   And you never saw a kiosk company that he bought up and

2   running.

3   A.   I know I did remember seeing a name of a company that he

4   was looking to purchase.  I just don't recall the name.

5   Q.   Okay.  Who showed you the name of that company?

6   A.   Randall.

7   Q.   The defense introduced Exhibit 36 during their cross-

8   examination of you, which was an email string in January of

9   2014 between you and the defendant.  And in it the defendant

10  says, I was able to lock down an app for the Droid and Apple

11  phone.

12          First, can you just tell the jury what's -- do you

13  know what an app is for a Droid and Apple phone.

14  A.   An app?

15  Q.   That's what the defendant said.  Do you have an

16  understanding --

17  A.   An app would be like an application that you download onto

18  your phone.

19  Q.   Okay.  Did you ever see an application that you could

20  download on your phone?

21  A.   I did not see an application.

22  Q.   You told the defense counsel that you didn't have a clear

23  understanding of what "backed by gold" meant; is that right?

24  A.   Yes.

25  Q.   But just to be clear, did the defendant tell you that My

1    Big Coin was currently backed by gold or did they say they'd be

2    backed by gold maybe one day in the future?

3    A.   I believe it was currently backed by gold.

4         MR. MARKHAM:  Can you go to Exhibit 11H, please.

5         I think we have to switch over to HDMI1, please.

6         Can you zoom in on that email on the bottom.

7         And please highlight the part that says, "We have 100

8    million in my name in gold in a bank in Spain."

9    Q.   When the defense counsel asked you whether the gold claims

10:56 10   were ambiguous, were you talking about this sentence or were

11   you talking about just genetically the gold claims?

12        MR. LOPEZ:  Objection.

13        THE COURT:  Sustained as to form.  You can rephrase.

14   BY MR. MARKHAM:

15   Q.   Do you find this sentence ambiguous, $100 million in my

16   name in gold in a bank in Spain?

17        MR. LOPEZ:  Objection.

18        THE COURT:  Well, you can rephrase.  Ask about his

19   understanding at the time he received this email.

10:56 20   BY MR. MARKHAM:

21   Q.   When you received this email, did you think the defendant

22   was telling you that one day he would have gold in a bank in

23   Spain, or was it your understanding that he currently had it?

24   A.   I believed that it was current.

25        MR. MARKHAM:  You can take this down.  Thank you.

1    Q.   You testified on cross-examination that DCR Strategies did

2    not provide a credit card for My Big Coin as far as you knew;

3    is that right?

4             MR. LOPEZ:  Objection.

5             THE COURT:  I'm sorry, counsel.  Can you give me a

6    basis in a word?

7             MR. LOPEZ:  That's not what he testified to.

8             THE COURT:  Okay.

9             MR. MARKHAM:  I can ask an open-ended version, your

10:57 10   Honor.

11            THE COURT:  Okay.  You can rephrase.

12   BY MR. MARKHAM:

13   Q.   To the best of your knowledge, did DCR Strategies provide

14   a credit card for My Big Coin?

15   A.   I don't believe they ever finished the contract.

16   Q.   And again, you said you were involved in this project at

17   least through the end of 2014; is that right?

18   A.   Yes.

19   Q.   So at least as of the end of 2014, to the best of your

10:57 20   knowledge, there was no credit card from DCR Strategies?

21   A.   At that point I did not have any knowledge of a credit

22   card.

23   Q.   And if you know, is DCR Strategies the same company as

24   MasterCard?

25   A.   As what?

```
 1   Q.   MasterCard.  Is that the same company as DCR Strategies?
 2   A.   No, they're not the same company.  DCR Strategies would
 3   issue a card --
 4   Q.   That's all.  I just wanted to know are they the same
 5   company, yes or no?
 6   A.   No.
 7             MR. MARKHAM:  That's all, your Honor.
 8             THE COURT:  Thank you.
 9             Recross, Mr. Lopez.
10             RECROSS-EXAMINATION
11   BY MR. LOPEZ:
12   Q.   Are you familiar with a company called CyberCenters?
13   A.   No, sir.
14             MR. MARKHAM:  Objection, beyond the scope.
15   A.   I can't hear.
16             THE COURT:  So, counsel, what do you say to the scope
17   here?  Just because this is a new -- at least for this
18   examination.  Mr. Lopez.
19             MR. LOPEZ:  It goes to the credit card issue, which
20   was part of --
21             THE COURT:  Well, let me hear the rest of the
22   question.
23   BY MR. LOPEZ:
24   Q.   Are you familiar with Pay Commander?
25   A.   Pay Commander does sound familiar, yes.
```

```
 1   Q.   And what do you understand Pay Commander was?

 2              MR. MARKHAM:  Objection.

 3              THE COURT:  Well, counsel, I'm still -- sustained as

 4   to scope.  So --

 5   BY MR. LOPEZ:

 6   Q.   What about Ultra Card?

 7              MR. MARKHAM:  Objection.

 8              THE COURT:  Sustained as to scope of redirect.

 9              MR. LOPEZ:  No further questions, your Honor.

10   10:59       THE COURT:  Thank you.

11              You're excused, sir.  Thank you.

12              THE WITNESS:  Take these or leave them here?

13              THE COURT:  You can leave them.

14              Counsel, if someone wants to clear the witness stand.

15   I'm not sure if you need those for the future witnesses.

16              Counsel, next --

17              Oh, actually, given the time, counsel, I think we

18   should take our break now.

19              Jurors, we'll take 20 minutes and then we'll resume.

20   10:59  Thank you.

21              THE CLERK:  All rise.

22              (Jury left the courtroom.)

23              THE COURT:  Counsel, who are we going to have after

24   the break?

25              MR. MARKHAM:  Rich Audet, he's the MasterCard witness.
```

```
 1    I believe after that it's Peter Bell.
 2              THE COURT:  Okay.  And who's after that?
 3              MR. MARKHAM:  Mr. Olivo.
 4              MR. MOORE:  Salvatore.
 5              THE COURT:  Okay.  Counsel, anything we should take up
 6    at the moment?
 7              MR. MARKHAM:  I'm not sure we got a definitive ruling
 8    on the IRS or the FinCEN.  We're moving fairly quickly, so we
 9    may be addressing those issues.
10              THE COURT:  And that was J and K?
11              MR. MARKHAM:  Yes, your Honor.
12              THE COURT:  And what was -- I see these are
13    certificates of lack of -- J, that was J -- it looks like
14    they're certificates of lack of records.
15              MR. MARKHAM:  Yes, your Honor.  And they're stipulated
16    to as authentic.
17              THE COURT:  Right.  And I think the only -- so if I
18    recall correctly, Mr. Lopez, your issue with J was just about
19    whether or not the absence of an IRS filing as to My Big Coin
20    would come in, that you were not disputing the lack of record
21    as to Mr. Crater?
22              MR. LOPEZ:  That's correct, your Honor.
23              THE COURT:  And, counsel, based on the evidence that I
24    think this jury has heard to date about Mr. Crater's role in My
25    Big Coin, I do think both are relevant, assuming the
```

1    authenticity, which doesn't seem to be at issue here.

2              Do you need to be heard further?

3              MR. LOPEZ:  Just for the record, your Honor.

4              There's been no evidence that Mr. Crater was the

5    responsible person for the corporation required by IRS

6    regulations to file the tax return.  And absent that, it's just

7    not -- it's not relevant.

8              THE COURT:  But, counsel, isn't it at least relevant

9    to whether or not, for lack of a better way to phrase it,

11:02 10   whether or not My Big Coin was a going concern, which at least

11   seems relevant to the fraud allegations here?

12             MR. LOPEZ:  Well, yes --

13             THE COURT:  Standing on your objection.

14             MR. LOPEZ:  Yes, your Honor.

15             THE COURT:  Okay.

16             Counsel, anything else you want to be heard on?

17             MR. MARKHAM:  I would just put on the record two

18   points.  One, the government has to prove a scheme to defraud.

19   My Big Coin is the scheme to defraud; and we also have to prove

11:02 20   that Randall Crater knowingly and willingly participated in it.

21   So the IRS records are relevant to that.

22             I would also note that our last witness,

23   Ms. Brekenfeld, will show that the money is going into bank

24   accounts controlled by Randall Crater, making him the

25   responsible party, but I don't think we need to get to that

1    issue.

2           THE COURT:  So preserving Mr. Lopez's objection to the

3    My Big Coin absence of a record for IRS, for the reasons that

4    I've stated, I expect it's going to come in.  I'll listen

5    obviously for the foundation in regards to both, but it sounds

6    like that is not disputed.

7           I don't think there was an objection on the FinCEN, so

8    I expect both J and K would come in.

9           On the summary charts, counsel, I'll listen carefully

11:03 10  to the foundation laid, but I think the foundation being that

11    they're summarizing voluminous records, I think based on what

12    I've heard so far and based on what the government has

13    proffered that they're coming in.

14           As I've suggested before, I think some of the

15    arguments made are really about the weight, if any, the jury

16    should give them, not as to admissibility.

17           But, Mr. Lopez, I'll listen as the witness goes

18    through the basis for each of the summary charts.

19           Counsel, Mr. Lopez, anything else before we take our

11:04 20  break?

21           MR. LOPEZ:  No, your Honor.

22           THE COURT:  And why don't -- Ms. Hourihan, why don't

23    we take 20 minutes from now.  You can tell the jurors we'll be

24    back at 25 after.

25           THE CLERK:  Okay.

1          THE COURT:  And, counsel, I think I probably will want

2     us to come back a little before the jury does, a little before

3     2:00 to talk about tomorrow and scheduling just so I can give

4     the jury an update on when they're likely to get this case,

5     talk about jury charge scheduling, which I started to say at

6     the beginning right as the jury was coming in, I anticipate

7     doing tomorrow morning at 8:30.  I would share my charge with

8     you at 8:15.  I think before the end of today I'll give you

9     some of my thoughts about that.

11:05 10          I think substantively, looking at the proposals on

11    either side, I don't think there was great disagreement about

12    the elements of the substantive charges here, but I'll talk to

13    you about any other questions I may have before the end of

14    today.

15          MR. MARKHAM:  And I would just note that we are going

16    to be proposing one or two additional instructions, but we'll

17    have those ready.

18          THE COURT:  Okay.  Counsel, on what topics?

19          MR. MARKHAM:  Specifically whether an exchange needs

11:05 20    to be public or not.  Right now it just says "public" in front

21    of exchange but it doesn't describe what that is.  And the

22    caselaw is pretty clear that "public" just means to more than

23    one person or to someone who is not your spouse.

24          THE COURT:  And, counsel, I would ask to get that

25    before the end of business today.

1           MR. MARKHAM:  Yes, your Honor.

2           THE COURT:  Was there another topic?

3           MR. MARKHAM:  No, I believe that's the only one, but

4    I've been taking notes --

5           THE COURT:  Mr. Lopez, do you anticipate any

6    additional instructions other than the ones submitted?

7           MR. LOPEZ:  I do not, your Honor.

8           THE COURT:  All right.  We'll take our break.  Thank

9    you.

11:06 10           THE CLERK:  All rise.

11           (Recess taken.)

12           (The Court entered the courtroom.)

13           THE COURT:  Counsel, I believe the jury is coming down

14    now.

15           (Jury entered the courtroom.)

16           THE CLERK:  Court is in session.  Please be seated.

17           THE COURT:  Counsel, Mr. Moore.

18           MR. MOORE:  The United States calls Rich Audet.

19           THE COURT:  He may be called.

11:27 20           RICHARD AUDET, having been duly sworn by the Clerk,

21    was examined and testified as follows:

22           THE CLERK:  Thank you.  Please be seated.

23           THE COURT:  Good morning, sir.

24           THE WITNESS:  Good morning.

25           THE COURT:  Mr. Moore.

1            DIRECT EXAMINATION

2    BY MR. MOORE:

3    Q.   Please state your name and spell your last name.

4    A.   Richard Audet, A-u-d-e-t.

5    Q.   And can you describe to the jury your education.

6    A.   I have an MBA.

7    Q.   And where are you currently employed?

8    A.   MasterCard International.

9    Q.   Were you employed by MasterCard between 2014 and 2017?

11:28 10   A.   I was.

11   Q.   What is your role with MasterCard?

12   A.   I am vice president of franchise customer enablement.

13   Q.   And can you explain to the jury what franchise customer

14   enablement is?

15   A.   Sure.  There's four sections to my role.  The first is

16   Onboarding Center of Excellence.  So I'm responsible for the

17   strategy and enabling that strategy for onboarding of

18   MasterCard customers, including licensed customers issues.

19           Second is the role of service provider governance.  So

11:28 20   setting the standards that our issuers and acquirers have to

21   abide by in working with fourth-party vendors that support the

22   MasterCard ecosystem.  There's an element of customer risk

23   management in my role, and there is also some tech development

24   and asset management that enables the network operations.

25   Q.   Can you explain to the jury what an issuer is?

1    A.    An issuer is an entity that's been licensed by MasterCard

2    for the purposes of giving card holders cards and using the

3    MasterCard brand.

4    Q.    Are you familiar with MasterCard's authorized currency?

5    A.    I am.

6    Q.    Can you explain to the jury what those are?

7    A.    So MasterCard has a lot of different rules and manuals,

8    but our main rule book that issuers follow is our MasterCard

9    rules.    Under Rule 3.16 we have a list of currencies that are

11:29 10   permissible on the MasterCard network, all of which are fiat

11    currencies.

12    Q.    Is My Big Coin a MasterCard authorized currency?

13    A.    It is not.

14    Q.    Are you familiar with MasterCard's licensed customers?

15    A.    I am.

16    Q.    Is My Big Coin a licensed customer of MasterCard?

17    A.    It is not.

18    Q.    Does MasterCard have rules restricting the use of prepaid

19    cards bearing the MasterCard logo?

11:30 20   A.    Yes, we do.

21    Q.    Do those rules also limit prepaid cards to only work for

22    recognized currencies?

23    A.    Yes.

24    Q.    Could you describe to the jury MasterCard's prepaid card

25    vetting process?

```
         1   A.    Sure.  So all of our issuers in the U.S. are regulated
         2   financial institutions, right, we only license banks and other
         3   regulated parties.  And those entities are required for all
         4   prepaid issuance to submit an application to MasterCard that
         5   outlines the parameters of the program that they are wishing to
         6   issue.  That vetting process covers reputational risk, AML
         7   risk, financial risk and some other components, but it's a
         8   thorough vetting of the parties that are involved, the product
         9   that's being launched, and if there's any abnormalities, such
11:31   10   as if there was a proposal for cryptocurrency or some other
        11   deviation from our standards would come out in that process.
        12             MR. MOORE:  Can we bring up Exhibit 1A.
        13             Can we scroll down to the second page.
        14             And actually down to the third page.
        15   Q.    Here I'm showing you the defendant's LinkedIn page, and at
        16   2 he says, We are partners with MasterCard which gives us a
        17   closed loop system so your able to brake down into any currency
        18   that is needed.  Is that statement true?
        19   A.    It is not true.
11:32   20   Q.    Did MasterCard have a partnership with My Big Coin in
        21   August 2015 or any time thereafter?
        22   A.    No.
        23             MR. MOORE:  Can we bring up with a side by side
        24   Exhibit 10A, page 5 -- actually, let's go to 11B.
        25             (Discussion off the record.)
```

```
 1              THE COURT:  Counsel?
 2              MR. MOORE:  Sorry, your Honor, just technical
 3    difficulties.
 4    BY MR. MOORE:
 5    Q.   Do you see the card in the top left corner of this web
 6    page?
 7    A.   I do.
 8    Q.   Is this --
 9              THE COURT:  And I just want to make clear for the
10    record, that this is now 15A against 11B.
11              Counsel.
12    BY MR. MOORE:
13    Q.   Is this card in the top left corner, is that an approved
14    MasterCard design?
15    A.   MasterCard has no record of that image being submitted.
16    Q.   Can you describe to the jury the process MasterCard
17    undertakes to approve image submissions for cards?
18    A.   Certainly.
19              So as you might imagine, we have a pretty detailed
20    standard set on what our cards and account representations must
21    abide by.
22              There is a process where issuers work with card
23    manufacturers that are approved by MasterCard to make cards.
24    Those card manufacturers submit images to MasterCard and each
25    one is reviewed by somebody at MasterCard to ensure that that
```

1   image fits within the parameters that we have put forth.

2   Q.   Okay.  And is there any record of any submissions from My

3   Big Coin for a card?

4   A.   There is not.

5          MR. MOORE:  Can we bring up Exhibit 12T, please.

6          (Pause.)

7          MR. MOORE:  Let's go to 7E.

8   Q.   All right.  Then do you see under where it says "FAQ," it

9   says, Use MBC anywhere instantly, send and receive MBC

11:37 10   worldwide merchandise worldwide by using MasterCard.

11          Is it true that you could send My Big Coin anywhere in

12   the world utilizing a MasterCard?

13   A.   No, that is not true.

14          (Discussion off the record.)

15   Q.   All right.  Here is an email from Marc Ariza to Randall

16   Crater about the Top Tier program, business prepaid MasterCard

17   program.  Do you know is marcaziza@gmail.com a MasterCard email

18   address?

19   A.   No, it is not.

11:39 20          THE COURT:  Just for the record, this is 11E?

21          MR. MOORE:  Thank you, your Honor.

22   BY MR. MOORE:

23   Q.   And is Top Tier program C business, is that a MasterCard

24   company?

25   A.   No, it is not.

1    Q.    So if you had an agreement with Top Tier for their program

2    C business, would that be an agreement with MasterCard?

3    A.    No, it would not.

4    Q.    Are you familiar with FirstView?

5    A.    MasterCard has record of FirstView.  Our issuers have

6    disclosed FirstView's involvement with programs to be of a

7    prepaid program manager and they're a third-party processor.

8          So we have some knowledge of their role in the

9    MasterCard network.

11:40 10   Q.    Do you know if FirstView proposed a new line of business

11   with MasterCard -- or with My Big Coin to MasterCard?

12   A.    We have no record of any proposal through our formal

13   submission process.

14   Q.    The jury has heard claims that My Big Coin at times stated

15   they had finalized a deal with MasterCard.  Do you know if a

16   statement like that could possibly be true?

17   A.    There's no record of any deal between MasterCard and My

18   Big Coin.

19   Q.    And the jury has also heard that My Big Coin was, quote,

11:40 20   the first cryptocurrency MasterCard used at ATMs any and

21   everywhere MasterCard is accepted worldwide.  Do you know if

22   that statement could possibly be true?

23   A.    That statement is not true.

24   Q.    And the jury's also heard statements, quote, "The first

25   cryptocurrency MasterCard, use at ATMs and anywhere MasterCard

     1    is accepted worldwide."  Could that statement be true?

     2    A.    No, that statement can't be true.

     3    Q.    And just to clarify for the jury, through your review of

     4    MasterCard's records, is there any documentation of any deal or

     5    proposed deal with My Big Coin?

     6    A.    No, there's not.

     7              MR. MOORE:  Thank you.  Nothing further.

     8              THE COURT:  Thank you.

     9              Mr. Lopez.

11:41 10                        CROSS-EXAMINATION

    11    BY MR. LOPEZ:

    12    Q.    Good morning, Mr. Audet.

    13              My name is Scott Lopez.  I represent Mr. Crater.

    14    A.    Good morning.

    15    Q.    We've never met.

    16    A.    No.

    17    Q.    Is it true that MasterCard can be used worldwide?

    18    A.    We have acquirers in many, many countries.  There are some

    19    markets, due to sanction reasons, that our cards cannot be

11:42 20    used, but I think from a marking perspective you could say yes.

    21    Q.    So if someone had a MasterCard, they would be able to use

    22    it worldwide presumably?

    23    A.    Yes.

    24    Q.    Now, you were shown a picture of My Big Coin's website,

    25    and you were asked if that was an authorized MasterCard card.

```
 1    A.   I was.

 2    Q.   And you said it wasn't.

 3    A.   I did.

 4    Q.   Does MasterCard have any record of issuing a

 5    cease-and-desist order to My Big Coin?

 6    A.   I wouldn't -- I don't think we do, but I wouldn't have

 7    knowledge of that.

 8    Q.   Well, generally speaking, if MasterCard thought someone

 9    was misappropriating their image --

10         MR. MOORE:  Objection, your Honor.

11    Q.   -- would you issue a cease-and-desist order?

12         THE COURT:  Well, counsel, objection based on prior

13    answer?

14         MR. MOORE:  Foundation, your Honor.

15         THE COURT:  Okay.

16         Well, sustained as to that question, Mr. Lopez, given

17    the prior question and answer.  You can ask another question.

18    BY MR. LOPEZ:

19    Q.   You said that you're a vice president of MasterCard,

20    right?

21    A.   I am.

22    Q.   And as a vice president, are you aware of whether or not

23    MasterCard issues cease-and-desist letters to individuals or

24    companies that are using their image without authorization?

25    A.   We do.
```

```
 1    Q.   And did you search your records to determine whether or
 2    not since 2014 MasterCard has issued a cease-and-desist order
 3    to My Big Coin?
 4    A.   I did not.
 5    Q.   You weren't asked to do that?
 6    A.   No.
 7    Q.   And you didn't do that.
 8    A.   No.
 9             MR. LOPEZ:  Your Honor, may I approach the witness?
10             THE COURT:  You may.
11             MR. LOPEZ:  Bear with me for a moment.
12    BY MR. LOPEZ:
13    Q.   It's been stipulated in this case that screenshots of the
14    Wayback Machine are considered authentic, so I want to you bear
15    with me.
16             Do you recognize the MasterCard resource guide?
17             THE COURT:  And I think we'll just -- so the record is
18    clear, let's just make these LL, the first one LL.
19             MR. LOPEZ:  LL.
20             THE COURT:  The one that has a vertical orientation --
21    okay, do you want to do LL1 and 2?
22             MR. LOPEZ:  That's fine, your Honor.
23             THE COURT:  Okay.  So the vertical one will be LL1,
24    and the horizontal will be LL2 for ID.
25             (Exhibits LL1 and LL2 marked for identification.)
```

BY MR. LOPEZ:

Q.   Mr. Audet, what I'm trying to get at is whether or not the full size MasterCard resource guide is the same resource guide that existed in 2013.

So I want to go through -- if you look at the first page, does that appear to be the same?

A.   Sorry.  Are you asking if the resource guide as it exists today is the -- looks like this, or are you asking if the resource guide in 2013 is identical to this?

Q.   I'm asking whether or not the research guide in 2013 is identical to the one that you're holding that's a full size?

A.   I couldn't say.

Q.   Well, let's go through it then.

If you look at the first page, which is LL1 and LL2, does that appear to be the same as this document?

THE COURT:  And I guess, Mr. Lopez, I just want to make sure we're all looking at the same document.

THE WITNESS:  Am I comparing these?

MR. LOPEZ:  Yes.  This is LL1 --

THE COURT:  I have that as LL2, Mr. Lopez.  Okay.

MR. LOPEZ:  All right.  Okay.

I'm starting with this, your Honor.

THE COURT:  Sure.  LL2.

MR. LOPEZ:  And I'm going to compare it to a number of pages that also exist in this document.

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
|        | 1  | THE COURT:  LL1, okay, thank you.                          |
|        | 2  | Is this one LL2?                                           |
|        | 3  | THE COURT:  That's LL1.                                    |
|        | 4  | MR. LOPEZ:  Okay, that's fine.                             |
|        | 5  | THE COURT:  Thank you.                                     |
|        | 6  | MR. LOPEZ:  I will mark that accordingly.                  |
|        | 7  | BY MR. LOPEZ:                                              |
|        | 8  | Q.   So looking at this document, sir --                  |
|        | 9  | A.   Okay.                                                 |
| 11:47  | 10 | Q.   -- do the first two pages appear to be the same as this |
|        | 11 | page?                                                      |
|        | 12 | A.   They do.                                              |
|        | 13 | Q.   Now, if you go to the next page of this document and the |
|        | 14 | second page of the other document, does that appear to have the |
|        | 15 | same items in the table of content?                       |
|        | 16 | A.   They appear to be the same.                          |
|        | 17 | Q.   With the same page numbers?                          |
|        | 18 | A.   Hold on.                                              |
|        | 19 | (Pause.)                                                  |
| 11:48  | 20 | A.   It appears that the very bottom of this document was cut |
|        | 21 | off in your printing, but otherwise they look identical.  |
|        | 22 | Q.   If you turn to the next page, does that have the rest of |
|        | 23 | the page?                                                  |
|        | 24 | A.   No, it doesn't.                                       |
|        | 25 | Q.   Well, we'll go through each of the pages.            |

```
 1    A.    Okay.
 2    Q.    So the next page, which at the top has "Franchise
 3    Development"?
 4    A.    Yes.
 5    Q.    On page 8?
 6    A.    So, I'm sorry, maybe I'm not following.
 7          MR. LOPEZ:  May I approach the witness, your Honor?
 8          THE COURT:  You may.
 9          Mr. Lopez, Ms. Joyce and the jury still have to hear
10    you.
11          MR. LOPEZ:  I understand.
12          THE COURT:  Thank you.
13    BY MR. LOPEZ:
14    Q.    Looking at this page, which begins "Table of Contents,"
15    does it appear as though the items listed are the same as the
16    top portion of this page?
17    A.    It does with the exception being that one line is cut off
18    from this page.  That's what I was saying.
19    Q.    I'm sorry, but you're all the way to the bottom --
20    A.    Yes.
21    Q.    So you're way ahead of me.
22          So you would agree that appears to be the same page as
23    this?
24    A.    It does.
25    Q.    And looking at the next page, does that appear to be the
```

1    top page of this?

2    A.   It does.

3    Q.   Okay.

4         And we'll skip to the bottom of that page, the next

5    page is another page.  Does that appear to be the same?

6    A.   It does.

7    Q.   And the next page appears to add some artwork or a photo?

8         MR. MOORE:  Can we clarify what page we're on just so

9    we can follow it?

11:50 10       THE WITNESS:  We're on page 5 of the full document.

11   BY MR. LOPEZ:

12   Q.   And would you agree that the same woman appears to be

13   depicted in the Wayback Machine from 2013?

14   A.   Yeah.

15   Q.   So would you agree with me that L1 is the same document

16   that existed in 2013?

17        MR. MOORE:  Objection, your Honor.

18        There's --

19        THE COURT:  Yeah, so sustained as to that.

11:51 20       Counsel, you can ask another question.

21   BY MR. LOPEZ:

22   Q.   Looking at LL1, the MasterCard Resource Guide in full, do

23   you know whether or not this is the MasterCard Resource Guide

24   today?

25   A.   I don't.  It seems unlikely.

```
 1   Q.   What's that?
 2   A.   It seems unlikely.  I don't know for certain.
 3            Is your question, are we still using the same resource
 4   guide?
 5   Q.   Yes.
 6   A.   Eight years later?
 7   Q.   Yes.
 8   A.   It seems doubtful, but I don't know for certain.
 9   Q.   So if you go to your website and type in "MasterCard
10   Resource Guide," you don't know whether or not this document
11   comes up?
12   A.   I don't.
13   Q.   Okay.
14            Does MasterCard refer to their customers as valued
15   partners?
16   A.   Typically we refer to issuers and acquirers as customers.
17   Q.   Well, if you go to LL2 --
18            MR. MOORE:  Objection, your Honor.  --
19   BY MR. LOPEZ:
20   Q.   You go to this page.
21            THE COURT:  Counsel, objection in terms of exhibit not
22   being in?
23            MR. MOORE:  Yes, your Honor.
24            THE COURT:  Well, I think, counsel, here it's for
25   purposes of impeachment, not reading from the document.
```

```
 1            MR. LOPEZ:  Your Honor, actually, I would like to
 2     introduce the Wayback Machine document.  Even though it's not a
 3     complete source, it's --
 4            THE COURT:  Well, I don't think the foundation has
 5     been laid for reasons that I think are clear on the record, but
 6     I understand this may be a different question not based on the
 7     document but in terms of the witness' knowledge.
 8            MR. LOPEZ:  Well, your Honor, maybe we should go to
 9     the --
10            THE COURT:  Sure.
11            (Discussion at sidebar.)
12            THE COURT:  Mr. Lopez, I'll hear you.
13            MR. LOPEZ:  Your Honor, it's stipulated by the
14     government that images from the Wayback Machine are considered
15     authentic.  LL2 are images from the Wayback Machine.  If I knew
16     that the witness was going to make me submit every last page
17     from the Wayback Machine, I guess I would have done that, but I
18     had hoped to introduce the other document, but having not, I
19     should at least be able to introduce LL2 since it's relevant to
20     the issues that we're talking about; to wit: whether or not
21     MasterCard partners with other companies and issues MasterCards
22     to them.
23            THE COURT:  Meaning, you're seeking to admit LL2 but
24     not LL1?
25            MR. LOPEZ:  That's correct, your Honor.
```

```
 1              THE COURT:  What does the government say to that?
 2         I can't hear.
 3              MR. MOORE:  Can you hear me, your Honor?
 4              THE COURT:  Yes.
 5              MR. MOORE:  So this witness has not seen this document
 6    before.  He did not author it, so it can't be used to impeach
 7    him.
 8              The witness has stated that he cannot authenticate
 9    this document as being real.
11:55 10            We have not seen this document before.  So our
11    stipulation as to the Wayback Machine applied to the documents
12    that were marked as exhibits.  We have no way of knowing
13    anything about this document as this is our first time ever
14    seeing it, and this witness can't authenticate it, so I don't
15    see a foundation for it being admitted.
16              THE COURT:  Counsel, I think that's where we stand in
17    terms of what this witness has testified to or not been able to
18    testify to.
19              I understand the limits of the parties' agreement, but
11:55 20  on this question, I thought Mr. Lopez, you weren't asking him
21    to recite something from the document, just asking to see if it
22    refreshed his recollection or if he agreed with a definition of
23    "valued partners," which I think is appropriate.
24              MR. LOPEZ:  Your Honor, I would also note that the
25    stipulation, which is 1C, says, Records obtained from Internet
```

1    Archive, available at https:/archive.org, are accurate and

2    authentic representations of the website pages as of the date

3    those pages were recorded by the Internet Archive.

4         So the authenticity is not the issue, and I don't

5    believe I have to provide the government with documents that I

6    am going to use to cross-examine witnesses.

7         THE COURT:  Right.  But to the extent you're seeking

8    to admit them, they move into a different realm.

9         Counsel, I'll hear you further on the issue of

11:57 10    admission when we don't have the jury in the box.

11         You can ask the question you were just about to.

12    We're not going to have this witness recite from a document

13    that's not been admitted, but to the extent you're using it to

14    refresh or jog his memory, you may do so.

15         MR. LOPEZ:  Thank you, your Honor.

16         THE COURT:  Thanks.

17         (End of discussion at sidebar.)

18    BY MR. LOPEZ:

19    Q.   Mr. Audet, I believe you testified that you've been

11:57 20    working for MasterCard since 2013 or thereabouts?

21    A.   I started in 2010.

22    Q.   2010.  Even better.

23         And would you agree with me that MasterCard refers to

24    their customers, issuers, the people involved under the

25    umbrella of MasterCard as partners?

```
 1    A.   Genetically?  Perhaps.

 2    Q.   Well, do they or don't they?

 3    A.   Well, yes, I mean, it's a generic business term, sure.

 4    Q.   So the word "partner" just means doing business together,

 5    right?

 6    A.   Could, yes.

 7    Q.   Okay.

 8         Now, are you familiar with the special issuers

 9    program?

11:58 10    A.   I am.

11    Q.   And as vice president, are you responsible for that

12    program?

13    A.   It's not called that anymore, but, yes, I do now have

14    responsibility for it.

15    Q.   Back in 2013 it was considered the special issuer program?

16    A.   It was, and --

17              MR. LOPEZ:  May I approach the witness, your Honor?

18              THE COURT:  You may.

19              MR. LOPEZ:  Mark this NN.

11:59 20              THE COURT:  Yes, we'll mark it for ID as NN.

21              (Exhibit NN marked for identification.)

22    BY MR. LOPEZ:

23    Q.   Mr. Audet, I've given you a document.  Do you recognize

24    it?

25    A.   I do.
```

```
 1   Q.    What do you recognize it to be?
 2   A.    This is the cover page, essentially instructions that came
 3   with a form that we used to register programs that fell outside
 4   of traditional credit/debit programs.
 5   Q.    And are you familiar with a bank called the Metropolitan
 6   Commercial Bank?
 7   A.    Yes.
 8   Q.    And how are you familiar with that bank?
 9   A.    The Metropolitan Commercial Bank is an issuer, a licensed
10   issuer for MasterCard.
11   Q.    They're licensed to do business with MasterCard?
12   A.    They hold a MasterCard license.
13   Q.    And do they issue prepaid credit cards?
14   A.    They issue prepaid cards, yes.
15   Q.    And do they issue prepaid credit cards with the MasterCard
16   logo on them?
17   A.    Yes, they do.
18   Q.    Now, when it comes to the logo, there's really different
19   types of logos, right?
20   A.    We did a brand changeover in 2016 or so.  I don't know if
21   that's what you're referring to.
22   Q.    Well, there's --
23   A.    For different brands?
24   Q.    There's the MasterCard protected intellectual property
25   MasterCard logo, right?
```

1           Do you understand my question?

2    A.    MasterCard does have a trademarked brand mark, yes.

3    Q.    Trademark.

4           And no one else can use that logo without MasterCard's

5    permission.

6    A.    Well, I'm -- I won't pretend to be an expert on that.

7    But --

8    Q.    Fair enough.

9    A.    We have a very large network, there's over 80 million

12:01 10    merchants in our network, all of which are able to use our

11    brand, our brand center as a public-facing website.  So, you

12    know, it's not just our issuers and acquirers use that logo,

13    but through working with our issuers and acquirers there are

14    downstream participants that do get permission to use it as

15    well.

16    Q.    And are you familiar with the actual registration

17    document?

18    A.    It's been a while.  It's been revamped since 2013 or so,

19    but, yes, I recall.

12:01 20    Q.    And is there a section which allows for a custom design to

21    be submitted for approval to MasterCard?

22    A.    As part of this document?

23    Q.    As part of the application.

24           If you know.

25    A.    There are -- so there are specific features that this

1    document tries to pull out.  One, if there's any other legal

2    entity that will be appearing on the card besides the issuer,

3    right, so we call that co-brand.

4         It asks specific questions around prepaid products to

5    help us identify if there's any additional risks that need to

6    be weighed.

7         But this document would not give specific design

8    permissions per se.  There's a separate review process that

9    occurs for card artwork.

12:02 10   Q.   Would you agree with me that if -- so say Metropolitan

11   Commercial Bank submitted an application under the special

12   issuer program on behalf of My Big Coin, that it would be

13   Metropolitan Commercial Bank who would have the account with

14   MasterCard, not My Big Coin, correct?

15   A.   Metropolitan Commercial Bank in submitting a program that

16   would work with My Big Coin would list My Big Coin as a

17   co-brand partner.  FirstView would be listed as a program

18   manager, as a third party that's supporting that program.  And

19   the irregular -- well, anything that sort of fell outside our

12:03 20   parameters for prepaid, such as a different currency, would be

21   disclosed in this document, or at least it should be.

22   Q.   Okay.  Now, going back to what's been marked as MM, is

23   that a fair and accurate representation of the instructions for

24   special issuer program registration in 2013, if you know?

25   A.   I believe this form to be a little bit older than 2013.

1    Q.    And -- but was it still in effect in 2013?

2    A.    Well, the instructions would have been different in 2013.

3    MasterCard -- I don't believe we were still using MasterCard

4    Online.  We had switched over to MasterCard Connect, which is a

5    different hub portal.  So I can't say with any degree of

6    certainty as to whether or not that was what the instructions

7    were in 2013.

8              MR. LOPEZ:  Can I just have a moment, your Honor?

9              THE COURT:  Sure.

12:04 10         (Pause.)

11   BY MR. LOPEZ:

12   Q.    Are you familiar with a company called CyberCenters

13   International?

14   A.    I am not.

15   Q.    I think you said you are familiar with FirstView

16   Financial?

17   A.    Yes.

18              MR. LOPEZ:  Can I approach the witness, your Honor?

19              THE COURT:  You may.

12:05 20         (Discussion off the record.)

21   BY MR. LOPEZ:

22   Q.    I'm going to show you a document, I'm going to ask you to

23   look through it.  And the question is whether or not that

24   refreshes your memory as to whether this is -- whether MM was

25   the instructions for the special issuer program for 2013, 2014.

1          (Pause.)

2    A.   I mean, looking at this I don't think I could say with any

3    degree of certainty that these were the cover sheet to that at

4    any point.

5    Q.   Thank you, sir.

6          Are you familiar with the special issuer definitions

7    that MasterCard has?

8    A.   Well, I think that that would be in the past tense.  I

9    don't think we define "special issuer" anymore.

12:07 10  Q.   What about an "affinity" or "co-brand partner"?

11   A.   I'm -- yes, I'm aware of what those are.

12   Q.   What's a standard affinity or co-brand partner?

13   A.   Co-brand partner is any entity that would be sharing the

14   card space from a naming convention standpoint.  So any

15   non-MasterCard issuer that would also be listed on plastics or

16   digital representation.  And affinity versus co-brand is an

17   affinity partner tends to be of a nonprofit variety whereas a

18   co-brand is a for-profit organization.

19   Q.   So would it be fair to say that an affinity or co-brand

12:07 20  partner is an entity who may or may not be eligible for

21   MasterCard membership and whose identity appears on the card

22   front or back?

23   A.   Co-brand partners -- I mean, is it -- could co-brand

24   partners be issuers?  If it went through the vetting process

25   and they held the proper regulatory licenses to be an issuer,

```
  1    perhaps.  But it's not --
  2    Q.    Does MasterCard still have the following affinity partner
  3    classifications:  Standard, primary, secondary, MasterCard
  4    sponsorship, affinity.
  5    A.    I don't believe so.
  6    Q.    When did that change?
  7    A.    2015.
  8    Q.    In 2014, do you have a memory as to what a primary partner
  9    is?
12:08 10    A.    I don't recall.
 11    Q.    Do you know what a secondary affinity or co-brand partner
 12    is, was in 2013?
 13    A.    I don't recall.
 14    Q.    What about a MasterCard sponsorship affinity partner?
 15    A.    Those were sort of MasterCard negotiated co-brand
 16    agreements.  So we did something with the World Cup or we did
 17    something, you know, a major sporting event where MasterCard
 18    was incentivizing the arrangement, so there was a direct
 19    incentive agreement between the parties, that would be a
12:09 20    sponsored --
 21    Q.    Like with Major League Baseball, for example?
 22    A.    I don't know if -- as an example, perhaps.  I don't know
 23    if we have a sponsorship agreement with them.
 24    Q.    How about the U.S. Open?
 25    A.    I'm not familiar with all of our sponsor co-brands.
```

1    Q.   What is the MasterCard Fintech Express?

2    A.   MasterCard Fintech Express was a -- or is a program to

3    speed the licensing of non-traditional customers.

4    Q.   And would a cryptocurrency be considered a non-traditional

5    customer?

6    A.   That program is not available in the United States.  So,

7    no -- one, no, and the program is not available in the U.S.

8    Q.   Is it available in other parts of the world?

9    A.   Where regulation permits, yes.

12:10 10   Q.   And what countries would those be?

11   A.   I couldn't list them here.

12   Q.   Can you tell us any?

13   A.   In the EEA, for example, where ESD2 enables --

14   Q.   EEA?

15   A.   I'm sorry, the European Economic Area.

16   Q.   Thank you.  Which would include England or London?

17   A.   Not anymore.

18   Q.   That's true.

19        What about Spain?

12:11 20   A.   Yes.

21   Q.   Okay.

22        So this MasterCard Fintech Express would allow for a

23   cryptocurrency company to have a relationship with MasterCard?

24   A.   Well, "relationship" is a broad term.  Could they become

25   an issuer, a cryptocurrency become an issuer?  I think the

1    answer to that remains no.

2    Q.    What about a partner through a commercial bank?

3    A.    Yes.

4    Q.    Okay.  And when did that start?

5    A.    So MasterCard's been allowing off-network conversion of

6    crypto to fiat currency where an issuer would partner with a

7    third-party exchange to facilitate conversion of fiat to

8    loading of prepaid cards since June of 2018 in Europe, and the

9    first program I believe was April of 2019 for the U.S.

12:12 10   Q.    I want to break that down a little bit.

11          You said you can convert it from cryptocurrency to

12   fiat currency through an exchange; is that correct?

13   A.    Correct, yes.

14   Q.    So it's the exchange that makes the conversion?

15   A.    Correct.

16   Q.    And the exchange for MasterCard would have to be in Europe

17   under the rules of the European Union?

18   A.    So there's a vetting process for those exchanges.  I'm not

19   overly familiar with what the vetting process is, but, as you

12:12 20   can imagine, there's a regulatory review to make sure that the

21   activity that's being proposed is permissible.

22   Q.    And since this is your area of knowledge, do you know if

23   there were other companies that were involved in exchanges from

24   cryptocurrencies to fiat currencies in the period from 2014 to

25   2017?

1    A.    There were proposals, but MasterCard didn't enter that

2    line of business until 2018.

3    Q.    But were there other companies, Visa, American Express --

4    A.    Oh, competitors.

5    Q.    Competitors, yes.

6    A.    I don't know.  I can't say with any certainty.

7    Q.    Okay.

8            MR. LOPEZ:  No further questions.

9            THE COURT:  Thank you.

12:13 10            Any redirect?

11            MR. MOORE:  Briefly, your Honor.

12            THE COURT:  Sure.

13            MR. MOORE:  11B, please, page 40.

14                          REDIRECT EXAMINATION

15    BY MR. MOORE:

16    Q.    You were asked questions about a prepaid credit card.

17            Do you know if a prepaid credit card is different than

18    a prepaid debit card?

19    A.    Prepaid credit cards don't exist.

12:14 20    Q.    Do you know whether a credit card is different than a

21    prepaid debit card?

22    A.    Of course.

23    Q.    Can you explain to the jury what the difference between

24    those two things are?

25    A.    Sure.  A prepaid card is where a cardholder loads funds

1    onto a card.  Those funds are usually stored in either a pooled
2    account or it could be a segregated account.
3         Whereas, a credit card is where an issuer would grant
4    a line of credit, so you're spending the issuer's money, not
5    your own.
6    Q.   All right.  You were asked questions about Metro
7    Commercial Bank.
8         Did Metro Commercial Bank submit My Big Coin as a
9    program to MasterCard?
12:14 10       MR. LOPEZ:  Objection.
11        THE COURT:  Overruled given the scope of cross.
12   Overruled.
13   A.   Metropolitan Commercial Bank, MasterCard has record that
14   they have a relationship with FirstView, but our records do not
15   show any submission for a program associated with My Big Coin.
16   Q.   And then you said that in June 2018, MasterCard for the
17   first time entered into relationships that allowed conversion
18   offline of cryptocurrencies to fiat exchanges; is that
19   accurate?
12:15 20  A.   Close.  I think it's a little bit of a nuance on that.
21        We started to permit our issuers to work with
22   MasterCard-approved exchanges for the conversion of crypto to
23   fiat.  I don't believe that there are direct contractual
24   relationships between us and the exchange, between MasterCard
25   and the exchanges.

1    Q.    And is 2014 to 2017 before June 2018 or after June 2018?

2              MR. LOPEZ:  Objection.

3              THE COURT:  Well, sustained.

4              (Discussion off the record.)

5    BY MR. MOORE:

6    Q.   And then you were asked a lot of questions about

7    partnerships and who was a partner.

8              Here there's a tweet from My Big Coin that says, On

9    November 4, 2014, My Big Coin Pay finalizes MasterCard deal

12:16 10    cryptocurrency and MasterCard.

11              Is this statement true or not?

12              MR. LOPEZ:  Objection.

13              THE COURT:  Overruled.  I'll allow this question.

14    A.   MasterCard has no record of a deal with My Big Coin.

15              MR. MOORE:  Thank you.  Nothing further.

16              THE COURT:  Any recross?

17                        RECROSS EXAMINATION

18    BY MR. LOPEZ:

19    Q.   Is a prepaid debit card safer than a credit card?

12:17 20    A.   I think that question would be somewhat subjective, but --

21    Q.   Well, is a prepaid debit card connected to an account?

22    A.   It can be.

23    Q.   But it doesn't have to be?

24    A.   No, it does not have to be.

25    Q.   So unlike the credit card where if you get the credit card

1    number, you could use the credit card and make unauthorized

2    purchases, you really can't do that with a -- well, you can do

3    it with a prepaid debit card up until the point where there's

4    no more money on the debit card, right?

5            MR. MOORE:  Objection, your Honor.

6            THE COURT:  Sustained as to form, compound, but you

7    can rephrase.

8    BY MR. LOPEZ:

9    Q.   What's safer, a credit or a prepaid debit card, if you

12:17 10   know?

11   A.   A credit card is safer than a prepaid card.

12           MR. LOPEZ:  No further questions.

13           THE COURT:  Sir, you're excused.  Thank you.

14           Counsel.

15           MR. MOORE:  The United States calls Peter Bell.

16           THE COURT:  He may be called.

17           PETER BELL, having been duly sworn by the Clerk, was

18   examined and testified as follows:

19           THE CLERK:  Thank you.  Please be seated.

12:18 20           THE COURT:  Good afternoon, sir.

21           THE WITNESS:  Good afternoon, your Honor.

22           THE COURT:  Mr. Moore.

23                         DIRECT EXAMINATION

24   BY MR. MOORE:

25   Q.   Please state your name for the record and spell your last

```
 1   name.
 2   A.    Peter Bell, B-e-l-l.
 3         THE COURT:  Thank you.
 4   BY MR. MOORE:
 5   Q.    And where do you live?  In what city and state?
 6   A.    Baltimore, Maryland.
 7   Q.    And can you please describe to the jury your level of
 8   education?
 9   A.    B.A. from University of Maryland.
10   Q.    And are you currently employed?
11   A.    I'm self-employed.
12   Q.    Are you familiar with My Big Coin?
13   A.    Yes, I am.
14   Q.    Who introduced you to My Big Coin?
15   A.    Mark Gillespie.
16   Q.    Did Mr. Gillespie explain to you what My Big Coin was?
17   A.    Yes, he did.
18   Q.    And what was your understanding of what My Big Coin was?
19   A.    That it was a cryptocurrency.
20   Q.    Who was the designer of the My Big Coin platform?
21   A.    Randall Crater.
22   Q.    At any point was it explained to you that My Big Coin was
23   backed by anything?
24   A.    All via Mark Gillespie, that it was backed by gold.
25   Q.    Do you know who Mr. Gillespie was getting his information
```

1   about My Big Coin from?

2           MR. LOPEZ:  Objection.

3   A.   Randall Crater.

4           THE COURT:  Well, sustained.  The answer is struck for

5   the moment.  You can ask him another question.

6   BY MR. MOORE:

7   Q.   Did you come to find out where Mr. Gillespie was getting

8   his information about My Big Coin from?

9   A.   Yes.

12:20 10   Q.   Where did you find out Mr. Gillespie was getting his

11   information about My Big Coin from?

12   A.   Mark Gillespie told me.

13   Q.   And who did he tell you he was getting --

14   A.   He told me he was getting his information from Randall

15   Crater.

16   Q.   Was it ever explained to you that My Big Coin was like

17   Bitcoin?

18           MR. LOPEZ:  Objection.

19           THE COURT:  Sustained as to form, counsel.

12:20 20   BY MR. MOORE:

21   Q.   Was My Big Coin ever compared to other cryptocurrencies?

22   A.   Yes.

23   Q.   Which cryptocurrencies was My Big Coin compared to?

24   A.   Bitcoin and cryptocurrencies in general, that it fell into

25   the realm of cryptocurrencies.

1    Q.   Did you ever have discussions about My Big Coin being

2    listed on an exchange?

3    A.   Yes.

4    Q.   Was it important to you that My Big Coin be listed on an

5    exchange?

6              MR. LOPEZ:   Objection.

7              THE COURT:   Sustained as to form.

8    BY MR. MOORE:

9    Q.   Was it ever -- did anyone ever tell you that My Big Coin

12:21 10   was listed on an exchange?

11   A.   I understood it was on one of the exchange boards.

12   Q.   Would My Big Coin being on an exchange board be important

13   to you?

14             MR. LOPEZ:   Objection.

15             THE COURT:   Sustained as to form.

16   BY MR. MOORE:

17   Q.   Can you -- what features about My Big Coin were important

18   to you?

19   A.   Being listed would lend credibility, being backed by gold

12:21 20   would lend credibility, things like that.

21   Q.   When you say "being listed," do you mean being listed on

22   an exchange?

23   A.   Yes.

24   Q.   Do you remember if there were ever discussions about a

25   credit card related to My Big Coin?

1    A.    Yes.

2    Q.    Was it explained to you how that credit card was supposed

3    to operate?

4    A.    Yes.

5    Q.    Could you explain to the jury your understanding of how

6    the credit card was supposed to operate?

7          MR. LOPEZ:  Objection.  Can we have some time frame to

8    any of these questions?

9          THE COURT:  So sustained as to form, counsel.

12:22 10         You can ask another question.

11   BY MR. MOORE:

12   Q.    Do you remember approximately when you were told that

13   there may be at some point a My Big Coin credit card?

14   A.    About a year or so after I had invested in My Big Coin, a

15   credit card was supposed to be one of the upcoming products.

16   Q.    And did you know how that credit card was supposed to

17   operate?

18   A.    Yes.  It was explained to me that it would work like a

19   debit card against your My Big Coin value.

12:22 20   Q.    And when you say "it would work like a debit card," are

21   you saying that you could spend the My Big Coin?

22   A.    Yeah, ideally you would use this credit card and if your

23   My Big Coin balance was worth $5,000, $10,000, whatever it was,

24   when you used this credit card, it debited those balances.

25   Q.    And you previously testified that you were told My Big

1    Coin was backed by gold; is that accurate?

2    A.    Correct.

3    Q.    Was that backing by gold, was that important to you?

4    A.    Yes.

5    Q.    Did you have an understanding if My Big Coin was open to

6    the public and widely available?

7            MR. LOPEZ:  Objection.

8            THE COURT:  Sustained as to form, counsel.

9    BY MR. MOORE:

12:23 10    Q.    Did you have an understanding if My Big Coin was widely

11    available?

12    A.    Yes.

13    Q.    Did you have an understanding of if it was open to the

14    public?

15    A.    Yes.

16    Q.    Would My Big Coin being open to the public be important to

17    you?

18            MR. LOPEZ:  Objection.

19            THE COURT:  Sustained as to form.

12:23 20    BY MR. MOORE:

21    Q.    Did you previously testify that you understood My Big Coin

22    was available to the public?

23    A.    I believe, yes.

24    Q.    Was that important to you?

25    A.    Yes.

1            MR. LOPEZ:  Objection.

2            THE COURT:  Counsel, if you want to ask it as an

3    open-ended question.

4            MR. LOPEZ:  Can I move to strike the answer, your

5    Honor?

6            THE COURT:  Yes, it's struck.

7    BY MR. MOORE:

8    Q.   What, if any, importance did you attach to My Big Coin

9    being open to the public?

12:24 10   A.   Being widely available led to its credibility and that I

11   was not the single investor in this product.

12   Q.   What, if any, importance did you attach to My Big Coin

13   being widely available?

14   A.   It was advertised as globally available, not just locally

15   available, and I thought that was very important.

16   Q.   Did anyone ever tell you that you were buying coins in any

17   type of presale?

18           MR. LOPEZ:  Objection, your Honor.

19           THE COURT:  Sustained as to form, counsel.

12:24 20   BY MR. MOORE:

21   Q.   Did you think My Big Coin already existed or -- when you

22   invested, did you think My Big Coin was already a product that

23   existed?

24           MR. LOPEZ:  Objection.

25           THE COURT:  Sustained, counsel.  Form.

```
     1    BY MR. MOORE:

     2    Q.    Did you invest in My Big Coin?

     3    A.    Yes, I did.

     4    Q.    Was it explained to you if this was a current product?

     5    A.    When I bought into My Big Coin, it was already in play,

     6    had started at $3 a coin and I bought in at, I don't recall,

     7    $15 or $25 a coin.

     8    Q.    You said it was already in play, is that what you said?

     9    A.    Yes, it was.

12:25 10    Q.    Was it already being in play important to you?

    11    A.    Yes.

    12    Q.    Did anyone ever explain to you that it was a future

    13    product?

    14          MR. LOPEZ:  Objection.

    15          THE COURT:  Sustained as to form.

    16    Q.    What was the process for purchasing My Big Coin?

    17    A.    My experience was my sales were via Mark Gillespie.  There

    18    was a board for trading your coin where I did not have success

    19    trading, but Mark Gillespie handled my transactions.

12:26 20    Q.    Okay.  Did you make an initial purchase of coins from My

    21    Big Coin?

    22    A.    Yes.

    23    Q.    Do you remember the process for that initial purchase of

    24    coins?

    25    A.    Yes, I bought them from Mark Gillespie.
```

```
 1   Q.   Do you remember making a wire transfer?
 2   A.   Yes.
 3            MR. LOPEZ:  Objection.  Can we --
 4            THE COURT:  Yeah, so sustained as to form, counsel.
 5            MR. MOORE:  All right.
 6   BY MR. MOORE:
 7   Q.   You said you purchased them from Mark Gillespie?
 8   A.   Yes, I did.
 9   Q.   How did that process work?
12:26 10  A.   I followed Mark Gillespie's instructions for procuring 200
11   My Big Coin.
12   Q.   What were those instructions?
13   A.   And he had me wire a sum of money.
14   Q.   Do you remember -- do you remember making that wire?
15   A.   Yes, because it was a little complicated from my bank to
16   another bank and getting those account numbers straight.
17            MR. MOORE:  Can we bring up Exhibit 2B, page 56.
18            Can we go to May 28th, $20,936.65 transaction.
19   Q.   Do you see this transaction on the screen?
12:27 20  A.   I do.
21   Q.   Do you recognize that name, Peter B. Bell?
22   A.   Yes, I do.
23   Q.   Do you know who that is?
24   A.   It's me.
25   Q.   And is this the wire transfer that you were referencing
```

1    earlier?

2    A.    Yes.

3    Q.    Do you remember -- when you -- do you remember the money

4    that you wired to My Big Coin, do you remember where that came

5    from?

6    A.    It came from one of my accounts.

7    Q.    Do you remember which account?

8    A.    I believe my Wells Fargo account.  It could have been a

9    Wells Fargo or Bank of America.  I'm not sure.  I also had one

12:28  10   with Fidelity.  I had three purchases of My Big Coin.  I

11   don't --

12   Q.    Do you remember if when you invested that you had the full

13   amount of cash?  Do you remember if you had the full amount of

14   cash ready to invest?

15          MR. LOPEZ:  Objection.

16          THE COURT:  Sustained as to form.

17   BY MR. MOORE:

18   Q.    Do you remember if you had to do anything in order to get

19   the cash to invest?

12:28  20   A.    Thank you -- yes -- for that clarification.  One

21   particular purchase I removed money from my 401(k) plan, which

22   was with Fidelity, and that money was wire transferred.  This

23   could be that particular order.

24   Q.    And for this money removed from your 401(k), were there

25   any expenses related to that?

1     A.    Yes, there were capital gains taxes on that, early

2     withdrawal penalties, and then there was also a transaction fee

3     from My Big Coin when you bought My Big Coin.

4     Q.    Do you know the name Kim Benge -- sorry, strike that.

5           On May 28, 2014, when you made this wire transfer of

6     $20,936.65, did you know who Kim Benge was then?

7     A.    Not necessarily.  I believe it was associated with

8     Greyshore Technologies.  Greyshore something or other.  And I

9     believe she was tied into that.

12:29 10    Q.    Do you know what the My Big Coin Exchange is?

11    A.    Yes.

12    Q.    Could you explain to the jury what your understanding of

13    the exchange is?

14          MR. LOPEZ:  Objection, time frame.

15          THE COURT:  Counsel, you can clarify the time frame.

16    BY MR. MOORE:

17    Q.    Do you remember approximately when you became aware of the

18    My Big Coin Exchange?

19    A.    Almost from immediately investing in My Big Coin I was

12:30 20    made aware of the exchange.

21    Q.    So at some point in the middle of 2014, would that be

22    accurate?

23    A.    Yes, mm-hmm.

24    Q.    At that time what was your understanding of what the

25    exchange was?

A.   Comparable to the New York Stock Exchange, My Big Coin had

its own exchange of buy/sell, trade volumes, things like that,

had a barcode scenario on it.

Q.   Did you believe that real transactions were on the My Big

Coin Exchange?

A.   I did.

          MR. LOPEZ:  Objection.

          THE COURT:  Sustained as to form.

BY MR. MOORE:

Q.   Did you form a belief as to the transactions that were

shown on the My Big Coin Exchange?

A.   I did.

          MR. LOPEZ:  Objection.

          THE COURT:  Sustained.  Just form, counsel.

BY MR. MOORE:

Q.   When you looked at the My Big Coin Exchange, what did you

observe on the screen?

A.   As an investor, I knew the value of my coins and I could

see what the market was asking for, what was bid, what was

asked, what was recently sold, and so you could kind of

track -- it kind of gave you a sense of the value of your

holdings, of your investment.

Q.   You said you could see on the website what was recently

sold; is that accurate?

A.   Correct.

```
 1    Q.   Did you believe those were real transactions?

 2    A.   I did.

 3    Q.   Are you familiar with the My Big Coin Wallet?

 4    A.   Somewhat.

 5    Q.   Can you explain what understanding you had?

 6    A.   I'm sorry, somewhat -- to the extent of my understanding,

 7    wallets -- Google has a wallet, Samsung cellphone has a wallet,

 8    and this was a cutting edge for maybe 2014, 2015, but, again,

 9    that was one of the My Big Coin products.  They were going to

10    have a My Big Coin Wallet where you consolidated, I guess, your

11    account and transactions.

12              MR. MOORE:  And can we show just to the witness what's

13    been premarked for identification as Exhibit T.

14              THE COURT:  Yes.

15    BY MR. MOORE:

16    Q.   Do you recognize this item?

17    A.   Yes, I do.

18    Q.   Do you recognize this image, the whole image, not just

19    what's in the middle?

20    A.   Yes.

21    Q.   How do you recognize it?

22    A.   It's the card that I was sent for -- it was the, I guess,

23    anticipated promised product that My Big Coin had been talking

24    about, that you'd get a credit card to use against -- that

25    would debit against your My Big Coin balance.
```

```
 1   Q.   And this image right here, did you capture this image?
 2   A.   Yes, I did.
 3   Q.   And is it an accurate representation of the image that you
 4   captured?
 5   A.   It's my card, and I -- that's my copyright there, mm-hmm.
 6            MR. MOORE:  Move to admit Exhibit T, your Honor.
 7            THE COURT:  Just so I'm clear, there's some
 8   handwriting at the top.
 9   BY MR. MOORE:
10   Q.   Who put the handwriting on this page?
11   A.   That's my handwriting.
12   Q.   And then there's a "K" in the top left hand corner.  Who
13   put the "K" on this page as well?
14   A.   That's my writing, but I don't remember what the "K" was
15   for.
16   Q.   When you submitted these images to the government, it was
17   with this handwriting that was already on it; is that accurate?
18   A.   Correct, yes.
19            MR. MOORE:  Move to admit, your Honor.
20            THE COURT:  Any objection?
21            MR. LOPEZ:  Object.
22            THE COURT:  Basis in a word, counsel?
23            MR. LOPEZ:  There's a statement on it that is hearsay.
24            THE COURT:  Counsel, what do you say to that,
25   Mr. Moore?
```

1          MR. MOORE:  We'd be happy to redact that.  I think the

2   witness is going to testify to the basis of that statement.

3          THE COURT:  Is there a way to just show -- can we just

4   put it on the ELMO?

5          (Discussion off the record.)

6          THE COURT:  If we just zoom in from underneath.

7          Any objection now?

8          MR. LOPEZ:  No, your Honor.

9          THE COURT:  So it can be the next number,

12:34 10   Ms. Hourihan.

11          THE CLERK:  37.

12          THE COURT:  37.

13          (Exhibit 37 received into evidence.)

14          THE COURT:  This can be published.  Thank you.

15   BY MR. MOORE:

16   Q.   So is this the card that you received?

17   A.   Correct.

18   Q.   Did this card work?

19   A.   I never tried it.  I called the bank to find out what the

12:35 20   process was to verify how it was going to work, and they seemed

21   to have no idea what I was talking about.

22   Q.   Do you remember if this was a credit card?

23   A.   Yes, basically a dual credit card/debit card -- although

24   this one says "debit card" only, so I guess this was a debit

25   only.

1    Q.   So do you have any basis to believe it's a credit card?

2    A.   When I got it -- I have enough credit cards, I didn't need

3    another credit card.  I was trying to understand what this was.

4    Of course it says it's a debit card, and I'd never had a debit

5    card before, so --

6    Q.   Does this card say "My Big Coin" on it?

7    A.   It does not.

8    Q.   So you're saying you never did any transaction with this

9    card; is that accurate?

12:36 10    A.   No.  I called the bank --

11            MR. LOPEZ:  Objection.

12            THE COURT:  Well, the part about "I called the bank"

13    may stand, but we'll stop there.

14            Counsel, Mr. Moore, next question.

15            MR. MOORE:  Can we bring just to the witness what's

16    been premarked as Exhibit U.

17            All right.

18            MR. LOPEZ:  Objection, same issue.

19            THE COURT:  Okay.  Why don't we otherwise lay the

12:36 20    foundation.

21    BY MR. MOORE:

22    Q.   Do you recognize this image?

23    A.   Yes, I do.

24    Q.   Did you take this image?

25    A.   Yes, I did.

```
 1   Q.   Is this an accurate representation of the website you were
 2   on?
 3   A.   Correct.
 4   Q.   And what website were you on?
 5   A.   The My Big Coin site.
 6   Q.   All right.
 7        MR. MOORE:  Your Honor, we would move to --
 8   Q.   Do you remember when you took this image?
 9   A.   I dated it August 22, 2016.
12:37 10      MR. MOORE:  All right.  Your Honor, we would move to
11   admit this exhibit.
12        THE COURT:  Okay.
13        MR. LOPEZ:  Note my objection, your Honor.
14        THE COURT:  Okay.  So, Mr. Lopez, are you objecting to
15   what's appearing at the top and --
16        MR. LOPEZ:  I would have preferred that the document
17   was shown to the jury without the printed information and then
18   if the witness testified to that and didn't use a document to
19   refresh his memory, then it would be admissible, but having
12:37 20   said that, I'll just note my objection.
21        THE COURT:  Okay.  Objection noted.  Given the
22   testimony about the date, I would allow that.
23        I guess, counsel, if you can show it without what's at
24   the very top, the significance of which I don't think has been
25   explained.  So if we can redact it from there, I'll allow U as,
```

1    what, 38?

2            THE CLERK:  Yes.

3            (Exhibit 38 received into evidence.)

4            THE COURT:  Thank you.

5            It can be published.

6    BY MR. MOORE:

7    Q.   And so is this what the My Big Coin website looked like?

8            MR. LOPEZ:  Objection.

9            My Big Coin Exchange.

12:38 10         THE COURT:  Okay.  Counsel, you can rephrase to make

11   clear what we're talking about.

12   BY MR. MOORE:

13   Q.   Is this what the My Big Coin Exchange website looked like?

14   A.   Yes, and it's a footprint of the pricing --

15           MR. LOPEZ:  Objection.  He answered the question, your

16   Honor.

17           THE COURT:  Sustained.  You can ask the next question.

18   BY MR. MOORE:

19   Q.   And what is this?

12:39 20   A.   I'm sorry.

21   Q.   And so -- so what is this that we're looking at?

22   A.   So, yeah, this is a footprint of the exchange history and

23   on the right you see all-time trades.  The latest is 280.  The

24   highest it's ever been was 500, the lowest was 60.

25           If you go over to the left side, people that have been

1    selling, 100 for 750, 6 sold for 600, 10 sold for 680, so on,

2    so forth.

3              Latest trades are on the right side, and -- so if you

4    looked at that, at the very bottom, somebody bought 60 for 400,

5    somebody bought 10 for 400, somebody bought 30 for 500.

6    Somebody is selling 80 for 190.

7    Q.   All right.

8    A.   So on, so forth.

9    Q.   In the top right corner, where it's circled, it says 280.

12:40 10   Did you have an understanding of what that 280 meant?

11   A.   Yeah, so 280 was, if you will, today's price.

12   Q.   Me and you have met before today; is that accurate?

13   A.   Correct.

14   Q.   Did you provide the government with text message exchanges

15   between you and the defendant?

16   A.   Yes, I did.

17   Q.   Have you had an opportunity to --

18              MR. MOORE:  Can we actually show just to the witness

19   what's been marked as Exhibit S, premarked as Exhibit S.

12:40 20   Q.   Did you provide to the government text message exchanges

21   between you and the defendant?

22   A.   Yes.

23   Q.   Have you had an opportunity before now to review what has

24   been premarked as Exhibit S?

25   A.   Yes.

```
 1   Q.   Is that a fair and accurate representation of the text

 2   messages between you and the defendant?

 3   A.   Yes.

 4           MR. MOORE:  Your Honor, I move to admit Exhibit S.

 5           THE COURT:  Any objection?

 6           MR. LOPEZ:  No objection, your Honor.

 7           THE COURT:  They may be admitted as Exhibit 39.

 8           (Exhibit 39 received into evidence.)

 9           MR. MOORE:  Can we go to line 1:2.

12:41 10  BY MR. MOORE:

11   Q.   And here you say, Hi, Randall, I've had 600 MBC posted on

12   the exchange at 265 for over a week.  The exchange is at 280

13   and they haven't moved.  What's up?  This is unlike any

14   exchange I've ever seen where typical a few cents difference

15   sees shares fly off the board, never mind a $15 per share

16   difference.  Please advise.  Thank you.

17           Can you explain to the jury what you were trying to

18   communicate in this message?

19   A.   For those of you who are familiar with the stock market,

12:41 20  just using IBM as an example, if it trades at 100 and you want

21   to get out and you put your shares up for sale of IBM for $98,

22   they would go -- they would disappear very quickly.  Never mind

23   if you put them on the grid for $85, they'd -- you'd hardly hit

24   "send."

25           So that would be the analogy.
```

```
 1              So here we are with this exchange and the cryptocoin
 2     market, actually, they have their board and it's no different,
 3     it's like a cardiac needle moving on a graph.  And the My Big
 4     Coin Exchange seemed to be very static.  And I put mine at $15
 5     below market, so that was giving somebody, I think, an
 6     excellent discount.  And they had been there for a week and
 7     nobody made me an offer.  Hence, my polite question.
 8              MR. MOORE:  All right.  Can we go to 1:3.
 9     Q.   And here the defendant responds back, I know a ton sold
12:43 10    the other day.
11              What did you understand him to mean when he said "I
12     know a ton sold the other day"?
13     A.   Well, that's good news if you're trying to get rid of
14     something, but I didn't see where the ton was listed on his
15     exchange, and I didn't know what the definitive word -- what a
16     "ton" meant, what was the quantity.  So on the one hand that
17     was great news, but on the other hand I didn't see where the
18     exchange happened on his exchange.
19     Q.   And did you have an understanding of who ran the My Big
12:43 20    Coin Exchange?
21     A.   I believe it was Randall Crater.
22              MR. MOORE:  Can we go to 1:5.
23     Q.   You write, It's a global exchange, so there should all be
24     possible but then if you sold a ton, my 600 is mere bagatelle.
25     Where's the glitch?
```

1          What did you mean by this message?

2    A.   I meant exactly that, if he sold a ton, which might be

3    thousands, of My Big Coin, that 600, my 600 was, you know,

4    peanuts.  So why weren't my peanuts moving if he had sold a

5    ton?

6          MR. MOORE:  Can we go to 1:20, please.

7    Q.   You say, I'm about the 600 MBC I've offered on the

8    exchange for a mere 265 each and a week later they're still

9    there.

12:44 10          What did you mean by this?

11   A.   His previous email had said something about energy, and I

12   have no idea what that had to do with anything I was trying to

13   attempt.  So I said, Right church, wrong pew, like, did he read

14   the wrong text.  Because my concern was I'm about the 600 My

15   Big Coin I've offered on the exchange for 265 and they're still

16   there.

17          MR. MOORE:  Can we go to 1:21 on the next page.

18   Q.   And then the defendant responds back, They will be gone.

19          What did you understand him to be saying there?

12:45 20   A.   That at some point they'll sell.

21          MR. MOORE:  Can we go to 1:24.

22   Q.   Here you say, almost 2 weeks at $15 below market, 265

23   versus 280, and they're still sitting there.  Never happened in

24   a million years on an exchange.  I'm in Vegas.  Should I swing

25   by the office?

1              What did you mean when you say "never happened in a

2    million years on an exchange"?

3              MR. LOPEZ:  Objection, your Honor.  It speaks for

4    itself.

5              THE COURT:  Well, overruled.

6              You can answer.

7    A.   In a global marketplace, somebody is out there who will

8    take advantage of a severe discount, and $15 off of the list

9    price, if you will, was a steep discount.  So I just couldn't

12:46 10   believe they weren't selling.

11   Q.   And you also say, "I'm in Vegas.  Should I swing by the

12   office?"

13             What did you mean by that?

14   A.   For the last 20 years I've had to go to Las Vegas on

15   business about twice a year, and so I just threw that out

16   because he had advertised he had an office in Las Vegas.

17   Q.   Were you ever able to verify that the defendant did have

18   an office in Las Vegas?

19   A.   Actually, I knew before I said it that he did not, so I

12:47 20   was just throwing some smoke his way.

21             MR. MOORE:  If we go down to 1:25.

22   Q.   All right.  Here the defendant says, Go by wherever you

23   want to first.  I don't control the exchange at all, and what

24   people put their coins for sale at, what price.  So this is

25   never happens in.

```
 1              Did you have a conversation at any point with Mark
 2    Gillespie about the prices on the My Big Coin Exchange?
 3    A.   I did, mm-hmm.
 4    Q.   And what did you learn from that conversation?
 5              MR. LOPEZ:  Objection.
 6              THE COURT:  Well --
 7              MR. LOPEZ:  Time frame.
 8              THE COURT:  You can clarify time frame, counsel.
 9    BY MR. MOORE:
12:47 10 Q.   Do you remember approximately when that conversation would
11    have been?
12    A.   Yeah, this would have been August of 2016.
13    Q.   And what did you learn from that exchange, or that
14    conversation with Mr. Gillespie.
15    A.   So Mark -- Mark and I, we go way back, so that's why I
16    trusted him.
17              I asked him, I said, Mark, this exchange is very
18    static, it doesn't move, it seems whimsical, it seems
19    arbitrary.  I mean, what happens?  Does Randall wake up in the
12:48 20 morning and decide 280 is a good price or 600 is a good price
21    to sell?  And he said, Yeah, that's about how it works.
22              I was like, Oh, my God.
23    Q.   Was that surprising to you, to learn that information?
24    A.   Yeah, the market doesn't work that way.
25    Q.   Before then, before that conversation with Mr. Gillespie,
```

```
 1    was it your understanding that the defendant controlled the
 2    prices on the exchange?
 3              MR. LOPEZ:  Objection.
 4    A.    No, I thought the market --
 5              THE COURT:  Sustained as to form, counsel.
 6              MR. LOPEZ:  Move to strike.
 7              THE COURT:  To the extent there was the beginning of
 8    an answer, it's struck.
 9              Moore, you can ask another question.
10    BY MR. MOORE:
11    Q.    So you said in approximately August 2016, make sure I
12    understand this correctly, you said Mr. Gillespie told you that
13    Mr. Crater controlled the prices on the exchange.  Is that
14    accurate what your testimony was?
15    A.    Yes.
16    Q.    Did that conversation change your understanding of how the
17    My Big Coin Exchange platform worked?
18    A.    It kind of cemented that it was an arbitrary -- it was a
19    wish list board.  It was not driven by real pricing, people,
20    real consumers driving the price up and down or demand.
21    Q.    Were you interested in transacting on that type of
22    exchange?
23    A.    No.
24              MR. MOORE:  Can we go to 1:27.
25    Q.    And here the start of the last sentence, you said, MBC
```

1    boasts 24/7 trades and I've had 600 posted at 265 for almost 2

2    weeks, $15 below the stated $280 market price, a steal in any

3    market.  What's the holdup?

4         Do you remember what your general feelings were when

5    you sent this message?

6    A.   Well, so I had been negotiating to get my money back, just

7    politely working the web to get my money back, how to retrieve

8    my money back from the My Big Coin investment.  And My Big Coin

9    was -- part of driving its value was it would be a limited

12:50 10   production, they'd release 1 million coins a year to keep that,

11   which would make it a more valuable product.

12        So my 600 coins, again, at 265, $15 below market

13   price, they should just be purchased very quickly.

14        MR. MOORE:  Can we go to 1:28.

15   Q.   And then here you note that 2 plus weeks on and my 600 MBC

16   haven't traded in spite of being offered below market; in my

17   stack of mail an unsolicited inquiry from the Commodity Futures

18   Trading Commission Re: My Big Coin Pay, Shot Spirits and

19   Greyshore Technology.

12:51 20        Was the inquiry from the CFTC, was it actually

21   unsolicited?

22   A.   No.

23   Q.   Why is that?

24   A.   Well, at this point I was -- we were implored to do our

25   due diligence, which due diligence is something you do before

1   you dive into the deep end of the swimming pool.  You don't do

2   it after you're in the deep end.

3          But it seemed the insiders on the My Big Coin side,

4   whenever you asked a fair, reasonable question, it was always,

5   "Do your due diligence."

6          So I started doing my due diligence, one thing led to

7   the other, so I reached out to the FDC and CFTC to ask, Is

8   there a company called My Big Coin?  Do they have to be

9   registered if they really exist, or can they exist as they

12:52 10   exist, or what's the story?

11          And they got very interested in My Big Coin at that

12   point.

13   Q.   So is it your testimony that you reached out to people who

14   worked in the government about your concerns about My Big Coin?

15   A.   Yes, so things at this point were in play and My Big Coin

16   Pay was merging with Shot Spirits, and there was a company

17   Greyshore Technology, and they were asking me about these

18   questions.

19   Q.   And your reach-out to people in the government, did that

12:52 20   occur after your conversation with Mr. Gillespie?  Do you

21   remember?

22   A.   I would say after my conversation with Mark.

23          MR. LOPEZ:  Time frame?  Are we in August?

24          THE COURT:  Counsel, I -- I think that was clear, but

25   you can ask on cross.

```
 1              Counsel, next question.

 2              MR. MOORE:  Can we go down to 1:32, and 1:33, give me

 3    both of those.

 4    Q.   Here in August 2016, the defendant says, They will be gone

 5    very soon, I can assure you, and you will be very happy.

 6              Do you remember if shortly after this text message

 7    anyone bought your coins on the My Big Coin Exchange.

 8    A.   No.

 9              MR. MOORE:  Can we go down to 1:43.

12:54 10   Q.   Here the defendant says, I'm installing the first ATM

11    machines for us right now, sir.  Call you after I'm out of the

12    location, very exciting day.

13              Did you have an understanding of what the defendant

14    was referencing by "the first ATM machines"?

15    A.   That it was another product that My Big Coin was

16    introducing to the marketplace and they were going to be ATM

17    machines where you could use your debit card and it would debit

18    against your My Big Coin balance.

19    Q.   Have you ever seen one of these contemplated ATM machines?

12:54 20   A.   I have not.

21              MR. MOORE:  Can we go to 1:70.  And let's do 1:71 as

22    well.  Sorry.

23    Q.   Here you say, Randall, I haven't heard back from you, so

24    I've gone ahead and put 600 coins up for sale on the exchange

25    for $150 each.  Shocked they didn't fly off the shelf with --
```

1    you have in quotation marks -- the market at $280.

2           And Randall responds back, They will.

3           Why did you put "the market" in quotation marks?

4    A.   At this point I think I've been trying to get my money

5    back for six months via an exchange that should be a

6    transaction that happened within a matter of minutes, if not

7    hours, and it's taken me whatever the dates are, five, six

8    months.  So a little tongue-in-cheek with "the market."

9    Q.   And he responds back, They will.

12:55 10          Do you remember if in November of 2016 you were able

11   to transact coins on the My Big Coin Exchange?

12   A.   I was not.

13          MR. MOORE:  Can we go to 179.

14   Q.   Here the defendant says, There was 400k worth sold just

15   last week.  I don't control who or how they sale.  They do

16   sell.

17          Did you see any evidence of this 400k transaction?

18   A.   No, I don't recall seeing it on the board.

19          MR. MOORE:  All right.  And at 187.

12:56 20   Q.   Here you say, if 400 sold how/where/via what mechanism and

21   for how much per coin?

22          And then let's go down to 190.

23   Q.   Here the defendant responds back, It's not if 400 sold,

24   they did sell, that's fact.

25          Did you believe that statement when the defendant said

1    it?

2    A.   No.  Which is like -- goes back to the prior slide --

3         MR. LOPEZ:  Objection, your Honor.

4         THE COURT:  Well, sustained since there's no question

5    pending, so, counsel.

6    BY MR. MOORE:

7    Q.   Why didn't you believe it?

8    A.   It wasn't showing up on the board.

9         MR. MOORE:  Can we go to 134.

12:57 10       I'm sorry, 134, sorry.

11   Q.   Here, starting after the comma, you say, We're now into

12   week three wherein I have 600 coins for sale on the exchange

13   for $150 each, which is a 47 percent discount off of list

14   posted exchange rate of $280 and obviously no movement.  Not

15   casting stones, just saying.

16        The defendant responds back to you at 135 and 136

17   saying, You want your coins sold, correct?  Yes or no.

18        And then at 137 you say, Yes.

19        And the defendant at 135 -- sorry, at 138 responds

12:58 20   back, Okay, it will be done by tomorrow.

21        Do you remember if on December 6, 2016, as the

22   defendant indicated, that your coins would be sold?

23   A.   They were not sold.

24        MR. MOORE:  All right.  Let's go down to 142, and 143,

25   get them both.

1    Q.   Here the defendant says to you, Already have client on it

2    for you.  It's done, just working a few things out.

3         What did you understand him to mean when he says he

4    has a client for you?

5    A.   Well, on the big board you certainly don't call Bob and

6    negotiate sales like this, so I guess he was -- he had found a

7    buyer for my coin at $150 and was getting them to buy my coin

8    at this discount.

9    Q.   Okay.  And then we'll go down to 146.

12:59 10        In the previous message you had asked about what you

11   need to do.  The defendant responds back at 146, It's being

12   handled, you nothing to do.

13        And then at 148 he says, They will send funds to you

14   direct.

15        Do you recall if that occurred, if a third-party buyer

16   sent you funds directly for My Big Coins?

17   A.   I never received funds.  There might have been a

18   transaction on the other end, but I did not receive any funds.

19        MR. MOORE:  All right.  And at 1:296.

12:59 20   Q.   Okay.  You write, Okay, but do you realize these moving

21   time tables are becoming increasingly bewildering.  I have

22   traded in currencies, not just the euro, crypto, stocks, bonds,

23   et cetera, and the longest any of these transactions have

24   required perhaps a week, maybe two at very most.  I started

25   this MBC effort some time ago.

1          And the defendant responds back at 297, Sorry it's
2     taken time.  Look, Peter, I'm working with hand and hand on
3     this.  I can assure you it's being felt with, sir.
4          What did you understand was going on in this exchange?
5     A.   Well, I always kept things cordial and civil, and I think
6     he did his best as well, but nevertheless, the transaction
7     wasn't happening, at least there wasn't money showing up in my
8     account.  And clearly he says he's working on it, giving it his
9     personal attention.
01:00 10    Q.   And then at 310 --
11          THE COURT:  Counsel, I don't know how much longer you
12     have, and Mr. Lopez may have cross-examination, we'll have to
13     stop here.
14          MR. MOORE:  Yes, your Honor.
15          THE COURT:  Sir, I'm going to have to have you step
16     down because we're going to take a break, and we'll resume at
17     2:00.  Thank you.
18          THE WITNESS:  Thank you.
19          THE COURT:  You can step down.
01:01 20         Jurors, we'll take our break now and please be back in
21     the jury room a little before 2:00 and we'll take up the
22     testimony then.
23          Thank you.
24          THE CLERK:  All rise for the jury.
25          (Jury left the courtroom.)

1          THE COURT:  Sir, you can step down, thank you.

2          (Witness left the courtroom.)

3          THE COURT:  Counsel, we had a hard stop then not just

4    for the jury, but also because the jackhammering that had

5    stopped is going to pick up between 1:05 and 1:45.  And then I

6    think it's going to pick up again at 4:05.

7          So, counsel, I think we should -- counsel should come

8    back with Mr. Crater at what, Ms. Hourihan, 1:55, so I can talk

9    to you about scheduling for tomorrow and what I hopefully can

01:02 10   tell the jury in terms of a preview for at least tomorrow and

11   maybe the rest of the week, and then just to firm up scheduling

12   as to the charge conference.  Okay?

13         Anything else before we break?

14         MR. LOPEZ:  No, your Honor.

15         THE COURT:  Okay.  Thank you.

16         (Recess taken.)

17         (Resumed, 1:59 p.m.)

18         THE COURT:  My apologies, counsel.  I was aware of the

19   time.  I was just trying to look through something with your

01:59 20   charge, your proposed instructions so I could address it with

21   you.

22         Counsel, just first on the government's anticipation

23   of where they're going to be and when they're going to rest?

24         MR. MARKHAM:  Your Honor, I anticipate we will rest

25   tomorrow morning before the 11:00 break.

```
 1              THE COURT:  Counsel, where are we going from here
 2    today?  And then you can just take me through the rest.  We're
 3    finishing Mr. Bell.
 4              MR. MARKHAM:  Yes, Your Honor, and then the next three
 5    witnesses, Salvatore Olivo, Joseph Guidoboni from the IRS, and
 6    Theodore Vlahakis from the U.S. Treasury.  They should be short
 7    witnesses.  So we're hoping to get through those three before
 8    the end of the day.
 9              THE COURT:  Okay.
```
02:00
```
10              MR. MARKHAM:  Then the last will be Kathleen
11    Brekenfeld, who may not be able to get on until tomorrow.
12              THE COURT:  Even if you start with her, you don't
13    anticipate finishing with her?
14              MR. MARKHAM:  No, Your Honor.  She's about an hour.
15              THE COURT:  Okay.  Counsel on the defense side, who
16    are your witnesses that you're planning to call?
17              MR. LOPEZ:  So tomorrow -- if I could just have a
18    moment, Your Honor.
19              THE COURT:  Sure.
```
02:01
```
20              MR. LOPEZ:  It might be faster to do it this way.
21              Do you want them in the order that they're going to
22    go?
23              THE COURT:  Sure, yeah.
24              MR. LOPEZ:  Haven't really -- do you want to do the
25    Zooms first?
```

```
 1              THE COURT:  Counsel, and, Ms. Hourihan, is there --
 2              (Discussion off the record.)
 3              THE COURT:  Okay.  So counsel, I think it's your
 4      preference.  From a technical standpoint I think we could do
 5      either.
 6              MR. LOPEZ:  So Tom Johnson.
 7              THE COURT:  Tom Johnson, yes.
 8              MR. LOPEZ:  Ken Hess.
 9              THE COURT:  Ken Hess, yeah.
02:01 10              MR. LOPEZ:  Mark Gillespie.
11              THE COURT:  Mark Gillespie, yes.
12              MR. LOPEZ:  Tom Callahan.
13              THE COURT:  Tom Callahan, yeah.
14              MR. LOPEZ:  John Gifford.
15              THE COURT:  John Gifford.
16              MR. LOPEZ:  Richard Galvin.
17              THE COURT:  Yeah.
18              MR. LOPEZ:  Michael Singleton.
19              THE COURT:  Yeah.
02:02 20              MR. LOPEZ:  Our expert, Nodari Gogoberidze.
21              THE COURT:  Singleton, then your expert.
22              MR. LOPEZ:  And possibly Justine Mahoney.
23              THE COURT:  Okay.
24              MR. LOPEZ:  Then Mr. Crater will decide whether he
25      intends to testify as well.
```

```
 1              THE COURT:  And so counsel, you'll be ready to start
 2    tomorrow?
 3              MR. LOPEZ:  I will.
 4              THE COURT:  And so it sounds like early.  So the only
 5    thing I would ask is you just let Ms. Hourihan know, she said
 6    it takes a few minutes, obviously, to switch us all over, to
 7    make sure the connection is working correctly through the Court
 8    system.
 9              MR. LOPEZ:  I haven't done Zoom in a courtroom, so in
10    terms of sharing documents, is that something that the clerk
11    does or that I do or --
12              THE CLERK:  Oh.
13              THE COURT:  So my memory is, and Ms. Hourihan can jump
14    in here, my memory is, counsel, people often arrange to have
15    the documents with the witness --
16              MR. LOPEZ:  Okay.
17              THE COURT:  -- so that they can be looking at whatever
18    you're going to use.
19              MR. LOPEZ:  Okay.
20              THE COURT:  And that's -- and then you can separately
21    be displaying it probably on the ELMO, Ms. Hourihan?
22              MR. LOPEZ:  That's fine.
23              (Discussion of the record.)
24              THE COURT:  Right.  So it will be in a small box for
25    the witness if you show it on the ELMO but the jury will see
```

1      it.

2                 THE CLERK:  No.

3                 THE COURT:  Oh, they won't?  Right.  So the Zoom is

4      being shown through the same system, counsel, which is why, if

5      you want to use documents with the witness, they should have a

6      copy on their end.

7                 MR. LOPEZ:  That's fine.

8                 THE COURT:  Okay.

9                 All right.  And counsel, I understood the situation as

02:04  10     to Mr. Galvin for Zoom.  At least as I have it, it sounds like

11     Mr. -- or at least the certificate of service suggested

12     Mr. Gifford hadn't been served yet.  Have you been in touch

13     with him?

14                 MR. LOPEZ:  I am waiting to hear back from my private

15     investigator.  We've talked to him before.  He said he was

16     willing, even before he was served, he was willing to do it via

17     Zoom.

18                 THE COURT:  Okay.  So counsel, I would just say

19     that -- and how long do you anticipate each of them, the two

02:04  20     Zoom witnesses?

21                 MR. LOPEZ:  I don't expect either one of them to be

22     more than half an hour.

23                 THE COURT:  And both tomorrow I'm assuming.

24                 MR. LOPEZ:  That would probably be best.

25                 THE COURT:  Yeah.  And then, counsel, of the people

1    you named, are they all relatively short, meaning how far do

2    you think you're going to get on this list tomorrow?

3           MR. LOPEZ:  The only one that will be on the longer

4    side will be Mark Gillespie.

5           THE COURT:  Okay.

6           MR. LOPEZ:  And I'm still waiting to hear whether or

7    not one other witness, Larry Brantley, actually made it on the

8    plane.

9           THE COURT:  Okay.  He wasn't on this list.

02:05 10       MR. LOPEZ:  No.

11          THE COURT:  So counsel, my practice is, and I don't

12   want to -- I want us to get the jury so we can keep moving

13   forward, but my usual practice is after the government rests,

14   I'd hear you probably on Whisper Tech to preserve any issues or

15   motions you may have, and then I'll explain to the jury again

16   that Mr. Crater has no obligation to put on any evidence but

17   this is the time when he would do it if he chooses to do so,

18   and then I'll turn to you to start your case.  Okay.

19          MR. LOPEZ:  I have two scheduling balls that are up in

02:05 20   the air.  Tom Callahan cannot make it in the morning.  So I

21   anticipate him in the afternoon.

22          THE COURT:  Okay.

23          MR. LOPEZ:  My expert also had to take tomorrow off

24   from work, so I want to get him on and off.

25          THE COURT:  So you can tell me the actual sequence

1    tomorrow, counsel.  It's more that you tell your brothers on

2    the other side.  The other thing is I'll ask you before we

3    break today about any disputed exhibits you think are going to

4    come up so I can look at those before tomorrow.

5             Counsel, and Ms. Hourihan, why don't you get the jury.

6             MR. LOPEZ:  Your Honor, on that point --

7             THE COURT:  Anything that's affecting her getting the

8    jury?

9             MR. LOPEZ:  No.

02:06 10          THE COURT:  Okay.

11            MR. LOPEZ:  Up until a couple of hours ago I wasn't

12   certain whether or not Mr. Gillespie was actually going to

13   testify.

14            THE COURT:  Sure.

15            MR. LOPEZ:  So there may be exhibits I'll seek to

16   introduce through him that I just haven't put together yet.

17            THE COURT:  Okay.  Counsel, I'll take that up

18   separately, but if there are additional exhibits that haven't

19   been marked and identified that you're planning to admit, I'd

02:06 20  want to talk about that tomorrow.  Okay.

21            Mr. Markham, briefly?

22            MR. MARKHAM:  Yes, I would just note we can't provide

23   our objections to the Court until we've seen them.  So I don't

24   know when you'll get those, Your Honor, our objections.

25            THE COURT:  All right.  So I would say my hope would

```
 1    be by -- well, by tomorrow morning so that I can see them, too.
 2    Preferably they'd be later today, counsel, so I could hear
 3    objections to any.
 4              MR. LOPEZ:  I'm meeting with Mr. Gillespie at 5:00
 5    p.m. at my office.  I'll go through the documents.  I will send
 6    a copy to my brother just as soon thereafter as I can.
 7              THE COURT:  Okay.  And counsel --
 8              MR. MARKHAM:  I would just say, Your Honor, depending
 9    what time we get them at night, I don't know if we'll have
02:07 10    objections for you.
11              THE COURT:  Sure.  We'll take it up in the morning.
12    Then on the jury charge, I had some thoughts that I'll probably
13    go just get.  I wanted to run by you before our charge
14    conference just to ask about certain of the proposals.
15              THE CLERK:  All rise for the jury.
16              (Jury enters the courtroom.)
17              THE COURT:  And we can have the witness, Mr. Bell,
18    come back in.  Thank you.
19              THE CLERK:  Court is in session.  Please be seated.
02:08 20    THE COURT:  Jurors, thank you for your patience.  We
21    took a few more minutes so I could talk over scheduling with
22    counsel, and I'll give you an update about that at the end of
23    today.
24              Thank you, Mr. Bell.  Mr. Moore.
25              MR. MOORE:  Yes, Your Honor.  Apologies.  It's taking
```

1    a moment for it to pop up on the screen.

2         THE CLERK:  I don't know what's coming up.  I didn't

3    have anything.

4         MR. MOORE:  I pulled the --

5         THE CLERK:  Do you want me to put it on?

6    Q.   All right.  I'll direct your attention to 1:310, there you

7    say, "Randall, deeds my friend.  At the end of the day I've had

8    coin for sale at or below market since May and at 47 percent

9    below market about the last six weeks.  Wherever any funds

02:10 10   might be, they're clearly not in my account.  How complicated

11   is that?

12        THE COURT:  Again, this is Exhibit 39 for the record?

13        MR. MOORE:  Yes, Your Honor.

14   Q.   And then at 311 the defendant responds back, "Well, you

15   actually posted it on the wrong site.  That's your fault but I

16   fixed it and got it handled for you, so that's on you, not me

17   Peter."

18        What did you understand the defendant to mean when he said

19   "Well, you actually posted it on the wrong site"?

02:11 20   A.   Well, at this point it was always something.  So now it's

21   my fault.  So I'd been trying to get my funds for over six

22   months, and here in the inth hour, if you will, oh, I've done

23   it all wrong.  I've handled the transaction incorrectly.  So

24   now we've got that fixed and it's going to work.

25   Q.   And he says "I fixed it and got it handled for you."  What

```
 1   did you take that to mean?
 2   A.   That he's in charge and he's the mechanic and he can get
 3   in there and make it happen.
 4   Q.   All right.  And then at 312 you respond back in that first
 5   line, "I have no idea what you're talking about."  What did you
 6   mean by that?
 7   A.   Well, all of a sudden I had done something wrong when, in
 8   fact, I've done the process before the same way, the initial
 9   purchase.
02:12 10  Q.   All right.  Then let's go to 313 and 314.  And Randall
11   states, "I'll show you how you messed up."  And you respond
12   back, "So that is another story for sure."
13        What did you mean by "that is another story for sure"?
14   A.   Here we go again.
15   Q.   And he says, "I'll show you how you messed up."  Did he
16   ever provide you with an explanation for how you supposedly
17   messed up?
18   A.   He did not.
19   Q.   And can we go to 334.  You say, "This venture has yet to
02:12 20  hit one timeline.  Since I've been on board with MBC as a
21   patient investor, not one of Mark's projected events has
22   happened, which is why I shifted my conversation over to you.
23   In the law few weeks you've been busy buying banks, you've had
24   40 something containers in transit and now are possibly selling
25   the company.  In the midst of all of that, my coin has been
```

1    sold, removed from the exchange, and a check is in the mail.

2    Now then, what am I supposed to start thinking?  Here is an

3    easy solution.  Wire the funds in the morning and you're a

4    prince.  No need for any more chats after that."

5        Here you make a reference to that "you've been buying

6    banks."  What does that reference mean?

7    A.   Oh, well, Randall is a very busy man and had a lot of

8    different businesses and ventures going on and he said he was

9    buying banks.  He had a ship or two with 40 something

02:13 10   containers on their way from wherever to America with different

11   goods.  I'm not clear on what.  He just had a lot of

12   transactions going on, very busy man.

13   Q.   All right.  Did he ever provide you any evidence that he

14   was in the process of purchasing a bank?

15   A.   No.

16   Q.   Did he ever provide you any evidence that he had 40

17   something containers that were currently in transit?

18   A.   No.

19        MR. MOORE:  Can we go to 366, actually 366, 367 and

02:14 20   368 all at once.

21   Q.   Here you say, "Is this or is it not your company?  Because

22   if it is your company and I, as your customer or shareholder,

23   have given you money, you work for me.  If it's not your

24   company, then why have you been wasting my time?"

25        After you sent this message to the defendant, did he ever

```
 1    indicate that My Big Coin is not his company?
 2    A.   Well, at this point in time I had been going a similar
 3    route with Mark Gillespie, who was something of a liaison, and
 4    now it seemed like I was in a comparable path with Randall
 5    Crater, and so my question was, well, maybe it's not your
 6    company either.  It wasn't Mark Gillespie's company, maybe it's
 7    not Randall's company.  Who's on first?
 8    Q.   Did Randall indicate that there was someone above him that
 9    you should be talking to?
 10   A.   No.
 11   Q.   At some point did you receive a check from the defendant?
 12   A.   Yes, I did.
 13   Q.   Do you remember approximately how much that check was?
 14   A.   $90,000.
 15   Q.   Was that more or less than you initially invested in My
 16   Big Coin, do you remember?
 17   A.   It was more.
 18   Q.   All right.  Do you understand why -- do you have an
 19   understanding of why the check you got back was for more?
 20        MR. LOPEZ:  Objection.
 21        THE COURT:  Sustained as to form.
 22   Q.   Why was the check for more?
 23        MR. LOPEZ:  Objection.
 24        THE COURT:  Well, sustained.  You can ask another
 25   question.
```

```
 1   Q.   All right.  Did you have discussions with the defendant
 2   about how much the check should be?
 3   A.   Well, so I guess my --
 4             MR. LOPEZ:  It's a yes or no.
 5             THE COURT:  Well, sustained as to that.  The question
 6   was, Did you have discussions with the defendant about how much
 7   the check should be.
 8             MR. MOORE:  I didn't hear the objection, Your Honor.
 9   I'm sorry.  What was it?
10             THE COURT:  It was -- I'm assuming it was
11   responsiveness.
12             MR. MOORE:  Okay.
13             THE COURT:  I'm going back to repeat your question.
14             Did you have discussions with the defendant about how
15   much the check should be?
16   A.   Yes.
17   Q.   All right.  And it was -- what were the nature of those
18   discussions?
19   A.   And so basically the market for the coin was $280.  I
20   wanted $150 per coin.  I had 600 coins.  He agreed to pay me
21   $150 per coin.
22   Q.   Okay.  And do you remember approximately how long you had
23   had money invested in My Big Coin at that time, approximately?
24   A.   I guess three years, something like that.
25   Q.   Do you remember us talking before the break about you text
```

1    messaging the defendant that you had had contact with the CFTC?

2    Do you remember us previously discussing that?

3    A.    Yes.

4    Q.    Do you know if the check you received from the defendant

5    was received before you sent that text message about the CFTC

6    or after you received that text message about the CFTC?

7    A.    After.

8    Q.    And that check, did that check come from the defendant

9    Randall Crater?

02:17 10   A.    Yes, it did.

11   Q.    It didn't come from a third-party buyer; is that accurate?

12   A.    No.   It did not come from a third-party buyer.

13         MR. MOORE:   Okay.   Thank you.   Nothing further.

14         THE COURT:   Thank you.   Mr. Lopez.

15                        CROSS-EXAMINATION

16   BY MR. LOPEZ:

17   Q.    Good afternoon, Mr. Bell.

18   A.    Good afternoon.

19   Q.    My name is Scott Lopez.   I represent Randall Crater.

02:18 20        How many coins did you purchase in total of My Big Coin?

21   A.    600.

22   Q.    So all the coins you purchased, you were able to sell?

23   A.    Yes.

24   Q.    You don't currently own any additional coins?

25   A.    I do not.

1  Q.   Now, when you were first approached by Mr. Gillespie, do

2  you remember when that was?

3  A.   Sometime in 2014.

4  Q.   Can you be more specific than that?

5  A.   Eight years ago.  I've known Mark since college.  We spoke

6  sporadically over the years, casual spontaneous phone call here

7  or there.

8  Q.   Do you remember --

9  A.   It came up.

02:19 10  Q.   Do you remember where you were?

11  A.   Monkton, Maryland.

12  Q.   And did he come to your house?

13  A.   No.  He lives in Hartland, Michigan.

14  Q.   So it was on the phone?

15  A.   Yeah.

16  Q.   And did he call you or did you call him?

17  A.   I may have called him.

18  Q.   And as you sit here today, you don't recall?

19  A.   I'm sorry?

02:19 20  Q.   As you sit here today, you don't recall whether he called

21  you or you called him?

22  A.   It's an easy, I'll say I called him.

23  Q.   Sir, I'm not asking you to guess.  I'm asking you to

24  testify truthfully to this jury if you have a memory of whether

25  you made the call or whether he called you?

1   A.   I called Mark Gillespie.

2   Q.   Why did you call Mark Gillespie?

3   A.   Social call.

4   Q.   Okay.  And during this social call, who brought up the

5   topic of My Big Coin?

6   A.   Mark Gillespie.

7   Q.   Okay.  Do you have a memory of that phone call?

8   A.   To a certain extent.

9   Q.   Okay.  What did he say to you during that phone call?

02:20 10   A.   Basically it was your typical call, two friends catching

11   up on this, that and the other.  Family, this, that and the

12   other, how are things going.  Finances stink.  Well, I have a

13   contact who is developing a new product.  Are you familiar with

14   cryptocurrency?  No, I'm not familiar with cryptocurrency

15   really, other than some vague things.

16       2014, it was still relatively new.  And so Mark explained

17   cryptocurrency to me, and this was a ground-floor opportunity

18   to buy into this company.  And I did not buy in that day.  I

19   just considered it.

02:21 20   Q.   Okay.  And what do you recall about -- strike that.

21       What do you recall he told you about cryptocurrency,

22   something you didn't know about prior to the phone call?

23   A.   Well, basically that Bitcoin was kind of the standard bear

24   at the moment but there was hundreds of cryptocurrencies out

25   there, and My Big Coin would be among those 100, and they would

```
 1    all do different things to create, distinguish themselves as a
 2    better product and one worth investing in.  And just as one
 3    might invest in foreign currencies, one could invest in
 4    cryptocurrencies.
 5    Q.   And as a result of that conversation, did you do any
 6    research on your own about cryptocurrencies?
 7    A.   A little bit.  I Googled it.
 8    Q.   And what did you learn about cryptocurrencies?
 9    A.   Pretty much what Mark had told me.
10    Q.   So what he told you was truthful?
11    A.   Yeah.
12    Q.   And when you were considering investing or purchasing
13    coins in this -- well, strike that.
14         Did you understand that this company was a new company?
15    A.   Yes.
16    Q.   How new?
17    A.   Maybe a year, year old, something like that.
18    Q.   Are you sure?
19    A.   You asked, I said about a year old.
20    Q.   So when did this conversation take place?
21    A.   Sometime in 2014.
22    Q.   Beginning of 2014, end of 2014?
23    A.   March of 2014.
24    Q.   So it was your understanding that the company had been
25    started in March of 2013 and was about a year old?
```

1    A.   Not exactly.  It's a very ballpark figure.

2    Q.   Okay.  Did you determine whether or not the company had

3    any track record?

4    A.   Because of its newness, I had trouble finding a track

5    record, and my source of information for any kind of that came

6    from Mark Gillespie.

7    Q.   Did you ask Mark for any documentation on the company?

8    A.   Not really.

9    Q.   I think you said you went to college?

02:23 10   A.   Yes, I did.

11   Q.   And what was your degree in?

12   A.   Theater.

13   Q.   Okay.  And had you invested in companies prior to this?

14   A.   Oh, yeah.  I have had a reputable broker recommend

15   WorldCom, which went bust, and cost me $60,000, and I didn't

16   get a penny back.  And there was a lot of information about

17   WorldCom.

18   Q.   So getting back to My Big Coin, you understood that

19   Mr. Gillespie was asking you to participate in a new company

02:23 20   with a new cryptocurrency.  Did you consider whether it was

21   risky?

22   A.   Highly speculative.

23   Q.   You knew it was highly speculative?

24   A.   Sure.

25   Q.   Okay.  Now, did Mr. Gillespie tell you anything else about

1    My Big Coin and its cryptocurrency before you decided to make

2    your first investment?

3    A.    Well, I think Mark laid out the future context and plans

4    of the company, that they would have a wallet.  They would have

5    a credit card.  They would be backed by gold.  There were PRs

6    coming out every day with different -- Venezuela was going to

7    build their currency, base their currency on My Big Coin.  A

8    lot of things like that.

9    Q.    And you understood that Mark Gillespie was telling you

02:25 10   about the company's future?

11   A.    Correct.

12   Q.    That in the future, it would be backed by gold?

13   A.    Actually, later on in a few conversations I believe he

14   said it was backed, was backed by 300 million in gold.

15   Q.    Huh, that's interesting.

16        When you spoke to the CFTC in March --

17        THE COURT:  Counsel, no commentary, okay?  Counsel,

18   you can ask the question.

19   BY MR. LOPEZ:

02:25 20   Q.    So is it your testimony, sir, that before you made your

21   first investment in May of 2014, Mark Gillespie told you that

22   the company was backed by $300 million in gold?

23   A.    Not after maybe my first purchase but before my second

24   purchase.

25   Q.    Okay.  Before your first purchase, what, if anything, else

```
  1   did Mark Gillespie tell you about My Big Coin?

  2   A.    I think I just told you.

  3   Q.    That it was risky?

  4   A.    No.

  5   Q.    You knew it was risky?

  6   A.    Yes.

  7   Q.    And you paid $20,000 or so for your first investment

  8   anyway, right?

  9   A.    I don't believe that was my first investment.

 10   Q.    Well, the first -- so your first investment was in --

 11   well, your first investment was in May?

 12   A.    Counselor, if I had known eight years ago that I'd be

 13   taking -- that I'd be here in front of you, I'd have taken

 14   copious notes.  As it is, I've explained that Mark said

 15   Venezuela, it was backed by gold.  And you've asked me the

 16   question three times now.

 17   Q.    So you don't have a memory, as you sit here today?

 18   A.    I beg your pardon?

 19   Q.    I said, you don't actually have a memory of what you were

 20   told before you made your first purchase?

 21   A.    I have a pretty good memory.  I'll say it again.  Mark

 22   Gillespie said that My Big Coin would be used as a standard for

 23   Venezuelan currency.  He said it would be backed by gold.  He

 24   said there would be a credit card.  He said there would be a

 25   wallet.  He said a lot of things.
```

```
 1   Q.   He said there would be in the future?
 2   A.   He might have said there were a lot of things in play.  He
 3   said he was going to buy a hunting lodge on 500 acres.
 4   Q.   Okay.  And you believed all of it?
 5   A.   I've known Mark for 40 years.
 6   Q.   Now, you testified earlier that you thought the My Big
 7   Coin Exchange was going to be comparable to the New York Stock
 8   Exchange, right?
 9   A.   I think that's taking it out of context.
10   Q.   Well, that's what you said.
11   A.   No.  The general picture is that it would operate in a
12   similar fashion.
13   Q.   So if I understand you correctly, you thought that My Big
14   Coin Exchange would operate in a similar fashion as the New
15   York Stock Exchange?
16   A.   That's fair, sure.
17   Q.   So there would be traders on the floor?
18   A.   Not necessarily because this was a cryptocurrency, but
19   there would be a big board.  You would be able to follow your
20   trades and so on and so forth.
21   Q.   And after you made your first investment, I'm assuming you
22   rushed to the site to see whether or not that was the case,
23   right?
24   A.   I don't know that I did that.
25   Q.   What about after your second investment?
```

```
 1   A.   Yes, I'd say I did.
 2   Q.   Okay.  And by this time, how much money did you have
 3   invested?
 4   A.   I had 400 coins.
 5   Q.   And you purchased them at different prices?
 6   A.   Correct.
 7   Q.   And the price of the first set of coins was less than the
 8   price of the second set of coins?
 9   A.   That's correct.
10   Q.   And you went to the exchange?
11   A.   Mm-hmm.
12        THE COURT:  You have to give a verbal answer.  You
13   mean yes?
14        THE WITNESS:  I'm sorry.
15   A.   Yes.
16   Q.   And you saw the exchange working like the New York Stock
17   Exchange?
18   A.   Differently.
19   Q.   Differently.  So at this point in time, you knew that My
20   Big Coin Exchange was not like the New York Stock Exchange,
21   right?
22   A.   Did not seem to be.
23   Q.   Okay.  And yet, you continued to invest in the coins,
24   right?
25   A.   Yes.
```

1    Q.   And I think you said that you understood that My Big Coin
2    was going to be, quote, "cutting edge," right?
3    A.   That's what Mark said, correct.
4    Q.   It was going to be cutting edge, not it was, in fact,
5    cutting edge, right?
6    A.   Everything starts somewhere.
7    Q.   And I think you also said that with respect to the credit
8    card, it was anticipated that the product that was promised
9    would allow you to load coin onto a credit card, right?
02:30 10    A.   Before I received it, that was the case.  When I received
11    it, it was supposed to be operational.  I called the bank to
12    get a clarification, and they didn't know what I was talking
13    about and, in fact, hung up on me.
14    Q.   Sir, I think you testified earlier that it was anticipated
15    what the product was going to be, right?
16    A.   Before I received one, correct.
17    Q.   Okay.  That was my question.  Now, you also testified that
18    you believe Randall ran the exchange?
19    A.   Correct.
02:30 20    Q.   Okay.  And what was the basis for your belief that Randall
21    ran the exchange?
22    A.   That it was Randall's company and he controlled the facets
23    of the company.
24    Q.   Did you do anything to verify that?
25    A.   Mark Gillespie was my point of contact.

```
 1   Q.   Sir, did you do anything to verify your belief that
 2   Randall ran the exchange?
 3   A.   I talked to Mark Gillespie.  That would be my
 4   verification.
 5   Q.   So you didn't look to see whether or not My Big Coin
 6   Exchange was a separate company from My Big Coin?
 7   A.   There was a chat room where people would discuss different
 8   things, and questions such as you're posing would come up, and
 9   the standard response for the pumpers in that room would be,
10   "Do your due diligence," and that's -- one thing led to
11   another.
12        MR. LOPEZ:  Your Honor, could you instruct the witness
13   to answer my question instead of giving me an answer to some
14   other question.
15        THE COURT:  Well, not in regards to that exchange,
16   counsel.
17   Q.   Did you determine who owned My Big Coin, yes or no?
18   A.   Yes.
19   Q.   What did you do to determine who owned My Big Coin?
20   A.   I asked Mark Gillespie and he said Randall Crater.
21   Q.   Did you do anything else to verify your good friend was
22   telling you the truth?
23   A.   I contacted the CFTC and the FTC.
24   Q.   Did you search the Nevada State Secretary of State's
25   office to see who owned the corporation called My Big Coin,
```

```
         1   Inc.?

         2   A.    Actually that might have been among my due diligences.

         3   Q.    Okay.  And what did you learn?

         4   A.    I think I saw Greyshore Technology, things that I didn't

         5   quite understand.

         6   Q.    All right.  Are you just making that up, sir?

         7   A.    I beg your pardon?

         8   Q.    Did you just make that up?

         9   A.    Which part?

02:32   10   Q.    About Greyshore Technology, on the Nevada Secretary of

        11   State's office, owning My Big Coin?

        12   A.    Now that you mentioned the Nevada whatever, when you go --

        13   I understood that different companies are registered in Nevada,

        14   and then Mark told me they even changed their registration to

        15   Montana for whatever reason, tax reasons, or something like

        16   that, or procedural reasons.

        17        So actually, now that I'm reminded, I did -- I did see

        18   some registrations through there and also then that they had

        19   moved the registration or titles of the company and

02:33   20   corporations, what have you, to I think Montana.

        21   Q.    So you were aware that there was an effort to merge the

        22   company, right?

        23   A.    I think into a company called -- yes.

        24   Q.    And you were aware that the goal was to merge the company

        25   and take it public?
```

```
 1              MR. MOORE:  Objection as to awareness of the goal.  I
 2      think that would be --
 3              THE COURT:  Well, counsel, no speaking objections.
 4              MR. MOORE:  Sorry.
 5              THE COURT:  Sustained as to form.  You can ask another
 6      question.
 7      Q.   Did anyone tell you whether or not My Big Coin was going
 8      to go public?
 9      A.   Mark Gillespie.
02:34 10  Q.   When did he tell you that?
11      A.   I think from the outset when I got involved, he painted
12      that picture.  Then he in subsequent conversations said there
13      would be a PR announcing that, but I wouldn't put a date on it.
14              MR. LOPEZ:  Okay.  Now, can you bring up Exhibit 39,
15      which was -- yes.
16      Q.   Sir, did you have an understanding as to whether or not
17      the exchange was shut down for a period of time?
18      A.   I don't recall.
19      Q.   Well, were you told by anyone that the exchange was shut
02:35 20  from 2016 to 2017?
21      A.   I don't remember hearing that, no.
22      Q.   When you went to the exchange in 2016, did it look like it
23      was working?
24      A.   No, it did not.
25      Q.   So is it possible that it was shut down?
```

 1    A.   I have no idea.

 2         MR. LOPEZ:  Okay.  Now, if you go up to 124, which is

 3    at the top of -- yes, 124 and go, 124 down to 126.

 4    Q.   You send a text on August 15, 2016, "Almost two weeks at

 5    15 below market, 265 versus 280 and they're still sitting

 6    there.  Never happened in a million years on an exchange.  I'm

 7    in Vegas.  Should I swing by the office?"  Did I read that

 8    correctly?

 9    A.   Yes, you did.

02:36 10    Q.   Were you, in fact, in Vegas?

11    A.   Yes, I was.

12    Q.   And did you swing by the office?

13    A.   No need to.

14    Q.   I think because you said there was no office?

15    A.   Didn't exist.

16    Q.   Did you look up whether or not My Big Coin had an office

17    in Las Vegas?

18    A.   It was advertised as an office in Las Vegas.

19    Q.   Did you go to that address?

02:37 20    A.   Did not need to.  I called the company that had the

21    address and he was not there, no.  He also didn't have an

22    address in Florida.

23    Q.   You called the company that was at that address?

24    A.   Correct.

25    Q.   And you didn't -- no one picked up?

```
 1    A.    No.  No one from My Big Coin.

 2    Q.    Okay.  So John Roche didn't pick up the phone?

 3    A.    No.  I called John Roche at a California number.

 4    Q.    All right.  So you have talked to John Roche?

 5    A.    One time.

 6    Q.    And when was that?

 7    A.    Couldn't put a date on it.

 8    Q.    Was it before or after you invested in My Big Coin?

 9    A.    After I had invested in My Big Coin.

02:37 10    Q.    Why did you call him?

11    A.    To learn the status of the coin and find out the direction

12    of the company because I wasn't satisfied with other things I

13    was hearing.

14    Q.    And do you recall when this conversation occurred?

15    A.    I just said I don't -- I can't put a date on it.

16    Q.    And Randall responds, "Go by wherever you want to.  First,

17    I don't control the exchange at all.  And what people put their

18    coins for sell at what price, so yours this never happened in a

19    million years is wrong and you may have our coins at a price

02:38 20    but some guys are selling coins cheaper then you are."  Did I

21    read that correctly?

22    A.    Hard to follow but you read it correctly.

23    Q.    Okay.  Did you understand that the exchange was a place

24    where someone who wanted to sell their coins could post the

25    number of coins that they wanted to sell at a certain price?
```

1    A.    Yes.

2    Q.    And were you aware that buyers could go to that exchange

3    site and see the seller's post?

4    A.    Correct.

5    Q.    And if the seller and the buyer wanted to do an

6    exchange -- you never did an exchange, right?

7    A.    I did two on the board but it was very complicated.

8    Q.    Did you ever complete any transaction after posting a sale

9    price for your coins on the exchange?

02:39 10   A.    Not really.  I think Mark Gillespie facilitated those

11   transactions.

12   Q.    And did Mark Gillespie purchase your coins?

13   A.    Mark had another buyer lined up.  It's possible Mark

14   bought them but, as I understood it, he had another buyer

15   interested in the coins.

16   Q.    And how many coins did you sell to --

17   A.    Excuse me.  I was buying, not selling.

18   Q.    You were buying the coins?

19   A.    I was buying the coins.

02:40 20   Q.    Okay.  So did you --

21   A.    I only sold the coins one time.  That was one transaction

22   with Randall Crater.

23   Q.    So when you bought your coins, did you go to the exchange

24   and see that someone was trying to sell them for a certain

25   price?

```
 1    A.    Yes, I did.

 2    Q.    Okay.  And did you communicate on the exchange with the

 3    seller?

 4    A.    No.  Actually, I communicated with Mark Gillespie.

 5    Q.    Do you know whether Mark Gillespie communicated with the

 6    seller on the exchange?

 7    A.    I have no idea.

 8    Q.    Okay.  Do you know how Mark Gillespie paid for the coins

 9    that you purchased?

02:40 10   A.    Mark would call me and say, "Somebody needs money and

11    they'll cut a deal on some coins.  Are you interested?"

12    Q.    And you said yes?

13    A.    And I said yes.

14    Q.    And then how did you consummate the sale?

15    A.    I'd wire the money to an account that Mark directed.

16    Q.    Okay.  So it wasn't done over the exchange?

17    A.    No.  I think I tried it and had difficulty and I ended up

18    wiring the money.

19    Q.    Did you come to an understanding that the exchange was not

02:41 20   an intermediary for sales of coins?

21    A.    Well, it seemed to be working that way, and as you pointed

22    out, it was supposedly closed, but meanwhile, in August,

23    Randall said he didn't control the exchange and it functioned.

24              MR. LOPEZ:  Could you read back the question.

25              (Question read)
```

```
 1    Q.   Do you understand the question?

 2    A.   I'd say somewhat.

 3    Q.   Did you come to understand that the exchange was not used

 4    to consummate the sale of coins?

 5    A.   I came to think that might be the case.

 6    Q.   But you never actually learned that it was?

 7    A.   Didn't seem to work for me.

 8    Q.   So it wasn't like you could go to Amazon and say, "I want

 9    to buy a TV," and you just click a button and Amazon takes care

10    of paying the seller of the TV and the TV ends up at your

11    house, right?

12    A.   Correct.

13    Q.   It wasn't like that?

14    A.   No, not for me.

15         MR. LOPEZ:  Okay.  Now go down to 1:28.

16    Q.   You write there, "Just back from my business trip and note

17    that two plus weeks on and my 600 MBC haven't traded in spite

18    of being offered below market, in my stack of mail an

19    unsolicited inquiry from the Commodity Futures Trading

20    Commission regarding My Big Coin pay, Shot Spirits and

21    Greyshore Technology."

22         Did I read that correctly?

23    A.   Yes, you did.

24    Q.   And Mr. Moore asked you about this, right, earlier?

25    A.   Mm-hmm.
```

```
  1   Q.   And I think you admitted that --
  2             THE COURT:  Yes, right?
  3             THE WITNESS:  I'm sorry.  Yes.
  4             THE COURT:  Thank you.
  5   Q.   I think you admitted that wasn't unsolicited, right?
  6   A.   Correct.
  7   Q.   So you would agree with me that that text is a lie?
  8   A.   I was blowing a little smoke, writer's license to incent
  9   Mr. Crater to respond.
02:43 10   Q.   So you were exaggerating?
 11   A.   In that instance I fell out of the George Washington Club,
 12   but I wouldn't hang my whole defense on that one.
 13   Q.   You let me worry about the defense, sir.  Okay?
 14   A.   Yes, sir.
 15   Q.   Thanks.
 16             MR. LOPEZ:  Go down to 1:31.  Go up to the top.  I'm
 17   not touching the screen.  I don't know why --
 18   Q.   And you write on the same date 8-18, "Interesting that I
 19   can call the likes of Orioles GM Dan Duquette, CompuCom
02:44 20   chairman Jim Dixon, or even former NASDAQ president Al
 21   Berkeley, to name a few, all of who would take my call but you,
 22   who I've wired over 50K to defaults to Mark Gillespie to call
 23   me about decorum, now that's rich.  No, that's arrogant.  We
 24   entertain regularly with live music and catering, as well as
 25   small formal dinner parties, the like and manner of which would
```

          1    make Emily Post blush.  And you have Mark call me about

          2    decorum.  You who hung up on me.  I politely opted to skip past

          3    Mark and go directly to the horse's mouth because, though he's

          4    been very upbeat, neither I or my broker can find a bit of

          5    information regarding MBC, so I'm opting to cash out below

          6    market at 265 per MBC.  It's your show, your baby, make it

          7    happen.  I don't believe it's within Mark's job description.

          8    If it is, have him do it.  Last, I don't own any stock so guess

          9    again regarding the unsolicited inquiry...wasn't my idea."

02:45    10         Did I read that correctly?

         11    A.   Yes, you did.

         12    Q.   So again you're telling him the unsolicited inquiry wasn't

         13    your idea.  I'm from New Jersey.  Idea.

         14    A.   Okay.

         15    Q.   That's not true either, is it?

         16    A.   What's not true?

         17         THE COURT:  So the question was, so again you're

         18    telling him the unsolicited inquiry wasn't your idea.

         19    A.   I might have talked with somebody else when I drafted that

02:46    20    prior email.

         21    Q.   And who might that somebody be associated with?

         22    A.   Off the cuff?

         23    Q.   No.  As part of your testimony.

         24    A.   I don't recall.  Could have been a fellow coin investor or

         25    might have been a friend who is a lawyer.  I don't recall.

1    Q.    So you're saying that the unsolicited inquiry was not

2    referencing back to the prior text where you reference an

3    unsolicited inquiry from the CFTC?

4    A.    I don't recall the exchange I had with Randall in that

5    context, so I can't answer your question.

6    Q.    Now let's go down to 1:46.

7          This email was sent on looks like October 18, 2016, a

8    couple of months after your reference to the CFTC.  And in this

9    you say, "Randall, enjoyed the cat chat yesterday," and I can't

02:47 10    make out the smiley face.  "Following up on the charitable

11    part, Dr. Lise Satterfield c/o House of Ruth Maryland, 2201

12    Argonne Drive, Baltimore, MD, 21218, site is www.hruth.org.  Go

13    to the 'donate online' section, designate your gift option.

14    The Lise K. Satterfield, M.D. fund is the one in my wife's

15    name.  No obligations either way, but you asked and, voila,

16    they appreciate every bit of support.  Best Peter."

17          Did I read that correctly?

18    A.    Yes, you did.

19    Q.    So now two months later you still haven't sold your 600

02:48 20    coin, right?

21    A.    Correct.

22    Q.    And you're soliciting Mr. Crater for a donation to your

23    wife's fund raiser?

24    A.    That would be incorrect or out of context.  Up until this

25    point, I had had civil exchanges with Randall, perhaps some of

1    them a little testy.  He allowed that he liked cats.  We talked

2    about cats.  He allowed that he was very charitable and he

3    loved charitable foundations and he'd like to donate to a fund

4    of some sort if I had one in mind.  My wife's a prominent

5    physician, family practice.  She has an account with the House

6    of Ruth with a fund in her name.

7        House of Ruth is for women and children that have been

8    assaulted in violent homes and such abuse.  So she has the Dr.

9    Lise Satterfield Fund, and he wanted to contribute, and I said,

02:49 10   whatever you want, money, clothes, whatever you want.  He says,

11   "It will go out tomorrow."  He brought it up.  I offered a

12   destination.

13   Q.   So it was his idea?

14   A.   His idea.

15   Q.   Okay.  Sir, when did you first talk to the CFTC?

16   A.   I beg your pardon?

17   Q.   When did you first talk to the CFTC?

18   A.   That's all on the record, but if I had to guess, summer of

19   2016.

02:49 20   Q.   I don't want you to guess.

21   A.   I can't tell you specifically.  I don't have notes from

22   that day in front of me at least.

23   Q.   Well, I think you testified earlier that it was sometime

24   after August of 2016?

25   A.   I think there was a document in front of me that was dated

1   as such.

2   Q.   So as you sit here today, do you know whether or not you

3   first communicated with the CFTC before or after August of

4   2016?

5   A.   To give you an honest, specific exact date, I probably

6   would have to pull up my notes to give you that exact date.

7   Probably could even give you the hour.

8   Q.   Do you have your notes with you?

9   A.   I do not.

02:50 10   Q.   Did you bring your notes with you when you were prepared

11   for your testimony in this case?

12   A.   No.  I turned all of my notes over to the FTC, CFTC, to

13   the investigation team, and they have all those records.

14   Q.   When did you do that?

15   A.   I'd have to go back to the documents.  I'd say 2016.

16   Q.   Was it before or after you started asking for your coins

17   back?

18   A.   I would say after.

19   Q.   Do you recall a telephone conversation in March, on March

02:51 20   10, 2016 with FINRA?

21   A.   Yes.

22   Q.   And you told them you started buying MBC on February 4,

23   2014?

24   A.   If that's what the record says, that's what I said.

25   Q.   And during that conversation there was a reference to what

1    Mr. Gillespie told you about who controls the exchange?

2    A.    Perhaps.

3    Q.    And do you know whether or not you told them something

4    different than you've testified to here today?

5    A.    I would think Mark and Randall Crater would be the names I

6    used.

7    Q.    Well, you testified that you thought that -- that

8    Mr. Gillespie told you that Mr. Crater controls the price at

9    which coins are sold?

02:52 10    A.    Correct.  Well, the market dictated that.

11    Q.    Right.

12    A.    My understanding was the market drove the pricing.

13    Q.    So let's dig down into that a little bit.  Did you know

14    whether or not Mr. Crater owned coins?

15    A.    I did not.

16    Q.    Did you know whether or not Mr. Crater could sell his

17    coins for whatever price he wanted?

18    A.    I had no idea.

19    Q.    Mr. Gillespie never told you that?

02:53 20    A.    Never came up.

21    Q.    Is it possible that because Mr. Crater, like any other

22    seller of coin, could select the price he wanted to sell it at,

23    could select the price he wanted to sell his coins?

24    A.    Moving forward, a year later I suppose so.  I didn't know

25    that at the time.

Q.    Okay.  So you interpreted what Mr. Gillespie said to you
as Mr. Crater controlling the price.  But as you sit here
today, would you agree that you really don't know whether or
not the prices on the exchange were market prices or were
prices set by someone?

A.    No.  The initial -- my initial buy-in was that the market
controlled and generated the prices.  It was about two years
into the investment where I was asking more and more questions
and coming up against different walls that I asked Mark, Well,
how does this My Big Coin Exchange work?  Does Randall just
wake up in the morning and change the price to whatever he's in
the mood?  And Mark said, "Pretty much."  That was about two
years.  So it would have been 2016.

Q.    And you took that to mean the prices on the exchange?

A.    That's correct.

Q.    Okay.  But you didn't know that Mr. Crater had his own
coin that he could sell for whatever price he wanted?

A.    No.

Q.    And if he did sell his coin for whatever price he wanted,
it would be posted on the exchange, right?

A.    I assumed that all the transactions were posted on the
exchange.

Q.    And if Mr. Crater posted it on the exchange, that would
affect the market price?

A.    Correct.

Q.   Okay.  Now, you did have an understanding that when you

posted your coins on the exchange, it wasn't just going to

happen immediately, right?

A.   On the one hand I kind of thought it should, but I was

expecting two days, something like that.

Q.   Well, this is a start-up company --

A.   Correct.

Q.   -- that has an exchange up and running in less than a

year, and you expected it to work the same way as the New York

Stock Exchange?

A.   Not on the first day.

Q.   On the second day?

A.   No.  But in the first week.

Q.   In the first week.  Did anyone tell you that or was that

just your own speculation?

A.   I was just -- I wasn't upset about it.  It was just kind

of an expectation.

Q.   So that really didn't weigh into your determination as to

whether or not you wanted to invest, right?

A.   Well, because the transactions I had were immediate and

they were with Mark Gillespie.

Q.   And they weren't done through the exchange?

A.   No.

Q.   Who is Nicholas Savona?

A.   Name sounds familiar but doesn't ring a bell specifically.

```
  1    Q.    Sir, would you agree with me that long before you were

  2    trying to sell your coins you were trying to get the

  3    authorities interested in My Big Coin?

  4    A.    I was only trying to get the authorities interested in My

  5    Big Coin to ascertain whether it was a valid, honorable

  6    institution.

  7    Q.    So the answer is yes?

  8    A.    Ask me the question again.

  9    Q.    Long before you tried to sell your coins, you went to the

02:57 10    authorities and raised questions about My Big Coin, right?

 11    A.    I wouldn't say long before, but before, yes.

 12    Q.    Three months before?

 13    A.    Maybe a month before.  I don't know.

 14    Q.    Maybe a month before August?

 15    A.    June, July.

 16          MR. LOPEZ:  Okay.  May I approach the witness, Your

 17    Honor?

 18          THE COURT:  You may.

 19    Q.    Showing you a document, do you recognize that document?

02:58 20    A.    Mm-hmm.  Sure, now I remember.

 21    Q.    Can you tell me what it is?

 22    A.    Yeah, it was my note to Nick.

 23          MR. MOORE:  Objection, Your Honor.

 24          THE COURT:  Right.  So counsel, sustaining the

 25    objection about reading from this document, but if you want to
```

1    ask a question about his recollection.

2    Q.   Is that your email address?

3    A.   Yes.

4    Q.   Did you write this email?

5    A.   Yes.

6    Q.   Was it addressed to Nicholas Savona?

7    A.   Yes.

8    Q.   And the subject was Donald Bailey?

9         MR. MOORE:  Objection, Your Honor.

02:59 10       THE COURT:  Sustained still.  It's still hearsay,

11   counsel, and it's not a -- it's not a sworn statement, counsel.

12   So if you want to ask a question about refreshing or for

13   impeachment purposes, you can.

14   Q.   Is this an email responding to an email from Mr. Savona

15   regarding Mark Gillespie?

16        MR. MOORE:  Same objection, Your Honor.

17        THE COURT:  Sustained, counsel.

18        MR. LOPEZ:  May I approach the witness, Your Honor?

19        THE COURT:  You may.

03:00 20       Mr. Lopez, we're going to make the first one that you

21   brought up Exhibit NN, just for the record.

22        (Exhibit NN marked for identification.)

23        MR. LOPEZ:  Okay.

24        THE COURT:  We'll make this OO.

25        (Exhibit OO marked for identification.)

```
 1   Q.    Do you recognize this email?

 2   A.    Mm-hmm, yes.

 3   Q.    This is an email that you wrote?

 4   A.    Yes.

 5   Q.    Is it an email about My Big Coin?

 6             MR. MOORE:  Objection, Your Honor.

 7             THE COURT:  Counsel, sustained for the reason I noted

 8   before.  But you can ask the witness questions about the

 9   timeframe, which is what I understood you were trying to do.

10             MR. LOPEZ:  Your Honor, can we --

11             THE COURT:  Sure.

12             (Discussion at sidebar.)

13             THE COURT:  Mr. Lopez.

14             MR. LOPEZ:  Yes, Your Honor.  I am trying to

15   cross-examine this individual on his involvement in trying to

16   get the authorities to go after My Big Coin, which is relevant

17   to his bias and I think impeachable.

18             THE COURT:  Understood on all of those points.  It's a

19   matter of whether or not there's a basis for introducing these

20   emails, which are hearsay, even if they're his own statements.

21   So I understood you were approaching him to refresh or give a

22   basis for controlling the witness in regards to impeachment,

23   not for the introduction of the exhibits.  Right?  The only

24   prior inconsistent statements that would come in as substantive

25   evidence would be prior sworn statements.
```

1        MR. LOPEZ:  But I'm not offering them to show the

2   proof of the matter asserted.  I'm showing them to show this

3   man was actively involved in assisting the authorities at the

4   same time he was trying to get his money out of the investment.

5        THE COURT:  Okay.  I'll hear from the government.

6        MR. MOORE:  Your Honor, that's still hearsay.

7        THE COURT:  I can't -- if you can speak up a little.

8        MR. MOORE:  Your Honor, that is still hearsay.  He's

9   still just trying to use this out-of-court statement for --

03:03 10   that isn't the truth of the matter asserted to assert that what

11   is being said in this email is actually what happened.  That's

12   like the definition of the truth of the matter asserted, so

13   it's hearsay and there's no exception for it.

14        THE COURT:  Yeah.  So, Mr. Lopez, for the reasons I

15   stated, I was sustaining the objections.  Both I'm going to

16   keep marked as lettered Exhibits NN and OO to preserve your

17   objection.  You can ask questions along the lines that I

18   understood, which is, you know, isn't it correct that you had

19   conversations as far back as, you know, March of 2016 with

03:04 20   FINRA.

21        MR. LOPEZ:  Note my objection, Your Honor.

22        THE COURT:  Noted

23        (End of discussion at sidebar.)

24   BY MR. LOPEZ:

25   Q.   So looking at the document which has been marked OO for

1    identification, would you agree with me that in March of 2016,

2    you were sending emails to the authorities about My Big Coin?

3    A.   Appears to be that way.

4    Q.   And you were happy to help, right?

5    A.   Trying to recoup my money, so I would say yes.

6    Q.   So you linked reporting to the authorities with recovering

7    your money?

8    A.   If it was a legitimate institution, I was going to get my

9    money back.  So no harm, no foul.

03:05 10   Q.   And did you think that something would happen because you

11   inquired about the legitimacy of My Big Coin with the

12   authorities?

13   A.   Yes.

14   Q.   And what did you think would happen?

15   A.   They would either say, Mr. Bell, this is a dangerous but

16   legitimate investment, or it's a scam.

17   Q.   Do you think that they might contact My Big Coin?

18   A.   Highly possible.

19   Q.   Did you think they might contact Mr. Crater?

03:06 20   A.   Highly possible.

21   Q.   And this was months before you were trying to get your

22   money back?

23   A.   No.  I was actually trying to get it out before then.

24   Q.   So did you make a connection with maybe using the

25   authorities to put pressure on Mr. Crater and My Big Coin?

```
 1   A.   To find out whether it was a legitimate enterprise.  You
 2   know, I was trying to sell --
 3   Q.   There's no question before you, sir.
 4   A.   Okay.
 5          THE COURT:  You have to wait for the next question
 6   before you, Mr. Bell.
 7          Mr. Lopez.
 8   Q.   And later in March, you were checking in to see how things
 9   were going, right?
10          MR. LOPEZ:  Let me approach the witness again, Your
11   Honor.
12          THE COURT:  You may.
13          MR. LOPEZ:  We'll mark this PP.  No pun intended.
14          (Exhibit PP marked for identification.)
15   Q.   On March 23 you're sending another email and you're just
16   checking in?
17          MR. MOORE:  Objection, Your Honor.
18          THE COURT:  Well, counsel you can rephrase.
19   Q.   What was the purpose of your email on March 23, 2016?
20   A.   Just seven days later I was trying to see if he had
21   followed up.  I had currency, 300 of my 600 coins, offered at
22   175 each and I was wondering if he had learned anything new
23   about my investment.
24   Q.   Okay.  So on March 23, 2016, you've now lowered your price
25   on the coin to $175?
```

1    A.    To 175, mm-hmm.

2    Q.    Per coin?

3    A.    Correct.

4    Q.    And just while I'm on that, I think you said you invested

5    about $50,000 in coin?

6    A.    I'd say roughly, the 600, mm-hmm.

7    Q.    Okay.  So the 600 coins totaled $50,000?

8    A.    Yes, mm-hmm.

9    Q.    What did you buy your first set of coins at?

03:08 10    A.    Oh, I don't have that in front of me.  I would say my

11    average of the 600 coins was around $80, $90, something like

12    that.

13    Q.    And you had 600 coins in total?

14    A.    Yes, sir.

15    Q.    So if it was 90 --

16    A.    I think that was my average.

17    Q.    Your average, but I thought the first coins were bought

18    for about $21?

19    A.    I bought three times.

03:09 20    Q.    Right.

21    A.    Roughly in the 20s --

22    Q.    We'll get back to that.

23    A.    Somewhere in the 60s and somewhere above that.

24    Q.    -- and do you recall receiving an email back from

25    Mr. Savona?

```
 1              MR. MOORE:  Objection, Your Honor.  If I could --
 2              THE COURT:  Yeah.  I understand the objection.
 3      Counsel, you can have the question.  I think, Mr. Lopez, if you
 4      would rephrase in regards to the agency.
 5      Q.   Did you hear back from FINRA?
 6      A.   I think Mr. Savona was switched out to a different
 7      department and somebody else took over, I believe.  I don't
 8      recall that kind of detail off the cuff.
 9      Q.   Let me see if I can refresh your memory.
10      A.   All right.
11              THE COURT:  I think this would be QQ.
12              THE CLERK:  Yes.
13              (Exhibit QQ marked for identification.)
14      Q.   Does this email refresh your memory as to whether or not
15      Mr. Savona got back to you?
16      A.   Okay, so he did, but I think he was transferred shortly
17      thereafter that at some point.  It was six years ago.  I don't
18      memorize all those dates.  It wasn't that consequential to me.
19              MR. LOPEZ:  All right.  May I just have a moment, Your
20      Honor?
21              THE COURT:  Sure.
22      Q.   Now, at some point you also wrote to the CFTC, right?
23      A.   I believe I called or emailed, both.
24      Q.   Well --
25      A.   I'm pretty sure I wrote -- actually, I sent them a packet
```

 1    of information, yeah.

 2            MR. LOPEZ:  Can I approach the witness, Your Honor?

 3            THE COURT:  You may.  I'm sorry.  This should be RR?

 4            MR. LOPEZ:  Yes, I believe so, Your Honor.

 5            (Exhibit RR marked for identification.)

 6    Q.   Have you had chance to look through that document?

 7    A.   Mm-hmm.

 8            THE COURT:  Counsel, can I speak to you briefly on

 9    sidebar on Whisper Tech for a moment.  Thank you.

03:14 10            **(Discussion held at sidebar.)**

 11            THE COURT:  Counsel, are both sides on?  Mr. Lopez?

 12            MR. LOPEZ:  Yes, Your Honor.

 13            THE COURT:  Can you hear me?

 14            MR. MOORE:  Yes, Your Honor.

 15            THE COURT:  Mr. Moore?

 16            MR. MOORE:  Yes, Your Honor.

 17            THE COURT:  Counsel, I just wanted to return to the

 18    question -- hopefully you can hear me -- in regards to whether

 19    or not the emails are --

03:14 20            MR. LOPEZ:  You're breaking up, Your Honor.

 21            THE COURT:  I think there might be something wrong

 22    with the batteries.  Let's see if this better.  Can you hear

 23    me?

 24            Mr. Lopez, in regards to whether or not, was it N

 25    through Q and now we're up to RR, is published to the jury, I

1   understand your argument that this is extrinsic evidence of a

2   prior statement; is that correct?

3          MR. LOPEZ:  That's correct, Your Honor.

4          THE COURT:  Meaning that you're not offering it for

5   the truth of the matter asserted in the exhibit but the fact

6   that the communications were made?

7          MR. LOPEZ:  That's correct.

8          THE COURT:  Okay.  And Mr. Moore, I understood your

9   point about hearsay, but I think similar to when I had certain

03:15 10  lettered exhibits just published but not admitted, that's the

11  distinction that Rule 613(b) makes, and I can't say now that

12  I've thought about it further, that they're being offered for

13  the truth.  Do you understand?

14         MR. MOORE:  Your Honor, I think that there would have

15  to have been testimony that he did not make those statements.

16  I think his testimony was just that he didn't recognize the

17  name.  So I'm not sure that there is a question about if the

18  statements were made for that to be a grounds for it to be

19  published to the jury.  I don't think he denied making a

03:16 20  statement.  He just was asked did he know the name and he said

21  it's sounds familiar but he's not sure.

22         THE COURT:  Okay.  I'll hear Mr. Lopez on that point.

23         MR. LOPEZ:  Your Honor, if I was to publish some of

24  these or all of them, there are statements in them that are

25  inconsistent with what he's testified to here.  But I don't get

1   that until I get the document published.

2           THE COURT:  Well, counsel, it's only if -- I think

3   Mr. Moore is right to the extent that the witness has to deny

4   the existence of it as opposed to you publishing first.

5           So meaning to the extent that I was limiting you in

6   what you could say about the substance of the email, you can

7   inquire about that because he has to deny it for the purposes

8   of being impeached with it.  Do you understand?

9           MR. LOPEZ:  I do, Your Honor.

03:17 10           THE COURT:  Okay.  I just wanted to clarify my

11   position as I thought about it further for both sides.  Okay?

12           MR. LOPEZ:  Thank you, Your Honor.

13           THE COURT:  Thank you

14           (End of discussion at sidebar.)

15   BY MR. LOPEZ:

16   Q.    Have you had a chance to review RR?

17   A.    Yes.

18   Q.    Now, would you agree with me that your memory was clearer

19   in August of 2016 than it is today?

03:18 20   A.    Oh, absolutely.

21   Q.    Okay.  At least with respect to what went down with My Big

22   Coin?

23   A.    Six years ago, eight years ago, for sure.

24   Q.    Okay.  Now turning to the second page at the very top, you

25   see where there's a reference to the purchases that you made?

A.    Mm-hmm, yes.

Q.    And does that refresh your memory as to what you purchased your coin at?

A.    Yeah.  As I said earlier, there were three purchases.  I don't remember the exact numbers, but here it is right here.

Q.    All right.  And does that refresh your memory?

A.    Yes.

Q.    So in February of 2014, you purchased 200 My Big Coins at a value of $28.87?

03:18  MR. MOORE:  Objection, Your Honor.

THE COURT:  Overruled.  Given the question and answer before it.

You can answer, sir.  Mr. Bell, you can answer the question which I think was, So in February of 2014, you purchased 200 My Big Coins at a value of $28.87.

A.    Yes, I did, Your Honor.

Q.    For approximately $6,000?

A.    Correct.

Q.    Okay.  And what did you purchase the coins -- the next

03:19  purchase was for how many coin?

A.    Should have been for another 200.  Those were for $102.13.

Q.    Okay.  Again, going back, you didn't -- I think your testimony was you didn't do anything to verify whether or not between February of 2014 and May of 2014, whether Mr. Gillespie was being honest with you?

```
 1   A.    No, we had a good trusting relationship.

 2   Q.    And then the third purchase you made was in -- strike

 3   that -- when?

 4   A.    September 2014, 200 for $111.66.

 5   Q.    And earlier you testified that there was a two-and-a-half

 6   percent charge, right?

 7   A.    Transaction fee, uh-huh.

 8   Q.    And I think you also said that some of the money came from

 9   your IRA?

10   A.    Correct.

11   Q.    And that there were penalties because of the IRA?

12   A.    Early withdrawal.

13   Q.    Any other --

14   A.    And I think capital gains on whatever -- whichever stocks

15   I got out of, yes.

16   Q.    And when you wrote to Mr. Koh in August of 2016, did you

17   mention any of those additional fees?

18   A.    I don't recall.  Is it in here?

19   Q.    Well, that's why I have the letter before you.

20   A.    (Witness reviews document.)  In this letter it doesn't

21   look like it was a detail I felt important to bring up,

22   incidental.

23   Q.    So you didn't tell him that there were additional fees?

24   A.    No.

25   Q.    But you also told him that you had previously -- if you go
```

1    down bottom of the next page -- that you had previously been in

2    touch with FINRA?

3    A.    Which page are you looking at?

4    Q.    The bottom of page 3.

5    A.    Okay.

6    Q.    You told Mr. Koh that you had been in touch with FINRA?

7    A.    Yes, I did.

8    Q.    Would it be fair to say that you were a little frustrated

9    that the authorities weren't giving this more attention?

03:23 10    A.    I don't believe I was frustrated.

11    Q.    Were you frustrated that you weren't able to sell your

12    coin?

13    A.    I was frustrated that I couldn't sell my coin and this is

14    two years on, I believe.  Let's see, this is dated August 2016.

15    I bought my coin in 2014.  I think I started to try to sell

16    them in maybe 2015, definitely early 2016.  And I had spoken

17    with FINRA back in, I guess it was March, and now this letter

18    is dated August.  So different federal branches have different

19    jurisdictions.  So I was just following up another venue.

03:23 20    Q.    You were trying to get somebody to look into this for you,

21    right?

22    A.    Absolutely.

23    Q.    Okay.  And you first texted Mr. Crater in October of 2015,

24    right?

25    A.    2015?

```
 1   Q.   Yeah.
 2           MR. LOPEZ:  If we go back to 39, number 1:1.
 3   Mr. Sweeney.
 4           THE COURT:  Will you clear the screen, Ms. Hourihan.
 5   A.   Okay.
 6   Q.   Then the next communication is on August 11, 2016, right?
 7   A.   If you're suggesting I hadn't talked to him for close to a
 8   year, I'm not sure if that's accurate or not.
 9   Q.   And you're telling him that you posted on the exchange for
10   265, which was about 5 percent under the exchange's so-called
11   market price?
12   A.   $15.
13   Q.   Which is about 5 percent?
14   A.   If you say so.
15   Q.   Which, if it was on the New York Stock Exchange, it would
16   have flown out the door?
17   A.   I would think so.
18   Q.   Okay.  And you're not getting anywhere with him.
19           MR. LOPEZ:  If I could just have a moment, Your Honor.
20           THE COURT:  You may.
21   Q.   But in March, you were telling Mr. Savona that you had
22   offered 300 MBC at $175 each?
23   A.   That's correct.
24   Q.   And that didn't go anywhere?
25   A.   They didn't sell.
```

03:25 (line 10)
03:25 (line 20)

```
 1   Q.   So three months later, after you've been in touch with
 2   FINRA, you're now upping the price to 265?
 3   A.   To market and I was following the board.
 4   Q.   So you were following the board, and you saw that there
 5   was a sale at around 280?
 6   A.   Correct.
 7   Q.   So you made it a lower price at 265?
 8   A.   Correct.
 9   Q.   And no one contacted you?
10   A.   And no one contacted me.
11   Q.   And you were expecting someone to contact you?
12   A.   Actually, I thought it would be a transparent transaction
13   through the board.  Like perhaps you might have bought them.
14   I'd never have known your name.  It's a cryptocurrency.  You
15   know, it's like they -- you buy my coin, the money goes into my
16   account, the coins go into your account.
17   Q.   And that was because you did that before?
18   A.   No.
19   Q.   So --
20   A.   That's what I understood.
21   Q.   Why did you think it would happen then?
22   A.   Because now I was selling for the first time and I
23   understood that's how the transactions went.
24   Q.   So someone else told you how the transactions went?
25   A.   When Mark Gillespie introduced me to My Big Coin, that's
```

1    how the transactions were supposed to happen.  Mark Gillespie

2    happened to handle all three of my transactions personally.

3    Q.   And when it didn't happen the way Mark Gillespie said and

4    it happened another way, what made you think that years later

5    it would happen differently?

6         MR. MOORE:  Objection, Your Honor.

7         THE COURT:  Well, sustained.  Just, counsel, you may

8    want to reframe.  There is a -- it's compound and there are

9    some other issues with the question, so if you want to reframe

03:28 10   it.

11   Q.   Somewhere between the time that Mark Gillespie sold coin

12   for you -- I'm sorry -- sold you coin or had someone sell you

13   coin, there was a process that occurred, right?

14   A.   With Mark Gillespie, correct.

15   Q.   And that process was that you wired funds to a bank

16   account that Mark Gillespie told you to?

17   A.   Yeah, he facilitated all of that.

18   Q.   Didn't go through the exchange?

19   A.   Did not.

03:28 20   Q.   Two years later, you posted your coins on the exchange,

21   right?

22   A.   Correct.

23   Q.   And I think you just testified that you thought it was all

24   going to be transparent on the exchange and you could all see

25   it on the exchange?

```
 1    A.    Correct.

 2    Q.    But that didn't happen?

 3    A.    Correct.

 4    Q.    And from that you determined that it didn't happen the way

 5    you thought it was going to happen?

 6    A.    Correct.

 7    Q.    You didn't think that a buyer would contact you and then

 8    you would do the transaction offline or off the exchange?

 9    A.    No.  As you pointed out, when the exchange was first set

03:29  10   up, it was maybe improper to think it would work the first two

11    days or the first week.  This is now perhaps two years on, and

12    I'm assuming the exchange works.

13    Q.    So it wasn't anything that Mr. Gillespie told you, it was

14    just your assumption?

15    A.    No.  Mark said it was functioning.

16    Q.    Okay.

17    A.    I hadn't tried -- I hadn't tried to sell anything up to

18    this point so I wouldn't know, other than the expectation.

19    Q.    Exactly.

03:30  20          THE COURT:  Counsel, I think we're up to SS.

21          MR. LOPEZ:  Yes, Your Honor.

22          (Exhibit SS marked for identification.)

23          MR. LOPEZ:  Mr. Sweeney, you can take that down.

24    Q.    Do you recognize the handwriting?

25    A.    Yes.
```

```
 1   Q.   Whose handwriting is that?

 2   A.   It's my handwriting.

 3   Q.   And do you recognize the address on the next page?

 4   A.   Yes, I do.  That's my address, home address.

 5   Q.   Okay.  And do you recognize the next page?

 6   A.   FedEx tracking bill.

 7   Q.   And you personally printed that out?

 8   A.   If you say so.  I can't tell if that's from my account.  I

 9   could have, if I wanted to, but I don't know if I did or not.

03:31 10   Q.   And the next page --

11   A.   It could have been sent to me.  I don't recall.

12   Q.   And the next page is also your address?

13   A.   Yes.

14   Q.   And the last page appears to be a check?

15   A.   Correct.

16   Q.   And is that the check that Mr. Crater sent to you?

17   A.   Correct.

18        MR. LOPEZ:  Your Honor, I move that this be introduced

19   into evidence.

03:31 20        THE COURT:  Any objection?

21        MR. MOORE:  No objection, Your Honor.

22        THE COURT:  Okay.  Ms. Hourihan, are we up to 40?

23        THE CLERK:  Yes.

24        THE COURT:  It's 40.  It may be admitted and

25   published.
```

```
 1              MR. LOPEZ:  Can I use the ELMO?
 2              THE COURT:  You may.  Ms. Hourihan, can you clear the
 3      screen.
 4              (Exhibit 40 admitted into evidence.)
 5      Q.   Now, this is your handwriting, right, sir?
 6      A.   Mm-hmm, yes.
 7      Q.   "Copy of FedEx bill from Randall Crater with tracking,
 8      copy of his screenshot, proof that the check was in the mail,
 9      copy of his check to me for purchase of my coin."
10              Is this one of the copious notes that you were referring
11      to earlier?
12      A.   Copious notes?
13      Q.   Notes that you took on this case.
14      A.   Yes.
15      Q.   Okay.  And the next page shows you a shipping label?
16      A.   Yes, I xeroxed that.
17      Q.   Okay.  And this is the tracking which your notes said that
18      Mr. Crater sent to you?
19      A.   He may have sent that to me.  I don't recall.  I have
20      accounts with all of them.  So I could have printed that out as
21      well as he may have printed that out to send to me.
22      Q.   I think you said --
23      A.   Yeah, yeah.
24      Q.   -- copy of the screen --
25      A.   Yeah, I do, so he sent that to me.
```

03:32 10
03:33 20

```
 1   Q.   So he was trying to prove to you that the check was in the
 2   mail?
 3   A.   Correct.
 4   Q.   Okay.  And then that's again your address?
 5   A.   Mm-hmm, yes.
 6   Q.   And then finally, the check which I understand is not a
 7   great copy --
 8   A.   That's fine.  $90,000.
 9   Q.   $90,000.  So that arrived in January of --
10   A.   '17, I think.
11   Q.   -- of 2017?
12   A.   Mm-hmm.
13   Q.   So after you contacted FINRA and after you contacted the
14   CFTC, you were finally able to get a $90,000 check from
15   Mr. Crater?
16   A.   Correct.
17   Q.   And that check in essence doubled your investment in My
18   Big Coin?
19   A.   Not entirely.
20   Q.   Well, you put in about $48,000?
21   A.   Well, again, I had penalties for withdrawal, capital gains
22   on that, and then I had capital gains I paid on this.
23   Q.   So did you make a 45 percent profit?
24   A.   I'd say I made $15,000, whatever the percentage is.
25   Q.   Wait a minute.  I'm having a hard time with the math.  If
```

1    it was $50,000, which is what you testified you invested, and

2    this check was for $90,000, isn't that a $40,000 profit?

3    A.   I think you conveniently forget capital gains tax you have

4    to pay on that, capital gains I pay on withdrawal.  The other

5    fees, so on, so forth.  So when you get to net, I said around

6    15,000.  If you want to say 20, that's fine.

7    Q.   But the 150 was the price you set for your coin, right?

8    A.   Well, the market was at 280.  So I bailed out at 150.  So

9    arguably I left 100 and something on the table.

03:35 10    Q.   Well, would you agree with me that the market is what a

11    willing buyer is willing to buy and a seller is willing to

12    sell?

13    A.   Often.

14    Q.   And you were willing to sell at $150 a coin, right?

15    A.   Below market.

16    Q.   You were willing to sell for $150 a coin?

17    A.   Yes, I was.

18    Q.   And Mr. Crater was willing to buy at $150 a coin?

19    A.   Yes, he was.

03:35 20    Q.   So the market price for your coins was $150 a coin, right?

21    A.   280 for everyone else's.  Right.

22    Q.   Thank you.

23         MR. LOPEZ:  No further questions, Your Honor.

24         THE COURT:  Thank you.

25         Redirect, Mr. Moore?

```
 1              MR. MOORE:  Very brief, Your Honor.

 2              THE COURT:  Sure.

 3                     REDIRECT EXAMINATION

 4    BY MR. MOORE:

 5    Q.   All right.  Defense counsel handed you a packet that

 6    starts out as a letter to Ken Koh.  Do you see that up there?

 7    It should be one of the papers in front of you.

 8    A.   It's not here.

 9              THE COURT:  On the hard copies.  Thank you.

10              THE WITNESS:  Oh.

11    Q.   To Ken Koh.

12    A.   Okay.

13    Q.   Can you turn to be Exhibit L of that packet.

14    A.   Which page is that?

15    Q.   It's attachment L behind the letter.

16              MR. MOORE:  May I approach, Your Honor, just to --

17              THE COURT:  Yes.

18              MR. MOORE:  Thank you.

19              THE WITNESS:  I'm sorry.

20    Q.   All right.  Do you see Exhibit L there?

21    A.   Yes.

22    Q.   And is that from the My Big Coin Exchange?

23    A.   Yes.

24    Q.   Did you make that printout?  Did you print that out from

25    the website?
```

```
       1   A.   Yes, I did.

       2   Q.   Do you see where it says "backed by gold"?

       3   A.   Yes.

       4   Q.   Do you remember seeing that on the My Big Coin website?

       5   A.   Yes.

       6   Q.   Does it say "will be backed by gold"?

       7   A.   It says "is backed by gold."

       8   Q.   Okay.  Did you rely on that representation?

       9   A.   Yes, I did.

03:37 10   Q.   You remember on cross you were asked about information you

      11   got from Mr. Gillespie?

      12   A.   Yes.

      13   Q.   Do you know where Mr. Gillespie got his information from?

      14   A.   Randall Crater.

      15   Q.   All right.  You were directed to text 125, where

      16   Mr. Crater says that he doesn't control the exchange.

      17            MR. MOORE:  Can we bring up 143, 142 and 143.

      18            THE COURT:  Again, this is 39, Exhibit 39?

      19            MR. MOORE:  Can we go down to 142 and 143.  Sorry.

03:38 20   1:142 and 1:143.

      21   Q.   All right.  So after he tells you he doesn't control the

      22   exchanges, do you see here where he says he already has a

      23   client for you, it's done, just working a few things out?

      24   A.   Correct.

      25            MR. MOORE:  And can you go down to 311.
```

1   Q.   Do you see here again after he says he doesn't control the

2   exchange, he says, "I fixed it and got it handled for you"?

3   A.   Correct.

4   Q.   Was it surprising to you that someone who didn't control

5   the exchange could fix your account?

6          MR. LOPEZ:   Objection.

7          THE COURT:   Sustained as to form.

8   Q.   Was his response here surprising to you?

9          MR. LOPEZ:   Objection.

03:39 10          THE COURT:   Sustained as to this question.

11          MR. MOORE:   All right.   Can we go to 46.   Just 46.

12   Q.   Do you remember being asked on cross-examination about

13   donations to your wife's charity?

14   A.   Yes.

15   Q.   Do you know if the defendant actually made those

16   donations?

17   A.   We're not aware of that, no, ever happening.

18   Q.   And you were shown a check sent to you by Randall Crater.

19   Do you remember on cross-examination being shown that check?

03:40 20   A.   Yes.

21   Q.   Do you remember if you received that check before you told

22   him about the CFTC or after?

23   A.   After.

24          MR. MOORE:   All right.   Thank you.   Nothing further.

25          THE COURT:   Any recross?

1              MR. LOPEZ:  Oh, yes.

2              THE COURT:  Sure.

3                         RECROSS EXAMINATION

4    BY MR. LOPEZ:

5    Q.   You purchased your coin in May of 2014, February of 2014,

6    and September of 2014?

7              MR. MOORE:  Objection.  Scope, Your Honor.

8              THE COURT:  Let me listen to where the question is

9    going.  Overruled as to this question.

03:41 10   Q.   And Mr. Moore just asked you --

11             THE COURT:  I'm sorry, was there an answer to that?

12             Sir, the question was, you purchased your coin in May

13   of 2014, February of 2014 and is it July of 2014?

14             MR. LOPEZ:  September of 2014.

15             THE COURT:  September of 2014.  That was the question,

16   Mr. Bell.

17   A.   Yes.

18   Q.   Okay.  And Mr. Moore just asked you on redirect if Exhibit

19   L to this letter to Mr. Koh was something that you relied upon

03:41 20   when you purchased your coin, right?

21   A.   Correct.

22   Q.   Can you tell me how you relied on something that was

23   published in March of 2015, which is what Exhibit L says, when

24   you purchased your coin in 2014?

25   A.   This piece of paper says founded in 2013.

```
 1    Q.    Right.

 2    A.    My Big Coin is a virtual currency.  It goes on to say My

 3    Big Coin is backed by gold bullion.  I was speaking to Mark

 4    Gillespie probably in 2013 about My Big Coin, and this is where

 5    the whole --

 6    Q.    Sir --

 7    A.    Go ahead.

 8    Q.    What's the date of the press release?

 9    A.    Current as of 2015, March 15, 2015.

03:42 10    Q.    March 20 of 2015 --

11    A.    Correct.

12    Q.    -- is when that press release was released?

13    A.    I had seen this before.  I don't know that it was -- but

14    current --

15    Q.    But you testified that Exhibit L, you relied upon it when

16    you purchased?

17            MR. MOORE:  Objection, Your Honor.

18            THE COURT:  Sustained as to that question, counsel.

19    Q.    Backed by gold wasn't important to your decision, you

03:43 20    wanted to make money, right, sir?

21    A.    Everybody wants to make money.

22    Q.    Thank you.

23    A.    But they said it was backed by gold.

24            MR. LOPEZ:  Nothing further.

25            THE COURT:  Sir, you're excused.  Thank you.
```

```
 1              THE WITNESS:  I'm sorry.  Thank you.
 2              THE COURT:  You can leave those there.  Thank you.
 3              Mr. Moore?
 4              MR. MOORE:  The United States calls Salvatore Olivo.
 5              THE COURT:  He may be called.
 6              SALVATORE OLIVO, Sworn
 7              THE COURT:  Good afternoon, sir.  Good afternoon.
 8              THE WITNESS:  Good afternoon to you.
 9              THE COURT:  Mr. Moore.
10                       DIRECT EXAMINATION
11   BY MR. MOORE:
12   Q.   Please state your name for the record and spell your last
13   name.
14   A.   Salvatore Olivo, O-l-i-v-o.
15              THE COURT:  Thank you.
16   Q.   And what is your field of employment?
17   A.   Self-employed jeweler.
18   Q.   Are you familiar with the Southampton Jewelry Exchange?
19   A.   I am.
20   Q.   Can you describe your relationship with the Southampton
21   Jewelry Exchange?
22   A.   Owner.
23   Q.   And how long has Southampton been in operation?
24   A.   Approximately 14 years.
25   Q.   I know it's obvious but where is it located?
```

```
 1   A.   ████████████████████████ in the Town of Southampton,

 2   New York.

 3   Q.   All right.  Are you familiar with an individual by the

 4   name of Randall Crater?

 5   A.   I am.

 6        THE COURT:  I'm sorry.  Just for the record, we'll

 7   just strike the street address and keep the town.  Thank you.

 8   Q.   How did you become familiar with Randall Crater?

 9   A.   Him coming into my business.

10   Q.   All right.  Did he make purchases from your business?

11   A.   Yes.

12   Q.   Were they -- for your business, were they small purchases

13   or larger purchases?

14   A.   They were all along the spectrum.  They were on the

15   smaller end of things and the larger end of things.

16   Q.   All right.  Did he spend less than your typical customer

17   or more than your typical customer?

18        MR. LOPEZ:  Objection.

19   A.   More.

20        THE COURT:  Well, sustained.  To the extent there was

21   an answer, it's struck.

22        Counsel, next question.

23        MR. MOORE:  I'm going to -- can we display just for

24   the witness what's been pre-marked as Exhibits F1 and F2.

25        THE COURT:  You may just for the witness, counsel.
```

03:45 (line 10)
03:45 (line 20)

```
  1    Q.   We've spoken before today; is that accurate?
  2    A.   Yes.
  3    Q.   And during the course of this case, did you provide
  4    receipts from your business?
  5    A.   I did.
  6    Q.   And are the documents at F1 and F2 those receipts that you
  7    provided from your business?
  8    A.   Yes.
  9    Q.   And are they a true and correct copy of the receipts you
03:46 10    submitted?
 11    A.   That is correct.
 12            MR. MOORE:  I ask that we admit Exhibits F1 and F2.
 13            THE COURT:  Any objection?
 14            MR. LOPEZ:  No, Your Honor.
 15            THE COURT:  Ms. Hourihan, is that 41?
 16            THE CLERK:  Yes.
 17            THE COURT:  Okay.  They can be admitted as 41A and B
 18    and published.
 19            (Exhibit 41A and 41B admitted into evidence.)
03:46 20    Q.   All right.  Can you describe to the jury what this is?
 21    A.   So starting at the top or the receipt as a whole?
 22    Q.   Let's start at the top.  Who is this addressed to?
 23    A.   Randall Crater.
 24    Q.   Okay.  And then at that first line it appears to say "pair
 25    fancy yellow diamond studs."  Can you describe to the jury what
```

1    that would be?

2    A.   Just that.  It would be diamond stud earrings.

3    Q.   And then the next item, it's a men's Breitling Bentley.

4    Can you describe to the jury what that is?

5    A.   So that would be a watch timepiece.

6    Q.   And then can you make out what the total amount spent in

7    the set of purchases is?

8    A.   $60,611.66.

9         MR. MOORE:  Okay.  Can we go to F2, please.

03:47 10   Q.   And can you tell who this receipt is made out to?

11   A.   So this is made out to Randall and Erica.

12   Q.   Do you have an understanding of who Erica is?

13   A.   Randall's wife.

14   Q.   And then do you see below where it says "payment from

15   Greyshore."  Then has check number 1319?

16   A.   Yeah.

17   Q.   Do you have an understanding of why the payment for these

18   items came from Greyshore?

19        MR. LOPEZ:  Objection.

03:48 20        THE COURT:  Well, sustained as to that question.  You

21   can ask another.

22   Q.   Do you remember, do you know who the purchaser of these

23   items is, who came into the store to purchase these items?

24   A.   Randall and Erica.

25   Q.   Okay.  And the first item here, it says 25 total, and is

```
 1   that --
 2   A.    OZTS, abbreviation for ounces.
 3   Q.    Of gold?
 4   A.    That's correct.
 5   Q.    So can you describe to the jury what that is?
 6   A.    These would be coins.
 7   Q.    Okay.  And then below it there's a men's 14-karat rose
 8   gold men's bracelet.  Can you describe what that is?
 9   A.    So we would have a men's bracelet there.
10   Q.    Okay.  And then the final item is a platinum ladies
11   engagement ring.  Can you generally describe what that is to
12   the jury.
13   A.    Platinum ladies engagement ring.
14   Q.    And can you tell what the total purchase amount here is?
15   A.    $56,376.75.
16         MR. MOORE:  Thank you.  Nothing further.
17         THE COURT:  Cross-examination?
18         MR. LOPEZ:  I have no questions, Your Honor.
19         THE COURT:  Thank you.  You're excused.  Thank you.
20         Counsel?
21         MR. MARKHAM:  Yes, Your Honor, the government calls
22   Joseph Guidoboni.
23         THE COURT:  Okay.  He may be called.  We have to stop
24   promptly at 4:00.  Not just for the benefit of the jury, but
25   I'm told the jackhammering will start at 4:05.  So we'll stop
```

1    at 4:00.

2              JOSEPH GUIDOBONI, Sworn

3              THE COURT:  Good afternoon.

4              THE WITNESS:  Good afternoon.

5              THE COURT:  Mr. Markham.

6              MR. MARKHAM:  Thank you, Your Honor.

7                       DIRECT EXAMINATION

8    BY MR. MARKHAM:

9    Q.   Can you please state your full name, spelling your last

10   name.

11   A.   Joseph Guidoboni, G-u-i-d-o-b-o-n-i.

12             THE COURT:  Thank you.

13   Q.   And what is your occupation?

14   A.   I'm a revenue agent in the special enforcement program/

15   grand jury group in Boston, Massachusetts.  I work for the

16   Internal Revenue Service.

17   Q.   And how long have you been with the IRS?

18   A.   34 years.

19   Q.   When are people required to file their tax returns with

20   the IRS?

21   A.   Annually.

22   Q.   And when someone files their taxes, are they required to

23   report all lawfully obtained income from that year?

24   A.   Yes.

25   Q.   Are you generally familiar with the tax requirements

1      related to virtual currency?

2      A.    Yes.

3      Q.    If someone operates a virtual currency company in the

4      United States, do they have to report their lawfully obtained

5      income from that business?

6      A.    Yes.

7      Q.    Okay.  How about apart from a normal paycheck, apart from

8      the normal 9:00 to 5:00 job, if someone sells their virtual

9      currency, do they have to report any earnings from that sale?

03:51 10   A.    They would have to report the -- if it's theirs, if it's a

11     capital asset, they would have to report it on their Schedule

12     D, that's correct, yes.

13     Q.    Is the Internal Revenue Service able to conduct a search

14     of tax records filed by a person or a business?

15     A.    Yes.

16     Q.    And what, if any, record does the IRS provide if no taxes

17     have been filed?

18     A.    It's the record that's called the certification of lack of

19     records.

03:52 20   Q.    Have you reviewed certifications for a person with a

21     taxpayer identification number ending in 7351?

22     A.    Yes.

23     Q.    And did that relate to an individual named Randall Crater?

24     A.    Yes.

25     Q.    According to those certifications, between 2013 and 2018,

1    did the defendant file a tax return?

2    A.    No.

3    Q.    Did you also review certifications related to a company

4    with a taxpayer identification number ending in 3471?

5    A.    Yes.

6    Q.    And did that relate to a company purportedly doing

7    business as My Big Coin Pay, Inc.?

8    A.    Yes.

9    Q.    According to those certifications, between 2013 and 2018,

03:52  10   did that company file a tax return?

11   A.    No, they didn't.

12   Q.    And the certifications we just discussed, are they

13   currently available for the jury at Exhibit J?

14   A.    Yes.

15         MR. MARKHAM:  Okay.  Your Honor, I'd ask at this point

16   to read a stipulation related to Exhibit J.

17         THE COURT:  Okay.  You may and is this the one we're

18   now calling 25?

19         MR. MARKHAM:  Yes, Your Honor.  I hadn't moved to

03:53  20   admit it yet on the record yet.

21         THE COURT:  Well, as to the stipulation, that can be

22   25.  Mr. Lopez, were you rising to preserve your objection?

23         MR. LOPEZ:  I was, Your Honor.

24         THE COURT:  As to the second two of the certificates

25   that's being proffered?

```
 1              MR. LOPEZ:  That's correct, Your Honor.
 2              THE COURT:  Okay.  Noted for the record.  You can read
 3      the stipulation.
 4              MR. MARKHAM:  And I apologize, Your Honor.  This is
 5      actually still 24, this stipulation.
 6              THE COURT:  So 24.
 7              MR. MARKHAM:  Yes, Your Honor.
 8              THE COURT:  So jurors, you remember what I've said
 9      before about what a stipulation is.  It means it's an agreement
10      between the parties as to a particular fact.  Again, the weight
11      that any evidence, including a stipulation, gets is up to your
12      decisionmaking at the end.
13              Counsel.
14              MR. MARKHAM:  Thank you, Your Honor.
15              The stipulation reads as follows:  Counsel for the
16      United States and counsel for the defendant have stipulated and
17      agreed to the following:  Records received from the Internal
18      Revenue Service, including the government exhibit, a
19      Certification of Lack of Record, are accurate and authentic
20      business records from the Internal Revenue Service.
21              And at this point I'd move to admit Exhibit J, Your
22      Honor.
23              THE COURT:  Okay.  Objection noted, Mr. Lopez.
24              MR. LOPEZ:  Thank you, Your Honor.
25              THE COURT:  Okay.  It will be admitted.  I think the
```

```
 1   next number is 42.
 2            THE CLERK:  Yes.
 3            THE COURT:  It may be admitted as 42.
 4            MR. MARKHAM:  Thank you, Your Honor.
 5            (Exhibit 42 admitted into evidence.)
 6            MR. MARKHAM:  And now can you bring up Exhibit 11H.
 7   Can you zoom in on the email at the very bottom.
 8   BY MR. MARKHAM:
 9   Q.   Do you see this email from Randall Crater?
10   A.   Yes, I do.
11            MR. MARKHAM:  Can you highlight the part at the end
12   where it says "$100 million in my name in gold in Spain in a
13   bank."
14   A.   I see that.
15   Q.   Sir, if you have a foreign bank account, is that something
16   you have to report to the IRS?
17   A.   The foreign bank account would have to be reported to the
18   IRS on the Schedule B, B as in Bob, and the section that you
19   would notify the IRS would be on the bottom of that schedule.
20   So you would have to notify the IRS, yes.
21   Q.   And based on the records made available to you by the IRS,
22   did the defendant ever claim he had a bank holding in Spain?
23   A.   No.
24            MR. MARKHAM:  No more questions, Your Honor.
25            THE COURT:  Cross-examination.
```

                            CROSS-EXAMINATION

 1

 2   BY MR. LOPEZ:

 3   Q.   What does "TIN" stand for?

 4   A.   Taxpayer identification number.

 5   Q.   And I take it My Big Coin applied for a taxpayer

 6   identification number?

 7   A.   I don't know that.

 8   Q.   Well, when you did the search, did you use a taxpayer

 9   identification number?

03:56 10   A.   I didn't do the search.

11   Q.   So you don't know whether or not My Big Coin had a

12   taxpayer identification number?

13   A.   That's correct.

14          MR. LOPEZ:  No more questions.

15          THE COURT:  Any redirect?

16          MR. MARKHAM:  Just one question, Your Honor.

17          THE COURT:  Sure.

18          MR. MARKHAM:  Or two questions.

19                       REDIRECT EXAMINATION

03:56 20   BY MR. LOPEZ:

21   Q.   The taxpayer identification number you saw was related to

22   My Big Coin Pay, Inc.; is that correct?

23   A.   That was the employer identification number for My Big

24   Coin Pay, Inc.  It's EIN, not a TIN.

25          MR. MARKHAM:  Can you bring up Exhibit 28.  And go to

```
 1   page 37.
 2   Q.    Do you see there where it says "My Big Coin Pay" at the
 3   top?
 4   A.    Yeah, yes, I do.
 5   Q.    And what is it announcing there below it?
 6   A.    "Finalizes MasterCard deal, cryptocurrency and
 7   MasterCard."
 8   Q.    You can stop there.  Thank you.
 9            MR. MARKHAM:  No more questions, Your Honor.
10            THE COURT:  Any recross?
11            (Counsel discussion off the record.)
12            MR. LOPEZ:  Let me just have one moment, Your Honor.
13            THE COURT:  You may.
14                       RECROSS-EXAMINATION
15   BY MR. LOPEZ:
16   Q.    So, sir, did My Big Coin Pay, Inc. apply for a TIN number?
17   A.    An EIN number based on that, yes, they had to, right, yes,
18   they had to.
19   Q.    And did your records tell you who actually applied for it,
20   the individual who applied for it?
21   A.    On the bottom of that exhibit there is a name, okay.
22   Q.    Okay.
23   A.    I'm not quite sure if she searched the IRS internal
24   documents, doubtful.
25            MR. LOPEZ:  I have no more questions.
```

```
 1                THE WITNESS:  Yeah, okay.
 2                THE COURT:  Thank you.  You're excused.  Thank you.
 3                THE WITNESS:  Thank you very much.
 4                THE COURT:  Counsel -- jurors, just bear with us for a
 5       moment.  I just want to check in with counsel about scheduling
 6       so I can update you before you leave today.  Counsel.
 7                (Discussion held at sidebar.)
 8                THE COURT:  Counsel, can you all hear me?
 9                MR. LOPEZ:  Yes, Your Honor.
03:58 10                THE COURT:  Mr. Markham?  Mr. Moore?
11                THE CLERK:  You can't hear?
12                THE COURT:  Mr. Markham?
13                MR. MARKHAM:  We lost one due to battery and the
14       second one is down.
15                THE COURT:  Mr. Moore.
16                MR. MOORE:  It's back up now.  I can hear it.
17                THE COURT:  Okay.
18                Okay.  Counsel, I'd like to tell the jury the
19       following:  That the government expects to rest tomorrow
03:59 20       morning.  I'll say what that means.  I'll remind them that the
21       defense doesn't have to put on any evidence but if it chooses
22       to do so, that would start tomorrow.
23                Counsel, fair to represent that they're going to get
24       this case for their deliberation this week, if I don't say
25       anything more than that?  I mean, it sounds like it may be
```

1  Wednesday but I wouldn't say Wednesday yet.

2          Mr. Lopez.

3          MR. LOPEZ:  I think that's fair, and I think it will

4  be Wednesday that the case goes to the jury.

5          THE COURT:  Okay.  Mr. Markham, fair?

6          MR. MARKHAM:  I think that's fair, Your Honor.  Thank

7  you.

8          THE COURT:  Okay.  Thank you.

9          (End of discussion at sidebar.)

04:00 10          Jurors, I just wanted to give you an update before we

11  leave.  First of all, tomorrow we'll just go until 3:30.  I

12  expect, based on what counsel's represented to me and what I

13  understand of the evidence, that the government intends to rest

14  its case tomorrow, which just means that the government will be

15  saying to you essentially that they've offered all of the

16  evidence that they believe supports the charges against

17  Mr. Crater.

18          Again, I remind you, Mr. Crater doesn't have to prove

19  anything.  The government always has the burden of proof, but

04:00 20  if Mr. Crater chooses to put on any evidence, that would start

21  tomorrow.  This is a very long-winded way of saying we expect

22  that you will get this case this week for your deliberation.

23  Not next week but this week.  I will keep you informed about

24  when that's going to happen.  But tomorrow will be until 3:30.

25          You may recall I said once you get this case for your

1    deliberation, you should expect to be here until about 5:00

2    each day, but I'll let you know when that happens.  Okay?

3            As you leave today, keep all of my cautionary

4    instructions in mind.  Don't discuss this case with each other

5    or anyone else.  Don't do any outside research, and obviously

6    keep an open mind, and we'll see you tomorrow morning.  Thank

7    you.

8            THE CLERK:  All rise.

9            (Jury exits the courtroom.)

04:02 10         THE COURT:  Everyone can be seated.  I'm going to talk

11    quickly because we don't know when the jackhammering is going

12    to start again.

13            Just a few things, counsel, on the jury charge, this

14    is what I'm planning, that counsel, if you will do the jury

15    charge tomorrow at 8:30 in the morning.  And if you show up

16    between 8:15 and 8:30, there will be a copy of the charge for

17    each side to review before we start that conference.  I will

18    have reviewed, as I already have, the proposals on either side.

19    I will tell you that, as I said in regards to the preliminary

04:03 20    instructions, there doesn't seem to be much disagreement

21    between the parties in regards to the elements of the eight>

22    charges here.

23            There were a few instructions -- in the interest of

24    fair disclosure, Mr. Lopez, there are a few instructions in

25    your proposals that I don't know if you're pressing the missing

1    witness instruction and whether or not a witness invokes the

2    Fifth Amendment.  The second issue hasn't come up yet, so I

3    don't know if that's necessary yet.

4         MR. LOPEZ:  And hopefully it won't.

5         THE COURT:  On the missing witness instruction, I

6    certainly will hear you tomorrow.  Based on what I know or back

7    and forth, I don't know that the standard will be met here for

8    a missing witness instruction.  So I just say that and I'll

9    hear you on it tomorrow.

04:04 10         There were two instructions from the defense's

11    proposal about giving a separate witness instruction about law

12    enforcement officers that I'm not going to give here and a

13    separate one about government witness, government witnesses.  I

14    do obviously give a general instruction about judging

15    credibility, which includes an instruction to them that they

16    should consider the affiliations or anyone that has any

17    interest in the outcome of the case.  I think that's covered by

18    that, so I'm not going to give that.

19         There's a proposal in regards to statements by the

04:04 20    defendant, which usually is in the case of statements to law

21    enforcement.  I'm not sure that we've had any statements to law

22    enforcement by Mr. Crater here.

23         MR. MARKHAM:  No, Your Honor.

24         THE COURT:  Meaning, I'm not sure if the government is

25    pressing the statements by defendant instruction.  So I can

1    hear you on that tomorrow, but that's one of the questions I

2    have.

3              MR. MARKHAM:  Yes, Your Honor.

4              THE COURT:  And just generally, you'll see that my

5    jury charge is in three parts.  Part one are just general

6    overall instructions about what is evidence, what's not

7    evidence, credibility.  I don't think there's going to be much

8    controversy there.

9              There was an instruction by Mr. Lopez about treating

04:05 10   the government as a party, or not giving the fact that the

11   government is a party more credence.  I'm planning to

12   incorporate some version of that.  But I don't think there will

13   be any particular controversy over part one.

14             Part two is the guts of the instructions, and that's

15   where I address the charges and the issue -- the instructions

16   about state of mind.

17             And then the third, again, I don't think there will be

18   any controversy about the third part, which is pretty brief,

19   which is basically the rules for deliberation.

04:06 20         So counsel, as I said, if you show up between 8:15 and

21   8:30, Ms. Hourihan will certainly be here at 8:15 so you can

22   look that over and we'll do the charge conference at 8:30.

23   Obviously there may be at least one of these instructions that

24   may come up tomorrow but hasn't come up yet.

25             Counsel, I think I have the lineup from the government

1    for tomorrow.  And we had already talked about the disputed

2    exhibits anticipated.

3           Mr. Lopez, on your side, are there any disputed

4    exhibits that I have now that you expect will come up with your

5    witnesses?

6           MR. LOPEZ:  I don't believe so, Your Honor.

7           THE COURT:  Okay.  Counsel, I guess what I would just

8    ask is if that changes before tomorrow morning and you just

9    want to email Ms. Hourihan with exhibit letters and copying

04:07 10   your brothers, that would be fine.  Otherwise, I'll ask again

11   tomorrow morning.

12          Counsel, any thoughts about how much time you're

13   looking for for closing arguments?

14          MR. MOORE:  Around 30 to 45 minutes, Your Honor.

15          THE COURT:  Okay.  Mr. Lopez?

16          MR. LOPEZ:  I was going to say 30, but if they're

17   going to go 45, I guess I'll have to --

18          MR. MOORE:  If he'll agree to 30, I'll agree to 30,

19   Your Honor.

04:07 20         THE COURT:  Counsel, is that fair?

21          MR. LOPEZ:  That's fair.

22          THE COURT:  Okay.  So the government's will be 30

23   total, counsel.  So I just ask you to tell me what time you're

24   going to reserve for rebuttal.

25          MR. MARKHAM:  Well, Your Honor, if it's going to be 30

```
 1    in total --
 2             THE COURT:  I knew you were going to say that.  So
 3    predictable.  So why don't we say, Mr. Lopez, 35, both sides.
 4    You don't have to use it if you don't want to.  The government
 5    should tell me how much of the 35 they're going to reserve for
 6    rebuttal.  Okay?
 7             MR. MOORE:  Can we say that tomorrow, Your Honor?
 8             THE COURT:  That's fine.
 9             MR. MOORE:  Thank you.
04:08 10         THE COURT:  But just ahead of your starting closings.
11             Anything else we should take up now?  What's the
12    parties' position now on whether or not I need to make
13    Petrozziello findings here at the end of all the evidence?
14             MR. MARKHAM:  Your Honor, the government believes we
15    have established the agency exception to hearsay.  All the
16    statements have already been admitted pursuant to that
17    exception, in addition for being effect on listeners.  So the
18    government's position is that you would not need to make that
19    finding.
04:08 20         THE COURT:  Okay.
21             Mr. Lopez.
22             MR. LOPEZ:  I disagree.  I want the finding.  In
23    looking at the exhibits, I do expect that M1 through M3 would
24    probably come up tomorrow.
25             THE COURT:  M1 through M3?
```

1          MR. LOPEZ:  Yes.  Those are the Harmonie website that

2     was linked to the My Big Coin website.

3          THE COURT:  And have those not been admitted?

4          MR. LOPEZ:  They have not been admitted.

5          MR. MARKHAM:  No, Your Honor.

6          THE COURT:  Okay.  Counsel, I guess just for -- I'm

7     going to give a little more thought overnight to the

8     Petrozziello findings.  I think here there has been sufficient

9     basis about the agency exception for the purposes of the

04:09 10    admission of statements who are purported to be or alleged to

11    be by the government agents of Mr. Crater.  I don't think on

12    this record I need to make Petrozziello findings.  I want to

13    give some further thought to it, and either way, Mr. Lopez,

14    your objection will be noted.

15         It was less clear to me when we had the final pretrial

16    or before I heard the evidence come in what the evidence of

17    agency would be versus conspiracy, and I think the foundation

18    has been laid for agency, and that was the basis of my

19    admission of the statements of various individuals, including

04:10 20    but not limited to Mr. Gillespie.

21         Counsel, anything else?

22         MR. MARKHAM:  Nothing that can't wait for the charge

23    conference, Your Honor.  We're still wordsmithing "on behalf of

24    the public" suggested language, but it's going to be one

25    sentence, and I think we can address it tomorrow.

```
 1              THE COURT:  Okay.  If you have language --
 2              MR. MARKHAM:  I tried over lunch, Your Honor, but
 3      between --
 4              THE COURT:  Yes, before you retire.  I won't say close
 5      of business but before you retire and want to email it to
 6      Ms. Hourihan, copying Mr. Lopez, I will certainly see it.
 7      Otherwise, I can hear it tomorrow.
 8              MR. MARKHAM:  Yes, Your Honor.
 9              THE COURT:  And just because I note that Mr. Gillespie
04:11 10      is on the witness list, is he still on the witness list for
11      tomorrow, Mr. Lopez?
12              MR. LOPEZ:  Yes, Your Honor.
13              THE COURT:  Are there any issues that we anticipate in
14      regards to his testimony?
15              MR. LOPEZ:  Not that I'm aware of at this point in
16      time.  I'm meeting with him and his attorney at 5:00 in my
17      office, and I would ask the Court to defer its decision on the
18      Petrozziello matter until after you've heard Mr. Gillespie's
19      testimony.
04:11 20              THE COURT:  Yeah.  I only raise it now because we're
21      approaching the end.  I'm going to reserve on it, but I wanted
22      to mention my thinking so far.
23              MR. LOPEZ:  That's fine.
24              THE COURT:  Does the government anticipate any issues
25      in that regard?
```

 1            MR. MARKHAM:  I have -- so when we talked to

 2    Mr. Gillespie's attorney once, it was very unclear whether he

 3    was going to assert his Fifth Amendment right.  Sounds like

 4    Mr. Lopez knows more about that than I do.  I anticipate

 5    substantial cross-examination of him.  So in terms of timing --

 6            THE COURT:  I think both -- I think I anticipate that

 7    from both sides.

 8            MR. MARKHAM:  Yes, Your Honor.

 9            THE COURT:  And I guess also on that point, Mr. Lopez,

04:12 10    is this a witness that you anticipate asking me to treat as

11    adverse?

12            MR. LOPEZ:  I'll know more after I meet with him and

13    actually find out.

14            THE COURT:  Okay, for the purposes of examination.

15            MR. LOPEZ:  And I'm sure his attorney is going to ask

16    this as well, but I would imagine that there should be some

17    initial voir dire to ensure that he's well aware that he may

18    have a Fifth Amendment privilege not to testify and he's

19    waiving it.

04:12 20            THE COURT:  Well, I guess, counsel, I assume if he's

21    represented, that's been made clear, so.

22            MR. LOPEZ:  That's fine.  It's not my client.

23            THE COURT:  A fact you may want to elicit.

24            Counsel, if there's nothing else, I'll see you

25    tomorrow earlier than usual at 8:30, and we'll go from there.

1        Thank you.

2                (Adjourned at 4:12 p.m.)

3                        -------------------

4                        CERTIFICATION

5            We certify that the foregoing is a correct transcript

6        of the record of proceedings in the above-entitled matter to

7        the best of our skill and ability.

8        /s/Debra M. Joyce              July 18, 2022
         Debra M. Joyce, RMR, CRR, FCRR   Date
9        Official Court Reporter

10

11

12       /s/Kelly Mortellite           July 18, 2022
         Kelly Mortellite, RMR, CRR      Date
13       Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2
   WITNESS                                             PAGE
3

4  JAMES DOUGLAS

5     Direct Examination                               14
      By Mr. Moore
6     Cross-Examination                                29
      By Mr. Lopez
7     Redirect Examination                             41
      By Mr. Moore
8     Recross-Examination                              43
      By Mr. Lopez
9
   ROBERT McGOWAN
10
      Direct Examination                               45
11     By Mr. Markham
      Cross-Examination                                61
12     By Mr. Lopez
      Redirect Examination                             86
13     By Mr. Markham
      Recross-Examination                              92
14     By Mr. Lopez

15 RICHARD AUDET

16     Direct Examination                               99
      By Mr. Moore
17     Cross-Examination                               105
      By Mr. Lopez
18     Redirect Examination                            125
      By Mr. Moore
19     Recross Examination                             127
      By Mr. Lopez
20
   PETER BELL
21
      Direct Examination                              128
22     By Mr. Moore
      Cross-Examination                               173
23     By Mr. Lopez
      Redirect Examination                            221
24     By Mr. Moore
      Recross Examination                             224
25     By Mr. Lopez

SALVATORE OLIVO

Direct Examination                                        226
By Mr. Moore

JOSEPH GUIDOBONI

Direct Examination                                        231
By Mr. Markham
Cross-Examination                                         236
By Mr. Lopez
Redirect Examination                                      236
By Mr. Lopez
Recross-Examination                                       237
By Mr. Lopez
                        E X H I B I T S
Exhibit No.           Description               Received
     35                                              19

     KK                                              68

     36                                              68

     LL1 and LL2                                    107

     NN                                             116

     37                                             142

     38                                             145

     39                                             147

     NN                                             200

     OO                                             200

     PP                                             204

     QQ                                             206

     RR                                             207

     SS                                             216

     40                                             218

     41A and 41B                                    228

     42                                             235