<pre>
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3    _____

 4    UNITED STATES OF AMERICA,

 5                      Plaintiff,        Criminal Action
                                          No. 19-10063-DJC
 6    v.
                                          July 19, 2022
 7    RANDALL CRATER,                     8:31 a.m.

 8
                      Defendant.
 9    _____

10

11

12              TRANSCRIPT OF JURY TRIAL DAY 6

13         BEFORE THE HONORABLE DENISE J. CASPER

14              UNITED STATES DISTRICT COURT

15         JOHN J. MOAKLEY U.S. COURTHOUSE

16                   1 COURTHOUSE WAY

17                 BOSTON, MA  02210

18

19

20

21         DEBRA M. JOYCE, RMR, CRR, FCRR
                Official Court Reporter
22         John J. Moakley U.S. Courthouse
            1 Courthouse Way, Room 5204
23              Boston, MA  02210
              joycedebra@gmail.com
24

25
</pre>

1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    CHRISTOPHER J. MARKHAM, ESQ.
     BABASIJIBOMI MOORE, ESQ.
4    US Attorney's Office - MA
     J. Joseph Moakley U.S. Courthouse
5    1 Courthouse Way
     Suite 9200
6    Boston, MA 02210
     617-449-6890
7    christopher.markham2@usdoj.gov
     babasijibomi.moore2@usdoj.gov
8
     FOR THE DEFENDANT:
9
     SCOTT P. LOPEZ, ESQ.
10   Lawson & Weitzen
     88 Black Falcon Avenue
11   Suite 345
     Boston, MA 02210
12   617-439-4990
     splopez@lawson-weitzen.com
13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on July 19, 2022.

The defendant, Randall Crater, is present with counsel.  The Assistant U.S. Attorneys are present.)

(The Court entered the courtroom.)

08:31   THE COURT:  Good morning.

ALL:  Good morning, your Honor.

THE COURT:  Counsel, before I go into anything that might be coming up today, let's turn to the charge and verdict form, which I've shared the draft with each of you.

A few things before I go through it with you and hear any objections or additions or anything.

First, just a few notes.

First, as I noted during the final pretrial, I'm not giving the jury a copy of the indictment, but to the extent
08:32   that the elements of some of the charges include the language substantially as charged in the indictment, I've recited the relevant allegations in the indictment in the preamble to that particular instruction.

This draft is based on my review of your proposed jury instructions, the 1st Circuit pattern instructions,

1    particularly as to Counts -- the wire fraud counts and the

2    unlawful monetary transaction counts, the applicable law and

3    the evidence to date on the government's side, in terms of the

4    government's proposals.  I did not include defendant's

5    statements to law enforcement since I didn't perceive that that

6    applies here.

7         On the defendant's side, Mr. Lopez, I kept in for the

8    moment the instruction about Mr. Crater's right not to testify,

9    but obviously I would take that out if he chooses to do so.

08:33 10      I took out the missing witness instruction because I

11   don't think the standard has been met here in that regard.

12        I took out, again for the moment, a witness invoking

13   the Fifth Amendment since that hasn't happened.

14        I took out the character evidence instruction because

15   I haven't heard that yet, but I have it on reserve.

16        And as I indicated yesterday, I'm not going to give a

17   separate law enforcement or government witness instruction

18   because I think those credibility issues are covered in the

19   witness credibility instruction.

08:34 20      Let me just go through Parts I, II, and III with some

21   additional notes, and then I'll hear from you.

22        Counsel, as to Part I, again, these are the, again,

23   instructions that I will give before you make your closing

24   arguments.  Just to point out on page 10, improper

25   considerations, Mr. Lopez, I included as the second paragraph

1    the language that Mr. Crater proposed as to the government as a

2    party.

3              Also on that page on the bottom, I included language

4    about other actors other than Mr. Crater, that Mr. Crater is

5    the only one on trial here.

6              Part II, which begins on page 15, as I said, is the

7    guts of the charge, and this is where I addressed the elements

8    of the charged -- that should be "offenses."  I give just a

9    brief summary of the charges on page 15.

08:35 10          On page 16, as is my practice, I addressed state of

11   mind definitions as they'll apply throughout my instructions on

12   the charges.

13             Page 17, I did think a willful blindness instruction

14   is appropriate here.

15             Page 19 is where I address the wire fraud counts.

16             A few things here, first in the preamble, as I said, I

17   addressed the relevant allegations in the indictment as to what

18   the scheme -- the alleged scheme is here.  This instruction,

19   the breakdown of the elements follows the pattern instructions

08:36 20   and is in line with your respective proposals.

21             On page 20, I returned to the issue of state of mind

22   to address intent to defraud.  This also addresses the issue of

23   good faith, good faith defense, which is addressed here in the

24   second and third paragraphs on page 20.

25             On page 21, as alleged in the indictment, also as is

1    indicated on the verdict form, I have included the dates of the

2    respective wire fraud counts so the jury would understand the

3    distinction between them and as it's alleged in the indictment

4    as well as the parties' stipulation in regards to the wires

5    themselves.

6         Page 22 is the unlawful monetary transactions.

7    Obviously, as the parties or the government pointed out, there

8    wasn't a pattern instruction, but I did review the parties'

9    respective proposals, as well as the language in Section 1960.

08:37 10         The elements here, this is on page 23, are broken down

11   as the government proposed them, but they do include all of the

12   essential elements, including that Mr. Crater acted knowingly.

13   The definitions here are as I think both sides proposed them as

14   to unlicensed money transacting business and money

15   transmitting.

16         I did consider, Mr. Lopez, the additional inserts that

17   you proposed from the FinCEN regulations.  This is issue date

18   March 18, 2013.  I did not include them, one, because some of

19   them were confusing; and two, I'll just note even in this

08:38 20   guidance footnote 1 that FinCEN is issuing this guidance under

21   its authority to administer the Bank Secrecy Act which, unless

22   counsel corrects me, I take to include the Bank Secrecy Act

23   includes Title 31, United States Code, 5330 but does not

24   include Title 18, United States Code, 1960.

25         I just note in footnote 1, FinCEN says This guidance

1    explains only how FinCEN characterizes certain activities

2    involving virtual currencies under the Bank Secrecy Act and

3    FinCEN regulations.  It should not be interpreted as a

4    statement by FinCEN to the extent to which those activities

5    comport with other federal or state statutes, rules,

6    regulations or orders.

7         I did include, however, Mr. Lopez, on page -- also on

8    page 23, the language that you proposed from the 2nd Circuit in

9    U.S. v. Bah, 574 F.3d 106 at 114 (2nd Cir. 2009).  This is the

08:39 10    second and third sentence of the middle paragraph.

11         Under federal law it is not unlawful merely to receive

12    money for transmission without a license.  Such receipt of

13    money for transmission, however, is unlawful if it is incident

14    to an unlicensed money transmitting business, which I think is

15    a fair summary of Bah.

16         MR. MARKHAM:  I apologize, your Honor.  I just lost

17    you on the page number we're on right now.

18         THE COURT:  23.  Again, I'm reading -- this is page 23

19    as to Count Eight.  Let me just read that more slowly this

08:40 20    time.

21         I did include the language, as I said, from United

22    States v. Bah, and that's what I have as, Under federal law it

23    is not unlawful merely to receive money for transmission

24    without a license.  Such receipt of money for transmission,

25    however, is unlawful if it is incident to an unlicensed money

1  transmitting business.

2         And I think that's a fair inclusion of the language on

3  page 114 in the Bah decision, which, again, was a 1960

4  prosecution.

5         I've also reviewed the government's supplemental

6  submission -- give me a moment -- which I received and

7  reviewed, including the cases cited there, namely United States

8  v. Singh, 995 F.3d 1069 at 1077 to 78 (9th Cir. 2021), and also

9  what it cites internally in which the government also pointed

08:41 10  to this District of D.C. case, 2018, 306 F. Supp. 3d 213 up to

11  218, and I included that language in the last sentence of the

12  last paragraph on page 23.

13         And in regards to Part III, I don't think there's any

14  particular controversy there.  These are pretty

15  straightforward, standard instructions.

16         I'll just note that my practice is before I read the

17  jury the last instruction on page 30, I would hear from counsel

18  to reserve any objections that you have to the instructions or

19  to correct me if I've misstated anything, and then I'll get to

08:42 20  the last instruction.

21         At the end of the last instruction I also usually tell

22  the jury about the JERS system through which they can look at

23  your exhibits electronically.

24         And I also submit a copy of the charge and the verdict

25  form in hard copy form but also upload it to the JERS system.

1          Counsel, with all of that said, I'll hear from either

2     side if you need to be heard on any instructions.

3          MR. MARKHAM:  No objections from the government, your

4     Honor.

5          THE COURT:  Mr. Lopez.

6          MR. LOPEZ:  Your Honor, with respect to the unlicensed

7     money transmitting business, I think that -- well, I'm not

8     objecting to the "under federal law it's not unlawful merely to

9     receive money transmitting without a license," but I think by

08:43 10   saying "such receipt of money for transmission, however, is

11    unlawful if it's incident to an unlawful money transmitting

12    business," I just think that's confusing.

13         THE COURT:  Well, counsel, I'll just point exactly to

14    what in <u>Bah</u> I was responding to.

15         If you look at 113 through 114 of <u>Bah</u>, <u>Bah</u> sought an

16    instruction -- he sought a more extensive one earlier and then

17    sought an instruction from the District Court consisting of one

18    sentence, 1960 does not make it unlawful to receive money for

19    transmission without a license.

08:44 20        And then in the further discussion of the government's

21    argument at oral argument on appeal, the government explained

22    resourcefully that receiving money is part of conducting a

23    money transmitting business.  The 2nd Circuit responded, quote,

24    "However, even accepting the government's analysis, the receipt

25    of money would be prohibited only if it is incident to an

1    unlicensed money transmitting business.  Thus, it would be a

2    defense to the federal charge, not a basis for conviction that

3    he'd received money in New York in violation of the New York

4    licensing laws and transmitted the money via his licensed

5    business in New Jersey."  There was obviously a different

6    defense in that case where he was licensed in another state.

7         But I think that's a fair reading of their holding,

8    and I don't -- I don't think that's confusing because it's

9    saying basically it's not unlawful merely to receive money, but

08:45 10   if it's incident to the unlicensed money transmitting business,

11   which in and of itself involves several steps, it would be.

12        So that's why I had both sentences, counsel.

13        MR. LOPEZ:  Just note my objection.

14        THE COURT:  Noted, counsel.

15        MR. LOPEZ:  The next paragraph, where it says, "Money

16   transmitting includes transferring funds," I would suggest that

17   "money transmitting means transferring funds," not "includes."

18   Includes seems to add something else to the process.  It's

19   going to be argued by me that the exchange and My Big Coin

08:45 20   didn't transfer any funds.  Those funds were not transferred

21   through those entities.

22        THE COURT:  Okay.

23        MR. LOPEZ:  And so the key is that to be a money

24   transmitting business, you actually have to transfer funds.

25        And then there's just --

1          THE COURT:  And I'll just say, counsel, that language

2     is exactly what's in 1960, and I'll just quote it, 1960 Section

3     (b)(2) says, quote, "the term 'money transmitting' includes

4     transferring funds on behalf of the public by any and all

5     means, including but not limited to transfers within this

6     country or to locations abroad by wire, check, draft, facsimile

7     or courier," end quote.

8          MR. LOPEZ:  I understand the statutory language.  I'm

9     saying that with respect to this case, the government argument,

08:46 10    I believe, is that My Big Coin was operating a money

11    transmitting business, and, therefore, was transmitting money

12    between the public.  And I've yet to hear any evidence to that

13    effect.

14          And then there's just a typo.

15          THE COURT:  Okay.

16          MR. LOPEZ:  Must occur within a transaction business.

17          THE COURT:  I'm sorry, where are you?

18          MR. LOPEZ:  The second-to-last line, it has a "G" at

19    the end of "within."

08:47 20          THE COURT:  Yes, I see it.  Thank you.

21          MR. LOPEZ:  That's it.  That's all.

22          THE COURT:  Mr. Markham, did you need to be heard

23    on --

24          MR. MARKHAM:  Not after you quoted the statutory

25    language, your Honor.  That's all.

1          THE COURT:  So, counsel, again, Mr. Lopez, if during

2     the course of the defense case one of the instructions I didn't

3     include you think there's reason to include it, just raise it

4     again and I will be listening.  This is on some of the witness

5     instructions.  And, Mr. Markham, I'd ask you to do the same.

6          Counsel, there was something on my bench here this

7     morning, maybe, counsel, you just want to tell me what this is.

8          MR. LOPEZ:  Your Honor, you asked that I provide the

9     government with potential exhibits that might be in dispute

08:48 10     today.  Those are both new exhibits and demonstrative aids that

11     I expect to use with my expert.

12          THE COURT:  Okay.  So the -- I see the blockchain and

13     then sort of this --

14          MR. LOPEZ:  And that --

15          THE COURT:  And the common elements.

16          MR. LOPEZ:  The common elements.

17          THE COURT:  So these are chalks?

18          MR. LOPEZ:  They're all chalks, just to help the jury

19     understand.

08:48 20          THE COURT:  Sure.

21          And, counsel, does the government need to be heard on

22     these?

23          MR. MARKHAM:  On the chalks specifically, your Honor?

24          THE COURT:  Yeah.

25          MR. MARKHAM:  No.

1          THE COURT:  And then on the -- I'm sorry, I was just

2     trying to read through this cover email.

3          Mr. Lopez, did you want me to take something from

4     this?

5          MR. LOPEZ:  Your Honor, that's just an email with an

6     amended subscription -- oh, that email.

7          THE COURT:  It says April 7, 2014.

8          MR. LOPEZ:  That was Mr. Kruger asking Mr. Gillespie

9     to assist Mr. Lynch.  It just shows that it wasn't Mr. Crater

08:49 10    who was involved with Mr. Lynch, it was Mr. Kruger, and

11    Mr. Gillespie was working at Mr. Kruger's request.

12          THE COURT:  Okay.

13          And then the second is an amended subscription

14    agreement, and it looks like Tom Johnson.

15          MR. LOPEZ:  Yes, Tom Johnson will be the first witness

16    called, and that's the subscription agreement he signed.

17          THE COURT:  Okay.

18          MR. LOPEZ:  And he'll explain.

19          THE COURT:  And I see that there's maybe more than one

08:50 20    in here, because I see Tom Johnson and then there's another --

21          MR. LOPEZ:  That's his wife.

22          THE COURT:  Joyce?

23          MR. LOPEZ:  Yes.

24          THE COURT:  Okay.

25          Mr. Markham, do you need to be heard on these?

|  |  |
|--|--|
| 1 | MR. MARKHAM:  We may, your Honor, I got these five |
| 2 | minutes ago and it's a 20-page exhibit. |
| 3 | (Discussion off the record.) |
| 4 | THE COURT:  And, counsel, just fast-forwarding to |
| 5 | another issue, Mr. Gillespie is still anticipated to be |
| 6 | testifying, Mr. Lopez? |
| 7 | MR. LOPEZ:  Yes, your Honor.  However, I need to |
| 8 | confer with my client about that. |
| 9 | THE COURT:  Okay. |

08:50 10           And the reason I was asking, counsel, was, again,
11   overnight I was refreshing myself on Fifth Amendment inquiry
12   and whether or not I'm asking to see if I need to have a voir
13   dire with him.
14           MR. LOPEZ:  I don't expect that at this point.  I met
15   with him yesterday with his lawyer present.
16           THE COURT:  Okay.
17           MR. LOPEZ:  My understanding, he's not going to be
18   asserting that right, but until they're in the box, you never
19   know.
08:51 20           THE COURT:  Okay.  Mr. Markham, do you have a position
21   one way or the other?
22           MR. MARKHAM:  We don't primarily because I just got an
23   email from Mr. Gillespie's attorney saying he intends to
24   testify, so -- that's her responsibility.
25           THE COURT:  Right.

1          So as it stands now based on discussions and

2    communications with counsel on either side, I have the -- the

3    Court has no reason to believe that Mr. Gillespie intends to

4    invoke.  That's where things stand.

5          MR. MARKHAM:  Yes, your Honor.

6          MR. LOPEZ:  That's correct, your Honor.

7          THE COURT:  Okay.

8          Counsel, anything else that should -- that will come

9    up today that we should address?

08:52 10          MR. LOPEZ:  Your Honor, I have been unable to organize

11    the Zoom witnesses.

12          THE COURT:  Okay.

13          MR. LOPEZ:  And so if we're going to do them, I will

14    try to schedule that for tomorrow.

15          And I have one other witness who is flying in -- who

16    was supposed to be here yesterday because the flight schedules

17    on Sunday --

18          THE COURT:  Okay.

19          MR. LOPEZ:  So he's coming today, and I anticipate

08:52 20    that he'll be testifying tomorrow, as well as Thomas Callahan.

21          THE COURT:  So tomorrow would be Callahan -- so are

22    you intending to call the Zoom witnesses just tomorrow?

23          MR. LOPEZ:  Yes, Larry Brantley, Thomas Callahan, and

24    potentially the Zoom witnesses, none of which are going to be

25    long witnesses.

```
 1                 THE COURT:  Okay.
 2                 And so all of them together, how long do you think
 3       that will be for tomorrow?
 4                 MR. LOPEZ:  An hour, an hour and a half at most.
 5                 THE COURT:  Does that sound about right to you,
 6       Mr. Markham?
 7                 MR. MARKHAM:  Yes -- well, for all four of them?  Yes,
 8       our cross-examinations are going to be quite limited.
 9                 THE COURT:  Okay.  And it was Mr. Gifford and
08:53 10  Mr. Galvin were the two Zoom?
11                 Meaning, Mr. Lopez, you still anticipate the jury
12       could get this case tomorrow even if we're doing those
13       witnesses?
14                 MR. LOPEZ:  Yes, your Honor.
15                 MR. MARKHAM:  Your Honor, can we confirm the lineup
16       just for today?
17                 THE COURT:  Sure.  And what's the sequence, counsel.
18       I know you had given me names, if you could give me the
19       sequence.
08:53 20             MR. LOPEZ:  I'm going to call Tom Johnson and then
21       Gogoberidze, who is our expert, and then Mark Gillespie.
22                 And if I don't call Mark Gillespie, I'll likely call
23       Ken Hess.
24                 THE COURT:  And then after Ken Hess, would that be the
25       last one today?
```

```
 1            MR. LOPEZ:  Yes, your Honor.

 2            THE COURT:  What about Michael Singleton?

 3            MR. LOPEZ:  I have not had an opportunity to confer

 4    with him yet, your Honor.

 5            THE COURT:  Okay.

 6            MR. LOPEZ:  But if -- if need be, I will put him up

 7    there.  I have talked to him.  I know what he is going to say.

 8    I just haven't organized the exhibits on him.

 9            THE COURT:  But if you were calling him, he would be
08:54 10    today?

11            MR. LOPEZ:  Yes, he's here, he's in town.

12            THE COURT:  Okay.  And I think -- I think, as I

13    mentioned yesterday, my practice after the government rests is

14    to address the jury just to explain the juncture that we've

15    reached.  Then if it's not around a break time, counsel, we'll

16    go on Whisper Tech, and Mr. Lopez, I'll hear you at that time.

17    And then I'll turn to you to begin the defense case.

18            So I take it Mr. Johnson is here, and the other

19    witnesses will be here?
08:55 20            MR. LOPEZ:  Yes.

21            THE COURT:  Okay.  So just going back to the exhibits,

22    does the government need to be heard on the two, the email and

23    I guess the subscription agreement, which is going to come up

24    with the first witness?

25            MR. MARKHAM:  Your Honor, we would like to reserve
```

1    potentially on hearsay -- we don't know the purpose for which

2    it's being used.  I don't think we have -- if it can be

3    authenticated, which we don't know what it is and depending on

4    how it's being used, we don't anticipate an objection.

5         THE COURT:  What about the second one which I'm

6    assuming would come up with Mr. Gillespie?

7         MR. MARKHAM:  Is this the email, your Honor?

8         THE COURT:  Yes.

9         MR. MARKHAM:  I mean, I have no idea what this is, it

08:56 10   doesn't have a Bates number on it, it's not from Randall

11   Crater's email account, which means we don't have a stipulation

12   to it.

13        I presume he's prepped Mark Gillespie to say that this

14   is a true and accurate representation of his email.  And

15   besides that, we -- I mean, we have an objection to the hearsay

16   statement in the middle of that that says Michael Kruger has

17   asked me to assist you in any way I can.  Obviously the only

18   reason to put that in is for the truth for the matter asserted,

19   as counsel just put on the record.

08:56 20        THE COURT:  Mr. Lopez, what do you say to that?

21        MR. LOPEZ:  Your Honor, I thinking the statement goes

22   to the witness' state of mind --

23        (Court reporter interrupted.)

24        MR. LOPEZ:  The effect on the listener, Mr. Gillespie,

25   and what he did thereafter.  It kind of runs together.

1          MR. MARKHAM:  Well, your Honor, the statement that

2    Michael Kruger asked me to assist is hearsay.  If he testifies

3    he asked why did you do that and he says, Well, Michael Kruger

4    asked me to, well, then that's a statement on the stand he can

5    make, but this email is hearsay.

6          THE COURT:  Counsel, I'll listen to the foundation and

7    if I need to hear you at that time, we'll go on Whisper Tech,

8    but I understand the arguments.

9          And then, counsel, I had a notation about M1, M2, and

08:57 10    M3.  I think these are the Harmonie documents.  I think these

11    are the Harmonie various letters about the gold bars if I'm

12    recalling.

13          MR. LOPEZ:  That's the website.

14          THE COURT:  The website.

15          MR. LOPEZ:  It's the website of Harmonie, which there

16    was a link -- there's a link on the My Big Coin website to

17    Harmonie International, and Harmonie International, which was

18    the company that presumably was backing them by gold, had the

19    My Big Coin credit card up on the screen and it showed that

08:58 20    Harmonie was -- that it was, in fact, linked.  In other words,

21    there was some basis for Mr. Crater's belief that Harmonie was

22    backing them with gold.

23          THE COURT:  Counsel, I just -- okay.

24          And you expect this to come up with which witness?

25          MR. LOPEZ:  Mark Gillespie.

```
 1                THE COURT:  Okay.
 2                MR. MARKHAM:  Your Honor, to be -- just to front this
 3      issue, we're of course going to be objecting to Mr. Gillespie
 4      saying what Randall Crater saw or relied on unless
 5      Mr. Gillespie was in a room with Randall Crater and saw him
 6      looking at this website.
 7                My understanding is they've never met before last
 8      night, so that's not possible.
 9                MR. LOPEZ:  I don't know that they met last night.
10                MR. MARKHAM:  Okay, then they've never met before,
11      better, it's completely impossible.
12                THE COURT:  I understand.
13                So I will listen carefully and I'll just note for
14      counsel in this binder the government gave me yesterday M1, 2
15      and 3 --
16                MR. LOPEZ:  I will not be asking Mr. Gillespie about
17      Mr. Crater's state of mind.
18                THE COURT:  Okay.  Understood.
19                Ms. Hourihan, do we have all the jurors?
20                THE CLERK:  Last I checked we didn't, but I can check
21      again.
22                THE COURT:  Okay.  So if everybody's here and,
23      counsel --
24                MR. LOPEZ:  Your Honor, I just handed up my Rule 29.
25                THE COURT:  Yes, I see that.  And I will take a closer
```

```
 1   look at it when we get there.
 2             MR. MARKHAM:  Your Honor, I haven't seen that.
 3             MR. MOORE:  Here.
 4             MR. MARKHAM:  Here we go.
 5             THE COURT:  Counsel, I think we ended with a witness.
 6   So who is next?
 7             MR. MARKHAM:  Theodore Vlahakis.  Could I ask the
 8   Court for a quick break before we start?
 9             THE COURT:  Why don't we do that, and I will head out,
10   Ms. Hourihan.
11             We can take two minutes.
12             MR. MARKHAM:  Thank you, your Honor.
13             (Recess taken.)
14             THE CLERK:  Court is in session.  Please be seated.
15             THE COURT:  We'll get started.  Mr. Markham.
16             MR. MARKHAM:  Yes, your Honor.  The government calls
17   Theodore Vlahakis.
18             THE COURT:  He may be called.
19             THEODORE VLAHAKIS, having been duly sworn by the
20   Clerk, was examined and testified as follows:
21             THE CLERK:  Yes, I do.
22             THE COURT:  Thank you.
23             THE CLERK:  Thank you.  Please be seated.
24             THE COURT:  Good morning, sir.
25             THE WITNESS:  Good morning, your Honor.
```

```
 1              THE COURT:  Mr. Markham.

 2              MR. MARKHAM:  Thank you, your Honor.

 3                         DIRECT EXAMINATION

 4      BY MR. MARKHAM:

 5      Q.   Can you please state your full name, spelling your last.

 6      A.   Theodore John Vlahakis.  The last name is spelled

 7      V-l-a-h-a-k-i-s.

 8      Q.   And what is your current occupation?

 9      A.   Senior compliance officer.

10      Q.   And where are you a senior compliance officer?

11      A.   U.S. Department of Treasury Financial Crimes Enforcement

12      Network, commonly known as FinCEN.

13      Q.   So from here on out if I refer to it as FinCEN, we're

14      talking about the Financial Crimes Enforcement Network.

15      A.   Correct.

16      Q.   The defendant is charged with operating an unlicensed

17      money transmitting business in violation of 18 USC 1960.

18              Are you familiar with that statute?

19      A.   Yes, I am.

20              (Discussion off the record.)

21              THE COURT:  Counsel, you can proceed.

22              MR. MARKHAM:  Thank you.

23      BY MR. MARKHAM:

24      Q.   So 18 USC 1960, how are you familiar with that statute?

25      A.   FinCEN enforces that statute.
```

```
 1   Q.    And does that statute create a registration requirement
 2   for money transmitting businesses?
 3   A.    Yes, it does.
 4   Q.    When a company registers as a money transmitting business,
 5   what government agency do they register with?
 6   A.    FinCEN.
 7   Q.    Have you ever personally seen registration documents for a
 8   money transmitter?
 9   A.    Yes.
10   Q.    In the context of that registration requirement, can you
11   provide just a general definition of a money transmitter?
12   A.    Yes.  A money transmitter is the business that provides
13   money transmission services.  Money transmission services is
14   the acceptance of currency, funds or the equivalent of currency
15   or funds from one person and the transmission of currency,
16   funds or the equivalent of currency to another person or
17   location by any means.
18   Q.    That was a bit technical, so let's just break down a
19   couple of examples.
20           What if a person or business is accepting one type of
21   currency from a person and then providing them a different type
22   of currency, is that a money transmitter?
23   A.    Yes, it is.
24   Q.    What if a person or business receives one type of currency
25   from people in general and in exchange provides a check for
```

1    another type of currency, is that a money transmitter?

2    A.    Yes, it is.

3    Q.    Are virtual currency exchanges required to register with

4    FinCEN as money transmitters?

5    A.    Yes, they are.

6    Q.    Are cryptocurrencies exchanges required to register with

7    FinCEN as money transmitters?

8    A.    Yes, they are.

9    Q.    Does someone have to take a fee when they're exchanging

09:12 10   funds to be a money transmitter?

11   A.    No, they do not.

12   Q.    So it depends on the conduct, not how much money they're

13   making from the conduct; is that correct?

14   A.    Correct.

15   Q.    Do some money transmitting businesses operate exclusively

16   online?

17   A.    Yes.

18   Q.    And do some money transmitting businesses have user name

19   and password requirements to enter their exchanges?

09:12 20   A.    Yes.

21   Q.    When someone -- when a money transmitting business

22   registers with FinCEN, what sort of information do they need to

23   provide?

24   A.    They provide the name of the business, the Taxpayer

25   Identification Number, the owner/controlling person

1    information, the information regarding the owner of the

2    business, the states in which the business operates, the

3    primary transaction bank account, and other similar

4    information.

5    Q.    Would they have to include the bank account they're using?

6    A.    Yes.

7    Q.    And how is this registration requirement accomplished?

8    A.    It's accomplished by completing a registration form called

9    FinCEN Form 107, Registration of Money Services Businesses.

09:13  10    Q.    Just stepping back, what's the purpose of the registration

11    requirement?

12    A.    It's a law enforcement tool, allows law enforcement to

13    follow the paper trail.  When a money services business

14    registers by completing FinCEN Form 107, it requires them to

15    have an anti-money laundering program, it requires them to

16    complete certain reports with FinCEN, including reports of

17    suspicious transactions, and it also requires them to maintain

18    certain records of transactions.

19    Q.    And in addition to the statute itself, does FinCEN provide

09:14  20    information about the registration requirement on its website?

21    A.    Yes, we do.

22             MR. MARKHAM:  Can you please bring up Exhibit 10B.

23             Ms. Hourihan, if we can have HDMI1.

24             Thank you.

25    Q.    Mr. Vlahakis, this is an email from someone named James

```
 1   Douglas, who the jury has heard from.  And it's to the
 2   defendant, Randall Crater.  Do you see this email on your
 3   screen?
 4   A.   Yes, I do.
 5   Q.   Can you read the date, please.
 6   A.   Date:  Wednesday, 11 December 2013.
 7   Q.   What does it say under "Attachments"?
 8   A.   Attachments, trade Bitcoin-business overview.pdf.
 9   Q.   And how about the subject line up at the top there, can
10   you read that, please.
11   A.   Subject:  TradeBitcoin.com business overview and FinCEN
12   requirements.
13   Q.   Now in the body of the email, do you see the link that
14   James Douglas provided the defendant?
15   A.   Yes, I do.
16   Q.   Do you recognize that link?
17   A.   Yes, I do.
18   Q.   What is it?
19   A.   It's the FinCEN fact sheet for money services businesses.
20   Q.   Do you know what type of information is available at that
21   link?
22   A.   Yes, I do.
23   Q.   Okay.  Can you provide some examples?
24   A.   Sure.  This is an FAQ document, essentially, for money
25   services business.  It defines the various types of MSBs.  It
```

         1    explains how to register.  It explains that if someone is

         2    confused about the definition of an MSB or any of our

         3    requirements, what number to call, that we have a regulatory

         4    help line, an email address.  And it just provides a general

         5    overview of our requirements related to money services

         6    business.

         7    Q.   Does that include the registration requirement?

         8    A.   Yes, it does.

         9    Q.   In addition to this link, does FinCEN provide other

09:16   10    guidance directing virtual currency exchanges about

        11    registration requirements?

        12    A.   Yes, we do.

        13    Q.   And do you know about what date those go back to?

        14    A.   2013.

        15         MR. MARKHAM:  Can you please bring up Exhibit 7F.

        16    Q.   Mr. Vlahakis, this is a copy of the My Big Coin Exchange

        17    website.  Can you see that on your screen?

        18    A.   Yes, I do.

        19    Q.   Can you read the name of the exchange on the top left?

09:16   20    A.   My Big Coin Exchange.

        21         MR. MARKHAM:  And can you zoom in on the middle there

        22    where it "Sell my MBC" over to "buy."

        23    Q.   Mr. Vlahakis, can you just read for the jury what it says

        24    here?

        25    A.   Sell My Big Coin MBC select currency to buy.

1    Q.   If a business is selling virtual currency and exchanging

2    it for other currencies, is that money transmitting?

3    A.   Yes, it is.

4         MR. MARKHAM:   Can you zoom in below where it says,

5    "Sell MBC" all the way over to "last trades."

6    Q.   Can you read those headers at the top above all these

7    three columns?

8    A.   Yes.   In the left, "Sell MBC," in the center, "Buy MBC,"

9    on the right, "Last Trades."

09:17 10   Q.   If a business is operating a forum where individuals can

11   trade their virtual currency for U.S. dollars, is that a money

12   transmitting business?

13   A.   Yes.

14        MR. MARKHAM:   Can you please bring up Exhibit 2C.   And

15   go to page 5.

16   Q.   Mr. Vlahakis, do you see a copy of a check on your screen?

17   A.   Yes.

18   Q.   And in the upper left-hand corner of the check, what

19   entity does it say it's coming from?

09:18 20   A.   Greyshore Advertisement.

21   Q.   And then can you read what it says in the "Memo" line?

22   A.   Sure.   Sale of coins.

23   Q.   If a person or business is buying back its virtual

24   currency and in exchange providing a check, is that a money

25   transmitting business?

1    A.    Yes, it is.

2    Q.    Can you just read who it says under "Authorized

3    Signature," who that's signed by?

4    A.    Kimberly Renee B-e-n-g-e.   Is that correct?

5          MR. MARKHAM:   Okay.   You can take this down.

6    Q.    Is FinCEN able to conduct a search of all persons or

7    entities that have registered as money transmitting businesses?

8    A.    Yes, we are.

9    Q.    And if they conduct that search and a company or person

10   has not registered, what sort of document is FinCEN providing?

11   A.    It is called a negative certification.

12   Q.    In preparation for your testimony here today, have you

13   reviewed certifications related to the defendant, Randall

14   Crater?

15   A.    Yes, I have.

16   Q.    Have you also reviewed certification related to the

17   company My Big Coin?

18   A.    Yes, I have.

19   Q.    According to those certifications between 2013 and 2018,

20   was My Big Coin registered as a money transmitting business?

21   A.    No, it was not.

22   Q.    And how about the defendant?

23   A.    No, he was not.

24         MR. MARKHAM:   Your Honor, at this time I'd like to

25   read a stipulation into the record related to the negative

1    certification.

2             THE COURT:  Sure.

3             And obviously, jurors, my prior instruction to you

4    about stipulations applies here.

5             Counsel.

6             MR. MARKHAM:  This is available in Exhibit 24.

7             THE COURT:  Thank you.

8             MR. MARKHAM:  In lieu of live testimony or other

9    evidence at trial, and for purposes of authenticity, counsel

09:19 10   for the United States and counsel for the defendant have

11   stipulated and agreed to the following:  Records received from

12   the U.S. Treasury Financial Crimes Enforcement Network,

13   including Government Exhibit K, a certification of lack of

14   record, are accurate and authentic business records from the

15   U.S. Treasury Financial Crimes Enforcement Network.

16             With that, just for the witness only, can we bring up

17   Exhibit K?

18             THE COURT:  Yes, you may, just the witness.

19   BY MR. MARKHAM:

09:20 20   Q.   Mr. Vlahakis, do you recognize this document?

21   A.   Yes, I do.

22   Q.   And what is it?

23   A.   It's a cover letter for FinCEN Form 082, which is called

24   Document Transmittal Form.

25   Q.   And in preparation for your testimony here today, did you

1    review the entirety of Exhibit K?

2    A.   Yes, I did.

3    Q.   And does Exhibit K include the certification of lack of

4    records that we were just talking about?

5    A.   Correct, it does.

6           MR. MARKHAM:  I move to admit these, your Honor.

7           THE COURT:  Any objection?

8           MR. LOPEZ:  No objection.

9           THE COURT:  It may be admitted.

09:20 10           I think we're up to 43, Ms. Hourihan.

11           THE CLERK:  Yes.

12           THE COURT:  As 43.  It may be published.

13           (Exhibit 43 received into evidence.)

14           MR. MARKHAM:  Can we go to page 3.

15    BY MR. MARKHAM:

16    Q.   This certification of lack of record, what entity or

17    person is it for?

18    A.   My Big Coin.

19           MR. MARKHAM:  Okay.  Now can we go to page 4.

09:21 20    Q.   This certification of lack of record, what person or

21    entity is this for?

22    A.   Randall Crater.

23           MR. MARKHAM:  You can take down this exhibit.

24    Q.   In addition to those certifications we just looked, have

25    you personally searched FinCEN's records to determine whether

```
 1  the defendant ever registered as a money transmitter?
 2  A.   Yes, I have.
 3  Q.   And what were the results of that search?
 4  A.   Negative, no records returned.
 5  Q.   Did you also search for My Big Coin?
 6  A.   Yes, I did.
 7  Q.   And how about other names that included My Big Coin, such
 8  as My Big Coin Exchange or My Big Coin Pay?
 9  A.   Correct, no records returned.
10  Q.   That's for any of those?
11  A.   Right.
12          MR. MARKHAM:  No more questions, your Honor.
13          THE COURT:  Thank you.
14          Cross-examination, Mr. Lopez.
15          MR. LOPEZ:  Thank you, your Honor.
16                    CROSS-EXAMINATION
17  BY MR. LOPEZ:
18  Q.   Good morning, sir.
19  A.   Good morning.
20  Q.   My name is Scott Lopez.  I represent Mr. Crater.
21          Does a money transmitting business have to actually
22  transmit money?
23  A.   Yes.
24  Q.   So if the business doesn't actually take in the money and
25  then transfer it to someone else, it's not a money transmitting
```

1    business, right?

2    A.    That's not necessarily true.

3          So we define a money transmitter as -- and I'll repeat

4    the definition just for the benefit of everyone here -- money

5    transmitter is an entity or business that provides money

6    transmission services.  And money transmission services means

7    the acceptance of currency, funds or the equivalent from one

8    person and the transmission of currency funds or its equivalent

9    to another person or location by any means.

09:23 10          So it could be that an entity is operating as a money

11   transmitter but it doesn't look like they're actually

12   transmitting money, but we would define it as a money

13   transmitter.

14          So it may not actually look like money is moving but

15   it may be.

16   Q.    So if I wanted to buy My Big Coin coins and I found

17   someone who wanted to sell them to me and I went and paid them

18   with a check for those coins, am I running a money transmitting

19   business?

09:24 20   A.    Could be, because, according to the definition, check is

21   value that substitutes for currency.  So we may not be

22   discussing actual currency here.

23          And we also have guidance that goes back to 2013 that

24   says that if you are an exchanger or administrator of virtual

25   currency, then you are a money transmitting business.

1    Q.   What if I did it by way of an ACH debit to my checking

2    account?

3    A.   Without knowing -- I'd need to know further details about

4    the business.  But you still could very well be a money

5    transmitting business.

6              MR. LOPEZ:  Can you pull up 7G, Joe.

7    Q.   Now, Mr. Markham focused in on the center portion of this

8    document.

9              Can you highlight that again.

09:25 10   Q.   Sir, are you saying that that depiction indicates that My

11   Big Coin Exchange is a money transmitting business?

12   A.   Well, without knowing further details about the business,

13   just looking at this description, this would fit into the

14   definition of a money transmitting business, because, going

15   back to your question, it's the conduct we're concerned with.

16   And so if you are selling and exchanging virtual currency, if

17   it looks like that's what you're doing, you're a money

18   transmitter.

19   Q.   But you can't tell from this web page whether that was

09:26 20   actually occurring, right?

21   A.   Can't tell just from looking at this.  However, I can say

22   that it's a web page and if it is -- it looks like a service

23   being offered to people, then that would be a money

24   transmission business.

25   Q.   But wouldn't it actually have to be a business?

```
 1   A.   It would have to be some type of entity business operating
 2   as a money transmitter, yes.
 3   Q.   And the question is:  Can you tell by looking at this page
 4   whether My Big Coin was, in fact, a money transmission
 5   business?
 6   A.   Without knowing further details about the business, I'm
 7   just looking at the page and looking at the definition --
 8   Q.   Sir, I know what you're trying -- please answer my
 9   question.
10   A.   Yes.
11   Q.   Are you saying by looking at this page you can
12   definitively determine that this was a money transmitting
13   business?
14        MR. MARKHAM:  Your Honor, I object.  It goes to the
15   ultimate issue.
16        THE COURT:  Overruled.
17        But, counsel, been asked and answered.
18        "But you can't tell from the web page whether that was
19   occurring, right?
20        "A.  Can't tell just from looking at this."
21        MR. LOPEZ:  With that I'll end, your Honor.
22        THE COURT:  Counsel, redirect?
23        MR. MARKHAM:  Nothing from the government, your Honor.
24        THE COURT:  Okay.
25        Sir, you're excused.  Thank you.
```

```
 1              THE WITNESS:  Thank you, your Honor.

 2              THE COURT:  Counsel.

 3              MR. MARKHAM:  Yes, your Honor.  The government calls

 4    Kathleen Brekenfeld.

 5              THE COURT:  She may be called.

 6              MR. MARKHAM:  Thank you.

 7              Ms. Hourihan, if we can switch back.

 8              THE CLERK:  Yes.

 9              KATHLEEN BREKENFELD, having been duly sworn by the

09:28 10  Clerk, was examined and testified as follows:

11              THE CLERK:  Thank you.  Please be seated.

12              THE COURT:  Good morning.

13              THE WITNESS:  Good morning.

14              THE COURT:  Counsel.

15                        DIRECT EXAMINATION

16    BY MR. MARKHAM:

17    Q.   Can you please state your full name spelling your last for

18    the record.

19    A.   Sure.  Kathleen Brekenfeld, B-r-e-k-e-n-f-e-l-d.

09:28 20              THE COURT:  Thank you.

21    Q.   And, Ms. Brekenfeld, where are you employed?

22    A.   With the FBI.

23    Q.   And how long have you had that job?

24    A.   About 11-and-a-half years.

25    Q.   Can you just briefly describe what your job entails?
```

1   A.   Sure.  I'm a forensic accountant with the FBI, and my job

2   is basically to analyze financial records and investigation,

3   more or less following the money.

4   Q.   What sort of cases do you typically work on?

5   A.   Typically white collar cases, so financial crimes.

6   Q.   And prior to joining the FBI, where did you work?

7   A.   I started my career at Ernst & Young, and then I moved to

8   a regional accounting firm.

9   Q.   Can you provide a brief educational background?

09:29 10  A.   Sure.  I graduated from the College of the Holy Cross with

11  a degree in economics and accounting, and then I'm also a

12  Certified Public Accountant and a Certified Fraud Examiner.

13  Q.   Bringing you back to the present day, were you asked to

14  review bank records relating to this matter involving the

15  defendant and My Big Coin?

16  A.   Yes.

17  Q.   Were you able to identify any bank accounts receiving

18  funds from My Big Coin?

19  A.   Yes.

09:29 20  Q.   Besides the bank records themselves, did you identify

21  funds relating to My Big Coin, and if so, how?

22  A.   Sure.  I did.  It was through the stipulations that were

23  entered into, as well as witness testimony, which I listened

24  to, and then there was a series of emails I was provided, which

25  assisted me in identifying individuals.

1    Q.   All right.  Let's go through each of those.

2         So first you said you read a stipulation entered into

3    in this case.

4    A.   Yes.

5         MR. MARKHAM:  Your Honor, at this time I'd like to

6    read that stipulation to the jury.

7         This is Docket No. 153, which should be marked as

8    Exhibit 25.

9         THE COURT:  You may.

09:30 10        MR. MARKHAM:  Thank you.

11        In lieu of live testimony or other evidence at trial,

12   counsel for the United States and counsel for Mr. Crater have

13   stipulated that Mr. Crater has previously made the following

14   statements:

15        Mr. Crater was the managing member and CEO of

16   Greyshore LLC.

17        Mr. Crater texted one or more owners of digital

18   currency in the name of My Big Coin.

19        Mr. Crater owned My Big Coin or MBC digital currency

09:30 20   coins and sold some of his MBC coins to individuals who paid

21   Mr. Crater by wiring funds to his designated payees, including

22   transfers to accounts in the names of Greyshore Advertisement

23   and Barbara Crater Meeks.

24        Mr. Crater spent money he earned from sales of digital

25   currency he owned and caused funds from his sale of digital

1    currency he owned to be transferred from one bank to another.

2          My Big Coin, Inc. was a Nevada corporation.

3          Mr. Crater's mother is Barbara Crater Meeks.

4          And Mr. Crater's wife is Erica Crater.

5    BY MR. MARKHAM:

6    Q.   Ms. Brekenfeld, is that stipulation I just read the one

7    you were referencing?

8    A.   Yes.

9    Q.   In addition to that stipulation, you mentioned witness

09:31 10   testimony?

11   A.   I did.

12   Q.   Okay.  Did you observe earlier in this trial the witness

13   testimony of John Lynch?

14   A.   Yes.

15   Q.   How about Norman Mendiola?

16   A.   Yes.

17   Q.   Jay Byrd?

18   A.   I did.

19   Q.   And how about Peter Bell?

09:31 20   A.   Yes.

21   Q.   Lastly, you mentioned something about emails.

22   A.   Yes.

23   Q.   Can you describe what emails you reviewed?

24   A.   Sure.  There was a series of emails which indicated that

25   there were individuals who had put money into My Big Coin.

```
 1   Q.   And were these emails from the Greyshore@icloud.com
 2   account?
 3   A.   Yes.
 4   Q.   In preparation your testimony today, did you also review
 5   bank records from Wells Fargo?
 6   A.   I did.
 7   Q.   Did you review bank records from Bank of America?
 8   A.   Yes.
 9   Q.   How about BB&T?
10   A.   Yes.
11   Q.   And Capital One?
12   A.   Yes.
13           MR. MARKHAM:  Your Honor, at this time I'd to read a
14   stipulation related to those bank records, and this is in
15   Exhibit Number 24.
16           THE COURT:  You may.
17           MR. MARKHAM:  Counsel for the United States and
18   counsel for the defendant have stipulated and agreed to the
19   following:
20           Records received from Wells Fargo, including
21   Government Exhibits 2A through 2B, are accurate and authentic
22   business records from Wells Fargo.
23           Records received from Bank of America, including
24   Government Exhibits 3A through 3C, are accurate and authentic
25   business records from Bank of America.
```

1           Records received from BB&T, also known as Truist

2    Financial Corporation, including Government Exhibits 4A through

3    4F, are accurate and authentic business records from BB&T.

4           And records received from Capital One, including

5    Government Exhibits 5A through 5B, are accurate and authentic

6    business records from Capital One.

7    BY MR. MARKHAM:

8    Q.    Ms. Brekenfeld, when you reviewed all those records I just

9    talked about, how many pages of documents were there,

09:33 10    approximately?

11    A.    Thousands of pages.

12    Q.    In preparation for your testimony here today, did you

13    create a series of slides that summarized your analysis of

14    those voluminous records?

15    A.    I did.

16           MR. MARKHAM:  Your Honor, permission to publish to the

17    jury only as a demonstrative at this point as Exhibit I.

18           THE COURT:  Counsel, you're not offering it as an

19    exhibit yet?

09:33 20           MR. MARKHAM:  I would offer it as an exhibit right

21    now.  Yes, your Honor.

22           THE COURT:  Counsel, any objection?

23           MR. LOPEZ:  Just note my prior objections.

24           THE COURT:  Okay.  Noted for the record.

25           Just give me one second, counsel.

1          (Pause.)

2          THE COURT:  Okay.  They may be admitted pursuant to

3    Rule 1006 as the next number, Ms. Hourihan, which I think is

4    44.

5          THE CLERK:  Yes.

6          (Exhibit 44 received into evidence.)

7          THE COURT:  They may be published.

8          MR. MARKHAM:  Can you please bring up that exhibit.

9    BY MR. MARKHAM:

09:34 10    Q.   Ms. Brekenfeld, what is this?

11   A.   This is a summary of the three My Big Coin accounts.

12   Q.   Okay.

13          MR. MARKHAM:  Can you zoom in just on the title and

14   the dates.

15   Q.   So can you read the title for the jury?

16   A.   "Three 'My Big Coin' Accounts," and this is for the time

17   period January 13, 2014 through May 12, 2016.

18   Q.   So first, the title "Three 'My Big Coin' Accounts," why

19   did you title it that?

09:35 20   A.   Because these are the three accounts into which funds were

21   received from the individuals that I previously mentioned were

22   identified as having given money to My Big Coin.

23   Q.   And the date range right below it, why did you choose that

24   date range?

25   A.   This is the period of time in which the majority of those

1   funds were received.

2   Q.   Now let's walk through the three accounts.

3        MR. MARKHAM:  Can you zoom in on the first one.

4   Q.   Can you read the information in this first box for the

5   jury?

6   A.   Kimberly Renee Benge, d/b/a Greyshore, and that should be

7   Advertisement.  I think we acknowledged there was a misspelling

8   on the signature card.

9        That is Wells Fargo account 5976, and the signatory is

09:36 10   Kimberly Renee Benge.

11   Q.   Let's walk through some of this information.

12        So Kimberly Renee Benge, according to the

13   stipulations, who is that?

14   A.   Mr. Crater's sister.

15   Q.   And the company Greyshore, according to the stipulations,

16   whose company is that?

17   A.   Mr. Crater's.

18   Q.   Where it says "d/b/a" there, so Kimberly Renee Benge d/b/a

19   Greyshore Advertisers, what does "d/b/a" mean?

09:36 20   A.   Doing business as.

21   Q.   You see there it says "Wells Fargo" and then four digits?

22   A.   Mm-hmm.

23   Q.   What are those four digits?

24   A.   Those are the last four numbers of the bank account.

25   Q.   And that's a bank account with Wells Fargo?

1    A.    Correct.

2    Q.    And lastly, where it says "Signatory," what does that

3    mean?

4    A.    That is the person that has signing authority for checks.

5    Q.    Okay.  So if you're not a signatory, are you allowed to

6    sign the checks?

7    A.    No.

8    Q.    Let's move on to the second account and the next box.

9          Can you please read the information in this box for

09:37 10   the jury.

11   A.    Barbara Crater weeks, BB&T Bank ending in 2534, signatory

12   is Barbara Crater Meeks.

13   Q.    And again, based on the stipulations, who is Barbara

14   Crater Meeks?

15   A.    Mr. Crater's mother.

16   Q.    So last one was the sister?

17   A.    Correct.

18   Q.    The next one is the mother?

19   A.    Correct.

09:37 20   Q.    And this bank account is with BB&T as I see there; is that

21   right?

22   A.    Yes.

23   Q.    And again, who is the signatory?

24   A.    Barbara Crater Meeks.

25   Q.    Can we go to the third account and the third box.

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | And read that information for the jury.                                 |
| 2    | A.   Greyshore LLC, Bank of America account ending in 6487,             |
| 3    | signatory is Randall Grey Crater and Kimberly Renee Crater              |
| 4    | Benge.                                                                  |
| 5    | Q.   According to the stipulations, who is the managing member          |
| 6    | and CEO of Greyshore?                                                   |
| 7    | A.   Mr. Crater.                                                        |
| 8    | Q.   And where it says "BoA" there, what does that stand for?           |
| 9    | A.   That's Bank of America.                                            |
| 09:38 10 | Q.   And who does it say are the signatories?                       |
| 11   | A.   Randall Grey Crater and Kimberly Renee Crater Benge.               |
| 12   | Q.   And these three accounts between January 13, 2014 and May          |
| 13   | 12, 2016, which is the date range you provided, did you break           |
| 14   | down how much money each account was received during that              |
| 15   | period?                                                                 |
| 16   | A.   I did.                                                             |
| 17   | Q.   Did you make a chart reflecting all those payments?               |
| 18   | A.   Yes.                                                               |
| 19   | MR. MARKHAM:   Can you go to page 2, please.                            |
| 09:38 20 | Start by just zooming in on the top half.                          |
| 21   | Q.   Okay.  What does this part reflect?                                |
| 22   | A.   This part reflects the total incoming funds into the three         |
| 23   | My Big Coin accounts for the captioned period.                          |
| 24   | Q.   For the captioned period, what were the total incoming             |
| 25   | funds?                                                                  |

1    A.    $7,841,549.

2          MR. MARKHAM:   Now can we zoom in on the bottom half.

3    Include the arrows if you could.

4    Q.    Just going left to right, can you walk through the jury

5    how much each account was receiving?

6    A.    Sure.   The Wells Fargo account ending in 5976, that's

7    Kimberly Renee Benge doing business as Greyshore Advertisement,

8    that account received $6,757,109.

9          The Barbara Crater Meeks BB&T Bank account ending in

09:39 10   2534 received $775,446.

11         And the Greyshore LLC account with Bank of America

12   ending in 6487 received $308,994.

13   Q.    Okay.   For these accounts during the same time period, did

14   you observe payments coming from individuals?

15   A.    Yes.

16   Q.    Did you identify any of those payments as relating to My

17   Big Coin?

18   A.    Yes.

19   Q.    Did you make a chart reflecting those payments?

09:40 20   A.    I did.

21         MR. MARKHAM:   Can you go to slide 3, please.

22   Q.    What is the title of this slide?

23   A.    "Summary of Incoming Payments."

24   Q.    And what indications did you observe relating to these

25   incoming payments that somehow connected it to My Big Coin?

```
 1    A.   It would be, as I mentioned, the individuals who are
 2    referenced in the series of emails or there were checks with
 3    "memo" lines indicating they were related to My Big Coin, wire
 4    detail might have had that they related to My Big Coin.
 5    Q.   Did you also observe witness testimony?
 6    A.   Yes, that as well.
 7    Q.   And like the previous slide, does this slide cover the
 8    same time period?
 9    A.   It does.
10    Q.   So January 13, 2014 through May 12, 2016, do I have that
11    right?
12    A.   Correct.
13    Q.   Let's walk through the information that it covers.
14         MR. MARKHAM:   Could you zoom in on the four column
15    headers and then include the first four entries.
16    Q.   So starting on the far left, what does that column header
17    reflect?
18    A.   That is the date into which the -- the date that the
19    payment was received.
20    Q.   Okay.   What about the next column, "Account"?
21    A.   The account receiving the payment.
22    Q.   And the next column, the "Name"?
23    A.   That is the individual who is making the transaction,
24    making the payment.
25    Q.   And lastly, the column where it says "Amount"?
```

```
 1   A.   The amount of the credit into the account.

 2   Q.   Okay.  So with that information in mind, can you just walk

 3   the jury through what the first row says?

 4   A.   Sure.  On January 13, 2014, Wells Fargo account ending in

 5   5976 received from Randall Ross the amount of $7,000.

 6   Q.   So that first one is from Randall Ross.  Who are the next

 7   two from?

 8   A.   They are both from Randall Ross.

 9   Q.   How about that fourth entry?

10   A.   George Roumell.

11   Q.   So for both of these individuals, Randall Ross and George

12   Roumell, how did you identify them as being related to My Big

13   Coin?

14   A.   That was through email review.

15        MR. MARKHAM:  Can you bring up Exhibit 11F.  And zoom

16   in on just the "To," "From" information right now.

17   Q.   Is this one of the emails you were asked to review?

18   A.   Yes.

19   Q.   Who was the email from?

20   A.   Randall Crater.

21   Q.   And who is it to?

22   A.   To John Roche.

23   Q.   And what is the date?

24   A.   February 5, 2014.

25        MR. MARKHAM:  Can we zoom in on the last two
```

1    sentences.

2    Q.   Can you read that information for the jury, what it says

3    in the email?

4    A.   My Big Coin.  John, can you email this to each person on

5    this list from your Big Coin email address, please.  For some

6    reason it's kicking back from my email.  Please, sir.  Thanks.

7    Just want to have this for our records.

8         MR. MARKHAM:  And now can you zoom in on the list of

9    names above that the message was supposed to be sent to.

09:43 10   Q.   Do you see Randall Ross on here?

11   A.   I do.

12   Q.   And do you see George Roumell on here?

13   A.   I do.

14   Q.   In addition to this email, did you observe other emails

15   identifying purported My Big Coin customers?

16   A.   Yes.

17   Q.   And are the individuals you identified in those emails

18   reflected in your summary chart?

19   A.   That's correct.

09:43 20       MR. MARKHAM:  Let's go back to the summary chart.  And

21   go to page 3, please.

22   Q.   You said in addition to those emails, you saw witness

23   testimony, correct?

24   A.   Yes.

25   Q.   For the witness Norman Mendiola, who the jury has heard

1    from, were you able to identify transfers from him into the My

2    Big Coin accounts?

3    A.   I was.

4         MR. MARKHAM:  Let's go to that first one from him,

5    it's on April 7, 2014, and zoom in on that.

6    Q.   Can you read this entry for the jury?

7    A.   On April 7, 2014, Wells Fargo account 5976 received money

8    from Norman Mendiola in the amount of $6,000.

9    Q.   Was this the only wire transfer you observed from him?

09:44 10   A.   No.

11   Q.   Okay.  How about for the witness John Lynch, were you able

12   to identify transfers from him into the My Big Coin accounts?

13   A.   I was.

14        MR. MARKHAM:  Let's go to the very next entry,

15   4/8/2014.

16   Q.   Can you read this entry for the jury?

17   A.   On April 8, 2014, Wells Fargo account ending 5976 received

18   funds from John Lynch in the amount of $200,000.

19   Q.   All right.  Next for the witness Peter Bell.  Were you

09:45 20   able to identify transfers from him into the My Big Coin

21   accounts?

22   A.   I was.

23   Q.   All right.  Can you scroll down to the entry on May 28th.

24        Can you read this for the jury?

25   A.   On May 28, 2014, Wells Fargo account 5976 received funds

1    from Peter Bell in the amount of $20,936.65.

2    Q.   Was this the only transfer you observed from him?

3    A.   No, there was another one, I believe.

4    Q.   And lastly, for the witness Jay Byrd, were you able to

5    identify transfers from him into the My Big Coin accounts?

6    A.   Yes.

7         MR. MARKHAM:  Can you go to June 4, 2015.  It's going

8    to be on the next page.

9    Q.   And read what that entry reflects.

09:46 10   A.   On June 4, 2014, BB&T Bank ending 2534 received funds from

11   Jay Byrd in the amount of $25,000.

12        MR. MARKHAM:  Okay.  You can take that -- you can zoom

13   out of that.

14   Q.   So besides the emails and the witness testimony we just

15   went over, did you observe any checks that you included in your

16   analysis?

17   A.   I did.

18        MR. MARKHAM:  Can we go to the next slide, page 5.

19   Q.   Are these some of the checks you were referencing?

09:46 20   A.   Correct.

21        MR. MARKHAM:  Can you zoom in on that first check?

22   Q.   So on the top left there, who does it say the check is

23   from?

24   A.   From Greg and Molly Cutchall.

25   Q.   And who is the check to?

```
 1   A.   To Greyshore Technology.

 2   Q.   Can you tell how much it's for?

 3   A.   For $10,000.

 4   Q.   In the "memo" line, who does it say the check is for?

 5   A.   My Big Coin shares.

 6   Q.   Is this check reflected in your chart?

 7   A.   It is.

 8   Q.   Now, let's do an example of a wire transfer.

 9        MR. MARKHAM:   Can you please bring up Exhibit 3C.

10   Q.   Ms. Brekenfeld, what is Exhibit 3C?

11   A.   That is a page from the Greyshore LLC Bank of America

12   account ending in 6487.

13   Q.   Is this one of the three My Big Coin accounts that you

14   observed?

15   A.   It is.

16   Q.   And who are the signatories on this account?

17   A.   Mr. Crater and Kimberly Renee Benge.

18        MR. MARKHAM:   Let's go to page 9.

19        And zoom in on the incoming wire from October 20,

20   2014.

21        The first one.

22   Q.   Did you observe this wire transfer when you were

23   conducting your analysis?

24   A.   I did.

25   Q.   And why was a wire transfer like this one important to
```

1    you?

2    A.    Because in the payment detail it referenced My Big Coin

3    stock or shares.

4           MR. MARKHAM:  Can you highlight for the jury, please.

5    Q.    Did you include this specific wire transfer in your chart

6    of incoming My Big Coin funds?

7    A.    No.

8    Q.    And why not?

9    A.    The originator was Spartan's Wealth Investment, not an

09:48 10   individual, and the individual was not readily apparent for

11   whom this transfer was intended -- or meant to be from.

12          So all the individuals -- everything on my chart were

13   individuals who had indicated that money was meant for My Big

14   Coin.

15   Q.    Okay.  So your chart doesn't include all the money coming

16   in for My Big Coin; is that fair?

17   A.    No.

18   Q.    And it only includes individual people you identified?

19   A.    Yes.

09:48 20          MR. MARKHAM:  Can you please go back to the summary

21   chart, page 3.

22          And now just scroll down to the bottom of page 4.

23   Q.    Ms. Brekenfeld, at the bottom of these entries, what does

24   the number in red represent?

25   A.    That's the total number of incoming funds from the

1  individuals indicated that they were putting money in for My

2  Big Coin.   The summary -- the sum of all these individuals.

3  Q.   And how much is that?

4  A.   $6,313,927.15.

5  Q.   So on the previous slide you identified a little over $7.8

6  million coming in during this time period; is that correct?

7  A.   Yes.

8  Q.   So the difference between this a little over 6.3 million

9  and that 7.8 million, are you testifying today as to exactly

09:49 10  what that difference is?

11  A.   No.

12  Q.   So could it be for My Big Coin?

13  A.   It could.

14  Q.   Could it be for something else?

15  A.   Yes, possibly.

16  Q.   For the same period that all of this $6.3 plus million was

17  coming in, did you analyze how the money was being spent?

18  A.   I did.

19  Q.   Let's go to slide 6, please.

09:50 20        And zoom in on just the top half of that slide.   Not

21  including the arrows.

22  Q.   Can you read this information for the jury?

23  A.   Three My Big Coin accounts for the period January 13, 2014

24  through May 12, 2016, total outgoing funds $7,841,820.

25  Q.   And what is this slide meant to reflect?

```
 1    A.   Meant to reflect a summary of where all the funds went

 2    that were from the My Big Coin accounts.

 3    Q.   All right.

 4         MR. MARKHAM:  Let's zoom in on the bottom half,

 5    including the arrows.

 6    Q.   So in your chart, how did you split up the spending you

 7    identified for this slide?

 8    A.   Between Crater personal accounts, it could be transfers,

 9    spending items, and then withdrawals.

10    Q.   Let's take those one by one.

11         MR. MARKHAM:  Start on the far right.  Just zoom in on

12    the arrow and the withdrawals.

13    Q.   When you say "withdrawals," what does that mean?

14    A.   It would be ATM and then counter withdrawals.

15    Q.   And about how much did you see of that?

16    A.   $755,377.

17         MR. MARKHAM:  Now can you go to the middle box.

18    Q.   What does this middle box reflect?

19    A.   Those are some spending items.

20    Q.   And what is the total amount you observed for spending

21    items?

22    A.   $5,568,943.

23    Q.   Now, let's just zoom in on the box itself for the examples

24    of spending items.

25         So in this box do you include every spending item that
```

```
 1   you observed?

 2   A.   No.

 3   Q.   So how did you choose these ones?

 4   A.   They were either the larger dollar items or transactions

 5   that specifically related to My Big Coin.

 6            MR. MARKHAM:  Let's go from top to bottom.  And,

 7   Mr. Barbosa, if you could just highlight these as we go.

 8   Q.   What is that first entry?

 9   A.   The Closing Table.

10   Q.   Do you know what The Closing Table is?

11   A.   I do.

12   Q.   What is it?

13   A.   A real estate company.

14   Q.   All right.  Now can you read the next two bullets?

15   A.   Lord & Guy and then Southampton Jewelry Exchange.

16   Q.   What are the amounts for each of those?

17   A.   $630,397 and $422,487 respectively.

18   Q.   Do you know what Lord & Guy is?

19   A.   I do.

20   Q.   What is it?

21   A.   It is an art auction.

22   Q.   And what about the Southampton Jewelry Exchange?

23   A.   Just that, jewelry, jewelry store.

24   Q.   Okay.  How about the next one?

25   A.   American Express.
```

```
 1   Q.   And what is American Express?

 2   A.   A credit card.

 3   Q.   Did you review these records?

 4   A.   I did.

 5   Q.   And the American Express records, what sort of spending

 6   items were you seeing?

 7   A.   Generally personal expenses.

 8   Q.   The next one, please.

 9   A.   Great Bay Marina.

10   Q.   And what is amount on that?

11   A.   $209,000.

12   Q.   And what is Great Bay Marina?

13   A.   Just that, a marina.

14   Q.   Okay.  And the next group of payments there.

15        So that first one where it says "Payments to My Big

16   Coin Associates," what does "My Big Coin Associates" mean?

17   A.   Those would be individuals who, again, based on email

18   review and then witness testimony, appear to be working for My

19   Big Coin in some capacity.

20   Q.   In what email account were you seeing these emails?

21   A.   The Greyshore account.

22   Q.   Okay.  We'll come back to these payments later.

23        How about the next bullet, outgoing My Big Coin --

24   it's okay, the outgoing My Big Coin payments, just the last

25   one.
```

A.    Yup.  Those are payments back to the individuals who were previously recognized as having put money into My Big Coin. It's just money going back to them.

Q.    So these are the individuals on pages 3 and 4 who you saw money coming in?

A.    Yes.

Q.    And these are the payments you're seeing actually going back out to those people?

A.    Right.

Q.    And we'll come back to those later as well.

        MR. MARKHAM:  Let's zoom in on the box on the far left.

Q.    What does this box reflect?

A.    Those are transfers to personal accounts.

Q.    Why did you identify these as Crater personal accounts?

A.    Because they were either in the name of Mr. Crater or Erica Crater.

Q.    Can you please read the name of each account and the amount of money received?

A.    The first one is Randall Crater Bank of America account ending in 6356, and that is $1,290,500.

        Then Randall Crater BB&T account ending in 7610, that is $157,500.

        And then Erica Crater Capital One account ending in 6387, that's $69,500.

1    Q.    Just like for this chart we just went through, where you

2    divvied up the amount of spending you were seeing under those

3    items, did you go through that same process for the Crater

4    personal accounts?

5    A.    I did.

6    Q.    Let's walk through that.

7          MR. MARKHAM:  Can you go to slide 7, please.

8          Just zoom in on the top half.

9    Q.    What information does this reflect?

09:55 10   A.    This is a summary of the Crater personal accounts for the

11   period January 13, 2014 through May 12, 2016 with a total

12   outgoing funds of $2,544,315.

13   Q.    All right.  The time frame here, is that the same time

14   frame as the previous slides?

15   A.    It is.

16   Q.    For these accounts, what is the total amount of outgoing

17   funds?

18   A.    $2,544,315.

19   Q.    As referenced in the last slide, approximately how much of

09:56 20   that could you identify as coming from the My Big Coin

21   accounts?

22   A.    About 1.5 million.

23          MR. MARKHAM:  Can you please bring up Exhibit 3B.

24   Q.    What is this?

25   A.    This is a bank statement from Randall Crater Grey's Bank

1  of America account ending in 6356.

2          MR. MARKHAM:  Can you go to page 23, please, and zoom

3  in on that entry from January 10, 2014.

4  Q.  Can you tell the jury what this entry in the Crater

5  personal account reflects?

6  A.  It would be a wire in from January 10, 2014 for $10,000

7  originating from the Able Income Fund LLC.

8  Q.  And what does it say under "Payment Debt"?

9  A.  My Big Coin Pos.

09:57 10  Q.  Let's turn to how the money is being spent.

11          MR. MARKHAM:  Can you go back to page 7, please.

12          Apologies, to the summary exhibit slide 7.

13  Q.  Let's start with the box on the far right, including the

14  arrow.

15          So what does this reflect?

16  A.  Those are ATM and counter withdrawals totaling $301,510.

17          MR. MARKHAM:  Let's zoom in on the middle box.

18  Q.  And what sort of spending does this middle box reflect?

19  A.  It would be vehicle purchases.

09:58 20  Q.  Why did you make vehicle purchases an entirely separate

21  box?

22  A.  Just due to the volume of vehicle purchases.

23  Q.  Can you read these various purchases and the amounts for

24  the jury?

25  A.  Sure.  Baker Motor Group, $124,871.

```
 1              Myrtle Beach Auto, $66,469.

 2              Mercedes-Benz of Huntington, $57,905.

 3              Beach Ford, $56,539.

 4              And Mercedes-Benz of Southampton, $47,613.

 5    Q.   So what's the total amount on vehicle purchases?

 6    A.   $353,397.

 7              MR. MARKHAM:  Next let's zoom in on the box on the

 8    left.

 9    Q.   And what does this box reflect?

10    A.   These are examples of spending items.

11    Q.   And just like the My Big Coin account summary where they

12    had spending items, is this every spending item that you

13    observed?

14    A.   It's not.

15    Q.   So how did you choose these ones?

16    A.   Again, these are the larger dollar values or payments

17    relating directly to My Big Coin.

18    Q.   All right.  Let's just go one by one and highlight as we

19    go.

20              So starting at the top.  What were the first three

21    largest spending items?

22    A.   Southampton Jewelry Exchange for $117,272.

23              Lord & Guy for $80,033.

24              And then London Jewelers for $55,132.

25    Q.   Did you observe spending items at the Southampton Jewelry
```

1  Exchange and Lord & Guy in the My Big Coin Accounts as well?

2  A.   I did.

3  Q.   Now let's go to the next two.  Can you read those, please?

4  A.   Baer's Furniture for $50,639, and The Perfect Purse for

5  $33,538.

6  Q.   Okay.  After the furniture and the purses, can you go to

7  the next one, please?

8  A.   Payments to My Big Coin Associates for $18,500.

9  Q.   Okay.  And again, did you observe payments to My Big Coin

10 Associates also in the three My Big Coin accounts?

11 A.   I did.

12 Q.   Were these the same individuals or different individuals?

13 A.   They were the same.

14 Q.   And the last bullet, Outgoing My Big Coin Payments?

15 A.   That would be for $105,000.

16 Q.   And just as a reminder to the jury, the outgoing My Big

17 Coin payments, what were those?

18 A.   Those were payments to individuals who were indicated

19 previously putting money into My Big Coin.  This was money

20 going back out to them.

21 Q.   Specifically for the My Big Coin Associates, the

22 second-to-last bullet here and the second-to-last bullet on the

23 three My Big Coin accounts, did you create a separate chart

24 reflecting all of those payments?

25 A.   I did.

```
 1              MR. MARKHAM:  Let's go to slide 8, please.
 2    Q.    So what is this?
 3    A.    This is a summary of the payments to those associates that
 4    I had previously mentioned.
 5    Q.    I see you broke it up into two separate charts.  Why is
 6    that?
 7    A.    The top chart is from the three My Big Coin accounts, and
 8    then the bottom chart is from the Crater personal accounts.
 9    Q.    Okay.  What are the names of the individuals you are
10    identifying here as receiving payments from these accounts?
11    A.    Marcus Gorby, Michael Kruger and Mark Gillespie.
12    Q.    And in total how much money was transferred to them from
13    the three My Big Coin accounts?
14    A.    $140,400.
15    Q.    And how about from Crater's personal accounts?
16    A.    $18,500.
17    Q.    Were some of those payments made by check?
18    A.    Yes.
19              MR. MARKHAM:  Can you go to slide 9, please.
20    Q.    Are these examples of some of those checks?
21    A.    They are.
22              MR. MARKHAM:  And just as an example, can you zoom in
23    on the middle one there.
24    Q.    What account is this check from?
25    A.    It's from the Greyshore LLC Bank of America account ending
```

1    in 6487.

2    Q.    And who is it to?

3    A.    To Marcus Gorby.

4    Q.    For how much?

5    A.    For $5,000.

6    Q.    Who does it appear to be signed by?

7    A.    Randall Crater.

8    Q.    And what does it say in the "memo" line it's for?

9    A.    Payment.

10:02 10          MR. MARKHAM:  Now let's go to the example above this

11    one.

12    Q.    So what account is this one from?

13    A.    From Greyshore Advertisement, the Wells Fargo account

14    ending in 5976.

15    Q.    Is this one of the three My Big Coin accounts?

16    A.    It is.

17    Q.    And who is it to?

18    A.    To Michael Kruger.

19    Q.    And what does it say it's for?

10:02 20    A.    For payment.

21    Q.    And who does it appear to be signed by?

22    A.    Kimberly Renee Benge.

23          MR. MARKHAM:  Okay.  Now let's go to the one at the --

24    the check at the bottom, please, for Mark Gillespie.

25    Q.    What account is this from?

1    A.   Greyshore LLC, the Bank of America account ending in 6487.

2    Q.   And who is it to?

3    A.   To Mark Gillespie.

4    Q.   And who does it appear to be signed by?

5    A.   Randall Crater.

6    Q.   In addition to the payments to My Big Coin Associates, you

7    said you also saw some payments going out to the My Big Coin

8    individual payors.

9    A.   Correct.

10:03 10   Q.   Did you create a chart reflecting those payments as well?

11   A.   I did.

12        MR. MARKHAM:   Let's go to slide 10.

13   Q.   And what does this chart reflect?

14   A.   That's a summary of those outgoing payments.

15   Q.   And who are the individuals identified in this chart?

16   A.   Michael Lummis, Randall Ross, and Peter Bell.

17   Q.   Now, you see this is broken up into two separate charts

18   like the last one we were looking at.  Can you just explain the

19   difference between the top chart and the bottom chart.

10:04 20   A.   The top chart are payments coming from those same three My

21   Big Coin accounts, and then the bottom chart is payments coming

22   from the Crater personal accounts.

23   Q.   In total between the Crater personal accounts and the

24   three My Big Coin accounts, how much money did you see going

25   back to these individuals?

1    A.    About $123,000, if my math is right.

2    Q.    I apologize for making you do math.  But about $123,000.

3    A.    Right.

4          MR. MARKHAM:  Can we do a side by side, can we pull up

5    slide 4 on the left and slide 10 on the right?

6          Slide 4 on the left and on the right slide 10.

7    Q.    So on the left in total, how much money did you identify

8    as coming into the My Big Coin accounts?

9    A.    $6,313,927.15.

10:05 10   Q.    And then on the right, as we just discussed, if you

11   combined the My Big Coin accounts with the Crater personal

12   accounts, approximately how much do you see actually going back

13   out to these same individuals?

14   A.    About $124,000.

15   Q.    So, again, not trying to make you do math on the stand,

16   but is the approximate difference about $6.2 million?

17   A.    Correct.

18         MR. MARKHAM:  You can take these down.

19   Q.    Now let's walk through the specific wire transfers charged

10:05 20   in this case.

21         So the superseding indictment, Counts One through

22   Three each identify a wire transfer directed to the Wells Fargo

23   account ending in 5976.

24         First, do you recognize that Wells Fargo account and

25   the last four?

1    A.    Yes.

2    Q.    Which one is that?

3    A.    The Kimberly Renee Benge d/b/a Greyshore Advertisement.

4    Q.    Is that identified in your chart as one of the three My

5    Big Coin accounts?

6    A.    Yes.

7          MR. MARKHAM:   Can you please bring up Exhibit 2B.

8    Q.    And what is this document?

9    A.    It's a bank statement from that exact account, the

10:06 10    Greyshore -- the Kimberly Renee Benge doing business as

11    Greyshore Advertisement account ending in 5976.

12    Q.    Now let's identify the three specific wire transfers.

13          MR. MARKHAM:   So for Count One, please go to page 40.

14          And zoom in on the wire transfer from 4/8 from John

15    Lynch.

16    Q.    Can you please read what this reflects?

17    A.    On April 8, 2014 Wells Fargo account ending in this

18    account 5976 received a wire from John Lynch in the amount of

19    $200,000.

10:07 20    Q.    Okay.

21          MR. MARKHAM:   Now for Count Two, let's go to page 50.

22          At the very top, can you zoom in on the first wire on

23    May 1st.

24    Q.    Does this record identify a May 1, 2014 wire transfer of

25    $250,000 from John Lynch?

A.    Yes.

MR. MARKHAM:  Now for Count Three, can you please go to page 86.

And toward the bottom, zoom in on the wire from August 13, 2014.

Q.   And Ms. Brekenfeld, does this record identify an August 13, 2014 wire transfer of $103,000 from John Lynch?

A.    It does.

Q.   Were all three of those wire transfers from John Lynch identified in your summary chart?

A.    Yes.

MR. MARKHAM:  Your Honor, at this time I'd ask to read the stipulation to the jury addressing interstate wires in Exhibit Number 24.

THE COURT:  You may.

MR. MARKHAM:  In lieu of live testimony and other testimony at trial, counsel for the United States and counsel for the defendant have stipulated and agreed to the following:

Wire communications identified in Counts One, Two, Three, and Four of the superseding indictment were transmitted in interstate commerce on or about the dates identified in the superseding indictment, and each wire communication was transmitted between Massachusetts and at least one other state on or about the dates identified in the superseding indictment.

End of stipulation.

1          All right.  Let's now move to Counts Five through

2     Seven which allege unlawful monetary transfers.

3     Q.   So each account identifies a transfer from the Wells Fargo

4     account we were just talking about to a Bank of America account

5     ending in 6356.

6          First, do you recognize the Bank of America account

7     ending in 6356 that is identified in the superseding

8     indictment.

9     A.   Yes.

10:09 10   Q.   Which account is that?

11    A.   The Greyshore LLC.

12    Q.   And is that a Randall Crater personal account in that

13    bucket, or is it one of the three My Big Coin accounts?

14    A.   I'm sorry.  That was the personal account.  Is that the

15    one you referenced?  I'm sorry.

16          MR. MARKHAM:  Can you go, actually, to the summary

17    exhibit.

18          And then go down it, I think it's slide 5.

19          Slide 6, please.  Zoom in on the Crater personal

10:09 20   accounts.

21    Q.   Ms. Brekenfeld, did you identify here Randall Crater Bank

22    of America account ending in 6356?

23    A.   Yes.

24          MR. MARKHAM:  Now can you go to Exhibit 3B.

25          Or pardon me, start with 3A.

1    Q.   And what is this document?

2    A.   It's a signature card.

3    Q.   And for what account?

4    A.   For 6356.

5    Q.   So that's the Bank of America account we were just looking

6    at?

7    A.   Yes.

8         MR. MARKHAM:  Now let's go to page 2.

9         And at the bottom, can you zoom in just on the bottom

10:10 10  part.

11   Q.   Who does this signature card appear to be signed by?

12   A.   Mr. Crater.

13        MR. MARKHAM:  Now let's go to the specific wire.

14        So bring up Exhibit 3B.

15   Q.   And what is this document?

16   A.   This is a copy of a bank statement for the Bank of America

17   account ending 6356 in the name of Randall Grey Crater.

18   Q.   So is this bank statement for the same account we just

19   looked at the signature card for?

10:10 20  A.   Yes.

21        MR. MARKHAM:  So for Count Five, please go to page 57

22   and zoom in on the wire receipt from May 2, 2014.

23   Q.   Does this record identify a May 2, 2014 wire transfer of

24   $100,000 from the Wells Fargo account?

25   A.   It does.

1          MR. MARKHAM:   The next for Count Six, let's go to page

2     57.

3          And zoom in on the wire receipt from May 15, 2014.

4     Q.   Okay.  Does this record identify a May 15, 2014 wire

5     transfer of $150,000 from the Wells Fargo account?

6     A.   It does.

7          MR. MARKHAM:   And lastly, for Count Seven, please go

8     to page 65.

9          And zoom in on that last transfer from June 2nd up at

10:11 10   the top.

11    Q.   So lastly, does this record identify a June 2, 2014 wire

12    transfer of $125,000 from the Wells Fargo account?

13    A.   It does.

14    Q.   Ms. Brekenfeld, for the three wire transfers we just

15    identified, were they for more than $10,000?

16    A.   They were.

17    Q.   And for each of those wire transfers, did you also

18    identify the outgoing wire in the Wells Fargo account?

19    A.   Correct.

10:12 20        MR. MARKHAM:   You can take this down.

21    Q.   Leading up to each of those wires to the Bank of America

22    account, did you observe how the Wells Fargo account was being

23    funded?

24    A.   I did.

25    Q.   Okay.  So before the Wells Fargo account moved the money

1    to the Bank of America account, how was it being funded

2    primarily?

3    A.   With incoming funds from the individuals whose money was

4    intended for My Big Coin.

5    Q.   The last charge in this case, Count Eight, alleges of

6    existence of a money transmitting business.  Did you identify

7    any checks that specifically referenced the purchase or sale of

8    coins?

9    A.   Yes.

10:12 10       MR. MARKHAM:  Can you bring up the summary exhibit

11   slide 11.

12   Q.   Are these examples of the checks you just referenced?

13   A.   They are.

14       MR. MARKHAM:  Let's zoom in on the top one first,

15   please.

16   Q.   For the money being paid out in this top check, what

17   account is it coming out of?

18   A.   From Greyshore Advertisement, Wells Fargo account ending

19   in 5976.

10:13 20   Q.   Is this one of the three My Big Coin accounts?

21   A.   It is.

22   Q.   How much is it for?

23   A.   For $3,000.

24   Q.   Who is it being sent to?

25   A.   To Randall Ross.

1  Q.   Was Randall Ross one of the individuals you previously

2  identified in your chart of incoming My Big Coin funds?

3  A.   Yes.

4  Q.   And in the "memo" line, what does it say the money is for?

5  A.   It's for sale of coins.

6         MR. MARKHAM:   Now can we go to the bottom check.

7  Q.   And what account is this from?

8  A.   It is from the Greyshore LLC Bank of America account 6487.

9  Q.   And is this another check to Randall Ross?

10:14 10  A.   It is.

11  Q.   And for the money being paid on this check, what

12  account -- pardon me, what does the "memo" line say it's for?

13  A.   Coin buy back.

14         MR. MARKHAM:   Okay.  You can take down this slide.

15  Q.   Switching gears a little bit to travel.  When you review

16  bank records, do those records typically reflect the location

17  where the spending is occurring?

18  A.   Yes, typically.

19  Q.   And for this case did you identify or analyze some of the

10:14 20  defendant's bank records to determine the location on specific

21  dates?

22  A.   I did.

23  Q.   Did you identify any instances where the defendant was

24  spending money outside the United States?

25  A.   Yes.

```
 1    Q.   Can you give an example?

 2    A.   Sure, Nassau, the Bahamas, there was some in Germany.

 3         MR. MARKHAM:  Can you go to Exhibit 4E.

 4    Q.   What is this exhibit?

 5    A.   This is a bank statement from BB&T Bank, and it is for the

 6    account ending in 7610 in the name of Randall Crater.

 7    Q.   So is this one of the Randall Crater personal accounts you

 8    identified?

 9    A.   It is.

10    MR. MARKHAM:  Can you go to page 116.

11         And zoom in near the bottom on all the debits from

12    January 31st.

13         Sorry, all of them.  There's about six of them.

14    Q.   Are these some of the debits you were talking about

15    earlier in Nassau?

16    A.   Yes.

17    Q.   Did you see spending in Nassau on any other dates?

18    A.   I believe there were.

19         MR. MARKHAM:  Can we bring up Exhibit 11H.

20         And let's zoom in on the email at the very bottom.

21         And can you highlight the line starting, "We have $100

22    million."

23    Q.   Ms. Brekenfeld, can you read that highlighted portion,

24    please.

25    A.   We have 100 million dollars in my name in gold in Spain in
```

1    a bank.

2    Q.    When reviewing the defendant's financial records, did you

3    identify any spending that appeared to be occurring in Spain?

4    A.    I did not.

5    Q.    And what time period did that include?

6    A.    From 2014 to 2017.

7    Q.    Were you also able to review the defendant's travel

8    records in preparation for your testimony today?

9    A.    I did.

10:16 10   Q.    Did those travel records indicate any travel to Spain

11   between 2013 and 2017?

12   A.    No.

13   Q.    How about this claim about gold backing, did you see in

14   the bank account records anything relating to a gold holding?

15   A.    I did not.

16   Q.    Did you see any transactions with a Spanish bank?

17   A.    I did not.

18           MR. MARKHAM:   You can take this down.

19           Can you please go to Exhibit 16.

10:17 20          And go down to page 28.

21   Q.    These are a series of text messages from John Lynch and

22   the defendant.   Do you recall seeing testimony related to these

23   text messages?

24   A.    I do.

25           MR. MARKHAM:   Can you zoom in on the third text from

1    the bottom from Randall Crater on May 8th.

2    Q.   Can you read that for the jury?

3    A.   Morning John.  Sorry didn't call.  Ate some bad food and

4    wasn't the best experience to say the least.  I'm heading to

5    Colorado right now.  I'll call you when I land.  Buddy, look

6    forward to getting to see you this week.

7            MR. MARKHAM:  Okay.  Now can you go to the next page,

8    page 29, and zoom in on the top two texts.

9    Q.   Can you read that first text, please?

10:18 10   A.   How was your flight to Colorado, Randall.  Are you free

11   for a quick call now?  John.

12   Q.   How does the defendant respond?

13   A.   Counting cash right now.

14           MR. MARKHAM:  Now, can you do a side-by-side

15   comparison of this exhibit and Exhibit 4E.

16           Page 29.

17           So on the left, can you zoom in on the top two texts

18   again.

19   Q.   Ms. Brekenfeld, this exhibit on the right, can you remind

10:19 20   the jurors what this is?

21   A.   Yeah.  It is a bank statement for the Randall Crater

22   account at BB&T Bank ending in 7610.

23   Q.   Is this where you saw that Nassau spending?

24   A.   It is.

25           MR. MARKHAM:  Can you go to page 136.

```
 1              And zoom in toward the bottom, so from May 4th all the
 2       way to the end.
 3       Q.   So on the left there's these texts from the May 8, 2017.
 4       On the right during that same time period, do you see any
 5       charges there that appear to reflect the defendant being in
 6       Colorado?
 7       A.   No.
 8       Q.   And when you say that, did you also review the defendant's
 9       credit card records?
10:20 10 A.   I did.
11       Q.   Specifically, on May 8th, the day when the defendant says
12       he is counting cash in Colorado, what two charges do you see in
13       on his debit card?
14       A.   There is a debit card purchase Orlando office, I'm
15       guessing Center, in Lake Mary, Florida.  And then the next one
16       is an overdraft fee.
17       Q.   Does the overdraft fee have a location?
18       A.   It does not.
19       Q.   How about the debit card purchase right above it on that
10:20 20 same date?
21       A.   Lake Mary, Florida.
22       Q.   Is Florida in Colorado?
23       A.   No.
24              MR. MARKHAM:  Now, in the text messages, can you go to
25       page 30.
```

```
 1              And zoom in on the fourth and fifth texts from the
 2   top.
 3   Q.   Can you please read these two texts from the defendant for
 4   the jury?
 5   A.   I'm in a room counting money just as I was till 2:30 this
 6   morning.
 7   Q.   So it says "minting" and then the next one is "morning"?
 8   A.   Morning, right.
 9              MR. MARKHAM:   Now in the defendant's bank records on
10   that same page, 136, can you just zoom in only on May 8th to
11   May 10th.   Okay.
12   Q.   Ms. Brekenfeld, on the exhibit on the right, the
13   defendant's bank records, on the day before and the day after
14   the defendant says he's counting money until 2:30 in the
15   morning, what do his debit account records reflect?
16              MR. LOPEZ:   Objection.
17              THE COURT:   Well, sustained as to form of the
18   question.   You can rephrase.
19   BY MR. MARKHAM:
20   Q.   Okay.   On May 8th and May 10th, what do his records
21   reflect?
22              MR. LOPEZ:   Objection.
23              THE COURT:   Sustained as to that question.
24   BY MR. MARKHAM:
25   Q.   Do you see on the right where it says "negative account
```

1    balance"?

2    A.    I do.

3    Q.    What does "negative account balance" mean?

4    A.    That your account literally is below zero.

5    Q.    And right above that, two days before on May 8th, do you

6    see where it says "overdraft item fee"?

7    A.    I do.

8    Q.    What is an overdraft item fee?

9    A.    When you make a charge out of your account and you have

10:22 10   insufficient funds, so you get a charge for that.

11   Q.    Okay.  Is that the day before the texts on the left?

12   A.    It is.

13            MR. MARKHAM:  No more questions, your Honor.

14            THE COURT:  Thank you.

15            Cross-examination, Mr. Lopez.

16            MR. LOPEZ:  Thank you, your Honor.

17                        CROSS-EXAMINATION

18   BY MR. LOPEZ:

19   Q.    Good morning, Ms. Brekenfeld.

10:23 20   A.    Good morning.

21   Q.    I know you know who I am because --

22   A.    I do.

23   Q.    -- because you've been sitting in the courtroom.

24            You would agree with me that your review of the My Big

25   Coin accounts and the other accounts that you reviewed is only

1    a snapshot of those accounts.

2    A.    It's for a limited period of time, correct.

3    Q.    And that limited period of time, with some exceptions, was

4    from January 13, 2014 until May 12, 2016.

5    A.    Yes.

6    Q.    And --

7            MR. LOPEZ:  Can we go to I, which is now Exhibit 44,

8    Mr. Sweeney, page 3.

9            Could you zero in on the 5/9/2014, about halfway down,

10:24 10    $700,000.

11   Q.    And I show you that on -- you included a $700,000 wire

12   that occurred on 5/9/2014 from a Mr. John Lynch.

13   A.    Yes.

14   Q.    And having sat in the courtroom and listening to the

15   testimony, do you now know what that transfer was for?

16   A.    I believe it was originally intended for a marijuana

17   license.

18   Q.    On May 9, 2014, what was it intended for, if you know?

19   A.    I believe it was a marijuana license.

10:24 20    Q.    So it wasn't related to My Big Coin.

21   A.    From my understanding of the testimony, since the

22   marijuana license didn't come to fruition, I believe Mr. Lynch

23   testified that he translated that into coins, in which case to

24   me it would still be relevant.

25   Q.    But that was outside of the snapshot that this relates to,

1   right?

2   A.   I believe it's still relevant because although --

3   Q.   Ma'am, I'm not asking you about what's relevant.

4   A.   Sure.

5   Q.   I'm asking you whether, when that money was received on

6   May 9, 2014, whether it was for Big Coin coins.

7   A.   No.

8   Q.   And yet, you included it your analysis, right?

9   A.   I did.

10:25 10   Q.   And that's because you didn't know what it was really for

11   at the time you looked at only the bank statements, right?

12        MR. MARKHAM:   Objection.   Misstates testimony.

13        THE COURT:   Overruled.   You can answer.

14   A.   No, I did not know any outside information about what this

15   was for.   I didn't interview Mr. Lynch.

16   Q.   Okay.

17        MR. LOPEZ:   And now if you could go down to May 16,

18   2014 and enlarge that.

19   Q.   And again, on May 16, 2014, there was a wire transfer from

10:26 20   Mr. Lynch for $750,000, right?

21   A.   Correct.

22   Q.   And when you took your snapshot of January 13, 2014 until

23   May 12, 2016, you assumed that was for My Big Coins coins,

24   right?

25   A.   Correct.

1   Q.   And you now know that it was not for My Big Coin coins,

2   right?

3   A.   That is correct.  It was, again, originally intended for

4   the marijuana license.

5        MR. LOPEZ:  Mr. Sweeney, if you could go down to the

6   lower portion of the page, and there's another 6/2.

7   Q.   And again, on 6/2, 2014, there was yet another transfer

8   for $750,000 which you assumed was for My Big Coin coins.

9   A.   Correct.

10  Q.   And which you now know was not.

11  A.   Correct.

12  Q.   And finally --

13       MR. LOPEZ:  Go to the next page, Mr. Sweeney, about a

14  third of the way down, July 22, 2014.

15  Q.   And that was a wire transfer of $750,000 on July 22, 2014,

16  and again, that was for a marijuana license, not for My Big

17  Coin coins, correct?

18  A.   Yes.

19  Q.   And in total, those wire transactions were about $3.7

20  million, right?

21  A.   I'll trust your math.

22  Q.   Okay.  That's unusual for an accountant.

23  A.   I need a calculator.

24       MR. LOPEZ:  So if you go down to the bottom of that

25  page, and just the amount on the bottom.

1    Q.   So because you included those amounts, the amounts that

2    you thought were incoming payments, based on your review of the

3    documents, was $6,313,927.15.

4    A.   That's correct.

5    Q.   Had you known that the $3.7 million was not for My Big

6    Coin coins, the amount would be much lower.

7    A.   It would.

8    Q.   Approximately $2,600,000?

9    A.   Sure.

10:29 10        MR. LOPEZ:  Now, can go to the first -- to page 2,

11   Joe.

12   Q.   Now, on page 2, can you highlight the total incoming

13   funds?

14        You would agree with me that the total incoming funds

15   would have been substantially less as well.

16   A.   No.

17   Q.   If you subtract the $3.7 million from the transactions

18   which you believed were coin and which you now know were not,

19   that wouldn't affect the total incoming funds?

10:30 20   A.   No, it would not.

21   Q.   Because it didn't matter what it was for when it came in?

22   A.   This is a reflection of every incoming fund.

23   Q.   So that number has nothing to do with My Big Coin.

24   A.   It does.  It's the total amount of funds coming into those

25   three accounts irrespective of where they came from.

```
 1   Q.   So if I understand you correctly, that number is not the
 2   number that was the total incoming funds for My Big Coin coins.
 3   A.   That's correct.
 4   Q.   Okay.  And I note that when you --
 5           MR. LOPEZ:  If I could just have a moment, your Honor.
 6           THE COURT:  Sure.
 7           MR. LOPEZ:  I'm looking for the right page.
 8           (Pause.)
 9   BY MR. LOPEZ:
10   Q.   I note that that amount is about $1.5 million more than
11   the amounts you tracked that came in for -- into the My Big
12   Coin account?
13   A.   Yes.
14   Q.   And you couldn't tell from your review of the records how
15   Mr. Crater earned those monies, right?
16   A.   Not all of it, correct.
17   Q.   Okay.  But, in any event, it demonstrates that he had
18   other substantial income besides the amounts that were related
19   to My Big Coin coins.
20   A.   Sure.
21   Q.   Now, you did testify about the use of his personal account
22   while he was traveling.
23   A.   Yes.
24   Q.   And Mr. Markham was trying to compare and contrast the
25   statements that he was making in text messages juxtaposed to
```

1      the spending habits.

2      A.   Sure.

3      Q.   Did you determine whether or not Mr. Crater's wife had a

4      debit card?

5      A.   I believe she did, yes, she has --

6      Q.   Or an ATM card?

7      A.   Sure.

8      Q.   For that account?

9      A.   She did.

10:33 10 Q.   So it's possible that Mr. Crater could be in Colorado and

11     Mrs. Crater could be in Florida spending money out of that

12     personal account?

13     A.   He could have given his wife a debit card, but that

14     account wasn't in her name.

15     Q.   Understood.  But it's possible --

16     A.   Sure.

17     Q.   -- that she could have had his debit card --

18     A.   It's possible.

19     Q.   -- and used it for personal expenses?

10:33 20 A.   Sure.

21     Q.   And you can't tell that from reviewing the documents.

22     A.   No.

23     Q.   Okay.

24          Now, I note that the period that you reviewed for the

25     My Big Coin accounts, which ended May 12th of 2016, didn't

1    include the amounts that Mr. Crater paid people back for their

2    investment in My Big Coin, did it?

3    A.   I'm sorry.  Can you repeat that?

4    Q.   Yes.  The period that you reviewed of incoming payments

5    did not include the outgoing payments to individuals that he

6    repurchased or refunded their money in order to get their coins

7    back.

8    A.   This was a separate -- that was a separate analysis, I

9    guess you would say.  I didn't include it in that one chart, no

10:34 10    I did not.

11    Q.   But that also would have affected -- if you had broadened

12    the period or the scope of your review and it included the

13    payments back to others, that would have affected your numbers.

14    A.   Sure.  As a matter of fact, I did.  I broadened the scope

15    of my review to include 2017 to make sure I didn't actually

16    miss any payments going back to, I guess you would call them

17    investors or My Big Coin customers.

18          MR. LOPEZ:  If you could go to page 10.

19    Q.   You're referring to the payments that you saw in early

10:35 20    2017.

21    A.   That's correct.

22    Q.   You said you reviewed Mr. Crater's American Express

23    statements.

24    A.   I did.

25    Q.   And you saw -- and you listed spending -- was that number

1    all the spending out of that account for the period in

2    question?

3    A.    So yeah, for the period of the captioned period, yes, that

4    would be payments coming out of his personal accounts for

5    American Express bills, the payments on the card.

6    Q.    So you didn't actually review the card statements.

7    A.    Oh, I did.

8    Q.    You did.  So the 289 --

9           MR. LOPEZ:  Can you go to slide 6.

10:36 10   Q.    So in the middle, focus on the spending items.

11          So the American Express you have as an example of the

12   spending, that he spent $289,421.

13   A.    Correct.

14   Q.    Did you determine whether or not any of those expenses

15   were expenses for My Big Coin?

16   A.    I've reviewed the statements, and, yes, it's possible that

17   some were expenses for My Big Coin.

18   Q.    It's possible that there could have been fees paid to

19   lawyers out of that account?

10:37 20   A.    Sure.

21   Q.    There could have been fees paid to credit card processing

22   companies out of that account?

23   A.    Sure.

24   Q.    And there could have been other expenses associated with

25   My Big Coin out of that account.

1    A.   Sure.  Credit cards are hard, you can't really tell from

2    the detail of the statement exactly what the intended purpose

3    is.

4    Q.   Okay.

5         MR. LOPEZ:  If I could just have a moment.

6         THE COURT:  You may.

7         MR. LOPEZ:  Now go to page 3.

8    BY MR. LOPEZ:

9    Q.   Now, I think you said that you've been sitting in the

10   courtroom since the beginning of the trial, and you saw

11   Mr. Lynch testify, you saw Mr. Mendiola testify, you saw

12   Mr. Byrd testify, and you saw Mr. Bell testify.

13   A.   I did.

14   Q.   If you go through the list here, however, you didn't see

15   Randall Ross testify.

16   A.   I did not.

17   Q.   You didn't see George Roumell testify?

18   A.   Nope.

19   Q.   Didn't see Michael Lummis testify?

20   A.   Correct.

21   Q.   Or Greg and Molly Cutchall testify?

22   A.   I did not.

23   Q.   Gerald Bloeser?

24   A.   No, I did not.

25   Q.   Barbara Hatzmann?

```
 1   A.   I did not.

 2   Q.   Henry Kara?

 3   A.   Nope.

 4   Q.   Richard Nylen?

 5   A.   Nope.

 6   Q.   Stephen DeCourcey?

 7   A.   I did not.

 8   Q.   Et cetera, et cetera.

 9        So there were only a few witnesses who you saw testify

10:40 10   that they were displeased with their investment in My Big Coin.

11   A.   Sure.

12            (Pause.)

13   Q.   Now, when you looked at the total outgoing funds from

14   Mr. Crater's personal accounts, the number you came up with

15   was --

16            MR. LOPEZ:   Can you go to page 7.

17   Q.   -- was $2,544,315?

18   A.   Correct.

19   Q.   And then if you go to page 6, the total outgoing funds

10:41 20   to -- no, not that number -- the total outgoing numbers to his

21   personal accounts is -- do you see the little -- $1,517,500.

22   A.   Yes.

23   Q.   So it seems like he had another million dollars in his

24   personal accounts that he spent on top of the monies that he

25   received into his personal accounts from the My Big Coin.
```

```
 1    A.    Yes.
 2    Q.    So that's $2.5 million in other income that hasn't been
 3    accounted for.
 4    A.    I don't think that math is right.
 5    Q.    Well, there was $1.5 million that we talked about
 6    previously, and then there's this 1 million.
 7          The 1.5 million was the amount of total outgoing funds
 8    of 7,841,820 and the amounts that you traced to My Big Coin,
 9    including the marijuana license of $6.3 million.
10:42 10    A.    I don't think I'm connecting --
11    Q.    Okay.
12          MR. LOPEZ:  So let's go back to page 6.
13    Q.    The total outgoing funds you have here are $7,841,820.
14    A.    That's correct.
15    Q.    If you go to page 4, the total amount of incoming payments
16    was $6,313,927.
17    A.    Yes.
18    Q.    So he roughly had $1.5 million more in the account that
19    went out than came in.
10:43 20    A.    Into the three My Big Coin accounts, that's correct.
21    Q.    Okay.
22          And then when you go to his personal accounts, which
23    is -- when you go to My Big Coin Accounts, which is page 6, the
24    total amount that went into those personal accounts was
25    $1,517,500.
```

1    A.    Correct.

2    Q.    But when you go and look at the amount of outgoing funds

3    from those accounts, which is page 7, it's $2,544,315 or a

4    million dollars more --

5    A.    Yes.

6    Q.    So altogether there were $2.5 million more of income that

7    wasn't related to My Big Coin.

8    A.    With the caveat that at the end of the day -- you've got

9    to give me that I expanded my scope to include a period beyond

10:44 10    2016.  At the end of the day, those -- Mr. Lynch's investments

11    were translated into coin.  So I would still include those as

12    coins.

13    Q.    But for the period between January 13, 2014 and May 12,

14    2016, you would agree with me that, based on your analysis,

15    Mr. Crater had approximately $2.5 million of other income that

16    you couldn't account for.

17    A.    I could.  They just weren't coins.  Sure.

18    Q.    Fair enough.  They could have been from his other

19    businesses?

10:45 20    A.    Sure.

21    Q.    Okay.

22          MR. LOPEZ:  And then if you go to page 8.

23    Q.    He did spend a substantial amount of money paying other

24    people?

25    A.    Page -- the $18,500?

```
 1   Q.   The $140,000.
 2   A.   No, those are from the -- those are from the My Big Coin
 3   accounts.  Is that the account you're referring to, not his
 4   personal accounts?
 5   Q.   Yes.
 6   A.   That's correct.
 7   Q.   And it's your position that those were for -- well, let me
 8   ask you.  Do you know what Marcus Gorby's association with
 9   Mr. Crater is?
10   A.   I don't.
11   Q.   Okay.  So he could have been paying Marcus Gorby for work
12   unrelated to My Big Coin?
13   A.    It's possible.  Although per my email review, it
14   referenced My Big Coin, which is why there was an email
15   exchange between them referencing My Big Coin.  So that's why
16   it was appropriate to me.
17        MR. LOPEZ:  And if you go to page 10.
18   Q.   He also made payments to others totaling over $120,000.
19   A.   Yes.
20        MR. LOPEZ:  Finally, can you go to page 7.
21        Focus in on the vehicle purchases.
22   Q.   It appears that he made a number of vehicle purchases.
23   A.   Yes.
24   Q.   And that would be between the period of January 13, 2014
25   and May 12, 2016?
```

A.   Yes.

Q.   Did you review the records associated with those purchases?

A.   The actual invoices?

Q.   Yes.

A.   I did not.

Q.   So you can't tell us whether those cars were purchased by him for him or by him for someone else.

A.   I did not.

10:47   MR. LOPEZ:  No more questions.  Thank you.

THE COURT:  Thank you.

Redirect.

REDIRECT EXAMINATION

BY MR. MARKHAM:

Q.   Ms. Brekenfeld, Mr. Lopez just asked you about John Lynch receiving marijuana licenses.  Do you remember that?

A.   I do.

Q.   Did you also observe Mr. Lynch's testimony when he said he never received the marijuana licenses?

10:48   A.   I did.

Q.   And what did Mr. Lynch say that money was then converted into?

A.   Coins.

MR. LOPEZ:  Objection.

THE COURT:  Overruled given the scope of cross.  It's

```
 1    allowed.  The answer may stand.
 2    Q.    So why did you include Mr. Lynch's payments in your chart?
 3    A.    Because essentially they were converted to coins and my
 4    goal was to have all payments related to the purchase of either
 5    coins or investments.  So I thought it was appropriate to
 6    include that given the external information received.
 7    Q.    Defense counsel talked to you about spending out of the My
 8    Big Coin accounts.  Do you recall that?
 9    A.    I do.
10:48 10    Q.    Who does it appear, based on your analysis, controlled the
11    My Big Coin accounts?
12    A.    Mr. Crater.
13    Q.    Did there appear to be personal spending in the My Big
14    Coin accounts?
15    A.    Yes.
16    Q.    Personal spending by whom?
17    A.    Mr. Crater.
18    Q.    Defense counsel asked you about never having seen Randall
19    Ross testify before.  Do you remember that?
10:49 20    A.    I do.
21    Q.    And same with George Roumell, you haven't seen him
22    testify?
23    A.    Correct.
24    Q.    So why did you include them on your summary chart of
25    payments to My Big Coin?
```

1    A.   As I previously testified, based on the review of emails

2    that was provided, it was indicated that those folks were

3    investing in My Big Coin or in shares, coins.  Their money was

4    intended to go to My Big Coin.

5    Q.   Defense counsel asked you about the text message where the

6    defendant said he was in Colorado and then the lack of spending

7    there.  Do you recall that?

8    A.   I do.

9    Q.   And I think I heard you saying that it's technically

10:49 10   possible that the debit spending from his personal debit

11   account was his wife holding a debit card, correct?

12   A.   Yes.

13   Q.   But just to be clear, did you review the defendant's

14   credit card statements?

15   A.   I did.

16   Q.   Did you review all his bank account statements?

17   A.   What was available, yes, I did.

18   Q.   Was there any spending in Colorado?

19   A.   Not that I was aware of that, I was able to see, no.

10:50 20   Q.   And in that text when the defendant said that he was

21   counting cash until 2:30 in the morning, what was reflected in

22   his personal debit account?

23   A.   That he was not there, and that there was -- for that

24   particular account, there was actually a negative balance and

25   that he was not in Colorado.

1    Q.   Mr. Lopez asked you about other income you saw coming into

2    the accounts.  Do you know exactly what all of that income was

3    for?

4    A.   I can't -- I can't tell.  Again, from bank statements you

5    can't exactly tell everything just from a transaction.

6    Q.   But in certain instances, was the money for My Big Coin?

7    A.   Yes.

8    Q.   And so why didn't you include it on your summary chart,

9    just to remind the jury?

10:50  10   A.   The transactions into his personal account you mean?

11   Q.   Yes.  So --

12   A.   Well, for example, there were certain times I couldn't --

13   I couldn't determine the individual who was making the

14   transaction.  It might be coming from a fund or something, so

15   those were not included.

16   Q.   So even if it said My Big Coin money was coming in, you

17   didn't include it because it wasn't from an individual human

18   being.

19   A.   Correct.

10:51  20   Q.   And in terms of the other income you saw coming into the

21   defendant's personal accounts, was any of it coming from Spain?

22   A.   No.

23           MR. MARKHAM:  No more questions, your Honor.

24           THE COURT:  Recross?

25                         RECROSS-EXAMINATION

```
 1   BY MR. LOPEZ:

 2   Q.   Did you just testify that you reviewed all of his bank

 3   accounts?

 4   A.   There was a scope beyond what those three accounts that

 5   were included, yes, there were more accounts.

 6   Q.   Okay.  And you reviewed the accounts that you were

 7   provided by the other investigators in this case?

 8   A.   That's correct.

 9   Q.   Okay.  But you didn't review the TD Bank account he had?

10   A.   I did.

11   Q.   Did you review his Chase account?

12   A.   Yes.

13   Q.   And did you review his BB&T account?

14   A.   I did.

15   Q.   They weren't provided in discovery.

16        MR. MARKHAM:  Objection, your Honor.  And inaccurate.

17        THE COURT:  Sustained as to that question to this

18   witness.

19   BY MR. LOPEZ:

20   Q.   And with respect to Mr. Lynch's payments for the marijuana

21   licenses, if I understand you correctly, you're saying that at

22   the time that you created your charts, you assumed something

23   that was incorrect, right?

24   A.   No.

25   Q.   Well, you assumed the payments for the marijuana licenses
```

     1  were for coins.
     2  A.   I didn't assume anything.  This was based on information
     3  that I was provided.
     4  Q.   So someone tells told you what the purpose of the payment
     5  was?
     6  A.   That's -- well, it was based on the reviews of the witness
     7  testimony, my email reviews, as well as anything that came in
     8  from wire details, checks, so, yes.
     9  Q.   This chart was created months ago, wasn't it?
10:53 10  A.   Correct.
    11  Q.   So focus on that time period, not the testimony.
    12  A.   Sure.
    13  Q.   When you created this document, you believed that the
    14  payments by Mr. Lynch in the amounts of $700,000 and $750,000
    15  were for My Big Coin coins.
    16  A.   Coins or investment into the account, into the business,
    17  that's correct.
    18  Q.   Okay.  And that -- you now know that that was incorrect.
    19       At the time you created the chart.
10:53 20  A.   Sure.
    21  Q.   Okay.  To the tune of $3.7 million.
    22  A.   Yes.
    23  Q.   And what you're saying now is because he subsequently
    24  testified that he asked Mr. Crater to --
    25       MR. MARKHAM:  Objection, misstates testimony.

```
 1              THE COURT:  Well --
 2              MR. LOPEZ:  Just like you did.
 3              THE COURT:  Counsel, overruled.
 4         Let me hear the rest of the question, counsel.
 5    BY MR. LOPEZ:
 6    Q.   You're now saying that because Mr. Lynch testified that he
 7    took back coins from Mr. Crater in lieu of those licenses, it's
 8    now appropriate to add them to this accounting.
 9    A.   Yes.
10             MR. LOPEZ:  Thank you.
11             THE COURT:  Thank you.  You're excused.  Thank you.
12             THE WITNESS:  Thank you.
13             THE COURT:  Counsel.
14             MR. MARKHAM:  The government rests, your Honor.
15             THE COURT:  Okay.
16         Jurors, as you might imagine, this is a juncture in
17    the trial where I need to speak with counsel.  The government
18    resting just means that the government has offered all of the
19    evidence that it intends to that support the charges against
20    Mr. Crater.
21         Given the time, I think we'll just take our break a
22    little bit early and we'll take 25 minutes for a recess.
23         Thank you.
24             THE CLERK:  All rise.
25             (Jury left the courtroom.)
```

 1            THE CLERK:  Please be seated.

 2            THE COURT:  Counsel, Mr. Lopez.

 3            MR. LOPEZ:  Yes, your Honor, at this time I move for

 4    judgment of acquittal pursuant to Federal Rule of Criminal

 5    Procedure 29(a).

 6            Do you want me to go through --

 7            THE COURT:  Counsel, I'll just note for the record I

 8    have a copy of Mr. Crater's motion for acquittal, including --

 9    which also attaches a memo of law.

10:56 10        Mr. Lopez, if you haven't done so yet, I'd also ask

11    that you enter it on the docket.

12            Give me a moment.

13            (Pause.)

14            THE COURT:  Counsel, I'll just note for the record

15    I've now had a chance to read the memo, the motion itself, and

16    the memo of law.

17            Counsel, the motion is preserved for the record.

18            Having heard all of the evidence, considered it

19    against the elements of the three sets of charges here,

10:58 20    considering the evidence viewed in the light most favorable to

21    the government, it's sufficient for a rational trier of fact to

22    find guilt beyond a reasonable doubt.

23            I've made note of your arguments that were laid out in

24    the memo, but that will be my ruling for -- at this time.

25            Counsel, anything else you need to be heard on at this

1    point?

2              MR. LOPEZ:  Well, there's nothing I can do to persuade

3    you otherwise, your Honor?

4              THE COURT:  Well, counsel, and I should specifically

5    say, as to your arguments, I considered them having fresh in my

6    mind all of the elements of wire fraud, the monetary

7    transaction counts, as well as the unlicensed money

8    transmitting business charges.

9              I think -- I understand your arguments about the state

10:59 10   of mind that applies to each of the counts, but particularly in

11   regards to the wire fraud knowingly and willfully with the

12   intent to defraud, I've considered that, but I certainly think

13   there's evidence, if I'm viewing the evidence in the light most

14   favorable to the government, from which a reasonable jury could

15   find each of the elements as to those wire fraud counts,

16   including as to state of mind.  I think that's true as to the

17   elements of the unlawful monetary transactions.  And as to the

18   unlicensed business transmitting charge, I certainly understand

19   the argument about what was alleged to be occurring over the

11:00 20  exchange, but I think it's sufficient to go to the jury.

21             MR. LOPEZ:  Very well, your Honor.  Thank you.

22             THE COURT:  Noted for the record.

23             (Pause.)

24             THE COURT:  And, counsel, I think if I make any

25   Petrozziello findings, they'd come after the close of all

1    evidence.

2         As I indicated yesterday, I think -- well, I know that

3    the basis of my admission of statements was as statements of

4    the party opponent through agents of Mr. Crater, but since I

5    don't have to make Petrozziello findings until the close of all

6    evidence and there's going to be a defense case, I will further

7    defer that ultimate determination until I hear all of the

8    evidence.

9         Counsel, I want us to all have the benefit of the

11:01 10    break, but, Mr. Lopez, as I understand it, the defense case is

11    going to start with Mr. Johnson.

12         MR. LOPEZ:  Yes.

13         THE COURT:  Are all of the witnesses that you

14    mentioned before coming on today still coming on today?

15         MR. LOPEZ:  I have to confirm that they're here, but,

16    yes, that's my intention.

17         THE COURT:  Anything else we should address?

18         MR. MARKHAM:  Nothing from the government, your Honor.

19         THE COURT:  Mr. Lopez.

11:02 20         MR. LOPEZ:  No, your Honor.

21         THE COURT:  I'll just turn to the jury when we come

22    back to say -- to remind them that Mr. Crater has no burden,

23    but that if he's offering evidence, it would occur at this

24    point.  Then I'll turn to you, Mr. Lopez, for the first

25    witness.

```
 1              MR. LOPEZ:  Thank you, your Honor.

 2              THE COURT:  And we'll take, as I said, 20 minutes from

 3    now.

 4              THE CLERK:  All rise.

 5              (Recess taken.)

 6              (The Court entered the courtroom.)

 7              THE COURT:  Everyone can be seated.

 8              MR. LOPEZ:  Your Honor, should I bring Mr. Johnson in?

 9              THE COURT:  You can, or have him by the back door to

11:22 10   come forward.

11              MR. LOPEZ:  So I should wait for him to enter?

12              THE COURT:  He can just stand back there and we can

13    call him.

14              THE CLERK:  All rise for the jury.

15              (Jury entered the courtroom.)

16              THE CLERK:  Court is in session.  Please be seated.

17              THE COURT:  Jurors, as I indicated before our recess,

18    you've heard the government rest its case.

19              I remind you again, Mr. Crater never has a burden in

11:23 20   this case and need not offer any evidence, but if he chooses to

21    offer any evidence, this would be the juncture in the case when

22    he would.

23              So I'll turn to Mr. Lopez with that said.

24              MR. LOPEZ:  The defense calls Tom Johnson.

25              THE COURT:  He may be called.
```

```
 1              TOM D. JOHNSON, having been duly sworn by the Clerk,
 2      was examined and testified as follows:
 3                  THE CLERK:  Thank you.  Please be seated.
 4                  THE COURT:  Good morning, sir.
 5                  THE WITNESS:  Good morning.
 6                  THE COURT:  Mr. Lopez.
 7                           DIRECT EXAMINATION
 8      BY MR. LOPEZ:
 9      Q.   Good morning, Mr. Johnson.
11:24 10              Can you state your full name.
11      A.   Tom D. Johnson.
12                  THE COURT:  Sir, if you could spell your last name for
13      the record.
14                  THE WITNESS:  J-o-h-n-s-o-n.
15                  THE COURT:  Thank you.
16      BY MR. LOPEZ:
17      Q.   Are you here pursuant to a subpoena?
18      A.   I am.
19      Q.   Sir, can you briefly -- well, can you tell us where you
11:24 20      live, just the city and town?
21      A.   Adrian, Michigan.
22      Q.   And can you tell us what your educational background is.
23      A.   Yeah, I have an associate's degree from Ferris State
24      College in Michigan and professional degrees from the American
25      College in the insurance industry.  I'm a CLU and ChFC, as well
```

```
 1    as having passed securities exams with the SEC.
 2    Q.    So let's take that one item at a time.
 3          Your associate's degree from Ferris College, what year
 4    did you receive that?
 5    A.    1968.
 6    Q.    And your CLU, what does that stand for?
 7    A.    Chartered Life Underwriter.
 8    Q.    And what is a Chartered Life Underwriter?
 9    A.    Professional education as it pertains to life insurance
10    and related products.
11    Q.    And you said a ChFC?
12    A.    Yes, that's a Chartered Financial Consultant, which is a
13    continued education from the first degree also sponsored by the
14    American College in Pennsylvania and --
15    Q.    And does that relate to insurance?
16    A.    And other investments.
17    Q.    Okay.  And you also said that you have training with the
18    SEC?
19    A.    Yeah, I -- early in my career I passed the Series 7
20    license to be able to market securities and then took the
21    management license to be able to supervise other salespeople in
22    selling, you know, security product.
23    Q.    And that was part of the insurance industry?
24    A.    Yes, financial services industry is a more intensive
25    proper allocation of the term now.  Insurance is one of the
```

1   products.

2   Q.   And have you ever held any licenses?

3   A.   Yes.  You know, I had the license to sell and market

4   insurance and securities, as well as I had a consulting license

5   being able to charge fees for financial planning and other

6   services in the financial service business, which is a license

7   similar to that of an attorney.

8   Q.   Were you licensed to sell securities?

9   A.   Yes.

10  Q.   Is that the same as a broker-dealer license?

11  A.   Well, a broker-dealer is a principal, you know, in that

12  capacity, and the salespeople work for one of the principals.

13  So it's not quite the same, but, you know, it has the same

14  client relationship, if you will.

15  Q.   Are you currently employed?

16  A.   I am not.

17  Q.   All right.  What is your current status?

18  A.   Retired.

19  Q.   And when did you retire?

20  A.   Official retirement was ten years ago in June.  Prior to

21  that I was on long-term disability for an extended period of

22  time due to a stroke and did not practice in the professional

23  designation.

24  Q.   Have you ever sat on any boards of companies?

25  A.   Yes.  There are three, you know, major relationships.  The

 1    first one was the Shane Group, which I was the second-largest

 2    shareholder in and we manufactured playground equipment and

 3    athletic field lighting.

 4        The company was subsequently sold, and at the time we

 5    were doing about $75 million a year in sales.

 6    Q.   Any other directorships?

 7    A.   Yes, the second directorship was a regional bank, City

 8    Bank & Trust.  I was on their board and did, you know, a lot of

 9    committee work during that time frame.

11:29 10       And the third company was a company known as Alro

 11    Steel, A-l-r-o, which is one of the top ten steel distribution

 12    companies in the United States now.  Last year they did over

 13    $2 billion in sales, a lot to the automobile -- automotive

 14    industry, as well as the construction industry in 13 states and

 15    40 locations.

 16    Q.   Now, turning your attention to this case.  When did you

 17    first become aware of My Big Coin?

 18    A.   I'm going to have to check --

 19        MR. MOORE:  Objection, your Honor.

11:30 20       THE COURT:  Sustained.

 21        Counsel, you can ask if there's something that could

 22    be used to refresh.

 23        MR. LOPEZ:  Is there something that would help to

 24    refresh your memory?

 25    A.   Yes, I have some notes.

1          MR. LOPEZ:  Can I approach?

2          THE COURT:  You may.

3          MR. MOORE:  May we see a copy, your Honor?

4          THE COURT:  Yes.

5          MR. MOORE:  He seems to have some documents already at

6     the stand.

7          THE COURT:  Well, let's see what Mr. Lopez does.

8          So, sir -- so, sir, you need to testify from your own

9     memory.  So counsel is going to show you something to see if

11:30 10     this refreshes your recollection.

11          MR. MOORE:  Could we ask for whatever it is that he

12     has with him at the stand to be taken back?

13          THE COURT:  Well, he's not looking at it right now,

14     so --

15     BY MR. LOPEZ:

16     Q.   With respect to the question when did you first become

17     aware of My Big Coin, I show you a document and ask you if that

18     refreshes your memory.

19     A.   Yes, it --

11:31 20     Q.   Is your memory now refreshed?

21     A.   Yes.

22     Q.   When did you first become aware of My Big Coin?

23     A.   2013 or early 2014.

24     Q.   How did you become aware of My Big Coin?

25     A.   I was a business partner with Chuck Roumell, who he and I

1    bought a company which manufactured jack stands and material

2    handling equipment for the pipe fitting industry, and Chuck and

3    George were friends with Mark Gillespie, and in a conversation

4    with Mark, George became aware of the currency related business

5    and started accumulating information from Mark verbally over

6    the phone, and we had conversations post workday about, you

7    know, the industry and the business.

8    Q.   Now, is Chuck Roumell also known as Charles Roumell?

9    A.   Yes.

11:32 10   Q.   And could you spell his last name for us?

11   A.   No.

12   Q.   You can't, okay.  Fair enough.

13        Now, at some point -- well, when you first learned

14   about My Big Coin, did you personally have any interest?

15   A.   The initial conversations I did not have an interest.

16   Q.   Why not?

17   A.   You know, there was -- it was basically a start-up

18   industry at that time.  Bitcoin was the only public

19   communication of that type of currency, and, you know, I was

11:33 20   not comfortable, you know, with my knowledge and experience

21   with it, as well as perception of potential conflict with

22   education and economics classes.

23   Q.   At some point did you change your mind?

24   A.   Yes, I did.

25   Q.   And at the time that you changed your mind, had you

1  personally talked to Mark Gillespie?

2  A.   No.

3  Q.   What made you change your mind?

4  A.   Continued conversations, you know, with Chuck and George,

5  and, you know, some additional public communication about

6  Bitcoin, knowing -- becoming a very significant value and, you

7  know, I made up my mind that it was likely to continue to be a

8  growing industry and wanted to be on the ground floor.

9       THE COURT:  I'm sorry, counsel, it might just be me, I

11:34 10  heard an identification of Chuck's last name, but I'm not sure

11  about George.

12       MR. LOPEZ:  I was just going to ask that question,

13  your Honor.

14       THE COURT:  Thank you.

15  BY MR. LOPEZ:

16  Q.   You mentioned Chuck Roumell.  What's George's last name?

17  A.   George Roumell, they're brothers.

18       THE COURT:  Thank you.

19  BY MR. LOPEZ:

11:34 20  Q.   So at some point you made the decision to do what?

21  A.   After a lot of conversation with Chuck and George, I

22  decided that I would take advantage of the potential purchasing

23  stock in the company.

24  Q.   And I think you said something about entry level.

25  A.   It was a founder's stock offering.

1   Q.   All right.  And can you describe or tell the jury what you

2   mean by that.

3   A.   The stock was not listed on a public basis, meaning that

4   SEC reporting and required communication had not been made and

5   that it was only eligible to informed, educated, and

6   risk-oriented individuals.

7   Q.   And what do you mean by "risk-oriented individuals"?

8   A.   Well, the disclosure statement required --

9        MR. MOORE:  Objection, your Honor, hearsay.

11:36 10        THE COURT:  No --

11        MR. MOORE:  The disclosure requirement, the disclosure

12   statement requires.

13        THE COURT:  Well, the question was:  What do you mean

14   by "risk-oriented individuals"?

15   BY MR. LOPEZ:

16   Q.   So just, without referencing any documents, just tell us

17   what you understand "risk-oriented individuals" to mean.

18   A.   A person was not eligible to buy these securities unless

19   they met specific requirements, both from an education and

11:36 20   financial capacity basis.

21   Q.   Now, can you tell the jury the factors that you took into

22   consideration before deciding to invest in My Big Coin?

23   A.   Yeah, the biggest issue was, you know, the success of

24   other competitors and the obvious continuation of a

25   blockchain-controlled currency.

 1              And I'm using the word "currency," and maybe that's

 2    not the right word.

 3    Q.   At the time did you think the -- let's call it the Bitcoin

 4    industry was going to grow?

 5    A.   Yes.

 6    Q.   Why?

 7    A.   Historical communication from the news media and public

 8    awareness of what the Bitcoin dollars were and the entities

 9    that were using them as a currency exchange.

11:38 10    Q.   And I think you mentioned that your education was part of

11    the analysis here.  What was your education in?

12    A.   Well, financial services industry, you know, and we had to

13    have, you know, an economics background as well as some legal

14    issues.

15    Q.   So do you recall when you actually decided to invest in My

16    Big Coin?

17    A.   When it was offered to Chuck and George and, you know, I

18    made a decision to go along with what Chuck in particular did.

19    And I don't know if George made a purchase or didn't make a

11:38 20    purchase, but Chuck did.

21    Q.   And do you recall how much you initially invested in My

22    Big Coin?

23    A.   Yes, $15,000.

24    Q.   And to be clear, you were investing in stock?

25    A.   That is correct.

```
 1    Q.   Not coins.

 2    A.   That is correct.

 3    Q.   Now, at some point did you receive a subscription

 4    agreement?

 5    A.   I did receive a subscription agreement.

 6    Q.   And in preparation for today's testimony, did you go

 7    through your file and look for that subscription agreement?

 8    A.   Yes, I went through the file and, you know, found copies

 9    of the subscription agreement.

11:39 10    Q.   Do you know whether or not the agreement that you found

11    was the original subscription agreement or some later

12    subscription agreement?

13    A.   There was an original and an amended subscription

14    agreement and copies of both of them were presented.

15    Q.   But when you looked through your file, were you able to

16    find a copy of the original subscription agreement?

17    A.   I think so.  I have what I sent to you and the court.  I

18    have copies.  I would have to review those.

19              MR. LOPEZ:  Let me approach.

11:40 20              Your Honor, may I approach the witness?

21              THE COURT:  You may.

22    BY MR. LOPEZ:

23    Q.   I show you a document.  I ask you to look at it.

24              THE COURT:  Counsel, what are we making this?

25              MR. LOPEZ:  I forget where we are.
```

```
 1              THE COURT:  I think we're up to TT, Ms. Hourihan.
 2              THE CLERK:  Yes.
 3              THE COURT:  TT.
 4              MR. LOPEZ:  We'll make it TT.
 5              THE COURT:  And is this a copy of which, Mr. Lopez,
 6    you handed up?
 7              MR. LOPEZ:  It is.  Okay.
 8              (Exhibit TT marked for identification.)
 9    A.   I'm looking at the dates of the signatures of this
10    agreement.
11    Q.   Okay.
12    A.   And this agreement is titled "Amended --
13              MR. MOORE:  Objection, hearsay.
14              THE COURT:  Well, counsel, I think this is for the
15    purposes of foundation, so I'll allow the full answer.
16    BY MR. LOPEZ:
17    Q.   Having reviewed the document, do you now have a memory as
18    to whether or not this was the original subscription agreement
19    that you received?
20    A.   No, this is the amended subscription agreement.
21    Q.   And I think you referenced your file.  Do you have
22    another -- copy of another subscription agreement from an
23    earlier time?
24    A.   I have copies of an email, you know, from Mark Gillespie
25    who was requesting the --
```

```
 1                MR. MOORE:  Objection, hearsay.

 2                THE COURT:  Well, sustained as to this.

 3                Mr. Lopez, next question.

 4     BY MR. LOPEZ:

 5     Q.   I'm just trying to get at whether or not you have a copy

 6     of the original subscription agreement in your file?

 7     A.   I don't think so.

 8     Q.   Okay.  Very good.

 9                Now, the document in front of you, what is that?

10     A.   It's the amended subscription agreement.

11     Q.   Okay.  And do you recognize the name on the first page?

12     A.   Yes.

13     Q.   And do you recognize the signature -- I mean the

14     handwriting?

15     A.   Yes.

16     Q.   Whose handwriting is that?

17     A.   Mine.

18     Q.   And what about the second page?

19     A.   It's my handwriting.

20     Q.   Okay.

21                Let's go to page 5.  Do you recognize the signature on

22     page 5?

23     A.   Yes.

24     Q.   And whose signature is it?

25     A.   It's mine.
```

1    Q.   And there's also another individual who's referenced in

2    this document.

3    A.   Yes.

4    Q.   And who is that individual?

5    A.   Joyce Sarapo, S-a-r-a-p-o.

6    Q.   And who is Joyce Sarapo?

7    A.   She is my wife.

8    Q.   And do you recognize her signature on the --

9    A.   Yes.

11:43 10    Q.   And then there's also another form which appears to be

11    appended to this document.

12    A.   Yes.

13    Q.   And what is that?

14    A.   It's a Roth individual retirement custodial account

15    document that allowed purchases of at discretion and, you know,

16    it's a government Form 5305RA.

17    Q.   And do you recognize the signatures on the next page?

18    A.   Yes.

19    Q.   And whose signatures are those?

11:44 20    A.   Mine and Joyce's.

21    Q.   And finally, the last document --

22    A.   Yes.

23    Q.   -- do you recognize the handwriting on that document?

24    A.   Yes.

25    Q.   And whose handwriting is that?

1    A.    Mine and an A.G. Edwards stockbroker account opening dated

2    2/11 of 2000.

3    Q.    And is there a signature on that page as well?

4    A.    Yes.

5    Q.    And do you recognize the signature?

6    A.    Mine and that of the broker.

7          MR. LOPEZ:  At this point I'd offer it into evidence,

8    your Honor.

9          THE COURT:  Any objection?

11:44 10        MR. MOORE:  Objection, hearsay.

11          THE COURT:  Counsel, let me hear you on Whisper Tech.

12          (Discussion at sidebar.)

13          THE COURT:  Counsel, I hear a hearsay objection.

14    Isn't there an exception to the hearsay rules that applies

15    here, Mr. Lopez?

16          MR. LOPEZ:  Well, your Honor, it's not hearsay.  It's

17    his own --

18          THE COURT:  Keep your voice down.

19          MR. MARKHAM:  Your Honor, the jury can very clearly

11:45 20    hear Mr. Lopez right now.

21          THE COURT:  Counsel.

22          (Discussion off the record.)

23          THE COURT:  Mr. Lopez.

24          MR. LOPEZ:  Your Honor, I guess I'm having difficulty

25    seeing how this could be hearsay.  It's not being offered for

the truth.  It's only being offered to show that he invested in

My Big Coin, the documentation that he had in order to be able

to invest in My Big Coin.

THE COURT:  Isn't that for the truth of the matter

asserted?

MR. LOPEZ:  I -- the form is a form, your Honor, and

the subscription agreement is a key to this case.

THE COURT:  And why isn't it being offered as a

business record?

11:46    MR. MOORE:  Your Honor, this is not kept in the

regular course of business.  He has not testified to that --

THE COURT:  I'm having difficulty hearing you.

MR. MOORE:  Your Honor, there's been no testimony that

this document was kept in the regular course of business.

He stated that he's retired.  These were in his

personal files.  That is not a business record.  This is just a

hearsay document that he had at his house.

THE COURT:  Mr. Lopez.

MR. LOPEZ:  Your Honor, this document goes to his

11:47    intent when he invested in My Big Coin.  It's not being offered

to prove the truth of it.  It's being offered to show what he

had to do and what kind of investor could, in fact, invest in

My Big Coin.

THE COURT:  Mr. Moore.

MR. MOORE:  Yes, your Honor.

1              That is hearsay.

2              If he's entering this document to show what it says

3       that someone had to do to invest in My Big Coin, he's offering

4       it for the truth of that assertion, that this is what someone

5       had to do to invest in My Big Coin.  That is quintessential

6       hearsay, and there's no exception that applies here.

7              THE COURT:  Counsel, I'm not seeing an exception that

8       applies here.

9              I will keep it marked as a lettered exhibit.

11:48 10        MR. LOPEZ:  Note my objection, your Honor.

11             THE COURT:  Noted.

12             MR. MARKHAM:  Your Honor, may I bring up one more

13      issue while we're --

14             Mr. Lopez.

15             THE COURT:  I can't hear you.

16             MR. MARKHAM:  Yes, your Honor.  We have received no

17      reverse Jencks for any of these witnesses, and it appears now

18      that Mr. Lopez is putting in front of them statements by the

19      witnesses that he has never provided to the government, and we

11:48 20  would move now to have all that reverse Jencks provided to us

21      before we cross-examine these witnesses.

22             THE COURT:  Mr. Lopez.

23             MR. LOPEZ:  Your Honor, I believe that these documents

24      was in the discovery of the 2 million pages of discovery that

25      the government has dumped on me in this case.  I just was using

1    Mr. Johnson because it's his file.

2         THE COURT:  Your Honor, this does not have a Bates

3    number on it.

4         MR. LOPEZ:  I didn't say it did.

5         THE COURT:  Counsel, just talking about Jencks.

6         MR. MARKHAM:  Yes, your Honor.  I don't know where

7    this document came from.  It has not been provided to the

8    government, and if the defense counsel, Mr. Lopez, is going to

9    say on the record right now that he does not have any

11:49 10   statements by any of these witnesses that he's calling that

11   have not already been furnished to the government, then I guess

12   we'll have to take him at his word on that, but I just want to

13   be clear that that's what he's stating on the record.

14        THE COURT:  Mr. Lopez.

15        MR. LOPEZ:  I don't have any statements from these

16   witnesses other than what --

17        THE COURT:  You provided this morning?

18        MR. LOPEZ:  Well, with respect to these witnesses,

19   yes.

11:49 20       But, I mean, I don't have any -- I don't have any

21   written statements, oral statements or anything from these

22   witnesses.

23        THE COURT:  Okay.  Understood.

24        Let's move on.

25        (End of discussion at sidebar.)

```
 1    BY MR. LOPEZ:

 2    Q.   So, Mr. Johnson, you did receive that document?

 3    A.   I did.

 4    Q.   And you completed it?

 5    A.   I did.

 6    Q.   And why did you complete it?

 7    A.   It had to be done to purchase the securities.

 8    Q.   And what was your understanding as to why it had to be

 9    done?

11:50 10   A.   To validate that I was a qualified investor, that I had

11    the education and background and financial capacity to justify

12    such an investment.

13    Q.   And what type of financial background and capacity was

14    necessary in order to --

15              MR. MOORE:  Objection, speculation.

16              MR. LOPEZ:  Can I finish the question?

17              THE COURT:  Let me hear the rest of the question.

18    BY MR. LOPEZ:

19    Q.   What was your understanding of the financial capacity that

11:51 20   an investor would need in order to invest in My Big Coin?

21    A.   The specific question said that you must answer and

22    certify that you have qualified for at least one of the

23    options.  And item A is a $1 million net worth, and I checked

24    that box as a requirement.

25              MR. MOORE:  Objection, your Honor.
```

1          THE COURT:  So, counsel, based on the document?

2          MR. MOORE:  Yes, your Honor.

3          THE COURT:  Okay.  And based on the testimony,

4    Mr. Moore, what do you say to the argument that it's not a

5    statement but an act?

6          MR. MOORE:  Your Honor, our issue here is that if his

7    memory is refreshed, I think that the document he's reading

8    from should be taken from him.  Then if he can -- if he knows,

9    he can testify from his memory.

11:52 10          THE COURT:  Okay.

11          Mr. Lopez, you can ask the question.

12    BY MR. LOPEZ:

13    Q.   At the time you decided to invest in My Big Coin, did you

14    have a net worth in excess of $1 million?

15    A.   I did.

16    Q.   Did you understand -- well, strike that.

17          Did you analyze the risk involved with the investment?

18    A.   Yes.

19    Q.   And what analysis did you do?

11:53 20    A.   I evaluated the risk as being a hundred percent

21    speculative and the high degree of risk of not being

22    successful.

23    Q.   And why did you -- why did you reach that conclusion?

24    What was the basis for that conclusion?

25    A.   History not available, it's a start-up, and a new industry

```
      1    and a new product.  There was nothing other than potential to

      2    make a judgment decision on.

      3    Q.   So at some point did you send $15,000 to someone?

      4    A.   I did.

      5    Q.   And who did you send that $15,000 to?

      6    A.   It was a bank account at Bank of America, which I have the

      7    numbers and other information in writing in my file.

      8    Q.   Let me ask you this:  Do you have a 401(k)?

      9    A.   I do have a 401(k).

11:54 10    Q.   And when you made this investment, did you consider making

     11    it through your 401(k)?

     12    A.   Not through my 401(k).  You know, I used my Roth IRA

     13    account, which is also a qualified account, but a different

     14    statute.

     15    Q.   And why did you use your Roth IRA account?

     16    A.   The potential profit at the subsequent sale of this

     17    product would not be taxed and would be available for

     18    disbursement as a normal retirement, you know, at any time, you

     19    know, without taxation.

11:55 20    Q.   So let me see if I understand that.

     21         So you could have used personal funds that were not

     22    part of the Roth IRA.

     23    A.   That's correct.

     24    Q.   And if there was a profit, it was your understanding that

     25    what would happen?
```

1           MR. MOORE:  Objection, form.

2           THE COURT:  Overruled.

3           You can answer.

4   A.   Just like any other investment, without favorable tax

5   inducements, it would be subject to either short-term or

6   long-term capital gains taxation if it's not in a qualified

7   plan.

8   Q.   And was the Roth IRA --

9           THE COURT:  I'm sorry, were you finished, sir?

11:56 10           Were you finished with your answer?

11           THE WITNESS:  As far -- yes.

12           THE COURT:  Mr. Lopez.

13   BY MR. LOPEZ:

14   Q.   And was your Roth IRA a qualified plan?

15   A.   Yes.

16   Q.   And the funds that you used to invest in My Big Coin came

17   from that account.

18   A.   That is correct.

19   Q.   I think you testified that if this speculative investment

11:56 20   did result in a windfall, let's say, to you, in profit, it

21   would be non-taxable.

22   A.   That's correct.

23   Q.   Because it was funded by funds in your Roth IRA.

24   A.   That's correct.

25   Q.   Okay.  Did you ever receive your stock certificates?

```
  1   A.    No.

  2   Q.    Do you have an understanding as to why you didn't receive

  3   your stock certificates?

  4   A.    Yes.  You know --

  5               MR. MOORE:  Objection.

  6               THE COURT:  Overruled.

  7               You can answer.

  8   A.    The stock certificates, as I understand, were printed with

  9   CUSIP numbers approved by the SEC and ready for distribution at

11:57 10  the time the company ceased operations on a temporary basis.

 11   Q.    As you sit here today, do you have an opinion as to

 12   whether or not you miscalculated this investment?

 13   A.    No.  It was --

 14               MR. MOORE:  Objection.

 15               THE COURT:  Sustained as to form, counsel.

 16   BY MR. LOPEZ:

 17   Q.    What is your belief today about this investment?

 18               MR. MOORE:  Objection.

 19               THE COURT:  Relevance, counsel, is that the basis?

11:58 20           MR. MOORE:  Yes, your Honor.

 21               THE COURT:  Sustained as to that.

 22               You can -- next question, Mr. Lopez.

 23   BY MR. LOPEZ:

 24   Q.    Are you still satisfied with this investment?

 25               MR. MOORE:  Objection.
```

1          THE COURT:  Counsel, you can rephrase.

2          MR. LOPEZ:  Sir, do you think anyone defrauded you?

3          MR. MOORE:  Objection.

4          THE COURT:  Sustained.

5     BY MR. LOPEZ:

6     Q.   Did anyone make any misstatements to you to induce you

7     into buying this interest?

8     A.   No, there was no misstatement in any shape, manner or

9     form --

11:59 10          MR. MOORE:  Objection.

11          THE COURT:  Sustained as to the question.  To the

12     extent there was the beginning of an answer, it's struck.

13          Mr. Lopez, you can ask a different question.

14     BY MR. LOPEZ:

15     Q.   This was your decision?

16     A.   Yes.

17     Q.   You knew it was risky?

18     A.   Yes.

19     Q.   And if you lose it --

11:59 20          MR. MOORE:  Objection, leading.

21          THE COURT:  Yes, but no double teaming, counsel, okay.

22          MR. MARKHAM:  That's just me talking to him, your

23     Honor.  Apologies.

24          Counsel, you can rephrase.  Open-ended direct exam.

25     BY MR. LOPEZ:

```
 1   Q.   Do you think this investment has any value today?

 2   A.   I don't have any reported knowledge.

 3             MR. LOPEZ:  Thank you.

 4             THE COURT:  Mr. Lopez, you're done?

 5             MR. LOPEZ:  I am, your Honor.

 6             THE COURT:  Mr. Moore.

 7                         CROSS-EXAMINATION

 8   BY MR. MOORE:

 9   Q.   Did the risk analysis that you did take in account -- did

10   the risk analysis you did take into account the possibility

11   that you were being lied to?

12             MR. LOPEZ:  Objection.  There's no basis for that.

13             THE COURT:  Counsel, overruled, cross-exam.  So you

14   can answer.

15             MR. LOPEZ:  Foundation.

16             THE COURT:  Overruled, counsel, given the scope of

17   direct and the fact that it's cross-exam now.

18             You can answer.

19             Do you want the question back?

20             THE WITNESS:  Yes, please repeat the question.

21   BY MR. MOORE:

22   Q.   Did --

23             THE COURT:  You can repeat if you want, Mr. Moore.

24   BY MR. MOORE:

25   Q.   Did the risk analysis that you did take into account the
```

```
 1    possibility that you were being lied to?
 2    A.   Yes.
 3    Q.   If you knew you were being lied to, would that have
 4    mattered in the -- to your decision?
 5    A.   Yes.
 6              MR. MOORE:  Thank you.
 7              Nothing further, your Honor.
 8              THE COURT:  Any redirect?
 9                        REDIRECT EXAMINATION
10    BY MR. LOPEZ:
11    Q.   But, as far as you know, you were not lied to?
12    A.   That is correct.
13              MR. MOORE:  Objection, your Honor.
14              THE COURT:  What, foundation?
15              MR. MOORE:  Yes, your Honor.
16              MR. LOPEZ:  What's good for the goose --
17              THE COURT:  Yeah, overruled.
18              MR. LOPEZ:  Thank you, your Honor.
19              That was redirect.
20              MR. LOPEZ:  Yes, your Honor.
21              THE COURT:  Recross?
22              MR. MOORE:  Nothing, your Honor.
23              THE COURT:  Thank you, sir.  You're excused.
24              MR. LOPEZ:  Can I have a second, your Honor?
25              THE COURT:  You may.
```

12:01

1              (Pause.)

2              MR. LOPEZ:  The defense calls Nodari Gogoberidze.

3              THE COURT:  He may be called.

4              NODARI GOGOBERIDZE, having been duly sworn by the

5    Clerk, was examined and testified as follows:

6              THE CLERK:  Thank you.  Please be seated.

7              THE COURT:  Good afternoon, sir.

8              THE WITNESS:  Good afternoon.

9              THE COURT:  Mr. Lopez.

12:03 10        MR. LOPEZ:  Thank you, your Honor.

11                        DIRECT EXAMINATION

12   BY MR. LOPEZ:

13   Q.   Good afternoon.

14   A.   Good afternoon.

15   Q.   Can you state your full name and spell your last name for

16   the jury.

17   A.   Nodari Gogoberidze.  Last name is spelled

18   G-o-g-o-b-e-r-i-d-z-e.

19              THE COURT:  Thank you.

12:03 20   BY MR. LOPEZ:

21   Q.   And which city do you live in?

22   A.   Cambridge.

23   Q.   Can you briefly describe your educational background?

24   A.   Yeah, so I have a bachelor's degree in finance, a master's

25   degree in software engineering, and I did my master's degree on

1    a thesis track.

2    Q.    Are you currently employed?

3    A.    Yes.

4    Q.    And where are you employed?

5    A.    The Broad Institute.

6    Q.    And who is the Broad Institute?

7    A.    It's a biological research institute.  I have no biology

8    background.  I'm hired as an engineer to help on the

9    computational biology side of it.

12:04 10   Q.    And is it affiliated with any universities?

11   A.    Yes, M.I.T. and Harvard and Harvard-affiliated hospitals.

12   Q.    And what are you currently working on, if you can disclose

13   that?

14   A.    Well, to the degree I can disclose, I'm working on

15   software that helps biologists analyze biological images using

16   artificial intelligence.

17   Q.    And how long have you been working at the Broad Institute?

18   A.    Six months roughly.

19   Q.    Where did you work before that?

12:04 20   A.    My previous job was a start-up as an M.I.T. spin-out

21   company where we were applying deep learning algorithms for the

22   detection of COVID.

23   Q.    I didn't quite get it.  Did you say "deep learning"?

24   A.    Yes, artificial intelligence.

25   Q.    Okay.  And what exactly were you doing in that position?

```
 1   A.   Well, M.I.T. researchers had developed a series of deep

 2   learning models, artificial intelligence models that were able

 3   to detect various respiratory conditions from audio samples,

 4   and once that research proved to be very promising, me and

 5   another engineer were brought in to help on the

 6   commercialization of that.  So we were machine learning

 7   engineers that were making a product out of the research

 8   models.

 9   Q.   Now, prior to that did you have a -- were you employed?

10   A.   Yeah, prior to that I was an instructor, instructor at

11   Harvard Extension School.

12   Q.   And what is the Harvard Extension School?

13   A.   It's a school, it's one of the 12 schools of Harvard.

14   Q.   And prior to being an instructor there, did you actually

15   attend the school?

16   A.   Yes, yes, I was a master's student there.

17   Q.   So that's -- you received your master's from Harvard?

18   A.   Yes.

19   Q.   What did you teach when you were an instructor at the

20   Harvard Extension School?

21   A.   Introduction to blockchain and Bitcoin.  It was a class

22   under the computer science program, so it was an

23   engineering-level class.

24   Q.   And just generally speaking, what were you teaching the

25   students to do?
```

```
    1   A.   I was teaching the students how blockchains work from an
    2   engineering perspective, including how to build a blockchain
    3   from scratch essentially.
    4   Q.   And did the students actually build a blockchain from
    5   scratch?
    6   A.   Yes.
    7   Q.   Are you being compensated for your appearance here today?
    8   A.   Yes.
    9   Q.   And do you recall the hourly rate?
12:07 10   A.   No, not precisely.  I think it was around $200.
   11   Q.   All right.  And is your testimony here contingent on the
   12   results of -- strike that.
   13        Is your compensation here contingent upon the results
   14   of this case?
   15   A.   No.
   16   Q.   Okay.
   17        Have you testified as an expert before?
   18   A.   No.
   19   Q.   So --
12:07 20        MR. LOPEZ:  At this point, your Honor, I offer --
   21        THE COURT:  Okay.  Noted for the record.  Thank you.
   22   BY MR. LOPEZ:
   23   Q.   What did I ask you to do in this case?
   24   A.   There was a report written by Ms. Clegg regarding the
   25   opinion formed around statements made by defense around the
```

1    blockchain system that they implemented.

2    Q.   And other than reviewing Ms. Clegg's reports, what else

3    did you do?

4    A.   I was provided access to the source code of their -- of

5    the software that they had publicly released.

6              I was provided wallet software, which included the

7    transactions and as well as some documents with the actual

8    transaction listings.

9    Q.   And where did you find that?

12:08 10   A.   The source code?

11   Q.   Yes.

12   A.   On GitHub.

13   Q.   And that source code, was that limited to just a wallet?

14   A.   It was the full source code.  It was everything to do with

15   how clients would set up, compile the software and set it up so

16   that they could actually transact on a network.

17   Q.   And that was all publicly available?

18   A.   Yes.

19   Q.   When you looked at it.

12:09 20   A.   Yes.

21   Q.   Did you review anything else before you offered an opinion

22   in this case?

23   A.   Well, the list of transactions on those documents and the

24   actual running of compiled software.

25   Q.   And as a result of your review, did you reach any

1    conclusions about Ms. Clegg's opinions?

2    A.    Yes.

3    Q.    Before we get to your opinions, I'd like you to explain to

4    the jury the fundamental components of a blockchain.

5    A.    Sure.  In broad strokes --

6    Q.    Well, let's start at the beginning.

7    A.    Okay.

8    Q.    Who is Satoshi Nakamoto?

9    A.    So Satoshi Nakamoto, we actually don't know who that

12:09 10   person is, or it could be a group of people, but it's a

11   pseudonym.  There was a white paper released, which was just a

12   technical document, listing out a proposal for a system that

13   could enable a peer-to-peer decentralized system for

14   transacting arbitrary data but in the case of that white paper,

15   it was describing a proposed cryptocurrency.

16   Q.    So what do you mean by "peer-to-peer"?

17   A.    "Peer-to-peer" meaning any participants around the world

18   that have internet connection can spin up some software and

19   engage in the network.

12:10 20   Q.    And I think you said it was a decentralized?

21   A.    Yes, decentralized meaning that there's no central servers

22   that dictate the rules of the system.  Each peer has the same

23   piece of software and what dictates the norms of the system is

24   the set of protocols that the software is built on.

25   Q.    And the set of protocols are created by who?

1    A.    So initially there is a specification for the blockchain,

2    such as the one described as to Satoshi Nakamoto, and then one

3    or more software engineers will develop the code that actually

4    implements that specification usually in an open source

5    fashion, meaning the code is publicly viewable by anybody and

6    usually it's in a collaborative fashion.  So it's not like a

7    group of engineers sitting in a room, they're kind of spread

8    across the country or the world.

9    Q.    I think you said that they -- they might have different

10   architectures.

11   A.    Yes.  There are many different implementations of a

12   blockchain.  There's many different ways to conform to a given

13   specification and then there are many deviations from the

14   specification.  So a blockchain, especially over time, has come

15   to constitute sort of like a core set of criteria but then

16   around that criteria there's many, many different

17   architectures, blockchain architectures that can meet that

18   criteria.

19   Q.    And just -- can you just list a few of those different

20   types of considerations?

21   A.    Sure.  So the primary components is you have these things

22   called blocks, which are data structures.  There's no geometry

23   involved, it's just a grouping of data in a certain way.  You

24   have blocks that are filled with transactions, the most simple

25   of which is just a sender from this address has sent this much

```
 1    cryptocurrency to this address.  And then those blocks are
 2    communicated via a network protocol, which is implemented by a
 3    software called a wallet.
 4    Q.   And -- strike that.
 5         Are there some common factors, common elements in
 6    every blockchain?
 7    A.   Yes.  So --
 8    Q.   Well, before we get there --
 9    A.   Sure.
12:13 10        MR. LOPEZ:  Can I have the ELMO?
11             THE COURT:  Mr. Lopez, I think there are three
12    documents, should we just make these the next numbers?
13             MR. LOPEZ:  Sure.
14             THE COURT:  So the first one, VV, common elements.
15             THE CLERK:  I don't think we have UU.
16             THE COURT:  Right, UU.  Yes, I should actually follow
17    the alphabet.  UU.
18             And then the diagram, the white diagram, VV; and then
19    the blue WW.
12:13 20        MR. LOPEZ:  That's fine, your Honor.
21             (Exhibits UU, VV, WW marked for identification.)
22             THE COURT:  Jurors, as with this witness these
23    documents are being used as chalks again to help illustrate the
24    witness' testimony, so the documents are not the evidence.  The
25    witness' testimony is.  Okay?  Thank you.
```

1          They can be published if you wish.

2    BY MR. LOPEZ:

3    Q.   Can you see that on your screen?

4    A.   Yes.

5    Q.   So let's talk about the common element.

6          Let's start with the blocks.

7          What is a block?

8    A.   A block is a data structure.  A data structure is just a

9    way of organizing data on a computer, and we call them blocks

12:14 10   but they consist of a header and a body.  And in the body is

11   one or more transactions.  And in the header there's some

12   metadata around the blocks, so that includes, for instance, a

13   time stamp of when the block was created, and very importantly

14   in the context of a blockchain, there is some sort of pointer

15   or link to a previous block that this block is being built

16   upon, and that pointer is made by taking a hash of the previous

17   block and including it in the block header of the next block.

18          Should I describe what a hash is?

19   Q.   Yes, please.

12:15 20   A.   So a hash is something that's used in cryptography.  So

21   you can take any amount of data, whether it's a tiny amount or

22   a large amount, and there's an algorithm that kind of generates

23   a fingerprint of that data by just what to a human would look

24   like a random arrangement of letters and numbers, but, very

25   importantly, it's an exact fingerprint of that data.  So if the

1  data changes even in a tiny amount, the hash will change

2  drastically.

3          So probabilistically speaking, the hash can only be

4  produced by a very specific arrangement of data.

5          And so when you hash the previous block, you're saying

6  that this is the fingerprint of the previous block.  If the

7  previous block is modified at all, that hash will change.

8  Q.   And is that done by an individual or is it done by

9  something else?

12:16 10  A.   It's done by the software that the participants in the

11  network are using.

12  Q.   What is a nonce?

13  A.   A nonce is a solution to a cryptographic puzzle.  So when

14  a participant in the network proposes a new block to that, it

15  should contain the nonce, which is a solution to a

16  cryptographic puzzle that all the participants are trying to

17  solve.  The person who solves it first or the participant that

18  solves it first gets to propose the block, and it's

19  computationally difficult to solve.  It's not just an

12:17 20  analytical solution.  You have to try a bunch of combinations

21  of things, and only a computer can do that very well.  And so

22  it's running thousands and thousands and thousands of cycles

23  trying to generate a solution, and among the network some

24  random participant will be the one to find it, but you can't

25  know ahead of time who will be the one to find it.

1             And the nonce is a solution, and once you find that

2    solution, all the other participants in the network can very

3    easily and very quickly verify it.  So it's very hard to find,

4    but once found, it's very easy to verify that it's correct.

5    Q.   So when doing that, in trying to find the solution, is

6    that an individual doing it or is it the computer doing it or

7    both?

8    A.   It's the computer -- it's the software on the computer.

9    We call them nodes.  So the reason we call them nodes is

12:17 10   because each of the -- kind of distinct from the computer, you

11   can have multiple nodes on a computer, you can have one node

12   spread across multiple computers, so we call them nodes, which

13   are just these participants in the network.

14            And, yeah, so the individual kind of launches the

15   software and then the software does the hard part.

16   Q.   So let me show you --

17            THE COURT:  And what's the significance of the nonce?

18            THE WITNESS:  The nonce is the solution to the

19   cryptographic puzzle.

12:18 20            So what that means is, imagine if you're trying to

21   solve some complicated math equation, you're solving for X,

22   it's the answer to what is X.  And so you have to put that in

23   the block so that all the other participants in the network can

24   see, okay, this is the solution that this person is claiming is

25   the solution, this node is claiming is the solution, now let me

        1   check it.  And checking it is very easy.  It's just finding it

        2   that's very difficult.

        3           And so the nonce is the solution.  It's the thing that

        4   actually solves that particular cryptographic puzzle.

        5           THE COURT:  Thank you.

        6   BY MR. LOPEZ:

        7   Q.   All right.  Now, anything else about blocks that the jury

        8   should know?

        9   A.   No.

12:19  10   Q.   So let's move on to transactions.

       11           What is a transaction?

       12   A.   A transaction, especially over time, has come to mean a

       13   lot of things, but at its most simplest form it's a participant

       14   in the network which has an address and they are sending some

       15   amount of cryptocurrency to another address, which is just a

       16   "From" field, a "To" field and then an "Amount" field.

       17   Q.   And what do they use in order to do that?

       18   A.   Well, they use the wallet software.  So this is now a

       19   human in the loop.  They would go onto their software, they

12:20  20   would find an address that they want to send some

       21   cryptocurrency to, that would be some participant on the

       22   network which has a unique address, and they will specify the

       23   amount they want to send, and then they will have their

       24   software perform what's called a digital signature, and then

       25   they will issue that transaction to the network.

```
 1   Q.   Okay.  And I think you said earlier the simplest
 2   transaction will contain a sender address and a recipient's
 3   address and the amount of cryptocurrency to be sent.
 4   A.   Mm-hmm.
 5        THE COURT:  And you have to give a verbal answer.  Do
 6   you mean yes?
 7        THE WITNESS:  Yes, yes.
 8        THE COURT:  Thank you.
 9   BY MR. LOPEZ:
10   Q.   And then there's also a fee to be paid to the node
11   proposing the block which is a miner or verifier?
12   A.   Correct.
13   Q.   Can you explain that?
14   A.   Sure.  So the miners are the ones who are doing the hard
15   work of gathering all the transactions and putting them in the
16   block and then, you know, using their computers to spin a bunch
17   of cycles and solve that cryptographic hash puzzle, so they
18   need an incentive to do that.  And there's two incentives, one
19   is that generating a new block will just generate new crypto
20   sort of -- you get to -- that's how new crypto enters the
21   system.  When you find the cryptographic hash puzzle, you get a
22   reward for that.
23        That's going down over time and eventually it will be
24   easier and you receive nothing for just generating a new block.
25        So the second way they're incentivized is for each
```

```
 1   transaction, the sender will specify an amount of their

 2   choosing to the person -- to the node that's proposing the

 3   block.

 4   Q.   Now, is a network also a common element?

 5   A.   Yes.  A network -- so, again, it's a peer-to-peer network,

 6   meaning there is no controlling entity in the sense that

 7   there's no node that's more powerful than the others.

 8   Q.   Does this, what's been marked as Exhibit WW, show what

 9   looks like a peer-to-peer network?

10   A.   Yeah, I quite like it, actually.  So what you can see

11   there is that there's different devices being used.  So it's

12   agnostic to the actual structure of the computer.  It's just

13   any kind of system that can run the software.  And I also kind

14   of like it because some nodes are bigger than the others

15   because some computers have more computational power than

16   others.  So you can think of like a large gaming PC, which has

17   a huge CPU and a GPU, versus an iPhone which has a small CPU

18   and GPU relative to the big one.  So different nodes have

19   different computational power, and that's actually very

20   important in the context of blockchain.

21   Q.   And would you -- are all of these an example of nodes?

22   A.   Yes.  In this illustration there's one device per node,

23   which doesn't always have to be the case, but it's almost

24   always the case.

25   Q.   And it looks like it could be a phone?
```

A.    Yes, yeah.  You can run software on a phone, a laptop, a
desktop, PC.

Q.    Is that also what you mean by decentralize?

A.    Yes.

Q.    Now, what are a node's responsibilities?

A.    A node's responsibilities are first and foremost verifying
the work of others.

       So when a new block is proposed, a node will receive
that block and go through and, first of all, check that nonce
to make sure that is, in fact, a solution to that cryptographic
puzzle.  And second of all, they will iterate through every
single transaction from that block and verify those digital
signatures to make sure they are, in fact, from the sender and
that the sender signed off on it.  Because if there was no
mechanism of that, you can just create a transaction saying
this person sent me this amount of crypto and if it's fake,
you'll just withdraw from their account.  There needs to be a
verification mechanism.

       So the node will check all of that, and if it all
passes, then they accept it as the new block on the head of the
blockchain.

       The second responsibility is doing either the mining
or verifying.  So if they're mining, they're trying to generate
this solution to the cryptographic puzzle by taking a bunch of
transactions in a transaction pool, putting them in a block,

1  forming the block, trying to solve that puzzle, and if they

2  find it, then broadcasting it out.

3        And usually this is done through proof of work.  I've

4  been describing proof-of-work with that solution to the

5  cryptographic puzzle.  That's what's known as a consensus

6  algorithm.  There are other consensus algorithms like

7  proof-of-stake, in which there is no solution to a

8  cryptographic puzzle but there's a voting system.  But all of

9  these consensus algorithms are something meant to have all the

12:25 10  participants in this decentralized network come to an

11  agreement.

12  Q.   Are the consensus algorithms all the same?

13  A.   No, they're very different.

14  Q.   Okay.  What is a malicious peer?

15  A.   So because this is a decentralized network, there's

16  nothing preventing anybody from joining here.  Anybody who sets

17  up a wallet software can write their own wallet software and

18  join the network.  But because of this, you should be under the

19  assumption that some of the nodes in the network are out to

12:26 20  steal your crypto or behave maliciously.  They might just be

21  hackers and mean to kind of subvert the system for any number

22  of reasons.

23  Q.   And are nodes monetarily incentivized to provide these

24  services?

25  A.   Yes, through the block generation reward in the case of

             1   proof-of-work and through the transaction fees.

             2   Q.   Now, the software known as a wallet, what does that

             3   include?

             4   A.   The software is -- the wallet is the software that

             5   actually implements the network protocols, the rules that the

             6   network follows, and --

             7   Q.   So the wallet itself has to have software that can

             8   interact with the blockchain?

             9   A.   The wallet is the software.  And it also holds the actual

    12:27  10   blockchain history.  So it's very important in the verification

            11   process that you have the whole history of all the previous

            12   blocks, or at least some concise form of that, and so the

            13   wallet holds the history of the blockchain and so you have the

            14   history and then you have the verification process and you have

            15   the mining process all happening in wallet software.

            16   Q.   And can a wallet engage with more than one network?

            17   A.   Yes.

            18   Q.   And what about can a wallet refuse to engage with a

            19   network?

    12:27  20   A.   Yes.

            21   Q.   How does it do that?

            22   A.   Well, networks are formed by wallet software saying, I'm

            23   going to implement these set of protocols.

            24   Q.   When you say "these set of protocols," what do you mean by

            25   that?

```
 1    A.   This set of rules.  So, for instance, you could have a
 2    rule saying that only certain kinds of blocks are verified.  I
 3    don't know why you would have that rule, but just as an
 4    example.
 5         So the protocol is the set of rules that must be
 6    followed, and it's baked into the software, and that set of
 7    rules defines a network.  So anybody obeying those rules will
 8    be on that network.  The canonical example is the internet
 9    protocol.  That's what defines the internet.  It's how web
10    pages interact with your computer.
11    Q.   And finally, can a blockchain implementation have more
12    than one network?
13    A.   Yes.  In fact, they almost always do.
14    Q.   And are there different names of different types of
15    networks?
16    A.   Yeah, the primary network, the one on which you have
17    monetary value attached to the actual transactions, that's the
18    main network.  So it's called the main net.
19         But because this is software and people are trying out
20    new protocols and trying out different things, there's usually
21    one or more test networks that are made which follow roughly
22    the same rules, except the only difference is that the actual
23    cryptocurrency has no monetary value, or at least there's no
24    value put on that.  So it doesn't matter if your crypto gets
25    stolen in a test network because it never mattered in the first
```

 1   place.

 2   Q.   Showing you what has been marked as Exhibit W for

 3   identification.

 4            What does that show you?

 5   A.   So this shows a proof-of-works file, blockchain.  You can

 6   see on the top left figure that a new transaction is entered,

 7   that's via the wallet software, and then that transaction is

 8   broadcast out to multiple nodes forming a network in that

 9   second figure.

12:30 10          Then in that third figure you can see that what

 11   happens in that third figure is the transaction has been put

 12   into a block, that block has undergone that process of finding

 13   that cryptographic puzzle solution, and all the components of

 14   the block have been verified.  So once confirmed to be

 15   legitimate, they're sent out to the network, and if the network

 16   then -- all the participants in the network then verify the

 17   work of the miner, they put it on the head of the blockchain as

 18   the most recent block.

 19          MR. MARKHAM:  Your Honor, I think we have the exhibits

12:30 20   mixed up in terms of lettering, just for the record.

 21          I believe this is not W --

 22          THE COURT:  No, I think that means VV.

 23          MR. MARKHAM:  Oh, that's VV.

 24          MR. LOPEZ:  VV, right.  I apologize.

 25   BY MR. LOPEZ:

```
 1   Q.   So now getting back to blockchain implementation.  You
 2   talked about Bitcoin.
 3            I take it Bitcoin's the most popular, if you full?
 4   A.   Yes.
 5   Q.   Are there other -- are there other blockchain
 6   implementations that are popular?
 7   A.   Yes.  The second most popular is Ethereum.  Algorand is
 8   one I'm very familiar with.  I don't think it's the third most
 9   popular, but it's up there among the most popular.  And there's
10   literally dozens of others that are widely used and probably
11   hundreds of others that aren't widely used.
12   Q.   Now, with respect to Bitcoin and Ethereum, are there
13   distinct differences about the two?
14   A.   Yes.  They're different in almost every way, other than
15   the core components that we just enumerated.
16   Q.   And do they use the same source code?
17   A.   No.  Ethereum blockchain was written entirely from scratch
18   with totally different type of system in mind.
19   Q.   And the source code for Bitcoin, is that licensed by
20   anyone?
21   A.   Well, it uses what's called the M.I.T. license, and that
22   is just an open source license, meaning anybody can download
23   the source code, anyone can modify the source code, and anyone
24   could use the source code in private products.  It's fully
25   permissive.
```

```
 1    Q.   And when you looked at the My Big Coin source code online,
 2    did it use the M.I.T. license?
 3    A.   Yes.
 4    Q.   Does the M.I.T. license -- well, is the M.I.T. license
 5    fully permissive?
 6    A.   Fully permissive, yes.
 7    Q.   What does that mean?
 8    A.   Well, the easiest way to explain it is to contrast it with
 9    another license, another open source license such as the GPL.
10    So what the GPL mandates is not only is the software free and
11    open source, but if you download it, change it, modify it, your
12    modification must also have the GPL license in it and must also
13    be free and open source.  So it mandates that if you use the
14    software, you have to keep it open source.
15         The M.I.T. is fully permissive, meaning you don't have
16    to keep it open source.  If you modify it, you can put it in a
17    private product and not share the source code if you want.
18    Although you don't have to do that either.  You can keep it
19    open source or you can make it private.
20    Q.   Well, I was going to get to that.
21         So how could you use the M.I.T. license?
22    A.   Yeah.  So basically as long as you keep the M.I.T. license
23    in the code base, you can do whatever you want.
24    Q.   Could you use it commercially?
25    A.   Yes.
```

1    Q.   Could you use it privately?

2    A.   Yes.

3    Q.   Can you tell the jury what a private blockchain is?

4    A.   Well, a private blockchain -- so what I've been describing

5    is a network that anybody can join.  A private blockchain is

6    similarly a network with a common protocol with implementing

7    blockchain software following those core components previously

8    talked about, but the ability to access that network is

9    privileged, so you have to have permission.

12:34 10   Q.   And is a private blockchain the same as a permissioned

11   blockchain?

12   A.   There's subtle differences.  So permission means you have

13   to have permission, but private generally means that it's not

14   publicly -- the information in the blockchain isn't publicly

15   available, so you can't go in and look at the transaction data.

16        On a permission chain, you need permission to transact in

17   it, but it may or may not be public, so you might have a public

18   permission chain but in a private blockchain it's private,

19   arbitrary individuals can't look at the data inside.

12:34 20   Q.   So if someone was to equate a private blockchain with a

21   permissioned blockchain, that would not be accurate?

22   A.   It's commonly done but they're not the same.

23   Q.   It's an error?

24   A.   It's an error.

25   Q.   Okay.

1          Now, after reviewing Ms. Clegg's report, did you reach

2     any conclusions?

3     A.    Yes.

4     Q.    Did you determine whether her definition of a blockchain

5     was correct?

6     A.    Well, it included all correct things but it left out the

7     possibility that private blockchains exist.  And so it was

8     defined in a way that I would put that definition on the public

9     blockchain, not all blockchains.

12:35 10   Q.    Did it indicate any exceptions to the public blockchain?

11    A.    Excuse me?

12    Q.    Did it indicate that there were -- or did it say that

13    there are sometimes exceptions to the public blockchain?

14    A.    I'm not aware what you mean by "exceptions."

15    Q.    Did she make any statements about whether or not a public

16    blockchain was fully amenable to blockchain analysis?

17    A.    Yes.  A public blockchain is fully amenable to a

18    blockchain analysis.  However, I would disagree on the extent

19    to which it's available for blockchain analysis.

12:36 20   Q.    And how would you disagree?

21    A.    Well, in the original sort of blockchain implementation

22    all the data was contained in plain text.  That isn't

23    necessarily the case anymore, so you can put arbitrary data on

24    the blockchain.  There's a special field -- in Bitcoin there's

25    a special field where you can put arbitrary text data or you

1    can encrypt that data and put that on there.  If you encrypt

2    it, then there's no way -- everybody can see there's encrypted

3    data on there, but they don't know what it is.

4    Q.   So would it be fair to say in some cases it's not fully

5    publicly available?

6    A.   Right, not all the data.

7    Q.   Are private blockchains amenable to blockchain analysis?

8    A.   Only if you have access to it.

9    Q.   And what would you need to gain access?

12:37 10   A.   You would need, first of all, permission.  You would need

11   some sort of cryptographic mechanism to -- an authorization

12   mechanism to access the blockchain and then you would actually

13   have to have a node -- have a computer with a wallet software

14   that was speaking to the other participants.

15   Q.   Did Ms. Clegg render an opinion in her report about

16   whether or not My Big Coin was available as a cryptocurrency

17   prior to June 28, 2017?

18   A.   Yes.

19   Q.   And do you recall what her opinion was?

12:37 20   A.   That it was not available as a blockchain system prior to

21   2017.

22   Q.   And with respect to this statement, did you form an

23   opinion as to its accuracy?

24   A.   Yes.

25   Q.   And have you formed an opinion -- have you formed that

1    opinion to a reasonable degree of professional certainty?

2    A.   Yes.

3    Q.   And what is your opinion?

4    A.   Well, my opinion is that -- that that only applies towards

5    a public blockchain that is fully inspectable, but there's many

6    circumstances in which a blockchain could have existed prior to

7    2017.

8    Q.   And did you have an opinion about whether it was possible

9    that MBC was a private blockchain?

12:38 10  A.   I certainly believe it's possible, yes.

11   Q.   Now, Ms. Clegg also had an opinion about a fork?

12   A.   Yes.

13   Q.   Do you recall what her opinion about the fork was?

14   A.   Yes.

15   Q.   And what was her opinion?

16   A.   Well, the opinion was that if a fork occurs, that all of

17   the transaction data prior to the fork is carried over

18   unmodified.

19   Q.   And do you agree with that opinion?

12:39 20  A.   No.

21   Q.   And have you formed an opinion on the accuracy of that

22   statement?

23   A.   Yes.

24   Q.   And have you formed your opinion to a reasonable degree of

25   professional certainty?

```
 1   A.    Yes.

 2   Q.    And what is that opinion?

 3   A.    Well, my opinion is that there are many circumstances in

 4   which you can see a fork in a blockchain and that the

 5   transaction data is either not fully carried over or is

 6   modified when carried over.

 7   Q.    Now, if you as a software engineer wanted to determine

 8   whether or not MBC existed as a cryptocurrency prior to June

 9   2017, what would you need to look at?

10   A.    Well, you would need access to a blockchain that existed,

11   and you would have to inspect it via blockchain analysis.

12   Q.    And would you need to have access to a particular node?

13   A.    Well, you would need to have access to either the source

14   code or the compiled wallet software, and that wallet software

15   would have to actually download in the transaction history, and

16   then you could perform blockchain analysis on it.

17   Q.    And in reviewing Ms. Clegg's report, did she review any of

18   that?

19   A.    No, I don't believe so.

20             MR. LOPEZ:  I have no further questions, your Honor.

21             THE COURT:  Thank you.

22             Cross-examination.

23             MR. MARKHAM:  Yes, your Honor.

24                          CROSS-EXAMINATION

25   BY MR. MARKHAM:
```

12:39 (line 10)
12:40 (line 20)

```
 1  Q.   So you currently work on biology software; is that right?

 2  A.   Yes.

 3  Q.   And you've never testified as an expert before?

 4  A.   No.

 5  Q.   But in this case you were paid by the defense to write a

 6  report on cryptocurrency.

 7  A.   On blockchain software.

 8  Q.   It's not even on cryptocurrency, just on blockchain

 9  software?

12:40  10  A.   Correct.

11  Q.   So you work in biology software and now you're being paid

12  $225 per hour to write an expert report on blockchain software,

13  correct?

14  A.   Yes.

15  Q.   You're also being paid by the defense to testify here

16  today, correct?

17  A.   Yes.

18  Q.   In reviewing your report, you said that you reviewed over

19  1,000 pages of materials?

12:41  20  A.   The PDF, the transaction documents, yes, I reviewed them.

21  Q.   So you personally reviewed over 1,000 pages of materials,

22  just like you said in the report, right?

23  A.   I did not perform blockchain analysis but I did review the

24  materials, yes.

25  Q.   We'll get to the fact that you didn't perform blockchain
```

1   analysis later.

2        But just yes or no, the 1,000 pages of documents you said

3   you reviewed in your report, did you actually review all 1,000

4   pages of those documents?

5   A.   I went through the document.

6   Q.   Sorry, you went through one document?

7   A.   I went through the document containing all of the

8   transactions.

9   Q.   Okay.  I'm -- let's see here.

12:42 10       THE COURT:  And, counsel, sir, it may be me, but if I

11   could ask you both to slow down a little.

12        MR. MARKHAM:  Yes, your Honor.

13        THE COURT:  Okay.  So on page 2 of your report, you

14   identify over a thousand pages of materials that you reviewed.

15   I'm just asking you whether you reviewed over a thousand pages

16   of materials.

17   A.   I reviewed the material, yes.

18   Q.   All right.  So you're being paid by the defense, they've

19   handed you over a thousand pages of materials to review, and to

12:42 20   be clear, you're not testifying to this jury that My Big Coin

21   was a cryptocurrency between 2014 and 2016.

22   A.   That's -- I don't have an opinion about that.

23   Q.   So you're just testifying that hypothetically it's

24   technically possible that My Big Coin had a blockchain, right?

25   A.   That's correct.

```
 1   Q.   And anything is possible.
 2   A.   Well, not anything is possible.  That is possible, yes.
 3   Q.   To be clear, you were not provided any evidence that
 4   that's actually true, though.
 5            MR. LOPEZ:  Objection, your Honor.  We have no burden.
 6            THE COURT:  I'm sorry.  Oh.  Sustained as to the form,
 7   counsel, but you can ask another question.
 8            MR. MARKHAM:  Yes, your Honor.
 9   BY MR. MARKHAM:
10   Q.   Were you provided any evidence that My Big Coin was
11   operating as a cryptocurrency in 2014?
12            MR. LOPEZ:  Objection.
13            THE COURT:  Well, counsel --
14            MR. LOPEZ:  May I be heard, your Honor?
15            THE COURT:  I understand the objection.
16            You can reframe the question.
17   BY MR. MARKHAM:
18   Q.   Are you testifying today that My Big Coin was operating as
19   a cryptocurrency between 2014 and 2016?
20   A.   I am not testifying to that.  I have no opinion about
21   that.
22   Q.   And you never conducted a blockchain analysis of the My
23   Big Coin blockchain, right?
24   A.   No, I'm not an expert in blockchain analysis.  I wouldn't
25   feel confident in doing that.
```

1    Q.    Well, could you find the blockchain?

2    A.    Could I find which blockchain?

3    Q.    The My Big Coin blockchain, the one you're testifying

4    about.

5    A.    The public one available in 2017 and onward?

6    Q.    Yes.

7    A.    Yes, I found that blockchain, yes.

8    Q.    And to your point, that was only available in 2017 and

9    onward, right?

12:44 10    A.    The source code for the GitHub was available for 2017 and

11    onward on the public blockchain.

12    Q.    Are you aware that was after the CFTC started

13    investigating My Big Coin for fraud?

14    A.    I don't know when the CFTC started, but --

15    Q.    But you are aware that they started at some point?

16    A.    Yes, yes, that I am aware of.

17    Q.    So you reviewed the expert report of the government's

18    expert, Ms. Pamela Clegg, correct?

19    A.    Correct.

12:44 20    Q.    And Ms. Clegg testified that she found no evidence that My

21    Big Coin was functioning as a cryptocurrency from 2014 through

22    June of 2017.  Do you remember that finding?

23    A.    Correct, yes, I do.

24    Q.    And do you also agree that you have seen no evidence of

25    that?

A.   I have not seen a blockchain implemented in the public

with the full block -- the full --

Q.   Just have you seen any evidence that My Big Coin was

operating as a cryptocurrency between 2014 and June of 2017?

A.   There was no publicly available blockchain.

Q.   So you agree with Ms. Clegg on that finding, that she has

seen no evidence of that?

A.   As a cryptocurrency, yes, sir.

Q.   Ms. Clegg also testified and put in her report that she

did not find -- or she did not identify My Big Coin being sold

on any cryptocurrency exchanges from 2014 through June of 2017.

Do you remember that finding in her report?

A.   Yes.

Q.   And do you agree that you've also seen no evidence of

that?

A.   Sure, yes.

Q.   So you agree with Ms. Clegg on that finding as well?

A.   Yes.

Q.   Are you aware that the first time My Big Coin was ever

identified on a cryptocurrency exchange was in September of

2017?

A.   Yes.

Q.   And are you aware -- strike that.

     Do you know what wash trading is?

A.   Very generally.  I couldn't give you the technical

1    definition.

2    Q.   And did you review any of the wash trading that Ms. Clegg

3    identified on the My Big Coin blockchain after June of 2017?

4    A.   No, I have no expertise in that sort of analysis.

5    Q.   Okay.  So you have no opinion one way or another about

6    when Ms. Clegg said she saw wash trading whether that's

7    accurate?

8    A.   Correct, I have no opinion.

9    Q.   For the period of 2014 to 2016, did you see any evidence

12:46 10   that, quote, several currency exchanges exist where you can

11   trade My Big Coin for dollars, euros and more, end quote?

12   A.   I have not seen evidence of that, although I didn't do an

13   exhaustive search.

14   Q.   For the period of 2014 to 2016, did you see any evidence

15   that My Big Coin as a cryptocurrency was able to, quote,

16   transfer money in seconds anywhere in the world, end quote?

17   A.   Sorry, could you repeat that?

18   Q.   Sure.  For the period of 2014 to 2016, did you see any

19   evidence that My Big Coin as a cryptocurrency could be used to,

12:47 20   quote, transfer money in seconds anywhere in the world, end

21   quote?

22   A.   I didn't see any evidence for or against that.

23   Q.   And isn't it also true that based on your knowledge of the

24   blockchain, and you talked about mining, it's actually not

25   possible to transfer blockchain that involves mining in

1    seconds?

2    A.    Actually, it is possible, yes.

3    Q.    Well, how long does the mining process take?

4    A.    In the Bitcoin network, which is just one implementation,

5    it takes an average of 10 minutes.

6    Q.    Understood.

7          Are you aware that My Big Coin in advertising compared

8    itself directly to Bitcoin?

9    A.    Yes, in fact, the source code is built on Bitcoin, yes.

12:47 10    Q.    For the period of 2014 to 2016, did you see any evidence

11   that My Big Coin was operating as, quote, the only commercial

12   based cryptocurrency in the world, end quote?

13   A.    I wouldn't even know what that meant.

14   Q.    So you're saying that statement doesn't even make sense?

15   A.    I just don't understand it.

16         Again, I don't have any expertise in cryptocurrencies.

17   Q.    You were familiar with mining in the context of

18   cryptocurrency though, right?  We were just talking about it?

19   A.    Yes, at the engineering level.

12:48 20    Q.    For the period 2014 to 2016, did you see any evidence that

21   you could mine the My Big Coin cryptocurrency?

22   A.    Not in a public blockchain, no.

23   Q.    Are you aware that all the things I just told you in

24   quotes I'm reading from advertising from the defendant or from

25   My Big Coin?  Did you know that?

 1    A.    In those social media posts?

 2    Q.    Yes.

 3    A.    Yes, I reviewed them.

 4    Q.    Okay.  I'm looking at your report on page 3 when you talk

 5    about blockchain consists of data structures.

 6    A.    Yes.

 7    Q.    And one of those data structures is blocks.

 8    A.    Yes.

 9    Q.    And you say the block's body contains a set of

10    transactions.

11    A.    Yes.

12    Q.    For the period of 2014 to 2016, isn't it true you saw no

13    evidence that My Big Coin's block's body contains a set of

14    transactions?  You were never able to confirm that?

15    A.    I was never able to see any publicly available blocks

16    prior to 2017.

17    Q.    Well, you were also never able to see any privately

18    available blocks, correct?

19    A.    Correct.

20    Q.    Let's move on to the next one, B, Transactions.

21          It says, An address is derived from the public key of

22    a cryptographically generated private or public private key

23    pair.  Did I read that correctly?

24    A.    You did.

25    Q.    And again, for My Big Coin, you saw no evidence that it

1   was doing this, a public-private key pair with

2   cryptographically generated anything?

3   A.   Well, the addresses in the report where it had the

4   transactions certainly were consistent with the sorts of

5   addresses that are generated in other popular blockchains via a

6   derivative of the public-private key pair.  So as far as I

7   could tell, the addresses that I saw on that transaction list

8   were almost certainly generated from public-private key pairs.

9   Q.   Right.  But the addresses you saw, those were after June

12:50 10   of 2017, correct?  Or you have no idea when those addresses are

11   from.

12   A.   Yeah, I have no idea.  You can't get a time stamp on that

13   address.

14   Q.   And lastly, under "Network," you said, In order to prevent

15   malicious peers from misbehaving, blocks are proposed and

16   accepted using consensus algorithms such as proof-of-work and

17   proof-of-stake?

18        Okay.  From 2014 to June of 2016, which one was My Big

19   Coin, proof-of-work or proof-of-stake?

12:51 20   A.   I would have no idea without seeing the underlying

21   implementation.

22        MR. MARKHAM:  Let's see if I can do this.

23        Can you pull up the ELMO, please?

24        THE COURT:  Ms. Hourihan, can you clear the screen,

25   please.

```
  1              THE CLERK:  Sure.
  2              MR. MARKHAM:  Well, because I'm not good at zooming
  3    in, let's just say this is Exhibit WW.
  4              THE WITNESS:  I have a black screen.
  5              THE CLERK:  I wasn't sure what you were showing.
  6              THE COURT:  So it's up now.
  7              THE WITNESS:  I got it.
  8              MR. MARKHAM:  Excellent.  Thank you, Mr. Barbosa.
  9              THE COURT:  I think this is WW.
12:51 10         MR. MARKHAM:  WW, your Honor.
 11              THE COURT:  Thank you.
 12    BY MR. MARKHAM:
 13    Q.   Okay.  So this was the picture of nodes that you went
 14    through, correct, with the defense counsel?
 15    A.   Yes.
 16    Q.   And you're not testifying that My Big Coin, you saw any
 17    evidence that it was operating like this from 2014 to 2016 with
 18    these nodes.
 19    A.   Correct.
12:52 20   Q.   Let's do the next one.
 21              MR. MARKHAM:  Exhibit VV, your Honor.
 22              THE COURT:  Yes.
 23    BY MR. MARKHAM:
 24    Q.   And again, same question.  You walked through this with
 25    the defense counsel.  But you've seen no evidence that My Big
```

1    Coin was actually operating anything like this from 2014 to
2    2016.
3    A.   Correct.  You would have to have a publicly available
4    blockchain for it to happen -- for you to be able to analyze
5    it.
6    Q.   So you testified for about 45 minutes and you can't
7    actually say that any of that testimony actually applies to My
8    Big Coin from 2014 to 2016.  You don't know that.
9    A.   All of the structures of a blockchain, all the structures
12:52 10   of a transactions, you can only verify on a publicly available
11   blockchain or a private blockchain that you have access to.
12   Q.   Correct.  And you've seen no evidence that My Big Coin was
13   actually operating a private blockchain from 2014 to 2016?
14   A.   A public blockchain I saw no evidence for it.
15   Q.   And a private blockchain.  You've seen no evidence of a
16   private blockchain during that time, correct?
17   A.   Yes, because it's not in the public.
18   Q.   And you're also not testifying that My Big Coin was
19   actually advertising a private blockchain during that time
12:53 20   period?
21   A.   I saw no evidence it was advertising the structure of the
22   blockchain, whether it was private permission, consortium,
23   public, anything else.
24   Q.   Are you saying that you saw no evidence of them
25   advertising it that way?

1    A.    Right, they were advertising what seemed to me to be

2    cryptocurrency, not the engineering level of the blockchain and

3    how it's -- what protocols it implements or anything, what

4    consensus algorithm it was using.  I didn't see that sort of

5    communication.

6    Q.    So private blockchains use mining?

7    A.    They can.

8    Q.    They don't have to use mining.

9          And private blockchains you're saying -- well, let me

12:54 10   put it this way:  Can you name me a private blockchain where

11   several currency exchanges exist where you can transfer that

12   private blockchain into dollars, euros, and more?

13   A.    I don't understand the question.

14   Q.    Well, you testified about private blockchains, right?

15   A.    Yes.

16   Q.    Name me one where you can trade it to anyone anywhere in

17   the world and then also exchange it on currency exchanges for

18   dollars, euros, and more.

19   A.    Well, I don't know most of the private blockchains, but

12:54 20   that's typically not the use case for it.

21         MR. MARKHAM:  No more questions, your Honor.

22         THE COURT:  Redirect, Mr. Lopez.

23         MR. LOPEZ:  Yes.

24                       REDIRECT EXAMINATION

25   BY MR. LOPEZ:

     1   Q.   Mr. Markham just asked you a series of questions about
     2   whether you found any evidence of a private blockchain during
     3   2014 to 2016.
     4   A.   Yes.
     5   Q.   And I think you said you didn't.
     6   A.   I didn't see it, no.
     7   Q.   And you -- and therefore, you cannot testify that it --
     8   you don't have an opinion that My Big Coin was, in fact, a
     9   private blockchain during those years?
12:55 10  A.   Correct.
    11             MR. MARKHAM:  Objection.
    12             THE COURT:  Sustained as to form.
    13             You can reframe.  Redirect.
    14   BY MR. LOPEZ:
    15   Q.   And your opinion is that Ms. Clegg could also not find any
    16   evidence of that as well, correct?
    17             MR. MARKHAM:  Objection.
    18             THE COURT:  Sustained as to form.  You can rephrase.
    19   BY MR. LOPEZ:
12:55 20  Q.   Ms. Clegg's opinion was that My Big Coin did not exist as
    21   a cryptocurrency prior to June 2017.
    22             MR. MARKHAM:  Objection.
    23             THE COURT:  I think this is just foundational.
    24             You can answer.
    25   A.   Correct.

1    Q.   And she further opined that My Big Coin did not exist

2    between 2014 and 2017.

3    A.   Correct.  I believe so, yes.

4    Q.   And your opinion, sir, is what with respect to that?

5    A.   That there are systems that you can have a private

6    blockchain that isn't publicly available and there are many

7    reasons to do that, and that there certainly could be

8    transactions occurring in that private blockchain and this has

9    precedent.

12:56 10   Q.   And so if Ms. Clegg had looked for evidence of that

11   private blockchain, she couldn't find any either, correct?

12   A.   Correct.

13            MR. LOPEZ:  Thank you.

14            THE COURT:  Recross?

15            MR. MARKHAM:  Yes, your Honor.

16                         RECROSS-EXAMINATION

17   BY MR. MARKHAM:

18   Q.   You're not a cryptocurrency expert, right?

19   A.   Absolutely not.

12:56 20   Q.   And you've seen no evidence based on your just blockchain

21   expertise that My Big Coin actually existed between 2014 and

22   2017?

23            MR. LOPEZ:  Objection, your Honor.

24            THE COURT:  Overruled.

25   A.   Rephrase the -- repeat the question, please.

1          THE COURT:  And you've seen no evidence based on just

2     your blockchain expertise that My Big Coin actually existed

3     between 2014 and 2017?

4     A.    Correct.

5     Q.    And you're not here to tell the jury that My Big Coin's

6     advertising was actually consistent with anything it was

7     offering because you don't even know what that was.

8     A.    Correct.

9          MR. MARKHAM:  No more questions, your Honor.

12:57 10          THE COURT:  Thank you.

11          Thank you, sir.  You're excused.

12          THE WITNESS:  Thank you.

13          THE COURT:  Mr. Lopez, I think we should take our

14     break now, give us a few minutes to talk about the rest of the

15     schedule.

16          Jurors, we'll take our lunch break.  Again, if you

17     could be back a little before 2:00, and we'll start promptly

18     and then we'll go from there.

19          Today, just a reminder we're only going until 3:30, if

12:58 20     you recall that from yesterday.  Thank you.

21          THE CLERK:  All rise.

22          (Jury left the courtroom.)

23          THE COURT:  Counsel, anything -- everyone else can be

24     seated.

25          Counsel, anything else we need to take up before the

1   break?

2          Mr. Lopez, are we starting with Mr. Gillespie?

3          MR. LOPEZ:  I'm going to -- Mr. Hess is a shorter

4   witness.  I was going to try to slip him in so he could go back

5   home.

6          THE COURT:  Okay.

7          And then Mr. Gillespie?

8          MR. LOPEZ:  Yes.

9          THE COURT:  And then is Mr. Singleton?

12:59 10          MR. LOPEZ:  I have not had contact with Mr. Singleton

11   today since I've been in court.

12          THE COURT:  Okay.  So --

13          MR. LOPEZ:  But I would anticipate those two witnesses

14   would get to 3:30.

15          THE COURT:  Okay.

16          And I'll talk about the schedule for tomorrow.

17          Also, obviously, Mr. Lopez, I'm going to ask you at

18   the end today about Mr. Crater's intentions in regards to his

19   testimony.

12:59 20          MR. LOPEZ:  You want an answer now?

21          THE COURT:  I'm going to ask you at the end of today.

22          MR. LOPEZ:  I will speak to him.

23          THE COURT:  Okay.

24          And, counsel, anything else we should take up now,

25   government's side?

1           MR. MARKHAM:  No, your Honor.  Just you said 3:30 is

2     when we're ending today; is that right?

3           THE COURT:  Yes.

4           MR. MARKHAM:  Thank you.

5           MR. LOPEZ:  Your Honor, for the record, I move to

6     strike Mr. Markham's entire cross-examination.

7           We have no burden in this case, and the government has

8     been trying to switch the burden of proof to us this entire

9     trial.

01:00 10           THE COURT:  So, counsel, I understood the basis of

11     your objection, and the questions were rephrased after that.

12           The expert was testifying about what he observed in

13     open source, which was the flavor of his testimony on direct.

14     I didn't think the questions that followed, Mr. Lopez,

15     suggested a burden for any evidence provided by you as opposed

16     to any evidence in the open source record which was the focus

17     of his direct examination.

18           MR. LOPEZ:  Well, but his -- the purpose of his direct

19     exam was to indicate that Ms. Clegg's opinion was incomplete

01:01 20     because she didn't take into consideration the possibility of a

21     private blockchain, and it was only after we submitted our

22     expert's report that now her shift was to publicly available

23     blockchains, and she basically changed her opinion.

24           But the government did no investigation into what

25     existed at My Big Coin prior to 2017.

1          THE COURT:  But, I guess, counsel, based on what this

2     jury has heard and certainly what the Court has heard, based on

3     both her testimony and even this -- your expert's testimony,

4     whether there was any evidence of any blockchain is certainly

5     before this jury.

6          MR. LOPEZ:  And that --

7          THE COURT:  The indicia, and what I mean by that is

8     the indicia of any blockchain.  I did think -- I mean, I

9     certainly was sensitive to the objections you made to the

01:02 10    questions, the particular phrasing of the questions.  I don't

11    think there was a shifting of the burden.  I also think when,

12    you know, the defendant offers witnesses, including an expert,

13    the government was entitled to cross, particularly in regards

14    to this expert being offered to rebut their expert.  So, I

15    appreciate you --

16         MR. LOPEZ:  Just very simply, your Honor --

17         THE COURT:  Sure.

18         MR. LOPEZ:  -- the government could have in their

19    investigation asked the witnesses that they put up in this case

01:03 20    for access to their wallets before it was shut down by the

21    CFTC.  They could have taken possession of those and they could

22    have determined through computer technology what existed prior

23    to 2017.  They did not do that.

24         Now they're saying, oh, but there's no evidence that

25    there was any blockchain before 2017.  By doing that, they're

1    switching the burden to us to prove that something existed that

2    they never bothered to look for.

3          MR. MARKHAM:  For the record, I disagree with all of

4    this.

5          THE COURT:  Mr. Lopez, were you finished?

6          MR. LOPEZ:  So I just -- just because they didn't find

7    any evidence and didn't look for any evidence doesn't mean it

8    didn't exist.  And since we don't have any burden to prove it

9    existed, it's their burden to prove it didn't, and the only way

01:03 10    they could have done that is by showing that whatever existed

11    prior to 2017 wasn't a blockchain and wasn't a cryptocurrency.

12          THE COURT:  I understand the argument, counsel.  I

13    don't think there's been any shifting of the burden based on

14    both the testimony not just from the experts, but the

15    percipient witness given the expert's context for what a

16    blockchain is.

17          So your objection is preserved on the record.

18          MR. LOPEZ:  Thank you, your Honor.

19          THE COURT:  Mr. Markham, did you want to say anything?

01:04 20          MR. MARKHAM:  No, your Honor.

21          THE COURT:  Okay.

22          Counsel, anything else before we break?

23          MR. MOORE:  I'm sorry.  Just to clarify, the witnesses

24    this afternoon are Hess and Gillespie?

25          MR. LOPEZ:  Yes.

```
 1              THE COURT:  And I would just ask -- I would ask the
 2     government attorneys to slow down, and I would ask Mr. Lopez to
 3     keep his voice up.
 4              MR. MARKHAM:  Too much coffee, your Honor.  I
 5     apologize.
 6              THE COURT:  Thank you.
 7              THE CLERK:  All rise.
 8              (Recess taken.)
 9              (Resumed, 2:01 p.m.)
01:59 10         THE COURT:  Ms. Hourihan is getting the jury.
11     Anything before we start?
12              MR. LOPEZ:  No, Your Honor.
13              THE CLERK:  All rise for the jury.
14              (Jury enters the courtroom.)
15              THE CLERK:  Court is in session.  Please be seated.
16              THE COURT:  Mr. Lopez.
17              MR. LOPEZ:  Yes, we're going to be calling Ken Hess
18     next.
19              THE COURT:  He may be called.
02:01 20         MR. LOPEZ:  The defense calls Ken Hess.
21              THE COURT:  He may be called.
22              THE CLERK:  You can take the stand, Mr. Hess.  You can
23     go up on the stand.
24              THE COURT:  Thank you.  Please raise your right hand
25     to be sworn.
```

```
 1              KEN HESS, Sworn

 2              THE CLERK:  Thank you.  Please be seated.

 3              THE COURT:  Good afternoon, sir.  Good afternoon.

 4    DIRECT EXAMINATION BY MR. LOPEZ:

 5    Q.   Good afternoon, Mr. Hess.

 6    A.   Good afternoon.

 7    Q.   Could you please state your full name for the record.

 8    A.   Kenneth Charles Hess, H-e-s-s.

 9              THE COURT:  Thank you.

02:02 10    BY MR. LOPEZ:

11    Q.   Okay.  And where do you live, sir?

12    A.   Presently I am a Florida resident, tax purposes, but most

13    of my home is Michigan.

14    Q.   And how long have you lived in Michigan?

15    A.   All my life, since 1940.  I'll be 82 in a couple of weeks.

16    Q.   And when did you move to Florida?

17    A.   I became a Florida resident in '20.

18    Q.   How far did you go in school?

19    A.   14 years, associate's.

02:03 20    Q.   An associate's degree?

21    A.   No.

22    Q.   And what did you study in college?

23    A.   Business.

24    Q.   Any particular part of business?

25    A.   I'm sorry?
```

```
 1    Q.   Any particular part of business?
 2    A.   Mostly accounting.  I took several classes and became --
 3    an accounting, and I did some -- I worked in finance with
 4    Chrysler Corporation for 15 years.
 5    Q.   And approximately when was that?
 6    A.   Started in 1968 with Chrysler.  I ended in 1983 with them.
 7    Q.   And did you -- were you employed after that?
 8    A.   Yes.  I went to work as a lease manager for a Chrysler
 9    Plymouth store and worked with them several years.  And he
02:04 10    offered me a buyout and I turned it down.  Probably a stupid
11    mistake.  One of many I've made over the years.
12    Q.   Are you currently retired?
13    A.   Yes.
14    Q.   And when did you retire?
15    A.   I played games with -- I had a corporation, then I worked
16    marketing for a while for the dealerships.  I still started up
17    another company with my wife two years ago, but I basically
18    retired seven, eight years ago.
19    Q.   Okay.  How did you hear about My Big Coin?
02:04 20    A.   Mark Gillespie and I worked at Credit Acceptance
21    Corporation for a number of years.  We did quite well.  They
22    kept changing the pay scale so I quit after a couple of years.
23    Mark stayed on a little longer than I did.
24         Ended up working for -- trying to think of the name of the
25    dealership -- McInerney Chrysler Plymouth, which is a
```

dealership in Detroit.  He went to work for them as a sales

manager.  I knew the McInerneys, so I went to talk to them and

took a position as a lease manager for them.  And that's -- we

worked together at the Chrysler Plymouth store for a while.

Q.   About how long?

A.   Oh, I stuck around maybe six, eight months.  I could see

it wasn't going anywhere.  I couldn't get any support.

     But while I was there, Mark was on the phone all the time.

And I ended up asking Mark, "So what were you spending all your

time talking to?  What's going on?"  And that's when I got

interested in My Big Coin.

Q.   Okay.  Have you ever met Mr. Crater?

A.   No.

Q.   Have you ever talked to Mr. Crater?

A.   No.

Q.   Have you ever talked to anyone else besides Mark Gillespie

in connection with My Big Coin?

A.   I did to -- and I can't think of his name, a lawyer.

Maybe you can --

Q.   Does the name Adam Tracy ring a Bell?

A.   That's the one, yes, Tracy.

Q.   And --

A.   I talked to him once or twice.  Didn't like his

conversation.  Didn't like his tone of voice.

Q.   All right.  I take it you didn't like him?

```
 1    A.    I didn't like him.
 2    Q.    Okay.  So at some point, Mr. Gillespie introduces you to
 3    My Big Coin?
 4    A.    Yes.
 5    Q.    And at some point do you decide to purchase some My Big
 6    Coin?
 7    A.    Yes.
 8    Q.    Can you tell me what led you to conclude that you wanted
 9    to purchase My Big Coin?
02:07 10    A.    Did some more investigation in talking to him.  And the
11    interest came about because I thought it was backed by gold,
12    and I think oil is what I heard, too, backed by both gold and
13    oil.  And that's when I got interested.
14    Q.    Okay.  And why did that interest you?
15    A.    Why?
16    Q.    Mm-hmm.
17    A.    Because I felt a little more secure making an investment.
18    And I've got other stocks, as probably most of us do.  Not
19    doing too well right now and none of them have any backing
02:07 20    other than their performance over the number of years.  And
21    with gold and oil, I felt a little more secure.
22    Q.    And I take it that you were told that before you purchased
23    your coin?
24    A.    I believe so.  Before I purchased the coin, I think, yes,
25    I did.
```

1    Q.    And who told that to you?

2    A.    I guess the only one I can think of would be Mark.

3    Q.    And did he say anything else to you before you decided to

4    purchase your coin?

5              MR. MOORE:  Objection, hearsay.

6              THE COURT:  Well, I'm assuming you're offering it for

7    effect on listener?

8              MR. LOPEZ:  Yes, Your Honor.

9              THE COURT:  Overruled.  You can answer.

02:08 10   A.    The only -- at the time that I invested, my son was

11   working in downtown Detroit with a gentleman, and his name was

12   Bill Donohue.  In finding out after I bought the coin --

13   Q.    Before we get there, I want to focus on when you purchased

14   the coin.

15   A.    Yes.

16   Q.    Okay.  I think you told us that you were told that it was

17   backed by gold and oil?

18   A.    Again, you're talking -- I'm 82 years old.  I can't

19   remember what I did last week for lunch, more or less what I

02:09 20   did a number of years ago and when I did it.  I had heard it

21   was backed by gold and oil.  I'm thinking I heard about that

22   prior to my purchase, but I honestly cannot tell you yes or no.

23   Q.    So you may have heard about that after you made your

24   purchase?

25   A.    It could have been after I bought the gold.

1    Q.    Okay.

2    A.    Or I'm sorry, the coin.

3    Q.    I know it's been a long time, but at the time you decided

4    to make the purchase, what did you know about cryptocurrencies?

5    A.    Very little.

6    Q.    Did you do --

7    A.    Very little.  Yes, I did.  And I knew there were a number

8    of coins in Europe, and I looked up their timeframe, and a

9    number of them, they were quite successful.

02:10 10   Q.    Did you make any assessment of the risks involved with

11   purchasing cryptocurrency?

12   A.    No.  I knew there was going to be a risk.  I knew, same as

13   my buying stock, you get no guarantees.

14   Q.    And have you bought stock in the past?

15   A.    Have I bought stock in the past?  Absolutely, yes.

16   Q.    And any risky stocks?

17   A.    Yes.

18   Q.    And have you lost money in stocks?

19   A.    Yes.

02:10 20   Q.    Okay.  So do you remember how much you purchased when you

21   initially purchased?

22   A.    Initial purchase was, I believe, 10,000.  I purchased a

23   total of 52,000 over the years.

24   Q.    Okay.  And was that spread out over time?

25   A.    Yes.

```
 1    Q.   Okay.  And how long after you purchased your first amount
 2    of coins until your second time, if you recall?
 3    A.   You know, I was looking at the certificates of the wire
 4    transfers just the other day.  I don't know why I didn't copy
 5    them, but I couldn't tell you the timeframe between the wire
 6    transfers.
 7    Q.   I think you said at some point you heard from someone that
 8    the coins were backed by gold and oil?
 9    A.   Yes.
10    Q.   Okay.  And at some point did you learn who was behind that
11    so-called statement of backed by gold?
12    A.   Yes.  That's what made me a little upset.
13              MR. MOORE:  Objection.
14    BY MR. LOPEZ:
15    Q.   And who was that?
16              MR. LOPEZ:  Objection.  Hearsay.
17              THE COURT:  Offered for the same reason as before,
18    Mr. Lopez?
19              MR. LOPEZ:  Yes.
20              THE COURT:  Okay.  Overruled.
21    BY MR. LOPEZ:
22    Q.   And who was that?
23    A.   His name was Bill Donohue.
24    Q.   And did you know Mr. Donohue?
25    A.   Yes.  Not favorably.  Mr. Donohue was -- touted my son.
```

6-182

```
1    He was with -- my son's got a company called 3-DAT.  3-DAT

2    developed a hologram for the federal government that is used

3    today in the jets and jet fighters.

4        He was working with my son on a hologram.  And in the same

5    office complex was Mr. Donohue with his office.  Mr. Donohue

6    touted my son into, before I got into it, $19,000.  He had some

7    Gibson certificates of gold bearer bonds from the German

8    government worth millions.

9        My son sent -- they sent money to the -- an office, a

02:13 10   company, federal government someplace in this area or in

11   Washington to certify these certificates that they were real.

12   They were certified that they were real.

13           MR. MOORE:  Objection, lack of personal knowledge.

14           THE COURT:  Well, counsel, perhaps you can hone in on

15   your question, Mr. Lopez.

16   A.   So --

17   Q.   No, sir.  I have to ask another question.

18       So did your son lose any money with respect to

19   Mr. Donohue?

02:14 20   A.   No.  He paid for the --

21           MR. MOORE:  Objection, hearsay.

22           THE COURT:  Well, overruled as to this.

23           You can finish your answer.

24   BY MR. LOPEZ:

25   Q.   Finish your answer, sir.
```

A.   He paid -- his company paid for the certificates to be
certified by the federal government that they were true bonds.

     At that time, Mr. Donohue approached me.  He said he
needed 25,000 to take these certificates to get them across the
border and get them into the United States, and he had to pay
off some people.  This is Bill Donohue.

     I gave him $25,000 to get these certificates, supposedly.
Well, it turned out to be trash.  They were nothing.  The
federal government, German government said they would only cash
them -- they were all good, but they would only cash them if
they were all cashed.

Q.   So, sir, when you heard that Mr. Donohue was involved with
My Big Coin, what, if anything, did you do?

A.   Well, that's what got me a little upset when I found out
that Mr. Donohue was upset with -- he was part of My Big Coin.

     So I called Mark at the time and I told Mark, I says,
"Please do me a favor.  Call Randall."  I said, "Mr. Donohue is
a sneak and a thief," and I could go on and on and on.

          MR. MOORE:  Objection.

          THE COURT:  Sustained as to that.

BY MR. LOPEZ:

Q.   We don't have to go on and on and on.

     Can you tell me the timeframe, if you have a memory?  Was
it towards later?

A.   I'd have to go back to my computer, and I don't remember

```
 1    the timeframe when it was -- it was after I had gotten --
 2    Q.   Was it after you had already invested $52,000?
 3    A.   Yes, yes.
 4    Q.   Do you know whether or not Mr. Gillespie ever did inform
 5    Mr. Crater?
 6    A.   Yes, he did.  And he --
 7    Q.   Sir?
 8    A.   Okay.
 9    Q.   Did Mr. Gillespie tell you that he did or were you present
10    when he did?
11    A.   Mr. Gillespie told me that he had contacted Mr. Randall.
12              MR. MOORE:  Objection.
13              THE COURT:  Sustained as to this.  So to the extent
14    there was an answer, it's struck.
15              MR. LOPEZ:  I have no further questions, Your Honor.
16              THE COURT:  Thank you, cross-examination.
17              MR. MOORE:  Yes, Your Honor.
18    CROSS-EXAMINATION BY MR. MOORE:
19    Q.   Were you aware that the defendant was paying
20    Mr. Gillespie?
21    A.   Was I aware that he was paying Mr. Gillespie?  No.
22    Q.   Would it have had any effect on your decision to get
23    involved in My Big Coin if you knew that the defendant was
24    paying --
25    A.   No, no.
```

1    Q.   -- Mr. Gillespie?

2    A.   Mark is still broke today.  Was broke then.  So if he got

3    paid, that would be a miracle.

4    Q.   And you said you assessed your risk before you invested in

5    My Big Coin.  Is that accurate?

6    A.   Yes, yes, I did.

7    Q.   When you were assessing that risk, did you factor in the

8    possibility that people could be lying to you?

9    A.   Lying to me about what?

02:17 10   Q.   About being backed by gold or being backed by oil.

11   A.   No.  I knew the possibility that it might not be true.  I

12   do that with stock.  You analyze whether you want to take the

13   risk or you don't, based upon your own personal beliefs.

14       I felt that it was still a strong chance until I heard

15   that Mr. Donohue was involved.

16   Q.   You said you invest in stock as well.  Is that correct?

17   A.   Correct.

18   Q.   Do you have an expectation that when the company's stock

19   you buy tells you something that they're making truthful

02:18 20   statements?

21   A.   Well, I guess I'd have to, yes.  I guess I'd have to

22   believe it that they're telling me the truth.

23   Q.   And would it matter?

24   A.   If you do investigation, it depends on who you're talking

25   to, whether it's the truth or whether you believe it or not.

```
 1   Q.   Would it matter to you if a company that you decided to
 2   invest in was intentionally lying to you?  Would that matter?
 3            MR. LOPEZ:  Objection.
 4            THE COURT:  Overruled.
 5   A.   If I knew they were lying to me?
 6   Q.   Yes, would that matter to you in your decision to invest?
 7   A.   I guess it would.  If I knew they were lying to me, then
 8   why would I invest?
 9            MR. MOORE:  Thank you.  Nothing further.
02:19 10         THE COURT:  Redirect, Mr. Lopez?
11   REDIRECT EXAMINATION BY MR. LOPEZ:
12   Q.   Did you think Mr. Gillespie was lying to you?
13            MR. MOORE:  Objection, Your Honor.
14   A.   No.
15            THE COURT:  Overruled based on the prior exchange of
16   questions, counsel.
17   A.   What we didn't talk about --
18            THE COURT:  You have to wait for the next question,
19   sir.  Mr. Lopez.
02:19 20         MR. LOPEZ:  I'm fine, Your Honor.
21            THE COURT:  Anything else?
22            MR. MOORE:  Briefly.
23   RECROSS-EXAMINATION BY MR. MOORE:
24   Q.   You haven't listened to any of the testimony in this
25   trial, have you?
```

```
 1   A.   No.
 2            MR. MOORE:  Thank you.  Nothing further.
 3            THE COURT:  Thank you, sir.  You're excused.  Thank
 4   you.
 5            MR. LOPEZ:  Thank you, Mr. Hess.
 6            THE WITNESS:  Thank you.
 7            THE COURT:  Mr. Lopez.
 8            MR. LOPEZ:  The defense calls Mark Gillespie to the
 9   stand.
10            THE COURT:  He may be called.
11            THE CLERK:  If you could please raise your right hand.
12            MARK GILLESPIE, Sworn
13            THE COURT:  Good afternoon, sir.
14            THE WITNESS:  Good afternoon.
15   DIRECT EXAMINATION BY MR. LOPEZ:
16   Q.   Sir, could you please state your full name for the record
17   and spell your last name.
18   A.   Mark Gillespie, G-i-l-l-e-s-p-i-e.
19            THE COURT:  Thank you.
20            THE WITNESS:  You're welcome.
21   BY MR. LOPEZ:
22   Q.   Sir, where do you live?
23   A.   I live in Hartland, Michigan.
24   Q.   What part of Michigan is that?
25   A.   Kind of central.
```

1    Q.   Okay.

2    A.   Lower center.

3    Q.   How far did you go in school?

4    A.   Into the fourth year at University of Maryland.

5    Q.   I take it you didn't graduate?

6    A.   No.  Dad had a heart attack.  No.  Came home.

7    Q.   I'm sorry.

8    A.   That's okay.

9    Q.   Are you currently employed?

02:22 10   A.   No.

11   Q.   When were you last employed?

12   A.   That would have ended on January 16, 2018.

13   Q.   And by whom were you employed?

14   A.   My Big Coin.

15   Q.   And when did you start?

16   A.   Excuse me, Scott.  Apologize.  That's actually not

17   correct.  I was an outside consultant, 1099, but that was -- my

18   focus was them and only them.

19   Q.   Okay.  So you were a consultant for My Big Coin?

02:22 20   A.   Yes.

21   Q.   You were not a salaried employee?

22   A.   No, no.

23   Q.   And you ceased working on January 10, 2018?

24   A.   Well, pretty much everything ground to a stop when we were

25   indicted.

```
 1   Q.   Well --
 2   A.   So that's where it stopped.
 3            MR. MARKHAM:  Objection.
 4            THE COURT:  Sustained as to that.  It's struck.
 5   BY MR. LOPEZ:
 6   Q.   When did you begin working for My Big Coin as a consultant
 7   and a 1099 employee?
 8   A.   That would be approximately April of 2014.
 9            THE COURT:  Sir, I'm just going to ask you, can you
10   move the microphone closer to you.
11            THE WITNESS:  Certainly.
12            THE COURT:  The base moves.  If you can just pull it
13   in.
14            THE WITNESS:  Certainly.
15   BY MR. LOPEZ:
16   Q.   Now, prior to working for My Big Coin, were you employed?
17   A.   I was.
18   Q.   And what were you -- where were you employed?
19   A.   At Northland Chrysler Plymouth in Oak Park, Michigan.
20   Q.   For how long did you work for that company?
21   A.   That was a new employ, so approximately a year.
22   Q.   Prior to that?
23   A.   Running dealerships for I believe it was BT Auto.  There
24   were like three stores.  When I say "dealerships," auto
25   dealerships.
```

```
 1   Q.   So when you worked for the auto dealerships, did you have

 2   a position?

 3   A.   I did.

 4   Q.   And what was that position?

 5   A.   It was GSM at Northland Chrysler Plymouth, which is

 6   general sales manager.  And it was, at BT auto, GM, which is

 7   general manager.

 8   Q.   Okay.  And I take it in those positions you supervised

 9   other salespeople?

10   A.   Absolutely.  As a GM, you supervise everything.

11   Q.   And at the first company you mentioned, how many -- about

12   how many employees did you supervise?

13   A.   Going back some years.  I would take a shot at

14   approximately 13 salespeople.

15   Q.   And prior to that?

16   A.   Three stores, 15 to 20.

17   Q.   Okay.  How long did you work in the auto industry?

18   A.   Started in approximately 1984.

19   Q.   So about 30 years?

20   A.   Approximately, generally.

21   Q.   Okay.  Do you know an individual by the name of Mike

22   Kruger?

23   A.   I do.

24   Q.   And when did you first meet Mike Kruger?

25   A.   I have never met Mike Kruger.
```

1    Q.    When were you first in communications with Mike Kruger?

2    A.    The vehicle for the first communication would be ATIG,

3    which was a stock.  I don't recall how we interfaced initially,

4    but he had a lot of opinions and interesting ideas, so we tend

5    to speak.

6    Q.    And what did ATIG stand for, if you recall?

7    A.    I do.  Atlantis Internet Group.

8    Q.    And what did ATIG do?

9    A.    ATIG was a very -- it was very much an anomaly.  It was

02:26 10   the only company in the United States that had a favorable

11   opinion from the NIGC, which is a government agency that takes

12   a look at Indian gaming.  And they were given an opinion that

13   they could conduct gambling.

14          MR. MARKHAM:  Objection.

15          THE COURT:  Basis in a word, counsel?

16          MR. MARKHAM:  Personal knowledge.  Foundation for

17   personal knowledge.

18          THE COURT:  Counsel, you can lay the foundation,

19   although I think the question was what it did.  So if you want

02:26 20   to reframe that, Mr. Lopez.

21   BY MR. LOPEZ:

22   Q.    Did you come in contact with anyone else as a result of

23   your interaction with ATIG?

24   A.    Come in contact?

25   Q.    Did you communicate with anyone else?

A.   Oh, sure.  There were other people.  We all talked.  I
have friends and -- yeah.

Q.   And ultimately what happened to ATIG?

A.   It is still a -- I believe a viable company, and it is
being -- I think there was a name change.  And this is very
much from memory, Mr. Lopez.

Q.   Okay.  All right.

A.   A name change to Atlantis Gaming Corporation I believe it
is.

02:27  Q.   Okay.  Now, at some point did Michael Kruger call you
about My Big Coin?

A.   Did he call me?  Yes, absolutely.

Q.   And what's your best -- what's your best estimate as to
when that was?

A.   It was before April of 2014.  And there were multiple
calls because he was pretty excited about it.  And I was busy
working, so I wasn't.

Q.   Okay.  And did you consider Mike Kruger a friend?

A.   I've never met the guy.  Well, that's not fair because
02:28  there are some people I haven't met I do consider friends.

Q.   Mr. Gillespie, if you could just answer the question, this
will go a lot faster.

A.   Yes.

Q.   Okay.  At some point did you learn about an individual
named John Roche?

```
 1    A.   I knew about -- yes, but it was before Mike Kruger.

 2    Q.   How did you know about John Roche?

 3    A.   That was through Atlantis Internet Group.

 4    Q.   ATIG?

 5    A.   Mm-hmm.

 6              THE COURT:  You have to give an affirmative answer.

 7    Do you mean yes?

 8              THE WITNESS:  I do, ma'am.

 9              THE COURT:  Thank you.

10              THE WITNESS:  Thank you.

11    BY MR. LOPEZ:

12    Q.   And what did you know about John Roche when he was

13    involved with ATIG?

14    A.   I knew that he had a position there.  And if memory

15    serves, it was business development coordinator.

16    Q.   Okay.  Did you learn anything else about him?

17    A.   A little bit about --

18              MR. MARKHAM:  Objection, calls for hearsay.

19    BY MR. LOPEZ:

20    Q.   What else did you know about John Roche?  What did you

21    personally know about John Roche?

22              MR. MARKHAM:  Objection, foundation.

23              THE COURT:  Well, counsel, what is the objection to

24    this one?

25              MR. MARKHAM:  It's unclear whether someone just told
```

1    him something or whether he personally knows something.

2         THE COURT:  Counsel, just reframe that question.

3         MR. LOPEZ:  I'll reframe it.

4    BY MR. LOPEZ:

5    Q.   Have you ever talked to John Roche?

6    A.   I have.

7    Q.   Has he ever told you anything about himself?

8    A.   Probably.  But, you know, this goes way back.  I can't

9    tell you what it was.

02:29 10   Q.   So you don't have a memory today of what John Roche told

11   you about himself or his background?

12   A.   I do not.

13   Q.   Okay.

14   A.   No.

15   Q.   What about Randall Crater?

16   A.   I had heard the name Randall Crater.

17   Q.   When did you first hear the name Randall Crater, if you

18   can recall?

19   A.   It will be around the same time I heard about Mike Kruger,

02:30 20   around that time.  I'm sorry, same time with John Roche.

21   Q.   And ATIG?

22   A.   Yes.

23   Q.   Do you know whether Mr. Crater was involved with ATIG?

24   A.   It's my understanding he was.

25   Q.   So at some point Mike Kruger calls you and tells you about

1    My Big Coin?

2    A.   Yes, sir.

3    Q.   And did that cause you to do something?

4    A.   Not at the initial call, no.

5    Q.   Okay.  At some point later when he continued to call you,

6    did you decide to do something?

7    A.   I decided to look into it.

8    Q.   Okay.  And how did you look into it?

9    A.   I believe I went on their website, and I might have even

02:31 10   created an account right then because that's the best way to

11   take a look at the function and functionality.

12        MR. LOPEZ:  Mr. Sweeney, could you pull up

13   Exhibit 15A.

14   Q.   Sir, do you recognize what's been marked as Exhibit 15A?

15   A.   I do.

16   Q.   And what do you recognize it to be?

17   A.   That would be the banner page, opening page, cover page

18   for My Big Coin.

19   Q.   And do you recall whether that home page was up in April

02:32 20   of 2014?

21   A.   I can't say definitively, no, but I believe it was.

22   Q.   It's your memory that you looked at this website?

23   A.   Oh, absolutely.

24   Q.   And did you look at anything else?

25   A.   I probably would have run the name, you know, through

         1    Google and checked whatever my sources were back then.  Maybe

         2    even talked to a couple of other friends or people, "Did you

         3    know" type of questions.  "Did you know of."

         4    Q.   Do you recall which names you ran through Google?

         5    A.   I'm trying to determine when I knew about My Big Coin Pay,

         6    which would have been the commercial entity for My Big Coin,

         7    but I can't say I ran that.  I don't know.

         8    Q.   Okay.  At some point did you learn that Michael Kruger

         9    wanted to get involved?

02:33   10         MR. MARKHAM:  Objection.

        11         THE COURT:  Basis, counsel?

        12         MR. MARKHAM:  Foundation, calls for hearsay.

        13         THE COURT:  Well --

        14         MR. MARKHAM:  Testifying to what Mike Kruger wants.

        15         THE COURT:  No.  Overruled to the extent you're asking

        16    for a yes or no answer, Mr. Lopez.

        17    BY MR. LOPEZ:

        18    Q.   At some point did you learn that Mr. Kruger wanted to get

        19    involved with My Big Coin?

02:33   20    A.   Yes.

        21    Q.   At some point did you get involved with My Big Coin?

        22    A.   At some point I did.

        23    Q.   And was it around the same time?

        24    A.   Later than Mike.

        25    Q.   How much later?

```
 1   A.   I don't know the answer.
 2   Q.   Okay.
 3           THE COURT:  Counsel, give me one second, please.
 4           (Discussion off the record.)
 5           THE COURT:  Thank you.  Thank you, Mr. Lopez.
 6           MR. LOPEZ:  Thank you, Your Honor.
 7   BY MR. LOPEZ:
 8   Q.   Do you have any memory as to -- your memory is that you
 9   didn't get involved until April of 2014?
02:35 10   A.   It might have been a couple of months earlier.
11           MR. LOPEZ:  Mr. Sweeney, could you bring up
12   Exhibit 11D.
13   A.   Mr. Lopez, I believe it was a couple of months earlier.
14           MR. LOPEZ:  Could you enlarge that for the jury and
15   for the witness.
16   Q.   So this is already in evidence I believe as 11D.
17        This is a letter, an email from you to an account
18   Greyshore@me.com.
19        Mr. Gillespie, do you know who is behind the
02:36 20   Greyshore@me.com?
21   A.   It's my understanding that Randall Crater is Greyshore.
22   Q.   And can you just read this email to yourself?
23   A.   I am familiar with it.  It came right back.  It was an
24   eventful thing to me.  I know what it says.
25   Q.   Okay.  So in February of 2014, you're asking for a
```

1  different fee structure.  Is that fair to say?

2  A.   That's not the way I see it, no.

3  Q.   All right.  Prior to February of 2014, were you being paid

4  by anyone to work for My Big Coin?

5  A.   With anybody -- no.  I guardedly say that, Mr. Lopez,

6  because it's eight and a half -- how long I just --

7  Q.   Okay.  So in this email, you're saying, "Randall,

8  afternoon.  I'm trying to get some skin in the game.  So hard

9  to converse with Mike, John, and you, feel all your excitement,

02:37 10  get my friends and family in, and not feel a part of this."

11       First of all, who is the Mike and John that you're

12  referring to?

13  A.   Mike Kruger, John Roche, "you" being Randall Crater.

14  Q.   Okay.  And I take it from this email that you were getting

15  your friends and family involved?

16  A.   Yes.

17  Q.   Do you have a memory as to which friends you got involved?

18  A.   I do.

19  Q.   Who did you get involved?

02:38 20  A.   Names?

21  Q.   Yes.

22  A.   James Penacki, Gary Wilson, Rick Royce, Kathy Drew, George

23  Rommel, Chuck Rommel.  Those were close friends.

24       And there's one more.  I don't remember his last name.  A

25  guy named Mike, who I had never met.

1    Q.    What about Peter Bell?

2    A.    There could be -- oh, there you go.  Wow, how could I miss

3    that?

4    Q.    And who was Peter Bell?

5    A.    Peter Bell was a friend of mine in the '70s at University

6    of Maryland in Munich, Germany.

7    Q.    And by February 2014, were you already getting people

8    involved, your friends involved?

9    A.    I believe so.

02:39 10   Q.    Okay.  And the next paragraph says, "Would you consider

11   not paying me the $700 plus I have earned at the 3 percent and

12   not paying me for the six PRs.  I'll do all that for free, and

13   instead lock me in or put the coins in my account for today's

14   rate at 28.87 for $5,774, 200 of MBC that will be paid the

15   5,774 within 60 days, probably 30 as I have 8K coming within

16   that timeframe in one lump sum from Canada.

17        "Your answer pro or con will to no way affect my

18   commitment here.  Thanks for your consideration."

19   A.    I remember it well.

02:40 20   Q.    What were you telling Randall in that communication?

21   A.    I don't know what latitude I have here and I don't want to

22   be lengthy, but it's not a real short answer.

23        Randall, prior to this conversation, had advised me that

24   there were --

25             MR. MARKHAM:  Objection.

```
 1              THE COURT:  Well, counsel --
 2              Sir, you can testify to what you were telling Randall
 3    in this communication.
 4              MR. LOPEZ:  Well, Your Honor, this is in response to
 5    something that Randall told him, so I think context is
 6    important.
 7              THE COURT:  Okay.  Well, let me hear the answer to the
 8    question.  So what were you telling Randall in this
 9    communication?
02:41 10  A.    I was telling him basically I don't plan to make any money
11    off my friends or family.
12    Q.    But you wanted some skin in the game?
13    A.    I was so excited.
14    Q.    And why were you so excited?
15    A.    In approximately 2014, all anybody talked about -- and I
16    knew very little -- blockchain, crypto, and it was of great
17    interest to me.  I had done a little bit of homework and I got
18    more excited about it.  And by talking with Mike and talking
19    with John Roche and by talking with Randall Crater, there was
02:41 20  electricity, and I felt it.
21              And I also felt a commitment.  That's huge to me.  I
22    choose who I work for.  I'm careful.  And I was explaining to
23    Randall that I don't want to make money off my friends.  I
24    didn't need to.
25    Q.    So you didn't want the commission?
```

```
 1    A.    Absolutely not.
 2    Q.    Did you even know prior to this, prior to your
 3    conversation with Randall, that there was even a commission?
 4    A.    I did.  Because in a very early conversation with Randall,
 5    while I was employed working at Chrysler, Randall said --
 6              MR. MARKHAM:  Objection, Your Honor.
 7              THE COURT:  Well, counsel, your response to that,
 8    Mr. Lopez?
 9              MR. LOPEZ:  I'm just trying to tell the story here,
10    Your Honor.
11              THE COURT:  Well, counsel, within the rules of
12    evidence.  So what's your response to the hearsay objection?
13              MR. LOPEZ:  It's an effect on the listener --
14              THE COURT:  Okay.  I'll allow the answer.
15              Jurors, you've heard the attorneys and me throw around
16    the term "hearsay."  There are exceptions that apply, and there
17    are certain things that are not hearsay when a statement is
18    offered for something other than the truth of the matter.
19              There's also an exception that applies one way and the
20    not the other.  Statements of a party opponent, meaning
21    statements of an adverse party, are not hearsay.  That's not
22    true when the party itself is offering the statement.  So
23    that's why you're hearing objections and you're hearing
24    reference to hearsay or not.
25              Counsel.
```

```
 1              MR. LOPEZ:  Thank you, Your Honor.
 2   BY MR. LOPEZ:
 3   Q.   Subsequent to this email, did you actually send Mr. Crater
 4   a check for $5,774?
 5   A.   I did, approximately --
 6   Q.   Okay.
 7   A.   -- three weeks later.
 8   Q.   I said "subsequent to."  Did you pay for the 200 coins?
 9   A.   Absolutely.
02:43 10   Q.   Okay.  So now you had skin in the game?
11   A.   I did.
12   Q.   At 28.87 a coin?
13   A.   Yes, sir.
14              MR. LOPEZ:  Can you call up 11G.
15              THE WITNESS:  Mr. Lopez, can I make a comment?
16              THE COURT:  Sir, you have to wait for the next
17   question.
18              THE WITNESS:  Okay.
19              THE COURT:  Thank you.
02:44 20              MR. LOPEZ:  Can you go down to the bottom email, to
21   the first of this email chain on the bottom, Mr. Sweeney, and
22   enlarge that.
23   BY MR. LOPEZ:
24   Q.   Do you know who George Schmidt is?
25   A.   I think I do.
```

```
 1    Q.    And do you recognize the email gmark39@gmail.com?

 2    A.    Yes, sir.  That's me.

 3    Q.    And Mr. Schmidt writes, "It looks like March is going to

 4    be good for us.  I have a question, though.  According to

 5    online chat at MBC, we cannot sell the coins on that site.  How

 6    do we liquidate our money?  Hope all is well in Detroit.

 7    George."

 8          Did I read that correctly?

 9    A.    You did.

10    Q.    So this is March and My Big Coin started a couple of

11    months before?

12    A.    I don't know when My Big Coin started.

13    Q.    Okay.  And you don't recall who Mr. Schmidt is?

14    A.    Yeah, I think I do.  I believe I'm correct.

15    Q.    And who is Mr. Schmidt?

16    A.    He was a gentleman that lived in New York, and that's -- I

17    know I spoke with him a few times.

18    Q.    And he's looking to liquidate already?

19    A.    Okay.

20          MR. LOPEZ:  All right.  Can you go up to the next one?

21    The next.  It starts on Saturday, March 1.

22    Q.    Randall writes, "On the weekend just email support and

23    they will handle on Monday morning, sir."

24          Did I read that correctly?

25    A.    "And they execute the sale" -- I'm sorry.  You're up top.
```

1    I apologize.  Yes, correct.

2    Q.   Okay.  Did you have an understanding as to what role

3    support had in executing sales of coin?

4         MR. MARKHAM:  Objection.

5         THE COURT:  Overruled.  You can answer.

6    A.   Generic answer, kind of support, anything that goes

7    sideways.

8    Q.   Okay.

9         MR. LOPEZ:  Can you go up to the email that starts "On

02:47 10   Saturday, March 1, 2014."  No.  The one above that.

11   Q.   On Saturday, March 1, Mr. Crater writes, "We are building

12   an exchange site, Mark, that goes live next week.  They cal

13   sale their coins there who wants to sale there coins I Jane

14   buyers send me there information I'll make it happen this week

15   for them."  Did I read that correctly?

16   A.   You did, sir.

17   Q.   So at least in March of 2014, there is no exchange site

18   yet, right?

19        MR. MARKHAM:  Objection.

02:48 20   THE COURT:  Sustained as to form.

21   BY MR. LOPEZ:

22   Q.   Do you know whether or not there was an exchange site in

23   March of 2014?

24   A.   I do not.

25        MR. LOPEZ:  Can you go to -- strike that.  Hold on.

1    Can you go to 11U.  Can you just enlarge it.

2    Q.   This is an email from, it begins from Norman Mendiola to

3    you.  "Attached you will find a Word document detailing the

4    account issues.  Let me know if you have any questions.  Thank

5    you, Norman."  Right?

6    A.   Yes, sir.

7    Q.   And you write back, "Morning, Randall and support."  Well,

8    not write back.  I take it you forward this to Randall and

9    support.

02:49 10       "Please find below the detail and information to update

11   Norman Mendiola account.  I have just finished a phone call

12   with Mike Kruger confirming the 17K was to be at $70.89.

13   Obviously your call, Randall.  Thanks, and please call if there

14   are any questions.  Mark Gillespie."

15       What did you mean by "Your call, Randall."

16   A.   What that means to me is that possibly the coin change,

17   the coin price had changed.  So maybe -- maybe now it's $73,

18   not 70.89 by the time the money hit, type of deal.

19       And, honest, I'm guessing.  But that's kind of what I get

02:50 20   out of it.

21   Q.   Did you know whose coin Mr. Mendiola was purchasing?

22   A.   Likely not.

23         MR. LOPEZ:  Okay.  Can you go to the second page of

24   that email.  And can you enlarge the screenshot.

25   Q.   Do you recognize what that is?

A.   This is, I believe, available through a tab on the My Big
Coin web page, and it is referencing an account overview,
its history, basically.

Q.   I think you testified earlier that you have an account, or
you had an account?

A.   Yes, sir.

Q.   And I think you purchased 200 coins?

A.   Yeah, yes, sir.

Q.   And Mr. Mendiola said that there was a screenshot of
his -- of his account?

A.   Yes, sir.

Q.   And are you saying that this is just one of the various
tabs on the -- in the account?

A.   I believe that's what it is.

Q.   Okay.  And what does that show you?

A.   It's kind of a status report.  To me, a bit of a history
of a completed coin transaction.

Q.   Okay.  And so just going through this, it says "Most
recent transactions, last 20."  Then it's got an MBC 33.83.

     Do you recognize what that is?

A.   The number of -- the fraction gets me.  Initially I
thought it was the number of coins in the transaction, but I'm
not positive right now.

Q.   So looking at this eight years later, you're not really
sure what this depicts?

```
 1   A.   I'm sure that it's available to anybody that makes an
 2   account and is giving information to the accountholder.  The
 3   specific information it conveys, at this point eight and some
 4   years later, I'm a little vague on.
 5   Q.   Okay.  At some point did you -- you can take that down.
 6        At some point did you become aware of an individual by the
 7   name of John Lynch?
 8   A.   I did.
 9   Q.   And when did you first learn about Mr. Lynch?
10   A.   Approximately the first quarter of 2014.
11   Q.   And the first quarter of 2014 is from January 2014 until
12   March 31, 2014?
13   A.   Yes, sir.  It could have been in April, Mr. Lopez.
14   Somewhere in that timeframe.  Pretty early.
15   Q.   Okay.  And how did you first learn about Mr. Lynch?
16   A.   Via phone call with Mike Kruger.
17   Q.   Okay.  And did Mike Kruger follow up with any other
18   communication after that phone call?
19   A.   Without question.
20   Q.   Okay.  And do you recall what if anything you were asked
21   to do with respect to Mr. Lynch?
22   A.   I do.
23   Q.   And what is that?
24   A.   Let me preface, I'm not certain who the request came from,
25   whether it was from --
```

```
 1              MR. MARKHAM:  Objection, Your Honor.

 2              MR. LOPEZ:  May I approach the witness?

 3              THE COURT:  You may.  For refreshing, Mr. Lopez?

 4              MR. LOPEZ:  Yes, Your Honor.

 5              THE COURT:  Okay.

 6              THE WITNESS:  Thank you.

 7    BY MR. LOPEZ:

 8    Q.   I show you a document and ask you to review it.

 9    A.   Got it.

02:55 10    Q.   And after having reviewed it, can you tell me whether or

11    not that refreshes your recollection?

12    A.   It does.  Thank you.

13    Q.   You're welcome.

14    A.   It's helpful.

15    Q.   Now that your recollection is refreshed, can you tell me

16    who first asked you to -- well, strike that.

17         Who asked you to contact Mr. Lynch?

18    A.   Mike Kruger.

19    Q.   And what did he ask you to do?

02:56 20    A.   Assist in any way possible.

21    Q.   Okay.  Now, at this point in time, April of 2014, you're

22    newly -- your consulting agreement with My Big Coin is rather

23    new, right?

24    A.   Yes, sir.

25    Q.   Were you being paid for your services as a consultant?
```

```
 1   A.   I was.

 2   Q.   And how much were you being paid?

 3   A.   First of all, there was no consulting agreement.  It was

 4   in terms of a contract -- it was a verbal.

 5   Q.   Sir, please just answer the question.

 6            THE COURT:  Just listen to the question, okay.

 7            THE WITNESS:  Okay.  I apologize.

 8            THE COURT:  Mr. Lopez, do you want to put it again?

 9            MR. LOPEZ:  Yes.

10   BY MR. LOPEZ:

11   Q.   You were being paid to be a consultant?

12   A.   Yes.

13   Q.   And do you have a memory as to how much you were being

14   paid per month?

15   A.   I remember, I believe I'm remembering correctly, the first

16   payment I got from My Big Coin was $5,000 for the month.

17   Q.   Okay.  And do you recall which month that was?

18   A.   I do not, sir.

19   Q.   Okay.  Now, while you were a consultant for My Big Coin,

20   did you become aware of the structure, the corporate structure

21   of My Big Coin?

22   A.   Yes.

23   Q.   And who was the president of My Big Coin, if you know?

24            MR. MARKHAM:  Objection, foundation.

25            MR. LOPEZ:  If he knows.
```

```
 1              THE COURT:  If he knows.  So you can answer.
 2    Overruled.
 3    A.    I believe the president of My Big Coin was John Roche.
 4    Q.    Okay.  And did Mr. Crater hold any officer positions, if
 5    you know?
 6    A.    I know of no officer positions Randall Crater held.
 7    Q.    Okay.  What if anything did you know about Randall
 8    Crater's role at My Big Coin?
 9    A.    I believe Randall's responsible for -- it would have been
10    the peer to peer, the blockchain.  And it's my opinion, I don't
11    know --
12    Q.    I don't want your opinion.
13              MR. MARKHAM:  Objection, move to strike.
14              THE COURT:  To the extent there was beginning of
15    another part of the answer, that's struck, but the rest will
16    stand.  Mr. Lopez.
17    BY MR. LOPEZ:
18    Q.    So would it be fair to say he was responsible for the
19    technology?
20              MR. MARKHAM:  Objection.
21              THE COURT:  Sustained as to form, counsel.  Direct.
22    A.    Yeah --
23              THE COURT:  Well, sustained, so we'll wait for another
24    question.
25    BY MR. LOPEZ:
```

```
 1   Q.   Was his role focused on technology?
 2            MR. MARKHAM:  Objection.
 3            THE COURT:  Well, sustained as to form.  Direct,
 4   counsel.
 5   BY MR. LOPEZ:
 6   Q.   What did you understand Mr. Crater's role to be at My Big
 7   Coin?
 8   A.   Tech.
 9   Q.   He was a tech guy?
10   A.   Absolutely.
11   Q.   And what was Mr. Roche's role?
12   A.   Mr. Roche's role was a position of ownership.
13            MR. MARKHAM:  Objection, foundation.
14            THE COURT:  Overruled.  You can finish your answer.
15   A.   Thank you.  Position of ownership, responsible for the
16   public side, getting public with My Big Coin Pay, and it would
17   have been marketing/advertising.
18   Q.   What about social media?
19   A.   Yeah, to me, that's -- I'm sorry.  That's advertising to
20   me, but yeah, okay.
21   Q.   So you understood that Mr. Roche was responsible for the
22   social media?
23   A.   There was no question in my mind about it, yes.
24   Q.   Okay.  And who was working with Adam Tracy to take the
25   company public?  Was it Mr. Roche or Mr. Crater, if you know?
```

```
 1              MR. MARKHAM:  Objection, foundation.  This is all
 2     based on hearsay.
 3              THE COURT:  Sustained as to this, counsel.  If you
 4     want to lay the foundation, there had been predicate questions
 5     for the other groupings.  Mr. Lopez.
 6     BY MR. LOPEZ:
 7     Q.   Do you know an individual named Adam Tracy?
 8     A.   I do.
 9     Q.   Who is Adam Tracy?
10     A.   I know of him.  Adam Tracy is a corporate lawyer.
11     Q.   Okay.  And who hired Adam Tracy to do work for My Big
12     Coin, if you know?
13              MR. MARKHAM:  Objection, foundation.
14              THE COURT:  Yes, sustained.
15     BY MR. LOPEZ:
16     Q.   Do you know who hired Mr. Tracy to do work for My Big
17     Coin?
18     A.   I don't know.
19     Q.   Okay.  Were you aware that Adam Tracy was doing work for
20     My Big Coin?
21     A.   Absolutely.
22     Q.   Were you aware of who at My Big Coin was working with Adam
23     Tracy to, I think you said, take the company public?
24              MR. MARKHAM:  Your Honor, objection.  Can we have a
25     brief sidebar?
```

```
 1              THE COURT:  I'll hear you sidebar.
 2    SIDEBAR:
 3              THE COURT:  Mr. Markham.
 4              MR. MARKHAM:  Your Honor, this man has never met
 5    Randall Crater.  My understanding is he's never met John Roche.
 6    And what's being allowed to happen here is he's back-dooring in
 7    hearsay statements over and over again.  He has no personal
 8    knowledge of who hired an attorney.  He has no personal
 9    knowledge who is taking this company public.  This is a way to
10    avoid the defendant testifying, putting in hearsay statements.
11              THE COURT:  All right.  Understood.  Mr. Lopez.
12              MR. LOPEZ:  I find it remarkable after all the leading
13    questions that the government asked in their case in chief and
14    they're objecting to my questions.  But I am trying to
15    establish that he has personal knowledge and then find out what
16    that personal knowledge is.
17              THE COURT:  So, counsel, a few things.
18              And I don't know why this is sounding so loud to me.
19              One, counsel, the difference between the government's
20    leading questions and the questions being asked now is I wasn't
21    given any objections to rule on.  I sustained the objections to
22    leading questions to the government's questions when there were
23    objections.  But I understand there's strategic reasons,
24    Mr. Lopez, while you might not have objected.
25              Here, I think the foundation hasn't been established
```

03:02 (line 10)
03:03 (line 20)

1  as to Mr. Tracy.  I allowed the questions as to Mr. Roche and

2  as to Mr. Crater, but I'm listening very carefully about

3  foundation.

4          MR. LOPEZ:  So noted.

5          THE COURT:  Okay.

6  (End of sidebar.)

7          THE COURT:  Mr. Lopez.

8          MR. LOPEZ:  Yes, thank you, Your Honor.

9  BY MR. LOPEZ:

03:04 10  Q.    Mr. Gillespie, you said earlier that you were excited

11  about this opportunity?

12  A.    Yes, sir.

13  Q.    And you became employed by My Big Coin?

14  A.    I did.

15  Q.    What was your plan at that time vis-à-vis My Big Coin?

16  A.    I had a good job.  I left it specifically for My Big Coin.

17         I had long conversations with my wife, and I advised her

18  that there was going to be a rough startup, was my opinion, and

19  don't expect much initially because I knew it would take time.

03:05 20  But I was very excited about the potential here.

21  Q.    And why were you excited about the potential?

22  A.    Twofold.  The field of play, cryptocurrency, blockchain,

23  et cetera, the potential.  It was and still is, but back then

24  it was just enormous.  And the other reason I was excited, I

25  had probably -- probably two conversations, maybe with John

```
 1   and --
 2   Q.   John?
 3   A.   John Roche -- and quite a few more conversations with
 4   Randall.
 5   Q.   Let me ask you this.  Do you know whose idea it was to
 6   start My Big Coin?
 7   A.   I do.
 8   Q.   Who?
 9   A.   John Roche.
10   Q.   And do you know why John Roche brought Randall Crater to
11   the table?
12           MR. MARKHAM:  Objection.
13           THE COURT:  Sustained.
14   BY MR. LOPEZ:
15   Q.   Do you have personal knowledge as to why John Roche sought
16   out Mr. Crater's assistance?
17           MR. MARKHAM:  Objection.
18           THE COURT:  Sustained.
19   BY MR. LOPEZ:
20   Q.   In your conversations with Mr. Crater, did he tell you
21   what he was doing for My Big Coin?
22           MR. MARKHAM:  Objection.
23           THE COURT:  Sustained.  Counsel, I'm assuming hearsay.
24           MR. MARKHAM:  Yes, Your Honor.
25           MR. MOORE:  I'll just ask.
```

```
  1              THE COURT:  Okay.
  2    BY MR. LOPEZ:
  3    Q.   Was Mr. Crater, as far as you knew, responsible for
  4    building the cryptocurrency platform?
  5              MR. MARKHAM:  Objection.  Based on hearsay.
  6              THE COURT:  Sustained as to this question, Mr. Lopez.
  7    BY MR. LOPEZ:
  8    Q.   Were you excited because My Big Coin was a cryptocurrency
  9    platform?
03:07 10    A.   Yes.
 11    Q.   You didn't have any doubts about that?
 12    A.   No.
 13    Q.   Okay.  And did you take into consideration the risks you
 14    were taking when getting involved with My Big Coin?
 15    A.   Oh, yes.
 16    Q.   And what risks did you consider?
 17    A.   Well, I had committed a fairly substantial sum that hurt
 18    us.  To me it was substantial, not to others.  And I believed
 19    it was going to be a rough startup.
03:08 20    Q.   Why did you believe it was going to be a rough startup?
 21    A.   It became clear that there weren't 39 employees, and I'm
 22    kind of familiar with what it takes to get up and moving,
 23    coordinate, build, and sustain a new-market, entry-level
 24    company.  It concerned me.
 25    Q.   And, sir, did you have in your mind that there was a
```

1    location where there was going to be employees?

2    A.   No, sir, I did not.

3    Q.   Okay.  This was an internet company, right?

4    A.   Correct.

5    Q.   So you did have an understanding that people might be

6    working around the world?

7    A.   Oh, absolutely.  No question.

8    Q.   Okay.  And you weren't privy to the extent to which My Big

9    Coin had employees, correct?

03:09 10   A.   No, sir.  Outside entity.

11   Q.   Okay.

12        MR. LOPEZ:  Could you bring up 11JJ.  Can you just

13   enlarge the middle portion.  Actually, strike that.  Can you

14   first enlarge the top portion.

15   Q.   This appears to be an email from you to Greyshore@me.com?

16   A.   Yes, sir.

17   Q.   Which is Mr. Crater?

18   A.   Yes.

19   Q.   And you write, "Seems like a great job by Tom.  Mike

03:10 20   should have no complaints.  I sent you Greyshore his email to

21   me."

22        Did I read that correctly?

23   A.   You did, sir.

24   Q.   Who is Tom?

25   A.   I believe his last name is Callahan.  I get confused on

1    that sometimes because there was another Tom Callahan.  There's

2    two, I think one in New York.

3    Q.   All right.  Let's go down to the next.  And this seems to

4    be a chat log between Michael Lummis and someone at Tom C?

5    A.   Yes, sir.

6    Q.   And it's asking for -- it's a chat about support.  Was

7    there a Tom C in support?

8    A.   That would be Tom Callahan.

9    Q.   Are you sure about that?

03:11 10          MR. MARKHAM:  Objection, asked and answered.

11          THE COURT:  Well, sustained.

12   BY MR. LOPEZ:

13   Q.   Have you heard the name Tom Connolly?

14   A.   Oh, thank you.  Yeah, long time ago.

15   Q.   Okay.  And who was Tom Connolly?

16   A.   I believe Tom Connolly was -- let me -- I think he was the

17   very accomplished tech person, very skilled.

18          MR. LOPEZ:  If he is --

19          MR. MARKHAM:  Objection.  Foundation at this point.

03:11 20          MR. LOPEZ:  -- answer the question.

21          THE COURT:  Overruled.  The answer may stand.  No

22   commentary either side, counsel.

23          MR. LOPEZ:  Apologize, Your Honor.

24          THE COURT:  No worries.

25          And, jurors, I'm not just saying that because I'm

1 cranky.  I'm saying it because the attorneys get an opportunity

2 to argue to you at the end of the case.  Okay.  Thank you.

3 BY MR. LOPEZ:

4 Q.   Can you tell us who you understood Tom Connolly to be?

5 A.   I understood Tom Connolly to be a tech with some pretty

6 substantial skills and a support team, for lack of a better

7 word.

8 Q.   Did you have an understanding as to where he was located

9 physically?

03:12 10 A.   I believe it was England.

11 Q.   Okay.  And did you have an understanding as to what his

12 computer background was?

13        MR. MARKHAM:  Objection, foundation.

14        THE COURT:  Counsel, sustained.  You can lay the

15 foundation, if you can.

16 BY MR. LOPEZ:

17 Q.   Do you know whether or not Mr. Crater had a licensing

18 agreement with My Big Coin?

19 A.   I never saw the agreement.  Yes, I heard about the

03:13 20 agreement.

21        MR. MARKHAM:  Objection, move to strike.

22        THE COURT:  Well, move to strike as to the last part,

23 but the first part will stand.

24 BY MR. LOPEZ:

25 Q.   And do you know whether Tom Connolly was helping him

```
  1    provide the technology that the licensing agreement called for?
  2              MR. MARKHAM:  Objection.  Can we lay a foundation?
  3              THE COURT:  Counsel, sustained on the foundation.  But
  4    you can ask questions in that regard.
  5    BY MR. LOPEZ:
  6    Q.   You knew there was a licensing agreement between
  7    Mr. Crater and My Big Coin, right?
  8    A.   I heard there was a licensing agreement.
  9              MR. MARKHAM:  Objection, move to strike.
 10              THE COURT:  Well, sustained as to that, Mr. Lopez.
 11    BY MR. LOPEZ:
 12    Q.   Who did you hear it from?
 13    A.   I thought it was John Roche.  I believe it was John Roche.
 14    Q.   Could it have been Mr. Crater?
 15    A.   It could have been.
 16    Q.   Okay.  Did you think Mr. Crater had the computer skills to
 17    code a blockchain?
 18    A.   No.
 19    Q.   So would you agree with me that someone else must have
 20    been involved?
 21              MR. MARKHAM:  Objection, form.
 22              THE COURT:  Well, sustained as to that, counsel.
 23    BY MR. LOPEZ:
 24    Q.   Did you know whether or not Mr. Crater had other people
 25    working for him besides --
```

1    A.    Yes.

2    Q.    Did you know whether or not any of those individuals had

3    backgrounds in computer software?

4              MR. MARKHAM:  Objection, foundation.

5              THE COURT:  Well, overruled as to that.

6              You can answer.  Did you know whether any of those

7    individuals had backgrounds in computer software?

8              THE WITNESS:  It's the "know" I'm having trouble with.

9    I don't know how they could do the job without it.

03:15 10          MR. MARKHAM:  Objection, Your Honor.  Can I be heard

11   on Whisper Tech?

12             THE COURT:  Sustained as to this, given the objection

13   to the predicate question.  Mr. Lopez.

14   BY MR. LOPEZ:

15   Q.    So you gave up a job, you became a consultant, you

16   purchased the coin?

17             MR. MARKHAM:  Objection.

18   BY MR. LOPEZ:

19   Q.    Did you think there wasn't --

03:15 20          THE COURT:  Counsel, can I just hear the rest of the

21   question.  So, Mr. Lopez, take it from the top, please.

22   BY MR. LOPEZ:

23   Q.    Did you think -- you left your job.  You started a new job

24   for My Big Coin as a consultant.  You purchased coin.

25             Did you know whether or not there was a cryptocurrency

1    that you were involved in?

2    A.    Yes.

3    Q.    Was there?

4    A.    Was there a cryptocurrency I was -- yes.

5    Q.    Okay.

6    A.    Yes, sir.

7    Q.    Now, at some point -- strike that.

8          There's been a lot of testimony in this case from

9    individuals who purchased My Big Coin from you and others.  And

03:16 10   they've testified that you told them that the coins were backed

11   by gold?

12   A.    Yes, sir.

13   Q.    When did you first learn, if you know, when the coins were

14   backed by gold?

15   A.    I don't know the answer.

16   Q.    Okay.  But you did tell people that purchased coin it was

17   backed by gold?

18   A.    Yes, sir.

19   Q.    When you purchased your coin, were you told it was backed

03:17 20   by gold?

21   A.    I do not know.

22   Q.    Okay.  Are you familiar with a company called Harmonie

23   International?

24   A.    I am.

25   Q.    And what's your familiarity with it?

```
 1    A.   It is a gold mineral-oriented company that has contacts

 2    all over the world.

 3              MR. MARKHAM:  Objection, foundation.

 4              THE COURT:  Counsel, sustained as to this.  You can

 5    lay the foundation.

 6              And, Mr. Gillespie, if you can just pull the

 7    microphone in a little closer.  If you lean back, just pull it

 8    forward.

 9              THE WITNESS:  Sure.

10              THE COURT:  Mr. Lopez.

11              MR. LOPEZ:  Yes.

12    BY MR. LOPEZ:

13    Q.   Have you ever seen Harmonie's website?

14    A.   I have.

15    Q.   And if you saw it again, would you be able to recognize

16    it?

17    A.   I would.

18              MR. LOPEZ:  For the witness only can you pick up --

19              (Counsel discussion off the record.)

20              THE COURT:  Counsel.

21              MR. LOPEZ:  He's right.  That's why you're here.

22    BY MR. LOPEZ:

23    Q.   Do you recognize that?

24    A.   Actually, no.

25    Q.   You don't?
```

```
 1   A.   That's not what I recall.  No, sir.

 2   Q.   Okay.  Fair enough.

 3        Now, at some point was there a credit card offered?

 4   A.   Yes, sir.

 5   Q.   And do you recall when a credit card was first offered?

 6   A.   When?  I do not, sir.

 7   Q.   Okay.  And do you recall whether that credit card was a

 8   standard credit card or a debit card that you could load?

 9   A.   That would have been a debit card, sir.

10   Q.   Do you have any memory of what happened with respect to

11   the various attempts to get a credit card?

12   A.   I remember initially there was one company and we switched

13   to a different company.

14   Q.   Okay.  Did you ever get a credit card?

15   A.   My wife did.

16   Q.   Did you ever use it?

17   A.   No, sir.

18   Q.   And why not?

19   A.   Didn't want to use the card.  We were struggling.

20   Q.   Okay.  Do you still own your coin today?

21   A.   Sorry.  Yes, sir.

22   Q.   And do you consider -- do you have an opinion as to

23   whether or not it has any value?

24             MR. MARKHAM:  Objection.

25             THE COURT:  Sustained.
```

```
 1            MR. LOPEZ:  May I be heard, Your Honor?

 2            THE COURT:  You can be.  This issue has come up with

 3       other witnesses, counsel.

 4            MR. LOPEZ:  I understand.

 5            SIDEBAR:

 6            THE COURT:  Mr. Markham, I'm assuming it was a

 7       relevance argument.

 8            MR. MARKHAM:  Yes, Your Honor.  Relevance.  And he's

 9       not qualified to provide -- he's not laid a foundation for an

03:21 10  opinion either.

11            THE COURT:  Right.  I was focused on relevance, but

12       understood.

13            Mr. Lopez.

14            MR. LOPEZ:  Your Honor, a layperson is allowed to

15       make --

16            THE COURT:  I'm sorry.  Can you speak a little louder?

17            MR. LOPEZ:  A layperson is allowed to make a personal

18       opinion on their belief about the value of an asset that --

19            THE COURT:  Okay, let's assume that.  What's relevant?

03:21 20       MR. LOPEZ:  It's relevant to his beliefs that the coin

21       is still valuable.

22            THE COURT:  But it's not relevant to the charge of the

23       defense or the defenses.

24            MR. LOPEZ:  Well, if it still has value, it is

25       relevant to whether or not it was a cryptocurrency.
```

1            THE COURT:  Mr. Markham.

2            MR. MARKHAM:  Your Honor, the charge time period ends

3       in 2017.

4            THE COURT:  Yes.  Okay.  Sustained as to the

5       objection.

6            And, counsel, can you hold on for one moment?

7       (End of sidebar.)

8            MR. LOPEZ:  Can you bring up 12U.

9       BY MR. LOPEZ:

03:24 10  Q.   Sir, this is an exhibit that's been introduced as

11      Exhibit 12U.

12           It says, "Good morning.  Hope you are rested and I hope

13      you are asleep."  This is to Mr. Crater.  And this is July of

14      2015.  "With your permission, I'd like to add a share agreement

15      for James Panakcia."

16           Who is James Panakcia, again?

17      A.   He's a very good friend of mine.

18      Q.   "You once gave me an extra 10K in shares for raising

19      funds.  I would like to give those to my friend Jim Panakcia,

03:24 20  if this is okay with you.  I ask you please take those shares

21      from me before or after we go, whatever's easiest for you, and

22      not your shares."

23           Why were you saying "not your shares"?

24      A.   He was my friend.

25      Q.   Why were you saying that you didn't want -- well, so this

1    is an email to Randall.  Why were you telling him not to use

2    his shares?

3    A.   He gave me 10,000 that frankly I don't even remember

4    getting from Randall.  But it says there he did, so he must

5    have.  And it says for raising funds.

6         I don't make -- I was never tasked with raising funds.

7    That was never a conversation.  It was not my job ever, and if

8    it had been, I wouldn't have taken it.  And I don't make money

9    off my friends.

03:25 10   Q.   Okay.  And you say and not your shares and accept his

11   share agreement.

12        "I won't bore you with his story, but he is in serious

13   need and is like family to me.  This act of charity needs to be

14   100 percent from me and not involve you.  I know how your mind

15   works, Randall, but this has to be only me."

16        What did you mean by that?

17   A.   It falls to me.  Why should it come from Randall --

18   Q.   Well --

19   A.   -- is my point.  I'm not being facetious.

03:26 20   Q.   Well, you're saying, "I know how your mind works,

21   Randall."  What did you mean by that?

22              MR. MARKHAM:  Objection.

23              THE COURT:  Overruled.

24              You can answer, sir.

25              THE WITNESS:  Thank you.

```
 1    A.    2015, okay.  That makes sense.  It's further along the
 2    chain.  I have seen Randall be very generous and very
 3    forward-thinking.
 4              MR. MARKHAM:  Objection, Your Honor.  We're going
 5    into --
 6              THE COURT:  Well, overruled.  Because, again, sir,
 7    this is what you -- this is what you meant in your email.
 8              THE WITNESS:  It is.
 9              THE COURT:  Okay.  So you may answer.
10              Objection overruled.
11              THE WITNESS:  Thank you.
12    A.    I have seen and heard examples of Randall --
13              MR. MARKHAM:  Objection, Your Honor.
14    BY MR. LOPEZ:
15    Q.    Just limit your testimony to what you saw, sir.
16    A.    Okay, got it.
17          I was personally involved in an instance -- you mentioned
18    the name earlier where Mike Lummis moved from the Keys --
19              THE COURT:  I'm sorry.  Mr. Markham, to the extent
20    there is an objection, it's overruled.
21              MR. MARKHAM:  There's one thing I'd like to bring to
22    the Court's attention, if we're going to go into character
23    evidence, that I think would be worth fronting to the Court in
24    terms of cross-examination, if that's where we're going.
25              THE COURT:  Counsel, based on what I've heard so far,
```

```
 1    I will let the witness answer this question.
 2                MR. MARKHAM:  Thank you.  Sorry, Your Honor.
 3                THE COURT:  Sir, you can finish.
 4                THE WITNESS:  Thank you.
 5    A.   Mike had moved with his wife from the Keys to Florida --
 6    I'm sorry, from the Keys to Vegas.  And they made a
 7    miscalculation based on the Vegas market.  Housing is
 8    incredibly expensive.  Awaiting funds, things were tough.  And
 9    he needed about 4K, as I recall, $4,000.  It was $4,000.
10         And I don't remember what I asked Randall.  I might have
11    asked Randall, is there any way?  But I'm not sure that's how
12    it went down.
13         But next thing I know -- oh, I know.  Randall asked me, Is
14    he a friend of yours?
15         And I said, Yes.
16         And he said, Tell him I'll send him a check.  And he sent
17    him a check.
18                MR. MARKHAM:  Objection, move to strike on relevance
19    grounds.
20                THE COURT:  Okay.
21         Jurors, again, this is a situation where it's being
22    offered for a limited purpose, which is in regards to what this
23    witness intended in the language in the email that we're
24    talking about that's before you.
25                Counsel?
```

1          MR. LOPEZ:  Can we go to 14D.

2          THE COURT:  And, counsel, given the time, how much

3    longer do you have?

4          MR. LOPEZ:  A few more minutes, Your Honor.

5          THE COURT:  Okay.  And I assume there's

6    cross-examination as well?

7          MR. MARKHAM:  Yes, Your Honor.

8          THE COURT:  Okay.  So, sir, I'm going to have to ask

9    you to step down.

03:29 10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  We have to stop at 3:30 today because the

12    Court has another hearing on.  We'll see you in the morning.

13          THE WITNESS:  Thank you.

14          THE COURT:  Thank you.

15          Jurors, just -- and, sir, if you can step out of the

16    courtroom.  I just want to talk to counsel and the jurors.

17          Counsel, before I do that, counsel, we're still in the

18    same position in terms of scheduling for both sides'

19    perspective, Mr. Markham?

03:29 20          MR. MARKHAM:  Yes, Your Honor.

21          THE COURT:  Mr. Lopez?

22          MR. LOPEZ:  Yes, Your Honor.

23          THE COURT:  So, jurors, we're going to let you go in a

24    moment today.  I do expect that all of the evidence will end

25    tomorrow, and we'll move to closing arguments and my final

1    charge to you.  And then you'll get this case for your

2    deliberations tomorrow.

3            That means, as you may recall, be prepared to be here

4    until from 9:00 to 5:00.  We will -- I'll tell you the schedule

5    precisely in terms of when we'll take breaks tomorrow because

6    we may alter those depending on where we are in the evidence

7    and when we're going to start closings.  But just bear in mind

8    that tomorrow will be 9:00 to 5:00.

9            Again, keep all of my cautionary instructions in mind.

03:30 10   Don't talk to each other or anyone else about the case.  Keep

11   an open mind, you're still hearing evidence.  Don't do any

12   outside research.  And we'll see you tomorrow morning.  Thank

13   you.

14           (Jury exits the courtroom.)

15           THE COURT:  Ms. Hourihan is going to confer with you

16   for a moment before you leave, if you can indulge her.  Thank

17   you.

18           Everyone can be seated.

19           Counsel, I think we have a few minutes.  I think,

03:31 20   counsel, for the next matter may be held up in another

21   courtroom.

22           So, counsel, just in terms of where we are, obviously

23   we have to finish with this witness, who I don't think is in

24   the courtroom.  Mr. Lopez, and then where are we going from

25   there?

1          MR. LOPEZ:  Your Honor, depending on whether

2    Mr. Galvin and Mr. Gifford testify by Zoom, I do expect to call

3    Larry Brantley, Mike Singleton, and Tom Callahan, none of whom

4    are long witnesses.  The longest of those would be Mike

5    Singleton.

6          THE COURT:  Okay.

7          MR. LOPEZ:  And Mr. Galvin shouldn't be very long.  I

8    anticipate only showing him a couple of documents.

9          THE COURT:  Okay.

03:32 10          MR. LOPEZ:  And Mr. Gifford I'm not going to be

11    showing any documents to.

12          THE COURT:  Okay.  And, counsel just a reminder, as I

13    mentioned yesterday, with the Zoom, you should make

14    arrangements to get the exhibits or documents to them ahead of

15    time.  I say that for both sides just because the ability to

16    show them on Zoom to everyone in the courtroom and exhibits is

17    not possible.

18          And then, counsel, any sense of when you're going to

19    do the two witnesses by Zoom, Gifford and Galvin?

03:32 20          MR. LOPEZ:  Your Honor, if I get it set up, I'm

21    just -- Galvin is in Colorado so he's two hours behind us.  So

22    and I think Mr. Gifford is in -- I forget.  Chicago, maybe.

23          THE COURT:  Okay.

24          MR. LOPEZ:  So I'll try to set it up so after we're

25    done with Mr. Gillespie, we can go into the Zoom.

1          THE COURT:  Okay.

2          Ms. Hourihan, you may want to talk with counsel

3    offline about that.  The two Zoom witnesses.

4          THE CLERK:  I think I need times.

5          THE COURT:  Okay.  So I think, Mr. Lopez, I'll leave

6    it to you to talk with Ms. Hourihan.  But for the purposes of

7    opening up the Zooms, we should just have an assigned time,

8    even if the witnesses know we might be a few minutes behind or

9    a few minutes ahead.  Okay.

03:33 10          And, counsel, in regards to Mr. Crater's intentions,

11   Mr. Lopez, in terms of testifying or not?

12          MR. LOPEZ:  I don't believe he's going to testify,

13   Your Honor.

14          THE COURT:  Okay.  Should I inquire now or inquire in

15   the morning?

16          MR. LOPEZ:  I'd rather inquire towards the end of the

17   case just in case he changes his mind.

18          THE COURT:  Okay.  Counsel, I will plan to do that in

19   the morning just so I can do so, Mr. Crater, fully and in open

03:34 20   court.  I will inquire again at the close of the case on

21   Whisper Tech, okay.

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  And I'll ask the questions of Mr. Lopez.

24          But then, Mr. Crater, I will turn to you to ask you

25   the questions directly as well.

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  Counsel, anything else in regards to

3   witnesses from your point of view, Mr. Lopez?

4        MR. LOPEZ:  No, Your Honor.

5        THE COURT:  Mr. Markham?

6        MR. MARKHAM:  If we could just exchange the exhibits

7   the night before.  I know Mr. Lopez is working very hard so

8   he's got people coming in.  But to the extent we're going to

9   have exhibits tomorrow, it will be helpful if we don't get them

03:34 10   at 6:00 in the morning.

11        THE COURT:  Right.  And, Mr. Lopez, I know what

12   Mr. Markham said is true, but if you could provide them to

13   counsel and then also to the Court as soon as you can so I have

14   the opportunity to review them as well.

15        And, counsel, my plan would be after the defense rests

16   I would then go on Whisper Tech, if we're not in recess, to

17   hear Mr. Lopez, to the extent you need to reserve anything.

18   Depending on where we are, we may take a break before I give

19   them part 1 of my charge.  And then we'll move into closings.

03:35 20        Does the government have a sense of how much time

21   they're going to use for the primary closing?

22        MR. MARKHAM:  We're aiming for 25 and 10, Your Honor.

23        THE COURT:  25 and 10, okay.

24        And then, counsel, in terms of the charge, I haven't

25   heard anything yet that would prompt me to add anything to the

1    instructions.  I did make just on the start of page -- part 2,

2    page 15, I did just add an S to the end of the heading

3    "Elements of the Charged Offenses."

4         And then there was something Mr. Lopez had pointed out

5    on one of the pages.  There was a G at the end of "within," on

6    page 23, which I corrected.  But otherwise it stands as I

7    shared it with you.

8         Anything else on instructions, counsel?

9         MR. MARKHAM:  Nothing from the government, thank you.

03:36 10         THE COURT:  Mr. Lopez?

11         MR. LOPEZ:  Your Honor, I'm going to object for the

12   record to the willful blindness instruction.  Particularly

13   after -- should Mr. Galvin testify -- well, I hope I'll you'll

14   have a different perspective on it.

15         THE COURT:  Okay.  Mr. Markham, do you want to be

16   heard on that?

17         MR. MARKHAM:  Well, I think if it's going to be

18   particularly after Mr. Galvin testifies, could I be heard after

19   Mr. Galvin testifies?

03:37 20         THE COURT:  Yes, sure.  I guess I would just say for

21   the moment I thought -- obviously I just heard the government's

22   evidence when I made a decision about that.  But given what I

23   heard of the presentation in the affirmative case, I thought it

24   was warranted here.  But, Mr. Lopez, if you want to bring that

25   to my attention again at the end of the defense case, I will

1   hear you then.

2           MR. LOPEZ:  Thank you, Your Honor.

3           THE COURT:  Counsel, anything else before we break?

4           MR. MARKHAM:  No, Your Honor.  Thank you.

5           MR. LOPEZ:  No, Your Honor.

6           THE COURT:  And, counsel, at this point in regards to

7   Petrozziello findings, in light of the basis on which I've

8   admitted the statements -- and I'm not inclined to make those

9   findings, but I will continue to reserve until the end of the

03:38 10  defense case.  Okay.

11          MR. LOPEZ:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          (Recessed, 3:37 p.m.)

14                  ------------------

15                      CERTIFICATION

16          We certify that the foregoing is a correct transcript

17  of the record of proceedings in the above-entitled matter to

18  the best of our skill and ability.

19

20

21  /s/Debra M. Joyce_____        July 19, 2022_____
    Debra M. Joyce, RMR, CRR, FCRR   Date
22  Official Court Reporter

23

24  /s/Kelly Mortellite_____         July 19, 2022_____
    Kelly Mortellite, RMR, CRR       Date
25  Official Court Reporter

1                               INDEX

2
   WITNESS                                                    PAGE
3

4  THEODORE VLAHAKIS

5     Direct Examination                                        22
      By Mr. Markham
6     Cross-Examination                                         32
      By Mr. Lopez
7
   KATHLEEN BREKENFELD
8
      Direct Examination                                        36
9     By Mr. Markham
      Cross-Examination                                         79
10    By Mr. Lopez
      Redirect Examination                                      93
11    By Mr. Markham
      Recross-Examination                                       96
12    By Mr. Lopez

13 TOM D. JOHNSON

14    Direct Examination                                       104
      By Mr. Lopez
15    Cross-Examination                                        127
      By Mr. Moore
16    Redirect Examination                                     128
      By Mr. Lopez
17
   NODARI GOGOBERIDZE
18
      Direct Examination                                       129
19    By Mr. Lopez
      Cross-Examination                                        154
20    By Mr. Markham
      Redirect Examination                                     166
21    By Mr. Lopez
      Recross-Examination                                      168
22    By Mr. Markham

23 KEN HESS

24    Direct Examination by Mr. Lopez                          175
      Cross-Examination by Mr. Moore                           184
25    Redirect Examination by Mr. Lopez                        186
      Recross-Examination by Mr. Moore                         186

MARK GILLESPIE

   Direct Examination by Mr. Lopez              187


<u>E X H I B I T S</u>


| <u>Exhibit No</u>. | <u>Description</u> | <u>Received</u> |
|---|---|---|
| 43 | | 31 |
| 44 | | 42 |
| TT | | 114 |
| UU, VV, WW | | 136 |

