1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5                     Plaintiff,          Criminal Action
                                          No. 19-10063-DJC
6    v.
                                          July 20, 2022
7    RANDALL CRATER,                      8:47 a.m.

8
                      Defendant.
9    _____

10

11

12            TRANSCRIPT OF JURY TRIAL DAY 7

13        BEFORE THE HONORABLE DENISE J. CASPER

14            UNITED STATES DISTRICT COURT

15        JOHN J. MOAKLEY U.S. COURTHOUSE

16                1 COURTHOUSE WAY

17              BOSTON, MA  02210

18

19

20

21
            DEBRA M. JOYCE, RMR, CRR, FCRR
22              Official Court Reporter
            John J. Moakley U.S. Courthouse
23           1 Courthouse Way, Room 5204
                Boston, MA  02210
24             joycedebra@gmail.com

25

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:

 3    CHRISTOPHER J. MARKHAM, ESQ.
      BABASIJIBOMI MOORE, ESQ.
 4    US Attorney's Office - MA
      J. Joseph Moakley U.S. Courthouse
 5    1 Courthouse Way
      Suite 9200
 6    Boston, MA 02210
      617-449-6890
 7    christopher.markham2@usdoj.gov
      babasijibomi.moore2@usdoj.gov
 8
      FOR THE DEFENDANT:
 9
      SCOTT P. LOPEZ, ESQ.
10    Lawson & Weitzen
      88 Black Falcon Avenue
11    Suite 345
      Boston, MA 02210
12    617-439-4990
      splopez@lawson-weitzen.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on July 20, 2022.

The defendant, Randall Crater, is present with counsel.  The Assistant U.S. Attorneys are present.)

THE CLERK:  All rise.

(The Court entered the courtroom.)

THE CLERK:  Court is in session.  Please be seated.

THE COURT:  Good morning.

ALL:  Good morning, your Honor.

THE COURT:  Counsel, I did receive, Mr. Lopez, your email with the attachments and the update about not calling Mr. Gifford; is that correct?

MR. LOPEZ:  That's correct, your Honor.

THE COURT:  Are the other -- I know we were finishing the direct of Mr. Gillespie.  What are the other witnesses?  Is Mr. Callahan still --

MR. LOPEZ:  Mr. Galvin I have scheduled for 10:00 this morning.

THE COURT:  I did see that.

MR. LOPEZ:  Michael Singleton, and Tom Callahan.

THE COURT:  So not Mr. Brantley.

```
 1            MR. LOPEZ:  And Mr. Brantley as well.

 2            THE COURT:  So only Mr. Gifford is coming off, okay.

 3            MR. LOPEZ:  I didn't catch that.

 4            THE COURT:  Only Mr. Gifford is coming off.

 5            MR. LOPEZ:  That's correct.

 6            THE COURT:  Okay.  And, counsel, where are we in

 7    regard to Mr. Crater's intentions about testifying?

 8            MR. LOPEZ:  My understanding is he does not want to

 9    testify.

08:48 10            Why don't I inquire of Mr. Crater.

11            If I can address you directly.

12            Good morning.

13            THE DEFENDANT:  Good morning, your Honor.

14            THE COURT:  Sir, as I indicated yesterday, I was going

15    to ask you directly about your intentions about testifying or

16    not.

17            Sir, do you understand you have the right not to

18    testify?

19            THE DEFENDANT:  Yes, your Honor.

08:48 20            THE COURT:  And you also have the right, if you choose

21    to, to testify.

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  And have you discussed that with your

24    counsel?

25            THE DEFENDANT:  Yes, your Honor.
```

```
 1            THE COURT:  Have you made a decision based on your
 2    discussions?
 3            THE DEFENDANT:  Yes, your Honor.
 4            THE COURT:  And what's that decision?
 5            THE DEFENDANT:  I'm not going to testify, your Honor.
 6            THE COURT:  Okay.  Thank you.  You may be seated.
 7            Any further inquiry I should make on this?
 8            MR. MARKHAM:  Nothing from the government, your Honor.
 9            THE COURT:  Mr. Lopez?
10            MR. LOPEZ:  No, your Honor.
11            THE COURT:  Counsel, let's just address -- there are a
12    few exhibits attached to Mr. Lopez's email.  I think the first
13    was admitted, Mr. Markham, the --
14            MR. MARKHAM:  Yes, your Honor, and I do apologize, I
15    don't -- I'm pulling it up right now.  I believe the first one
16    was already in evidence.
17            THE COURT:  If we could just get a number, and we can
18    come back to this if the paralegals on either side can let me
19    know.
20            MR. MARKHAM:  The exhibits are in order, so October
21    19, 2014.
22            THE COURT:  I think it's -- you said 2014, right?
23            MR. MARKHAM:  Yes, October 19, 2014.
24            THE COURT:  Yes.  I just wanted to get a number.
25            And think, Mr. Lopez, if I'm reading -- I understood
```

```
 1    this email to be attaching sort of these account lineups.

 2              MR. LOPEZ:  Yes.

 3              THE COURT:  So it's a multipage exhibit.

 4              MR. LOPEZ:  Correct.

 5              THE COURT:  And then I think the next one after that

 6    says "Press Release Today."

 7              MR. LOPEZ:  Yes.

 8              THE COURT:  And that's August 4, 2014.

 9              MR. LOPEZ:  Yes.

08:50 10          THE COURT:  What's the government's position?

11              MR. MARKHAM:  There's going to be no objection to

12    this, your Honor.

13              THE COURT:  Okay.  And what about -- the last one I

14    have says "Partnership Portfolio Commitment" from Mr. Galvin.

15              MR. MARKHAM:  I apologize, your Honor.  Can I go back

16    to the email?  I'm just looking at all -- the email we don't

17    have any objections to.

18              I'm just looking at the page-long attachment that's

19    from Adam Tracy that seems to just be a bunch of hearsay

08:50 20      statements about My Big Coin.

21              MR. LOPEZ:  Your Honor, Mr. Singleton is going to

22    testify that he was -- he helped prepare that.

23              MR. MARKHAM:  Okay, your Honor.

24              THE COURT:  Okay.  So you don't anticipate objecting

25    then?
```

1           MR. MARKHAM:  We don't, your Honor.

2           THE COURT:  What about the Mr. Galvin email?

3           MR. MARKHAM:  Yes, your Honor, this isn't an

4   authenticated email.  The Randall Crater are stipulated to, so

5   this one would have to be authenticated.

6           THE COURT:  And, Mr. Lopez, you're planning to offer

7   it?

8           MR. LOPEZ:  I am, your Honor.  And Mr. Galvin does

9   have a copy of it, so I believe I'll be able to authenticate

08:51 10  it.

11          THE COURT:  Oh, okay.  Right, Mr. Galvin is still

12  testifying.

13          If it's authenticated, counsel, do you anticipate an

14  objection?

15          MR. MARKHAM:  No, your Honor.

16          THE COURT:  Okay.

17          So I'll listen for the foundation on those last two,

18  and then we'll get the number on the October 19th.  So

19  Mr. Lopez, you can refer to it by its admitted number.

08:52 20          MR. MARKHAM:  I believe it's 11EE, 11 double E.

21          THE COURT:  Okay.

22          Counsel, any other disputed exhibits, Mr. Lopez, you

23  anticipate coming up?

24          MR. LOPEZ:  Only the Harmonie website exhibits.

25          THE COURT:  Right.  Those were the M series.

1          MR. LOPEZ:  Yes.

2          THE COURT:  Okay.

3          MR. LOPEZ:  And there's also an 11II that's already

4     admitted, but I'm going to have Mr. Singleton explain what it

5     is.

6          THE COURT:  Okay.

7          MR. MARKHAM:  I apologize, your Honor, it looks like

8     it's not 11EE --

9          MR. LOPEZ:  Yeah, I don't believe I -- this hasn't

08:52 10     been marked.

11          THE COURT:  So, counsel, I don't know if there was

12     another -- I have a memory of Mr. Lynch discussing it.

13          MR. LOPEZ:  I tried to get it in through Mr. Lynch,

14     but he said he didn't recognize it.

15          MR. MARKHAM:  Your Honor, I'm almost positive this is

16     in evidence because it's also one of the emails that

17     Ms. Brekenfeld relied on going through these, but it may have

18     been forwarded to someone, which is why in our date order it's

19     off.

08:53 20          THE COURT:  Sure.  So, I guess, counsel, let's not

21     assume this is in, but I'm assuming there's no objection and

22     maybe we should just have it offered as another exhibit number.

23          MR. MARKHAM:  Yes, your Honor, that's fine --

24          THE COURT:  Okay.

25          MR. MARKHAM:  -- with the government.

1          THE COURT:  And then, counsel, Mr. Lopez, how much
2     time do you anticipate the rest of these witnesses taking?
3          MR. LOPEZ:  I think if they go in order, we should be
4     done, depending on the cross, by 11:00.
5          THE COURT:  Okay.
6          And so, counsel, obviously we'll have to see how
7     things go.  I'll try to keep us to our usual break schedule so
8     that if it looks like we're getting close to finishing the
9     evidence, we may go a little past 11:00 just so we can give the
08:54 10     jury and everyone else a break.  Then I would do -- I would
11     hear, Mr. Lopez, to the extent he has to reserve on any motion.
12     Then I would do the first part of the charge.  Then we'll do
13     closings.
14          I understood the government was going to reserve 10 of
15     their 35 minutes for rebuttal.
16          MR. MOORE:  That's correct, your Honor.
17          THE COURT:  Okay.  So I will give -- and then
18     Mr. Lopez has the total of 35 minutes.  If anyone -- I'll give
19     you a two-minute warning at 23, two-minute warning at 33 for
08:54 20     Mr. Lopez, and a two-minute warning at 8 minutes for the
21     rebuttal.
22          And then, counsel, I'll do the rest of the charge and
23     we'll go from there.
24          We do have lunch for the jurors.  So I'm keeping that
25     in mind as well.  We'll see how things go, but my hope is that

```
 1   we could do closings and charge before lunch so we can send
 2   them up there with all of those things done by then.
 3          Counsel, I've indicated before that I'll have you
 4   certify on the record to Ms. Hourihan that the exhibits are in
 5   order and I understand that you're planning to upload them to
 6   JERS as well, so we'll just have you certify that they're in
 7   order in hard copy or on JERS, and/or on JERS.
 8          MR. MARKHAM:  Yes, your Honor.  The only logistical
 9   point is we're adding new exhibits this morning, so we might
10   need some level of break to --
11          THE CLERK:  If there's only a couple, you can just
12   email them to me.  So you don't need a new disk.  If you have
13   the disk now I can take it.
14          MR. MARKHAM:  It's upstairs.  We'll bring it down at
15   the break.
16          THE CLERK:  Okay.
17          THE COURT:  In terms of the witness by Zoom,
18   Mr. Lopez, are you anticipating he will go on after
19   Mr. Gillespie, depending on where we are?
20          MR. LOPEZ:  Yes.  I guess assume Mr. Gillespie will be
21   about 10, 15 minutes, maybe even five minutes for me.  I don't
22   know how long Mr. Markham is going to go.
23          If it turns out that we're ahead of time, I'll -- I
24   expect Tom Callahan to be outside, so I'll call him.
25          THE COURT:  So I'm not going to break up
```

         1    Mr. Gillespie's testimony, I don't think we'll need to.  We may

         2    have to break up one of the other witness' testimony depending

         3    on where we are for Mr. Galvin, but it sounds like Mr. Callahan

         4    is probably not going to be too long.

         5         MR. LOPEZ:  No.

         6         THE COURT:  And then, counsel, in terms of my charge,

         7    I think I mentioned this yesterday, my practice is when I get

         8    to the second-to-last page, so when I get to the end of the

         9    instruction on page 29, I would hear you at sidebar, Whisper

08:57   10    Tech, to preserve any objections or make -- have me make any

        11    corrections, and then I would get to the last instruction.

        12         I give the jury a hard copy of the jury charge and the

        13    verdict form, and I'll upload it, we'll upload it onto the JERS

        14    system as well.

        15         And, counsel, just on this -- I will preserve for the

        16    moment on Petrozziello and 801(d)(2) until after the closings,

        17    and I'll give you my thoughts and make my ruling on the record.

        18         Counsel, anything else we should take up?

        19         MR. MARKHAM:  The only thing I just wanted to bring to

08:58   20    the Court's attention is Mr. Galvin, I don't know the extent of

        21    what his testimony is going to be.  We did speak to him, and he

        22    discussed a lot of things about William Donahue, who is sort of

        23    a figure lurking in the background in this case, and about how

        24    William Donahue defrauded him.  We're going to be objecting to

        25    that as irrelevant.  I don't know if they're going to get into

1    that in direct examination.  I just wanted the Court to be

2    aware.

3              THE COURT:  Okay.

4              Mr. Lopez, do you need to be heard at this time?

5              MR. LOPEZ:  Your Honor, I do not intend to inquire

6    into that subject area.  However, I will forewarn the Court and

7    Mr. --

8              THE COURT:  Is there going to be an issue about

9    responsiveness, counsel?

08:58 10              MR. LOPEZ:  Well --

11              MR. MARKHAM:  Verboseness, your Honor, I think --

12              THE COURT:  Verboseness.  it's great for Zoom, by the

13    way.

14              MR. LOPEZ:  It's very similar to Mr. Lynch, who just

15    seemed not to be able to just answer the question and wait for

16    the next question.  So I'll do my best to control this witness,

17    but --

18              THE COURT:  I may at some point give you permission to

19    lead, counsel, which may not have an objection from

08:59 20    Mr. Markham.

21              MR. MARKHAM:  I think we'll just take it as it goes,

22    your Honor.  But, yes, I will say the first question I asked

23    him, he launched into a tirade about all this irrelevant stuff,

24    you know.

25              THE COURT:  So, counsel, I may -- if I see that

```
 1    happening, counsel, I may also give Mr. Galvin direction in
 2    that regard.
 3              MR. LOPEZ:  Be my guest, your Honor.
 4              THE COURT:  Okay.
 5              Ms. Hourihan, one thing.
 6              (Discussion off the record.)
 7              THE COURT:  Counsel, if we're ready, why don't we see
 8    if we have all of our jurors.
 9              Counsel, are we ready to begin if they're all here?
10              MR. MARKHAM:  Yes, your Honor, the government is.
11              THE COURT:  Mr. Lopez, is --
12              MR. LOPEZ:  I believe so.  I just have to go check
13    on Mr. --
14              THE COURT:  Okay.
15              THE CLERK:  All rise for the jury.
16              (Jury entered the courtroom.)
17              THE CLERK:  Court is in session.  Please be seated.
18              THE COURT:  Good morning.
19              JURY:  Good morning.
20              THE COURT:  We'll get started again.
21              Sir, Mr. Gillespie, come forward.
22              Thank you.
23              Good morning, sir.
24              THE WITNESS:  Good morning.
25              THE COURT:  I just remind you, you remain under oath.
```

```
 1              THE WITNESS:  Absolutely.

 2              THE COURT:  Thank you.

 3              Mr. Lopez.

 4              MR. LOPEZ:  Thank you, your Honor.

 5              MARK GILLESPIE, having been previously sworn by the

 6      Clerk, was further examined and testified as follows:

 7                     CONTINUED DIRECT EXAMINATION

 8      BY MR. LOPEZ:

 9      Q.   Good morning, Mr. Gillespie.

09:02 10      A.   Good morning, counsel.

11              MR. LOPEZ:  Mr. Sweeney, could you bring up 14D.

12              Could you enlarge this email.

13      Q.   Mr. Gillespie, can you just review this email before I ask

14      you some questions.

15      A.   Yes, sir.

16              (Pause.)

17      Q.   So looking at the email that you wrote, Greetings MBCP

18      Investors, is that My Big Coin Pay investors?

19      A.   It is.

09:03 20      Q.   You write, Congratulations.  Time to realize your returns

21      in your investment in MBCP.  MBC/MBCP will fund your UltraCard

22      with your returns from your MBC investment.  The prepaid

23      UltraCard is accepted anywhere MasterCard is accepted, pay

24      bills, shop online, withdraw cash and more.  UltraCard is fully

25      integrated with virtual currency My Big Coin, Bitcoin and many
```

```
  1    others and comes with a free virtual checking account.
  2            Please go to myultracard.com and register for your
  3    card ASAP.  If you have already acquired your UltraCard, don't
  4    order another.  Simply email me the last four digits on your
  5    card ASAP.  Again, congratulations.  Best regards from all of
  6    us at Big Coin.  Mark Gillespie.
  7            Did I read that correctly?
  8    A.   Absolutely correct, yes, sir.
  9    Q.   And you sent that to Mr. Crater?
09:04 10    A.   I did.
 11    Q.   And why did you send it to Mr. Crater?
 12    A.   Probably for his review.
 13    Q.   For his review?
 14    A.   I believe so.
 15    Q.   And he responded to you?
 16    A.   I don't recall.
 17    Q.   Well, can you look at the top of the email.
 18    A.   Oh, I'm sorry.  Yeah, absolutely.
 19    Q.   He said, Wouldn't send this out, Mark?
09:05 20    A.   Right.  Gotcha.
 21    Q.   So he was telling you not to send this out?
 22            MR. MARKHAM:  Objection.
 23    A.   Yes.
 24            THE COURT:  Overruled, the question and answer can
 25    stand.
```

1            MR. LOPEZ:  All right.  Can you bring up 14E.

2    BY MR. LOPEZ:

3    Q.   As a result of his direction, did you send a different

4    email to the MBCP investors?

5    A.   Apparently.

6    Q.   Is this the email that you sent?

7    A.   It is.

8    Q.   And you write, Greetings All, very informal advisement.

9    Please go to My UltraCard and register for your card ASAP.  Get

09:06 10   your card.  Formal explanation and paperwork will follow

11   shortly from My Big Coin approximately first of the coming

12   week.  If you have already ordered your card, please send me

13   the last four digits off your card ASAP.

14   A.   Yes, sir.

15   Q.   Would you agree with me that that email was substantially

16   different than the one you were intending to send out

17   previously?

18   A.   I believe he corrected me on a few things as I recall.

19   Q.   Okay.

09:06 20          MR. LOPEZ:  Joe, could you bring up 179.

21   Q.   Sir, do you see this email?

22   A.   I do.

23          MR. LOPEZ:  Your Honor, may I approach the witness?

24   It might be a little bit easier.

25          THE COURT:  You may.

```
 1                    And, counsel, is this the one --
 2              MR. LOPEZ:  Yes.
 3              THE COURT:  -- we're offering.
 4              MR. LOPEZ:  Yes, your Honor.
 5              THE COURT:  Okay.  Any objection?
 6              MR. MARKHAM:  No, your Honor.
 7              THE COURT:  Okay.
 8              So, Ms. Hourihan, we'll make this the next number.
 9              Is it 45?
09:07 10              THE CLERK:  It is.
11              THE COURT:  This is admitted as 45.  Thank you.
12              (Exhibit 45 received into evidence.)
13              THE WITNESS:  Thank you.
14    BY MR. LOPEZ:
15    Q.   I realize this email was sent to you a long time ago, but
16    do you remember it?
17    A.   I do.
18    Q.   And do you remember what Mr. Lynch was asking you to do?
19    A.   Without going and reading the whole thing and taking the
09:07 20    Court's time, I believe it was reviewing his accounts to try
21    and make sure monies were in proper categories.
22    Q.   And if you turn to page 3 --
23              MR. LOPEZ:  Jeff, will you go down to page 3.
24    Q.   This is his -- this is a document that he prepared or
25    someone prepared?
```

```
 1    A.    His paralegal Justine.

 2    Q.    Justine.  And that's entitled "Sequence of Wiring

 3    Activity."

 4    A.    Yes, sir.

 5              MR. LOPEZ:  Go to the next page.

 6              And the next page.

 7              And the next page.

 8              And the last page.

 9    Q.    Would it be -- well, strike that.

09:08 10             Did Mr. Lynch contact you on more than one occasion

11    with respect to his accounts?

12    A.    Frequently.

13    Q.    And what do you mean by "frequently"?

14    A.    Constantly.  Often.

15    Q.    Do you know whether or not Mr. Lynch was computer savvy?

16    A.    My recollection is not particularly.

17    Q.    Okay.  And what is your basis for that belief?

18    A.    That he would flip stuff over to his paralegal, who was

19    very accomplished.

09:09 20    Q.    Okay.

21              MR. LOPEZ:  I have no further questions, your Honor.

22              THE COURT:  Thank you.

23              Cross-examination.

24              MR. MARKHAM:  Yes, your Honor.

25                              CROSS-EXAMINATION
```

1    BY MR. MARKHAM:

2    Q.    Good morning.

3    A.    Good morning, sir.

4    Q.    So the defense there just had you review a couple of

5    emails from 2017.  I believe you still have one in front of

6    you.

7    A.    Yes, sir.

8    Q.    One of them the defendant had you correct a few statements

9    before you sent an email out.  Do you remember that?

09:10 10    A.    I do.

11    Q.    Okay.  Had the defendant told you at that point that the

12    CFTC was investigating My Big Coin for fraud?

13    A.    I don't know what date that was.

14          MR. LOPEZ:  Objection.

15    A.    What date are we talking?

16          THE COURT:  Counsel, what's the basis in a word?

17          MR. LOPEZ:  Timing.  I don't know that there's been

18    any --

19          THE COURT:  So, counsel, that was in regards to the

09:10 20    last exhibit.

21          MR. MARKHAM:  The second-to-last exhibit, your Honor.

22    I'm just asking if in 2017 if he knew that.

23          THE COURT:  Sure.  You can put the question again.

24          MR. LOPEZ:  In May of 2017.

25          THE COURT:  Okay.  You can ask the question again with

1    the timing.

2    BY MR. MARKHAM:

3    Q.   In May of 2017, when the defendant had you revise an email

4    to correct the misstatements, were you aware that the CFTC was

5    already investigating?

6    A.   I don't know what day I was advised, so I don't --

7    Q.   So you don't know.

8    A.   I don't know.

9    Q.   Okay.  So yesterday you told the jury that in 2014 you

09:11 10   were a consultant for My Big Coin; is that correct?

11   A.   Yes, sir.

12   Q.   And you said that you were not a rich man in 2014.

13   A.   No, sir.

14   Q.   You knew that My Big Coin was risky and that money would

15   be tight.

16   A.   Yes, sir.

17   Q.   I believe you testified that you told your wife about

18   that, you were candid with her, that it wasn't going to be some

19   big money venture.

09:11 20   A.   Yes, sir.

21   Q.   You also testified that the email address

22   gmark39@gmail.com belongs to you.

23   A.   It does, sir.

24   Q.   And you testified that you talked to Peter Bell about

25   investing in My Big Coin.

```
 1    A.    Yes, sir.

 2    Q.    But you didn't see Peter Bell testify, right?

 3    A.    No, sir.

 4    Q.    Okay.  So while you just testified that in 2014 you were

 5    not a rich man and you thought this was a risky venture --

 6    A.    Yes, sir.

 7    Q.    -- do you recall telling Peter Bell in 2014 that My Big

 8    Coin had made you a billionaire?

 9    A.    No, sir.

09:12 10    Q.    You're saying --

11    A.    You're asking me if I recall telling him that?

12    Q.    Did you ever tell that to him?

13    A.    I can't imagine.  My answer would be no.

14    Q.    Right.  Because that would be false if you told him that,

15    right?

16    A.    Had made me a billionaire, which means I'm already a

17    billionaire, no.

18    Q.    In 2014 you weren't a billionaire, right?

19    A.    No, sir.

09:12 20    Q.    And you weren't on the board of directors of My Big Coin.

21    You were just a --

22    A.    There was no board of directors.

23          MR. MARKHAM:  Permission to approach, your Honor.

24          THE COURT:  You may.

25    BY MR. MARKHAM:
```

1    Q.   This was an exhibit marked by defense counsel yesterday as

2    Exhibit RR for identification.  Can you just flip to the very

3    last page?

4    A.   Yes, sir.

5    Q.   Do you see there's a message there, it says, From Mark

6    Gillespie gmark39@gmail.com, that's you?

7    A.   Yes, sir.

8    Q.   And the date is December 2014?

9    A.   It is.

09:13 10   Q.   Subject line:  Three money signs.

11   A.   Three money signs.  Oh, I'm sorry, yes.

12   Q.   And it's to Peter Bell?

13   A.   It is.

14   Q.   Okay.  Do you see in this email where you say, Confirmed.

15   I'm on the BOD with a 225k base?

16   A.   Right.

17   Q.   Well, you just told this jury you were a consultant in

18   2014 and there was no board of directors?

19   A.   That's correct.

09:13 20   Q.   So why are you telling Peter Bell, an investor, that

21   you're confirmed on the board of directors?

22   A.   Because I was advised that I will be on the board of

23   directors.

24   Q.   Well, no, you say here, Confirmed, I am on the board of

25   directors.

```
 1    A.    Yes.
 2    Q.    And so you're telling him here that even though -- you're
 3    telling him here that you're confirmed on the board of
 4    directors --
 5    A.    Right.
 6    Q.    -- and you just told this jury that there was no board of
 7    directors in 2014?
 8    A.    Correct.
 9    Q.    Okay.  So were you lying to him here?
09:14 10    A.    Am I lying to Peter Bell?
11    Q.    Well, you told Peter Bell that you were confirmed on the
12    board of directors?
13    A.    Yes.
14    Q.    And your testimony today is that in reality there was no
15    board of directors?
16    A.    That is correct.
17    Q.    Okay.  And then you see in the third line, I am told I am
18    worth about 1 billion.
19    A.    Yes.
09:14 20    Q.    Okay.  So you were telling your wife that you weren't
21    going to have money and that you knew this was risky, but then
22    you go around telling investors that you're worth about 1
23    billion now because you're working with My Big Coin?
24    A.    Yes.
25    Q.    The defendant told you he had an elite deal with
```

1    MasterCard, correct?

2    A.   He had no lead deal?  I don't understand your question,

3    I'm sorry.

4    Q.   Did the defendant ever tell you that he had, quote, an

5    elite deal with MasterCard?

6    A.   Elite deal, yes.

7    Q.   And did the defendant also tell you that he had a banking

8    license?

9    A.   I don't recall ever hearing that.

09:15 10   Q.   Okay.

11         MR. MARKHAM:  Can you pull up Exhibit 32, please.

12         Can you zoom in on the bottom email from Mark

13   Gillespie.

14         And highlight number 3.

15   Q.   So this is an email admitted into evidence.

16         Do you see under number 3 you say to a group of

17   investors, that's in the "To" line, foritaginvetors, you say,

18   Randall Crater has been awarded a banking license.  He is

19   highly vetted.

09:16 20   A.   Yes, I see that.

21   Q.   So the defendant told you that?

22   A.   I don't know who told me that.

23   Q.   So are you saying you made this up?

24   A.   I don't know who delivered the message to me that Randall

25   had a banking license.

```
 1   Q.   Let's stop.  Yes or no, did you, when you sent this email
 2   to another group of investors --
 3   A.   Right.
 4   Q.   -- were you making things up again --
 5   A.   No, sir.
 6   Q.   -- or did someone tell you that?
 7   A.   Someone told me that, sure.
 8   Q.   So someone told you that Randall Crater had a banking
 9   license?
10   A.   Yes.
11   Q.   Are you aware that Randall Crater doesn't have a banking
12   license?
13   A.   No, I'm not.
14   Q.   And you weren't aware when you sent that message, right?
15   A.   I'm aware that somebody told me he had a banking license.
16   Q.   Okay.  And you're telling me you don't remember Randall
17   Crater telling you that, it could have been someone else?
18   A.   That's correct.
19   Q.   Let's go to number 5, please.  Highlight that.
20            It says, Randall Crater has an elite deal with
21   MasterCard.  He is highly vetted.
22   A.   Yes, sir.
23   Q.   And you just testified the defendant did tell that you
24   one, right?
25   A.   Yes, sir.
```

```
 1    Q.   So he told you he had an elite deal with MasterCard.

 2              Are you aware the defendant did not have an elite deal

 3    with MasterCard or any deal with MasterCard?

 4    A.   No, I'm not aware of that at all.

 5    Q.   So you weren't aware when you sent this email either?

 6    A.   What's the date?

 7              I believe I was aware he had a deal with MasterCard.

 8    Q.   Right.  So someone told you that he had a deal with

 9    MasterCard and you just testified that that someone was the

10    defendant.

11    A.   No, that's not what I'm saying, sir.

12    Q.   You just told this jury that the defendant told you he had

13    an elite deal with MasterCard?

14    A.   Yes.

15    Q.   Okay.

16              MR. MARKHAM:  Can we go to the top of this message,

17    please.

18              Scroll up.

19              Now, you say you don't remember whether the defendant

20    told you he had a banking license.

21    A.   Right.

22    Q.   But you do remember he told you about the MasterCard deal.

23    A.   Yes.

24    Q.   You forward this email to Randall Crater, and do you see

25    what he says here, Looks great.
```

```
 1    A.   I do.
 2    Q.   And that's because you were writing this to him for his
 3    approval because you were sending it to investors.
 4    A.   Yes, sir.
 5    Q.   The defendant told you that My Big Coin was a
 6    cryptocurrency backed by gold?
 7    A.   Yes, sir.
 8    Q.   And the defendant told you that My Big Coin had an
 9    exchange website where people could buy and sell their coins,
10    right?
11    A.   Yes, sir.
12              MR. MARKHAM:  Can you pull up 15A.
13    Q.   This is an exhibit that was shown to you yesterday.
14              MR. MARKHAM:  Can you just zoom in on the bottom left.
15              Yeah, How it Works.
16    Q.   So under "How it Works," it says, Using MBC, exchange MBC
17    on an exchange market.
18              The defendant told you people could do that, right?
19    A.   Yes.
20    Q.   Okay.
21              MR. MARKHAM:  Can you bring up 7G.
22              And can you zoom in on the middle there where it says,
23    Sell My Big Coin, select a currency.
24    Q.   Have you ever seen the My Big Coin exchange website?
25    A.   I have, sir.
```

```
 1    Q.    And here where it says that you can sell My Big Coin and

 2    then you can transfer it using this website for another

 3    currency --

 4    A.    Yes, sir.

 5    Q.    -- Randall Crater told you that people could really do

 6    that, right?

 7    A.    Yes, sir.

 8    Q.    That's because this was a currency exchange.

 9    A.    A currency exchange?

09:19 10    Q.    Yes.  It says you can sell My Big Coin --

11    A.    Right.

12    Q.    -- and that you can select a currency to buy.  So this is

13    a place where you can go to exchange currency.

14            MR. LOPEZ:  Objection.

15            THE COURT:  Well, sustained as to the form of this

16    question.

17    BY MR. MARKHAM:

18    Q.    Was this website telling people -- or did you believe that

19    this website could be used to sell My Big Coin in exchange for

09:19 20    other currency?

21            MR. LOPEZ:  Objection.

22            THE COURT:  Sustained as to form.  You can rephrase.

23    BY MR. MARKHAM:

24    Q.    Could this website be used to exchange My Big Coin for

25    other currency like it's advertising?
```

```
 1              MR. LOPEZ:  Objection.
 2              THE COURT:  Overruled.
 3    A.   I'm not certain.  Sitting here right now, I'm not
 4    positive.
 5    Q.   Okay.  So you were selling this product for multiple years
 6    getting people to invest?
 7    A.   No, sir.
 8    Q.   You never got people to invest?
 9    A.   My friends and only my friends.
10    Q.   Right --
11    A.   I sold nothing.
12    Q.   So you got your friends to invest, that's what you're
13    saying?
14    A.   Yes.
15    Q.   And you told Peter Bell you were a billionaire.
16    A.   Yes.
17    Q.   And you told him you were on the board of directors.
18    A.   Yes.
19    Q.   And during that entire time, you didn't even know if the
20    My Big Coin Exchange that was being advertised worked?
21    A.   I knew the exchange worked.
22    Q.   Okay.  So you knew that this exchange worked?
23    A.   Absolutely.
24    Q.   And the defendant told you it worked, right?
25    A.   Well, I used it, all my friends had used it.
```

1    Q.   Oh, so you had used this exchange to exchange My Big Coin

2    for currency?

3    A.   No.  I had no need to exchange.  I bought and sold coin

4    peer-to-peer.

5    Q.   I understand.

6         MR. MARKHAM:  So can you zoom in on the bottom part,

7    please.

8    Q.   So what you're saying is you know for a fact that you

9    could sell and buy My Big Coin using this trading mechanism

09:21 10   here?

11   A.   Yes.

12   Q.   The defendant told you he could personally stop the sale

13   of My Big Coins on this exchange, right, if he needed to?

14   A.   I don't recall him ever telling me that.

15        MR. MARKHAM:  Can you bring up Exhibit 13B.

16        Can you just zoom in on the top email.

17   Q.   This is an email about exchanging My Big Coins.  Do you

18   see what Randall Crater says, I did it myself, so I know it got

19   done.  I stopped the sale of the coins and refunded your

09:21 20   account.  It may take a little while for it to update but I did

21   it myself.

22        Did I read that correctly?

23   A.   You did, sir.

24   Q.   And your e-mail is on the "cc" line there, right, that's

25   Mark Gillespie?

 1   A.   Yes.  Now I remember, yes, sir.

 2   Q.   The defendant paid you money, right?

 3   A.   Yes, sir.

 4   Q.   Thousands of dollars?

 5   A.   Yes, sir.

 6   Q.   More than one occasion he sent you money?

 7   A.   Yes, sir.

 8   Q.   In some cases, it appeared from an email you looked at

 9   yesterday that he specifically paid you money to write press

09:22 10   releases?

11   A.   No, sir.

12        MR. MARKHAM:  Can you bring up Exhibit 11D.  Zoom in.

13   Q.   And in the middle there, this is from you to the

14   defendant.  You say, Would you consider not paying me the 700

15   plus I have earned at the 3 percent and not paying me for the 6

16   PRs?

17        Are you saying "PRs" doesn't stand for press release

18   in this email?

19   A.   It does, sir.

09:23 20   Q.   So you had written press releases?

21   A.   Yes, sir.

22   Q.   And you're asking him, instead of paying you for the six

23   PRs, to give you some sort of ownership stake.

24   A.   Yes, sir.

25   Q.   But you just testified that he never paid you to write

         1    press releases?

         2    A.    That's correct, sir.

         3    Q.    When you solicited people to invest in My Big Coin, your

         4    friends, didn't you also direct those people to pay the money

         5    to Randall Crater's bank account?

         6    A.    Greyshore initially, yes, sir.

         7    Q.    Are you aware that it's been stipulated in this case that

         8    the defendant is the CEO of Greyshore?

         9    A.    Yes.

09:23   10    Q.    Are you aware that the defendant had control of the

        11    Greyshore account?

        12    A.    I am, sir.

        13    Q.    Were you aware that the Greyshore account wasn't actually

        14    in the defendant's name but in the name of his sister?

        15          MR. LOPEZ:   Objection.

        16          THE COURT:   Sustained as to this question.

        17    BY MR. MARKHAM:

        18    Q.    Okay.  So you solicited Jay Byrd to invest; is that right?

        19    A.    Never, no, sir.

09:24   20    Q.    Never?

        21    A.    Never.

        22    Q.    But you did solicit Peter Bell to invest?

        23    A.    My friend, yes.

        24    Q.    Yes, your friend Peter Bell.

        25    A.    Correct.

```
 1    Q.    And you're aware that those wire transfers went to a bank
 2    account that the defendant controlled?
 3    A.    Absolutely.
 4          MR. MARKHAM:  No further questions, your Honor.
 5          THE COURT:  Thank you.
 6          Redirect, Mr. Lopez.
 7                         REDIRECT EXAMINATION
 8    BY MR. LOPEZ:
 9    Q.    Mr. Gillespie, you said you bought and sold coin on a
10    peer-to-peer exchange?
11    A.    I did, sir.
12    Q.    Can you describe the process by which that happened?  What
13    did you have to do?
14    A.    First you must have My Big Coin in your personal account.
15    From that point, you would move X number of coins that you had
16    determined you wanted to sell to the exchange.  Once they were
17    on the exchange, you would stipulate the price that you
18    personally wanted to sell those for.  Those -- you and other
19    people that were selling coins, they were visible to other
20    people signed in on the exchange -- and I'm doing this from
21    memory, so please bear with me, it's been a long time.  Those
22    people could see what was for sale.  If they determine they
23    wanted to buy Joe Blow's coins for $29 a coin, they can contact
24    him, discuss how to pay, and move on from there.
25          It's my understanding that no monies passed through
```

 1    our exchange.  That's why on our website it stipulates clearly

 2    this is a peer-to-peer exchange.  The only monies that I knew

 3    or believed we, "we," received was from our fee.  Just like a

 4    fee PayPal has.  And if memory serves, that fee was 2.5

 5    percent, and I think it was less earlier when we first started

 6    and it was raised a little bit.

 7    Q.   So no money actually passed through the exchange?

 8              MR. MARKHAM:  Objection.

 9              THE COURT:  Sustained as to form.

09:26 10              You can rephrase.

11    BY MR. LOPEZ:

12    Q.   Did any money pass through the exchange?

13    A.   I saw no evidence of that.  I don't know how it would.

14              MR. LOPEZ:  Thank you.

15              THE COURT:  Recross?

16              MR. MARKHAM:  Yes, your Honor.

17                        RECROSS-EXAMINATION

18    BY MR. MARKHAM:

19    Q.   The defense counsel just asked you if any money passed

09:26 20    through the exchange.

21    A.   Yes, sir.

22    Q.   Are you aware of whether any of the money passed through

23    the defendant's bank account in making those trades?

24    A.   I am not.

25    Q.   So.  So you don't know whether the defendant ever bought

1   and sold coin that was being sold on that exchange?

2   A.   Do I know if Randall bought coin on that exchange.  I have

3   no clue.

4   Q.   So if you saw a check from him that said "coin buyback"

5   from My Big Coin, that wouldn't surprise you, right?

6   A.   It wouldn't surprise me?  I'm sorry, I'm not

7   understanding.

8   Q.   So you don't know whether the defendant, Randall Crater,

9   this person you worked with for a couple of years, ever bought

09:27 10   or sold My Big Coin?

11   A.   I can't think of any situation off the top of my head, no.

12   Q.   Sir, do you remember the email I just showed you where the

13   defendant went into the exchange and said, I got it done?

14   A.   Oh, wait a minute, okay.  Yeah, I'm sorry.  I see what

15   you're saying.  Yeah, I think I might know of one example of

16   that, possibly.

17   Q.   Okay.

18          MR. MARKHAM:  Can you bring up Exhibit 7G again.

19          Okay.  Zoom in on that part in the middle that says,

09:28 20   "Sell My Big Coin" and has arrows and "select a currency."

21   Q.   I would just like one straight answer.

22          MR. LOPEZ:  Objection.

23          THE COURT:  Yeah, no commentary.

24   BY MR. MARKHAM:

25   Q.   Was this a fabrication or could you actually do it?

1          MR. LOPEZ:  Objection.

2     A.   I personally -- I'm sorry, do what?  Could you be more

3     specific?

4          THE COURT:  So, counsel, sustained as to that

5     question.  And you can ask another question.

6          And, Mr. Gillespie, wait, if there's an objection,

7     before answering.

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Mr. Markham.

09:28 10   BY MR. MARKHAM:

11    Q.   Was this statement on the My Big Coin website accurate,

12    that you could sell My Big Coin and then select a currency to

13    buy?  Yes or no?

14    A.   I don't know is my answer.

15    Q.   And even though you didn't know whether this was accurate,

16    you had no problem selling this stuff to your own friends?

17    A.   Selling this stuff -- could you be more specific, please?

18    Q.   Yeah.  Selling My Big Coin to Peter Bell, you didn't have

19    any problem doing that, even though you didn't even know if

09:29 20   this was true?

21    A.   I would have no problem at all doing that.

22    Q.   You would have no problem at all selling people something

23    that you didn't know whether this product was real.

24    A.   Well, first of all, I wasn't selling anything, is number

25    one.  And number two, if it's on there, based on my personal

1    experience with a couple of years at this point with this

2    company, if they said they could do it, I would absolutely

3    believe they could do it.

4    Q.   Right, anything that's said on these websites, you would

5    believe that's absolutely true and then go tell other people,

6    right?

7    A.   Well, I knew for a fact -- let me be very careful here.

8            I knew from my personal experience, everything I

9    personally did and my friends did on this website worked.  So

09:29 10   if I focus on one thing that I personally hadn't used and

11   didn't have personal experience with, I would think everything

12   else works, so, yeah, this works.

13   Q.   Right, and that's because you were on the board of

14   directors, right?

15   A.   No, sir.

16   Q.   Right.  But you told Peter Bell you were on the board of

17   directors?

18   A.   No, sir, that's really not what I told Peter Bell.

19   Q.   Please take that email I just brought you.

09:30 20   A.   I understand.

21           THE COURT:  Counsel, is there a question?

22           MR. MARKHAM:  Yes, your Honor.

23   BY MR. MARKHAM:

24   Q.   Did you write to Peter Bell, Confirmed.  I am on the BOD

25   with a 225K base?

1    A.   Yes, sir, I wrote that.

2    Q.   You wrote that.

3    A.   Yes.

4    Q.   You also said, I am told now I am worth 1 billion?

5    A.   Yeah.

6    Q.   And those things aren't true.

7    A.   The way I wrote it, no.

8         MR. MARKHAM:  No more questions, your Honor.

9         THE COURT:  Thank you, sir.  You're excused.

09:30 10      THE WITNESS:  Thank you.

11        THE COURT:  You can leave those there, I think.

12        Thanks.

13        MR. LOPEZ:  Your Honor, can I get the next witness?

14        THE COURT:  I think so.  I think that makes sense.

15        MR. LOPEZ:  It will be Michael Singleton.

16        THE COURT:  Thank you.

17        MICHAEL SINGLETON, having been duly sworn by the

18   Clerk, was examined and testified as follows:

19        THE CLERK:  Thank you.  Please be seated.

09:31 20      THE COURT:  Good morning, sir.

21        THE WITNESS:  Good morning.

22        THE COURT:  Sir, you can remove your mask.  We're far

23   enough away from you.  Thank you.

24                        DIRECT EXAMINATION

25   BY MR. LOPEZ:

```
 1   Q.   Good morning.

 2   A.   Good morning.

 3   Q.   Would you please introduce yourself to the jury and spell

 4   your last name.

 5   A.   My name is Michael Singleton, spelling S-i-n-g-l-e-t-o-n.

 6            THE COURT:  Thank you.

 7   BY MR. LOPEZ:

 8   Q.   And where are you from, Mr. Singleton?

 9   A.   Houston, Texas.

10   Q.   And are you here pursuant to a subpoena?

11   A.   Yes, sir.

12   Q.   And how far did you go in school?

13   A.   Two years of college.

14   Q.   And do you know Mr. Crater?

15   A.   Yes, sir.

16   Q.   How did you come to know Mr. Crater?

17   A.   I was introduced to him in 2013 by an attorney by the name

18   of Marc Ariza.

19   Q.   And how did you know Attorney Ariza?

20   A.   I had a trust, family trust put together, and Mr. Ariza

21   provided that service.

22   Q.   Are you currently employed?

23   A.   Self-employed.

24   Q.   And what do you do?

25   A.   I do sales.  Actually, I have a non-written agreement with
```

```
 1    an OEM manufacturer and I sell electronic consumer goods.
 2    Q.    Directing your attention back to 2014, were you
 3    self-employed at that time?
 4    A.    Yes, sir.
 5    Q.    And what were you doing at that time?
 6    A.    Consulting.
 7    Q.    What type of consulting?
 8    A.    Helping small companies that were in a position to go
 9    public.
09:33 10  Q.    And what was the name of your company?
11    A.    Tobias Interest LLC.
12    Q.    And for how long had you been working with that name in
13    that industry?
14    A.    I had been working with that name for about three years
15    basically.
16    Q.    And how long had you been doing consulting work?
17    A.    Started in 2004.
18    Q.    Now, prior to My Big Coin, had you ever worked with
19    Mr. Crater?
09:34 20  A.    No, sir.
21    Q.    So this was your first --
22    A.    Yes, sir.
23    Q.    First time working with him?
24    A.    Yes.
25    Q.    And did you work with anyone else at My Big Coin?
```

1   A.   No.

2   Q.   Did you know whether or not Mr. Crater had a partner in My

3   Big Coin?

4   A.   Yes, there was -- I was introduced to John Roche, who was

5   considered to be a partner.

6   Q.   And what was Mr. Roche's position, if you know?

7   A.   He was the CEO of the company.

8   Q.   And what does "CEO" stand for?

9   A.   Chief executive officer.

09:34 10   Q.   Okay.  Do you know whether or not Mr. Crater had any

11   official position with My Big Coin?

12   A.   No.

13   Q.   Okay.  Now, prior to your work for My Big Coin, did you

14   require any type of an agreement to be signed?

15   A.   Yes.  I discussed a consulting agreement, but initially

16   we, you know, kind of needed to find a securities attorney.

17   Q.   So you started working before you had an actual agreement?

18   A.   Yes, yes.

19   Q.   And what was your understanding as to what you were hired

09:35 20   to do?

21   A.   Well, basically because I had a better understanding of

22   the industry and Mr. Crater didn't, I was hired to actually be

23   the go-between between the securities attorney and the company.

24   Q.   And was there a plan on how to take the company public?

25   A.   Yes.  To find a securities attorney who could actually do

1    an IPO or file an S-1 registration.

2    Q.    What is an S-1 registration?

3    A.    An S-1 registration is the document that you file with the

4    SEC that makes your company more transparent and it attaches

5    you to -- once it's approved, you start becoming a reporting

6    company to the SEC.

7    Q.    And after you started working for My Big Coin, did you

8    find such an attorney?

9    A.    Yes, sir.

09:36 10    Q.    And what was that attorney's name?

11    A.    Adam Tracy.

12    Q.    And was Adam -- was Attorney Tracy hired by My Big Coin?

13    A.    Yes.

14    Q.    Now, at some point did you enter into a more formal

15    relationship with My Big Coin?

16    A.    Yes, I had a consulting agreement that stated the things

17    that I would do and what I would be compensated for doing those

18    things.

19    Q.    And who signed that consulting agreement on behalf of My

09:36 20    Big Coin?

21    A.    If I had to go back, I think the first one may have been

22    signed by Randall, and the second one was signed by John Roche.

23    Q.    Now, can you just briefly describe to the jury what your

24    prior experience was in taking companies public?

25    A.    Well, I had a mentor who passed away that I worked with

1    and so my experience primarily was actually had a company that,

2    as far as coming up with the idea.  I came up with the idea.

3    My mentor put the package together.  It was called Blue Diamond

4    Ventures and took that company public.

5    Q.    Now, did Randall or John Roche or My Big Coin pay you for

6    your efforts?

7    A.    There was an initial payment that I was paid by Adam

8    Tracy.

9    Q.    And why were you paid by Adam Tracy?

09:37 10   A.    Actually, I negotiated with Adam Tracy on top of his fee

11   for a fee for myself because I didn't have a written agreement

12   in place at that time.

13   Q.    Okay.  So this was before you had the consulting

14   agreement?

15   A.    Yes.

16   Q.    And do you know whether or not Mr. -- or Attorney Tracy

17   was paid by anyone?

18   A.    He was paid by Randall.

19   Q.    And do you recall how much Randall paid him?

09:38 20   A.    I think the initial fee was $25,000, somewhere in that

21   area.

22   Q.    And of that $25,000, how much were you paid?

23   A.    $10,000.

24   Q.    Now, at some point was Attorney Tracy hired and entered

25   into an engagement letter?

```
 1    A.   Yes.
 2    Q.   And do you recall who signed that engagement letter?
 3    A.   Randall signed that engagement letter.
 4    Q.   Okay.  So how did it come to pass that Attorney Tracy was
 5    selected to work with My Big Coin?
 6    A.   Well, when Randall contacted me about possibly taking this
 7    company public, my thought was not for them to do a reverse
 8    merger but to actually do the S-1 so it would be more
 9    transparent.  So I started looking for a securities attorney
10    that actually specialized in that, and I think in my searches,
11    you know, going through Google, I guess the algorithm must have
12    picked up, a couple of days later I got like a pop-up and it
13    was Adam who was advertising as an attorney who did S-1
14    registrations.
15    Q.   So after doing your research, did you contact Attorney
16    Tracy?
17    A.   Yes.
18    Q.   Did you speak with him?
19    A.   Yes.
20    Q.   Did he confirm that he did, in fact, have expertise in S-1
21    filings?
22    A.   Yes.
23    Q.   Did you tell him at that time that My Big Coin was a
24    cryptocurrency company?
25    A.   No --
```

1          MR. MOORE:  Objection, hearsay.

2          THE COURT:  Well, counsel, what's your response to the

3    objection here?  Do you want to rephrase?

4          MR. LOPEZ:  I'll rephrase.

5          THE COURT:  Thank you.

6    BY MR. LOPEZ:

7    Q.   What, if anything, did you tell Attorney Tracy about My

8    Big Coin?

9          MR. MOORE:  Same objection.

09:40 10          THE COURT:  Well, sustained.

11    BY MR. LOPEZ:

12    Q.   Did you know that My Big Coin was a cryptocurrency

13    company?

14    A.   Yes, but I didn't know what it was.

15    Q.   At that time were you aware of any cryptocurrency company

16    that had been approved by the Securities and Exchange

17    Commission to go public?

18    A.   No.

19    Q.   Do you know whether or not there's any cryptocurrency

09:40 20    companies today that have been --

21    A.   To my understanding, no.

22    Q.   Okay.

23          So you hire Adam Tracy.  What happens next?

24    A.   Well, after the engagement letter, Adam and Randall had a

25    conference call which would be what the next steps would be.

1    So there was quite a bit of documentation that needed to be
2    collected by Adam to be able to get the company in a structured
3    position to take the next steps.
4    Q.   And who was acting on behalf of My Big Coin in gathering
5    that information?
6    A.   Initially I would have to say eventually John Roche came
7    into the picture and that would have been his responsibility.
8    Q.   Okay.  And at some point did the documentation that
9    Attorney Tracy required or requested, was it sent to him?
10   A.   At some point, yes.
11   Q.   How long did it take for that to happen?
12   A.   I'd say we were probably about three to four months into
13   the engagement when that happened.
14   Q.   And just as a point of reference, what year and month are
15   we talking about when you were hired?
16   A.   This would have been in 2014.
17   Q.   Early 2014, late 2014?
18   A.   Probably mid 2014.
19   Q.   So three or four months later we're talking November,
20   October of 2014?
21   A.   Probably closer to October.
22   Q.   Closer to October.  Okay.
23        So now October 2014, Attorney Tracy is sent the
24   documentation that he needs in order to take the next steps for
25   the S-1 filing.

```
 1    A.    Yes.

 2    Q.    And what happens then?

 3    A.    The next step would have been the company -- so when you

 4    file an S-1 registration, you have to be audited by a

 5    sanctioned CPA or auditing firm sanctioned by the SEC.  And so

 6    the next step was to do the preparation for an audit.

 7    Q.    Let me just take a step back.

 8          Do you know whether or not the S-1 registration was

 9    actually filed by Attorney Tracy with the SEC?

09:43 10    A.    No.

11    Q.    So because of your experience, you knew that the next step

12    was the company to be audited?

13    A.    Yes.

14    Q.    Okay.  And was the company audited?

15    A.    There was documentation prepared for an audit, yes.

16    Q.    And were you involved in that audit at all?

17    A.    I worked closely with John Roche in getting the

18    documentation prepared for the audit.

19    Q.    Do you remember what the name of the auditing firm was?

09:43 20    A.    John Scrudato.

21    Q.    And was John Scrudato paid to audit the company?

22    A.    Yes.

23    Q.    And did he produce an audit report that was sufficient to

24    submit to the SEC?

25    A.    I don't recall.
```

```
 1   Q.   Okay.  What happened next?
 2   A.   Kind of became a standstill per se, and months went on
 3   where there were promises of Adam Tracy that never transpired.
 4   Q.   And how long did that go on for?
 5   A.   I would say we were in the eight to 12 months of a
 6   constant, you know, we're going to get it done, we're going to
 7   get it done, we're going to get it done, and eventually he came
 8   back and stated that he wouldn't be able to take My Big Coin
 9   public.
10          MR. LOPEZ:  Can you bring up 11II, Mr. Sweeney.
11          MR. SWEENEY:  Scott, do we have a number on it?
12          MR. LOPEZ:  I don't.  It's already admitted.
13          (Discussion off the record.)
14   BY MR. LOPEZ:
15   Q.   Do you see Exhibit 11II in front of you?
16   A.   Yes.
17   Q.   And do you see that you're the one that drafted that
18   email?
19   A.   Yes.
20   Q.   And it was to Adam Tracy, Randall Crater -- who's Jeremy
21   Markham?
22   A.   He worked at Adam's firm.
23   Q.   Okay.  John Roche?
24   A.   Yes.
25   Q.   And then you also cc'd yourself.
```

1    A.    Yes.

2    Q.    And it looks like there's a list of attachments there.

3    A.    Yes.

4         MR. LOPEZ:  Can you enlarge the text of the message.

5    Q.    Adam, the documents are completed with the exception of

6    the PFSF due diligence docs and the indemnification docs.  The

7    indemnification docs will be signed and forwarded to you this

8    afternoon.  John is on top of the PFSF docs and set up a

9    corporation.

09:46 10        What is the "PFSF due diligence docs"?

11   A.    Okay.  So once it was determined that he couldn't do an

12   S-1, taking My Big Coin public, Adam started looking for

13   additional avenues, and if I recall, PFSF was a shell company

14   that he found.

15   Q.    Okay.  And what was your understanding of what Attorney

16   Tracy was trying -- of what Attorney Tracy was trying to

17   accomplish?

18   A.    So when this came into play, it was a process of doing a

19   reverse merger into this particular shell and then filing the

09:47 20   S-1 after that.

21        MR. LOPEZ:  If you could just, Joe, go to the first

22   page, the next page.

23   Q.    It looks like this was a stock option and restricted stock

24   plan.  That was one of the documents attached?

25   A.    Yes.

```
 1   Q.   And who drafted that plan?

 2   A.   These were documents that came from Adam.

 3   Q.   Okay.  And let's go back to the first page.

 4        So the other documents that were attached appear to be

 5   an MBC shareholder UWC stock plan.  What does "UWC" stand for?

 6   A.   I don't recall.

 7   Q.   Okay.  MBC Roche employment agreement, MBC board of

 8   director UWC Tobias, was that something related to your

 9   company?

10   A.   Yes.

11   Q.   And so on.

12        And so this exhibit was an effort to take the next

13   steps?

14   A.   Yes.

15        MR. LOPEZ:  Your Honor, may I approach the witness?

16        THE COURT:  You may.

17   BY MR. LOPEZ:

18   Q.   Sir, do you recognize this document?

19        MR. LOPEZ:  You can take down 11II.

20   A.   Yes.

21   Q.   And what is it?

22   A.   It's a press release.

23   Q.   Okay.  And -- well, it's an email from you to Mr. Crater,

24   right?

25   A.   Yes.
```

1    Q.   And it references a press release.

2    A.   Yes.

3    Q.   And turning to the second page, is that a press release?

4    A.   Yes.

5    Q.   And why were you sending Mr. Crater a press release?

6    A.   So Attorney Tracy, they talked about doing a press release

7    for Attorney Tracy, so he sent the structure of this press

8    release and informed Matt of how we should create it.  So

9    basically we used it PR News to get it out to the public.

09:50 10    Q.   Were you involved in drafting or editing this press

11   release?

12   A.   Yes.

13   Q.   Looking at the email and the press release, is that a fair

14   and accurate copy of the email and press release, as you

15   recall?

16   A.   Yes.

17            MR. LOPEZ:  Your Honor, at this point I move to admit.

18            THE COURT:  Any objection?

19            MR. MOORE:  No objection, but we would ask for a

09:51 20   limiting instruction about the reason that this is being

21   admitted for in relation to the truth of the matter asserted,

22   your Honor, for the press release portion.

23            THE COURT:  Counsel, any objection to that?

24            MR. LOPEZ:  No, your Honor.

25            THE COURT:  Counsel, let me hear you on Whisper Tech

```
 1    for a moment.
 2              I think this will be, Ms. Hourihan, 46.
 3              THE CLERK:  Yes.
 4              (Exhibit 46 received into evidence.)
 5              (Discussion at sidebar.)
 6              THE COURT:  Counsel.
 7              MR. MOORE:  Yes, your Honor.
 8              THE COURT:  Mr. Moore, what's the limiting instruction
 9    you want here?
10              MR. MOORE:  Just at the top of this makes various
11    claims about Harmonie International --
12              THE COURT:  I'm having a hard time hearing you.
13              MR. MOORE:  Sorry, your Honor.  Is that any better?
14              THE COURT:  That's better.
15              MR. MOORE:  Just at the top of this it makes various
16    claims about Harmonie International and gold backing.  So my
17    understanding is that this is being admitted for the effect on
18    the listener and not for the truth of any of these assertions.
19    That's the instruction we're asking for, your Honor.
20              THE COURT:  Understood.
21              Mr. Lopez, do you need to be heard?
22              MR. LOPEZ:  Your Honor, I -- I'm just -- yes, it's
23    hearsay, but this is his own personal knowledge that he's
24    testifying to, because he reviewed it.  He believed it to be
25    accurate.  So I don't understand why he can't testify to it.
```

```
 1              THE COURT:  No, I understand it's coming in.  A
 2   limiting instruction is about the hearsay as to the statements
 3   in this document.
 4              MR. LOPEZ:  I understand.  If you want -- I'm okay
 5   with a limiting instruction.
 6              THE COURT:  Okay, thank you.
 7              (End of discussion at sidebar.)
 8              THE COURT:  As I said, this can be admitted as 46.
 9              Jurors, this exhibit, which has some attachments, is
10   being offered for the effect on the listener and not for the
11   truth of the matters asserted in the attachment.
12              That's 46.
13              It can be published.
14              MR. LOPEZ:  Can you put it on the ELMO, Ms. Hourihan.
15   BY MR. LOPEZ:
16   Q.   All right.  So this is the email that you sent?
17   A.   Yes.
18   Q.   And the second one down says -- it's a news release,
19   Revolutionary Cryptocurrency Platform, My Big Coin announces
20   that the company is negotiating to become the first
21   cryptocurrency company to have its digital currency to be
22   wholly backed by gold.  Correct?
23              And the date of this email is August 4, 2014.
24   A.   Yes.
25   Q.   So, to your knowledge, was the company backed by gold
```

```
 1   prior to this date, August 4, 2014?

 2   A.   No.

 3   Q.   Okay.

 4        Now, let me turn to the second page.

 5        And this is the press release?

 6   A.   Yes.

 7   Q.   And you reviewed this press release?

 8   A.   Yes.

 9   Q.   Did you believe it to be accurate at the time that you

10   reviewed it?

11   A.   That there were negotiations, yes.

12   Q.   And did you edit it?

13   A.   I did, but it was okayed by Attorney Adam Tracy.

14   Q.   Okay.  So Adam Tracy had the final approval?

15   A.   Yes.

16   Q.   In any event, this reads, August 4, 2014, MyBigCoin.com,

17   Inc., the corporate parent of the online cryptocurrency

18   platform and virtual wallet website www.MyBigCoin.com, today

19   announces that the company is now entering into final

20   negotiations with Harmonie International to obtain a committed

21   backing for its cryptocurrency from Harmonie International of

22   up to $100 million in the lawful commodity of gold in an amount

23   of approximately 2,231 kilograms.  If successful in its

24   negotiations, My Big Coin would become the first company whose

25   business model focuses entirely on digital currencies and the
```

```
 1    peer-to-peer transfer of digital currencies to have its
 2    cryptocurrency wholly backed by gold.
 3           Did I read that correctly?
 4    A.   Yes.
 5    Q.   And it goes on to say that the company has engaged an
 6    attorney, Adam Tracy, and his securities firm.
 7    A.   Yes.
 8    Q.   And the company's expectation is to have its common stock
 9    listed on the over-the-counter marketplace.
10    A.   Yes.
11    Q.   Was that the plan in August of 2014?
12    A.   To my knowledge, yes.
13    Q.   Okay.  And then below that, there's what's called a safe
14    harbor statement.
15    A.   Yes.
16    Q.   And toward the middle of that paragraph, it talks about
17    forward-looking statements include expressions such as
18    "believe," "anticipate," "expect," "estimate," "intend," "may,"
19    "plan," "predict," "will," and similar terms and expressions.
20           Did you, sir, based on your experience, consider this
21    press release a forward-looking statement?
22    A.   No.
23    Q.   No, okay.  Why not?
24    A.   When you say "forward-looking statement," can you define
25    that?
```

```
 1   Q.   Well, it's just defined -- a forward-looking statement --
 2   A.   This part of the document was prepared by Attorney Tracy
 3   and he okayed this.  So --
 4   Q.   So if I understand your answer, you don't believe this was
 5   a forward-looking statement because it was talking about
 6   negotiations that were ongoing at that point in time?
 7           MR. MOORE:  Objection, relevance.
 8           THE COURT:  Well, sustained as to form.
 9           MR. LOPEZ:  I'll move on, your Honor.
09:58 10           THE COURT:  Thank you.
11   BY MR. LOPEZ:
12   Q.   Are you familiar with a company called Harmonie
13   International?
14   A.   Yes.
15           MR. LOPEZ:  Can you bring up just for the witness M1.
16           THE COURT:  Just for the witness, yes.
17   BY MR. LOPEZ:
18   Q.   Have you ever viewed the Harmonie International website?
19   A.   Yes.
09:59 20   Q.   And looking at what's been marked as M1, does that appear
21   to be a copy of the Harmonie International website?
22   A.   It's a picture that I've seen before.
23   Q.   That you've seen before.
24   A.   Yes.
25   Q.   You recognize it?
```

```
 1    A.    Yes.
 2    Q.    And is that a fair and accurate copy of what you have seen
 3    before?
 4    A.    The picture, yes.
 5    Q.    Okay.
 6              MR. LOPEZ:  Your Honor, I would move to admit that.
 7              THE COURT:  Any objection to M1?
 8              MR. MOORE:  Objection on relevance grounds.
 9              THE COURT:  Well, given the testimony, overruled on
10    that ground.
11              I think this is 46.
12              MR. LOPEZ:  I believe so, your Honor.
13              THE CLERK:  No.
14              MR. LOPEZ:  No, 47.
15              THE COURT:  47, thank you.
16              (Exhibit 47 received into evidence.)
17              THE COURT:  It may be admitted as 47.
18              MR. LOPEZ:  Can you publish it to the --
19    BY MR. LOPEZ:
20    Q.    Sir, what did you understand Harmonie International to be?
21              MR. MOORE:  Objection.
22              THE COURT:  In a word, counsel?
23              MR. MOORE:  Foundation.
24              THE COURT:  Well, sustained.  You can lay the
25    foundation.
```

```
 1   BY MR. LOPEZ:
 2   Q.   Do you know what kind of company Harmonie International
 3   was?
 4   A.   It was presented to me as an oil and gas company.
 5   Q.   And this was their website.
 6   A.   I remember the picture.  I don't totally remember the
 7   website.
 8   Q.   Okay.
 9        MR. MOORE:  Your Honor, based off of that answer, I
10   would ask to reconsider the admission of this exhibit.
11        THE COURT:  Okay.  We'll take that up later.
12        Counsel, Mr. Lopez.
13        MR. LOPEZ:  I'd like to show him another --
14        THE COURT:  Well, we can take this one down.
15        MR. LOPEZ:  Yes, we can take this one down.
16        Can you bring up M2, just for the witness.
17        THE COURT:  Just for the witness yes.
18   BY MR. LOPEZ:
19   Q.   Do you remember seeing this on Harmonie International's
20   website?
21   A.   I remember seeing this before, but I don't remember seeing
22   it on the website.
23   Q.   What do you mean you remember seeing it before?
24   A.   I think John and Randall shared a copy of it with me.
25   Q.   So you didn't actually see it on the website?
```

```
 1    A.   I don't recall seeing it on the website.
 2    Q.   Okay.
 3              THE COURT:  Just so the record is clear, the exhibit
 4    that you were shown before that was up on the screen
 5    previously, is that how you remember it as well?
 6              THE WITNESS:  The picture?
 7              THE COURT:  Yeah, the first one.
 8              And can we go back to what was 47, don't publish it,
 9    just for the witness, Mr. Lopez.
10:02 10          MR. LOPEZ:  Yes.
11              THE COURT:  When you were asked about this one, had
12    you seen it on the website?
13              THE WITNESS:  I recall seeing this picture, but I
14    think it was in a documentation that was presented.
15              THE COURT:  You don't recall seeing it on a website?
16              THE WITNESS:  No.
17              THE COURT:  Mr. Lopez, you can move forward.
18              MR. LOPEZ:  Your Honor, this is from the Wayback
19    Machine, and we have a stipulation that --
10:03 20          THE COURT:  I understand.  I'll take that up with
21    counsel separately.
22              MR. LOPEZ:  All right.
23              THE COURT:  Thank you.
24              MR. LOPEZ:  Can I show him M3?
25              THE COURT:  Yes, just for the witness.
```

```
 1    BY MR. LOPEZ:
 2    Q.    Do you recall seeing this on Harmonie website?
 3    A.    No.
 4    Q.    At some point did you stop working for My Big Coin?
 5    A.    Yes.
 6    Q.    Approximately how long did you work for My Big Coin before
 7    you stopped working?
 8    A.    Through 2015.
 9    Q.    All right.  And did you find out why you were no longer
10:04 10    needed?
11          MR. MOORE:  Objection.
12    BY MR. LOPEZ:
13    Q.    If you know.
14          THE COURT:  Overruled.
15          If you know.
16    A.    I was disgruntled with Attorney Tracy in reference to the
17    stalls and things that weren't transpiring, and when they came
18    out with a new shell, Attorney Tracy convinced them that -- or
19    Randall and John that moving forward it would be a lot easier
10:04 20    for him to get his job done if I wasn't on the calls.
21          MR. LOPEZ:  No further questions.
22          THE COURT:  Thank you.
23          Counsel, just give me a moment just logistically here.
24    Mr. Moore, how long do you have approximately?
25          MR. MOORE:  Less -- five to ten minutes, your Honor.
```

```
 1                THE COURT:  Okay.
 2                (Discussion off the record.)
 3                THE COURT:  Mr. Lopez, just for your benefit, I had
 4      Ms. Hourihan reach out to the witness we're going to have
 5      electronically just to let him know we're delayed.  I'm
 6      inclined to just to keep continuing, but if there's someone on
 7      your team that wants to send a message to him, that's fine.
 8                MR. LOPEZ:  Thank you, your Honor.
 9                THE COURT:  Mr. Moore, you can proceed.
10:05 10                          CROSS-EXAMINATION
11      BY MR. MOORE:
12      Q.   Do you know who Kim Benge is?
13      A.   Say that name again.
14      Q.   Do you know who Kim Benge is?
15      A.   Yes.
16      Q.   Who is she?
17      A.   Randall's sister.
18      Q.   All right.  Are you aware that in 2014 that she was not
19      working for My Big Coin?
10:06 20      A.   No.
21                MR. MOORE:  Can we bring up 11II.
22      Q.   Do you see here in the attachments where it says "Benge
23      Employment Agreement"?
24      A.   Yes.
25      Q.   All right.  Do you know who drafted that Benge employment
```

```
 1    agreement?

 2    A.    Mr. Tracy.

 3          MR. MOORE:   Can we go to page 16 of this attachment.

 4    Q.    Do you see here where it says, "Signed by Kim Benge"?

 5    There's a little "s" with slashes and Kimberly Benge's name?

 6    A.    Yes.

 7    Q.    Do you know if she actually signed this document?

 8    A.    No.

 9    Q.    Do you know which bank account My Big Coin used?

10:07 10   A.    No.

11    Q.    So you don't know if the audit showed which bank account

12    My Big Coin used?

13    A.    I think it did show, but I don't remember the name of the

14    bank.

15    Q.    Did you know that money from My Big Coin was being

16    transferred into a Greyshore account in the name of Kim Benge?

17    A.    No.

18    Q.    Do you know what happened to that money after it went into

19    the account?

10:07 20   A.    No.

21    Q.    Randall Crater signed your initial consulting agreement

22    with My Big Coin, correct?

23    A.    Yes.

24    Q.    And your communications about My Big Coin were with

25    Randall Crater?
```

```
 1    A.    Randall Crater and John Roche.
 2    Q.    Okay.  And Randall Crater was the person who paid Adam
 3    Tracy, correct?
 4    A.    Yes.
 5    Q.    And from that money that he paid Adam Tracy, you were
 6    paid, correct?
 7    A.    Yes.
 8    Q.    And Randall Crater made the big decisions about My Big
 9    Coin, correct?
10:08 10          MR. LOPEZ:  Objection.
11                THE COURT:  Objecting to characterization?
12                MR. LOPEZ:  Yes.
13                THE COURT:  Okay.  Sustained as to form.
14                You can rephrase.
15                MR. MOORE:  All right.
16    BY MR. MOORE:
17    Q.    When you needed answers about what was happening with My
18    Big Coin, who did you go to?
19    A.    John or Randall.
10:08 20    Q.    And you don't have any idea if My Big Coin was a real
21    cryptocurrency, do you?
22    A.    No.  I never received any cryptocurrency, so I couldn't
23    say that.
24    Q.    And so all the information in that press release was just
25    stuff that was told to you, right?
```

```
 1    A.    Yes.

 2    Q.    All right.  You have no firsthand basis, knowledge of any

 3    of the things written in that press release.

 4    A.    Firsthand, no.

 5    Q.    Okay.

 6              MR. MOORE:  Thank you.  Nothing further.

 7              THE COURT:  Redirect?

 8              MR. LOPEZ:  No, your Honor.

 9              THE COURT:  Okay.

10:09 10         Thank you, sir.  You're excused.  Thank you.

11              Counsel, just give me a moment.

12              THE COURT:  So, Mr. Lopez, for the record, why don't

13    you call your next witness, and then I'll give an instruction

14    to the jury.

15              MR. LOPEZ:  Richard Galvin.

16              THE COURT:  Okay.  He may be called.

17              Jurors, for logistical reasons on the part of the

18    witness, the next witness you're going to hear from is via

19    Zoom.

10:10 20         It will just take us a moment -- when I say "we," I

21    mean Ms. Hourihan -- to set up the Zoom connection.  You should

22    consider this in the same way that you've considered and will

23    consider any of the live testimony.  The same rules will apply.

24    So it will just take us a moment to get this set up.

25              THE COURT:  Good morning, sir.
```

```
 1              THE WITNESS:  Good morning.

 2              THE COURT:  Give us a moment.

 3              (Discussion off the record.)

 4              THE COURT:  Mr. Galvin, in a moment we're going to

 5    swear you in and then the examination will begin.

 6              Can you speak up a little or --

 7              THE WITNESS:  Sure.  Is this okay now?

 8              THE COURT:  That's better.

 9              THE WITNESS:  Okay.

10:12 10        THE COURT:  And, Mr. Galvin, once you're sworn,

11    Mr. Lopez will conduct direct examination and then the

12    government attorneys will have the opportunity for cross-exam.

13              Again, if you can listen to the questions and just

14    answer the questions that are posed to you.  Okay?

15              THE WITNESS:  Yes, ma'am.  Yes, ma'am.

16              THE COURT:  Okay.

17              Ms. Hourihan, why don't we swear Mr. Galvin.

18              RICHARD GALVIN having been duly sworn by the Clerk,

19    was examined and testified as follows:

10:12 20        THE CLERK:  Thank you.

21              THE COURT:  Mr. Lopez.

22              MR. LOPEZ:  Thank you, your Honor.

23                        DIRECT EXAMINATION

24    BY MR. LOPEZ:

25    Q.   Good morning, Mr. Galvin.
```

```
   1    A.    Good morning.
   2    Q.    Can you please state your full name and spell your last
   3    name.
   4    A.    Sure.  My name is Richard Galvin, G-a-l-v-i-n.
   5          THE COURT:  Thank you.
   6    BY MR. LOPEZ:
   7    Q.    And Mr. Galvin, are you here pursuant to a subpoena?
   8    A.    Yes, sir.
   9    Q.    Okay.  And can you tell me your educational background.
10:13 10  A.    I graduated 12th grade at the Air Force Academy in 1972
  11    and did some years of insurance education and then some real
  12    estate licensing education.  And so I got an accredited college
  13    degree through all those different licensings.
  14    Q.    And are you currently employed?
  15    A.    Yes, sir.
  16    Q.    And what do you do?
  17    A.    Okay.  Well, for my entire life I've been involved in the
  18    insurance, real estate, oil and gas and mining business.  Since
  19    about 25 I've had my own company, Galvin Investment Company,
10:13 20  which has morphed into numerous other subsidiaries but mostly
  21    in oil and gas, mining and real estate development.
  22    Q.    Do you know an individual by the name of William Donahue?
  23          THE COURT:  Oh, we lost your sound.
  24    A.    Repeat, please.
  25    Q.    Yes.  Do you know an individual by the name of William
```

 1    Donahue?

 2    A.    Yes, sir.  Never met the man personally in person, but I

 3    do know of him, yes.

 4    Q.    And directing your attention to the time period of 2013-

 5    2014, did you hire Mr. Donahue to do something for you?

 6    A.    Let me start from the beginning, if I may.

 7              THE COURT:  Mr. Galvin, if you could just answer the

 8    questions given to you.  Given obviously the requirements of

 9    the trial, we have to have questions and answers.

10:14  10             So, Mr. Lopez, if you'd repeat the question, and I'd

11    just ask, Mr. Galvin, if you can speak as close as you can to

12    the speaker on your end, the microphone on your end, that would

13    be helpful.

14              THE WITNESS:  Sure.

15              THE COURT:  Mr. Lopez.

16    BY MR. LOPEZ:

17    Q.    Directing your attention to, let's say, 2012 to 2014, did

18    you have occasion to hire Mr. Donahue to do something for your

19    company?

10:15  20    A.    I'm sorry, I'm getting disrupted by calls here, I

21    apologize.  I am a busy man and unfortunately it's breaking up

22    the Zoom.

23              Billy Donahue, no, no, he was not hired by me.

24    Q.    Was he hired by one of your companies --

25    A.    Sorry.  It took me off my earpiece, so I have to apologize

```
  1    here.  See if I can get it back.
  2    Q.   Can you hear me?
  3             Mr. Galvin, can you hear me?
  4             THE CLERK:  We lost him.
  5             THE COURT:  Why don't we see if he Zooms back in.
  6             (Pause.)
  7             THE COURT:  Mr. Galvin, can you hear us?
  8             THE WITNESS:  Okay.  Sorry about that.  I apologize.
  9    But when calls come in, it knocks me off from being able to
10:18 10    hear you.  So I apologize for that.
 11             THE COURT:  Thank you.
 12             Mr. Lopez.
 13    BY MR. LOPEZ:
 14    Q.   At some point was Mr. Donahue hired to fund your company?
 15    A.   We contracted to fund the company, yes.
 16    Q.   Okay.  And when was that?
 17    A.   Well, the first initial contract was done in 20 -- March
 18    24, 2013 --
 19             MR. MARKHAM:  Objection, your Honor.  He's -- well --
10:18 20             THE COURT:  So, Mr. Galvin, you need to testify from
 21    your own memory and not from any documents.
 22             THE WITNESS:  Okay.
 23             THE COURT:  Thank you.
 24             THE WITNESS:  Very good.  It's been a while.  2013 is
 25    a long time ago.
```

```
 1              THE COURT:  Understood.
 2              Mr. Lopez.
 3              MR. LOPEZ:  Yes.
 4  BY MR. LOPEZ:
 5  Q.   Mr. Galvin, can you tell me what high grade concentrate
 6  is?
 7  A.   Yeah, high grade concentrates are material that once you
 8  take the ore from the bowels of mother earth, if you will, and
 9  you take all the silicas and sands away, you come up with what
10  they call the heavies.  Those heavies are considered in the
11  industry high-grade concentrates.  They hold the microscopic
12  particles of gold, platinum, palladium and iridium, PGMs.
13  Q.   Do you or your company own any high-grade concentrates?
14  A.   Yes, we do.  We have 500 barrels, about 1 ton per barrel,
15  in a bonded warehouse in El Paso, Texas, have for close to 30
16  years now.
17  Q.   Now, I sent you a number of documents yesterday for you to
18  review.
19  A.   Yes, sir.
20  Q.   And I'll state for the record that it was a portion of
21  12A, which has been admitted.
22              THE COURT:  Yes.
23              THE WITNESS:  Okay.
24  BY MR. LOPEZ:
25  Q.   And I direct your attention to the document entitled
```

```
 1    "Corporate Resolutions."
 2            THE COURT:  In 12A?
 3            MR. LOPEZ:  In 12A.
 4            THE WITNESS:  Am I able to pull that up and look at it
 5    now?
 6            THE COURT:  You may.
 7            MR. LOPEZ:  You may.
 8            THE WITNESS:  All right, very good.  Hold on one
 9    second, please.
10:20 10          That was on Tuesday, July 19, right?  There it is.
11            Let me open it up.  Okay.  Corporate resolution, there
12    you go.
13    BY MR. LOPEZ:
14    Q.   And that corporate resolution in the first paragraph
15    appears to be dated January 29, 2014?
16    A.   That's correct.
17            MR. LOPEZ:  Mr. Sweeney, could you pull up 12A.
18            THE COURT:  So, counsel, because we're on Zoom, we
19    can't do both things at once.
10:20 20          MR. LOPEZ:  Okay.  So let me put it in ELMO.  No.
21            THE COURT:  So all one system.
22            MR. LOPEZ:  So, okay.
23    BY MR. LOPEZ:
24    Q.   Can you go to page 2 of that document, corporate
25    resolutions.
```

```
 1    A.    Yes, sir.  I have it.

 2    Q.    And do you see a name in the middle of that page?

 3    A.    William Donahue.  Is that what you're referring to?

 4    Q.    Yes.  Can you read what it says there, William E. Donahue.

 5    A.    Yeah, William E. Donahue, Jr., country and citizen of the

 6    United States of America, passport number 4342 --

 7    Q.    No, no, I'm talking about the middle page 2 where --

 8    A.    I'm on page 2.

 9          THE COURT:  And might I suggest here --

10:21 10    A.    What number?

11          THE COURT:  -- Mr. Lopez, if you read it to the

12    witness and see if he --

13    BY MR. LOPEZ:

14    Q.    Can you find the page that has "William E. Donahue, Jr.,

15    director, principal facilitator and fund manager Galvin

16    Investments, LLC"?

17    A.    Oh, yes, that's on page 3 in my --

18    Q.    Okay.  Apologize.

19          What did you understand that corporate resolution to

10:22 20    do?

21    A.    Well, my recollection, the best I remember, was William

22    needed to be part of my company in order to facilitate his own

23    credit facility to fund my company.  This is one of his many

24    requests that he had from me in order to get a $100 million

25    standby letter of credit.
```

```
 1   Q.   Now, can you go through the pages until you get to a

 2   document dated October 12, 2011 entitled DRRF Metals, Inc.?

 3   A.   Sure.  Sure.  I'm there, October 12, 2011, that's page 6

 4   in my --

 5   Q.   And who is that addressed to?

 6   A.   It's addressed to Richard Galvin.

 7   Q.   That would be you.

 8   A.   That's correct, Galvin Investment Companies, Galvin

 9   Metals, mm-hmm.

10:22 10   Q.   And what is the purpose of that document?

11   A.   Well, it was -- Dr. Finch, DRRF Metals, is a nuclear

12   scientist doctor that had taken samples from my barrels after

13   they were processed by Ledoux & Company and others, Dr. Noee,

14   there was many people around these barrels while they were

15   being sampled for its content.

16        And those samples were then put together and sent out to

17   Dr. Finch for him to review through his XRF, which is an x-ray

18   type machine, to find out what microscopic particles are in

19   these complex metals.  And that's what he did, he performed

10:23 20   what they call an assay.

21   Q.   Okay.  An assay.

22        Now, going through the next pages, there's a series of

23   pages which appear to be resumés.

24   A.   Well, the assay reports were done -- I call myself assayed

25   to death.  I had so many people --
```

```
 1    Q.   Sir --
 2              THE COURT:  Well, Mr. Galvin, if you could wait for
 3    the next question, Mr. Lopez will put it to you.
 4              THE WITNESS:  Sure.
 5              THE COURT:  Thank you.
 6    BY MR. LOPEZ:
 7    Q.   Would you agree with me these are resumés of assayers?
 8    A.   Yes, sir.
 9    Q.   Can you now turn to the page that lists assay reports.
10:24 10   A.   Sure.  I think that's page -- there it is, 7 in mine, yup.
11    Q.   You see that?
12    A.   Page 7, yes.
13    Q.   It looks like there's listed seven assay reports on the --
14    A.   Yeah, seven different companies.
15    Q.   On the concentrate held by Galvin Investments?
16    A.   That is correct.
17    Q.   And that lists Mineral Worlds, Inc., DRRF Metals, Inc.,
18    DBS Minerals Research, Inc., Roger J. Smid, Gilman Metals
19    Company LLC, Technodynamics LLC, and ChemSep Corporation.
10:25 20   A.   Yes, sir.
21    Q.   Are those all, as far as you know, legitimate assay
22    reports?
23              MR. MOORE:  Objection.
24    A.   Oh, yes.  Oh, yes.
25              MR. LOPEZ:  And how do you know that?
```

```
 1              THE COURT:  Overruled.  The answer may stand.
 2   BY MR. LOPEZ:
 3   Q.   How do you know that?
 4   A.   Well, because I worked with all of them.  I was there on
 5   most of them, in the labs when they were being conducted.
 6   Q.   Okay.  Now, sir, did you ever authorize Mr. Donahue to
 7   share those documents that we just went through with any other
 8   company?
 9   A.   No, no, that was for internal use only because he was my
10   lender.  There was no other reason for it to go out to anyone.
11   Q.   Okay.  Now --
12   A.   He would have to have my authorization as well.
13              THE COURT:  Mr. Galvin, just wait for the next
14   question, okay.  Thank you.
15              THE WITNESS:  Yes, ma'am.
16              MR. LOPEZ:  If I could just have a moment, your Honor.
17              THE COURT:  Sure.
18              MR. LOPEZ:  If you could bring up 12E.
19   BY MR. LOPEZ:
20   Q.   Now, sir, turning to the documents that I sent you from
21   Broker Logistics Limited with an invoice date of 12/1/2014.
22   A.   Okay.
23   Q.   Made out to Galvin Investment Companies LLC?
24   A.   That's correct.
25   Q.   Okay.  And looking at the first page, which appears to be
```

```
 1   a list of metals, can you tell me what that is?
 2   A.   When you say a list of metals, this Broker Logistics sheet
 3   to me, invoice number 129445, invoice date 12/1/14, is a list
 4   of the barrels and its locations in the warehouse with serial
 5   numbers.  Nothing to do with what metal content is involved.
 6   Q.   Understood.  But what's it an invoice for?
 7   A.   Oh, that's my invoice that I get every month, have for
 8   over 20 years, still getting them today, is for the payment of
 9   the rents for the insurance and the storage of those in a
10   bonded warehouse in El Paso, Texas.
11   Q.   When you say "storage," are you referring to the 500
12   barrels of concentrate you own?
13   A.   Yes, sir.
14   Q.   Did you ever authorize Mr. Donahue to share those
15   documents with anyone else?
16   A.   No, sir.  There would be no -- I would not want that for
17   various reasons.  So, no.
18   Q.   And now I direct your attention to the last document I
19   sent you yesterday, which is an email --
20   A.   Hold on.
21   Q.   Can you read the top of that email?
22   A.   I'm getting to it.
23        Which page are you on?
24   Q.   I believe it's the last page of the set I sent you.
25   A.   Okay, the last page, okay.  52.  All right.  Hold on.
```

```
 1              Okay, there we are, mm-hmm.

 2    Q.   Do you see that email?

 3    A.   Yeah.  It's partnership portfolio commitment by --

 4    Q.   To MBC and now MBCPay.

 5    A.   Yeah, I'm on that page.

 6              THE COURT:  We'll just make this, for the record, XX.

 7              MR. LOPEZ:  Okay.

 8              THE COURT:  Thank you.

 9              (Exhibit XX marked for identification.)

10:28 10   BY MR. LOPEZ:

11    Q.   And that's an email that you wrote?

12    A.   Yes, sir.

13    Q.   And it was sent to --

14    A.   -- My Big Coin --

15              THE COURT:  So, Mr. Galvin, the court reporter needs

16    to transcribe everything.  So I want to make sure people don't

17    talk over each other.

18              Mr. Lopez, you may ask a question.

19    BY MR. LOPEZ:

10:29 20   Q.   I'll get through everything.  Just answer the question

21    that I ask.

22              Is that an email that you wrote?

23    A.   Yes, sir.

24    Q.   And is it sent to MyBigCoin@gmail.com?

25    A.   Yes, sir.
```

```
 1   Q.   And billy@hiinternational.com?  Or hiintl.com.

 2   A.   Yeah, yeah, Billy and Stuart both.

 3   Q.   And is that Billy@hiintl.com Billy Donahue?

 4   A.   Yes, yes, sir.

 5   Q.   And StuartBorland@hiintl.com?

 6   A.   Yes, sir.

 7   Q.   Is that Stuart Borland?

 8   A.   Yes, sir.

 9   Q.   And do you know whether Stuart Borland works with

10   Mr. Donahue?

11   A.   My understanding they did.

12   Q.   Now, this email reads:  Dear John, I'm aware of our HI --

13            THE COURT:  Well, counsel, are you offering it?

14            MR. LOPEZ:  Sure, I'll offer it.

15            THE COURT:  Any objection?

16            MR. MOORE:  No, your Honor.

17            THE COURT:  It may be admitted as -- I think we're up

18   to 47, Ms. Hourihan.

19            THE CLERK:  48.

20            THE COURT:  48, all right.  48.

21            (Exhibit 48 received into evidence.)

22   BY MR. LOPEZ:

23   Q.   In this email you write, Dear John.

24            Did you know who John was?

25   A.   No, this is a letter I was requested by Billy to do.
```

1    Q.   I'll get to that.

2         I'm aware of our HI lower/Galvin 100 M partnership

3    portfolio commitment to MBC and now MBCPay.  We hope to have

4    much success with this portfolio investment and look forward to

5    receiving good news and a return on our partnership's portfolio

6    investments.  Billy says yes, we say yes.  Sincerely Richard

7    Galvin, principal, partner, director.

8         Did I read that correctly?

9    A.   That's what I see.  Yes.

10:31 10   Q.   Why did you send that email?

11   A.   Well, as instructed by Billy at that time, had gained my

12   confidence to do whatever he requested to get the $100 million

13   standby letter of credit and funding of my company.  Numerous

14   requests that Billy had.  He said cut and paste and please send

15   this, so I did as a request from him.  I didn't know who I was

16   sending it to or who My Big Coin was.  Billy said to say it's a

17   partner of ours, just send it.

18   Q.   Did you ever intend to commit your 500 barrels of

19   concentrate to My Big Coin?

10:31 20   A.   No, sir.

21   Q.   My Big Coin Pay?

22   A.   No, sir.

23   Q.   Did you ever authorize Billy Donahue to offer your 500

24   barrels of concentrate to My Big Coin or My Big Coin Pay?

25   A.   No, sir.  You'd have to have a corporate resolution for

```
 1   that.  I did not authorize him, no.
 2   Q.   One final question, Mr. Galvin.  The 500 barrels do, in
 3   fact, contain concentrate, right?
 4   A.   That's correct.  That's correct, mm-hmm.
 5          MR. LOPEZ:  Thank you.
 6          No more questions, your Honor.
 7          THE COURT:  Thank you.
 8          Cross-examination, Mr. Markham.
 9                     CROSS-EXAMINATION
10   BY MR. MARKHAM:
11   Q.   Mr. Galvin, can you see me and hear me?
12   A.   Yes, sir.
13   Q.   Okay.  So you just testified that you never committed $100
14   million of anything to My Big Coin, right?
15   A.   Absolutely not.
16   Q.   And certainly if you never committed $100 million of
17   anything, you never committed $300 million of anything, right?
18   A.   That's correct.
19   Q.   And you have never spoken to Randall Crater?
20   A.   No, sir, not to my recollection or knowledge.
21   Q.   You talked about these barrels that are in a warehouse in
22   El Paso.
23   A.   Correct.
24   Q.   And those barrels contain what's called mined waste
25   material; is that right?
```

A.   It's high-grade concentrates.  We've taken all the silicas and sands away from the mine waste and got what we called the heavies.  Therefore, they become a high-grade concentrate that can be refined.

Q.   And those originally came from a Superfund site?

A.   Yes, sir.

Q.   And the Superfund site -- a Superfund site is an area that the government has deemed to be filled with toxic waste materials, right?

A.   That is correct.

Q.   And those barrels have been in El Paso since 1996?

A.   That's correct.

Q.   And there's no gold bullion in those barrels, right?

A.   No, no, of course not.

Q.   And you never told anyone that there's gold bullion in those barrels.

A.   I couldn't, no, that would be a lie.

Q.   That would be dishonest.

A.   That's correct.

Q.   And so to the extent there's potential for some amount of money or precious materials in those barrels, you'd have to have a very specialized technology to extract it, right?

A.   That is correct.  We patented a process to do that and it's a nuclear -- it takes nuclear science.  If you want me to go into it, I can, but, yes, it's a very unique process.

1    Q.    Okay.  So there's no gold bullion in those barrels, and if
2    you want to get anything out of those barrels, you need to be a
3    nuclear scientist?
4    A.    You would have to have the nuclear formulas, that's
5    correct.
6    Q.    That would take a lot of money, right?
7    A.    It has, yes.
8    Q.    Right, it's 2022, and those barrels have been there since
9    1996 from the start, right?
10:35 10    A.    Yeah, they have, that's correct.
11   Q.    Fair to say that would take a lot of time?
12   A.    Time and money, about $50 million so far has been invested
13   in this process to get a patented process and a first plant
14   built, which is a small prototype production plant.  So, yes,
15   it's very expensive.
16   Q.    Just like the way you have it, you couldn't just sell that
17   gold one day to pay someone else, it would take you $50
18   million, 30 years, and some nuclear scientists?
19   A.    No, you'd have to have access, correct.
10:35 20   Q.    Okay.  You never gave those barrels to Randall Crater,
21   correct?
22   A.    No, sir.
23   Q.    And you never told Randall Crater that there's $300
24   million worth of anything in those barrels?
25   A.    No, sir.

1    Q.   And those barrels are not located in Spain in a bank,

2    right?

3    A.   Well, the last time I got my bill, which was this month,

4    they're still in Texas as far as Broker Logistics tells me.  I

5    could down and inspect.  They're still there.

6              MR. MARKHAM:  Thank you, Mr. Galvin.

7              THE COURT:  Thank you.

8              Any redirect?

9                        REDIRECT EXAMINATION

10   BY MR. LOPEZ:

11   Q.   At some point did you learn that one of the assayers had

12   put -- or one of the assay reports had Harmonie International

13   on it?

14             MR. MARKHAM:  Objection, outside the scope.

15             THE COURT:  Well, scope, counsel, scope objection,

16   Mr. Lopez.

17             MR. LOPEZ:  Mr. Donahue is with Harmonie

18   International.

19             THE COURT:  But the objection is scope of cross-exam,

10:36 20   counsel.

21             THE WITNESS:  Do I need to answer that or no?

22             THE COURT:  No, I'm waiting for Mr. Lopez.  If you can

23   hold on for a moment.

24             THE WITNESS:  Okay, very good.  Sure, sure.

25   BY MR. LOPEZ:

1    Q.    Did you ever authorize Mr. Donahue to tell anyone that

2    your barrels of concentrate were worth $100 million?

3    A.    No, sir.

4             MR. LOPEZ:  Thank you.

5             THE COURT:  Any recross?

6             MR. MOORE:  No, your Honor.

7             THE COURT:  Thank you, sir.

8             Thank you, Mr. Galvin.  We appreciate it.

9             THE WITNESS:  Yes, ma'am.

10:37 10      (Discussion off the record.)

11            THE COURT:  And, Mr. Lopez, I would give you

12    permission to briefly publish to the jury 12A and 12E and what

13    we've now marked as 48, just so they can see it.

14            I believe they've seen 12A and 12E, but if you wanted

15    to just briefly do that.

16            THE COURT:  Okay.  So 12A is fine.

17            MR. LOPEZ:  Joe, could you just scroll through the

18    pages of 12A.

19            THE COURT:  And I'll just say 12A is being published.

10:38 20      MR. LOPEZ:  Just slowly.

21            And then the corporate resolution.

22            (Showing document.)

23            MR. MARKHAM:  Your Honor, I think we've gone past the

24    page that the witness actually went over.

25            MR. LOPEZ:  No, we haven't.

```
          1            THE COURT:  I think there was actually reference to
          2     these, so keep going.
          3            (Showing document.)
          4            THE COURT:  Oh, Mr. Markham, is your point he wasn't
          5     asked about each of these pages?  It was just --
          6            MR. MARKHAM:  We're just now doing a 68-page
          7     presentation document --
          8            THE COURT:  Sure.  Mr. Lopez, I think that's correct.
          9     I think it was about the cover sheet.
10:40    10            Can we move onto 12E.
         11            12E is being published.
         12            (Document shown.)
         13            THE COURT:  Counsel, I think the last one was 48,
         14     what's now 48.
         15            MR. LOPEZ:  Yes, your Honor.
         16            THE COURT:  Do you want to switch to the ELMO?
         17            MR. LOPEZ:  I do, but I want to go back to the first
         18     page of 12E.
         19            MR. MARKHAM:  Your Honor, we'll have closing arguments
10:41    20     today.
         21            THE COURT:  Counsel, I think 12E has been published
         22     already, but I can -- you can go to 48.
         23            And this is what's now 48.
         24            MR. LOPEZ:  Yes.
         25            THE COURT:  Thank you.
```

1              (Document shown.)

2              THE COURT:  Counsel, next witness.

3              MR. LOPEZ:  Yes, your Honor.  It will be Tom Callahan,

4    your Honor.

5              THE COURT:  He may be called.

6              MR. LOPEZ:  Let me go get him.

7              (Pause.)

8              MR. LOPEZ:  Thomas Callahan.

9              THE COURT:  He may be called.

10:43 10         THE CLERK:  Mr. Callahan, you can take the witness

11   stands.

12             THOMAS CALLAHAN, having been duly sworn by the Clerk,

13   was examined and testified as follows:

14             THE CLERK:  Thank you.

15             THE COURT:  Good morning, sir.

16             THE WITNESS:  Good morning.

17             THE COURT:  Mr. Lopez.

18             MR. LOPEZ:  Yes.

19                       DIRECT EXAMINATION

20   BY MR. LOPEZ:

21   Q.   Could you please introduce yourself to the jury spelling

22   your last name, sir.

23   A.   Yes, my name is Thomas Callahan.  Last name is spelled

24   C-a-l-l-a-h-a-n.

25             THE COURT:  Thank you.

```
 1    BY MR. LOPEZ:
 2    Q.   And are you here pursuant to a subpoena?
 3    A.   I am.
 4    Q.   How far did you go in school, sir?
 5    A.   I am a PhD candidate.  I finished all the course work, did
 6    not take the comps or do a dissertation.
 7    Q.   That's the hardest part.
 8    A.   Some would say that.
 9    Q.   Are you familiar with a company by the name of My Big
10    Coin?
11    A.   I am.
12    Q.   And how are you aware of that?
13    A.   I was introduced to it by a gentleman by the name of John
14    Lynch.
15    Q.   And what is your relationship with Mr. Lynch?
16    A.   Friends of 40-plus years.
17    Q.   And what did you learn Mr. Lynch had done for you?
18    A.   I got a call one Sunday morning and he told me about this
19    investment and he suggested it to me, and I told him at the
20    time I didn't think I had the money to do it.  He said, Listen,
21    if it works out, you pay me back.  If it doesn't work out, I
22    won't chase you.  So, in essence, it was a non-recourse loan.
23    Q.   As a result of that conversation, did you become aware
24    that he purchased some My Big Coin coin on your behalf?
25    A.   Yes.
```

```
 1   Q.   And that he paid for it?

 2   A.   Yes.

 3   Q.   Okay.  And I take it you haven't paid for any My Big Coin

 4   that you own?

 5   A.   I also bought an additional $3,000 with my own funds.

 6   Q.   Okay.

 7        So how many My Big Coins do you currently own?

 8   A.   I forget the exact number, but the total investment was a

 9   little bit north of 22,000.

10   Q.   Okay.  Now, before you purchased your coin personally, did

11   you speak to Mr. Crater?

12   A.   I've never spoken to Mr. Crater.

13   Q.   Did you speak to Mr. Gillespie?

14   A.   I have spoken to Mark.

15   Q.   Was it before you purchased the $3,000?

16   A.   My only conversations with Mark Gillespie related to a

17   credit -- a debit card, rather.  And I was having an issue with

18   the debit card and I got his number from John Lynch and I

19   called Mark and he called the bank and they needed some

20   additional paperwork from me and that resolved the issue on the

21   debit card.

22   Q.   And were you able to use a debit card?

23   A.   Yes.

24   Q.   Do you remember the name of the debit card?

25   A.   It said UltraCard on it.
```

10:45 (line 10)
10:46 (line 20)

1    Q.    And did it have your name on it?

2    A.    It had "preferred customer."

3    Q.    And when you received the card, did you register the card?

4    A.    In terms of registering with the bank?

5    Q.    Yes.

6    A.    Yeah, and I put funds in it and I used the card.

7    Q.    And where did you use the card?

8    A.    I used it at a bunch of different places just to see if it

9    would work.  Also, in the summer of 2016, I was going to be

10:46 10   going to Miami Beach area.  A friend of mine was relocating to

11   that area, and I used it -- I think I might have used it to pay

12   for the hotel at the time, but I kind of put money aside for a

13   vacation fund and put it on that card and it worked.

14   Q.    Now, when you personally purchased coin, did you evaluate

15   the risk involved?

16   A.    Oh, yeah.  Yeah, I mean, it was a very speculative

17   investment.  I was aware of that.

18   Q.    Based on your conversations with Mr. Lynch, was he aware

19   of it?

10:47 20        MR. MOORE:  Objection, your Honor.  Calls for

21   speculation.

22        THE COURT:  Well, sustained as to this.

23   BY MR. LOPEZ:

24   Q.    When you spoke to Mr. Lynch, did he say anything to you

25   about the coin being backed by gold?

1          MR. MOORE:  Objection, hearsay.

2          THE COURT:  Well, offered for effect on the listener

3     presumably, so overruled.

4          You can answer, sir.

5     A.   I don't know specifically.  I know I saw it on a web page.

6     Q.   At some point in the future?

7     A.   Yeah, at some point in the process.  I mean, the original

8     investment was I think 2014.

9     Q.   Okay.  And you had no difficulty using the credit card.

10:48 10  A.   Except that one time and Mark Gillespie called the bank

11    and it was, I believe, in Georgia -- I thought Georgia, South

12    Carolina, but I think it was in Georgia -- and he found out

13    they needed me to update the copy I sent them of my license,

14    maybe my license expired or something, but he got the actual

15    reason, you know, I couldn't either check my balance online or

16    use the card, and he found out exactly what I needed to do, and

17    I did it and I started using the card.

18    Q.   And thereafter you were able to use the card you received

19    from My Big Coin?

10:49 20  A.   Yeah.

21         MR. LOPEZ:  No further questions.

22         THE COURT:  Counsel, cross-exam.

23         MR. MOORE:  Yes, your Honor.

24         THE COURT:  Mr. Moore.

25                    CROSS-EXAMINATION

```
 1    BY MR. MOORE:
 2    Q.   You've been to the My Big Coin website before?
 3    A.   Yes.
 4    Q.   And you remember seeing on there that My Big Coin was
 5    backed by gold?
 6    A.   There was something on the original website that said
 7    that, yes.
 8    Q.   And do you remember the My Big Coin YouTube video?
 9    A.   I'm sure I looked at it if there was a link, you know.
10    Q.   Do you remember a video being embedded on the My Big Coin
11    page?
12    A.   I'm not sure if I saw it on that or something else I saw
13    online, to be honest with you.
14    Q.   But you do have a recollection of a video?
15    A.   There was some video.  I'm sure I clicked on it and
16    watched it.
17    Q.   It was a video about My Big Coin?
18              MR. LOPEZ:  Objection.
19              THE COURT:  Counsel, basis here?
20              MR. LOPEZ:  I mean, it's -- I know it's
21    cross-examination and it's leading, but it's going into the
22    actual substance.
23              THE COURT:  Well, so far -- overruled as to the
24    questions so far, counsel.
25              MR. LOPEZ:  Okay.
```

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | THE COURT:  I'm listening.                                           |
| 2  | Mr. Moore.                                                           |
| 3  | BY MR. MOORE:                                                        |
| 4  | Q.   The video you recollect was a video about My Big Coin?          |
| 5  | A.   Yeah, it was about it.  I don't remember any of the             |
| 6  | details, though.                                                     |
| 7  | Q.   You followed My Big Coin on Twitter, correct?                   |
| 8  | A.   Yeah, I have a Twitter account and that was one of the          |
| 9  | ones I followed, yes.                                                |

10:50 10   Q.   And you signed up for Twitter to follow My Big Coin,
      11   right, that was one of the reasons you signed up?
      12   A.   There was a couple of reasons.  That was one of them.
      13   Q.   Do you remember seeing tweets about My Big Coin on
      14   Twitter?
      15   A.   I tell you most of the tweets were, you know, Happy 4th of
      16   July and stuff like that.  I don't recall that many that were
      17   even pertaining to the investment itself.
      18   Q.   Okay.  But there were at least some tweets about the
      19   investment.
10:51 20   A.   I'm sure there probably were, but, you know, I would get
      21   notice of a tweet and it would be a Happy 4th of July and
      22   things like that, Merry Christmas, Happy Thanksgiving.
      23   Q.   And when you saw on the My Big Coin web page that it was
      24   backed by gold, you relied upon that, correct?
      25              MR. LOPEZ:  Objection.

```
 1   A.    No.
 2         THE COURT:  Well, overruled.  You can answer.
 3   A.    No, because the investment was made before any mention of
 4   gold.
 5   Q.    But did you think that that was significant, My Big Coin
 6   being backed by gold?
 7   A.    I thought it was interesting, but the investment had
 8   already been paid.
 9   Q.    And that investment was --
10   A.    The original investment.
11   Q.    Most of that was made by John Lynch?
12   A.    On my behalf, yes.
13   Q.    Do you remember being asked questions about the My Big
14   Coin UltraCard you received?
15   A.    In terms of questions --
16   Q.    On cross-examination do you remember being asked about
17   that?
18         THE COURT:  You mean on direct examination.
19   BY MR. MOORE:
20   Q.    I'm sorry, on direct examination.
21   A.    Right, yeah.
22   Q.    That was just a normal prepaid debit card, right?
23   A.    Yeah, it was a prepaid debit card.
24   Q.    You couldn't use your My Big Coins with that card, could
25   you?
```

1    A.    It never got to that point.

2    Q.    So the cash that you spent was just your own cash you

3    loaded on the card?

4    A.    Yeah, yeah, exactly.

5    Q.    And even after you loaded your own card, didn't you have

6    to, like, activate the card?

7    A.    Well, when you receive the card in the mail, you activate

8    it.  And I would go online and I could follow my balance

9    online.  If I went and put $200 on, I'd go back to the computer

10:52 10  and confirm that the $200 was on my card.

11   Q.    So this is just like a prepaid debit card you can get at

12   CVS?

13   A.    Well, I wouldn't go that far.  One thing that was

14   interesting to me, when I had a problem with it, Mark Gillespie

15   was able to call the bank directly and get an answer for you.

16   Q.    Are you aware that with prepaid cards at CVS, you can also

17   card the bank, are you aware of that?

18   A.    Yeah, if you're the credit card holder, but I wasn't --

19   but Mark wasn't.  Mark wasn't the debit card holder.  I was.

10:53 20  Q.    So the interesting thing about that was that Gillespie had

21   access to your account as well?

22   A.    Well, it was of interest to me that Mark was able to call

23   and find out the reason I couldn't access my balance online or

24   the card didn't work or I couldn't put money on the card.  I

25   don't recall exactly which reason it was that I called Mark,

```
 1    but it wasn't -- I wasn't able to either access my balance or
 2    something, and Mark made a phone call and said, You got to send
 3    them photo of your -- or picture of your current driver's
 4    license and then maybe another piece of paper.  And then the
 5    card worked.
 6    Q.   So as far as you're aware, the prepaid debit card you
 7    received was not actually connected to your My Big Coin account
 8    in any way?
 9    A.   I don't think it ever got to that point.
10          MR. MOORE:  Thank you.  Nothing further.
11          THE COURT:  Any redirect?
12                      REDIRECT EXAMINATION
13    BY MR. LOPEZ:
14    Q.   On that last point, when you say it never got to that
15    point, what do you mean by that?
16    A.   Well, the understanding was that at some point we would be
17    able to -- they were going to transition that card to a card
18    that actually said My Big Coin on it.  It would be used, be
19    able to use it at ATMs.  I mean, part of this as all connected
20    to accessing the marijuana market and they were able to
21    circumvent the need to use cash transactions at marijuana
22    stores.  That was part of the whole thing.
23    Q.   Do you know why it never got to that point?
24          MR. MOORE:  Objection.
25          THE COURT:  What, foundation, counsel?
```

```
 1              MR. MOORE:  Yes, your Honor.
 2              THE COURT:  You can lay the foundation.
 3      BY MR. LOPEZ:
 4      Q.   Do you know why it never got to that point?
 5              THE COURT:  Well, that's the same question, so
 6      sustained.
 7              You can try to lay the foundation, counsel.
 8      BY MR. LOPEZ:
 9      Q.   Do you have personal knowledge as to why it didn't get to
10      that point?
11      A.   There was a law case filed by the CFTC.
12              MR. MOORE:  Objection, your Honor.
13              THE COURT:  Well, sustained as to that.  It's struck.
14              MR. LOPEZ:  Thank you, Mr. Callahan.
15              MR. MOORE:  Just one question.
16              THE COURT:  Recross.
17                          RECROSS-EXAMINATION
18      BY MR. MOORE:
19      Q.   All the stuff that you know about the My Big Coin card,
20      that came from Gillespie, right?
21      A.   No, I mean, I got stuff in the mail, and I had -- the only
22      person I talked to on the phone regarding it was when I had a
23      problem, I got Mark's number and I called Mark and he called
24      the bank and it got straightened out.
25              MR. MOORE:  Thank you.  Nothing else.
```

```
 1              THE COURT:  Thank you.
 2              Thank you, sir.  You're excused.  Thank you.
 3              MR. LOPEZ:  Your Honor, one more brief witness, but I
 4     don't know if he's here.  If I can have a second.
 5              THE COURT:  Sure, sure.
 6              Jurors, I'm aware of the time, but I also understand
 7     this is a brief witness from both sides, I believe.
 8              (Pause.)
 9              MR. LOPEZ:  The defense calls Larry Brantley.
10:56 10              THE COURT:  He may be called.
11              LARRY BRANTLEY, having been duly sworn by the Clerk,
12     was examined and testified as follows:
13              THE CLERK:  Thank you.  Please be seated.
14              THE COURT:  Good morning, sir.  Good morning.
15              THE WITNESS:  Hi.
16              THE COURT:  And, sir, can you turn the microphone.
17     Thank you.
18              Mr. Lopez.
19                        DIRECT EXAMINATION
20     BY MR. LOPEZ:
21     Q.   Can you introduce yourself to the jury and spell your last
22     name.
23     A.   Larry Brantley, B-r-a-n-t-l-e-y.
24              THE COURT:  Thank you.
25     BY MR. LOPEZ:
```

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  | Q. | And, sir, how far did you go in school?                      |
| 2  | A. | Bachelor's degree in business.                              |
| 3  | Q. | And are you currently employed?                             |
| 4  | A. | Yes.                                                         |
| 5  | Q. | Where are you employed?                                      |
| 6  | A. | Calgon Carbon Corporation.                                   |
| 7  | Q. | And where do you live?                                       |
| 8  | A. | I live in Slidell, Louisiana.                                |
| 9  | Q. | And where is that near?                                      |

10:57 10   A.   Beg your pardon?

11   Q.   Where is that near?

12   A.   It's near New Orleans, across Lake Pontchartrain.

13   Q.   Are you familiar with a company by the name of My Big

14   Coin?

15   A.   Yes.

16   Q.   How are you -- when did you first become aware of it?

17   A.   Through Mark Gillespie.  We were involved with a company

18   called ATIG, Atlantis Internet Group, and we were investors in

19   that group and I was looking for a different -- other

10:58 20   investments and this came about and he said I could get in with

21   My Big Coin.

22   Q.   Okay.  And at some point did you get involved?

23   A.   Yes.

24   Q.   Okay.  And what did you understand My Big Coin to be?

25   A.   It was fairly new, new at the time.  I never heard of

1    cryptocurrencies, but it was -- I did a little research at that

2    time, it was like the Bitcoin.  And at that particular time the

3    Bitcoin was like $100 a share, and this was I think it was

4    starting off similar.  I think it was $70 a share when I got

5    involved maybe.

6    Q.   Do you recall what Mr. Gillespie told you about My Big

7    Coin before you decided to invest?

8    A.   Beg your pardon?

9    Q.   Do you recall what Mr. Gillespie told you before you

10:59 10   decided to invest?

11   A.   Basically I could get in on the ground floor.  It was

12   brand new and it was just starting.

13   Q.   Okay.  Did you evaluate the risk involved?

14   A.   Yeah, I mean, it was always some risk.  It was similar to

15   ATIG.  It was the ground floor.  And I figured if I got in on

16   the ground floor, I might make a substantial amount of money.

17   Q.   Did any of your family members also purchase coins?

18   A.   Yes.

19   Q.   Who?

10:59 20   A.   Well, my wife invested with me, and also my two sons.

21   Q.   How much did you invest?

22   A.   Well, it started off with the coins, and I think I

23   invested 15,000 to 20,000 in coins, and then later on it went

24   into the stock, and I invested 25,000 in stock, and I believe

25   my sons, one son maybe invested 7,000 to 10,000 and another one

1       might have invested 5,000.

2       Q.    Have you ever met Mr. Crater?

3       A.    Mr. Who?

4       Q.    Mr. Crater?

5       A.    No.

6       Q.    Have you ever met Mr. Gillespie?

7       A.    Yes.

8       Q.    Have you talked to Mr. Crater?

9       A.    Not personally.  Just texts.

11:00 10    Q.    Just texts?

11      A.    Mm-hmm.

12              THE COURT:  And I'm sorry, you have to give a verbal

13      answer.  Do you mean "yes" when you said mm-hmm?

14              THE WITNESS:  I beg your pardon?

15              THE COURT:  You have to give a verbal answer.  Did you

16      mean "yes" just now?

17              THE WITNESS:  I'm hard of hearing.

18              THE COURT:  I'll speak up.  Just texts, just texts?

19              THE WITNESS:  Text messages.

11:01 20              THE COURT:  Okay.

21              THE WITNESS:  Mm-hmm.

22      BY MR. LOPEZ:

23      Q.    At some point did you hear that My Big Coin was backed by

24      gold?

25      A.    Yeah, later after I got into it, yeah.

```
 1    Q.   How much later?
 2    A.   It's hard to tell.  It was -- it was later.  That's when I
 3    think a couple more different companies was getting involved,
 4    but -- yeah.
 5    Q.   Did that statement "backed by gold" have any influence
 6    over your decision to purchase My Big Coin coins or My Big Coin
 7    stock?
 8    A.   I had already -- by that time I had already purchased
 9    pretty much.
11:02 10   Q.   And when did you make your purchases?
11    A.   It's hard to say.  2013, '14, '15.
12    Q.   All right.
13    A.   My memory is lapsing.  I'll be 70 next year, and it's --
14    Q.   And when did you first hear, if you recall, that it was
15    backed by gold?
16    A.   Six months a year after my purchase or so.  It was after.
17         MR. LOPEZ:  Thank you very much, Mr. Brantley.  And
18    thank you for coming up here from New Orleans.
19         THE WITNESS:  Okay.
11:02 20        THE COURT:  Cross-examination, counsel?
21         MR. MOORE:  Yes, your Honor.
22                        CROSS-EXAMINATION
23    BY MR. MOORE:
24    Q.   Are you familiar with The Investors Board?
25    A.   Message board, yes.
```

1   Q.   Do you remember making posts on The Investors Board about

2   investments?

3   A.   Yes.  I put more -- yes, yes.

4   Q.   Do you ever remember Mark Gillespie instructing you to

5   make posts about the My Big Coin cryptocurrency and its

6   integration into online casinos?

7   A.   I don't -- I don't recall that.  A couple of nights ago I

8   think the FBI called me and brought that to my attention, but I

9   never -- I can't recall.  I might have.

11:03 10         MR. MOORE:  May I approach, your Honor?

11              THE COURT:  You may.

12              MR. MOORE:  Just to refresh.

13   BY MR. MOORE:

14   Q.   Can you just take a look at that and see if that refreshes

15   your memory if you ever received that instruction?

16              (Pause.)

17   A.   Okay, I might have posted this --

18              THE COURT:  Well -- well, sir, just wait for a

19   question.

11:04 20         Mr. Moore.

21   BY MR. MOORE:

22   Q.   Does this refresh your recollection if Mark Gillespie ever

23   asked you to make posts on The Investor Board about My Big

24   Coin?

25              MR. LOPEZ:  Objection.

```
 1              THE COURT:  I'm -- it's offered for impeachment,
 2      Mr. Moore?
 3              MR. MOORE:  Yes, your Honor.
 4              THE COURT:  Okay.  Overruled.
 5              Why don't you put the question again.
 6      BY MR. MOORE:
 7      Q.   Does this email refresh your recollection if Mark
 8      Gillespie ever asked you to make posts on The Investor Board
 9      about My Big Coin cryptocurrency?
11:05 10 A.   I don't recall it, but I see that it has my email address
11      on it, yeah.
12      Q.   But you're not denying -- you don't have reason to
13      believe --
14      A.   I'm not denying it.
15      Q.   And you wouldn't have had any firsthand knowledge about
16      any of this information, correct?
17      A.   About this, no.
18      Q.   So you would have just been relying on what Mr. Gillespie
19      told you?
11:05 20 A.   Yes.
21      Q.   And whoever Mr. Gillespie got that information from?
22      A.   I have no idea.
23      Q.   Okay.
24              You were asked about your risk analysis of My Big
25      Coin.  In that risk analysis, did you evaluate the possibility
```

```
 1   that you were being intentionally lied to about what My Big
 2   Coin was?
 3   A.   No, I never thought about that.
 4   Q.   Would it have mattered to you, when you invested, if the
 5   people who told you about My Big Coin were intentionally lying
 6   to you?
 7   A.   Yeah, it would have mattered, yes.
 8           MR. MOORE:  Thank you.  Nothing further, your Honor.
 9           THE COURT:  Redirect?
11:06 10                    REDIRECT EXAMINATION
11   BY MR. LOPEZ:
12   Q.   Mr. Crater never asked you to post anything about My Big
13   Coin on an investor board, did he?
14   A.   No.
15           MR. LOPEZ:  Thank you.
16           No further questions, your Honor.
17           MR. MOORE:  Nothing further, your Honor.
18           THE COURT:  Thank you.
19           Sir, you're excused.  Thank you.
11:06 20           Thank you.  You can leave those there.  Thank you.
21           THE WITNESS:  Okay.
22           MR. LOPEZ:  Your Honor, the defense rests.
23           THE COURT:  Okay.
24           Jurors, as you might imagine, this is another juncture
25   where I need to talk to the attorneys, so we'll take our break
```

```
 1    now for 20 minutes.  What I expect will happen when you return

 2    is that we'll move into the final stages of the trial.  Okay.

 3            Thank you.

 4            THE CLERK:  All rise for the jury.

 5            THE COURT:  And I should remind you, all of my

 6    cautionary instructions still remain since you don't have the

 7    case yet for your deliberations.  Thank you.

 8            (Jury left the courtroom.)

 9            THE COURT:  Everyone can be seated.

10            Mr. Lopez, obviously I've heard that Mr. Crater rests.

11            Mr. Crater, is your position about not testifying

12    still the same?

13            THE DEFENDANT:  Yes, your Honor.

14            THE COURT:  Okay.  And your answers to all the

15    questions I asked you this morning in that regard are still the

16    same?

17            THE DEFENDANT:  Yes, your Honor.

18            THE COURT:  You can be seated.  Thank you.

19            Counsel, Mr. Lopez, do you need to be heard now that

20    you've rested?

21            MR. LOPEZ:  I do, your Honor.  I move for an acquittal

22    on all counts pursuant to Federal Rule of Criminal Procedure

23    29(a).  Starting first with the unlicensed money transmitting

24    business, there's been absolutely no evidence in this case --

25            THE COURT:  Can you speak just a little louder.  Thank
```

Lines with timestamps: 11:07 on line 10, 11:08 on line 20.

1    you.

2            MR. LOPEZ:  There's been absolutely no evidence in

3    this case that any money was transmitted through My Big Coin

4    Exchange at any time.  And so the government has failed to even

5    show by a preponderance of the evidence that there was any

6    money transmitted through that exchange.  And so we should

7    certainly get an acquittal.

8            With respect --

9            THE COURT:  That was as to Count Eight?

11:09 10        MR. LOPEZ:  Yes.

11            (Discussion off the record.)

12            THE COURT:  Mr. Lopez.

13            MR. LOPEZ:  With respect to the money laundering

14    charges, I point out that the government didn't charge

15    Mr. Crater with depositing funds that came from criminal

16    activity.  They have charged him with withdrawing funds that

17    came from criminal activity.

18            My argument is how could those funds, if they weren't

19    criminally derived when they were deposited, how could they

11:09 20   somehow become criminally derived thereafter?

21            In addition, there were more funds in that account

22    than were entered through this My Big Coin.  And so the funds

23    were commingled, but the caselaw is clear that mere commingling

24    is not sufficient.  You have to show that the monies that were

25    actually transferred were criminally derived and they were

1    greater than $10,000.  The $10,000 has been established.  I

2    don't dispute that.  The government has not shown that those

3    funds were criminally derived.

4         THE COURT:  And now you're moving to the monetary,

5    right, to the monetary transaction charges?

6         MR. LOPEZ:  Correct, yes.

7         THE COURT:  Okay.  Anything else, counsel?

8         I should say I assume you're also still relying on the

9    memo for judgment of acquittal you filed after the close of the

11:10 10   government's case, which I've had a chance to review.

11        MR. LOPEZ:  Yes, your Honor, which I believe I state

12   in the first paragraph that it's at both stages.

13        THE COURT:  Sure.

14        MR. LOPEZ:  And with respect to the wire fraud, it's

15   my weakest argument.  I don't think they have shown that

16   Mr. Crater was doing anything other than acting in good faith,

17   but I would understand if the Court would allow that to go to

18   the jury.

19        THE COURT:  Understood, thank you.

11:11 20   Mr. Markham or Mr. Moore, I'll hear you.  Obviously if

21   you want to focus on counts -- the latter counts, the unlawful

22   monetary transactions and the money transmitting business

23   charges.

24        MR. MARKHAM:  Yes, your Honor.

25        So for the unlawful monetary transactions,

1    Ms. Brekenfeld testified that the money that came into the

2    Wells Fargo account was for My Big Coin investments from

3    Mr. Lynch, which she based also off of Mr. Lynch's testimony

4    that that money went in for My Big Coin investments.

5            She then testified that that same money was

6    transferred, far more than $10,000, to Randall Crater's

7    personal Bank of America account.  It wasn't a commingling

8    issue.  Essentially the entire the account was filled with My

9    Big Coin funds at the time it was transferred.  That was her

11:12 10    testimony.

11            Do you want anything more, your Honor, before I go to

12    Count Eight?

13            THE COURT:  No, I understand.

14            Count Eight.

15            MR. MARKHAM:  Yes, your Honor.  For Count Eight what

16    we've demonstrated is the My Big Coin Exchange was clearly

17    advertising itself as a currency exchange.  And what you've

18    heard from witnesses is that they believed that the My Big Coin

19    Exchange worked because they either heard that from the

11:12 20    defendant himself or from someone like Mr. Gillespie.  Based on

21    that alone, that charge can go to the jury.

22            But what we've also shown is through the money

23    transfers is that when people were posting things on the My Big

24    Coin Exchange for sale, that that money for that sale came from

25    Randall Crater's bank account, and we've shown that there are

1   checks that say things like "coin buyback."

2         So when you look at the jury instruction that such

3   receipt for transmission is unlawful if it is incident to an

4   unlicensed money transmitting business, that's what the

5   government has shown.  That it's, at a minimum, incident to the

6   money transmitting business that is My Big Coin that sells

7   virtual currency in exchange for U.S. dollars.

8         THE COURT:  Thank you.

9         Counsel, I appreciate the arguments on either side.

11:13 10   As Mr. Lopez appropriately anticipated, I'm going to allow

11   Counts One through Four for the -- the wire fraud counts to go

12   to the jury.

13         My ruling as to the other counts is the same as well.

14         As to wire fraud, I think a reasonable jury could find

15   all of those elements beyond a reasonable doubt.

16         I understand the arguments about Mr. Crater's intent

17   to defraud, but that will be for the jury to decide, and

18   there's sufficient evidence proffered by the government here

19   and also considering all of the evidence.

11:14 20         On the unlawful monetary transactions, I do think a

21   reasonable jury could find all of these elements beyond a

22   reasonable doubt, also in regards to what was coming into the

23   accounts and the origin of same.

24         And then the unlicensed money transmitting business.

25   I understand, Mr. Lopez, your argument, but I do think a

1    reasonable jury could find based on all of the evidence here a

2    basis for each of those elements.

3          So your motion and your objection is preserved for the

4    record on Mr. Crater's behalf.

5          Counsel, I just wanted to say a few things.

6          Obviously, if I were to make Petrozziello findings, it

7    would be now after the close of all evidence.

8          I don't think, as I suggested yesterday or earlier

9    this week, I don't think I'm required to make those here.

11:15 10        The admissions of statements of the party opponent,

11   that is statements of Mr. Crater, I allowed under multiple

12   sections of Federal Rule of Evidence 801(d)(2), Subsection (A),

13   the defendant's own statements, either in his individual or

14   representative capacity on behalf of My Big Coin; (B), that

15   Mr. Crater, as to certain of the statements, manifested that he

16   adopted or believed them to be true; or (C), was made by a

17   person whom the party, Mr. Crater, authorized to make the

18   statement on the subject, and I think there's sufficient

19   evidence, basis for those admissions, or that statements were

11:16 20   made by Mr. Crater's agent or employee on a matter within the

21   scope of that relationship and while it existed.

22          I think multiple of these bases apply and I considered

23   them in the admission of certain statements that came in as

24   statements of a party opponent for the purposes of 801(d)(2).

25          For all those reasons I need not reach whether or not

```
 1    any of them might also be admissible under 801(d)(2)(E), which
 2    is as co-conspirator statements, which would require
 3    Petrozziello findings, given that I admitted these statements
 4    on the alternative bases.
 5         As I noted before, certainly no formal conspiracy
 6    charge is required for conspiracy to be invoked or to warrant
 7    Petrozziello findings, but I just note that no conspiracy
 8    charge has been -- is charged here and now having heard all of
 9    the evidence, that has not been the government's theory of the
11:17 10   case from a factual point of view.
11         For all those reasons, I don't think it's necessary to
12    make Petrozziello findings.
13         Mr. Lopez, your objection in this regard is preserved
14    as well.
15         MR. LOPEZ:  Thank you, your Honor.
16         THE COURT:  Counsel, we're going to take until 11:30.
17    I'll start with Part I of my charge, and we'll then go into
18    closing arguments, the government and then Mr. Lopez and then
19    the government's rebuttal.  And then we'll go straight into
11:17 20   Parts II and III of my charge, and then, probably by the time
21    all of those things happen, it will be time for their lunch
22    anyway, so we'll be giving them the case at the same time that
23    hopefully their lunch will be upstairs.
24         Counsel, anything else I should address now?
25         Counsel, I can't remember if you used it in the
```

1    openings, but you can certainly move the podium if you want to

2    use it for closings.

3            MR. MARKHAM:  Thank you, your Honor.  Nothing else

4    from the government.

5            THE COURT:  Mr. Lopez.

6            MR. LOPEZ:  Nothing else at this time, your Honor.

7            THE COURT:  Thank you.

8            THE CLERK:  All rise.

9            (Recess taken.)

11:34 10         THE COURT:  Counsel, if we can get the disk to

11    Ms. Hourihan so she can upload the exhibits during closings.

12            MR. MARKHAM:  Yes, Your Honor.  We're still working on

13    it as fast as we can.

14            THE COURT:  Okay.  Thank you.

15            When you have the disk, just bring it up so we can try

16    to do that before the jury comes out.

17            Counsel, Mr. Lopez, we're bringing the jury down.

18    Counsel, it's my practice to just take the two jurors at the

19    end, 13 and 14, and make them our alternates.  And I will have

11:36 20    them stay separate from the deliberating jury in a separate

21    space and I'll remind them of the cautionary instructions.  And

22    usually, if the deliberations go into another day, I would have

23    them come back and do the same thing.

24            Counsel, does anybody need to be heard on that?

25            MR. MARKHAM:  No, Your Honor, not from the government.

```
 1              MR. LOPEZ:  No, Your Honor.
 2              THE CLERK:  All rise for the jury.
 3              (Jury entered the courtroom.)
 4              THE CLERK:  Court is in session.  Please be seated.
 5              THE COURT:  Jurors, as I said, we're moving into the
 6     final stages of the trial at this point.  I will give you Part
 7     One of my jury charge to you now.  Then you'll hear closing
 8     arguments, and then I'll give you the final two parts after
 9     closing arguments before you begin your deliberations.  Just so
11:37 10    you know, you can feel free just to listen to my jury charge.
11     You will get a hard copy of it, along with a verdict form, and
12     you will also get an electronic copy which will be uploaded to
13     the JERS system.  You probably saw that flat screen TV in the
14     jury room.  That's so you can all look at the exhibits that
15     have been admitted together if you choose to, and my jury
16     charge, a copy of the jury charge and the verdict form will
17     also be on that system.
18              Jurors, to begin my charge, it is your duty to find
19     the facts from the evidence admitted in this case.  To those
11:38 20    facts you must apply the law as I give it to you.  The
21     determination of the law is my duty as the presiding judge in
22     this court.  It is your duty to apply the law exactly as I give
23     it to you, whether you agree with it or not.  That means that
24     you must decide the case solely on the evidence before you and
25     according to the law.  In following my instructions, you must
```

1    follow all of them and not single out some and ignore others.

2    They're all equally important.  You must not read into these

3    instructions, or into anything I may have said or done, any

4    suggestion by me as to what verdict you should reach.  That is

5    a matter entirely up to you to decide.

6              To help you understand and remember these instructions

7    on the law, I'll divide them into three parts.  First, opening

8    general instructions.  Second, instructions about the charges

9    in this case and about the law you must apply in considering

11:39 10   those charges.  And third, some general instructions about the

11   procedures during your deliberations.

12             I'm delivering the first part of the instructions

13   before you hear counsel's closing arguments so you have a

14   general framework for hearing those arguments.  I'll deliver

15   the second part about the elements of the charges and the third

16   part about the procedures during your deliberations after the

17   closing arguments and before you begin deliberations.  All of

18   my instructions, all three parts, are part of my final jury

19   instructions and are all equally important and comprise the law

11:39 20   that you must consider and apply in this case.

21             Every person accused of a crime is presumed to be

22   innocent unless and until his or her guilt is established

23   beyond a reasonable doubt.  The presumption is not a mere

24   formality.  It is a matter of the most important substance.

25   The presumption of innocence alone may be sufficient to raise a

1    reasonable doubt and to require the acquittal of a defendant.

2    The defendant before you, Mr. Randall Crater, has the benefit

3    of that presumption throughout the trial, and you are not to

4    convict him of any particular charge unless you are persuaded

5    of his guilt of that charge beyond a reasonable doubt.  The

6    presumption of innocence until proven guilty means that the

7    burden of proof is always on the government to satisfy you that

8    Mr. Crater is guilty of the crime with which he's charged

9    beyond a reasonable doubt.  The law does not require that the

11:40 10   government prove guilt beyond all possible doubt.  Proof beyond

11   a reasonable doubt is sufficient to convict.  This burden never

12   shifts to the defendant, Mr. Crater.  It is always the

13   government's burden to prove each of the elements of the crime

14   charged beyond a reasonable doubt by the evidence and the

15   reasonable inferences to be drawn from the evidence.  The law

16   does not require defendant to prove his innocence or to produce

17   any evidence.  The defendant, Mr. Crater, has the right to rely

18   upon the failure or the inability of the government to

19   establish beyond a reasonable doubt any essential element of

11:41 20   the crime charged against him.

21          If, jurors, after fair and impartial consideration of

22   all the evidence you have a reasonable doubt as to Mr. Crater's

23   guilt of a crime charged, it is your duty to acquit him of that

24   crime.  On the other hand, if after fair and impartial

25   consideration of all the evidence you are satisfied beyond a

1    reasonable doubt of Mr. Crater's guilt of a crime charged, you

2    should vote to convict him.

3            The defendant, Mr. Crater, has a constitutional right

4    not to testify and no inference of guilt or anything else may

5    be drawn from the fact that the defendant did not testify.  For

6    any of you to draw such an inference would be wrong.  Indeed,

7    it would be a violation of your oath as a juror.

8            The evidence from which you are to decide the facts in

9    this case consists of sworn testimony of witnesses, both on

11:42 10    direct and cross-examination and redirect and recross-

11    examination regardless of who called the witness.  The exhibits

12    that have been received into evidence and any facts to which

13    the lawyers have agreed or stipulated.

14            A stipulation means, as I've told you now a few times,

15    simply that the government and the defendant accept the truth

16    of a particular proposition or fact.  Since there's no

17    disagreement, there's no need for evidence apart from the

18    stipulation.  You must accept the stipulation as fact to be

19    given whatever weight you choose.

11:42 20            Although you may consider only the evidence presented

21    in the case, you are not limited in considering that evidence

22    to the plain statements made by the witnesses or contained in

23    the documents.  In other words, you're not limited solely to

24    what you see and hear as the witnesses testify.  You are

25    permitted to draw from the facts that you find to have been

1   proven such reasonable inferences as you believe are justified

2   in the light of common sense and personal experience.   An

3   inference is simply a deduction or a conclusion that may be

4   drawn from the facts that have been established.  Any inference

5   you draw must be reasonable and based on the facts as you find

6   them.   Inferences may not be based on speculation or

7   conjecture.

8            Jurors, there are two kinds of evidence:  Direct and

9   circumstantial.  Direct evidence is direct proof of a fact,

11:43 10   such as testimony of an eyewitness that the witness saw

11   something.  Direct evidence could be a simple assertion by

12   someone, for example, it's raining outside.  This is a

13   statement of a fact observed.  If you thought that person who

14   said that to you was truthful and had a sufficient basis for

15   knowing what the weather was like outside, you could accept

16   that statement as direct evidence that it's raining outside.

17   Alternatively, if you doubted the reliability of the statement,

18   you could reject it.

19            Circumstantial evidence is indirect evidence.  That is

11:44 20   proof of a fact or facts from which you could draw the

21   inference by reason and common sense that another fact exists

22   even though it has not been proved directly.  To illustrate an

23   example of circumstantial evidence, let's return to the prior

24   example regarding the weather outside.  Suppose that instead of

25   having someone report to you about the weather conditions,

1    someone came in from outside wearing a wet raincoat and shaking

2    water off an umbrella.  Without any words being spoken, that is

3    without any direct statement or assertion being made, an

4    observer might conclude that it was on raining outside.  The

5    observer would have some direct evidence to consider, the

6    observation of a wet raincoat and a dripping umbrella.

7    Thinking about those pieces of direct evidence might lead the

8    observer to draw a conclusion or an inference about an

9    unobserved fact, that it was raining.

11:45 10           Jurors, you are entitled to consider both kinds of

11    evidence, direct and circumstantial.  The law permits you to

12    give equal weight to both but it's for you to decide how much

13    weight to give to any evidence.  Circumstantial evidence alone

14    may be sufficient to convict the defendant if it persuades you

15    beyond a reasonable doubt that the defendant is guilty of the

16    offenses alleged in the indictment.

17           As I mentioned to you at the beginning of the trial,

18    certain things are not evidence.  I'm going to repeat those

19    things to you.  Arguments and statements by the lawyers are not

11:45 20    evidence.  The lawyers are not witnesses.  What they say or

21    what they said in their opening statements, closing arguments

22    and at other times is intended to help you interpret the

23    evidence but it is not evidence.

24           If the facts, as you remember them from the evidence,

25    differ from the way the lawyers have stated them or will state

1    them, your memory of them controls.  Questions by lawyers

2    standing alone are not evidence.  Again, the lawyers are not

3    witnesses.  The question and the witness' answer taken together

4    are the evidence.

5         Objections by lawyers are not evidence.  Lawyers have

6    a duty to their respective clients to object when they believe

7    a question is improper under the rules of evidence.  If I

8    sustained an objection, in other words, if I agreed with the

9    person objecting, you must ignore the question or exhibit and

11:46 10  must not try to guess what the answer might have been or what

11   the exhibit might have contained.

12        Anything you may have seen or heard when the court was

13   not in session is not evidence.  You are to decide the case

14   solely on the evidence received at this trial.  The indictment

15   is not evidence.  This case, like most criminal cases, began

16   with an indictment.  The fact that the defendant, Mr. Crater,

17   has had an indictment filed against him is no evidence

18   whatsoever of his guilt.  The defendant has pled not guilty in

19   this case and denies the charges in the indictment.  The

11:47 20  indictment is simply an accusation.  It is the means by which

21   the allegations and the charges of the government are brought

22   before this court.

23        Anything that I've excluded from evidence or ordered

24   stricken and instructed you to disregard is not evidence.  You

25   must not consider such items.  A particular item of evidence

1    was sometimes received for a limited purpose only.  That is, it

2    can be used by you only for one particular purpose and not for

3    any other purpose.  I've told you when that's occurred and

4    instructed you on the purposes for which the item can or cannot

5    be used.  Jurors, you must decide this case solely upon the

6    evidence.  You must not be influenced by any personal likes or

7    dislikes, prejudice or sympathy.  You must also not consider or

8    be influenced by any possible punishment that may be imposed on

9    the defendant or any other possible consequences of a

11:48 10    conviction.  Your function is to weigh the evidence in the case

11    and determine whether the government has proved the defendant's

12    guilt beyond a reasonable doubt solely upon the basis of the

13    evidence.

14         The fact that the prosecution is brought in the name

15    of the United States of America entitles the government to no

16    greater consideration than that accorded to any other party to

17    a litigation.  For the same reason it's entitled to no less

18    consideration.  All parties, whether government or individuals,

19    stand as equals at the bar of justice.  You are to perform the

11:48 20    duty of finding the facts without bias or prejudice as to any

21    party.  You are to perform your final duty in an attitude of

22    complete fairness and impartiality.  This case is important to

23    the government, for the enforcement of criminal laws is a

24    matter of concern to the community.  However, it is equally

25    important to Mr. Crater, the defendant, who faces serious

1    charges.

2           During this trial you have heard evidence of acts that

3    the government alleges were committed by both this defendant

4    and by other individuals.  It is for you to decide, based on

5    all the evidence in this case and the instructions as I give

6    them to you, whether the government has proved beyond a

7    reasonable doubt that the defendant, Mr. Crater, is guilty of

8    the charged offenses.  In so doing, you should not speculate

9    about or consider in any way the status of other individuals.

11:49 10  The only person on trial in this case is the defendant,

11   Mr. Crater.

12          While you may, of course, consider all of the evidence

13   in this case, including acts that the government alleges were

14   committed by any agents of the defendant in deciding,

15   consistent with my instructions, whether all the evidence

16   proves the defendant's guilt beyond a reasonable doubt, the

17   current status of any other individual is not relevant to that

18   determination.  Your verdict, as I said, must be based solely

19   on the evidence and the law as I've given it to you in these

11:50 20  instructions.

21          Jurors, whether the government has sustained its

22   burden of proof does not depend upon the number of witnesses

23   it's called or upon the number of exhibits it's offered but

24   instead upon the nature and the quality of the evidence

25   presented.  You do not have to accept the testimony of any

1    witness if you find the witness not credible.  You must decide

2    which witnesses to believe and which facts are true.  To do

3    this, you must look at all the evidence, drawing upon your

4    common sense and personal experience.  You may believe all of

5    the testimony of a witness, or some of it, or none of it.  You

6    alone are the judges of the credibility of the witnesses.

7            In deciding whether to believe a witness' testimony,

8    you may want to take into consideration such factors as the

9    witness' conduct and demeanor while testifying, any apparent

11:50 10  fairness or any bias they may have displayed, any interest you

11   may discern that they may have in the outcome of the case, any

12   prejudice they may have shown, their opportunities for seeing

13   and knowing the things about which they have testified, the

14   reasonableness or unreasonableness of the events that they have

15   related to you in their testimony and any other facts or

16   circumstances disclosed by the evidence that tend to

17   corroborate or contradict their version of the events.

18           The testimony of a witness may be discredited or

19   impeached by showing that he or she previously made statements

11:51 20  that are inconsistent with his or her present testimony.  You

21   may consider that earlier statement to help you decide how much

22   of the witness' testimony to believe.  If you find that the

23   prior statement was not consistent with the witness' testimony

24   at this trial, then you should decide whether that affects the

25   believability of that person's testimony at this trial.

1    Sometimes, of course, people make innocent mistakes,

2    particularly as to unimportant details.  Not every

3    contradiction or inconsistency is necessarily important.

4    Again, jurors, you alone are the judges of the witness'

5    credibility.

6         Some prior inconsistent statements may be used for

7    purposes other than impeachment.  If you find that a witness

8    has made inconsistent statements under oath on an earlier

9    occasion, such as in a prior trial, court proceeding or by

11:52 10   other sworn statement, you may consider that earlier statement

11   for its truth or falsity the same as any testimony at this

12   trial.

13        You've heard from two witnesses offered as experts in

14   this case regarding cryptocurrency.  An expert witness has

15   special knowledge or experience that allows the witness to give

16   an opinion.  You may accept or reject such testimony.  In

17   weighing an expert's testimony, you should consider the factors

18   that generally bear upon the credibility of a witness, as well

19   as the expert's qualifications, including his or her education,

11:53 20   experience and training, the soundness of the reasons given for

21   the opinion, and all other evidence in the case.  You may give

22   the expert testimony whatever weight, if any, you find it

23   serves in light of all the evidence in this case.  You should

24   not, however, accept a witness' testimony merely because he or

25   she is an expert.  Remember, jurors, you alone decide how much

```
 1   of a witness' testimony to believe and how much weight it

 2   should be given.

 3           That's the end of Part One of my charge.  We'll now

 4   hear closing arguments.

 5           Counsel, Mr. Moore.

 6           MS. MOORE:  Can we switch to HDMI1, please.

 7           At the beginning of this case, we told you that the

 8   evidence would prove that Randall Crater defrauded investors

 9   and customers of millions of dollars through a company called

10   My Big Coin; that he got them to invest in his company and to

11   buy a so-called cryptocurrency through a combination of

12   outright lies and misleading statements, and that he took that

13   money, other people's money, and spent it to buy over a million

14   dollars worth of jewelry and artwork and over $200,000 on a

15   boat.

16           You now know that's what the evidence has shown.  The

17   defendant told people that My Big Coin was a cryptocurrency

18   even though it had no blockchain and no cryptography.  He told

19   people that My Big Coin was backed by gold even though there

20   was no gold.  He told people My Big Coin was backed by oil even

21   though there was no oil.  He told people there was a business

22   partnership with MasterCard even though there was no

23   partnership with MasterCard.  He told people that My Big Coin

24   was available on multiple currency exchanges and available at

25   any time and any place even though he knew all of that was not
```

1    true.

2           And the people who heard those lies from the defendant

3    and from his lackeys, the people who read the My Big Coin

4    website and its Twitter feed and the defendant's LinkedIn page,

5    many of those people fell for them.  They believed him.  People

6    like John Lynch, who wired him over $6 million and money from

7    his family and closest friends, people like Jay Byrd, Peter

8    Bell, Norman Mendiola, and the defendant, he took their money

9    and he spent it, not on his business, on himself and his

11:55 10   personal lavish lifestyle.

11           And later when the victims started asking for their

12   money back, he came up with more falsehoods and excuses,

13   falsehoods and excuses that became more outlandish the more the

14   victims pressed him, falsehoods meant to lull his victims into

15   a false sense of security and to convince them not to seek help

16   from regulators or law enforcement.

17           When victims asked to meet with him, he said he was

18   traveling to California and then to Colorado.  When victims

19   asked to talk to him, he said he was counting cash until 2:00

11:56 20   in the morning and waiting on armored vehicles to move his

21   cash.  When victims asked him where his My Big Coin MasterCard

22   was, he said he had mailed him My Big Coin cards but they fell

23   behind a shelf at the UPS store.  Think about that, members of

24   the jury.  He told them the cards fell behind a shelf.  That is

25   absurd.  None of it was true.  And of course the defendant knew

1    all of that.

2          For his scheme to deceive others, get their money and

3    to cover his tracks, the defendant has been charged with three

4    crimes.  He's charged with wire fraud, unlawful monetary

5    transactions, and operating an unlicensed currency exchange.

6    Judge Casper is giving instructions on the elements of those

7    crimes, and her instructions control.  But on its most basic

8    term, wire fraud is just a scheme to take someone's money by

9    lying to them and using some type of interstate wire.  Here,

11:57 10   those wires were wire transfers in a bank and an email.

11          Unlawful monetary transactions is basically money

12   laundering, sending over $10,000 in dirty money from the scheme

13   from one bank to another.

14          And finally, an unlicensed money transmitting business

15   is a business that sends money without registering with FinCEN,

16   which is a part of the United States Treasury Department that

17   helps protect our financial system against crime.

18          Over the next 20 minutes we're going to walk through

19   the evidence that establishes the elements of the three charged

11:58 20   crimes beyond a reasonable doubt.  Along the way, I'm going to

21   make three points to you.

22          Point one, there was a scheme to defraud, separating

23   people from their money with lies about a cryptocurrency

24   business.  Point two, the defendant was behind the scheme.  He

25   knew what he was doing and he knew it was wrong.  Point three,

1    when you follow the money, the evidence shows that the man who

2    was behind this scheme is the defendant, Randall Crater.  In

3    fact, you already know that nearly all of the $6 million that

4    victims lost in this case ended up right in the defendant's

5    pocket.

6            Let's get to point one.  There was a scheme to

7    defraud.  James Douglas told you in 2013 he was working on a

8    money transmitting business that allowed people to use

9    cryptocurrency to transfer money around the world.  Mr. Douglas

11:59 10   knew that running a money transmitting business had significant

11   regulatory and registration requirements.  He was given the

12   contact information of Randall Crater as someone who could help

13   him meet those legal requirements to run this cryptocurrency

14   money transmitting business.  You saw this on Exhibit 10B.

15           Mr. Douglas sent the defendant a FinCEN form and he

16   wrote, We will definitely need to complete.  He shares his

17   business idea with the defendant, and the defendant assured

18   Mr. Douglas that he could handle the regulatory requirement for

19   the proposed money transmitting business.  He didn't help James

11:59 20   Douglas.  He helped himself to Mr. Douglas' idea.  He called it

21   My Big Coin, failed to register the business, as he knew he was

22   required to by the regulations.  The defendant then set up

23   Michael Kruger and Mark Gillespie to recruit others into the

24   scheme in exchange for them receiving a portion of the money

25   that those individuals invested.

1         Now, keep in mind, this evidence not only shows you

2    how the defendant created this scheme and was behind it, it

3    also shows you that he was on notice of the requirement for him

4    to register My Big Coin with FinCEN, but you know he never did

5    that.  And here is what Crater and his cohorts told their

6    investors and customers as part of this scheme:  He told people

7    that My Big Coin was like Bitcoin, but better.  He told

8    investors, We are the only cryptocurrency to be backed by gold.

9    He told the investors, We are partners with MasterCard.  He

12:00 10   told the investors they could use My Big Coin to send money in

11   seconds anywhere in the world.  Apart from the false statements

12   made by the defendant on his LinkedIn page available in Exhibit

13   1A, the defendant repeated these untrue claims on his personal

14   Twitter page here at Exhibit 6, the MBC YouTube video at

15   Exhibit 27, and on the MBC Twitter page here at Exhibit 28, and

16   on the Facebook page at Exhibit 30.

17         The defendant was behind all those false claims.  How

18   do you know that?  For one thing because the defendant repeated

19   those same falsehoods directly to victims.  You will remember

12:01 20   the defendant wrote, "We have 300 million in gold backing us."

21         But here is an email the defendant received just

22   before sending that email.  The pictures of rusted barrels that

23   you can't even see inside.  He knew these pictures were not

24   good enough to convince anybody that My Big Coin was backed by

25   gold.  He emailed John Roche that this documentation does not

1    say gold, that he needed current paperwork and not ten-year-old

2    reports.  But what did he do the very next day?  He told an

3    investor that MBC has 300 million in gold backing us.  Members

4    of the jury, that's not good faith.  That's a fraud.  That's

5    the defendant's own words.

6            He also told Robert McGowan that there was 300 million

7    in gold in a bank account in his own name.  But you know there

8    was no gold.  Kathleen Brekenfeld showed you the defendant's

9    bank account.  He did not have $100 million in his name in a

12:02 10   bank in Spain.  The bank records tell you he's never been to

11   Spain.  The travel records also show, never been to Spain.  And

12   here is how you know beyond a reasonable doubt there was no

13   gold:  Because we're sitting here.  Eight years later and the

14   only gold that Randall Crater has is the jewelry that he

15   purchased for himself and his family.

16           He purchased that jewelry and gold with other people's

17   money.  Members of the jury, that's not good faith.  That's a

18   fraud.  And you can convict the defendant on the basis of the

19   email exchange at 12E, 12F, and 12G alone.  Write that down.

12:03 20          And you know why the defendant told these stories

21   about gold.  Pamela Clegg testified that cryptocurrencies with

22   real world assets increase the value of the coin and makes them

23   more stable, and that's why the defendant made up that story.

24   Because he knew it would help convince people to invest, and

25   that's exactly what happened.

1          You heard several investors, John Lynch, Peter Bell,

2     Jay Byrd, Norman Mendiola, and they all tell you how the

3     gold-backing claim was important to them.  And common sense

4     tells you that's true.  Of course it matters to investors

5     whether or not there's $300 million in solid gold backing a

6     cryptocurrency.  Of course that gives them confidence.

7     Additionally, he put on the front page of the My Big Coin site

8     that MBC is backed by gold bullion.  None of his claims about

9     gold were true, and the person behind the scam, the defendant,

12:03 10    he knew it.

11          He also told investors he had a partnership with

12    MasterCard, and that was important because a deal with a giant

13    international company like MasterCard would have lent

14    credibility to My Big Coin.  John Lynch told you that Crater

15    told him he was directly interfacing with MasterCard, but you

16    know that partnership was just another fabrication.

17          You heard from Rich Audet that MasterCard has no such

18    deal with My Big Coin.  You also know that beginning in March

19    2014 investors were told they would receive a My Big Coin

12:04 20    MasterCard, that they could use that card to make purchases

21    using the coins in their account, not cash loaded onto the

22    card, but coins from the MBC account.  Once again, it wasn't

23    true.  Instead of a card linked to a cryptocurrency, the

24    victims were sent a generic prepaid debit card that didn't even

25    say "My Big Coin" on it.  To use this generic prepaid debit

1    card, they had to load their own money onto the card.  This is

2    the type of generic prepaid debit card you can buy at any CVS

3    in the country after paying a five-dollar loading fee.  Paying

4    five dollars to CVS does not make you a partner with

5    MasterCard.  You heard Lynch, Byrd, Bell, and Mendiola tell you

6    that the cards they received were worthless.  And the person

7    behind the scheme, the defendant, he knew he was sending people

8    worthless cards.

9          The defendant also told people that My Big Coin can be

12:05 10   sent instantaneously around the world and was being utilized by

11   businesses, that it could be used any time, any place.  And you

12   know if that were true, it would have made My Big Coin very

13   valuable.

14         Now, the defense has attempted to suggest that My Big

15   Coin was actually something called a permissioned blockchain,

16   that was not available to the general public.  But that's not

17   what the defendant told investors.  That is not what he said on

18   the My Big Coin Twitter page.  It says, "Start accepting online

19   payments instantly.  No paperwork.  No approval process."  No

12:06 20   paperwork and no approval process is not a permissioned

21   blockchain.  John Lynch, Peter Bell, Jay Byrd and Norman

22   Mendiola all told you the defendant and his lackeys told them

23   that My Big Coin was like Bitcoin, and they were never told My

24   Big Coin was a permissioned blockchain.

25         The defendant's own expert admitted that being

1    available any time and any place is not consistent with a
2    permissioned blockchain.  And common sense tells you that's
3    true.  And of course, there's no evidence to support the
4    defendant's claim.  You heard from Pamela Clegg that actual
5    cryptocurrencies, like Bitcoin, have publicly available
6    blockchains.  MBC didn't.  In fact, Clegg told you that My Big
7    Coin did not even exist until January 28, 2017, after the
8    government's investigation had started and after the defendant
9    was aware of this investigation.  Even the defendant's own
12:07 10    expert told you he saw no evidence, no evidence at all, that My
11    Big Coin existed as a cryptocurrency before that date.  The
12    whole time he was telling investor stories he didn't even have
13    a cryptocurrency to sell.  All he had was falsehoods about what
14    My Big Coin was, how it could be used, what it was worth and
15    what supported its value, falsehoods to get people to buy coins
16    and invest in the company, to get them to send the defendant
17    their money.  That was the scheme.
18            That brings us to the second main point.  The
19    defendant was behind the scheme.  He knew what he was doing and
12:07 20    he knew it was wrong.  One way you knew the defendant executed
21    the scheme is that beginning in early 2014, it was the
22    defendant and his lackeys who used the My Big Coin website,
23    social media and in-person meetings and emails to solicit
24    potential investors.  It was the defendant who sent Kruger and
25    Gillespie across the country with the promise they would

1    receive a portion of the monies they collected.  He paid them.
2    And he was behind the lies that they told, lies that, as we
3    just saw, the defendant also told directly.  And when they
4    found an individual who wanted to invest in coins they were
5    given, they would give the investor instructions for sending or
6    wiring the money for the investment to accounts controlled by
7    the defendant, Randall Crater.
8         Another way you know the defendant executed the scheme
9    is that the defendant had exclusive control over the My Big
12:08 10  Coin Exchange.  Investors were told they could track their coin
11    purchases and the fluctuating value of coins, but you know that
12    in reality it was the defendant who manually tracked coin
13    purchases and information about funds from the victims.
14         You heard from Lynch that he had to regularly email to
15    have his account corrected and the account of his family and
16    friends also updated.  And you saw in the defendant's own words
17    when people had issues with his exchange, he was the one they
18    went to in order to fix the issues, and he told an investor, "I
19    did it myself.  I know it got done."  That's right here in
12:09 20  Exhibit 13B.
21         And here is what else you know:  The defendant was
22    simply making up the prices for transactions while telling
23    investors that the price of coins fluctuated based on trading
24    in coins.  You heard from Peter Bell that Gillespie told him
25    that Crater set the prices wherever he wanted.  This false

1    representation that MBC prices is based on supply and demand

2    when, in fact, the defendant was just making them up is more

3    evidence that the defendant knew what he was doing.  And he

4    knew it was wrong.

5         Here is what else you know:  The defendant set this

6    whole thing up to insulate himself, to make it harder to tie

7    the money back to him.  When victims sent their money, he

8    directed the funds to be wired to an account in the name of his

9    mother and his sister.  He then would wire the money from those

12:10 10    accounts to his personal bank account or he simply spent the

11    money directly from the accounts.  Think about that.  He used

12    his family to shield himself.

13         You heard from his sister Kimberly Benge that the

14    defendant instructed her to open this Wells Fargo account and

15    that he had exclusive control over the account, including the

16    checkbook, after she opened it.  You've seen the checks with

17    forged signatures that the defendant utilized on his shopping

18    sprees.  Those are available at Exhibit 2C.

19         And you saw the forged employment agreement later --

12:10 20    earlier today.  And when people bought shares in My Big Coin,

21    the defendant, he took that money.  He spent it on himself.  He

22    didn't invest that money in the business.  He spent it at the

23    Southampton Jewelry Exchange and at Lord & Guy.  He went to

24    Gucci.  He went to Louis Vuitton.  He could afford all of these

25    extravagances because he was spending other people's money.

```
 1              And when investors started asking for their money
 2       back, he stalled.  He told them more falsehoods.  Here are just
 3       three examples of this here on the monitor:  He told them,
 4       You'll be paid Monday.  But you heard Monday never came.  He
 5       said a wire was 100 percent sent and that the investors had
 6       nothing to worry about at all.  Here we are five years later
 7       and that wire that was 100 percent sent still hasn't shown up.
 8       He even said that the NFL was going to get involved with My Big
 9       Coin.  All lies straight from the defendant to investors.
12:11 10  Three examples right here on your screen, members of the jury.
11       Lying is not good faith.
12              But by April 2015 the defendant was simply running out
13       of other people's money to spend.  His bank accounts were
14       overdrawn and regulators were starting to catch on to the
15       scheme.  So what did the defendant do when he found out the
16       CFTC was investigating?  He simply just made up more lies.  He
17       told John Lynch that he was counting cash all night.  He said
18       he was waiting on armored trucks to move his cash.  He sent out
19       those generic prepaid debit cards and told customers he was
12:12 20  going to load them with money that they had invested in My Big
21       Coin.  Money he didn't have because he had already spent it on
22       himself and his lavish lifestyle.  He told investors not to
23       worry because he would rather bankrupt My Big Coin and give
24       them access to the gold than let harm come to them.  You know
25       harm did come to them.  You heard from Mr. Mendiola that he was
```

1   working as a valet driver, invested his savings and he never

2   saw a single nugget of that gold.  That is not good faith.

3        He took other steps to slow down the CFTC

4   investigation as well.  He told Lynch to claim that he was My

5   Big Coin's lawyer, to invoke the attorney-client privilege.

6   And Lynch told you what that means.  It means don't talk.

7        And then after Lynch had been trying to set up a

8   meeting with the defendant for over a year, he finally agreed

9   to meet Lynch in person on John 5, 2017.  It's no coincidence

12:13 10  that this in-person meeting happened just one month before

11  Lynch was scheduled to testify in front of the CFTC.  It's also

12  no coincidence that during this meeting the defendant promised

13  Lynch additional coins.

14       And then on June 28, 2017, three years after the

15  defendant began this scheme, he finally created some semblance

16  of a cryptocurrency.  And you know from Pamela Clegg there is

17  evidence that after this currency was finally created on June

18  28, 2017, there was evidence of bogus trading back and forth

19  between the same people to make it look like this was an active

12:14 20  trading market when, in reality, it wasn't.

21       And you know why he did that.  Because Lynch was

22  scheduled to testify in front of the CFTC just a few weeks

23  later in July of 2017.  So at this point it was critical to

24  make it look like the currency was real and there was trading

25  in it.  Fake trades is not good faith either.

1          And that brings us to our third point.  Despite all

2     his efforts to cover his tracks, to wash his dirty money

3     through unlawful transfers and to cover up his crimes,

4     following the money trail leads directly back to the defendant.

5     Nearly all of the $6 million in investor and customer money,

6     other people's money, went to line the defendant's own pockets.

7     He spent that money on himself and his lavish lifestyle.  That

8     shows he controlled this scheme and he benefited the most from

9     it.

12:14 10        Members of the jury, this is not the story of a failed

11    business.  It's the story of a fraud, full stop.  We've talked

12    about how this evidence proves the defendant is guilty of the

13    three charged crimes.  Now let's talk about the specific

14    counts.

15          The wire frauds in this case are Counts One through

16    Four.  Counts One through Three are wires Lynch sent in April,

17    May and August 2014 to the Wells Fargo account that the

18    defendant had his sister open.  Each was for over $100,00.  The

19    parties agree that each of these wires traveled in interstate

12:15 20   commerce, and you heard about these wires from John Lynch.

21          Counts Five through Seven charge the defendant with

22    unlawful monetary transactions in connection with sending

23    victim money from the Wells Fargo account he had his sister

24    open to his personal Bank of America account in May and June

25    2014.  Each of these transfers were for well over the

 1    10,000-dollar requirement.  And you heard about these

 2    transactions from Ms. Brekenfeld.

 3          Count Eight charges the defendant with not registering

 4    the money transmitting business he operated.  You know that the

 5    defendant never registered his business with FinCEN despite

 6    being on notice of the requirement.  You saw that in Exhibit

 7    43.  And common sense tells you why he didn't register his

 8    business.  Because he was using it to commit fraud.  He didn't

 9    want regulators asking questions about it.

12:16 10          Members of the jury, you've listened patiently and

11    you've listened carefully to the evidence in this case.  You've

12    heard from multiple witnesses how the defendant set up this

13    scheme, how his lies were imported, and you've seen lots of

14    emails and other records that confirm the witness' testimony.

15    You've seen that the person who benefited the most from this

16    scheme was the defendant.  And even though he took multiple

17    steps to cover up the money trail, the trail still leads back

18    to him.

19          But at the end of the day, all you need to decide this

12:17 20    case is your common sense.  Common sense tells you this was a

21    scam.

22          THE COURT:  Two minutes, counsel.

23          MR. MOORE:  It's a scam to tell investors you're

24    meeting armored trucks full of cash when you spent all of their

25    money.  It's a scam to tell investors that you are wiring their

1    money from Spain when you aren't.  And it's a scam when you get

2    people to send you money by making false claims about a

3    cryptocurrency that doesn't actually exist, backed by gold,

4    that you don't have, and a partnership with MasterCard that is

5    imaginary.  The defendant was behind it.  The money went to

6    him.  And he is the one who spent it.  Not on his business, on

7    his own lavish lifestyle.

8              When you consider the evidence and you use your common

9    sense, you'll know what to do.  You'll return the only verdict

12:17 10   that's consistent with the evidence in this case:  Guilty on

11   all counts.  Thank you.

12             THE COURT:  Thank you.

13             Mr. Lopez.

14             MR. LOPEZ:  Thank you, Your Honor.

15             Good morning, ladies and gentlemen of the jury.  To

16   begin with, I want to thank you for the time and attention that

17   you've given to this case.  I know that this has been a major

18   disruption to your lives, to your families, and it's been a

19   long trial.  So your service here is greatly appreciated by

12:19 20   Mr. Crater and myself and by the Court and by the prosecution.

21             Now, it's a solemn responsibility to sit as a juror.

22   Mr. Crater has literally put his life in your hands.  The

23   impact on his life of the decisions you make in this case will

24   affect him for the rest of his life.  And it's an awesome

25   responsibility to judge another individual.

1          Now, this is the last time you'll hear from the

2    defense in this case.  We have no rebuttal.  The government

3    gets to rebut what I tell you briefly, but this is the last

4    chance I get to speak to you.

5          Now, the Court has told you that you are the finders

6    of fact in this case, you and only you.

7          This case has been a very interesting case.  We're

8    relying upon the oath that you took to judge this case fairly

9    and impartially.  In this case, the government has the burden

12:20 10   of proof and Mr. Crater is presumed innocent.  And yet, the

11   government's entire case has been trying from the outset to

12   shift the burden of proof to Mr. Crater.  I submit to you that

13   the government has misunderstood this case from the outset.

14   The government doesn't really know what a cryptocurrency is.

15   All the government knows is that there was money that changed

16   hands.  It ended up in Mr. Crater's hands and he spent it,

17   let's call it frivolously.  But that's not a crime.

18          The investigation in this case was so inept that it's

19   remarkable.  They had the opportunity to get Mr. Lynch's

12:21 20   wallet.  Mr. Lynch had a backup of his wallet.  They spent

21   hours and hours upon hours with Mr. Lynch preparing him for his

22   testimony, making sure that he followed the script right down

23   to the letter.  And yet they never once asked him for his

24   wallet.  His wallet would have been able to allow a forensic

25   software engineer to determine exactly My Big Coin was, exactly

1    whether or not it was a cryptocurrency.  They didn't do it.

2    They didn't do it because they rushed to a judgment that

3    because he received a lot of money and he spent it, he must be

4    a criminal.

5          You know, England had Shakespeare and Scotland had

6    Robert Burns.  I don't know if some of you are familiar with

7    Robert Burns, but he brought poetry to the masses, and he's

8    widely considered to be the national poet of Scotland.  His

9    poems would usually deal with big ideas.  And he wrote a poem

12:23 10   entitled To a Mouse.  And in that poem a mouse has spent a lot

11   of time making a nest.  And Robbie Burns, who is a farmer,

12   destroys it by plowing his fields.  The purpose of the poem is

13   to apologize to the mouse.  Robbie understands that this mouse

14   has put an awful lot of time and effort into his nest and he's

15   destroyed it because he's a farmer.  In the poem he's feeling

16   guilty about destroying the mouse's nest and he wants to make

17   clear to the mouse that he's sorry.

18         The poem isn't so much about the mouse itself.  It's

19   more about the fact that sometimes no matter how well you plan

12:23 20   something, it can be taken away and destroyed in a matter of

21   minutes.  Thus, the phrase "The best laid plans of mice and men

22   often go askew."

23         What does that poem have to do with this case?  Well,

24   I submit to you, ladies and gentlemen, that Mr. Crater is the

25   mouse and the farmer is the government.

1            There was no search for truth in this case.  There was
2       no thorough investigation.  They didn't even understand
3       cryptocurrency.  They relied upon what they were told and they
4       didn't even verify that what they were told was actually the
5       truth.  They never even questioned Mr. Crater.  They never
6       approached him.  They never offered him an opportunity to
7       explain himself.  And they didn't know about Mr. Galvin, did
8       they?  Think about that.  There was no gold.  We know that now.
9       Do we know that because the government told you?  No.  We know
12:25 10  that because the defense hired a private investigator who found
11      Mr. Galvin and verified that the representations about the gold
12      that Mr. Donahue was making to Randall Crater and My Big Coin
13      was a fraud.
14            Yes, Mr. Crater relied upon what Mr. Donahue told him.
15      Now you know the truth.  The government didn't.
16            All the way back in March of 2014, in Exhibit 11L,
17      Mr. Crater thought he had a deal for gold with Mr. Donahue.  He
18      signed a contract to that effect.  He then made sure that
19      Mr. Donahue signed the contract.  That's in 11N.  Mr. Roche
12:26 20  wrote to Mr. Crater -- and, by the way, we know now that Billy
21      Donahue was Mr. Roche's friend, and we don't know what role
22      Mr. Roche had because the government never investigated him.
23      And Mr. Roche writes to Mr. Crater on March 24, 2014 in 11O,
24      "Something of this nature not disclosing a whole lot, have an
25      attorney clean it up.  Gold bullion has followed certified AU

1    metals endures bars from a gold bullion minimum 999.5 percent
2    or better," et cetera, et cetera.

3           So not only is Mr. Donahue lying to Mr. Crater but so
4    is Mr. Roche.  And then we have, in November of 2014, another
5    contract signed by Mr. Donahue with Mr. Roche for another $100
6    million.  And then in January, January 15 of 2015, we get to
7    12A.  And in 12A, we now know that there were barrels and
8    barrels and barrels depicted to Mr. Crater that there was gold
9    bullion, that there was gold in them hills.  And we now know
12:27 10   from Mr. Galvin there was, in fact, gold in those 500 barrels.
11   The only problem is that Mr. Donahue didn't have any ownership
12   interest in them.  Nevertheless, he represented in a document,
13   the investment document, that he was the director and principal
14   facilitator and fund manager for Galvin Investments LLC.  We
15   now know that that had nothing to do with MBC, My Big Coin, but
16   Randall Crater didn't know that in January of 2015.

17          Mr. Donahue even went so far as to send in assays and
18   you'll see in 12A there is even a value put on these 500
19   barrels.  I would place -- this is a letter from Dr. Robert
12:29 20   Finch, a nuclear chemist that Mr. Galvin mentioned.  And in
21   that he says, "However, to the best of my ability, I would
22   place a minimum value in excess of one billion, $198 million
23   providing we can extract all PGMs and other rare earth metals."
24   That was sent to Mr. Crater.  Mr. Crater is not a nuclear
25   chemist.  He didn't even graduate from high school.  He's got a

1    GED.  But to the average person who doesn't know any better,

2    that looked pretty authentic.  And, in fact, Mr. Galvin told

3    you that was authentic, and resumes upon resumes of different

4    assayers.

5         And then on January 15 -- on January 16, 2015,

6    Mr. Donahue in 12C writes, "Our product is in a Texas U.S.

7    federal bonded warehouse."  I'll read that again.  "Our

8    product," meaning my product and your product MBC "is in a

9    Texas U.S. federal bonded warehouse."  And we now know from

12:30 10   Mr. Galvin it was located in a Texas warehouse.  Do we know

11   that because of the government's investigation?  No.

12        And then on the 26th of January, Mr. Donahue sends

13   Mr. Crater in 12D, another document which says, "We'll get this

14   updated but it shows that the product is in a secure storage

15   facility and is there.  In most cases, the bank will want to

16   send an inspector to the facility when they want to confirm."

17   And then behind that we have page after page after page of what

18   we now know is an invoice for the storage of those 500 barrels

19   of concentrate.  We know that because Mr. Galvin testified to

12:31 20   that.  Not because of the government's investigation.

21        And then, on January 27, 2015, which the government

22   has pointed out a number of times, Randall is writing an email

23   which says, "Billy, thanks for what you have supplied us thus

24   far.  Yet our biggest concern is that the word 'gold' isn't

25   mentioned anywhere in either of the documents you forwarded to

1    us."  He's referring to this document and the warehouse

2    receipt.

3          So Mr. Crater, even at a time when he's being fed all

4    of this misinformation, he still has the wherewithal to say,

5    "Hey, there's something not right here."  But he's being told

6    that it's worth a lot of money.  And then, and the government

7    really harps on this one, he writes an email to John Lynch,

8    "And we have 300 million in gold backing," 12G.  Well, I submit

9    to you, and it's not our burden to prove anything, but this is

12:32 10   the only time Mr. Crater put anything in writing that said 300

11   million.  Was it a typo?  I don't know.  But it's not our

12   burden.  But Mr. Crater did honestly believe that he had $100

13   million in backing.

14         And then a day later, on January 29, William Donahue

15   sends another letter to him that says "Attached as requested."

16   Well, the request in 12H was, "Great.  Thank you, Billy.  Wow,

17   I just need a letter from Galvin stating we can use the gold

18   and we are golden, brother.  Call later to tell me who to issue

19   stock to."  That's Mr. Roche talking to his brother Billy

12:33 20   Donahue about what he needs from Galvin.  And lo and behold, an

21   email turns up from Mr. Galvin, "Attached as requested,

22   Harmonie is the authorized partner, asset managing partner,

23   fund manager, principle facilitator and trader for H.I. Galvin

24   relationship portfolio, H.I. Galvin, Harmonie International

25   Galvin relationship portfolio.  Plus I am a trusted director.

1    When do we start speaking with underwriting to coordinate when,

2    where and with whom.  We keep performing and we still see no

3    confirms of back office progress.  Tons of work to do when

4    going public, and we are not seeing any plans of the next step

5    launch and road show events" and so on and so on.

6            Well, we now know from Mr. Galvin that Mr. Donahue

7    said, "Just cut and paste this and send it to me.  I need it."

8    And so in Exhibit 48, that's exactly what Mr. Galvin did, not

9    knowing the significance of his actions.

12:34 10         And then, in April we get another email from

11   Mr. Donahue stating, "Here is the updated documentation in 12E,

12   and that's, again, a list of the warehouse invoice with the 500

13   barrels of minerals.  Not gold.  Not completely all gold.

14           Now, you would think after a thorough investigation

15   into this matter the government would have uncovered that

16   obvious glaring issue and yet they come before you today and

17   they say to you, Oh, no, Mr. Crater thought up this scheme.

18   They then take a bunch of different disjointed statements here

19   and there and they make up a story about what went down here.

12:35 20   And that story is just that, a story.  It's not proof.

21           Now, we now know that Mr. Crater was defrauded by Bill

22   Donahue.  The evidence does not prove that Mr. Crater knowingly

23   defrauded anyone.  Now, granted, there were many statements

24   made.  Some of them accurate, some of them not.  Some of them

25   mistakes, some of them innocent.

1             But let's get to really the money transmitting charge,

2       for example.  The government's own witness admitted that he

3       could not tell from looking at the My Big Coin Exchange site

4       whether it was in fact a money transmitting company.  The

5       government never proved that any money was transmitted through

6       that exchange site.  It's not Mr. Crater's burden to prove that

7       it didn't work.  It's their burden to prove that it did work

8       and they have failed miserably to do so.

9             On the money laundering charge, note that they're

12:37  10       talking about the withdrawals from the account.  And I suggest

11       to you that the withdrawals from the account came out of an

12       account that had more than enough money to cover whatever

13       monies went in from My Big Coin.  And interestingly, the

14       government doesn't mention anything about this, but they're not

15       saying the money was criminally derived when it went in.  They

16       didn't charge him with depositing criminally deprived money.

17       They're charging him with withdrawing money that was criminally

18       derived.  So my question to you is, how did it become

19       criminally deprived by being kept in a bank account?  And the

12:38  20       money that was withdrawn was less than the amount of money that

21       was in the account thereafter.  So it may have been commingled,

22       but commingling money doesn't make it illegal.

23             Now, we all know that the crux of this case is the

24       wire fraud case.  And the government has made many allegations

25       with respect to this wire fraud and has failed to prove many of

```
 1   them.  Number one, MBC is not a cryptocurrency.  What evidence
 2   did they provide to you to prove to you that it wasn't a
 3   cryptocurrency?  They didn't have a forensic computer
 4   specialist look at it.  They didn't try to find the nodes that
 5   had the codes.  They didn't look at any of the wallets.  They
 6   totally disregarded any type of investigation and then they
 7   bring an expert in who says, Well, there's no public -- you
 8   can't find anything publicly about this cryptocurrency.  Well,
 9   we know from the defense's expert that there could have been a
10   private blockchain, but then the government says, But even the
11   defense expert admits that there's nothing publicly available
12   about the private blockchain.  Well, that's why it's a private
13   blockchain.  And if you had done an investigation and you
14   determined that it was a private blockchain, you could have
15   then sought to get permission and then you could have tried to
16   evaluate what exactly was there.  It wasn't done.
17          It wasn't done because, ladies and gentlemen, this is
18   2013, 2014.  Cryptocurrency is brand new.  People don't
19   understand cryptocurrency.  And apparently they didn't bother
20   to look.  But it's not simple.  It's very complicated.  Did the
21   government use their resources to determine what they had?
22   Absolutely not.  They just assumed a fact which never was
23   entered into evidence.
24          I won't go back to "backed by gold."  We know the
25   government didn't prove this.
```

1           Now, there was also statements about that My Big Coin
2    couldn't be traded and exchanged for other currencies.  Well,
3    again, did the government prove that My Big Coin could not be
4    traded and exchanged for other currencies?  Did they put one
5    witness on the stand who said, "I tried to trade My Big Coin
6    for other currencies and was unable to do so"?  No.  In fact,
7    two of their witnesses didn't even try to make a trade, and the
8    one witness who did, Mr. Bell, well, I mean, he had -- he
9    didn't have higher expectations than any other reasonable
12:41 10   person would.  He thought My Big Coin was like the New York
11   Stock Exchange.  That's outrageous.  A startup company within
12   the first year that says it has an exchange and he thinks it's
13   going to be the same as a stock exchange that's been in
14   existence for over 100 years?  That's a credible statement?  I
15   suggest that Mr. Bell had other intentions.  I submit that
16   Mr. Bell was playing both sides against each other.  On the one
17   hand, he was helping the government build a case against My Big
18   Coin, and on the other hand he was trying to profit on his
19   investment in My Big Coin.  And guess what?  He did both.  He
12:42 20   hit the Trifecta, so to speak.  He got twice as much back than
21   he invested and he got My Big Coin shut down and the other
22   investors lost their money, maybe.  My Big Coin might live for
23   another day.
24           Now, there was an allegation that it couldn't be
25   exchanged for other goods and services.  Well, Mr. Callahan

```
 1   told you that he had a credit card and he was able to purchase
 2   things on the credit card.  But let's step back.  I said at the
 3   beginning of this case that this case was about starting a new
 4   business, a new startup.  And Mr. Crater had no experience in
 5   startups.  He relied on other individuals.  He relied on
 6   lawyers.  He relied on accountants.  He relied on bankers or
 7   people he thought were bankers like Mr. Donahue.  He relied on
 8   Mr. Roche.  He relied on others.  And why did he rely on
 9   others?  Because he's got a GED.  So he knew that he could not
10   do this by himself.  He needed help.  What did he do?  He was
11   responsible for the technology side.  And we now know he's not
12   a computer scientist.  He's not a coder.  He had to rely on
13   someone else to do that.  And when you rely on someone else to
14   do something and they tell you they've done it, it's perfectly
15   reasonable to believe it.  Especially when you've paid them to
16   do it.  And that's what we're talking about with Mr. Crater
17   here.
18           Now, it's true there were statements about the value
19   of the coin based on actual trading.  And the government has
20   presented some evidence that there was some possibility of
21   manipulation behind the price of the coin.  And the government
22   further alleges that Mr. Crater had exclusive control over
23   that.  But we know that's not what the evidence shows.  The
24   evidence shows that he had a head programmer in England who was
25   responsible for putting together the website and the
```

1   cryptocurrency and occasionally adjusting the price of the

2   coin.  We also know, however, from Mr. Bell, who kept trying to

3   trade, that he couldn't get anyone to trade with him at the

4   price he wanted.  Well, that's how the market works.  You need

5   a willing buyer and a willing seller.  He was a willing seller

6   but at that point in time, of the people that owned My Big

7   Coin, there weren't any willing buyers.  And again, his

8   expectation was that it was the New York Stock Exchange and it

9   should go just like that.  (Indicating.)  I don't know who ever

12:45 10   gave him that expectation but Mr. Crater never did.

11         Ladies and gentlemen, the government's theory here is

12   half the story.  There were a lot of other things going on

13   here.  And again, Mr. Crater has no burden of proof.  But we

14   know that there was inroads into the marijuana industry and he

15   was working on that.  And, you know, they make a big deal about

16   how, oh, he was counting his money.  Well, what did he tell

17   him?  He told him that he was counting money that was in a

18   Brinks truck, but you don't know the rest of the story.  There

19   were marijuana dispensaries that he was involved in.  And so

12:46 20   what the government does is they take little pieces of

21   information and they speculate about what it means, and then

22   they argue to you, We've proven that fact.  I suggest to you

23   that that's not the case.

24         Now, John Lynch, the witness who could not answer a

25   question yes or no.  He put in a lot of money.  He was one of

1    these people who just was gung ho about it.  Unfortunately, he

2    testified that he did it because someone told him it was backed

3    by gold.  But that's not the way it went and he knows it.  And

4    he lied to you.  And you know how I know he lied to you?

5    Because any lawyer that keeps saying "I take my oath seriously"

6    over and over again, who is trying to convince you that his

7    lies are the truth isn't credible.  He was in this.  He brought

8    his friends into it.  He recruited more people to My Big Coin

9    than Randall Crater did.  You haven't heard any evidence that

12:47 10   Randall Crater ever solicited one person to back, to purchase

11   My Big Coin.  The government alleges he sent out these lackeys,

12   Mr. Gillespie and Mr. Kruger, and he offered to pay them money.

13   Where is the proof of that?  They haven't proven that.

14        Also, Mr. Gillespie was off talking, saying this,

15   where is the proof that Mr. Crater authorized the statements he

16   was telling to investors?  Aside from the backed by gold.  Now,

17   "backed by gold," everyone was duped by that.  But it didn't

18   make the statement untrue when made because the people who made

19   those statements believed them to be true.  That's good faith.

12:48 20        Now, Jay Byrd.  Well, although he denied it, he was

21   pretty angry and he was brought into it and, I don't know, he

22   spoke to Mr. Gillespie.  I don't know what Mr. Gillespie told

23   him.  I don't know that he remembers.  And interestingly, if

24   you think about the government's witnesses and their memories

25   and then you compare it to the memories of the witnesses the

1  defense put forward, it's striking how clear the memory was of

2  the government's witnesses about everything in a sequence, for

3  things that happened eight or nine years ago, and then you

4  compare that to the witnesses that we put before you even

5  though we have no burden to prove anything.  Now, I submit to

6  you that every one of the government witnesses has a financial

7  incentive in this matter and that they're biased and that

8  they're not credible.

9        Now, what about the experts?  Well, they put up

12:49 10  someone who had no software background, didn't know anything

11  about computer science, did some reading, teaches other people

12  one-hour and two-hour courses about blockchain.  But doesn't

13  really understand blockchain.  She just understands what she

14  read.  And then she worked for a company that does this type of

15  research and tracing, but, interestingly, if you listened

16  carefully, she admitted, she didn't do it herself.  And yet she

17  came before you and said, This is my opinion.  Well, ladies and

18  gentlemen, I submit that she relied on her software engineers

19  for her opinion, and those software engineers weren't here.  So

12:50 20  we don't know what they were told to her.

21        We actually presented you with a software engineer who

22  told you that Ms. Clegg's opinion was false by omission.  How

23  do I say that?  She wrote a report which talked about publicly

24  available blockchains, but she never mentioned the fact that if

25  it was a private blockchain, she couldn't do blockchain

analysis in the public arena.  She didn't put that in her
report.  Was that a purposeful omission?  Well, after she saw
our report, now everything, what's publicly available, what's
not publicly available, and yes, our expert did concede that
private blockchains cannot be analyzed or can't do blockchain
analysis unless you get permission to get into the blockchain.

THE COURT:  Two minutes, counsel.

MR. LOPEZ:  Now, the spending habits and the taxes.  I
don't have much to say about that, but he's not charged with
failing to file tax returns, and his spending habits don't
prove that he's guilty of anything.

When you go back into that jury room, think about the
government's burden of proof.  The facts that they say they
proved to you, every single one of them, ask yourself, did they
prove that fact to you beyond a reasonable doubt?  And when
you're weighing that, say to yourself, "I have to presume
Mr. Crater is innocent unless and until they prove the facts
necessary to convict him beyond a reasonable doubt."

Now, you have the power and obligation to act.  We
told you at the beginning of this trial we're going to ask you
to do what no one else could do for Mr. Crater.  Protect him.
Protect him under the Constitution.  We are asking you not to
leave him at the mercy of the government any longer.  We ask
you to rescue him from this misguided prosecution.  We ask you
to give him his life back.  That, ladies and gentlemen of the

1    jury, is the greatest calling of an American jury.  That's what

2    we're here to do today, to do justice, to find the truth.

3            Mr. Crater was acting in good faith throughout.  And

4    the evidence supports that.  More importantly, the government

5    hasn't proven that he was acting in bad faith.  We urge you, we

6    beg you, to find Mr. Crater an innocent man, not guilty on all

7    charges.

8            THE COURT:  Thank you.  Rebuttal.

9            MR. MARKHAM:  Yes, Your Honor.

12:53 10        Defense counsel just stood here and told you that

11    Randall Crater never authorized the statement by Mark

12    Gillespie.  Mark Gillespie less than an hour ago sat on that

13    witness stand and told you that Randall Crater told him a whole

14    bunch of things and that Mark Gillespie then went and repeated

15    them to investors.  What are we talking about here?

16            Look at Exhibit Number 32.  Mark Gillespie gets

17    specific approval from the defendant for an email to investors

18    which says, quote, "Randall Crater has a banking license and an

19    elite deal with MasterCard."  Those were clear lies.  We've

12:54 20    proven to you that they are clear lies.  And what was the

21    defendant's response to that email from Mark Gillespie?  He

22    said, "Looks good."  He's telling them to spread these lies to

23    investors so that he can get $6 million and it worked.

24            The defense wants you to focus on old British poetry

25    because they don't want you to look at the defendant's own

1     words which are filled with knowing falsehoods.  All of this

2     money was criminally derived because it was all based on lies.

3          When you go back into the jury room, look at -- in

4     addition to 32, look at Exhibit 39.  This is the defendant's

5     text messages to Peter Bell in 2006, and he tells him that he

6     is in the middle of, I'm quoting, "Buying four banks for this

7     business where you can walk up to the counter and sell coins."

8     Was that a typo too?  He says he's going to have a, quote, "big

9     Army deal."  Was that a typo?  No.  It's just all made-up stuff

12:55 10    to get people's money or to keep their money.  It's part of the

11    scheme.

12         Look at Exhibit 16, again the defendant's own words

13    and in realtime, where he tells John Lynch in 2017 that now the

14    NFL is getting involved.  He says he's counting cash until 2:30

15    in the morning, waiting for an armored truck in Colorado.

16         Now, the defense says that the government didn't show

17    you the rest of the story.  Well, we did show you the rest of

18    the story.  Ms. Brekenfeld stood on that witness stand and told

19    you that at the time he made that statement, he was not in

12:55 20    Colorado.  He was spending money in Florida.  And he wasn't

21    counting cash, he had a negative account balance.  He was flat

22    broke making false statements to investors in order to trick

23    them to keep their money.

24         Exhibit 11H, the defendant says that the gold is in my

25    name in a bank in Spain.  The defense just walked you through

1    email after email showing attachments of old rusty barrels and

2    something that says 100 million dollar commitment to My Big

3    Coin.  Not a single one of those emails says that the gold is

4    in the defendant's name.  In fact, they don't say that at all.

5    They say the opposite.  None of them say that it's in Spain.

6    You can convict the defendant on that email alone.  He knew it

7    was false and he sent it anyway to a potential investor in

8    order to get their money.

9          Now, recognizing this evidence is absolutely

12:56 10    devastating for his client, the defense has made a lot of

11    statements about the government's burden in this case in terms

12    of what we specifically have to prove that are just not

13    accurate.  What the government's going to ask you to do is

14    listen to the Judge's instructions.  The government does not

15    have to prove that every statement ever said about My Big Coin

16    was a fraudulent misrepresentation.  The government doesn't

17    have to prove that Randall Crater was the mastermind of My Big

18    Coin.  The government doesn't have to prove that Randall Crater

19    was the only person who did anything wrong or that any specific

12:57 20    victim was defrauded of any specific amount of money.  To be

21    clear, what the government has to prove is that there are one

22    or more fraudulent misrepresentations about My Big Coin and

23    that the defendant knowingly and willfully participated in the

24    scheme.  The government has shown that to you.

25          In terms of the wires, the government only has to show

1    that the specific wires charged were in furtherance of My Big

2    Coin.  Counts One through Three are wire transfers for My Big

3    Coin investments.  Of course those further My Big Coin.

4         And Count Four is the defendant's lie that there's

5    $300 million in gold.  Of course that's in furtherance of the

6    scheme.  Whether it's a typo or not, it's still in furtherance.

7    Now, all the other fraudulent misrepresentations he made mean

8    that he's guilty.

9         For the unlawful money transmission, it's pretty

12:58 10    simple.  If you find the defendant committed wire fraud, that

11    he knowingly and willfully participated in the scheme, you just

12    have to find that he moved more than $10,000 of the My Big Coin

13    money to another account.  That's it.  And Ms. Brekenfeld told

14    you from that witness stand, she went through transaction by

15    transaction showing you that money comes in for My Big Coin

16    into an account the defendant controlled and then he

17    transferred it to another account he controlled.

18         Now again, the defense talked to you about these

19    emails about $100 million in gold.  Just remember what the

12:59 20    defendant told Robert McGowan, that the gold is in my name in a

21    bank in Spain.  That's Exhibit 11H.  That was just a lie.  The

22    bank records, IRS records, and the travel records show that the

23    defendant does not have a bank account in Spain.  And the

24    defendant knows he doesn't have a bank account in Spain because

25    he's the defendant.  He knows he's never been to Spain because

```
 1    he's the defendant.
 2              MR. LOPEZ:  Objection.
 3              THE COURT:  Well, overruled, counsel.
 4              MR. LOPEZ:  Note my objection, Your Honor.
 5              THE COURT:  Noted.  Mr. Markham.
 6              MR. MARKHAM:  There was no basis for the defendant to
 7    claim he had gold in his name personally anywhere.  And, of
 8    course, he would want to tell investors that was the case
 9    because if he started telling people, Well, actually I got an
10    attachment to an email from some guy I've never met who has
11    nuclear waste product somewhere in Texas, they wouldn't give
12    them -- him all of their money.
13              Also, don't forget what the defendant was saying in
14    realtime when he was getting these emails.  Exhibit 12B, he
15    admits that he has no, quote, "proof," that the gold exists.
16    Then he sends a follow up email saying, I'm quoting, "Our
17    biggest concern is that the word 'gold' isn't mentioned
18    anywhere in either of the documents you forwarded.  We need
19    something verifying that those barrels are filled with gold."
20    That's Exhibit 12F.
21              And what does he do the very next day?  While he's
22    talking internally about how they don't have any proof that
23    this stuff exists, externally to his biggest investor he's
24    saying point blank, "I have the gold.  It's 300 million.  Keep
25    sending me your money."  That's not good faith.  That's just
```

1    fraud.

2          And don't forget what happened for the next two years.

3    Of course, the gold never came through.  That's why none of the

4    investors ever got any of their money back.  Did the defendant

5    ever take down all those social media posts saying that he had

6    gold?  Did he ever print a retraction and go to his investors

7    and say, sorry, it turns out he didn't have it?  No.  He just

8    keeps saying he has it.  So he can keep taking their money and

9    spending it on cars and jewelry and a house.  It's called

01:01 10   fraud.

11          THE COURT:  Two minutes, counsel.

12          MR. MARKHAM:  On the MasterCards, again, buying a

13   prepaid MasterCard and telling people you have a deal with

14   MasterCard is totally misleading.  But most importantly, don't

15   forget, these MasterCards did not do what he said they would

16   do, which is spend My Big Coin currency in the real world.  And

17   if you look at Exhibit 32, the defendant is told that to build

18   that system it takes 300 man hours and all the funding and that

19   he didn't have it yet.  He knew he didn't have it.

01:01 20         As for the cryptocurrency, just remember the

21   government's expert and the defense's expert agrees there's no

22   evidence this ever existed.  And even in terms of their secret

23   cryptocurrency that no one can find any evidence exists, their

24   own defense expert said if that was the case, all the My Big

25   Coin advertising would be fraudulent.  The only cryptocurrency

1    in the world that's commercially based, available anywhere in

2    the world in seconds, all of that would be misleading and not

3    true.  So either way, whether it's some secret cryptocurrency

4    no one can find or they just didn't exist at all, it's still a

5    fraud.

6            Now, he's trying to blame everyone else.  Blame Bill

7    Donahue, blame John Roche, and blame Mark Gillespie, the guy he

8    pays to spread his lies.  Blame the victims for falling for it.

9    Blame the CFTC for actually investigating fraud.  How dare they

01:02 10    look into this company and figure out that it's a fraud, and

11    totally ignores the defendant is the one making these

12    statements that he knows are not true.  And that's why he has

13    to move the money into his sister's account and then move it to

14    his account and then hide it from the IRS and then never

15    register with FinCEN because he's hiding his fraud.

16            Don't forget there were real victims in this case.

17    You met Norman Mendiola and this fraud mattered to him.  The

18    guy was a valet driver who pumped his savings into My Big Coin

19    because he thought it would be safe and a good investment based

01:03 20    on the advertising.  And then the defendant went and spent that

21    money on a house and jewelry and cars.  And the fraud mattered

22    to Jay Byrd.  You heard him testify, too.  He's a retiree.

23            THE COURT:  Counsel, wrapping up.

24            MR. MARKHAM:  Yes, Your Honor.

25            He's a retiree on a fixed income.

1           As for Count Eight, the last one I'll address with

2    you, you just have to find that exchanging money is unlawful if

3    it is incident to an unlicensed money transmitting business.

4    We've shown you the checks from Randall Crater saying these are

5    for coin buyback and it's related to My Big Coin that's an

6    unlicensed money transmitting business.  He's transmitting the

7    money.

8           The defendant committed these crimes and we ask that

9    you find him guilty on all counts.  Thank you.

01:03 10          THE COURT:  Thank you.

11          Jurors, we've now come to the last two parts of my

12    charge to you.  These are the remainder of the jury

13    instructions.

14          I'm now going to instruct you on the nature of the

15    crimes charged in the indictment and the elements of each

16    offense that the government must prove beyond a reasonable

17    doubt.  The defendant, Mr. Crater, is charged with eight

18    federal crimes:  Four counts of wire fraud in violation of

19    Title 18, United States Code, Section 1343, Counts One through

01:04 20    Four; three counts of unlawful monetary transactions in

21    violation of Title 18, United States Code, Section 1957, which

22    are Counts Five through Seven; and one count of operating an

23    unlicensed money transmitting business in violation of Title

24    18, United States Code, Sections 1960, Section (a) and

25    (b)(1)(B), which is Count Eight.

1          To find the defendant guilty on any particular charge,

2    the government must prove each of the elements of the charged

3    offense beyond a reasonable doubt.  Before addressing the

4    elements of each of these charges, I'll first address the

5    meaning of some important terms regarding state of mind that

6    apply throughout the rest of my instructions.

7          You will hear reference throughout these instructions

8    to whether the government has proven beyond a reasonable doubt

9    that the defendant committed certain acts knowingly, willfully

01:05 10    or intentionally.  To act knowingly means that the act was done

11    voluntarily and intentionally and not because of mistake or

12    accident.  You may infer, but you're certainly not required to

13    infer, that a person intends the natural and probable

14    consequences of acts knowingly done or knowingly omitted.

15          To act willfully means to act voluntarily and

16    intelligently with the specific intent that the underlying

17    crime be committed.  That is to say with bad purpose.  Either

18    to disobey or disregard the law, not to act by ignorance,

19    accident or mistake.  Thus, if a defendant acted in good faith

01:06 20    or without the purpose to disobey or disregard the law, he

21    cannot be guilty of the crime that requires that he acted

22    willfully.

23          To act with intent or intentionally refers to a mental

24    condition or state of mind, that is the state of mind with

25    which an act is done or failed to be done.  All of these terms,

1   jurors, concern the defendant's state of mind.  The burden to

2   prove intent, as with all other elements of the crime, rests

3   with the government.

4          Because it's impossible to prove through direct

5   evidence the inner workings of the human mind, it is frequently

6   necessary to resort to circumstantial evidence.  Thus, in

7   deciding whether something is done knowingly, willfully or

8   intentionally, you may consider the actions of the defendant by

9   what he said or did, all of the facts and circumstances

01:06 10   surrounding his conduct and any reasonable inferences to be

11   drawn from those facts and circumstances.  It is entirely up to

12   you, the jurors, however, to decide what facts are proven by

13   the evidence received during this trial.

14          In deciding whether the defendant, Mr. Crater acted

15   knowingly, you may infer that the defendant had knowledge of

16   the facts if you find that he deliberately closed his eyes to a

17   fact that otherwise would have been obvious to him.  In order

18   to infer knowledge, you must find that two things have been

19   established.  First, that the defendant was aware of a high

01:07 20   probability of the fact at issue.  Second, that the defendant

21   consciously and deliberately avoided learning of that fact.

22   That is to say, the defendant willfully made himself blind to

23   that fact.  It is entirely up to you to determine whether he

24   deliberately closed his eyes to the fact and if so, what

25   inference, if any, should be drawn.  However, it's important to

1    bear in mind that mere negligence, recklessness or mistake in

2    failing to learn the fact is not sufficient.  There must be a

3    deliberate effort to remain ignorant of the fact.

4         The question of whether someone committed an act

5    knowingly or intentionally should never be confused with the

6    motive for an act.  Motive is what prompts a person to act or

7    to fail to act.  The concept of motive is different than the

8    concept of knowledge or intent.  Intent and knowledge refer

9    only to the state of mind with which the act is done or

01:08 10   omitted.  The government is never required to prove motive.

11   For purposes of determining innocence or guilt, therefore, the

12   motive of a defendant is immaterial, except in so far as

13   evidence of motive may aid in the determination of his state of

14   mind or his intent.

15        In Counts One through Four, Mr. Crater is charged with

16   wire fraud.  The indictment charges that from in or around 2014

17   until at least in or around 2017, Mr. Crater, together with

18   others, devised and executed a scheme to defraud investors by

19   soliciting investments in My Big Coin and coins and falsely

01:09 20   claim that, among other things, that the coins were a

21   functioning virtual currency and cryptocurrency backed by gold

22   and other assets and were readily exchangeable for goods and

23   currency.

24        As to each of the wire fraud charges, the government

25   must prove beyond a reasonable doubt that, one, that there was

1    a scheme substantially as charged in the indictment to defraud

2    or a scheme to obtain money or property through false or

3    fraudulent pretenses; two, the scheme to defraud involved the

4    misrepresentation or concealment of a material fact or matter,

5    or the scheme to obtain money or property involved a false

6    statement, assertion, half truth or knowing concealment of a

7    material fact or matter; three, that Mr. Crater knowingly and

8    willfully participated in this scheme with the intent to

9    defraud; and four, that for the purpose of executing the scheme

01:10 10   or in furtherance of the scheme, Mr. Crater caused an

11   interstate wire communication to be used or it was reasonably

12   foreseeable that for the purpose of executing the scheme, or in

13   furtherance of the scheme an interstate wire communication

14   would be used on or about the date alleged.

15          Jurors, a scheme includes any plan, pattern or course

16   of action.  It is not necessary that the government prove all

17   of the details alleged in the indictment concerning the precise

18   nature and the purpose of the scheme or that the alleged scheme

19   actually succeeded in defrauding anyone.  But the government

01:10 20   must prove beyond a reasonable doubt that the scheme was

21   substantially as charged in the indictment.  The term "defraud"

22   means to deceive another in order to obtain money or property.

23          Intent to defraud involves the state of a person's

24   mind and the purpose with which he or she acted at the time the

25   acts in question occurred.  Direct proof of knowledge and

1    fraudulent intent is almost never available, and you are not

2    required to find that such proof existed.  It would be a rare

3    case where it could be shown that a person wrote or stated that

4    as of a given time in the past he committed an act with

5    fraudulent intent.  Such direct proof is not required and you

6    may, as I previously instructed, consider circumstantial

7    evidence as to the defendant's state of mind.  Since an

8    essential element of the crime charged is intent to defraud, it

9    follows that good faith on the part of the defendant is a

01:11 10   complete defense to a charge of wire fraud.

11           It is for you to decide whether the defendant acted in

12   good faith or not.  The law is not violated if the defendant

13   acted in good faith and held an honest belief that his actions

14   were proper and not in furtherance of any illegal venture.  The

15   defendant, however, has no burden to establish the defense of

16   good faith.

17           The term false or fraudulent pretenses means any false

18   statements or assertions that were either known to be untrue

19   when made or were made with reckless indifference to their

01:12 20   truth and that were made with the intent to defraud.  The term

21   includes actual, direct false statements as well as half truths

22   and the knowing concealment of facts.

23           A material fact or matter is one that has a natural

24   tendency to influence or be capable of influencing the decision

25   of the decisionmaker to whom it was addressed.  An interstate

wire communication includes, for example, a wire transfer of
funds between financial institutions, as well as an email
transmission or other internet communication.  The wire
communication does not itself have to be essential to the
scheme but it must have been made for the purpose of carrying
it out.  There is no requirement that Mr. Crater was
responsible for the wire communication, that the wire
communication itself was fraudulent, or that the use of wire
communication facilities and interstate commerce was intended
as the specific or exclusive means of accomplishing the alleged
fraud.  But the government must prove beyond a reasonable doubt
that Mr. Crater knew or could have reasonably foreseen that use
of a wire communication would follow in the course of the
scheme.  The parties have stipulated that the wire
communications alleged in Counts One through Four of the
indictment were transmitted in interstate commerce on or about
the dates alleged.  That is, April 8, 2014, for Count One; May
1, 2014 for Count Two; August 13, 2014 for Count Three; and
January 28, 2015 for Count Four.  And each wire communication
was transmitted between Massachusets and at least one other
state on or about the dates identified in the indictment.
Thus, you do not have to decide whether wire communications
were transmitted in interstate commerce.  You must decide,
however, whether the government has proven beyond a reasonable
doubt that Mr. Crater caused an interstate wire communication

1    to be used to carry out the scheme or that it was foreseeable

2    that for the purpose of executing the scheme or in furtherance

3    of the scheme, an interstate wire communication would be used.

4    The government must prove beyond a reasonable doubt that

5    Mr. Crater knew or could have foreseen that use of a wire

6    communication would be used in the alleged scheme.

7         Jurors, in Counts Five through Seven, the defendant,

8    Mr. Crater, is charged with unlawful monetary transactions.

9    Namely, that he knowingly engaged in a monetary transaction

01:15 10    involving more than $10,000 of criminally derived property.  It

11    is against federal law to engage in such activity.  The

12    indictment alleges that the transaction charged in Count Five

13    occurred on or about May 2, 2014, that the transaction charged

14    in Count Six occurred on or before May 15, 2014, and that the

15    transaction charged in Count Seven occurred on or about June 2,

16    2014.

17         As to each of these charges, the government must prove

18    beyond a reasonable doubt that, one, Mr. Crater deposited,

19    withdrew or exchanged funds over $10,000 in a financial

01:15 20    institution affecting interstate commerce on or about the date

21    alleged in the indictment.  Two, that he knew the money came

22    from some kind of criminal offense.  Three, the money was, in

23    fact, criminally derived from the wire fraud.  And, four, the

24    wire fraud took place in the United States.

25         Affecting interstate commerce means that the

1    transaction affected commerce in any way or degree.  A minimal

2    effect is sufficient, for example, a deposit in an FDIC-insured

3    bank is sufficient.  The government does not have to prove that

4    Mr. Crater knew that the money was derived from the wire fraud

5    or that Mr. Crater committed the wire fraud.  It is enough that

6    Mr. Crater had general knowledge that the money came from some

7    kind of criminal offense.

8              In Count Eight, the defendant, Mr. Crater, is charged

9    with conducting an unlicensed money transmitting business.  It

01:16 10   is a federal crime to conduct an unlicensed money transmitting

11   business.  The indictment alleges that Mr. Crater conducted an

12   unlicensed money transmitting business between in or about 2014

13   and in or about 2017.  As to this charge, the government must

14   prove beyond a reasonable doubt that, one, that Mr. Crater

15   conducted, controlled, managed, supervised, directed or owned

16   on or about the dates alleged in the indictment; two, all or

17   part of an unlicensed money transmitting business; and, three,

18   that Mr. Crater did so knowingly.

19             Unlicensed money transmitting business means a money

01:17 20   transmitting business which affects interstate or foreign

21   commerce in any manner or degree and fails to comply with the

22   requirements, registration requirements of the U.S. Treasury

23   under Title 31, United States Code, Section 5330 or regulations

24   prescribed under such section.  Under federal law, it is not

25   unlawful merely to receive money for transmission without a

1    license.  Such receipt of money for transmission, however, is

2    unlawful if it is incident to an unlicensed money transmitting

3    business.

4         Money transmitting includes transferring funds on

5    behalf of the public by any and all means, including but not

6    limited to transfers within this country or to locations abroad

7    by wire, check, draft, facsimile or courier.  For money

8    transmitting to be conducted on behalf of the public, it must

9    occur within a transaction, business dealings or for a member

01:18 10   of the broader community rather than within a personal or close

11   relationship.

12        Jurors, the exhibits that have been admitted in

13   evidence for your consideration will be given to you.  The

14   numbers assigned to the exhibits are for convenience and to

15   ensure an orderly procedure.  You should draw no inference from

16   the fact that a particular exhibit was assigned a particular

17   number or that there may be gaps in the number sequence.

18        As I indicated to you at the beginning of the trial,

19   you are permitted to take notes, but some cautions apply.  You

01:19 20   should bear in mind that not everything that is written down is

21   necessarily what was said.  Thus, when you return to the jury

22   room to discuss this case during your deliberations, do not

23   assume simply because something appears in somebody's notes

24   that it necessarily took place in court.  Notes are an aid to

25   recollection, nothing more.  The fact that something is written

1        down does not mean that it is necessarily accurate.

2              You'll be pleased to know that I've come to the final

3        section of my instructions, which is relatively brief.

4              These are the rules for your deliberations.  When you

5        retire, you will discuss the case with the other jurors to

6        reach agreement, if you can do so.  As your first order of

7        business, you should select a foreperson.  You should permit

8        your foreperson to preside over your deliberations, and your

9        foreperson will speak for you here in court.  Your verdict as

01:20 10      to each count must be unanimous.  That is, all of you must

11        agree on the verdict.

12              Each of you must decide the case for yourself but you

13        should do so only after considering all the evidence,

14        discussing it fully with the other jurors, and listening to the

15        views of the other jurors.  Do not be afraid to change your

16        opinion if you think you were wrong.  But do not come to a

17        decision simply because other jurors think it is right.  This

18        case has taken time and effort to prepare and try.  There is no

19        reason to think it could be better tried or that another jury

01:20 20      is better qualified to decide.  It is important, therefore,

21        that you reach a verdict if you can do so conscientiously.

22              If it looks at some point as if you may have

23        difficulty in reaching a unanimous verdict, and if the greater

24        number of you are agreed on a verdict, the jurors in both the

25        majority and the minority should reexamine their positions to

1   see whether they've given careful consideration and sufficient

2   weight to the evidence that has favorably impressed the jurors

3   who disagree with them.  You should not hesitate to reconsider

4   your views from time to time and to change them if you are

5   persuaded that this is appropriate.  It is important that you

6   attempt to reach a verdict but, of course, only if each of you

7   can do so after having made your own conscientious

8   determination.  Do not surrender an honest conviction as to the

9   weight and the effect of the evidence simply to reach a

01:21 10   verdict.

11          I want to read to you now what is called the verdict

12   form.  This is simply a written notice of the decision you will

13   reach in this case.  It's pretty straightforward.  It's two

14   pages.  It has the case caption and number on the top.  And it

15   corresponds to each of the counts that are alleged against

16   Mr. Crater, so Counts One through Eight.

17          As to each count, there is a place to indicate your

18   verdict finding Mr. Crater not guilty or guilty.  And you'll

19   see as to the wire fraud counts, Counts One through Four,

01:22 20   they're identified by their date in the parentheses.  So wire

21   fraud on or about April 8, 2014 as to Count One; May 1, 2014 as

22   to Count Two; August 13, 2014 as to Count Three; and January

23   25, 2015 as to Count Four.  Count Five, the unlawful monetary

24   transaction counts, again, are identified by date, May 2, 2014

25   as to Count Five; May 15, 2014 as to Count 6; and June 2, 2014

1   as to Count Seven; and Count Eight is the single operating an

2   unlicensed money transmitting business.

3          On the bottom of the form, there is a place to date it

4   and have your foreperson sign it.  After you've reached a

5   unanimous agreement on the verdict, your foreperson, as I said,

6   will fill out the form, sign it and date it and advise the

7   court security officer and Ms. Hourihan that you're ready to

8   return to the courtroom.  After you return to the courtroom,

9   your foreperson will deliver the completed verdict form as he

01:23 10   or she will be directed to do in open court.

11          Jurors, if it becomes necessary during your

12   deliberations to communicate with me, you may send a note

13   through the Court security officer signed by your foreperson or

14   by one or more members of the jury.  No member of the jury

15   should ever attempt to communicate with me on anything

16   concerning the case except by a signed writing, and I will

17   communicate with any member of the jury on anything concerning

18   this case only in writing or orally here in open court.

19          If you send out a question, I'll consult with the

01:24 20   parties as promptly as possible before answering it, which may

21   take some time.  You may continue with your deliberations while

22   waiting for the answer to any question.  Remember, you are not

23   to tell anyone, including me, how the jury stands numerically

24   or otherwise, until you've reached a unanimous verdict or I've

25   otherwise discharged you.

```
          1              Bear with us for a moment.  I have to have one last

          2    sidebar on Whisper Tech with counsel.

          3              (Discussion held at sidebar.)

          4              THE COURT:  Counsel, Mr. Markham.

          5              MR. MARKHAM:  No objection from the government, Your

          6    Honor.  Nothing further.

          7              THE COURT:  Okay.  Mr. Lopez.

          8              MR. LOPEZ:  Thank you, Your Honor.  First I object to

          9    the willful blindness instruction.

01:25    10              THE COURT:  Noted.

         11              MR. LOPEZ:  Second, with respect to the money

         12    laundering instruction, I would ask that you add that the

         13    government must prove beyond a reasonable doubt that the money

         14    was in fact the proceeds of the wire fraud as separate from the

         15    laundering transaction.  In other words, they have to prove

         16    that the monies were dirty from the wire fraud.

         17              THE COURT:  Counsel, the wire fraud instruction that I

         18    gave was consistent with the pattern instructions in regards

         19    to --

01:25    20              MR. LOPEZ:  Your Honor --

         21              THE COURT:  -- Counts Five through Seven.

         22              MR. LOPEZ:  -- it gets to my point, that the money

         23    that came out had to be the money that was from the wire fraud,

         24    not some other source.  There was money that was clean in that

         25    account that could have been withdrawn legally.  It's only the
```

1    wire fraud money that couldn't be withdrawn.

2            THE COURT:  Counsel, I understand the point, but I

3    think I've given them the instructions that are consistent with

4    the law.

5            Mr. Markham, do you want to be heard?

6            MR. MARKHAM:  I would just note that in number three

7    of the unlawful monetary transactions instruction it says that

8    the money was in fact criminally derived from the wire fraud.

9            THE COURT:  Right.  Meaning that that's part of the

01:26 10   government's burden.  To the extent that, Mr. Lopez, you wanted

11   some further instruction, your objection is noted for the

12   record.

13           MR. LOPEZ:  Thank you, Your Honor.

14           THE COURT:  Anything else?

15           MR. LOPEZ:  No, Your Honor.

16           THE COURT:  Did you say no?

17           MR. LOPEZ:  I did say no.

18           THE COURT:  Thank you.

19           (End of discussion at sidebar.)

01:27 20          THE COURT:  Jurors, it's now time for this case to be

21   submitted to you.  As I said before, you will get a written

22   copy of the jury instructions that I've just read to you, as

23   well as a copy hard copy of the verdict form.

24           I want to caution you, however, if you choose to

25   review the jury charge, not to dwell on any particular portion

1    of it, if you decide to review it at all, because you must

2    consider these instructions as a whole and not just one

3    individual particular instruction.

4           In a moment, when we send you back up to the jury

5    room, you may commence your deliberations.  All of you who are

6    the jury, which will be all 12 of you, must be together at all

7    times when you're deliberating.  Whenever you need a recess for

8    any purpose, your foreperson may declare a recess.  Do not

9    discuss the case during a recess in your deliberations.  All

01:27 10   your discussion of the case should occur only when all of you

11   are together and your foreperson has indicated that

12   deliberations may proceed.  This should be your procedure so

13   that everyone in the jury has an equal opportunity to

14   participate and hear all of what other members of the jury have

15   to say.

16          In a moment we're going to send you up to the jury

17   room and you can commence your deliberations.  You will also,

18   as I said before, get hard copies of the exhibits that were

19   admitted into evidence.  And they will also be available on the

01:28 20   JERS system.  The JERS system, as I referred to before, is the

21   system that's up on the screen that's in the jury room.  I

22   believe there's a button in the low right-hand corner.  If you

23   press it, it will take you through how to operate it.  It's

24   pretty straightforward.  It's like a big iPad on the wall.

25   You'll have the exhibits as well as the jury charge and

1  verdict.

2          With that said, we'll have the deliberating jury

3  proceeds upstairs.  I would ask that Ms. Hayes and Ms. Swindell

4  remain behind.

5          Ms. Hourihan.

6          (Jury exits the courtroom.)

7          THE COURT:  Ms. Hayes and Ms. Swindell, you probably

8  figured out from the fact that the other 12 have left that you

9  are the alternate jurors here.  We are going to have you stick

01:29 10  around in a separate room, separate from the deliberating jury.

11  We will make sure that you get lunch as well.  What I have to

12  instruct you now is that the two of you still need to abide by

13  all of my cautionary instructions.  So don't talk to each other

14  about the case or anyone else about the case.  Don't do any

15  outside research.  Keep an open mind.  If there becomes reason

16  that we have to replace one of the deliberating jurors, we'll

17  obviously be turning to one of you.  So I would ask for your

18  patience and we'll make sure that you're comfortable.  Okay.

19  Thank you.

01:30 20          (Two jurors exit.)

21          THE COURT:  Counsel, I will have you certify on the

22  record to Ms. Hourihan, when she returns, that from both

23  parties' views the admitted exhibits are in order, both in hard

24  copy form as well as the electronic form that's been uploaded

25  onto JERS, just on the record.

1          Anything else from either side.  Mr. Markham?

2          MR. MARKHAM:  We do have to add a couple of exhibits

3     that were added today to the binder, but, yes, we'll try to get

4     that done.

5          THE COURT:  Okay.  So I just ask you do that and let

6     Mr. Lopez know you're doing that.

7          Anything else, Mr. Lopez, from your standpoint?

8          MR. LOPEZ:  No, Your Honor.

9          THE COURT:  Counsel, my general practice is we'll wait

01:31 10    to see what the afternoon brings.  If it gets to be around

11    4:20, 4:30, I usually have Ms. Hourihan go upstairs and just

12    check in with the jury to see what they want to do.  And if

13    they want to go home for the day, we'll assemble and we'll see

14    that they're all together and we'll send them off.

15         If the deliberations go into tomorrow, it is also my

16    practice that we gather to greet them every morning and then I

17    send them back up.  It's my intention to bring back the two

18    alternates and have them to continue abiding by my cautionary

19    instructions and we'll keep them separate from the deliberating

01:32 20    jury.

21         I'm sure counsel knows to do this on both sides but

22    make sure that Ms. Hourihan has your cell phone numbers, and I

23    don't know if there will be questions or not from the jury but

24    just so she can reach you in short order if there is any.  And

25    like I said, if they want to go home in the afternoon, I'll

1    want to do that in the presence of counsel and Mr. Crater.

2        I referenced this before, counsel.  No case is easy to

3    try.  And I know it's particularly challenging when there are a

4    lot of documents, and this case involved cryptocurrency, which

5    is new to probably many people in the room, or relatively.  I

6    appreciate the advocacy on both sides and the courtesy I think

7    you've shown to each other and to this Court and I appreciate

8    it, so thank you.

9        MR. LOPEZ:  Thank you, Your Honor.

01:33 10        MR. MARKHAM:  Thank you, Your Honor.

11        MR. MOORE:  Thank you, Your Honor.

12        THE COURT:  Counsel, I'll leave you to Ms. Hourihan in

13    terms of certification and, as I said, we'll see what the day

14    brings.  Thank you.

15        MR. MOORE:  Yes, Your Honor.

16        (The Court exits.)

17        MR. LOPEZ:  I, Scott Lopez, officially certify that

18    I've reviewed the exhibits and I approve of them being

19    submitted to the jury.

01:40 20        THE CLERK:  As well as the JERS disk?

21        MR. LOPEZ:  As well as the JERS disk, assuming the

22    JERS disk is an exact duplicate.

23        MR. MOORE:  I, Siji Moore, certify that I approve the

24    exhibits and JERS disks to be sent to the jury.

25        (Recess from 1:40 to 3:32 p.m.)

|   |   |
|---|---|
| 1 | THE CLERK:  All rise. |
| 2 | THE COURT:  Counsel, as I'm sure Ms. Hourihan has made |
| 3 | you aware, we received a juror question that I'll just read for |
| 4 | the record. |
| 5 | Can we have an exhibit reference to Count Four of the |
| 6 | indictment, January 28, 2015, wire fraud, question mark. |
| 7 | Counsel, I'll -- and you can all be seated, I'm just |
| 8 | standing because we've been sitting a lot. |
| 9 | Counsel, I'll hear you on proposed responses. |

```
03:32 10        MR. MARKHAM:  Your Honor, I'm pretty positive it's

     11    12G.  I think that's what both parties have, so --

     12        THE COURT:  So, Mr. Lopez --

     13        MR. LOPEZ:  I concur.

     14        THE COURT:  Do you agree with that?

     15        So I'll just say, In response to your question for an

     16    exhibit reference to Count Four of the indictment, it is

     17    Exhibit 12G.

     18        MR. MARKHAM:  And, your Honor, there's no descriptions

     19    in the JERS disk.  I didn't double check that before it went

03:33 20    in, largely because I was in the courtroom, the paralegals were

     21    doing it upstairs.  I'm just wondering whether it's worth

     22    providing an exhibit list or providing an updated JERS list if

     23    they're having a hard time finding exhibits.

     24        THE COURT:  Okay.

     25        MR. MARKHAM:  Because we have an exhibit list that we
```

         1    could just -- that way they have a way to get through these

         2    exhibits.

         3              THE COURT:  Mr. Lopez, do you have any position on

         4    that?

         5              MR. LOPEZ:  I would just like to see the final exhibit

         6    list before it goes in.

         7              THE COURT:  Why don't you both look at the exhibit

         8    list, and if there's an agreement, we can send that up to them.

         9              In the meantime, while you talk about that, I'm just

03:34   10    going to write up the answer.

        11              (Discussion off the record.)

        12              MR. MARKHAM:  And, your Honor, there's one other item.

        13              THE COURT:  Just give me a moment.

        14              (Discussion off the record.)

        15              THE COURT:  I just wrote, counsel, In response to your

        16    question requesting an exhibit reference to Count Four of the

        17    indictment, that exhibit number -- I used the number symbol --

        18    is Exhibit 12G.

        19              Fine with both sides?

03:35   20              MR. MARKHAM:  Yes, your Honor.

        21              MR. LOPEZ:  Fine, your Honor.

        22              THE COURT:  Should I add a line, For ease of

        23    reference, please find an exhibit list attached?

        24              MR. MARKHAM:  Yes, your Honor.  I think we're going to

        25    have it printed out in the next 10 minutes.  Given the number

1    of emails, I do think it would be helpful.

2            THE COURT:  For your ease of reference, please find an

3    exhibit list for the admitted exhibits that you have in the

4    jury room and in electronic form on the JERS system.

5            Okay.  Let me just read you the whole thing.

6            In response to your question requesting an exhibit for

7    Count Four of the indictment, that exhibit number is Exhibit

8    12G.

9            For your ease of reference, please find an exhibit

03:37 10   list for the admitted exhibits that you have in the jury room

11   and in electronic form on the JERS system.

12           And then I just signed it.

13           So, counsel, and I have no pride of ownership, if you

14   want to look at it before it goes up, but I would just say wait

15   for the exhibit list to come down, make sure that both sides

16   sees it, and if it's in order, Ms. Hourihan will just bring

17   this response up with the exhibit list.

18           MR. MARKHAM:  Thank you, your Honor.

19           Can I note one thing?

03:37 20           THE COURT:  Sure.

21           MR. MARKHAM:  Just so you know, a request will be

22   coming in.

23           A couple of the agents in this case, their home

24   address were on subpoena returns that are now on the public

25   docket.  They have understandable concern about that.

ROUGH DRAFT

        1           Also, I guess during voir dire, their hometowns were

        2     mentioned as well.  I'd just ask if there's any way we could

        3     seal the two subpoena responses and potentially their hometowns

        4     in the voir dire.

        5           THE COURT:  So I guess as to what's on the docket,

        6     counsel -- and I'm assuming, Mr. Lopez, you don't have any

        7     objection?

        8           MR. LOPEZ:  Your Honor, my memory was that at least

        9     with respect to one of the agents, the address we had was not

03:38  10     actually their home address because I didn't get good service,

       11     but --

       12           MR. MARKHAM:  I haven't looked -- they just e-mailed

       13     me saying these are the two docket numbers.

       14           THE COURT:  I'd just say, Mr. Markham, if you can just

       15     identify them for Mr. Lopez, like which ECF entries you're

       16     talking about and exactly what you want to redact, I would

       17     entertain redacting at least that information.

       18           In terms of the voir dire, that is not on the docket,

       19     I don't think, Ms. Hourihan.  I don't think the transcript

03:39  20     would be on the docket.

       21           (Discussion off the record.)

       22           THE COURT:  Did you order the impanelment transcript?

       23           You probably didn't.

       24           MR. MARKHAM:  No.

       25           THE COURT:  So assuming that's the case, it wouldn't

```
 1   appear on the docket, so I have less concern about that.
 2            As you may have noted, if someone mentioned a street
 3   address, I did have that redacted when I heard it, but I think
 4   most people just identified their towns.
 5            MR. MARKHAM:  Okay, your Honor.
 6            MR. LOPEZ:  Your Honor, for the record, I have no
 7   problem with redacting if it's a home address.
 8            THE COURT:  Okay.  That's fine.
 9            Just, Mr. Markham, if you can just identify that for
10   Ms. Hourihan --
11            MR. MARKHAM:  Yes, your Honor.
12            THE COURT:  -- which exhibits we're talking about.
13   And like I said, I don't think the transcript will appear.
14            MR. MARKHAM:  Excellent, your Honor.  Thank you for
15   that.
16            THE COURT:  And again, counsel, just noting the time,
17   I will have Ms. Hourihan just check in with the jury if we
18   haven't heard anything around 4:30 to see what they'd like to
19   do.
20            MR. MARKHAM:  Yes, your Honor.
21            THE COURT:  Thank you.
22            THE CLERK:  All rise.
23            (Recess taken from 3:40 to 4:31 p.m.)
24            THE CLERK:  All rise.
25            (The Court entered the courtroom.)
```

ROUGH DRAFT

```
 1              THE CLERK:  Please be seated.
 2              THE COURT:  Good afternoon again, counsel.
 3              We got another note from the jury.  I'll just read it
 4       for the record.  I understand Ms. Hourihan has shared it with
 5       you.
 6              We, the jury, cannot come to a conclusion on the 4th
 7       count because we are unable to locate the evidence of the wire
 8       transfer from January 28, 2015.  Can we please be directed to
 9       the wire transfer that supports this charge?  Which bank?
04:36 10  Account number?
11              And then it's signed by what I take to be either the
12       foreperson or another member of the jury.
13              Counsel?
14              MR. MARKHAM:  Yes, your Honor.  My understanding is
15       they don't have the indictment with them, so I don't think they
16       understand that Count Four is an email, it's not a wire
17       transfer.
18              THE COURT:  Okay.
19              MR. MARKHAM:  So I think at a bare minimum we can
04:36 20  direct to them page 21 of the jury instructions which make
21       clear that an interstate wire communication can include an
22       email.
23              THE COURT:  Okay.
24              MR. MARKHAM:  But I also think -- I think it needs to
25       be made clear to them that Count Four is not -- they're looking
```

1    for an account number that doesn't exist.

2         THE COURT:  Got it.

3         Mr. Lopez?

4         MR. LOPEZ:  Your Honor, as I read the question,

5    they're looking for something that doesn't exist.  So I

6    wouldn't want to instruct them -- I wouldn't want to add

7    anything to the instruction that might suggest that it doesn't

8    exist because it's their job to determine what the facts are --

9         THE COURT:  But, I think, counsel, what the issue may

04:37 10    be is if you look on page 21 --

11        MR. LOPEZ:  Yes.

12        THE COURT:  -- of the charge, the parties have

13   stipulated that the wire communications alleged in Count One

14   through Four, and then we've elsewhere described that a wire

15   communication in the paragraph above, a wire communication can

16   include a wire transfer of funds between financial institutions

17   as well as an email transmission or internet communication.

18        There is no dispute that Count Four charges the email

19   transmission, not a wire transfer.

04:38 20        So that's, as I take -- I think that's a reasonable

21   reading of their question.

22        MR. LOPEZ:  But their understanding of the fraud is

23   that -- the wire fraud that it has to be a scheme in order to

24   obtain money or property by means of false representations.

25   They're looking for the money.  There is no money, and

1      therefore, there should be no fraud.

2            THE COURT:  Counsel, I think that's reading more into

3      this.

4            I think what they're asking for is, because we're

5      unable to locate the evidence of the wire transfer from January

6      28, 2015, can we please be directed to the wire transfer.

7            I think it's appropriate here, counsel, to point them

8      to what they've already been instructed about on page 21, that

9      the wire communication alleged in Count Four is a January 28,

04:39 10   2015 email and remind them, again, with reference to page 21,

11     that an interstate wire communication includes, for example,

12     wire transfer of funds, as well as an email transmission or

13     other internet communication.

14           MR. LOPEZ:  Just note my objection, your Honor.

15           THE COURT:  Noted.

16           Mr. Markham.

17           And is 12E the email?

18           MR. MARKHAM:  12G is the --

19           THE COURT:  Excuse me, 12G.

04:40 20         MR. MARKHAM:  So essentially they asked for that email

21     and now they're looking for the wire transfer on the same date,

22     it seems they're just confused.

23           I do wonder whether providing them this one page of

24     the indictment that lists out the exact wires charged would

25     make them -- would not be any input from counsel, it just be

1    the wire charged in the indictment, because it says interstate

2    wire email.

3              THE COURT:  Well, counsel, I may just quote -- if I

4    can just see the page, counsel.

5              MR. MARKHAM:  Yes.

6              Permission to approach.

7              THE COURT:  Yes.

8              Counsel, just give me a minute, and then I'll read it

9    back to you before we give it to the jury.

04:42 10              (Pause.)

11              THE COURT:  The exhibit number again was 12G?

12              MR. MARKHAM:  12G, your Honor, yes.

13              (Pause.)

14              THE COURT:  Okay.  So this is what I propose to say:

15    In response to your question the, open quote, interstate wire

16    communication, end quote, alleged in Count Four is the January

17    28, 2015 email from Mr. Crater, open paren, Exhibit 12G, close

18    paren period.

19              As explained on page 21 of the jury channel, an, open

04:45 20    quote, interstate wire communication, can be a wire transfer of

21    funds between financial institutions or an email transmission.

22              Counsel.

23              MR. MARKHAM:  No objection from the government, your

24    Honor.

25              MR. LOPEZ:  I object, your Honor.

1          THE COURT:  For the reasons stated before?

2          MR. LOPEZ:  Yes, your Honor.

3          THE COURT:  Counsel, I would further say what you

4    further argued before, Mr. Lopez, is contrary to the next

5    sentence in the paragraph in regards to what the wire

6    communication does not itself have to be essential to the

7    scheme but must be made for the purpose of carrying it out.

8          So I think I always want to make sure that I'm not

9    answering a question they haven't asked, and I think here where

04:46 10   we've given them the operative document and they're asking a

11   question, it's reflecting some confusion about the meaning of

12   wire communication for the purposes of Count Four.

13         So noted for the record.

14         MR. LOPEZ:  Your Honor, just to add, it's possible

15   that their interpretation of your instructions is that in order

16   to be part of the scheme, there has to be some obtaining of

17   money, and there's no obtaining of money.  Now you're

18   elaborating upon your instructions and further instructing them

19   that the email itself is sufficient, the implication is even

04:46 20   without any transfer of funds.

21         I think that is outside the realm of the jury

22   instructions.

23         THE COURT:  Counsel, I think this is, as I said, I

24   don't think I'm saying anything in this response, I'm referring

25   to the definition of interstate wire communication, which is

1    reflected on page 21, that the email is what's charged in Count

2    Four, which is already before them, both in evidence, 12G, and

3    as alleged, and the last sentence just, again, quotes what I've

4    already said in the charge.

5          Thank you.

6          MR. LOPEZ:  Note my objection, your Honor.

7          THE COURT:  Okay.

8          Counsel, I'm just going to sign this.

9          Okay.  Counsel, again, no pride of ownership, so if

04:48 10   you want to take a look at it before it goes up, thank you.

11         And I'll give this back to you, this page of the

12   indictment.

13         MR. MARKHAM:  Thank you, your Honor.

14         (Recess taken.)

15         THE COURT:  Before you all leave, counsel, I just had

16   a further thought that I was just going to add here, just to

17   Mr. Lopez's point -- you can all be seated for the moment.

18         I think I'm just going to add a line at the end that

19   says, As to each of -- as with each of the wire fraud counts,

04:50 20   you must find that all elements of the wire fraud have been

21   proven beyond a reasonable doubt as explained in the wire fraud

22   instruction.

23         Any objection to that addition?

24         MR. MARKHAM:  No, your Honor.

25         THE COURT:  Mr. Lopez.

1          MR. LOPEZ:  No, your Honor.

2          THE COURT:  Okay.  Give me a second.

3          (Pause.)

4          THE COURT:  Okay.  Let me just read it back.

5          In response to your question, the, open quote,

6     interstate wire communication, end quote, alleged in Count Four

7     is the January 28, 2015 email from Mr. Crater, open paren,

8     Exhibit 12G, close paren.

9          As explained on page 21 of the jury charge, an, open

04:55 10     quote, interstate wire communication, end quote, can be a wire

11     transfer of funds between financial institutions or an email

12     transmission.

13          As with each of the wire fraud counts, open paren,

14     counts 1-4, close paren, you must find that all elements of the

15     wire fraud have been proven beyond a reasonable doubt as

16     explained in the wire fraud instruction.

17          And then I signed it.

18          MR. MARKHAM:  No objection, your Honor.

19          THE COURT:  Okay.

04:55 20     Mr. Lopez?

21          MR. LOPEZ:  Your Honor, as the hour is late, what I'm

22     wondering is if maybe we should wait until tomorrow to give

23     that back to the jury --

24          THE COURT:  Well, I think that given that they're

25     giving us questions and not an indication that they're burning

ROUGH DRAFT

```
 1    to get out of here, I will send this up, and then we'll see
 2    what they want to do.
 3              MR. LOPEZ:  Fine.
 4              THE COURT:  And Ms. Hourihan is close if they decide
 5    they want to come back tomorrow.
 6              MR. LOPEZ:  I assume that they're up to Count Four and
 7    they have --
 8              THE COURT:  I think assumptions --
 9              MR. MOORE:  There's a famous saying about that.
10              THE COURT:  Are always unclear about what a jury's
11    process is.  I won't speculate on how they're doing their
12    business.  Thank you.
13              ALL:  Thank you.
14              (Recess taken from 4:56 to 5:08 p.m.)
15              (The Court entered the courtroom.)
16              THE COURT:  The jury wants to go home for the day, so
17    I'm just going to give them instructions, cautionary
18    instructions, until they return tomorrow and we recognize that
19    they're all here.
20              (Pause.)
21              THE CLERK:  All rise for the jury.
22              (Jury entered the courtroom.)
23              THE COURT:  Good afternoon, jurors.
24              I understand you want to go home; it's been a long
25    day, we understand.
```

ROUGH DRAFT

1          Just keep in mind all of my cautionary instructions

2     until I see you again in the morning and send you back to

3     continue your deliberations.

4          In the meantime, don't talk to each other or anyone

5     else about the case, keep an open mind, don't do any outside

6     research, and I'm going to ask all of our jurors, not just the

7     12 deliberating jurors, but our two alternates, to return

8     tomorrow a little before 9:00.  You'll all come into the

9     courtroom, we'll make sure you're all here, and then I'll send

05:11 10    the deliberating jury back up to continue your deliberations.

11          Have a good evening.  Thank you.

12          THE JURY:  Thank you, your Honor.

13          (Jury left the courtroom.)

14          THE COURT:  Counsel, unless you think we'll have

15     anything else to discuss, I would just say that we can assemble

16     a few minutes before 9:00 tomorrow.

17          Anything else I should take you now?

18          MR. MARKHAM:  Nothing from the government, thank you.

19          MR. LOPEZ:  No, your Honor, thank you.

05:11 20    THE COURT:  Thank you.

21          (Court adjourned at 5:11 p.m.)

22          --------------------

23

24

25

ROUGH DRAFT

CERTIFICATION

We certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of our skill and ability.

/s/Debra M. Joyce                    July 20, 2022
Debra M. Joyce, RMR, CRR, FCRR   Date
Official Court Reporter

/s/Kelly Mortellite                  July 20, 2022
Kelly Mortellite, RMR, CRR       Date
Official Court Reporter

INDEX

WITNESS                                                          PAGE


MARK GILLESPIE

   Continued Direct Examination                                   14
   By Mr. Lopez
   Cross-Examination                                              18
   By Mr. Markham
   Redirect Examination                                           33
   By Mr. Lopez
   Recross-Examination                                            34
   By Mr. Markham

MICHAEL SINGLETON

   Direct Examination                                             38
   By Mr. Lopez
   Cross-Examination                                              61
   By Mr. Moore

RICHARD GALVIN

   Direct Examination                                             65
   By Mr. Lopez
   Cross-Examination                                              79
   By Mr. Markham
   Redirect Examination                                           82
   By Mr. Lopez

THOMAS CALLAHAN

   Direct Examination                                             85
   By Mr. Lopez
   Cross-Examination                                              89
   By Mr. Moore
   Redirect examination                                           94
   BY MR. LOPEZ
   Recross-Examination                                            95
   By Mr. Moore

LARRY BRANTLEY

   Direct Examination                                             96
   By Mr. Lopez
   Cross-Examination                                             100
   By Mr. Moore
   Redirect Examination                                          103

By Mr. Lopez

E X H I B I T S

| Exhibit No. | Description | Received |
|---|---|---|
| 45 | | 17 |
| 46 | | 52 |
| 47 | | 57 |
| XX | | 76 |
| 48 | | 77 |