IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.        ) | Criminal No. 19-cr-10063-DJC |
| ) | |
| RANDALL CRATER,   ) | |
| ) | |
|    Defendant   ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Mr. Crater spent nearly four years perpetrating a brazen fraud resulting in losses of over $7.5 million from at least 55 victims. Mr. Crater controlled the purported virtual currency company "My Big Coin," which Mr. Crater and his paid agents used to execute his fraudulent scheme: telling a variety of lies and half-truths about My Big Coin to obtain money from investors and customers. All of that money went to bank accounts controlled by Mr. Crater, which he used primarily to fund his lavish lifestyle. Mr. Crater was convicted at trial on all counts, including wire fraud (Counts I-IV), unlawful monetary transactions (Counts V-VII), and operating an unlicensed currency exchange (Count VIII). The government recommends a sentence that includes 156 months of incarceration, restitution for all victim losses, and a forfeiture order for all monies transferred by victims to accounts controlled by Mr. Crater.

**I.   Summary of the Facts**

The evidence at trial demonstrated that Mr. Crater controlled My Big Coin and its virtual currency. Mr. Crater claimed that he "built the system," Ex. 11t (April 11, 2014 email from Mr. Crater), and advertised himself as the "creator" and "developer" of My Big Coin, Ex. 1.a (Mr. Crater LinkedIn Profile). Mr. Crater also paid and directed others to promote My Big Coin,[1] and

---

[1] *See, e.g.,* Day 4 Tr. 83:14–16 (Jay Bird testifying that "[e]very time I talked to Mark Gillespie it was always -- he always referred to Randall Crater. He passed the information from

1

personally conducted the transfers of the My Big Coin currency for customers. *See, e.g.*, Ex. 44 (summary financial exhibit showing money transfers in and out of accounts controlled by Mr. Crater); Ex. 11i (March 13, 2014 email from Mr. Crater to a customer asking "how many coins would you like to buy" and stating "I'll back date the cost of the coins to the day you set the account up").

All of the money from customers and investors went directly into bank accounts that Mr. Crater controlled:



Randall Crater on to us."); Day 7 Tr. 23:17–33:3 (Mr. Gillespie testifying that Mr. Crater paid him thousands of dollars to spread information about My Big Coin); *see also* Government Motion on Hearsay Statements of Agents, Dkt. No. 159 (identifying evidence that several individuals, including Mark Gillespie, were paid agents of the defendant); Day 5 Tr. 245:8–11 (the Court holding "I think here there has been sufficient basis about the agency exception for the purposes of the admission of statements who are purported to be or alleged to be by the government agents of Mr. Crater").

Ex. 44 at 2; *see also* Day 6 Tr. 94:10–17 (Ms. Brekenfeld: "Q. Who does it appear, based on your analysis, controlled the My Big Coin accounts? A. Mr. Crater. Q. Did there appear to be personal spending in the My Big Coin accounts? A. Yes. Q. Personal spending by whom? A. Mr. Crater.").

Mr. Crater also structured his business to avoid detection. For example, he funneled all payments from My Big Coin investors and customers into accounts that he controlled but that were opened in the names of his sister and mother. Ex. 44 p. 1 (identifying My Big Coin accounts opened in the names of Mr. Crater's sister (Kimberly Benge) and mother (Barbara Crater Meeks)); Day 4 Tr. 157:25–158:1, 160:6–161:5 (Ms. Benge testifying that Mr. Crater instructed her to open the bank account). Mr. Crater forged his sister's signature on checks paid to individuals who were promoting My Big Coin. *Compare* Ex. 44 at 9, 11 (examples of checks containing a signature in the name of "Kimberly Benge" from the Wells Fargo account controlled by Mr. Crater) *with* Day 4 Tr. 162:21–22 (Ms. Benge: "Q. Did you ever write any checks from this [Wells Fargo] account? A. No, sir.") *and id.* 164:6–8 (Ms. Benge: "Q. . . . Who had the checkbook for Greyshore between the period of 2014 and 2017? A. Mr. Crater did."). Mr. Crater also never reported any of the My Big Coin income to the IRS and never registered the My Big Coin Exchange with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), both of which were legal requirements. *See, e.g.*, Ex. 42 (IRS Certification of Lack of Record), Ex. 43 (FinCEN Certification of Lack of Record); *see also* Ex. 10.b (December 11, 2013 email from James Douglas providing instructions to Mr. Crater about the requirement and process of FinCEN registration).

With this framework in place, Mr. Crater and his paid agents told a series of lies to get money from investors and customers. Most notably, Mr. Crater and his paid agents falsely claimed that My Big Coin was a cryptocurrency, was backed by gold, and had a partnership with

3

Mastercard. These claims were all demonstrably false.[2] Mr. Crater told these lies (and others) over the course of *at least four years*, from January 2014 through the end of 2017, and through *a variety of methods*, including in-person conversations, emails, and his personal social medial accounts.[3] As just one example, here is an advertisement, gold-colored and filled with false statements, from Mr. Crater's personal Twitter account (Ex. 6):



---

[2] The government previously summarized the evidence demonstrating that these claims were false in Dkt. No. 210, Government Opposition to the Defendant's Motion for Judgment of Acquittal and Motion for New Trial.

[3] Witnesses testified that Mr. Crater made these false claims in person. *E.g.*, Day 5 Tr. 47:10–14, 48:17–25 (Robert McGowan testimony). Mr. Crater also repeated the false claims in various emails, *see* Exs. 10.a–14.g., and on social media, *e.g.*, Ex. 1.a (Mr. Crater LinkedIn); Ex. 6 (Mr. Crater Twitter).

These same false claims also blanketed the internet through the My Big Coin webpages, Exs. 7a.–7.h., and multiple My Big Coin social media pages, Exs. 27 (YouTube video), 28 (Twitter page), 30 (Facebook page), which Mr. Crater and his paid agents used to promote My Big Coin. For example, the My Big Coin Exchange purported to show an active trading market for the fake My Big Coin cryptocurrency. *E.g.*, Ex. 7.f. Simultaneously, on both Twitter and Facebook, My Big Coin advertised rapid increases in "current value"[4] interspersed with false statements about important developments at My Big Coin. *See* Exs. 27, 28, and 30 (making various false statements about My Big Coin, including that it was a cryptocurrency, had entered into a gold contract, had entered into a contract with Mastercard, was trading on multiple cryptocurrency exchanges, was launching a "mobile app for the apple and android phones", and would be "the first company in the digital currency space to launch an IPO").

In coordination with these lies about his business, Mr. Crater also lied about his own personal history and instructed his paid agent (Mark Gillespie) to do the same. For example, Mr. Crater personally approved an email to an investor group claiming (among other things) that "Randall Crater has been awarded a banking license," "Randall Crater has an elite deal with MasterCard," and "Randall Crater's reputation with the . . . tech community . . . is not just good, it is STELLAR." Ex.32 (August 24, 2015 email from Mr. Crater to Mark Gillespie). None of that was true.

Three years into the scheme, Mr. Crater became aware that the Commodity Futures Trading Commission ("CFTC") was investigating My Big Coin for fraud. Only then was a My Big Coin cryptocurrency created. Day 4 Tr. 217:23–218:4 (Ms. Clegg testifying that My Big Coin not a

---

[4] For example, the My Big Coin's Twitter page claimed regular increases in "current value" between January 21 and November 7, 2014, starting at $23.17 and eventually rising to $121.38.

cryptocurrency until June 28, 2017); Expert Report at 7, Dkt. No. 141-6 (same).  But that cryptocurrency was still not the product that Mr. Crater had been promising to investors and customers for years (*e.g.*, backed by gold or partnered with reputable businesses like Mastercard). And notably, that newly-created cryptocurrency immediately reflected "wash trading" designed to trick investors and customers into believing that the My Big Coin cryptocurrency had an active trading market when no such market existed.  Day 4 Tr. 217:23–218:4; Expert Report at 11.

Around that same time, Mr. Crater also began telling his primary investor a new series of falsehoods.  For example, after being repeatedly pressed for payments on the investment, Mr. Crater falsely claimed that "the NFL is getting involved."  Ex. 16 p. 13 (April 26, 2017 text message from Mr. Crater).  When pressed further, Mr. Crater falsely claimed to be in "Colorado" for multiple days "counting cash" and, later, waiting for an armored car service to pick up the cash. *Compare id.* pp. 28–29, 34–35 (May 8 and 11, 2017 text messages from Mr. Crater) *and* Day 6 Tr. 77:11–23 (Ms. Brekenfeld testimony that Mr. Crater's bank records reflected purchases in Florida (not Colorado) and a negative account balance).  When these efforts at deception began to falter, Mr. Crater attempted to convince his primary investor not to cooperate with the CFTC's investigation.[5]

All of Mr. Crater's cover-up efforts ultimately failed.  But to this day, the investors and customers who put their faith in Mr. Crater and his business have never been repaid.  The investigation identified 55 individual victims (*i.e.*, investors or customers) who lost a combined $7,668,317.50.  PSR ¶¶ 20–22.  All of that money went to bank accounts controlled by Mr. Crater, and Mr. Crater used the money primarily for personal expenses, including to buy a house, cars,

---

[5] *See, e.g.*, Ex. 14f (June 1, 2017 email correspondence where Mr. Crater claims that the investor does not need to cooperate with the CFTC investigation and the investor disagrees).

and jewelry. *See, e.g.*, Ex. 44 pp. 6–7; Day 6 Tr. 94:10–17 (Ms. Brekenfeld testimony); Day 4 Tr. 140:18–19 (Mr. Abadi testimony).

**II.      Sentencing Recommendation**

The government does not dispute the PSR's recitation of the offense conduct, the calculation of an Offense Level of 34 or Criminal History Category of I.  In accordance with the PSR, the government recommends the following sentence:

- Period of Incarceration.  A period of incarceration of 156 months (thirteen years).  The Guidelines Sentencing Range (GSR) is 151 to 188 months, and there is no basis to deviate from the GSR.

- Supervised Release.  36 months of supervised release.

- Restitution and Forfeiture.  Restitution in the amount of $7,668,317.50.  PSR ¶¶ 20–22.  In addition to restitution, the government requests a separate forfeiture order in the amount of $7,668,317.50.[6]

- Special Assessments.  Mandatory special assessments of $800.

- Fine.  The government does not recommend a fine because the government has not been able to ascertain Mr. Crater's ability to pay any fine.

---

[6] Restitution and forfeiture are distinct and both are mandatory. *See, e.g., United States v. Bodouva*, 853 F.3d 76, 78–79 (2d Cir. 2017) ("Because the statutory schemes authorizing restitution and forfeiture are separate, district courts are bound not to reduce the amount of a mandatory criminal forfeiture order by the amount of past or future restitution payments, in the absence of specific statutory authorization to do so."); *United States v. Arnold*, 878 F.3d 940, 946 (10th Cir. 2017) ("Several courts have reached the same conclusion, holding that the statutes mandating restitution and forfeiture do not allow a defendant's payments toward one to offset the amount owed to the other.") (collecting cases).

### III. Bases for Sentencing Recommendation

For the reasons below, the recommended sentence is "sufficient, but not greater than necessary," in light of the factors to be considered by the Court. *See* 18 U.S.C. § 3553(a).

**a. Seriousness of the Offense**

Mr. Crater's actions resulted in identified losses of over $7.5 million dollars from at least 55 victims. The Court heard from several victims at trial. Norman Mendiola was a valet driver working his way through school when he was tricked into investing in My Big Coin. Day 4 Tr. 114:14–21. Mr. Mendiola described how My Big Coin being a "cryptocurrency" and "backed by gold was a big factor, selling factor," for him, *id.* 117:1–118:2, and also that the "deal" with Mastercard "legitimized, in my eyes, the My Big Coin as a real company," *id.* 126:23–24. Mr. Mendiola was also enticed by the "social media posts with price action increasing over time." *Id.* 117:2–4. As demonstrated at trial, all of those claims about My Big Coin—the gold, the Mastercard deal, the price increases, and even the existence of the cryptocurrency itself—were lies. The result was that Mr. Mendiola lost his savings, *id.* 127:14–15, and while he continued to work his way through school, Mr. Crater lived a life of luxury.

Jay Byrd also testified at trial. He was a retiree when he invested in My Big Coin. *Id.* 79:8. Mr. Byrd was tricked into believing that My Big Coin was "like a Bitcoin, it was a cryptocurrency, and that this was actually going to be a better one than Bitcoin" because it was backed by gold and had partnerships with legitimate companies. *Id.* 80:20–22. Mr. Byrd invested a substantial portion of his savings in the company and lost it all. *Id.* 88:8–10. That was money Mr. Byrd should have had for his retirement, and Mr. Crater spent it on himself.

The Court has also received impact statements from other victims describing the lies they were told about My Big Coin and the impact on their lives. As one victim put it, "it has brought

8

strain, agony, and pain to me and my whole family." Another victim described the "many sleepless nights" that resulted from Mr. Crater's actions. And yet another victim described how the loss of her My Big Coin investment effectively rendered her homeless and stated that it "wears on me daily."

As the above makes clear, the impact on the victims was real and, in some instances, devastating. The sentence from this Court should reflect the seriousness of Mr. Crater's crimes and the impact on these victims.

### b. General Deterrence and Respect for the Law

Criminal actors must be deterred from taking advantage of investors and customers, particularly in the cryptocurrency industry. The cryptocurrency market is relatively new, and Mr. Crater appears to be the first founder and creator of a cryptocurrency company to be convicted at trial for their fraudulent marketing practices. As the Court observed firsthand during trial, many cryptocurrency investors and customers do not understand how cryptocurrency actually functions, making it difficult for individuals to conduct their own due diligence. And compared with investors in more traditional financial markets, cryptocurrency investors and customers have substantially less regulatory protection.[7] Opportunities abound for fraudsters, like Mr. Crater, who

---

[7] The lack of regulatory oversite and the potential for fraud in the cryptocurrency markets has been highlighted by multiple regulatory agencies. *See, e.g.*, Statement of Chairman, Commodity Futures Trading Commission (Oct. 26, 2022) ("With reportedly one in five Americans owning cryptocurrency, and growing interest by more traditional finance 'Trad-Fi,' it is important for the United States to have a regulatory framework with effective guardrails to address crypto's financial stability risks. The market's ability to harness crypto's promise to deliver more inclusive, cheaper, faster, and competitive financial services, should not come at the expense of financial stability. . . . The CFTC has experienced an uptick in crypto complaints – the main source for enforcement actions. Wash trades, rug pulls, pump and dump, and other fraudulent or manipulative schemes continue."); Statement of Chair, U.S. Securities & Exchange Commission (Dec. 11, 2017) ("A number of concerns have been raised regarding the cryptocurrency and ICO markets, including that, as they are currently operating, there is substantially less investor

are willing to take advantage of this still developing and relatively unfamiliar landscape. Such conduct causes not only losses to victims, but as the cryptocurrency industry continues to grow and interconnect with the traditional financial markets, the result is a loss of confidence and stability in the financial markets themselves. The government's proposed sentence will deter such criminal conduct and promote respect for laws prohibiting fraud and manipulation, including in the cryptocurrency industry. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'") (quoting Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After Booker,* 47 Wm. & Mary L.Rev. 721, 724 (2005)); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("We have previously emphasized the importance of general deterrence in white-collar crime.")

c. **Specific Deterrence**

Mr. Crater must be deterred from future criminal behavior. Prior to My Big Coin, Mr. Crater was convicted of felony conversion in 2011, apparently remaining on probation right up until the time when he began defrauding investors and customers with My Big Coin. PSR ¶ 43. Mr. Crater then perpetrated this elaborate cryptocurrency fraud over a period of at least four years, and even continued to defraud investors after being investigated by the CFTC. Mr. Crater was not deterred by his previous criminal sentence, the complaints and requests from victims to have their money returned, or an investigation by government regulators. The Court should therefore fashion

---

protection than in our traditional securities markets, with correspondingly greater opportunities for fraud and manipulation.").

a sentence to adequately deter Mr. Crater from criminal conduct in the future. The government's recommended sentence provides that deterrent.

                Respectfully submitted,

                RACHAEL S. ROLLINS
                United States Attorney

By:   */s/ Christopher J. Markham*
       CHRISTOPHER J. MARKHAM
       Assistant United States Attorney


       */s/ Siji Moore*
       SIJI MOORE
       Trial Attorney

CERTIFICATE OF SERVICE

    I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

Dated:  January 24, 2022

                                        By:    */s/ Christopher J. Markham*
                                                  CHRISTOPHER J. MARKHAM
                                                  Assistant United States Attorney