UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 19-cr-10063-DJC |
| RANDALL CRATER, | ) | **[FILED UNDER SEAL]** |
| | ) | |
| Defendant | ) | LEAVE TO FILE |
| | | GRANTED ON JANUARY 25, 2023 |

## DEFENDANT'S SENTENCING MEMORANDUM
## AND REQUEST FOR DEPARTURE AND/OR VARIANCE
_____

Defendant, Randall Crater, submits this sentencing memorandum and request for departure and/or variance with attached letters of support to assist the Court in fashioning a reasonable and appropriate sentence in this case. For the reasons set forth in this memorandum and based on the information and materials provided to the Court and expected arguments at the sentencing hearing, undersigned counsel respectfully suggests that a sentence of incarceration for a period of 30 months; (2) no fine; (3) the required special assessments ($800.00); (4) restitution in the amount found by the Court after a restitution hearing; and (5) any additional conditions the Court deems necessary to satisfy the sentencing purposes set forth in 18 U.S.C. § 3553(a) as a reasonable and just sentence under the totality of the circumstances in this case. Defendant further requests the Court to make a recommendation to the Bureau of Prisons that he serves his sentence at a federal prison camp that is closest to his family.

18 U.S.C. § 3553(a) instructs this Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2): retribution ("to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"); specific and general deterrence; incapacitation ("to protect the public from further crimes of the defendant"); and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). *See* 18 U.S.C. § 3553(a).

Fortunately, the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 245-67 (2005). Post *Booker*, the Guidelines are only one factor considered by the Court. This Court is obligated "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States,* 552 U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81(1996). Given all of the known and unknown circumstances in this case, the defense respectfully submits that a non-guideline sentence is warranted in this atypical case.

I.    HISTORY AND CHARACTERISTICS OF RANDALL CRATER.

Defendant incorporates by reference herein the forensic psychological evaluation report authored by Susan C. Knight, Ph.D., ABPP, a licensed clinical psychologist and Board-Certified Forensic Psychologist, dated January 18, 2023, as if fully set forth herein. Given the sensitive information contained in Dr. Knight's

report, undersigned counsel will be filing the report under seal. *See* Report attached hereto.



. In sum, Mr. Crater's individual characteristics makes him an atypical defendant.

II.    <u>THE ATYPICAL NATURE AND CIRCUMSTANCES OF THE OFFENSE</u>.

The defense concedes that on the surface of this case, the facts appear to be a straightforward wire fraud and money laundering case. The defense also concedes that the jury rejected Mr. Crater's good faith defense. However, there is much more to this case than what was proven at trial and defendant submits that the atypical nature and circumstances of this case should be considered when the Court imposes a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

First and foremost, defendant was not the "owner and principal operator" of My Big Coin (MBC). The owner and principal operator of MBC was an individual named ████████ and he was recognized as such during the CFTC investigation. *See* Exhibit "A" (waiver of attorney-client privilege for MBC signed by ████). It was ████████ who held himself out as the CEO of MBC and MBC Pay. *See* Exhibit "B" (email from ████████████, Esq. dated May 13, 2015); *see also* Affidavit of ████████ attached hereto.

It was ████████ who first told Mr. Crater about cryptocurrencies. *See* Exhibit "C" (Exhibit 10A – email from ████ dated 12/8/2013). It was ████████ who told Crater about the gold bullion and the person who dealt directly with ████. *See* Exhibit "D" (emails dated March 24, 2014, and October 11, 2015).

Also, it was ████████ who was allowed to provide the CFTC with an affidavit that alleged his girlfriend "threw away and destroyed" all the records he had relating to MBC. An affidavit that was written by ████████████, an attorney for the CFTC who was conducting the CFTC's investigation. *See* Exhibit "E" (email communication between ████████████ dated 9/7/2017). Indeed, Attorney ████ was one of the witnesses the Court did not permit undersigned counsel to call in Mr. Crater's defense without first complying with the *Touhy* framework.

Second, Mr. Crater did not know that ████████████ was a fraud and that there never was any gold. Indeed, the defense offered the testimony of Richard Galvin to prove there was no gold and to show Mr. Crater's good faith. *See also* Letter from Kenneth C. Hess, Dkt. No. 237.

Mr. Crater does not offer this information to minimize his role in the offenses at issue. Rather, this information is offered to set the record straight as to who was, in fact, the true owner and operator of MBC and MBC Pay notwithstanding the government's allegations to the contrary. More importantly, Mr. Crater offers this information to show that he was misled by individuals (█████████████ and others) he trusted which, with the benefit of hindsight, demonstrates his gullibility and naivete. Finally, Mr. Crater offers this information to demonstrate that there were other individuals far more culpable than Mr. Crater who have not been investigated or prosecuted by the government.

Third, █████████████ is not a typical victim. Indeed, but for his substantial losses, he could have been charged as a co-conspirator of Mr. Crater. Mr. ████ admitted at trial that he repeated the same false statements made to him to his friends, family, colleagues, partners, and employees without doing any due diligence into the validity of the claims made. In addition, many of the victims now seeking restitution from Mr. Crater actually purchased MBC coins after they spoke to █████████ and not to Mr. Crater. █████████████ also paid █████████████ to help him sell MBC coins. █████████████ was motivated by greed because he believed that if the price of an MBC coin increased the value of his MBC coins would also increase. *See* Affidavit of █████████████ attached hereto.

Fourth, there are individuals seeking restitution in this case even though █████████████ testified, under oath, that he refunded their money in full including █████████████████████████. If these individuals were paid by

████████, these "victims" are seeking a windfall. If they were not, then ████████ testimony was false. It is also not clear whether the loss attributed to ████████ also includes the restitution amounts requested by these 3 individuals. The government is also requesting restitution for individuals who purchased MBC coins and were not defrauded including ████████ ████████. As a result, Mr. Crater requests an evidentiary hearing on the issue of restitution. Thus, the nature and circumstances in this case are atypical.

III. <u>ADVISORY GUIDELINE CALCULATION</u>.

Mr. Crater objects to three issues in the calculation of the Advisory guideline sentence calculated in the Presentence Investigation Report ("PSR"). Specifically, Mr. Crater objects to the loss amount, the 2-point increase for sophisticated means, and the 4-point increase for his role in the offense.

A. <u>The Loss Amount Should Be Reduced by $3,700,000</u>.

The PSR provides an eighteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the loss was calculated to be $7,668,317.50. PSR ¶ 32. This loss amount includes the money ████████ used to purchase MBC coins from Mr. Crater and his $3,700,000 he paid for an interest in 4 marijuana licenses and a 50% interest in the Troki business. These marijuana investments were unrelated to the MBC scheme and the government did not prove at trial that these investments were fraudulent or were obtained through false representations. Moreover, when ████████ decided to divest his interests in these marijuana investments in

2017, he agreed to accept payment in the form of MBC coins. However, critically, █████████████ did not testify that he relied on any false representations when he made his decision. Indeed, faced with the knowledge that a federal agency was investigating MBC, █████████████ apparently decided he did not want to have any interest in any marijuana businesses when he was interviewed by the CFTC and he was willing to accept MBC coins in repayment. Given his conduct in this case, he should not receive a windfall simply because the government decided not to charge him as a co-conspirator.

B. <u>The Loss Amount Should Be A 16-Level Increase.</u>

This loss amount also includes money owed to █████████████ ($75,000.00), █████████ ($175,000.00) and █████████ ($15,000.00), for a total of $265,000.00 even though these individuals were refunded their investment by █████████████ if he testified truthfully. Also, it appears that the $265,000.00 is also being requested by █████████ because his victim impact statement states that he lost $5.6 million in MBC including the $270,000.00 (*sic*) he paid to friends who wanted "out of their investments." The loss amount also includes money owed to █████████ ($15,000.00), █████████████ ($35,800.00), █████████████ ($24,750.00), ████ ($70,050.00) █████████ ($47,000.00) and █████████ ($27,500.00) for a total of $220,100 even though, to undersigned's knowledge, they have made no claim for restitution and were not defrauded by Mr. Crater. As a result, Mr. Crater respectfully submits that the loss amount should be reduced to a 16-level increase for a loss amount between $1,500,000 but less than $3,500,000, pursuant to

§2B1.1(b)1)(I) or, in the alternative, requests an evidentiary hearing on the issue of restitution.

    C. <u>Mr. Crater Did Not Use Sophisticated Means</u>.

With respect to sophisticated means, there was no hiding of assets or transactions, there was no use of fictitious entities, corporate shells, or offshore financial accounts. The offense conduct as alleged and proven at trial was a simple wire fraud case wherein misrepresentations were made to obtain money or property.

Moreover, Mr. Crater did not "blanket the internet with webpages that contained false advertising." The government did not prove that Mr. Crater controlled the MBC's website or the MBC Exchange or MBC's Twitter or Facebook pages. And, in fact, he did not. *See* Affidavit of ████████ attached hereto. The government did not have to prove that he controlled MBC's social media because Mr. Crater's LinkedIn page contained misrepresentations. To hold Mr. Crater accountable for false advertising he did not control does not serve the interests of justice in this matter.

In addition, while it is true that monies he received were deposited into accounts in the name of his sister and mother, that fact alone does not rise to the level of sophisticated means. In other words, this fact did not make the offense an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *See* Application Note 9(B). Rather, it was a straightforward wire fraud and money laundering case that was easily traceable to

Mr. Crater. As such, Mr. Crater submits a 2-point increase for sophisticated means is not warranted.

      D.   <u>Mr. Crater Should Not Be Assigned a 4-point Increase for his Role in the Offense</u>.

Mr. Crater was neither an organizer nor leader of a criminal activity that involved five or more participants. As Doctor Knight noted in her report, Mr. Crater ███████████████████████.

Moreover, the evidence at trial did not prove that the criminal activity involved five or more participants. Rather, the evidence at trial proved that Mr. Crater and Mr. Gillespie were involved. The evidence also showed that ███████████ was involved; however, he was being paid by ████████ to solicit customers for MBC. *See* Affidavit of ████████ attached hereto. He was not being paid by Mr. Crater. The government also did not show that ██████ was involved. Indeed, the government did not want to confuse the jury by providing evidence about ██████. As for ██████████, he was not part of the MBC conspiracy. Rather, he was defrauding Mr. Crater and others either with or without ████████ assistance.

Finally, ████████ told the government on more than one occasion that he never did any work for Mr. Crater on MBC. Rather, the only work he did, he did for ██████. Indeed, although the government initially listed him as a government witness, upon information and belief, when ████████ would not change his testimony to support the government's version of the case during his trial preparation session, he was removed from the witness list. In sum, the government did not prove

that the criminal activity at issue involved five or more participants. Thus, Mr. Crater objects to this 4-point increase.

Should the Court agree with the above analysis, then the Total Offense Level should be a 26 and with a criminal history category of I, the advisory guideline range should be 63-78 months.

IV. <u>GROUNDS FOR DEPARTURE AND/OR VARIANCE</u>.

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a)(2). Moreover, 18 U.S.C. § 3582 further instructs the Court to "consider the factors set forth in section 3553(a) to the extent they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*" (Emphasis added).

In determining the proper sentence in this case, it is important to note that "the starting point for every sentence should be probation or some other sentence not involving commitment or confinement." *American Bar Association Project on Minimum Standard for Criminal Justice, Sentencing Alternatives and Procedures*, (Approved Draft, 1968), Section 2.3(e), pp. 72-73. However, under the Advisory Guidelines, Mr. Crater is not eligible for probation unless this Court departs downward or varies from the guideline ranges.

A. <u>Mr. Crater's Age</u>.

U.S.S.G. § 5H1.1 states:

Age (including youth) may be relevant in determining whether a departure is warranted, if considerations on age, individually or in

> combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm or where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

Elderly offenders, whether or not seriously infirm, suffer greater punishment in prison because they are at risk of being preyed upon by younger inmates and lack social support. *See Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Department of Justice, National Institutes of Corrections, p. 9-11 (2004 ed.), available at 018735.pdf.

Moreover, it is well established that the risk of recidivism drops dramatically in defendants who are forty and older, which lessens the need to protect the public from further crimes of the defendant pursuant to 18 U.S.C. § 3553(a)(2)(C). *See* United States Sentencing Commission, *Older Offenders in the Federal System* (July 2022), p. 43 Older Offenders in the Federal System (ussc.gov) (The recidivism rate of older offenders (21.3%) was less than half that of offenders under the age of 50 (53.4%). Older offenders also had a small median number of recidivism events (one), compared to offenders under the age of 50 (three). Older offenders also had a longer median time to recidivism (20 months), compared to offenders under the age of 50 (19 months).

Also, in 26 U.S.C. § 994(j) Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…. Under the

guideline applicable in this case, the Sentencing Commission has not done so. Rather, the guidelines only suggest that a non-violent offender with an applicable guideline range in Zone A or B should be considered for imposing a sentence other than imprisonment. *See* U.S.S.G. § 5C1.1, Application Note 4.2B1.1.

B. <u>The Loss Attributable To Mr. Crater Substantially Overstates The Seriousness Of His Conduct</u>.

The loss set forth in the PSR presumes that Mr. Crater alone is responsible for the entire amount of loss specified in the particular loss range selected by the sentencing court. *See United States v. Shattuck*, 961 F.2d 1012, 1016 (1st Cir.1992) (quoting *United States v. Gregorio*, 956 F.2d 341, 347 (1st Cir.1992)). Mr. Crater's sentence is largely determined by the 18-point increase on an incorrect loss amount. As has been recognized, though, "with their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability." *United States v. Milne*, 384 F. Supp. 2d 1309 (E.D. Wisc. 2005). *See also, United States v. Stuart*, 22 F. 3d 76, 83 (3rd Cir. 1994) ("in a few circumstances, strict application of the loss tables can overstate the seriousness the of the offense").

The commentary to § 2B1.1 notes that "there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense" and that in "such cases, a downward departure may be warranted." USSG § 2B1.1, Application Note 21(C); *See also, United States v. Costello*, 16 F. Supp. 2d 36, 40 (D. Mass. 1998)("I conclude that in this situation a downward departure is warranted because the $20 million loss figure substantially overstates the defendant's culpability."). With the greater discretion afforded courts by the decision

in *United States v. Booker*, 543 U.S. 22205, courts have also granted variances in cases where the loss amount overstated the defendant's responsibility. *See, e.g., United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (where the court "found the guideline range, which depended so heavily on the loss amount, greater than necessary"); *United States v. Watt*, 2010 WL 1676439, *16 (D. Mass. April 27, 2010) (where the court imposed a below-guidelines sentence recognizing that the guidelines scheme, which effectively makes loss "a proxy for evaluating culpability," was not always appropriate). In this case, the loss attributable to Mr. Crater substantially overstates the seriousness of his conduct. Accordingly, the Court should depart or vary from the guideline ranges.

C. <u>Multiple Factors Caused The Losses Contained In the PSR</u>.

Mr. Crater further submits that multiple factors caused the losses contained in the PSR. Indeed, Mr. Crater was misled by ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ and had Mr. Crater not relied on their misrepresentations, the losses that the PSR now attributes only to Mr. Crater would not have occurred. *United States v. Rostoff*, 53 F.3d 398, 407 (1st Cir. 1995). Thus, the Court may depart on this ground as well.

D. <u>Mr. Crater's Naiveté In Committing The Offenses In This Case Demonstrates That His Conduct Was An Aberration</u>.

Mr. Crater's naiveté in committing the offenses in this case can also be considered by the Court. Mr. Crater is not the typical schemer. Rather, Mr. Crater wrongfully and atypically believed that MBC was a real cryptocurrency that would revolutionize the medical marijuana industry and result in huge financial gains to owners of MBC coins. He did not intend that MBC would result in losses to himself

or others. *See United States v. Jagmohan*, 909 F.2d 61, 65 (2nd Cir. 1990)(district court's downward departure based on defendant's naiveté in committing offense affirmed).

E. Mr. Crater's Current Family Responsibilities Justifies A Substantial Departure.

Mr. Crater's current family responsibilities and the impact his incarceration will have on his family is yet another ground upon which the Court can justify a downward departure. *See United States v. Rivera*, 994 F.2d 942, 953-954 (1st Cir. 1993)(court has discretion to depart where family circumstances are unusual or out of the ordinary). Presently, Mr. Crater is substantially responsible for keeping a roof over the heads of his mother, wife and three teenage children. Ironically, if Mr. Crater is unable to continue to financially support his family, not only will his family lose their home, but Mr. Crater's current lender will suffer losses if he is forced into foreclosure. There is no one else who can support his family. *See United States v. Johnson,* 964 F.2d 124 (2d Cir. 1992)(departure granted to defendant with sole responsibility for raising four young children). Obviously, any sentence greater than home confinement will also wreak havoc on Mr. Crater's children.

Finally, the Court may depart or vary from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure, if (1) such offender characteristics or other circumstances, taken together, make the case an exceptional one; and (2) each such offender characteristic or other circumstance is (A) present to a substantial degree; and (B) identified in the

14

guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted. U.S.S.G. § 5K2.0(c). In the present case, Mr. Crater submits that the above offender characteristics and other circumstances, when taken together, make this case an atypical and exceptional one that warrants a departure or a variance by 17-levels in order to impose a sentence of incarceration no greater than 30 months.

V.    A SENTENCE OF THIRTY MONTHS OF INCARCERATION IS SUFFICIENT TO SATISFY THE SENTENCNING PURPOSES SET FORTH IN 18 U.S.C. § 3553(A)(2) AND, (A)(6).

A. <u>The Purposes of Sentencing.</u>

18 U.S.C. § 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Paragraph (2) in turn directs the court to consider the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Paragraph (6) also requires the Court to avoid unwarranted disparities.

In this case, a sentence of incarceration for a period 30 months; (2) no fine; (3) the required special assessments ($800.00); (4) restitution in the amount found by the Court after a restitution hearing; and (4) any additional conditions the Court deems

necessary to satisfy the sentencing purposes set forth in 18 U.S.C. § 3553(a) is a reasonable and just sentence under the totality of the circumstances in this case. Defendant further requests the Court to make a recommendation to the Bureau of Prisons that he serves his sentence the federal prison camp that is nearest to his family.

Under past practice, the threshold question in most cases was whether to impose a sentence of imprisonment. The relevant considerations were whether public safety required incarceration, what the defendant's risk of recidivism was, what his treatment and medical needs were, and what collateral effects imprisonment would have on family and employment.

Congress expected that the threshold question in most cases would continue to be whether probation was sufficient or whether prison was necessary. In 18 U.S.C. § 3582(a), Congress instructed:

> The court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Thus, Congress intended that probation would be used with at least the same frequency as before the guidelines. Indeed, Congress even identified when probation should be the presumptive sentence. 28 U.S.C. § 994(j) instructed the Commission to ensure that the guidelines reflect the "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."

B. <u>Seriousness of the Offense, Promoting Respect for the Law and Just Punishment</u>.

Thirty months of incarceration for a 52 year old man will not be an easy sentence. Mr. Crater will be reminded every day that he is incarcerated that he is being punished. Also he will be required to pay a substantial amount in restitution, which will serve as an additional reminder that he is being punished and is being required to pay his debt to society.

Also, Mr. Crater has been punished by losing what is most precious to him – his reputation. Indeed, Mr. Crater has already endured the humiliation and embarrassment of his crimes each time saw his name in the newspaper.

In addition, a sentence that is excessive in light of the seriousness of Mr. Crater's role in the offense promotes disrespect for the law and provides unjust punishment. Seriousness of an offense may be lessened, for example, when the crime was non-violent offense. Moreover, an offense can be considered less serious if a defendant's motives were not entirely egregious or if no actual loss was intended. In this case, Mr. Crater motives, while ultimately misguided, also included the good motive of helping others profit from MBC. Thus, in light of the actual seriousness of the offenses in this case, a sentence of thirty months of incarceration will promote respect for the law and provide just punishment.

Accordingly, a sentence of thirty months of incarceration is sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

C. <u>Adequate Deterrence</u>

Incarceration or incapacitation of Mr. Crater is probably not necessary to deter him in the future. Incarcerating Mr. Crater is probably not necessary to deter others in the future. However, while many believe that the higher the sentence, the greater effect in deterring others, the empirical evidence shows no relationship between sentence length and deterrence. Indeed, in one of the best studies of specific deterrence, which involved federal white-collar offenders in the pre-guideline era, no difference in deterrence was found even between probation and imprisonment. <u>See</u> David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). That is to say, offenders given terms of a prison sentence were no more or less likely to reoffend than those given probationary sentences. As such, a sentence of thirty months of incarceration will be more than adequate deterrence in this case.

D. <u>Protection of the Public</u>

Without repeating what is stated above, the chances of Mr. Crater recidivating is very low. Indeed, his conduct in this case is completely out of character.

E. <u>Avoiding An Unwarranted Disparity</u>.

Another reason why a thirty-month sentence of incarceration is justified in this case is to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). *See* <u>Exhibit "F"</u> (average sentence for credit card and other financial instrument was 27 months in 2021); <u>Exhibit "G"</u> (the average sentence for health care fraud offenders

was 30 months in 2021); <u>Exhibit "H"</u> (the average sentence for fraud offenses is 21 months).  Another unwarranted sentencing disparity in this case is the fact that only Mr. Crater has been prosecuted; thus, the more culpable participants in the fraud have not been prosecuted and likely cannot be prosecuted in 2023 for crimes which ended in 2017.

F.  <u>The Ability To Pay Restitution</u>.

A sentence of thirty months of incarceration will allow Mr. Crater to pay the restitution amount determined by the Court.  If the Court imposes the sentence the government has requested, Mr. Crater will be in his early sixties with very few prospects of paying any restitution to the victims in this case.

VI.    <u>CONCLUSION</u>.

For all the reasons set forth above, undersigned counsel respectfully submits that, in this atypical case, a sentence of incarceration for a period of 30 months; (2) no fine; (3) the required special assessments ($800.00); (4) restitution in the amount found by the Court after a restitution hearing; and (5) any additional conditions the Court deems necessary to satisfy the sentencing purposes set forth in 18 U.S.C. § 3553(a) is a reasonable and just sentence under the totality of the circumstances in this case.  Defendant further requests the Court to make a recommendation to the Bureau of Prisons that he serves his sentence the federal prison camp that is closest to his family.

Respectfully submitted,
For the Defendant,
Randall Crater
By his attorneys:


  /s/ Scott P. Lopez
Scott P. Lopez, BBO # 549556
splopez@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Ave, Suite 345
Boston, MA 02210
617-439-4990 (tel.)
Dated: January 25, 2023         617-439-3987 (fax)


## CERTIFICATE OF SERVICE

I hereby certify that a redacted version of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 25, 2023.


  /s/ Scott P. Lopez
Scott P. Lopez

**Susan C. Knight, Ph.D., ABPP**
*Licensed Clinical Psychologist*
*Board-Certified Forensic Psychologist*
knight@apsforensic.com

**Applied Psychological Services, LLC**
1941 Savage Rd., Ste. 400A
Charleston, South Carolina, 29407
(843) 637-5729-Phone; (843) 410-2802-Fax



**SOURCES OF INFORMATION:** The following sources of information were reviewed in





















































Respectfully Submitted,

Susan C. Knight, Ph.D., ABPP
Licensed Clinical Psychologist
Board-Certified Forensic Psychologist

January 18, 2023
_____
Date Signed









S

d

N

M





24

# Exhibit A



1









# Exhibit B



DOJ-FILTER-0000027102

# Exhibit C

# Fwd: Read this



In large parts of Africa, cell phone minutes are used as currency. In the U.S., airplane miles and credit card points are, in some ways, a type of currency. So, yes, we can imagine a world in which we all transact with different currencies. After all, before the euro, Europeans were routinely holding and transacting in multiple currencies.

**Bitcoin is different**

But bitcoins shouldn't lead one to consider a world with even more currencies, but rather a world in which we all transact in a single currency – one whose supply is fixed by mathematics, not by the random discovery of gold or silver mines or the penchant of governments to print money.

The media has predictably focused on the two sexiest storylines: Bitcoin as speculative investment and bitcoin as anonymous currency used by the illegal underworld. However, the debate that should and apparently does interest global policymakers from Ben Bernanke to Zhou Xiaochuan is this: is the timeliness, need for, and technological feasibility of a more efficient, more transparent, global currency close upon us?

The singular advantage of such a world is the inability of governments to surreptitiously tax their citizens via the printing press, buy real goods and services, and watch prices rise -- forcing those holding money, government bonds, or other nominal securities to suffer a loss in real wealth and, thus, hold the bag.

**Replace the dollar?**

Anyone familiar with current U.S. monetary policy might well wonder whether our country wouldn't be better served with bitcoins replacing the dollar. For the past six years, the Federal Reserve has printed vast sums of dollars to help pay Uncle Sam's bills, more than quadrupling the monetary base. This unprecedented reliance on the printing press to finance government expenditures has been dubbed quantitative easing. But what's really being eased is the obligation of Congress and the Administration to practice reasonable fiscal prudence.

Today, 29 cents of every dollar of federal spending is being printed out of thin air by the Federal Reserve. Yes, the Fed feels it can withdraw all this money from the private sector whenever it likes. But doing so will require getting the politicians to do something they don't like, namely raising taxes to pay for what they spend.

The great profusion of money creation is not limited to the U.S. The UK, the Eurozone, and Japan are all printing money like mad. They say this is meant to "stimulate their economies," but each of these governments/regions is thoroughly broke if one looks out beyond the nose of our short-term budget horizons. That's why they are printing money and will continue to do so until inflation, if not hyperinflation, starts rearing its ugly head. The use of bitcoins would hasten the day when the printing presses are turned off and prudent fiscal management is turned on.

Bitcoins could assist in money laundering, but we don't ban the use of regular cash to prevent this activity. Bitcoins are simply electronic cash. Bitcoins also run the risk of being banned by countries upset with their reduced ability to make money by making money. But if enough global businesses were to start using Bitcoins, it would be tough for any country to declare their use illegal.

Another economic knock on Bitcoins is that it effectively produces a single currency. Hence, if prices and wages get out of line in one country, devaluation can't fix the problem. The U.S. has lived with what has essentially been a single currency for a long time. Somehow we've learned that adjusting prices and wages to remain competitive is part and parcel of doing business in a big country/region. The Eurozone members are slowly catching on to this proposition as well.

A final concern is that countries won't be able to print money to bail out their banks in the midst of a financial crisis. This seems all to the good because this ability to paper over our financial system's problems has prevented addressing the two key problems plaguing the financial system – opacity and leverage. Having a global currency, whose supply is limited, fully transparent, and independent of any government's control, could usher in real financial reform. Limited Purpose Banking, which transforms banks and other financial corporations into equity-financed mutual funds, whose holdings are disclosed on a real-time basis, is precisely what is needed.

The long sweep of financial history tells us that many extremely valuable innovations were initially viewed with suspicion. But without them, we'd still be engaged in barter. Bitcoins may well be one of the truly major financial innovations that brings the world together and forces long-needed fiscal and financial reform. Let's give it a chance.

--

The content of this e-mail, together with any of its attachments, is for the exclusive and confidential use of the named addressee(s) and it may contain legally privileged and confidential information and/or copyrighted material. Any other distribution, use or reproduction without the sender's prior consent is unauthorized and strictly prohibited. If you have by coincidence, mistake or without specific authorization received this e-mail in error, please notify the sender by e-mail immediately, uphold strict confidentiality and neither read, copy, transfer, disseminate, disclose, nor otherwise make use of its content in any way, and delete the material from your computer. The content of the e-mail and its attachments is the liability of the individual sender, and if it does not relate to the affairs of CGN does not assume any civil or criminal liability should the e-mail or its attachments are virus infected. To unsubscribe send an e-mail to

--

The content of this e-mail, together with any of its attachments, is for the exclusive and confidential use of the named addressee(s) and it may contain legally privileged and confidential information and/or copyrighted material. Any other distribution, use or reproduction without the sender's prior consent is unauthorized and strictly prohibited. If you have by coincidence, mistake or without specific authorization received this e-mail in error, please notify the sender by e-mail immediately, uphold strict confidentiality and neither read, copy, transfer, disseminate, disclose, nor otherwise make use of its content in any way, and delete the material from your computer. The content of the e-mail and its attachments is the liability of the individual sender, and if it does not relate to the affairs of CGN does not assume any civil or criminal liability should the e-mail or its attachments are virus infected. To unsubscribe send an e-mail to

DOJ-FILTER-0000009351

# Exhibit D



DOJ-FILTER-0000010734



# Exhibit E





# Exhibit A

0000000001.0002 P.0001



# Exhibit B

0000001.0003 P.0001

# U.S. COMMODITY FUTURES TRADING COMMISSION

Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5000
Facsimile: (202) 418-5523
*www.cftc.gov*

Division of
Enforcement

## *SUBPOENA DUCES TECUM*



**YOU ARE HEREBY COMMANDED to deliver to** ▆▆▆▆▆▆▆ **or other officers of the Commodity Futures Trading Commission ("Commission"), the information specified in the attached Schedule A. This information to be produced at 1155 21st Street NW, Washington, DC, at or before 5:00 p.m. on October 12, 2016, in connection with the investigation conducted by the Commission in the matter of:**

In re Certain Persons Engaged In Fraud With Respect To Unlawful Retail Commodity Transactions

☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆

FAILURE TO COMPLY WITH THIS SUBPOENA MAY RESULT IN THE
COMMENCEMENT OF A LEGAL ACTION IN THE UNITED STATES DISTRICT COURT
TO COMPEL COMPLIANCE WITH THE REQUIREMENTS HEREOF.

☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆☆

Issued on September 27, 2016 in Washington, D.C. by:



*NOTICE TO WITNESS: Fees and mileage need not be tendered to the witness upon service of a subpoena issued in behalf of an officer or employee of the CFTC. 28 U.S.C. § 1825.*

## PROOF OF SERVICE

### In the Case of Service upon a Natural Person:

[ ]   handing it to the person named below:

_____

[ ]   leaving it at the person's office with the following person in charge:

_____

[ ]   leaving it at the person's office in the following conspicuous place:

_____

[ ]   leaving it at the person's usual place of abode, street address:

_____

[ ]   mailing by certified or registered mail to the following address:

_____

[x]   delivery by UPS Overnight Delivery Service to the following address:

_____

[ ]   the following method by which actual notice was given:
      Electronic mail to _____

### In the Case of Service upon Other Than a Natural Person:

[ ]   handing it to the following registered agent for service or other officer, director or agent in charge of such office (name and title):

_____

[ ]   mailing by certified or registered mail to the entity's following agent or representative:

_____

[ ]   delivery by UPS Overnight Delivery Service to the following address:

[ ]   the following method by which actual notice was given:

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I served this subpoena in accordance with the method noted above.*

*Dated:* September 27, 2016

## SCHEDULE A

## DEFINITIONS AND INSTRUCTIONS

A.   The term **"You," "Your,"** or **"Yours"** refer to ▮▮▮▮▮▮▮ his agents, employees, attorneys, affiliates, and all other persons acting in concert or participation with him.

B.   The term **"My Big Coin Pay"** refers to My Big Coin Pay, Inc., My Big Coin, Inc. and any other entity with "My Big Coin" in its name, including any and all of their parents, affiliates, subsidiaries, divisions, related corporations, partnerships, proprietorships, associations, or organizations, and all its directors, principals, officers, partners, members, consultants, agents, employees, representatives, beneficiaries, attorneys, and accountants. This entity is believed to be a Nevada entity incorporated on or about April 28, 2014 and located at 3960 Howard Hughes Parkway, Suite 500, Las Vegas, NV 89169.

C.   The term **"Greyshore"** refers to Greyshore Technology LLC and any entity with "Greyshore" in its name, and any and all of their parents, affiliates, subsidiaries, divisions, related corporations, partnerships, proprietorships, associations, or organizations, and all its directors, principals, officers, partners, members, consultants, agents, employees, representatives, beneficiaries, attorneys, and accountants. This entity is believed to be a New York Limited Liability Company located at 81 Newtown Lane #328, East Hampton, NY 11937.

D.   The terms **"Shot Spirits Corporation," "Sure Shot Spirts Corporation,"** and **"SSPT"** refers to Shot Spirits Corporation and any and all of their parents, affiliates, subsidiaries, divisions, related corporations, partnerships, proprietorships, associations, or organizations, and all its directors, principals, officers, partners, members, consultants, agents, employees, representatives, beneficiaries, attorneys, and accountants. This entity is believed to be incorporated in Nevada and located at 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.

E.   The term **"Commission"** means the United States Commodity Futures Trading Commission, and **"Division"** refers to the Division of Enforcement of the United States Commodity Futures Trading Commission.

F.   The term **"Customer"** refers to any person who was provided, or was solicited to provide, services in connection with the trading of commodity futures, options, foreign currency or retail commodities, including cryptocurrency (also known as virtual currency). This includes current, former, and prospective customers.

G.   For purposes of this request, the term **"document"** is synonymous in meaning and equal in scope to the broad usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure and includes, but is not limited to, any writing, drawing, graph, chart, audio tape, videotape, computer disk, or any other data compilation from which information can be obtained or translated, if necessary, through detection devices into reasonably

1

usable form. The terms **"document"** or **"documents"** mean all writings or printed matter of any kind, including the originals and all copies, identical or non-identical, whether different from the originals by reason of any notation made on such copies or otherwise, including, without limitation: records, correspondence, memoranda, notes, rolodexes, address books, diaries, statistics, e-mail, Instant Messages, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, inter-office or intra-office communications, telephone message slips, offers, notations of conversations, bulletins, drawings, plans, computer printouts, computer input or output, teletypes, telefaxes, invoices, worksheets, ledger books, books of account, and all drafts, alterations, modifications, changes and amendments of any of the foregoing. The terms **"document"** or **"documents"** also includes all graphic or oral records or representations of any kind, including without limitation, photographs, charts, graphs, microfilm, videotape, recordings, electronic mail, instant messages, motion pictures, and electronic, mechanical, or electrical records, or recordings of any kind, including, without limitation, tapes, cassettes, and discs.

The term **"document"** also refers to each and every document in your actual or constructive possession, including but not limited to: (i) all documents within your custody or control or any of your present or former agents, employers, employees, or partners, and (ii) all documents that you have a legal or equitable right to obtain from another person. A draft or non-identical copy is a separate document within the meaning of this term. **"Document"** also includes the file and folder tabs associated with each original and copy. You should produce the specified materials to the Commission as they are kept in the usual course of business or shall organize and label them to correspond with the categories in this request.

H.    **"Including"** or **"includes"** are used in the broadest sense of the terms and specification of a particular matter included in a request is not meant to exclude any other documents that might be responsive to a specific request.

I.    The term **"communication"** refers to all manners of transmitting or receiving information, opinions, or thoughts, orally, in writing, in person, telephonically, electronically, or otherwise.

J.    **"Relate to"** means analyze, appraise, assess, characterize, comment on, concern, consider, constitute, contain, deliberate, delineate, describe, discuss, evaluate, evidence, explicate, pertain to, recommend, record, refer to, reflect, report on, set forth, show or study.

K.    **"Person"** means any natural person, and includes individuals, partnerships, corporations, trusts, any business, legal, or governmental entities, associations or political subdivisions.

L.    **Singular/Plural.** Use of either the singular or plural should not be deemed a limitation and the use of the singular should be construed, where applicable, the plural and vice versa.

M. **Use of And/Or.** The conjunctive form **"and"** and the disjunctive form **"or"** are mutually interchangeable and are meant to encompass each other.

N. **Relevant Time Period.** The **"Relevant Time Period"** means **January 1, 2013 to present** as specified in <u>Attachment A</u>.

O. This request applies to all documents that were generated, created, prepared, sent, received, dated, in effect, in existence or used during the **Relevant Time Period** (or time period otherwise specified), as well as all responsive documents which record or relate to matters occurring within the Relevant Time Period (or time period otherwise specified), which are in your possession, custody or control, without regard to the physical location of such documents, including but not limited to documents held by any of your agents, such as attorneys.

P. **Destruction/Unavailability.** With respect to any and all documents requested herein that are claimed to have been destroyed or otherwise are no longer within your possession, custody, or control, please furnish a list with the following information:

    i. the nature, source, and date of the document;

    ii. a description of the document's subject matter;

    iii. the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

    iv. all names and addresses of all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure;

    v. the date the document was destroyed;

    vi. the person who ordered or authorized such destruction;

    vii. the reason for the document's destruction, and the policy and authority for the same; and

    viii. the custodian of the document on the date of destruction.

Q. **Privilege.** With respect to any and all documents requested herein that may be withheld on the ground of privilege, specifying the following information:

    i. the nature, source, and date of the document;

    ii. a description of the document's subject matter;

iii.    the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

iv.    all names and addresses of all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure; and

v.    the nature of the privilege or rule of law relied upon, including the identity of the person or persons asserting the privilege or rule as well as the legal basis for asserting that privilege or rule, or other reason for non-production.

R.    **Perpetual Request.** The obligations created by this document request are continuing, and the witness under subpoena shall supplement his or her production if he or she locates additional responsive documents in his or her possession, custody, or control.

S.    In your cover letter, please indicate by bates number the numbered item, category or lettered sub item or sub category in response to which the document is being produced.

T.    **Format of Production.** All electronically stored information responsive to this subpoena shall be produced in its native format, whenever possible, and in accordance with the attached Data Delivery Standards, which are incorporated by reference herein. If native data does not exist for a particular category of responsive documents, you shall so state, and shall produce such documents in an imaged format with load files for all available metadata, and in accordance with the attached Data Delivery Standards. You shall only produce documents in hard-copy format under the following circumstances:

    a.    The documents are maintained in hard copy by you in the ordinary course of business; and

    b.    An electronic copy is otherwise unavailable.

If, however, the cumulative volume of hard copy documents responsive to this subpoena exceeds 4 bankers boxes, you shall image the paper documents onto a disk in accordance with the attached Data Delivery Standards.

For all hard-copy documents, you shall produce the specified materials as they are kept in the usual course of business or shall organize and label them to correspond with the categories in this request.

If you have any questions regarding format whatsoever, you should contact the requesting attorney prior to production. Note that the Commission recommends that you produce a representative sample prior to any electronic production.

U.    **Copies of Hard-Copy Originals.** Legible, true, correct, and complete photocopies may be submitted in lieu of original hard copy documents, provided that the originals are retained in their current state and are available for inspection if requested by Commission staff, and

provided further that submission of a copy shall constitute a waiver of any claim as to the authenticity of the copy should it be necessary to introduce such copy into evidence in any Commission proceeding or court of law.

V.  **Integrity of Documents.** A complete copy of each document should be submitted even though only a portion of the document is responsive. The document shall not be edited, redacted, cut, or expunged and shall include all covering letters and memoranda, transmittal slips, appendices, tables or other attachments and all other documents referred to in the document or attachments.

W.  No agreement purporting to modify, limit or otherwise vary this document request shall be valid and binding on the Division of Enforcement or the Commission unless confirmed or acknowledged in writing (or made of record in court) by a duly authorized representative thereof.

X.  If you have any questions regarding the terms used in this request or its scope, you may contact ███████████ (202) 418-5342.

## ATTACHMENT A

## DOCUMENTS SUBPOENAED

Any and all documents within your custody, control, or possession during the periods set forth below responsive to the following descriptions:

### For the time period of January 1, 2013 to present:

1. Copies of all documents reflecting communications between You, My Big Coin Pay, Greyshore, Shot Spirits Corporation ("SSC"), Kimberly Benge, Randall Crater, and/or Mark Gillespie. This request is limited to documents relating to the offer, sale, purchase, or trading of My Big Coin ("MBC") cryptocurrency.

2. Copies of all documents reflecting communications between You, My Big Coin Pay, SSC, Greyshore, Kimberly Benge, Randall Crater, or Mark Gillespie, and customers, including prospective, former, and existing customers. This request is limited to documents relating to the offer, sale, purchase, or trading of MBC.

3. Copies of all advertisements or promotional materials used by You, My Big Coin Pay, SSC, Greyshore, Kimberly Benge, Randall Crater, and/or Mark Gillespie, relating to the offer, sale, purchase, or trading of MBC.

4. A list of all customers of Yours, My Big Coin Pay, SSC, Greyshore, Kimberly Benge, Randall Crater, or Mark Gillespie's, who were customers in connection with the offer, sale, purchase, or trading of MBC. This specifically includes current, former, and prospective customers. The list must include account numbers and contact information for each customer.

5. Copies of all contracts or agreements between You, My Big Coin Pay, SSC, Greyshore, Kimberly Benge, Randall Crater, or Mark Gillespie.

6. Copies of all contracts or agreements between You, My Big Coin Pay, SSC, Greyshore, Kimberly Benge, Randall Crater, or Mark Gillespie, and customers relating to the offer, sale, purchase, or trading of MBC.

7. For all trading accounts held in the name of or opened by You, My Big Coin Pay, SSC, Greyshore, Kimberly Benge, Randall Crater, and/or Mark Gillespie:

   a. Copies of all account opening documents;

   b. Copies of all monthly trading documents;

   c. Copies of all daily trading documents; and

0000000001.0003 P.0009

        d.      Copies of all profit and loss documents.

8. Documents identifying all bank accounts held by or for **You, My Big Coin Pay, SSC,** and/or **Greyshore.**

9. For all bank accounts held by or for **You, My Big Coin Pay, SSC** and/or **Greyshore** :

        a.      Copies of all monthly statements; and

        b.      Copies of all statements of transactions, including but not limited to, all wire advices and canceled checks.

10. Copies of all documents related in any way to **MBC, My Big Coin Pay, SSC,** and/or **Greyshore,.**

## Regardless of time period:

11. Corporate documents for **My Big Coin Pay** including but not limited to articles of incorporation, corporate registrations, compliance manuals, business plans, and lists of employees and their contact information.

12. Corporate documents for **SSC,** including but not limited to articles of incorporation, corporate registrations, compliance manuals, business plans, and lists of employees and their contact information.

13. Corporate documents for **Greyshore,** including but not limited to articles of incorporation, corporate registrations, compliance manuals, business plans, and lists of employees and their contact information.

0000000001.0003 P.0010

# Exhibit F



# Quick Facts 📊⚖️

*— Credit Card & Other Financial Instrument Fraud Offenses —*

## Fiscal Year 2021

▶ IN FY 2021, 57,287 CASES WERE REPORTED TO THE U.S. SENTENCING COMMISSION.

▶ 4,235 OF THESE INVOLVED THEFT, PROPERTY DESTRUCTION, AND FRAUD.

▶ 18.6% OF THEFT, PROPERTY DESTRUCTION, AND FRAUD OFFENSES INVOLVED CREDIT CARD AND OTHER FINANCIAL INSTRUMENT FRAUD.[1] [2] [3]

▶ CREDIT CARD AND OTHER FINANCIAL INSTRUMENT FRAUD HAS DECREASED BY 33.5% SINCE FY 2017.



**Number of Credit Card and Other Financial Instrument Fraud Offenders**



**Median Loss for Credit Card and Other Financial Instrument Fraud Offenses**

## Offender and Offense Characteristics

- 77.5% of credit card and other financial instrument offenders were men.

- 42.2% were Black, 32.6% were White, 17.9% were Hispanic, and 7.3% were Other races.

- Their average age was 38 years.

- 81.2% were United States citizens.

- 49.9% had little or no prior criminal history (Criminal History Category I).

- The median loss for these offenses was $120,689;[4]
    - 12.6% involved loss amounts of $15,000 or less;
    - 19.8% involved loss amounts greater than $550,000.

- Sentences were increased for:
    - the number of victims or the extent of harm to victims (47.9%);[5]
    - using sophisticated means to execute or conceal the offense (20.6%);
    - using an unauthorized means of identification (41.6%);
    - deriving more than $1 million in gross receipts from or substantially jeopardizing the safety and soundness of a financial institution (2.2%);
    - a leadership or supervisory role in the offense (13.6%);
    - abusing a public position of trust or using a special skill (5.4%);
    - obstructing or impeding the administration of justice (3.5%).

- Sentences were decreased for:
    - minor or minimal participation in the offense (6.3%).

- The top five districts for credit card and other financial instrument fraud offenders were:
    - Central District of California (64);
    - Southern District of New York (49);
    - District of New Jersey (40);
    - Middle District of Florida (33);
    - Eastern District of Pennsylvania (32).

## Punishment

- The average sentence for credit card and other financial instrument fraud offenders was 27 months.

- 92.2% were sentenced to prison.

- 23.0% were convicted of an offense carrying a mandatory minimum penalty; of those offenders, 24.6% were relieved of that penalty.

This document was produced and published at U.S. taxpayer expense.
For more Quick Facts visit https://www.ussc.gov/research/quick-facts.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

*— Credit Card & Other Financial Instrument Fraud Offenses —*

## Sentences Relative to the Guideline Range

- Of the 55.6% of credit card and other financial instrument fraud offenders sentenced under the *Guidelines Manual*:

    - 61.6% were sentenced within the guideline range.

    - 24.5% received a substantial assistance departure.
        ◊ Their average sentence reduction was 61.8%.

    - 12.0% received some other downward departure.
        ◊ Their average sentence reduction was 51.0%.

- 44.4% received a variance; of those offenders:

    - 95.4% received a downward variance.
        ◊ Their average sentence reduction was 53.2%.

    - 4.6% received an upward variance.
        ◊ Their average sentence increase was 69.9%.

- The average guideline minimum and average sentence imposed remained steady over the past five years.

    - The average guideline minimum increased from 35 months in fiscal year 2017 to 38 months in fiscal year 2021.

    - The average sentence imposed decreased from 28 months in fiscal year 2017 to 27 months in fiscal year 2021.

### Sentence Relative to the Guideline Range (%)




### Average Guideline Minimum and Average Sentence (months)



### Sentence Imposed Relative to the Guideline Range FY 2021



<sup>1</sup>

[1]    Cases with incomplete sentencing information were excluded from the analysis.

[2]    Theft property destruction and fraud offenses include cases with complete guideline application information in which the offender was sentenced under §2B1.1 (Larceny Embezzlement and Other Forms of Theft Offenses Involving Stolen Property Property Damage or Destruction Fraud and Deceit Forgery Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States) using a *Guidelines Manual* in effect on November 1 2001 or later. See www.ussc.gov/research/quick-facts for the quick facts on §2B1.1 offenders.

[3]    Credit card and other financial instrument fraud includes cases where the offense conduct as described in the Presentence Report involved fraudulent activity involving credit cards debit cards checks bank accounts or non-mortgage loans. Prior to fiscal year 2020 credit card fraud was a stand-alone category. Beginning in FY2020 credit card fraud is combined with other offenses involving financial instruments resulting in a larger category of offenses. Therefore previous quick facts for credit card offenses are not comparable to the category of offenses reported in this publication.

[4]    The Loss Table was amended effective November 1 2001 and November 1 2015.

[5]    The Victims Table and Sophisticated Means adjustment were amended effective November 1 2015.

[6]    "Early Disposition Program (or EDP) departures" are departures where the government sought a sentence below the guideline range because the defendant participated in the government's Early Disposition Program through which cases are resolved in an expedited manner. See USSG §5K3.1.

SOURCE: United States Sentencing Commission FY 2017 through FY 2021 Fraud Team Datafiles USSCFTFY17-USSCFTFY21.

# Exhibit G



# Quick Facts

*— Health Care Fraud Offenses —*

## Fiscal Year 2021

▶ IN FY 2021, 57,287 CASES WERE REPORTED TO THE U.S. SENTENCING COMMISSION.

▶ 4,235 OF THESE INVOLVED THEFT, PROPERTY DESTRUCTION, AND FRAUD.

▶ 8.0% OF THEFT, PROPERTY DESTRUCTION, AND FRAUD OFFENSES INVOLVED HEALTH CARE FRAUD.[1][2][3]

▶ HEALTH CARE FRAUD HAS DECREASED BY 28.7% SINCE FY 2017.

**Number of
Health Care Fraud Offenders**



**Median Loss for
Health Care Fraud Offenses**



## Offender and Offense Characteristics

- 65.8% of health care fraud offenders were men.

- 53.4% were White, 18.8% were Black, 18.5% were Hispanic, and 9.3% were Other races.

- Their average age was 50 years.

- 92.3% were United States citizens.

- 92.0% had little or no prior criminal history (Criminal History Category I).

- The median loss for these offenses was $1,002,407;[4]
    - 18.8% involved loss amounts of $150,000 or less;
    - 17.3% involved loss amounts greater than $9,500,000.

- Sentences were increased for:
    - the number of victims or the extent of harm to victims (21.7%);[5]
    - conviction of a federal health care offense involving a government health care program and a loss or more than $1 million (36.0%);
    - using sophisticated means to execute or conceal the offense (16.7%);
    - using an unauthorized means of identification (9.2%);
    - a leadership or supervisory role in the offense (26.8%);
    - abusing a public position of trust or using a special skill (30.7%);
    - obstructing or impeding the administration of justice (5.1%).

- Sentences were decreased for:
    - minor or minimal participation in the offense (5.4%).

- The top five districts for health care fraud offenders were:
    - Northern District of Alabama (31);
    - Southern District of Florida (30);
    - Northern District of Texas (22);
    - Southern District of Texas (21);
    - Central District of California (17).

## Punishment

- The average sentence for health care fraud offenders was 30 months.

- 73.5% were sentenced to prison.

- 3.9% were convicted of an offense carrying a mandatory minimum penalty; of those offenders, 30.8% were relieved of that penalty.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

*— Health Care Fraud Offenses —*

## Sentences Relative to the Guideline Range

- Of the 52.4% of health care fraud offenders sentenced under the *Guidelines Manual*:

  - 34.1% were sentenced within the guideline range.

  - 58.0% received a substantial assistance departure.
    ◇ Their average sentence reduction was 66.3%.

  - 6.8% received some other downward departure.
    ◇ Their average sentence reduction was 66.5%.

- 47.6% received a variance; of those offenders:

  - All received a downward variance.
    ◇ Their average sentence reduction was 56.6%.

- The average guideline minimum fluctuated while the average sentence imposed decreased over the past five years.

  - The average guideline minimum increased and decreased throughout the fiscal years. The average guideline minimum was 52 months in fiscal year 2017 and 53 months in fiscal year 2021.

  - The average sentence imposed decreased from 37 months in fiscal year 2017 to 30 months in fiscal year 2021.

### Sentence Relative to the Guideline Range (%)




### Average Guideline Minimum and Average Sentence (months)




### Sentence Imposed Relative to the Guideline Range FY 2021





Substantial Assistance 30.4%
Within Range 17.8%

Variances 47.6%

Under *Guidelines Manual* 52.4%

---

[1] Cases with incomplete sentencing information were excluded from the analysis.

[2] Theft property destruction and fraud offenses include cases with complete guideline application information in which the offender was sentenced under §2B1.1 (Larceny Embezzlement and Other Forms of Theft Offenses Involving Stolen Property Property Damage or Destruction Fraud and Deceit Forgery Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States) using a *Guidelines Manual* in effect on November 1 2001 or later. See www.ussc.gov/research/quick-facts for the *Quick Facts* on §2B1.1 offenders.

[3] Health care fraud includes cases where the offense conduct as described in the Presentence Report involved the defrauding of a government or private health care entity.

[4] The Loss Table was amended effective November 1 2001 and November 1 2015.

[5] The Victims Table and Sophisticated Means adjustment were amended effective November 1 2015.

[6] "Early Disposition Program (or EDP) departures" are departures where the government sought a sentence below the guideline range because the defendant participated in the government's Early Disposition Program through which cases are resolved in an expedited manner. *See* USSG §5K3.1.

SOURCE: United States Sentencing Commission FY 2017 through FY 2021 Fraud Team Datafiles USSCFTFY17-USSCFTFY21.

# Exhibit H



# Quick Facts

*— Theft, Property Destruction, and Fraud Offenses —*

## Fiscal Year 2021

▶ In FY 2021, 57,287 cases were reported to the U.S. Sentencing Commission.

▶ 4,235 of these involved theft, property destruction, and fraud.[1]

▶ Theft, property destruction, and fraud offenses have decreased by 33.4% since FY 2017.

**Number of Theft, Property Destruction, and Fraud Offenders**



**Median Loss for Theft, Property Destruction, and Fraud Offenses**



## Offender and Offense Characteristics[2]

- 69.1% of theft, property destruction, and fraud offenders were men.

- 42.9% were White, 30.2% were Black, 19.3% were Hispanic, and 7.6% were Other races.

- Their average age was 43 years.

- 85.1% were United States citizens.

- 71.0% had little or no prior criminal history (Criminal History Category I).

- The median loss for these offenses was $134,086;[3]
  - 14.5% involved loss amounts of $6,500 or less;
  - 15.0% involved loss amounts greater than $1.5 million.

- Sentences were increased for:
  - the number of victims or the extent of harm to them (30.6%);[4]
  - sophisticated means used to execute or conceal the offense (16.1%);
  - using an unauthorized means of identification (14.5%);
  - a leadership or supervisory role in the offense (9.9%);
  - abusing a public position of trust or using a special skill (18.7%);
  - obstructing or impeding the administration of justice (3.9%).

- Sentences were decreased for:
  - minor or minimal participation in the offense (3.5%).

- The top five districts for theft, property destruction, and fraud offenders were:
  - Central District of California (190);
  - Southern District of New York (171);
  - Western District of Texas (167);
  - Southern District of Florida (165);
  - Northern District of Texas (162).

## Punishment

- The average sentence length was 21 months.

- 70.9% of theft, property destruction, and fraud offenders were sentenced to prison.

- 10.5% were convicted of an offense carrying a mandatory minimum penalty; of those offenders, 26.1% were relieved of that penalty.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

— *Theft, Property Destruction, and Fraud Offenses* —

## Sentences Relative to the Guideline Range

- Of the 58.1% of theft, property destruction, and fraud offenders sentenced under the *Guidelines Manual*:

  - 69.2% were sentenced within the guideline range.

  - 21.9% received a substantial assistance departure.
    ◊ Their average sentence reduction was 64.3%.

  - 6.8% received some other downward departure.
    ◊ Their average sentence reduction was 58.8%.

- 41.9% received a variance; of those offenders:

  - 94.5% received a downward variance.
    ◊ Their average sentence reduction was 59.6%.

  - 5.5% received an upward variance.
    ◊ Their average sentence increase was 94.6%.

- The average guideline minimum and average sentence imposed remained steady over the past five years.

  - The average guideline minimum decreased from 32 months in fiscal year 2017 to 30 months in fiscal year 2021.

  - The average sentence imposed decreased from 23 months in fiscal year 2017 to 21 months in fiscal year 2021.

### Sentence Relative to the Guideline Range (%)



### Average Guideline Minimum and Average Sentence
(months)



### Sentence Imposed Relative to the Guideline Range FY 2021



[1] Theft Property Destruction and Fraud offenses include cases in which the offender was sentenced under §2B1.1 (Larceny Embezzlement and Other Forms of Theft Offenses Involving Stolen Property Property Damage or Destruction Fraud and Deceit Forgery Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States).

[2] Cases with incomplete sentencing information were excluded from the analysis.

[3] The Loss Table was amended effective November 1 2001 and November 1 2015.

[4] The Victims Table and Sophisticated Means adjustment were amended effective November 1 2015.

[5] "Early Disposition Program (or EDP) departures" are departures where the government sought a sentence below the guideline range because the defendant participated in the government's Early Disposition Program through which cases are resolved in an expedited manner. *See* USSG §5K3.1.

**Subject: Randall Crater**

The Honorable Denise Casper
Federal District Judge
Boston, Massachusetts

Dear Judge Casper,

As it is a privilege for me to write to you on behalf of my friend of 35 years. I have lived and worked in Florence and Myrtle Beach, South Carolina all of my life. I met Randell when I was a teenager playing in the pool league in Florence. It's like a bowling or softball league. Florence is not a big city.

Randell and I hit it off right away when we met. He is an outgoing and friendly person. We became close friends and have kept our friendship which I value greatly. He has always been there to listen if I needed him. Soon after Randell and I first met, I learned his father was terminally ill with cancer. I think his dad was young, I believe he was in his 40s. Randall was not close for his father. He drank heavily and he had a girlfriend I was told. In the last months of his life Randell's mother had to work long days at McLeod Hospital. Randell left school and stayed with his father. He cooked his food and changed him when he became incontinent. He also worked part time and help keep the house. I always admired him for that not knowing later in life, I would be in the same situation. After Randell's father passed our friendship continued. If Randell was ever short of money, he knew he could call me. We never turned each other down, we could call each other to help friends and family, even if we didn't know the people. It was a friendship of trust. It went both ways. It has never wavered and is as strong today as it was when we were teenagers, shooting pool in the league.

Ten years ago, my father was diagnosed with dementia. I worshiped my father. He was an incredible person and the center of my family's life. His condition advanced quickly. At first, taking away his ability to work, and take care of himself. This went on for years until his death. Ultimately, I had to put my life on hold to take care of him. My finances had become terrible, and my emotional state was worse. I don't know what I would've done without Randell. He constantly stayed in touch with me and took my calls if it was a day or late night. He would always listen and pick up my spirits. He would come see us whenever he was in Florence. As a person and a friend, I have never known anyone more generous with their time. I have never had a friend so selfless, and able to say the right thing at the right time. You knew he meant it from the heart and cared about you. He was an emotional savior in the last weeks of my father's life. During my father's illness Randell sent me a little money here and there to get by that equaled thousands of dollars. Sometimes I would ask for it and a lot of times he said it just because he knew I needed it. He never asked for a dime back because he always knew I would be there for him, if he ever needed me.

Judge Casper, I don't know a lot about this trial other than Randell has been convicted in your court and you will sentence him this month. I know I am not able to comment on the charges. I can tell you, Randell Crater is not a scammer or scoundrel. He has gotten himself into something over his head I am certain. Money was lost and he should be accountable for his share. Randell's wife, children, and his mother all depend on him for support.

My father told me once that folks can build a bank account during their lives, doing the right thing and treating others right. That bank account can stand in place of punishment for a mistake. For me and my family, he has created a large account that I would ask to empty in his favor. You will not regret it. Thank you for reading this and God bless.

Respectfully Yours,

Gil Flowers

To: The Honorable Denise Casper
Federal District Judge
Boston, Massachusetts

Dear Judge Casper,

I have volunteered to write a character letter to you on behalf of my friend Randall Crater. I am Pastor Franklin Barnette. I am 60 years old. My ministry is in Plano Texas. I have had a non- denominational ministry for 15 years. Originally, I am from Roxboro, North Carolina.

I met Randall Crater between 5 and 6 years ago. We were introduced over the telephone when I joined some friends who were on a business call. I was interested in their project. Mr. Crater was helping out on it, but I cannot recall the details.

Mr. Crater was an open and friendly person. He expressed interest in me and my ministry. Over time, he learned my story of being an African American from the county in NC. I was on active duty in the Air Force. I have an Honorable Discharge and started out in buses thereafter. It was during my grandmother's funeral that I felt the Lord's calling.

I was an introvert who was afraid to speak in public. Something told me to get up and say something on behalf of my grandmother. I did. Though I could not remember all that I said, people came up to me and said I was a blessing to them. From that day, my life changed. I am now an ordained minister. The Lord put me where I should be.

In the course of my ministry, I fell on very hard financial times about 4 years ago. I was in a long stay hotel with no money to pay the bill. I called Randall since we spoke regularly and told him of my situation. I remember that he was on the interstate driving somewhere. He pulled his car over at a rest area and paid my hotel bill from a credit card. He sent me money that allowed me to get back on my feet and continue God's work.

Randall has been a blessing to my life. We have talked about both of us coming up hard in North Carolina and the travails of our lives as well as the successes.

He loves and talks about his wife and children. He has uplifted me with advice on many occasions  I have done the same for him especially as he faced his trial and after he was convicted.

Judge, I know nothing about the ins and outs of the criminal law. I do know Mr. Crater. He is a man of great generosity and kindness. He would be the last person I would believe would be facing this situation.

I would pray that your honor sentence my friend to a minimum amount of confinement. No matter what his mistakes in this business, he has lived a good life to this point, helping many. There are numbers of people who depend upon him daily.

Sincerely,

Franklin Barnette

January 23, 2023

Honorable Judge Denise Casper
United States District Court
Boston Massachusetts

## OBJECT: REFERENCE LETTER FOR RANDALL CRATER

Dear Honorable Judge Denise Casper,

I am most pleased to write this character reference letter for Randall Crater.

I have known Randall since 2012, when he was introduced to me in Houston Texas by attorney Mark Ariza. Randall and I have had many memorable conversations over the years about Randalls family and most notably his children. Throughout our conversations I always came away admiring Randalls love and commitment to make sure his children spent valuable time with their father. Your honor since meeting Randall and eventually becoming his friend I can honestly say Randall Crater is an individual whose character is deep rooted in fairness, honesty, and empathy for other human beings. Randall has very big heart and has never failed to help a friend in need if he had the means to so.

Sincerely,

*Michael Singleton*

Michael Singleton
Friend
832-291-0847
Iconsult888@gmail.com

To: The Honorable Denise Casper
Federal District Judge
Boston, Massachusetts

Dear Judge Casper,

I am writing this as a testimony about Randall Crater. Over the last several years, I have had the pleasure to get to know Randall, and since, I call him my best friend. He has been a person I can count on in many respects of life.

This man has touched my life and taught me different life lessons from his experiences he has been through. Randall is the kind of person that you can call any time, and he will do anything in his power to help.

I ask when looking at Randall that you keep in mind that Randall is a great husband to his wife, an amazing dad to his children, and such a caring human being that loves people and loves to help people. I can't say enough good things about my friend here, so I really appreciate you taking the time to read this, and I hope it helps you to know a little more how big of a heart Randall has.

Thank you.

James Ripley