IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-cr-10063-DJC |
| | ) | |
| RANDALL CRATER, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

The defendant submitted a detailed sentencing memorandum (Dkt. No. 244) in which he expresses no remorse and takes no responsibility for his actions.  Instead, the defendant blames everyone else and attempts to paint himself as the real victim.  In doing so, he provides no explanation for the critical facts in this case, including the wide variety of lies he personally told investors and customers, or the fact that it was the defendant who received all the proceeds from this fraud (over $7.5 million).  The government will be prepared to further address these points at the sentencing hearing.  This Supplemental Sentencing Memorandum addresses only the defendant's three objections to the Presentencing Report ("PSR") and the defendant's request for an evidentiary hearing on the issue of restitution.

**I.      The Defendant's Objections to the PSR**

The Court makes factual findings at sentencing using a preponderance of the evidence standard.  *United States v. Rivera-Ruiz*, 43 F.4th 172, 181–82 (1st Cir. 2022); *see also* U.S.S.G. § 6A1.3 cmt.  As set forth below, the facts stated in the PSR are supported by the trial record and are established by a preponderance of the evidence.

*a.   There is no basis to reduce the PSR's loss amount by $3,700,000*

The defendant admits that he received millions of dollars from a single investor but claims that $3,700,000 was for marijuana licenses unconnected to My Big Coin.  Def. Sentencing Mem.

1

at 6-7.  That is incorrect.  The defendant's sale of the marijuana licenses utilized the My Big Coin currency.  Day 3 Tr. 3:8-10 ("A. The way that was documented or was supposed to be documented was I would get additional coins in my account while waiting for the licenses to come to me."); Day 2 Tr. 132:18-21 ("I had a total in there of more than $5.6 million. Some of it was, again, for the coins and some of it for the various licenses, but it was all denominated in coins.").  The defendant never delivered the marijuana licenses and left the investor only with the My Big Coin currency.  Day 2 Tr. 123:5-124:5; *see also* Def. Sentencing Mem. at 7 (referencing that in 2017 the defendant repaid the investor for the licenses using "MBC coins").  Therefore, the record is clear that the victim paid the defendant $3,700,000 and received the My Big Coin currency in exchange.  The My Big Coin currency was the fraud, and tricking victims into accepting it in exchange for something of value was at the core of the defendant's scheme.[1]

   b.  *The defendant used sophisticated means*

The defendant claims that the "sophisticated means" enhancement is inappropriate because the fraud was "simple," for example, it did not involve "hiding assets" or "fictitious entities."  Def. Sentencing Mem. at 8.  The record demonstrates otherwise.  The government presented evidence at trial that the My Big Coin scheme involved sophisticated means in its execution and concealment.  *See* U.S.S.G. § 2B1.1, App. n.9 (defining sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense").

---

[1] The government also notes that these marijuana licenses were apparently from Michigan.  *See* Def. Sentencing Mem. at PDF p. 50 (Affidavit in Support).  The undersigned AUSA has contacted the Michigan Cannabis Regulatory Agency and there is apparently no record of the defendant owning marijuana licenses in Michigan.  This may explain why the defendant was never able to deliver the licenses and instead provided the fraudulent and worthless My Big Coin currency.

The "My Big Coin Exchange" purported to show an active and fluctuating trading market for the fake My Big Coin cryptocurrency. *E.g.*, Ex. 7f. The defendant's emails show that he had control over the My Big Coin Exchange. *See, e.g.*, Ex. 11i (March 13, 2014 email from the defendant to a customer asking "how many coins would you like to buy" and stating "I'll back date the cost of the coins to the day you set the account up"); Ex 11jj (December 23, 2014 email from Mr. Gillespie to the defendant containing a chat log with a customer where the customer is instructed how to buy and sell "coins" on the My Big Coin Exchange). Similarly, the defendant's financial records show that he personally controlled the bank accounts used to buy and sell the My Big Coin currency. *See, e.g.*, Ex. 44 (summary financial exhibit showing all the money from My Big Coin investments and coin purchases going into financial accounts controlled by the defendant, and copies of checks from accounts controlled by the defendant for the "sale of coins" and "coin buy back").

Meanwhile, My Big Coin blanketed the internet with false advertising, including on the My Big Coin webpages, Exs. 7a–7h., and multiple My Big Coin social media pages, Exs. 27 (YouTube video), 28 (Twitter page), 30 (Facebook page). My Big Coin advertised rapid increases in "current value" interspersed with false statements about important developments at My Big Coin. Exs. 28, 30. While the defendant blames other individuals for the fraudulent online marketing campaign, he fails to address that (1) the defendant was paying and directing several of those individuals, *see infra* § I.c.ii., and (2) the defendant personally advertised the exact same false statements on his personal social media accounts. *See, e.g.*, Ex. 6 (Twitter).

Additionally, three years into the scheme, the defendant became aware that the CFTC was investigating My Big Coin for fraud. Only then was a My Big Coin cryptocurrency created. Day 4 Tr. 217:23-218:4 (Ms. Clegg testifying that My Big Coin not a cryptocurrency until June 28,

2017); Expert Report at 7, Dkt. No. 141-6 (same).  But notably, that newly-created cryptocurrency immediately reflected its own sophisticated fraud: "wash trading" designed to trick investors into believing that the My Big Coin cryptocurrency had an active trading market when no such market existed.  Day 4 Tr. 217:23-218:4; Expert Report at 11.

Lastly, the defendant hid the My Big Coin assets.  U.S.S.G. § 2B1.1(b)(2) cmt. n.9(B) ("[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . also ordinarily indicates sophisticated means").  The defendant never reported any of the My Big Coin income to the Internal Revenue Service.  Ex. 42 (IRS Certification of Lack of Record).  The defendant also hid the My Big Coin Exchange from regulatory scrutiny of the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"): while telling his investors that he had a "banking license," Ex. 32 (August 24, 2015 email), and despite being told that he was required to register My Big Coin with FinCEN, Ex. 10b (December 11, 2013 email to the defendant providing instructions for the FinCEN registration requirement), the defendant never registered, Ex. 43 (FinCEN Certification of Lack of Record).  The defendant also funneled all payments from My Big Coin investors and customers into accounts that he controlled but that were opened in the names of his sister and mother.  Ex. 44 (identifying My Big Coin accounts opened in the names of the defendant's sister and mother); Day 4 Tr. 157:25-158:1, 160:6-161:5 (the defendant's sister testifying that the defendant instructed her to open the bank account).  Then defendant then forged his sister's signature on checks to his agents.  *Compare* Ex. 44 at 9, 11 (examples of checks in name of "Kimberly Benge") *with* Day 4 Tr. 162:21-22 (Ms. Benge: "Q. Did you ever write any checks from this account?  A. No, sir.") *and id.* 164:6-8 (Ms. Benge: "Q. . . . Who had the checkbook for Greyshore between the period of 2014 and 2017?  A. Mr. Crater did.").

The above-referenced actions demonstrate that My Big Coin was no "simple" fraud, particularly when viewed as a whole. *See United States v. Doley*, 783 F.3d 7, 25 (1st Cir. 2015) (a "scheme may be sophisticated even if the individual elements taken alone are not") (citing *United States v. Evano*, 553 F.3d 109, 113 (1st Cir. 2009)). The creation of a fake digital currency and a fake currency exchange, along with a corresponding, multi-faceted advertising campaign and efforts to conceal the fraud, constitute sophisticated means that warrant the enhancement.

   c. *The defendant was an organizer or leader and the fraud involved five or more participants*

The defendant claims that he was not an organizer or leader of My Big Coin and that My Big Coin did not involve five or more people. Def. Sentencing Mem. at 9-10. Once-again, that is incorrect.

   i.     *The defendant was an organizer or leader*

The evidence at trial demonstrated that the defendant was an organizer or leader of My Big Coin. The defendant claimed that he "built the system," Ex. 11t (April 11, 2014 email), and publicly advertised himself as the "creator" and "developer" of My Big Coin, Ex. 1a (LinkedIn Profile). The defendant's emails—over 75 of which were marked as exhibits at trial—show that he was the primary operator of My Big Coin. *See, e.g.*, Exs. 10a – 14g. The defendant's bank records also establish that he paid and directed others to promote My Big Coin, *see infra* § I.c.ii., and personally conducted the transfers of the My Big Coin currency for customers. *See, e.g.*, Ex. 44 (summary financial exhibit); Ex. 11i (March 13, 2014 email from the defendant to a customer asking "how many coins would you like to buy" and stating "I'll back date the cost of the coins to the day you set the account up").

Perhaps the greatest indicia that the defendant was an organizer or leader of My Big Coin is that all of the funds transferred from customers and investors went directly into bank accounts

that he controlled, Day 6 Tr. 94:10-17 (Ms. Brekenfeld testimony); Ex. 44 (summary financial exhibit), and the defendant used the money primarily for personal expenses, including to buy a house, cars, and jewelry.  Day 6 Tr. 94:10-17 (Ms. Brekenfeld testimony); Day 4 Tr. 140:18-19 (Mr. Abadi testimony); Ex. 44 at 6-7.

The defendant wants the Court to disregard this evidence because, according to post-trial affidavits collected for his sentencing memorandum, the defendant was not the real mastermind of My Big Coin.  This claim is belied by the evidence.  And further, even if there were others involved in making decisions at My Big Coin, that in no way diminishes the overwhelming evidence that the defendant was an organizer or leader of the fraudulent scheme.

### ii.  *My Big Coin involved more five or more participants*

The defendant concedes in his sentencing memorandum that, at a minimum, the following five individuals worked on behalf of My Big Coin: the defendant, Johne Roche, Mark Gillespie, Michael Kruger, and Marcus Gorby.  As the defendant once explained to a potential investor, he had multiple "guys" that he was "allowing . . . to promote the coin."  Ex. 35f.  The government presented evidence that the defendant was paying at least three of these "guys" from the My Big Coin accounts that he controlled.  *See, e.g.*, Ex. 44 at 8-9 (identifying payments and examples of checks to Mr. Gillespie, Mr. Gorby, and Mr. Kruger).

The individuals the defendant paid were doing work for My Big Coin and reporting to the defendant.  For example, testimony at trial and the defendant's emails show that Mr. Gillespie was the defendant's paid agent.  *See*, *e.g.,* Day 4 Tr. 83:14-16 (victim testifying that "[e]very time I talked to Mark Gillespie it was always -- he always referred to Randall Crater. He passed the information from Randall Crater on to us."); Day 7 Tr. 23:17–33:3 (Mr. Gillespie testifying that the defendant paid him thousands of dollars to promote My Big Coin); Ex. 32 (August 24, 2015

email in which the defendant approves marketing messaging for Mr. Gillespie's use); Exs. 11d
(February 1, 2014 email from Mr. Gillespie to the defendant negotiating compensation), 11g
(March 1, 2014 email from Mr. Gillespie to the defendant about how to respond to an investor's
questions).  The defendant also corresponded with Mr. Gorby via email about My Big Coin's
social media.  *See, e.g.*, Exs. 11q (April 3, 2014 email from Mr. Gorby to the defendant with links
to the My Big Coin Facebook and Twitter pages), 12v (August 15, 2015 email from Mr. Gorby to
the defendant with a copy of the upcoming My Big Coin YouTube video).  The defendant's emails
also showed that he was corresponding with Mr. Kruger about soliciting funds from investors. *See,
e.g.*, 11u (April 23, 2014 email from Mr. Gillespie to the defendant explaining that he spoke with
Mr. Kruger about a specific investor who will be investing "17k"); 11y (August 6, 2014 email
from Mr. Kruger asking Mr. Gillespie to send bank wiring information to an investor and coping
the defendant).

Of note, the Court already found by a preponderance of the evidence that the defendant
had multiple paid agents.  The government provided supplemental briefing to show that multiple
"individuals were operating as agents of the defendant within the meaning of Rule 801(d)(2)(D)
of the Federal Rules of Evidence."  Dkt. No. 159.  The Court agreed with the government's
position.  Day 5 Tr. 245:8-11 (finding a "sufficient basis about the agency exception for the
purposes of the admission of statements who are purported to be or alleged to be by the government
agents of Mr. Crater").

## II.    The Defendant's Request for a Restitution Hearing

The PSR recommends that the Court order restitution totaling $7,668,317.50 and that the
money be directed back to the individuals who transferred it from their bank accounts to the
accounts controlled by the defendant.  The defendant does not contest that he received the

$7,668,317.50 from the specific victims identified in the PSR. Instead, the defendant argues that an evidentiary hearing is necessary prior to a restitution order because a small number of individuals who paid for My Big Coin were "not defrauded," and another small number of victims have already obtained some compensation from another victim for their losses. Def. Sentencing Mem. at 5-6. The first argument is erroneous, and the second argument does not justify an evidentiary hearing that would further delay the defendant repaying the victims.

Evidentiary hearings at sentencing are the exception, not the rule. An evidentiary hearing is typically only necessary where, for example, the available evidence is inherently unreliable and the disputed question could result in a harsher sentence. *See United States v. Jimenez Martinez*, 83 F.3d 488, 494 (1st Cir. 1996) (no reliable evidence available and the enhancement could result in four additional years of incarceration). Neither issue presents itself here: the Court has already received extensive testimonial and documentary evidence, including on the topic of victim losses, and the specific apportionment of restitution monies will not impact the defendant's sentence.

Further, the defendant's specific arguments for an evidentiary hearing lack merit. As to the first argument, the defendant provides no evidence to support his claim that certain individuals were "not defrauded" when they invested in My Big Coin. To the contrary, as proven at trial, My Big Coin was marketed from the beginning as a cryptocurrency (among other things) when it was not in fact a cryptocurrency. Every individual who paid the defendant for My Big Coin was therefore defrauded, and the defendant provides no basis for the Court to find otherwise.

Second, the defendant's claim that certain victims were already compensated for their losses does not justify an evidentiary hearing. The defendant has not argued that he is not subject to a forfeiture order of $7,668,317.50, and the record and law are clear that the defendant must pay restitution in that same amount. Further, the bank records clearly indicate who transferred those

8

funds into the bank accounts controlled by the defendant.  That alone is sufficient for the Court to order restitution.  If after further investigation and discussion with victims the government identifies a basis for reapportionment of restitution amongst the victims, the government can address that issue and, if necessary, return to the Court for a revised restitution order.  But that would not change the amount of restitution or the defendant's Guidelines Sentencing Range, and that hypothetical should not forestall a prompt restitution order from this Court requiring the defendant to repay the identified victims as soon as possible.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Christopher J. Markham*
CHRISTOPHER J. MARKHAM
Assistant United States Attorney


*/s/ Siji Moore*
SIJI MOORE
Trial Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

Dated:  January 30, 2022

By:     */s/ Christopher J. Markham*
CHRISTOPHER J. MARKHAM
Assistant United States Attorney