```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   UNITED STATES OF AMERICA,

 5                    Plaintiff,        Criminal Action
                                        No. 19-10063-DJC
 6   V.
                                        January 31, 2023
 7   RANDALL CRATER,                    1:58 p.m.

 8                    Defendant.
     _____
 9

10

11                   TRANSCRIPT OF SENTENCING

12          BEFORE THE HONORABLE DENISE J. CASPER

13             UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                 1 COURTHOUSE WAY

16                 BOSTON, MA  02210

17

18

19

20
               DEBRA M. JOYCE, RMR, CRR, FCRR
21                Official Court Reporter
             John J. Moakley U.S. Courthouse
22            1 Courthouse Way, Room 5204
                  Boston, MA  02210
23               joycedebra@gmail.com

24

25
```

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   CHRISTOPHER J. MARKHAM, ESQ.
     BABASIJIBOMI MOORE, ESQ.
 4   US Attorney's Office - MA
     J. Joseph Moakley U.S. Courthouse
 5   1 Courthouse Way
     Suite 9200
 6   Boston, MA 02210
     617-449-6890
 7   christopher.markham2@usdoj.gov
     babasijibomi.moore2@usdoj.gov
 8
     FOR THE DEFENDANT:
 9
     SCOTT P. LOPEZ, ESQ.
10   Lawson & Weitzen
     88 Black Falcon Avenue
11   Suite 345
     Boston, MA 02210
12   617-439-4990
     splopez@lawson-weitzen.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on January 31, 2023.

The defendant, Randall Crater, is present with counsel.  The Assistant U.S. Attorneys are present.)

THE CLERK:  All rise.

(The Court entered the courtroom.)

THE CLERK:  Court is in session.  Please be seated.

Criminal action 19-10063, United States v. Randall Crater.

Would counsel please state your name for the record.

MR. MARKHAM:  Christopher Markham for government, your Honor, good afternoon.

MR. MOORE:  Good afternoon, your Honor.  Siji Moore.

THE COURT:  Good afternoon, counsel.

MR. LOPEZ:  Good afternoon, your Honor.  Scott Lopez for Mr. Crater.

THE COURT:  Good afternoon, counsel.

Good afternoon, Mr. Crater.

Counsel -- I also know that Probation is represented here.

PROBATION OFFICER:  Good afternoon, your Honor.

```
 1              THE COURT:  Good afternoon.
 2              Counsel, sir, I know that we're here for sentencing.
 3    I did receive a number of written submissions on either side.
 4    I just wanted to make sure that I've received and reviewed
 5    everything that both sides wanted me to.
 6              I've received and reviewed the presentence report as
 7    revised January 23rd; Mr. Crater's sentencing memo, that was
 8    filed initially under seal and then in redacted form, Docket
 9    242 and 244.  I've also read all of the attachments, which
01:59 10    includes Dr. Knight's evaluation, certain letters of support;
11    and JSIN information from the Sentencing Commission, along with
12    some other materials.
13              I've also received the government's sentencing memo,
14    Docket -- I think it was 238.
15              I've received the Brekenfeld affidavit with the loss
16    amount chart.
17              I've also received several other letters from
18    Mr. Hess, Mr. Gillespie, Dockets 237, 243.
19              I received a notice -- the government's notice
01:59 20    regarding forfeiture, Docket 148, and various victim impact
21    letters that were collected at Dockets 231 and Docket 233.
22              I'd separately received victim impact letters compiled
23    by the government.  There's certain overlap between the filings
24    in that grouping, but I have reviewed those.
25              I've also received Mr. Crater's supplement to the
```

1   sentencing memo, Docket 245, which attached additional

2   exhibits, I through Q, which were letters from Mr. Crater's

3   wife, neighbors, friends, and two attorneys, and I believe a

4   former colleague.

5         I've received the government's response to

6   Mr. Crater's sentencing memo, Docket 246.

7         And then filed today, I received two additional

8   letters on Mr. Crater's behalf, Dockets 248 and 249.

9         Counsel, other than those materials, any other written

02:01 10   materials that either side wanted me to consider?

11         MR. MARKHAM:  Nothing from the government, your Honor.

12         THE COURT:  Mr. Lopez?

13         MR. LOPEZ:  No, your Honor.

14         THE COURT:  And, Mr. Lopez, have you had a chance to

15   review the presentence report with Mr. Crater?

16         MR. LOPEZ:  Yes.

17         THE COURT:  Okay.  And let me just state for the

18   record what Probation's calculations were, and I know there was

19   some objections on Mr. Crater's part.

02:01 20         The base offense level started at 7 with an increase

21   for loss amount of 18 and an increase of 2 for involving 10 or

22   more victims; and a further increase for sophisticated means of

23   two levels, for a base offense level of 29; a further 1 level

24   increase for conviction under the money laundering statute; an

25   increase of 4 for Mr. Crater being an organizer or leader, for

1    a total offense level of 34.

2             Counsel, Mr. Lopez, I know you have objections to

3    those enhancements.  I should also just note for the record

4    that I have also reviewed the objections to certain of the

5    government's factual statement in the PSR that were -- those

6    were objections 1 through 14.

7             I'll just say for the record, Mr. Lopez, your

8    objections as to 1 to 13 are preserved, but overruled.

9             I'll just note for the record, Mr. Lopez, as to the

02:02 10   characterizations or the conclusions from the evidence offered

11   at trial, I find that, based on the evidence at trial, all of

12   the following was at least proved by a preponderance of the

13   evidence for the purposes of sentencing in regards to the

14   multiple paid agents:  That My Big Coin did not exist as a

15   cryptocurrency, private, public or otherwise, before June 28,

16   2017; that there were false statements made in regards to My

17   Big Coin being backed by gold; that there's no evidence that

18   Mr. Crater had a Spanish bank account or $100 million in gold

19   in a Spanish bank account; that there was no partnership with

02:03 20   MasterCard; and there is evidence that he was never counting

21   cash or waiting for an armored car to pick up same; and then he

22   had access to the accounts in his sister's and mother's names.

23   Those were objections 1 through 14, which I -- 1 through 13,

24   excuse me, which I overrule.

25            As to objection 14, Mr. Lopez, this was the objection

| | |
|---|---|
| 1 | about use of the monies received from investors and customers |
| 2 | by Mr. Crater.  I did agree that there was evidence shown at |
| 3 | trial that he used some of those monies for personal expenses. |
| 4 | I don't think there's evidence of all, but certainly some.  So |
| 5 | I think the paragraph in that regard was properly stated, so |
| 6 | I'm going to overrule objection 14. |
| 7 | Mr. Lopez, I will hear you on what was contained in |
| 8 | objections 15, 16, 17, and 18, which, as I understand it, |
| 9 | Mr. Lopez, was an objection to the loss amount, an objection to |
| 02:05 10 | the enhancement for Mr. Crater being an organizer or leader, an |
| 11 | objection to the final total offense calculation, an objection |
| 12 | to -- I think the last objection, Mr. Lopez, was just |
| 13 | preserving the argument that there were mitigating factors that |
| 14 | I should consider. |
| 15 | Mr. Lopez, I'll hear you on any or all of those. |
| 16 | MR. LOPEZ:  Yes, your Honor. |
| 17 | So with respect to objection 15, it's our position, |
| 18 | your Honor, that the -- that $3.7 million was not part of the |
| 19 | My Big Coin scheme. |
| 02:05 20 | THE COURT:  Is this the Mr. Lynch amount? |
| 21 | MR. LOPEZ:  This is the Mr. Lynch amount, that |
| 22 | Mr. Lynch went in as partners with Mr. Crater in marijuana |
| 23 | licenses. |
| 24 | It is true that those monies were being held in coin, |
| 25 | but it wasn't part of the My Big Coin scheme.  Specifically, |

1   Mr. Lynch did not provide Mr. Crater with the money, the 3.7

2   million, based on his -- or based on his reliance on the

3   alleged false statements that the Court has now found by a

4   preponderance of the evidence and that was proved at trial.

5          Specifically, it had nothing to do with being backed

6   by gold or being a partner with MasterCard or that it was a

7   cryptocurrency.  So I think a separate, distinct -- the

8   government didn't charge that as a separate offense, and so I

9   don't think it should be included in the loss amount.

02:06 10          THE COURT:  Okay.

11          And, counsel, why don't I hear you on the other

12   arguments, then I'll give the government an opportunity to

13   respond.

14          That was -- yes, that was objection 15.

15          MR. LOPEZ:  The four-point increase on 16.

16          THE COURT:  Yes, yes.

17          MR. LOPEZ:  Well, your Honor, it's our position that

18   the government has not shown that Mr. Crater was the -- was the

19   leader of this alleged criminal enterprise.  It is true that

02:07 20   there was a LinkedIn account that said he was a creator of My

21   Big Coin, but there were other people involved here, which the

22   government, I would say intentionally, did not investigate so

23   that they could then argue that Mr. Crater was the owner and

24   operator of My Big Coin.

25          Mr. Crater was not the owner and operator of My Big

```
 1    Coin.  There was another individual which in the papers that I
 2    submitted clearly show he was the owner and operator of My Big
 3    Coin.
 4          Mr. Crater was involved, but he wasn't managing these
 5    other people.  These other people, it's true, were keeping
 6    Mr. Crater abreast of activities that they were doing, but they
 7    weren't doing those activities for Mr. Crater.
 8          And so I don't think even on a preponderance of
 9    evidence you can show that he was, in fact, the leader or
10    organizer of this enterprise and that it included five
11    individuals or more.
12          THE COURT:  Thank you.
13          And I think your other objections 17 and 18 were based
14    on those arguments?
15          MR. LOPEZ:  Yes, the --
16          THE COURT:  Oh, and sophisticated means.
17          MR. LOPEZ:  Sophisticated means.
18          I'm not arguing that My Big Coin, the entire -- the
19    entire scheme, some of which Mr. Crater was involved in, was
20    not sophisticated.  This is the first cryptocurrency -- this is
21    the first cryptocurrency fraud case like this.  So, yes, there
22    were many factors, but, as I submitted in the other materials,
23    he did not control the social media, he did not control the
24    company.  There were other people that were more intimately
25    involved in managing and running this enterprise that, in
```

1  essence, Mr. Crater reported to instead of -- instead of

2  managing.

3      The sophisticated two points, if you just look at what

4  Mr. Crater did, there was nothing terribly sophisticated about

5  what he did.

6      He opened up bank accounts in names of his sister and

7  his mother, and then monies from My Big Coin coins that he sold

8  to others was deposited into those accounts.  That's -- that's

9  just not sophisticated.  It's kind of like a red flag, and so I

02:10 10  just don't see that what Mr. Crater did here rises to the level

11  of sophistication that the guideline anticipates.

12      THE COURT:  Thank you.

13      Counsel, give me a moment here.

14      (Pause.)

15      THE COURT:  Counsel, I'll hear from the government in

16  response.

17      MR. MARKHAM:  Yes, your Honor.  Is there any

18  objection -- any order you'd like me to go in?

19      THE COURT:  No, counsel, you can take them in the

02:10 20  order your brother did --

21      MR. MARKHAM:  Okay, I'll do that.

22      First, as to the loss amount, specifically the $3.7

23  million, what I'm hearing is that the defense concedes that the

24  defendant received $3.7 million and, in exchange, he didn't

25  provide these marijuana licenses because he didn't have them;

1    instead, he provided My Big Coin, essentially, as a placeholder

2    until the marijuana licenses came through.

3          And in the defense's sentencing memorandum, what they

4    also concede is that in 2017, when these marijuana licenses

5    never came through, Mr. Lynch, the victim, agreed to keep the

6    My Big Coin in exchange for that $3.7 million because the

7    marijuana licenses were never going to come.

8          So it's fairly simple.  $3.7 million were exchanged

9    for My Big Coin, and the defendant tricking people into

02:11 10   thinking My Big Coin was something of value is the heart of

11   this scheme.

12         Mr. Lynch, if he had been told the truth about what My

13   Big Coin really was, never would have accepted My Big Coin as a

14   placeholder, and he never would have later accepted it as a

15   final payment instead of the marijuana licenses.

16         So that $3.7 --

17         THE COURT:  What about what I understood Mr. Lopez to

18   be arguing, that there's no reliance by Mr. Lynch on the

19   representations that others of the victims recited in regards

02:11 20   to being backed by gold and so forth?

21         MR. MARKHAM:  Well, your Honor, Mr. Lynch testified

22   the exact opposite at trial.  He sat on that witness stand for

23   two days in front of you and told you about all the

24   misrepresentations he relied on that the defendant told him.

25         I think saying that Mr. Lynch never relied on any

1  misrepresentations from the defendant is particularly belied by

2  the text messages between the defendant and Mr. Lynch, I

3  believe it's Exhibit 16, where the defendant told Mr. Lynch

4  exactly what your Honor just found by preponderance of the

5  evidence was false, which was that he was counting cash in

6  Colorado waiting for an armored car service.  That was a text

7  message to Mr. Lynch, and it was about how My Big Coin was so

8  successful that he was surrounded by cash.

9       Respectfully, your Honor, I think you've already found

02:12 10  by preponderance of the evidence that Mr. Lynch was lied to,

11  specifically in relation to My Big Coin, during the relevant

12  time period.

13       THE COURT:  And in regards to the organizer or leader.

14       MR. MARKHAM:  Yes, your Honor.  This is another issue

15  that the Court has actually addressed.  At trial you found that

16  there was a sufficient basis about the agency exception for the

17  purposes of the admission of statements of people who are

18  purported or alleged by the government to be agents of

19  Mr. Crater.

02:13 20       So, if you recall, your Honor, this was litigated with

21  respect to hearsay statements, people like Mr. Kruger and

22  Mr. Gorby and Mr. Gillespie; and the Court found that those

23  people were paid agents of the defendant.

24       The basis for that, which the government provided in

25  its memorandum on that point, was that there was email after

email where these people are reporting back to the defendant about what's going on at the company, including potential investors, what's on the social media websites, and other things.

And then there's also payments out of the defendant's bank accounts to those three people.  We have checks specifically to Mr. Gorby, Mr. Gillespie, and Mr. Kruger, that's Trial Exhibit 44.  There's also wire transfers to those people.

So what the evidence at trial showed, is at least for those three people, they were being paid by the defendant and then going out and working for My Big Coin at the defendant's behest.

So those are three people who were working at his direction, which alone is sufficient to qualify as a leader or organizer.

In terms of there being five or more individuals in total, the defense's own sentencing memorandum says that.  The defendant, John Roche, Mr. Gillespie, Mr. Kruger, Mr. Gorby, those are five people who are listed in the defense's sentencing memorandum.

THE COURT:  And, counsel, what, if anything, do you say -- certainly I remember my finding at trial and certainly I remember the broader strokes of presentation of evidence in this regard, but I think in the sentencing materials, I've

1    received letters I think from Mr. Gorby, Mr. Gillespie, and

2    Mr. Kruger, some of which dispute Mr. Crater's role.  What, if

3    anything, should I take from those?

4            MR. MARKHAM:  Well, your Honor, to the extent that

5    those statements by -- so, for instance, Mr. Gorby said that he

6    never communicated or never coordinated with the defendant

7    about the My Big Coin social media.  That's not true.  The

8    Court has email from Mr. Gorby where he's sending the upcoming

9    YouTube video to Mr. Crater.  I believe that's cited in the

02:15 10   government's supplemental sentencing memo.  Similarly, there's

11   another email from him where he provides him links to some

12   social media accounts.  And the Court has payments to Mr. Gorby

13   from the defendant.

14           So, you know, I think this is a difficult situation

15   where those people won't come in to trial and allow themselves

16   to be cross-examined, but they're just simply submitting

17   affidavits that are directly contradicted by the record

18   evidence.  In that case, the Court should go with the record

19   evidence.

02:16 20          I will note that the one person who submitted a very

21   similar affidavit is that Gillespie, he's the one person who

22   actually did testify at trial.  And what happened to him on

23   cross-examination?  He admitted that he lied to investors.

24   There was the email where he told an investor, one of the

25   victims who should be repaid in the restitution order the

1  government is proposing, where he told one of the investors

2  that he was a billionaire.  And he testified at trial that he

3  was acting at the direction of Mr. Crater and was getting

4  information from Mr. Crater.  So the one person we have who has

5  actually come in here, we've seen what his relation was with

6  Mr. Crater, and the financial records and the emails tell a

7  similar story, perhaps not to the level of Mr. Gillespie, but

8  similar with respect to Mr. Kruger and Mr. Gorby.

9         THE COURT:  Thank you.

02:16 10         MR. MARKHAM:  The one other note I'd have on that,

11  your Honor.  There's the broader argument that Mr. Crater was

12  simply acting at the behest of John Roche.  The emails simply

13  don't bear that out.  There's no -- these are not filled with

14  emails where John Roche is telling Randall Crater what to do on

15  a day-to-day basis.

16         Instead, in terms of operating My Big Coin, what the

17  over 75 emails the government put into evidence at trial is the

18  defendant talking directly to people who want to buy My Big

19  Coin and operating the business, explaining to them how they

02:17 20  pay for it and where she should pay it to, which, by the way,

21  were banks that he controlled, not John Roche; and other emails

22  where he's directing other people, in particular, Mark

23  Gillespie.

24         So to set the record straight, he has described

25  himself as the creator.  The emails demonstrate that he was

1    operating it, and at least three of the people were being paid

2    by him to operate it in order to get investments that all went

3    into bank accounts he controlled, over $7.6 million.

4         THE COURT:  Counsel, I'll hear you on sophisticated

5    means.

6         MR. MARKHAM:  Yes, your Honor.  So the guidelines

7    describe sophisticated means as a specially complex or

8    specially intricate offense conduct pertaining to the execution

9    or concealment of the offense.

02:18 10         And the 1st Circuit has instructed District Courts to

11   consider the conduct as a whole.  So a scheme -- and this is a

12   quote -- a scheme may be sophisticated, even if the individual

13   elements taken alone are not.

14        So looking at the scheme as a whole, I do think

15   there's a clear picture of something that is far more

16   sophisticated than the average fraud.

17        So, first, there's the My Big Coin exchange, which is

18   purporting to show an active and fluctuating trading market for

19   the My Big Coin cryptocurrency.

02:18 20        Now, that exchange was a fraud.  There was no My Big

21   Coin cryptocurrency, and this floating exchange where you could

22   actively trade on it, you couldn't do that.

23        What was happening was that people -- and this is

24   borne out in the emails -- people were contacting Mr. Crater

25   about buying or selling cryptocurrency and essentially makes it

1   happen, and it wasn't even a cryptocurrency.

2          And simultaneously with that exchange, this fake My

3   Big Coin Exchange with this active and fluctuating trading

4   market, there's the massive marketing campaign across multiple

5   socia media platforms, including Facebook, Twitter, YouTube,

6   and they're all advertising lies.

7          And these lies are coordinated.  If you look at the

8   Facebook pages and you look at the Twitter pages, there will be

9   substantial lie, such as, you know, initial public offering is

02:19 10  coming soon, or, My Big Coin is going to be the first

11  cryptocurrency to have an initial public offering.

12         And sure enough, what do you see?  You see the prices,

13  the fake prices, going up of what this active trading market

14  was supposed to be.

15         So the government's position is that that setup alone,

16  a fake cryptocurrency exchange, combined with the mass

17  marketing online, constitutes sophisticated means.

18         Now, the defendant would like to say that he had

19  nothing to do with any of that marketing.  The problem is that

02:19 20  the defendant's own Twitter page repeats all of these lies.

21  The defendant's LinkedIn page repeats all of these lies, and it

22  also has links to the My Big Coin, Twitter, and Facebook pages.

23         So getting all the money from a fraud scheme while

24  linking to the lies is the same as telling the lies yourself.

25  That's what you're trying to accomplish.

1          Lastly, your Honor, in terms of concealment, so moving

2     from execution to concealment, I would just note that all of

3     this money was concealed from the IRS.  This entire scheme was

4     concealed from FinCEN, specifically because they would have

5     caught something like this.

6          And while the defendant was telling an investor group

7     that he personally had a banking license, or at least he

8     approved that message to an investor group, that Randall Crater

9     had a banking license, and there's an email in evidence where

02:20 10   the defendant is told that he has to register with FinCEN, he

11    never did.

12         And then, after all of that, he funneled all of the

13    money to multiple bank accounts, none of which were in his

14    name, got the money back to himself, and then spent it.

15         So the government's position is between that level of

16    concealment, combined with the execution, constitutes

17    sophisticated means.

18              THE COURT:  Thank you.

19              MR. LOPEZ:  Can I briefly respond, your Honor?

02:21 20        THE COURT:  Yes, you may.

21              MR. LOPEZ:  With respect to the pot licenses --

22              THE COURT:  I'm sorry --

23              MR. LOPEZ:  With respect to the pot licenses --

24              THE COURT:  Sure.

25              MR. LOPEZ:  -- Mr. Lynch did not testify that anything

1    that Mr. Crater told to him about the pot licenses was false.

2    Not one bit.  And so to say that this was somehow part of the

3    My Big Coin scheme just --

4            THE COURT:  But I understood the government's argument

5    to be different than that, that the lies were in the value of

6    the coins being equal to the investment in the licenses.

7            MR. LOPEZ:  Your Honor, the government has said a lot

8    in this case about what the evidence has proven, but the

9    government actually hasn't proven a lot of what the government

02:22 10   has said.

11           So, for example, I don't remember you ever finding

12   with respect to the hearsay that you found that he had paid

13   agents in the plural.  I don't recall that.

14           THE COURT:  I think it was for the purposes of the

15   statements of agents, if I'm recalling correctly.

16           MR. LOPEZ:  Correct.  It didn't matter whether they

17   were paid or not.

18           With respect to Mr. Gorby, Mr. Gorby has submitted an

19   affidavit in this case which clearly states that he told the

02:22 20   investigators on more than one occasion that he wasn't working

21   for Randall Crater, that he never did anything for Randall

22   Crater with respect to My Big Coin.  And when they were

23   preparing him for trial and he wouldn't recant that

24   information, they dropped him as a witness.

25           So now the government gets up and says Mr. Gorby was

1   this and this, but that is directly contradicted by Mr. Gorby's

2   own affidavit.

3        With respect to the Roche emails, Mr. Markham came

4   into this case rather late.  There were over two million

5   documents in this case.  There are numerous emails from

6   Mr. Roche to others showing he controlled My Big Coin.  He

7   directed Randall to do things with respect to My Big Coin.  And

8   for the government to stand up at sentencing and make that --

9   I'm not saying it's an intentional misrepresentation, but it is

02:23 10   a misrepresentation, nonetheless.  And if the Court doesn't

11  believe me, then give me the time to go back and pull all of

12  those emails, which we couldn't admit into evidence because

13  they're inadmissible hearsay because Mr. Roche was nowhere to

14  be found.

15       So that's -- and with respect to Twitter, Mr. Crater

16  had a LinkedIn account.  He didn't control the Twitter account.

17  Mr. Roche controlled the Twitter account.

18       So, you know, Mr. Crater stands convicted of these

19  crimes because all the jury had to find was that there was no

02:24 20  gold.

21       We presented evidence that there was no gold, and the

22  jury didn't believe that Mr. Crater was acting in good faith,

23  and on that one fact alone could have convicted him of all

24  these crimes.

25       With respect to the cryptocurrency, they didn't prove

1 there wasn't a cryptocurrency before 2017.  They had -- they

2 had access to Mr. Lynch's wallet, and they never asked to see

3 it.

4          This was a deficient investigation, and now they're

5 making broad statements about what they proved that they didn't

6 prove, and it's all come down on Mr. Crater, who, yes, had a

7 role here, but he certainly wasn't the mastermind schemer that

8 the government is trying to get this Court to accept.

9          THE COURT:  Thank you.

02:25 10          MR. MARKHAM:  Your Honor --

11          THE COURT:  Counsel, we're going to leave the

12 arguments there.

13          Much of the dispute that counsel's arguments to me

14 reflect -- were reflected in the arguments leading up to the

15 trial and in the course of the trial, not just to the Court in

16 the form of various motions in limine, but certainly to the

17 arguments to the jury.  So it doesn't surprise me, counsel,

18 that you still have very different views of what was proven at

19 trial.

02:25 20          Respectfully, as some of my findings in regards to

21 Mr. Crater's objections suggest, I think there was more than

22 sufficient evidence to prove the facts that I know that

23 Mr. Crater still objects to.  And I'm not going to reiterate

24 all of those, but those include the objections that I overruled

25 to objections 1 through 14.

1          Just to now turn to the objections that bear upon the

2    various enhancements, first, in regards to the loss amount, I

3    certainly understand Mr. Lopez's argument that of a kind, the

4    representations or the transaction with Mr. Lynch was different

5    than the typical or the archetypal investors and owners that

6    otherwise gave money to Mr. Crater and Big Coin.  That having

7    been said, it's still a loss amount for purposes of calculating

8    the base offense level.

9          Here the fraud is in the value of My Big Coin, which

02:27 10   came nowhere near and had no value, nowhere near the $3.7

11   million exchange, regardless whatever exchange there was of

12   information or representations about the marijuana licenses,

13   and here we're talking about the value of My Big Coin.  So I do

14   think the loss amount has been correctly calculated by

15   Probation.

16          In regards to the organizer or leader, and I should

17   just note for the record what I think counsel, Mr. Lopez,

18   appropriately acknowledged in the sentencing memo, the jury had

19   before it essentially a good faith defense, and I think it's

02:27 20   fair to say from their verdict that they rejected that, and

21   some part of that was what Mr. Crater's conduct was in regards

22   to My Big Coin.  And although it was disputed, I think there

23   was sufficient evidence and certainly enough evidence for me to

24   find by a preponderance of the evidence that he was an

25   organizer or leader for all of the reasons that have been

1    articulated in both the government's presentation and reflected

2    in the facts.

3           It's hard for me to judge the affidavits, again, of

4    folks who were not called at trial to dispute what could have

5    been clearly found by -- beyond a reasonable doubt at trial,

6    and I will rely on the evidence that was presented at trial in

7    that regard.  And that's in regards to the four-level

8    enhancement for Mr. Crater being an organizer or leader for

9    criminal activity that involved five or more participants or

02:28 10   was otherwise extensive.  And I do find, Mr. Crater, that there

11   were five or more participants and the scheme was otherwise

12   extensive.

13          In regards to the last of the enhancements that are

14   objected to, whether or not the offense conduct was achieved by

15   sophisticated means, here I want to note application -- the

16   application to subsection (b)(10) to 2B1.1, some of which I

17   think Mr. Markham was quoting here.

18          Sophisticated means means specially complex or

19   especially intricate offense conduct pertaining to the

02:29 20   execution or concealment of an offense, and it gives some

21   examples, conduct such as hiding assets or transactions or use

22   of fictitious entities, corporate shells, or offshore financial

23   accounts also ordinarily indicates sophisticated means.

24          And taking in reverse order what the government has

25   referred to here to support this enhancement, at the very least

1    there was concealment by Mr. Crater in regards to monies

2    received during the course of the scheme from the IRS, and

3    certainly in regards to the exchange itself.  I think there was

4    sufficient evidence to say that Mr. Crater had a role in that

5    exchange, made representations about the operation of that

6    exchange.

7           And in regards to the marketing, I do recall,

8    Mr. Lopez, the emails and the connections to various media

9    accounts, that others were involved in marketing it online, but

02:31 10   there was also reflection of those also being posted, if I

11   recall, to at least one of Mr. Crater's accounts.

12          So having considered all of these, and, as I said,

13   starting with concealment as well -- oh, and, lastly, I should

14   mention I also don't think it's disputed that the monies went

15   into three separate accounts, including two that were

16   associated with Mr. Crater's sister and mother, for which there

17   was more than sufficient evidence to say really went back to

18   and benefitted Mr. Crater.  I think there's more than

19   sufficient evidence that the offense was committed by

02:31 20   sophisticated means.

21          Mr. Lopez, I'll preserve your objections in regards to

22   15, 16 and then as well 17, which was the calculation of the

23   offense -- the total offense level based on these enhancements,

24   and also your objection, 18, in regards to lack of mitigating

25   factors.

1           But I just note all of that for the record.

2           Counsel, in terms of where that leaves us with the

3    guidelines, and I should just say what I know counsel

4    understands, which is the guidelines are but one of the factors

5    I need to consider for sentencing, and we'll turn to the rest

6    of them in a moment, but I will adopt Probation's calculation

7    of the total offense level at 34.  I don't think there's any

8    dispute that Mr. Crater is in Criminal History Category I.

9           There's an advisory guideline sending range based on

02:32 10   those calculations of 151 to 188 months; one to three years of

11   supervised release; a fine range of $35,000 to $250,000;

12   restitution sought by the government for the victims here of

13   $7,668,317.50; the mandatory special assessment of $800; and

14   forfeiture, which the government seeks.

15          Counsel, I obviously have a sense of your respective

16   recommendations, but I'll hear both sides.

17          MR. MARKHAM:  Thank you, your Honor.

18          So the government is asking for 156 months of

19   incarceration, three years of supervised release, and

02:33 20   restitution and forfeiture as the Court just went over.

21          Now, your Honor observed an eight-day trial, and

22   there's been substantial post-trial briefing in this case, so I

23   will not repeat all the facts.

24          What I do want to focus on, first, is the defendant's

25   sentencing memorandum.

1          In 20 pages, the defendant did not use one word to

2     express remorse or accept responsibility for his actions; and

3     instead, he continues to blame everyone he can think of.  He

4     even claims at one point that he was the real victim of fraud

5     and wants to believe his good faith defense that was already

6     soundly rejected by the jury.

7          And the reason that that defense was rejected is

8     because of the facts.  The defendant provides no explanation

9     for how, if he's the real victim in this case, the fraud

02:34  10    proceeds, over $7.6 million, went to him, the vast majority

11    that he spent on himself, on a house, on multiple cars,

12    artwork, and jewelry.  That's not what happens to victims, the

13    money goes to the fraudster.

14         And second, the defendant provides no explanation for

15    the various, frankly, outlandish lies that he told personally.

16         The defendant told people personally that he was

17    selling a cryptocurrency as early as 2013.  And one example of

18    him selling a customer that cryptocurrency is Exhibit 10c.  And

19    from the beginning, the defendant knew that My Big Coin did not

02:34  20    use cryptography and did not have a blockchain, but he was

21    telling people that My Big Coin was a cryptocurrency anyway in

22    order to get their money.

23         Fast-forward two years later, Trial Exhibit 32

24    provides another prime example.  In that exhibit, the defendant

25    personally approves an email, and this is August 24, 2015,

where a group of investors are being told, quote, Randall

Crater has been awarded a banking license.  Randall Crater has

an elite deal with Mastercard, end quote.

In that moment in 2015, the defendant knew that he did

not have a banking license and that he did not have an elite

deal with Mastercard.  He didn't have any deal with Mastercard.

But he approved that message anyway to an investor group in

order to get their money.

Go forward two more years, now in 2017, he's still

lying to investors.

The defendant personally sent text messages to his

primary investor in 2017 saying, quote, The NFL is getting

involved in My Big Coin.

And also claiming that My Big Coin was so profitable

he was counting cash in Colorado waiting for an armored car

service.  That's Trial Exhibit 16.

Those were all lies from the defendant's own text

messages.  Those are not other people tricking him into

thinking he's in Colorado counting cash waiting for an armored

car service, they're of his own design.

And, your Honor, the lies didn't actually ever end.

So, Trial Exhibit 6, this was the Twitter account of

the defendant, the big golden advertisement, where he repeats

that My Big Coin has a partnership with Mastercard, you can

transfer money anywhere in seconds, and that it's a

1    cryptocurrency backed by gold.

2         The government found this on his Twitter account just

3    months before trial.  None of this stuff was ever taken down.

4    He knew that these were all lies.  And while he tries to say

5    that specifically with respect to the gold claim, not the other

6    lies, but with the gold claim, he was actually tricked.  At

7    some point he knew.  He never took it down, and he never paid

8    back any of the victims any of their money.

9         The idea, which is what the defendant says in his

02:37 10   sentencing memorandum, that he was simply naive and misled by

11   others, is not true.

12        And the defendant's total refusal to take

13   responsibility for his actions and express remorse should be

14   considered by the Court with respect to specific deterrence.

15        So keep in mind the history here.

16        The defendant was convicted of a crime before this

17   case.  In 2011, he pleaded guilty to felony conversion.  He

18   served a period of probation right up to the time that he

19   started with My Big Coin.

02:37 20        THE COURT:  And what do you say -- I recall that I've

21   gotten a letter from his attorney in that matter to provide

22   some context about that.  What do you say to that?

23        MR. MARKHAM:  Well, your Honor, what's interesting

24   about that letter is that his attorney says he was actually on

25   probation for five years from that offense, if he can remember

1    correctly, which would have meant that he was -- he started

2    this criminal scheme while on a period of probation.  The

3    government hasn't been able to independently corroborate that,

4    so it wasn't pushing for that enhancement.

5         But what his attorney said in that letter was not that

6    he didn't commit felony conversion, he said did he commit it,

7    that he pled guilty to it, and that he worked over time to pay

8    back his victims.  The government is unable to corroborate who

9    the victims were in that case and whether he actually paid them

02:38 10   back.

11        But I think what the most important thing for this

12   case is that of the $7.6 million he got in this case, he hasn't

13   paid back a penny to any of his victims.

14        I don't know if there are specific items in that

15   letter, your Honor, that you'd ask the government to address

16   more, but, essentially, in that letter he concedes that he pled

17   guilty to felony conversion; he concedes he was on a period of

18   probation.  He just says he tried to make it right by paying

19   back those victims, which the government can't corroborate.

02:38 20        So that brings us up to My Big Coin, which was itself

21   a fraud from the beginning that lasted for at least four years,

22   involved a wide variety of --

23        THE COURT:  Well, I guess my point about it is this,

24   counsel:  I understand -- obviously I've seen record of the

25   prior conviction.  There wasn't a lot of context put around it

```
 1   other than the attorney's letter.
 2          Obviously this scheme extends -- the scheme, the
 3   cryptocurrency scheme, spans four years, obviously a much
 4   greater loss amount and greater victims.
 5          I understand that part of Mr. Lopez's argument,
 6   particularly relying on Dr. Knight's evaluation, is whatever
 7   role Mr. Crater had here, his lack of personal sophistication,
 8   his lack of formal education somewhat mitigates what other
 9   culpability the government might choose to have the Court
10   assign to him.
11          What do you say to that?
12          MR. MARKHAM:  Yes, your Honor, and I agree with that.
13   I think the Court should consider how sophisticated defendant
14   is in terms of his characteristics and background.  And there's
15   some other things in the Knight report that of course the
16   government is unable to corroborate and won't go into details
17   here, but fair to say that it causes sympathy.
18          I also don't think it's a stretch to say that if
19   Mr. Crater had gone to some prep school in Connecticut and then
20   gone to Harvard and Wharton, the government would not be asking
21   for something at the bottom of the guidelines in this case.
22          The guidelines are what we start with.  There's no
23   basis for going below the guidelines simply based on a personal
24   history that started when he was, you know, a young child.  He
25   was 50 when he committed all these crimes, and the government
```

1    has taken that into account in terms of his personal history

2    somewhat by asking for the low end of the guidelines.

3            THE COURT:  Well, you haven't asked for the low end.

4    You've asked for a closer to the low end.

5            MR. MARKHAM:  Yes, your Honor.  From 151 to over 180

6    months has asked for 156, your Honor.

7            Now, the problem with the defendant saying that I did

8    all this or I did this in large part because I'm

9    unsophisticated, it doesn't take sophistication to know when

02:41 10    you say the NFL is getting involved that that's just a lie.

11            It doesn't take sophistication to know when you say

12    you're counting cash in Colorado it's just a lie.

13            Those individual lies did not require sophistication

14    for him to understand the gravity of his actions.

15            And he understood the gravity of his actions because

16    he was able to go buy a house and multiple cars and over $1.2

17    million in things like jewelry and artwork with other people's

18    hard-earned money that he had promised they could get back at

19    any time if they wanted it.

02:41 20            But that doesn't take sophistication.  And the fact

21    that it lasted for at least four years and involved so many

22    victims and so many different lies far outweighs difficulties

23    in someone's childhood.

24            Now, keep in mind, when the customers started asking

25    for their money back, he didn't stop.  When the CFTC began

1    investigating for fraud, he didn't stop.  And even after his

2    conviction, to this day, he's still not taking responsibility.

3    He's still trying to blame John Roche, though all the money

4    went to him and he told all the lies himself personally.

5         So the sentence in this case has to provide for

6    specific deterrence.

7         I agree with you the initial felony conversion in

8    2011, -- I think this is part of what the Court was getting

9    at -- is not close to this level of a massive fraud scheme, but

02:42 10   it's of a piece with starting in 2011 an inability to

11   specifically deter Mr. Crater with anything short of a

12   substantial incarcerative sentence.

13        Beyond just specific deterrence, I do think it is

14   appropriate for the Court to consider general deterrence in

15   this case.

16        Courts have recognized that because economic and

17   fraud-based crimes are more rational, cool, and calculated than

18   a sudden crime of passion or opportunity, these crimes are

19   prime candidates for general deterrence.  And that's a quote

02:43 20   from the 11th Circuit.

21        And this case allows for more general deterrence than

22   actually the average fraud case because we're dealing with

23   cryptocurrency.  The cryptocurrency market is relatively new,

24   and the defendant appears to be the first founder and creator

25   of a cryptocurrency company to be convicted at trial for fraud

1    and his marketing practices.

2            And the Court saw firsthand how some of the victims

3    are unable to do their own diligence on cryptocurrency because

4    they don't quite understand how it functions.  So it's hard for

5    individual victims to protect themselves; and in the

6    cryptocurrency market, there's also a lack of regulatory

7    protection.  There is not the same regulatory apparatus around,

8    say, stocks.

9            So this is a relatively new market, it's still

02:44 10   growing, people have a harder time protecting themselves, they

11   have less regulatory protection, and that makes it a prime

12   target for fraudsters.

13           So I do not think it's a stretch to say people are

14   watching what happens here, and the sentence should serve as a

15   deterrent to all the unscrupulous actors currently operating in

16   the cryptocurrency space.

17           Lastly, your Honor, the government asks that the Court

18   not forget the real victims in this case.  You met some of

19   them, Norman Mendiola, who testified at trial, he was a valet

02:44 20   driver when he invested in My Big Coin.  And he thought his

21   investment would be safe because My Big Coin was backed by gold

22   and partnered with Mastercard.

23           Now, none of that was true, and that was money that

24   Mr. Mendiola should have had when he was putting himself

25   through school, as he testified at trial.  But, instead, the

1    defendant spent it on himself.

2         Jay Byrd, who's another victim that testified at

3    trial, he was a retiree when he invested.  He's never gotten a

4    penny back, and that's money Mr. Byrd should have for his

5    retirement.  But, instead, the defendant bought things like

6    jewelry and artwork.

7         Your Honor has also received various victim impact

8    statements.  One victim described how this fraud caused strain,

9    agony, and pain to me and my whole family.  Another recounted

02:45 10   many sleepiness nights.  And yet, another described her

11   inability to get the My Big Coin investment back, like she had

12   been promised, effectively rendered her homeless.

13        So the impact on victims was real, and the defendant

14   used that money for himself and has to this day not made an

15   effort to pay it back.  The Court's sentence must provide some

16   measure of justice to those victims, and the government's

17   recommended sentence will accomplish that.

18        THE COURT:  So, counsel, a few questions.

19        MR. MARKHAM:  Yes, your Honor.

02:46 20   THE COURT:  The first is, as part of Mr. Crater's

21   sentencing memo, Mr. Lopez attached a few summaries of JSIN

22   information from the Sentencing Commission in regards to median

23   sentences imposed in theft, property, destruction, and fraud

24   offenses, credit card and other financial instrument fraud

25   offenses, and healthcare fraud offenses.

1          Obviously there's some value in comparisons and some

2     challenges in comparisons in regards to particular loss amounts

3     or particular circumstances in particular cases, but what do

4     you point to in terms of comparable sentences -- obviously the

5     government is relying heavily on the advisory guideline

6     sentencing ranges, but is there any -- what should -- what

7     would you have the Court make of the JSIN information or any

8     other comparable information in regards to sentences for

9     similarly situated defendants?

02:47 10          MR. MARKHAM:  Yes, your Honor.  So in terms of Exhibit

11     H, which actually is the exhibit from the defense sentencing

12     memorandum, addresses theft and fraud offenses.

13          THE COURT:  Yes.

14          MR. MARKHAM:  That would be the applicable one in this

15     case.  And while the defense notes what the median sentence is

16     for crimes of that nature, if you actually go to the exhibit, I

17     think the most important thing is that the median loss for

18     these fraud offenses is $150,000.

19          THE COURT:  I did see that, counsel.

02:47 20          MR. MARKHAM:  So --

21          THE COURT:  But it also says --

22          MR. MARKHAM:  Or less than $150,000.

23          And it says that sentences are typically increased for

24     the following reasons:  The number of victims, sophisticated

25     means used to execute or conceal the offense, a leadership or

1    supervisory role, all enhancements that apply in this case.

2         So in terms of what those statistics reflect, I don't

3    think that they provide a good comp for what the defendant

4    should be getting in this case, unless the Court finds that the

5    loss amount in this case drastically overemphasizes what the

6    defendant's culpability is.

7         In terms of addressing that, I actually think this is

8    the weakest part of the defense's argument, because all the

9    money went to him.

02:48 10        As the Court has often seen in cases involving a

11   conspiracy, there will be situations where there is a $10

12   million loss number, but perhaps you have a money mule or a

13   co-conspirator who gets $100,000 to participate in the scheme,

14   and under the guidelines they have to be held responsible for

15   the entire loss amount, but perhaps that guidelines advisory

16   sentence overcalculates what their actual culpability is.

17        In this case, the government has traced back every

18   single cent of the $7.6 million to accounts the defendant

19   controlled and that he was able to spend at will.

02:49 20        And in terms of comparable sentences, it is not

21   unusual for courts in this district to provide a guidelines

22   sentencing range, even where the loss amount is driving those

23   guideline sentencing ranges.

24        I would point to United States v. Hassan Abbas, which

25   is a recent Judge Sorokin sentencing, 20-cr-10016, where he

1   judged a guideline sentencing range of 108 months driven

2   largely by the losses to victims of a little over $2 million.

3          Now, all of these cases have their own eccentricities,

4   so I do think it's very difficult to provide apples-to-apples

5   comparisons, but one thing is certainly true:  A guideline

6   sentence driven by the loss amount is not the exception.  Those

7   do occur, including in this jurisdiction.

8          And in terms of the statistics provided by the

9   defense, the median statistics really make the government's

02:50 10   point because typically frauds only result in maybe $138,000 in

11  losses, that was the median, I believe, and it didn't involve

12  all the enhancements in this case which the Court already found

13  applied.

14         THE COURT:  But it also reflects, on the second page,

15  counsel, that 42 percent receive a variance.

16         MR. MARKHAM:  Forty-two percent receive a guideline

17  sentence, your Honor?

18         THE COURT:  Receive a variance.

19         MR. MARKHAM:  Receive a variance.

02:50 20         Yes, your Honor, but -- so it's difficult for me to

21  know what all the variances are in those situations.

22         You know, in those situations did -- was there

23  evidence before the Court of a four-year scheme that had lies

24  personally out of the defendant's mouth --

25         THE COURT:  Understood.  There are limits on both

```
 1   sides.
 2              MR. MARKHAM:  -- go to the defendant.
 3              So that's all on the loss amount driving the
 4   guidelines, your Honor.
 5              THE COURT:  And then, counsel, in regards to the
 6   affidavit, the Brekenfeld affidavit that attached the summary
 7   of the losses, that figure, and I'm looking at 236-1, that loss
 8   amount, if I'm reading all of this correctly, comes out to
 9   $10,000 more than the restitution that the government is
02:51 10   seeking.  What's the difference?
11              MR. MARKHAM:  Yes, your Honor.  The difference is
12   there's a $10,000 duplicate entry on the Brekenfeld affidavit.
13   So after it was submitted, that was identified, and Probation
14   rightly took out that duplicate entry.
15              So it's the Robert Man -- Robert M., we'll leave it at
16   that for on the record, on page 2 of the Brekenfeld affidavit.
17   It just clearly has the same name twice in a row with the same
18   number twice in a row.  The PSR correctly only applies one of
19   those.
02:52 20              THE COURT:  Okay.
21              And lastly, I think I mentioned at the outset the
22   government's notice of forfeiture, but I don't think I received
23   a proposed order or motion in that regard, counsel.
24              MR. MARKHAM:  Yes, your Honor.  The government will
25   have that submitted after sentencing.  So the government will
```

1    be sure to get that --

2              THE COURT:  And it's in the money judgment amount of

3    the same amount that you're seeking in restitution.

4              MR. MARKHAM:  Yes, your Honor, that will be the

5    number.

6              THE COURT:  Thank you.

7              MR. MARKHAM:  Thank you, your Honor.

8              THE COURT:  Mr. Lopez, I'll hear from you.

9              MR. LOPEZ:  Thank you, your Honor.

02:52 10             As you know, our recommendation is a sentence of

11   imprisonment of 30 months, a special assessment of $800, and

12   restitution in the amount determined by the Court.  We believe

13   that's sufficient, but not greater than necessary, to serve the

14   purposes of sentencing.

15             As the Court knows, 18 USC Section 3582(a) instructs

16   the Court to consider the factors set forth in Section 3553(a),

17   to the extent they're applicable, recognizing that imprisonment

18   is not an appropriate means of promoting correction and

19   rehabilitation.

02:53 20             In determining the proper sentence in this case, or in

21   any case, it is important to note that the starting point for

22   every sentence should be a consideration of probation or some

23   other sentence not involving commitment or confinement.

24             Now, obviously under the advisory guidelines,

25   Mr. Crater is not eligible for probation, unless this Court

1    departs or varies; and Mr. Crater is not seeking a sentence of

2    probation.  He recognizes that the Court is going to sentence

3    him to a prison term.  However, many of the government's

4    arguments are based on assumptions and inferences from these

5    assumptions.

6           Assumption number one.  Mr. Crater did this all by

7    himself.  Not true, not proven.

8           Mr. Crater thought up the scheme.  Not true, and not

9    proven.

02:54  10         Mr. Crater knew there was no gold.  Not true, but

11   proven by the defense at trial.

12          Mr. Crater knew that My Big Coin was not a

13   cryptocurrency.  I recognize that the Court for purposes of

14   sentencing has found that it didn't exist.  But the point is,

15   is that Mr. Crater believed that it was real at the time that

16   he spoke about it.

17          Now, of course, the government has countered every

18   point that we've made with the same refrain:  Randall Crater is

19   a liar.  And if this case was about scoring points in a

02:54  20   football game -- as if this case is about scoring points in a

21   football game.  This case is not a game.  It's not about

22   scoring points.  It's about a man, a good man who did the wrong

23   thing, but a good man, nonetheless.  A man who will pay

24   restitution, if given the opportunity to do so.

25          Only someone who's worked in the field of law

1    enforcement can fully appreciate the vast power and immense

2    discretion that is placed in the hands of a prosecutor with

3    respect to the objects of his investigation.

4          Justice Robert Jackson, when he was an Attorney

5    General under President Franklin Roosevelt, described it in a

6    memorable speech to the U.S. Attorneys as follows:  The

7    qualities of a good prosecutor are as elusive and impossible to

8    define as those which -- as which mark a gentleman, and those

9    who need to be told would not understand it anyway.  A

02:55 10    sensitiveness to fair play and sportsmanship is perhaps the

11    best protection against the abuse of power.  And the citizen's

12    safety lies in the prosecutor who temperatures zeal with human

13    kindness, who seeks truth and not victims, who serve the law

14    and not factional purposes, and who approaches his task with

15    humility.

16          This sacred duty has been ignored in this case, I

17    submit, your Honor.  This is not a personal attack.  This is

18    merely a personal observation based on 36 years defending

19    individuals.

02:56 20          Specifically, the government's sentence request is

21    patently unreasonable in this case.  It is not equal and

22    impartial justice.  It looks more like vengeance.

23          This case is outside the heartland of other fraud

24    cases.  Randall Crater is not your typical defendant.  This is

25    not a typical fraud case.  In a typical fraud case, the

1    government investigates all the actors involved in the fraud.

2    In this case, an attorney for the CFTC drafted an affidavit for

3    one of the actors in this case and the affidavit said all his

4    records -- all the records in his possession regarding My Big

5    Coin were destroyed by his live-in girlfriend.  And then they

6    stopped investigating him.

7         In this case, the government decided not to

8    investigate the other actors so they could claim that all the

9    money went to Randall Crater.  This strategic decision allows

02:57 10   the government to claim that Randall is the schemer and

11   mastermind of My Big Coin.  And this strategic decision

12   prevented this Court from hearing critical evidence, evidence

13   that Randall Crater was not the owner and operator of My Big

14   Coin, that Randall Crater did not control the social media for

15   My Big Coin.

16        So the government wants it both ways.  They only

17   investigated Randall, did not investigate the others involved,

18   and now they argue that Randall was the mastermind, which the

19   Court knows from Dr. Knight's report, cannot be true.

02:57 20        So the government demonizes --

21        THE COURT:  So, I guess, counsel -- and just to

22   interrupt here, because obviously, Mr. Lopez -- and I want to

23   hear the rest of your argument, but, in fairness, I'll tell you

24   what I'm thinking and the facts that I am focused on.

25        As counsel on both sides and Mr. Crater knows, I

1    presided over the trial.  I heard all of the evidence.  The

2    jury listened to and convicted Mr. Crater on all counts.

3         I'm certainly aware of what the government had to

4    prove and what I think was fairly proven, and I've recited all

5    of those things that I think were fairly proven for my purposes

6    for sentencing by at least a preponderance of the evidence.

7         I don't -- as some of my findings suggested, I don't

8    think Mr. Crater has to be the most sophisticated person to

9    engage in sophisticated means of perpetrating this fraud.  I

02:58 10  don't think it's necessary that and I don't think it was

11   necessarily proven that he engineered every aspect of the

12   fraud.  But I do think he played, as I've now found, a

13   leadership role.

14        And I guess the fact that I'm most troubled by,

15   concerned by, and is a proxy here -- I know you dispute the

16   loss amount, but I don't think there's a fair dispute that

17   they -- all of the losses went into accounts controlled by

18   Mr. Crater.

19        So I guess to the extent that there might have been

02:59 20  other people involved, which is not squarely before me, perhaps

21   that's an appropriate consideration, but what do you say of the

22   fact whatever role, the parties dispute what the -- how high up

23   that was, at the end of the day, what is it, $7.7 million went

24   to Mr. Crater.  And there was evidence at trial, again, shown

25   by beyond a reasonable doubt, but certainly by a preponderance

1    of the evidence, that he then used a significant amount of it

2    for his personal use.

3         Do you understand my point?

4         MR. LOPEZ:  I understand your point, your Honor.  And

5    I -- and we're not disputing that for purposes of sentencing.

6    But in terms of relative culpability, the fact that the

7    government failed to fully investigate this case and failed to

8    fully appreciate and investigate the broad scope of this

9    fraud -- the government says all the money went to Randall.

03:00 10   All the money that they investigated him about went to Randall,

11   but they didn't investigate the others.  They didn't even ask

12   for John Roche's bank account or My Big Coin bank account.

13   They don't know, and, yet, they stand up in front of you and

14   say all of it went to Randall.  I'm just pointing out they only

15   can say that because they didn't do an adequate investigation.

16        Now, the government demonizes Randall to score

17   points --

18        THE COURT:  But there's no argument that any part of

19   the $7.7 went to anyone but Mr. Crater.

03:01 20        MR. LOPEZ:  Well, your Honor, that --

21        THE COURT:  And I know you're preserving your argument

22   in regards to the Mr. Lynch investment, but I didn't understand

23   that to be part of the argument here.

24        MR. LOPEZ:  I would say that there's no dispute that

25   the 7.7 went into accounts that were controlled by Randall, his

1  mother or sister.

2          I would dispute that all the money went to Randall,

3  because that presumes that no money was spent on My Big Coin,

4  which the government didn't present any evidence about.

5          As you recall at trial, there was over a million

6  dollars of other money that the government's own expert

7  acknowledged came from other sources.  So, yes, he commingled

8  his funds, but he was also trying to make a go of this company,

9  notwithstanding the government's protestations to the contrary.

03:01 10          So -- and the government has now admitted this, that

11  they're here to score points with the Court and the media and

12  the public at large, and, most importantly, to send a message

13  to the cryptocurrency industry.

14          Now, in this case, Randall committed a crime.  Randall

15  will express his remorse.  He hasn't done it in his sentencing

16  memo, but he will today.

17          He is a felon in the eyes of the law.  He will pay

18  restitution, if given the opportunity.  But that's not enough

19  for the government.  The government asks you to send a

03:02 20  52-year-old man to jail for 156 months, or 13 years.  The

21  government's request is not reasonable, it is not, fair, and it

22  is not just.  And it guarantees that restitution will never be

23  made, even though the government claims that it's acting in the

24  best interest of the victims of the fraud in this case.

25          Of course, no jail sentence is short for the human

1       being who has to actually spend time confined to a correctional

2       facility, separated from friends and family.

3               To be clear, the guidelines call for a sentence of

4       incarceration.  We are asking the Court to consider the

5       guidelines and then set them aside and impose a sentence that

6       the Court, that this Court deems just and fair.

7               Now, why should you depart from the guidelines?  First

8       of all, Mr. Crater's age.  He's 52 years old.  Elderly

9       offenders, whether or not seriously infirm, suffer greater

03:03 10       punishment in prison because they are at risk of being preyed

11      upon by younger inmates and lack of social support.  It is

12      well-established that the risk of recidivism drops dramatically

13      in defendants who are 40 and older, which lessens the need to

14      protect the public from further crimes of the defendant.

15              In 26 USC Section 994(j), Congress directed the

16      Sentencing Commission to ensure that the guidelines reflect the

17      appropriateness of imposing a sentence other than imprisonment

18      in cases in which a defendant is a first offender who has not

19      been convicted of a crime of violence or otherwise serious

03:04 20       offense.  Now, it is true that Mr. Crater has a prior

21      conviction, but for purposes of the sentencing guidelines,

22      because he's in a Category I, he's considered a first offender.

23              But the guidelines don't comply with what Congress has

24      directed because in order to get a non-prison sentence you have

25      to be in zone A or zone B.  In fact, under the loss guidelines

1       in this case, a loss of $40,000 or more is sufficient for a

2       person to go to jail for 15 to 21 months.  Thus, it's our

3       position that the fraud guidelines do not obey the demands of

4       Congress, they do not ensure that the guidelines reflect the

5       general appropriateness of imposing a sentence other than

6       imprisonment.  They are not based on the Commission's

7       institutional role, and they should not be allowed by -- they

8       should not be followed by this Court in this non-heartland

9       case.

03:05  10          It's our position that the loss attributable to

11      Mr. Crater substantially overstates the seriousness of his

12      conduct.  The loss presumes that Mr. Crater alone is

13      responsible for the entire amount of loss specified in the loss

14      range.  And we know that that's not true.  It did go to him,

15      but he was not solely responsible.

16          Now, the commentary to Section 2B1.1 notes that there

17      may be cases in which the offense level determined under this

18      guideline substantially overstates the seriousness of the

19      offense.  And I submit that this is such a case.  I'm not going

03:05  20      to repeat what I've already said in my sentencing memo, I've

21      cited the cases there.

22          It's also true that multiple factors cause the losses

23      contained in the PSR.  It wasn't just what Mr. Crater did.

24      There were other factors.  Factor 1, the CFTC investigation

25      which shut down the company and made everyone run for the

1   hills, so to speak.

2          Now, keep in mind that earlier -- the government has

3   argued that even after the CFTC started its investigation, he

4   continued to keep things up on the websites.  If he had taken

5   anything down -- well, with respect to his LinkedIn account,

6   the other accounts he didn't have control over -- if he had

7   taken that down, they would have just said that's consciousness

8   of guilt.  So he was just between a rock and a hard place.  But

9   there were multiple factors.  He -- whether the jury decided

03:06 10   this or not, he did not know from that one email that the

11   government has pointed to where he was questioning the validity

12   of the gold, he did not know that Mr. Donahue had falsely

13   represented to him for years that there was gold.  And there --

14   there were multiple reasons for these losses.

15          We submit that he was naive, and the government claims

16   that that's not a reason.

17          This was also an aberration for him.  This is not a

18   man who was making a living out of defrauding people.  He

19   really thought that this was -- the cryptocurrency was going to

03:07 20   be a valuable commodity for the marijuana industry, and he was

21   working toward that.

22          Mr. Crater's current family responsibilities justifies

23   a substantial departure, and I won't go into the details

24   because it's already in our memo.

25          Also, your Honor, when --

1        THE COURT:  And I did take note of that, counsel.

2        MR. LOPEZ:  And when there's a combination of two or

3   more offender characteristics or other circumstances, none of

4   which is independently sufficient to provide a basis, the Court

5   can nonetheless depart.

6        Now, why is a sentence of 30 months sufficient to

7   satisfy the sentencing purposes?

8        Section 3553(a) provides a court shall impose a

9   sentence sufficient, but not greater than necessary, to comply

03:08 10  with the purposes of sentencing.

11       Paragraph 2, in turn, directs the Court to consider

12   the need for the sentence to reflect the seriousness of the

13   offense, to provide just punishment, to afford adequate

14   deterrence, to protect the public, to provide the defendant

15   with needed educational or vocational training, and the Court

16   also is required to take into consideration unwarranted

17   disparities.

18       Before the guidelines in this country, the threshold

19   question in most cases was whether to impose a sentence of

03:08 20  imprisonment.  The relevant considerations were whether public

21   safety required incarceration, what the defendant's risk of

22   recidivism was, what his treatment and medical needs were, and

23   what collateral effects imprisonment would have on family and

24   employment.

25       Congress expected that the threshold question in most

1    cases would continue to be whether probation was sufficient,

2    and instructed, as I said earlier, to take that into

3    consideration.

4         Thirty months of incarceration for a 52-year-old man

5    will not be an easy sentence.  Mr. Crater will be reminded

6    every day that he is incarcerated that he is being punished.

7    Also, he will be required to pay a substantial amount of

8    restitution which will serve as an additional reminder that he

9    is being punished and is being required to pay his debt to

03:09 10    society.

11         Mr. Crater has been punished by losing what is most

12    precious to him, his reputation.  Indeed, he's already endured

13    the humiliation and embarrassment of his crimes each time he

14    saw his name in the newspapers.

15         A sentence that is excessive in light of the

16    seriousness of Mr. Crater's -- Mr. Crater's role in the offense

17    promotes disrespect for the law and provides unjust punishment.

18         Seriousness of offense may be lessened, for example,

19    when the crime was non-violent.  An offense can be considered

03:10 20    less serious if a defendant's motives were not entirely

21    egregious, or if no actual loss was intended.

22         In this case, Mr. Crater's motives, while all

23    ultimately misguided, also included the good motive of helping

24    others profit from MBC.  Thus, in light of the actual

25    seriousness of the offenses in this case, a sentence of 30

1    months of incarceration will promote respect for the law and

2    provide just sentence.

3         A sentence of 30 months is sufficient to reflect the

4    seriousness of the offense, to protect -- to promote respect

5    for the law, and to provide just punishment.

6         Incarceration or incapacitation of Mr. Crater is

7    probably not necessary to deter him in the future.

8    Incarcerating Mr. Crater is probably not necessary to deter

9    others in the future.  However, while many believe that the

03:10 10   higher the sentence, the greater effect in deterring others,

11   the empirical evidence shows no relationship between sentence

12   length and deterrence.

13        Without repeating what I've said above, the chances of

14   Mr. Crater recidivating is very low.  Indeed, his conduct in

15   this case is completely out of character.

16        Another reason why a 30-month sentence is justified is

17   to avoid unwarranted sentence disparities among defendants with

18   similar records who have been found guilty of similar conduct,

19   and the Court noted the documentation I attached to my --

03:11 20        THE COURT:  But, counsel, you would acknowledge -- the

21   median loss reflected there is $134,000, I think it's a little

22   bit lower for credit card fraud offenses, and even the median

23   loss for healthcare fraud offenses, which I would expect to be

24   higher, is $1 million.

25        So, counsel, what do you say to that point?

1          MR. LOPEZ:  Your Honor, the point is, is that the

2     amount of loss didn't drive the sentence, that the Court in

3     those cases were able to vary or depart downward in order to

4     enter a just and fair sentence.

5          With respect to the unwarranted disparities, it's our

6     position that Mr. Crater was the only one that was prosecuted

7     in this case.  We don't know why that happened, but there were

8     other individuals who, we submit, were far more culpable and

9     who were not investigated, and that should be taken into

03:12 10     consideration.

11          Now, a sentence of 30 months will also allow

12     Mr. Crater to pay restitution.  If the Court imposes a sentence

13     the government requests, Mr. Crater will be in his early 60s

14     with very few prospects of paying any restitution to victims in

15     this case.

16          A sentence of imprisonment longer than 30 months is

17     not necessary to rehabilitate Randall.  My Big Coin and Randall

18     have been under the government's scrutiny ever since FINRA

19     opened an investigation into My Big Coin in 2014.  The only

03:13 20     purpose of a sentence greater than 30 months is incapacitation,

21     and I respectfully submit to this Court that Randall Crater

22     does not have to be incapacitated for more than 30 months.  He

23     is not a danger to the community, and but for his conduct in

24     this case, he's not a criminal.  He's actually a mensch by

25     nature.

1          He's also the point person for the care of his elderly

2     mother, and his family depends upon him as a father and

3     breadwinner.

4          A sentence greater than 30 months is not necessary to

5     provide specific deterrence.  The investigation and prosecution

6     has already provided the specific deterrence to Randall.  A

7     sentence of imprisonment longer than 30 months is not necessary

8     to deter others from committing fraud.

9          Randall has come before this Court to receive his

03:14 10    punishment for what he did, not what the government says he

11    did, not what others did.

12         The government does not know Randall, I do.  I've had

13    more than two years to get to know Randall.  Randall committed

14    a crime, but he's no criminal, he's no schemer.  I've

15    represented schemers.  I think I know the difference.  He's not

16    a sophisticated person.  He's not highly educated.  He did not

17    intend for anyone to lose money.

18         I submit that Randall Crater is a person that is

19    deserving of this Court's mercy.  All we ask is that the Court

03:14 20    impose a sentence that is sufficient, but not greater than

21    necessary, to serve all the purposes of sentencing; and for

22    that reason, we submit that a sentence of incarceration for a

23    period 30 months, no fine, the required special assessment of

24    $800, and restitution in the amount found by the Court, and any

25    other conditions the Court deems necessary to satisfy the

1  sentencing purposes, is a reasonable and just sentence under

2  the totality of the circumstances in this case.

3       Defendant further requests that the Court make a

4  recommendation to the Bureau of Prisons that he serve his

5  sentence at a federal prison camp that is closest to his

6  family, which in this case is the minimum security satellite

7  camp at FCI Coleman in Sumterville, Florida.

8       Thank you, your Honor.

9       THE COURT:  Thank you.

03:15 10       Counsel, just give me one moment.

11       Mr. Lopez, are you pressing the argument that I think

12  was made in the papers about a restitution hearing?

13       MR. LOPEZ:  Your Honor, clearly the request for

14  restitution appears to include individuals who haven't

15  requested restitution because they didn't think they were

16  defrauded by anyone, and includes restitution for individuals

17  who, according to Attorney Lynch's testimony, were repaid.  So

18  they -- those individuals would actually get a windfall if

19  they're awarded restitution a second time.

03:16 20       Also, it's not clear whether the amount that Attorney

21  Lynch is asking for includes the amounts he paid to others or

22  not, and so I just want some clarification.

23       I don't know that an evidentiary hearing is necessary,

24  but I think that the parties should at least confer and

25  determine what's really owed before the Court imposes that

1    burden on Mr. Crater.

2          THE COURT:  So, counsel, as I've done in some other

3    cases, and as the statute allows me to, I could hold off on

4    deciding restitution and otherwise hear the parties, set a

5    deadline for the parties to submit what may end up being a

6    joint submission in regards to what the restitution figure

7    should be.

8          Counsel.

9          MR. MARKHAM:  I mean, your Honor, the government would

03:17 10   object to that.  I'd like to be heard on it, if you would.

11          So, first of all, this idea that certain victims were,

12   quote, not defrauded, and my brother counsel says that they

13   haven't asked for the money back because they know they haven't

14   been defraud, there's simply no evidence of that.  The

15   government has not been contacted by these people saying please

16   don't have my money be sent back.

17          What the evidence has shown from the beginning, this

18   was marketed as a cryptocurrency.  That was a lie, it wasn't a

19   cryptocurrency, and every dollar that the defendant got was --

03:17 20   should be returned back to those victims who sent it.

21          And the evidentiary hearing is not required because

22   what Ms. Brekenfeld's affidavit states is the basis for her

23   recommendation, which is simply -- it's not what people say in

24   the statements, it's just bank records.  There are bank records

25   that were introduced into evidence at trial that show transfers

1    coming in from each of these individual people.  All the PSR is

2    recommending, the government is recommending is that those

3    transfers be reversed.

4         So, you know, there's essentially two reasons the

5    defense is asking for some sort of evidentiary hearing, one is

6    that certain victims were not defrauded --

7         THE COURT:  Well, I don't think he is -- Mr. Lopez

8    isn't necessarily.

9         So, counsel, I'm just get to the question about --

03:18 10   obviously, the government recognizes I have the authority to

11   continue the matter just as to restitution for a period of I

12   think it's less than 90 days.

13        MR. MARKHAM:  But, your Honor --

14        THE COURT:  I understand.

15        MR. MARKHAM:  -- I don't understand to what benefit --

16   so the defendant gets to keep the money for longer to press the

17   rights of Mr. --

18        THE COURT:  Well, I guess what about this issue of

19   Mr. Lynch monies?

03:18 20        MR. MARKHAM:  Mr. Lynch's attorney is in the room, he

21   could be heard on that, if the Court would like.  I've

22   certainly spoken to him.  And, yes, Mr. Lynch has covered the

23   losses out of the goodness of his heart of some people, and if

24   he would want to press this issue that the money should

25   actually go back to him instead of those other victims, he

1    could press that issue.  He is not, and the restitution order

2    should not be delayed for one day for the defendant I guess to

3    press Mr. Lynch's rights for him, which I know is particularly

4    ironic considering the defendant propose that Mr. Lynch be

5    indicted in his own sentencing memorandum.

6              Bottom line, Mr. Lynch's attorney is here and is not

7    asking for that, and frankly, does not want that.

8              THE COURT:  Mr. Lopez, just on this point.

9              MR. LOPEZ:  Yes, your Honor.  So, for example, Larry

03:19 10   Brantley, who testified at trial, they have a restitution

11   amount for $35,800.  Mr. Brantley hasn't asked for that money

12   back.

13             Ken Hess, who wrote a letter in support of Mr. Crater,

14   isn't asking for that money back.

15             If we could have some additional time to verify that,

16   I think that would be in the interest of justice.

17             THE COURT:  Okay.

18             So, counsel, I will decide on that in a moment.

19             Just to move forward, Mr. Markham, I had received and

03:20 20   reviewed the victim impact statements that I referenced before.

21   Is there anyone making an oral statement today or am I relying

22   on the written statements?

23             MR. MARKHAM:  Your Honor, the government has not been

24   contacted by anyone who would like to make an oral statement.

25             THE COURT:  Thank you.

1          Mr. Crater, Mr. Lopez indicated that you may want to

2     address the Court.  You're certainly not required to, but if

3     you'd like to address the Court, I would hear you.

4          THE DEFENDANT:  Yes, your Honor.

5          I would like to begin by saying that I want to

6     apologize to all the people who lost money on My Big Coin.  I

7     am truly sorry that anyone lost money.

8          I want to apologize to my wife, Erica, my three

9     children, and apologize to my 77-year-old mother and my older

03:21 10     sister who had to testify against me in this case.

11          Lastly, I want to apologize to you, your Honor.  I am

12     truly sorry for what has happened in this case.  At 52 years

13     old, this is the last place that I ever imagined I would be.  I

14     still cannot believe that I have been convicted of federal

15     crimes and am now facing a prison sentence for my role in My

16     Big Coin.  One cannot truly express my sadness and regret that

17     anyone lost money.

18          I want you to know, your Honor, that was not my

19     intent.  I did not set out to defraud anyone.  My intent was to

03:21 20     make money for myself and others.  It is important that you

21     know my true intent was when you hand down your sentence

22     because I did not set out to steal money from anyone, and that

23     is not to say that I am not remorseful for how things turned

24     out.  I am.  No one feels as bad as I do that -- as I do that

25     people lost money.  Stealing from others is not who I am.

1        I regret my lavish spending.  I know how bad it looks

2   in hindsight, but at the time I thought I was spending the

3   money I had made from selling the My Big Coins that I thought I

4   owned.  I should have known it was too good to be true.

5        I know you have read Dr. Knight's written report and

6   the letters submitted from my friends, family, and neighbors.

7   I know now that I was defrauded by others, but I am not

8   offering this as an explanation or an excuse.  I should have

9   known better.  I should not have been as trusting as I was.  I

03:22 10  should have known I was being lied to.  I shouldn't have been

11  repeating the lies to others.

12        The bottom line for me, your Honor, is no matter what

13  was intended, there's public statements made that caused people

14  to invest.  Those statements have been found to be untrue and

15  the intent behind them fraudulent.  I made those statements,

16  and my name is tied to them.  At the time I believed them to be

17  true.  They were not.  People were hurt, they lost money.  This

18  is now on me.  This is -- there is no one else standing here

19  today.  I know that I must be punished.  All that I ask is that

03:23 20  your sentence is not so long that I will never be able to pay

21  back the people who lost money.  If given the opportunity, I

22  will spend the rest of my life trying to make amends by working

23  my tail off and paying back the people who lost money on My Big

24  Coin.  All that I'd ask is that you give me a chance to do so.

25        THE COURT:  Thank you.  Thank you, Mr. Crater.

                    Counsel, I appreciate the arguments.  I'm going to

take a recess and I'll come back to the bench.

                    THE CLERK:  All rise.

                    (Recess taken.)

                    THE CLERK:  All rise.

                    (The Court entered the courtroom.)

                    THE CLERK:  Court is in session.  Please be seated.

                    THE COURT:  As I noted before I took the recess, I

appreciate the advocacy by counsel on both sides.

                    Mr. Crater, I've considered the statement that you

just made to the Court, along with all of the other

information, evidence before me, not just for sentencing in

regards to the presentence report, the various sentencing memos

and filings, the victim impact letters, the letters that were

filed in support of you, Mr. Crater, by various people, and all

of the items filed for sentencing, as well as the record at

trial.

                    To determine what a reasonable sentence would be,

Mr. Crater, I have to consider all of the factors, as Mr. Lopez

pointed out, under Title 18, United States Code, Section

3553(a).  Those factors include not just the advisory guideline

sentencing range, but the nature and circumstances of the

crimes that you've committed, your personal history and

background, and the need for any sentence I impose to do a

number of things, not just reflect the seriousness of your

offenses, but promote respect for the law; provide just
punishment and adequate deterrence, not just for you, but for
others; and avoid unwarranted sentencing disparities between
similarly situated defendants.

Mr. Crater, I've considered all of those factors,
including the issue about restitution to victims, which I've
also considered.  I've considered all of those factors, and I
want to comment on some of those factors.

First and foremost, I considered the crimes for which
you are convicted after a jury trial: four counts of wire
fraud, three counts of unlawful monetary transactions, one
count of unlicensed -- running a money -- unlicensed money
transmitting business.

All of these crimes arose out of your business, My Big
Coin, that was a scheme that operated for over four years
between January of 2014 and the end of 2017.

I'm not going to repeat everything that I recounted in
ruling on the objections for Mr. Lopez on your behalf, and I'm
certainly not going to repeat all of the evidence that was
presented at trial, but I think there was sufficient evidence
to show that you had a leadership in that enterprise, you
engaged others in effectuating that fraud.  You took money from
investors and customers, and you did so making various false
misrepresentations and statements, including, but not limited
to, that My Big Coin was a cryptocurrency, that My Big Coin

1    Exchange was a cryptocurrency exchange, that it was backed by

2    gold, and that there was a partnership with Mastercard.

3         None of those things were true, and I think the jury's

4    verdict reflected a rejection of your defense that you didn't

5    knowingly make those statements and representations.

6         Certainly cryptocurrency is a newer enterprise, newer

7    market, a 21st century market, but the scheme at its core was

8    age old, and that was fraud.  And I think the jury in this case

9    figured that out, and that's the record on which I have to

03:40 10    decide your sentence.

11         Significantly, as I suggested before, much of the

12    money was used by you for your personal use through accounts

13    that you controlled and reflected purchases, as I recall, of

14    some luxury goods in some circumstances.

15         There were certainly, Mr. Crater, real victims in this

16    case, at least 55 individuals of different backgrounds, which

17    was reflected by some of the witnesses that testified at your

18    trial, and totaling losses over $7 million.  Some of those

19    victims lost life savings, some lost lesser amounts but

03:41 20    attested to, as I think Mr. Markham quoted, the strain, agony,

21    and pain of having been defrauded out of large amounts of money

22    or amounts that were large to those individuals.

23         I've considered the victim impact statements in this

24    regard, along with the evidence that was presented at your

25    trial.

1          Mr. Crater, I've certainly also considered your

2    personal history and characteristics, and I have not just your

3    sentencing memos, but certain of the letters that were written

4    to me by your family members, as well as the presentence

5    report, and the report of Dr. Knight to rely upon to provide

6    some context for your personal history.

7          You're 52 years old.  You were born in Elkin, North

8    Carolina.

9          You were raised by your parents, and for your

03:42 10   childhood and into your teens you and your older sister lived

11    with your parents.  Early on you had some early health issues I

12    think when you were a child.

13          You had what I think everybody whose read the report,

14    Dr. Knight's report, would agree was a turbulent upbringing.

15    Your father was an alcoholic and abusive, and abusive in some

16    violent ways, not just towards your mother, but also towards

17    you.  He was engaged in drug trafficking to which you were not

18    only a witness but enlisted to assist him.  Your mother and

19    both you and your sister were subject to violence and threats

03:43 20   of violence due to your father's drug business.

21          Your mother overdosed on several occasions, at least

22    one of those occasions when you were 10 or 11 years old, and

23    certainly the report, sadly, reflects some generational cycles

24    of abuse.

25          Your mother eventually left your father, taking you

1    with her, and your father later passed away from melanoma.

2           You observed violence against your mother, some at

3    your father's hand and some by others.

4           You left high school in ninth grade, although you

5    later earned your GED.

6           You worked various jobs in your teens and 20s, and I

7    think it's fair to say that you attempted to but had several

8    failed businesses, including I think a restaurant; some kind of

9    poker establishment, a poker machine business; and obviously

03:44 10   your last engagement was what brought you before this Court in

11   regards to My Big Coin.

12          In terms of your own health, I've taken note of your

13   own diagnosis for melanoma some time ago, age 29, which seems

14   to have resolved, and some other health issues you had in 2012

15   and 2015.

16          In terms of substance abuse, that appears to have been

17   in your distant past, in your 20s as well.

18          I understand, as you mentioned today, that you're

19   married and have three children, two sons, 15 and 17, and a

03:45 20   daughter who's 16, and that your wife is a stay-at-home mother

21   who home schools them.  I've considered that argument in

22   regards to who financially supports the family.

23          I understand obviously, and I've considered your

24   criminal history here, which is in Category I, reflecting one

25   conviction for felony conversion or obtaining property by false

1    pretenses.  I would agree with Mr. Markham it is of a kind of

2    fraud, that is the core here, but not nearly on the scale, size

3    or harm of the crimes that you've committed in this case.

4         And lastly, I would note that I considered

5    Dr. Knight's evaluation, not just in terms of its summary of

6    your personal history and your family history, but also the

7    diagnosis that she found in regards to a specific learning

8    disorder, but no formal mental illness there, which I've also

9    made note of.

03:46 10      I've considered as well, Mr. Crater, the advisory

11   guideline sentencing range, which we've had a lot of discussion

12   about in which I'll have to agree is driven largely by the loss

13   amount.  I've considered Mr. Lopez's argument about the

14   overstatement of your culpability based on that guideline

15   range.  That's not to minimize at all the loss amount involved

16   here or the harm to individual victims, which will be addressed

17   in part by restitution here, but to acknowledge that the

18   overstatement of culpability is something I've taken very

19   seriously here.

03:47 20      Finally, Mr. Crater, I've considered all of the goals

21   of sentencing, not just just punishment and respect for the

22   law, deterrence as well, which I think is necessary, not just

23   for general deterrence, but also for specific deterrence given

24   the nature of your prior crime and the nature of the scope and

25   length of the crimes that you committed here.

1           I've also considered all of your personal history

2     regarding family support, the other personal history that I've

3     noted before.

4           And I've also considered the information, to the

5     extent it is imperfect information, in regards to other

6     defendants charged with similar offenses.  I made reference to

7     the exhibits reflecting information from the Sentencing

8     Commission about other defendants charged in fraud cases.  I

9     think that's in some respects an imperfect comparison since the

03:48 10    fraud amounts involved there, at least the median fraud

11    amounts, are certainly largely eclipsed by the much larger loss

12    amount here, and the imposition of enhancements here, which I

13    found appropriate.

14          I have made note that a significant number of those

15    sentences reflected variances, over 42 percent and over 90

16    percent of those variances were downward variances.

17          I've also made note of the fact that over 71 percent

18    of defendants charged in fraud cases receive some period of

19    incarceration.

03:49 20          For all those reasons, Mr. Crater, I don't think a

21    sentence of 30 months is appropriate here, not in terms of the

22    harm to victims, not in terms of the scope of the crime.  On

23    the other hand, I don't think that the sentence that the

24    government recommends here is reasonable considering all of the

25    3553(a) factors that I've considered.

1      For all of those reasons, I'm going to impose a

2  sentence of 100 months of incarceration, three years of

3  supervised release, restitution in an amount that will be

4  determined.  I'm not imposing a fine since I don't think you

5  can pay a fine in addition to restitution.

6      I am imposing the mandatory $800 special assessment,

7  and I will allow a money judgment for forfeiture.

8      I do think this sentence is sufficient, but not

9  greater than necessary, to satisfy all of the goals of

03:50 10  sentencing that I've mentioned.

11      Counsel, before I formally impose sentence and set a

12  date for filings about restitution, does either side need to be

13  heard?

14      MR. MARKHAM:  Your Honor, on the forfeiture money

15  judgment, is that in the amount recommended in the PSR?

16      THE COURT:  Counsel, I can make it in that amount

17  based on the loss amount, I suppose, since the restitution

18  issue is separate.

19      MR. MARKHAM:  Yes, your Honor, restitution would be

03:50 20  separate.

21      THE COURT:  Counsel, anything else from the

22  government's side?

23      MR. MARKHAM:  I would just note, your Honor, that the

24  parties have discussed changes to conditions to supervised

25  release prior to report date, and the government will not be

1  asking for remand but will be asking for location monitoring,

2  which can be done in Florida in the defendant's home state.

3  We would just ask that the defendant be ordered to

4  report to Probation in Florida to his Probation officer I think

5  within 48 hours would be appropriate.

6  THE COURT:  And then self-surrender to the institution

7  to which he is committed?

8  MR. MARKHAM:  Yes, your Honor.

9  THE COURT:  Okay.

03:51 10  And, counsel, just in regards to the conditions of

11  supervised release, I'd be inclined to adopt the conditions

12  listed 1 through 7 on page 29 of the PSR.

13  Looking at them now, I don't think there's any great

14  controversy about them, but on the government's side, any

15  objection?

16  MR. MARKHAM:  Nothing from the government, your Honor.

17  THE COURT:  Mr. Lopez, anything in regards to that or

18  otherwise?

19  I did make a note of the recommendation as to

03:52 20  recommending FCI Coleman or a BOP facility that is close to

21  Mr. Crater's family.

22  MR. LOPEZ:  Nothing further, your Honor.

23  THE COURT:  Okay.

24  Counsel, in terms of restitution, as what I said

25  suggested, I'm going to set a date in a week's time.

1          Ms. Hourihan, what's the date, a week from now?

2          THE CLERK:  February 7th.

3          THE COURT:  February 7th, counsel, for you to file a

4    joint statement about your respective positions about

5    restitution.

6          If there's disagreement between the parties still

7    remaining, that statement should reflect the disagreement.  If

8    there is disagreement, then I would make -- what's a week from

9    then?

03:53 10          THE CLERK:  14th.

11          THE COURT:  14th, I'll give you until the 14th to file

12    for the -- for the defense to file a memo about their

13    objections, and then the government can respond after that, a

14    week later with any response.

15          Ms. Hourihan, a date for restitution.

16          THE COURT:  Do you want it the following week.

17          THE CLERK:  We'll make it the following week, but,

18    counsel, if the parties believe it's a matter I can decide on

19    the papers to amend the judgment, I would certainly consider

03:53 20    that, otherwise I would have a hearing, which I don't expect,

21    Mr. Lopez, would be evidentiary, but I would hear the

22    arguments.  Okay.

23          MR. LOPEZ:  That's correct, your Honor.

24          THE CLERK:  The 28th at 2:00.

25          THE COURT:  28th at 2:00 for a hearing.

```
 1              Mr. Markham.
 2              MR. MARKHAM:  Can I have one moment to check my --
 3              THE COURT:  Sure.
 4              MR. MARKHAM:  -- calendar.
 5              (Pause.)
 6              MR. MARKHAM:  Yes, your Honor, that works for
 7    government, thank you.
 8              THE COURT:  Mr. Lopez.
 9              MR. LOPEZ:  That works, your Honor.
03:54 10         THE COURT:  Mr. Crater, if you can please rise.
11              Mr. Crater, pursuant to the Sentencing Reform Act of
12    1984 and, as I said, having considered the sentencing factors
13    under Title 18, United States Code, Section 3553(a), it is the
14    judgment of this Court that you're hereby sentenced to a term
15    of 100 months of imprisonment.  This term shall consist of 100
16    months on Counts One through Four, Five through Seven, and
17    Count Eight to be served concurrently.
18              I don't believe -- does that exceed any of the
19    maximums?
03:54 20         PROBATION OFFICER:  Only on Count Eight, your Honor.
21    Count Eight does have a 60-month maximum.
22              THE COURT:  So 100 months on Counts One through Seven,
23    and 60 months on Count Eight, all to be served concurrently.
24              I will include a recommendation that you be housed at
25    FCI Coleman or another BOP facility that is close to your
```

1     family in Florida.  You probably understand from Mr. Lopez this

2     is merely a recommendation by me, only the BOP makes that final

3     decision.

4          Upon your release from imprisonment, you shall be

5     placed on a term of supervised release for three years.  Again,

6     this will be a term that's concurrent on all of the Counts One

7     through Eight.

8          Within 72 hours of your release from BOP custody you

9     shall report in person to the district to which you're

03:55 10   released.

11          Restitution, I will impose restitution, which is

12     mandatory here, in an amount that I will determine in a month's

13     time, and that will be reflected in what will be the amended

14     judgment that I will enter at that time.

15          In light of the substantial amount of restitution that

16     I anticipate here, I'm not imposing a fine, since I find you

17     don't have the financial ability to pay a fine in addition to

18     restitution to victims.

19          In addition to your supervised release you'll be

03:56 20   subject to standard and mandatory conditions.

21          Mr. Lopez, will Mr. Crater waive the reading of those?

22          MR. LOPEZ:  Yes, your Honor.

23          THE COURT:  You'll also be subject, Mr. Crater, to

24     certain special conditions, again, which will be reflected in

25     the written judgment that I will issue, but I'll read those to

1    you as well.

2            Those special conditions include that you must not

3    knowingly have any contact, direct or indirect, with any of the

4    victims in this matter.

5            You're prohibited from engaging in any occupation,

6    business, or profession that would require or enable you to

7    handle investments or large sums of money.

8            You must participate in any mental health treatment

9    program as may be directed by Probation.

03:56 10            You must pay the balance of any fine or restitution

11    imposed by the court-ordered repayment schedule.

12            You're prohibited from incurring new lines of credit

13    or new credit card charges without the prior approval of

14    Probation while your financial obligations remain outstanding.

15            You must provide any requested financial information

16    to Probation, which may be shared with the asset recovery unit

17    of the U.S. Attorney's Office.

18            You shall be required to contribute to the costs of

19    evaluation, treatment, programming, or monitoring based on your

03:57 20    ability to pay or the availability of third-party payment.

21            I'll also order the mandatory $800 special assessment,

22    which shall be due immediately.

23            That will be the judgment of the Court.

24            Can you be seated, Mr. Crater.

25            THE DEFENDANT:  Okay.

```
 1              THE COURT:  I would just note that this will be a
 2     self-surrender, Mr. Crater, to the facility that you're
 3     designated.
 4              Ms. Hourihan, date for that.
 5              THE CLERK:  March 17th.
 6              THE COURT:  Mr. Lopez, March 17th.
 7              MR. LOPEZ:  Yes, thank you, your Honor.
 8              THE COURT:  And in regards to conditions of release,
 9     Mr. Markham, I understand that there's an agreement that in
10     addition to the conditions that you've been subject to pending
11     this sentencing, there will also be the addition of location
12     monitoring and that you should report in person to the
13     Probation Office in your district.
14              Do you understand?
15              THE DEFENDANT:  Yes, your Honor.
16              THE COURT:  Mr. Markham, was there anything else in
17     that regard?
18              MR. MARKHAM:  Not with that, your Honor.  But in terms
19     of contacting victims, I did want to just note something for
20     the Court so we don't have an inadvertent violation.
21              THE COURT:  Sure.
22              MR. MARKHAM:  A couple of people identified as victims
23     were also referenced in the defendant's sentencing memorandum
24     as people he may know, and as part of the restitution joint
25     filing you may want, I think it's possible that defense counsel
```

1    might reach out to specifically the people identified in the

2    defendant's sentencing memorandum.  And in order to facilitate

3    that, I just want to make sure that Mr. Lopez is able to speak

4    only to those specific victims but at least to those ones.

5          THE COURT:  Well, I understood that to be Mr. Lopez's

6    contact as opposed to Mr. Crater's.

7          MR. MARKHAM:  Understood, your Honor.  I just want to

8    make sure the record is clear that he is allowed to contact

9    them for the purposes of the restitution joint filing.

03:59 10          Thank you.

11          THE COURT:  That's how I would take it.

12          Mr. Lopez, do you need any further --

13          MR. LOPEZ:  If it's implied that I can't contact any

14    of the alleged victims --

15          THE COURT:  No, I took the opposite to be

16    Mr. Markham's position, meaning, I don't have any concerns

17    about your contact with certain victims for the purposes of the

18    restitution.

19          Anything else I should address from the defense point

03:59 20    of view, other than advising Mr. Crater of his appellate

21    rights?

22          MR. LOPEZ:  Your Honor, just with respect to location

23    monitoring, there's no other conditions like curfews or other

24    restrictions?

25          THE COURT:  So I'm going to turn to Probation.

1    PROBATION OFFICER:  With that, too, your Honor, was
2    one clarification I wanted to bring to the Court's attention.
3        So location monitoring is typically done in
4    conjunction with a home detention affording a defendant
5    opportunity to leave with prior permission from the Probation
6    Office for reasons such as employment, legal appointments,
7    religious, medical, and I just wanted to clarify if that was
8    the intention of the --
9        MR. LOPEZ:  It's my understanding it's just so that
04:00 10   they can locate -- they can monitor his location, but no other
11   restrictions.
12        THE COURT:  Okay.
13        Mr. Markham, so with the usual exceptions for medical
14   appointments and assuming assume legal appointments to the
15   extent he may have any.
16        MR. MARKHAM:  Yes, your Honor.  It's my understanding
17   the defendant does have some employment right now.
18        THE COURT:  And employment.
19        MR. MARKHAM:  The purpose of the location monitoring
04:01 20   is not home confinement, it's to be able to locate the
21   defendant, if necessary, to mitigate any risk of flight.
22        PROBATION OFFICER:  So with that, your Honor it would
23   be GPS monitoring, which would then enable the Probation Office
24   to identify the defendant's exact location rather than
25   determine whether he's home or not home.

1          THE COURT:  So I think we're all talking about the

2     same thing, but GPS, counsel.

3          MR. MARKHAM:  Yes, your Honor, thank you.

4          MR. LOPEZ:  Yes, your Honor.

5          PROBATION OFFICER:  Thank you, your Honor.

6          THE COURT:  Thank you.

7          And, counsel, with that, I just -- Mr. Crater, I just

8     wants to advise you that you have the right to appeal your

9     conviction, as well as the sentence I've just imposed.  If

04:01 10   you're unable to pay the costs of appeal, you may ask

11    permission to have those costs waived and appeal without

12    paying.

13         You must file a notice of appeal within 14 days after

14    the entry of my written judgment, and if you request, the clerk

15    of this court will immediately prepare and file a notice of

16    appeal on your behalf.

17         Do you understand?

18         THE DEFENDANT:  Yes, ma'am.  Yes, your Honor.

19         THE COURT:  Thank you, again, counsel.

04:02 20   And, Mr. Crater, I do wish you good luck.  Nothing

21    about any sentencing is ever easy.  I gave great consideration

22    to what I thought was significant evidence at trial and

23    sentencing, both -- by both sides, and I imposed the sentence

24    that I thought was appropriate here, but I do wish you good

25    luck moving forward.  Thank you.

1          THE DEFENDANT:  Thank you, your Honor.

2          THE CLERK:  All rise.

3          (Court adjourned at 4:02 p.m.)

4                    - - - - - - - - - - - -

5                         CERTIFICATION

6          I certify that the foregoing is a correct transcript

7     of the record of proceedings in the above-entitled matter to

8     the best of my skill and ability.

9

10

11

12     /s/Debra M. Joyce_____         May 4, 2023_____
       Debra M. Joyce, RMR, CRR, FCRR    Date
13     Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25